1   FRED M. BLUM (SBN 101586)
    fblum@behblaw.com
2   MICHAEL E. GALLAGHER, ESQ. (SBN 195592)
    mgallagher@behblaw.com
3   EARL L. HAGSTROM (SBN 150958)
    ehagstrom@behblaw.com
4   CHRISTOPHER J. DOW  (SBN 250032)
    cdow@behblaw.com
5   BASSI, EDLIN, HUIE & BLUM LLP
    500 Washington Street, Suite 700
6   San Francisco, CA 94111
    Telephone:  (415) 397-9006
7   Facsimile:  (415) 397-1339

8   Attorneys for Defendant and Third-Party Plaintiff
    WHITTAKER CORPORATION
9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12           WESTERN DIVISION OF CENTRAL DISTRICT

13

14  SANTA CLARITA VALLEY WATER )   Case No. 2:18-CV-06825-GW (RAOx)
    AGENCY,                    )
15                            )   *Assigned to Hon. George H. Wu*
            Plaintiffs,        )
16                            )   **DECLARATION OF GARY**
        vs.                   )   **HOKKANEN IN SUPPORT OF**
17                            )   **WHITTAKER CORPORATION'S**
    WHITTAKER CORPORATION,     )   **OPPOSITION TO SAUGUS**
18                            )   **INDUSTRIAL CENTER, LLC'S**
            Defendants.        )   **AND SANTA CLARITA VALLEY**
19                            )   **WATER AGENCY'S JOINT**
    _____)   **MOTION FOR SETTLEMENT**
20  WHITTAKER CORPORATION,     )   **APPROVAL, CLAIM BAR AND**
                              )   **GOOD FAITH DETERMINATION**
21          Third-Party Plaintiff, )
                              )   Date:       October 19, 2020
22      vs.                   )   Time:       8:30 a.m.
                              )   Courtroom:  9D
23  KEYSOR-CENTURY CORP., a    )
    California Corporation; and SAUGUS )   Action Filed:     August 8, 2018
24  INDUSTRIAL CENTER, LLC, a  )   Third Amended Complaint Filed:
    Delaware Limited Liability )               March 18, 2019
25  Company,                   )
                              )   Trial Date:     January 19, 2021
26          Third-Party Defendants. )
                              )
27                            )
                              )
28                            )

DECLARATION OF GARY HOKKANEN

I, Gary Hokkanen, declare as follows:

1.     I am a Principal Hydrogeologist and Vice President of EKI Environment & Water.  I have 40 years of experience in the investigation and remediation of contaminated property, with extensive experience assessing volatile organic compound (VOC) contamination in soil and groundwater.  I received my B.S. in Civil Engineering from the University of Minnesota in 1980 and an M.S. in Hydrogeology from the University of Waterloo (Ontario, Canada) in 1984.  Prior to my employment at EKI, I was employed with the U.S. Environmental Protection Agency (1980-82), EWA, Inc. (1984-85); Barr Engineering Company (1985-89); Geraghty & Miller, Inc. (1989-94); Geomatrix Consultants (1994-2004), Hokkanen Environmental (2004-14), and Farallon Consulting (2014-19).  I have testified in several litigation matters.

2.     I was retained by Whittaker to develop and provide expert opinions regarding issues related to the contamination at Saugus Industrial Center (SIC) located at 26000 Springbrook Avenue in Santa Clarita, California (the Site).

3.     I am providing this Declaration in support of Whittaker's opposition to SICs Motion for Summary Judgement and in support of Whittaker's Cross Motion for Summary Judgement.

4.     This Declaration is based upon my training and experience and my review of environmental reports prepared by consultants for SIC and other parties, deposition testimony, documents produced and other materials which I consider to be reliable and appropriate bases for the opinions expressed here.

**SUMMARY**

5.     My opinions relating to contamination at the SIC Site are as follows:

a.   VOCs have contaminated groundwater at the Site and there is a plausible pathway for groundwater from the Site to migrate to the Santa Clarita Valley Water Agency (SCVWA) groundwater production wells due to the unique geology of the Site and its proximity to the production wells.

SIC has not met the criteria to qualify as a Bona Fide Prospective Purchaser because (i) a disposal of hazardous substances likely happened after SIC acquired ownership and control of the property, (ii) the Phase I performed prior to acquisition of the property failed to meet the standards required for all appropriate inquiries, (iii) SIC failed to exercise appropriate care with respect to releases of hazardous substances at the Site, and (iv) SIC did not fully comply with requests by the California Department of Toxic Substances Control (DTSC).

**BACKGROUND**

6.     SIC purchased the former Keysor-Century Corporation (Keysor) property in December 2003.  The property is approximately 32 acres and is bordered on the west by the Southern Pacific Railroad and Bouquet Canyon Road (previously known as San Fernando Road) (Figure 1 in Attachment A).  The SIC property is bordered by undeveloped land to the north and east and an industrial area is present to the south.

7.     From 1958 to 2003 the property was used by Keysor as a polyvinyl chloride (PVC) processing plant that manufactured pelletized PVC for use in making vinyl discs.  Raw materials used and stored at the property included trichloroethene (TCE), vinyl chloride monomer (VCM), 1,2-dichloroethane (1,2-

DECLARATION OF GARY HOKKANEN

DCA), vinyl chloride, vinyl acetate, and toluene in addition to various stabilizers, defoamers and suspension agents. Chemicals were mixed in reactors in an outdoor processing area to form the vinyl chloride polymer, which was used to manufacture the PVC pellets. The United States Environmental Protection Agency (USEPA) reported that more than 50 million pounds per year of volatile organic compounds (VOCs) were used as raw materials at the Site.[1] In 1988, 300,000 pounds of TCE were used at the Site.[2]

8.    Six aboveground storage tanks were present on the Site in 1988.[2] The tanks were located in the outdoor production area. The tanks included:

        a.  11,200 gallon, vinyl chloride monomer

        b.  8,600 gallon, vinyl chloride monomer

        c.  20,000 gallon, vinyl acetate monomer

        d.  7,500 gallon, TCE

        e.  4,400 gallon, vinyl chloride monomer recovery

        f.  1,200 gallon, vinyl acetate monomer recovery

9.    In a Phase I Environmental Site Assessment conducted in 2000 the site inspection identified 13 aboveground storage tanks on the Site.[3]

10.    Wastewater generated from Keysor's manufacturing operations was discharged to an unlined pond on the eastern portion of the property beginning in 1958.[1] The wastewater contained TCE and other chemicals used in the manufacturing process. The facility began discharging some of the wastewater to the local sewer system in 1963. Wastewater was discharged to the unlined pond after 1963. In January 1974 Los Angeles County ordered Keysor to stop wastewater discharges to the unlined pond. At this time, Keysor was reportedly discharging some wastewater to an unlined drainage channel located adjacent to

DECLARATION OF GARY HOKKANEN

the plant along the Southern Pacific Railroad right of way.  The unlined drainage channel was in the front of the plant along the railroad right of way and drained to the South Fork of the Santa Clara River.  Although Keysor was ordered in January 1974 to cease discharging wastewater to the unlined channel, they were cited for this activity in October 1974 and December 1977.  The Los Angeles County Engineer conducted an inspection in November 1976 and discovered that Keysor was still using the unlined pond for wastewater discharge.  In addition, the inspection observed wastewater being discharged to the slopes surrounding the pond.  By October 1977 the unlined pond had been removed.

11.    Numerous spills and releases of chemicals were reported during the operation of the Keysor facility.  For example, USEPA reports that in 2002 numerous spills were reported.  Process water and wastewater containing TCE, vinyl chloride, and vinyl acetate had been released in amounts ranging from 100 to 1000 gallons.[1]

12.    On December 18, 2003, Saugus Industrial Center, LLC took ownership and control of the property, which it had purchased through a bankruptcy court sale.  Prior to the purchase, SIC's consultant RAMCO Environmental, LLC (RAMCO) prepared a Preliminary Environmental Assessment (PEA) report for the SIC Site.[4]  RAMCO stated that the PEA was formatted to ASTM E-1527-00, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process.  Photographs taken during the PEA site visit are in Attachment B and show storage tanks, drums, sumps, reactors and the former wastewater pond.

DECLARATION OF GARY HOKKANEN

13.    On September 25, 2003 RAMCO conducted a soil vapor survey in the process area at the Site.  Soil samples were collected in the process area on October 8, 2003.

14.    Limited shallow soil sampling (to a depth of 18 inches) was conducted by RAMCO on the Site in May, after SIC had assumed ownership and control of the Site, near the warehouse and compounding plant building (where the dry finished PVC was handled).  RAMCO also collected soil samples at three locations in the former wastewater treatment area in December 2004.

15.    Beginning in October 2003 Keysor began demolishing and removing the chemical manufacturing equipment and hazardous materials.  This activity continued to approximately May to June 2004 by which time SIC had already owned the property for four months, having assumed ownership and control of the property on December 18, 2003.  During the period from October 2003 continuing to approximately May to June 2004 an incinerator, chemical storage tanks, reactors, polymer bins, loading silos, drums, wastewater tanks, and the monomer recovery tower were removed.  Hazardous waste manifests show that solid and liquid non-RCRA hazardous waste were removed from the Site during this same period.  Thousands of gallons of PVC resin were removed from tanks at the Site in January 2004 soon after SIC had assumed ownership and control.  Liquids from rinsing tanks and from drums on the Site were also removed during this time.  A January 21, 2004 hazardous waste manifest included TCE from two 55-gallon drums.

16.    In April and May 2004, nine sumps that contained wastewater from the manufacturing process were excavated and removed from the Site.[5] Prior to their removal, 4000 gallons of accumulated water was removed from the sumps.

DECLARATION OF GARY HOKKANEN

The water was analyzed and found to contain several VOCs, including TCE.  All underground industrial wastewater lines into and out of the sumps were washed and then plugged in place at the exterior wall of the sump.  Transmission lines to the wastewater treatment area were cut and the lines were plugged at each open end.

17.    The USEPA issued its Expanded Site Inspection Report for the SIC Site in January 2006.[1]  The purpose of the Expanded Site Inspection was to assess the relative threat associated with actual or potential releases of hazardous substances to the environment.  Five groundwater monitoring wells were installed and sampled and 60 soil samples at 15 locations were collected.  Photographs taken on April 21, 2004 during the Expanded Site Inspection showing the manufacturing equipment left on-site by Keysor are provided in Attachment C.  Based on the findings of the Expanded Site Inspection USEPA concluded that the Site warranted further assessment by either USEPA or DTSC.  DTSC assumed the position as the lead agency for the Site soon thereafter.

18.    SIC entered into a Voluntary Cleanup Agreement (VCA) with DTSC in October 2007, 22 months after USEPA concluded that further assessment was warranted and almost four years after taking ownership and control of the Site.  The VCA contained a schedule for the site characterization (i.e. investigation) and remediation of the Site.  Site characterization was to be completed approximately one year after execution of the VCA, in October 2008.  Remediation of the Site was scheduled to begin six months after completion of the site characterization, in April 2009.  Site characterization of the SIC Site was not completed until 2014, six years later than the schedule in the VCA and ten years after SIC had assumed ownership and control over the Site.  Characterization did not include off-site groundwater contamination that migrated off-site and as of June 2020 has not been

DECLARATION OF GARY HOKKANEN

completed.  Remediation of the Site was not initiated until April 2016, seven years after the date agreed upon by SIC and DTSC in the VCA and 12 years after SIC assumed ownership and control of the property.

19.     Five new groundwater monitoring wells were installed by RAMCO in October 2008 one year after signing the VCA and nearly five years after SIC took ownership and control of the Site.  The five groundwater monitoring wells installed by USEPA at the Site in 2004 during USEPA's Expanded Site Inspection and the five new wells installed by RAMCO were sampled by RAMCO in October 2008.

20.     An initial soil vapor investigation was conducted by RAMCO in November 2008.

21.     Site characterization continued following the 2008 initial sampling. The investigations developed information on the geology, hydrogeology, and contamination at the SIC Site.  Site characterization of the SIC Site was completed in 2014, seven years after the VCA and ten years after SIC assumed ownership and control of the Site.  However, characterization of off-site groundwater contamination, which has migrated from the Site has not been completed as of June 2020.

22.     Based on the information collected during the site characterization a soil vapor extraction system was installed and began operation in April 2016, almost nine years after the VCA and 12 years after SIC assumed ownership and control of the property.  An in-situ groundwater remediation program was initiated at the Site in January 2017.  According to Jose Diaz, the DTSC project manager of this Site, groundwater contamination at the Site has not been remediated to DTSC's satisfaction and continues to migrate off the Site.

DECLARATION OF GARY HOKKANEN

## **Geology**

23.    The SIC Site is underlain by three geologic formations: alluvial sediments, older surficial sediments, and the Saugus Formation.

24.    The alluvial sediments are the uppermost formation and were deposited primarily by the South Fork of the Santa Clara River.

25.    The alluvial sediments at the Site are primarily comprised of sand, gravel, and boulders and vary in thickness from approximately ten feet on the eastern portion to over 90 feet on the western portion, as reported in 2011 by RAMCO, SIC's consultant.[6]

26.    The older surficial sediments are beneath the alluvial sediments and are generally comprised of material that was eroded from upland areas, primarily gravel and sand.  These older surficial sediments have been subsequently eroded and are missing over much of the Site.

27.    The Saugus Formation underlies both the alluvial and older surficial sediments.  Because the older surficial sediments are not present over much of the Site, the Saugus Formation is in direct contact with the alluvial sediments.

28.    The Saugus Formation is composed of conglomerate, sandstone, and siltstone.  However, the upper surface of the Saugus Formation at the SIC Site is generally unconsolidated and porous, easily transmitting groundwater.

29.    In addition to geologic formations at the Site, there is also evidence of faulting.  The San Gabriel Fault, the major fault in the area, is present north of the SIC Site.  The Holser Fault is associated with the San Gabriel fault and cuts across the SIC Site in a southeast to northwest direction (Figure 2).  The Holser Fault is a reverse fault that is steeply inclined to the south/southwest and cross-cuts the

Saugus Formation.[6,7]  There is evidence that the fault is exposed in the canyon walls adjacent to the SIC Site in outcropping Saugus Formation.

30.    The faulting at and near the SIC Site has caused the Saugus Formation, which was originally horizontal, to deform and dip to the southwest. The Saugus Formation at the SIC Site has been mapped by RAMCO[6] and Dibblee[7] as dipping 50 to 60 degrees to the south/southwest (Figures 2-6).  Figure 3 shows a portion of the Dibblee geologic map in the area where the SIC Site is located and shows the steep dipping angle and direction of the Saugus Formation.  Figure 2 shows the location of the cross sections by SIC's consultant RAMCO.  Figure 4 is a northeast/southwest cross section that shows the steeply dipping Saugus Formation (labeled QTs on the Figure).  Figure 5 is an east/west cross section that also shows the steeply dipping Saugus Formation beneath the SIC Site.  The Saugus Formation is approximately 60 feet below ground surface on the western boundary of the Site on Figure 5.  Figure 6 is a cross section that trends slightly southeast to northwest.  It shows the alluvial sediments (labeled Qal) approximately 150 feet thick at the Site boundary at the end of the cross section. Further away from the fault zone the Saugus Formation dips between 10 to 15 degrees.

**Hydrogeology**

31.    Eighteen groundwater monitoring wells have been installed at the SIC Site to measure water levels and to collect groundwater samples to assist in characterizing the Site (Figure 7).

DECLARATION OF GARY HOKKANEN

32.     Thirteen shallow monitoring wells were screened to intersect the water table.  These monitoring wells vary between 70 and 105.7 feet deep.  All these wells went dry between 2012 and 2015 as the water table in the area lowered.

33.     The other five monitoring wells were screened deeper than the shallow wells and did not go dry.  These monitoring wells vary between 125 and 180 feet deep.

34.     Water levels in these monitoring wells have been measured on a semi-annual basis since 2008.

35.     The thickness of the alluvial sediments varies on the Site from approximately 10 to more than 90 feet.  The Saugus Formation is directly under the alluvial sediments on the Site.  Over half of the 18 groundwater monitoring wells are screened in the Saugus Formation.  All of these wells have detected TCE. Currently the water table is present in the Saugus Formation over most of the Site.

36.     The alluvial sediments are in direct hydraulic connection with the underlying Saugus Formation.

37.     Water table contour maps were generated for the shallow groundwater well network until the shallow wells went dry, due to a lowering of the water table. Water levels could only be measured in the five deeper wells after the shallow wells went dry.

38.     Based on the water level measurements in the shallow wells, the groundwater flow direction was variable during the period they were measured from 2008 to 2013.

39.     In several of the water table contour maps the shallow water table shows mounding under the Site and indicates shallow groundwater flow on the east

DECLARATION OF GARY HOKKANEN

side of the Site is in a northeast direction and flow on the west side of the Site is west to southwest.  This mounding is shown in the water table contour maps in RAMCO's 2011, 2012, and 2013 reports.  As shown in the water table contour map for the third quarter of 2012 groundwater flow on the east side of the Site is shown in a northeast direction (Figure 8)[8].  Groundwater flow on the west side of the Site is in a westerly direction towards the SCVWA groundwater production wells.  Similarly, in the water table contour map for the second quarter of 2013 groundwater flow on the east side of the Site is shown in a northeasterly direction and groundwater flow on the west side of the Site is shown in a southwest direction (Figure 9)[9].  The mounding may be due to the unique geology at the Site, including the faulting and the severely dipping Saugus Formation.  The groundwater divide shown on Figures 8 and 9 (where the groundwater flow direction goes in opposite directions) is shown as southeast to northwest on the Site.  The location of the groundwater divide may be related to the location of the Holser Fault on the Site, which also is in a southeast to northwest direction on the Site (Figure 2).

### Groundwater Quality

40.    Groundwater samples have been collected from the groundwater monitoring wells at the Site since 2008.  The primary constituents detected in groundwater at the Site are TCE, chloroform, PCE, vinyl chloride, cis-1,2-DCE, methyl ethyl ketone, methyl isobutyl ketone, acetone, 1,2-DCA and toluene.

41.    TCE has been detected at the SIC Site at a maximum concentration of 4020 ug/L in shallow well GW-4 and 1100 ug/L in deep well GW-15 near the western boundary (Figure 10).  TCE has been detected in both off-site monitoring wells, GW-13A and GW-13B, on the west side of Railroad Avenue, approximately

DECLARATION OF GARY HOKKANEN

300 feet southwest of the SIC Site.  GW-13A is 80 feet deep and GW-13B is 180 feet deep.  The maximum concentration of TCE detected in GW-13A was 49 ug/L and 790 ug/L in GW-13B.  TCE has also been detected in SG1-HSU3c at a maximum concentration of 2.4 ug/L.  Groundwater monitoring well SG1-HSU3c is located approximately 200 feet south of GS-13B and 600 feet east of Saugus 1.  SG1-HSU3c is screened at a depth of 720 to 740 feet below ground surface.  Groundwater monitoring well AL-12B is located approximately 600 feet southwest of GW-13B.  AL-12B is located adjacent to one of the Santa Clarita Valley Water Agency groundwater production wells, Saugus 1.  Monitoring well AL-12B is 180 feet deep.  The maximum TCE concentration detected in AL-12B is 240 ug/L.  TCE has been detected in AL-12B in all 76 sampling events.

42.    Chloroform has also been detected in SIC wells and in AL-12B (Figure 10).  The maximum chloroform concentration detected at the SIC Site was 730 ug/L in GW-15.  Chloroform was detected at a maximum concentration of 340 ug/L in GW-13B and 370 ug/L in AL-12B.

43.    Based on the data collected from SIC monitoring wells and AL-12B, TCE and chloroform have migrated from the SIC Site to the AL-12B location, adjacent to SCVWA Saugus 1 groundwater production well (Figure 10).

44.    The SCVWA Saugus 1 groundwater production well is located 900 feet west/southwest of the SIC Site (Figure 10).  The Saugus 1 groundwater production well is 1640 feet deep and has eight screen intervals, all in the Saugus Formation.  The well screens for Saugus 1 are located from 490-510, 570-630, 710-810, 890-1000, 1020-1080, 1130-1190, 1240-1320, and 1400-1620 feet below ground surface (Figure 11).

DECLARATION OF GARY HOKKANEN

45.     The SCVWA Saugus 2 groundwater production well is located approximately 1200 feet south of the SIC Site (Figure 10).  This well is 1611 feet deep and has seven screen intervals, all in the Saugus Formation.  The well screens for Saugus 2 are located from 510-550, 580-720, 820-880, 920-960, 1040-1100, 1210-1250, and 1310-1590 feet below ground surface (Figure 11).

46.     When the Saugus 1 and Saugus 2 groundwater production wells pump groundwater the water enters the well from all of the screen intervals at the same time.  All of the water is pumped from the Saugus Formation.

47.     The capture zones for the Saugus 1 and Saugus 2 groundwater production wells were determined by using a computer model.[10] A capture zone is the area of an aquifer from which groundwater is drawn into a production well when a well is pumped zone for the Saugus 1 groundwater production well extends to and includes the location of groundwater monitoring well SG1-HSU3c and the western portion of the SIC Site itself.

48.     As discussed above, the Saugus Formation dips at a 60 degree angle to the southwest at the SIC Site, in the direction of the Saugus 1 and Saugus 2 groundwater production wells.  Away from the fault zone where the SIC Site is located, the regional dip of the Saugus Formation is approximately 10 degrees. The transition of the 60 degree dip of the Saugus Formation at the SIC Site to the regional dip of 10 degrees has not been mapped.  To estimate where the Saugus Formation that is present under the SIC Site intersects the Saugus 1 and Saugus 2 groundwater production wells a range of dipping angles between the SIC Site and the production wells is used.  The average dipping angle would be 35 degrees (the average of 60 and 10 degrees).  The average dipping angle will by bracketed by $\pm$ 5 degrees to produce a range of 30 to 40 degrees.

DECLARATION OF GARY HOKKANEN

1    48a.    Based on this range, groundwater (and contaminants in the

2    groundwater) migrating in the dipping Saugus Formation would intersect the

3    Saugus 1 groundwater production well, located 900 feet from the SIC Site, at an

4    approximate depth of 520 to 755 feet below ground surface (bgs).

5

6    48b.    Groundwater (and contaminants) migrating in the dipping Saugus

7    Formation would intersect the Saugus 2 groundwater production well, located 1200

8    feet from the SIC Site, at an approximate depth of 690 to 1000 feet bgs.

9    48c.    Based on these estimates, groundwater from the SIC Site would enter

10   well screens in both the Saugus 1 and Saugus 2 groundwater production wells.

11   Figure 12 is a conceptual cross section showing the approximate locations of the

12   SIC Site, the Saugus 1 and Saugus 2 groundwater production wells, and the

13   dipping Saugus Formation.

14

15   49.    TCE has been detected in both Saugus 1 and Saugus 2 groundwater

16   production wells.  The highest concentrations of TCE detected in Saugus 1 and

17   Saugus 2 groundwater production wells are 4.2 and 1.2 ug/l, respectively.  In 2019

18   TCE concentrations in Saugus 1 groundwater production well ranged from 0.7 to

19   1.3 ug/l.  TCE concentrations in Saugus 2 groundwater production well in 2019

20   ranged from <0.5 to 0.6 ug/l ug/l.  Jose Diaz, the DTSC project manager of this

21   Site, testified that DTSC considers the SIC Site a potential source of VOCs,

22   including TCE, in the Saugus 1 and Saugus 2 groundwater production wells.

23   Benjamin Lechler, a consultant to SCVWA, testified that there was a plausible

24   pathway for VOCs to move from the SIC Site to the portion of the Saugus

25   Formation where groundwater enters the Saugus 1 and Saugus 2 groundwater

26   production wells.

27

28

50.    Chloroform has also been detected in Saugus 1 and Saugus 2 groundwater production wells.  Chloroform was detected in 134 of the 141 sampling events and in Saugus 1 groundwater production well from 2010 to 2013. In Saugus 2 groundwater production well, chloroform was detected in nine of 114 sampling events during the same time period.

51.    The highest concentrations of TCE and chloroform were detected on the SIC Site.  TCE and chloroform have been detected in decreasing concentrations in a westerly direction toward the GW-13 wells, located between the SIC Site and Saugus 1 groundwater production well, in SG1-HSU3c, and in AL-12B located adjacent to Saugus 1 groundwater production well (Figure 10).

52.    Groundwater contaminated with VOCs, including TCE, is present on the SIC Site.  VOCs, including TCE, are also present in Saugus 1 and Saugus 2 groundwater production wells located 900 and 1200 feet from the SIC Site.  The same is true for chloroform.  Groundwater at the SIC Site and the groundwater production wells are each contaminated with TCE and chloroform.  Groundwater monitoring data shows that TCE and chloroform have migrated west across Railroad Avenue and are found in the 180-foot deep monitoring well GW-13B located adjacent to Saugus 1 groundwater production well.  The Saugus Formation has been mapped to be dipping 60 degrees to the southwest at the SIC Site in the direction of Saugus 1 and Saugus 2 groundwater production wells.  TCE has been detected in a deeper well screened in the Saugus Formation located between the SIC Site and the groundwater production wells.  Contaminated groundwater at the Site is present in groundwater monitoring wells at the SIC Site in the Saugus Formation.  TCE has been detected in both Saugus 1 and Saugus 2 groundwater production wells.  Contaminated groundwater migrating in the steeply dipping Saugus Formation would therefore intersect the screened intervals in Saugus 1 and

Saugus 2 groundwater production wells at depth.  Chloroform has consistently been detected in Saugus 1 groundwater production well and occasionally in Saugus 2 groundwater production well.  Therefore, a plausible pathway exists for contaminated groundwater from the SIC Site to migrate to Saugus 1 and Saugus 2 groundwater production wells.

### BONA FIDE PROSPECTIVE PURCHASER

53.    SIC asserts that it qualifies as a Bona Fide Prospective Purchaser.

54.    The criteria to qualify as a Bona Fide Prospective Purchaser are contained in 42 U.S.C. 9601 (40) and are as follows:

(A) In general.  The term "bona fide prospective purchaser" means, with respect to a facility:

(i) a person who

(I) acquires ownership of the facility after January 11, 2002; and

(II) establishes by a preponderance of the evidence each of the criteria described in clauses (i) through (viii) of subparagraph (B); and

(B) Criteria.  The criteria described in this subparagraph are as follows:

(i) Disposal prior to acquisition.

All disposal of hazardous substances at the facility occurred before the person acquired the facility.

(ii) Inquiries.

(I) In general.

The person made all appropriate inquiries into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices in accordance with subclauses (II) and (III).

(II) Standards and practices.

The standards and practices referred to in clauses (ii) and (iv) of paragraph (35)(B) shall be considered to satisfy the requirements of this clause.

(iii) Notices.

The person provides all legally required notices with respect to the discovery or release of any hazardous substances at the facility.

(iv) Care.—The person exercises appropriate care with respect to hazardous substances found at the facility by taking reasonable steps to—

(I) stop any continuing release;

(II) prevent any threatened future release; and

(III) prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substance.

(v) Cooperation, assistance, and access.

The person provides full cooperation, assistance, and access to persons that are authorized to conduct response actions or natural resource restoration at a vessel or facility (including the cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial response actions or natural resource restoration at the vessel or facility).

(vii) Requests; subpoenas.

The person complies with any request for information or administrative subpoena issued by the President under this chapter.

55.    SIC failed to meet the following criteria:

a.  42 U.S.C. 9601 (40) (B) (i) – all disposal must occur before the property was acquired;

b.  42 U.S.C. 9601 (40) (B) (ii) (I) - all appropriate inquiries made in compliance with accepted good commercial practices;

c.  42 U.S.C. 9601 (40) (B) (iv) – exercised appropriate care to stop any continuing release; prevent any threatened future release; and prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substances; and

d.  42 U.S.C. 9601 (40) (B) (vii) – the person complies with environmental agency directives and requests.

**Disposal of hazardous substances occurred after SIC acquired ownership and control of the property: 42 U.S.C. 9601 (40) (B) (i)**

56.    CERCLA 42 U.S.C. 9601 (40) (B) (i) requires that "all disposal of hazardous substances at the facility occurred before the person acquired the facility."

57.    EPA conducted a CERCLA Screening Site Inspection in 1989.[2]  The purpose of a Screening Site Inspection is to determine if a site should be addressed under the federal Superfund program.  The report for the Screening Site Inspection stated that "large quantities of hazardous substances were discharged on site".

58.    Ninyo & Moore conducted a Phase I Environmental Site Assessment in 2000.[3]  The Phase I report concluded that there were recognized environmental conditions on the Site.

59.    The California Regional Water Quality Control Board (Water Board) conducted an inspection of the Site on April 25, 2002.[11]  The Site Inspection report concluded that "Regional Board staff is concerned about the numerous releases that had formerly occurred at this facility."

60.     Based on the 1989 EPA Screening Site Inspection, the 2000 Phase I and the 2002 Water Board site inspection hazardous substances were present on the property before SIC acquired ownership and control of the property.

61.     In December 2003, SIC purchased the property from Keysor through a bankruptcy court sale.  SIC knew the property was contaminated.

62.     Prior to the purchase, SIC's consultant RAMCO prepared a Preliminary Environmental Assessment (PEA) report for the SIC Site.[4]  The PEA report was issued in October 2003.  The site visit for the PEA took place on September 24, 2003.  The PEA report stated that at the time of the site visit "all tanks, reaction vessels, drums, and bins were found to be empty."  Subsequent work at the Site confirmed that this information was false.

63.     In 2004, after SIC assumed ownership and control of the property, demolition and removal of multiple chemicals, tanks, sumps, and other equipment left on the property by Keysor took place.

64.     As discussed above, hazardous waste manifests show that liquid waste from tanks and drums was removed from the Site after the September 24, 2003 PEA site visit and after SIC acquired ownership and control of the property.  In addition, hazardous waste manifests show that rinsate from tanks were removed from the Site as hazardous waste.  Based on the hazardous waste manifests, the statement in the PEA report prepared by SIC's consultant indicating that the chemical tanks were empty was false.  For example, a December 10, 2003 hazardous waste manifest lists 2000 gallons of hazardous waste liquid containing TCE and lead.

65.     RAMCO removed nine sumps in April and May 2004.

66.    The sumps were connected to underground pipes that brought wastewater in and then other pipes that transmitted the collected wastewater to a treatment area.

67.    The sumps were found to contain a total of approximately 4000 gallons of water.  The water was sampled and analyzed and found to contain several VOCs, including TCE.  The water was removed prior to demolition.

68.    The underground pipes that brought wastewater into the sumps were washed and then plugged in place at the exterior wall of the sump.  The underground pipes that transmitted the wastewater to the treatment area were cut and both ends were plugged.

In my 40 years of working on industrial properties it is my experience that it would be extremely difficult to remove numerous sumps, underground pipes, chemicals from tanks and drums that were used to store various chemicals used in the chemical manufacturing process and rinse large tanks that contained the chemicals used at the facility without releasing some of the chemicals to the ground surface. I have found no documentation of the procedures used during the demolition process, including how the decommissioning of the drums and large chemical storage tanks was conducted and the procedures used to ensure that no wastewater containing VOCs were released during the cutting of the wastewater pipes and excavation of the sumps.  It is likely that disposal of hazardous substances occurred during the demolition and equipment removal process.

### SIC has not met the all appropriate inquiry requirements: 42 U.S.C. 9601 (40) (B) (ii) (I)

69.    CERCLA 42 U.S.C. 9601 (40) (B) (ii) (I) is a requirement that all appropriate inquiries are made into the previous ownership and uses of the facility

in accordance with generally accepted good commercial and customary standards and practices.  All appropriate inquiry is defined as performing a Phase I environmental site assessment consistent with standards established by the American Society of Testing and Materials (ASTM).  The purpose of performing the Phase I prior to acquisition of a property is to evaluate the environmental conditions and to assess potential liability for any contaminants.

70.     The ASTM standard for Phase I environmental site assessments at the time of the 2003 PEA was ASTM E 1527-00.

71.     The 2003 PEA performed by RAMCO failed to follow the ASTM E 1527-00 Standard, as demonstrated in paragraphs 73-84 below.

72.     One part of the Phase I assessment is a site reconnaissance or site visit.  The ASTM E 1527-00 Standard states that the objective of the site reconnaissance is to "obtain information indicating the likelihood of identifying *recognized environmental* conditions in connection with the property."  The term *recognized environmental condition* is defined as "the presence or likely presence of a *hazardous substances* of *petroleum products* on a *property* under conditions that indicate an existing release, a past release, or a material threat of a release of an *hazardous substances* or *petroleum products* into structures on the *property* or into the ground, ground water, or surface water of the *property.*"

73.     RAMCO failed to conduct a site reconnaissance according to the ASTM Standard.

74.     The ASTM Standard specifies that the site reconnaissance include, in part (a) observation of the interior of structures, (b) the approximate quantities, present and past, of hazardous substances and petroleum products used at the property, types of containers and storage conditions, (c) identification of above

DECLARATION OF GARY HOKKANEN

ground storage tanks, underground storage tanks, vent pipes, fill pipes (content, capacity, age), (d) identification of odors, (e) sumps containing liquids likely to be hazardous substances shall be described, (f) description of drums and contents, (g) identification and description of containers identified as containing hazardous substances, including quantities, types of containers and storage conditions, (h) means of heating and cooling buildings including fuel sources, (i) identification and description of stains or corrosion on floors, walls or ceilings, (j) identification and description of floor drains, (k) identification and description of pits, ponds, or lagoons, (l) identification of stained soil or pavement, and (m) identification of stressed vegetation.

75.    Based on Section 5.0 of the RAMCO Phase I, Information From Site Reconnaissance/Interviews, not a single one of these 13 requirements described in paragraph 75 were conducted by RAMCO.

76.    The PEA report stated that at the time of the site visit "all tanks, reaction vessels, drums, and bins were found to be empty."  As discussed above, based on hazardous waste manifests after the PEA site visit and after SIC acquired the property, this statement is false.

77.    Section 10 of the ASTM Standard also requires that a reasonable attempt shall be made to interview at least one staff member of a local government agency, including the local fire department, local health agency, or local or regional office of a state environmental agency.  According to the RAMCO Phase I report, no local government agency officials were interviewed.

78.    The ASTM E 1527-00 Standard states: "The purpose of this practice, as well as Practice E 1528, is to define good commercial and customary practice in the United States of America for conducting an *environmental site assessment* of a

parcel of *commercial real estate* with respect to the range of contaminants within
the scope of Comprehensive Environmental Response, Compensation and Liability
Act (CERCLA) and *petroleum products*."

79.    The ASTM E 1527-00 Standard further states: "In defining a standard
of good commercial and customary practice for conducting an *environmental site
assessment* of a parcel of *property*, the goal of the processes established by this
practice is to identify *recognized environmental conditions*."

80.    The 2003 RAMCO PEA did not identify any recognized
environmental conditions or their impact on the property.  It only provided a
general recommendation "for further investigation of the site soil and
groundwater".  As stated in Section 11.7 of the ASTM E 1527-00 Standard: *"The
report shall include a conclusions section that summarizes all *recognized
environmental conditions* connected with the property and the impact of these
*recognized environmental conditions* on the property."  A Phase I Environmental
Site Assessment was conducted at the property in 2000 by Ninyo & Moore.[3]  As
required by the ASTM Phase I standard, Ninyo & Moore identified 15 recognized
environmental conditions.  For example, Ninyo & Moore identified one of the
recognized environmental conditions as follows: "The reactor sump concrete is
corroded, creating a cavity and exposing the soils behind the sump."

81.    The identification of recognized environmental conditions and their
impact on a property is the stated purpose of the ASTM Phase I standard.

82.    The RAMCO PEA did not list any recognized environmental
conditions connected with the property and their impact on the property as
required.  Without the identification of specific recognized environmental

DECLARATION OF GARY HOKKANEN

conditions prior to acquiring the property, it would be impossible to determine if specific releases identified in the future were present prior to the acquisition.

83.    The RAMCO PEA did not meet the requirements of ASTM E 1527-00 Standard and did not meet the requirement of 42 U.S.C. 9601 (40) (B) (ii) (I).

### SIC failed to take the steps necessary to meet the requirements of 42 U.S.C. 9601 (40) (B) (iv)

84.    CERCLA 42 U.S.C. 9601 (40) (B) (iv) (I) requires that reasonable steps be taken to stop any continuing releases of hazardous substances.  The definition of "release" contained in 42 U.S.C. 9601 (22) includes any leaching of hazardous substances.  As discussed above, SIC had ample knowledge that disposal of hazardous substances had previously occurred at the Site.  The previous disposal of hazardous substances would have contaminated the soil and residual water below the ground surface.  These hazardous substances would have continued to migrate downward due to leaching by rainwater that infiltrated into the ground.  Photographs taken in February 2005 show conditions at the Site during a rainfall event that would lead to infiltration of water into the ground (Attachment D).[12]  The continued migration of contaminants would reach the groundwater after a period of time.  SIC delayed addressing the continued leaching of these hazardous substances for 12 years, allowing them to migrate freely on and off the Site.

85.    CERCLA 42 U.S.C. 9601 (40) (B) (iv) (II) requires that reasonable steps be taken to prevent any threatened future release of hazardous substances. As discussed in the preceding paragraph, releases of hazardous substances that had contaminated the soil and residual water below the ground surface not only threatened to contaminate the underlying groundwater, but these releases would

and did contaminate the groundwater due to infiltrating rainwater.  SIC did not take steps to prevent threatened future releases until 2016, 12 years after taking ownership and control of the Site from Keysor.

86.    CERCLA 42 U.S.C. 9601 (40) (B) (iv) (III) requires that appropriate care be exercised with respect to hazardous substances found at the facility by taking reasonable steps to prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substance.  It was not until 2016 that SIC took steps to prevent or limit the exposure.

87.    An in-situ groundwater remediation program was initiated at the SIC Site in January 2017, approximately 13 years after SIC took ownership and control of the property.  An Emulsified Vegetable Oil (EVO) substrate and microbial suspension was injected into several on-site wells to promote biodegradation of the VOCs.  This remediation program only addressed contaminated groundwater on the SIC Site, leaving the off-site contaminated groundwater, which originated on the SIC Site, to freely migrate towards the SCVWA Saugus 1 and Saugus 2 groundwater production wells.

88.    Only two of the groundwater monitoring wells installed by SIC were placed off the SIC property (GW-13A and GW-13B).  Groundwater samples from these wells showed that contaminants from the SIC Site had migrated off site in the direction of SCVWA's groundwater production wells.  The horizontal and vertical extent of the off-site impact to groundwater from the SIC Site has not been determined.  Contaminated groundwater from the SIC Site that has migrated off-site continues to migrate in tandem with the ongoing migration of groundwater.  As the contaminated groundwater continues to migrate, the extent of the area of contaminated groundwater continues to increase.

DECLARATION OF GARY HOKKANEN

89.    On-site groundwater remediation will not reduce or control off-site groundwater contaminated by previous releases of hazardous substances from the SIC Site.

90.    Since SIC has not characterized the off-site groundwater contamination that originated from its Site, SIC cannot establish the extent of human, environmental, and natural resource exposure making it impossible for SIC to determine the extent and scope of the existing and ongoing impacts of the contamination that has migrated off-site during the 16 years since it purchased the property.

91.    Since SIC has not taken steps to remediate off-site groundwater contamination, they have failed to take appropriate care to prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substances at and from the SIC Site and the requirements specified in 42 U.S.C. 9601 (40) (B) (iii) (III) have not been met.

### SIC did not comply with DTSCs request under the VCA as required by 42 U.S.C. 9601 (40) (B) (vii)

92.    CERCLA 42 U.S.C. 9601 (40) (B) (vii) requires compliance with any request for information or administrative subpoena.  For the SIC Site, meeting this requirement means complying with DTSC requests and directives, including the VCA.

93.    As discussed above, SIC signed a VCA with the DTSC in October 2007.  DTSC agreed to oversee the characterization and cleanup of the Site proposed by SIC and SIC agreed to comply with the terms and conditions of the VCA, including the VCA schedule.

94.   On September 22, 2011 DTSC sent out a Notice to Terminate the VCA to Hunt Braley, counsel to SIC, and Alex Palmer, consultant to SIC.  The letter stated that "DTSC is terminating the agreement due to the lack of satisfactory investigation progress, poor project proponent responsiveness, and environmental concerns with known impacts (vinyl chloride) to soil and groundwater.  SIC has failed to properly characterize the full nature and extent of contamination resulting from past operations on the Site and failed to respond to repeated requests by DTSC staff to negotiate the terms of an access agreement to complete the groundwater investigation along the southwestern perimeter of the contaminant plume.  In addition, engineering and geological work performed at the Site and associated deliverables are not in conformance with applicable state law including but not limited to Business and Professions Code Sections 6735 and 7835."

95.   SIC did not meet the requirement of 42 U.S.C. 9601 (40) (B) (vii). Saugus Industrial Center failed to meet several of the statutory requirements necessary to establish itself as a Bona Fide Prospective Purchaser (BFPP), as such has not met the criteria to qualify as a BFPP as set out in 42 U.S.C. 9601 (40).


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed on September 28, 2020 in Oakland, California.

Gary Hokkanen

DECLARATION OF GARY HOKKANEN

# ENDNOTES

1.  Westin Solutions, Inc., 2006.  Expanded Site Inspection Report, Keysor Century Corporation, Saugus, California.  January.

2.  ecology and environment, inc., 1990.  CERCLA Screening Site Inspection, Keysor Century Corporation, 26000 Springbrook Road, Saugus, California, Los Angeles County.  September 14.

3.  Ninyo & Moore Geotechnical and Environmental Sciences Consultants, 2000.  Phase I Environmental Site Assessment, Finova Capital Corporation, Keysor-Century Corporation, Saugus, California.  December 8.

4.  RAMCO Environmental, LLC, 2003.  Preliminary Environmental Site Assessment Report For Property Title Transfer, 26000 Springbrook Ave., Saugus, California.  October 31.

5.  RAMCO Environmental, LLC, 2004.  Closure Report, Industrial Waste Water Sump Removal, Keysor-Century Corporation, 26000 Springbrook Avenue, Saugus, California.  June 14.

6.  RAMCO Environmental Inc., 2011.  Modified Geology Report, 26000 Springbrook Ave., Saugus, California.  September 4.

7.  Dibblee, T.W. Jr., 1996, Geologic Map of the Newhall Quadrangle, Los Angeles County, California. Dibblee Geological Foundation Map DF-56, Edited by Ehrenspeck, H.E. (1996) and Minch, J.A. (2008). Scale 1:24,000.

8.  SGS Environmental Management, 2012.  Saugus Industrial Center, Groundwater Monitoring and Sampling Report, Third Quarter 2012 (July – September 2012).  October 19.

9.  SGS Environmental Management, 2013.  Saugus Industrial Center, Groundwater Monitoring and Sampling Report, Second Quarter 2013 (April – June 2013).  April 26.

10. CH2MHill, 2004. Analysis of Perchlorate Containment in Groundwater Near the Whittaker-Bermite Property, Prepared in Support of the 97-005 Permit Application.  December.

DECLARATION OF GARY HOKKANEN

11.    California Regional Water Quality Control Board, Los Angeles Region, 2002.  Inspection to Evaluate Threat To State's Water Resources Due To Unpermitted Release of Volatile Organic Chemicals To Subsurface, Keysor-Century Corporation, 26000 Springbrook Avenue, Saugus, California.  September 17.

12.    Goodman, Larry, 2020.  Videotaped Deposition of Larry Goodman, Tuesday, February 4, 2020.

DECLARATION OF GARY HOKKANEN