FRED M. BLUM, ESQ. (SBN101586)
fblum@behblaw.com
MICHAEL E. GALLAGHER, ESQ. (SBN 195592)
mgallagher@behblaw.com
EARL L. HAGSTROM (SBN 150958)
ehagstrom@behblaw.com
CHRISTOPHER DOW, ESQ. (SBN 250032)
cdow@behblaw.com
BASSI, EDLIN, HUIE & BLUM LLP
500 Washington Street, Suite 700
San Francisco, CA 94111
Telephone:  (415) 397-9006
Facsimile:  (415) 397-1339

Attorneys for Defendant
WHITTAKER CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTA CLARITA VALLEY WATER AGENCY, <br><br> Plaintiffs, <br><br> vs. <br><br> WHITTAKER CORPORATION, <br><br> Defendants. <br><br> WHITTAKER CORPORATION, <br><br> Third-Party Plaintiff, <br><br> vs. <br><br> KEYSOR-CENTURY CORP., a California Corporation; and SAUGUS INDUSTRIAL CENTER, LLC, a Delaware Limited Liability Company, <br><br> Third-Party Defendants. | Case No. 2:18-CV-6825-SB (RAOx) <br><br> *Assigned to Hon. Stanley Blumenfeld, Jr.* <br><br> **DEFENDANT WHITTAKER CORPORATION'S NOTICE OF MOTION AND CROSS MOTION FOR  PARITAL SUMMARY JUDGMENT ON PLAINTIFF SCVWA'S CERCLA AND HSAA CLAIMS AND OPPOSITION TO PLAINTIFF SCVWA'S MOTION FOR SUMMARY JUDGMENT ON CERCLA AND HSAA CLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:      January 8, 2021 <br> Time:      8:30 a.m. <br> Dept.:      6C <br><br> Action Filed:  August 8, 2018 <br> Trial Date:    January 19, 2021 |

1

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

PLEASE TAKE NOTICE that at 8:30 a.m. on January 8, 2021, or as soon thereafter as the as the matter may be heard, in Courtroom 6C, at 350 West 1st Street, Los Angeles, California, Defendant WHITTAKER CORPORATION ("Whittaker") shall move the Court for an order granting partial summary judgment in its favor and dismissing Plaintiff SANTA CLARITA VALLEY WATER AGENCY's ("Plaintiff or SCVWA") dismissing SCWCA's first, second, eighth and ninth counts.  The Court should also determine that:

1. There was no necessity under CERCLA to remediate VOCs that have migrated off the Whittaker Property;

2. After the date that perchlorate treatment was installed on Well V-201, the failure of SCVWA to obtain a permit from the Department of Drinking Water to use the water for household use was not based on a health based criteria;

3. After the date that perchlorate treatment was installed on Well V-201 the treated water was safe to drink; and

4. SCVWA cannot recover its replacement water costs since it did not properly document the costs supporting the alleged replacement water costs

Whittaker makes this motion on the grounds that SCVWA has not substantially complied with the National Contingency Plan as required by CERCLA.

///
///
///
///
///
///
///

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

1      In support of this motion, Whittaker presents this motion, the accompanying

2 memorandum of points and authorities, the declarations of Daniel Trowbridge,

3 Gary Hokkanen and Anthony Daus and exhibits thereto, Whittaker's Statement of

4 Uncontroverted Facts and Conclusions of Law pursuant to Local Rule 56-1, the

5 pleadings and records on file with the Court, oral argument, and any other matters

6 that the parties may submit or the Court may deem appropriate.  Whittaker shall

7 also lodge a proposed Order pursuant to Local Rule 56-1.

8

9 Date:   December 14, 2020     BASSI, EDLIN, HUIE & BLUM LLP

10

11      By:___/s/Michael E. Gallagher_____

12      MICHAEL E. GALLAGHER
      Attorneys for Defendant and Third-Party
13      Plaintiff WHITTAKER CORPORATION

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN
SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND
HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................1

  A.   WHITTAKER'S CROSS MOTION FOR PARTIAL
       SUMMARY JUDGMENT ...........................................1

  B.   OPPOSITION TO SCVWA'S PARTIAL SUMMARY
       JUDGMENT MOTION. ...........................................4

II.  OVERVIEW OF CERCLA AND THE NCP ...............................6

  A.   CERCLA ONLY PROVIDES A REMEDY FOR ACTIONS
       THAT ARE NECESSARY TO PROTECT HUMAN HEALTH OR
       THE ENVIRONMENT ...........................................6

  B.   REMOVAL ACTIONS ............................................7

III. STATEMENT OF FACTS ...........................................9

  A.   WHITTAKER IS NOT THE SOURCE OF THE VOCs FOUND IN
       SCVWA'S WELLS .............................................10

       1.   SCVWA's experts and consultants concede there
            is insufficient evidence to conclude that Whittaker
            the source of the VOCs in the wells ...............12

       2.   There are other sources of VOCs that could have
            contaminated SCVWA's wells.........................12

  B.   THE VOC'S DO NOT POSE A RISK TO HUMAN HEALTH
       OR THE ENVIRONMENT ........................................14

       1.   The VOCs Are Below The MCLs And Have Been
            Determined By DTSC To Pose No Environmental Risk ........14

       2.   SCVWA's Failure to Obtain a Permit from DDW
            for Well V-201 Is Not Related to Any Health Risks
            from VOCs .........................................17

  C.   SCVWA HAS NOT SUBSTANTIALLY COMPLIED WITH
       VARIOUS PORTIONS OF THE NCP ...............................20

i

1          1.     SCVWA Had At Least A 6 Month Planning Period

2                   Before It Needed To Purchase Replacement Water

3                   and Did Not Comply with the NCP Requirements

4                   of a Non-Time Critical Removal Action ...............................20

5          2.     SCVWA Did Not Comply with the NCP Requirements

6                   of a Time Critical Removal Action ........................................24

7 IV.    WHITTAKER'S PARTIAL SUMMARY JUDGMENT MOTION..........24

8     A.    SCVWA DID NOT SUBSTANTIALLY COMPLY WITH THE NCP...........24

9         1.     SCVWA's Replacement Water Determination Was

10                a Non-Time Critical Removal Action ....................................25

11         2.     The Failure to Complete a Removal Site Evaluation

12                and Public Participation Requirements Constitutes

13                Lack of Substantial NCP Compliance. ...................................25

14         3.     The Failure to Properly Document The Costs

15                Supporting The Alleged Replacement or Blending

16                Water Costs Constitutes Lack of Substantial NCP

17                Compliance ............................................................................27

18     B.    THERE WAS NO NECESSITY TO REMEDIATE VOCs THAT HAVE

19         MIGRATED OFF THE WHITTAKER PROPERTY .....................................28

20     C.    THE CLAIMED COSTS ARE NOT RECOVERABLE .................................29

21 V.    WHITTAKER'S OPPOSITION TO SCVWA PARTIAL

22     SUMMARY JUDGMENT.................................................................29

23     A.    A MATERIAL DISPUTE EXISTS AS TO WHETHER WHITTAKER IS

24         THE SOURCE OF THE VOCs FOUND IN SCVWA'S WELLS ................29

25 VI.    PLAINTIFF FAILS TO CARRY ITS BURDEN TO

26     DEMONSTRATE IT IS ENTITLED TO SUMMARY

27     JUDGMENT ON PLAINTIFF'S AFFIRMATIVE DEFENSES...............31

28 VII.    CONCLUSION ...................................................................34

ii

## TABLE OF AUTHORITIES

**CASES**

*AmeriPride Services Inc. v. Texas Eastern Overseas Inc.,*
    *782 F.3d 474 (9th Cir.2015)* ....................................................................6

*Ashcroft v. Igbal.  Shumacher v. Georgia-Pacific Corrugated LLC,*
    2019 WL 8013092 (C.D. Cal. 2019) .........................................................31

*Aviall Services, Inc. v. Cooper Industries, L.L.C.,*
    572 F. Supp. 2d 673 (N.D. Tx. 2008)...............................................24, 26

*Bell Atlanntaic Corp. v. Twombly,*
    550 U.S. 544 (2007).....................................................................................31

*Carson Harbor Village, Ltd. v. Unocal Corp.,*
    *270 F.3d 863* ..................................................................................................6

*Castaic Lake Water Agency v. Whittaker*
    272 F. Supp. 2d 1053 (C.D. 2003) ...................................................4, 5, 29

*City of Colton v. American Promotional Events, Inc.,*
    2006 WL 5939684 *5 (C.D. Ca, October 31, 2006) ....................7, 8, 27, 28

*City of Rialto v. United States Department of Defense,*
    2007 WL 9723250, *8-10 (C.D. Ca., June 27, 2007) ...........................8, 27

*County Line Investment Co. v. Tinney,*
    933 F.2d 1508 (10th Cir. 1991) .........................................................3, 6, 29

*Exxon Corp. v. Hunt,*
    475 U.S. 355 (1986).......................................................................................7

*La.-Pac. Corp. v. ASARCA Inc.,*
    24 F.3d 1565 (9th Cir. 1994) ......................................................................24

*PMC, Inc. v. Sherwin–Williams Co.,*
    1997 WL 223060, at *9 (N.D.Ill. Apr.29, 1997).....................................24

*Roosevelt Irrigation District v. Salt River Project,*
    2017 WL 2721439, *11 (D. Az. March 14, 2017)................................9, 27

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

*Schaeffer v. Gregory Village Partners, L.P.*,

 105 F.Supp.3d 951 (N.D.Cal. 2015)............................................30

*Shumacher v. Georgia Pacific Corrugated LLC*,

 2019 WL 801392 *1 (C.D. Cal. 2019) ........................................31

*Southfund Partners III v. Sears, Roebuck And Co.*,

 57 F. Supp. 2d 1369 (N.D. Ga. 1999)............................................7

*United States v. Chapman*,

 146 F.3d 1166 (9th Cir. 1998).........................................................9

*United States v. W.R. Grace &Co.*,

 429 F.3d 1224 (9th Cir. 2005) .......................................................6


**STATUTES**

40 C.F.R. § 300.160............................................... 7, 8, 9, 24, 27

40 C.F.R. § 300.410...................................................... 7, 8, 22, 24

40 C.F.R. § 300.415...................................................... 7, 8, 22, 29

40 C.F.R. § 300.700...................................................... 7, 8, 22, 24


**OTHER AUTHORITIES**

*Drinking Water: Final Action on Perchlorate*¸

 85 Fed. Register 43990 (July 21, 2020).....................................15


**RULES**

Cal. Health & Safety Code §25236 ............................................15

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN
SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND
HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

# I. **INTRODUCTION**

Whittaker moves for Partial Summary Judgment on SCVWA's Hazardous Substances Account Act ("HSAA") and/or the Comprehensive Environmental Response Compensation Liability Act ("CERCLA") claims as well as opposes SCVWA's Partial Summary Judgment on the same claims.[1]

## A. **WHITTAKER'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

In order to recover their CERCLA response costs SCVWA must prove that these costs were necessary and incurred in substantial compliance with the National Contingency Plan (40 C.F.R. Part 300) ("NCP"). SCVWA cannot meet this burden.

SCVWA's claims are centered on its allegations that perchlorate and volatile organic compounds ("VOCs"), specifically TCE and PCE, have contaminated four of their groundwater wells. The costs that SCVWA seeks to recover do not relate to perchlorate as Whittaker has already paid for perchlorate treatment systems for the three wells that are currently producing water. Trowbridge Declaration in Support of Whittaker's Motion for Summary Judgment, ¶ 6, Ex. D, DDW Guideline 97-005 Documentation for Valencia Water Division, Well V201, Revised Final Draft, Kennedy Jenks, February 4, 2020 Ex. 235 to the Deposition of Meredith Durant ("February 97-005 Report") at Executive Summary III- IV.[2] The predicate for SCVWA's cost recovery under CERCLA is

---

[1] As it pertains to the issues raised in this motion the HSAA and CERCLA have the same requirements. As such, when Whittaker refers to CERCLA it is also referring to the HSAA.

[2] Trowbridge Declaration in Support of its Motion for Summary Judgment (Docket No. 253-3) ("Trowbridge Decl."). Additional exhibits are attached to the Trowbridge Declaration in Support of Whittaker's Opposition to Plaintiff's Motion for Partial Summary Judgment ("Trowbridge Decl. II"). For ease of the Court, the

1

that the chosen action was necessary to protect human health or the environment.  If remediation is required or undertaken for any other reason, CERCLA does not provide a remedy.  As it relates to the alleged VOC contamination, SCVWA cannot prove that any remediation is necessary to protect human health or the environment.

That the VOC's do not create a risk to human health is beyond dispute since SCVWA has been providing VOC contaminated water to its customers for a decade.[3]  The VOCs found in the water wells have uniformly been detected at concentrations below those levels that the Federal and State deem a threat to human health or the environment.  SCVWA concedes that it is unlikely this will change and that as long as the concentrations stay below these levels that the water is safe to drink.  Moreover, in a recent October 2020 internal SCVWA email, Dirk Marks the Director of Water Resources for SCVWA, admitted that regulators have "declined to directly order . . . [SCVWA] to treat for VOC." Trowbridge Decl. II, ¶ 40, Exh. AI, Internal Corres. among directors of SCVWA, October 14-15, 2020 ("10/15/20 V-201 Corres.").

SCVWA's necessity argument is not based on any real health risk, but the failure of the Department of Drinking Water ("DDW") to grant SCVWA a drinking water permit under their Policy 97-005 for two wells -V-201 and V-205 for reasons unrelated to VOCs.   The DDW's failure to grant a permit was not based on any determination that once perchlorate was treated that the water

---

numbering for this declaration will begin where the numbering for the declaration filed in support of Whittaker's Motions ended.

[3] Nor are the VOC's a threat to the environment off the Whittaker Site since the Department of Toxic Substances Control has determined that off-site VOC remediation is not required. Trowbridge Decl., ¶ 3, Ex. A, OU7 RAP at 2.3.4; ¶ 6, Ex. D, February 97-005 Report at Executive Summary III- IV.

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

1    presented a health risk.  According to Jeffery O'Keefe, who is the Southern
2    California Section Chief of the DDW, the 97-005 Policy is not a health based
3    standard, but one based on treatability.  Trowbridge Decl., ¶ 19, Ex. Q, Deposition
4    of Jeffrey O'Keefe ("O'Keefe Depo.").  Even applying the 97-005 Policy MCL
5    Equivalent calculation performed by SCVWA, which is used to determine if
6    additional treatment is necessary, the result was below the number which would
7    require additional treatment beyond the removal of perchlorate. Trowbridge Decl ¶
8    6, Ex. D February 97-005 Report at Executive Summary – VI; 7-1, 7-3; ¶ 16, Ex.
9    N, Durant Depo at 32:15; ¶ 20, Trowbridge Decl. II, ¶ 61, Ex. BD, September
10   2020 DDW *Process Memo 97-005 Users Guide* ("DDW Users Guide"), at p. 3.

11       CERCLA is not a generalized scheme that allows recovery of all damages
12   relating to environmental harms.  *County Line Investment Co. v. Tinney*, 933
13   F.2d 1508, 1517 (10th Cir. 1991).  Any damage that SCVWA has suffered was
14   based on the economics of purchasing more expensive water from the State
15   Water Project.  This is an economic damage not recoverable under CERCLA.

16       In addition to proving necessity, the NCP delineates the mandatory steps,
17   in order, for evaluating and responding to releases that threaten human health or
18   the environment.  The types of responses are broken down into two categories –
19   removal and remedial actions.  Removal actions are generally appropriate where
20   there is a temporary response necessary to respond to an environmental threat.
21   Removal actions are broken down to two types.  These are time-critical removal
22   actions and non-time critical removal actions.  The determination of whether a
23   removal action is time critical is dependent on whether there is six months of
24   planning available or whether immediate action is required.  There are fewer
25   procedural and substantive NCP requirements for time-critical removal actions.

26       Without explanation SCVWA concludes that the need to purchase
27   replacement water to replace the water from its wells with purchased water from
28   the State Water Project was a time-critical removal action.  However, not only is

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN
SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND
HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

the bare conclusion offered without factual basis insufficient to establish the predicate for a time-critical removal action, but the evidence demonstrates that there were several options within SCVWA's existing framework to replace the water. These include increased pumping at other SCVWA wells as well as use of vast quantities of water held in reserve by SCVWA. SCVWA does not argue that it satisfied the NCP requirements for a non-time critical removal action.

Even under the least restrictive time critical removal action NCP requirements, SCVWA failed to substantially comply with the required planning and public participation process. The planning process includes a removal site evaluation. SCVWA did not perform such an evaluation nor did it engage in the required public participation. Nor did it properly document the costs they seek to recover. SCVWA did not substantially comply with the NCP for its past cost claim. Furthermore, a significant part of the claimed costs were not incurred to protect human health or the environment.

Since SCVWA cannot demonstrate that any VOC response costs were necessary and substantially complied with the NCP, Whittaker is entitled to summary judgment on their first, second, eighth and ninth counts.

**B.**    **OPPOSITION TO SCVWA'S PARTIAL SUMMARY JUDGMENT MOTION.**

SCVWA summary judgment relies almost exclusively on the prior perchlorate decision in *Castaic Lake Water Agency v. Whittaker* 272 F. Supp. 2d 1053 (C.D. 2003). The Motion is premised on the incorrect assumption that if Whitaker is responsible for perchlorate contamination in its wells then it must also be responsible for the VOCs found in the wells.[4] *Id.* Yet VOCs and perchlorate

---

[4] SCVWA moves for summary judgment on its CERCLA claims only as it relates to VOCs.

DEF. WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH. IN
SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND
HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

are very different and many of the assumptions that the Court made in *Castaic Lake* regarding perchlorate are not operative regarding VOCs.  As examples:

- The *Castaic Lake* the Court assumed that the pathway that the perchlorate took to SCVWA's wells was via surface runoff.  *Id.* at 1067.  The alleged pathway for VOCs is demonstrably different - via migration from the surface to the groundwater and then through groundwater to the wells.  Trowbridge Decl. ¶ 4, Ex. B, Plaintiff's Third Amended Complaint ("TAC").

- In *Castaic Lake* Whittaker did not produce any expert testimony that it was not the source of the perchlorate.  The expert testimony was that the source could not be identified.  *Castaic Lake*, 272 F. Supp. at 1068.  In this case, with the benefit of 17 years of additional extensive groundwater monitoring data from on and off the Whittaker site, Whittaker's expert Gary Hokkanen has testified that Whittaker is not the source of the VOCs. Trowbridge Decl. II, ¶ 41, Ex. AJ, Deposition of Gary Hokkanen, pp. 102:8-14; 111:24-113:3; 166:7-21; 169:14-17; 178:6-16; 187:3-188:18 ("Hokkanen Depo").  Whittaker's other expert, Anthony Daus has testified that the remediation performed at the Site has prevented the VOC's from the Site.  Trowbridge Decl. II, ¶ 42, Ex. AK, Deposition of Anthony Daus ("Daus Depo"), pp. 174:10-20; 196:18-197:9 .

- In *Castaic Lake* SCVWA's experts opined that Whittaker was the source of the perchlorate.  In this case, SCVWA's own expert hydrologist testified that Whittaker was not the source of VOC contamination in at least two (2) of the wells at issue.  Trowbridge Decl. II, ¶ 43, Ex. AL  Deposition of Dr. Mark Trudell ("Trudell Depo.") at 165:8-13; 170:12-171:3.

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

Application of *Castaic Lake* to the VOC contamination at issue, leads to the conclusion that there are multiple material issues in dispute.  In addition, there are other issues that defeat SCVWA's motion on their CERCLA claims, including the NCP issues discussed above.

## II.    OVERVIEW OF CERCLA AND THE NCP

CERCLA's core purpose is the protection of the "public health and environment 'by facilitating the expeditious and efficient cleanup of hazardous waste sites.' " *AmeriPride Services Inc. v. Texas Eastern Overseas Inc.,* 782 F.3d 474, 487 (9th Cir.2015)(quoting *Carson Harbor Village, Ltd. v. Unocal Corp.,* 270 F.3d 863, 888).  CERCLA is a narrowly drawn federal remedy, not intended to provide full generalized compensation for all harm caused by contamination. *County Line Investment Co.*, 933 F.2d at 1517.

A claim under CERCLA is referred to as a response action.  These are divided into two broad categories; removal actions and remedial actions.  *United States v. W.R. Grace &Co.*, 429 F.3d 1224, 1227 (9th Cir. 2005).  Regardless of what kind of response action is undertaken, to prevail in a private cost recovery action, a plaintiff must prove that it incurred response costs that were necessary and substantially consistent with the national contingency plan.  *AmeriPride Services*, 782 F. 3d at 489.  This applies to the any party bringing an action, regardless of whether it is a private party or the federal or state government.  *Id.*

### A.    CERCLA ONLY PROVIDES A REMEDY FOR ACTIONS THAT ARE NECESSARY TO PROTECT HUMAN HEALTH OR THE ENVIRONMENT

In creating CERCLA, Congress did not create a broad statute that allowed a party to recover all costs relating to environmental contamination.  *County Line*, 933 F.2d at 1517.  Congress intended CERCLA to be a narrowly drawn federal remedy, not one to make injured parties whole or to be a general vehicle for toxic tort actions.  *Id.*  As the Supreme Court made clear, "Superfund money

[is not] available to compensate private parties for economic harms that result from discharge of hazardous substances." *Exxon Corp. v. Hunt,* 475 U.S. 355, 359 (1986).

The need to establish environmental necessity does not disappear just because a party is seeking reimbursement for items specifically mentioned in the NCP. For instance, providing alternative or replacement water is a recoverable item. Yet, a plaintiff still has to establish that the replacement water was needed to remediate a harm that caused injury to human health or the environment. *City of Colton v. American Promotional Events, Inc.*, 2006 WL 5939684 *5 (C.D. Ca, October 31, 2006), *vacated and remanded on other grounds* 390 Fed. Apx. 749; *Southfund Partners III v. Sears, Roebuck And Co.,* 57 F. Supp. 2d 1369, 1378 (N.D. Ga. 1999).

## B.    REMOVAL ACTIONS

An example of a removal action is the supplying of an alternative water source "if it is necessary immediately to reduce exposure to contaminated household water . . . ." 40 CFR § 300.415e(9). Most of the costs for which SCVWA is seeking reimbursement fall into this category.

There are two types of removal actions – time critical and non-time critical. The distinction is that in a non-time critical removal action there is at least 6 months available before on-site activities needs to be initiated. *Id.* at § 300.415(b)(4). The types of activities that may be required for a non-time critical removal action include a removal site evaluation (40 CFR§§300.410, 300.700(b)(5)(v)), (2) the need to provide public participation after 120 days (*Id.* at §§300.410(n)(3), 300.700(b)(5)(v)), (3) an engineering evaluation/cost analysis (EE/CA) or its equivalent, which is an analysis of removal alternatives for a site (*Id.* at §300.415(a)(4) and (4) the requirement that costs be properly documented. 40 CFR §§ 300.160, 300.700(n)(ii).

---

7

1    Even when conducting a time critical removal action, in which the least

2   amount of NCP compliance is required, private parties are required to comply with

3   numerous parts of the NCP.  The relevant parts of the NCP which pertain to this

4   Motion, are a removal site evaluation, public participation and proper

5   documentation.

6    One requirement is the preparation of a removal site evaluation.  *Id.* at §§

7   300.410, 300.700(c)(5)((v).  Although the NCP states that the removal site

8   evaluation is potentially applicable, courts have found the absence of one to be

9   fatal to actions to recover removal costs.  *City of Rialto v. United States*

10  *Department of Defense*, 2007 WL 9723250, *8-10 (C.D. Ca., June 27, 2007); *City*

11  *of Colton* 2006 WL 5939684 *5.  The purpose of the removal site evaluation is to

12  ascertain whether there is a threat to human health or the environment and what, if

13  any, actions are needed to respond.  *Id.*, 40 C.F.R. § 300.410.

14    While the public participation requirements are somewhat relaxed in a time

15  critical removal action, there are requirements that still apply.  For instance, if the

16  removal is to last more than 120 days a party must conduct interviews with local

17  officials, members of the community, public interest groups or other interested

18  parties to solicit their concerns and to determine whether they need any additional

19  information and how they might like to be involved in the cleanup process. 40

20  C.F.R. § 300.415(n)(3).  A formal community relations plan based on the

21  interviews which specifies the community relations activities to be undertaken

22  must then be prepared.  *Id.; City of Colton,* 2006 WL at *6.

23    The last relevant requirement is proper documentation.  EPA has provided

24  guidance on documentation necessary to support cost recovery private party

25  actions.  40 C.F.R. §§ 300.160(a)(1), 300.700(c)(5)(ii).  EPA has stated that,

26  "[d]uring all phases of response," the party seeking response costs "shall complete

27  and maintain documentation to support all actions taken under the NCP and to

28  form the basis for recovery."  *Id*. at § 300.160(a)(1).  "[D]ocumentation shall be

8

sufficient to provide the source and circumstances of the release, the identity of responsible parties, the response action taken, accurate accounting of federal, state, or private party costs incurred for response actions, and impacts and potential impacts to the public health and welfare and the environment." *Id.*

Section 40 C.F.R. § 300.160 requires documentation sufficient to persuade the court that the costs have been proven to be compliant with the NCP by a preponderance of the evidence. *Roosevelt Irrigation District v. Salt River Project*, 2017 WL 2721439, *11 (D. Az. March 14, 2017). The Ninth Circuit has applied civil evidentiary standards to determine the adequacy of cost documentation. *United States v. Chapman*, 146 F.3d 1166, 1171 (9th Cir. 1998).

## III.  STATEMENT OF FACTS

SCVWA placed a series of groundwater wells downgradient from the Site in which perchlorate and VOCs have been detected. Perchlorate moves in the subsurface at least 2.5 times faster than VOCs. Trowbridge Decl., ¶ 5, Ex. C, Hokkanen Decl., ¶¶ 14, 16, 25. Whittaker has paid for the installation of perchlorate treatment systems for wells Saugus 1 and 2 and for well V-201. Trowbridge Decl., ¶ 6, Ex. D, February 97-005 Report at Executive Summary III-IV; ¶ 22, Ex. T, Deposition of Lynn Takaichi ("Takaichi Depo."), at 86:2-4; ¶ 22, Ex. AH, V-201 Well Treatment System Funding and Implementation Agreement ("V-201 Well Treatment Agreement"); Trowbridge Decl. II, ¶ 44, Ex. AM, *Castaic Lake Water Agency Litigation Settlement Agreement*, ("2007 Settlement Agreement"), dated April 6, 2007.[5]

---

[5] For the purposes of this Motion, Whittaker does not dispute that it is the source of the perchlorate. However, there is no admission as to VOCs. Whittaker is not the source of VOCs. Hokkanen Decl., ¶¶ 19-30.

DEF. WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH. IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

1    Saugus 1 and 2 have been supplying water for consumers since 2011;

2    notwithstanding the presence of VOC's in the water.  Trowbridge Decl., ¶ 6, Ex.

3    D, February 97-005 Report; , Executive Summary I-IV; ¶ 7, Ex. E, Deposition of

4    Michael Alvord as FRCP 30(b)(6) Witness (December 12, 2019)("Alvord 12/12/19

5    30(b)(6) Depo.") 19:12-23. SCVWA has not obtained a permit to use water from

6    V-201 or 205 for household use.  Trowbridge Decl., ¶ 6, Ex. D, February 97-005

7    Report, Executive Summary I-IV.

8    **A.    WHITTAKER IS NOT THE SOURCE OF THE VOCs FOUND IN**

9    **SCVWA'S WELLS**

10    Whether Whitaker is the source of the perchlorate in SCVWA's wells is a

11    different question than whether it is a source of the VOCs.  The fact that

12    perchlorate moves 2.5 times faster through the soil and groundwater has given

13    Whittaker sufficient time to install on-Site remediation systems to prevent the

14    migration of the VOCs to SCVWA's wells.  . ¶ Trowbridge Decl., ¶ 5, Ex. C,

15    Trudell Report; Hokkanen Decl., ¶¶ 14, 16, 25; Declaration of Anthony Daus

16    ("Daus Decl."), ¶ 3-12.

17    Whittaker has been investigating and remediating the contamination at the

18    Site under the supervision of DTSC since 1986.  As part of that remediation it

19    has installed a series of treatment systems to remove VOCs from the soil and

20    groundwater.  These include soil vapor extraction systems for the soil and pump

21    and treat systems for the groundwater.  Daus Decl., ¶¶ 3-5, Ex. 1.

22    DTSC has acknowledged that Whittaker's compliance with its orders has

23    resulted in significant success in removing VOCs from the subsurface of the Site.

24    As a result, DTSC has allowed Whitaker to cease a significant portion of its

25    remediation activities.  Trowbridge Decl., ¶ 19, Ex. Q, Correspondence titled

26    Approval of Remedial Action Completion Report OUs 2 through 6 – Former

27    Whittaker Bermite Facility, from DTSC's Haissam Y. Salloum to Whittaker's

28    Consultant, Hassan Amini dated August 31, 2020; ¶ 16; Ex. N, Correspondence

from DTSC's Javier Hinojosa, dated September 12, 2012, approving Whittaker's completion report pertaining to Whittaker's OU1 RAP.

The data derived from a series of numerous groundwater monitoring wells supports the conclusion that the VOCs have not migrated off-Site. Hokkanen Decl., ¶ 19-30. One of the things that both parties agree on is that although VOCs and perchlorate travel at different speeds, they both take the same migration pathway. Hokkanen Decl., ¶ 22. According to SCVWA's expert, Dr. Mark Trudell, "they are migrating on exactly the same groundwater flow path." Trowbridge Decl., ¶ 5, Ex. C, Trudell Report, at 14-15. Thus, if both VOCs and perchlorate have migrated off site to Saugus 1, Saugus 2, V-201 and V-205, the groundwater monitoring wells between the Site and the groundwater wells should show similar patterns of consistent detections of both perchlorate and VOCs. Yet, they do not. Hokkanen Decl., ¶ 31-47.

For instance, there are three monitoring wells on the western edge of the Site and immediately upgradient of Saugus 1 and 2. Daus Decl. ¶ 9, Hokkanen Decl., ¶ 23, 31-34. These wells consistently show the presence of perchlorate, but not VOCs. Hokkanen Decl., ¶ 31-34. The consistent presence of perchlorate, but not VOCs, supports the conclusion that Whittaker is not the source of any VOCs found in Saugus 1 or 2. Hokkanen Decl., ¶ 34.[6] Further, Dr. Trudell testified that if Whittaker was the source of VOCs that they should have been detected in the CW – a, b, and c wells. Trowbridge Decl. II, ¶ 43, Ex. AL, Trudell Depo., at 231:15-232:2. They are not. Hokkanen Decl., ¶ 40-41.

_____

[6] VOCs have been detected in the wells a small percentage of the time. Their presence is not indicative of a VOC plume moving from Whitaker. The presence of a VOC plume would lead to consistent detections. Hokkanen Decl., ¶¶ 42-43.

DEF. WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH. IN
SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND
HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

Based on the above data, and a complete review of the remaining data, Mr. Hokkanen concluded that Whittaker is not the source of the VOCs found in SCVWA's wells.  Hokkanen Decl., ¶ 30, 34, 41, 48-49.

### 1.    SCVWA's experts and consultants concede there is insufficient evidence to conclude that Whittaker the source of the VOCs in the wells

SCVWA's expert Dr. Trudell concluded that there was insufficient data for him to conclude that Whittaker was the source of the VOCs in V-201 and V-205.  Trowbridge Decl. II, ¶ 43, Ex. AL, Trudell Depo. at 165:8-13; 170:12-171:3.. When asked if he could testify to reasonable degree of scientific certainty that Whittaker was the source of the TCE in V-201 he testified "I would have to say that I'm not sure of that."  *Id.* at 170:12-17.  He gave similar testimony as to V-205. *Id.* at 170:18-171:3.

Dr. Trudell also testified that it was possible Whittaker was not the source of PCE in the Saugus 1.  *Id.* at 219:1-19.  This is consistent with the testimony of SCVWA's consultant B.J. Lechler that there is not sufficient information to conclude that Whittaker is the source of the VOCs in either Saugus 1 or 2. Trowbridge Decl. II, ¶ 45, Ex. AN, Additional Excerpts from the Deposition of B.J. Lechler ("Lechler Depo.") at 45:6-16; 45:23-47:16; 116:24-117:21.  Based on the totality of the existing data, Mr. Lechler admitted that he could not conclude that the contamination at or near Saugus 1 or 2 came from the Whittaker site. *Id.* at 45:23-47:16.

### 2.    There are other sources of VOCs that could have contaminated SCVWA's wells

The mere presence of VOCs in the SCVWA's wells is not proof that they came from the Site.  Both parties' experts and consultants agree that there are other sources of VOCs.  For instance, Dr. Trudell identified significant detections of off Site VOCs which he admits were not associated with the Site.

Trowbridge Decl. II, ¶ 45, Ex. AL, Trudell Depo at 164:5-11; 165:8-13; 170:12-171:3.  These VOCs are within the zone of influence of the extraction system installed at V-201.  The extraction wells would have been drawn into the V-201. Hokkanen Decl., ¶¶ 44-47.

For V-205, the data shows that VOCs were detected in V-205 before perchlorate.  Given that perchlorate travels considerably faster than VOCs, it is impossible for Whittaker to be the source.  Hokkanen Decl., ¶ 45.

For Saugus 1 and 2 Lechler concluded that Whittaker may not be the VOC source and that the source might be releases near the wells that vertically migrated.   Trowbridge Decl., ¶ 46, Ex., AO, Final Updated Groundwater Evaluation (March 2015), at ES-9.  It is Whitaker's expert's opinion that the source of VOCs in Saugus 1 and 2 is the neighboring Saugus Industrial Center ("SIC") property.  Hokkanen Decl., ¶ 50-87.

The presence of other sources is also shown in VOC readings taken at locations in SCVWA's distribution system.  The system is fed by water from the SPTF that is then blended with water from the State Water Project.  Testing is done for VOCs before it leaves the SPTF and after it is blended with the State Water.  *Id.* ¶ 89-90.  It is results at these locations, which are called turnouts, which form the basis of SCVWA's statement that up to 10% of the water they serve is contaminated with VOCs. Trowbridge Decl., ¶ 23 Ex. U, Abercrombie MSJ Decl. at ¶¶ 8-9.

At numerous times the concentrations of VOCs that is found after the blending is too high for the SPTF to be the source.  Hokkanen Decl. ¶¶ 89-92. For instance, in 2012, concentrations of VOCs were detected above the MCLs. SCVWA acknowledged that the SPTF could not be the source, and concluded that the most likely source was Flamingo Dry Cleaners.  Trowbridge Decl., ¶ 47, Ex. AP, Whittaker Interrogatories to Plaintiff, Set 3, at 29; Ex. B; ¶ 48,  Ex. AQ, SCVWA's Amend Resp. to Whittaker's Interrogatories, Set 3 ("Amended Rog

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

Resp., S3).  In a separate incident in October of 2015, SCVWA detected PCE at concentrations in which the SCVWA lab director concluded that "the source of the PCE would not be the Saugus Plant."  Trowbridge Decl., ¶ 49, Ex. AR, October 1, 2015 Correspondence re PCE Detections at SC-1, between SCVWA's Regulatory Affairs Supervisor, Jeff Koelewyn and Senior Engineer Jim Leserman.  In February of 2014, PCE was detected at the turnouts for which the SPTF could not be the source. Trowbridge Decl., ¶ 50, Ex. AS, February 10, 2014 Correspondence re January SPTF Report between SCVWA's Regulatory Affairs Supervisor, Jeff Koelewyn and Senior Engineer Jim Leserman, SCVWA 0044538.

Moreover, internal records that document the percentage of State Water that is blended with effluent from the SPTF show concentrations of VOCs at the turnouts that cannot be the result of VOC contamination coming from the SPTF and which SCVWA's FRCP 30(b)(6) admits may be the result of a release from an unknown source.  Trowbridge Decl. II, ¶ 51, Ex. AT, Additional Excerpts from Alvord 12/12/19 30(b)(6) Depo. at 40:19-41:5, 38:15-41:5.

**B.**    **THE VOC'S DO NOT POSE A RISK TO HUMAN HEALTH OR THE ENVIRONMENT**

**1.**    **The VOCs Are Below The MCLs And Have Been Determined By DTSC To Pose No Environmental Risk**

For a least a decade, SCVWA has regularly and knowingly served water contaminated with VOC below to its customers.  SCVWA considers contamination below the MCLs to be safe to drink and admits that up to 10% of the water delivered to households contains detectable levels of VOCs.  Trowbridge Decl., ¶ 23, Ex. U, Abercrombie MSJ Decl. at ¶¶ 8-9; ¶ 7, Ex. E, Alvord 12/12/19 30(b)(6) Depo. at 19:12-23; ¶ 24, Ex. V, Deposition of Michael Alvord (December 5, 2019)("Alvord Depo.") 30:15-31:14.

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

The Federal Safe Water Drinking Act regulates the level of contaminants that are allowed in drinking water through the creation of MCLs. 42 U.S.C. §§ 300 *et seq*.  The MCL for perchlorate was 6 parts per billion ("ppb") and 5 ppb for VOCs.[7]  Trowbridge Decl., ¶ 20, Ex. R, *MCLs, DLRs, PHGs, for Regulated Drinking Water Contaminants*, California State Water Resources Control Board, last updated August, 21, 2020.  If water contains contaminants below the MCL it is considered safe to drink.  Trowbridge Decl., ¶ 21, Ex. S, EPA Memorandum *Summary of Key Existing EPA CERCLA Policies for Groundwater Restoration*, Environmental Protection Agency, June 26, 2009, at p. 3 ("EPA 209 Memorandum").  The VOCs found in SCVWA's wells have never been above the MCLs.  Trowbridge Decl., ¶ 3, Ex. A, *OU7 RAP* at 2-5, ¶ 2.3.4.[8]  In the required DTSC OU7 RAP, it was agreed that no remediation of VOCs in off-site groundwater is necessary.  Trowbridge Decl., ¶ 8, Ex. F, OU7 RAP Approval. DTSC's determination that there is no need to remediate VOCs is significant since DTSC has the exclusive authority to make that determination.  CAL. HEALTH & SAFETY CODE §25236.

After the installation of the perchlorate treatment systems, the concentrations of perchlorate in extracted well water were reduced to nondetectable and have been and continues to be served by SCVWA to its customers.  Trowbridge Decl., ¶ 6,

---

[7] EPA recently issued a "Final Action" withdrawing the 2011 determination as to perchlorate, finding it does not meet the criteria for regulation as a contaminant under the SWDA.  *Drinking Water: Final Action on Perchlorate*¸ 85 Fed. Register 43990 (July 21, 2020).  The State of California has its own MCL for perchlorate. Trowbridge Decl. ¶ 22, Ex. T.

[8]  For the purposes of this Motion, Whittaker does not dispute that the groundwater prior to perchlorate treatment, was not safe to drink.  However, once the treatment occurred the water was safe even though there may have been VOCs below the MCLs in the water.

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

1    Ex. D, February 97-005 Report, at Executive Summary – II – IV.  SCVWA

2    considers the water safe to drink and has delivered it to its customers.

3       SCVWA has taken a similar position concerning water that is drawn from

4    Well V-201.  Well V-201 is currently being used as a containment well to pump

5    and treat perchlorate contaminated water.  After treatment the water still contains

6    VOCs below the MCLs.  The Department of Drinking Water ("DDW"), for

7    reasons that will be discussed *infra*, has not granted SCVWA an amended permit

8    to distribute the water from V-201 for consumer use.  It thus has to be disposed of

9    in the storm drain, which ultimately discharges to the Santa Clara River.

10    Trowbridge Decl., ¶ 25, Ex. W, *Water Information Sheet, Well V201:· NPDES*

11    *Exceedance,* SCVWA, July 17, 2018.  In press releases issued by SCVWA,

12    concerning the safety of the water after the perchlorate treatment, it has represented

13    that "[t]he water [which contains VOCs] could be served to homes for drinking . . .

14    ." *Id.* While SCVWA neglects to disclose in its brief that the blend water that is

15    required to be blended with the water pumped from V-201 because of other

16    secondary contaminants, Total Dissolved Solids ("TDS") and Sulfates, not

17    VOCS: "To mitigate the levels of TDS and sulfate, SCV Water now blends the

18    well water with additional sources of potable water thereby reducing the

19    concentration of TDS and sulfate to acceptable levels, before discharging to the

20    storm drain." *Id.*

21       SCVWA does not expect that VOC concentrations in its wells will increase

22    to levels above the MCLs.  B.J. Lechler, who has been a project manager and

23    consultant for SCVWA since 2010, testified that he is unaware of any analysis that

24    VOCs in Saugus 1or 2 will ever be above the MCLs.  Trowbridge Decl., ¶ 26, Ex.

25    X, Deposition of B.J. Lechler ("Lechler Depo."), at 15:23-25, 59:15-24.  SCVWA

26    has made similar representations to DDW regarding well V201.  Trowbridge

27    Decl., ¶ 27, Ex. Y, Deposition of Meredith Durant, taken August 4, 2020 ("Durant

28    Depo."), 50:14-24; ¶ 6, Ex. D, February 97-005 Report at 3-9 ("The low-level

DEF. WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH. IN
SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND
HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

detections and stability in TCE and PCE concentrations in Saugus 1 and Saugus 2 and these sentinel monitoring wells suggest that future increase in VOC concentrations in Well V201 are not likely.").

Whittaker's expert engineer Anthony Daus has reviewed the existing data and has opined that the remediation systems installed at the Site have effectively prevented the off-site migration of VOCs to SCVWA's wells.  Trowbridge Decl. II, ¶ 42, Ex. AK, Deposition of Anthony Daus ("Daus Depo"), pp. 174:10-20; 196:18-197:9;  Daus Decl., ¶ 3-12.

While SCVWA's experts may disagree with Mr. Daus regarding whether VOCs have migrated to SCVWA's wells, they do concede that the remedial measures implemented by Whittaker at its Site have significantly reduced the threat of VOC contamination. the In their February, 2020 submission to DDW, SCVWA represented that the remedial work done by Whittaker "suggests that contaminant mass previously present has been removed (or reduced) in several source areas, which is expected to limit potential future increases in contaminant concentrations in groundwater impacted by these source areas."  Trowbridge Decl., ¶ 6, Ex. D February 97-005 Report at p. 3-21.  DTSC agreed with SCVWA and has allowed Whittaker to cease a significant amount of its onsite remedial measures with respect to VOCs.  Trowbridge Decl., ¶ 19, Ex. Q, Correspondence titled Approval of Remedial Action Completion Report OUs 2 through 6 – Former Whittaker Bermite Facility, from DTSC's Haissam Y. Salloum to Whittaker's Consultant, Hassan Amini dated August 31, 2020; ¶ 16, Ex. N, Correspondence from DTSC's Javier Hinojosa, dated September 12, 2012, approving Whittaker's completion report pertaining to Whittaker's OU1 RAP.

## 2.  SCVWA's Failure to Obtain a Permit from DDW for Well V-201 Is Not Related to Any Health Risks from VOCs

Once Whittaker paid for the installation of a treatment system for Well V201 the water was safe to drink; notwithstanding the presence of VOCs below the

MCLs.  Trowbridge Decl., ¶ 6, Ex. E, Alvord 12/12/19 30(b)(6) Depo. at 19:12-23; ¶ 24, Ex. V, Deposition of Michael Alvord (December 5, 2019)("Alvord Depo.") 30:15-31:14.

Contrary to SCVWA's assertions, VOCs are not the reason that the water was declared an extremely impaired aquifer, nor is the failure to treat VOCs the reason that a permit has not been granted.  The declaration of an extremely impaired water source is dependent on the presence of a contaminant in concentrations exceeding multiples of the MCLs.  Trowbridge Decl., ¶ 31, Ex. AC, Revised Guidance for Direct Domestic Use of Extremely Impaired Sources, Revised August 20, 2020, DDW ("97-005 Process Memo"); p. 10.  VOCs have never been above the MCLs.  Trowbridge Decl., ¶ 3, Ex. A, *OU7 RAP* at 2-5, ¶ 2.3.4.   Moreover, in a recent October 2020 internal SCVWA email, Dirk Marks the Director of Water Resources for SCVWA, admitted that regulators have "declined to directly order . . . [SCVWA] to treat for VOC." Trowbridge Decl., ¶ 3, Ex. AI, 10/15/20 V-201 Corres.

The DDW requirements under DDW Policy 97-005 are not based on DDW's determination that SCVWA's well water is unsafe to drink.  According to Mr. O'Keefe, the 97-005 Policy is not a health based standard, but one based on treatability.   Trowbridge Decl., ¶ 29, Ex. AA, O'Keefe Depo. at 10:11-18, 84:8-85:6.  The 97-005 Policy uses an equation called the MCL Equivalent to determine if additional treatment is necessary before the water can be distributed to households.  Trowbridge Decl., ¶ 31, Ex. AC, Process Memo, pp. 13-16;  Mr. O'Keefe testified that the equation "is not intended to be a risk assessment at all . . . It's a treatability assessment."  Trowbridge Decl., ¶ 29, Ex. AA, O'Keefe Depo. at 89:9-20.  This sworn testimony is consistent with the September 2020 DDW *Process Memo 97-005 Users Guide* ("DDW Users Guide").  Trowbridge Decl. II, ¶ 61, Ex. BD.

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

1    Further, under the treatability standard, any further action by SCVWA for

2    VOCs should not be required.  The key determination for determining whether

3    additional treatment is necessary is whether an evaluation, called the MCL

4    Equivalent, is calculated to be below 1.  Trowbridge Decl., ¶ 31, Ex. AC, Process

5    Memo, p. 14.  In determining whether the MCL Equivalent is below 1, DDW does

6    not require any health risk assessment.  Trowbridge Decl., ¶ 29, Ex. AA, O'Keefe

7    Depo, at 89:9-20.  SCVWA has completed the work necessary to determine the

8    MCL Equivalent for V-201.  They have concluded that the MCL Equivalent score

9    for V-201 is below 1.  Trowbridge Decl., ¶ 6, Ex. D February 97-005 Report at

10   Executive Summary – VI.

11   According to the DDW Users Guide, and SCVWA's interpretation of its

12   obligations, no additional treatment for VOCs is necessary if the score is below 1.

13   SCVWA's consultants have submitted many reports to DDW in which they

14   determined the MCL Equivalent.  In each case the number has been below 1.

15   Trowbridge Decl., ¶ 6, Ex. D February 97-005 Report at at 7-1, 7-3.  According to

16   their consultant Meredith Durant, "less than 1 is . . . [a] green light. . . ."

17   Trowbridge Decl., ¶ 27, Ex. Y, Durant Depo at 32:15.  The DDW Users Guide

18   reaches an identical conclusion.  It states that "[t]he MCL equivalent is calculated

19   as the sum of each contaminant in the fully treated water divided by its respective

20   MCL (or NL) and must be less than 1."  Trowbridge Decl. II, ¶ 61, Ex. BD, DDW

21   Users Guide, at 3.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN
SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND
HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

**C.    SCVWA HAS NOT SUBSTANTIALLY COMPLIED WITH VARIOUS
PORTIONS OF THE NCP**

**1.    SCVWA Had At Least A 6 Month Planning Period Before
It Needed To Purchase Replacement Water and Did Not
Comply with the NCP Requirements of a Non-Time Critical
Removal Action**

At the time SCVWA decided to purchase replacement water from the State
Water Project it had significant alternatives within its own system to provide the
needed water.  Trowbridge Decl. II, ¶¶ 52-57, Ex. AU-AZ; 2014-2019 Santa
Clarita Valley Water Report, Ludhorff & Scalmanini, June 2015-June 2020, at
Table 4-1.  There was no reason to act quickly.  The "lost" production capacity
from V-201 and V-205 was a very minor part of the total production could have
been easily replaced.  *See* Trowbridge Decl. II, ¶¶ 52-57, Ex. AU, 2014 Santa
Clarita Valley Water Report, at Tables 4-1; *See* Declaration of Keith
Abercrombie, July 20, 2020, ¶¶ 7, 16, Docket No. 250-2, attached to the
Declaration of Jeff Zelikson. Any alleged need to act quickly is contradicted by
SCVWA's Annual Reports which it prepares and provides to its customers each
year. In its 2014-2019 annual reports, despite V-201 and V-205 wells being out of
service in various years, SCVWA reported to its customers it maintained sufficient
pumping capacity in the Saugus formation to meet the planned normal range[9] of
pumping as described in the 2010 Urban Water Management Plan.  Trowbridge
Decl. II, ¶¶ 52-57, Ex. AU, 2014 Santa Clarita Valley Water Report, at ES6, Ex
AV, 2015 Santa Clarita Valley Water Report, at ES-6; Ex. AW 2016 Santa
Clarita Valley Water Report, at ES-5; Ex. AX 2017 Santa Clarita Valley Water
Report, at ES-5; Ex. AY 2018 Santa Clarita Valley Water Report, at ES-5, Ex. AZ

---

[9] To comply with its Urban Water Management Plans and to ensure the Saugus
Aquifer remains sustainable, as groundwater elevations are generally decreasing.

1  2019 Santa Clarita Valley Water Report, at ES-2.  It also stated that it had vast

2  reserves of "banked" water available to provide to its customers in the event of a

3  dry year or an emergency.  *Id.* at Tables 4-1.

4      The reported lost production from V-201, and V-205 according to Mr.

5  Abercrombie is just 214 acre feet ("af") per year, and 774 af per year, which

6  amounts to less than 1.5% of the total annual production of water to its customers

7  in a given year. Trowbridge Decl. II, ¶¶ 52-57, Ex. AU-AZ, 2014 Santa Clarita

8  Valley Water Report, at Table 4-1; Declaration of Keith Abercrombie, July 20,

9  2020, ¶¶ 7, 16, Docket No. 250-2, attached to the Declaration of Jeff Zelikson

10  ("Abercrombie 7/20 Decl.").

11      SCVWA repeatedly reported to its customers that pumping from the Saugus

12  formation was within the normal range as projected by its Urban Water

13  Management Plans, and that if it were necessary, SCVWA could pump more than

14  3 times that production from the Saugus formation alone to account for dry years.

15  Trowbridge Decl. II, ¶¶ 52-57, Ex. AU-AZ, 2014 Santa Clarita Valley Water

16  Report, at Tables 3-1.

17      Further, it is clear from the statements SCVWA make in its annual reports to

18  its customers wherein it reported that it had capacity to pump a the planned normal

19  amount of groundwater from the Saugus formation in the years it contends it lost

20  production from V-201 and V-205, and that it could have pumped three times more

21  had it been necessitated by a "dry year" or other emergency.  *See* Trowbridge Decl.

22  II, ¶¶ 52-57, Ex. AU, 2014 Santa Clarita Valley Water Report, at ES6, Ex AV,

23  2015 Santa Clarita Valley Water Report, at ES-6; Ex. AW, 2016 Santa Clarita

24  Valley Water Report, at ES-5; Ex. AX, 2017 Santa Clarita Valley Water Report, at

25  ES-5; Ex. AY, 2018 Santa Clarita Valley Water Report, at ES-5, Ex. AZ, 2019

26  Santa Clarita Valley Water Report, at ES-2.  In a non-time critical removal action,

27  a party may be required to perform or prepare  (1) a removal site evaluation (40

28  CFR§§300.410, 300.700(b)(5)(v)), (2) the need to provide public participation

after 120 days (*Id.* at §§300.410(n)(3), 300.700(b)(5)(v)), (3) an engineering evaluation/cost analysis (EE/CA) or its equivalent, which is an analysis of removal alternatives for a site (*Id.* at §300.415(a)(4) and (4) the requirement that costs be properly documented. 40 CFR §§ 300.160, 300.700(n)(ii).

SCVWA concedes that it did not prepare a removal site evaluation, an EC/CA or to provide public participation even though the removal activity has been ongoing for more than 120 days; although it's NCP expert argues that they were not necessary.  Trowbridge Declaration ¶ 60, Ex. BC, Deposition of Jeffrey Zelikson ("Zelikson Depo."), at 187:3-7, 197:25-198:25, SCVWA Motion, at p. at 26, fn 12.  Although SCVWA contends its removal action began in 2012, it still has not completed an EE/CA.  The failure to prepare either of these documents, especially the EE/CA prevented SCVWA from making the analysis as to whether the purchase of additional water was necessary.

SCVWA also contends that they conducted extensive public participation through numerous general public meetings with the SCVWA board.  Declaration of Keith Abercrombie, Nov. 30, 2020, Docket 250-6, ¶ 10.  But what is missing is any mention that the public was invited to comment about any of the issues relevant to the how the water lost would be replaced.  Nor is there any mention of involving other entities which Zelikson admits were affected parties.  These include SIC, other potential sources of contamination such as dry cleaners. Trowbridge Declaration ¶ 60, Ex. BC, Zelikson Depo., at 182:4-10.

Further, the Reports which SCVWA notified its customers make no mention of the need to purchase additional water from the State Water Project.  Instead they discuss the excess water that is available to SVCWA.  *See* Trowbridge Decl. II, ¶¶ 52-57, Ex. AU, 2014 Santa Clarita Valley Water Report, at ES6, Ex AV, 2015 Santa Clarita Valley Water Report, at ES-6; Ex. AW 2016 Santa Clarita Valley Water Report, at ES-5; Ex. AX, 2017 Santa Clarita Valley Water Report, at ES-5; Ex. AY, 2018 Santa Clarita Valley Water Report, at ES-5, Ex. AZ, 2019 Santa

1   Clarita Valley Water Report, at ES-2,  The reports further make clear that SCVWA
2   made no effort to inform the public regarding its alleged "time-critical removal
3   actions," and in fact suggested, that due to the vast amounts of water "banked" in
4   reserve, there was no danger whatsoever to the household water supply of its
5   customers.  Trowbridge Decl. II, ¶¶ 52-57, Ex. AU-AZ, 2014-2019 Santa Clarita
6   Valley Water Reports, at Tables 4-1.
7           Nor has been there any proper documentation. The substantial majority of
8   the alleged present costs incurred by SCVWA, approximately, $6.5 million, relate
9   to SCVWA's claim that they expended that sum to purchase replacement water as
10  a result of their inability to use their groundwater wells. Trowbridge Decl. II, ¶ 58,
11  Ex. BA, SCVWA's Fourth Amended Initial Disclosures, served on August 28,
12  2020, at Computation of Damages.  The sole basis for the claim is a declaration of
13  Keith Abercrombie, who is the Chief Operating Officer for SCVWA.  SCVWA
14  has taken the position that Mr. Abercrombie is not an expert in this case.
15  Trowbridge Decl. II, ¶ 59, Ex. BB, Correspondence from SCVWA's counsel Tara
16  Paul, dated October 5, 2020.  The declaration provides no back up documents to
17  support the conclusion.  *See* Abercrombie 7/20 Decl., Docket No. 250-2.
18          Based on the declaration, SCVWA's NCP expert, Jeffrey Zelikson,
19  concluded that these costs were properly documented for NCP purposes.  In his
20  deposition Mr. Zelikson conceded that:

21      • The numbers supplied in the Abercrombie Declaration were only
22        estimates and Mr. Zelikson is unaware if the number can be off by as
23        much as 50%.  Trowbridge Decl. II ¶ 60, Ex. BC, Zelikson Depo., at
24        123:15-126:10.
25      • Mr. Zelikson does not know whether the equation used in the
26        declaration was appropriate or accurate and that he did not do
27        anything to verify its accuracy.  *Id.* at 126:19-129:12.

28

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

- Mr. Zelikson did not review any of the backup documents that supported Mr. Abercrombie's conclusions. *Id.*

This does not satisfy the requirements of the NCP.

## 2. SCVWA Did Not Comply with the NCP Requirements of a Time Critical Removal Action

While there are numerous provisions of the NCP that apply to a private parties attempt to recover response costs under CERCLA, only three are relevant to this motion. These are (1) the preparation of a removal site evaluation (40 CFR§§300.410, 300.700(b)(5)(v)), (2) the need to provide public participation after 120 days (40 CFR§§300.410(n)(3), 300.700(b)(5)(v)) and (3) the requirement that costs be properly documented. 40 CFR §§ 300.160, 300.700(n)(ii).

As discussed above, there requirements were not satisfied.

## IV. WHITTITAKER'S PARTIAL SUMMARY JUDGMENT MOTION

### A. SCVWA Did Not Substantially Comply With The NCP

Whether SCVWA has substantially complied with the NCP is a question of both law and fact. *La.-Pac. Corp. v. ASARCA Inc.*, 24 F.3d 1565, 1576 (9th Cir. 1994). Once the factual details regarding SCVWA's conduct been established, "the court decides—as a matter of law—whether those efforts substantially comply with the NCP." *Id.*; *PMC, Inc. v. Sherwin–Williams Co.*, 1997 WL 223060, at *9 (N.D.Ill. Apr.29, 1997) (rejecting expert opinion regarding whether actions substantially complied with public participation requirement because this "is a question of law"), *vacated in part on other grounds*, 151 F.3d 610 (7th Cir.1998).

Mr. Zelikson's opinion that there has been substantial compliance with the NCP is irrelevant and has been previously struck in other actions. *Aviall Services, Inc. v. Cooper Industries, L.L.C.*, 572 F. Supp. 2d 673, 695 (N.D. Tx.

DEF. WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH. IN
SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND
HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

2008).  The Court did find that expert opinion is not entirely irrelevant.  It may assist the trier of fact in establishing the relevant facts.  *Id.*

### 1.    SCVWA's Replacement Water Determination Was a Non-Time Critical Removal Action

The determination as to whether a removal action is time critical centers on whether there was 6 months available for planning.  There was no reason why SCVWA had to immediately purchase water from the State Water Project.  The water could have easily been replaced by an increase in production from other wells in the SCVWA system.  Trowbridge Decl. II, ¶¶ 52-57, Ex. AU, 2014 Santa Clarita Valley Water Report, at ES6, Ex. AV, 2015 Santa Clarita Valley Water Report, at ES-6, Table 3-1; Ex. AW 2016 Santa Clarita Valley Water Report, at ES-5, Table 3-1; Ex. AX 2017 Santa Clarita Valley Water Report, at ES-5, Table 3-1; Ex. AY 2018 Santa Clarita Valley Water Report, at ES-5, Table 3-1, Ex. AZ 2019 Santa Clarita Valley Water Report, at ES-2, Table 3-1.  The pumping was not at capacity.  *Id.*  Nor was there any reason as to why SCVWA could not have used some its plentiful reserves.  *Id. at* Tables 4-1.

Whether Zelikson believes that a time critical removal action is the proper standard is a legal determination that is left to the court.[10]

### 2.    The Failure to Complete a Removal Site Evaluation and Public Participation Requirements Constitutes Lack of Substantial NCP Compliance.

There is no dispute that SCVWA failed to prepare a removal site evaluation.  Trowbridge Decl. II, ¶ 60, Exh. BC, Zelikson Depo., at 187:3-7,

---

[10] SCVWA's assertion that Whittaker's expert concluded that a time critical removal action is the proper standard is also irrelevant.  Moreover, he never reached such a conclusion nor does the deposition excerpt cited by SCVWA support the conclusion.  Gee Decl., Ex. N, at 51:7-52:23, 145:25-146:20.

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

197:25-198:25.  In interrogatory responses asking for facts supporting SCVWA's contention that they complied with the NCP, SCVWA referred Whittaker to the Report of Mr. Zelikson as the sole location in which the facts and documents would exist. Trowbridge Decl. II, Ex. AQ SCVWA's Amended Responses, dated August 9, 2020, to Whittaker's Interrogatories, Set Three ("Amended Interog."), at Interog. 27, at pp. 6-7.

Mr. Zelikson's Report makes no mention of a removal site evaluation. Zelikson Declaration, Docket No. 250-2, p. 8-84, Expert Report of Jeffrey Zelikson, August 3, 2020.  Nor does Mr. Zelikson explain why an evaluation was not performed other than to state that as an expert, it is his obligation to make that determination.  When asked to support his opinion that a removal site evaluation was not necessary, he stated that "the job of the expert here is to decide what is or what isn't applicable, and I decided that this one isn't and I think it's obvious why it's not."  Trowbridge Decl. II, ¶ 60, Exh. BC, Zelikson Depo., at 189:16-190:3.  Ultimately, Mr. Zelikson's opinion comes down to his conclusion that the removal site evaluation was unnecessary since, in his opinion, it would have changed anything.  *Id.* at 187:3-190:3, 197:25-198:14

Ignoring the arrogance of his position, it is legally incorrect.  Whether SCVWA substantially complied with the NCP is a legal question.  An argument that compliance with the NCP would not have affected the outcome is also not a basis for not complying with the NCP.  *Aviall Service*, 572 F. Supp. 2d at 696.  In *Aviall Services* plaintiff attempted to argue that its failures to comply with the NCP's public participation requirements were excused since "additional participation would not have changed anything."  *Id.*  The argument was summarily rejected, with the Court finding that even if it would not have changed anything that did not constitute a legal justification for non-compliance with the NCP public participation requirements.  "Hindsight" was not a legally sufficient excuse.  *Id.*

1    SCVWA's failure to prepare a removal site evaluation requires that

2  summary judgment be granted.  *City of Rialto*, 2007 WL at *8-10; City *of Colton*,

3  2006 WL at *5.

3.    **The Failure to Properly Document The Costs Supporting**
      **The Alleged Replacement or Blending Water Costs**
      **Constitutes Lack of Substantial NCP Compliance**

7    SCVWA did not provide Mr. Zelikson any of the documents supporting its

8  claim for reimbursement for approximately $6.5 million in replacement water.

9  Whether these documents exist elsewhere is irrelevant since SCVWA stated in

10  their interrogatory responses that they were relying solely on the documents in Mr.

11  Zelikson's Report.  Trowbridge Decl. II, Ex. AQ, SCVWA's Amended Responses

12  to Interrogatories, Set 3, Propounded by Whittaker, at Interog. 27, p. 6-7.  Mr.

13  Zelikson did not review any of the backup documents that purportedly supported

14  Mr. Abercrombie's conclusions.  Zelikson Depo., at 126:19-129:12.  He relied

15  solely on Mr. Abercrombie's declaration to form his opinion that SCVWA's

16  replacement water costs were recoverable under the NCP.  Mr. Zelikson does not

17  know whether the equation used in the declaration was appropriate or accurate and

18  he did not do anything to verify its accuracy.  *Id.*  In sworn testimony, he admitted

19  that he could not testify the numbers are accurate.  He concedes that the

20  conclusions in the declaration were only estimates and could be off by as much as

21  50 percent.  Trowbridge Decl. II, ¶ 60, Exh. BC, Zelikson Depo. at 123:15-

22  126:10.

23    In order to recover the costs for replacement water, 40 C.F.R. section

24  300.160 requires documentation sufficient to persuade the court that the costs have

25  been proven by a preponderance of the evidence.  *Roosevelt Irrigation*, 2017 WL

26  at *11.  Vague estimates, based on documentation that wasn't seen and equations

27  that are not known to be accurate, are insufficient to meet SCVWA's burden to

28  demonstrate it has substantially complied with the NCP.

**B.     THERE WAS NO NECESSITY TO REMEDIATE VOCs THAT HAVE MIGRATED OFF THE WHITTAKER PROPERTY**

There is no proof that the VOC's detected off the Whittaker site ever presented a threat to public health or the environment.  Regardless of who the source, DTSC is not requiring any remediation of the VOCs offsite. DTSC Letter dated December 2, 2014 (revised December 17, 2014).  The VOC concentrations were never above their respective MCL's. SCVWA has been providing water containing the VOCs to households for years.  Trowbridge Decl. ¶ 7, Ex. E, Alvord 12/19 30(b)(6) Depo. At 19:12-23; Alvord Depo.  At 30:15-31:14.  SCVWA has admitted in public statements that the water is safe.  Trowbridge Decl. ¶ 25, Ex. W.

SCVWA relies solely on the actions of the DDW to establish the threat from the VOCs.  However, the DDW has never concluded that the VOCs have made the water unsafe to drink.  The referenced standard used by the DDW is not based on the threat to public health, but the treatability of contaminants.  Trowbridge Decl. ¶ 25, Ex. W, O'Keefe Depo. at 10:11-18, 84:8-85:6.  Moreover, according to DDW's MCL Equivalency standard, and SCVWA's own calculations, there is no need for any further action to treat VOCs.  Trowbridge Decl. ¶ 27, Ex. Y, Durant Depo at 32:15-16; Trowbridge Decl. II ¶ BD, DDW Users Guide, at 3.

SCVWA has not disclosed any expert that can testify as to the health threat that may be presented by the VOCs at issue in this suit.  SCVWA has not identified any witness or expert that is qualified to testify that the VOC's at issue present a danger to human health.  In combination with DTSC's determination that the VOCs in off-site groundwater need not be remediated, there is no proof at all of any threat.  In the end, all that SCVWA can show is that VOC's below the MCLs are present in the groundwater, without even being able to identify their source.  That is not sufficient to satisfy the requirements of CERCLA.  *City of Colton*, 2006 WL at *5.

1      In order for the supplying of an alternative water source to be a recoverable

2 removal cost, SCVWA must prove more than just that it supplied the water.  It

3 must also show that was "necessary immediately to reduce exposure to

4 contaminated household water . . . ." 40 CFR § 300.415e(9).  Once the perchlorate

5 was removed from the water, the necessity to supply alternative water ceased.

6      As discussed above, the VOCs in the water did not present any health risk.

7 Even if SCVWA was precluded from serving the water due to the actions of DDW,

8 any additional DDW requirements do not render SCVWA's costs NCP compliant,

9 as CERCLA was not meant to be a complete remedy for all ills caused by

10 contamination.  *County Line*, 933 F.2d at 1517.  At worst, SCVWA only harm is

11 economic as they claim they were forced to buy more expensive water.

### C.    THE CLAIMED COSTS ARE NOT RECOVERABLE

The claimed costs are not recoverable.

- For the blending water there is no evidence of any proper removal site evaluation, public participation nor documentation.
- For the replacement water there is no evidence of a necessity, any proper removal site evaluation, an EE/CA. public participation nor documentation.
- For technical reports, etc., there is no evidence of a necessity, any proper removal site evaluation, an EE/CA, public participation nor documentation.

## V.    WHITTAKER'S OPPOSITION TO SCVWA PARTIAL SUMMARY JUDGMENT

### A.    A MATERIAL DISPUTE EXISTS AS TO WHETHER WHITTAKER IS THE SOURCE OF THE VOCs FOUND IN SCVWA'S WELLS

The fact pattern in *Castaic Lake* which forms the backbone of SCVWA's

summary judgment motion is different from the one here.  In *Castaic Lake* the

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN
SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND
HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

Court assumed that the pathway that the perchlorate took to SCVWA's wells was via surface runoff. *Id.* at 1067. The alleged pathway for VOCs is demonstratively different -via migration from the surface to the groundwater and then through groundwater to the wells. Trowbridge Decl., ¶ 4, Ex. B, TAC, ¶¶ 18-19.

More critical, in *Castaic Lake* Whittaker did not produce any expert testimony that it was not the source of the perchlorate. The expert testimony was that the source could not be identified. *Castaic Lake*, 272 F. Supp. at 1068. In this case, Whittaker's expert Gary Hokkanen and Anthony Daus have opined and testified that Whittaker is not the source of the VOCs. Hokkanen Decl., ¶¶ 26, 30, 34, 39, 42, 43, 45, Daus Decl., ¶ ¶ 3-12. Possible other sources of VOCs that explain the detections in SCVWA's wells have also been identified. Hokkanen Decl., ¶¶ 46-94.

This is sufficient to satisfy Whittaker's burden and defeat summary judgment. *Schaeffer v. Gregory Village Partners, L.P.*, 105 F.Supp.3d 951, 968, 969 (N.D.Cal. 2015). In *Schaeffer*, plaintiffs, homeowners who had PCE contamination on their property, sued defendants, including the owner of a strip mall that had housed a dry cleaning business that released PCE into the soil and groundwater.., 105 F.Supp.3d *at* 956. Plaintiffs also sued Chevron because it owned a property just south of the strip mall that formerly housed operations that used PCE. *Id*. at 958.

Upon plaintiffs' motion for summary judgment, the court found that plaintiffs had identified ample evidence showing the contamination at their home could be derived from the former dry cleaning operations at the strip mall. *Id*. at 964. However, the motion was denied since defendant raised a genuine dispute as to whether PCE from its property was the source of the contamination at plaintiffs' home. *Id*. Leaky USTs and the dry cleaning operation at the Chevron property were alternative sources of the contamination. *Id*. A sanitary sewer that ran by plaintiff's property was also a potential source. Further, plaintiff could not

DEF. WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH. IN
SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND
HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

"indisputably connect" the contamination at their home to the PCE coming from the strip mall, as a map showed a break in contamination levels between the strip mall and their residence. *Id.* The defendant strip mall's expert opined that the source of PCE at the residence could not be determined, but the likeliest source was the sanitary sewer. *Id.*

## VI. PLAINTIFF FAILS TO CARRY ITS BURDEN TO DEMONSTRATE IT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S AFFIRMATIVE DEFENSES

This Court frequently applies the "fair notice" pleading standard, not the heightened standard articulated in *Bell Atlanntaic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal. Shumacher v. Georgia-Pacific Corrugated LLC*, 2019 WL 8013092 (C.D. Cal. 2019). "Because affirmative defenses need not be pled in great detail, "motions to strike affrirmative defenses are largely a waste of time unless prejudice can be shown." *Id.* at *2.

Just as the Court has found on several occasions, the Court should deny Plaintiff's motion, even if some of the defenses are not technically "affirmative defenses," as the presence of these assertions in the answer do not prejudice Plaintiff. The motion to strike these defenses does nothing to streamline the litigation or eliminate spurious issues from consideration. *Shumacher v. Georgia Pacific Corrugated LLC,* 2019 WL 801392 *1 (C.D. Cal. 2019).

In its two page motion to strike Whittaker's affirmative defenses, SCVWA does not even mention prejudice. In this action, fact and expert discovery deadlines have passed, and SCVWA cannot identify any prejudice resulting from the existence of the affirmative defenses in Whittaker's answer and counterclaim. Moreover, Plaintiff's Motion relies on a single improperly propounded interrogatory, and completely ignores the factual allegations in Whittaker's Amended Answer to Plaintiff's Third Amended Complaint and Counter-Claim.

*See* Docket No. 116, pp. 22-27, and other discovery responses which pertain to the same issues.  Trowbridge Decl., ¶ Ex. BE, Whittaker's Supplemental Responses to Plaintiff's Interrogatories, Set One.

Plaintiff made almost zero effort to comply with rule 7-3 with respect to its motion for summary judgment as to Whittaker's Third Amended Complaint, and simply asserts, while attempting to mislead this Court by failing to disclose the extensive factual basis underlying Whittaker's affirmative defenses.  Plaintiff simply asserted to Whittaker that a list of defenses were not factually supported, while ignoring extensive factual allegations disclosed in fact discovery and expert discovery.

As it failed to actually address its position as to the affirmative defenses in its moving papers, Plaintiff offers a single interrogatory response, to which Whittaker served proper objections.  Just as Plaintiff failed to describe the substance and support for its motion with Whittaker prior to filing the motion, Plaintiff's motion identifies individual examples of affirmative defenses while simply asserts in a footnote that 17 of Whittaker's defenses are improper.  Plaintiff has completely failed to carry its burden to demonstrate there is no genuine dispute of as to any material fact supporting these affirmative defenses.  Trowbridge Decl. ¶ 64-72.

Plaintiff further fails to include in its actual motion that Whittaker agreed to dismiss several of the alleged improper affirmative defenses if Plaintiff was willing to agree it would not attempt to assert that Whittaker had waived certain arguments in its defense at trial.  While Plaintiff verbally agreed, it subsequently changed course and unnecessarily included it in this motion.  Whittaker further agreed to dismiss the affirmative defense based on the business judgment rule, and is unclear why Plaintiff decided to waste the Courts time by including it in its motion.

As to assumption of the risk, the one example Plaintiff provides, Plaintiff refers to a single to further mislead the Court that Whittaker's assumption of the

32

risk defense was limited to a contractual release.  Nonetheless, Plaintiff fails to note that it has indeed assumed several risks by contract, as evidenced by the 2007 and 2015 settlement agreements.  However, despite Plaintiff's partial presentation to the Court, assumption of the risk is a much broader legal concept.  Assumption of the risk may be implied, and the elements of the defense include a person's knowledge and appreciation of the danger involved and his voluntary acceptance of the risk.

Here, Whittaker contends Plaintiff assumed the risk by drilling groundwater wells where it did, when it was aware of existing contamination.  One of Plaintiff's person's most knowledgeable, Richard Slade, who was also a consultant retained to help devise a plan for drilling new wells in the region, noted the prevalence of possible leaky underground fuel tanks, PCE contamination coming from dry cleaners and other volatile organic compounds.  He also noted the ease with which the shallower alluvium formation, overlying the Saugus formation, where the wells at issue in this case are located, could be and had been easily contaminated, and that he assumed the Alluvium and Saugus were connected (or "communicated" hydraulically).   A true and correct copy of Mr. Slade's Deposition is attached hereto as **Exhibit BG**, Slade, 64:11-68:17; 85:12-85:24; 87:9-89:11.  Mr. Slade further testified as to the "'inherent risks in the construction of new wells in this entire region due to the possibility of encountering' contamination in the groundwater relating to petroleum occurrences, prior industrial and/or manufacturing facilities, or natural conditions such as the presence of hydrogen sulfide iron, or magnesium."  *Id.* at 91:8-22.

As to waiver, Whittaker contends it Plaintiff has waived its claims pertaining to Well V-201 as part of the 2015 V-201 Well Treatment Agreement.  Whittaker MSJ, pp. 32:1-33:8, Docket No. 253.  Whittaker also argued Plaintiff had not met the conditions precedent under the agreement in order to pursue litigation with

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS

respect to Well V-201.  Whittaker contended Plaintiff waived its claims as to Well Q2, which was the subject of an earlier motion filed by Whittaker.

## VII.    **CONCLUSION**

For the above stated reasons Whittaker's cross- motion should be granted, and Plaintiff's Motion for Partial Summary Judgment should be denied.


Date:    December 14, 2020          BASSI, EDLIN, HUIE & BLUM LLP

By:    */s/Michael E. Gallagher*
        MICHAEL E. GALLAGHER
        Attorneys for Defendant and Third-Party
        Plaintiff WHITTAKER CORPORATION

DEF.  WHITTAKER NTC OF MTN AND MEM. OF PTS. & AUTH.  IN SUPPORT OF ITS CROSS PARTAL MSJ ON PLF. SCVWA'S CERCLA AND HSAA CLAIMS AND OPP. TO PLF. MSJ ON CERCLA AND HSAA CLAIMS