NOSSAMAN LLP
FREDERIC A. FUDACZ (SBN 50546)
ffudacz@nossaman.com
BYRON GEE (SBN 190919)
bgee@nossaman.com
PATRICK J. RICHARD (SBN 131046)
prichard@nossaman.com
RAVEN McGUANE (SBN 336505)
rmcguane@nossaman.com
777 S. Figueroa Street, 34th Floor
Los Angeles, CA 90017
Telephone:  213.612.7800
Facsimile:    213.612.7801

Attorneys for Plaintiff SANTA CLARITA VALLEY
WATER AGENCY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTA CLARITA VALLEY WATER AGENCY,<br><br>Plaintiff,<br><br>vs.<br><br>WHITTAKER CORPORATION and DOES 1-10, Inclusive,<br><br>Defendant.<br><br>AND RELATED CASES | Case No:  2:18-cv-6825 SB (RAOx)<br><br>*Assigned to Hon. Stanley Blumenfeld, Jr.*<br><br>**PLAINTIFF'S MOTION IN LIMINE NO. 2 TO EXCLUDE DAUS OPINIONS 1, 4 AND 5**<br><br>Date Action Filed:<br>Trial Date:  August 24, 2021 |

## I.    INTRODUCTION.

Mr. Daus' expert report suggests that the VOC contamination from the Whittaker Bermite site is contained and is no longer threat to Plaintiff's Water Supply wells.  His report, however, is irrelevant because it fails to address the obvious fact that Whittaker released massive quantities of VOCs to the soil and groundwater that significant amounts of VOCs[1] have already left the site and Whittaker has not characterized the offsite groundwater plume and should be excluded under FRE 402.  His opinion is also irrelevant because DTSC has not determined that Whittaker's groundwater remedy is complete and likely will not be able to do so for several decades.  In addition, Mr. Daus' methodology for determining that VOC contamination no longer flows off site toward Plaintiff's water production wells because he sheepishly admits that he did omitted groundwater extraction from his groundwater flow model - an essential element in groundwater flow dynamics.  Finally, Mr. Daus' opinion that onsite groundwater extraction remedy contains contamination from leaving the site depends on his flawed groundwater flow methodology and should also be excluded based on his failure to consider that offsite groundwater extraction wells draw VOC contamination away from the site.

Mr. Daus' opinion first opinion is (1) flawed because Mr. Daus does not provide a professional standard for "satisfaction" and  (2) not reflective of Whittaker's entire history (from its 1987 site closure) with DTSC which elongated a cleanup that should have taken a few years has been to over 30 years because of Whittaker's failure to comply with DTSC directives.  During the decades that

---

[1] According to Whittaker consultant CDM Smith, at least 263,000 pounds of VOCs were found in the soil at the site.  Gee Decl. ISO Mtns. Ex. C at 21-22 (Stanin Expert Report). The massive releases also impacted groundwater, though DTSC has not required Whittaker to estimate the volume of VOCs released to the groundwater.

Whittaker resisted DTSC directives, contamination from the site continued to spread to offsite wells. In addition, DTSC site mitigation managers that oversaw the activities at Whittaker will provide testimony, so any testimony by Mr. Daus regarding DTSC's oversight of the Whittaker site would be excessively cumulative and less reliable than DTSC percipient witness testimony regarding the same subject matter.

Mr. Daus' opinions 4 and 5 suffer the same methodology flaws as Mr. Hokkanen's opinion 4 because Mr. Daus' groundwater flow opinion fails to consider the impact of groundwater pumping which he admits should have been considered, resulting a contrary groundwater flow conclusion that is inconsistent with Whittaker's own consultants, including GSI, the firm that employs Mr. Daus. The following Daus opinions should be excluded:

> **Opinion 1:** The Site investigation and remedial measures implemented by Whittaker have been performed under the direct supervision of the DTSC and to the DTSC's satisfaction.
> **Opinion 4:** The VOC plume in OU-3 and OU-4 has been sufficiently delineated to implement the approved groundwater remedy.
> **Opinion 5:** The groundwater extraction system is providing containment of the VOC plume in S-IIIa in OU-3 and OU-4.

## II.    STANDARDS FOR EXCLUSION OF EXPERT TESTIMONY

*As set forth in the FRE 702 Advisory notes, the 2000 Amendment "affirms* the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony. Among the factors that, the courts consider are:

- "Whether the expert has adequately accounted for obvious alternative explanations. *See Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition), and
- "Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). *See Kumho*

*Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1176 (1999) (*Daubert* requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field")."

- In addition, Mr. Daus' testimony regarding the satisfaction of DTSC with Whittaker's actions is opinion testimony that is better provided by DTSC. The project managers for DTSC will be trial witnesses. *See United States v. Fletcher* 47 F.3d 1176(9th Cir 1995, as amended on denial of rehearing (July 13, 1995).

## III.    ANALYSIS

### A.    Mr. Daus' Opinion Regarding DTSC's Satisfaction with Whittaker's efforts is incomplete and misleading

#### 1.    Mr. Daus does not work for DTSC and his testimony will be cumulative with DTSC witnesses that are designated to testify on its oversight of Whittaker's cleanup activities.

Mr. Daus does not articulate a professional standard for "DTSC Satisfaction" nor does he have any work experience related to "DTSC Satisfaction" – he does not and has not worked for DTSC.  *See* Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995)(The court should consider hether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying). In addition, Mr. Daus suggests that DTSC is satisfied with Whittaker's soil cleanup activities because DTSC deemed Whittaker's soil remediation activities as complete.  DTSC has not deemed the groundwater cleanup beneath the Whittaker site or offsite groundwater near the Whittaker site to be complete.

In addition, Mr. Daus' Opinion 1 testimony should be excluded because it is unduly cumulative of deposition testimony provided by DTSC's Jose Diaz (DTSC Project Manager for the Whittaker site) and Hassan Amini (Whittaker's project manager and Daus' colleague).  *See United States v. Fletcher* 47 F.3d 1176 (9th Cir 1995, as amended on denial of rehearing (July 13, 1995)(Expert witness testimony by Altona would have been cumulative because AmTel's own attorney . . . testified

- 3 -

Case No. 2:18-cv-6825 SB (RAOx)

1  at length regarding AmTel's attempt to comply with California telemarketing

2  registration statutes).

3       **2.    Mr. Daus did not consider the impact of Whittaker's refusal to comply with DTSC orders and directives on the spread of Groundwater Contamination.**

4

5       Had Whittaker complied with DTSC directives at the time it shut down in

6  1987 (Gee Decl. ISO Mtns. Ex. D at 3.2 (Daus Expert Report)), the necessary

7  cleanup equipment could have installed within 6 years (according to Whittaker'

8  2004 public participation plan, the completion of work was anticipated to take

9  approximately six years; see table 1 of

10  https://www.envirostor.dtsc.ca.gov/public/deliverable_documents/6284116983/Wh

11  ittaker%20Public%20Participation%20Plan.pdf).  Groundwater extraction at the

12  site would have commenced in 1993, some 25 years before the 2018 start date

13  reported by Mr. Daus in his first opinion.  Groundwater cleanups are often

14  estimated to take approximately 30 years to complete and would be nearly

15  completed by now had Whittaker commenced cleanup activities at the time of

16  plant closure.  Instead, despite warnings from its environmental consultant,

17  Whittaker chose to simply "remove the main large material and drums… and then

18  fill those holes back in and leave the landfill as is."  See Gee Decl. ISO Mtns. Ex.

19  S (Thompson Memo).  Whittaker's plan to hide contamination allowed

20  groundwater contamination to spread to impact multiple SCV Water wells.

21       Ultimately, DTSC commenced a criminal investigation against Whittaker for

22  its clandestine disposal activities.  See Gee Decl. ISO Mtns. Ex. W (Long Letter).

23  Mr. Daus should have known of the criminal investigation because his long-time

24  colleague, Hassan Amini was cited prominently in DTSC's request to the

25  California Attorney General assistance to prosecute Whittaker for its unlawful

26  disposal practices.  Gee Decl. ISO Mtns. Ex. K at 232:8-233:24 (Daus Depo.

27  Excerpts).  Mr. Amini was previously employed by a developer to evaluate the

28  Whittaker site. He provided testimony that Whittaker's Vice President became

angry with him when he disclosed that a site buried by Whittaker's consultants was a large RCRA unit.  See Gee Decl. ISO Mtns. Ex. W at 12 (Long Letter).

**B. Daus' Opinion 4 regarding OU-3 and OU-4 delineation is also flawed because he does not explain the contrary evidence by Whittaker's own consultants and omits the influence of groundwater pumping in his analysis.**

Mr. Daus' opinion 4 is based on the same unreliable "Hokkanen Maginot wall" theory that VOCs do not leave the site because three monitoring wells on the western boundary of the site have infrequent VOC detections.  *See* Hokkanen Daubert motion for Opinion 4.[2]  However, unlike Mr. Hokkanen who turns a blind eye toward Whittaker's own consultant analysis, Mr. Daus methodology to determine groundwater flow is flawed by his own admission.

Mr. Daus' conclusions regarding flow through the Hokkanen Maginot wall is flawed because he failed  to consider the impact of the operation of SCV Water groundwater production wells on groundwater flow from the Whittaker site, which he admitted influences groundwater flow direction:

> Q: Okay. And so in your opinion, how do hydrogeologists go about determining groundwater flow direction?
> A: I think we use groundwater elevation data, and we may tie that into surface water elevation data, and other surface water data. So they're -- they're connected. Surface water and groundwater are often connected. So we look at the -- at the -- at the body of information regarding groundwater elevation and surface water elevation.

[2] Like Mr. Hokkanen, Mr. Daus' flow diagrams conflicted with Whittaker's consultant, AECOM.  When asked about the AECOM flow diagram, Mr. Daus indicated that he considered the diagrams, but could not explain the conflict between AECOM and his analysis. Mr. Daus' flow diagrams also contradict that of his GSI colleagues, Mr. Hassan Amini and Dr. Panday Sorab, who in February 26, 2019 made a PowerPoint presentation to SCV Water that shows groundwater flow in the directions north and south of the Hokkanen Maginot wall. See Gee Decl. ISO Mtns. Ex. X at 12, 15 (Powerpoint Presentation).  This presentation was made by, among others, Mr. Hassan Amini and Dr. Panday Sorab, colleagues of Mr. Daus at GSI.  See email invitation to SCV Water and its consultants attached as Gee Decl. ISO Mtns. Ex. Y (Email re Presentation).

Q Okay. And when you're saying surface elevation and groundwater elevation, you're talking about potential groundwater flow absent the influence of groundwater pumps?
A I think you have to look at those things. You have to look at anything that would influence the flow, whether it's a -- whether it's a recharge source, for example, if it's a lake or a river or a discharge point. If it were also a river or a groundwater pumping well or any one of a number of things, a swamp, so you have to look at the -- kind of the full picture of information and consider geologic information. For example, you might have to consider faults or mountain ranges as you can imagine or different water sheds. You really want to be kind of broad in your consideration of information.

Gee Decl. ISO Mtns. Ex. K at 32:4-33:7 (Daus Depo. Excerpts).

However, in order to opine that groundwater would not flow from the Whittaker site toward the Saugus 1 and 2 wells, Mr. Daus only considered groundwater elevation and not groundwater well pumping influences:

Q Let me ask a simple question. Did you consider Saugus-1 and Saugus-2 operational when you conducted your evaluation?
A Well, I knew Saugus-1 and 2 were out on -- you know, to the north and to the east -- or west of the site, but my evaluation was of the data that shows containment -- or of the groundwater elevation data, and that's what I considered.
Q Okay. So the answer is the influences from the Saugus-1 and Saugus-2 operation was not considered in your report?
A Whatever was happening at the site, whatever has been going on at the site, under this containment system that they have operating at the site is what I considered. . .
Q Okay. So my question is  . . . that you did for your containment evaluation, the base conditions involved Saugus-1 and Saugus-2 operating?
 A No.
Gee Decl. ISO Mtns. Ex. K at 123:8-124:6 (Daus Depo. Excerpts).

Thus, Mr. Daus' opinion regarding that the groundwater in areas OU-3 and OU-4 is sufficiently delineated is unreliable because Mr. Daus did not consider the potentially significant influence of groundwater pumping.

### C. Mr. Daus' Conclusion that the groundwater remedy is providing VOC "containment" is also flawed.

Mr. Daus' opinion 5 that VOC contamination is being contained on the Whittaker site relies on his opinion that in the groundwater does not flow from the Whittaker site toward Saugus 1 and 2 as discussed in Part III.B above For this reason alone, Mr. Daus' Opinion 5 that the VOC contamination on the Whittaker site is contained by the extraction wells on the Whittaker site is unreliable.

In addition to Mr. Daus' groundwater pumping omission, his analysis is inconsistent with information presented by Mr. Amini and Dr. Panday Sorab in their Model Update presentation.  Mr. Daus praised Dr. Sorab who works for GSI – the same company that employs Mr. Daus.

> Q Okay. And do you know . . . if Dr. Panday is … reliable? -- if Dr. Panday oversees a
> hydrogeological containment model, would you believe that his work would be credible?
> A I would view Dr. Panday's work as credible. . .  Sorab is actually in the National Academy of Engineers for his modeling, and that's a very rare breed.
> Q Okay. So does that mean his modeling --  his modeling efforts would have a lot of credibility?
> A: He has a lot of credibility about groundwater models -- regarding groundwater models.

In the Model Update, discussed above, Mr. Amini and Dr. Sorab presented a particle tracking model that contradicts Mr. Daus' opinion because it shows that the extraction wells do not reach the most heavily contaminated groundwater in the southwest corner of the Whittaker site.  Gee Decl. ISO Mtns. Ex. X at 53 (Powerpoint Presentation).  The groundwater concentrations along the western boundary of the lower portion of the Whittaker site has some of the highest concentrations of TCE contamination at the Whittaker site.  See Gee Decl. ISO Mtns. Ex. C at 31 (Stanin Expert Report).

## IV.    CONCLUSION

Based on the above, Mr. Daus' Opinion 1 should be excluded because it is omits much of Whittaker's strained history with DTSC and is unduly cumulative of testimony provided by DTSC of its oversight of the Whittaker site.  Mr. Daus' fourth and fifth opinions should be excluded because he does not consider groundwater pumping influences in his groundwater flow analysis – influences that he acknowledges should be considered.  The fourth and fifth opinions are also contradicted by the work overseen by Mr. Daus' GSI colleagues, Mr. Hassan Amini and Dr. Sorab.  Mr. Daus endorsed Dr. Sorab as a credible groundwater modeler because he is a member of the National Academy of Engineers for his modeling expertise,

Date: July 13, 2021                    NOSSAMAN LLP

                                        By:  /s/ Byron Gee
                                            Byron Gee
                                        Attorneys for Plaintiff SANTA
                                        CLARITA VALLEY WATER
                                        AGENCY

1

## WHITTAKER'S OPPOSITION TO SCVWA'S MIL #2 (DAUS)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.    THE STANDARD FOR ADMITTING EXPERT TESTIMONY

2      Plaintiff incorrectly seeks to exclude the opinions of Whittaker's expert Mr.

3  Daus under *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579 (1993) and

4  Federal Rules of Evidence, Rule 702 by claiming these opinions employ flawed

5  methodology and are not the product of reliable principles and methods. This

6  argument crumbles when the basis for each of the opinions challenged by Plaintiff

7  are examined.

8      That Plaintiff disagrees with the opinions of Whittaker's experts is not a

9  proper basis for their exclusion. *Kennedy v. Collagen Corp*., 161 F.3d 1226, 1230

10 (9th Cir. 1998), *cert. den*. 526 U.S. 1099 (stating that a court "should not exclude

11 expert testimony simply because it disagrees with the conclusions of an expert"

12 and "[t]he [*Daubert*] test is whether or not the reasoning is scientific and will assist

13 [the trier of fact]."

14      Even assuming for the sake of argument that some of these expert opinions

15 put forth by Mr. Daus are flawed in methodology (and Whittaker in no way

16 concedes this point), "'[d]isputes as to the strength of [an expert's] credentials,

17 faults in his use of [a particular] methodology, or lack of textual authority for his

18 opinion, go to the weight, not the admissibility, of his testimony.'" *Id*. (*quoting*

19 *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995)).

20      In determining whether an expert's testimony is reliable and based upon the

21 scientific method the Ninth Circuit in *Edwin Hardeman v Monsanto Company*, 997

22 F.3d 941, 960 (9th Cir. May 14, 2021) held: "[w]hen determining reliability, district

23 court judges can consider the following non-exclusive factors: (1) "whether the

24 theory or technique employed by the expert is generally accepted in the scientific

25 community;" (2) "whether it's been subjected to peer review and publication;" (3)

26 "whether it can be and has been tested;" and (4) "whether the known or potential

27 rate of error is acceptable." *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311,

28 1316 (9th Cir. 1995) (citing *Daubert*, 509 U.S. at 593– 95). "Th[is] inquiry is

'flexible,'" *Wendell*, 858 F.3d at 1232 (quoting *Daubert*, 509 U.S. at 594), and "should be applied with a 'liberal thrust favoring admission," *Messick v. Novartis Pharms. Corp.,* 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert,* 509 U.S. at 588, 113 S.Ct.2786)." "Scientific evidence is reliable when "the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003)." *Hardeman, supra,* 997 F.3d 941at 960.

Testimony given by Mr. Daus in this case  meets all of these factors, cited both in the 2000 Advisory Notes to Federal Rule of Evidence 702 and by the Ninth Circuit in its *Hardeman*.   Furthermore, the principals and methods relied upon by Mr. Daus are well grounded in science and widely accepted and applied by experts in the field. That Plaintiff may disagree with the methodology used by or the conclusions reached by Mr. Daus is not a basis to exclude the opinions offered. See, *Kennedy v. Collagen Corp*., 161 F.3d 1226 at 1230.

In removing any lingering doubt about the admissibility of  reliable expert testimony the *Hardeman*  Court made it clear that: "[T]he interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system . . . to 'attack[] shaky but admissible evidence.'" *Wendell,* 858 F.3d at 1237 (quoting *Daubert*, 509 U.S. at 596) (alteration in original). The Supreme Court has not directed courts to follow a different rule since it first decided Daubert almost 28 years ago." *Hardeman* at 962.

Here, the reasoning and methodology of Whittaker's expert Mr. Daus is based on hard science and will assist the Court and the jury in determining the central issues in this case.

## II.    **ARGUMENT**

That SCVWA disagrees with the opinions of Whittaker's expert is not a proper basis for the Court to exclude them under *Daubert*. Here, the reasoning and methodology of Mr. Daus is based on hard science, data and a methodology widely

published in text books and accepted in the field of Hydrology.  The opinions of Mr. Daus will assist the Court and the jury in determining the central issues in this case.  In challenging Opinions 4 and 5, SCVWA asserts, incorrectly, that the methodology employed by Mr. Daus did not consider the impact of groundwater being pumped by SCVWA's groundwater production wells. SCVWA is wrong.

By relying on groundwater data, Mr. Daus took into account anything that would have an influence on the groundwater.  This includes the pumping of the wells.  Groundwater levels measured at the Site will capture the influence of all pumping on the groundwater flow system, whether from on-Site or off-Site extraction wells. Since drawdown is cumulative, any drawdown in groundwater elevations that is generated by pumping at Saugus 1 and Saugus 2 or any other off-Site well and extends far enough away from the pumping well is included in the measured water levels in monitoring wells.  Daus Dcl. ¶2.

## A. THE BASIS FOR DAUS OPINION NO. 1 MEETS THE STANDARDS FOR ADMISSIBILITY

Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. 2000 Amendments to FRE 702.  Mr.  Daus has been a practicing Hydrologist for 35 years, during which time he has interfaced with DTSC or its predecessor regulatory agency, the Department of Health Services (DHS), on numerous soil and groundwater cleanup projects in Southern California.  In these decades of experience, concurrence from DTSC that an approved remedial action plan or RAP is ordered to be implemented is proof that DTSC is satisfied with the RAP and that the work has been completed. Daus Dcl. ¶1.

In Opinion 1 Mr. Daus opines: "Since Site investigation and remediation activities began in the early 1980's, the DTSC has provided extensive oversight of the planned and completed response actions. The DTSC frequently provided substantive comments to ensure Whittaker's response actions met the DTSC's requirements. In addition, the DTSC has continually provided approval for

completed actions or required additional actions to meet its approval throughout this extensive investigation and cleanup program." Hagstrom Dcl. ¶1.

Practical experience and extensive training provide the necessary basis for Mr. Daus to understand whether DTSC was and is "satisfied" with the progress made in remediating the soil and groundwater at the Whittaker property. *Kumho Tire Co. v. Carmichael,* 119 S. Ct.1167 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based upon extensive and specialized experience."). Soil remediation at the Whittaker property has been completed.

DTSC issued closure letters confirming soil remediation activities at the Whittaker property were completed to DTSC's exacting standards. Hagstrom Dcl. ¶¶ 2 and 3. DTSC does not issue such letters lightly. Before issuing a closure letter, like that issued to Whittaker, DTSC undertakes an exhaustive evaluation of the work performed to determine that the media at issue does not pose a future risk to human health and the environment. The receipt of a closure letter is *prima facie* evidence that DTSC is "satisfied" with the work done by the responsible party, in this case Whittaker.

DTSC approved the groundwater Remedial Action Plan ("RAP"), which has been effectuated and operated under DTSC oversight. If DTSC was not "satisfied" with Whittaker's groundwater remediation system it would not have approved the RAP and if it was not satisfied with its operation DTSC would ordered changes to the RAP, which it has not.

The presence of VOC's within the property boundaries does not, without more, equate to the migration of VOCs outside of and off the property. SCVWA may disagree with that, but mere disagreement is not a basis to exclude Mr. Daus' opinion that VOC's have not left the Whittaker property. Mr. Daus' expert testimony takes into consideration critical factors, such as the timing of a release, the volume of a release, where the releases concentrated in a single area, the

adsorption and retardation factors of the soil, the location of aquitards beneath the release areas, off-gassing of the VOCs, the removal and excavation of the source or sources of the VOCs, the effectiveness and rate of extraction of a soil vapor extraction system as well as the depth and spacing of the extraction arrays **and the pumping of SCVWA's groundwater production wells on groundwater flow.**

These are the factors experts in the hydrology field rely upon in evaluating the effectiveness of a remediation system. Mr. Daus has, following a widely used and well accepted methodology, compiled and condensed this technical information into a coherent narrative that he will explain to the finder of fact, in a concise and comprehensible manner.

Mr. Daus did what scientists and experts do – he considered the data, assessed the possible outcomes, reached a conclusion based on the data and formulated an opinion in other words he applied the scientific method. He did not, as SCVWA's argument does, rely upon speculation as to what might have happened had equipment been installed in the 1990s and unsubstantiated allegations of the temperament of a former Whittaker executive.[3]

SCVWA criticism that Mr. Daus did not take into account a criminal investigation in which no charges were brought is nonsensical. Whether a criminal investigation was commenced into Whittaker's disposal practices 40 plus years ago, and the date when Whittaker reached agreement with DTSC to initiate a groundwater capture and treatment program is nothing more than SCVWA's attempt to portray Whittaker as a bad actor, even assuming such evidence is admissible, it is not pertinent to the opinions offered by Mr. Daus.

---

[3] SCVWA ignores that vast strides made in the effectiveness of groundwater treatment systems since 1993, which could easily provide more efficient and effective treatment in a shorter period of time, thus rendering SCVWA's argument moot.

**B. THE BASIS FOR DAUS OPINION NO. 4 MEETS THE STANDARDS FOR ADMISSIBILITY**

In Opinion 4 Mr. Daus opines: "The groundwater containment remedy for the VOC plume in OU-3 and OU-4 was described in the FS and RAP and approved by the DTSC. To develop and implement this remedy, the groundwater plume was sufficiently delineated both laterally and vertically.  Hagstrom Dcl. ¶1

Mr. Daus' Opinion No. 4 is based upon data collected and analyzed from an array of groundwater wells that comprise the groundwater remedy approved by DTSC. The location, depth, operation and testing of this array of wells, all approved by DTSC, demonstrate that the VOC plume at the property has been sufficiently delineated both vertically and laterally to successfully implement the groundwater remedy.  SCVWA misunderstands the importance and application of groundwater level measurements in determining groundwater flow direction.  As explained by Mr. Daus, the impact of the pumping of wells, if relevant, would, would be seen in groundwater data.

> **The groundwater levels measured at the Site will capture the influence of all pumping on the groundwater flow system, whether from on-Site or off-Site extraction wells.** Since drawdown is cumulative, any drawdown in groundwater elevations that is generated by pumping at Saugus 1 and Saugus 2 or any other off-Site well and extends far enough away from the pumping well is included in the measured water levels in monitoring wells.  Contrary to Mr. Gee's statement, **the influence of all pumping wells is inherently factored into the groundwater elevation data including the impacts from pumping from Saugus 1 and Saugus 2**.  The groundwater elevations that I prepared using the September 2019 data reflect the impact of all pumping, whether on-Site or off-Site, on the groundwater elevations.  Daus Dcl. ¶2 (Emphasis added)

> As stated in the DTSC-approved groundwater monitoring program, the purpose of the ongoing groundwater monitoring program is to provide the information or data necessary to evaluate the effectiveness of the remedial actions in achieving the intended goals. **If groundwater pumping from on-Site or off-Site extraction wells changes in the**

**future, groundwater elevation data and subsequent groundwater contour maps and analysis prepared using these data will reflect those changes**. If these future maps and analysis suggests that additional capture is needed, adjustments to the groundwater pumping scheme may be deemed necessary. Whether additional groundwater pumping is necessary is a data-driven, scientific analysis based on information obtained as part of the groundwater monitoring program.

Daus Dcl. ¶2. (Emphasis added).

Moreover, SCVWA's litigation driven argument that the remedial system is somehow flawed, belies that fact that SCVWA has, through joint technical meetings, been deeply involved in the development of the groundwater remedy since its inception. SCVWA engineers, hydrologists and executives have had the opportunity to and have voiced their opinions on the design and implementation of the remedy to DTSC, opinions that were considered, and some of which were adopted by DTSC. If the "pumping" of Saugus-1 and Saugus-2 were "**potentially** significant" (emphasis added), SCVWA had the opportunity to raise that issue is these joint technical sessions and it would have been considered.

That SCVWA does not now agree with Mr. Daus' data-based opinion does not make the opinion "flawed" or unreliable. The foundation of SCVWA's entire argument to exclude Mr. Daus' Opinion No. 4 is that he "did not consider the potentially significant influence of groundwater pumping." SCVWA would have the Court exclude Mr. Daus' opinion because there is a "potential" that Saugus-1 and Saugus-2 might influence groundwater flow, a potential that would have been factored into the approved remedy if it was "significant". SCVWA's disagreement with Mr. Daus' Opinion No. 4 is not enough to exclude his testimony. *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1230, (9th Cir. 1998) *cert. den*. 526 U.S. 1099 (stating that a court "should not exclude expert testimony simply because it disagrees with the conclusions of an expert"). Moreover, the methodology employed by Mr. Daus did consider SCVWA's pumping of its groundwater production wells.

**C. THE BASIS FOR DAUS OPINION NO. 5 MEETS THE STANDARDS FOR ADMISSIBILITY**

In Opinion 5 Mr. Daus opines that "Several important lines of evidence indicate that the groundwater extraction system is containing the VOC plume on-Site. These include the groundwater quality monitoring data, piezometric contour maps, groundwater elevation hydrographs, and chemographs. Each of these lines of evidence and the supporting data are described in [the detailed discussion of] this section." Hagstrom Dcl. ¶1.

Mr. Daus' Opinion No. 5 is, as was Opinion No. 4, based upon data collected and analyzed from an array of groundwater wells that comprise the groundwater remedy at the Whittaker property, a remedy approved by DTSC, after input by SCVWA's technical staff and its executives. SCVWA's contention that Daus Opinion No. 5 is "unreliable", is based, in large part, on the same argument it makes to exclude Daus Opinion No. 4, which, as shown above, lacks factual foundation and legal support.

Contrary to SCVWA's statements, Mr. Daus' opinion is not inconsistent with the work of Dr. Panday and Dr. Amini (and even if it was, inconsistency is not a basis to exclude expert testimony). And even if it was, a difference of opinion is any a basis for exclusion.

The Model Update that Dr. Amini and Dr. Panday presented simulated particle tracks that were based on a numerical model that contained numerous assumptions regarding the groundwater flow system and was calibrated to 2018 average groundwater elevation data. Particles were then released at the wells and traveled in reverse to show the modeled capture zone for each well. The model presented in the Model Update was prepared based on what was known and assumed at the time the model was prepared. Daus Dcl. ¶3.

Between 2018 and 2019, groundwater elevations continued to drop as pumping from the containment system continued and increased, providing new

information about the hydrogeologic conditions and how the aquifers respond to pumping.  This new information could not have been incorporated in the Model Update presentation in February 2019 as it was not known at that time. Daus Dcl. ¶3.

The groundwater contour maps and analysis prepared by Mr. Daus is based on the actual measured depth to groundwater data collected in September 2019, rather than a simulated forecast.   Importantly, in Mr. Daus' opinion that the on-Site groundwater extraction system provides containment of the VOC plume is supported not only by the groundwater elevation data but also by the groundwater quality monitoring data. Daus Dcl. ¶¶. 2 and 3.

## III.    CONCLUSION

SCVWA's implication that the simulated capture zones of the groundwater remedial system installed at the Whittaker property are not sufficiently wide to capture VOCs in the southwest corner of the Whittaker property is misplaced.  The analysis by Mr. Daus, as set out in his expert opinions, confirms that the capture zone provided by all the extraction wells in the aggregate contain the VOC plume within the boundary of the Whittaker property.

That SCVWA disagrees with these opinions is not surprising and not a basis to exclude them.

Dated:  July 19, 2021                  BASSI EDLIN HUIE & BLUM


By: _____
                                        FRED M. BLUM
                                        Attorneys for Defendant and Third-Party
                                        Plaintiff WHITTAKER
                                        CORPORATION

1 **REPLY IN SUPPORT OF PLAINTIFF'S MIL #2 (DAUS)**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Whittaker attempts to rehabilitate Mr. Daus' opinion with a declaration that does not change his resume or his testimony.  The fact remains that his first opinion lacks any legal standard and will be cumulative of DTSC and Whittaker percipient witness testimony with firsthand knowledge of Whittaker's onsite activities.  His opinion is also irrelevant because this lawsuit is about SCV Water recovering its cost to continue to address Whittaker's contamination releases and not onsite soil cleanup activities.

Whittaker also attempts to rehabilitate Mr. Daus' testimony regarding pumping influences of Saugus 1 and 2 which he admits that hydrogeologists (like Mr. Daus) need to include in groundwater containment analysis, yet he failed to do so.  Neither Whittaker nor Mr. Daus attempt to correct his testimony (for example through a deposition transcript errata notification), and rather conflate his testimony by stating that there are secondary influences of groundwater pumping that are inherent in groundwater elevation.

Finally, Mr. Daus distinguishes his work from his esteemed colleagues by suggesting that his analysis utilizes real data, data that was collected over a short time period and does not include contamination data analysis of the most heavily contaminated areas in the southwest region of the site and closest to SCV Water wells V- 201 and V-205.

## II.    LEGAL ARGUMENT

### A.    Daus' Opinion 1 Regarding the DTSC's Satisfaction With Whittaker's Efforts Should Be Excluded as Unreliable, Not Probative, Cumulative, and a Waste of Time

Daus' Opinion 1—that the DTSC is purportedly "satisfied" with site investigation and remedial measures implemented by Whittaker—is unreliable, unnecessary, and more prejudicial than probative.

First, Daus failed to articulate any professional standard for the alleged "DTSC Satisfaction"—nor could Daus set forth such a standard, as he lacks the

necessary qualifications to do so given that he has never worked for DTSC and has no expertise regarding "DTSC Satisfaction."  The Ninth Circuit has repeatedly upheld the exclusion of testimony by expert witnesses as to matters outside their expertise.  *See, e.g., Alexander v. United States*, 63 F.3d 820, 822 (9th Cir. 1995) (district court properly excluded expert testimony regarding vessel charters where expert's qualifications were not "on point" with the issues testified to); *Mathes v. The Clipper Fleet*, 774 F.2d 980, 984 (9th Cir. 1985) (former deckhand's previous observation of transfers of items from one vessel to another did not qualify witness to testify regarding industry custom and practice for transferring items); *Higgenbottom v. Noreen*, 586 F.2d 719, 722 (9th Cir. 1978) (trial judge did not abuse discretion by disallowing testimony as to proper installation of fireplace unit, where expert had installed only four such fireplaces in thirteen years).

Moreover, Whittaker's claim that Daus need not show any basis for his "DTSC Satisfaction" opinion aside from his general background is incorrect—an expert who cites his own experience/expertise rather than data should be excluded. "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

Second, Daus' first opinion is wholly unnecessary, and any arguable relevance or probative value is outweighed by the certainty that it will involve the needless presentation of cumulative evidence, and a waste of time.  FRE 403.  The testimony is not probative because Whittaker did not and is not actually implementing any action to remediate offsite contamination.  *See* "Castaic Lake Water Agency (predecessor in interest to SCV Water) - Whittaker off-site Groundwater contamination" page of the DTSC Envirostor website. https://www.envirostor.dtsc.ca.gov/public/profile_report?global_id=60000168. SCV Water has been actively remediating the offsite groundwater since 2003. The subject of this lawsuit is whether Whittaker is responsible for paying SCV Water to

address the impacts of Whittaker's contamination on its off-site production wells, not whether DTSC consents to its cleanup of its onsite soil.

Moreover, there will already be testimony from at least two witnesses regarding the DTSC's "satisfaction" or lack thereof: Mr. Diaz (DTSC Project Manager for the Whittaker site) and Hassan Amini (Whittaker's project manager and Daus' colleague). In light of the testimony to be provided by the DTSC site mitigation managers who actually oversaw Whittaker's activities, any testimony by Daus regarding DTSC's oversight would not only be needlessly cumulative, but also less reliable than that of the percipient witness testimony on the issue.

**B.    Daus' Opinion 4 Regarding OU-3 and OU-4 Delineation Should Be Excluded as Unreliable Under *Daubert***

Daus' Opinion 4 should also be excluded under *Daubert* principles. Where, as here, the expert himself admits that there is a serious flaw in his opinion because he failed to consider the impact of SCV Water's groundwater production wells with respect to his groundwater flow opinion, it establishes more than just a fallacy that goes to the "weight of the evidence." In this case, there is simply "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Daus admits that to render a reliable opinion, a hydrogeologist must look at all the relevant data relating to groundwater flow, including groundwater wells: "I think you have to look at those things. **You have to look at anything that would influence the flow**, whether it's a -- whether it's a recharge source, for example, if it's a lake or a river or a discharge point. If it were also a river **or a groundwater pumping well** or any one of a number of things, a swamp, so **you have to look at the -- kind of the full picture of information** and consider geologic information." Gee Decl. ISO Mtns. Ex. K at 32:4-33:7 (Daus Depo. Excerpts).

Daus also admitted—after repeated attempts to evade the question—that he nonetheless *disregarded* all data regarding the Saugus 1 and 2 groundwater production wells:

Q Let me ask a simple question. Did you consider Saugus-1 and Saugus-2 operational when you conducted your evaluation?

A Well, I knew Saugus-1 and 2 were out on -- you know, to the north and to the east -- or west of the site, but my evaluation was of the data that shows containment -- or of the groundwater elevation data, and that's what I considered.

Q Okay. So the answer is the influences from the Saugus-1 and Saugus-2 operation was not considered in your report?

A Whatever was happening at the site, whatever has been going on at the site, under this containment system that they have operating at the site is what I considered. . .

Q Okay. So my question is . . . that you did for your containment evaluation, the base conditions involved Saugus-1 and Saugus-2 operating?

A **No.**

Gee Decl. ISO Mtns. Ex. K at 123:8-124:6 (Daus Depo. Excerpts).

Thus, by his own admission, Daus concedes that he failed to consider the very data that "you have to look at" as a hydrogeologist, and his opinion is therefore unreliable under his own stated methodology.

Whittaker attempts to modify Mr. Daus' testimony by providing additional testimony regarding the long term impacts of pumping that will have groundwater elevation influences. Mr. Daus did not indicate that he changed his testimony (note that Whittaker counsel did not cite to any changes to Mr. Daus' testimony errata sheet), but rather attempts to conflate his testimony with secondary impacts of offsite well pumping.

**C.   Daus' Opinion 5 That the Groundwater Remedy Is Providing VOC "Containment" Should Also Be Excluded As Unreliable**

Finally, Daus' Opinion 5 is likewise unreliable and should be excluded. He opines that VOC contamination has been contained on the Whittaker site, based upon his opinion that groundwater does not flow from the Whittaker site toward Saugus 1 and 2. However, in light of Daus' admitted failure to give any consideration to the Saugus 1 and 2 groundwater pumping wells, his analysis is unreliable for the same reasons set forth above in Part II.B.

1    Additionally, Daus' analysis is contradicted by the particle tracking model,

2  as explained by experts Amini and Sorab.  Their model demonstrates that

3  Whittaker's extraction wells do not reach the most heavily contaminated

4  groundwater in the southwest corner of the site.  Gee Decl. ISO Mtns. Ex. X at 53

5  (Powerpoint Presentation).  That is where some of the highest concentrations of

6  TCE contamination are found.  See Gee Decl. ISO Mtns. Ex. C at 31 (Stanin

7  Expert Report).

8    Mr. Daus attempts to diminish the work of his esteemed colleagues.

9  However, Mr. Daus himself admits that the onsite groundwater extraction program

10  began in 2018 (and was fully implemented in 2019, the year he generated his

11  contour maps) and groundwater projects typically take 30 years.  As discussed

12  above, there is simply too little data to determine if Whittaker's onsite extraction

13  program will be effective.

14  **III.   CONCLUSION**

15    For the above stated reasons, Mr. Daus' opinions 1, 4 and 5 should be

16  excluded.

17

18  Date: July 23, 2021                    NOSSAMAN LLP
                                          FREDERIC A. FUDACZ
19                                         BYRON GEE
                                          PATRICK J. RICHARD
20                                         RAVEN McGUANE
21
22                                         By:  /s/ Byron Gee
                                              Byron Gee
23                                         Attorneys for Plaintiff SANTA
                                          CLARITA VALLEY WATER
24                                         AGENCY

25

26

27

28

Case No. 2:18-cv-6825 SB (RAOx)

PLAINTIFF'S MOTION IN LIMINE NO. 2 TO EXCLUDE DAUS OPINIONS 1, 4 AND 5

58166684.v1