NOSSAMAN LLP
FREDERIC A. FUDACZ (SBN 50546)
ffudacz@nossaman.com
BYRON GEE (SBN 190919)
bgee@nossaman.com
PATRICK J. RICHARD (SBN 131046)
prichard@nossaman.com
ILSE C. SCOTT (SBN 233433)
iscott@nossaman.com
RAVEN McGUANE (SBN 336505)
rmcguane@nossaman.com
777 S. Figueroa Street, 34th Floor
Los Angeles, CA 90017
Telephone: 213.612.7800
Facsimile: 213.612.7801

Attorneys for Plaintiff SANTA CLARITA VALLEY WATER AGENCY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTA CLARITA VALLEY WATER AGENCY,<br><br>Plaintiff,<br><br>vs.<br><br>WHITTAKER CORPORATION and DOES 1-10, Inclusive,<br><br>Defendant.<br><br>AND RELATED CASES | Case No: 2:18-cv-6825 SB (RAOx)<br><br>*Assigned to*<br>*Hon. Stanley Blumenfeld, Jr.*<br><br>**PLAINTIFF'S OFFER OF PROOF IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MIL NO. 7 RE OPINIONS OF EXPERT RICHARD HUGHTO; DECLARATION OF PATRICK J. RICHARD**<br><br>Date Action Filed: August 8, 2018<br>Trial Date: August 24, 2021 |

Plaintiff submits this Offer in further Opposition to Whittaker's Motion in Limine No. 7 (Dkt. 309). Hughto's opinions and the basis are identified more fully in his Reports (Blum Decl. [Dkt. 324], Exs. 1 & 2) and deposition, as Rule 26 does not require that an expert Report be limited to 10 pages.  Further meet-and-confer confirms Whittaker's Motion is limited to specific opinions, although Plaintiff intends to fully address the Court's concerns as to admissibility of Dr. Hughto's work; this Offer is intended as a tool to cross-reference opinions and support, and Plaintiff requests the opportunity to resubmit the information as a double-spaced pleading should the Court so require.  Importantly, Whittaker's suggestion that there is only evidence of VOC and perchlorate contamination at two locations is incorrect (their expert ignored all data from CDM Smith); they are found across the Site due to its self-described "indiscriminant dumping".[1]

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| 1. Whittaker conducted waste handling practices not condoned by the State of California prior to the implementation of the RCRA regulations in 1980. (Blum Decl., Ex. 1 at p. 32.) | Supports allegation that perchlorate and VOC contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate and VOC waste due to Whittaker's indiscriminant dumping and failure to identify and document its disposed chemicals and/or the locations of its own landfills. Whittaker's failure to follow standard documentation practices, and its poor housekeeping practices for the storage and disposal of solvents and other chemicals, is proper expert testimony that will assist the trier of fact to understand the heavy contamination at "burn pits" and the "Hula Bowl" dump sites (relevant to CERCLA plausible pathways), and | Dr. Hughto's report lists the evidence supporting this opinion, including a 12/22/77 Whittaker government inspection summary that identified waste handling practices not condoned by the State. (Blum Decl., Ex. 1 at p. 23.) Data collected resulted in remediation of soil being conducted in over 50 areas of the site employing multiple remedial technologies, demonstrating that there were at least 50 areas of contamination releases. (*Id.* at pp. 7-8.)  Dr. Hughto also gave a detailed deposition as to the basis of this and his other work and opinions in this matter. |

---

[1] *See* Dr. Hughto's Fig. 6 (Blum Decl. [Dkt. 324], Ex. 2 at p. 22), attached hereto as Exhibit A. All references to "Blum Decl." herein cite the declaration filed at Dkt. 324.

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| | to establish negligence and negligence per se. More broadly, this type of evidence is directly relevant to rebut Whittaker's story that the discharge of solvents occurred primarily at one location at a discrete point in time pursuant to accepted practices.<br><br>Also supports punitive damages claim, as Whittaker acted with willful and conscious disregard of safety. | |
| 2. Whittaker did not follow its stated guidelines precluding dumping of waste to the ground. (Blum Decl., Ex. 1 at p. 32.) | Supports allegation that perchlorate and VOC contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate/VOC waste due to Whittaker's indiscriminant dumping and failure to identify and document its disposed chemicals and/or the location of its own landfills.<br><br>Also supports punitive damages claim, as Whittaker acted with willful and conscious disregard of safety. | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 24-25). Therein, Dr. Hughto cites, among other things, a 1/12/82 Bermite memo authored by Zoyd R. Luce indicating that Bermite became aware that its practice of dumping scrap at the Hula Bowl was no longer permissible under California law and should be discontinued immediately. (*Id.* at p. 24). He further cites a Whittaker 8/26/82 memo authored by John J. Peloquin regarding the Hula Bowl "disaster area" that stated, "The present condition of the Hula Bowl would very likely trigger ground water monitoring." (*Id.* at p. 25.) He further cites a Bermite 9/7/82 memo authored by Zoyd R. Luce noting that progress at the Hula Bowl was slow in what was called a critical area. (*Id.* at p. 25.) Additionally, Whittaker's consultant Acton Mickelson documented elevated VOCs in the Hula Bowl on 2/16/96 (*id.* at p. 31). The Hula Bowl was also used to detonate waste munitions and explosives found at the site (as documented by GSI on 2/14/2020) (*id.* at p. 8). Waste material was ultimately excavated from the Hula Bowl area, as documented by Wenck Associates on 6/19/87. (*Id.* at p. 5.) |
| 7. Whittaker's process for management of | Supports punitive damages claim, as Whittaker acted with | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 16-32). Dr. Hughto cites |

PLF.'S OFFER OF PROOF RE DEF.'S MIL NO. 7 RE OPINIONS OF EXPERT RICHARD HUGHTO; RICHARD DECL.
58227886.v9

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| compliance with environmental regulations at the Site led to it and the governing regulatory agencies identifying numerous violations of several different sets of governing regulations and laws. (Blum Decl., Ex. 1 at p. 32.) | willful and conscious disregard of safety. Also supports allegation that perchlorate and VOC contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate/VOC waste due to Whittaker's indiscriminant dumping and failure to identify and document its disposed chemicals and/or the location of its own landfills. | extensive evidence, including deposition testimony from Whittaker's witnesses Jim Jisa (Jisa Tr. at 54:15-55:4) and Zoyd Luce (Luce Tr. at 110:4-15 & 137:7-10), and testimony from DTSC witness Alan Sorsher (Sorsher Tr. at 24:21-25:23 & 80:21-81:2). The depositions are cited in his report (Blum Decl., Ex. 1 at pp. 16, 21, & 27). He also cites documentary evidence including correspondence, company memoranda, site investigation reports and notices from regulatory agencies (*id.* at pp. 18-32). |
| 8. Whittaker's methods of operation at the facility resulted in it and governing regulatory agencies identifying violations of RCRA regulatory requirements after 1980. The violations included, among others:<br>• Placing waste materials on the ground during Hog-Out operations<br>• Placing waste materials on the ground in as many as 28 other areas<br>• Failure to comply with Closure Plan preparation and implementation requirements<br>• Failure to adequately close the 317 and 342 Area impoundments<br>• Failure to conduct required soil and groundwater monitoring at the time of the closure | Supports allegation that perchlorate and VOC contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate/VOC waste due to Whittaker's indiscriminant dumping and failure to identify and document its disposed chemicals and/or the location of its own landfills. Whittaker's failure to follow standard documentation practices, and its poor housekeeping practices for the storage and disposal of solvents and other chemicals, is proper expert testimony that will assist the trier of fact to understand the heavy contamination at "burn pits" and the "Hula Bowl" dump sites (relevant to CERCLA plausible pathways), and to establish negligence and negligence per se. More broadly, this type of evidence is directly relevant to rebut Whittaker's story that the discharge of solvents | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 18-30). Therein, Dr. Hughto cites as supporting evidence, among other things, a 5/29/79 letter from John J. Peloquin at Whittaker summarizing conditions and practices observed during a site inspection, wherein indiscriminant waste dumping to the environment was cited in three areas. (*Id.*, at p. 23.) He further cites a 9/30/80 Bermite memo authored by Zoyd R. Luce in which it discussed the Hog-Out operations and noted that, "The Hog-Out area is currently contaminated and does not meet the requirements of the Resource Contamination and Recovery Act", which is directly relevant as the propellant removed during the Hog-Out operation contained ammonium perchlorate and became a source of groundwater contamination with perchlorate and chlorinated solvents. (*Id.*, at 23-24.) Dr. Hughto further cites a 10/9/80 Bermite memo authored by Zoyd R. Luce in which it listed then-current violations of RCRA prohibitions against dumping waste materials on the ground, affecting 29 different areas and including PCE, propellant, and perchlorate wastes. (*Id.*, at p. 24.)<br>Dr, Hughto's report also details the factual bases for his opinions |

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| of the impoundments<br>• Failure to comply with the groundwater monitoring requirements<br>• Failure to submit Closure Plan for the closure of surface impoundments at Buildings 317 and 342 in advance of closing those impoundments<br>• Inadequate soil sampling during closure<br>• Inadequate characterization of contamination<br>• Failure to report waste burial areas that would have required investigation under RCRA<br>• Submission of deficient Waste Analysis Plans<br>• Submission of deficient Closure Plans<br>• Submitting incomplete and inaccurate Closure Certification Report<br>• Conducted a Hydrogeologic Assessment without an approved Closure Plan<br>• Failure to manage hazardous waste such that it would not pose a threat to the environment | occurred primarily at one location at a discrete point in time pursuant to accepted practices.<br><br>Also supports punitive damages claim, as Whittaker acted with willful and conscious disregard of safety. | concerning Whittaker's regulatory failures in its closure of the site in his report. (Blum Decl., Ex. 1 at pp. 18-30). Dr. Hughto cites, among other things, Whittaker's 5/26/81 Closure and Post-Closure Plan for the facility at issue, as well as Bermite's 9/9/83 Closure Plan, Whittaker's 3/1/85 Closure Plan, and Whittaker's 8/1/86 amended Closure Plan. (*Id.* at p. 18.) He further cites the evidence showing that these closure plans were inadequate and/or in violation of legal requirements, including inadequacies documented by the California DOHS on 4/28/66, by the USEPA on 6/4/86, and by the USEPA on 3/3/87. (*Id.* at pp. 19-20.) Dr. Hughto also cites a 6/22/87 memo delivered to the DTSC that described landfills at the facility that had not been adequately investigated nor removed, and thus would have served as a source of soil and groundwater contamination over an extensive area at the site, and the related correspondence between Whittaker's attorneys and environmental consultants and environmental regulators between 7/20/87 and 11/29/95. (*Id.* at p. 20.) Dr. Hughto further relies upon cited testimony from former Whittaker employee Bradley Peach in his Declaration, and from DOHS official Alan Sorsher (Sorsher Tr. at 24:21-25:23) regarding the buried waste at the site. (*Id.* at pp. 20-21.) Additionally, Dr. Hughto relied on the 3/12/03 correspondence from the DTSC rescinding the May 1993 closure certification for an impoundment at the site, citing the need to follow the hazardous waste regulations. (*Id.* at p. 22.) The waste management practices employed by Whittaker resulted in the need to conduct soil remediation at over 50 locations at the site. (*Id.* at pp. 7-8.) |

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| (Blum Decl., Ex. 1 at 32-33.) | | |
| 9. Whittaker dumped scrap material in the Hula Bowl. Whittaker's waste disposal practices at the Hula Bowl were deficient. (Blum Decl., Ex. 1 at p. 33.) | Supports allegation that perchlorate and VOC contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate/VOC waste due to Whittaker's indiscriminant dumping and failure to identify and document its disposed chemicals and/or the location of its own landfills. Whittaker's failure to follow standard documentation practices, and its poor housekeeping practices for the storage and disposal of solvents and other chemicals, is proper expert testimony that will assist the trier of fact to understand the heavy contamination at "burn pits" and the "Hula Bowl" dump sites (relevant to CERCLA plausible pathways), and to establish negligence/negligence per se. More broadly, this type of evidence is directly relevant to rebut Whittaker's story that the discharge of solvents occurred primarily at one location at a discrete point in time pursuant to accepted practices. Also supports punitive damages claim. | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 24-25). Therein, Dr. Hughto cites, among other things, a 1/12/82 Bermite memo authored by Zoyd R. Luce indicating that Bermite became aware that its practice of dumping scrap at the Hula Bowl was no longer permissible under California law and should be discontinued immediately. (*Id.* at p. 24). He further cites a Whittaker 8/26/82 memo authored by John J. Peloquin regarding the Hula Bowl "disaster area" that stated, "The present condition of the Hula Bowl would very likely trigger ground water monitoring." (*Id.* at p. 25.) He further cites a Bermite 9/7/82 memo authored by Zoyd R. Luce noting that progress at the Hula Bowl was slow in what was called a critical area. (*Id.* at p. 25.) Additionally, Whittaker's consultant Acton Mickelson documented elevated VOCs in the Hula Bowl on 2/16/96 (*id.* at p. 31. The Hula Bowl was also used to detonate waste munitions and explosives found at the site (as documented by GSI on 2/14/2020) (*id.* at p. 8). Waste material was ultimately excavated from the Hula Bowl area, as documented by Wenck Associates on 6/19/87. (*Id.* at p. 5.) |
| 10. Soil sampling, analysis, and remediation were deficient pursuant to State regulations. (Blum Decl., Ex. 1 at p. 33.) | Supports allegation that perchlorate and VOC contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate/VOC waste due to Whittaker's indiscriminant dumping | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 18-32). Dr. Hughto cites extensive evidence, including testimony from DTSC witness Alan Sorsher (Sorsher Tr. at 24:21-25:23 & 80:21-81:2) (cited in his report, Blum Decl., Ex. 1 at pp. 21, 27) and documentary evidence including |

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| | and failure to identify and document its disposed chemicals and/or the location of its own landfills.<br><br>Also supports punitive damages claim. | correspondence, company memoranda, site investigation reports and notices from regulatory agencies confirming the deficiency of soil sampling, analysis and remediation (*id.* at pp. 18-32). |
| 12. Whittaker buried wastes at multiple locations across the Site. This included a practice Whittaker itself referred to as "indiscriminant waste dumping". (Blum Decl., Ex. 1 at p. 33.) | Supports allegation that perchlorate and VOC contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate/VOC waste due to Whittaker's indiscriminant dumping and failure to identify and document its disposed chemicals and/or the locations of its own landfills.<br><br>Also supports punitive damages claim. | Dr. Hughto's report describes the results of the practice of dumping and disposing of waste materials at numerous locations across the site. Those locations included the Hula Bowls, East Fork, and The Point as documented by IT, 5/10/90 and Acton Mickelson, 1/1997. (Blum Decl., Ex. 1 at p. 4.) The materials buried included bad batches of munitions per Kanowsky, 11/11/96. (*Id.* at p. 4.) During the planning of remediation for the site, including the buried materials, it was decided to manage buried munitions and explosives, as documented by GSI, 12/14/18. (*Id.* at p. 7.) Dr. Hughto will report on Whittaker's 5/26/81 Closure and Post-Closure Plan, which, among other provisions, called for all employees leaving Bermite to be asked for information on buried or hidden material that would warrant decontamination treatment. (*Id.* at p. 18.) |
| 13. Whittaker engaged in the deceptive practice of not notifying regulatory authorities of some of the waste dumping and burial areas it identified prior to investigation and removal. (Blum Decl., Ex. 1 at p. 33.) | Supports allegation that perchlorate and VOC contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate/VOC waste due to Whittaker's indiscriminant dumping and failure to identify and document its disposed chemicals and/or the location of its own landfills.<br><br>Also supports punitive damages claim. | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 16-17, 20-23). Dr. Hughto cites extensive evidence, including deposition testimony from Whittaker's witnesses Jim Jisa (Jisa Tr. at 54:15-55:4) and Zoyd Luce (Luce Tr. at 110:4-15 & 137:7-10) (cited in the report, Blum Decl., Ex. 1 at p. 16), a 11/29/95 memo from DTSC indicating that Whittaker's environmental consultant had conducted investigation and remediation of hazardous waste disposal areas not disclosed to the State or DTSC (*id.* at p. 20), testimony from DTSC witness Alan Sorsher (Sorsher Tr. at 24:21-25:23) in which he confirmed that Whittaker "intentionally failed to disclose" information regarding its waste |

- 6 -   Case No. 2:18-cv-6825 SB (RAOx)
PLF.'S OFFER OF PROOF RE DEF.'S MIL NO. 7 RE OPINIONS OF EXPERT RICHARD HUGHTO; RICHARD DECL.
58227886.v9

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| | | disposal practices at the Site (cited in the report, Blum Decl., Ex. 1 at p. 21) and other documentary evidence including correspondence, company memoranda, site investigation reports and notices from regulatory agencies (*id.* at pp. 16-17, 20-23). |
| 14. Whittaker's practice of not reporting land waste disposal areas to the State and not investigating the impacts of those areas was delinquent and led to additional migration of contamination to and within the groundwater. (Blum Decl., Ex. 1 at p. 33.) | Supports allegation that perchlorate and VOC contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate/VOC waste due to Whittaker's indiscriminant dumping and failure to identify and document its disposed chemicals and/or the location of its own landfills.<br><br>Also supports punitive damages claim. | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 16-17, 20-23.) Dr. Hughto cites extensive evidence, including deposition testimony from Whittaker's witnesses Jim Jisa (Jisa Tr. at 54:15-55:4) and Zoyd Luce (Luce Tr. at 110:4-15 & 137:7-10) (cited in the report, Blum Decl., Ex. 1 at p. 16), a 11/29/95 memo from DTSC indicating that Whittaker's environmental consultant had conducted investigation and remediation of hazardous waste disposal areas not disclosed to the State or DTSC (*id.* at p. 20), testimony from DTSC witness Alan Sorsher (Sorsher Tr. at 24:21-25:23) in which he confirmed that Whittaker "intentionally failed to disclose" information regarding its waste disposal practices at the Site (cited in the report, Blum Decl., Ex. 1 at p. 21) and other documentary evidence including correspondence, company memoranda, site investigation reports and notices from regulatory agencies (*id.* at pp. 16-17, 20-23). |
| 15. Whittaker was found to violate the State Hazardous Waste Control Act, including unlawful storage, disposal, and transport of hazardous waste, as well as the presence of previously unreported hazardous waste sites at the facility. (Blum Decl., Ex. 1 at p. 33.) | Supports allegation that perchlorate and VOC contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate/VOC waste due to Whittaker's indiscriminant dumping and failure to identify and document its disposed chemicals and/or the location of its own landfills.<br><br>Also supports punitive damages claim. | Dr. Hughto cites a 12/22/77 Whittaker government inspection summary that identified waste handling practices not condoned by the State. (Blum Decl., Ex. 1 at p. 23.) He further cites to a Statement of Facts from former State Regulator Alan Sorsher and his findings that Whittaker had violated the California Hazardous Waste Control Act, including unlawful storage, disposal, and transport of hazardous waste, as well as the presence of unreported hazardous waste. (*Id.*, at p. 28.) |
| 16. Whittaker disposed of boiler | Supports allegation that perchlorate and VOC | Dr. Hughto explains the basis of this opinion in his report. (Blum Decl., |

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| wastewater on the ground in a manner it found to be in violation of the Clean Water Act, RCRA, and California law. (Blum Decl., Ex. 1 at p. 34.) | contamination have migrated into the groundwater as a result of Whittaker's actions.<br><br>Also supports punitive damages claim. | Ex. 1 at pp. 24-25.) Dr. Hughto cites a 3/12/82 Bermite memorandum by Jim Jisa that referred to its practice of dumping boiler wastewater on the ground and stated, "This is a direct violation of the Clean Water Act, R.C.R.A., and California State Department of Health regulations." (*Id.* at p. 24.) He further cites a 4/21/82 Bermite memorandum by Jim Jisa that referred to its waste handling issues, including boiler water discharge to the ground, and stated "All of these problems have the potential to create serious violations of RCRA and the Clean Water Act." (*Id.* at p. 24.) |
| 17. Whittaker attempted to avoid compliance with the regulatory requirements for groundwater monitoring in place beginning in 1980. (Blum Decl., Ex. 1 at p. 34.) | Supports punitive damages claim, as Whittaker acted with willful and conscious disregard of safety.<br><br>Also supports allegation that Whittaker's failure to engage in prompt, regulatory-compliant groundwater monitoring allowed additional migration of perchlorate and VOC into and within groundwater. | Dr. Hughto cites to the RCRA (5/19/80) requirement to conduct groundwater monitoring for landfills, surface impoundments, and land treatment facilities within 18 months of promulgation. (Blum Decl., Ex. 1 at p. 17.) Whittaker took action to avoid conducting the groundwater monitoring, despite addressing the need in a 5/26/81 Closure and Post-Closure Plan. (*Id.* at p. 18.) Whittaker engaged a hydrologist consultant to evaluate whether groundwater monitoring was required (Bean, 12/4/82), and he recommended not pursuing a waiver from the groundwater monitoring requirements due to expected migration of contaminants in the ground. (Id. at p. 26.) A 8/20/87 Closure Plan Modification proposed monitoring wells, but fewer than the 4 required for each area. (*Id.* at p. 19.) USEPA issued a Determination of Violation and Compliance Order (6/4/86) citing a number of deficiencies, which led to a Consent Agreement and Final Order (8/26/86) requiring Whittaker to address groundwater monitoring requirements, among other things. (Id. at p. 19.) The State identified failure to conduct required groundwater monitoring (6/25/90 and 1/16/91) in a summary of violations. (Id. at p. 28.) There were other instances of regulatory identification of failure to conduct the required |

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| | | groundwater monitoring, including in March 2001. (Id. at pp. 23-29.) |
| 18. Whittaker's failure to follow regulatory requirements for groundwater monitoring at its waste disposal locations led to additional migration of contamination to and within the groundwater. (Blum Decl., Ex. 1 at p. 34.) | Supports allegation that Whittaker's failure to engage in prompt, regulatory-compliant groundwater monitoring allowed additional migration of perchlorate and VOC into and within groundwater. Also supports punitive damages claim. | Dr. Hughto relies on hydrologic principles that govern migration of contamination in the soil and groundwater, which demonstrate that contaminants like TCE and perchlorate will migrate over time into and within the groundwater. A delay in monitoring and/or mitigating the contamination conditions results in additional migration of the contamination until appropriate actions are taken. (Blum Decl., Ex. 1 at pp. 5-6, 18, 30.) |
| 19. Whittaker's groundwater investigation and monitoring practices continued to be found to violate State requirements after 2000. (Blum Decl., Ex. 1 at p. 34.) | Supports allegation that Whittaker's failure to engage in prompt, regulatory-compliant groundwater monitoring allowed additional migration of perchlorate and VOC into and within groundwater. Also supports punitive damages claim. | Dr. Hughto cites to a history of violations of laws and regulations related to groundwater monitoring. These include the State's 6/25/90, 7/1990, 1/16/91, and 3/2001 findings of deficiencies in the monitoring program. (Blum Decl., Ex. 1 at p. 28.) Dr. Hughto further cites to Geomatrix's 12/16/05 documentation which lists a number of violations identified by DTSC that include issues related to site monitoring, like failure to analyze samples, insufficient monitoring points, failure to analyze data necessary to delineate contamination, and failure to follow the Sampling and Analysis Plan. (*Id.* at p. 29.) |
| 20. Whittaker was responsible for releases that caused on-site and off-site groundwater contamination with perchlorate, TCE, and PCE. (Blum Decl., Ex. 1 at p. 34.) | Supports allegation that perchlorate and VOC contamination are found throughout the site and have migrated into groundwater due to Whittaker's indiscriminant dumping, and that Whittaker's failure to engage in prompt, regulatory-complaint groundwater monitoring allowed additional migration of perchlorate and VOC into and within groundwater. | Dr. Hughto cites to a series of investigations conducted to identify the presence and extent of groundwater contamination at the site. (Blum Decl., Ex. 1 at pp. 5-7 and 30-32.) The investigations resulted in quantifying groundwater contamination in dozens of areas of the site, primarily with TCE and perchlorate from sources in each of those areas. (*Id.*) |
| Rebuttal to Dawson Opinion 3 that | Dr. Hughto's rebuttal is needed to explain that | The data collected at the site show that dozens of areas of the site |

- 9 - Case No. 2:18-cv-6825 SB (RAOx)

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| "[t]here is no indication that any significant quantities of perchlorate or chlorinated solvents were intentionally buried on site or in proximity to the Bermite facility." (Blum Decl., Ex. 2 at pp. 4-6.) | Dawson fails to account for evidence of Whittaker's waste disposal at the Site, including indiscriminant waste dumping, and neglects the evidence reflecting discovery of perchlorate and chlorinated solvent contamination at the Site. | contain soil and groundwater contamination, including areas like the Hula Bowls, where buried waste was identified. (Blum Decl., Ex. 2 at pp. 4-6.) Buried wastes and drums and wastes were discovered and soil contamination with perchlorate and chlorinated solvents was found in waste burial areas in numerous areas of the site, including areas that required remediation. Dr. Hughto also cites to several documents that discuss the waste burial and related contamination, including Whittaker calling the Hula Bowl waste disposal a "disaster area". (*Id.* at p. 6.) |
| Rebuttal to Dawson Opinion 5 that "[t]he most significant source of chlorinated solvent losses at the Bermite facility was effluent from the water separator unit on vapor degreasers used in the production of missile motors, while smaller contributions were made from solvent bearing wash waters." (Blum Decl., Ex. 2 at pp. 7-9.) | Dr. Hughto's rebuttal is needed to explain that Dawson's opinion is not based on a scientific analysis of the evidence regarding solvent contamination at the Site, and also fails to account for other solvent release mechanisms in onsite operations. | Dr. Hughto cites the components of a scientific analysis that would support an opinion like that offered by Mr. Dawson. None of the components of that analysis are reported to have been performed by Dawson. Dawson hypothesizes the solvent release source and mechanism without showing evidence that the mechanism occurred at any of the many solvent contaminated areas. He does not identify any vapor degreasers where there was a release from the separator. Further, Dawson does not correlate the presence of the vapor degreasers with the solvent contamination. The highest solvent contamination concentrations on the site were detected in the Burn Area, where there was no vapor degreaser, yet Dawson does not explain that conflict with his opinion. Solvent contamination was detected in 41 areas of the site, and Dawson does not correlate those to his theory of release. (Blum Decl., Ex. 2 at p. 7.) |

Date: August 18, 2021

NOSSAMAN LLP

By: /s/ Patrick J. Richard
    Patrick J. Richard

Attorneys for Plaintiff SANTA CLARITA VALLEY WATER AGENCY

# EXHIBIT A



Figure 6
VOC and Perchlorate Impacted Areas Identified by Whittaker

Rebuttal Expert Report of Richard J. Hughto, Ph.D., P.E.
Santa Clarita Valley Water Agency vs. Whittaker Corporation
Source: *Expert Report of Phyllis S. Stanin, 8/3/2020*

# DECLARATION OF PATRICK J. RICHARD

I, Patrick J. Richard, declare as follows:

1. I am an attorney and partner at the law firm of Nossaman LLP, and counsel of record for Plaintiff Santa Clarita Valley Water Agency ("SCV Water") in the above-captioned action. I am a member in good standing of the State Bar of California and have been admitted to practice before this Court. I have personal knowledge of the facts set forth in this Declaration, and, if called as a witness, could and would testify competently to such facts under oath. I make this Declaration pursuant to the Court's August 13, 2021 Order (Dkt. 335) regarding the parties' efforts to meet and confer regarding Plaintiff's Offer of Proof in support of its Opposition to Whittaker's Motion in Limine No. 7 to exclude certain opinions of expert Dr. Richard Hughto (Dkt. 309).

2. Defendant's Motion in Limine No. 7 sought to exclude seven opinions offered by Plaintiff's expert witness Dr. Richard Hughto—specifically, "opinions 9, 11, 12, and 16" relating to waste disposal practices (Dkt. 309, at 3:19) and "opinions 8, 15, 16 and 19" relating to Defendant's violation of environmental laws (Dkt. 309, at 5:12.)

3. The parties met and conferred extensively about this matter on August 17, 2021. During the meet and confer, Plaintiff agreed to withdraw Dr. Hughto's Opinion 11 as to Phosphorus Stabilization ("Whittaker concluded that its Phosphorus Stabilization and other practices were potential serious violations of the Clean Water Act and RCRA." (Blum Decl. [Dkt. 324], Ex. 1 at p. 33.)

4. During the meet and confer, Defendant Whittaker indicated that it has no objection to any of the following opinions of Dr. Hughto, but Plaintiff will nonetheless provide the information regarding those opinions here, in an abundance of caution:

| Key Opinion | Purpose/Relevance | Basis |
|---|---|---|
| 3. The impacts that industrial waste disposal to the ground can have on groundwater quality were identified in the | Important context to evaluate Whittaker's conduct and its claim that industry did not understand the potential relationship between industrial waste and potential groundwater contamination. Also supports punitive | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 8-14). Therein, Dr. Hughto cites, among other things, historical literature on this topic dating back to 1899 demonstrating the knowledge the contamination |

| | | |
|---|---|---|
| literature beginning prior to 1900. (Blum Decl., Ex. 1 at p. 32.) | damages claim. This establishes that Whittaker had knowledge of the dangers created by its negligent waste disposal practices, and nonetheless Whittaker acted with willful and conscious disregard of safety. | releases can impact groundwater. The science developed and was more widely recognized in subsequent years leading to development of laws and regulations related to such contamination with much of the study and regulation being in California, including California law going back over 100 years. (*id.* at pp. 8-9). |
| 4. The understanding of the condition and the physical principles that govern migration of contaminants from waste disposed on the ground to and with the groundwater evolved beginning in the early twentieth century. (Blum Decl., Ex. 1 at p. 32.) | Supports punitive damages claim, as Whittaker acted with willful and conscious disregard of safety; and see above. | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 8-14). Therein, Dr. Hughto cites, among other things, multiple examples of scientific literature on the development of knowledge regarding this topic, much of which is from California (*id.* at pp. 9-14). |
| 5. Historic literature beginning in the early 1900s on industrial waste disposal impacts on groundwater consistently cited California locations being investigated and California regulatory development as early as 1907. (Blum Decl., Ex. 1 at p. 32.) | Supports punitive damages claim, as Whittaker acted with willful and conscious disregard of safety. | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 8-14). Therein, Dr. Hughto cites, among other things, scientific literature about California locations relating to the development of regulations regarding waste disposal and its impact on groundwater (*id.* at pp. 9-14). |
| 6. California promulgated regulations to deal with the types of groundwater contamination generated at the Whittaker Site in the 1900s. | Provide important context to support punitive damages claim, as Whittaker acted with willful and conscious disregard of safety.<br><br>Also supports allegation that perchlorate and VOC | Dr. Hughto describes the basis for this opinion in his report (Blum Decl., Ex. 1 at pp. 14-32). Dr. Hughto cites extensive evidence, including scientific literature, deposition testimony from Whittaker's witnesses Jim Jisa (Jisa Tr. at 54:15-55:4) and Zoyd Luce (Luce Tr. at 110:4-15 |

| | | |
|---|---|---|
| Whittaker's waste handling and disposal practices resulted in widespread groundwater contamination from multiple sources on its Site. (Blum Decl., Ex. 1 at p. 32.) | contamination are found throughout the site, and no area can be excluded as a location for disposal of perchlorate/VOC waste due to Whittaker's indiscriminant dumping and failure to identify and document its disposed chemicals and/or the location of its own landfills. | & 137:7-10), and documentary evidence including correspondence, company memoranda, site investigation reports and notices from regulatory agencies (*id.* at pp. 18-32). |
| Rebuttal to Dawson Opinions 1 & 2 (Blum Decl., Ex. 2 at pp. 1-3.) | N/A, in light of the Court's Aug. 18, 2021 Order (Dkt. 335) excluding Dawson's Opinions 1 & 2. | N/A, in light of the Court's Aug. 18, 2021 Order (Dkt. 335) excluding Dawson's Opinions 1 & 2. |
| Rebuttal to Dawson Opinion 4 that "[t]he most likely sources of significant perchlorate losses at the Bermite facility were: 1) Atmospheric dusts and washdown water from the operation of grinding operation bag houses; and 2) Waste water from hog out operations and JATO production." (Blum Decl., Ex. 2 at pp. 6-7.) | Dr. Hughto's rebuttal is needed to explain that Dawson's opinion is not based on any quantitative data or information from the Site, did not follow a reliable scientific method, and thus cannot rule out other significant sources that resulted in contamination of the Site. He also explains that the evidence identifies more areas in which perchlorate impacts have been detected than those referenced by Dawson, and that the areas in which perchlorate was actually detected include locations other than the operations cited by Dawson. Thus, the sources of perchlorate impact are broader than Dawson accounts for. | Dr. Hughto recognizes that Mr. Dawson renders this opinion without referencing any site-specific data or performing any scientific analysis of the data. Mr. Dawson does not cite to any specific sources to which he attributes the contamination. There are many perchlorate-impacted areas at the site, and Mr. Dawson's opinion does not demonstrate a cause and effect relationship of a source for any of them. (Blum Decl., Ex. 2 at pp. 6-7.) |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on August 18, 2021 at San Francisco, California.

*/s/ Patrick J. Richard*

Patrick J. Richard