1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

4

5   SANTA CLARITA VALLEY WATER AGENCY,      )
                                            )
6                     Plaintiff,            )
                                            )
7          v.                               )          Case No.
                                            )   CV 18-6825 SB (RAOx)
8   WHITTAKER CORPORATION, et al.,          )
                                            )          Volume 4
9                     Defendants.           )     (Pages 370 - 458)
    _____)

10

11          REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                    TRIAL DAY 2:  P.M. SESSION
12              THURSDAY, NOVEMBER 18, 2021
                          1:03 P.M.
13                 LOS ANGELES, CALIFORNIA

14

15

16

17

18

19

20

21

22   _____

23        MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                    (213) 894-2305


                UNITED STATES DISTRICT COURT

1                   **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4      NOSSAMAN, LLP
     BY:  BYRON P. GEE
5      BY:  RAVEN MCGUANE
     BY:  PATRICK J. RICHARD
6      BY:  FRED FUDACZ
         Attorneys at Law
7      777 South Figueroa Street, 34th Floor
     Los Angeles, California  90017
8      (213) 612-7800

9      NOSSAMAN, LLP
     BY:  ILSE CHANDALAR SCOTT
10          Attorney at Law
     50 California Street, 34th Floor
11      San Francisco, California  94111
     (415) 398-3600
12

13   **FOR THE DEFENDANT WHITTAKER CORPORATION:**
14
     EDLIN, GALLAGHER, HUIE & BLUM
15      BY:  MICHAEL E. GALLAGHER, JR.
     BY:  FRED M. BLUM
16      BY:  DANIEL ERIC TROWBRIDGE
         Attorneys at Law
17      500 Washington Street, Suite 700
     San Francisco, California  94111
18      (415) 397-9006

19

20   **ALSO PRESENT:**

21      MATT STONE
     SCOTT FRYER
22      RON BEATON
     ERIC LARDIERE
23

24

25

                  **UNITED STATES DISTRICT COURT**

INDEX OF WITNESSES

PLAINTIFF'S WITNESSES                                              PAGE

ABERCROMBIE, Keith

    Cross-Examination (Resumed) by Mr. Blum                     375
    Redirect Examination by Mr. Gee                            393
    Recross-Examination by Mr. Blum                            393


HUGHTO, Ph.D., Richard

    Direct Examination by Mr. Richard                          395

**UNITED STATES DISTRICT COURT**

1                         **INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR EVIDENCE PG. |
|--------|-------------|------------------|
| 96 - | 12/30/2010 letter from California Department of Public Health | 375 |
| 123 - | Hughto expert report | 414 |

**UNITED STATES DISTRICT COURT**

```
 1              THURSDAY, NOVEMBER 18, 2021; 1:03 P.M.

 2                    LOS ANGELES, CALIFORNIA

 3                            -oOo-

 4              (In the presence of the jury:)

 5         THE COURT:  We are back on the record in the trial

 6    matter with all present who were present before the break,

 7    including the jury.  And Mr. Abercrombie is still on the

 8    witness stand.

 9              And you understand that you remain under oath?

10         THE WITNESS:  Yes, Your Honor.

11         THE COURT:  All right.  Mr. Blum, you may continue

12    with your cross.

13         MR. BLUM:  Your Honor, we sent an instruction.

14         THE COURT:  Oh, yes.  Do I have that?

15         MR. BLUM:  It was sent to Mr. Cruz.

16         THE COURTROOM DEPUTY:  It hasn't arrived at my

17    e-mail.

18         THE COURT:  All right.  Do you have a written form

19    that you can hand to the Court?  If so, I'm happy to read the

20    instruction that you are requesting.

21         MR. BLUM:  We'll proceed, Your Honor.

22         THE COURT:  All right.

23    ///

24    ///

25    ///
```

01:03PM (line 5)
01:06PM (line 10)
01:06PM (line 15)
01:06PM (line 20)
01:06PM (line 25)

**UNITED STATES DISTRICT COURT**

1      **<u>KEITH ABERCROMBIE</u>,**

2   **<u>PLAINTIFF'S WITNESS, PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:</u>**

3                  **CROSS-EXAMINATION (RESUMED)**

4   BY MR. BLUM:

5        Q.    Ready to go, Mr. Abercrombie?

6        A.    Yes.

7        Q.    All right.  I want to clear up one or two things

8   that we dealt with before the break.

9             The e-mail that we were discussing of Mr. Gee that

10   was forwarded by Mr. Alvord, Mr. Gee was the one that is

11   sitting at the counsel table right now; correct?

12        A.    Correct.

13        Q.    All right.  And -- all right.  Let's move on to a

14   different subject.  Let's talk about the permit.

15             Have you ever reviewed the permit that was issued

16   that allowed the water agency to serve water from S-1 and S-2,

17   or Saugus 1 and Saugus 2, wells?

18        A.    Yes.

19        Q.    When was the last time you looked at it?

20        A.    Looked at parts of it, I don't know, within the last

21   few weeks.

22        Q.    Okay.  Now, that is stipulated Exhibit No. 96, if

23   you can bring it up, please.

24             (Exhibit 96 received into evidence.)

25        Q.    (BY MR. BLUM:)  Now, I want to talk to you about

01:07PM (lines 5, 10, 15, 20)
01:08PM (line 25)

**UNITED STATES DISTRICT COURT**

1    some terms before we get into the heart of it.

2         We talked about an MCL, but do you know what a

3    public health goal is?

4         A.   Generally.  It's a standard that's used -- it's not

5    a -- it's not a standard that the Department of Public Health

6    or DDW uses for these type of sub chemicals that have an MCL.

7    But my understanding is it's something that also looks at

8    health and -- I think it maybe, you know, doesn't take into

9    account things like the -- the ability to -- the ability to

10   treat or get rid of something, nor the cost that it would take

11   to get rid of something.

12        Q.   And what's an MCL equivalent?

13        A.   An MCL equivalent is a term that I think is found in

14   the 97-005 process document that allows you to take a group of

15   chemicals that exist at some levels, say, below the MCL, and do

16   a mathematical calculation on those chemicals and then add all

17   that up to -- to sort of determine if -- you know, to come up

18   with that term, the MCL equivalent.

19        Q.   And am I correct, sir, that according to the user's

20   guide for the DDW, if that equivalent is below 1, then the

21   water is safe?

22        A.   I believe that -- that user's guide provides for a

23   process to calculate an MCL equivalent or demand that we

24   calculate an MCL equivalent, and then the DDW takes that

25   information along with the rest of the information into

```
          1    consideration as to how they permit the project.
          2         Q.    And the critical number is:  Is it above or below 1;
          3    correct?
          4         A.    Correct.
01:10PM   5         Q.    And isn't it true that, in all of the applications
          6    that the water agency has made to the DDW, that the water
          7    agency has never calculated the MCL equivalent above 1?
          8         A.    I'm not -- I don't know that that's the case.  I
          9    seem to recall there had been a level at one point above 1.
01:10PM  10    You know, we -- we've -- this wasn't a calculation that, you
         11    know, we were that familiar with, so we took what they told us,
         12    we did -- did the process.  They came back and said, well, you
         13    didn't include this chemical or this constituent.  We want to
         14    look at those things as well.  And so I think it's had several
01:10PM  15    iterations.
         16         Q.    In the latest application made by the water agency,
         17    isn't it true that, according to the consultants you hired,
         18    Kennedy Jenks, that MCL equivalent was below 1?
         19         A.    I believe that's the case, yes.
01:11PM  20         Q.    And the public health goal for -- I think for PCE or
         21    TCE is 1.7 or 1.9 part per billion; correct?
         22         A.    I -- I don't know what the level is.
         23         Q.    But when was the last time the VOCs in either V-201,
         24    V-205, Saugus 1, or Saugus 2 was above the public health goal?
01:11PM  25         A.    I don't know.
```

1    Q.    Has it ever been?

2    A.    Well, assuming that's the number, the 1.9.  I'm not

3  aware that we've seen a number that high in 201, nor 205.  I

4  don't know about the Saugus wells.  I know those numbers have

01:11PM  5  been higher than I think we've seen at 201 and 205.  So I can't

6  say for sure.

7    Q.    But you don't know if it's above or below the public

8  health goal?

9    A.    Correct.

01:12PM  10    Q.    How about right now or the latest testing that was

11  done, is it above or below the public health goal?

12    A.    I haven't looked at the latest testing, so I don't

13  know.

14    Q.    Well, sitting here, can you testify that, in the

01:12PM  15  latest round of testing, that the VOCs in any of the wells that

16  are at issue here were above an MCL, an MCL equivalent, or a

17  public health goal?

18    A.    The VOCs have MCLs.  The MCL equivalent process is

19  useful for looking at those, but it's also useful for looking

01:12PM  20  at things that don't have MCLs.  So I don't -- I guess I don't

21  follow the -- your question.

22    Q.    All right.  Why don't we just move on.

23       If you take a look at the permit, the requirement --

24  is there something in the permit called an "operational goal"?

01:13PM  25    A.    I believe that's the term they use, yes.

```
 1          Q.    Is it -- isn't an operational goal different than a

 2   permit requirement?

 3          A.    I don't think so.  I mean, I look at everything in

 4   this permit as -- as something we've -- we try to follow.  This

 5   is a document that they've presented to us.  They've listed

 6   various things that you have to do.  And so this entire permit

 7   is something that we -- we look to follow.

 8          Q.    I understand that, but that wasn't my question.

 9                Isn't an operational goal different than a

10   requirement?

11          A.    I don't know that to be the case, no.

12          Q.    Do you know that it's not the case?

13          A.    I don't know that it's not the case either, but I

14   don't know that it is the case.

15          Q.    Okay.  If we could take a look at the permit on

16   96.8.

17                Do you see where it says under "General" and under

18   paragraph 2 there?

19          A.    Okay.

20          Q.    Now, this says that the water agency shall meet all

21   MCLs; correct?

22          A.    Correct.

23          Q.    And as far as you know, for VOCs, it has always done

24   that; correct?

25          A.    Yes.
```

01:13PM (line 5)
01:13PM (line 10)
01:13PM (line 15)
01:14PM (line 20)
01:14PM (line 25)

**UNITED STATES DISTRICT COURT**

1    Q.   All right.  Now, if we can go to page 12.  And let's

2 see.  Do you see where it talked -- you see where it says 20,

3 paragraph 20 under blending?

4    A.   Yes.

01:14PM  5    Q.   Okay.  And what does it say about achieving the

6 operational goal?

7    A.   Do you want me to read the paragraph?

8    Q.   Well, doesn't it say that you're supposed to

9 establish procedures and verification in order to achieve your

01:14PM 10 operational goal?

11    A.   Correct.

12    Q.   Now, if you're correct and 10 percent of the water

13 still contains VOCs, how long has it been since the water

14 agency has met the operational goal?

01:15PM 15    A.   Well, I mean, we meet it every month when we -- or

16 every week when we sample and there's no detection.  But we

17 haven't consistently met it since the operation of the facility

18 on, like, a permanent basis.

19    Q.   And the wells are still operating?  The DDW hasn't

01:15PM 20 pulled your permit?

21    A.   They have not.

22    Q.   Have you -- have you seen a letter from them that

23 says, water agency, meet the operational goal or turn the

24 faucet off?

01:15PM 25    A.   No.

UNITED STATES DISTRICT COURT

1    Q.   Now -- all right.  Let's go further on.

2         Now, attached to this permit, wasn't there an

3    engineering report that was prepared by one of the water

4    agencies?  I think it's the Metropolitan Water Department.

01:16PM    5         If we can go to page 19, 96.19.  Do you remember

6    seeing this?

7    A.   Yes.  I've seen that as part of that document.

8    Q.   All right.  And this was prepared by

9    Susan Brownstein; correct?

01:16PM   10   A.   That's what it says.

11   Q.   And who is Susan Brownstein?

12   A.   It says that she's a -- one of the engineers, so a

13   staff member at DDW.

14   Q.   Okay.  And then it was approved by Mr. O'Keefe;

01:16PM   15   correct?

16   A.   Yes.

17   Q.   Isn't -- what's Mr. O'Keefe's current position with

18   the DDW?

19   A.   Might be the same.  I mean, he's in charge of -- of

01:16PM   20   the district.  So I don't know what the title is, but it might

21   be the same as it was then, actually.

22   Q.   The colloquialism would be head honcho?

23   A.   Yeah.

24        MR. BLUM:  All right.  Now, if we could go to

01:17PM   25   page .34.

1    Q.   Now, have you seen -- have you ever read in this

2    report the discussion of sources of the contamination other

3    than Whittaker?

4    A.   No.  I really never read that part of the report.

5    MR. BLUM:  If you can go to the last full paragraph.

6    And if you can blow that up, Rick.

7    Q.   (BY MR. BLUM:)  Okay.  You see where it talks about

8    AL-12B?

9    A.   Uh-huh.  Yes.

10   Q.   All right.  And then the second-to-the-last line, it

11   says, "The TCE and the PCE contamination at this location is

12   not believed to have originated at the Whittaker Bermite site"?

13   A.   Okay.

14   Q.   What, if anything, has the water agency done to find

15   out what the source is of that contamination?

16   A.   Well, I mean, there is -- there was a study I know

17   that was done that we talked about just before that was done in

18   2015-ish or so by CH2M Hill to try to look further into the

19   contamination sources.

20   Q.   That was the study in which CH2M Hill says you need

21   to do further testing, which has never been done?

22   A.   Right.

23   Q.   All right.  Now, hasn't the water agency continually

24   told the public that there's multiple possible sources of VOCs

25   that can contaminate the water?

         1          A.    I don't know.  I know we've got the report from --

         2   the CH2M Hill report that you've talked about that has

         3   identified potentially two sources.

         4          Q.    Well, has the water agency ever told the public that

01:18PM  5   VOCs can come from gas stations, petroleum production,

         6   stormwater runoff, or septic tanks?

         7          A.    We might have.  That might have been a -- as far as

         8   in the water quality report, a statement that defines potential

         9   sources just in general for VOCs.

01:19PM 10          Q.    And in your -- based on your knowledge, it's true

        11   that VOCs can originate at gas stations, petroleum production,

        12   stormwater runoff locations, or septic tanks; correct?

        13          A.    I believe that would be correct, yes.

        14          Q.    All right.  I want to move to the damage -- the

01:19PM 15   damage portions here.

        16          THE COURT:  And before you do so, ladies and

        17   gentlemen, you're going to be hearing -- I believe, that

        18   Mr. Abercrombie was designated a 30(b)(6) witness with respect

        19   to the issue of damages.  When a corporation designates a

01:19PM 20   Rule 30(b)(6) witness as a deponent, that witness is authorized

        21   to speak for the organization on the specified matters, unlike

        22   other employees deposed in the litigation.

        23          The testimony of a Rule 30(b)(6) representative

        24   in -- is an evidentiary admission.  When you evaluate the

01:20PM 25   testimony of a Rule 30(b)(6) representative, you may have to

384

<table>
<tr><td>1</td><td>decide which testimony to believe and which testimony not to</td></tr>
<tr><td>2</td><td>believe.  You may consider the credibility of the witness in</td></tr>
<tr><td>3</td><td>determining whether to believe the testimony of a Rule 30(b)(6)</td></tr>
<tr><td>4</td><td>representative.</td></tr>
<tr><td>5</td><td>You may proceed.</td></tr>
<tr><td>6</td><td>MR. BLUM:  Thank you, Your Honor.</td></tr>
<tr><td>7</td><td>Q.    (BY MR. BLUM:)  Mr. Abercrombie, do you recall in</td></tr>
<tr><td>8</td><td>December of 2019 you testified as a 30(b)(6) witness on the</td></tr>
<tr><td>9</td><td>issue of damages?</td></tr>
<tr><td>10</td><td>A.    I recall a deposition, yes.</td></tr>
<tr><td>11</td><td>Q.    Do you recall you were testifying as a corporate</td></tr>
<tr><td>12</td><td>representative?</td></tr>
<tr><td>13</td><td>A.    I -- I recall I was that when I was there, yes.</td></tr>
<tr><td>14</td><td>Q.    All right.  Good.</td></tr>
<tr><td>15</td><td>Now, the damage calculations that you did that you</td></tr>
<tr><td>16</td><td>showed the jury when you were looking at the -- when you were</td></tr>
<tr><td>17</td><td>looking at the amount of water that would have been produced</td></tr>
<tr><td>18</td><td>and therefore had to be replaced; correct?</td></tr>
<tr><td>19</td><td>A.    Yes.</td></tr>
<tr><td>20</td><td>Q.    Do you remember that?</td></tr>
<tr><td>21</td><td>Which years did you choose to look at in order to</td></tr>
<tr><td>22</td><td>make the determination as to how much water would be needed?</td></tr>
<tr><td>23</td><td>A.    For -- for V-201, I believe I initially looked at --</td></tr>
<tr><td>24</td><td>this was in or about 2010, you know, time frame when the well</td></tr>
<tr><td>25</td><td>went out of service.  So it's kind of when I started looking at</td></tr>
</table>

01:20PM (line 5)
01:20PM (line 10)
01:20PM (line 15)
01:21PM (line 20)
01:21PM (line 25)

**UNITED STATES DISTRICT COURT**

1    that.  And I looked at the historical production of the well.

2    That well had only been drilled and put online in, like, '89,

3    '90.

4          So I looked back at the production from that well

01:21PM 5    for time periods before the 2010 time period, if you will.  And

6    I believe I had, like, a five- or six-year period I looked at,

7    and then I went back to pick up the full maybe nine years or

8    whatever it was.

9          Q.   And then did you average those numbers?

01:22PM 10   A.   No.  I -- I -- I got those two -- I mean, I averaged

11   the individual numbers over those five years or whatever, but

12   then I picked the smaller of those two to avoid a fight.

13         Q.   Okay.

14         A.   Frankly.  It wasn't a huge volume of water, but I

01:22PM 15   didn't want to go down that path.  So I -- with your client.

16   So I -- I picked the five-year average or whatever it was that

17   gave the slightly smaller volume of 2 -- I think it was

18   214 acre-feet per year.

19         Q.   Now, you testified, sir, did you not, that the only

01:22PM 20   two possible sources of water are groundwater and State water;

21   correct?

22         A.   Those are the two we have available to us, yes.

23         Q.   That's not a correct statement, is it?

24         A.   Well, for -- I mean, if you want to include the

01:23PM 25   500 acre-feet of water we have for recycled water.

1    Q.   Well, how about banked water?

2    A.   Well --

3    Q.   Do you have banked water?

4    A.   To me, imported water includes any water we bring

5  down the aqueduct into our treatment plants.

6    Q.   But do you -- what is banked water, sir?

7    A.   Banked water is water that we as an agency have

8  purchased and put in groundwater storage banks in the

9  Central Valley, for instance, that can be used in periods of

10  drought.

11    Q.   And other than transportation costs, you don't have

12  to pay for that water because you already paid for it earlier

13  on; correct?

14    A.   Um, in some cases.  Other cases, I think that their

15  deals for the water, that you have to replace that water with

16  volumes in the future depending on where you're getting it

17  from.

18    Q.   Don't you also have contracts with Kern and

19  Yolo County for water?

20    A.   I believe so, yes.

21    Q.   So there are at least four water sources, not two;

22  correct?  Actually, five.  Yolo County, Kern County, and

23  Big Water, plus the two we talked about; correct?

24    A.   Well, I would still lump that, again, into imported

25  water, is water that comes down the aqueduct and into our

1   system.

2       Q.   Now, in doing your calculations about the costs, did

3   you take into account the different costs of water if you use

4   banked water or water you have under contract with, Kern County

01:24PM  5   or Yolo, versus water that you have to buy outright from the

6   State?

7       A.   The calculations --

8       Q.   Did you take it into account or not?

9       A.   We did not take that into account because they

01:24PM  10  weren't part of the calculation.

11      Q.   They were not part of it because you decided they're

12  not part of it; correct?

13      A.   Because they are not appropriate to be part of it.

14      Q.   Well, can you -- do you have access to your banked

01:25PM  15  water?

16      A.   Are you asking today do we have access to it?  I

17  don't know.

18      Q.   Well, when you -- a year ago, did you have access to

19  it?

01:25PM  20      A.   Again, I don't know.  I'm not the department that

21  has -- I mean, we have access to it until we've used it.

22      Q.   Well, in making your calculations, did you look into

23  whether or not there was banked water or water you had rights

24  to under contracts with other counties to draw from?

01:25PM  25      A.   No.

1    Q.    All right.  Now, in -- so let's go to the issue of

2    damages.  And I want to talk about specifically your testimony

3    as a corporate representative for the water agency.

4          As that representative, are you aware of any

01:26PM    5    instance in which VOCs have prevented the delivery of water to

6    your customers?

7    A.    Other than delaying our permit, no.

8    Q.    Are you -- are you aware of any instance in which

9    VOCs have prevented the delivery of water to your customers?

01:26PM   10    Yes or no.

11    A.    No.  My answer was what I just said.  We can't

12    deliver water from V-201 right now because of VOCs.

13    Q.    Okay.  Well, is that what you testified to in your

14    deposition?

01:26PM   15    A.    I don't know.  I don't remember.

16    Q.    All right.  It's page 45, lines 12 through 15.

17          MR. BLUM:  When counsel has a chance to see it, I'm

18    going to play the video.

19          Patrick, is it okay?

01:27PM   20          MR. RICHARD:  He's not my witness.

21          MR. GEE:  I'm fine with it.

22          (Videotaped deposition was played:)

23    Q.    *Are you aware of any occasion in which the*

24      *presence of VOCs has prevented water from being*

25      *delivered to any of your customers?*

1        A.      *No.*

2        Q.      (BY MR. BLUM:)  Now, when you were testifying on

3   that day, you were under oath; correct?

4        A.      Correct.

01:27PM   5        Q.      Same oath you took here?

6        A.      Yes.

7        Q.      And you told the truth then; right?

8        A.      Yes.

9        Q.      And there was no qualification in your deposition

01:27PM  10   when you were asked, has it prevented any delivery?  It was

11   just "No."

12        A.      That's correct.

13        Q.      Now, here, there's qualifications; correct?

14        A.      Well, I'm telling you what the case is here.

01:27PM  15        Q.      Now, the other -- one of the last questions is

16   are -- other than blending water and the cost of blending

17   water, are you aware of any damages suffered by the plaintiff

18   from VOCs?

19        A.      Well, are you lumping replacement water in with

01:28PM  20   blending water?  I mean, that's --

21        Q.      No.

22        A.      That's an --

23        Q.      Other than blending water, any damages?

24        A.      Well, there's replacement water.

01:28PM  25        Q.      Anything else?

```
  1        A.    I can't think of anything right now.

  2        Q.    Okay.  Now, isn't -- in your deposition as the

  3  corporate representative, didn't you testify that the only

  4  damage was blending water?

  5        A.    I guess so since you're asking me the question, but

  6  I don't remember what I testified.

  7        Q.    All right.  Again, page 45, line 20 through 23.

  8              MR. BLUM:  Your Honor, I'm just waiting for counsel.

  9              THE COURT:  He's had sufficient time.  Please

 10  proceed.

 11              MR. BLUM:  Okay.  Play it.

 12              (Videotaped deposition was played:)

 13        Q.    Are you aware of any damages suffered by the

 14        Water District as a result of the presence of VOCs

 15        other than the need to blending water for V-201?

 16        A.    No.

 17        Q.    (BY MR. BLUM:)  When you said that, when you said

 18  "No," you were under oath; correct?

 19        A.    Correct.

 20        Q.    All right.  Now, this is the last issue that I

 21  want -- that we're going to talk about.

 22              You saw -- you were shown a photograph -- I think

 23  it's Exhibit 471 -- of basically the piping that's in -- for

 24  V-201; correct?

 25        A.    Yes.
```

01:28PM (line 5)
01:29PM (line 10)
01:30PM (line 20)
01:30PM (line 25)

1    Q.    That was paid for by Whittaker; right?

2    A.    Well, part of that was, of the perchlorate treatment

3    system.

4    Q.    Well, that is the perchlorate treatment system.

01:30PM    5    A.    Well, there's more in the picture.  The well is in

6    the background.  There's other things.  So, yes, that treatment

7    system was funded by Whittaker pursuant to our V-201 agreement.

8    Q.    Right.

9         And, in fact, Whittaker has already paid tens of

01:30PM    10    millions of dollars to the water agency; correct?

11    A.    Over the years in building the several plants, sure.

12    Q.    Actually, it's been upwards of 60 million with

13    another 10 million in a contingency fund?

14    A.    I don't know the numbers, so --

01:31PM    15         MR. BLUM:  All right.  If we can go to

16    Exhibit 489 -- I'm sorry.  Not 489.  Yeah, 489, page 795.  And,

17    again, I think this is the -- yeah.  The paragraph line that

18    says the settlement agreement, two above where it says DTSC

19    CLWA.

01:31PM    20    Q.    (BY MR. BLUM:)  All right.  See where it says that

21    they've -- Whittaker has paid $50 million for a treatment

22    system that's supposed to go for 30 years?  Correct?

23    A.    Well, I think that's saying they're committing to

24    pay for that.  I don't know that it's all been spent.

01:32PM    25    Q.    All right.  Well, if you -- let's go to the next

1    paragraph.  It talks about $31 million has been reimbursed to

2    the agency for past expenses; correct?

3         A.    Correct.

4         Q.    And below it, another 5 to 10 million will be used

01:32PM  5    to construct wells and pipelines?

6         A.    Yes.

7         Q.    And another 10 million is available to allow water

8    supplies if additional treatment is necessary?

9         A.    Correct.

01:32PM 10         Q.    And also, didn't Whittaker commit to pay for the

11    construction of two entirely new wells?

12         A.    Um, I think that's part of that 10 -- or part of

13    that 5 to 10 million that you're -- or maybe I'm confused

14    but --

01:32PM 15         Q.    And part of it is to -- is to build and drill two

16    entirely new wells outside the plume of the perchlorate or the

17    VOCs; correct?

18         A.    Two new replacement wells, yes.

19         Q.    And Whittaker has committed to pay for that;

01:33PM 20    correct?

21         A.    I believe there is an agreement, yes.

22         Q.    It's about $65 million in total; right?

23         A.    Maybe.  Yeah.

24              MR. BLUM:  Okay.  Thank you.

01:33PM 25              THE COURT:  Mr. Gee, redirect?

**REDIRECT EXAMINATION**

BY MR. GEE:

    Q.    Mr. Abercrombie, I just have one simple follow-up

question.

        Did Whittaker only pay for the perchlorate treatment

systems only after being sued?

    A.    The initial systems, yes.

    Q.    And we earlier talked about V-201, perchlorate

treatment system.  Was there a willingness to immediately fund

the cost of -- to install the V-201 perchlorate treatment

system?

    A.    No.  It was a process.  I mean, it took a number of

years before we could get to the point of having the V-201

agreement in place that accomplished that.

        MR. GEE:  That's all I have.

        THE COURT:  Anything further?

        MR. BLUM:  Yes, sir.

**RECROSS-EXAMINATION**

BY MR. BLUM:

    Q.    Mr. Abercrombie, wasn't the holdup on the building

of the V-201 the fact that the water agency wanted to have

carte blanche in how they constructed it and Whittaker said,

no, we'll -- we'll design it and we'll control it?

    A.    No.  A lot of the holdup was that Whittaker wanted

an agreement structured in a certain way to meet certain needs

| | |
|---|---|
| 1 | they had with funding, I think, from the Department of Defense. |
| 2 | MR. BLUM:  All right.  Thank you. |
| 3 | THE COURT:  You're excused, sir.  Please watch your |
| 4 | step going down. |
| 5 | And we're still with the plaintiff's case.  So who's |
| 6 | your next witness? |
| 7 | MR. RICHARD:  Yes, Your Honor, thank you.  Plaintiff |
| 8 | would call Mr. Rick -- or Dr. Rick Hughto to the stand.  I |
| 9 | don't see him, so we'll run and get him. |
| 10 | He's right here so -- |
| 11 | THE COURTROOM DEPUTY:  Good afternoon, sir.  Would |
| 12 | you please come forward. |
| 13 | Would you please walk around, and I'll swear you in |
| 14 | when you get up on the platform. |
| 15 | Please raise your right hand to be sworn. |
| 16 | Do you solemnly swear that the testimony you shall |
| 17 | give in the cause now before this Court shall be the truth, the |
| 18 | whole truth, and nothing but the truth, so help you God? |
| 19 | THE WITNESS:  I do. |
| 20 | THE COURTROOM DEPUTY:  Thank you.  Please be seated. |
| 21 | Sir, for the record, would you please state your |
| 22 | name and then spell your last name. |
| 23 | THE WITNESS:  Can I take this off, please? |
| 24 | My name is Richard Hughto, spelled H-u-g-h-t-o. |
| 25 | THE COURT:  Mr. Richard. |

01:35PM (line 5)
01:35PM (line 10)
01:36PM (line 15)
01:36PM (line 20)
01:36PM (line 25)

**UNITED STATES DISTRICT COURT**

1          MR. RICHARD:  Oh, thank you, Your Honor.

2                **RICHARD HUGHTO, PH.D.,**

3   **PLAINTIFF'S WITNESS, HAVING BEEN SWORN, TESTIFIED AS FOLLOWS:**

4                **DIRECT EXAMINATION**

01:36PM 5   BY MR. RICHARD:

6      Q.  Good afternoon, sir.

7      A.  Good afternoon.

8      Q.  You've been retained as an expert in this matter; is

9   that right?

01:36PM 10      A.  Yes, I have.

11      Q.  And before we talk about your work in this case,

12   Dr. Hughto, can you please describe for us a bit about your

13   educational background?

14      A.  Yes.  I received a Bachelor of Engineering in civil

01:37PM 15   and environmental engineering from Manhattan College in 1972.

16   I've received a Master's in environmental engineering from

17   Manhattan College also in 1973.  And I received a Ph.D. in

18   water resource engineering from Cornell University.  And I

19   finished there in 1979.

01:37PM 20      Q.  Okay.  And do you have any background in hydrology

21   or hydrogeology?

22      A.  I do.  I studied hydrology and hydrogeology in all

23   three levels of education that I had.  I've been practicing in

24   hydrology in professional positions I've had since 1975.

01:37PM 25      Q.  And what is hydrology, sir?

**UNITED STATES DISTRICT COURT**

          1        A.    Hydrology is the study of movement -- of the

          2   movement of water in the environment.  One way to think about

          3   it is the hydrologic cycle, which is water comes from the sky

          4   as precipitation, falls on the earth, either will penetrate the

01:38PM   5   earth, percolating through the soil into groundwater, and

          6   groundwater is just the movement of water under -- within the

          7   soil below the ground surface.  And also that the water that

          8   falls from precipitation could run off and become surface water

          9   in rivers, lakes, or other surface water bodies.

01:38PM  10        Q.    Thank you.

         11        And in addition to your degrees and Ph.D. from

         12   Cornell University, can you please describe any professional

         13   licenses and registrations you have in your field?

         14        A.    Yes.  I've had a number of licenses over the years.

01:38PM  15   I've had professional engineering licenses in six different

         16   states.  I had a -- a license called a licensed site

         17   professional in Massachusetts which is a specialty only in

         18   Massachusetts which is a -- a license which you're allowed to

         19   render decisions on the investigation and remediation of

01:39PM  20   contaminated sites in Massachusetts.  In order to render

         21   opinions on those types of sites to the State in Massachusetts,

         22   you must have that license.  And I've also been a certified

         23   hydrologist by the American Institute of Hydrology.

         24        THE COURT:  Dr. Hughto, could I just have you move

01:39PM  25   maybe an inch or so away from the microphone.  You're doing a

good job speaking into it so everyone can hear you, but you're

just a tad too close.

        THE WITNESS:  Okay.

        THE COURT:  Thank you.

        MR. RICHARD:  Thank you, Your Honor.

Q.    (BY MR. RICHARD:)  And how did you become -- did you

say a certified or a registered professional hydrologist?

A.    It's certified.

Q.    And how did you become a certified hydrologist?

A.    There is a process for applying.  Again, it's

through the American Institute of Hydrology, a nationwide

professional organization in which you fill an application out,

showing your -- your education and experience in the field.

        And if you're -- you have sufficient experience,

according to those senior officials at the American Institute

of Hydrology, you can -- you'll be granted a license.  If -- if

there's any question there, they also have an examination

process where applicants can take an examination much like the

professional engineering license and -- and gain the -- the

certification through that process.

        I didn't take the exam.  I was given the license

based on my education and experience.

Q.    Have you taught any courses in your professional

field?

A.    Yes.  While I was in graduate school at Cornell, I

```
 1   was -- I taught hydrology courses to juniors and seniors,

 2   usually in the summer.  I was also a teaching assistant in

 3   other related type of courses.  But the -- I was the principal

 4   instructor in the hydrology course, I taught to the juniors and

 5   seniors and, again, teaching the principles of the movement of

 6   water in the environment and also discussing the movement of

 7   contaminants in the environment.

 8        Q.    Did you teach students about things such as

 9   hydrogeologic cycle that you mentioned earlier?

10        A.    I did.

11        Q.    Did you teach them about aquifers?

12        A.    Yes, I have.  Aquifers are -- are the bodies of --

13   the underground bodies of water called groundwater, and that

14   was a component of the course.

15        Q.    Do you have any experience teaching or speaking on

16   something called "site assessments"?

17        A.    I do.

18        Q.    Can you briefly explain your experience in that

19   regard?

20        A.    Yes.  I've been involved in performing what we call

21   site assessments for around 40 years now.  During that period

22   of time, I've been involved in instructing different groups how

23   to conduct site assessments, from people that I hired and

24   personally mentored and instructed to professional groups, like

25   the group -- group of LSPs, the group that I had the license
```

01:40PM   5

01:41PM   10

01:41PM   15

01:41PM   20

01:41PM   25

**UNITED STATES DISTRICT COURT**

for in Massachusetts.  Other -- other professional types of

groups of people who work in my industry.  I have also done

programs for legal groups, groups of lawyers, groups of

bankers, insurance companies, and a number of other types of

organizations.

Q.   And I should just ask you briefly, when -- can you

explain what you mean by "site assessment" in those various

teaching and presentations?

A.   Yes.  A site assessment is a multistep process with

the goal of determining whether there is the potential or there

is an existing contamination condition on a property.  And in

going forward, if you do happen to find one, determining

whether it needs to be cleaned up or mitigated or -- and, if

so, determining a method that is consistent with the objectives

of your assessment.

I had multistep.  The first step is -- is reviewing

records.  It could be records -- records related to the

ownership of a property to what happened on the property.  What

kind of operations were there?  Was it manufacturing?  Was it a

gas station?  What -- what happened there over time and what

happened that could have impacted the environment on the

property?  What could have impacted soil and groundwater

quality, just based on records?

Once a thorough record search is completed, if --

the next phase is to look into whether any of the conditions or

any of the history that may have led to contamination, in your

judgment as the assessor, whether any of those actually did

cause contamination, which in most cases calls for field

investigations, whether it's through the collection of --

01:43PM   collection of soil samples.  It could be visual, could be

collecting groundwater samples, soil, vapor, air, water,

sediment, collecting samples to determine whether there is

contamination present.

        If so, if you find contamination, the next step is

01:44PM   to determine the degree and the extent of the contamination.

How far did it go?  Where is it vertically?  Horizontally?  In

what media?  When I say "media," I mean water, soil, air.  And

does it need to be cleaned up?

        There is a process the government has set up to

01:44PM   determine whether the -- called a risk assessment in which

the -- you evaluate whether the contamination conditions you

have need to be cleaned up for the uses of the property you're

assessing.

        And the final phase is the -- is the actual

01:44PM   mitigation of the problem, if that is necessary, at a site.

        Q.   And how long have you been involved in site

assessments, that multistep process you just described?

        A.   About 40 years.

        Q.   Can you tell us briefly, give us an overview of your

01:45PM   work history?

1          A.    Yes.  After I finished the Master's degree at

2    Manhattan College, I went to work for the Federal Government,

3    the Environmental Protection Agency in New York City.  That

4    office governs New York, New Jersey, Puerto Rico, and the

01:45PM   5    Virgin Islands.

6               I was an engineer there for about two-and-a-half

7    years.  And my primary responsibility was evaluating the

8    impacts of waste disposal practices on the land or in water on

9    the environment.  It included actual field work to collect

01:45PM   10   samples, to characterize the environment, as well as to

11   mathematically model the impacts of contaminants on the

12   environment.

13              I left the EPA in December of 1975.

14         Q.    Before we go on to the next position, just what was

01:45PM   15   your title with the EPA?

16         A.    I was -- the government has ways of categorizing

17   people.  And I was an environmental engineer.  They have

18   numbers after it.  I think I was a 7, a 9, and some other

19   numbers.

01:46PM   20        Q.    You might just want to slow down just a little bit

21   for our court reporter.  I'm sure she'll appreciate that.

22              Okay.  After -- you worked at the EPA for -- what

23   did you say?  Two or three years?

24         A.    Two-and-a-half years.

01:46PM   25        Q.    And then did you go back to grad school at some

**UNITED STATES DISTRICT COURT**

402

```
  1    point?  Or what was your next position?
  2         A.    Yes.  I left EPA, actually, on Christmas Eve of '75
  3    and then in January began the Ph.D. program at Cornell.  While
  4    I was at Cornell, I was also working as a research assistant
  5    for -- for a couple of different professors.  I was a teaching
  6    assistant, and I was -- I taught the hydrology course I talked
  7    about during the summer and was a student as well.
  8         Q.    Okay.  And then when did you get your Ph.D.?
  9         A.    I finished the work there in 1979, and the degree
 10    was conferred a couple of years later when I finished all the
 11    paperwork.
 12         Q.    And, again, your Ph.D. was in what specifically?
 13         A.    It was in water resource engineering.
 14         Q.    Okay.  And where did you work -- what was your next
 15    full-time position after 1979?
 16         A.    In August of 1979, I moved to Boston, went to work
 17    for a company called Camp Dresser & McKee, also known as CDM.
 18         Q.    And what did you do there?
 19         A.    I was doing site assessment type work pretty much
 20    from the beginning for different types of land development,
 21    people under the enforcement programs of the Government, both
 22    state and federal levels, and develop -- and was part of the
 23    formation of a group to be the first consultants in the country
 24    to study and clean up federal Superfund sites for the Federal
 25    Government, procured a couple of multi-hundred-million-dollar
```

01:46PM (line 5)
01:46PM (line 10)
01:47PM (line 15)
01:47PM (line 20)
01:47PM (line 25)

1    contracts to be studying Superfund sites around the country.

2         Q.    So CDM at that time was a private business that had

3    a contract with -- with whom?

4         A.    The contracts that I was referring to are with the

01:48PM  5    EPA and some with the Department of Defense, working on these

6    large federal Superfund sites.

7         Q.    Okay.  And how long were you with CDM doing these

8    site assessments for the EPA and others?

9         A.    I was there just short of seven years.

01:48PM  10        Q.    Okay.  And then where did you work, sir?

11        A.    I went to a small firm known as Rizzo Associates,

12   R-i-z-z-o, located in the Boston suburbs.

13        Q.    And what did you do there?

14        A.    I was hired there to develop a group at -- it was a

01:48PM  15   small consulting firm, and I was hired to develop a group to

16   form the site assessment group and to conduct the assessments

17   and also to conduct remediation of contaminated sites.  At the

18   same time, I ultimately became the chief operating officer of

19   the company as well as doing the technical job that I had.

01:49PM  20        Q.    Okay.  And where was Rizzo located?

21        A.    At first, a town called Natick, Massachusetts, but

22   12 miles west of downtown Boston.

23        Q.    And can you give us an example of the type of site

24   assessments you worked on at either CDM or Rizzo Associates?

01:49PM  25        A.    Would you like an example, like a case study type of

1    example?

2        Q.    Sure.

3        A.    And this is somewhat applicable to what we're

4    talking about here.

01:49PM  5            I worked for about a decade on a site in the Boston

6    suburbs that -- that made metal parts.  They were -- they

7    extruded metal, which meant they took different types of metal,

8    primarily aluminum, and formed them into different shapes.  And

9    they made dozens of different products.

01:49PM  10           One they made a lot of, if you ever took the covers

11   off of your light switches and plugs, there's an aluminum thing

12   behind where all the wires are, they made those.  They made

13   millions of them.  They made parts that went into dashboards

14   and doors of cars and things.

01:50PM  15           So what they did, they made these huge sheets of

16   aluminum and other metals and, through heat and cutting

17   processes, formed these different products that they made.

18           Oils were involved in that process.  You need oils

19   when you're going to be doing the forming and the cutting.  And

01:50PM  20   so the parts they made would end up being greasy and oily at

21   the end.  And they had to remove the grease and oils from the

22   products.

23           So they use what's called a vapor degreaser, which

24   is a machine or a piece of equipment in which a chemical

01:50PM  25   solvent is used to remove the -- those greases from the -- from

the manufactured parts.  Then those greases and oils end up

going into the solvent and -- which creates a sludge, which is

the oils and some of the used-up solvent that has to be managed

properly.

01:51PM

As a result of this operation and -- there are

different types of degreasers.  The one there was what's called

a vapor degreaser, which also was at the Whittaker site.  And

what vapor degreaser does is -- or how it operates is heat is

applied to the solvent which vaporizes it, much like you could

01:51PM heat water and make it go into water vapor.  And the part is

exposed to the vapor.  And then that grease and oil dissolves,

and then the -- the solvent is recondensed and it takes out the

oils.

The problem at the site I'm talking about that I

01:51PM worked up in the Boston area was that the -- this vapor

actually got outside the degreaser pretty consistently, would

get on the walls of the room, condense on the walls, form the

liquid, and it would go down the walls through the crack in the

flooring and go into the ground underneath.

01:52PM        Q.    Let me --

       A.    They appeared not to have leaks in the system.  They

didn't appear to have disposal waste.  But from years of

investigation we did, we found that the only place that it

entered the environment was through the cracks in the floor.

01:52PM And the -- so we had to figure out the extent of the source.

01:52PM

1          It migrated downward into the ground, into the
2     water, into bedrock under the soil.  It migrated onto the
3     neighboring property which, unfortunately, had a water supply
4     well that belonged to the town where they resided.

5          The work I was doing there was -- was determining
6     the degree and extent of contamination, how it got from Point A
7     to Point B and evaluating means of mitigating the situation and
8     negotiating with a number of different parties who had interest
9     in it, including that town.

01:52PM

10     Q.   So that was just my -- my next question was -- and
11     so you were personally involved in that extrusion manufacture
12     with the vapor degreaser that you just described?
13     A.   Yes.
14     Q.   Okay.  Have you been involved in site assessments

01:53PM

15     for any military sites that made ammunition or other munitions?
16     A.   Yes.  Just related to the munitions of the military
17     type sites?
18     Q.   Yes.
19     A.   I was involved with two sites in California.  One

01:53PM

20     was -- they were both involved in -- in rockets and missiles.
21     I can't recall because it's been a while whether there was any
22     ammunition, but there was rocket fuels and missiles involved,
23     manufactured at both locations.
24          One was a United Technologies facility,

01:53PM

25     United Technologies, a giant company that operates around the

world.  And the other one was operated by Goodrich.  More

famous for tires than they are for missiles.

Q.    Okay.  And those are projects, again, that you were

involved in the site assessment?

01:54PM    A.    Yes.  Excuse me.  Yes.

Q.    And have you been involved in any projects that

involved TCE and the historical use of TCE at a particular

site?

A.    I've been involved with -- in many dozens of TCE

01:54PM    sites around the country over the last 40 years.  There are

probably very few times when I didn't have some kind of a TCE

site on my dance card.

Q.    And, first of all, what is TCE, in your experience?

A.    TCE is trichloroethylene.  It ends with e-n-e which

01:54PM    is an important distinction because there's going to be one

that ends in a-n-e discussed in this case.  It is a chemical

solvent.  The one that I did -- when I talked about the

extruding operation, they used TCE as their -- their degreasing

solvent.

01:54PM    It's a chemical that is heavier than water, somewhat

soluble in water, and it is a very effective degreaser.  And in

many cases, in my experience, it's the degreaser of choice for

degreasing metal parts.  And I found in different work I've

done related to the Department of Defense, it has been required

01:55PM    as a contract term to be used on -- in certain manufacturing.

**UNITED STATES DISTRICT COURT**

1      Q.    And I didn't ask you this earlier.  When you were

2  with the EPA, did you have any experience with TCE?

3      A.    Yes.  There were some sites, particularly New Jersey

4  that I recall, in which we were evaluating the impacts of, I

01:55PM   5  believe, some waste disposal areas and industrial facilities in

6  New Jersey.  And TCE was involved in some cases -- or it was

7  discovered in some cases and had -- and had to be -- the

8  situation had to be assessed in the manner that I've described

9  earlier.

01:55PM   10      Q.    And so that -- you were with the EPA in the early

11  '70s?

12      A.    Correct.  I got there in mid '73 and left at the end

13  of '75.

14      Q.    And so can you describe briefly whether you have any

01:56PM   15  experience with landfills?

16      A.    Yes.  I've been working with different types of

17  landfills for over -- going -- actually, back into the days I

18  was at EPA, which would go back pretty close to 50 years now.

19  And I categorize them sometimes as informal and formal

01:56PM   20  landfills.

21           Formal landfills would be something that was

22  designed to be a landfill, like maybe a municipality's landfill

23  where they would actually build a foundation possibly with a

24  liner, building leeching -- leeching collection equipment,

01:56PM   25  building a monitoring system, and also with plans for closure

**UNITED STATES DISTRICT COURT**

in the end.

There are also what -- what I call informal landfills where people just dispose of stuff.  That was at the Whittaker site.  It's been done at other locations that I worked at.  And I've -- I've had to assess those types of situations for many years as well.

Q.   So what do you mean when you call it an informal landfill?

A.   That's my own term.  It's one that wasn't designed to be a landfill.  There was no real engineering involved.  It was just a place where materials were -- were put.

Q.   And do you have any experience, again, very briefly, with groundwater modeling?

A.   I do.  I began studying groundwater modeling as part of my master's program in 1972 and 1973.  As I think I described when I worked for EPA, following that time, part of my job was to develop groundwater and surface water models to evaluate contamination conditions.

My Ph.D. thesis was on modeling of ground and surface water systems.  And I've been involved on and off in mathematical modeling and evaluation of contamination conditions ever since.

Q.   Has your work also touched on something called RCRA?

A.   It has.

Q.   And what is RCRA?

UNITED STATES DISTRICT COURT

01:58PM

1        A.    RCRA is the Resource Conservation and Recovery Act.

2        Q.    And can you explain very briefly from the

3   perspective of an environmental professional like yourself what

4   RCRA is?

5        A.    RCRA is a law that came out of the increasing

6   concern over the -- about environmental contamination during

7   the '50s, '60s, and '70s.  The law was passed in 1976.

8   Regulations pursuant to it weren't promulgated until 1980.

9             And I like to think of two parts of RCRA, large

10  law -- large set of regulations to primary parts, the first

11  being what's called the cradle-to-grave tracking of waste

12  materials.  Manufacturing operations -- RCRA applies to

13  manufacturing operations, not to abandoned landfills or

14  abandoned sites.

15            The -- and if waste materials are created, RCRA

16  provides for or requires that those be tracked, those waste

17  materials be tracked.  Where are they created?  Where are they

18  stored?  How are they stored?  In what quantities?  In what

19  location in the facility?  There are requirements where you

20  store your waste in the facility.  You have to meet certain

21  government regulations.  How long do you keep it there?  You're

22  only allowed to have certain types of wastes in a location for

23  a certain amount of time.  How is it disposed?  Did it follow

24  regulations?  Did it go to a licensed facility?  What's the

25  paper trail for documenting that each one of those steps took

place?  That's what I call the cradle-to-grave aspect.

        The other aspect of RCRA is the -- the outside

environment at a RCRA site that -- this is -- this is --

really, it follows the site assessment process that I testified

02:00PM    about a little while ago.

        There are -- there are areas on a RCRA site that may

have become contaminated as a result of the activities on the

site, that those would be investigated.  And if contamination

is found to exist, a series of phases, like I described on the

02:00PM    site assessment, would be conducted to determine the extent,

whether it needs to be cleaned up and followed through to the

cleanup when necessary.

        Q.    And are there any key provisions or aspects of RCRA

that have impacted the work you've done over the last -- well,

02:00PM    since RCRA was adopted 40 years ago?

        MR. BLUM:  Vague as to time.

        THE COURT:  Overruled.

        THE WITNESS:  Aspects of the regulations or aspects

of implementation?

02:01PM    Q.    (BY MR. RICHARD:)  Sure.  Just trying to give the

jury a sense of this big statute.

        Are there any provisions that -- or aspects of it

that have impacted the work you do or that come up, you know,

in every case?

02:01PM    A.    Yes.  One thing that consistently comes up is that

1    the -- the process starts -- and this is the second process,

2    not the cradle-to-grave part I was talking about, the

3    assessment process -- with an application called a Part A

4    application in which the information is provided on those areas

02:01PM    5    to the site that are being or going to be investigated, and

6    then those different phases of assessment undertaken.

7            What is critical that I found over the years is that

8    the applicant be forthcoming and fully -- and disclose fully

9    the information related to the location, allowing -- like I

02:02PM    10   said, they're applying to the government -- which allows the

11   government to adequately regulate the -- regulate the site and

12   hopefully bring it to closure.

13           If the applicant, the industry, whoever it is, does

14   not give full disclosure, then the government doesn't have the

02:02PM    15   information it needs to -- to regulate the site properly.  And

16   we want to be showing some documents, I believe, that

17   demonstrates that Whittaker did -- at its site did not fully

18   disclose information they had to the Government.

19       Q.   My question is, so in -- how many times would you

02:02PM    20   say over the last 40 years you have become familiar with the

21   Part A application from the applicant, that is, the owner or

22   operator of a site with potential contamination?

23       A.   Oh, that's really hard to estimate.  Maybe a couple

24   dozen times.

02:03PM    25       Q.   Okay.  And in your experience, for the work you do,

what part of the application have you become most familiar with?

A.    The Part A application?

Q.    Yes, sir.

A.    It's disclosing the -- the use -- the types of operations, uses of the property that could result in the contamination of the property.

Q.    Okay.  And sometimes do those Part A applications call for information about landfills or potential landfills at the site?

A.    They do.

Q.    And in a site investigation, how do you keep track, for the ones you've worked on, where the contamination or suspected contamination might be?

A.    How to keep track of it?  I'm not sure I understand the question.  But it --

Q.    Well, sure.

A.    By going through the phased process I was talking about.

Q.    Okay.  Let's start there.

Before you know whether there are areas that are contaminated, what do you call those areas?

A.    Oh, they could be called areas of concern.  They might be called salvage management units.  It depends on where you are and what process you're in when you're doing the

assessment.  But under RCRA, they become salvage management

units.  I think I understand the question now.

The different operations on a property or at a

facility that could lead to contamination, it could be

somewhere where there's a lagoon or impoundment.  It could be a

landfill.  It could be a place where waste was just dumped.

There are different types of operations that could lead to

contamination, and those are what -- the things that I would, I

guess, keep track of in assessing the site.

Q.   You mentioned -- you used the phrase "areas of

concern."  Is that what you were just describing?

A.   Yes.

Q.   Okay.  And if we could -- I think rather than use a

foam board, we'll just call up Exhibit 123, which is a

stipulated exhibit.

(Exhibit 123 received into evidence.)

Q.   (BY MR. RICHARD:)  Can you see Exhibit 123, this

graphic called "Areas of Concern and RCRA Locations"?

A.   I can, yes.

Q.   And what is -- again, just very generally, what does

this type of map regarding areas of concern tell us when you're

involved in a site inspection?

A.   Well, this would be a -- a very good product to have

at the end of what I was talking about, that first phase of

assessment, which is to -- having looked at the records related

1    to the facility -- I'm looking at the history of the

2    facility -- to identify areas that are -- as they're

3    categorized here, areas of concern.

4              In this case -- this is the Whittaker site, by the

02:05PM   5    way.  And there are 70 -- there's numbers up to 77, but there

6    are couple that are 1-A, 1-B, 1-C.  There are over 80 areas

7    here that are areas of concern based on the history and the

8    records that are available that deem -- that -- there was

9    enough concern to take the next step and determine whether or

02:06PM  10    not those actually resulted in contaminating the property.

11         Q.    And -- okay.  Thank you.  And we'll return to that,

12    but we can take that down.   Thanks.

13              And before we turn to the work you've done in this

14    case, can you tell us whether you've been recognized as an

02:06PM  15    expert in any state or federal courts in the country?

16         A.    I have.

17         Q.    And on more than one occasion?

18         A.    Yes.

19         Q.    And starting with federal courts, can you give us an

02:06PM  20    example of federal courts where you've testified as an expert

21    on environmental issues?

22         A.    I believe these are all federal.  I'm not sure

23    because, when I'm sitting in a room like this, it's -- it could

24    be federal.  It could be state.

02:06PM  25              In Massachusetts and in a number of locations, I've

testified, including the federal court there in New York, New Jersey, Ohio, Wisconsin, Chicago.

Q.   Okay.  And when were you first recognized as an expert in a court?

02:07PM

A.   First time I testified at trial was in the -- the mid 1990s.

Q.   Okay.  And what types of issues were involved in that?

A.   That was a -- part of the case I was -- I was
02:07PM
testifying in was a -- the standard of care for a consultant -- conducting a site assessment, whether they -- their procedures were consistent with the standard of care in the industry.

Q.   Okay.  So you've been investigating and sometimes testifying about site assessment issues for many decades now?

02:07PM

A.   Yes, I have.

Q.   You're getting to be an old-timer.  Sorry.

A.   More gray hair up there every day.

Q.   Can you tell us, sir, the work -- first of all, what was your assignment or the scope of your assignment in this
02:08PM
particular case?

A.   In this case, I was asked to look at, first, the history of -- and this all relates to the Whittaker site.  I was asked to look at the history related to the operations on the property, related to contamination of the property to the
02:08PM
extent that it existed.

I was also asked to look at the -- the data related
to soil -- primarily soil, groundwater, and soil vapor quality
from samples collected by consultants, primarily to Whittaker.

And finally, I was asked to evaluate the --
Whittaker's waste handling disposal practices.

Q.    Okay.  And can you tell us what -- what work you did
in this case to try to address those issues?

A.    Yes.  I -- I reviewed a lot of documents.  I would
have liked to have more complete set of records, but I didn't.
So I -- I reviewed correspondence within Whittaker, between
Whittaker and regulatory agencies.  I reviewed testimony of
Whittaker employees who were deposed as a part of the case.  I
reviewed technical documents, meaning site assessment type
documents where they went through the different phases of site
assessments that I talked about from the -- from the evaluation
of the history right through collecting samples and doing
cleanup at the site.  And I looked at historic literature
related to the -- the industry knowledge of the impacts of
waste disposal on the environment and particularly in Southern
California.  And I also looked at some of the ordinances and
laws passed related to contamination.

Q.    Okay.  Did you do -- prepare any documents in this
case?

A.    Yes.  Well, after I did all those things I just said
and looked at all this information, I applied my training,

1    education, experience and prepared two expert reports in the

2    case.

3        Q.    And you just said a minute ago you would have liked

4    to have more complete set of records.  What did you mean in

02:10PM  5    that regard?

6        A.    Many of the industrial site -- site assessment

7    projects I've been involved with, there are records available,

8    including things like what I just described, with the cradle to

9    grave and RCRA, of how wastes were generated, stored, handled,

02:11PM  10   disposed of.  There are frequently records of what -- what

11   chemicals were purchased and how they're used in a facility,

12   where they're used in a facility, how they're stored, how

13   they're managed.

14       Q.    You need to slow down, Dr. Hughto.

02:11PM  15       A.    Sure.

16       Q.    Just a little bit.  I can't be the only one who's

17   having a hard time.  So --

18       A.    There are frequently operating records which an

19   operator of a facility, meaning the person who operates it, is

02:11PM  20   taking notes on what happens, you know, created these products

21   today, had a spill over here, purchased so much TCE today,

22   things like that, that allow you to track what went on over

23   time and understand what processes went on at different points

24   in time, what chemicals were used, what wastes were handled,

02:11PM  25   how they were handled, where, and so on.

UNITED STATES DISTRICT COURT

```
 1              I didn't have any of those.  And based on what I
 2    know, they were not produced so that I had them available to
 3    me.
 4         Q.    And for other sites you've worked on involving
 5    other, you know, businesses owning property that was suspected
 6    of contamination that was involved in manufacturing, were you
 7    able to observe operational records of those manufacturing
 8    operations?
 9         A.    Yes.
10         Q.    And would that sometimes include daily logs?
11         A.    It would.
12         Q.    And you mentioned purchase of chemicals.  Would that
13    include purchase of chlorinated solvents?
14         A.    Yes.
15         Q.    And what types of records have you seen at other
16    facilities, other site assessments you've been involved in,
17    that would tell us what chlorinated solvents were purchased and
18    over what period of time?  What are those records called?
19         A.    Well, they could be purchase orders.  They could be
20    invoices.  They could be notes in a daily log to tell you that,
21    you know, 5,000 gallons of TCE arrived today.  It could be any
22    of those, and there are probably other methods.
23         Q.    Okay.  And in your experience, when you're either
24    working for or you're involved in a site, do state and federal
25    regulators often ask for those same types of records you just
```

**UNITED STATES DISTRICT COURT**

1    listed?

2         A.    My experience has been that they do.

3         Q.    And in the materials you reviewed in this case, did

4    you see requests from state and federal regulators for the same

02:13PM  5    types of records you just listed?

6              MR. BLUM:  Vague.

7              THE COURT:  Overruled.

8              You can answer.

9              THE WITNESS:  I did see that type of request.

02:13PM  10        Q.    (BY MR. RICHARD:)  And what was the upshot of --

11   let's start with state regulators requesting records of

12   Whittaker.

13        A.    As far as I know, the types of records that I just

14   described that I don't have, they didn't receive them either.

02:13PM  15        Q.    And in the records you reviewed, was Whittaker ever

16   cited for failing to provide records to the state regulators?

17        A.    I believe they were.

18        Q.    And you mentioned -- I think you said disposal.  But

19   for the solvents or other chemicals that would be disposed of

02:14PM  20   in the other site -- sites that you've assessed, what types of

21   records would reflect disposal practices?

22        A.    Again, daily operating type logs that -- let's say,

23   created so much of this type of waste of today, put it into

24   barrels, put it in the hazardous waste storage area, things

02:14PM  25   like that.

1            Also, there are labels that go -- go into -- into

2     these types of storage areas.  There are manifests, which are

3     formal documents, that track everywhere a waste goes once

4     it's going to leave a facility, going to its final resting

02:14PM  5     place.  Those are all methods for finding out what happens with

6     waste.

7        Q.    And did you see any of those daily logs or manifests

8     or other records that would tell us on a daily, weekly, monthly

9     basis or yearly basis what happened to the waste containing

02:15PM  10    chlorinated solvents at the Whittaker site?

11       A.    I have not seen those types of records for the

12    Whittaker site.

13       Q.    In your experience, would those types of records

14    have existed for a site making missiles and munitions and

02:15PM  15    things of that nature?

16       A.    My opinion is those types of documents would have

17    existed in some form at -- for this type of -- for the

18    Whittaker facility.

19       Q.    Okay.  And in terms of the work you did in this

02:15PM  20    case, can you give us a sense of the time period you've -- you

21    tried to focus on?

22       A.    Yes.  I focused on the time period from the early

23    1940s through the -- as far as the operations are concerned,

24    through the closers -- closure of the facility in 1987.

02:16PM  25       Q.    And for the period after the closure, did you review

```
 1   any types of records regarding the Whittaker site?
 2        A.    Yes.  I -- I reviewed a number of documents that
 3   were generated and covered activities conducted after the
 4   closure of the facility.
 5        Q.    Can you give us an example?  You mentioned
 6   something, SVE, earlier.  What is that?
 7        A.    SVE is soil vapor extraction.  That is a technique
 8   for removing -- or remediating or removing volatile organic
 9   compounds from soil at a property.  Volatile organic compounds
10   are organics, obviously.  But volatile means that they will
11   move into the air.  Like when you fill the gas tank up in your
12   car, you start to smell the gas.  That's because some of those
13   constituents in the gasoline are volatile.  That's what you're
14   smelling.  They got exposed to the atmosphere and --
15             THE REPORTER:  Excuse me.  Can you please slow down?
16             THE WITNESS:  I'm sorry.  They get exposed to the
17   atmosphere, they evaporate, which is what volatilizing is.
18             When there are volatile organic compounds like TCE,
19   PCE that were used at the Whittaker site are in soil, one
20   method -- and soil is about one-third air.  If you take soil,
21   there is -- you have all the soil particles, but there's air
22   space in between the soil particles in -- roughly speaking, 30,
23   35 percent of that soil, depending on the type of soil, is air.
24             Those volatile -- let's just say TCE, the soil is
25   contaminated with TCE.  Some of it will evaporate into what
```

02:16PM (line 5)
02:16PM (line 10)
02:17PM (line 15)
02:17PM (line 20)
02:17PM (line 25)

1    they call pore spaces or air space in the soil.

2         Soil vapor extraction is a pretty simple technology.

3    All you do is suck the air out of the ground.  The air has

4    those chemicals that volatilized in it.  And as you take

02:18PM  5    contaminated air out, clean air moves in, you supply clean air

6    from the sides, and that becomes contaminated.  And you keep

7    that vacuum process running until you reach an objective for

8    cleaning up that portion of the site.

9         Q.   (BY MR. RICHARD:)  And you said you looked at the

02:18PM 10    activities at the site from roughly the early 1940s until it

11    closed in 1987.  What type of activities were occurring at the

12    site in terms of manufacturing?  Let's start there.

13         A.   Yes.  There was manufacturing of ammunition for

14    World War II, to the military up through the Vietnam War.

02:18PM 15    There are also other -- there were fuses and switches related

16    to different products, defense products that were created

17    there.  There was some fireworks and other, I'll say, exploding

18    devices that were manufactured.

19         An example was about a hundred million round --

02:19PM 20    rounds of ammunition, 20-millimeter rounds of ammunition were

21    created or manufactured at the facility.  A hundred million of

22    them.  20 millimeters is a little less than an inch.

23         Q.   Okay.  And did you consider whether any of those

24    types of manufacturing processes generated waste or something

02:19PM 25    called industrial waste?

A.    Yes.  The -- part of the process is -- and again, in creating the metal parts of ammunition, you have -- again, actually, there was testimony that said that some of the -- some of the components that were utilized on the property were manufactured elsewhere and shipped to the property in grease. So these different components from offsite manufactured onsite would have oils and greases on them that would need to be degreased using a degreaser like I described earlier.

There also would be -- there were processes that -- were propellants that were in the missile products that were created.  The propellants make things go, so to speak.  They have -- they had some sort of an age limit on them where they're not as effective after a certain age and was required to change it out.  Those -- that propellant, that fuel would be taken out and, I assume, replaced.  And that waste product would have to be disposed.

And that, actually, process took -- took place on the ground with the -- high-pressure water would be applied to these -- to these parts to flush the propellant out.

Q.    Does that particular process have a name, the one you just --

A.    Called "hog out."

Q.    And were you generally familiar with the types of environmental waste created by the processes at the Whittaker site from your work in other cases and other site assessments?

A.   Yes.

Q.   And are you familiar with something called
"perchlorate"?

A.   I am.

02:21PM    Q.   And what is perchlorate?

A.   Perchlorate is a -- the propellant I was just
talking about -- is a component of a propellant that I was just
talking about.  It's an oxidizer.  Some of these operate --
some of these propellants operate -- in the absence of oxygen,
02:21PM  it provides the oxygen.  You need oxygen to make things go boom
or to explode.  And perchlorate is a component of the
propellants that will do that.

Q.   And for this same time period, the early '40s
through 1987, did you evaluate guidelines and rules for waste
02:21PM  handling in California?

A.   I did.

Q.   And what did you review in that regard?

A.   I reviewed literature related to -- literature that
was created related to environmental contamination and impacts
02:22PM  on groundwater.  So I reviewed some legislation that was
created in California.

Q.   And can you give us an example, when you say
legislation, what you're referring to?

A.   Yes.  In -- there were two laws that were very early
02:22PM  on in 1907 and 1917 that were passed that required that, in

order to dispose of waste on soil that -- where -- that -- that

would allow this waste to percolate into underlying water

supply water, not very artfully stated, but that you -- that

would require a permit from the state.

02:22PM  Q.    And that -- that pertained to, you said,

groundwater?

A.    For -- yeah, waste that could cause percolation of

the waste materials into groundwater.

Q.    And what's percolation?

02:23PM  A.    Percolation is essentially just vertical migration

of -- of water into the ground.  Pour a bucket of water on the

ground, it disappears because it goes down into the soil and

actually occupies those air spaces I was just talking about.

Q.    So let's start there.  For the period at the turn of

02:23PM  the last century, so around 1900, you know, plus or minus, at

that time, what -- what literature did you review regarding the

connection, if any, between waste on the ground and percolation

to the groundwater?

A.    There is one paper, professional paper, gentleman's

02:23PM  last name is Shelton, that was published in 1899.  And

Mr. Shelton was involved in the manufactured gas industry which

produces -- essentially took coal and made gas out of it to do

what we use natural gas for today.  It's an industry that

creates a lot of waste and byproducts loaded with contaminants.

02:24PM       Mr. Shelton studied what the -- the nuisances and

1    the liabilities, as he states it, related to those -- to those

2    waste products in the environment.

3              And I'm just reading from my report here because I

4    don't commit everything to memory.

02:24PM    5              Some of the nuisances and potential liabilities that

6    he identified was pollution of private wells adjacent to a

7    property, pollution of state streams, pollution of rivers used

8    for water supply in cities, and emission of noxious fumes.

9              So in 1899, there was a professional paper by

02:25PM   10   somebody who has identified these types of nuisances and

11   potential liabilities related to waste disposal.

12              MR. BLUM:  Your Honor, this is a narrative.

13              THE COURT:  Sustained.

14              MR. RICHARD:  I'll ask another question, but thank

02:25PM   15   you for that explanation.

16        Q.    (BY MR. RICHARD:)  Fast-forwarding to the -- to the

17   1940s.  Was there other literature -- or '40s and '50s.  Can

18   you summarize for us the other literature you reviewed, sir?

19        A.    Yes.  I have a number of different pieces of

02:25PM   20   literature that I'll -- would you like me to read from the

21   report some of these things?  Want to put it on the screen?

22   How would you like to operate that?

23        Q.    I think in the interest of time, just briefly give

24   us a sense of some of the different things you looked at in

02:25PM   25   terms of literature from the '30s, '40s, '50s, without going

1    into great detail.

2         A.   Okay.

3              MR. BLUM:  Your Honor, I would request if the

4    witness is reading from his report, that he tell us where.

02:26PM  5    Q.   (BY MR. RICHARD:)  Well, that's right.  Can you do

6    that, sir?

7         A.   I'm sorry.  What was that?

8         Q.   If you're going to cite to something in your report

9    that you didn't commit to memory, can you just let us know what

02:26PM  10   page of your report?

11        A.   Sure.  This is my original report, and I'm on

12   page 9.

13             Near the top, there's a paragraph that begins

14   "Thomas."  Dr. Thomas, named Harold Thomas, was a professor at

02:26PM  15   Harvard, wrote a book called "The Conservation of Groundwater"

16   in which he was identifying -- he wrote the book in 1951.  It

17   was published in 1951.  So the work certainly precedes that

18   time.

19             And he discusses the -- that such -- the

02:26PM  20   contamination -- that "recharging the ground, such

21   contamination is likely to become more common unless adequate

22   precautions are taken to prevent recharge by contaminated

23   water."  And in doing his work, he cited case studies in

24   California.

02:26PM  25             Again, I studied a lot of different literature to do

this, and I'm only going to cite here some of the things that
relate to Southern California, that there are more -- other
articles in publications than just these.

There's -- following paragraph, Counsel, the --
there was an article in a journal called *Wastes Engineering* in
1953 that called underground water more -- I'm sorry --
"pollution of underground water and more serious than that of
surface water because subterranean water movement is slow," and
it goes on from there.

That paper also said -- it was presented in an
article about Southern California conditions, including the
Santa Clara River, which is proximate to the Whittaker site.

Next one I'm going to mention is at the top of
page 11.  It's a USGS study.  The USGS is the United States
Geological Survey who for many decades have been the
Government's -- I think it's a government agency or
quasi-government agency that is an authority on geology,
hydrogeology that is a frequently used resource in our country.

Q.    Is that a resource you've used in other engagements,
sir?

A.    It is.  And widely used not just by me but by people
in my industry across the country.

Q.    Okay.

A.    There was a study published in '63, 1963, about
groundwater contamination and legal controls in Michigan.  And

the reason I'm mentioning it is that it also cites conditions

in Southern California.

Q.   When you refer to conditions in Southern California,

what are you talking about?

02:28PM   A.   That -- the paper was more about contamination and

legal controls in Michigan, but the author has also discussed

conditions in Southern California.

Q.   Okay.  And that's probably sufficient.  If we need

to come back, I can let you know.

02:29PM   But can you give us a general sense as to how these

materials that you reviewed, those older laws and ordinances

and the literature and the like, how -- can you tell us what

your conclusions are with respect to how those studies and laws

impact your work in this case, in other words, your conclusions

02:29PM   as to appropriate waste handling practices at the Whittaker

site.

A.   Yes.  The -- by considering the knowledge in the

industry at the time and -- I know you said that was

sufficient, but there was one -- also one other reference

02:29PM   that --

MR. BLUM:  Your Honor --

THE WITNESS:  -- referenced --

THE COURT:  Sustained.

Please answer his question.

02:29PM   THE WITNESS:  Yes.  That -- it was widely known to

1    industry, to the Government, and in the general public based on

2    the literature that I've reviewed, that -- that dumping waste

3    on the ground could impact groundwater and surface water.  Laws

4    were passed beginning 1907 in California to address those

02:30PM    5    potential issues.

6            So at the -- and fast-forward to this 1940s to the

7    1987 period, Whittaker operations, at the Bermite-Whittaker

8    site, my opinion, the proper waste handling practices would be

9    not to place waste in the environment in a way that it could

02:30PM   10    impact -- directly impact the soils, groundwater and surface

11    water, methods such as dumping on the surface of the ground.

12        Q.    (BY MR. RICHARD:)  And did you see any evidence as

13    to Whittaker's own policy regarding dumping waste onto the

14    ground?

02:30PM   15        A.    I did.  At least two Whittaker employees, I believe

16    Mr. Luce, L-u-c-e, and Mr. Jisa, J-i-s-a, testified that

17    that -- that dumping of wastes and burying of wastes were --

18    were prohibited --

19            MR. BLUM:  Objection, Your Honor.  There's no

02:31PM   20    connection to what we have here.

21            THE COURT:  Overruled.

22        Q.    (BY MR. RICHARD:)  So I was asking about evidence as

23    to Whittaker's policy regarding waste handling.

24        A.    And there was one more.  There's -- several

02:31PM   25    witnesses testified that they followed the DOD, Department of

1  Defense, manual for practices.  The 1968 manual, DOD manual for

2  practices -- I believe "prohibited" is the correct word -- of

3  dumping waste materials on the ground surface.

4      Q.    Okay.  And did you review that DOD manual or parts

02:32PM  5  of it for your work in this case?

6      A.    I did.

7      Q.    And did that also address percolation or the

8  potential from percolation from the ground to -- groundwater

9  sources of drinking water?

02:32PM  10     A.    Yes.

11     Q.    Did you find any evidence that Whittaker had an

12  actual environmental manual?

13     A.    I have seen no environmental manual that was

14  published by Whittaker itself.

02:32PM  15     Q.    Did you see any evidence that they had no such

16  manual?

17     A.    Have I seen evidence that they had no manual?

18          THE COURT:  Rephrase the question.

19          MR. RICHARD:  Yes, Your Honor.

02:32PM  20     Q.    (BY MR. RICHARD:)  You personally didn't see any

21  evidence of Whittaker ever having an environmental manual.  Did

22  they have any other types of manuals that you reviewed?

23     A.    Well, I -- I think I testified a little bit earlier

24  about things that I did not see.  I have not seen any manuals

02:33PM  25  for the handling of waste that I can recall that were authored

by Whittaker.

   Q.   Okay.  And before we rest for the afternoon or take
a break, can you tell us, now that you've described your
background and the various materials you reviewed in this case,
02:33PM  can you just share with us the areas where you reached
conclusions without going into detail?  Just give us a sense of
the areas that you reached conclusions on regarding the
Whittaker site.

   A.   Yes.  I've reached conclusions on the waste handling
02:33PM  practices of Whittaker, on the correlation of the environmental
data, the results of the soil and groundwater sampling with the
waste handling practices, and also I've drawn conclusions
related to Whittaker's interactions with the regulatory
agencies.

02:34PM     Q.   Okay.  And with respect to that first area,
Whittaker's waste handling practices, can you -- did you reach
any conclusions as to whether Whittaker followed its own policy
for waste handling?

         THE COURT:  We're actually going to break at this
02:34PM  point.

         So it's now past 2:30.  It's 2:34.  So we are going
to break for the day.

         Please remember, do not speak to anyone about the
case, the people, or the subject matter involved.  Continue to
02:34PM  keep an open mind.

 1          Please return tomorrow at 8:30 when we will start,

 2    so before 8:30 so that we can start at 8:30 sharp.  We'll see

 3    you then.  Thank you.

 4          THE COURTROOM DEPUTY:  All rise for the jury,

 5    please.

02:34PM

 6          (Out of the presence of the jury:)

 7          THE COURT:  Please be seated.

 8          We're outside the presence of the jury.

 9          You may step down, Dr. Hughto.

10          We will begin our afternoon session in 15 minutes.

11    So we'll break for 15 minutes.  It's now 2:35.  We'll --

12    everyone's ordered back here at 2:50.

02:35PM

13          And the first thing we're going to talk about and

14    maybe the only thing we'll talk about is the bench trial.  And

15    if there's evidence to be presented to the Court this

16    afternoon, the plaintiff will start by presenting that

17    evidence.

02:35PM

18          If there's not, we'll talk about making sure that

19    you do have witnesses available starting fairly soon so that we

20    can fit that in and make the afternoon productive.

02:35PM

21          Also, I believe I only have the witnesses that

22    extend through Dr. Hughto; although, I haven't fully checked.

23    Do we have additional witness and witness binders with

24    challenged or even unchallenged evidence?

25          MR. RICHARD:  Yes, Your Honor.  We've identified, I

02:36PM

| | |
|---|---|
| 1 | think, Mr. Lardiere.  We've identified the video for |
| 2 | Mr. Peloquin. |
| 3 | THE COURT:  Have you provided those -- those binders |
| 4 | to Mr. Cruz? |
| 02:36PM  5 | MR. RICHARD:  I haven't personally.  I believe |
| 6 | they -- I'd have to check. |
| 7 | THE COURT:  All right.  So who are the additional |
| 8 | witnesses that you have prepared and provided binders for? |
| 9 | MR. RICHARD:  I believe it's Mr. Lardiere and then |
| 02:36PM 10 | we have a binder for Mr. Peloquin.  I don't know if that was |
| 11 | included in the binder for Mr. Lardiere. |
| 12 | THE COURT:  And when do you anticipate getting to |
| 13 | your next witness after Dr. Hughto? |
| 14 | MR. RICHARD:  Tomorrow afternoon. |
| 02:37PM 15 | THE COURT:  All right.  And your next witness is |
| 16 | Eric Lardiere? |
| 17 | MR. RICHARD:  Yes. |
| 18 | THE COURT:  All right.  We'll be in recess, as I've |
| 19 | indicated, until 2:50.  I'll see everyone in a few minutes. |
| 02:37PM 20 | MR. RICHARD:  Thank you, Your Honor. |
| 21 | (Break taken.) |
| 22 | THE COURT:  On the record in Santa Clarita Valley |
| 23 | Water Agency versus Whittaker.  We're outside the presence of |
| 24 | the jury.  We have counsel representing both parties. |
| 03:02PM 25 | The first item of business is the bench trial.  And |

the parties did provide the Court, after we had a discussion
about the contours of the bench trial, with their respective
positions.  And it appears that the parties are not in
agreement as to the scope of the bench trial.  And it appears
the only thing they agree upon is that there will be two
witnesses, Jeffrey Zelikson and Peter Mesard, M-e-s-a-r-d, who
would testify at the bench trial.  And then there is disputes,
as I understand it, about Daniel Shoup, Steven Luis, or Luis,
Duane Steffey, S-t-e-f-f-e-y, Gary Hokkanen, H-o-k-k-a-n-e-n,
and Richard Slade.

So what I'm inclined to do, I'll hear from the
parties, is just to start having these witnesses come in the
afternoon and we'll have a discussion each day about who's --
whether I'm going to let a witness testify in the scope of it.
It appears the parties are continuing to fight over the Court's
orders concerning the JMIL, at least with regard to
Daniel Shoup.

So tell me when Mr. Zelikson, whether he's available
tomorrow afternoon.

MR. RICHARD:  He is not available because he's
having -- he's in the hospital with a medical procedure
tomorrow.  We just verified that with him.  He previously told
us he wasn't available, and I just confirmed why.

So the only question -- so in terms of plaintiff's
case, Your Honor, Mr. -- there's no dispute as to the witnesses

1   we would call in our case.  So unless Your Honor is

2   anticipating having defendants call, you know, the NCP

3   witnesses or the bench portion while we're still in plaintiff's

4   portion of the trial case --

03:04PM   5        THE COURT:  I am inclined to do that.

6        MR. RICHARD:  Oh.  Okay.  Then, you know, for the

7   other witnesses beyond Mr. Mesard, those witnesses have some

8   testimony that is probably relevant to both the jury and the

9   bench.  I don't have strong feelings if they want to present

03:04PM   10  information to the jury that doesn't relate to the common law

11  claims, you know, that's up to the Court and counsel.

12        The more serious concern we have is that if the

13  witnesses have already been -- like Mr. Shoup, you know,

14  precluded from testifying, absent some further showing that

03:05PM   15  hasn't been made, that's my only concern, is let's stay within

16  the lines of -- of the Court's prior rulings and not try to

17  creep around those.

18        That concern diminishes or evaporates if those

19  witnesses are solely testifying.  In other words, if they're

03:05PM   20  solely testifying in the bench portion of the case, the fact

21  that Your Honor excluded Mr. Shoup, for example, and his

22  speculations, if they want to present that evidence to the

23  Court, you know, I have no objection to that.  But to -- to

24  resuscitate that and present that to the jury.  So that's --

03:05PM   25        THE COURT:  Let me turn to Mr. Blum.

**UNITED STATES DISTRICT COURT**

1          I am not going to be inclined to give further

2    consideration to issues that I've already decided.  And so what

3    I am -- Mr. Blum, don't interrupt the Court.

4          MR. BLUM:  Sorry.

03:05PM   5          THE COURT:  So it doesn't mean that I'm unwilling to

6    have you present these witnesses to the Court.  And you can

7    explain, for example, with Daniel Shoup why he does fit within

8    the scope of the Court's order.

9          I didn't entirely preclude Mr. Shoup.  I left open

03:06PM   10   the possibility that you would have a chance to provide the

11   Court with an offer of proof to show that there was additional

12   information that he could provide that would enable his

13   testimony to be admitted.  But you're going to have to do that

14   by bringing him into court, and you're going to have to bring

03:06PM   15   him into court pretty soon.

16          MR. BLUM:  Your Honor, I'm not sure what the problem

17   is.  They're the ones that listed all these other ones, not me.

18   I have no intent to call Mr. Shoup right now or -- or

19   Mr. Hokkanen in the bench trial.  That's not my designation.

03:06PM   20   The only person we intend to call is Mr. Mesard.  And I told

21   plaintiff's counsel that the only reason Mr. Shoup was on the

22   list was because there was an opening depending upon an offer

23   of proof and that we would tell them if we thought that there's

24   been a sufficient foundation.  We haven't told them because --

03:07PM   25          THE COURT:  All right.  Let's do it this way to be

**UNITED STATES DISTRICT COURT**

```
  1     most productive.  So both sides -- or the plaintiff intends to

  2     introduce Jeffrey Zelikson only in the bench-only portion of

  3     the trial.  Correct, Mr. Richard?

  4              MR. RICHARD:  Yes, Your Honor.

  5              THE COURT:  And, Mr. Blum, you intend to introduce

  6     Peter Mesard as essentially the counterweight to Mr. Zelikson.

  7     Is that right?

  8              MR. BLUM:  Yes, sir.

  9              THE COURT:  Do you anticipate calling anybody else

 10     in the bench trial other than Mr. Mesard?

 11              MR. BLUM:  Your Honor, with the only caveat, if

 12     there's a change in the way the evidence and evidentiary

 13     rulings have gone, but absent that, no.

 14              THE COURT:  You'll have to explain that to me

 15     because this is the bench trial.  And --

 16              MR. BLUM:  I understand.

 17              THE COURT:  -- we know what the issues are.  So

 18     there's nothing that should occur, I think, in the course of

 19     the jury trial that would impact the evidence that will be

 20     presented to me.  But maybe I'm missing something, which is

 21     possible that you can explain.

 22              MR. BLUM:  No, Your Honor.  There's a lot of the

 23     issues in the issues that you have to resolve that overlap with

 24     the issues the jury has to resolve, like all the causation

 25     evidence and things of that sort.  You have a causation
```

(03:07PM, 03:07PM, 03:08PM, 03:08PM, 03:08PM)

determination to make independently of the jury.

And issues such that would relate to allocation, a lot of them are being presented to the jury which relate to you.  But we believe that all of the evidence, other than the NCP, overlaps.  And there's no need to call somebody only for the bench trial because you're going to hear it in the jury trial part.

THE COURT:  All right.  Have you had sufficient time, Mr. Blum, to think through all the possibilities that you can possibly think through to see if something could come up in the jury portion of the trial that would change whether you wish to present someone other than Peter Mesard at the bench trial?

MR. BLUM:  Your Honor, I'm trying to answer this question and not think that I'm being sarcastic.

THE COURT:  No, I'm -- it's a genuine question to find out whether you're in a position to give me your best response or whether you would rather take the evening to consider it and give me your best response.

Because you will face the question that you'll want to avoid, that if you do call or ask me -- ask to call someone other than Peter Mesard, you're going to have to explain to me why you could not have anticipated the witness.  And I'm going to expect you to give me a good faith response that you thought it through.

1        Frankly, I find it -- I would find it surprising

2    from what little I know of you and what I know of the amount of

3    time that you all have spent on this case that something is

4    going to escape your intellectual grasp of what may occur.

03:10PM    5        MR. BLUM:  Your Honor, I wish I -- well, I hope to

6    live up to your expectations, but I want the night to think

7    about it.

8        THE COURT:  That's fine.

9        All right.  Then there's really nothing further to

03:10PM   10   talk about with regard to the bench plan.

11       I have looked at the objections to the two exhibits

12   with regard to Mr. Lardiere's testimony.  And so they are

13   Exhibit 26 and Exhibit 486.  And so let me start with 26.  And

14   let me hear from the plaintiff with respect to the foundation

03:11PM   15   for using this document with Mr. Lardiere.

16       MR. RICHARD:  Oh.  My --

17       THE COURT:  And just to focus this, this document

18   seems to me generally to be an admissible document.  The

19   objection that I'm focusing on is that Mr. Lardiere has no

03:11PM   20   personal knowledge about this document.  I believe that is --

21       MR. RICHARD:  Are we talking about the same

22   document?

23       THE COURT:  You know what?  I've confused -- I was

24   going off of memory.

03:11PM   25       So let's talk about 486 since that's the one I'm

1    referring to.  Forgive me.

2              MR. RICHARD:  All right.  No problem, Your Honor.

3              THE COURT:  So this is the Consent Order.  It was

4    signed by a Whittaker officer.  And so I'll hear from Mr. Blum

03:12PM  5    as to what the objection is besides personal knowledge.  But

6    the personal knowledge objection is at least of -- a question

7    for the Court.

8              MR. RICHARD:  Sure.  I appreciate that, Your Honor.

9              And if there were no other document signed by or

03:12PM  10   provided to Mr. Lardiere or mentioning the 1994 order, I

11   wouldn't be showing it to him.  But he -- both the 2002

12   Imminent and Substantial Endangerment Order, which he is

13   familiar with, he was working there, he attached it to a

14   declaration and said he had reviewed it and, et cetera, that

03:12PM  15   document expressly refers to the 1994 Consent Order, as does

16   the 2007 settlement agreement that Mr. Lardiere signed.

17             So I have -- I will -- you know, I know how to lay a

18   foundation.  And if I didn't think I could lay a foundation, I

19   wouldn't have it on my list.

03:13PM  20             THE COURT:  Well, I think that's helpful.

21             So you intend to pursue with Mr. Lardiere whether,

22   in fact, he does have a foundation to testify about this

23   document.  If so, you'll use it with him.  If not, you'll try

24   to get it in through some other witness.

03:13PM  25             MR. RICHARD:  Exactly.

**UNITED STATES DISTRICT COURT**

1        THE COURT:  Do you have another witness who will be

2   able to sponsor this document?

3        MR. RICHARD:  I think it's also in Dr. Hughto's

4   witness list.

03:13PM   5        THE COURT:  All right.  So let me hear, Mr. Blum,

6   why I shouldn't permit this document, 486, with the proviso

7   just discussed.

8        MR. BLUM:  Your Honor, the -- if the only question

9   to Mr. Lardiere is have you seen this, that's basically, you

03:13PM   10   know, no harm, no foul in reality.  It really doesn't matter.

11   But if they're admitting it for the truth of the matter for the

12   factual assertions within the document itself, that's a whole

13   other issue.

14        THE COURT:  Let's assume that that's the purpose,

03:14PM   15   that Mr. Richard seeks to introduce this document.  And before

16   you get there, because I don't want to fall into this trap

17   again, is Mr. Richard correct that this document has been

18   discussed with Dr. Hughto?  Dr. Hughto has considered this

19   document.  You expect Dr. Hughto has relied upon this document.

03:14PM   20        MR. BLUM:  That's my recollection, Your Honor.

21        THE COURT:  All right.  So tell me what you're

22   practically fighting over.

23        MR. BLUM:  Well, the difference is -- there's a

24   difference between Mr. Hughto saying I've relied upon this and

03:14PM   25   asking Mr. Lardiere what he knows about it when it's obvious he

can't know anything about it.  He's not allowed to rely upon

hearsay.  Mr. Hughto is.

THE COURT:  No.  There's a difference here, I think,

or maybe I'm not tracking you, Mr. Blum, is that if, in fact,

03:15PM   there's a foundation to discuss the document with Mr. Lardiere,

then this is a corporate document.  This is a party document.

It's going to be a document that will be admitted into

evidence.

So what is the evidentiary objection in that regard,

03:15PM   assuming a foundation?

MR. BLUM:  Specific one is the parts relating to the

search warrant have not been excised.

THE COURT:  Well, they will need to be excised.

MR. BLUM:  And there's other -- and the allegations

03:15PM   in the Consent Order don't specifically relate to the question

at hand.  Again, it's a broad brush issue.

THE COURT:  I'm sure you spoke with Mr. Gallagher,

and I do not intend to rehash the discussion about

Mr. Hughto -- or Dr. Hughto and all of the exhibits and all of

03:15PM   the issues that we have been addressing for a long period of

time.  I've said my piece on that issue.

So if what you're saying is there are other things

in here beyond strictly TCE, PCE, and perchlorate, I'm no

longer looking on the 403 scale as that counting towards undue

03:16PM   prejudice because all of that information is out there

UNITED STATES DISTRICT COURT

1    presented to the jury and not just by one side but also by the

2    other side.  And certainly, it's been presented to the jury

3    without objection, that is, the stipulated exhibits.

4         So is that the scope of your argument?

03:16PM   5         MR. BLUM:  And the excising of issues relating to

6    the search warrant and the criminal investigation.

7         THE COURT:  Yes.  And that clearly must be excised.

8    And I can't say this in strong enough terms to the plaintiff.

9    I do not expect to see any reference in any document that is

03:17PM  10   received into evidence relating to a criminal investigation, a

11   search warrant, et cetera.  In my view, that still raises a

12   substantial 403 issue.

13        And for the parties' benefit and for the benefit of

14   the record, the law with respect to 404(b) as it applies to

03:17PM  15   corporations has not been, as far as I know, fully decided in

16   the Ninth Circuit, by the Ninth Circuit.  There may be some

17   District Court authority unpublished that addresses the issue.

18   There's circuit authority that I'm aware of outside of the

19   Ninth Circuit that acknowledges 404(b) applies to corporate

03:17PM  20   entities.

21        I haven't had occasion, nor do I feel the need, to

22   explore the depths of that issue.  I'm inclined to believe it

23   does apply to corporations, but that's an inclination rather

24   than an informed view.

03:18PM  25        In my view, ultimately the reason I don't need to

address that issue dispositively is because even if 404(b) does

not apply to corporate entities, Rule 403 still does.  And so

in my view, it's largely in this case an academic issue.

The question for the Court is whether or not the

potential for undue prejudice, as well as undue consumption of

time, substantially outweighs the probative value.  And I am

persuaded still that in the case of a criminal investigation,

search warrants and the like, it most certainly does.

In my view, it would be unfair to Whittaker to

introduce that evidence without opening the door to further

evidence as to every aspect of the potential investigation, the

investigation, the search warrant.  And that not only will

consume a lot of time, but it is quite likely, in my view, to

create undue prejudice to Whittaker.

So that, to me, is a clear line.  I've been clear

about it.  Nothing that I have heard since then has altered my

calculation.

What has altered my calculation on 403 is that I was

being asked essentially to take a surgical knife to carve out

things other than the VOCs that I referred to, TCE, PCE, and

perchlorate, only to later find out that the parties have

agreed, in part, presumably because there are internal memos

from Whittaker, that there are all of these references to

indiscriminate dumping, burying, different sites across the

site where there was waste disposal, not all of which

necessarily refers to TCE, PCE, and perchlorate.

And so, again, I've concluded on that and have provided the Court's ruling this morning.  And I do just, once again, remind you, Mr. Richard, that I am expecting that you will live up to your responsibilities and make sure that you still, when you're introducing evidence, have a good faith basis to connect up the issues in this case and the evidence that you're producing.

MR. RICHARD:  Yes, Your Honor.  Just one quick point or two quick points.

On the 1994 order, it would save some back and forth if the portions to be excised or whited out could -- if they send that over to us, I'm happy to look at it.  If I try to find all those references -- in other words, this is their concern.  If they want to send over a redacted copy --

THE COURT:  I am going to do that only because I view this of such concern that I don't want there to be an error made on the part of the plaintiff.  So for that reason -- and I think it would only be through human error.  I can't imagine they would directly violate the Court's instruction.

So the request is granted.

MR. RICHARD:  Thank you.

And I would note that in reviewing one of the trial exhibits, there is a reference -- this document has not yet been published and defendants haven't flagged it -- but I

believe Exhibit No. 1 has one reference either to the search

warrant or something.

So I would urge that if -- rather -- if there's a

concern, you know -- I have never challenged Your Honor's

03:21PM  inclination, ruling, admonitions regarding the search warrant

or the criminal investigation.  I've never challenged that or

argued with Your Honor.  I understand it's a bright line, and

it makes sense.

So there, I just waived that issue on appeal as

03:22PM  well.

What I don't want, though, is the responsibility

necessarily to redact documents that they had already

stipulated to that may have an offhand reference that we didn't

catch.  Some of these documents, as Your Honor saw, 781 --

03:22PM  THE COURT:  Let me just interject.

MR. RICHARD:  Thank you.

THE COURT:  It is not your responsibility.  I am

going to put that responsibility on the defense since they have

the greatest incentive to make sure that there is no mistake,

03:22PM  there is no error.

So by all means, Mr. Blum, if -- you'll have some

time, I know there's a lot to do, but put whatever resources

you think are necessary.  And before -- before we actually give

the exhibits over to the jury -- so that will be at least some

03:23PM  time -- if you identify any reference that should be redacted,

1    it will get redacted and replaced.

2              MR. BLUM:  Yes, sir.

3              THE COURT:  And the last document -- and I'll let

4    you go, I know you have a few other things to do, as do I -- is

03:23PM  5    Exhibit 26.  And let me understand from you, Mr. Richard, what

6    is this being introduced for?

7              MR. RICHARD:  So this is a letter that became a

8    whole lot more relevant after Mr. Blum's opening statement

9    yesterday where he told the jury several times that my client

03:23PM  10   would rather litigate than investigate and that they fully

11   accept responsibility for perchlorate.  He said that over and

12   over.

13             THE COURT:  It is clearly a theme.

14             MR. RICHARD:  Right.  And so here we have a letter

03:23PM  15   to Mr. Lardiere saying we have contamination, please pay for

16   treatment of perchlorate and other contaminants.  And it's

17   written from the general manager who's here.  The reference to

18   April Jacobs is just a cover e-mail.  And so Mr. Lardiere gets

19   a letter.

03:24PM  20             I thought we had already stipulated to this because

21   it says stipulated as modified and we modified it to remove any

22   references to insurance.  So I was taken a little aback to see

23   it popping up again.  But as redacted, I mean, it's absolutely

24   relevant.  It goes to rebut 30 minutes of his opening

03:24PM  25   statement.

1          THE COURT:  All right.  Let me hear from you,

2    Mr. Blum.  I don't know that it necessarily has the full thrust

3    that -- that Mr. Richard suggests, but wouldn't that be for the

4    jury to decide?

03:24PM   5          MR. BLUM:  No.  It's a demand for settlement.  It's

6    a mediation privilege.  It's black letter law, Your Honor.  It

7    doesn't matter what it says, it can't be used in the case here.

8          THE COURT:  Well, first of all, as I'm sure you

9    know, there are exceptions to -- to that rule.  But so tell me

03:25PM   10   how is the settlement agreement -- there have been references

11   to settlement agreements in this case.  So explain to me how

12   all of that got in.

13         MR. BLUM:  Because we've agreed on those.

14         THE COURT:  All right.

03:25PM   15         MR. BLUM:  Each side had -- believes that there

16   should be a reason why they want to use it, but we don't agree

17   on this.

18         THE COURT:  And why don't you agree on this?

19         MR. BLUM:  Because the -- a demand is basically

03:25PM   20   that, just a demand.  And it's -- and it's the basis as to why

21   there is a mediation privilege at all.  That's why we don't

22   want it in.

23         THE COURT:  Well, the rule, as you know, is more

24   limited than you're suggesting.

03:25PM   25         MR. BLUM:  I understand.  Nothing is ever as broad

**UNITED STATES DISTRICT COURT**

1    as we hope it is.

2              THE COURT:  But it's also -- it serves a particular

3    purpose.  And here, this is being offered to respond to a theme

4    that is a substantial theme that you have suggested in this

03:26PM  5    case.  And so if it were so that the water agency throughout

6    made numerous overtures to avoid litigation with you or your

7    client, you're saying that you could tell the jury that they

8    just wanted to litigate, they didn't want to actually do -- in

9    good faith try to resolve this, they were only interested in

03:26PM  10   litigating and they can't introduce anything in response to

11   that?

12             MR. BLUM:  No, they can produce lots of stuff in

13   response to it.  For instance, Your Honor -- so the -- the

14   response that we would have theoretically to this letter is why

03:26PM  15   this demand was unreasonable.  So -- and then they're going to

16   come back with, yes, it was reasonable and we're going to start

17   litigating the negotiations.

18             THE COURT:  But isn't that actually relevant?  Not

19   that -- not that you -- not that you get into the negotiations.

03:27PM  20   The Court can't see the relevance of that.  But isn't that

21   possibly a response to your theme?  I'm not saying it's

22   correct.  I have no particular view on this matter.  But that

23   perhaps they thought, you know what?  We have to litigate

24   because we have a history here with -- with Whittaker dragging

03:27PM  25   their feet.  The only way they're ever going to do anything is

1   if we sue them.

2           MR. BLUM:  But they can say that and they can say

3   they made a demand.  I have no problem with that.  But bringing

4   in the -- all the correspondence, the -- the retort would be we

03:27PM   5   got this.  It was unreasonable.  And the reasonable question to

6   that is, well, why was it unreasonable?  And now we're off --

7   now we're off on the issue of the negotiations.

8           THE COURT:  All right.  Let me hear from

9   Mr. Richard.

03:27PM   10          MR. RICHARD:  There is no question, Your Honor, that

11  during our meet and confer two months ago, we reached an

12  agreement and that agreement is reflected in our mutual joint

13  list, stipulated as to modified exhibit.  We removed the

14  references to the insurance carrier.  We had this discussion.

03:28PM   15  I don't know why we're discussing this.

16          But to answer his question, there were no

17  negotiations because Mr. Lardiere ignored the letter.  So

18  Mr. Blum is talking about what ifs, that tomorrow 20 minutes

19  into Mr. Lardiere's examination will become clear.

03:28PM   20          So it should be admitted.  It's -- this is one where

21  it would have to be pretty prejudicial not to allow me to rebut

22  the major theme that he raised.  But we did have a stipulation,

23  which is why it's a modified redacted one-page letter.

24          THE COURT:  So that's fine.  Thank you.

03:28PM   25          Lastly with you, Mr. Blum, I now have Rule 408 up.

**UNITED STATES DISTRICT COURT**

|     |                                                                           |
| --- | ------------------------------------------------------------------------- |
| 1   | And it says, "Evidence of the following is not admissible on              |
| 2   | behalf of any party, either to prove or disprove the validity             |
| 3   | or amount of a disputed claim or to impeach by a prior                    |
| 4   | inconsistent statement or a contradiction."  And then it goes             |
| 5   | on to discuss the contents of what is protected.                          |
| 6   | It doesn't appear to me that this is being offered                        |
| 7   | either to prove or disprove the validity or amount of a                   |
| 8   | disputed claim but only to express that there were overtures              |
| 9   | made and resistance to paying by Whittaker.  So why is this not           |
| 10  | within the exception or exclusion of Rule 408?                            |
| 11  | MR. BLUM:  Your Honor, I -- I mean, I'll be real                          |
| 12  | frank.  I've made my argument.  I understand what the Court's             |
| 13  | saying --                                                                 |
| 14  | THE COURT:  Fair enough.                                                  |
| 15  | MR. BLUM:  -- or anticipated what the Court's going                       |
| 16  | to say.                                                                   |
| 17  | THE COURT:  Fair enough.  I'm giving you the fair                         |
| 18  | opportunity.  I understand if you're submitting, you're                   |
| 19  | submitting.                                                               |
| 20  | I am going to overrule the objection.  I do think                         |
| 21  | this falls outside of Rule 408.  I do think that Whittaker has            |
| 22  | made a very substantial theme in this case that the whole                 |
| 23  | purpose in bringing this lawsuit, that is, that the whole                 |
| 24  | purpose in what occurred with the regulators even was for                 |
| 25  | purposes of building up this lawsuit to make Whittaker pay for            |

03:29PM (line 5)
03:29PM (line 10)
03:29PM (line 15)
03:30PM (line 20)
03:30PM (line 25)

things that it doesn't owe.  And obviously, I'm not either

embracing that or saying that is -- is incorrect, but that is

an issue.  It is a theme.  And the jury, I think, is entitled

to see a response if there is one.

03:30PM          So for that reason, the objection is overruled.

          Before we conclude for the afternoon, I did now

check further and that is the only -- or the last of the

challenged documents that I have received.  Is there anything

else that the Court has not ruled upon with regard to future

03:31PM   witnesses?

          MR. RICHARD:  The only open issue -- and we've

talked about it, so it's not that we haven't talked,

Your Honor -- but we have a disagreement on a couple of

provisions -- testimony in the video play for Mr. Peloquin.  I

03:31PM   don't believe there's a dispute as to the exhibits that will be

introduced through that video.  We've each designated those,

and I believe that those exhibits have been provided to

Your Honor.

          But before we play the video, we probably need ten

03:31PM   minutes, unless they withdraw their objections, between now and

the next time we convene.  You know, it's a standard -- and

maybe we have an objection to something they designated.  But

my memory is that -- I'd like to just hit play on the Peloquin

video.  It's about an hour and eight minutes.  But if -- there

03:32PM   are a couple of provisions that Your Honor's going to have to

```
 1    rule on at this point, a couple of objections or questions.
 2             THE COURT:  How has that been presented to the
 3    Court?
 4             MR. RICHARD:  The testimony?  I believe it's -- I'm
 5    not sure.
 6             THE COURT:  We had discussed a procedure.  I think
 7    we specifically talked about how the parties would present it
 8    to the Court.  And I gave you, I think, the following guidance,
 9    that I only wanted to see the objections and have enough
10    context to make a ruling.  And I would leave it to your
11    judgment as to how much context, essentially, you wanted to
12    provide the Court.  And then I would receive that in hard paper
13    form.
14             So my question is:  Where are we on that?
15             MR. RICHARD:  Yes.  I know that we have filed with
16    the Court some portion of Mr. Peloquin's testimony.  We'll meet
17    and confer.  And if there's two pages I need to bring tomorrow,
18    I just can't -- we've gone back and forth in this video so
19    often, I don't -- I can't stand here and say the Court has the
20    most recent limited objections.
21             THE COURT:  Well, what I would suggest you do is,
22    when you go back this afternoon, perhaps what you can do is
23    just send it.  I want it in hard copy.  But if it's not that
24    voluminous and you want to send it electronically, you can send
25    it electronically.  Copy Mr. Blum and send it to the Court's
```

03:32PM (line 5)
03:32PM (line 10)
03:32PM (line 15)
03:33PM (line 20)
03:33PM (line 25)

chambers e-mail.

MR. RICHARD:  Thank you very much, Your Honor.

THE COURT:  And there are no other witnesses that have been presented to the Court with challenged exhibits?

03:33PM

MR. RICHARD:  No, Your Honor.  We're meeting and conferring on the experts for -- for Monday and Tuesday.

THE COURT:  All right.  Then we're in recess.  Have a good evening, everyone.

MR. BLUM:  May I ask a logistical question?

03:33PM

THE COURT:  Yes.

MR. BLUM:  Have you made any decisions on next Wednesday?

THE COURT:  I really haven't.  I wanted to get --

This is off the record.

03:34PM

(Off-the-record discussion.)

THE COURT:  Let's go back on the record on this one.

There was an issue with regard to the bench plan that the Court did not address and that has to do with time.  I believe that Mr. Richard was hoping that the 20 hours that the

03:34PM

parties had agreed to, after I'd asked them to try to pare this down, didn't include the portion of the bench trial.

That was not my expectation, Mr. Richard.  My expectation was that you were going to get 20 hours to complete this trial.  It doesn't appear to me that there's going to be

03:35PM

much time devoted to the bench trial.

1          Let me leave it at this.  If, in my view, you are

2     making a good faith effort and are being efficient and you need

3     a little extra time, I'm not going to likely shut you off.  But

4     you should make an earnest good faith effort to get through the

03:35PM    5     evidence in the time that everyone has agreed to.

6          And if -- that's why I will at times, I will try to

7     give gentle reminders, like I did with Mr. Gee.  And it doesn't

8     mean that I'm necessarily right.  Sometimes it's not entirely

9     clear because I don't know what your other witnesses are going

03:35PM   10     to say or really what your positions are going to be.

11          But I do notice at times that, you know, you're

12     spending time on things that, in my judgment -- and this is not

13     critical, we all have different judgments -- but that probably

14     jurors are not going to be nearly as concerned about that

03:36PM   15     perhaps you think they're going to be concerned about.

16          So make your best judgments.  I do intend to hold

17     you within due process limitations to the time that everyone

18     has agreed to, but I also expect to be reasonable.  And I think

19     if you're being reasonable and you need some additional time on

03:36PM   20     either side, I will certainly give it consideration.

21          We're in recess.

22          (Proceedings adjourned at 3:36 p.m.)

23

24

25

**UNITED STATES DISTRICT COURT**

1              **CERTIFICATE OF OFFICIAL REPORTER**

2

3   COUNTY OF LOS ANGELES  )
                             )

4   STATE OF CALIFORNIA    )

5

6           I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17              DATED THIS 19TH DAY OF NOVEMBER, 2021.

18

19

20                 /S/ MYRA L. PONCE
               _____

21            MYRA L. PONCE, CSR NO. 11544, CRR, RDR
              FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

## $

**$31** [1] - 392:1
**$50** [1] - 391:21
**$65** [1] - 392:22

## '

**'30S** [1] - 427:25
**'40S** [3] - 425:13, 427:17, 427:25
**'50S** [3] - 410:7, 427:17, 427:25
**'60S** [1] - 410:7
**'63** [1] - 429:24
**'70S** [2] - 408:11, 410:7
**'73** [1] - 408:12
**'75** [2] - 402:2, 408:13
**'89** [1] - 385:2
**'90** [1] - 385:3

## 1

**1** [8] - 375:17, 376:20, 377:2, 377:7, 377:9, 377:18, 377:24, 448:1
**1-A** [1] - 415:6
**1-B** [1] - 415:6
**1-C** [1] - 415:6
**1.7** [1] - 377:21
**1.9** [2] - 377:21, 378:2
**10** [6] - 380:12, 391:13, 392:4, 392:7, 392:12, 392:13
**11** [1] - 429:14
**12** [3] - 380:1, 388:16, 403:22
**123** [3] - 414:14, 414:16, 414:17
**15** [3] - 388:16, 434:10, 434:11
**18** [1] - 374:1
**1899** [2] - 426:20, 427:9
**19** [1] - 381:5
**1900** [1] - 426:15
**1907** [2] - 425:25, 431:4
**1917** [1] - 425:25
**1940S** [4] - 421:23, 423:10, 427:17, 431:6
**1951** [2] - 428:16, 428:17
**1953** [1] - 429:6
**1963** [1] - 429:24
**1968** [1] - 432:1

**1972** [2] - 395:15, 409:15
**1973** [2] - 395:17, 409:15
**1975** [2] - 395:24, 401:13
**1976** [1] - 410:7
**1979** [4] - 395:19, 402:9, 402:15, 402:16
**1980** [1] - 410:8
**1987** [4] - 421:24, 423:11, 425:14, 431:7
**1990S** [1] - 416:6
**1994** [3] - 442:10, 442:15, 447:11
**1:03** [1] - 374:1

## 2

**2** [4] - 375:17, 377:24, 379:18, 385:17
**20** [7] - 380:2, 380:3, 390:7, 423:22, 452:18, 456:19, 456:23
**20-MILLIMETER** [1] - 423:20
**2002** [1] - 442:11
**2007** [1] - 442:16
**201** [2] - 378:3, 378:5
**2010** [2] - 384:24, 385:5
**2015-ISH** [1] - 382:18
**2019** [1] - 384:8
**2021** [1] - 374:1
**205** [2] - 378:3, 378:5
**214** [1] - 385:18
**23** [1] - 390:7
**26** [3] - 441:13, 449:5
**2:30** [1] - 433:21
**2:34** [1] - 433:21
**2:35** [1] - 434:11
**2:50** [2] - 434:12, 435:19

## 3

**30** [3] - 391:22, 422:22, 449:24
**30(B)(6** [6] - 383:18, 383:20, 383:23, 383:25, 384:3, 384:8
**34** [1] - 381:25
**35** [1] - 422:23
**3:36** [1] - 457:22

## 4

**40** [5] - 398:21, 400:23, 407:10, 411:15, 412:20
**403** [4] - 444:24, 445:12, 446:2, 446:18
**404(B** [3] - 445:14, 445:19, 446:1
**408** [3] - 452:25, 453:10, 453:21
**45** [2] - 388:16, 390:7
**471** [1] - 390:23
**486** [3] - 441:13, 441:25, 443:6
**489** [3] - 391:16

## 5

**5** [2] - 392:4, 392:13
**5,000** [1] - 419:21
**50** [1] - 408:18
**500** [1] - 385:25

## 6

**60** [1] - 391:12

## 7

**7** [1] - 401:18
**70** [1] - 415:5
**77** [1] - 415:5
**781** [1] - 448:14
**795** [1] - 391:16

## 8

**80** [1] - 415:6
**8:30** [3] - 434:1, 434:2

## 9

**9** [2] - 401:18, 428:12
**96** [2] - 375:22, 375:24
**96.19** [1] - 381:5
**96.8** [1] - 379:16
**97-005** [1] - 376:14

## A

**ABACK** [1] - 449:22
**ABANDONED** [2] - 410:13, 410:14
**ABERCROMBIE** [6] - 374:7, 375:5, 383:18, 384:7, 393:3, 393:20
**ABERCROMBIE** -

**375:1**
**ABILITY** [2] - 376:9
**ABLE** [2] - 419:7, 443:2
**ABSENCE** [1] - 425:9
**ABSENT** [2] - 437:14, 439:13
**ABSOLUTELY** [1] - 449:23
**ACADEMIC** [1] - 446:3
**ACCEPT** [1] - 449:11
**ACCESS** [4] - 387:14, 387:16, 387:18, 387:21
**ACCOMPLISHED** [1] - 393:14
**ACCORDING** [3] - 376:19, 377:17, 397:15
**ACCOUNT** [4] - 376:9, 387:3, 387:8, 387:9
**ACHIEVE** [1] - 380:9
**ACHIEVING** [1] - 380:5
**ACKNOWLEDGES** [1] - 445:19
**ACRE** [2] - 385:18, 385:25
**ACRE-FEET** [2] - 385:18, 385:25
**ACT** [1] - 410:1
**ACTIVITIES** [4] - 411:7, 422:3, 423:10, 423:11
**ACTUAL** [3] - 400:19, 401:9, 432:12
**ADD** [1] - 376:16
**ADDITION** [1] - 396:11
**ADDITIONAL** [5] - 392:8, 434:23, 435:7, 438:11, 457:19
**ADDRESS** [5] - 417:7, 431:4, 432:7, 446:1, 456:18
**ADDRESSES** [1] - 445:17
**ADDRESSING** [1] - 444:20
**ADEQUATE** [1] - 428:21
**ADEQUATELY** [1] - 412:11
**ADJACENT** [1] - 427:6
**ADJOURNED** [1] - 457:22
**ADMISSIBLE** [2] - 441:18, 453:1
**ADMISSION** [1] - 383:24

**ADMITTED** [3] - 438:13, 444:7, 452:20
**ADMITTING** [1] - 443:11
**ADMONITIONS** [1] - 448:5
**ADOPTED** [1] - 411:15
**AFTERNOON** [12] - 394:11, 395:6, 395:7, 433:2, 434:10, 434:16, 434:20, 435:14, 436:13, 436:19, 454:6, 455:22
**AGE** [2] - 424:12, 424:13
**AGENCIES** [3] - 381:4, 417:11, 433:14
**AGENCY** [2] - 401:3, 435:23
**AGENCY** [18] - 375:16, 377:6, 377:7, 377:16, 379:20, 380:14, 380:23, 382:14, 382:23, 383:4, 386:7, 388:3, 391:10, 392:2, 393:21, 429:16, 429:17, 451:5
**AGO** [5] - 387:18, 411:5, 411:15, 418:3, 452:11
**AGREE** [3] - 436:5, 450:16, 450:18
**AGREED** [5] - 446:22, 450:13, 456:20, 457:5, 457:18
**AGREEMENT** [10] - 391:7, 391:18, 392:21, 393:14, 393:25, 436:4, 442:16, 450:10, 452:12
**AGREEMENTS** [1] - 450:11
**AIR** [13] - 400:6, 400:12, 422:11, 422:20, 422:21, 422:23, 423:1, 423:3, 423:5, 426:13
**AL-12B** [1] - 382:8
**ALLEGATIONS** [1] - 444:14
**ALLOCATION** [1] - 440:2
**ALLOW** [4] - 392:7, 418:22, 426:2,

452:21

**ALLOWED** [4] - 375:16, 396:18, 410:22, 444:1

**ALLOWING** [1] - 412:9

**ALLOWS** [2] - 376:14, 412:10

**ALTERED** [2] - 446:16, 446:18

**ALUMINUM** [3] - 404:8, 404:11, 404:16

**ALVORD** [1] - 375:10

**AMERICAN** [3] - 396:23, 397:11, 397:15

**AMMUNITION** [6] - 406:15, 406:22, 423:13, 423:20, 424:2

**AMOUNT** [5] - 384:17, 410:23, 441:2, 453:3, 453:7

**ANE** [1] - 407:16

**ANGELES** [1] - 374:2

**ANSWER** [5] - 388:11, 420:8, 430:24, 440:14, 452:16

**ANTICIPATE** [2] - 435:12, 439:9

**ANTICIPATED** [2] - 440:23, 453:15

**ANTICIPATING** [1] - 437:2

**APPEAL** [1] - 448:9

**APPEAR** [3] - 405:22, 453:6, 456:24

**APPEARED** [1] - 405:21

**APPLICABLE** [1] - 404:3

**APPLICANT** [3] - 412:8, 412:13, 412:21

**APPLICANTS** [1] - 397:18

**APPLICATION** [7] - 377:16, 397:12, 412:3, 412:4, 412:21, 413:1, 413:3

**APPLICATIONS** [2] - 377:5, 413:8

**APPLIED** [3] - 405:9, 417:25, 424:18

**APPLIES** [3] - 410:12, 445:14, 445:19

**APPLY** [2] - 445:23, 446:2

**APPLYING** [2] -

397:10, 412:10

**APPRECIATE** [2] - 401:21, 442:8

**APPROPRIATE** [2] - 387:13, 430:15

**APPROVED** [1] - 381:14

**APRIL** [1] - 449:18

**AQUEDUCT** [2] - 386:5, 386:25

**AQUIFERS** [2] - 398:11, 398:12

**AREA** [3] - 405:15, 420:24, 433:15

**AREAS** [1] - 414:18

**AREAS** [15] - 408:5, 411:6, 412:4, 413:21, 413:22, 413:23, 414:10, 414:21, 415:2, 415:6, 415:6, 415:7, 421:2, 433:5, 433:7

**ARGUED** [1] - 448:7

**ARGUMENT** [2] - 445:4, 453:12

**ARRIVED** [2] - 374:16, 419:21

**ARTFULLY** [1] - 426:3

**ARTICLE** [2] - 429:5, 429:11

**ARTICLES** [1] - 429:3

**AS** [2] - 375:2, 395:3

**ASPECT** [3] - 411:1, 411:2, 446:11

**ASPECTS** [4] - 411:13, 411:18, 411:22

**ASSERTIONS** [1] - 443:12

**ASSESS** [1] - 409:5

**ASSESSED** [2] - 408:8, 420:20

**ASSESSING** [2] - 400:18, 414:9

**ASSESSMENT** [17] - 399:7, 399:9, 399:15, 400:15, 402:19, 403:16, 407:4, 411:4, 411:10, 412:3, 412:6, 414:1, 414:25, 416:11, 416:14, 417:13, 418:6

**ASSESSMENTS** [11] - 398:16, 398:21, 398:23, 400:22, 403:8, 403:16, 403:24, 406:14, 417:15, 419:16,

424:25

**ASSESSOR** [1] - 400:2

**ASSIGNMENT** [2] - 416:19

**ASSISTANT** [3] - 398:2, 402:4, 402:6

**ASSOCIATES** [2] - 403:11, 403:24

**ASSUME** [2] - 424:15, 443:14

**ASSUMING** [2] - 378:2, 444:11

**ATMOSPHERE** [2] - 422:14, 422:17

**ATTACHED** [2] - 381:2, 442:13

**AUGUST** [1] - 402:16

**AUTHOR** [1] - 430:6

**AUTHORED** [1] - 432:25

**AUTHORITY** [3] - 429:17, 445:17, 445:18

**AUTHORIZED** [1] - 383:20

**AVAILABLE** [9] - 385:22, 392:7, 415:8, 418:7, 419:2, 434:19, 436:18, 436:20, 436:23

**AVERAGE** [2] - 385:9, 385:16

**AVERAGED** [1] - 385:10

**AVOID** [2] - 385:12, 440:21, 451:6

**AWARE** [7] - 378:3, 388:4, 388:8, 388:23, 389:17, 390:13, 445:18

---

**B**

---

**BACHELOR** [1] - 395:14

**BACKGROUND** [4] - 391:6, 395:13, 395:20, 433:4

**BANKED** [7] - 386:1, 386:3, 386:6, 386:7, 387:4, 387:14, 387:23

**BANKERS** [1] - 399:4

**BANKS** [1] - 386:8

**BARRELS** [1] - 420:24

**BASED** [6] - 383:10, 397:22, 399:23, 415:7, 419:1, 431:1

**BASIS** [5] - 380:18,

421:9, 447:7, 450:20

**BECAME** [2] - 403:18, 449:7

**BECOME** [9] - 396:8, 397:6, 397:9, 411:7, 412:20, 413:1, 414:1, 428:21, 452:19

**BECOMES** [1] - 423:6

**BEDROCK** [1] - 406:2

**BEEN** [1] - 395:3

**BEGAN** [2] - 402:3, 409:14

**BEGIN** [1] - 434:10

**BEGINNING** [2] - 402:20, 431:4

**BEGINS** [1] - 428:13

**BEHALF** [1] - 453:2

**BEHIND** [1] - 404:12

**BELIEVES** [1] - 450:15

**BELONGED** [1] - 406:4

**BELOW** [8] - 376:15, 376:20, 377:2, 377:18, 378:7, 378:11, 392:4, 396:7

**BENCH** [18] - 434:14, 435:25, 436:2, 436:4, 436:7, 437:3, 437:9, 437:20, 438:19, 439:2, 439:10, 439:15, 440:6, 440:12, 441:10, 456:17, 456:21, 456:25

**BENCH-ONLY** [1] - 439:2

**BENEFIT** [2] - 445:13

**BERMITE** [2] - 382:12, 431:7

**BERMITE-WHITTAKER** [1] - 431:7

**BEST** [3] - 440:17, 440:19, 457:16

**BETWEEN** [5] - 417:10, 422:22, 426:17, 443:24, 454:20

**BEYOND** [2] - 437:7, 444:23

**BIG** [1] - 386:23

**BIG** [1] - 411:21

**BILLION** [1] - 377:21

**BINDER** [2] - 435:10, 435:11

**BINDERS** [3] - 434:23, 435:3, 435:8

**BIT** [4] - 395:12,

401:20, 418:16, 432:23

**BLACK** [1] - 450:6

**BLANCHE** [1] - 393:22

**BLENDING** [7] - 380:3, 389:16, 389:20, 389:23, 390:4, 390:15

**BLOW** [1] - 382:6

**BLUM** [13] - 374:11, 437:25, 438:3, 439:5, 440:9, 442:4, 443:5, 444:4, 448:21, 450:2, 452:18, 452:25, 455:25

**BLUM** [53] - 374:13, 374:15, 374:21, 375:4, 375:25, 381:24, 382:5, 382:7, 384:6, 384:7, 388:17, 389:2, 390:8, 390:11, 390:17, 391:15, 391:20, 392:24, 393:17, 393:19, 394:2, 411:16, 420:6, 427:12, 428:3, 430:21, 431:19, 438:4, 438:16, 439:8, 439:11, 439:16, 439:22, 440:14, 441:5, 443:8, 443:20, 443:23, 444:11, 444:14, 445:5, 449:2, 450:5, 450:13, 450:15, 450:19, 450:25, 451:12, 452:2, 453:11, 453:15, 456:9, 456:11

**BLUM'S** [1] - 449:8

**BOARD** [1] - 414:14

**BODIES** [3] - 396:9, 398:12, 398:13

**BOOK** [2] - 428:15, 428:16

**BOOM** [1] - 425:10

**BOSTON** [5] - 402:16, 403:12, 403:22, 404:5, 405:15

**BREAK** [1] - 435:21

**BREAK** [6] - 374:6, 375:8, 433:3, 433:19, 433:22, 434:11

**BRIEFLY** [7] - 398:18, 399:6, 400:24, 408:14, 409:12,

410:2, 427:23
**BRIGHT** [1] - 448:7
**BRING** [5] - 375:23, 386:4, 412:12, 438:14, 455:17
**BRINGING** [3] - 438:14, 452:3, 453:23
**BROAD** [2] - 444:16, 450:25
**BROWNSTEIN** [2] - 381:9, 381:11
**BRUSH** [1] - 444:16
**BUCKET** [1] - 426:11
**BUILD** [2] - 392:15, 408:23
**BUILDING** [5] - 391:11, 393:20, 408:24, 408:25, 453:25
**BURYING** [2] - 431:17, 446:24
**BUSINESS** [2] - 403:2, 435:25
**BUSINESSES** [1] - 419:5
**BUY** [1] - 387:5
**BY** [20] - 375:4, 375:25, 382:7, 384:7, 389:2, 390:17, 391:20, 393:2, 393:19, 395:5, 397:6, 411:20, 414:17, 420:10, 423:9, 427:16, 428:5, 431:12, 431:22, 432:20
**BYPRODUCTS** [1] - 426:24

# C

**CALCULATE** [2] - 376:23, 376:24
**CALCULATED** [1] - 377:7
**CALCULATION** [5] - 376:16, 377:10, 387:10, 446:17, 446:18
**CALCULATIONS** [4] - 384:15, 387:2, 387:7, 387:22
**CALIFORNIA** [11] - 406:19, 417:20, 425:15, 425:21, 428:24, 429:2, 429:11, 430:2, 430:3, 430:7, 431:4

**CALIFORNIA** [1] - 374:2
**CAMP** [1] - 402:17
**CAR** [1] - 422:12
**CARD** [1] - 407:12
**CARE** [2] - 416:10, 416:12
**CARRIER** [1] - 452:14
**CARS** [1] - 404:14
**CARTE** [1] - 393:22
**CARVE** [1] - 446:19
**CASE** [40] - 377:8, 377:19, 379:11, 379:12, 379:13, 379:14, 389:14, 394:5, 395:11, 403:25, 407:16, 411:24, 415:4, 415:14, 416:9, 416:20, 416:21, 417:7, 417:12, 417:23, 418:2, 420:3, 421:20, 428:23, 430:14, 432:5, 433:4, 433:24, 436:25, 437:1, 437:4, 437:20, 441:3, 446:3, 446:7, 447:7, 450:7, 450:11, 451:5, 453:22
**CASES** [7] - 386:14, 400:3, 407:22, 408:6, 408:7, 424:25
**CATCH** [1] - 448:14
**CATEGORIZE** [1] - 408:19
**CATEGORIZED** [1] - 415:3
**CATEGORIZING** [1] - 401:16
**CAUSATION** [2] - 439:24, 439:25
**CAVEAT** [1] - 439:11
**CDM** [4] - 402:17, 403:2, 403:7, 403:24
**CENTRAL** [1] - 386:9
**CENTURY** [1] - 426:15
**CERTAIN** [7] - 393:25, 407:25, 410:20, 410:22, 410:23, 424:13
**CERTAINLY** [4] - 428:17, 445:2, 446:8, 457:20
**CERTIFICATION** [1] - 397:20
**CERTIFIED** [4] - 396:22, 397:7, 397:8, 397:9

**CETERA** [2] - 442:14, 445:11
**CH2M** [3] - 382:18, 382:20, 383:2
**CHALLENGED** [5] - 434:24, 448:4, 448:6, 454:8, 456:4
**CHAMBERS** [1] - 456:1
**CHANCE** [2] - 388:17, 438:10
**CHANGE** [3] - 424:14, 439:12, 440:11
**CHARACTERIZE** [1] - 401:10
**CHARGE** [1] - 381:19
**CHECK** [2] - 435:6, 454:7
**CHECKED** [1] - 434:22
**CHEMICAL** [4] - 377:13, 404:24, 407:16, 407:20
**CHEMICALS** [8] - 376:6, 376:15, 376:16, 418:11, 418:24, 419:12, 420:19, 423:4
**CHICAGO** [1] - 416:2
**CHIEF** [1] - 403:18
**CHLORINATED** [3] - 419:13, 419:17, 421:10
**CHOICE** [1] - 407:22
**CHOOSE** [1] - 384:21
**CHRISTMAS** [1] - 402:2
**CIRCUIT** [3] - 445:16, 445:19
**CIRCUIT** [1] - 445:18
**CITE** [2] - 428:8, 429:1
**CITED** [2] - 420:16, 428:23
**CITES** [1] - 430:1
**CITIES** [1] - 427:8
**CITY** [1] - 401:3
**CIVIL** [1] - 395:14
**CLAIM** [2] - 453:3, 453:8
**CLAIMS** [1] - 437:11
**CLARA** [1] - 429:12
**CLARITA** [1] - 435:22
**CLEAN** [1] - 402:24, 423:5
**CLEANED** [4] - 399:13, 400:13, 400:17, 411:11
**CLEANING** [1] - 423:8
**CLEANUP** [2] - 411:12, 417:17

**CLEAR** [5] - 375:7, 446:15, 452:19, 457:9
**CLEARLY** [2] - 445:7, 449:13
**CLIENT** [3] - 385:15, 449:9, 451:7
**CLOSE** [2] - 397:2, 408:18
**CLOSED** [1] - 423:11
**CLOSERS** [1] - 421:24
**CLOSURE** [5] - 408:25, 412:12, 421:24, 421:25, 422:4
**CLWA** [1] - 391:19
**COAL** [1] - 426:22
**COLLECT** [1] - 401:9
**COLLECTED** [1] - 417:3
**COLLECTING** [3] - 400:6, 400:7, 417:16
**COLLECTION** [3] - 400:4, 400:5, 408:24
**COLLEGE** [3] - 395:15, 395:17, 401:2
**COLLOQUIALISM** [1] - 381:22
**COMMIT** [3] - 392:10, 427:4, 428:9
**COMMITTED** [1] - 392:19
**COMMITTING** [1] - 391:23
**COMMON** [2] - 428:21, 437:10
**COMPANIES** [1] - 399:4
**COMPANY** [3] - 402:17, 403:19, 406:25
**COMPLETE** [3] - 417:9, 418:4, 456:23
**COMPLETED** [1] - 399:24
**COMPONENT** [3] - 398:14, 425:7, 425:11
**COMPONENTS** [2] - 424:4, 424:6
**COMPOUNDS** [3] - 422:9, 422:18
**CONCERN** [13] - 410:6, 413:23, 414:11, 414:21, 415:3, 415:7, 415:9, 437:12, 437:15, 437:18, 447:15, 447:17, 448:4

**CONCERN** [1] - 414:18
**CONCERNED** [3] - 421:23, 457:14, 457:15
**CONCERNING** [1] - 436:16
**CONCLUDE** [1] - 454:6
**CONCLUDED** [1] - 447:2
**CONCLUSIONS** [7] - 430:13, 430:14, 433:6, 433:7, 433:9, 433:12, 433:17
**CONDENSE** [1] - 405:17
**CONDITION** [1] - 399:11
**CONDITIONS** [8] - 399:25, 400:16, 409:18, 409:22, 429:11, 430:1, 430:3, 430:7
**CONDUCT** [3] - 398:23, 403:16, 403:17
**CONDUCTED** [2] - 411:10, 422:3
**CONDUCTING** [1] - 416:11
**CONFER** [2] - 452:11, 455:17
**CONFERRED** [1] - 402:10
**CONFERRING** [1] - 456:6
**CONFIRMED** [1] - 436:23
**CONFUSED** [2] - 392:13, 441:23
**CONNECT** [1] - 447:7
**CONNECTION** [2] - 426:17, 431:20
**CONSENT** [3] - 442:3, 442:15, 444:15
**CONSERVATION** [2] - 410:1, 428:15
**CONSIDER** [3] - 384:2, 423:23, 440:19
**CONSIDERATION** [3] - 377:1, 438:2, 457:20
**CONSIDERED** [1] - 443:18
**CONSIDERING** [1] - 430:17
**CONSISTENT** [2] - 399:14, 416:12

CONSISTENTLY [3] - 380:17, 405:16, 411:25
CONSTITUENT [1] - 377:13
CONSTITUENTS [1] - 422:13
CONSTRUCT [1] - 392:5
CONSTRUCTED [1] - 393:22
CONSTRUCTION [1] - 392:11
CONSULTANT [1] - 416:10
CONSULTANTS [3] - 377:17, 402:23, 417:3
CONSULTING [1] - 403:15
CONSUME [1] - 446:13
CONSUMPTION [1] - 446:5
CONTAINING [1] - 421:9
CONTAINS [1] - 380:13
CONTAMINANTS [4] - 398:7, 401:11, 426:24, 449:16
CONTAMINATE [1] - 382:25
CONTAMINATED [8] - 396:20, 403:17, 411:7, 413:22, 422:25, 423:5, 423:6, 428:22
CONTAMINATING [1] - 415:10
CONTAMINATION [31] - 382:2, 382:11, 382:15, 382:19, 399:11, 400:1, 400:3, 400:8, 400:9, 400:10, 400:16, 406:6, 409:18, 409:21, 410:6, 411:8, 412:22, 413:7, 413:13, 413:14, 414:4, 414:8, 416:24, 417:21, 419:6, 425:19, 428:20, 428:21, 429:25, 430:5, 449:15
CONTENTS [1] - 453:5
CONTEXT [2] - 455:10, 455:11

CONTINGENCY [1] - 391:13
CONTINUALLY [1] - 382:23
CONTINUE [2] - 374:11, 433:24
CONTINUING [1] - 436:15
CONTOURS [1] - 436:2
CONTRACT [3] - 387:4, 403:3, 407:25
CONTRACTS [4] - 386:18, 387:24, 403:1, 403:4
CONTRADICTION [1] - 453:4
CONTROL [1] - 393:23
CONTROLS [2] - 429:25, 430:6
CONVENE [1] - 454:21
COPY [3] - 447:15, 455:23, 455:25
CORNELL [5] - 395:18, 396:12, 397:25, 402:3, 402:4
CORPORATE [6] - 384:11, 388:3, 390:3, 444:6, 445:19, 446:2
CORPORATION [1] - 383:19
CORPORATIONS [2] - 445:15, 445:23
CORRECT [42] - 375:11, 375:12, 376:19, 377:3, 377:4, 377:21, 378:9, 379:21, 379:22, 379:24, 380:11, 380:12, 381:9, 381:15, 383:12, 383:13, 384:18, 385:21, 385:23, 386:13, 386:22, 386:23, 387:12, 389:3, 389:4, 389:12, 389:13, 390:18, 390:19, 390:24, 391:10, 391:22, 392:2, 392:3, 392:9, 392:17, 392:20, 408:12, 432:2, 439:3, 443:17, 451:22
CORRELATION [1] - 433:10

CORRESPONDENCE [2] - 417:10, 452:4
COST [3] - 376:10, 389:16, 393:10
COSTS [3] - 386:11, 387:2, 387:3
COUNSEL [1] - 429:4
COUNSEL [6] - 375:11, 388:17, 390:8, 435:24, 437:11, 438:21
COUNTERWEIGHT [1] - 439:6
COUNTIES [1] - 387:24
COUNTING [1] - 444:24
COUNTRY [6] - 402:23, 403:1, 407:10, 415:15, 429:18, 429:22
COUNTY [4] - 386:19, 386:22, 387:4
COUPLE [8] - 402:5, 402:10, 402:25, 412:23, 415:6, 454:13, 454:25, 455:1
COURSE [4] - 398:4, 398:14, 402:6, 439:18
COURSES [3] - 397:23, 398:1, 398:3
COURT [74] - 374:5, 374:11, 374:14, 374:18, 374:22, 383:16, 390:9, 392:25, 393:16, 394:3, 394:25, 396:24, 397:4, 411:17, 420:7, 427:13, 430:23, 431:21, 432:18, 433:19, 434:7, 435:3, 435:7, 435:12, 435:15, 435:18, 435:22, 437:5, 437:25, 438:5, 438:25, 439:5, 439:9, 439:14, 439:17, 440:8, 440:16, 441:8, 441:17, 441:23, 442:3, 442:20, 443:1, 443:5, 443:14, 443:21, 444:3, 444:13, 444:17, 445:7, 447:16, 448:15, 448:17,

449:3, 449:13, 450:1, 450:8, 450:14, 450:18, 450:23, 451:2, 451:18, 452:8, 452:24, 453:14, 453:17, 455:2, 455:6, 455:21, 456:3, 456:7, 456:10, 456:13, 456:16
COURT [5] - 401:21, 416:1, 416:4, 438:14, 438:15
COURT [21] - 374:19, 394:17, 434:15, 436:1, 437:11, 437:23, 438:3, 438:6, 438:11, 442:7, 445:17, 446:4, 451:20, 454:9, 455:3, 455:8, 455:12, 455:16, 455:19, 456:4, 456:18
COURT'S [8] - 436:15, 437:16, 438:8, 447:3, 447:20, 453:12, 453:15, 455:25
COURTROOM [4] - 374:16, 394:11, 394:20, 434:4
COURTS [3] - 415:15, 415:19, 415:20
COVER [1] - 449:18
COVERED [1] - 422:3
COVERS [1] - 404:10
CRACK [1] - 405:18
CRACKS [1] - 405:24
CRADLE [4] - 410:11, 411:1, 412:2, 418:8
CRADLE-TO-GRAVE [3] - 410:11, 411:1, 412:2
CREATE [1] - 446:14
CREATED [10] - 410:15, 410:17, 418:20, 420:23, 423:16, 423:21, 424:11, 424:24, 425:19, 425:21
CREATES [2] - 405:2, 426:24
CREATING [1] - 424:2
CREDIBILITY [1] - 384:2
CREEP [1] - 437:17
CRIMINAL [4] - 445:6, 445:10, 446:7, 448:6

CRITICAL [3] - 377:2, 412:7, 457:13
CROSS [1] - 374:12
CROSS [1] - 375:3
CROSS-EXAMINATION [1] - 375:3
CRUZ [2] - 374:15, 435:4
CURRENT [1] - 381:17
CUSTOMERS [3] - 388:6, 388:9, 388:25
CUTTING [2] - 404:16, 404:19
CYCLE [2] - 396:3, 398:9

# D

DAILY [5] - 419:10, 419:20, 420:22, 421:7, 421:8
DAMAGE [4] - 383:14, 383:15, 384:15, 390:4
DAMAGES [6] - 383:19, 384:9, 388:2, 389:17, 389:23, 390:13
DANCE [1] - 407:12
DANIEL [3] - 436:8, 436:17, 438:7
DASHBOARDS [1] - 404:13
DATA [2] - 417:1, 433:11
DAYS [1] - 408:17
DDW [7] - 376:6, 376:20, 376:24, 377:6, 380:19, 381:13, 381:18
DEALS [1] - 386:15
DEALT [1] - 375:8
DECADE [1] - 404:5
DECADES [2] - 416:14, 429:15
DECEMBER [2] - 384:8, 401:13
DECIDE [2] - 384:1, 450:4
DECIDED [3] - 387:11, 438:2, 445:15
DECISIONS [2] - 396:19, 456:11
DECLARATION [1] - 442:14
DEEM [1] - 415:8
DEFENDANTS [2] - 437:2, 447:25
DEFENSE [4] - 394:1,

403:5, 407:24, 432:1
**DEFENSE** [2] - 423:16, 448:18
**DEFINES** [1] - 383:8
**DEGREASED** [1] - 424:8
**DEGREASER** [8] - 404:23, 405:7, 405:8, 405:16, 406:12, 407:21, 407:22, 424:8
**DEGREASERS** [1] - 405:6
**DEGREASING** [2] - 407:18, 407:23
**DEGREE** [4] - 400:10, 401:1, 402:9, 406:6
**DEGREES** [1] - 396:11
**DELAYING** [1] - 388:7
**DELIVER** [1] - 388:12
**DELIVERED** [1] - 388:25
**DELIVERY** [3] - 388:5, 388:9, 389:10
**DEMAND** [6] - 376:23, 450:5, 450:19, 450:20, 451:15, 452:3
**DEMONSTRATES** [1] - 412:17
**DEPARTMENT** [6] - 376:5, 381:4, 394:1, 403:5, 407:24, 431:25
**DEPARTMENT** [1] - 387:20
**DEPONENT** [1] - 383:20
**DEPOSED** [2] - 383:22, 417:12
**DEPOSITION** [6] - 384:10, 388:14, 388:22, 389:9, 390:2, 390:12
**DEPTHS** [1] - 445:22
**DEPUTY** [4] - 374:16, 394:11, 394:20, 434:4
**DESCRIBE** [3] - 395:12, 396:12, 408:14
**DESCRIBED** [9] - 400:22, 406:12, 408:8, 409:16, 411:9, 418:8, 420:14, 424:8, 433:3
**DESCRIBING** [1] - 414:11
**DESIGN** [1] - 393:23

**DESIGNATED** [3] - 383:18, 454:16, 454:22
**DESIGNATES** [1] - 383:19
**DESIGNATION** [1] - 438:19
**DESIGNED** [2] - 408:22, 409:9
**DETAIL** [2] - 428:1, 433:6
**DETECTION** [1] - 380:16
**DETERMINATION** [2] - 384:22, 440:1
**DETERMINE** [6] - 376:17, 400:7, 400:10, 400:15, 411:10, 415:9
**DETERMINING** [5] - 384:3, 399:10, 399:12, 399:14, 406:5
**DEVELOP** [4] - 402:22, 403:14, 403:15, 409:17
**DEVELOPMENT** [1] - 402:20
**DEVICES** [1] - 423:18
**DEVOTED** [1] - 456:25
**DIFFERENCE** [3] - 443:23, 443:24, 444:3
**DIFFERENT** [28] - 375:14, 379:1, 379:9, 387:3, 396:15, 398:22, 402:5, 402:20, 404:7, 404:8, 404:9, 404:17, 405:6, 406:8, 407:23, 408:16, 412:6, 414:3, 414:7, 417:14, 418:23, 423:16, 424:6, 427:19, 427:24, 428:25, 446:24, 457:13
**DIMINISHES** [1] - 437:18
**DIRECT** [1] - 395:4
**DIRECTLY** [2] - 431:10, 447:20
**DISAGREEMENT** [1] - 454:13
**DISAPPEARS** [1] - 426:12
**DISCLOSE** [2] - 412:8, 412:18
**DISCLOSING** [1] -

413:5
**DISCLOSURE** [1] - 412:14
**DISCOVERED** [1] - 408:7
**DISCUSS** [2] - 444:5, 453:5
**DISCUSSED** [5] - 407:16, 430:6, 443:7, 443:18, 455:6
**DISCUSSES** [1] - 428:19
**DISCUSSING** [3] - 375:9, 398:6, 452:15
**DISCUSSION** [6] - 382:2, 436:1, 436:13, 444:18, 452:14, 456:15
**DISPOSAL** [9] - 401:8, 405:22, 408:5, 417:5, 417:19, 420:18, 420:21, 427:11, 446:25
**DISPOSE** [2] - 409:3, 426:1
**DISPOSED** [4] - 410:23, 418:10, 420:19, 424:16
**DISPOSITIVELY** [1] - 446:1
**DISPROVE** [2] - 453:2, 453:7
**DISPUTE** [2] - 436:25, 454:15
**DISPUTED** [2] - 453:3, 453:8
**DISPUTES** [1] - 436:7
**DISSOLVES** [1] - 405:11
**DISTINCTION** [1] - 407:15
**DISTRICT** [2] - 390:14, 445:17
**DISTRICT** [1] - 381:20
**DOCUMENT** [25] - 376:14, 379:5, 381:7, 441:15, 441:17, 441:18, 441:20, 441:22, 442:9, 442:15, 442:23, 443:2, 443:6, 443:12, 443:15, 443:17, 443:19, 444:5, 444:6, 444:7, 445:9, 447:24, 449:3
**DOCUMENTING** [1] - 410:25
**DOCUMENTS** [11] - 412:16, 417:8,

417:13, 417:14, 417:22, 421:3, 421:16, 422:2, 448:12, 448:14, 454:8
**DOD** [3] - 431:25, 432:1, 432:4
**DOLLAR** [1] - 402:25
**DOLLARS** [1] - 391:10
**DONE** [11] - 378:11, 379:23, 382:14, 382:17, 382:21, 399:2, 407:24, 409:4, 411:14, 415:13
**DOOR** [1] - 446:10
**DOORS** [1] - 404:14
**DOWN** [12] - 385:15, 386:5, 386:25, 394:4, 401:20, 405:18, 415:12, 418:14, 422:15, 426:12, 434:9, 456:21
**DOWNTOWN** [1] - 403:22
**DOWNWARD** [1] - 406:1
**DOZEN** [1] - 412:24
**DOZENS** [2] - 404:9, 407:9
**DR** [13] - 394:8, 395:12, 396:24, 418:14, 428:14, 434:9, 434:22, 435:13, 443:3, 443:18, 443:19, 444:19
**DRAGGING** [1] - 451:24
**DRAW** [1] - 387:24
**DRAWN** [1] - 433:12
**DRESSER** [1] - 402:17
**DRILL** [1] - 392:15
**DRILLED** [1] - 385:2
**DRINKING** [1] - 432:9
**DROUGHT** [1] - 386:10
**DTSC** [1] - 391:18
**DUANE** [1] - 436:9
**DUE** [1] - 457:17
**DUMPED** [1] - 414:6
**DUMPING** [6] - 431:2, 431:11, 431:13, 431:17, 432:3, 446:24
**DURING** [4] - 398:21, 402:7, 410:6, 452:11

## E

**E-MAIL** [4] - 374:17, 375:9, 449:18, 456:1
**EARLY** [5] - 408:10, 421:22, 423:10, 425:13, 425:24
**EARNEST** [1] - 457:4
**EARTH** [2] - 396:4, 396:5
**EDUCATION** [4] - 395:23, 397:13, 397:22, 418:1
**EDUCATIONAL** [1] - 395:13
**EFFECTIVE** [2] - 407:21, 424:13
**EFFICIENT** [1] - 457:2
**EFFORT** [2] - 457:2, 457:4
**EIGHT** [1] - 454:24
**EITHER** [11] - 377:23, 379:13, 396:4, 403:24, 419:23, 420:14, 448:1, 453:2, 453:7, 454:1, 457:20
**ELECTRONICALLY** [2] - 455:24, 455:25
**ELSEWHERE** [1] - 424:5
**EMBRACING** [1] - 454:2
**EMISSION** [1] - 427:8
**EMPLOYEES** [3] - 383:22, 417:12, 431:15
**ENABLE** [1] - 438:12
**END** [6] - 404:20, 404:21, 405:1, 408:12, 409:1, 414:24
**ENDANGERMENT** [1] - 442:12
**ENDS** [2] - 407:14, 407:16
**ENE** [1] - 407:14
**ENFORCEMENT** [1] - 402:21
**ENGAGEMENTS** [1] - 429:19
**ENGINEER** [2] - 401:6, 401:17
**ENGINEERING** [8] - 381:3, 395:15, 395:16, 395:18, 396:15, 397:19, 402:13, 409:10
**ENGINEERING** [1] - 395:14, 429:5

ENGINEERS [1] - 381:12
ENTERED [1] - 405:24
ENTIRE [1] - 379:6
ENTIRELY [4] - 392:11, 392:16, 438:9, 457:8
ENTITIES [2] - 445:20, 446:2
ENTITLED [1] - 454:3
ENVIRONMENT [12] - 396:2, 398:6, 398:7, 399:21, 401:9, 401:10, 401:12, 405:24, 411:3, 417:19, 427:2, 431:9
ENVIRONMENTAL [1] - 401:3
ENVIRONMENTAL [12] - 395:15, 395:16, 401:17, 410:3, 410:6, 415:21, 424:24, 425:19, 432:12, 432:13, 432:21, 433:10
EPA [10] - 401:13, 401:15, 401:22, 402:2, 403:5, 403:8, 408:2, 408:10, 408:18, 409:16
EQUIPMENT [2] - 404:24, 408:24
EQUIVALENT [10] - 376:12, 376:13, 376:18, 376:20, 376:23, 376:24, 377:7, 377:18, 378:16, 378:18
ERIC [1] - 435:16
ERROR [3] - 447:18, 447:19, 448:20
ESCAPE [1] - 441:4
ESSENTIALLY [5] - 426:10, 426:22, 439:6, 446:19, 455:11
ESTABLISH [1] - 380:9
ESTIMATE [1] - 412:23
ET [2] - 442:14, 445:11
EVALUATE [5] - 383:24, 400:16, 409:18, 417:4, 425:14
EVALUATING [3] - 401:7, 406:7, 408:4
EVALUATION [2] - 409:21, 417:15
EVAPORATE [2] -

422:17, 422:25
EVAPORATES [1] - 437:18
EVE [1] - 402:2
EVENING [2] - 440:18, 456:8
EVERYWHERE [1] - 421:3
EVIDENCE [1] - 453:1
EVIDENCE [23] - 375:24, 414:16, 431:12, 431:22, 432:11, 432:15, 432:17, 432:21, 434:15, 434:17, 434:24, 437:22, 439:12, 439:19, 439:25, 440:4, 444:8, 445:10, 446:10, 446:11, 447:6, 447:7, 457:5
EVIDENTIARY [3] - 383:24, 439:12, 444:9
EXACTLY [1] - 442:25
EXAM [1] - 397:21
EXAMINATION [4] - 375:3, 393:1, 393:18, 395:4
EXAMINATION [3] - 397:17, 397:18, 452:19
EXAMPLE [9] - 403:23, 403:25, 404:1, 415:20, 422:5, 423:19, 425:22, 437:21, 438:7
EXCEPTION [1] - 453:10
EXCEPTIONS [1] - 450:9
EXCISED [4] - 444:12, 444:13, 445:7, 447:12
EXCISING [1] - 445:5
EXCLUDED [1] - 437:21
EXCLUSION [1] - 453:10
EXCUSE [2] - 407:5, 422:15
EXCUSED [1] - 394:3
EXHIBIT [11] - 375:22, 375:24, 390:23, 391:16, 414:14, 414:16, 414:17, 441:13, 448:1, 449:5
EXHIBIT [2] - 414:15, 452:13

EXHIBITS [8] - 441:11, 444:19, 445:3, 447:24, 448:24, 454:15, 454:17, 456:4
EXIST [2] - 376:15, 411:9
EXISTED [3] - 416:25, 421:14, 421:17
EXISTING [1] - 399:11
EXPECT [4] - 440:24, 443:19, 445:9, 457:18
EXPECTATION [2] - 456:22, 456:23
EXPECTATIONS [1] - 441:6
EXPECTING [1] - 447:4
EXPENSES [1] - 392:2
EXPERIENCE [15] - 397:13, 397:14, 397:22, 398:15, 398:18, 407:13, 407:22, 408:2, 408:15, 409:12, 412:25, 418:1, 419:23, 420:2, 421:13
EXPERT [5] - 395:8, 415:15, 415:20, 416:4, 418:1
EXPERTS [1] - 456:6
EXPLAIN [8] - 398:18, 399:7, 410:2, 438:7, 439:14, 439:21, 440:22, 450:11
EXPLANATION [1] - 427:15
EXPLODE [1] - 425:11
EXPLODING [1] - 423:17
EXPLORE [1] - 445:22
EXPOSED [3] - 405:11, 422:14, 422:16
EXPRESS [1] - 453:8
EXPRESSLY [1] - 442:15
EXTEND [1] - 434:22
EXTENT [5] - 400:10, 405:25, 406:6, 411:10, 416:25
EXTRA [1] - 457:3
EXTRACTION [2] - 422:7, 423:2
EXTRUDED [1] - 404:7
EXTRUDING [1] - 407:18

EXTRUSION [1] - 406:11

# F

FACE [1] - 440:20
FACILITIES [2] - 408:5, 419:16
FACILITY [16] - 380:17, 406:24, 410:19, 410:20, 410:24, 414:4, 415:1, 415:2, 418:11, 418:12, 418:19, 421:4, 421:18, 421:24, 422:4, 423:21
FACT [5] - 391:9, 393:21, 437:20, 442:22, 444:4
FACTUAL [1] - 443:12
FAILING [1] - 420:16
FAIR [3] - 453:14, 453:17
FAIRLY [1] - 434:19
FAITH [2] - 440:24, 447:6, 451:9, 457:2, 457:4
FALL [1] - 443:16
FALLS [3] - 396:4, 396:8, 453:21
FAMILIAR [6] - 377:11, 412:20, 413:1, 424:23, 425:2, 442:13
FAMOUS [1] - 407:2
FAR [6] - 379:23, 383:7, 400:11, 420:13, 421:23, 445:15
FAST [2] - 427:16, 431:6
FAST-FORWARD [1] - 431:6
FAST-FORWARDING [1] - 427:16
FAUCET [1] - 380:24
FEDERAL [2] - 401:2, 402:24
FEDERAL [11] - 402:22, 402:24, 403:6, 415:15, 415:19, 415:20, 415:22, 415:24, 416:1, 419:24, 420:4
FEELINGS [1] - 437:9
FEET [3] - 385:18, 385:25, 451:25
FEW [4] - 375:21,

407:11, 435:19, 449:4
FIELD [5] - 396:13, 397:13, 397:24, 400:3, 401:9
FIGHT [2] - 385:12, 436:15
FIGHTING [1] - 443:22
FIGURE [1] - 405:25
FILED [1] - 455:15
FILL [2] - 397:12, 422:11
FINAL [2] - 400:19, 421:4
FINALLY [1] - 417:4
FINE [3] - 388:21, 441:8, 452:24
FINISHED [4] - 395:19, 401:1, 402:9, 402:10
FIREWORKS [1] - 423:17
FIRM [3] - 403:11, 403:15
FIRST [14] - 399:16, 402:23, 403:21, 407:13, 410:10, 414:24, 416:3, 416:5, 416:18, 416:21, 433:15, 434:13, 435:25, 450:8
FIT [2] - 434:20, 438:7
FIVE [4] - 385:6, 385:11, 385:16, 386:22
FIVE-YEAR [1] - 385:16
FLAGGED [1] - 447:25
FLOOR [1] - 405:24
FLOORING [1] - 405:19
FLUSH [1] - 424:19
FOAM [1] - 414:14
FOCUS [2] - 421:21, 441:17
FOCUSED [1] - 421:22
FOCUSING [1] - 441:19
FOLLOW [5] - 378:21, 379:4, 379:7, 393:3, 410:23
FOLLOW-UP [1] - 393:3
FOLLOWED [3] - 411:11, 431:25, 433:17
FOLLOWING [4] - 409:16, 429:4,

453:1, 455:8
**FOLLOWS** [1] - 411:4
**FOLLOWS** [2] - 375:2, 395:3
**FORGIVE** [1] - 442:1
**FORM** [5] - 374:18, 403:16, 405:17, 421:17, 455:13
**FORMAL** [3] - 408:19, 408:21, 421:3
**FORMATION** [1] - 402:23
**FORMED** [2] - 404:8, 404:17
**FORMING** [1] - 404:19
**FORTH** [2] - 447:11, 455:18
**FORTHCOMING** [1] - 412:8
**FORWARD** [3] - 394:12, 399:12, 431:6
**FORWARDED** [1] - 375:10
**FORWARDING** [1] - 427:16
**FOUL** [1] - 443:10
**FOUNDATION** [8] - 408:23, 438:24, 441:14, 442:18, 442:22, 444:5, 444:10
**FOUR** [1] - 386:21
**FRAME** [1] - 384:24
**FRANK** [1] - 453:12
**FRANKLY** [2] - 385:14, 441:1
**FREQUENTLY** [3] - 418:10, 418:18, 429:18
**FUEL** [1] - 424:14
**FUELS** [1] - 406:22
**FULL** [5] - 382:5, 385:7, 402:15, 412:14, 450:2
**FULL-TIME** [1] - 402:15
**FULLY** [6] - 412:8, 412:17, 434:22, 445:15, 449:10
**FUMES** [1] - 427:8
**FUND** [2] - 391:13, 393:9
**FUNDED** [1] - 391:7
**FUNDING** [1] - 394:1
**FUSES** [1] - 423:15
**FUTURE** [2] - 386:16, 454:9

# G

**GAIN** [1] - 397:19
**GALLAGHER** [1] - 444:17
**GALLONS** [1] - 419:21
**GARY** [1] - 436:9
**GAS** [8] - 383:5, 383:11, 399:20, 422:11, 422:12, 426:21, 426:22, 426:23
**GASOLINE** [1] - 422:13
**GEE** [4] - 375:9, 375:10, 392:25, 457:7
**GEE** [3] - 388:21, 393:2, 393:15
**GENERAL** [1] - 379:17
**GENERAL** [4] - 383:9, 430:10, 431:1, 449:17
**GENERALLY** [4] - 376:4, 414:20, 424:23, 441:18
**GENERATED** [3] - 418:9, 422:3, 423:24
**GENTLE** [1] - 457:7
**GENTLEMAN'S** [1] - 426:19
**GENTLEMEN** [1] - 383:17
**GENUINE** [1] - 440:16
**GEOLOGICAL** [1] - 429:15
**GEOLOGY** [1] - 429:17
**GIANT** [1] - 406:25
**GIVEN** [1] - 397:21
**GOAL** [14] - 376:3, 377:20, 377:24, 378:8, 378:11, 378:17, 378:24, 379:1, 379:9, 380:6, 380:10, 380:14, 380:23, 399:10
**GOD** [1] - 394:18
**GOODRICH** [1] - 407:1
**GOVERNMENT** [8] - 400:14, 401:16, 410:21, 412:10, 412:11, 412:14, 429:16, 429:17
**GOVERNMENT** [5] - 401:2, 402:21, 402:25, 412:18, 431:1
**GOVERNMENT'S** [1] -

429:16
**GOVERNS** [1] - 401:4
**GRAD** [1] - 401:25
**GRADUATE** [1] - 397:25
**GRANTED** [2] - 397:16, 447:21
**GRAPHIC** [1] - 414:18
**GRASP** [1] - 441:4
**GRAVE** [4] - 410:11, 411:1, 412:2, 418:9
**GRAY** [1] - 416:17
**GREASE** [3] - 404:21, 405:11, 424:5
**GREASES** [3] - 404:25, 405:1, 424:7
**GREASY** [1] - 404:20
**GREAT** [1] - 428:1
**GREATEST** [1] - 448:19
**GROUND** [15] - 396:7, 405:19, 406:1, 409:19, 423:3, 424:18, 426:11, 426:12, 426:17, 428:20, 431:3, 431:11, 431:14, 432:3, 432:8
**GROUNDWATER** [1] - 428:15
**GROUNDWATER** [20] - 385:20, 386:8, 396:5, 396:6, 398:13, 399:22, 400:6, 409:13, 409:14, 409:17, 417:2, 425:20, 426:6, 426:8, 426:18, 429:25, 431:3, 431:10, 432:8, 433:11
**GROUP** [8] - 376:14, 398:25, 402:23, 403:14, 403:15, 403:16
**GROUPS** [6] - 398:22, 398:24, 399:2, 399:3
**GUESS** [3] - 378:20, 390:5, 414:9
**GUIDANCE** [1] - 455:8
**GUIDE** [2] - 376:20, 376:22
**GUIDELINES** [1] - 425:14

# H

**H-U-G-H-T-O** [1] - 394:24
**HAIR** [1] - 416:17

**HALF** [2] - 401:6, 401:24
**HAND** [3] - 374:19, 394:15, 444:16
**HANDLED** [3] - 418:9, 418:24, 418:25
**HANDLING** [10] - 417:5, 425:15, 430:15, 431:8, 431:23, 432:25, 433:9, 433:12, 433:16, 433:18
**HAPPY** [2] - 374:19, 447:13
**HARD** [4] - 412:23, 418:17, 455:12, 455:23
**HARM** [1] - 443:10
**HAROLD** [1] - 428:14
**HARVARD** [1] - 428:15
**HAVING** [1] - 395:3
**HAZARDOUS** [1] - 420:24
**HEAD** [1] - 381:22
**HEALTH** [7] - 376:3, 376:8, 377:20, 377:24, 378:8, 378:11, 378:17
**HEALTH** [1] - 376:5
**HEAR** [8] - 397:1, 436:11, 440:6, 441:14, 442:4, 443:5, 450:1, 452:8
**HEARD** [1] - 446:16
**HEARING** [1] - 383:17
**HEARSAY** [1] - 444:2
**HEART** [1] - 376:1
**HEAT** [3] - 404:16, 405:8, 405:10
**HEAVIER** [1] - 407:20
**HELP** [1] - 394:18
**HELPFUL** [1] - 442:20
**HIGH** [2] - 378:3, 424:18
**HIGH-PRESSURE** [1] - 424:18
**HIGHER** [1] - 378:5
**HILL** [3] - 382:18, 382:20, 383:2
**HIRED** [4] - 377:17, 398:23, 403:14, 403:15
**HISTORIC** [1] - 417:17
**HISTORICAL** [2] - 385:1, 407:7
**HISTORY** [8] - 400:1, 400:25, 415:1, 415:7, 416:22, 416:23, 417:16,

451:24
**HIT** [1] - 454:23
**HOG** [1] - 424:22
**HOKKANEN** [2] - 436:9, 438:19
**HOKKANEN** [1] - 436:9
**HOLD** [1] - 457:16
**HOLDUP** [2] - 393:20, 393:24
**HONCHO** [1] - 381:22
**HONOR** [39] - 374:10, 374:13, 374:21, 384:6, 390:8, 394:7, 395:1, 397:5, 427:12, 428:3, 430:21, 431:19, 432:19, 434:25, 435:20, 436:25, 437:1, 437:21, 438:16, 439:4, 439:11, 439:22, 440:14, 441:5, 442:2, 442:8, 443:8, 443:20, 447:9, 448:7, 448:14, 450:6, 451:13, 452:10, 453:11, 454:13, 454:18, 456:2, 456:5
**HONOR'S** [2] - 448:4, 454:25
**HOPE** [2] - 441:5, 451:1
**HOPEFULLY** [1] - 412:12
**HOPING** [1] - 456:19
**HORIZONTALLY** [1] - 400:11
**HOSPITAL** [1] - 436:21
**HOUR** [1] - 454:24
**HOURS** [2] - 456:19, 456:23
**HUGE** [2] - 385:14, 404:15
**HUGHTO** [15] - 394:8, 394:24, 395:12, 396:24, 418:14, 434:9, 434:22, 435:13, 443:18, 443:19, 443:24, 444:2, 444:19
**HUGHTO** [1] - 395:2
**HUGHTO'S** [1] - 443:3
**HUMAN** [1] - 447:19
**HUNDRED** [3] - 402:25, 423:19, 423:21
**HYDROGEOLOGIC**

[1] - 398:9
**HYDROGEOLOGY** [3] - 395:21, 395:22, 429:18
**HYDROLOGIC** [1] - 396:3
**HYDROLOGIST** [3] - 396:23, 397:7, 397:9
**HYDROLOGY** [8] - 395:20, 395:22, 395:24, 395:25, 396:1, 398:1, 398:4, 402:6
**HYDROLOGY** [3] - 396:23, 397:11, 397:16

**I**

**IDENTIFIED** [5] - 383:3, 427:6, 427:10, 434:25, 435:1
**IDENTIFY** [2] - 415:2, 448:25
**IDENTIFYING** [1] - 428:16
**IFS** [1] - 452:18
**IGNORED** [1] - 452:17
**II** [1] - 423:14
**IMAGINE** [1] - 447:20
**IMMEDIATELY** [1] - 393:9
**IMMINENT** [1] - 442:12
**IMPACT** [5] - 430:14, 431:3, 431:10, 439:19
**IMPACTED** [4] - 399:21, 399:22, 411:14, 411:23
**IMPACTS** [5] - 401:8, 401:11, 408:4, 417:18, 425:19
**IMPEACH** [1] - 453:3
**IMPLEMENTATION** [1] - 411:19
**IMPORTANT** [1] - 407:15
**IMPORTED** [2] - 386:4, 386:24
**IMPOUNDMENT** [1] - 414:5
**INCENTIVE** [1] - 448:19
**INCH** [2] - 396:25, 423:22
**INCLINATION** [2] - 445:23, 448:5
**INCLINED** [4] -

436:11, 437:5, 438:1, 445:22
**INCLUDE** [5] - 377:13, 385:24, 419:10, 419:13, 456:21
**INCLUDED** [2] - 401:9, 435:11
**INCLUDES** [1] - 386:4
**INCLUDING** [5] - 374:7, 406:9, 416:1, 418:8, 429:11
**INCONSISTENT** [1] - 453:4
**INCORRECT** [1] - 454:2
**INCREASING** [1] - 410:5
**INDEPENDENTLY** [1] - 440:1
**INDICATED** [1] - 435:19
**INDISCRIMINATE** [1] - 446:24
**INDIVIDUAL** [1] - 385:11
**INDUSTRIAL** [3] - 408:5, 418:6, 423:25
**INDUSTRY** [9] - 399:2, 412:13, 416:12, 417:18, 426:21, 426:23, 429:22, 430:18, 431:1
**INFORMAL** [3] - 408:19, 409:2, 409:7
**INFORMATION** [11] - 376:25, 412:4, 412:9, 412:15, 412:18, 413:9, 417:25, 437:10, 438:12, 444:25
**INFORMED** [1] - 445:24
**INITIAL** [1] - 393:7
**INSPECTION** [1] - 414:22
**INSTALL** [1] - 393:10
**INSTANCE** [4] - 386:9, 388:5, 388:8, 451:13
**INSTITUTE** [3] - 396:23, 397:11, 397:15
**INSTRUCTED** [1] - 398:24
**INSTRUCTING** [1] - 398:22
**INSTRUCTION** [3] - 374:13, 374:20, 447:20
**INSTRUCTOR** [1] - 398:4

**INSURANCE** [3] - 399:4, 449:22, 452:14
**INTELLECTUAL** [1] - 441:4
**INTEND** [5] - 438:20, 439:5, 442:21, 444:18, 457:16
**INTENDS** [1] - 439:1
**INTENT** [1] - 438:18
**INTERACTIONS** [1] - 433:13
**INTEREST** [2] - 406:8, 427:23
**INTERESTED** [1] - 451:9
**INTERJECT** [1] - 448:15
**INTERNAL** [1] - 446:22
**INTERRUPT** [1] - 438:3
**INTRODUCE** [5] - 439:2, 439:5, 443:15, 446:10, 451:10
**INTRODUCED** [2] - 449:6, 454:16
**INTRODUCING** [1] - 447:6
**INVESTIGATE** [1] - 449:10
**INVESTIGATED** [2] - 411:8, 412:5
**INVESTIGATING** [1] - 416:13
**INVESTIGATION** [9] - 396:19, 405:23, 413:12, 445:6, 445:10, 446:7, 446:11, 446:12, 448:6
**INVESTIGATIONS** [1] - 400:4
**INVOICES** [1] - 419:20
**INVOLVED** [24] - 398:20, 398:22, 400:21, 404:18, 406:11, 406:14, 406:19, 406:20, 406:22, 407:4, 407:6, 407:7, 407:9, 408:6, 409:10, 409:20, 414:22, 416:7, 418:7, 419:6, 419:16, 419:24, 426:21, 433:24
**INVOLVING** [1] - 419:4
**ISLANDS** [1] - 401:5

**ISSUE** [18] - 378:16, 383:19, 384:9, 388:1, 390:20, 443:13, 444:16, 444:21, 445:12, 445:17, 445:22, 446:1, 446:3, 448:9, 452:7, 454:3, 454:11, 456:17
**ISSUED** [1] - 375:15
**ISSUES** [14] - 415:21, 416:7, 416:14, 417:7, 431:5, 438:2, 439:17, 439:23, 439:24, 440:2, 444:20, 445:5, 447:7
**ITEM** [1] - 435:25
**ITERATIONS** [1] - 377:15
**ITSELF** [2] - 432:14, 443:12

**J**

**JACOBS** [1] - 449:18
**JANUARY** [1] - 402:3
**JEFFREY** [2] - 436:6, 439:2
**JENKS** [1] - 377:18
**JERSEY** [4] - 401:4, 408:3, 408:6, 416:2
**JISA** [1] - 431:16
**JISA** [1] - 431:16
**JMIL** [1] - 436:16
**JOB** [3] - 397:1, 403:19, 409:17
**JOINT** [1] - 452:12
**JOURNAL** [1] - 429:5
**JUDGMENT** [3] - 400:2, 455:11, 457:12
**JUDGMENTS** [2] - 457:13, 457:16
**JUNIORS** [2] - 398:1, 398:4
**JURORS** [1] - 457:14
**JURY** [24] - 374:4, 374:7, 384:16, 411:21, 434:4, 434:6, 434:8, 435:24, 437:8, 437:10, 437:24, 439:19, 439:24, 440:1, 440:3, 440:6, 440:11, 445:1, 445:2, 448:24, 449:9, 450:4, 451:7, 454:3

**K**

**KEEP** [6] - 410:21, 413:12, 413:15, 414:9, 423:6, 433:25
**KEITH** [1] - 375:1
**KENNEDY** [1] - 377:18
**KERN** [3] - 386:18, 386:22, 387:4
**KEY** [1] - 411:13
**KIND** [3] - 384:25, 399:19, 407:11
**KNIFE** [1] - 446:19
**KNOWLEDGE** [6] - 383:10, 417:18, 430:17, 441:20, 442:5, 442:6
**KNOWN** [3] - 402:17, 403:11, 430:25
**KNOWS** [1] - 443:25

**L**

**LABELS** [1] - 421:1
**LADIES** [1] - 383:16
**LAGOON** [1] - 414:5
**LAKES** [1] - 396:9
**LAND** [2] - 401:8, 402:20
**LANDFILL** [5] - 408:22, 409:8, 409:10, 414:6
**LANDFILLS** [8] - 408:15, 408:17, 408:20, 408:21, 409:3, 410:13, 413:9
**LARDIERE** [15] - 435:1, 435:9, 435:11, 435:16, 441:15, 441:19, 442:10, 442:16, 442:21, 443:9, 443:25, 444:5, 449:15, 449:18, 452:17
**LARDIERE'S** [2] - 441:12, 452:19
**LARGE** [2] - 403:6, 410:9, 410:10
**LARGELY** [1] - 446:3
**LAST** [15] - 375:19, 375:20, 377:23, 382:5, 382:10, 389:15, 390:20, 394:22, 407:10, 411:14, 412:20, 426:15, 426:20, 449:3, 454:7
**LASTLY** [1] - 452:25
**LATEST** [4] - 377:16,

378:10, 378:12, 378:15
**LAW** [6] - 410:5, 410:7, 410:10, 437:10, 445:14, 450:6
**LAWS** [5] - 417:21, 425:24, 430:11, 430:13, 431:3
**LAWSUIT** [2] - 453:23, 453:25
**LAWYERS** [1] - 399:3
**LAY** [2] - 442:17, 442:18
**LEAD** [2] - 414:4, 414:7
**LEAKS** [1] - 405:21
**LEAST** [5] - 386:21, 431:15, 436:16, 442:6, 448:24
**LEAVE** [3] - 421:4, 455:10, 457:1
**LED** [1] - 400:1
**LEECHING** [2] - 408:24
**LEFT** [4] - 401:13, 402:2, 408:12, 438:9
**LEGAL** [3] - 399:3, 429:25, 430:6
**LEGISLATION** [2] - 425:20, 425:23
**LESS** [1] - 423:22
**LETTER** [8] - 380:22, 449:7, 449:14, 449:19, 450:6, 451:14, 452:17, 452:23
**LEVEL** [2] - 377:9, 377:22
**LEVELS** [3] - 376:15, 395:23, 402:22
**LIABILITIES** [3] - 427:1, 427:5, 427:11
**LICENSE** [7] - 396:16, 396:18, 396:22, 397:16, 397:19, 397:21, 398:25
**LICENSED** [2] - 396:16, 410:24
**LICENSES** [3] - 396:13, 396:14, 396:15
**LIGHT** [1] - 404:11
**LIKELY** [3] - 428:21, 446:13, 457:3
**LIMIT** [1] - 424:12
**LIMITATIONS** [1] - 457:17
**LIMITED** [2] - 450:24, 455:20

**LINE** [5] - 382:10, 390:7, 391:17, 446:15, 448:7
**LINER** [1] - 408:24
**LINES** [2] - 388:16, 437:16
**LIQUID** [1] - 405:18
**LIST** [4] - 438:22, 442:19, 443:4, 452:13
**LISTED** [4] - 379:5, 420:1, 420:5, 438:17
**LITERATURE** [11] - 417:17, 425:18, 426:16, 427:17, 427:18, 427:20, 427:25, 428:25, 430:12, 431:2
**LITIGATE** [3] - 449:10, 451:8, 451:23
**LITIGATING** [2] - 451:10, 451:17
**LITIGATION** [2] - 383:22, 451:6
**LIVE** [2] - 441:6, 447:5
**LOADED** [1] - 426:24
**LOCATED** [2] - 403:12, 403:20
**LOCATION** [4] - 382:11, 410:19, 410:22, 412:9
**LOCATIONS** [4] - 383:12, 406:23, 409:4, 415:25
**LOCATIONS** [1] - 414:18
**LOG** [1] - 419:20
**LOGISTICAL** [1] - 456:9
**LOGS** [3] - 419:10, 420:22, 421:7
**LOOK** [13] - 377:14, 378:23, 379:3, 379:7, 379:15, 382:18, 384:21, 387:22, 399:25, 416:21, 416:23, 417:1, 447:13
**LOOKED** [14] - 375:19, 375:20, 378:12, 384:23, 385:1, 385:4, 385:6, 414:25, 417:17, 417:20, 417:25, 423:9, 427:24, 441:11
**LOOKING** [7] - 378:19, 384:16, 384:17, 384:25, 415:1, 444:24

**LOOKS** [1] - 376:7
**LOS** [1] - 374:2
**LSPS** [1] - 398:25
**LUCE** [1] - 431:16
**LUCE** [1] - 431:16
**LUIS** [2] - 436:8
**LUMP** [1] - 386:24
**LUMPING** [1] - 389:19

## M

**MACHINE** [1] - 404:24
**MAIL** [4] - 374:17, 375:9, 449:18, 456:1
**MAJOR** [1] - 452:22
**MANAGED** [2] - 405:3, 418:13
**MANAGEMENT** [2] - 413:24, 414:1
**MANAGER** [1] - 449:17
**MANHATTAN** [3] - 395:15, 395:17, 401:2
**MANIFESTS** [2] - 421:2, 421:7
**MANNER** [1] - 408:8
**MANUAL** [9] - 432:1, 432:4, 432:12, 432:13, 432:16, 432:17, 432:21
**MANUALS** [2] - 432:22, 432:24
**MANUFACTURE** [1] - 406:11
**MANUFACTURED** [7] - 405:1, 406:23, 423:18, 423:21, 424:5, 424:6, 426:21
**MANUFACTURING** [9] - 399:19, 407:25, 410:12, 410:13, 419:6, 419:7, 423:12, 423:13, 423:24
**MAP** [1] - 414:21
**MASSACHUSETTS** [7] - 396:17, 396:18, 396:20, 396:21, 399:1, 403:21, 415:25
**MASTER'S** [1] - 409:15
**MASTER'S** [2] - 395:16, 401:1
**MATERIALS** [9] - 409:11, 410:12, 410:15, 410:17, 420:3, 426:8, 430:11, 432:3, 433:4

**MATHEMATICAL** [2] - 376:16, 409:21
**MATHEMATICALLY** [1] - 401:11
**MATTER** [7] - 374:6, 395:8, 433:24, 443:10, 443:11, 450:7, 451:22
**MATTERS** [1] - 383:21
**MCKEE** [1] - 402:17
**MCL** [13] - 376:2, 376:6, 376:12, 376:13, 376:15, 376:18, 376:23, 376:24, 377:7, 377:18, 378:16, 378:18
**MCLS** [3] - 378:18, 378:20, 379:21
**MEAN** [17] - 379:3, 380:15, 381:19, 382:16, 385:10, 385:24, 387:21, 389:20, 393:12, 399:7, 400:12, 409:7, 418:4, 438:5, 449:23, 453:11, 457:8
**MEANING** [2] - 417:13, 418:19
**MEANS** [3] - 406:7, 422:10, 448:21
**MEANT** [1] - 404:7
**MEDIA** [2] - 400:12
**MEDIATION** [2] - 450:6, 450:21
**MEDICAL** [1] - 436:21
**MEET** [7] - 379:20, 380:15, 380:23, 393:25, 410:20, 452:11, 455:16
**MEETING** [1] - 456:5
**MEMBER** [1] - 381:13
**MEMORY** [4] - 427:4, 428:9, 441:24, 454:23
**MEMOS** [1] - 446:22
**MENTION** [1] - 429:13
**MENTIONED** [5] - 398:9, 414:10, 419:12, 420:18, 422:5
**MENTIONING** [2] - 430:1, 442:10
**MENTORED** [1] - 398:24
**MESARD** [7] - 436:6, 437:7, 438:20, 439:6, 439:10, 440:12, 440:22

**MESARD** [1] - 436:6
**MET** [2] - 380:14, 380:17
**METAL** [5] - 404:6, 404:7, 407:23, 424:2
**METALS** [1] - 404:16
**METHOD** [2] - 399:14, 422:20
**METHODS** [3] - 419:22, 421:5, 431:11
**METROPOLITAN** [1] - 381:4
**MICHIGAN** [2] - 429:25, 430:6
**MICROPHONE** [1] - 396:25
**MID** [2] - 408:12, 416:6
**MIGHT** [7] - 381:19, 381:20, 383:7, 401:20, 413:14, 413:24
**MIGRATED** [2] - 406:1, 406:2
**MIGRATION** [1] - 426:10
**MILES** [1] - 403:22
**MILITARY** [3] - 406:15, 406:16, 423:14
**MILLIMETERS** [1] - 423:22
**MILLION** [11] - 391:12, 391:13, 391:21, 392:1, 392:4, 392:7, 392:13, 392:22, 402:25, 423:19, 423:21
**MILLIONS** [2] - 391:10, 404:13
**MIND** [1] - 433:25
**MINUS** [1] - 426:15
**MINUTE** [1] - 418:3
**MINUTES** [7] - 434:10, 434:11, 435:19, 449:24, 452:18, 454:20, 454:24
**MISSILE** [1] - 424:10
**MISSILES** [4] - 406:20, 406:22, 407:2, 421:14
**MISSING** [1] - 439:20
**MISTAKE** [1] - 448:19
**MITIGATED** [1] - 399:13
**MITIGATING** [1] - 406:7
**MITIGATION** [1] - 400:20
**MODEL** [1] - 401:11

**MODELING** [4] - 409:13, 409:14, 409:19, 409:21
**MODELS** [1] - 409:17
**MODIFIED** [4] - 449:21, 452:13, 452:23
**MONDAY** [1] - 456:6
**MONITORING** [1] - 408:25
**MONTH** [1] - 380:15
**MONTHLY** [1] - 421:8
**MONTHS** [1] - 452:11
**MORNING** [1] - 447:3
**MOST** [5] - 400:3, 413:1, 439:1, 446:8, 455:20
**MOVE** [5] - 375:13, 378:22, 383:14, 396:24, 422:11
**MOVED** [1] - 402:16
**MOVEMENT** [6] - 396:1, 396:2, 396:6, 398:5, 398:6, 429:8
**MOVES** [1] - 423:5
**MR** [99] - 374:13, 374:15, 374:21, 375:4, 375:25, 381:24, 382:5, 382:7, 384:6, 384:7, 388:17, 388:20, 388:21, 389:2, 390:8, 390:11, 390:17, 391:15, 391:20, 392:24, 393:2, 393:15, 393:17, 393:19, 394:2, 394:7, 395:1, 395:5, 397:5, 397:6, 411:16, 411:20, 414:17, 420:6, 420:10, 423:9, 427:12, 427:14, 427:16, 428:3, 428:5, 430:21, 431:12, 431:19, 431:22, 432:19, 432:20, 434:25, 435:5, 435:9, 435:14, 435:17, 435:20, 436:20, 437:6, 438:4, 438:16, 439:4, 439:8, 439:11, 439:16, 439:22, 440:14, 441:5, 441:16, 441:21, 442:2, 442:8, 442:25, 443:3, 443:8, 443:20,

443:23, 444:11, 444:14, 445:5, 447:9, 447:22, 448:16, 449:2, 449:7, 449:14, 450:5, 450:13, 450:15, 450:19, 450:25, 451:12, 452:2, 452:10, 453:11, 453:15, 454:11, 455:4, 455:15, 456:2, 456:5, 456:9, 456:11
**MULTI** [1] - 402:25
**MULTI-HUNDRED-MILLION-DOLLAR** [1] - 402:25
**MULTIPLE** [1] - 382:24
**MULTISTEP** [3] - 399:9, 399:16, 400:22
**MUNICIPALITY'S** [1] - 408:22
**MUNITIONS** [3] - 406:15, 406:16, 421:14
**MUST** [2] - 396:22, 445:7
**MUTUAL** [1] - 452:12

## N

**NAME** [5] - 394:22, 394:24, 424:20, 426:20
**NAMED** [1] - 428:14
**NARRATIVE** [1] - 427:12
**NATICK** [1] - 403:21
**NATIONWIDE** [1] - 397:11
**NATURAL** [1] - 426:23
**NATURE** [1] - 421:15
**NCP** [2] - 437:2, 440:5
**NEAR** [1] - 428:13
**NEARLY** [1] - 457:14
**NECESSARILY** [4] - 447:1, 448:12, 450:2, 457:8
**NECESSARY** [4] - 392:8, 400:20, 411:12, 448:23
**NEED** [17] - 382:20, 390:15, 400:13, 400:17, 404:18, 418:14, 424:7, 425:10, 430:8, 440:5, 444:13, 445:21, 445:25,

454:19, 455:17, 457:2, 457:19
**NEEDED** [1] - 384:22
**NEEDS** [4] - 393:25, 399:13, 411:11, 412:15
**NEGOTIATING** [1] - 406:8
**NEGOTIATIONS** [4] - 451:17, 451:19, 452:7, 452:17
**NEIGHBORING** [1] - 406:3
**NEVER** [5] - 377:7, 382:4, 382:21, 448:4, 448:6
**NEW** [7] - 401:3, 401:4, 408:3, 408:6, 416:1, 416:2
**NEW** [3] - 392:11, 392:16, 392:18
**NEXT** [14] - 391:25, 394:6, 399:25, 400:9, 401:14, 402:1, 402:14, 406:10, 415:9, 429:13, 435:13, 435:15, 454:21, 456:11
**NIGHT** [1] - 441:6
**NINE** [1] - 385:7
**NINTH** [3] - 445:16, 445:19
**NOTE** [1] - 447:23
**NOTES** [2] - 418:20, 419:20
**NOTHING** [5] - 394:18, 439:18, 441:9, 446:16, 450:25
**NOTICE** [1] - 457:11
**NOVEMBER** [1] - 374:1
**NOXIOUS** [1] - 427:8
**NUISANCES** [3] - 426:25, 427:5, 427:10
**NUMBER** [10] - 377:2, 378:2, 378:3, 393:12, 396:14, 399:4, 406:8, 415:25, 422:2, 427:19
**NUMBERS** [7] - 378:4, 385:9, 385:11, 391:14, 401:18, 401:19, 415:5
**NUMEROUS** [1] - 451:6

## O

**O'KEEFE** [1] - 381:14
**O'KEEFE'S** [1] - 381:17
**OATH** [4] - 374:9, 389:3, 389:5, 390:18
**OBJECTION** [10] - 431:19, 437:23, 441:19, 442:5, 442:6, 444:9, 445:3, 453:20, 454:5, 454:22
**OBJECTIONS** [5] - 441:11, 454:20, 455:1, 455:9, 455:20
**OBJECTIVE** [1] - 423:7
**OBJECTIVES** [1] - 399:14
**OBSERVE** [1] - 419:7
**OBVIOUS** [1] - 443:25
**OBVIOUSLY** [2] - 422:10, 454:1
**OCCASION** [3] - 388:23, 415:17, 445:21
**OCCUPIES** [1] - 426:13
**OCCUR** [2] - 439:18, 441:4
**OCCURRED** [1] - 453:24
**OCCURRING** [1] - 423:11
**OFF-THE-RECORD** [1] - 456:15
**OFFER** [2] - 438:11, 438:22
**OFFERED** [2] - 451:3, 453:6
**OFFHAND** [1] - 448:13
**OFFICE** [1] - 401:4
**OFFICER** [2] - 403:18, 442:4
**OFFICIALS** [1] - 397:15
**OFFSITE** [1] - 424:6
**OFTEN** [2] - 419:25, 455:19
**OHIO** [1] - 416:2
**OIL** [1] - 405:11
**OILS** [7] - 404:18, 404:21, 405:1, 405:3, 405:13, 424:7
**OILY** [1] - 404:20
**OLD** [1] - 416:16
**OLD-TIMER** [1] - 416:16
**OLDER** [1] - 430:11

**ONCE** [3] - 399:24, 421:3, 447:3
**ONE** [39] - 375:7, 375:10, 377:9, 381:3, 381:12, 389:15, 393:3, 396:2, 399:12, 404:10, 405:6, 406:19, 406:24, 407:1, 407:15, 407:17, 409:9, 410:25, 411:25, 415:17, 418:16, 422:19, 422:20, 424:20, 426:19, 429:13, 430:19, 431:24, 441:25, 444:11, 445:1, 447:9, 447:23, 448:1, 452:20, 452:23, 454:4, 456:16
**ONE-PAGE** [1] - 452:23
**ONE-THIRD** [1] - 422:20
**ONES** [3] - 413:13, 438:17
**ONLINE** [1] - 385:2
**ONSITE** [1] - 424:6
**OOO** [1] - 374:3
**OPEN** [3] - 433:25, 438:9, 454:11
**OPENING** [4] - 438:22, 446:10, 449:8, 449:24
**OPERATE** [3] - 425:8, 425:9, 427:22
**OPERATED** [1] - 407:1
**OPERATES** [3] - 405:8, 406:25, 418:19
**OPERATING** [4] - 380:19, 403:18, 418:18, 420:22
**OPERATION** [3] - 380:17, 405:5, 407:18
**OPERATIONAL** [8] - 378:24, 379:1, 379:9, 380:6, 380:10, 380:14, 380:23, 419:7
**OPERATIONS** [10] - 399:19, 410:12, 410:13, 413:6, 414:3, 414:7, 416:23, 419:8, 421:23, 431:7

**OPERATOR** [2] - 412:22, 418:19
**OPINION** [2] - 421:16, 431:8
**OPINIONS** [1] - 396:21
**OPPORTUNITY** [1] - 453:18
**ORDER** [4] - 442:3, 442:12, 442:15, 444:15
**ORDER** [7] - 380:9, 384:21, 396:20, 426:1, 438:8, 442:10, 447:11
**ORDERED** [1] - 434:12
**ORDERS** [2] - 419:19, 436:16
**ORDINANCES** [2] - 417:20, 430:11
**ORGANIC** [3] - 422:8, 422:9, 422:18
**ORGANICS** [1] - 422:10
**ORGANIZATION** [2] - 383:21, 397:12
**ORGANIZATIONS** [1] - 399:5
**ORIGINAL** [1] - 428:11
**ORIGINATE** [1] - 383:11
**ORIGINATED** [1] - 382:12
**OUTRIGHT** [1] - 387:5
**OUTSIDE** [7] - 392:16, 405:16, 411:2, 434:8, 435:23, 445:18, 453:21
**OUTWEIGHS** [1] - 446:6
**OVERLAP** [1] - 439:23
**OVERLAPS** [1] - 440:5
**OVERRULE** [1] - 453:20
**OVERRULED** [4] - 411:17, 420:7, 431:21, 454:5
**OVERTURES** [2] - 451:6, 453:8
**OVERVIEW** [1] - 400:24
**OWE** [1] - 454:1
**OWN** [3] - 409:9, 431:13, 433:17
**OWNER** [1] - 412:21
**OWNERSHIP** [1] - 399:18

**OWNING** [1] - 419:5
**OXIDIZER** [1] - 425:8
**OXYGEN** [3] - 425:9, 425:10

# P

**P.M** [1] - 374:1
**P.M** [1] - 457:22
**PAGE** [10] - 380:1, 381:5, 381:25, 388:16, 390:7, 391:16, 428:10, 428:12, 429:14, 452:23
**PAGES** [1] - 455:17
**PAID** [4] - 386:12, 391:1, 391:9, 391:21
**PAPER** [7] - 410:25, 426:19, 427:9, 429:10, 430:5, 455:12
**PAPERWORK** [1] - 402:11
**PARAGRAPH** [8] - 379:18, 380:3, 380:7, 382:5, 391:17, 392:1, 428:13, 429:4
**PARE** [1] - 456:20
**PART** [23] - 377:21, 381:7, 382:4, 387:10, 387:11, 387:12, 387:13, 391:2, 392:12, 392:15, 402:22, 405:10, 409:14, 409:16, 412:2, 413:1, 416:9, 417:12, 424:1, 440:7, 446:22, 447:18
**PART** [4] - 412:3, 412:21, 413:3, 413:8
**PARTICLES** [2] - 422:21, 422:22
**PARTICULAR** [5] - 407:7, 416:20, 424:20, 451:2, 451:22
**PARTICULARLY** [2] - 408:3, 417:19
**PARTIES** [9] - 406:8, 435:24, 436:1, 436:3, 436:12, 436:15, 446:21, 455:7, 456:20
**PARTIES'** [1] - 445:13
**PARTS** [12] - 375:20, 404:6, 404:13,

404:20, 405:1, 407:23, 410:9, 410:10, 424:2, 424:19, 432:4, 444:11
**PARTY** [2] - 444:6, 453:2
**PASSED** [4] - 410:7, 417:21, 425:25, 431:4
**PAST** [2] - 392:2, 433:21
**PATH** [1] - 385:15
**PATRICK** [1] - 388:19
**PAY** [7] - 386:12, 391:24, 392:10, 392:19, 393:5, 449:15, 453:25
**PAYING** [1] - 453:9
**PCE** [6] - 377:20, 382:11, 422:19, 444:23, 446:20, 447:1
**PELOQUIN** [4] - 435:2, 435:10, 454:14, 454:23
**PELOQUIN'S** [1] - 455:16
**PENETRATE** [1] - 396:4
**PEOPLE** [7] - 398:23, 399:2, 401:17, 402:21, 409:3, 429:21, 433:24
**PER** [2] - 377:21, 385:18
**PERCENT** [2] - 380:12, 422:22
**PERCHLORATE** [15] - 391:2, 391:4, 392:16, 393:5, 393:8, 393:10, 425:3, 425:5, 425:6, 425:11, 444:23, 446:21, 447:1, 449:11, 449:16
**PERCOLATE** [1] - 426:2
**PERCOLATING** [1] - 396:5
**PERCOLATION** [6] - 426:7, 426:9, 426:10, 426:17, 432:7, 432:8
**PERFORMING** [1] - 398:20
**PERHAPS** [3] - 451:23, 455:22, 457:15
**PERIOD** [11] - 385:5,

385:6, 398:21, 419:18, 421:20, 421:22, 421:25, 425:13, 426:14, 431:7, 444:20
**PERIODS** [2] - 385:5, 386:9
**PERMANENT** [1] - 380:18
**PERMIT** [14] - 375:14, 375:15, 377:1, 378:23, 378:24, 379:2, 379:4, 379:6, 379:15, 380:20, 381:2, 388:7, 426:4, 443:6
**PERSON** [2] - 418:19, 438:20
**PERSONAL** [3] - 441:20, 442:5, 442:6
**PERSONALLY** [4] - 398:24, 406:11, 432:20, 435:5
**PERSPECTIVE** [1] - 410:3
**PERSUADED** [1] - 446:7
**PERTAINED** [1] - 426:5
**PETER** [4] - 436:6, 439:6, 440:12, 440:22
**PETROLEUM** [2] - 383:5, 383:11
**PH.D** [1] - 395:2
**PH.D** [6] - 395:17, 396:11, 402:3, 402:8, 402:12, 409:19
**PHASE** [3] - 399:25, 400:19, 414:24
**PHASED** [1] - 413:18
**PHASES** [3] - 411:9, 412:6, 417:14
**PHOTOGRAPH** [1] - 390:22
**PHRASE** [1] - 414:10
**PICK** [1] - 385:7
**PICKED** [2] - 385:12, 385:16
**PICTURE** [1] - 391:5
**PIECE** [2] - 404:24, 444:21
**PIECES** [1] - 427:19
**PIPELINES** [1] - 392:5
**PIPING** [1] - 390:23
**PLACE** [8] - 393:14, 405:23, 409:11, 411:1, 414:6, 421:5, 424:17, 431:9

385:6, 398:21, 419:18, 421:20, 421:22, 421:25, 425:13, 426:14, 431:7, 444:20
**PLAINTIFF** [7] - 389:17, 394:7, 434:16, 439:1, 441:14, 445:8, 447:18
**PLAINTIFF'S** [2] - 375:2, 395:3
**PLAINTIFF'S** [4] - 394:5, 436:24, 437:3, 438:21
**PLAN** [2] - 441:10, 456:17
**PLANS** [1] - 408:25
**PLANTS** [2] - 386:5, 391:11
**PLATFORM** [1] - 394:14
**PLAY** [5] - 388:18, 390:11, 454:14, 454:19, 454:23
**PLAYED** [2] - 388:22, 390:12
**PLUGS** [1] - 404:11
**PLUME** [1] - 392:16
**PLUS** [2] - 386:23, 426:15
**POINT** [2] - 406:6, 406:7
**POINT** [6] - 377:9, 393:13, 402:1, 433:20, 447:9, 455:1
**POINTS** [2] - 418:23, 447:10
**POLICY** [3] - 431:13, 431:23, 433:17
**POLLUTION** [4] - 427:6, 427:7, 429:7
**POPPING** [1] - 449:23
**PORE** [1] - 423:1
**PORTION** [8] - 423:8, 437:3, 437:4, 437:20, 439:2, 440:11, 455:16, 456:21
**PORTIONS** [2] - 383:15, 447:12
**POSITION** [5] - 381:17, 401:14, 402:1, 402:15, 440:7
**POSITIONS** [3] - 395:24, 436:3, 457:10
**POSSIBILITIES** [1] - 440:9
**POSSIBILITY** [1] - 438:10
**POSSIBLE** [3] - 382:24, 385:20, 439:21

POSSIBLY [3] - 408:23, 440:10, 451:21
POTENTIAL [10] - 383:8, 399:10, 412:22, 413:9, 427:5, 427:11, 431:5, 432:8, 446:5, 446:11
POTENTIALLY [1] - 383:3
POUR [1] - 426:11
PRACTICALLY [1] - 443:22
PRACTICES [10] - 401:8, 417:5, 420:21, 430:15, 431:8, 432:1, 432:2, 433:10, 433:12, 433:16
PRACTICING [1] - 395:23
PRECAUTIONS [1] - 428:22
PRECEDES [1] - 428:17
PRECIPITATION [2] - 396:4, 396:8
PRECLUDE [1] - 438:9
PRECLUDED [1] - 437:14
PREJUDICE [3] - 444:25, 446:5, 446:14
PREJUDICIAL [1] - 452:21
PREPARE [1] - 417:22
PREPARED [4] - 381:3, 381:8, 418:1, 435:8
PRESENCE [6] - 374:4, 388:24, 390:14, 434:6, 434:8, 435:23
PRESENT [9] - 374:6, 400:8, 437:9, 437:22, 437:24, 438:6, 440:12, 455:7
PRESENTATIONS [1] - 399:8
PRESENTED [9] - 379:5, 429:10, 434:15, 439:20, 440:3, 445:1, 445:2, 455:2, 456:4
PRESENTING [1] - 434:16
PRESSURE [1] - 424:18

PRESUMABLY [1] - 446:22
PRETTY [6] - 402:19, 405:16, 408:18, 423:2, 438:15, 452:21
PREVENT [1] - 428:22
PREVENTED [4] - 388:5, 388:9, 388:24, 389:10
PREVIOUSLY [1] - 436:22
PREVIOUSLY [1] - 375:2
PRIMARILY [3] - 404:8, 417:2, 417:3
PRIMARY [2] - 401:7, 410:10
PRINCIPAL [1] - 398:3
PRINCIPLES [1] - 398:5
PRIVATE [2] - 403:2, 427:6
PRIVILEGE [2] - 450:6, 450:21
PROBATIVE [1] - 446:6
PROBLEM [5] - 400:20, 405:14, 438:16, 442:2, 452:3
PROCEDURE [2] - 436:21, 455:6
PROCEDURES [2] - 380:9, 416:11
PROCEED [3] - 374:21, 384:5, 390:10
PROCEEDINGS [1] - 457:22
PROCESS [23] - 376:14, 376:23, 377:12, 378:18, 393:12, 397:10, 397:18, 397:20, 399:9, 400:14, 400:22, 404:18, 411:4, 412:1, 412:3, 413:18, 413:25, 423:7, 424:1, 424:17, 424:20, 457:17
PROCESSES [5] - 404:17, 418:23, 423:24, 424:9, 424:24
PROCURED [1] - 402:25
PRODUCE [1] - 451:12
PRODUCED [2] -

384:17, 419:2
PRODUCES [1] - 426:22
PRODUCING [1] - 447:8
PRODUCT [2] - 414:23, 424:15
PRODUCTION [4] - 383:5, 383:11, 385:1, 385:4
PRODUCTIVE [2] - 434:20, 439:1
PRODUCTS [8] - 404:9, 404:17, 404:22, 418:20, 423:16, 424:10, 427:2
PROFESSIONAL [13] - 395:24, 396:12, 396:15, 396:17, 397:7, 397:12, 397:19, 397:23, 398:24, 399:1, 410:3, 426:19, 427:9
PROFESSOR [1] - 428:14
PROFESSORS [1] - 402:5
PROGRAM [2] - 402:3, 409:15
PROGRAMS [2] - 399:3, 402:21
PROHIBITED [2] - 431:18, 432:2
PROJECT [1] - 377:1
PROJECTS [3] - 407:3, 407:6, 418:7
PROMULGATED [1] - 410:8
PROOF [2] - 438:11, 438:23
PROPELLANT [4] - 424:14, 424:19, 425:6, 425:7
PROPELLANTS [4] - 424:10, 424:11, 425:9, 425:12
PROPER [1] - 431:8
PROPERLY [2] - 405:4, 412:15
PROPERTY [17] - 399:11, 399:18, 399:22, 400:17, 406:3, 413:6, 413:7, 414:3, 415:10, 416:24, 419:5, 422:9, 424:4, 424:5, 427:7
PROTECTED [1] - 453:5

PROTECTION [1] - 401:3
PROVE [2] - 453:2, 453:7
PROVIDE [5] - 420:16, 436:1, 438:10, 438:12, 455:12
PROVIDED [6] - 412:4, 435:3, 435:8, 442:10, 447:3, 454:17
PROVIDES [3] - 376:22, 410:16, 425:10
PROVISIONS [4] - 411:13, 411:22, 454:14, 454:25
PROVISO [1] - 443:6
PROXIMATE [1] - 429:12
PUBLIC [9] - 376:3, 377:20, 377:24, 378:7, 378:11, 378:17, 382:24, 383:4, 431:1
PUBLIC [1] - 376:5
PUBLICATIONS [1] - 429:3
PUBLISHED [5] - 426:20, 428:17, 429:24, 432:14, 447:25
PUERTO [1] - 401:4
PULLED [1] - 380:20
PURCHASE [3] - 419:12, 419:13, 419:19
PURCHASED [4] - 386:8, 418:11, 418:21, 419:17
PURPOSE [4] - 443:14, 451:3, 453:23, 453:24
PURPOSES [1] - 453:25
PURSUANT [2] - 391:7, 410:8
PURSUE [1] - 442:21
PUT [8] - 385:2, 386:8, 409:11, 420:23, 420:24, 427:21, 448:18, 448:22

Q

QUALIFICATION [1] - 389:9
QUALIFICATIONS [1] - 389:13
QUALITY [3] - 383:8,

399:23, 417:2
QUANTITIES [1] - 410:18
QUASI [1] - 429:17
QUASI-GOVERNMENT [1] - 429:17
QUESTIONS [2] - 389:15, 455:1
QUICK [2] - 447:9, 447:10
QUITE [1] - 446:13

R

RAISE [1] - 394:15
RAISED [1] - 452:22
RAISES [1] - 445:11
RATHER [5] - 414:13, 440:18, 445:23, 448:3, 449:10
RCRA [16] - 409:23, 409:25, 410:1, 410:4, 410:5, 410:9, 410:12, 410:15, 411:2, 411:3, 411:6, 411:13, 411:15, 414:1, 414:18, 418:9
REACH [2] - 423:7, 433:16
REACHED [4] - 433:5, 433:7, 433:9, 452:11
READ [5] - 374:19, 380:7, 382:1, 382:4, 427:20
READING [2] - 427:3, 428:4
READY [1] - 375:5
REAL [2] - 409:10, 453:11
REALITY [1] - 443:10
REALLY [7] - 382:4, 411:4, 412:23, 441:9, 443:10, 456:13, 457:10
REASON [6] - 430:1, 438:21, 445:25, 447:18, 450:16, 454:5
REASONABLE [4] - 451:16, 452:5, 457:18, 457:19
REBUT [2] - 449:24, 452:21
RECEIVE [2] - 420:14, 455:12
RECEIVED [7] - 375:24, 395:14, 395:16, 395:17, 414:16, 445:10,

454:8
**RECENT** [1] - 455:20
**RECESS** [3] - 435:18, 456:7, 457:21
**RECHARGE** [1] - 428:22
**RECHARGING** [1] - 428:20
**RECOGNIZED** [2] - 415:14, 416:3
**RECOLLECTION** [1] - 443:20
**RECONDENSED** [1] - 405:12
**RECORD** [8] - 374:5, 394:21, 399:24, 435:22, 445:14, 456:14, 456:15, 456:16
**RECORDS** [25] - 399:17, 399:23, 414:25, 415:8, 417:9, 418:4, 418:7, 418:10, 418:18, 419:7, 419:15, 419:18, 419:25, 420:5, 420:11, 420:13, 420:15, 420:16, 420:21, 421:8, 421:11, 421:13, 422:1
**RECOVERY** [1] - 410:1
**RECROSS** [1] - 393:18
**RECROSS-EXAMINATION** [1] - 393:18
**RECYCLED** [1] - 385:25
**REDACT** [1] - 448:12
**REDACTED** [5] - 447:15, 448:25, 449:1, 449:23, 452:23
**REDIRECT** [1] - 392:25
**REDIRECT** [1] - 393:1
**REFER** [1] - 430:3
**REFERENCE** [7] - 430:19, 445:9, 447:24, 448:1, 448:13, 448:25, 449:17
**REFERENCED** [1] - 430:22
**REFERENCES** [5] - 446:23, 447:14, 449:22, 450:10, 452:14

**REFERRED** [1] - 446:20
**REFERRING** [3] - 403:4, 425:23, 442:1
**REFERS** [2] - 442:15, 447:1
**REFLECT** [1] - 420:21
**REFLECTED** [1] - 452:12
**REGARD** [9] - 398:19, 418:5, 425:17, 436:16, 441:10, 441:12, 444:9, 454:9, 456:17
**REGARDING** [7] - 414:21, 422:1, 426:16, 431:13, 431:23, 433:7, 448:5
**REGISTERED** [1] - 397:7
**REGISTRATIONS** [1] - 396:13
**REGULATE** [3] - 412:11, 412:15
**REGULATIONS** [5] - 410:8, 410:10, 410:21, 410:24, 411:18
**REGULATORS** [5] - 419:25, 420:4, 420:11, 420:16, 453:24
**REGULATORY** [2] - 417:11, 433:13
**REHASH** [1] - 444:18
**REIMBURSED** [1] - 392:1
**RELATE** [5] - 429:2, 437:10, 440:2, 440:3, 444:15
**RELATED** [17] - 398:3, 399:17, 406:16, 407:24, 412:9, 414:25, 416:23, 416:24, 417:1, 417:18, 417:21, 423:15, 425:18, 425:19, 427:1, 427:11, 433:13
**RELATES** [1] - 416:22
**RELATING** [3] - 444:11, 445:5, 445:10
**RELEVANCE** [1] - 451:20
**RELEVANT** [4] - 437:8, 449:8, 449:24, 451:18
**RELIED** [2] - 443:19, 443:24

**RELY** [1] - 444:1
**REMAIN** [1] - 374:9
**REMEDIATING** [1] - 422:8
**REMEDIATION** [2] - 396:19, 403:17
**REMEMBER** [5] - 381:5, 384:20, 388:15, 390:6, 433:23
**REMIND** [1] - 447:4
**REMINDERS** [1] - 457:7
**REMOVE** [3] - 404:21, 404:25, 449:21
**REMOVED** [1] - 452:13
**REMOVING** [2] - 422:8
**RENDER** [2] - 396:19, 396:20
**REPHRASE** [1] - 432:18
**REPLACE** [1] - 386:15
**REPLACED** [3] - 384:18, 424:15, 449:1
**REPLACEMENT** [3] - 389:19, 389:24, 392:18
**REPORT** [12] - 381:3, 382:2, 382:4, 383:1, 383:2, 383:8, 427:3, 427:21, 428:4, 428:8, 428:10, 428:11
**REPORTER** [1] - 401:21
**REPORTER** [1] - 422:15
**REPORTS** [1] - 418:1
**REPRESENTATIVE** [7] - 383:23, 383:25, 384:4, 384:12, 388:3, 388:4, 390:3
**REPRESENTING** [1] - 435:24
**REQUEST** [3] - 420:9, 428:3, 447:21
**REQUESTING** [2] - 374:20, 420:11
**REQUESTS** [1] - 420:4
**REQUIRE** [1] - 426:4
**REQUIRED** [3] - 407:24, 424:13, 425:25
**REQUIREMENT** [3] - 378:23, 379:2, 379:10

**REQUIREMENTS** [1] - 410:19
**REQUIRES** [1] - 410:16
**RESEARCH** [1] - 402:4
**RESIDED** [1] - 406:4
**RESISTANCE** [1] - 453:9
**RESOLVE** [3] - 439:23, 439:24, 451:9
**RESOURCE** [4] - 395:18, 402:13, 429:18, 429:19
**RESOURCE** [1] - 410:1
**RESOURCES** [1] - 448:22
**RESPECT** [5] - 383:18, 430:13, 433:15, 441:14, 445:14
**RESPECTIVE** [1] - 436:2
**RESPOND** [1] - 451:3
**RESPONSE** [8] - 440:18, 440:19, 440:24, 451:10, 451:13, 451:14, 451:21, 454:4
**RESPONSIBILITIES** [1] - 447:5
**RESPONSIBILITY** [5] - 401:7, 448:11, 448:17, 448:18, 449:11
**REST** [2] - 376:25, 433:2
**RESTING** [1] - 421:4
**RESULT** [4] - 390:14, 405:5, 411:7, 413:6
**RESULTED** [1] - 415:10
**RESULTS** [1] - 433:11
**RESUMED** [1] - 375:3
**RESUSCITATE** [1] - 437:24
**RETAINED** [1] - 395:8
**RETORT** [1] - 452:4
**RETURN** [2] - 415:11, 434:1
**REVIEW** [4] - 421:25, 425:17, 426:16, 432:4
**REVIEWED** [16] - 375:15, 417:8, 417:10, 417:11, 417:13, 420:3, 420:15, 422:2,

425:18, 425:20, 427:18, 430:11, 431:2, 432:22, 433:4, 442:14
**REVIEWING** [2] - 399:16, 447:23
**RICHARD** [12] - 394:24, 394:25, 436:10, 439:3, 443:15, 443:17, 447:4, 449:5, 450:3, 452:9, 456:19, 456:22
**RICHARD** [44] - 388:20, 394:7, 395:1, 395:2, 395:5, 397:5, 397:6, 411:20, 414:17, 420:10, 423:9, 427:14, 427:16, 428:5, 431:12, 431:22, 432:19, 432:20, 434:25, 435:5, 435:9, 435:14, 435:17, 435:20, 436:20, 437:6, 439:4, 441:16, 441:21, 442:2, 442:8, 442:25, 443:3, 447:9, 447:22, 448:16, 449:7, 449:14, 452:10, 454:11, 455:4, 455:15, 456:2, 456:5
**RICK** [3] - 382:6, 394:8
**RICO** [1] - 401:4
**RID** [2] - 376:10, 376:11
**RIGHTS** [1] - 387:23
**RISE** [1] - 434:4
**RISK** [1] - 400:15
**RIVER** [1] - 429:12
**RIVERS** [2] - 396:9, 427:7
**RIZZO** [3] - 403:11, 403:20, 403:24
**RIZZO** [1] - 403:12
**ROCKET** [1] - 406:22
**ROCKETS** [1] - 406:20
**ROOM** [2] - 405:17, 415:23
**ROUGHLY** [2] - 422:22, 423:10
**ROUND** [2] - 378:15, 423:19
**ROUNDS** [2] - 423:20
**RULE** [8] - 383:20, 383:23, 383:25,

**UNITED STATES DISTRICT COURT**

384:3, 446:2, 452:25, 453:10, 453:21
**RULE** [3] - 450:9, 450:23, 455:1
**RULED** [1] - 454:9
**RULES** [1] - 425:14
**RULING** [3] - 447:3, 448:5, 455:10
**RULINGS** [2] - 437:16, 439:13
**RUN** [2] - 394:9, 396:8
**RUNNING** [1] - 423:7
**RUNOFF** [2] - 383:6, 383:12

## S

**S-1** [1] - 375:16
**S-2** [1] - 375:16
**SAFE** [1] - 376:21
**SALVAGE** [2] - 413:24, 414:1
**SAMPLE** [1] - 380:16
**SAMPLES** [6] - 400:5, 400:6, 400:7, 401:10, 417:3, 417:16
**SAMPLING** [1] - 433:11
**SANTA** [2] - 429:12, 435:22
**SARCASTIC** [1] - 440:15
**SAUGUS** [5] - 375:17, 377:24, 378:4
**SAVE** [1] - 447:11
**SAW** [2] - 390:22, 448:14
**SCALE** [1] - 444:24
**SCHOOL** [2] - 397:25, 401:25
**SCOPE** [5] - 416:19, 436:4, 436:14, 438:8, 445:4
**SCREEN** [1] - 427:21
**SEARCH** [8] - 399:24, 444:12, 445:6, 445:11, 446:8, 446:12, 448:1, 448:5
**SEATED** [2] - 394:20, 434:7
**SECOND** [2] - 382:10, 412:1
**SECOND-TO-THE-LAST** [1] - 382:10
**SEDIMENT** [1] - 400:7
**SEE** [24] - 379:17, 380:2, 382:7, 388:17, 391:20,

394:9, 414:17, 420:4, 420:9, 421:7, 431:12, 432:15, 432:20, 432:24, 434:2, 435:19, 440:10, 445:9, 449:22, 451:20, 454:4, 455:9
**SEEING** [1] - 381:6
**SEEKS** [1] - 443:15
**SEEM** [1] - 377:9
**SEND** [6] - 447:13, 447:15, 455:23, 455:24, 455:25
**SENIOR** [1] - 397:15
**SENIORS** [2] - 398:1, 398:5
**SENSE** [4] - 411:21, 421:20, 427:24, 430:10, 433:6, 448:8
**SENT** [2] - 374:13, 374:15
**SEPTIC** [2] - 383:6, 383:12
**SERIES** [1] - 411:9
**SERIOUS** [2] - 429:7, 437:12
**SERVE** [1] - 375:16
**SERVES** [1] - 451:2
**SERVICE** [1] - 384:25
**SESSION** [1] - 434:10
**SET** [4] - 400:14, 410:10, 417:9, 418:4
**SETTLEMENT** [5] - 391:18, 442:16, 450:5, 450:10, 450:11
**SEVEN** [1] - 403:9
**SEVERAL** [4] - 377:14, 391:11, 431:24, 449:9
**SHALL** [3] - 379:20, 394:16, 394:17
**SHAPES** [1] - 404:8
**SHARE** [1] - 433:5
**SHARP** [1] - 434:2
**SHEETS** [1] - 404:15
**SHELTON** [3] - 426:20, 426:21, 426:25
**SHIPPED** [1] - 424:5
**SHORT** [1] - 403:9
**SHOUP** [8] - 436:8, 436:17, 437:13, 437:21, 438:7, 438:9, 438:18, 438:21
**SHOW** [1] - 438:11
**SHOWED** [1] - 384:16
**SHOWING** [4] -

397:13, 412:16, 437:14, 442:11
**SHOWN** [1] - 390:22
**SHUT** [1] - 457:3
**SIDE** [4] - 445:1, 445:2, 450:15, 457:20
**SIDES** [2] - 423:6, 439:1
**SIGNED** [3] - 442:4, 442:9, 442:16
**SIMPLE** [2] - 393:3, 423:2
**SITE** [62] - 382:12, 396:16, 398:16, 398:21, 398:23, 399:7, 399:9, 400:20, 400:21, 402:19, 403:8, 403:16, 403:23, 404:5, 405:7, 405:14, 406:14, 407:4, 407:8, 407:12, 409:4, 411:3, 411:4, 411:6, 411:8, 411:10, 412:5, 412:11, 412:15, 412:17, 412:22, 413:10, 413:12, 414:9, 414:22, 415:4, 416:11, 416:14, 416:22, 417:13, 417:14, 417:17, 418:6, 419:16, 419:24, 420:20, 421:10, 421:12, 421:14, 422:1, 422:19, 423:8, 423:10, 423:12, 424:25, 429:12, 430:16, 431:8, 433:8, 446:25
**SITES** [15] - 396:20, 396:21, 402:24, 403:1, 403:6, 403:17, 406:15, 406:17, 406:19, 407:10, 408:3, 410:14, 419:4, 420:20, 446:24
**SITTING** [3] - 375:11, 378:14, 415:23
**SITUATION** [2] - 406:7, 408:8
**SITUATIONS** [1] - 409:6
**SIX** [2] - 385:6, 396:15
**SIX-YEAR** [1] - 385:6
**SKY** [1] - 396:3

**SLADE** [1] - 436:10
**SLIGHTLY** [1] - 385:17
**SLOW** [4] - 401:20, 418:14, 422:15, 429:8
**SLUDGE** [1] - 405:2
**SMALL** [2] - 403:11, 403:15
**SMALLER** [2] - 385:12, 385:17
**SMELL** [1] - 422:12
**SMELLING** [1] - 422:14
**SOIL** [25] - 396:5, 396:7, 399:22, 400:5, 400:6, 400:12, 406:2, 417:2, 422:7, 422:9, 422:19, 422:20, 422:21, 422:22, 422:23, 422:24, 423:1, 423:2, 426:1, 426:12, 433:11
**SOILS** [1] - 431:10
**SOLELY** [2] - 437:19, 437:20
**SOLEMNLY** [1] - 394:16
**SOLUBLE** [1] - 407:21
**SOLVENT** [7] - 404:25, 405:2, 405:3, 405:9, 405:12, 407:17, 407:19
**SOLVENTS** [4] - 419:13, 419:17, 420:19, 421:10
**SOMEONE** [2] - 440:12, 440:21
**SOMETIMES** [5] - 408:19, 413:8, 416:13, 419:10, 457:8
**SOMEWHAT** [2] - 404:3, 407:20
**SOMEWHERE** [1] - 414:5
**SOON** [2] - 434:19, 438:15
**SORRY** [6] - 391:16, 416:16, 422:16, 428:7, 429:6, 438:4
**SORT** [3] - 376:17, 424:12, 439:25
**SOURCE** [2] - 382:15, 405:25
**SOURCES** [8] - 382:2, 382:19, 382:24, 383:3, 383:9,

385:20, 386:21, 432:9
**SOUTHERN** [6] - 417:19, 429:2, 429:11, 430:2, 430:3, 430:7
**SPACE** [2] - 422:22, 423:1
**SPACES** [2] - 423:1, 426:13
**SPEAKING** [3] - 397:1, 398:15, 422:22
**SPECIALTY** [1] - 396:17
**SPECIFIC** [1] - 444:11
**SPECIFICALLY** [4] - 388:2, 402:12, 444:15, 455:7
**SPECIFIED** [1] - 383:21
**SPECULATIONS** [1] - 437:22
**SPELL** [1] - 394:22
**SPELLED** [1] - 394:24
**SPENDING** [1] - 457:12
**SPENT** [2] - 391:24, 441:3
**SPILL** [1] - 418:21
**SPONSOR** [1] - 443:2
**STAFF** [1] - 381:13
**STAND** [3] - 374:8, 394:8, 455:19
**STANDARD** [5] - 376:4, 376:5, 416:10, 416:12, 454:21
**START** [11] - 413:20, 420:11, 422:12, 423:12, 426:14, 434:1, 434:2, 434:16, 436:12, 441:13, 451:16
**STARTED** [1] - 384:25
**STARTING** [2] - 415:19, 434:19
**STARTS** [1] - 412:1
**STATE** [3] - 385:20, 387:6, 396:21
**STATE** [10] - 394:21, 402:22, 415:15, 415:24, 419:24, 420:4, 420:11, 420:16, 426:4, 427:7
**STATEMENT** [5] - 383:8, 385:23, 449:8, 449:25, 453:4
**STATES** [1] - 429:14
**STATES** [2] - 396:16,

427:1
**STATION** [1] - 399:20
**STATIONS** [2] - 383:5, 383:11
**STATUTE** [1] - 411:21
**STAY** [1] - 437:15
**STEFFEY** [1] - 436:9
**STEFFEY** [1] - 436:9
**STEP** [5] - 394:4, 399:16, 400:9, 415:9, 434:9
**STEPS** [1] - 410:25
**STEVEN** [1] - 436:8
**STILL** [10] - 374:7, 380:13, 380:19, 386:24, 394:5, 437:3, 445:11, 446:2, 446:7, 447:6
**STIPULATED** [7] - 375:22, 414:15, 445:3, 448:13, 449:20, 449:21, 452:13
**STIPULATION** [1] - 452:22
**STORAGE** [3] - 386:8, 420:24, 421:2
**STORE** [1] - 410:20
**STORED** [4] - 410:18, 418:9, 418:12
**STORMWATER** [2] - 383:6, 383:12
**STREAMS** [1] - 427:7
**STRICTLY** [1] - 444:23
**STRONG** [2] - 437:9, 445:8
**STRUCTURED** [1] - 393:25
**STUDENT** [1] - 402:7
**STUDENTS** [1] - 398:8
**STUDIED** [3] - 395:22, 426:25, 428:25
**STUDIES** [2] - 428:23, 430:13
**STUDY** [7] - 382:16, 382:20, 396:1, 402:24, 403:25, 429:14, 429:24
**STUDYING** [2] - 403:1, 409:14
**STUFF** [2] - 409:3, 451:12
**SUB** [1] - 376:6
**SUBJECT** [2] - 375:14, 433:24
**SUBMITTING** [2] - 453:18, 453:19
**SUBSTANTIAL** [1] - 442:12
**SUBSTANTIAL** [3] -

445:12, 451:4, 453:22
**SUBSTANTIALLY** [1] - 446:6
**SUBTERRANEAN** [1] - 429:8
**SUBURBS** [2] - 403:12, 404:6
**SUCK** [1] - 423:3
**SUE** [1] - 452:1
**SUED** [1] - 393:6
**SUFFERED** [2] - 389:17, 390:13
**SUFFICIENT** [6] - 390:9, 397:14, 430:8, 430:19, 438:24, 440:8
**SUGGEST** [1] - 455:21
**SUGGESTED** [1] - 451:4
**SUGGESTING** [1] - 450:24
**SUGGESTS** [1] - 450:3
**SUMMARIZE** [1] - 427:18
**SUMMER** [2] - 398:2, 402:7
**SUPERFUND** [3] - 402:24, 403:1, 403:6
**SUPPLIES** [1] - 392:8
**SUPPLY** [4] - 406:3, 423:5, 426:3, 427:8
**SUPPOSED** [2] - 380:8, 391:22
**SURFACE** [10] - 396:7, 396:8, 396:9, 409:17, 409:20, 429:8, 431:3, 431:10, 431:11, 432:3
**SURGICAL** [1] - 446:19
**SURPRISING** [1] - 441:1
**SURVEY** [1] - 429:15
**SUSAN** [2] - 381:9, 381:11
**SUSPECTED** [2] - 413:14, 419:5
**SUSTAINED** [2] - 427:13, 430:23
**SVE** [2] - 422:6, 422:7
**SWEAR** [2] - 394:13, 394:16
**SWITCHES** [2] - 404:11, 423:15
**SWORN** [2] - 375:2, 395:3
**SWORN** [1] - 394:15

**SYSTEM** [9] - 387:1, 391:3, 391:4, 391:7, 391:22, 393:9, 393:11, 405:21, 408:25
**SYSTEMS** [3] - 393:6, 393:7, 409:20

---

# T

**TABLE** [1] - 375:11
**TAD** [1] - 397:2
**TALKS** [2] - 382:7, 392:1
**TANK** [1] - 422:11
**TANKS** [2] - 383:6, 383:12
**TAUGHT** [4] - 397:23, 398:1, 398:4, 402:6
**TCE** [19] - 377:21, 382:11, 407:7, 407:9, 407:11, 407:13, 407:14, 407:18, 408:2, 408:6, 418:21, 419:21, 422:18, 422:24, 422:25, 444:23, 446:20, 447:1
**TEACH** [2] - 398:8, 398:11
**TEACHING** [5] - 398:2, 398:5, 398:15, 399:8, 402:5
**TECHNICAL** [2] - 403:19, 417:13
**TECHNIQUE** [1] - 422:7
**TECHNOLOGIES** [2] - 406:24, 406:25
**TECHNOLOGY** [1] - 423:2
**TEN** [1] - 454:19
**TENS** [1] - 391:9
**TERM** [5] - 376:13, 376:18, 378:25, 407:25, 409:9
**TERMS** [6] - 376:1, 421:19, 423:12, 427:25, 436:24, 445:8
**TESTIFIED** [2] - 375:2, 395:3
**TESTIFIED** [11] - 384:8, 385:19, 388:13, 390:6, 411:4, 415:20, 416:1, 416:5, 431:16, 431:25, 432:23

**TESTIFY** [5] - 378:14, 390:3, 436:7, 436:14, 442:22
**TESTIFYING** [7] - 384:11, 389:2, 416:10, 416:14, 437:14, 437:19, 437:20
**TESTIMONY** [15] - 383:23, 383:25, 384:1, 384:3, 388:2, 394:16, 417:11, 424:3, 437:8, 438:13, 441:12, 454:14, 455:4, 455:16
**TESTING** [4] - 378:10, 378:12, 378:15, 382:21
**THE** [88] - 374:5, 374:10, 374:11, 374:14, 374:16, 374:18, 374:22, 383:16, 390:9, 392:25, 393:16, 394:3, 394:11, 394:19, 394:20, 394:23, 394:25, 396:24, 397:3, 397:4, 411:17, 411:18, 420:7, 420:9, 422:15, 422:16, 427:13, 430:22, 430:23, 430:25, 431:21, 432:18, 433:19, 434:4, 434:7, 435:3, 435:7, 435:12, 435:15, 435:18, 435:22, 437:5, 437:25, 438:5, 438:25, 439:5, 439:9, 439:14, 439:17, 440:8, 440:16, 441:8, 441:17, 441:23, 442:3, 442:20, 443:1, 443:5, 443:14, 443:21, 444:3, 444:13, 444:17, 445:7, 447:16, 448:15, 448:17, 449:3, 449:13, 450:1, 450:8, 450:14, 450:18, 450:23, 451:2, 451:18, 452:8, 452:24, 453:14, 453:17, 455:2, 455:6,

455:21, 456:3, 456:7, 456:10, 456:13, 456:16
**THEME** [7] - 449:13, 451:3, 451:4, 451:21, 452:22, 453:22, 454:3
**THEORETICALLY** [1] - 451:14
**THEREFORE** [1] - 384:18
**THESIS** [1] - 409:19
**THEY'VE** [3] - 379:5, 391:21
**THIRD** [1] - 422:20
**THOMAS** [3] - 428:14
**THOROUGH** [1] - 399:24
**THREE** [2] - 395:23, 401:23
**THROUGHOUT** [1] - 451:5
**THRUST** [1] - 450:2
**THURSDAY** [1] - 374:1
**TIMER** [1] - 416:16
**TIRES** [1] - 407:2
**TITLE** [2] - 381:20, 401:15
**TODAY** [6] - 387:16, 418:21, 419:21, 420:23, 426:23
**TOMORROW** [6] - 434:1, 435:14, 436:19, 436:22, 452:18, 455:17
**TOOK** [9] - 377:11, 389:5, 393:12, 404:7, 404:10, 410:25, 424:17, 426:22
**TOP** [2] - 428:13, 429:13
**TOTAL** [1] - 392:22
**TOUCHED** [1] - 409:23
**TOWARDS** [1] - 444:24
**TOWN** [3] - 403:21, 406:4, 406:9
**TRACK** [5] - 413:12, 413:15, 414:9, 418:22, 421:3
**TRACKED** [2] - 410:16, 410:17
**TRACKING** [2] - 410:11, 444:4
**TRAIL** [1] - 410:25
**TRAINING** [1] - 417:25
**TRANSPORTATION**

[1] - 386:11

**TRAP** [1] - 443:16
**TREAT** [1] - 376:10
**TREATMENT** [10] - 386:5, 391:2, 391:4, 391:6, 391:21, 392:8, 393:5, 393:9, 393:10, 449:16
**TRIAL** [21] - 374:5, 416:5, 434:14, 435:25, 436:2, 436:4, 436:7, 437:4, 438:19, 439:3, 439:10, 439:15, 439:19, 440:6, 440:7, 440:11, 440:13, 447:23, 456:21, 456:24, 456:25
**TRICHLOROETHYLENE** [1] - 407:14
**TRIED** [1] - 421:21
**TRUE** [3] - 377:5, 377:17, 383:10
**TRUTH** [5] - 389:7, 394:17, 394:18, 443:11
**TRY** [9] - 379:4, 382:18, 417:7, 437:16, 442:23, 447:13, 451:9, 456:20, 457:6
**TRYING** [2] - 411:20, 440:14
**TUESDAY** [1] - 456:6
**TURN** [4] - 380:23, 415:13, 426:14, 437:25
**TWO** [25] - 375:7, 383:3, 385:10, 385:12, 385:20, 385:22, 386:21, 386:23, 391:18, 392:11, 392:15, 392:18, 401:6, 401:23, 401:24, 406:19, 410:9, 418:1, 425:24, 431:15, 436:5, 441:11, 447:10, 452:11, 455:17
**TWO-AND-A-HALF** [2] - 401:6, 401:24
**TYPE** [14] - 376:6, 398:3, 402:19, 403:23, 403:25, 406:17, 414:21, 417:13, 420:9, 420:22, 420:23, 421:17, 422:23,

423:11
**TYPES** [26] - 396:21, 399:1, 399:4, 402:20, 404:7, 405:6, 408:16, 409:5, 410:22, 413:5, 414:7, 416:7, 419:15, 419:25, 420:5, 420:13, 420:20, 421:2, 421:11, 421:13, 421:16, 422:1, 423:24, 424:23, 427:10, 432:22

**U**

**ULTIMATELY** [2] - 403:18, 445:25
**UNCHALLENGED** [1] - 434:24
**UNDER** [12] - 374:9, 379:17, 380:3, 387:4, 387:24, 389:3, 390:18, 396:6, 402:21, 406:2, 414:1
**UNDERGROUND** [3] - 398:13, 429:6, 429:7
**UNDERLYING** [1] - 426:2
**UNDERNEATH** [1] - 405:19
**UNDERTAKEN** [1] - 412:6
**UNDUE** [4] - 444:24, 446:5, 446:14
**UNFAIR** [1] - 446:9
**UNFORTUNATELY** [1] - 406:3
**UNITED** [3] - 406:24, 406:25, 429:14
**UNITS** [2] - 413:24, 414:2
**UNIVERSITY** [2] - 395:18, 396:12
**UNLESS** [3] - 428:21, 437:1, 454:20
**UNLIKE** [1] - 383:21
**UNPUBLISHED** [1] - 445:17
**UNREASONABLE** [3] - 451:15, 452:5, 452:6
**UNWILLING** [1] - 438:5
**UP** [34] - 375:7, 375:23, 376:17, 382:6, 385:7, 393:3, 394:14, 399:13,

400:13, 400:14, 400:17, 402:24, 404:20, 405:1, 405:3, 405:15, 411:11, 411:23, 411:25, 414:14, 415:5, 416:17, 422:11, 423:8, 423:14, 437:11, 440:10, 441:6, 447:5, 447:7, 449:23, 452:25, 453:25
**UPSHOT** [1] - 420:10
**UPWARDS** [1] - 391:12
**URGE** [1] - 448:3
**USED-UP** [1] - 405:3
**USEFUL** [2] - 378:19
**USER'S** [2] - 376:19, 376:22
**USES** [3] - 376:6, 400:17, 413:6
**USGS** [2] - 429:14
**UTILIZED** [1] - 424:4

**V**

**V-201** [10] - 377:23, 384:23, 388:12, 390:15, 390:24, 391:7, 393:8, 393:10, 393:13, 393:21
**V-205** [1] - 377:24
**VACUUM** [1] - 423:7
**VAGUE** [2] - 411:16, 420:6
**VALIDITY** [2] - 453:2, 453:7
**VALLEY** [2] - 386:9, 435:22
**VALUE** [1] - 446:6
**VAPOR** [11] - 400:6, 404:23, 405:7, 405:8, 405:10, 405:11, 405:15, 406:12, 417:2, 422:7, 423:2
**VAPORIZES** [1] - 405:9
**VARIOUS** [3] - 379:6, 399:7, 433:4
**VERIFICATION** [1] - 380:9
**VERIFIED** [1] - 436:22
**VERSUS** [2] - 387:5, 435:23
**VERTICAL** [1] - 426:10

**VERTICALLY** [1] - 400:11
**VIDEO** [7] - 388:18, 435:1, 454:14, 454:16, 454:19, 454:24, 455:18
**VIDEOTAPED** [2] - 388:22, 390:12
**VIETNAM** [1] - 423:14
**VIEW** [9] - 445:11, 445:24, 445:25, 446:3, 446:9, 446:13, 447:17, 451:22, 457:1
**VIOLATE** [1] - 447:20
**VIRGIN** [1] - 401:5
**VISUAL** [1] - 400:5
**VOCS** [17] - 377:23, 378:15, 378:18, 379:23, 380:13, 382:24, 383:5, 383:9, 383:11, 388:5, 388:9, 388:12, 388:24, 389:18, 390:14, 392:17, 446:20
**VOLATILE** [6] - 422:8, 422:9, 422:10, 422:13, 422:18, 422:24
**VOLATILIZED** [1] - 423:4
**VOLATILIZING** [1] - 422:17
**VOLUME** [2] - 385:14, 385:17
**VOLUMES** [1] - 386:16
**VOLUMINOUS** [1] - 455:24

**W**

**WAITING** [1] - 390:8
**WAIVED** [1] - 448:9
**WALK** [1] - 394:13
**WALLS** [3] - 405:17, 405:18
**WAR** [2] - 423:14
**WARRANT** [6] - 444:12, 445:6, 445:11, 446:12, 448:2, 448:5
**WARRANTS** [1] - 446:8
**WASTE** [41] - 401:8, 405:22, 408:5, 410:11, 410:15, 410:16, 410:20, 414:6, 417:5,

417:19, 420:23, 420:24, 421:3, 421:6, 421:9, 423:24, 423:25, 424:15, 424:24, 425:14, 426:1, 426:2, 426:7, 426:8, 426:17, 426:24, 427:2, 427:11, 430:15, 431:2, 431:8, 431:9, 431:13, 431:23, 432:3, 432:25, 433:9, 433:12, 433:16, 433:18, 446:25
**WASTES** [1] - 429:5
**WASTES** [5] - 410:22, 418:9, 418:24, 431:17
**WATCH** [1] - 394:3
**WATER** [4] - 381:4, 386:23, 390:14, 435:23
**WATER** [96] - 375:16, 376:21, 377:6, 377:16, 379:20, 380:12, 380:13, 380:23, 381:3, 382:14, 382:23, 382:25, 383:4, 383:8, 384:17, 384:22, 385:14, 385:20, 385:25, 386:1, 386:3, 386:4, 386:6, 386:7, 386:12, 386:15, 386:19, 386:21, 386:25, 387:3, 387:4, 387:5, 387:15, 387:23, 388:3, 388:5, 388:9, 388:12, 388:24, 389:16, 389:17, 389:19, 389:20, 389:23, 389:24, 390:4, 390:15, 391:10, 392:7, 393:21, 395:18, 396:2, 396:3, 396:6, 396:7, 396:8, 396:9, 398:6, 398:13, 400:6, 400:12, 401:8, 402:13, 405:10, 406:2, 406:3, 407:20, 407:21, 409:17, 409:20, 424:18, 426:2, 426:3, 426:11, 427:8,

428:23, 429:6, 429:7, 429:8, 431:3, 431:11, 432:9, 451:5
**WAYS** [1] - 401:16
**WEDNESDAY** [1] - 456:12
**WEEK** - 380:16
**WEEKLY** [1] - 421:8
**WEEKS** [1] - 375:21
**WELLS** [9] - 375:17, 378:4, 378:15, 380:19, 392:5, 392:11, 392:16, 392:18, 427:6
**WEST** [1] - 403:22
**WHITED** [1] - 447:12
**WHITTAKER** [49] - 382:3, 382:12, 391:1, 391:7, 391:9, 391:21, 392:10, 392:19, 393:5, 393:22, 393:24, 405:7, 409:4, 412:17, 415:4, 416:22, 417:3, 417:10, 417:11, 417:12, 420:12, 420:15, 421:10, 421:12, 421:18, 422:1, 422:19, 424:24, 429:12, 430:15, 431:7, 431:15, 432:11, 432:14, 432:21, 433:1, 433:8, 433:10, 433:17, 435:23, 442:4, 446:9, 446:14, 446:23, 451:24, 453:9, 453:21, 453:25
**WHITTAKER'S** [5] - 417:5, 431:13, 431:23, 433:13, 433:16
**WHOLE** [5] - 394:18, 443:12, 449:8, 453:22, 453:23
**WIDELY** [2] - 429:21, 430:25
**WILLINGNESS** [1] - 393:9
**WIRES** [1] - 404:12
**WISCONSIN** [1] - 416:2
**WISH** [2] - 440:12, 441:5
**WITHDRAW** [1] - 454:20
**WITNESS** [18] - 374:8,

383:18, 383:20, 384:2, 384:8, 388:20, 394:6, 428:4, 434:23, 435:13, 435:15, 436:14, 440:23, 442:24, 443:1, 443:4
**WITNESS** [11] - 374:10, 375:2, 394:19, 394:23, 395:3, 397:3, 411:18, 420:9, 422:16, 430:22, 430:25
**WITNESSES** [16] - 431:25, 434:19, 434:21, 435:8, 436:6, 436:12, 436:25, 437:3, 437:7, 437:13, 437:19, 438:6, 454:10, 456:3, 457:9
**WORD** [1] - 432:2
**WORDS** [3] - 430:14, 437:19, 447:14
**WORLD** [1] - 423:14
**WORLD** [1] - 407:1
**WRITTEN** [2] - 374:18, 449:17
**WROTE** [2] - 428:15, 428:16

## Y

**YEAR** [4] - 385:6, 385:16, 385:18, 387:18
**YEARLY** [1] - 421:9
**YEARS** [21] - 384:21, 385:7, 385:11, 391:11, 391:22, 393:13, 396:14, 398:21, 400:23, 401:7, 401:23, 401:24, 402:10, 403:9, 405:22, 407:10, 408:18, 409:6, 411:15, 412:7, 412:20
**YESTERDAY** [1] - 449:9
**YOLO** [3] - 386:19, 386:22, 387:5
**YORK** [3] - 401:3, 401:4, 416:1
**YOURSELF** [1] - 410:3

## Z

**ZELIKSON** [4] - 436:6, 436:18, 439:2, 439:6

**UNITED STATES DISTRICT COURT**