1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

4

5  SANTA CLARITA VALLEY WATER AGENCY,      )
                                           )
6                      Plaintiff,          )
                                           )
7        v.                                )        Case No.
                                           )  CV 18-6825 SB (RAOx)
8  WHITTAKER CORPORATION, et al.,          )
                                           )        Volume 5
9                      Defendants.         )   (Pages 459 - 617)
   _____)

10

11          REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                    TRIAL DAY 3:  A.M. SESSION
12              FRIDAY, NOVEMBER 19, 2021
                         8:23 A.M.
13                LOS ANGELES, CALIFORNIA

14

15

16

17

18

19

20

21

22  _____

23      MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                  (213) 894-2305

UNITED STATES DISTRICT COURT

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        NOSSAMAN, LLP
         BY:  BYRON P. GEE
5        BY:  RAVEN MCGUANE
         BY:  PATRICK J. RICHARD
6        BY:  FRED FUDACZ
              Attorneys at Law
7        777 South Figueroa Street, 34th Floor
         Los Angeles, California  90017
8        (213) 612-7800

9        NOSSAMAN, LLP
         BY:  ILSE CHANDALAR SCOTT
10            Attorney at Law
         50 California Street, 34th Floor
11       San Francisco, California  94111
         (415) 398-3600
12

13
     **FOR THE DEFENDANT WHITTAKER CORPORATION:**
14
         EDLIN, GALLAGHER, HUIE & BLUM
15       BY:  MICHAEL E. GALLAGHER, JR.
         BY:  FRED M. BLUM
16       BY:  DANIEL ERIC TROWBRIDGE
              Attorneys at Law
17       500 Washington Street, Suite 700
         San Francisco, California  94111
18       (415) 397-9006

19

20   **ALSO PRESENT:**

21       MATT STONE
         SCOTT FRYER
22       RON BEATON
         ERIC LARDIERE
23

24

25

**UNITED STATES DISTRICT COURT**

461

1              **INDEX OF WITNESSES**

2

3    PLAINTIFF'S WITNESSES                                    PAGE

4    HUGHTO, Ph.D., Richard

5        Direct Examination (Resumed) by Mr. Richard         471
         Cross-Examination by Mr. Blum                       569

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR EVIDENCE PG. |
|---|---|---|
| 1 | Imminent and Substantial Endangerment Determination and Order and Remedial Action Order | 559 |
| 24 | 10/26/1982 letter | 504 |
| 25 | 12/4/1982 letter | 510 |
| 201 | 8/14/1978 letter to RWCQB | 473 |
| 203 | 1/16/1980 Procedures for Disposal of Hazardous Materials | 479 |
| 205 | 10/9/1980 memo | 480 |
| 206 | 10/15/1980 memo | 485 |
| 210 | 8/26/1982 memo | 499 |
| 215 | 12/22/1982 Bermite letter | 520 |
| 382 | 7/31/1990 DTSC letter | 558 |
| 429 | Hughto rebuttal report | 565 |
| 437 | 11/15/1985 letter | 521 |
| 448 | 6/22/1987 memo | 549 |
| 453 | 3/17/1982 Bermite memo | 507 |
| 466 | 9/29/1982 memo | 501 |
| 468 | 6/19/1981 Bermite memo | 490 |
| 504 | Memoranda dated 4/12/1982 | 494 |
| 1427 | 5/10/1985 annual RCRA Groundwater Monitoring Inspection and Evaluation Report | 581 |

**UNITED STATES DISTRICT COURT**

                    FRIDAY, NOVEMBER 19, 2021; 8:23 A.M.

                         LOS ANGELES, CALIFORNIA

                                  -oOo-

 4          (Out of the presence of the jury:)

08:23AM  5          THE COURT:  Good morning, everyone.

 6          Let's go ahead and call the matter.

 7          THE COURTROOM DEPUTY:  Calling Item No. 1, Case

 8  No. CV 18-06825-SB, Santa Clarita Valley Water Agency versus

 9  Whittaker Corporation, et al.

08:23AM 10          Counsel, please state your appearances, starting

11  with plaintiff's counsel.

12          MR. RICHARD:  Good morning.  Patrick Richard.  This

13  morning with me is Ms. Scott, Mr. Gee, and our client

14  representative, Mr. Stone, and our paralegal, Ms. Micevych.

08:24AM 15          MR. BLUM:  Good morning, Your Honor.  Fred Blum for

16  Whittaker along with our client, Eric Lardiere, and co-counsel,

17  Daniel Trowbridge, Mike Gallagher, paralegal, Scott Fryer, and

18  our technician, Rick Bell.

19          THE COURT:  Good morning, everyone.

08:24AM 20          We are outside the presence of the jury.

21          The Court did rule on the objections to the

22  deposition designation and/or counter-designation of

23  John Peloquin, P-e-l-o-q-u-i-n.  I provided both counsel with

24  the Court's rulings, and all counsel have submitted on the

08:24AM 25  Court's ruling without request for hearing.

1    Let me just quickly memorialize for the record the

2 Court's ruling.

3    So with regard to page 93, lines 3 to 11, the

4 objection is sustained.

08:25AM    5    Page 128, line 9, through 129, line 2, sustained.

6    Page 130, line 15, to 131, line 3, overruled.

7    Page 134, line 18, to 135, line 9, sustained.

8    Page 167, line 15, to page 168, line 8, and 168,

9 line 11, to 169, line 13, sustained.

08:25AM   10    Page 181, line 1, to 182, line 3, overruled.

11    And the only question I have is presentation.

12 Mr. Richard, is it the parties' intent to have the plaintiff

13 play all of the designations and counter-designations, or how

14 do you anticipate the logistics of it?

08:26AM   15    MR. RICHARD:  Yes, Your Honor.  We have spoken to

16 opposing counsel, and we're just going to have a single

17 play-through.  We'll split the time.  It's roughly 30 minutes

18 each side.

19    And then we do have a stipulation about the exhibits

08:26AM   20 that come in through Mr. Peloquin's testimony, and I have extra

21 copies of that stipulation.  It just basically identifies the

22 records, the exhibits that have already been stipulated but

23 that the jury will be seeing when they see the video.

24    THE COURT:  Is there any reason we can't just do the

08:26AM   25 stipulation or tell me what the admitted exhibits are going to

**UNITED STATES DISTRICT COURT**

```
 1  be?  Or do they need to know that?
 2          MR. RICHARD:  No, no.  I'm just proposing that we
 3  have a record of it for the Court.  So whenever the Court wants
 4  the stipulation, I can either read it or just hand it to the --
 5          THE COURT:  Why don't you just read it, please.
 6          MR. RICHARD:  Sure.
 7          Stipulation regarding Peloquin deposition video.
 8  Both parties have identified parts of the videotaped deposition
 9  of John Peloquin that they would like the jury to hear.
10          So I guess this is something that we would like
11  Your Honor to read so the jury knows --
12          THE COURT:  That's fine.  So you can just provide
13  that, please --
14          MR. RICHARD:  Okay.
15          THE COURT:  -- to Mr. Cruz, and the Court will read
16  it to the jury.
17          And I believe there was an issue that the plaintiff
18  wished to address with the Court.
19          MR. RICHARD:  Yes, Your Honor.
20          We had touched on this earlier in the week.  There
21  is a document that was a deposition exhibit.  It's before the
22  Court.  We have an extra copy if the Court needs it.  There's a
23  50-page document, findings of fact and conclusions of law from
24  a case in which my client was not a party involving the
25  United States of America and insurance companies for Whittaker.
```

08:27AM (line 5)
08:27AM (line 10)
08:27AM (line 15)
08:27AM (line 20)
08:28AM (line 25)

**UNITED STATES DISTRICT COURT**

08:28AM

08:28AM

08:29AM

08:29AM

08:29AM

```
 1          And counsel earlier this week represented to the
 2   Court that he wanted to ask Dr. Hughto about these findings
 3   because Dr. Hughto had not reviewed them and he wanted to ask
 4   why not.  Then he realized that, in fact, Dr. Hughto had been
 5   asked about these findings during his deposition.  So he
 6   changed course.
 7          But he's identified, that is, Whittaker's counsel
 8   has identified 27 different facts in these findings from
 9   another judge that referred to evidence that we do not have
10   that he wants to ask Dr. Hughto about.
11          And whether the document is merely for purposes of
12   identification, once the jury hears that there's been findings
13   of fact in another case about government inspectors and
14   disposal practices and all the rest, this would be a
15   straight-up problem.
16          It's actually a due process problem because it would
17   raise these findings of fact to really collateral estoppel
18   because I have no way to meet evidence with -- with evidence.
19   And there's no benign way to examine a witness.  Even if
20   they're not in evidence, telling a witness I have findings of
21   fact from another court that I want to ask you about is a
22   problem.
23          THE COURT:  We have one minute.  The jury is going
24   to come in at 8:30 sharp.  So you have about 30 seconds.  This
25   should have been raised with the Court previously.
```

| | |
|---|---|
| 1 | Mr. Blum, I'll give you 30 seconds to respond. |
| 2 | MR. BLUM:  Dr. Hughto did consider them.  They were |
| 3 | in Mr. Dawson's report.  And they were cited in Mr. Dawson's |
| 4 | report verbatim.  And he also said that he got all of the |
| 08:29AM  5 | documents that Mr. Dawson got. |
| 6 | THE COURT:  Give me the thrust of necessity to |
| 7 | cross-examine Dr. Hughto about this. |
| 8 | MR. BLUM:  Dr. Hughto says there was no |
| 9 | documentation or evidence regarding contracts, inspectors, and |
| 08:30AM  10 | other things.  And these things were specifically cited in |
| 11 | Mr. Dawson's report, and part of the sources was the findings. |
| 12 | So when he said yesterday on the witness stand there were no |
| 13 | documents, it's not true. |
| 14 | THE COURT:  All right.  I'm going to make a 403 |
| 08:30AM  15 | ruling and preclude your reference to the findings and |
| 16 | conclusions. |
| 17 | In my view, while there is an issue with respect to |
| 18 | the existence of documents, this opens the door, it seems to |
| 19 | me, to the search warrant issue, potentially to the criminal |
| 08:30AM  20 | investigation because I believe I heard Mr. Blum previously |
| 21 | suggest that some of the documents may have been confiscated |
| 22 | and that's why they don't exist. |
| 23 | And in my view, the probative value of this evidence |
| 24 | is not so high that it warrants entering into issues where I do |
| 08:31AM  25 | think the Court is going to be called upon to potentially even |

```
 1   revisit its ruling with respect to whether I'm going to allow

 2   in the issue regarding the criminal investigation.

 3           So I do not see an easy way to allow this evidence

 4   to come in without opening doors and also without getting into

 5   findings and conclusions.

 6           Mr. Blum, you're going to have -- I'll give you ten

 7   more seconds, but this should have been brought to the Court's

 8   attention previously.

 9           MR. BLUM:  Your Honor --

10           THE COURT:  I have given the parties an incredible

11   amount of judicial time, including an entire afternoon, and

12   this is being brought to the Court's attention while the jury

13   is now right outside the door.

14           MR. BLUM:  Your Honor, you asked me to -- to specify

15   what I wanted, and I submitted those to them several days ago.

16   So I haven't sat on anything.

17           THE COURT:  And has it been presented to the Court?

18           MR. BLUM:  I haven't gotten a response from them

19   until last night.

20           THE COURT:  Mr. Blum --

21           MR. BLUM:  No.

22           THE COURT:  Did you present it to the Court?

23           Please take your seat.  The Court has ruled.  Take

24   your seat.

25           MR. BLUM:  May I ask you a question, Your Honor?
```

08:31AM (line 5)
08:31AM (line 10)
08:31AM (line 15)
08:32AM (line 20)
08:32AM (line 25)

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Yes.

2          MR. BLUM:  The "I refer to it as from a source,"

3    generally without being specific as to where it came from to

4    show that he did have -- he did have access to somebody else's

08:32AM   5    review of these contracts.

6          THE COURT:  Let me hear what the question is.

7          MR. BLUM:  The question would be, Dr. Hughto, in

8    Mr. Dawson's report, didn't he cite to another source who had

9    reviewed the contracts and had cited what the contracts were

08:32AM  10    verbatim?

11          THE COURT:  What is the relevance of what the

12    contracts are?  Is this for the defense contractor defense?

13          MR. BLUM:  No, sir.  It's for the issue of standard

14    of care, that we are arguing that we operated pursuant to the

08:33AM  15    DOD guidelines.  Mr. Hughto is going to say we didn't.

16          THE COURT:  And how is the jury going to know

17    whether that's true or not by knowing whether there are some

18    documents that they're never going to see?

19          MR. BLUM:  Because there are people who actually saw

08:33AM  20    them.  For one of them -- there is a Mr. Robert Zoch who saw

21    them, and Robert Zoch's declaration and his report were relied

22    upon by Dr. Hughto.

23          THE COURT:  So then produce the evidence through

24    that witness.

08:33AM  25          The Court has ruled.  Please take a seat.

|  |  |  |
|---|---|---|
|  | 1 | MR. BLUM:  Thank you, Your Honor. |
|  | 2 | THE COURT:  Let's go ahead and bring in the jury. |
|  | 3 | THE COURTROOM DEPUTY:  May the witness take the |
|  | 4 | stand? |
| 08:33AM | 5 | THE COURT:  Yes.  Of course, please. |
|  | 6 | (In the presence of the jury:) |
|  | 7 | THE COURT:  We remain on the record in Santa Clarita |
|  | 8 | Valley Water Agency versus Whittaker Corporation.  We are now |
|  | 9 | joined by our jury. |
| 08:34AM | 10 | Good morning, ladies and gentlemen. |
|  | 11 | THE JURY:  Good morning. |
|  | 12 | THE COURT:  And we have Dr. Hughto on the witness |
|  | 13 | stand.  You may recall that he was testifying on direct |
|  | 14 | examination. |
| 08:34AM | 15 | And, Mr. Richard, you may continue your examination |
|  | 16 | after I remind Dr. Hughto that he is under oath. |
|  | 17 | Do you understand that? |
|  | 18 | THE WITNESS:  I do. |
|  | 19 | THE COURT:  All right.  Please proceed when you're |
| 08:34AM | 20 | ready. |
|  | 21 | MR. RICHARD:  Thank you, Your Honor.  And good |
|  | 22 | morning. |
|  | 23 | Good morning, ladies and gentlemen, counsel. |
|  | 24 | /// |
| 08:34AM | 25 | /// |

**UNITED STATES DISTRICT COURT**

**RICHARD HUGHTO, PH.D.,**

**PLAINTIFF'S WITNESS, PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION (RESUMED)**

BY MR. RICHARD:

    Q.   I believe we left off on something of a cliffhanger. I was asking about your first opinion, Dr. Hughto.  With respect to the first area of your opinions, can you share with us any conclusions you have reached as to whether Whittaker followed their own policy for waste handling?

    A.   I can.  My opinion in that area is that Whittaker did not follow its own stated policies related to waste disposal.

    Q.   And can you explain that briefly?

    A.   Yes.  As I testified yesterday, I have not seen many documents related to the operations, to the tracking of -- of waste handling within the facility.  But what I have been able to review and draw some understanding was correspondence within Whittaker, correspondence between Whittaker and regulatory agencies, and testimony of Whittaker employees and related documents and that -- that brought out that there was a policy of no dumping of waste on the ground.  And there was -- there is documentation of extensive dumping of waste on the ground.

    Q.   Okay.  And before we turn to the records that you reviewed that you just alluded to, can you briefly tell us the nature of your second conclusion regarding the data that you

reviewed and the correlation of that to site practices?

A.    Yes.    I alluded some yesterday to the site data which includes the physical observations and chemical testing data related to soil, groundwater soil vapor, and other media on the site.    And I reviewed the data.    I reviewed the areas where there had been waste handling and disposal on the site and -- the site being the Whittaker site.    And there is a correlation between where contamination was found, particularly very high concentrations of contamination, and where these waste handling practices took place on the site.

Q.    And can you give us examples of the types of practices that occurred or the documents that -- based on the documents and other evidence you reviewed, what types of practices were you able to identify and correlate to the data you reviewed?

A.    Yes.    There were -- there was an area where there were impoundments which I think I discussed yesterday which were essentially ponds where liquid waste was handled.    There were landfill areas, surface waste disposal types of areas, and there was a Burn Valley where waste materials from across the site was -- were brought and -- some of which, anyway, were burned as a -- as a waste disposal mechanism.

Q.    Okay.    And, again, we'll -- we'll get into the documents here in a minute for a little more detail.

But you mentioned a third area of conclusions you

had reached.  Can you tell us what that was?

    A.   Sure.  The third area is related to Whittaker's relationship and interaction with the regulatory agencies.  And my opinion is that Whittaker delayed the implementation of required groundwater monitoring, despite clearly having knowledge that it was required, and also that they misled the -- "they" being Whittaker -- misled the regulatory agencies in the area of disclosure of some of the waste disposal practices.

    Q.   Okay.  Why don't we turn to some of the materials that you reviewed.  The -- and I believe you have a binder there, but we'll put it up on the screen.

    A.   I have two.

    Q.   Well, the first document that I would like to ask you about is Exhibit 201, which the parties have stipulated to.

        (Exhibit 201 received into evidence.)

    Q.   (BY MR. RICHARD:)  This is a letter from August 14th, 1978, to a Mr. Hampson of the California Regional Water Quality Control Board from Whittaker-Bermite, PB George, plant safety engineer.

        And do you recognize this as one of the documents you reviewed in your work in this case?

    A.   I do.

    Q.   And what -- it's from Whittaker; is that right?

    A.   It is.

474

1     Q.    And in what way did this document -- well, let's

2   look at the first paragraph just to put it in a little more

3   context.  This is the safety -- plant safety engineer writing

4   to the California Regional Water Quality Control Board?

08:40AM   5     A.    It is.

6     Q.    And he's referring to a conversation.  And he says,

7   "The following information is submitted as required for

8   emergency destruction of hazardous materials."

9           Do you see that?

08:40AM  10     A.    I do.

11     Q.    And what do those hazardous materials include?

12     A.    In the bottom half of the page, see chemical

13   compositions, are -- it mentions five different substances --

14   aluminum powder, ammonium perchlorate, butarez, epoxy, and

08:41AM  15   mapo.

16     Q.    And above that, how many -- what was the volume of

17   hazardous substances that Whittaker was seeking to have

18   emergency destruction of at this time?

19     A.    It -- in the second paragraph, it mentions a total

08:41AM  20   estimated weight of 5,000 pounds, and it contained 75 55-gallon

21   drums.

22     Q.    So Whittaker at this time in 1978 had 75 55-gallon

23   drums that included trace amounts of perchloroethylene.  Do you

24   see that?

08:41AM  25     A.    I do.

**UNITED STATES DISTRICT COURT**

1    Q.    What is perchloroethylene?

2    A.    Perchloroethylene is -- I've also referred to as

3    PCE.  It is one of the solvents used in degreasing at the

4    property.

08:41AM   5    Q.    And so in what way is this first document that we're

6    looking at, how does this impact the conclusions you reached in

7    this matter?

8    A.    It is a demonstration that they have accumulated a

9    fairly large quantity, 5,000 pounds, of waste material, which

08:42AM  10    is -- if you look at the percentages, the majority was ammonium

11    perchlorate, which is the propellant material, perchlorate

12    being one of the primary soil and groundwater contaminants at

13    the site, and that there is an emergency -- a destruction

14    that's required, and they're looking to get approval on an

08:42AM  15    emergency basis.

16    Q.    And what is -- why is it significant to you that it

17    was on an emergency basis?

18    A.    I think it's -- in my experience, it's unusual --

19          MR. BLUM:  Objection.  Speculation.

08:42AM  20          THE COURT:  Sustained.  Rephrase your question.

21          MR. RICHARD:  Sure.

22    Q.    (BY MR. RICHARD:)  Can you tell us what is it about

23    the reference to emergency destruction that made this document

24    of significance to you in the work you did in this case?

08:43AM  25          MR. BLUM:  Objection.  Speculation.  No foundation.

**UNITED STATES DISTRICT COURT**

```
     1              THE COURT:  Overruled.

     2              And, ladies and gentlemen, you should consider it

     3    for that very limited purpose in terms of its significance to

     4    this expert in the performance of his work responsibility.

08:43AM  5              You can answer the question.

     6              THE WITNESS:  Yes.  It -- the -- I'm trying to

     7    recall the question now after the discussion.

     8              The emergency, to me, in my experience, if

     9    there's -- if a facility has a routine waste management policy

08:43AM 10    and practice that they follow, it is unusual to have an

    11    emergency situation where something falls outside of that.

    12    That's what struck me here is that we have -- you have

    13    perchlorate in PCE, a solvent, that are site contaminants that

    14    need to be handled and destroyed on an emergency basis.

08:44AM 15        Q.   (BY MR. RICHARD:)  Okay.  Thank you.

    16              Next, we have another Whittaker document,

    17    Exhibit 202, which is also the subject of a stipulation.  This

    18    is dated May 29th, 1979, from a Mr. John Peloquin, corporate

    19    industrial hygienist, to a Mr. Zoyd Luce.

08:44AM 20              Do you have this document, sir?

    21        A.   I do have it.  Hard copy, and it's on the screen.

    22        Q.   And is this one of the documents you reviewed in the

    23    course of your work in this case?

    24        A.   It is.

08:44AM 25        Q.   And in what way did this document impact the work
```

**UNITED STATES DISTRICT COURT**

you did to reach the conclusions you've shared with us?

A.    There are a lot of documents here, so I'm just going to take a quick look through to refresh my memory.

Yes.  On the second page of the document, there is an Item 4 which struck me.  And there's a discussion of one of the vapor degreasers at the site and the recognition by the author, Mr. Peloquin, that acute exposure to the vapors -- I explained yesterday how vapor degreaser works.  You take a solvent and you vaporize it.  And someone who is operating a machine or close to a machine, if not careful, can become exposed.

What Mr. Peloquin is saying here in 1979 is that acute exposure to the vapors can cause death.  Chronic mild exposure to the vapors has been known to cause permanent liver damage.  He's identifying the potential health effects of being exposed to the vapor degreasing solvents that were being used.

Q.    Okay.  And why --

A.    And going -- I'm sorry.  Going on in the document.  Would you like me to proceed?

Q.    Yes.  Anything else of significance in this Exhibit 202 before we --

A.    Yes.  In item 7 on that same page, there's talk of a waste dumping program that needs to be initiated and implemented.  Mr. Peloquin, again, is -- is the author, and he says that it appears there's an indiscriminate dumping of waste

**UNITED STATES DISTRICT COURT**

```
        1    to the environment in a few areas that he lists.

        2        Q.    Okay.  And did you review any safety manuals that

        3    related to the disposal of hazardous waste at the Whittaker

        4    site?

08:47AM 5        A.    I did.

        6        Q.    And can we look -- why don't you tell us first.

        7    What -- in what way did the safety manual or manuals you

        8    reviewed impact the work you did in this case?

        9        A.    I -- I'm referring to a DOD, Department of Defense,

08:47AM 10   safety manual that I think was from 1968.  I also saw a

        11   subsequent one that was from a -- a date after this facility

        12   was no longer operating.  But in that document, there is a

        13   prohibition against disposal of waste on the ground surface.

        14       Q.    And then in terms of Whittaker's own safety manuals,

08:48AM 15   did those -- what was the relationship between their own

        16   manuals that you reviewed and these DOD safety guidelines you

        17   identified?

        18       A.    I don't -- I have not received any Whittaker safety

        19   manuals.  The information I have on Whittaker policies for

08:48AM 20   disposal of waste comes from correspondence and testimony of

        21   the employees.

        22       Q.    Maybe I'm not describing it correctly.  Can -- can

        23   you take -- do you have Exhibit 203 in front of you, sir?

        24       A.    I do.

08:48AM 25       Q.    And can you tell us what, before we publish it --
```

**UNITED STATES DISTRICT COURT**

1    oh, I think -- yeah, there's a stip to this as well.  But can

2    you tell us what Exhibit 203 is?

3         A.    Yes.  It's a document entitled, "Procedures for

4    Disposal of Hazardous Material," dated January 16th, 1980.

08:48AM  5              (Exhibit 203 received into evidence.)

6         Q.    (BY MR. RICHARD:)  Okay.  And is this a document you

7    reviewed in the course of your work in this case?

8         A.    It is.

9         Q.    Okay.  And how do you refer to this document?

08:49AM 10         A.    I would call it the -- what the title is, the

11   Hazardous Material Disposal Procedure document.

12        Q.    Okay.  And if we could look at page 3, the General

13   Standards section.

14             MR. RICHARD:  Can you enlarge towards the bottom

08:49AM 15   there, bottom of the page?  Thank you.

16        Q.    (BY MR. RICHARD:)  And we see a reference to DOD.

17   Do you see that, right after General Standards for Destruction?

18        A.    Oh, I see.  Yes.  There's some citation to it,

19   apparently a citation to a DOD document.

08:49AM 20        Q.    Okay.  And I just wanted to ask you, you've talked

21   about the -- what was prohibited in terms of their policy.

22             Can you explain what paragraph B generally refers

23   to?

24        A.    Yes.  The -- paragraph A introduces the idea that --

08:50AM 25   that sometimes you have to destroy some of the ammunition

```
 1   explosives created on the property.

 2         And B is entitled "Prohibited Disposal" and says,

 3   "Burying ammunition and explosives or dumping them into waste

 4   places, pits, wells, marshes, shallow streams, or inland

 5   waterways is prohibited."

 6   Q.   Okay.  Thank you.

 7         And did -- why don't we take a look at Exhibit 205,

 8   also stipulated.

 9         (Exhibit 205 received into evidence.)

10   Q.   (BY MR. RICHARD:)  This is a memo from October 9th,

11   1980, from Zoyd Luce to Mr. Moore.

12         Can you tell us, is this one of the documents you

13   reviewed in the course of your work in this case?

14   A.   It is.

15   Q.   And in -- it's entitled "Violations of the Resource

16   Conservation and Recovery Act."  Is that the RCRA law you

17   talked about yesterday?

18   A.   It is.

19   Q.   And it begins by -- well, can you read that first

20   paragraph there below the subject line?

21   A.   Sure.  It reads:  "Attached is a list of current

22   violations of the Resource Conservation and Recovery Act's

23   prohibitions against dumping waste materials on the ground.  I

24   will be working from this list to correct these problems during

25   coming weeks."
```

08:50AM (line 5)
08:50AM (line 10)
08:50AM (line 15)
08:51AM (line 20)
08:51AM (line 25)

 1            MR. BLUM:  Your Honor, I'm sorry.  What's the title

 2    of this document?

 3            THE COURT:  You can ask your next question, please,

 4    Mr. Richard.

08:51AM   5            MR. RICHARD:  Thank you.

 6       Q.    (BY MR. RICHARD:)  And when you -- in what way did

 7    this Exhibit 205 from 1980 impact the work you did regarding

 8    whether Whittaker followed its own policy against dumping waste

 9    on the ground?

08:52AM  10       A.    First of all, looking at this paragraph that's

11    enlarged and what's highlighted are the words "current

12    violations," meaning, to me, that that was going on at the time

13    Mr. Luce prepared this memo.  And that's October 9th, 1980.

14            Continuing on the two-page -- two additional pages

08:52AM  15    to this memo, and there's a title here, "Types of Materials

16    Being Dumped in the Ground by Building Location."  And it --

17    what it does is it identifies, I believe it is, 29 different

18    locations on the property where materials were being dumped on

19    the ground.  And materials include -- they include a lot of

08:52AM  20    materials used at the property.

21            To highlight some of them, perchloroethylene, which

22    is PCE, the solvent that I've been talking about and is a

23    significant contaminant at the site is included.  It's also --

24    it's included more than once, including some misspellings of

08:53AM  25    the word, but it's -- perchloroethylene is PCE.

1      Q.    Let me stop you there.  I know I'm interrupting.

2   Let's just go through.  If we can go to the bottom of the

3   left-hand column under all of these sites that were listed in

4   1980 as having types of material being dumped on ground.

08:53AM   5            We see something called JATO mix.  Do you see that?

6      A.    I do.

7      Q.    And what's the reference there to -- first of all,

8   why would H2O be listed, if you know?

9      A.    Well, probably because water was discharged.  The

08:53AM   10   water could have contained contaminants.

11      Q.    Okay.  And we see the second item listed there is

12   what?

13      A.    Perchloroethylene, which is PCE.

14      Q.    Okay.  And then we see up at the top of the

08:54AM   15   right-hand column the -- is that lampblack building?

16      A.    Yes.

17      Q.    And, again, we see perchloroethylene?

18      A.    Yes.

19      Q.    And so that's another area where Mr. Luce of

08:54AM   20   Whittaker was observing that that material was being dumped on

21   the ground.  Is that how you interpreted this?

22      A.    Yes.

23      Q.    And then the item right below that is Building 307.

24   Do you see that?

08:54AM   25      A.    I do.

1    Q.    And is prechloroethylene a recognized chemical or --

2    A.    Not one that I know of.  And when I saw this, I did

3    look the word up and could not find it.

4    Q.    So how did you interpret that?

08:54AM   5    A.    I interpreted that to mean there's a typo there and

6    they meant perchloroethylene.  The "E" and the "R" should have

7    been transposed.

8    Q.    We see that same issue with Building 317 which lists

9    a number of other chemicals as well.  Do you see that?

08:55AM   10    A.    I do.

11    Q.    So just looking at that, that's -- one, two,

12    three -- four different areas where Mr. Luce was observing that

13    perchloroethylene was being dumped on the ground in

14    October 1980; is that right?

08:55AM   15    A.    In the four areas, he specifically calls it out.

16    And then there's a catch-all in the burn pit area which would

17    be a fifth area.

18    Q.    Okay.  And let's look at that.

19          So for the -- 28 of the 29 sites, there are

08:55AM   20    chemicals identified, some of the -- sometimes it's referred to

21    as just solvents.  But for the burn pits, what does it say

22    there?

23    A.    It says, "All chemicals and explosives on plant."

24    Q.    And what does that tell you?

08:55AM   25    A.    That tells me Mr. Luce was saying that all of the

**UNITED STATES DISTRICT COURT**

```
 1    chemicals and the explosives on the plant were being disposed

 2    of on the ground in the burn pit area.

 3         Q.    And was that one of the areas that you reviewed data

 4    for that was obtained many, many years after 1980 as to what

 5    contaminants were in the soil at the burn pits?

 6         A.    Yes.

 7         Q.    And we see -- so the four specific references to PCE

 8    and then the catch-all for all chemicals and explosives on the

 9    plant end up in the burn pits, what -- what does that tell you,

10    if anything, as to what -- what solvent or solvents were being

11    used at this time?

12         A.    Well, again, the -- the first line of this memo

13    talked about current violations and what was being dumped on

14    the ground at that current time.  And there are these multiple

15    references to perchloroethylene, which means to me that

16    perchloroethylene was being used at the property at that time.

17         Q.    And in your experience, were there -- do we see any

18    reference to a chemical referred to as TCA?

19         A.    You said TCA?

20         Q.    Yes, sir.

21         A.    I do not see a reference to TCA on -- on these two

22    pages.

23         Q.    And are you familiar with the chemical referred to

24    as TCA?

25         A.    I am.
```

08:56AM (line 5)
08:56AM (line 10)
08:57AM (line 15)
08:57AM (line 20)
08:57AM (line 25)

```
 1          Q.     And what is that?
 2          A.     TCA is an abbreviation for 1,1,1-trichloroethane,
 3   ending in a-n-e.  And it is a compound that has been used as a
 4   degreasing solvent, wasn't as -- in my experience, talking to
 5   people who used different solvents, wasn't as effective in
 6   degreasing as TCE or PCE but became more popular in the '80s
 7   because of the discovery of potential health effects with TCE
 8   and PCE.
 9          Q.     Thank you.
10          Before we move on -- well, why don't we just move
11   on.  The next document I'd like to show you has also been
12   stipulated to, Exhibit 206.
13          (Exhibit 206 received into evidence.)
14          Q.     (BY MR. RICHARD:)  This is a memo.  The subject is
15   "Contamination of the hog-out area."  And this is written just
16   a little bit after the memo we just looked at.  So this is
17   dated October 15, 1980, company confidential, from
18   Mr. Zoyd Luce to Mr. Ray Sabin that begins "Several problems
19   exist with respect to the hog-out operation."
20          Do you see that?
21          A.     I do.
22          Q.     And can you explain for us -- I think you touched on
23   it yesterday, but what is a hog-out operation?
24          A.     The -- the propellant that was in some of the -- the
25   missile technologies created at the site, were manufactured at
```

08:57AM — line 5
08:58AM — line 10
08:58AM — line 15
08:58AM — line 20
08:59AM — line 25

**UNITED STATES DISTRICT COURT**

1    the site were only effective for a certain period of time.  And

2    if they were stored for that amount of time or greater, the --

3    the propellant would have to be removed and possibly replaced.

4            The hogging out was the process by which they

08:59AM  5    removed the propellant, and it was done -- at least one method

6    that I'm familiar with from the documentation is that it was

7    done with high pressure water shooting into the canisters, I

8    guess we can call them, to flush the propellant out.

9        Q.   And just on that point, if you could look at Item 4,

08:59AM  10   talks about that waste propellant being washed down the hill.

11   Do you see that?

12        A.   I do.

13        Q.   And can you read that for us?

14        A.   Sure.  "The waste propellant has washed down the

09:00AM  15   hill in copious amounts and is contaminating the Orofino Canyon

16   stream, in direct violation of the RCRA."

17        Q.   And that's one of the four items that -- this is in

18    addition to the 29 areas where we just saw Mr. Luce observe

19    dumping of waste on the ground.  Here, he's describing these

09:00AM  20   as, quote, "existing problems."

21            Why would washing a -- water with a propellant down

22    the hill in copious amounts, in your experience, be considered

23    an existing problem?

24        A.   It is a problem, first of all, because, as it says

09:00AM  25   here, it's going to -- to a -- to a stream, which is an

environmental impact, an adverse environmental impact.

Also, the propellant contains perchlorate, the contaminant that -- the chemical I've been talking about, which is very soluble in water.  If it gets exposed to water, it will dissolve in water readily and move very quickly in water.

By using so much water to do the hog-out operation and then having all this water flowing down a hill in contact with the propellant, it will -- that water will dissolve a great deal of the perchlorate and be dissolved when it enters the stream, but it also has the ability to percolate into the ground as it is exposed to the ground and migrate to the groundwater.

Q.   But, Dr. Hughto, in your experience, were the health impacts of perchlorate really all that well-known in 1980?

A.   They were not.

Q.   So was -- in your experience, was Mr. Luce correct in describing these as problems if he didn't know all the health -- potential health effects of these contaminants that were being washed down the hill in copious amounts?

A.   I'm sorry.  Was Mr. Luce -- was --

Q.   Incorrect in describing these as existing problems and the problems proposed by this contamination?

A.   In my opinion, he was correct in this material.  If it washed down the hill and into the stream as he describes, that it was contaminating that stream.

|       |                                                                      |
|-------|----------------------------------------------------------------------|
|     1 | Q.    Okay.  And was there any significance to you for the           |
|     2 | work you did in this case in evaluating the policy of no             |
|     3 | dumping, et cetera, where Mr. Luce writes in the second line up      |
|     4 | at the top there, "The crux of the problem is that the area is       |

09:02AM 5   not presently, adequately policed"?

6       A.    Yes.  It appears that Mr. Luce is calling out the

7   fact that this hog-out operation, which again is jetting large

8   quantities of water in to remove these propellents, that he --

9   under the ground, that he's -- he's saying it is not properly

09:03AM 10  policed or adequately policed is his term.

11      Q.    Okay.

12      A.    And, again, it was happening on the ground.  So it

13  was a discharge of -- of a waste material to the ground.

14      Q.    And did you see any evidence that Mr. Luce ever

09:03AM 15  wrote a memo, at least that was provided to you, in which he

16  changed his mind and said, don't worry about these discharges

17  because we're being told to do this by government inspectors?

18      A.    I've never seen such a document.

19      Q.    Okay.  And then he goes on at the bottom of this

09:03AM 20  memo where he talks about the problems posed by this

21  contamination.  Do you see that?  "Suggests serious problems

22  within the Bermite management."

23      A.    I see that, yes.

24      Q.    And then for the third or fourth time, he uses the

09:04AM 25  word "problems" and says, "Problems surrounding the hog-out

**UNITED STATES DISTRICT COURT**

contamination are" -- and he describes No. 1, several employees responsible.

Do you see that?

A.    I do.

09:04AM  Q.    And he refers to instructions dated in July 1979 and says -- regarding propellant plant waste for disposal and says, quote, "Yet those instructions have been ignored in the case of the hog-out area."  And he asks the question, "Why?" close quote.

09:04AM  Was that significant to you in the work you did in this case?

A.    It is and has been and -- because it shows that a Whittaker employee, safety employee, is calling out the fact that the waste disposal -- the plant waste disposal
09:05AM  instructions are not being followed.

Q.    And then he concludes this memo.  And, again, this is back in 1980.  Do you see that last paragraph there?

A.    I do.

Q.    And can you read that to us?

09:05AM  A.    "The problem is serious and requires your immediate attention.  The safety department cannot continue to promulgate guidelines and rules when their execution by management does not occur."

Q.    And was that significant to you in the work you did
09:05AM  in this case, Dr. Hughto?

1        A.    It is.

2        Q.    Why is that?

3        A.    Again, Mr. Luce is pointing out the fact that there

4    are guidelines and rules and that these are not -- excuse me --

09:06AM  5    they are not -- the management is not ensuring that they're

6    being executed.

7        Q.    And did you see any evidence that the problems about

8    dumping on the site and problems in the hog-out area, were

9    those taken care of within a couple of weeks after Mr. Luce's

09:06AM  10   memo based on the materials you reviewed?

11       A.    I have not seen documentation of -- of Whittaker

12   going back to the hog-out area and changing the practices.

13       Q.    Did you see evidence that other folks continued to

14   identify issues at some of the same areas that Mr. Luce was

09:06AM  15   identifying in 1980?

16       A.    Yes.

17       Q.    Before we look at that, I want to show you

18   Exhibit 468, another document that is subject to stipulation.

19            (Exhibit 468 received into evidence.)

09:07AM  20       Q.    (BY MR. RICHARD:)  This subject is "Unknown" -- it's

21   put in quotes, "Unknown stored liquid waste."  It's dated

22   June 19th, 1981, another Whittaker memo.  This one's just one

23   page.

24            Do you see that?

09:07AM  25       A.    I see it.

**UNITED STATES DISTRICT COURT**

1      Q.    And is this one of the documents you reviewed in the

2    course of your work in this case?

3      A.    It is.

4      Q.    And in what way would this short memo on unknown

09:07AM  5    stored liquid waste and unidentified liquid waste impact the

6    conclusions you reached?

7      A.    Let me read the beginning of it --

8      Q.    Certainly.

9      A.    -- so I can put that into context of your question.

09:07AM  10         "Because unidentified liquid waste has again

11    appeared from several sources, it will be necessary for

12    Jim Jisa to have a contracted wasted hauler" -- I assume he

13    meant waste, not wasted, "hauler remove it from Bermite."

14         What this is saying to me is that there are

09:08AM  15    unidentified liquid wastes and that the word "again" is

16    important to me because, again, the word "again" means that

17    this happened in the past.  So they have these unidentified

18    liquid wastes again from several sources.

19         And the -- farther down the memo, there's a callout

09:08AM  20    for -- if people have any such wastes and lists seven of them.

21    What this says to me, if there was a routine waste management

22    policy that was being practiced and enforced that -- that

23    unidentified liquids would not again on a repeated basis, the

24    word "again" appears to me, showing up and having to be --

09:08AM  25    managed by the author of this memo.

**UNITED STATES DISTRICT COURT**

|     |     |
| --- | --- |
| | 1 |

Q.    And you mentioned the seven areas which are -- he put in all caps "ARE NOT NOW HANDLED IN THE SYSTEM," and he refers to solvents and sludge, among other things.

Do you know what he's referring to there?

A.    Well, first, it's saying not handled in the system, meaning -- it says to me that there's not a system in place, a waste management system in place to deal with these -- these seven items.

You asked about solvents.  The TCE, PCE that have been used up to this date in degreasing would be solvents.  And there are other solvents that were used around the facility. The word "solvents" was on Exhibit 205 that listed the -- the 29 areas where materials were dumped on the ground.  Solvents as a general category were listed there.

And you asked about sludge.  One sludge that I believe would have existed on the property would have been the sludge that I believe I described yesterday from the degreasing machines that -- when it removes the grease, the grease has to go somewhere, and the grease became part of a sludge that would have to be managed.

Q.    Let me ask you a question.

In your experience, would the sludge from degreasers contain the solvent that was being used, whether it was TCE or PCE?

A.    It would.



Q.   And in your work in this case, did you see any logs, operational logs -- daily, weekly, monthly -- that actually identified or kept track of where all that contaminated sludge went?

09:10AM  A.   I have seen no documents that tracked the generation of such a sludge, the handling of it, the storage of it, or the final disposition.

Q.   And with respect to the data you found of solvents, chlorinated solvents, TCE and PCE in and among other areas in 09:11AM the burn pit, would the volume or concentration of those VOCs in that area be consistent with placing or releasing sludge in that same area?

A.   Yes.   In the burn pit area, there were extremely high concentrations of PCE, TCE, and TCA in the soils 09:11AM underlying the burn pit area, which meant to me that some kind of a waste disposal practice was going on there that included not just residuals or -- or waste that had a small amount of these solvents.   It was -- something was being disposed of there that had high concentrations of solvents, and 09:11AM the sludge from the degreasing machines would be consistent with that type of a finding.

Q.   And -- okay.   Thank you.

If we could look at a document from 1982.   This is Exhibit 504.   It's also the subject of a stipulation, it's 09:12AM dated April 12th, 1982.   This is from Jim Jisa, and the subject

**UNITED STATES DISTRICT COURT**

494

| | |
|---|---|
| 1 | is Hula Bowl. |
| 2 | (Exhibit 504 received into evidence.) |
| 3 | Q.    (BY MR. RICHARD:)   Do you see that? |
| 4 | A.    I do. |
| 09:12AM 5 | Q.    And my first question is:   The Hula Bowl area was |
| 6 | one of the 29 areas on Exhibit 205 that we just looked at; is |
| 7 | that right? |
| 8 | A.    Yes. |
| 9 | Q.    And so -- let's see. |
| 09:12AM 10 | We have Zoyd Luce talking about the Hula Bowl in |
| 11 | October 1980 as one of the many areas where materials were |
| 12 | being dumped on the ground.   And then here we are in April 1982 |
| 13 | with a memo that says subject "Hula Bowl."   And it looks like |
| 14 | they had a meeting regarding the Hula Bowl status. |
| 09:13AM 15 | Do you see that? |
| 16 | A.    I do. |
| 17 | Q.    And can you tell us -- and this document then has |
| 18 | some attachments -- in what way this document impacted the work |
| 19 | you did in this case? |
| 09:13AM 20 | A.    Yes.   It's a brief memo.   It talks about a meeting |
| 21 | that occurred and said that the decision was made to cover up |
| 22 | all material except old drums and said that the drums will be |
| 23 | flattened, put in a dumpster, and sold for scrap.   They |
| 24 | apparently had a monetary value to them.   They could be sold, |
| 09:13AM 25 | possibly recycled. |

**UNITED STATES DISTRICT COURT**

It goes on to say, "It was also decided to not allow
any more dumping in this area.  This means that inert scrap
will have to go to a landfill."

Q.    Okay.

A.    So what this is saying to me -- and you asked about
the importance in my evaluation of documents in this case.
This is saying to me that waste materials were dumped in that
area, and the data -- the subsequent data, the soil and the
groundwater data, verified that there was waste disposal in
this area and that they, at this point in 1982, are going to,
with the exception of the old drums, just cover up the
materials there.

Q.    And he refers to it.  He describes it --

A.    By the way, if I can finish the answer, sir.

It says, "except the old drums."  And it says, "the
drums will be flattened," meaning these aren't drums full of
something and they're -- the material in the drums is being
taken out to be disposed.  Whatever was in the drums, if
anything, when they disposed of them would remain in the area.

Q.    And he refers to old drums.  Did you see any
documentation -- again, logs, daily, weekly, monthly -- that
would tell us how long those old drums had been in the
Hula Bowl?

A.    I have seen no documents to tell me when drums were
taken to the Hula Bowl, what the contents were, where they came

1    from, or what the final disposition was.

2        Q.    Did you see any documents that would pinpoint for us

3    how long Whittaker had been using the Hula Bowl as a dumping

4    area?

09:15AM   5        A.    I am trying to recall if I've seen documentation how

6    long it's been used, and I am -- I'm blanking on it as -- off

7    the top of my head.

8        Q.    You know, "I don't remember" is a perfectly fine

9    answer.

09:15AM  10        Okay.  Did you see any documentations -- any

11   documents that Whittaker or Bermite, based on your review,

12   attempted to enforce restrictions on what could be dumped in

13   the Hula Bowl before April 1982 when Jim Jisa identifies that

14   they're no longer going to be dumping in that area?

09:16AM  15        A.    I don't recall seeing any such documents.

16        Q.    Okay.  And then there's some handwritten notes as

17   part of this exhibit.  Do you see that?

18        A.    I do.

19        Q.    And there are some that are numbered paragraphs,

09:16AM  20   suggestions on Hula Bowl.  Do you see that?

21        A.    I do.

22        Q.    And did you review these notes as part of your work

23   in this case?

24        A.    I did.

09:16AM  25        Q.    And there's a paragraph, looks like it's 2(a),

1   "Dumping metal drums with any residue of hazardous material is

2   illegal."  Do you see that?

3        A.    I do.

4        Q.    It goes on to say, "This has happened in the past."

09:17AM  5   Would that have any -- did that have any significance for the

6   work you did in this case?

7        A.    Yes.  This -- this paragraph you're talking about is

8   A under No. 2 above, which -- No. 2.  It says, "The dumping

9   prohibited items in Bermite dumpsters should not be used as a

09:17AM  10  way to circumvent any new procedure which takes effect after

11  cleanup is completed.  For example."  And then the A paragraph

12  that you talked about.

13        What this says is that -- that there have been drums

14  with residual hazardous materials to be disposed in the past

09:17AM  15  and that they have been informally warned by the entity

16  Blue Barrel Disposal about the disposing of these drums and

17  been told that it was illegal.

18        Q.    Okay.  And we talked a minute ago about back in

19  1980, Mr. Luce raising the issue of promulgating rules that

09:18AM  20  weren't followed.  I wanted to ask you if the next page of

21  these notes, it's page 504.4, there's a reference to the

22  Hula Bowl, and then it says, "It should be the responsibility."

23        Do you see that?

24        A.    The first line of the page?

09:18AM  25        Q.    Yes.

| | | |
|---|---|---|
| | 1 | A.   Yes. |
| | 2 | Q.   And can you -- can you read that for us? |
| | 3 | A.   Apparently it carries over from the previous page. |
| | 4 | Q.   Just start with, "It should be." |
| 09:18AM | 5 | A.   Okay.  Yeah, that's a new sentence here. |
| | 6 | "It should be the responsibility of the people in |
| | 7 | charge of the various buildings to see that this is enforced. |
| | 8 | The overall attitude has always been," open quotes, "'Screw |
| | 9 | it,'" comma, "'throw it in the dumpster,'" close quote. |
| 09:19AM | 10 | "Everyone should realize that just because we own this land |
| | 11 | doesn't exempt us from the many laws governing disposal." |
| | 12 | Q.   Thank you. |
| | 13 | And in what way did that reference impact the work |
| | 14 | you did in this case? |
| 09:19AM | 15 | A.   What this is saying is that it -- that there are |
| | 16 | people in charge.  There was -- there were references in the |
| | 17 | earlier document that we looked at, if I get the number of it, |
| | 18 | that talked about policing and better management oversight of |
| | 19 | the waste disposal processes.  And here's another -- another |
| 09:19AM | 20 | reference to the responsibility of the people in charge.  The |
| | 21 | attitude has been throw it in the dumpster. |
| | 22 | But here, the author of these handwritten notes is |
| | 23 | saying that they've been told that that is illegal.  Just by |
| | 24 | being a practice, that it's illegal and shouldn't be continued. |
| 09:20AM | 25 | Q.   Okay.  Thank you. |

**UNITED STATES DISTRICT COURT**

1          So we've looked at one document from 1980 that

2     talked about the Hula Bowl, among other areas, where there was

3     dumping.  We have this memo from April 1982 talking about the

4     Hula Bowl in the comments you just read.

09:20AM  5          I want to show you Exhibit 210.  Now we're moving

6     into August 1982.  This is August 26, 1982.  It's also the

7     subject of a stipulation.

8          (Exhibit 210 received into evidence.)

9     Q.     (BY MR. RICHARD:)  Subject:  "EPA health and safety

09:20AM 10    survey."

11         Do you see that?

12    A.     I do.

13    Q.     And again, this is from John Peloquin, corporate

14    industrial hygienist.  And I want to ask you about page 2.  And

09:20AM 15    you see that paragraph No. 7?

16    A.     I do.

17    Q.     He's also talking about the Hula Bowl there, isn't

18    he?

19    A.     He is.

09:21AM 20    Q.     And what does he say?

21    A.     The paragraph begins with, "The Hula Bowl is a

22    disaster area."

23    Q.     Okay.

24    A.     Shall I continue?

09:21AM 25    Q.     Sure.

**UNITED STATES DISTRICT COURT**

```
 1        A.     "All drums and scrap metal must be removed as soon
 2   as possible.  The trash dump must be sanitized," sanitized
 3   being underlined, "immediately.  All illegal industrial and
 4   sanitary waste must be removed and disposed of properly.  In
 5   the future, all trash must be disposed of properly.
 6           "The Hula Bowl apparently has been used as an oil
 7   changing station.  The oil spills and dirty filters must be
 8   cleaned up.  The present condition of the Hula Bowl could very
 9   likely trigger groundwater monitoring.  Cleanup of this area
10   must receive top priority.  A program preventing recurrence of
11   this situation must also receive top priority."
12        Q.     Okay.  So we talked -- they talked about the
13   Hula Bowl in 1980, 1980 -- early 1982, and then now we're in
14   August 1982.
15           My first question is:  Based on your experience, if
16   all that was dumped or placed in the Hula Bowl were wood
17   pallets and scrap metal, typically would there be a concern
18   about illegal industrial and sanitary waste?
19           MR. BLUM:  Speculation, Your Honor.
20           MR. RICHARD:  I'll rephrase it.
21        Q.     (BY MR. RICHARD:)  In your experience, sir, are
22   scrap wood pallets and metal generally referred to as illegal
23   industrial and sanitary waste?
24        A.     Not in my experience.
25        Q.     Okay.  If we could look at Exhibit 466.  This is a
```

**UNITED STATES DISTRICT COURT**

memo from September 29th, 1982.  It's also from Zoyd Luce.

This one's to Mr. Jisa.

            (Exhibit 466 received into evidence.)

            THE COURT:  And this is subject to stipulation?

            MR. RICHARD:  I'm sorry, Your Honor.  Yes, it is.  I

was doing so well on that point.

      Q.    (BY MR. RICHARD:)  This short memo refers to

relocation of propellant waste.  Do you see that, sir?

      A.    I do.

      Q.    And why would a reference to -- would a reference to

propellant waste, what does that tell us in terms of the work

you did in this case?

      A.    That the propellant waste is a waste material

generated as a result of the processes at the property.

      Q.    And typically when you see a reference to

propellant, does that indicate any of the chemicals that we're

talking about in this case?

      A.    Yes, it does.  Perchlorate is a constituent of the

propellants.

      Q.    And he's -- he says, "We will remove our waste from

the area to Building 308 and store it temporarily in trailers

inside the Hula Bowl."

            Why would there be an issue with storing propellant

inside the Hula Bowl -- or propellant waste?  Sorry.

      A.    Propellant waste, my understanding was it was -- the

1    way it was handled on the site was burned in the Burn Valley or

2    the burn pit area.  It -- the -- my -- I do not -- I have not

3    seen any documentation that these wastes could be disposed of

4    in the Hula Bowl area.

09:24AM   5         MR. BLUM:  Objection, Your Honor.  There's no

6    evidence that it was disposed of.

7         THE COURT:  Just the objection and the legal ground.

8    The objection --

9         MR. BLUM:  Objection.  Not in evidence.

09:25AM   10        THE COURT:  The objection is sustained, and the jury

11   is to disregard the answer.

12        Q.    (BY MR. RICHARD:)  Sir, did you see any

13   documentation as to how long the propellant waste containing

14   perchlorate was stored at the Hula Bowl?

09:25AM   15        A.    I don't recall seeing such documentation.

16        Q.    Okay.  The -- I saw a reference to -- yes, in

17   Exhibit 210, that paragraph you read about the Hula Bowl at the

18   top of page 2, we saw a reference to triggering groundwater

19   monitoring, just to go backwards for a second.

09:25AM   20        A.    Yes.  I see that.

21        Q.    And in general, can you explain to us why the

22   situation described in August 1982 regarding the Hula Bowl

23   would very likely trigger groundwater monitoring, based on your

24   experience?

09:26AM   25        A.    Yes.  The timing of this memo being --

|       | 1  | MR. BLUM:  Objection, Your Honor. |
|       | 2  | THE COURT:  What's the legal ground of the |
|       | 3  | objection? |
|       | 4  | MR. BLUM:  Speculation, no foundation. |
| 09:26AM | 5  | THE COURT:  Overruled as the question was framed. |

MR. BLUM:  Objection, Your Honor.

THE COURT:  What's the legal ground of the objection?

MR. BLUM:  Speculation, no foundation.

THE COURT:  Overruled as the question was framed.

You can answer.  And the question is limited to what essentially triggers groundwater monitoring in the context of the facts of this case, based upon your experience.

MR. RICHARD:  Thank you, Your Honor.

THE WITNESS:  Thank you.

This is 1982.  The RCRA regulations were promulgated in '80.  And one aspect of the RCRA regulations before, that when an area may have an impact on surface water or groundwater that required installing monitoring wells and the regulations were specific enough to say one monitoring well upgradient and four monitoring wells in total -- and I forget if I described upgradient and downgradient yesterday.

Water flows downhill.  And surface to ground also flows downhill under the ground.  There's a slope to groundwater.  Upgradient is where the water came from.  Downgradient is where it's going to.

So the -- what this paragraph means to me is that the author is -- is concluding or -- or opining that the conditions are such that it will trigger groundwater monitoring requirements.

1    Q.    (BY MR. RICHARD:)  Did you see any evidence in your

2    work in this case that in the same time frame Whittaker was

3    seeking to obtain a waiver or delay imposition of the

4    requirements you just described for groundwater monitoring?

09:28AM    5    A.    I believe that -- both, that there was an effort

6    to -- for a waiver as well as delay in installing groundwater

7    monitoring wells that were required.

8    Q.    If you could look at Exhibit 24, which is also the

9    subject of a stipulation.

09:28AM    10    (Exhibit 24 received into evidence.)

11    Q.    (BY MR. RICHARD:)  This is a letter from Zoyd Luce,

12    the same fellow who's been identifying those problems of

13    dumping for the prior two years, at least, to the -- Mr. Wong.

14    Do you see that?  Waste management specialist, State of

09:28AM    15    California, Department of Health Services?

16    A.    I do.

17    Q.    The reference is to interim status document.

18    Subject:  Waiver for groundwater monitoring.  Is this one of

19    the documents you reviewed in this case?

09:28AM    20    A.    It is.

21    Q.    And he identifies a number of areas there.

22    And then the bottom of the page, he says -- that

23    paragraph, "We feel that we do not require groundwater

24    monitoring."  He goes on.

09:29AM    25    Is this one of the documents you reviewed?  Did I

1    ask you that?

2         A.    You did ask me, and I did review it.

3         Q.    Okay.  Well, I asked you twice.

4              In what way did this document impact the work you

09:29AM  5    did in this case?

6         A.    It, uh -- the way it impacts, it's written by

7    Mr. Luce again.  Mr. Luce was quite aware of the dumping on the

8    ground because he was the author of Exhibit 205 that listed the

9    29 areas of disposal waste in the ground, including liquid

09:29AM 10    waste.

11             And so this appears to me to be a -- an effort to

12   delay the groundwater monitoring because the -- the

13   requirements are clearly triggered by the fact they're dumping

14   liquid waste on the ground in these areas.

09:30AM 15             MR. BLUM:  I object as pure speculation and move to

16   strike.

17             THE COURT:  Overruled.

18        Q.    (BY MR. RICHARD:)  The next page of Exhibit 24, we

19   see Mr. Luce talking about the estimated cost of groundwater

09:30AM 20   monitoring at that time?

21        A.    I do.

22        Q.    And he goes on to say, "We feel no benefit would be

23   derived by Bermite."  Do you see that?

24        A.    I do.

09:30AM 25        Q.    By this time in August -- in October 1982, had

**UNITED STATES DISTRICT COURT**

Whittaker identified or Bermite-Whittaker -- by the way, when it refers to Bermite, that was a -- as we see on the very top of this document and many others, Bermite was a division of Whittaker Corporation; is that right?

A.   That is my understanding.

Q.   Okay.  By October 1982, the time of this letter seeking a waiver for groundwater monitoring, was Whittaker aware of issues regarding the pond or the sump that you described at Building 317 based on the materials you reviewed?

A.   Yes.

Q.   And again, what -- what was, in general, the issue with the pond or sump at Building 317?

A.   When you said "the issue," there are multiple issues.  The pond -- the construction of the pond was in Part 2 -- solvent waste went through the pond in Part 2 for evaporation.  That same area was the hog-out area, and some of the water from the hog-out area was channeled to the pond.  The pond had an issue during periods of precipitation of certain quantity where it would overflow.

The pond also was unlined when it was first constructed, which would allow the contents to percolate into the ground.  It was later lined, but there were periodically issues found with the liner and had to be repaired, meaning that the liner had lost at least some of its integrity in allowing this waste to percolate into the ground.

           1      Q.    Okay.  Let's look at a couple of documents regarding

           2   the pond at Building 317.

           3             Exhibit 453 is another document that is subject to a

           4   stipulation.  It's dated March 17th, 1982.

09:32AM    5             (Exhibit 453 received into evidence.)

           6      Q.    (BY MR. RICHARD:)  So we just looked at a document

           7   from October, now we're going back in time a few months.  This

           8   is from Jim Jisa.  Subject:  Sump adjacent to Building 317.

           9             Do you see that?

09:33AM   10      A.    I do.

          11      Q.    Is this one of the documents you relied on in your

          12   work in this case?

          13      A.    It is.

          14      Q.    And the first sentence says, "The sump adjacent to

09:33AM   15   Building 317 is not adequate to sustain the amount of waste

          16   flow going into it."

          17             Almost sounds like an overflowing toilet.  Can you

          18   tell us --

          19             MR. BLUM:  Objection, Your Honor.

09:33AM   20             THE COURT:  Sustained.

          21             And I'm going to admonish both counsel that I do not

          22   want to hear comments, only questions.

          23             MR. RICHARD:  Fair enough, Your Honor.  Thank you.

          24      Q.    (BY MR. RICHARD:)  Did that first description or the

09:33AM   25   following description have any significance in the work you did

```
 1   in this case?
 2        A.   Yes.
 3        Q.   Then can you explain that?
 4        A.   Sure.  The -- I just talked about that a little bit
 5   in the previous answer, that the -- the capacity was not such
 6   that it could handle the waste material, the waste -- the
 7   solvent waste being discharged as a matter of course in
 8   operating the facility and the precipitation that was caused
 9   during heavy rains and there would be overflows.
10        Q.   And the next paragraph, paragraph No. 2 there, do
11   you see that?
12        A.   I do.
13        Q.   And you had mentioned "hog out," and so I want to
14   ask you about this paragraph.  "The original design was for a
15   motor washout.  Now we run A.P. from the Building 314 hog out
16   into the sump as well as waste from" -- what does that say? --
17   "steam lines and liquid waste from the M.T.V. operation."
18             Why would that be a -- a concern at this time in
19   March 1982, based on your experience?
20        A.   Well, the -- the sump pond only had a certain
21   capacity.  And if -- if it is at its capacity during a period
22   of heavy rain and you're adding in these other sources of
23   water, regardless of what's in the water, it's going to
24   effectively decrease the capacity and cause more overflows.
25        Q.   And is that what Mr. Jisa's referring to in the next
```

line where he says, quote, "The sump as it currently exists is

not large enough to contain the present waste flow going into

it.  We resubmit the following recommendations for your

consideration"?  Is that what he's referring to there, the size

09:35AM   of the sump pond?

A.    That's my understanding of what he's saying, is

similar to what I just said in my previous answer.

Q.    And would there be any significance to you in the

work that you did in this case that Mr. Jisa is resubmitting

09:35AM   his recommendations regarding the inadequate sump at

Building 317?

A.    Well, resubmitting, this says to me that it isn't

the first time that he's made these types of recommendations,

which makes it sounds like it's a problem that has occurred in

09:36AM   the past or has been observed in the past and brought to the

attention of -- whoever he brought it to the attention of.

Here he has a memo to distribution with -- with multiple cc's.

Q.    Okay.  So this was a waste pond that was designed

for one use and then, by March 1982, was being used for several

09:36AM   other waste disposal issues and was not sufficiently large for

those new purposes.  Is that how -- is that a fair reading of

this?

A.    Yes.

Q.    And if you could, sticking on the topic of this pond

09:36AM   or sump at Building 317, I'd like to show you a document from

```
  1    December 4, 1982, Exhibit 25, which is also the subject of a

  2    stipulation.

  3              (Exhibit 25 received into evidence.)

  4         Q.   (BY MR. RICHARD:)  And have you seen this?  It's a

  5    letter, three-page letter from Mr. Robert T. Bean, consulting

  6    geologist.  And it's to Zoyd Luce, who at this time is vice

  7    president, industrial relations.  Do you see that?

  8         A.   I do.

  9         Q.   And in -- I wanted to ask you before we get to the

 10    other topics.  If you could turn to page 2, evaluation of

 11    sumps.  Do you see in the middle of the page there, evaluation

 12    of sumps?

 13              MR. RICHARD:  If we can enlarge that.

 14              THE WITNESS:  I see it.

 15         Q.   (BY MR. RICHARD:)  And what sumps is he referring to

 16    here?  I'm sorry.  I should have probably started at page 1

 17    where he refers to sump at 317.  My apologies.

 18              Do you see Item 3 at page 1?

 19         A.   I do.

 20         Q.   Okay.  And what is the reference to 37,000 gallons?

 21         A.   Well, what it says -- just to get the full context

 22    of that No. 3 item that you're pointing out.  Mr. Bean is

 23    saying he's prepared this letter at the request -- at the

 24    request of Mr. Luce of Whittaker "after evaluation of all

 25    information obtained from the foregoing."  And he said -- then
```

09:37AM (line 5)
09:37AM (line 10)
09:37AM (line 15)
09:38AM (line 20)
09:38AM (line 25)

he lists three areas where he visited, which includes No. 3,

the sump at 317, about -- he says it's about a 37,000-gallon

capacity with a liner and dry box.

Q.   Okay.  And so with that background, if we could turn

09:38AM   to page 2, evaluation of those sumps.  And so he's -- he's

talking about the two sumps there.  Right?  And he refers to

Jim Jisa again.  Do you see that?

A.   Yes.

Q.   And you mentioned earlier that the sump at one point

09:39AM   did not have a liner and then it had a liner, and you described

some issues with the liner of the sump.  Can you tell us what a

liner of a sump or pond is?

A.   Sure.  It's a constructed use -- usually it's

plastic.  It could be clay or some impermeable soil but

09:39AM   generally a plastic material placed at the bottom to contain

the pond -- contain the water in the pond and prevent

percolation of the water to soils underneath.

Q.   Okay.  So you have the pond that we just saw was not

adequate for all the new uses and would overflow in heavy

09:40AM   rains.  But here, the memo says -- this letter from their

outside consultant, Mr. Bean, "According to Jim Jisa, there

have been liner breaks.  Unless the break occurred directly

above the drain, the hazardous wastewater would move

essentially straight down until it met a bed of low

09:40AM   permeability, such as clay or mud stone.  A perched groundwater

**UNITED STATES DISTRICT COURT**

body is probably already present overlying this bed,"

et cetera.

Can you explain what he's talking about there?

A.    Yes.  When he's talking about liner breaks, which

means to me failures or breaks of some sort in the liner -- and

I saw other -- mention of this in other documents.

And what Mr. Bean is saying, Mr. Bean being the

geologist they hired to study this situation, that if the --

that -- there was a drain underneath.  The dry box, my

understanding, is what they were calling it.  It's a drain that

was under the liner.  So if the break or the leak, the liner

was above that drain, then whatever leaked out of the pond

would have gone into the drain and been collected and not

gotten into the ground.

What Mr. Bean is saying here is that if it -- if it

didn't, that it would move essentially straight down.  Water

put on the surface of the ground or under the surface of the

ground, gravity will take it straight down.

And this -- there were solvents in this water in

this pond that was a solvent wastewater disposal area.  And

it -- the solvents are heavier than water.  They will make the

water go down at an even faster rate than they would if they

didn't contain the solvents.

So what he's saying is that the -- if there's a

break in the pond and it wasn't right where the drain was put

to pick it up, pick up a leak, that it would have migrated

directly down until it reached some impermeable soil, like a

clay, a clay being, you know, relatively impermeable.  The

water would hit that and pond on top of it, so to speak,

underground on top of the clay which could be a perched water

condition which he mentioned is -- in his next sentence.

        Q.    Well, yeah, thank you, sir.  Let's back up for a

minute.

              At page 1, he tells us -- he tells Mr. Luce why he

was hired.  Do you see the second sentence there at that first

paragraph, "The principal object of the reconnaissance was to

evaluate whether or not groundwater monitoring for hazardous

waste would be required," period, close quote.  Right?  Do you

see that?

        A.    I do.

        Q.    And then at page 2, the area that you were just

reading, he says, quote, "The wastewater would then move

downgradient in that aquifer.  In the case of both sumps, this

would almost certainly be in a westerly direction," period,

close quote.

              Can you tell us --

        A.    I'm sorry.  Where are you?

        Q.    Page 2.  Sorry.  Oh, I should have waited.  I'm

sorry.

              Do you see that?

1          THE COURT:  The screen shows it.

2          THE WITNESS:  Yes.  Okay.  I see it now.

3      Q.    (BY MR. RICHARD:)  Okay.  And you were just telling

4  us about how the liner breaks would result in this -- this

09:43AM  5  water containing hazardous material moving through the soil to

6  the aquifer; correct?

7      A.    Correct.  And what he's saying here it's going to

8  move downgradient in that aquifer.  So it would move vertically

9  from the surface or where it's released under the pond, go down

09:43AM  10  to the groundwater, and then migrate with the groundwater.

11     Q.    Okay.  And based on your experience, what would that

12  observation about hazardous waste moving through the soil to

13  the aquifer and then moving in a westerly direction, what would

14  that have to do with whether or not groundwater monitoring

09:44AM  15  should be put in place?

16     A.    Well, as I said when I first described the

17  regulation, if the area could be shown to potentially impact --

18  or actually impact or potentially impact surface water or

19  groundwater, that triggered the groundwater monitoring

09:44AM  20  requirement that I described with the minimum of the four

21  monitoring wells.

22     Q.    In your experience, what is groundwater monitoring?

23  What is the purpose of groundwater monitoring where you have

24  actual or even potential contamination?

09:44AM  25     A.    The purpose of groundwater monitoring, particularly

**UNITED STATES DISTRICT COURT**

in the context we're talking here, is to -- is to attempt to

understand if there is an impact on the quality of the

groundwater and, if so, to understand how -- how it got to be

contaminated, where the contamination came from, where it's

09:45AM  5   going to.

Q.    Well, what is groundwater monitoring?  What does

that mean?  How does that tell you --

A.    Do you mean how do you do it?

Q.    Just basically, what is it?

09:45AM  10   A.    Well, the -- the way you monitor the groundwater for

the purposes that I just described is you install wells in the

ground in -- at different elevations in groundwater that you

want to study, that -- and those wells allow you -- wells are

just pipes that are put in the ground.  And there are slots in

09:45AM  15   the pipes where the water is so the water can flow in.

You can collect a sample out of that well because

the water -- of the groundwater that flows into the well.  Then

you can analyze that -- you can analyze the sample to see if

there's chemical contamination of it.

09:45AM  20   And you can also -- when you have multiple wells,

you can measure the elevation of the water in the different

wells which gives you an indication of which way the

groundwater is flowing.

Q.    And in this case, why would the groundwater flowing

09:46AM  25   in a westerly direction be an issue, if you know?

```
 1              MR. BLUM:  Objection, Your Honor.  Vague as to time.
 2              MR. RICHARD:  I'll rephrase.
 3         Q.   (BY MR. RICHARD:)  At this time, when Mr. Bean is
 4    telling Whittaker that the hazardous wastewater is flowing down
 5    to the aquifer, which almost certainly is in a westerly
 6    direction, at that time, in December 1982, why would that
 7    information be important?
 8         A.   Well, as I said previously, the -- the regulations
 9    required one upgradient well and a minimum of four in total.
10    Knowing which way the groundwater likely flowed or almost
11    certainly flowed, as Mr. Bean put it, gives you the perspective
12    of where to place the monitoring wells to do the proper
13    monitoring that's required.
14         Q.   Okay.  And then he goes on to talk about the
15    potential for migration just below the portion we've
16    highlighted there.  Do you see that?
17         A.   I do.
18         Q.   And he refers to a health services memo, and he was
19    kind enough to quote from it.  It says, quote, "All or part of
20    the groundwater monitoring requirements of this document may be
21    waived if the owner or operator can demonstrate that there is a
22    low potential for migration of hazardous waste or hazardous
23    waste constituents from the facility via the uppermost aquifer
24    to water supply wells or to surface water," close quote.
25              Was that generally consistent with your
```

1    understanding of groundwater monitoring requirements at this

2    time?

3        A.    It is.

4        Q.    And so he identifies the basis on which one could

09:47AM  5    obtain a waiver.  He has been hired to evaluate whether or not

6    groundwater monitoring will be required.

7            And then can you read the paragraph at the bottom of

8    page 2 that begins "Unfortunately"?

9        A.    Yes.  And it then continues on to page 3.

09:48AM  10           "Unfortunately, however, there is almost certainly

11    the potential for migration of hazardous waste or hazardous

12    waste constituents from the facility to surface water.  Heavily

13    vegetated areas is present approximately 300 feet down-valley

14    to the west of the phosphorous sump.  According to Jim Jisa, a

09:48AM  15    small lake is present in this area most of the year.  Overflow

16    from this lake moves down a tributary to the west to

17    Placerita Creek and eventually to the Santa Clara River."

18        Q.    And then -- so that was talking about surface water,

19    the potential for surface water contamination.

09:48AM  20           Then he does talk about the potential for

21    groundwater contamination in the next sentence?

22        A.    He does.

23        Q.    And what does he say there?

24        A.    It says, "Analysis of hydrogeologic conditions" --

09:49AM  25    hydrogeologic is the conditions in the ground related to

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | groundwater flow -- "indicates that any hazardous wastewater |
| 2 | from the lower sump can be expected to percolate to the first |
| 3 | perched aquifer and then move underground down the small valley |
| 4 | to discharge into the lake.  Natural discharge of groundwater |
| 09:49AM 5 | in this manner keeps water in the lake." |
| 6 | Q.    And then does he refer in his conclusions to the |
| 7 | possibility of a more complete hydrogeologic investigation? |
| 8 | A.    He does. |
| 9 | Q.    And you're familiar with hydrogeologic |
| 09:49AM 10 | investigations, sir? |
| 11 | A.    I am. |
| 12 | Q.    And how is it you're familiar with what |
| 13 | hydrogeologic investigations are? |
| 14 | A.    I've been responsible for conducting them for over |
| 09:50AM 15 | 40 years. |
| 16 | Q.    Okay.  And so he describes that a more complete |
| 17 | hydrogeologic investigation would include test holes for water |
| 18 | levels and pumping tests to determine permeability, et cetera. |
| 19 | Do you see that? |
| 09:50AM 20 | A.    I do. |
| 21 | Q.    And he goes on to describe test holes and that those |
| 22 | could then serve for monitoring wells.  Do you see that? |
| 23 | A.    I do. |
| 24 | Q.    And then can you explain to us his conclusion that |
| 09:50AM 25 | begins "However"? |

**UNITED STATES DISTRICT COURT**

                1      A.    Yes.  He's -- first I'll read it, and then I'll

                2    explain it.

                3      Q.    Thank you.

                4      A.    Where are we?

09:50AM         5            "However" -- and obviously it's conclusion here, the

                6    second half of his paragraph 2 -- "since the results of a

                7    complete investigation would probably be negative as far as

                8    justifying a waiver on monitoring wells is concerned, such an

                9    investigation is not recommended."

09:51AM        10            Mr. Bean prepared this, as read early on in the

               11    memo, to determine whether or not there is a potential for

               12    groundwater -- or the need for groundwater monitoring.  What

               13    he's saying here is that if a complete investigation was to be

               14    undertaken -- and he describes the complete investigation

09:51AM        15    earlier in that paragraph -- that the results would probably be

               16    negative as far as justifying the waiver of monitoring.

               17            And as a result, he does not -- he recommends that

               18    the -- such an investigation not be conducted because he

               19    doesn't believe that it would provide the information that

09:51AM        20    would allow -- allow them -- allow Whittaker to get the waiver

               21    for the groundwater monitoring requirements.

               22      Q.    Okay.  And did you see any evidence that in this

               23    same time frame Whittaker, in fact, was seeking to avert

               24    groundwater -- avert or avoid groundwater monitoring?

09:52AM        25      A.    Yes.  Yes.

1          Q.    And if we could look at another document that is the

2    subject of a stipulation.  This is Exhibit 215, dated

3    December 22nd, 1982, another memo from Zoyd Luce.

4                 (Exhibit 215 received into evidence.)

09:52AM   5          Q.    (BY MR. RICHARD:)  And this is to Al Simmons, safety

6    director.  Do you see that?

7          A.    I do.

8          Q.    Was Mr. Simmons with Whittaker?

9          A.    Yes.

09:52AM  10          Q.    And he refers to a copy of a report by a geologist

11   hired to evaluate the possibility of groundwater monitoring and

12   the latest letter from the EPA on the subject.  And he goes on

13   to say, "At this point, I see little hope of averting

14   groundwater monitoring at Bermite," period, close quote.

09:53AM  15                 In what way did this memo from Mr. Luce from

16   December 1982, this Exhibit 215, impact the work you did in

17   this case?

18          A.    That Mr. Luce is passing on this information to

19   Mr. Simmons and is -- and concluding that there's little hope

09:53AM  20   they could avert this groundwater monitoring requirement that

21   they were hoping to get a waiver from.

22          Q.    Okay.  Eventually Whittaker did obtain groundwater

23   samples; is that right?

24          A.    Yes.

09:53AM  25          Q.    And did they have a well used for any purpose -- you

know, for pulling up water to use at the Whittaker Bermite site

for any period of time, as far as you know?

    A.   My understanding is there was at least one well used

for non-potable water supply on the property.

    Q.   And at some point in time, did that well experience

any type of contamination?

    A.   I believe there was contamination discovered in that

well in 1985.

    Q.   Okay.  If we could look at Exhibit 437, which is

also subject to a stipulation of the parties.

        (Exhibit 437 received into evidence.)

    Q.   (BY MR. RICHARD:)  This is a letter from the

California Regional Water Quality Control Board, November 15th,

1985, to the maintenance superintendent of the Bermite division

of Whittaker Corporation.  Do you see that?

    A.   Yes.

    Q.   Groundwater investigation studies.  Do you see that?

    A.   I do.

    Q.   And he says, "Recent groundwater sampling results of

your facility's water well have shown levels of organic

contamination above the State Department of Health Services

action levels."

        In what way did this document in this time period

impact the work you did in this case?

    A.   Well, it is a demonstration that there was

     1    groundwater contamination on the property and specifically

     2    calls out organics.  It doesn't say which organics, but it does

     3    identify organics.  So this paragraph raises my concern because

     4    it does show some groundwater contamination on the property.

09:55AM  5         Q.   And the California Regional Water Control Board goes

     6    on to request certain types of records.  Do you see those

     7    categories?

     8         A.   I do.

     9         Q.   And the first one is what?

09:55AM  10        A.   "Name and quantity of all chemicals used or stored

     11   in the facility," open paren, "(historical and current

     12   practices)," close paren.

     13        Q.   And in your experience, why would that information

     14   from Whittaker be important at this -- at this time?

09:56AM  15        A.   Well, the state is asking -- the State is aware --

     16   the State is the author of the letter -- that they're aware of

     17   the contamination in Whittaker's own supply well and gather --

     18   and this is a routine type of a follow-up, consistent with what

     19   I described, a site assessment, historical research,

09:56AM  20   yesterday -- to further investigate groundwater contamination

     21   at that facility.

     22        Q.   And the next category says, "Present and past waste

     23   disposal practices for organic liquids."  And what would that

     24   tell us, based on your experience, those records?

09:56AM  25        A.   Those records -- and again, this is classic

1    follow-up information for a site assessment -- is it will

2    inform whoever it's produced to of what practices there were

3    for the disposal waste -- waste, in this particular --

4    particularly organic liquids that would inform what it was

09:57AM  5    chemically, the waste or the liquid, where -- where it was

6    generated and where it was placed -- where it's placed when it

7    was disposed.

8        Q.   And did you see specific records -- again, the daily

9    or weekly or monthly operational logs that you talked about or

09:57AM  10   inventories, things of that nature, regarding the first and

11   second category of this request from the California Regional

12   Water Control Board from November 1985?

13       A.   You're asking if I've seen any documents that would

14   be responsive to No. 1 or No. 2?

09:58AM  15       Q.   Yes, sir.

16       A.   I have not seen such documents.

17       Q.   And did you see any evidence that at some point in

18   time after November 15th, 1985, Whittaker was cited for not

19   being able to provide those types of records to state or

09:58AM  20   federal environmental protection folks?

21       A.   I do believe such -- I am -- I recall such a

22   citation.

23       Q.   Okay.  Well, let's look at one of those.

24            How are we doing on time, Your Honor?

09:58AM  25            THE COURT:  Continue, please.

```
 1              MR. RICHARD:  Thank you.

 2         Q.    (BY MR. RICHARD:)  If we could look at Exhibit 1381,

 3    which is also the subject of a stipulation.

 4              This is a letter with an enclosed determination of

09:58AM  5    violation from June 4th, 1986.

 6              MR. BLUM:  Your Honor, this is up for I.D. only.

 7              THE COURT:  I can't hear you, Mr. Blum.

 8              MR. BLUM:  This was supposed to be for I.D. only.

 9              THE COURT:  All right.  So please take that off of

09:59AM 10    the screen.

11              And, Mr. Blum, when you address the Court, if you

12    would please make sure you're speaking into the microphone.

13              MR. BLUM:  Yes, sir.  Yes, sir.

14         Q.    (BY MR. RICHARD:)  Sir, is this one of the notices

09:59AM 15    of violation you believe you reviewed in this matter?

16         A.    It is.

17         Q.    And just very quickly, if you could refer to Count 5

18    regarding operating records.

19         A.    I would, but I'm not sure I have the document.  I --

09:59AM 20    you said it was 1318?

21         Q.    1381.

22         A.    Oh, 81.  Okay.  In either case, I don't have a tab

23    that's 1381.

24              MR. RICHARD:  Excuse me, Your Honor.

10:00AM 25              Okay.  We'll come back to it after the break,
```

**UNITED STATES DISTRICT COURT**

|     |                                                                                  |
| --- | -------------------------------------------------------------------------------- |
| 1   | Your Honor.                                                                       |
| 2   | Q.    (BY MR. RICHARD:)  Okay.  Moving on.                                        |
| 3   | At some point did you review documents regarding                                 |
| 4   | Whittaker's dealings with one of its consultants,                                 |

10:00AM

5   Wenck Associates?

6       A.    Yes.

7       Q.    And can you generally describe for us what you

8   reviewed in that regard?

9       A.    I reviewed -- I reviewed, I believe, some reports,

10:00AM  10  some correspondence that presented results of investigations

11  that Wenck -- an environmental consultant who did actually do

12  investigations at the site for Whittaker.  I reviewed

13  documentation, reports, correspondence that documented some of

14  that work.

10:01AM  15      Q.    Okay.  If we could look at one of those documents,

16  Exhibit 445.

17          MR. RICHARD:  It's already in evidence, Your Honor,

18  and it's the subject of a stipulation.

19      Q.    (BY MR. RICHARD:)  Now, this is a memo dated

10:01AM  20  June 22nd, 1987, from Wenck Associates to Whittaker

21  Corporation.  Do you see that?

22      A.    I do.

23      Q.    And this -- do you have an understanding as to what

24  these pages -- what these pages are?

10:01AM  25      A.    It's -- it's a document that I believe Mr. Sorsher

1    refers to as a -- the mystery memo.  It's the documentation of

2    some of the investigation of landfills on the property.

3         Q.    Okay.  And you're familiar with Mr. -- with who

4    Mr. Sorsher is?

10:02AM   5         A.    Yes.  And who he was.  He was a -- he was an

6    official with the DTSC who was responsible for the oversight of

7    the -- the investigation work being done at the site.

8         Q.    Did you ever read any of his testimony?

9         A.    Yes.

10:02AM  10         Q.    Including deposition?

11         A.    Yes.

12         Q.    Okay.  Do you have an understanding as to when this

13    mystery memo was provided to Mr. Sorsher?

14         A.    My recollection is that it was provided to

10:02AM  15    Mr. Sorsher anonymously in 1991.

16         Q.    Okay.  So in what way -- and let's start with the --

17    it's talking about landfills.  The subject is Investigation of

18    Landfills on Bermite Facility through June 19th, 1987.  Do you

19    see that?

10:02AM  20         A.    I do.

21         Q.    And he talks about a number of landfills, quote,

22    "have been investigated and removed from the Bermite facility.

23    There are others that have been investigated and have not been

24    removed.  Further areas have been identified as possible

10:03AM  25    landfill sites and require investigation."

1       So just seeing that description of we have some

2  landfills that have been removed, some that have been

3  investigated, and some that still need to be investigated, in

4  your experience, is that a kind of -- a common state of affairs

10:03AM  5  at a site that has contamination issues?

6       THE COURT:  Why don't you rephrase your question.

7       MR. RICHARD:  Sure.

8       Q.   (BY MR. RICHARD:)  In the process of site

9  investigations you've conducted, is it fair to say you've

10:03AM  10  learned things over time?

11       A.   Correct.

12       Q.   Okay.  And in this case, the folks that had been

13  hired by Whittaker identified landfills have been found in the

14  bottom and on the sides of valleys and embankments.  Do you see

10:04AM  15  that?

16       A.   I do.

17       Q.   And he describes the use of the landfills evidently

18  was anywhere from one day to possibly 40 years or more.  And

19  then he goes into the next paragraph, if we can enlarge that.

10:04AM  20       "The materials that have been found in the landfills

21  have varied from inert metal scrap" -- we talked about that

22  earlier -- "to liquid and solid hazardous wastes."

23       And so I want to stop you and ask you, for the site

24  investigations you've been involved in, once you or a

10:04AM  25  consultant who's investigating the property identifies the

presence of liquid and solid waste materials in landfills, is that a significant step in the course of a site assessment?

A.    It's a significant finding.

Q.    And why -- why would finding liquid and solid hazardous waste in landfills be a significant finding?

A.    Well, in doing a site investigation or site assessment, as I was describing yesterday, one of the objectives at least is to identify impacts from waste materials or other -- or other sources of contamination.  Encountering liquid and solid hazardous wastes as described here would be a significant finding, indicating that such materials had been disposed at that location.

Q.    And just sticking on that point for a minute in terms of what Wenck was reporting here.  If you go to page 2 in the middle of the page of Exhibit 445.  There's a paragraph that begins "The percentage of hazardous wastes..." do you have that?

A.    I do.

Q.    So he's talking about "The percentage of hazardous wastes that have been found in each landfill site has varied from an estimated 1 percent to approximately 85 percent."  He goes on -- first of all, let me stop you there.

Would that be a significant finding, in your experience, in the course of a site assessment?

A.    It would be.

1    Q.    Why is that?

2    A.    What I -- I previously testified that finding the

3    waste would be a significant finding.  The next thing you want

4    to know when you find the waste is how significant is it to the

10:06AM    5    impact on the property?  So knowing the -- the contents of it

6    and the magnitude of it is very important here being up to

7    approximately 85 percent of the waste in some of these -- or

8    85 percent of being waste in some of these locations is

9    significant.

10:07AM   10    Q.    And Whittaker's consultant in this memo from June

11    1987 goes on to note, "Those materials that have been

12    determined to be hazardous have invariably been found in intact

13    drums or deteriorated broken drums or metal containers."

14         Would that information be an important finding in a

10:07AM   15    site assessment, in your experience?

16    A.    Yes, it would.

17    Q.    And why is this?

18    A.    Well, one of the things in trying to understand a

19    site assessment or investigation like this is -- again, is

10:07AM   20    what's the source -- is there a source of waste material that

21    could be contaminating the environment and what is the nature

22    of that source?

23         Ultimately, you're trying to figure out if there's a

24    problem that needs to be fixed and how to fix it.  So we have

10:07AM   25    to -- need to understand what it is if we're going to try to

1    fix it.

2         Q.    And he goes on in this memo from June 1987,

3    Exhibit 445, quote, "On average, about five drums per day have

4    been discovered over the last month," period, close quote.

10:08AM    5         What, if anything, does that tell you, sir?

6         A.    That tells me that -- I don't know if they worked

7    every day in the month or they were working five days a week.

8    But if it was every day that they had on average had recovered

9    about 150 drums in a one-month period.

10:08AM    10         Q.    And when it says "discovered," does that indicate to

11    you whether it was above ground or below ground?

12              MR. BLUM:  Vague, Your Honor.  It also has to be --

13    speculative.

14              MR. RICHARD:  I'll rephrase.

10:08AM    15         Q.    (BY MR. RICHARD:)  In your experience with the site

16    assessment of landfills, do you attach any significance to the

17    description here of drums being discovered?

18         A.    They're being discovered -- they could be totally

19    underground, partially underground, or on the surface of -- so

10:09AM    20    it just -- they haven't even been discovered.  If it's in a

21    remote location, it could have been just discovered.  It

22    doesn't say to me that they were buried.

23         Q.    Okay.  And Mr. Wenck was, in his conclusion, talking

24    about further investigation.  Do you see that at the bottom of

10:09AM    25    page 2, "further investigation and characterization of the

```
 1   known and potential landfills as necessary"?
 2               MR. RICHARD:  Can we enlarge that?
 3               THE WITNESS:  Yes, I see that.
 4        Q.    (BY MR. RICHARD:)  And again, in your experience
 5   with the site assessment, once hazardous materials have been
 6   identified in some areas of a site, does a site assessment
 7   consultant or environmental specialist typically recommend
 8   further investigation?
 9               MR. BLUM:  Vague as to when.
10               THE COURT:  Rephrase.
11               MR. RICHARD:  Sure.
12        Q.    (BY MR. RICHARD:)  And you were involved in site
13   investigations back in the '80s, sir?
14        A.    I was.
15        Q.    I don't mean -- okay.
16               And at that time, say, 1987, in your experience,
17   when a site investigation of a large thousand-acre site
18   identified hazardous materials in some landfills, would the
19   site assessment continue further investigation and
20   characterization of the site?
21        A.    Yes.  As I described the process yesterday, this
22   would be one step.  It would -- an important step.  It found
23   somewhere on the property where there was waste disposed.  The
24   next step is to figure out the extent of that and what impact
25   it has had beyond the boundaries of the landfill on soil and
```

10:09AM (line 5)
10:10AM (line 10)
10:10AM (line 15)
10:10AM (line 20)
10:10AM (line 25)

1    groundwater and other environmental media.

2        Q.    And this memo from Mr. -- or from Wenck Associates

3    goes on to refer to something called -- "if the facility is to

4    be closed clean."  Do you see that?  "The removal of all" --

10:11AM   5    "The removal of all known landfill wastes is necessary if the

6    facility is to be closed clean," period, close quote.

7              Do you have any experience with clean closures under

8    RCRA?

9              MR. BLUM:  Again -- never mind.

10:11AM  10              THE WITNESS:  I do.

11        Q.    (BY MR. RICHARD:)  And can you explain for the jury

12    what a -- what it means to have a clean closure?

13              MR. BLUM:  Vague as to when.

14              THE COURT:  Please clarify.

10:11AM  15              MR. RICHARD:  Sure.

16        Q.    (BY MR. RICHARD:)  In your experience, going back

17    over 40 years, Dr. Hughto, beginning with your -- well, can you

18    tell us in this time frame, in the '80s, say, 1987, in general

19    what it meant to obtain a clean closure under RCRA?

10:12AM  20        A.    Again, we are going back quite a few years here.  My

21    recollection would be the clean closure for landfill material

22    under RCRA would have been to remove the landfill material.

23        Q.    Okay.

24        A.    And there were provisions of what would happen if

10:12AM  25    you couldn't remove it all for whatever reason.

1    Q.    And can -- he goes on to say, "When the RFA," he's

2    referring to the RCRA facility assessment mentioned up above --

3    in the middle of this paragraph, in his conclusion of

4    Exhibit 445, "When the RFA identifies landfills left on the

10:12AM  5  property and if the percentages of hazardous waste found so far

6    are indicative of the remaining known and unknown landfills,

7    those landfills will be treated as hazardous wastes and will be

8    declared RCRA units," period, close quote.

9         Can you explain what a RCRA unit is, sir, or was at

10:13AM 10  this time?

11   A.    Well, a RCRA unit is a location portion of a site or

12   operation.  I believe he's talking about a solid waste

13   management unit that was discussed yesterday, had the

14   abbreviations SWMUs, that is -- we see an isolated operation or

10:13AM 15  condition of -- that may have that environmental impact.

16   Q.    And based on the materials you reviewed in this case

17   for this site and based on your experience, was it a reasonable

18   conclusion to reach that as Mr. -- as the memo from

19   Wenck Associates states, quote, "If the cost of characterizing

10:14AM 20  the present RCRA units on the facilities is any indication, the

21   cost of the EPA required investigation of landfills will be

22   tremendous," period, close quote.

23        In your experience, was that a reasonable assessment

24   at the time, that the costs of an investigation, if required by

10:14AM 25  the EPA, would be tremendous?

```
 1        A.   I -- I can tell you what my experience is, but I

 2   don't know what he means by "tremendous."  But it would be

 3   expensive.

 4             MR. BLUM:  I would move -- he's answered the

 5   question, Your Honor.

 6             THE COURT:  Remember the --

 7             MR. BLUM:  No, he doesn't know what he meant.

 8             THE COURT:  Mr. Blum, remember what I said.

 9   Objection, legal grounds, the --

10             MR. BLUM:  Beyond the scope of the question.

11             THE COURT:  The objection is sustained.  His

12   response is stricken.

13             MR. RICHARD:  Sure.  Let me rephrase.

14        Q.   (BY MR. RICHARD:)  In your experience, could EPA

15   investigations of a site of this magnitude end up costing quite

16   a bit?

17        A.   My experience, if EPA took the lead on investigating

18   this site, that it would have been very experience, as I

19   consider very expensive to perform the monitoring.

20        Q.   And in your experience, if the EPA asked questions

21   about a facility's current and past landfills, is this the type

22   of information that you would expect to be provided to the EPA

23   from the consultant, that is, findings of hazardous waste in

24   numerous landfills?

25        A.   I don't understand the question.
```

         1          Q.    Sure.

         2                Should Whittaker have shared this information with

         3    the EPA in response to the EPA's questions?

         4          A.    Which EPA question are you referring to?

10:16AM  5          Q.    Sure.

         6                Are you familiar with Part A application?

         7          A.    You said Part A application?

         8          Q.    Yes.

         9          A.    Yes.

10:16AM  10         Q.    And in general, can you explain what that is?

         11         A.    It is a RCRA applicant, somebody's going to enter

         12   the RCRA program because they own or operate a facility subject

         13   to the RCRA regulations, initiates that process by filling out

         14   what's -- it's an EPA form called Part A, which they identify

10:16AM  15   the types of waste materials that are handled, generated on a

         16   property.

         17         Q.    Okay.  And just to move this along.  I'm just going

         18   to ask you to assume that Mr. Sorsher talked about requests

         19   from 1988 from the EPA about current and past landfills.

10:16AM  20                Well, let me ask you this.  You're familiar with the

         21   Part A application process that sometimes additional questions

         22   from the -- the regulators can be put to the owner or operator

         23   of the site?

         24         A.    Yes.

10:17AM  25         Q.    Okay.  And my question is:  Would you expect that,

```
                   in response to questions and the Part A process, questions from
                   the EPA about landfills and hazardous substances, that the
                   information we've just been talking about would be the type of
                   information that would be provided to the EPA in the course of
10:17AM            that process?
                           MR. BLUM:  Speculation.  No foundation.
                           THE COURT:  Sustained as vague.
                           MR. RICHARD:  Fair enough, Your Honor.
                   Q.     (BY MR. RICHARD:)  Let me -- let me have you look at
10:17AM            page 5 of Exhibit 445 so we can specifically review the
                   information regarding landfills from 1987.  Do you see the
                   reference there to "landfills that have been removed"?
                   A.     I do.
                   Q.     And did you see documentation that Whittaker had
10:18AM            notified the State or the EPA, before it removed those
                   landfills, that it was intending to do so?
                   A.     You mean on this page?
                   Q.     In any of the materials you reviewed in this case,
                   do you know whether those landfills were -- let's take 314,
10:18AM            Canyon landfill.  Do you know whether that was closed with
                   advice and knowledge of the EPA?
                   A.     It's my understanding from this memo that these --
                   this is the list of those that had been -- at the time this
                   memo was prepared, there were different categories.  And it
10:18AM            says some of the landfills had been removed and that this was
```

UNITED STATES DISTRICT COURT

1  the listing of those that had been removed during the

2  investigation process.

3      Q.   Okay.  And do you know whether this memo that we've

4  been talking about was provided to the EPA before 1991?

10:19AM  5      A.   It -- it's my understanding that this memo had not

6  been provided to DTSC until 1991.

7      Q.   And did that impact -- that fact impact any of the

8  work you did in this case?

9      A.   Yes.

10:19AM  10      Q.   And can you explain that?

11      A.   That the -- my opinion that the -- that Whittaker

12  was not forthcoming and did not fully disclose their waste

13  disposal practices to the regulatory agencies I believe is

14  supported by information in this exhibit.

10:19AM  15      Q.   Okay.  And then under landfills investigated but not

16  removed as of June 1987, we see several landfills identified,

17  beginning with the burn pit.  And my question is:  What -- in

18  general, what constitutes, in your experience, a landfill?

19      MR. BLUM:  Objection, Your Honor.  It is vague as to

10:20AM  20  what is meant in this document.

21      THE COURT:  Rephrase your question.

22      MR. RICHARD:  Sure.

23      Q.   (BY MR. RICHARD:)  Setting aside this document, sir,

24  in your experience, are you familiar with the term "landfill"?

10:20AM  25      A.   I am.

```
 1          Q.    Okay.  And in your experience, what does that term
 2   mean to environmental professionals such as yourself?
 3                MR. BLUM:  Vague as to time, Your Honor.
 4                THE COURT:  Overruled.
 5                You can answer.
 6                THE WITNESS:  I addressed this yesterday early on
 7   that -- my experience with landfills.  And my definition, if
 8   you will, would be it's an area where waste materials or
 9   residual materials are stored -- or it was -- not stored but
10   disposed.
11          Q.    (BY MR. RICHARD:)  Okay.  And so based on the
12   materials you reviewed in this case, including the data that
13   you've talked to us about, were these landfills based on your
14   understanding of the word "landfill," the burn pit, the
15   Hula Bowl, East Fork?
16          A.    Are you asking if I think these five items here in
17   that category would be landfills in my definition?
18          Q.    Yes, sir.
19          A.    Yes.
20          Q.    Okay.  And I wanted to ask you about the East Fork
21   landfill.  If you can turn to page 6 of Exhibit 445.
22                Do you see the reference to East Fork?
23          A.    Yes.
24          Q.    And then under Comments, "This landfill was one of
25   the highest ratio of waste to fill-soil of those investigated.
```

10:20AM (line 5)
10:21AM (line 10)
10:21AM (line 15)
10:21AM (line 20)
10:22AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   It is estimated that up to 85 percent of the material is waste.

 2   Some organic vapors were detected in the initial cut."

 3            What does that tell us?  Why would that information

 4   be important to you in the work you did in this case?

 5       A.   What it tells us is there's a landfill that's

 6   30,000 cubic yards, pretty good size piece of earth, and that

 7   it is -- that 85 percent of it, roughly, is waste material,

 8   which is quite a bit of waste material.

 9            Just as a reference, an 18-wheel dump truck is about

10   20 cubic yards.  And here, we have 85 percent of 30,000.  So

11   it's a -- it's a lot of stuff.

12            And that we have a large volume of material that was

13   landfilled.  And during the investigation, the investigators

14   measured organic vapors.  There are machines you can take in

15   the field when you're doing investigations that you can hold in

16   areas where you're excavating or performing borings or

17   collecting soil samples to evaluate -- that will measure

18   organic contaminants like PCE and TCE and other organics and

19   that it appears that -- that that occurred during the

20   investigation of the East Fork landfill.

21       Q.   And with respect to samples, when you say samples

22   are taken, generally what does that refer to when you're

23   talking about soil?  What happens to those samples?

24       A.   What happens after you collect them?

25       Q.   Yes.
```

**UNITED STATES DISTRICT COURT**

         A.    Samples -- soil samples in general -- to understand

the purpose for collecting them but, generally speaking, a

couple of things happen.

         One is you do a physical characterization.  You say,

oh, this is sand, this is clay, glacial till, whatever kind of

soil it happens to be.  You do a physical examination.  You say

what is it?  Is this just soil?  Or is it soil with waste

material in it?  Is it domestic trash?  Whatever it is.  And

then frequently the sample would be sent to a laboratory for

analysis.

         Q.    Okay.  And so if you could look at the next page,

page 8 of Exhibit 445, talking about another one of these

areas.  This is referred to as Water Tower 2, 20,000 cubic

yards.  Do you see that?

         A.    I do.

         Q.    And my question is:  What's an OVA?  It says --

after the Volume, it says OVA, no readings taken yet.

         A.    An OVA, that's the abbreviation for an organic vapor

analyzer.  It's the detection device that I just mentioned

where you can in realtime measure organic contents of certain

organic compounds in vapors or in the air.

         Q.    Okay.  And under the Comments, like the third

sentence says, quote, "Some intact drums were discovered" --

well, first let's begin.  There were three backhoe trenches dug

in this landfill.  Are you familiar with what a backhoe trench

1    is?

2         A.    Yes.

3         Q.    What does it mean to dig a backhoe trench?

4         A.    A backhoe trench is a common way of characterizing a

10:25AM  5    landfill area or areas of soil contamination or suspected soil

6    contamination.  And it's pretty simple.  It's just taking a

7    backhoe and excavating a trench through the area, sometimes

8    multiple trenches in different directions, to try to get a

9    handle on -- on -- or to be able to characterize what it is

10:26AM 10   your objective is in that particular investigation.

11             Often it's just to figure out the extent of the

12   waste.  It's a pretty -- pretty straightforward way to figure

13   out the extent of, say, a landfill area because you can dig a

14   hole and look and see.

10:26AM 15        Q.    And in this case, he's describing that when they dug

16   those trenches with three backhoes -- or I'm sorry, three

17   trenches with a backhoe, quote, "Some intact drums were

18   discovered."  Do you see that?

19        A.    I do.

10:26AM 20        Q.    Then what does that tell us?

21        A.    Well, in the course of digging these trenches, they

22   encountered intact drums, drums that still had their shape,

23   didn't -- hadn't deteriorated or rusted through.

24        Q.    And then he concludes, after he talks about the

10:26AM 25   large surface material was removed and the trenches were then

1    filled back in, "no sampling of materials is planned."  Do you

2    see that?

3         A.    I do.

4         Q.    And does that indicate that in this area they

5    decided not to take any samples and have those tested further?

6         A.    The sentence before that says, "It is planned to try

7    some more backhoe pits and take OVA readings."  So they're

8    going to continue the -- the trenches and take OVA readings.

9    Right now, it says "No sampling of materials is planned."  That

10   additional excavation in performing the OVA readings may change

11   that.

12        Q.    Okay.  So Wenck in June 1987, is it fair to say

13   they're in the middle of a site assessment?

14        A.    Yes.

15        Q.    And they have further activities planned?

16        A.    Yes.

17        Q.    Did you see any evidence that the executives of

18   Whittaker decided to pare back, cut back on the scope of that

19   site assessment?

20        A.    I saw documentation of paring back on certain

21   activities related to landfills.  I'm not sure it was the

22   investigation.

23        Q.    Okay.

24              THE COURT:  We're actually going to break at this

25   point.

1         So it is now almost 10:30.  We're going to break

2  until 10:45.

3         Please remember not to speak about the case, the

4  people, or the subject matter involved.  Continue to keep an

10:28AM  5  open mind.

6         Leave your notebooks behind, and Mr. Cruz will

7  direct you.

8         See you back in 15 or so minutes.

9         THE COURTROOM DEPUTY:  All rise for the jury,

10:28AM  10  please.

11         (Out of the presence of the jury:)

12         THE COURT:  And please be seated.

13         And, Dr. Hughto, I'm directing that you leave the

14  courtroom at this time, please.

10:29AM  15         THE WITNESS:  Okay.

16         THE COURT:  And I do want to -- I do want to return

17  to the issue of the findings and conclusions just to make sure

18  I understand better the scope of the issue.

19         And so -- and, Mr. Blum, you can take to the

10:29AM  20  lectern, please.

21         I've had a chance to review the filing this morning

22  fairly briefly, as I've been trying to pay attention to the

23  evidence.  And there are some highlighted portions of the

24  findings.  And I don't intend to go through each of them.  Time

10:30AM  25  won't permit, and we do need to take a break, including the

1    Court.

2           So, first of all, with regard to references to

3    depositions and declarations and other evidence in the

4    findings, do you have any of that information?  And I'm

10:30AM   5    referring to the cited evidence where there are highlighted

6    information that apparently you intend to cross-examine

7    Dr. Hughto on.

8           MR. BLUM:  I don't think we have -- most of it we do

9    not -- overwhelming amount we do not have.

10:31AM  10           THE COURT:  All right.  So, first of all, fairly

11    clearly you are free to use the actual evidence.  And I will

12    hear from Mr. Richard in a moment in case there is disputes.

13           But as a first-level proposition is that there's

14    citation to evidence.  And so where there's citation to

10:31AM  15    evidence, rely upon the evidence where you have the evidence.

16           Second level is -- and maybe this should have come

17    first -- is that you're certainly free, as I suspect you would

18    do, to distinguish between not having seen evidence or

19    documents versus the conclusion to be drawn that that evidence

10:31AM  20    doesn't or never existed or was somehow improperly destroyed,

21    which I did not intend to foreclose.  And that, it seems to me,

22    largely deals with the issue that you have raised with the

23    Court.

24           Were you intending to go through the actual findings

10:32AM  25    themselves and refer to them as findings by a previous judge?

1    MR. BLUM:  No.  Your Honor, what I wanted to do,

2  because he did not -- first of all, it's unclear whether he's

3  seen the findings.  He testified in his deposition that he was

4  given all of the documents relied upon by Mr. Dawson, which --

10:32AM  5  which would have included the findings, but then the findings

6  aren't listed in his rebuttal report on things that he's

7  reviewed.  So -- and he wasn't sure one way or another whether

8  or not he's seen them.  He said they were familiar, but he

9  wasn't sure.

10:32AM  10    So to get around that issue, we do know that he has

11  seen citations from the findings when he reviewed Mr. Dawson's

12  report which quoted certain portions.  And I was going to limit

13  my examination of him to things that I know he's seen, which

14  would be those portions cited in Mr. Dawson's report.

10:33AM  15    THE COURT:  Do you intend to go through all of these

16  highlighted portions of the findings and conclusions?

17    MR. BLUM:  Your Honor, no.  And the only caveat I

18  would make is if he changes his mind and says, yes, I've seen

19  them and I relied on them.  Then I would go over most of them

10:33AM  20  but not all of them because a lot of them were done just

21  because better include it than not because I know I would only

22  be limited to what I stated.

23    THE COURT:  Tell me why you need to do more than

24  what I have suggested, which is to just clarify with Dr. Hughto

10:33AM  25  that when he says he hasn't seen it, it doesn't mean it doesn't

exist, it never existed, it just hasn't been presented to him,

and then asking further about how long ago these documents

would have existed, assuming they do exist?  I haven't

articulated that properly, but you get the point.

10:34AM   MR. BLUM:  I do, Your Honor.

THE COURT:  And so I've not heard Dr. Hughto really

step very far to say that these documents clearly never

existed.  I mean, he's been fairly careful, it seems to me, to

say he has not been provided with, he has not seen.  And it

10:34AM  would appear to me that there is a fair response to that along

the lines that I have suggested.

So tell me why you need more.

MR. BLUM:  Your Honor, for what the -- for what the

testimony is as of now, I don't.  I'm going to be real frank

10:34AM  with the Court.

But the part where -- this was in his report -- and

I'm assuming it's going to come in this afternoon -- is when he

starts talking about the contracts and whether or not

Whittaker, in performing the services, performed it consistent

10:35AM  with the DOD contracts, for instance, the burn pits.

THE COURT:  Let me just stop this because we're

running a little late into the -- into the recess, and I may

have a procedural way to address the concern that you have.

So right now, it appears to me that you're

10:35AM  satisfied, based upon what has come in so far, that you could

1    handle it at the general level that I just suggested.

2              MR. BLUM:  Yes, sir.

3              THE COURT:  If it turns out that in the afternoon

4    that Dr. Hughto takes a step further and goes into substance

10:35AM  5   and suggests that certain documents don't exist when there's

6    reason to believe that they do exist, I will give you an

7    opportunity to persuade the Court that I should allow you to --

8    I'll allow in certain evidence through your own expert.  I'm

9    assuming you have an expert, Dr. Hokkanen or someone else.

10:36AM  10             MR. BLUM:  Mr. Dawson.

11             THE COURT:  Mr. Dawson, rather, who would be able to

12   sponsor this type of information.

13             MR. BLUM:  Yes, sir.

14             THE COURT:  All right.  Is there any reason why that

10:36AM  15  procedure would prejudice you?

16             MR. BLUM:  Nope.

17             THE COURT:  All right.  Mr. Blum?  I'm sorry.  I'm

18   looking at you, Mr. Richard.  Mr. Richard.

19             MR. RICHARD:  We're headed down a dangerous path

10:36AM  20  here because --

21             THE COURT:  Before we go into substance, I'm just

22   asking whether procedurally you -- I'm assuming you have no

23   objection to him -- in my view, properly cross-examining

24   Dr. Hughto about what he means when he says that he hasn't seen

10:36AM  25  documents.

**UNITED STATES DISTRICT COURT**

1          MR. RICHARD:  Of course, Your Honor.

2          The mischief here is twofold.  One, Your Honor's

3    made rulings on Mr. Dawson in the scope of his testimony as to

4    his first two opinions.  What I'm hearing is that Whittaker's

5    going to attempt to resuscitate those opinions by showing the

6    excluded portions of Mr. Dawson's report.

7          THE COURT:  No, let me just stop you because maybe

8    I -- I wasn't clear or maybe I'm not understanding you.

9          I'm not suggesting to you that I'm going to allow

10   any of this evidence in of the findings and conclusions.  I've

11   simply given Mr. Blum a procedural avenue in the event that, in

12   my view, Dr. Hughto has essentially opened the door where he

13   has suggested something that is factually not true and that

14   is -- can be ascertained from the findings and conclusions.

15         You'll have an opportunity to persuade me that

16   that's not the case or that, even if it is, potentially there's

17   a 403 reason why I should nonetheless stand pat and keep the

18   findings and the conclusions out.

19         So you're not prejudiced, it seems to me.  I'm just

20   simply setting up a process in the event that this comes out.

21         I would suggest to you in the short amount of time

22   remaining that you perhaps have a conversation with Dr. Hughto

23   about this issue to make sure that he doesn't inadvertently

24   walk into something that no one intended for him to walk into.

25         We're in recess until 10:45.

**UNITED STATES DISTRICT COURT**

|  |  |  |
|---|---|---|
|  | 1 | (Break taken.) |
|  | 2 | (In the presence of the jury:) |
|  | 3 | THE COURT:  We are back on the record in the trial |
|  | 4 | matter with all present who were present before the break, |
| 10:50AM | 5 | including the jury, and Dr. Hughto who remains on the witness |
|  | 6 | stand under oath. |
|  | 7 | And you may continue with your direct examination. |
|  | 8 | MR. RICHARD:  Thank you very much, Your Honor. |
|  | 9 | Q.    (BY MR. RICHARD:)  I would like to show you, sir, |
| 10:51AM | 10 | Exhibit 448.  It's been previously stipulated to. |
|  | 11 | (Exhibit 448 for identification.) |
|  | 12 | Q.    (BY MR. RICHARD:)  And this is a memo from |
|  | 13 | Christopher F. Thompson.  Do you see that up top? |
|  | 14 | MR. RICHARD:  Can you enlarge that? |
| 10:51AM | 15 | THE WITNESS:  I do. |
|  | 16 | Q.    (BY MR. RICHARD:)  And who is Mr. Thompson?  Who is |
|  | 17 | he with? |
|  | 18 | A.    Whittaker. |
|  | 19 | Q.    Do you think he was with an outside consulting firm, |
| 10:51AM | 20 | sir? |
|  | 21 | A.    Oh, actually, I was mistaken.  He was with Wenck |
|  | 22 | consultants. |
|  | 23 | Q.    Okay.  Thank you. |
|  | 24 | And here -- and this is one of the documents you |
| 10:51AM | 25 | reviewed in the course of your work in this case? |

**UNITED STATES DISTRICT COURT**

1        A.    It is.

2        Q.    And this particular document refers to a meeting of

3   June 17th, 1987.  Do you see that?

4        A.    I do.

10:51AM  5        Q.    And do you know who the folks are that are listed,

6   Gordon Louttit -- do you know who that was?

7        A.    I believe all four of these people are -- were

8   Whittaker employees.

9        Q.    And he says, quote, "The purpose of this meeting was

10:52AM 10   to discuss the recently compiled estimated cost to complete

11   closure for the Bermite facility."  Do you see that?

12        A.    I do.

13        Q.    And then he goes on and he describes how long the

14   meeting was and says, quote, "The net result of the meeting was

10:52AM 15   that the total cost for the closure activities for all RCRA,

16   non-RCRA, and other projects was pared down from a recently

17   estimated 1.8 million to approximately $636,000," period, close

18   quote.

19             And my first question is:  Did you see evidence as

10:53AM 20   to whether there had been -- what it was that explained the

21   paring down from the 1.8 million to the $636,000?

22        A.    I believe the -- the memo goes on to describe some

23   of the proposed actions or assumptions that went into that

24   change in the cost estimate.

10:53AM 25        Q.    Okay.  And let's look at some of those.

**UNITED STATES DISTRICT COURT**

1          So the first one is to Joe.  That's Joe Alibrandi.

2     Do you know who he was with -- with Whittaker?

3          A.    I believe he was the president at the time.

4          Q.    And it says, "Joe feels it is not necessary to sift

5     the landfills to the degree we have been presently.  He feels

6     we should only remove the large obvious materials and leave the

7     others," period, close quote.

8          And did that have any impact, those two sentences I

9     just read, referring to something that the president of

10    Whittaker was advising in June 1987?  Did that have any impact

11    on the work you did in this case?

12         A.    Well, it could be one explanation of how the -- if

13    this was to be implemented, how the cost would change.  You

14    will no longer be sifting landfills and dealing with all

15    material.  It's just getting rid of the large materials.

16         Q.    And from the perspective of an environmental

17    professional, would that present an issue?

18         A.    Yes, it would.

19         Q.    And why is that?

20         A.    The -- what -- the purpose for being out there is to

21    identify potential sources of contamination and the extent of

22    contamination and to mitigate the damages that the sources

23    would -- would cause.

24         If you only take out the big stuff and you leave the

25    rest of the material, the rest of the material could be waste

material.  It could be highly contaminated and could continue
to cause soil and groundwater contamination even though you got
rid of the large obvious materials.

     Q.    Okay.  And would that approach have an impact on a
complete characterization of the extent of contamination at a
site?

                MR. BLUM:  Objection.  Speculation.

                THE COURT:  Sustained as phrased.

     Q.    (BY MR. RICHARD:)  Okay.  Thank you.

           What does it mean to have a complete
characterization of a site of suspected and actual hazardous
contamination?  What does the word "characterization" mean in
that context?

     A.    Complete -- are you reading from the document?

     Q.    No, I'm just asking you.

     A.    General?

           A complete characterization would be performing the
activities necessary to fully characterize the degree and
extent of contamination and the sources of the contamination
and the natural environmental factors that -- like the types of
soils you have and depths to groundwater, flow of groundwater,
things -- the natural environment that could be impacted and
would be necessary to characterize the impacts.

     Q.    And at a site where Wenck Associates in a memo dated
the same date, June 22nd, 1987, identified known and unknown

```
 1      landfills with hazardous substances, would an approach in that

 2      context, some known landfills, some unknown landfills but the

 3      detection of hazardous substances, would the approach described

 4      by the president of Whittaker be consistent with a complete

 5      characterization of the site as you've just described?

 6               MR. BLUM:  Vague.  Speculative.

 7               THE COURT:  Overruled.

 8               You may answer.

 9               THE WITNESS:  You could characterize the site and

10      then change -- what I understand that Joe is recommending here

11      is only taking, like, big things and leaving a lot of waste

12      behind.  You could characterize that, meaning define the degree

13      and extent and understand what it is, and still leave it there.

14      So you could characterize it but not mitigate the damage.

15          Q.   (BY MR. RICHARD:)  I see.

16               And did you see evidence that after June 22, 1987,

17      they attempted to mitigate costs?  Well, strike that.

18               I'll refer you to paragraph 2 where there's a

19      reference to the first sentence.  "Joe feels that it is not

20      necessary to remove the quantity of material that we have been

21      removing from the different landfills.  He feels we should

22      investigate with the backhoe the landfills the way in which we

23      have been doing, take photographs of the materials that is

24      found, remove the main large materials and any drums or

25      suspected hazardous materials, take OVA," et cetera, "and
```

The timestamps in the left margin are: 10:56AM (line 5), 10:56AM (line 10), 10:57AM (line 15), 10:57AM (line 20), 10:57AM (line 25).

**UNITED STATES DISTRICT COURT**

1    readings of the backhoe pits that are dug and, once all this is

2    done, fill those holes back in and then leave the landfill as

3    is."

4           Would leaving the landfill as is remove any

10:58AM  5    remaining hazardous substances that were not just large

6    materials?

7        A.    Well, it's -- if you go back to the -- earlier in

8    the sentence, it says "remove the main large material and any

9    drums or suspected hazardous materials" and then just take OVA

10:58AM  10   readings and that would be the extent of the investigatory

11   aspect of it.

12          That would -- if -- if that were implemented, they

13   would remove suspected hazardous materials.  They would not

14   have collected any samples to understand whether there was

10:58AM  15   contamination in the remaining materials that were there, if --

16   if the suspected hazardous materials actually were hazardous

17   materials or if they impacted the surrounding soils or

18   groundwater.  So it would -- this approach would be incomplete.

19       Q.    And without further testing, how would Whittaker

10:59AM  20   know at this time whether there had been contamination of the

21   groundwater beneath their landfills?

22       A.    If -- if the plan -- if the investigation were to be

23   conducted as is described in the yellow highlighting on the

24   screen right now, they could not -- they would not know whether

10:59AM  25   there was an impact to groundwater or not.

**UNITED STATES DISTRICT COURT**

1        Q.    Okay.  He goes on to say, "He," referring to Joe,

2    "feels that leaving the moving around of the landfill to the

3    developer is the best way not to incur further costs with these

4    landfills."

10:59AM  5        Was that reference or the repeated references to

6    avoiding further costs significant to you in the work you did

7    in this case?

8        A.    Yes.

9        Q.    And why is that?

11:00AM  10       A.    Oh, it -- it -- it appears that Whittaker,

11   Whittaker's representatives, were very conscious of the costs

12   and -- and wanted to take measures to minimize what it was

13   going to cost to investigate and remediate the site.

14       Q.    And it goes on in that same paragraph, "He

11:00AM  15  recognizes the fact that Whittaker would have some liability.

16   When asked about these possible costs, Joe felt certain that

17   there will be some costs associated with these landfills at a

18   later date but did not seem too concerned about them.  He did

19   not seem concerned when told that the costs could run many

11:00AM  20  times what they are at present," period, close quote.

21       And in your experience, is there a difference

22   between cleaning up the costs -- cleaning up contamination

23   early as opposed to waiting until a later date?

24       A.    Yes.

11:01AM  25       Q.    Can you explain that?

**UNITED STATES DISTRICT COURT**

1      A.   Yes.  The -- by leaving waste behind, it has the

2  opportunity to migrate in the environment, which would increase

3  the extent of contamination, which could -- if it needed to be

4  cleaned up, it increases the -- the complexity and the scope of

11:01AM   5  a -- of the engineering project to be required to either

6  mitigate the groundwater contamination or whatever increase in

7  migration, whatever contamination that increase in migration

8  costs.

9          And also, if part of the solution was to excavate

11:01AM  10  those source materials and dispose of them, over time -- my

11  experience has been the cost of doing that has not decreased

12  over time.  It has increased.

13          And with the migration, if you have a source area

14  with the migration I was describing -- actually, the source

11:02AM  15  area is bigger.  So if you're going to excavate a source area

16  now versus five years from now, it would probably be larger

17  five years from now.  So it would involve more excavation.

18      Q.   Okay.  We talked a bit before the break about

19  whether you had seen any notices of violations from either DTSC

11:02AM  20  or the EPA in this time frame.  Do you have Exhibit 382 in your

21  binder?  We're not going to publish this just yet.

22      A.   I do have it.

23      Q.   And is this one of the documents you reviewed in the

24  course of your work in this case?

11:02AM  25      A.   It is.

1    Q.    And in general, can you tell us what this is?

2    A.    It's from the -- from the State of California to

3 Mr. Glen Abdune-Nur of Whittaker.  And it's a report of

4 violations and a schedule for compliance that the State is

5 dictating.

6    Q.    And this is July 31st, 1990.  And --

7    A.    Yes.

8    Q.    In general, at that time was Whittaker notified that

9 its closure of the 317 surface impoundment that we had

10 discussed earlier today was not done adequately and was a

11 violation?

12   A.    Yes.

13   Q.    And does it further indicate that Whittaker was

14 provided notice that -- in connection with that violation for

15 the surface impoundment at Building 317, that there were

16 volatile organic chemicals, among other chemicals, with the

17 potential to move to -- from the ground to groundwater?

18   A.    Yes.  That condition did exist in the 317 area.

19   Q.    Okay.  And you talked about that earlier in

20 connection with the memo from eight years earlier, 1982; is

21 that correct?

22   A.    I did.

23   Q.    Okay.  And then there's a reference under Count 4 to

24 the failure to install monitoring wells.  Do you see that?

25   A.    I do.

11:03AM (line 5)
11:03AM (line 10)
11:03AM (line 15)
11:04AM (line 20)
11:04AM (line 25)

1    Q.   And is that count of the violation consistent with

2    what you'd described earlier as being required in terms of

3    monitoring wells?

4    A.   Yes.

11:04AM  5    MR. RICHARD:  Your Honor, I just want to reserve my

6    right.  We would move this into evidence, and so perhaps we can

7    return back to this.  I don't want to take our time now.

8    THE COURT:  Is there an objection?

9    MR. BLUM:  Some parts need to be redacted,

11:04AM  10   Your Honor.

11   THE COURT:  All right.  The Court is going to

12   receive it, subject to redaction that the parties have a meet

13   and confer about.

14   (Exhibit 382 received into evidence.)

11:05AM  15   MR. RICHARD:  Okay.  Thank you, Your Honor.

16   Q.   (BY MR. RICHARD:)  Moving on to Exhibit 1 -- so

17   you've told us about a notice -- a report of violation from

18   '86, the one from 1990.  Did you review other materials from

19   the regulators to Whittaker Corporation?

11:05AM  20   A.   Yes.

21   Q.   And did one of those materials include something

22   called Imminent and Substantial Endangerment Determination and

23   Order and Remedial Action Order?

24   A.   Yes.

11:05AM  25   MR. RICHARD:  And again, we have a stipulation,

         1   Your Honor, but there will be portions that will be edited

         2   before its final submission to the jury.

         3          THE COURT:  All right.  And, ladies and gentlemen,

         4   let me just explain to you.  When I'm referring to redactions

11:05AM  5   or edits, what that means is that you will receive certain

         6   documents where there will be blacked-out portions of the

         7   document.  And the reason they are blacked out is because I

         8   have to make evidentiary rulings on a whole host of things,

         9   including whether it's relevant.

11:06AM 10          And so you should ignore, if you see a redaction,

        11   not only will you not see it but ignore why the Court may have

        12   redacted it.  Just as you see me making evidentiary rulings,

        13   that's essentially what I'm doing if there's a dispute.  And

        14   sometimes the parties don't have a dispute that it's not

11:06AM 15   relevant or what have you.

        16          All right.  Please continue.

        17          MR. RICHARD:  Thank you very much, Your Honor.

        18          So may we publish the first page of Exhibit 1 to the

        19   jury.

11:06AM 20          (Exhibit 1 received into evidence.)

        21     Q.   (BY MR. RICHARD:)  So this is an order from 2002

        22   that you reviewed in the course of your work in this case?

        23     A.   It is.

        24     Q.   And can you explain to us in what ways, if any, this

11:06AM 25   order from the California Environmental Protection Agency,

```
 1  Department of Toxic Substances Control, impacted the work you
 2  did?
 3       A.   Yes.  This is an order, as it says in the title,
 4  from the State to Whittaker Corporation related to the
 5  Whittaker-Bermite facility.  It states -- and I'm going to from
 6  memory say that it states that there may be an imminent and
 7  substantial endangerment as a result of the contamination
 8  conditions on the property.
 9            And for my purposes in reviewing this, the date,
10  being 2002, is important because, again, this is 20 years after
11  the -- the discussions and the correspondence about whether to
12  put in the first monitoring wells is going on.
13            And this is the -- it's an order to conduct what's
14  called an RIFS, which is a remedial investigation feasibility
15  study, which is essentially the Superfund's version of a site
16  assessment.
17            The remedial investigation, you figure out what the
18  problem is, the extent and the degree, and what impact it could
19  have to public health and the environment.
20            In the feasibility study, you evaluate methods for
21  fixing, my non-technical term for fixing the problems that you
22  discover.  And the order goes on to say that you will implement
23  the remediation to fix those problems.
24            A similar order -- there was a similar order in '95
25  or '96, I forget exactly, could be '94, '95, '96, that also
```

11:07AM (lines 5)
11:07AM (line 10)
11:08AM (line 15)
11:08AM (line 20)
11:08AM (line 25)

          1   required an RIFS and remediation of the problems.  And here it

          2   is '02, and the problem still exists, the investigations

          3   haven't been completed, the remediation hasn't been performed

          4   to complete -- to mitigate the problems on the site.  There's

11:08AM   5   another order in place to conduct -- to conduct that RIFS and

          6   do the remediation as necessary at the site.

          7        Q.   And in your review of the order, did it address some

          8   of the same chemicals that are at issue in this case?

          9        A.   Yes.

11:09AM  10        Q.   And can you explain that briefly?

         11        A.   The -- it does address perchlorate in the degreasing

         12   solvents.

         13        Q.   Okay.  And those -- so, for example, if we look at

         14   page 9 towards the bottom of the page, bottom third of the

11:09AM  15   page, "In 1996," do you see that?

         16        A.   Yes.

         17        Q.   And it goes on to say, "In 1996, in an attempt to

         18   remove metallic debris from the Burn Valley so that a

         19   geophysical survey and sampling could be performed..."  So

11:09AM  20   1996, 16 years after some of those memos we looked at from

         21   1980, there's an investigation.

         22             Can you explain the data with respect to the

         23   chemicals at issue in this case, that this paragraph of this

         24   Imminent and Substantial Endangerment Determination and Order

11:10AM  25   is describing?

1      A.    Yes.  So the sentence goes on, it says, "Respondent

2 uncovered soil contaminated with first nitrate."  Nitrate is

3 actually naturally occurring.  It is an ion that was -- was a

4 component of some of the manufacturing conducted on the site.

11:10AM  5      The next is phosphorous, which is misspelled here,

6 but it's -- it also is a naturally occurring metal that was a

7 component in the -- in some of the manufacturing, heavy metals.

8 Heavy metals include a wide variety of metals.  They didn't

9 specify here which, but there were heavy metals that became

11:11AM  10 waste products as a result of the manufacturing at the site.

11      The next one is TCE, which we talked about, the

12 degreasing solvent TCE.  The concentrations there where it's

13 110 to 41,000 milligrams per kilogram.  Some perspective,

14 41,000 is about 4 percent.

11:11AM  15      Q.    Is that a lot or a little, in your experience?

16      A.    That's a lot.  That means you collect a soil sample,

17 4 percent of it is TCE.  It's not soil.  It is 4 percent TCE,

18 and the remainder is some other waste material.

19      The number here, the 41,000, is one-tenth,

11:11AM  20 approximately, of the highest number I've seen from the

21 Burn Valley area, which -- from other data collected in 1996,

22 which -- which is -- the highest number -- I think -- I think

23 the highest number was -- it was not ten times, but it was --

24 it was in the 4 to 5 percent range.

11:12AM  25      It continues on, PCE, 13 to 25,000.  So that would

```
  1  be 2-and-a-half percent was PCE.

  2          Q.    Okay.  And so just --

  3          A.    It goes on to mention others.

  4          Q.    It does.

11:12AM   5          Let me ask you in terms of -- let's talk a little

  6  bit about the data you reviewed.  You mentioned CDM Smith

  7  yesterday.

  8          A.    I did.

  9          Q.    And you had worked for CDM; is that right?

11:12AM  10          A.    I had worked for CDM before they acquired Smith.

 11          Q.    Okay.  And you were there for how many years?

 12          A.    I was there for about seven years.

 13          Q.    Okay.  And what was CDM Smith's role or one of their

 14  roles with respect to the Whittaker site based on the materials

11:12AM  15  you reviewed?

 16          A.    CDM Smith was brought aboard to -- they're an

 17  environmental consulting and construction firm.  And they were

 18  brought onboard to continue the site assessment activities, the

 19  characterization of the -- the degree and extent of

11:13AM  20  contamination, and to evaluate methods for cleaning up the

 21  contamination and actually implement the -- the cleanup in

 22  different areas of the site.

 23          Q.    And what was one of the ways or techniques they used

 24  to clean up portions of the site?

11:13AM  25          A.    There were a number of different remediation
```

technologies applied here because of the types -- different

types of contamination.  But one that they didn't apply is --

was soil vapor extraction, which I described yesterday.

Q.    And you did.  That's where you take the air out that

11:13AM    has contamination and then more contaminated air moves in and

so on and so on; is that right?

A.    You suck out contaminated air, fresh air comes in,

it becomes contaminated, and you keep sucking it until -- until

you don't get any more contamination.

11:13AM    Q.    And in your experience, is that waste material

that's taken out of the ground measured in some fashion?

A.    Yes, it is.

Q.    Okay.  And did you review reports prepared by

CDM Smith that were provided to Whittaker regarding the

11:14AM    measurements of the TCE and PCE and other chemicals removed

from the soil at Whittaker?

A.    I did.

Q.    And can you just generally describe for us the --

how many of those records you reviewed, how many -- and the

11:14AM    dates of those reports?

A.    Oh, I -- there are a lot of reports.  There were

data collection reports, there were remediation reports,

there's correspondence, progress reports, reports reporting the

results periodically of the remediation as it was being

11:14AM    conducted, and there was actually a remediation closure report.

565

```
 1            And the time frame was -- oh, it went up to -- the
 2  most recent one I have, I think, is about two years ago.  And I
 3  forget exactly when it began, but it was after this order in
 4  2002.
 5       Q.   Okay.  And in reviewing those reports -- and by the
 6  way, can we pull up Exhibit 429.
 7            MR. RICHARD:  And we -- this already has been
 8  stipulated to between the parties.
 9            (Exhibit 429 received into evidence.)
10       Q.   (BY MR. RICHARD:)  Do you see the chart here, right,
11  or you can write on the screen, I think, with your finger but
12  not a marker.  I'm not sure how that works.
13       A.   I've got a laser pointer here I can use with the --
14  it's displayed here on the easel, the same figure.
15       Q.   Yeah, it's hard to see.
16            THE COURT:  Use the screen.  The jury will
17  appreciate that since they have a screen right in front of
18  them.
19            THE WITNESS:  Okay.  They may not appreciate my
20  drawing, though.
21            MR. RICHARD:  No jokes, Dr. Hughto.  I thought I was
22  clear on that.
23       Q.   (BY MR. RICHARD:)  Do you see the reference to
24  CDM Smith?  So you recognize that this chart we're looking at
25  with these red blotches identified as Priority 1, 2, 3, this
```

The time stamps shown in the left margin: 11:15AM (lines 5, 10, 15, 20, 25).

**UNITED STATES DISTRICT COURT**

1    was -- was this a document that was in one of the reports that

2    you reviewed?

3        A.    Yes.

4        Q.    Okay.

11:16AM  5        A.    And as source -- the source of it is on the bottom

6    of the page.

7        Q.    Okay.  And so the source of this is a -- from 2013,

8    one of those reports from Whittaker's consultants, CDM Smith?

9        A.    That's correct.

11:16AM  10       Q.    Okay.  And can you tell us, based on your review of

11   those reports from CDM Smith, the areas in which the TCE and

12   PCE were found at this site?

13       A.    Sure.  The -- let's start with the Burn Valley.  And

14   I haven't practiced with this screen.  But I'm going to draw a

11:16AM  15   circle around this area which is -- that's the Burn Valley.

16   And as Mr. Patrick said, they're Priority 1, 2, and 3 in the

17   legend.  This reddish color is Priority 1, which was the

18   initial -- there are 31 locations that -- that CDM identified

19   that may need soil vapor extraction treatment based on their

11:17AM  20   data collection and their evaluation of the data.  They

21   prioritized them based on amount of contamination.

22           The red ones here are the Priority 1, which their

23   plan was to implement the soil vapor extraction at the earlier

24   time.

11:17AM  25           So this is the Burn Valley we talked about where

1  waste was taken to be burned.  That little brown part in just

2  above the red area is the East Fork landfill that we had some

3  questions about before the break today.

4      Q.    Okay.  And can you identify the Hula Bowl?

11:17AM  5      A.    Yes.  The Hula Bowl is over here (indicating).

6      Q.    And can you tell us, did -- in the reports you

7  reviewed, did CDM Smith identify the removal of the TCE and PCE

8  from the Hula Bowl area?

9      A.    They did using the soil vapor extraction technology.

11:18AM  10      Q.    Okay.  Thank you.

11          And about what quantity of TCE and PCE were removed

12  from the Hula Bowl?

13      A.    My recollection is it was just short of 800 pounds.

14      Q.    And from the Burn Valley, can you tell us about how

11:18AM  15  much TCE and PCE and other VOCs were removed from that area

16  based on the CDM Smith reports you reviewed?

17      A.    Yes.  It was just about 50,000 pounds.

18      Q.    And then in terms of the pond at 317, in that area

19  that we talked about, can you find that roughly on the map?

11:19AM  20      A.    Yes.  That's down in this area (indicating).

21      Q.    Okay.  And what amount of TCE, PCE -- and by the

22  way, what was the primary -- I mean, were those the two main

23  volatile organic compounds found in this soil vapor extraction

24  process?

11:19AM  25      A.    I'd say the majority of the -- the chemicals that

were analyzed or found in the vapor, they sucked out of the ground, they actually analyzed the vapor.  And the vast majority of the volatile compounds were TCE and PCE.

Q.    And so then down in those ponds near Building 317 that we talked about earlier in those documents from 1982, what amount of TCE and PCE was removed from that area?

A.    That -- that area was not done by CDM Smith.  That area that -- the soil vapor extraction, that area was done late '80s, into the early '90s, prior to CDM Smith arriving at the site.  And the answer is about 50,000 pounds were removed there as well.

Q.    And did CDM Smith and the materials you reviewed identify approximately how many pounds of TCE and PCE were still in the ground and not removed?

A.    My recollection is about 150,000 pounds.

MR. RICHARD:  And I think I -- that's all I have for right now, Your Honor.  I'll save the -- anything else for redirect, if necessary.  Thank you.

THE COURT:  Mr. Blum.

MR. BLUM:  Your Honor, may I just have one moment, please?

THE COURT:  Yes.

MR. BLUM:  Your Honor, I'm going to place some exhibits at the lectern for the witness that are --

THE COURT:  That's fine.

UNITED STATES DISTRICT COURT

1          Mr. Blum, do you have a copy that you're able to

2   give to the plaintiff or -- or are these just mixed in with all

3   of the exhibits?

4          MR. BLUM:  They're mixed in, Your Honor.  It's

11:22AM  5   Exhibit 1420 and 1425.

6          THE COURT:  All right.

7                    **CROSS-EXAMINATION**

8   BY MR. BLUM:

9      Q.   Good afternoon -- it's still morning.  Good morning,

11:22AM  10  Mr. Hughto.  How are you?

11     A.   I'm doing fine, thank you.  Good morning to you.

12     Q.   And it's Dr. Hughto; correct?

13     A.   It is.

14     Q.   Excuse me.

11:23AM  15      Sir, you've been an expert numerous times, have you

16  not?

17     A.   Yes, I have.

18     Q.   How many times?

19     A.   I haven't counted the number of times.  I've worked

11:23AM  20  on thousands of different projects over the years.  I've served

21  in some sort of an expert capacity.

22     Q.   And you don't do it for free, do you?

23     A.   I do -- I do not do the work for free.

24     Q.   Your testimony today, what's your hourly rate?

11:23AM  25     A.   $320.

**UNITED STATES DISTRICT COURT**

```
 1          Q.    And how much time have you spent on this case?

 2          A.    I don't know.

 3          Q.    Generally, can you give me a ballpark?

 4          A.    No, I can't.  I wouldn't -- I don't know the

 5    numbers, so I don't want to ballpark it.

 6          Q.    So you can't tell me how much you've been paid by

 7    the plaintiffs for the work you've done, can you?

 8          A.    I don't know off the top of my head.

 9          Q.    You understand as an expert that is a usual question

10    that is asked by the opposing counsel, is it not?

11          A.    It's a question I've been asked before.

12          Q.    Knowing that the question was going to be asked, is

13    there a reason why you don't know the answer?

14          A.    I never said I knew it was going to be asked.

15          Q.    In your prior occasions, it's been asked of you, has

16    it not?

17          A.    What I said was it has been asked of me before.

18          Q.    And knowing that it has been asked of you before, is

19    there a reason why you don't know the answer?

20          A.    A lot of things have been asked of me over the years

21    in many, many cases.  I didn't bring answers to all of those

22    questions with me today by memory.  I'm here to answer the

23    questions you ask me today.

24          Q.    Is it correct, sir, that the reason that you don't

25    know is because that's not a piece of information you want the
```

11:23AM (line 5)
11:23AM (line 10)
11:24AM (line 15)
11:24AM (line 20)
11:24AM (line 25)

     1    jury to have?

     2         A.    Absolutely not.

     3         Q.    Because that would not be an act of a scientist;

     4    correct?

11:24AM   5         A.    Telling the jury would not be an act of a scientist?

     6         Q.    Purposely not having information in order to benefit

     7    you would not be the act of a scientist, would it not --

     8    correct?  Is that a correct statement?

     9              THE COURT:  The Court's going to ask you to move on

11:25AM  10    to another question, please.

    11         Q.    (BY MR. BLUM:)  In testifying today, do you see

    12    yourself as a paid expert for the plaintiff or a scientist?

    13         A.    I am a scientist who's serving as an expert for the

    14    plaintiff.

11:25AM  15         Q.    Now, as a scientist, is it your obligation to look

    16    at all of the data without prejudice or bias, that it might

    17    benefit the client that hires you?

    18         A.    It is my role or my responsibility to my client to

    19    evaluate the information I'm provided without bias, which is

11:25AM  20    what I do.

    21         Q.    So you purposely would not seek information -- let

    22    me ask it again.  It would be correct that as a scientist, you

    23    would not ignore information simply because it would benefit

    24    Whittaker; correct?

11:25AM  25         A.    I would not do that.

         1         Q.    And, for instance, you would make sure that in order

         2    to reach your opinions, that there has been an exhaustive

         3    search for relevant information; correct?

         4         A.    By whom?

11:26AM  5         Q.    Well, would it be correct, sir, that you are not

         6    able to reach a scientific conclusion until you have exhausted

         7    the sources of information?

         8         A.    When I reach a scientific conclusion, I do it based

         9    on the information that I have.

11:26AM 10         Q.    Okay.  Do you recall that you were deposed in this

        11    case?

        12         A.    I do recall that.

        13         Q.    And do you recall you were asked a similar question

        14    and you testified that you could not reach a conclusion until

11:26AM 15    you exhaust the sources of information?

        16         A.    You'd have to show me the transcript.

        17         Q.    All right.  I'm going to do that.

        18              MR. RICHARD:  May I have a page and line?

        19              MR. BLUM:  Yeah.  Give me -- I'm sorry.  One second.

11:27AM 20              Page 164, lines 8 through 18.

        21              MR. RICHARD:  I'm sorry, what lines?

        22              MR. BLUM:  8 through 18.

        23              I'm sorry.  That's not correct.

        24              MR. RICHARD:  We have no objection.

11:27AM 25              MR. BLUM:  No, I'm looking at mine.  I got the wrong

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| | 1 | one up. |
| | 2 | Here it is.  Could you play it, please?  164, 8 |
| | 3 | through 18. |
| | 4 | (Videotaped deposition played:) |
| 11:27AM | 5 | Q.   *Okay.  So you developed the hypothesis, you* |
| | 6 | *gathered some data and information, and you evaluate* |
| | 7 | *it to develop a conclusion or an answer which is --* |
| | 8 | *which term would you prefer?* |
| | 9 | A.   *I would just say you would perform an* |
| 11:28AM | 10 | *analysis.* |
| | 11 | Q.   *Okay.  And does the analysis have any* |
| | 12 | *conclusion to it or is it --* |
| | 13 | A.   *Once you've exhausted your sources of* |
| | 14 | *information and analyzed the model, yes, you can* |
| 11:28AM | 15 | *get some conclusion from it.* |
| | 16 | Q.   (BY MR. BLUM:)  Have you exhausted your sources of |
| | 17 | information in this case? |
| | 18 | A.   I have reviewed the sources of information that I |
| | 19 | have been provided and that I have obtained on my own, which |
| 11:28AM | 20 | would be mostly the information from the State website, related |
| | 21 | to the site. |
| | 22 | Q.   That wasn't my question, Doctor. |
| | 23 | A.   I'm answering the question as I understand it. |
| | 24 | And I have -- I have read those reports, reviewed |
| 11:28AM | 25 | them, and rendered my judgments after doing that. |

**UNITED STATES DISTRICT COURT**

```
          1      Q.    Have you exhausted all known sources of information
          2  in this case?
          3      A.    All known -- known by whom?
          4      Q.    Known by you.
11:28AM   5      A.    I have -- I've exhausted the sources -- and I think
          6  I said in the answer, the -- from the deposition, the sources
          7  that I have.
          8      Q.    And -- and other than what is on the website, the
          9  sources that you had is what you've been given by the
11:29AM  10  plaintiff's attorneys; correct?
         11      A.    I'm just pausing to think if I had any other
         12  sources.
         13            I've received most of what I have from the
         14  plaintiff's attorneys.  I pulled information from the website.
11:29AM  15  I may have found other things in Internet research, but those
         16  are the primary sources of the information I used.
         17      Q.    For instance, are you aware that there are --
         18  there's places where you can get aerial photographs of the site
         19  or order aerial photographs of the site?
11:29AM  20      A.    Yes, I am.
         21      Q.    Well, did you see those aerial photographs?
         22      A.    I did not order aerial photographs or see them
         23  because I didn't see it as what I would gain from that exercise
         24  being critical to the -- the opinions I was asked to -- the
11:30AM  25  topics I was asked to give opinions on.
```

        Q.    So as a scientist, it's okay to presume that the

evidence or the material is irrelevant before you look at it?

        A.    All scientists and engineers have to make -- have to

make judgments or cuts on what is looked at in doing an

11:30AM  analysis.

              I've looked at aerial photos of sites for -- that

are part of the 40 years I've been doing this type of thing and

know what I can get from aerial photographs and know that, when

I'm rendering certain types of opinions, aerial photographs are

11:30AM  very important.

              In this case, I didn't take that next step to get

the aerial photographs because I believed the information that

I had and I've been testifying about and wrote the reports

about was sufficient to -- to opine on the topics I was asked

11:30AM  to opine on.

        Q.    Okay.  So you -- you -- for instance, could an

aerial photograph have shown changes at the site between the

time that Whittaker operated and prior to the time Whittaker

operated?

11:31AM        A.    An aerial photograph?

        Q.    For instance, if you had an aerial photograph from

1945, would you have been able to -- to at least raise some

reasonable conclusions as to what activities were happening on

the property in 1945?

11:31AM        A.    It's a possibility of aerial photos, especially of

1    that vintage, of varying -- well, all aerial photos are varying

2    quality but those -- from that vintage are certainly of lesser

3    quality than those of succeeding decades.

4           But you can use aerial photographs to gain some

5    information about activities on a site.

6        Q.   But in this case, you don't know if you could

7    because you haven't looked at them; right?

8        A.   I did not -- I did not go out and solicit additional

9    aerial photographs, no.

10       Q.   Did you look at the files that EPA had on this

11   property?

12       A.   I did not go to EPA offices to -- to look at their

13   files or do a FOIA request for their files.  I looked at EPA

14   records that I -- that were made available to me.

15       Q.   By plaintiff's counsel?

16       A.   I believe -- I was trying to recall if that was

17   all -- some of the EPA correspondence may have come from

18   their -- from the EPA website and some other came from

19   plaintiff's counsel.

20       Q.   Well, didn't you testify initially that the website

21   you checked was the EnviroStor website?

22       A.   I believe that's what it's called.

23       Q.   And EnviroStor is the website for DTSC; correct?

24       A.   Yes, it is.

25       Q.   It's not the website for the EPA, is it?

**UNITED STATES DISTRICT COURT**

1    A.    No.  And I checked the EPA website as well and was

2  not very successful in finding documents related to this case.

3    Q.    I thought you testified you only checked EnviroStor.

4  Did you -- so you actually went to the EPA website?

11:33AM  5    A.    I looked at the EPA website and did searches related

6  to this property or site.

7    Q.    Did you check the website for the Regional Water

8  Quality Control Board?

9    A.    Oh, I -- I can't recall if I did or not.

11:33AM  10    Q.    And they have -- and what is the Regional Water

11  Quality Control Board?

12    A.    As I stated, it's the -- it's the -- the regulatory

13  body, the government body that regulates the water for that

14  region for -- they have different regions in the state.

11:33AM  15    Q.    And they've actually conducted some of the

16  inspections at the site; correct?

17    A.    That is my understanding.

18    Q.    And they have a separate website, separate from EPA

19  and DTSC; correct?

11:34AM  20    A.    I believe they do.

21    Q.    Now, did you check the documents for -- the building

22  department for L.A. County to see if there were any permits

23  relating to sumps, septic tanks, buildings or -- that you

24  discussed in your report as to when they were built?

11:34AM  25    A.    I did not look at the building department records.

**UNITED STATES DISTRICT COURT**

1      Q.   So would you say you have exhausted all known

2   sources of information?

3      A.   All known information -- sources of information

4   about?

11:34AM   5      Q.   The issues that you're testifying about.

6      A.   I have reviewed all -- as I said more than once, all

7   the sources of information that I -- provided to me and that I

8   got on my own and rendered my opinions based on those

9   documents.

11:34AM   10      Q.   All right.  I'm going to come back, but I want to

11   talk about something else.  I want to talk about perchlorate.

12   Actually, you know what?  Let's talk about something else.

13          In the field of the history of environmental

14   regulation, is the year 1980 important?

11:35AM   15          THE COURT:  Rephrase your question.

16          THE WITNESS:  I -- I don't understand -- all years

17   are important.

18      Q.   (BY MR. BLUM:)  What -- in 19 -- isn't 1980 the year

19   that the first regulations relating to RCRA were published?

11:35AM   20      A.   That is true.

21      Q.   Do you know when in 1980?

22      A.   Oh, I -- I forget the precise date.

23      Q.   Summer?  Winter?  Fall?

24      A.   I still forget the precise date.

11:35AM   25      Q.   Would it be correct that prior to these regulations,

UNITED STATES DISTRICT COURT

1   there were no federal regulations controlling the disposal,

2   transportation, or handling of hazardous wastes?

3        A.    These -- these were the first -- "these" being RCRA,

4   the RCRA regulations were the first regulations that I'm aware

11:36AM  5  of related to the -- the -- what I called yesterday the

6   cradle-to-grave monitoring of the handling of hazardous wastes

7   at facilities.

8        Q.    Were you actually working as an environmental

9   professional at that time?

11:36AM 10       A.    Yes, I was.

11       Q.    Weren't there a lot of companies trying to figure

12  out exactly what those regulations meant and what they had to

13  do to comply?

14       A.    The companies -- when you say "companies," do you

11:36AM 15  mean -- you're asking if I was an environmental professional.

16  You mean environmental professional companies or manufacturing

17  companies?

18       Q.    Manufacturing companies.

19       A.    I -- I'm aware that many manufacturing companies

11:36AM 20  were trying to figure out in 1980 and before because there were

21  drafts of the regulations, prior to, what their

22  responsibilities were going to be pursuant to those

23  regulations.

24       Q.    And would it be correct that a manufacturing company

11:37AM 25  that wanted to follow the rules should in 1980 when the rules

1    were first published take a look at their operations, compare

2    them to the regulations, and then determine what they can still

3    do and what they have to stop doing?

4         A.    The beginning -- could you repeat the question?

11:37AM  5    I've lost the first part of it.

6         Q.    Isn't it correct that a manufacturing company at the

7    time the rules were first published that wanted to be a good

8    environmental steward and comply with the law should have

9    looked at what their operations were, compared them to what the

11:37AM  10   RCRA regulations said, and then determined this I can do, this

11   I can't do, and this I got to change?

12        A.    A manufacturer who wants to comply with the new --

13   you're talking about RCRA; right?

14        Q.    Yes, sir.

11:38AM  15        A.    A manufacturer who wanted to comply with RCRA --

16              And we're talking about in 1980?

17        Q.    Yes, sir.

18        A.    -- in 1980, if they wanted to comply with the law

19   and the regulations would -- it would be a good practice to

11:38AM  20   review all of their practices, current practices at the time,

21   for -- that would be regulated under these new regulations,

22   including all of the detailed handling of hazardous waste, and

23   determine how they may have to alter any of their operations in

24   order to comply.

11:38AM  25        Q.    Isn't that what -- isn't that what Whittaker did?

**UNITED STATES DISTRICT COURT**

```
 1    Isn't that what all these memos of 1980, 1981, and 1982 are, a

 2    good company that wants to follow RCRA, trying to come to grips

 3    with these new rules?

 4        A.    I've read a lot of documents and including those

 5    that I testified about earlier this morning.  And I -- I can't

 6    recall any that say what that -- we're doing a review of RCRA

 7    and we want to figure out what we have to do to comply and

 8    here -- and here's the list of options -- the list of measures

 9    we need to take.

10        Q.    You didn't see -- in any of the internal memos that

11    Mr. Richard showed you, none of them said these are RCRA

12    violations, we've got to change our procedures?

13        A.    There were references to RCRA violations, there were

14    references to bad policing of waste handling, and there were --

15    excuse me -- references to management of the waste handling

16    processes.

17        Q.    And didn't they say we've got to change what we're

18    doing?

19        A.    I don't recall that phrase.

20        Q.    All right.  Can you go to Exhibit 1427, please.

21              MR. BLUM:  Stipulated, Your Honor.

22              (Exhibit 1427 received into evidence.)

23              THE WITNESS:  1427?  Is it in the binder?

24        Q.    (BY MR. BLUM:)  Yes, sir.  No, it's going to be up

25    on the screen.
```

|   |   |
|---|---|
| 1 | A.    Oh, okay. |
| 2 | Q.    Do you see this document? |
| 3 | A.    I do. |
| 4 | Q.    This is one of the documents you relied upon; |
| 5 | correct? |
| 6 | A.    It's one of the documents I reviewed and |
| 7 | considered -- |
| 8 | Q.    Okay. |
| 9 | A.    -- doing my work on this case. |
| 10 | Q.    And this is from an inspection by the Regional Water |
| 11 | Quality Control Board at the L.A. region; correct? |
| 12 | A.    It's the annual RCRA Groundwater Monitoring |
| 13 | Inspection and Evaluation Report. |
| 14 | Q.    Okay.  By the Regional Water Quality Control Board; |
| 15 | right? |
| 16 | A.    Yes.  That's what it says. |
| 17 | Q.    Now, if you can go to the -- page 2, paragraph 3, |
| 18 | where it says view and evaluation. |
| 19 | A.    Okay. |
| 20 | Q.    And if you -- now, we've talked about -- I think |
| 21 | we've talked about this.  But an ISD, that's an interim status |
| 22 | document? |
| 23 | A.    You're asking me if ISD is interim status document? |
| 24 | Q.    Yeah. |
| 25 | A.    Can you show me in the document where it defines |

Timestamps in left margin:
11:41AM — line 5
11:41AM — line 10
11:41AM — line 15
11:41AM — line 20
11:42AM — line 25

```
        1   that?

        2        Q.   Do you know what interim status is?

        3        A.   I know what interim status is, yes.

        4        Q.   If you go above that, under "Purpose."

11:42AM 5             MR. BLUM:  It's at the top of the page.

        6        Q.   (BY MR. BLUM:)  Do you see under "Purpose," it

        7   defines ISD as an interim status document?

        8        A.   I see that.

        9        Q.   You know, this brings up a side -- a side issue.

11:42AM 10  You -- I know we went through your expertise.  But you've,

       11   um -- you don't have any professional designations in

       12   California, do you?

       13        A.   I do not.

       14        Q.   And you've never lived or physically worked in

11:42AM 15  California, have you?

       16        A.   I have -- I've never lived in California.

       17        Q.   Well, have you ever physically been in California

       18   for work other than testifying as an expert?

       19        A.   Yes, I have.

11:43AM 20       Q.   Are you an expert in California environmental law?

       21        A.   I used -- as with any jurisdiction, the rules, laws,

       22   regulations change constantly.  So I review, as I'm involved in

       23   a specific assignment, site assessment assignment or some

       24   other, look at them at that point and see how they apply at

11:43AM 25  that point.  I wouldn't call myself an expert in California law
```

going back in time.  But as it would apply to an assignment I

had, I would gain the expertise I needed to fulfill my

requirements for that project.

Q.   Are you an expert in what the California

environmental law was in the 1980s?

A.   I have reviewed a number of the regulations and laws

as it applies to -- sufficiently, I think, to render the

judgments I'm rendering here.

Q.   Have you looked at opinions of the different

regulatory agencies or the Attorney General or Courts, for that

matter, interpreting these opinions to see how they were

applied in the 1980s?

A.   I have not looked at any court records.

Q.   Have you looked at decisions from the Regional Water

Quality Control Board?

A.   Regarding?

Q.   How the monitoring programs were interpreted in the

1980s.

A.   The -- which monitoring programs?

Q.   The monitoring programs that were under California

law that required or effected the obligation to monitor

groundwater.

A.   Can we put all that together into a question now?

Q.   Yeah.  What's the Porter-Cologne Act?

A.   What's that?

Q.    The Porter-Cologne Act.

A.    I'm not familiar with that Act.

Q.    Can you tell me whether or not what Title 9 -- or sorry, what Title 10 was to the Hazardous Waste Control Act in the 1980s?

A.    I am not familiar with Title 10.

Q.    Can you tell -- can you tell me whether or not in the 1980s California was even empowered to enforce RCRA?

A.    I -- I do not know when California was designated by EPA to be responsible -- to carry out RCRA.

Q.    Isn't it true that during parts of 1980, EPA withdrew the ability of California to enforce RCRA?  And this is during some of the time periods that we're dealing with here.

A.    I am not aware of that -- that withdrawal.

Q.    Well, let me ask you, then.  Are you an expert in California environmental law for the 1980s?

A.    I would not call myself an expert in the law.

Q.    So when you're talking about obligations that Whittaker may have had, you are not rendering an opinion that they were required under any law of the State of California, are you?  Because you're not an expert.

A.    If I render an opinion -- if I read a law or set of regulations and it requires something, let's say, for example, groundwater monitoring under the RCRA regulations and I can

1    read that and I -- and I see what the requirements are, I

2    believe I can render an opinion on it.

3         Q.    I'm talking about California law here, Doctor, not

4    about federal law.  I'm talking specifically, would it be

11:46AM  5    correct that you are not qualified to tell this jury anything

6    about what California law required Whittaker to do in the

7    1980s?

8         A.    I believe I did testify about the -- some of the

9    earlier laws, the '07 and '17 laws and Dickey Commission that

11:47AM  10   had -- has some requirements.  Those, as far as I know, were

11   still in place in the 1980s.  Some of the finer points, the

12   Title 10 that you talked about, some of the other -- I forget

13   the names of the -- the act, those I am not familiar with and

14   would not -- and a result, would not render an opinion related

11:47AM  15   to them.

16        Q.    By the way, we checked your report and your, um,

17   rebuttal report as well as your deposition.  We found no

18   mention in those that you looked at the EPA website.  Was that

19   just an oversight on your part?

11:47AM  20        THE COURT:  Counsel, rephrase your question.

21   Don't -- don't testify to the jury as to what you did.

22        Q.    (BY MR. BLUM:)  If there is no mention in your

23   reports, the two reports you did, of you looking at the EPA

24   website, does that mean you didn't do it?

11:47AM  25        A.    It does not.

 1    Q.    Weren't you required -- was it your understanding

 2  that you were required to list all of the sources of data you

 3  considered?

 4    A.    When I prepare a report, I endeavor to -- and I've

11:48AM  5  got an assistant that I use -- for keeping track of the sources

 6  that I review and -- and seek.  And I -- if I did not have the

 7  EPA website listed in my two expert reports, then that was an

 8  oversight on -- an omission on my part.  I did look at the EPA

 9  website.

11:48AM 10    Q.    And is it in either of your reports in those lists

11  of documents you reviewed?

12    A.    Do you have copies to show me that I can check?

13    Q.    You don't have a copy of your report?

14         THE COURT:  Counsel, 403.  Please move on to your

11:48AM 15  next question.

16    Q.    (BY MR. BLUM:)  Okay.  Now, let's talk about

17  perchlorate for a moment.

18         Now, you testified that at the time -- in the '80s,

19  that there was not an understanding that perchlorate was a

11:49AM 20  health risk; correct?

21    A.    The understanding in the regulatory community and

22  the environmental consulting type community was limited, very

23  limited for perchlorate health impacts in the -- you said early

24  1980s?

11:49AM 25    Q.    Well, how about through 1988.

1      A.     Through that time period.

2      Q.     At the time, perchlorate -- the problem with

3 perchlorate was thought to be that it was ignitable; correct?

4      A.     It -- it -- during that time period, it was believed

11:49AM   5 to be ignitable.

6      Q.     And isn't it correct that diluted perchlorate,

7 perchlorate that was diluted with water, was not thought to be

8 ignitable?

9      A.     By whom?

11:49AM   10      Q.     By the industry that you work in.

11      A.     The -- the -- that would really be a function of

12 the -- whatever else was included -- you're talking about a

13 mixture of water and perchlorate.

14      Q.     Yes.

11:50AM   15      A.     What the -- what other substances may be there,

16 what's the percentage of water and perchlorate, ignitability

17 really -- it's not just a -- it just doesn't go away if you put

18 a little bit of water on it.

19      Q.     Wasn't there a -- what some people referred to as a

11:50AM   20 1 percent rule, that perchlorate had to be at least more than

21 1 percent of the solution in water in order for there to be a

22 potential that it could be ignitable?

23      A.     I am not familiar with that rule.

24      Q.     Are you -- are you --

11:50AM   25      A.     And it's probably not a -- it's probably more of a

        1    guideline or hypothetical as opposed to a -- strictly what a

        2    rule would be.

        3         Q.   All right.  Can we go to Exhibit 468, please.

        4              MR. BLUM:  It's stipulated.

11:50AM 5         Q.   (BY MR. BLUM:)  All right.  Now, this is one of the

        6    exhibits that you discussed with Mr. Richard, please --

        7    correct?

        8         A.   I did.  Yes.

        9         Q.   All right.  Just, I'm sorry, if you'd just give me a

11:51AM 10   moment.

        11             And according to the exhibit, what did Whittaker do

        12   once it located these materials?

        13             Well, I'll help you.  It's in the second -- the

        14   second and third line of the first paragraph.

11:51AM 15        A.   It does not say anything that somebody did in the

        16   second, third line of the first paragraph.

        17        Q.   What did Mr. Jisa say was going to happen?

        18        A.   I don't see anything that says Mr. Jisa said

        19   anything.

11:51AM 20        Q.   All right.  What did the author say was going to be

        21   necessary?

        22        A.   It says -- I'll read it, the clause.  "It will be

        23   necessary for Jim Jisa to have a contracted wasted *[sic]* hauler

        24   remove it from Bermite."

11:52AM 25             It doesn't say he did anything, which was the

original question.  It just says that it will be necessary for
him to do it.  Doesn't say he did it.

Q.   It doesn't say let's go out to the burn pit and drop
it on the ground, does it?

A.   It does not say that.

Q.   Doesn't say it says we're going to call a hauler and
remove it; correct?

A.   It -- it does not say --

THE COURT:  All right.  Counsel, move on to your
next question, please.

Q.   (BY MR. BLUM:)  Do you have any evidence that you've
read or seen that the waste hauler was not called?

A.   For this particular body of waste that's talked
about in this memo?

Q.   Yes.

A.   I -- I have not seen any documentation other than
this about the handling of that waste, whether it was taken
offsite by a hauler, dumped on the ground, or left where it was
when they wrote the memo.

Q.   So you cannot testify that the material was not
removed by a waste hauler, can you?

A.   As I said, I don't know what was done with it,
whether -- whether it was handled by the waste hauler or not.

Q.   Now, if you take a look at the third paragraph, do
you see what's in caps?

**UNITED STATES DISTRICT COURT**

1          A.    I do see that.

2          Q.    And it talks about these types of waste.  And then

3    what does it say?

4          A.    "Which are then," in capitals, "NOT NOW HANDLED IN

11:53AM  5    THE SYSTEM."

6          Q.    Does that mean to you that these are wastes that are

7    no longer used in the manufacturing process?

8          A.    No.  It doesn't say that.

9          Q.    Could it mean that?

11:53AM 10          A.    For me, if that's what it meant, then that's what it

11    should say.  It says, to me -- when I'm thinking the system,

12    this memo is about liquid waste and handling liquid waste.  And

13    it sounds like it's not handled -- whatever the system is for

14    handling of liquid waste at the site.

11:54AM 15          Q.    Can you say to a reasonable degree of scientific

16    certainty that what is meant by this memo is not that these are

17    just -- these are just products that aren't used anymore at the

18    site?

19          A.    That is not stated in this -- in this memo, and the

11:54AM 20    language to me doesn't imply that.

21          Q.    All right.  Let's go to Exhibit 445, stipulated.

22                THE COURT:  And there's no need to state that when

23    it's already been received, in effect.

24                MR. BLUM:  Okay.  Thank you, Your Honor.

11:55AM 25          Q.    (BY MR. BLUM:)  Now, this is the document that the

plaintiffs have coined the mystery memo.  You've seen this

before; correct?

    A.    I have.

    Q.    All right.  Now, I want to -- in your job, your

assignment here, were you asked to make a distinction between

what was disposed of post-1967 versus pre-1967?

    A.    I was not.

    Q.    So when you say something was disposed of, you're

not rendering an opinion as to when it was disposed of;

correct?

    A.    Unless the -- the documentation which I base that

statement states what had happened, I am not -- my opinions on

waste dumping that occurred is not -- it is not within -- a

pre-'67 versus a post-'67.

    Q.    Or when they say they found a drum, you have no

opinion as to when that drum was actually put at that location;

correct?

    A.    I do not recall seeing any evidence related to the

drum recoveries that stated when it was placed.

    Q.    Okay.  So, for instance, if we go to the -- under

Summary, if we go to the paragraph, the first one where it

talks about 40 years or more, landfills evidently were anywhere

from one day to possibly 40 years?

    A.    Can you -- I don't know where you are.

    Q.    Sure.  It's 445.

1       A.    Oh, gotcha.  The second paragraph?

2       Q.    Yeah.  Do you see where it says 40 years, sir?

3       A.    At the end of the paragraph?

4       Q.    No.  It's actually -- yeah, I guess it's towards the

11:57AM  5   end.

6       A.    I see the paragraph.

7       Q.    All right.  Could it have been longer than 40 years?

8       A.    I'll read the paragraph so I know what you're

9   talking about.

11:57AM  10      Q.    Sure.

11            (Pause in the proceedings.)

12            THE WITNESS:  Well, it says the use of landfills

13  evidently was anywhere from one day to possibly 40 years or

14  more.

11:57AM  15      Q.    (BY MR. BLUM:)  So these landfills could have been

16  operating for a century; correct?

17      A.    Uh, I'm trying to remember if the history goes back

18  to 1887 or not.  I thought -- yeah, I -- I'm not -- I

19  haven't -- I'm not focused on what the history was back in 1887

11:58AM  20  and the few decades thereafter.

21      Q.    Well, your job was to look at the site from 1934 to

22  1987; correct?

23      A.    I primarily focused on the early 1940s as far as

24  activities on the site through '87.

11:58AM  25      Q.    But I know -- that may be primarily.  But your job

```
 1    was, as stated in your report, '34 to '87; correct?

 2        A.   I believe so.

 3        Q.   Could these landfills have been operating in 1934?

 4        A.   I don't recall any information from -- well,

 5    actually, with many of these, there was no information because

 6    they got scooped up and taken away without submitting any

 7    records.  I do not recall any records that document the period

 8    during which these landfills were used.

 9        Q.   So as a result, as a scientist, you can't conclude

10    what was the total length of the operation of these landfills?

11        A.   That -- I cannot based on the information that I've

12    seen, the limited information on the -- provided by the

13    consultants on the landfills.  I cannot conclude what the

14    length of operation was.

15        Q.   All right.  And when it talks about, right above

16    that, drums and metal containers, you have no opinion as to

17    when those drums or containers were put in the landfills, do

18    you?

19        A.   It's that same paragraph?

20        Q.   Yeah.  It's -- yes.  You know what?  Um, no, I'm

21    sorry.  I've hit my screen.

22             Let's move down to the -- below that, the paragraph

23    that starts "The materials that have been found."  And it talks

24    about metal scrap and it talks about liquid or solid hazardous

25    wastes.  Correct?  "Liquid and solid hazardous wastes" is
```

11:58AM (line 5)
11:58AM (line 10)
11:59AM (line 15)
11:59AM (line 20)
12:00PM (line 25)

**UNITED STATES DISTRICT COURT**

1   underlined.

2       A.   Yes.  I'm reading the whole paragraph because you

3   said a couple of things.

4       Q.   Sure.

12:00PM  5       (Pause in the proceedings.)

6       THE WITNESS:  It does say and it is underlined

7   that -- "liquid and solid hazardous wastes."

8       Q.   (BY MR. BLUM:)  And you have no idea when those

9   liquid or solid wastes were put in these landfills, do you?

12:00PM 10       A.   No.  Again, there was no documentation what the

11  material was.  And also, the -- it says it was manifested and

12  shipped offsite.  I have not seen the manifest records which

13  would tell us what it was.  And knowing what it was, what the

14  waste consisted of, could help inform us of when it was put

12:01PM 15  there.  For example, TCE waste wouldn't have been there a

16  hundred years ago.

17       Q.   TCE waste could have been there during -- placed

18  there in World War II, couldn't it?

19       A.   Yes, it could have.  TCE was used on the site for

12:01PM 20  degreasing during World War II.

21       Q.   But sitting here today, you have no opinion as to

22  when these liquid and solid hazardous wastes referred to on

23  page 1 were actually placed in the landfills, do you?

24       A.   Based on the records that I've seen and been

12:01PM 25  provided and have been made available, I cannot make that

```
 1    judgment because the -- as I said, the manifests and the
 2    detailed testing results have not been provided to me.
 3         Q.    Now, what is a manifest?
 4         A.    Manifest is a form, the government form.  And when
 5    you're shipping a waste offsite from one location to another,
 6    this manifest is a government form that informs the Government
 7    of what it is, where it went, came from, and where it went to
 8    and what the quantity was and the timing.
 9         Q.    Now, when you fill out a manifest, don't you --
10    isn't there actually carbons so you're actually filling out
11    multiple copies of it -- multiple copies of the manifest?
12         A.    It's one of those old school multiform -- multicopy
13    forms to fill out.
14         Q.    And one of the copies goes to the Department of
15    Toxic Substances Control; correct?
16         A.    I know a copy goes to state regulatory agency.
17         Q.    So if Whittaker was trying to hide these -- these
18    activities, wouldn't manifesting them have been a real bad
19    idea?
20         A.    Well, I'm not going to endeavor to decide what's a
21    bad idea for Whittaker or not.
22         Q.    Let me --
23         A.    Supplying the manifest -- manifesting the waste and
24    supplying the copy to the State is complying with the
25    regulations.
```

**UNITED STATES DISTRICT COURT**

         1       Q.    And it's telling the State, hey, there's some

         2   hazardous wastes at that site?

         3       A.    Well, it would be telling them there was some

         4   hazardous waste at that site.

12:03PM  5       Q.    Is there a tax on hazardous waste?

         6       A.    There is.

         7       Q.    And the taxes on hazardous waste are usually drawn

         8   from manifests; correct?

         9       A.    I'm not familiar with how the Government decides

12:03PM 10   what the tax is going to be.

        11       Q.    Doesn't the Government look at manifests in order to

        12   at least use that information in calculating the taxes?

        13             THE COURT:  The Court's going to sustain its own

        14   objection as lack of foundation.

12:04PM 15       Q.    (BY MR. BLUM:)  Do you know how the hazardous waste

        16   tax system works in California in the 1980s?

        17       A.    I am not familiar with the hazardous waste taxing.

        18       Q.    All right.  Let's go down, then.  Let's go to the

        19   last sentence after it says, "Manifest was shipped to a

12:04PM 20   permitted hazardous waste facility."  What is a permitted

        21   hazardous waste facility?

        22       A.    Facilities that receive waste materials have a

        23   permit.  They're allowed to accept certain types of wastes

        24   based on the physical nature, whether it's solid or liquid,

12:04PM 25   based on the chemical constituents, based on volumes,

characteristics like that.  So each facility has its own permit with its own restrictions.  So that's what a permitted hazardous waste facility is.

Q.    That means that in order for a hazardous waste facility to accept the waste, the facility has to know what the waste is; correct?

A.    The facility certainly should know what the waste is.  It doesn't always happen, I can tell you.  But that facility that is permitted should know what they're receiving.

Q.    So the facility, if they follow the law, is supposed to have a waste analysis with the manifest or something else to prove what's in the waste that they're trying to dispose of at that permitted facility?

A.    "Prove" is kind of a strong term there.  It's -- there's representative sampling that gets done.  There are tests that go along with the permit.  There are tests that have to be done to show the characteristics of the waste and that it complies -- that the waste would comply or not comply with the -- with the permitted terms.

Samples are representative.  You know, you got a truckload of stuff, you may collect one or two samples out of it.  That doesn't prove that all of it has that characteristic.  That's why I differed with the word "prove."

Q.    That's fine.

But there's a record at the facility relating to

1    what is taken there, by whom, and at least what the

2    representations are of what's in it; correct?

3        A.    There should be.

4        Q.    And those records, at least copies of them, are also

12:06PM  5    given to a governmental agency but -- by rule and regulation;

6    correct?

7        A.    It's my understanding that those -- a copy -- or the

8    tear-off copies of the form goes to the regulatory authority.

9        Q.    So in manifesting wastes such as Whittaker did,

12:06PM  10   according to this memo, they created a long and duplicative

11   record of exactly what wastes were at their site; correct?

12       A.    What do you mean by "long and duplicative"?

13       Q.    Well, they created several different records that

14   were sent to the State of California stating what hazardous

12:07PM  15   wastes were at their site?

16       A.    If -- if they did, indeed, ship this to a hazardous

17   waste facility under a manifest, then the record of that

18   manifest or a copy of that manifest should be at the state

19   agency.

12:07PM  20       Q.    Okay.  As well as records from the receiving site;

21   correct?

22       A.    Well, it's the same form, as everyone who touches it

23   signs in one of the boxes and says, I -- you know, I had it

24   first, I gave it to somebody else, and they gave it to the

12:07PM  25   trucker, the trucker gave it to the facility.  It's all in one

**UNITED STATES DISTRICT COURT**

600

```
 1    form.

 2         Q.    All right.  That's the cradle-to-grave regulation;

 3    right?

 4         A.    From the handling of the waste that goes offsite.

 5         Q.    All right.  Let's go down to the next paragraph.

 6    It's the investigation and characterization of the landfill --

 7    landfills has so far consisted of.  Then it talks about -- do

 8    you have any problem with the first act of an investigation

 9    being a visual inspection of the surface contours and presence

10    or absence of waste materials on the surface?  Anything wrong

11    with that?

12         A.    What do you mean is anything wrong with it?

13         Q.    Is there anything wrong with the initial

14    investigation of a landfill being a visual inspection as

15    described in paragraph 1?

16         A.    I think it -- the visual inspection is actually a

17    good way to begin an investigation.

18         Q.    The second thing they did was a subsurface visual

19    inspection by uncovering the near-surface soils with a backhoe

20    or a dozer.  Anything wrong with that?

21         A.    Okay.  When you say "anything wrong," what do you

22    mean?

23         Q.    Well, is that a proper thing to do as a second step

24    in investigating a landfill?

25         A.    It's a proper step to take in the process.
```

12:07PM  (line 5)
12:08PM  (line 10)
12:08PM  (line 15)
12:08PM  (line 20)
12:08PM  (line 25)

1      Q.   All right.

2      A.   Whether it's the second step, the first step or the

3  third, it -- it's a proper step to take at some point.

4      Q.   Okay.  Now, we talked -- you talked about an OVA,

12:09PM   5  a -- and that's an organic vapor analyzer?

6      A.   That's my understanding of what OVA is.

7      Q.   How does an OVA work?  And by the way, I don't mean

8  the technical end.  Can you do it --

9      A.   You don't want the chemistry inside the device?

12:09PM  10      Q.   I want it at a kindergarten level so I'll understand

11  it.

12      A.   It is a device -- small box, size of a lunch box

13  kind of.  It has a probe that comes out of it.  It's battery

14  operated.  The probe has a -- kind of a -- several-inch-long

12:09PM  15  metal tube that is hollow.  And it is meant to -- to -- as I

16  said earlier this morning, to analyze vapors, just air.  You

17  don't want to stick it in the dirt, stick it in the water

18  because then you have to clean the machine or replace parts.

19          It -- you hold it over vapors that you want to

12:10PM  20  analyze.  Those vapors -- there's a fan in the machine.  It

21  sucks the vapors through the machine.  It does an analysis and

22  will tell you the total amount of a set of organic -- organic

23  compounds present in that sample.

24      Q.   It doesn't distinguish between different kinds of

12:10PM  25  organic compounds; correct?

UNITED STATES DISTRICT COURT

```
 1        A.    Not the -- the OVA that's standardly used in the

 2   field.

 3        Q.    What's a screening tool?

 4        A.    A screening tool?

 5        Q.    Yeah.  In an environmental investigation, is an OVA

 6   a screening tool?

 7        A.    I don't think it could be considered a screening

 8   tool.

 9        Q.    Tell the jury what a screening tool is.

10        A.    A screening tool is a tool that's used in an

11   analysis that's a -- an early-on step just to get a first

12   indication, like if you -- there was talk of excavating with a

13   backhoe.

14             One thing you use an OVA for is protection of your

15   people in the field.  If there's these volatile vapors that

16   could be hazardous to your health, the person standing next to

17   the hole who's taking notes on what they're seeing needs to

18   know that.

19             So it will be -- it's called screening the sample.

20   You're screening the vapor.  And -- and it's an initial

21   analysis.  It doesn't tell you the details of what's in there,

22   but it tells you roughly.  And it allows you to categorize what

23   you're seeing and use that as one basis for what to do next.

24        Q.    And that's -- and this was a proper next step --

25   correct? -- using an OVA as a screening tool?
```

12:10PM (line 5)
12:10PM (line 10)
12:11PM (line 15)
12:11PM (line 20)
12:11PM (line 25)

**UNITED STATES DISTRICT COURT**



                A.     The -- the No. 2 in the other question and the next

and everything is -- is difficult.  But it is -- a screening

tool and an OVA in this case as a screening tool is a proper

component of an assessment.

12:11PM         Q.     Okay.  Now, if an OVA finds the presence of VOCs,

isn't the next step to do what's called confirmatory sampling?

                A.     That would be a possible next step.  It depends on

what you find, where you find it, how much you found.  It's --

it's not -- it's not a -- you know, you find this so,

12:12PM  therefore, you have to do this next step.

                Q.     Isn't that exactly, though, what Whittaker did?

They then took soil samples?

                A.     I understand that they did take some soil samples.

And I can't recall the details of whether in this memo they --

12:12PM  they relate what their sequence of investigation techniques

was.

                Q.     Well, isn't -- No. 3 is using the OVA and No. 4 is

collecting samples to determine if there are hazardous wastes?

                A.     Oh, that is what No. 4 states they did.

12:13PM         Q.     And then No. --

                A.     If they collected them.  It doesn't -- it's general,

obviously.  Doesn't say where they collected or what the

criteria were for getting from Step 3 to Step 4.

                Q.     And then No. 5 is using all of the experience and

12:13PM  all of the data concluding what, if any, part of a landfill

**UNITED STATES DISTRICT COURT**

1 should be a hazardous waste; correct?

2   A. Well, that's not what it says.

3   Q. Right.  Well, make -- it says, "Making a

4 determination from experience that an uncovered material is or

12:13PM 5 is not classified as a hazardous waste"; correct?

6   A. That's what it says.

7   Q. All right.  And then those -- then it goes on to say

8 that those parts that were hazardous wastes were manifested out

9 and those parts that were not were just sent to an ordinary

12:13PM 10 landfill; correct?

11   A. I've just read the next paragraph which begins "the

12 percentage."

13   It says here that -- that percentage of hazardous

14 wastes in these different areas varies.  And it said that the

12:14PM 15 majority of low percentage of hazardous wastes.  The next

16 sentence, though, says, "Those materials have been determined

17 to be hazardous."

18   Hazardous materials are different from hazardous

19 waste.  So it doesn't say that they took away hazardous waste.

12:14PM 20 It says, "Those materials that have been determined to be

21 hazardous have invariable" -- "have invariability *[sic]* been

22 found intact drums or deteriorated, broken drums or metal

23 containers."  It tells you what they found.

24   Q. Now, if we're going to be technical, a hazardous

12:14PM 25 material is something under the Hazardous Materials

Transportation Act; correct?

A.    There are hazardous materials designations under

state regulations, under federal regulations.  There are

different lists of hazardous materials.

12:15PM   Q.    Just for a moment let's assume that the materials

and waste were used interchangeably.  Doesn't the first -- the

statement on the first page say that if it was found to be a

hazardous waste, it was manifested and, if it was not a

hazardous waste, it was sent to a landfill?

12:15PM   A.    Let me -- back on the first page on the hard copy I

have here.  Which paragraph are you referring to?

Q.    Third paragraph.  "The materials that have been

removed have been disposed of in an appropriate manner.  The

hazardous waste has been manifested and shipped to a permitted

12:15PM   hazardous waste facility, and the other wastes have been hauled

to a local landfill."

A.    That's what it says.

Q.    All right.  Now, do you see where -- if we go back

to the second page where it says conclusion and then you see in

12:16PM   the middle where it talks about there's a need for more

investigation and --

A.    Hang on a second.  Are you going to highlight it

or --

Q.    Sure.  Go ahead.

12:16PM   A.    I see.  Right from the beginning?

1    Q.    Yeah.

2          (Pause in the proceedings.)

3    Q.    (BY MR. BLUM:)  Tell me when you've read it.

4    A.    Oh, I'm sorry.  I thought you were going to ask a

12:16PM  5  question about it.

6    Q.    Do you see where it says, "An RFA," RCRA facility

7    assessment, "is now being planned for the entire facility by

8    the EPA.  This assessment will be a complete investigation of

9    the disposal practices of the Bermite facility"?

12:17PM  10  A.    I see that.

11   Q.    Did you ever see the EPA's assessment?

12   A.    I do not recall seeing an EPA authored RCRA facility

13   assessment.

14   Q.    All right.  If we can go to page 3.  And I'm sorry.

12:17PM  15  We can move to page 5.

16         Now, is there a specific definition of "landfill"

17   under RCRA?

18   A.    I believe "landfill" is defined in -- in RCRA.  I'm

19   not 100 percent sure, but I believe it is.

12:17PM  20  Q.    When the author of this document, was he using the

21   RCRA definition or what most of us would describe as a

22   landfill?  What's Webster's dictionary definition?

23   A.    I do not know the person who prepared this or what

24   they were thinking, and I actually don't know the Webster's

12:18PM  25  definition.

```
 1        Q.    All right.  We can go to the next page.  And the
 2   next page talks about the investigation that was done at some
 3   of these different, quote, "landfills," unquote -- right? --
 4   specifically the East Fork?
 5        A.    Yes.  On the page you have up there, yes.
 6        Q.    All right.  Now, you see where it says, um, Samples
 7   Taken and 11 samples?
 8        A.    Correct.  11 samples as indicated on Figure 2.
 9        Q.    All right.  And was a RCRA hazardous waste analysis
10   performed on these samples?
11        A.    It says under -- well, Sample 1, A through E, 10
12   samples taken.  And then it says, "RCRA hazardous analysis,
13   this test not run."
14        Q.    Okay.
15        A.    And I don't know what RCRA hazardous analysis is.
16   You asked -- your question was about a RCRA hazardous waste
17   analysis.  But the author of the memo said RCRA hazardous
18   analysis.
19             It also goes on, under Sample No. 6 just below that,
20   it addresses -- or it lists RCRA hazardous analysis and said
21   the results were negative.
22        Q.    Okay.  Do you know what a RCRA hazardous waste
23   analysis is?
24        A.    What a RCRA hazardous waste analysis is?
25        Q.    Yes.
```

The timestamps in the left margin are: 12:18PM (line 5), 12:18PM (line 10), 12:19PM (line 15), 12:19PM (line 20), 12:19PM (line 25).

**UNITED STATES DISTRICT COURT**

         1           A.    Yes, which this doesn't say, by the way.  It says
         2    RCRA hazardous analysis.
         3                 There are tests that can be done to -- in the
         4    laboratory and -- actually, by other means, also -- to
12:19PM  5    determine if a waste material is actually characterized as a
         6    hazardous waste.
         7           Q.    And it says a RCRA analysis.  RCRA actually
         8    determines what has to be tested for and the means to test it;
         9    correct?
12:20PM 10           A.    There are designations in RCRA for the test to be
        11    taken and the methods used in the test.
        12           Q.    I think it's SW 84.6 is a really --
        13           A.    I think it's SW 846.
        14           Q.    Right, 846.
12:20PM 15                 It's a very lengthy document that describes, if
        16    you're testing for VOCs, this is how you test; if you're
        17    testing for heavy metals, this is how you test.  It's several
        18    feet in length; correct?
        19           A.    I don't know about several feet, but it's a very
12:20PM 20    lengthy document.
        21           Q.    All right.  And for Sample No. 5, it says the
        22    results were negative; correct?
        23           A.    It says the results for the screening bioassay and
        24    for a RCRA hazardous analysis, a negative.
12:20PM 25           Q.    What is a screening bioassay?

                          **UNITED STATES DISTRICT COURT**

1        A.    A bioassay is a test that is performed to get an

2   indication of the impact of a contaminant or a waste material

3   or a mixture of contaminants on some biological creatures, I'll

4   say.

12:21PM   5        A screening assay, kind of like the OVA was a

6   screening indication for vapors, there are screening techniques

7   to determine -- or to -- doesn't really determine if it's

8   screening but to get an idea of whether that -- whatever's

9   being tested has had an adverse impact on whatever biological

12:21PM  10   organisms are being evaluated.

11        Q.    And if you get a negative result on the screening,

12   then you have to go follow through and do the confirmatory

13   testing -- correct? -- just like the OVA and VOCs?

14        A.    Well, a couple parts of that question.  First, I

12:21PM  15   never said anything about if you get a negative on an OVA you

16   would do anything in particular.  A negative on OVA does not

17   mean that there is no organics in the vapors.  OVAs only --

18   only -- only analyzed for certain compounds and certain ranges

19   and are not sophisticated lab tests and are prone to false

12:22PM  20   positives, false negatives.

21        A screening bioassay is a first indication.  But if

22   there's a concern over some biological community, the fact that

23   the screening results are negative does not mean there was no

24   impact.  It's just the first step in doing evaluation.

12:22PM  25        Q.    So it's up to the expertise and the knowledge of the

UNITED STATES DISTRICT COURT

environmental professional whether -- after a negative bioassay

result, whether further testing is required; correct?

    A.    Yeah.  The next step after doing the screening

bioassay -- now, you can have objectives in your test -- in

12:22PM    your investigation and your testing which should define what

the role in the investigation of the screening is.  And if the

results are in certain ranges, whether they're negative or

positive in a range or outside a range, what is going to be

done next and that is what an environmental professional does

12:23PM    and sometimes in concert with regulatory -- regulators.

    Q.    Okay.  Let's go to the next page, .7.  And this is

for the Hula Bowl 1; correct?

    A.    It is about Hula Bowl 1.

    Q.    Was an OVA used?

12:23PM    A.    It says OVA, no vapors detected.

    Q.    Were --

    A.    Which actually makes no sense.  There are vapors.

There are vapors.  If there's no vapor, we couldn't breathe.

So it says no vapors detected, that makes no sense to me.

12:23PM    Q.    Doesn't that really mean there were no VOC vapors

detected?

    A.    I can only read what's on the page.

    Q.    Does it --

    A.    I can't tell you what the person who wrote this -- I

12:24PM    can't tell you what they did in the field, what they found, or

1    what the person who wrote this means.

2         Q.   As an environmental professional, isn't the most

3    likely meaning of it that there were no VOC vapors detected?

4         A.   I'm not going to render an opinion on what somebody

5    meant when they wrote this down.

6         Q.   Well, you've rendered opinions on what people meant

7    all afternoon, Doctor.  What makes you not be able to render an

8    opinion here?

9         A.   I'm reading the words, and these words say no vapors

10   detected.  It says nothing about organics.

11        Q.   So am I correct that you are going to stick to only

12   the verbatim words that are in documents and you're not going

13   to render an opinion onto the meaning or the intent of any

14   document here?

15             THE COURT:  This is argumentative.  Ask your next

16   question.

17        Q.   (BY MR. BLUM:)  All right.  How many samples were

18   taken at Hula Bowl?

19        A.   It says, "Samples taken, yes."  25 samples as

20   indicated in Figure 3.

21        Q.   All right.  Were any of those -- were all those

22   samples run as a RCRA hazardous analysis?

23        A.   Let's see.  It says for Samples 1 to 5, which I will

24   assume they mean there were five samples, although it doesn't

25   say it, it says RCRA hazardous analysis results, negative.  And

12:24PM (lines 5)
12:24PM (lines 10)
12:24PM (lines 15)
12:24PM (lines 20)
12:25PM (lines 25)

**UNITED STATES DISTRICT COURT**

1    then the next section, it says samples B2, B3, et cetera, 20

2    samples taken.  And for RCRA hazardous analysis, it says

3    results, negative.

4         Q.    All right.  25 samples run, 25 samples negative;

12:25PM  5    correct?

6         A.    That is what it says on the page.

7         Q.    Okay.  All right.  Let's move on to a completely

8    different subject.

9              If you could take a look at, um, Exhibit 203,

12:25PM  10    please.  What is Exhibit 203?

11         A.    It is titled "Procedures for Disposal of Hazardous

12    Material," dated January 16 of 1980.

13         Q.    Who wrote it?

14         A.    This document does not have an author on the title

12:26PM  15    page or the next page from my recollection, but I -- my

16    recollection is I concluded it was prepared by

17    Whittaker-Bermite, but -- but I can't recall, as I sit here,

18    why I drew that conclusion.

19         Q.    You concluded it was written by Whittaker?

12:26PM  20         A.    Yes.

21         Q.    Didn't you testify yesterday that you found no

22    manual for the proper handling of hazardous wastes that was

23    written by Whittaker?

24         A.    I don't know if I said it in those words, but I --

12:26PM  25    I -- I did say I -- I did not have -- well, the record would be

```
 1   what the record is, but I did not at the time recall that I had

 2   any handbooks for -- from -- authored by Whittaker for the

 3   handling of hazardous wastes.

 4        Q.   You were wrong, weren't you?

 5        A.   This -- this document, it -- it addresses certain

 6   types of materials and how they are to be handled, certain

 7   types of waste materials on the property.

 8        Q.   So yesterday when you said you found nothing, there

 9   actually were things; correct?

10        A.   There were things for certain types of wastes.  I

11   don't believe this document addresses hazardous waste.

12        Q.   Well, let's go to the table of contents, which is

13   page 2.

14             Now, have you reviewed this document and these

15   different sections?

16        A.   I've reviewed the document.  I -- I don't -- it was

17   a relatively lengthy document.  I can't recall whether I read

18   every page or not, but I -- I did review the document.

19        Q.   And can we go to page 5, which deals with burning?

20   And we talk -- there's initials DOD 4145, et cetera.  Can you

21   remind the jury what you believe that refers to?

22        A.   I believe it's a procedure -- the DOD is Department

23   of Defense.  And I think I may have mentioned this earlier in

24   my testimony.  I believe it was either a procedure or a

25   designation relative to the destruction of waste by burning
```

12:27PM (line 5)
12:27PM (line 10)
12:27PM (line 15)
12:28PM (line 20)
12:28PM (line 25)

**UNITED STATES DISTRICT COURT**

1    them.

2        Q.    Doesn't that refer to a contract, DOD contract?

3        A.    Yeah, I'm not sure if it is a contract or not.

4        Q.    So, now, have you dealt with sites that -- where

12:29PM   5    weapons for the Department of Defense were being manufactured?

6        A.    Yes.

7        Q.    Does the Department of Defense in those instances

8    usually have very extensive requirements that relate to how

9    things are manufactured and dealt with?

12:29PM  10        A.    There are certain -- my experience is that how

11   things are manufactured are specified in great detail, not just

12   the methods of how but what ingredients, what, for example,

13   chemical ingredients would be used in the manufacturing

14   process.

12:29PM  15        Q.    So in this case, the use of perchlorate would have

16   been required by the Department of Defense for the Sparrow and

17   Chaparral missiles; correct?

18        A.    I -- you'd have to show me the contracts or the

19   specifications.

12:29PM  20        Q.    In your experience --

21              THE COURT:  Counsel, we're going to take a break

22   right now.

23              MR. BLUM:  Thank you.

24              THE COURT:  It's now just about 12:30.  We're going

12:29PM  25   to break until 1:00 o'clock.

**UNITED STATES DISTRICT COURT**

1         Please remember, don't speak to anyone about the

2  case, the people, or the subject matter involved.  Continue to

3  keep an open mind until you've had a chance to hear all of the

4  evidence and hear the views of your fellow jurors.

12:30PM   5         Leave your notebooks behind, and please take

6  everything else with you.  Thank you.

7         THE COURTROOM DEPUTY:  All rise for the jury,

8  please.

9         (Out of the presence of the jury:)

12:30PM   10         THE COURT:  Please step down, Doctor, and head

11  outside.

12         Please be seated, everyone.

13         We're outside the presence of the jury as well as

14  Dr. Hughto.

12:31PM   15         We're going to be in recess until 1:00 o'clock.

16         Mr. Blum, I'm going to ask if you would please be

17  aware of being argumentative.  You tend to get argumentative

18  with witnesses as opposed to simply asking the question and

19  then allowing argument in closing argument.

12:31PM   20         Not only is it -- does it -- is it problematic from

21  an evidentiary standpoint, but it also tends to drag out the

22  trial much longer than is necessary.  We're spending at times

23  four to five to six questions when everyone understands the

24  point after the first question.

12:31PM   25         So I've tried not to interject sua sponte that

1    you're being argumentative, but you can expect that I am going

2    to start doing it when I see it.

3              All right.  We're in recess.

4              (Morning proceedings adjourned at 12:31 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                            )
4    STATE OF CALIFORNIA     )

5

6              I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17              DATED THIS 20TH DAY OF NOVEMBER, 2021.

18

19

20              /S/ MYRA L. PONCE
     _____
21        MYRA L. PONCE, CSR NO. 11544, CRR, RDR
             FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**

**$**

**$320** [1] - 569:25
**$636,000** [2] - 550:17, 550:21

**'**

**'02** [1] - 561:2
**'07** [1] - 586:9
**'17** [1] - 586:9
**'34** [1] - 594:1
**'80** [1] - 503:12
**'80S** [5] - 485:6, 531:13, 532:18, 568:9, 587:18
**'86** [1] - 558:18
**'87** [2] - 593:24, 594:1
**'90S** [1] - 568:9
**'94** [1] - 560:25
**'95** [2] - 560:24, 560:25
**'96** [2] - 560:25
**'SCREW** [1] - 498:8
**'THROW** [1] - 498:9

**1**

**1** [23] - 463:7, 464:10, 489:1, 510:16, 510:18, 513:9, 523:14, 528:21, 558:16, 559:18, 559:20, 565:25, 566:16, 566:17, 566:22, 588:20, 588:21, 595:23, 600:15, 607:11, 610:12, 610:13, 611:23
**1,1,1-TRICHLOROETHANE** [1] - 485:2
**1.8** [2] - 550:17, 550:21
**10** [4] - 585:4, 585:6, 586:12, 607:11
**100** [1] - 606:19
**10:30** [1] - 543:1
**10:45** [2] - 543:2, 548:25
**11** [4] - 464:3, 464:9, 607:7, 607:8
**110** [1] - 562:13
**128** [1] - 464:5
**129** [1] - 464:5
**12:30** [1] - 614:24
**12:31** [1] - 616:4
**12TH** [1] - 493:25
**13** [2] - 464:9, 562:25

**130** [1] - 464:6
**131** [1] - 464:6
**1318** [1] - 524:20
**134** [1] - 464:7
**135** [1] - 464:7
**1381** [3] - 524:2, 524:21, 524:23
**1420** [1] - 569:5
**1425** [1] - 569:5
**1427** [3] - 581:20, 581:22, 581:23
**14TH** [1] - 473:18
**15** [4] - 464:6, 464:8, 485:17, 543:8
**150** [1] - 530:9
**150,000** [1] - 568:15
**15TH** [2] - 521:13, 523:18
**16** [2] - 561:20, 612:12
**164** [2] - 572:20, 573:2
**167** [1] - 464:8
**168** [2] - 464:8
**169** [1] - 464:9
**16TH** [1] - 479:4
**17TH** [2] - 507:4, 550:3
**18** [4] - 464:7, 572:20, 572:22, 573:3
**18-06825-SB** [1] - 463:8
**18-WHEEL** [1] - 539:9
**181** [1] - 464:10
**182** [1] - 464:10
**1887** [2] - 593:18, 593:19
**19** [2] - 463:1, 578:18
**1934** [2] - 593:21, 594:3
**1940S** [1] - 593:23
**1945** [2] - 575:22, 575:24
**1968** [1] - 478:10
**1978** [2] - 473:18, 474:22
**1979** [3] - 476:18, 477:12, 489:5
**1980** [27] - 479:4, 480:11, 481:7, 481:13, 482:4, 483:14, 484:4, 485:17, 487:14, 489:17, 490:15, 494:11, 497:19, 499:1, 500:13, 561:21, 578:14, 578:18, 578:21, 579:20, 579:25, 580:16, 580:18, 581:1, 585:11, 612:12

**1980S** [10] - 584:5, 584:12, 584:18, 585:5, 585:8, 585:17, 586:7, 586:11, 587:24, 597:16
**1981** [2] - 490:22, 581:1
**1982** [25] - 493:23, 493:25, 494:12, 495:10, 496:13, 499:3, 499:6, 500:13, 500:14, 501:1, 502:22, 503:11, 505:25, 506:6, 507:4, 508:19, 509:19, 510:1, 516:6, 520:3, 520:16, 557:20, 568:5, 581:1
**1985** [4] - 521:8, 521:14, 523:12, 523:18
**1986** [1] - 524:5
**1987** [14] - 525:20, 526:18, 529:11, 530:2, 531:16, 532:18, 536:11, 537:16, 542:12, 550:3, 551:10, 552:25, 553:16, 593:22
**1988** [2] - 535:19, 587:25
**1990** [2] - 557:6, 558:18
**1991** [3] - 526:15, 537:4, 537:6
**1996** [4] - 561:15, 561:17, 561:20, 562:21
**19TH** [2] - 490:22, 526:18
**1:00** [2] - 614:25, 615:15

**2**

**2** [25] - 464:5, 497:8, 499:14, 502:18, 506:15, 508:10, 510:10, 511:5, 513:16, 513:23, 517:8, 519:6, 523:14, 528:14, 530:25, 540:13, 553:18, 565:25, 566:16, 582:17, 603:1, 607:8, 613:13
**2(A** [1] - 496:25

**1980S** continued...

**2-AND-A-HALF** [1] - 563:1
**20** [3] - 539:10, 560:10, 612:1
**20,000** [1] - 540:13
**2002** [3] - 559:21, 560:10, 565:4
**201** [2] - 473:15, 473:16
**2013** [1] - 566:7
**202** [2] - 476:17, 477:21
**2021** [1] - 463:1
**203** [5] - 478:23, 479:2, 479:5, 612:9, 612:10
**205** [6] - 480:7, 480:9, 481:7, 492:12, 494:6, 505:8
**206** [2] - 485:12, 485:13
**210** [3] - 499:5, 499:8, 502:17
**215** [3] - 520:2, 520:4, 520:16
**22** [1] - 553:16
**22ND** [3] - 520:3, 525:20, 552:25
**24** [3] - 504:8, 504:10, 505:18
**25** [5] - 510:1, 510:3, 611:19, 612:4
**25,000** [1] - 562:25
**26** [1] - 499:6
**27** [1] - 466:8
**28** [1] - 483:19
**29** [6] - 481:17, 483:19, 486:18, 492:13, 494:6, 505:9
**29TH** [2] - 476:18, 501:1

**3**

**3** [15] - 464:3, 464:6, 464:10, 479:12, 510:18, 510:22, 511:1, 517:9, 565:25, 566:16, 582:17, 603:17, 603:23, 606:14, 611:20
**30** [3] - 464:17, 466:24, 467:1
**30,000** [2] - 539:6, 539:10
**300** [1] - 517:13
**307** [1] - 482:23
**308** [1] - 501:21
**31** [1] - 566:18

**314** [2] - 508:15, 536:19
**317** [15] - 483:8, 506:9, 506:12, 507:2, 507:8, 507:15, 509:11, 509:25, 510:17, 511:2, 557:9, 557:15, 557:18, 567:18, 568:4
**31ST** [1] - 557:6
**37,000** [1] - 510:20
**37,000-GALLON** [1] - 511:2
**382** [2] - 556:20, 558:14

**4**

**4** [11] - 477:5, 486:9, 510:1, 557:23, 562:14, 562:17, 562:24, 603:17, 603:19, 603:23
**40** [9] - 518:15, 527:18, 532:17, 575:7, 592:22, 592:23, 593:2, 593:7, 593:13
**403** [3] - 447:14, 548:17, 587:14
**41,000** [3] - 562:13, 562:14, 562:19
**4145** [1] - 613:20
**429** [2] - 565:6, 565:9
**437** [2] - 521:9, 521:11
**445** [9] - 525:16, 528:15, 530:3, 533:4, 536:10, 538:21, 540:12, 591:21, 592:25
**448** [2] - 549:10, 549:11
**453** [2] - 507:3, 507:5
**466** [2] - 500:25, 501:3
**468** [3] - 490:18, 490:19, 589:3
**4TH** [1] - 524:5

**5**

**5** [8] - 524:17, 536:10, 562:24, 603:24, 606:15, 608:21, 611:23, 613:19
**5,000** [2] - 474:20, 475:9
**50,000** [2] - 567:17, 568:10
**50-PAGE** [1] - 465:23

**504** [2] - 493:24, 494:2
**504.4** [1] - 497:21
**55-GALLON** [2] - 474:20, 474:22

## 6

**6** [2] - 538:21, 607:19

## 7

**7** [3] - 477:22, 499:15, 610:11
**75** [2] - 474:20, 474:22

## 8

**8** [5] - 464:8, 540:12, 572:20, 572:22, 573:2
**800** [1] - 567:13
**81** [1] - 524:22
**84.6** [1] - 608:12
**846** [2] - 608:13, 608:14
**85** [6] - 528:21, 529:7, 529:8, 539:1, 539:7, 539:10
**8:23** [1] - 463:1
**8:30** [1] - 466:24

## 9

**9** [4] - 464:5, 464:7, 561:14, 585:3
**93** [1] - 464:3
**9TH** [2] - 480:10, 481:13

## A

**A-N-E** [1] - 485:3
**A.M** [1] - 463:1
**A.P** [1] - 508:15
**ABBREVIATION** [2] - 485:2, 540:18
**ABBREVIATIONS** [1] - 533:14
**ABDUNE** [1] - 557:3
**ABDUNE-NUR** [1] - 557:3
**ABILITY** [2] - 487:10, 585:12
**ABLE** [9] - 471:16, 472:14, 523:19, 541:9, 547:11, 569:1, 572:6, 575:22, 611:7
**ABOARD** [1] - 563:16
**ABSENCE** [1] - 600:10

**ABSOLUTELY** [1] - 571:2
**ACCEPT** [2] - 597:23, 598:5
**ACCESS** [1] - 469:4
**ACCORDING** [1] - 511:21
**ACCORDING** [3] - 517:14, 589:11, 599:10
**ACCUMULATED** [1] - 475:8
**ACQUIRED** [1] - 563:10
**ACRE** [1] - 531:17
**ACT** [5] - 571:3, 571:5, 571:7, 586:13, 600:8
**ACT** [6] - 480:16, 584:24, 585:1, 585:2, 585:4, 605:1
**ACT'S** [1] - 480:22
**ACTION** [1] - 558:23
**ACTION** [1] - 521:22
**ACTIONS** [1] - 550:23
**ACTIVITIES** [9] - 542:15, 542:21, 550:15, 552:18, 563:18, 575:23, 576:5, 593:24, 596:18
**ACTUAL** [4] - 514:24, 544:11, 544:24, 552:11
**ACUTE** [2] - 477:7, 477:13
**ADDING** [1] - 508:22
**ADDITION** [1] - 486:18
**ADDITIONAL** [4] - 481:14, 535:21, 542:10, 576:8
**ADDRESS** [5] - 465:18, 524:11, 546:23, 561:7, 561:11
**ADDRESSED** [1] - 538:6
**ADDRESSES** [3] - 607:20, 613:5, 613:11
**ADEQUATE** [2] - 507:15, 511:19
**ADEQUATELY** [3] - 488:5, 488:10, 557:10
**ADJACENT** [2] - 507:8, 507:14
**ADJOURNED** [1] - 616:4
**ADMITTED** [1] - 464:25

**ADMONISH** [1] - 507:21
**ADVERSE** [2] - 487:1, 609:9
**ADVICE** [1] - 536:21
**ADVISING** [1] - 551:10
**AERIAL** [15] - 574:18, 574:19, 574:21, 574:22, 575:6, 575:8, 575:9, 575:12, 575:17, 575:20, 575:21, 575:25, 576:1, 576:4, 576:9
**AFFAIRS** [1] - 527:4
**AFTERNOON** [5] - 468:11, 546:17, 547:3, 569:9, 611:7
**AGENCIES** [5] - 471:19, 473:3, 473:7, 537:13, 584:10
**AGENCY** [2] - 463:8, 470:8, 559:25
**AGENCY** [3] - 596:16, 599:5, 599:19
**AGO** [5] - 468:15, 497:18, 546:2, 565:2, 595:16
**AHEAD** [3] - 463:6, 470:2, 605:24
**AIR** [6] - 540:21, 564:4, 564:5, 564:7, 601:16
**AL** [1] - 520:5
**AL** [1] - 463:9
**ALIBRANDI** [1] - 551:1
**ALLOW** [11] - 468:1, 468:3, 495:1, 506:21, 515:13, 519:20, 547:7, 547:8, 548:9
**ALLOWED** [1] - 597:23
**ALLOWING** [2] - 506:25, 615:19
**ALLOWS** [1] - 602:22
**ALLUDED** [2] - 471:24, 472:2
**ALMOST** [6] - 507:17, 513:19, 516:5, 516:10, 517:10, 543:1
**ALTER** [1] - 580:23
**ALUMINUM** [1] - 474:14
**AMERICA** [1] - 465:25
**AMMONIUM** [2] - 474:14, 475:10

**AMMUNITION** [2] - 479:25, 480:3
**AMOUNT** [10] - 468:11, 486:2, 493:18, 507:15, 544:9, 548:21, 566:21, 567:21, 568:6, 601:22
**AMOUNTS** [4] - 474:23, 486:15, 486:22, 487:19
**ANALYSIS** [22] - 540:10, 573:10, 573:11, 575:5, 598:11, 601:21, 602:11, 602:21, 607:9, 607:12, 607:15, 607:17, 607:18, 607:20, 607:23, 607:24, 608:2, 608:7, 608:24, 611:22, 611:25, 612:2
**ANALYSIS** [1] - 517:24
**ANALYZE** [4] - 515:18, 601:16, 601:20
**ANALYZED** [4] - 568:1, 568:2, 573:14, 609:18
**ANALYZER** [2] - 540:19, 601:5
**ANGELES** [1] - 463:2
**ANNUAL** [1] - 582:12
**ANONYMOUSLY** [1] - 526:15
**ANSWER** [15] - 476:5, 495:14, 496:9, 502:11, 503:6, 508:5, 509:7, 538:5, 553:8, 568:10, 570:13, 570:19, 570:22, 573:7, 574:6
**ANSWERED** [1] - 534:4
**ANSWERING** [1] - 573:23
**ANSWERS** [1] - 570:21
**ANTICIPATE** [1] - 464:14
**ANYWAY** [1] - 472:21
**APOLOGIES** [1] - 510:17
**APPEAR** [1] - 546:10
**APPEARANCES** [1] - 463:10
**APPEARED** [1] - 491:11

**APPLICANT** [1] - 535:11
**APPLICATION** [3] - 535:6, 535:7, 535:21
**APPLIED** [2] - 564:1, 584:12
**APPLIES** [1] - 584:7
**APPLY** [3] - 564:2, 583:24, 584:1
**APPRECIATE** [2] - 565:17, 565:19
**APPROACH** [4] - 552:4, 553:1, 553:3, 554:18
**APPROPRIATE** [1] - 605:13
**APPROVAL** [1] - 475:14
**APRIL** [4] - 493:25, 494:12, 496:13, 499:3
**AQUIFER** [7] - 513:18, 514:6, 514:8, 514:13, 516:5, 516:23, 518:3
**ARE** [1] - 492:2
**AREA** [59] - 471:7, 471:10, 472:16, 472:25, 473:2, 473:8, 482:19, 483:16, 483:17, 484:2, 485:15, 488:4, 489:8, 490:8, 490:12, 493:11, 493:12, 493:13, 493:15, 494:5, 495:2, 495:8, 495:10, 495:19, 496:4, 496:14, 499:22, 500:9, 501:21, 502:2, 502:4, 503:13, 506:16, 506:17, 512:20, 513:16, 514:17, 517:15, 538:8, 541:5, 541:7, 541:13, 542:4, 556:13, 556:15, 557:18, 562:21, 566:15, 567:2, 567:8, 567:15, 567:18, 567:20, 568:6, 568:7, 568:8
**AREAS** [28] - 472:5, 472:19, 478:1, 483:12, 483:15, 484:3, 486:18, 490:14, 492:1, 492:13, 493:9, 494:6, 494:11,

499:2, 504:21, 505:9, 505:14, 511:1, 517:13, 526:24, 531:6, 539:16, 540:13, 541:5, 563:22, 566:11, 604:14
**ARGUING** [1] - 469:14
**ARGUMENT** [2] - 615:19
**ARGUMENTATIVE** [4] - 611:15, 615:17, 616:1
**ARRIVING** [1] - 568:9
**ARTICULATED** [1] - 546:4
**AS** [1] - 471:2
**ASCERTAINED** [1] - 548:14
**ASIDE** [1] - 537:23
**ASPECT** [2] - 503:12, 554:11
**ASSAY** [1] - 609:5
**ASSESSMENT** [23] - 522:19, 523:1, 528:2, 528:7, 528:24, 529:15, 529:19, 530:16, 531:5, 531:6, 531:19, 533:2, 533:23, 542:13, 542:19, 560:16, 563:18, 583:23, 603:4, 606:7, 606:8, 606:11, 606:13
**ASSIGNMENT** [4] - 583:23, 584:1, 592:5
**ASSISTANT** [1] - 587:5
**ASSOCIATED** [1] - 555:17
**ASSOCIATES** [5] - 525:5, 525:20, 532:2, 533:19, 552:24
**ASSUME** [4] - 491:12, 535:18, 605:5, 611:24
**ASSUMING** [4] - 546:3, 546:17, 547:9, 547:22
**ASSUMPTIONS** [1] - 550:23
**ATTACH** [1] - 530:16
**ATTACHED** [1] - 480:21
**ATTACHMENTS** [1] - 494:18
**ATTEMPT** [3] - 515:1, 548:5, 561:17

**ATTEMPTED** [2] - 496:12, 553:17
**ATTENTION** [6] - 468:8, 468:12, 489:21, 509:16, 543:22
**ATTITUDE** [2] - 498:8, 498:21
**ATTORNEY** [1] - 584:10
**ATTORNEYS** [2] - 574:10, 574:14
**AUGUST** [6] - 473:18, 499:6, 500:14, 502:22, 505:25
**AUTHOR** [11] - 477:7, 477:24, 491:25, 498:22, 503:23, 505:8, 522:16, 589:20, 606:20, 607:17, 612:14
**AUTHORED** [2] - 606:12, 613:2
**AUTHORITY** [1] - 599:8
**AVAILABLE** [2] - 576:14, 595:25
**AVENUE** [1] - 548:11
**AVERAGE** [2] - 530:3, 530:8
**AVERT** [3] - 519:23, 519:24, 520:20
**AVERTING** [1] - 520:13
**AVOID** [1] - 519:24
**AVOIDING** [1] - 555:6
**AWARE** [9] - 505:7, 506:8, 522:15, 522:16, 574:17, 579:4, 579:19, 585:15, 615:17

**B**

**B2** [1] - 612:1
**B3** [1] - 612:1
**BACKGROUND** [1] - 511:4
**BACKHOE** [11] - 540:24, 540:25, 541:3, 541:4, 541:7, 541:17, 542:7, 553:22, 554:1, 600:19, 602:13
**BACKHOES** [1] - 541:16
**BACKWARDS** [1] - 502:19
**BAD** [3] - 581:14, 596:18, 596:21

**BALLPARK** [2] - 570:3, 570:5
**BARREL** [1] - 497:16
**BASE** [1] - 592:11
**BASED** [27] - 472:12, 490:10, 496:11, 500:15, 502:23, 503:8, 506:9, 508:19, 514:11, 522:24, 533:16, 533:17, 538:11, 538:13, 546:25, 563:14, 566:10, 566:19, 566:21, 567:16, 572:8, 578:8, 594:11, 595:24, 597:24, 597:25
**BASIS** [6] - 475:15, 475:17, 476:14, 491:23, 517:4, 602:23
**BATTERY** [1] - 601:13
**BEAN** [9] - 510:5, 510:22, 511:21, 512:7, 512:15, 516:3, 516:11, 519:10
**BECAME** [3] - 485:6, 492:19, 562:9
**BECOME** [1] - 477:10
**BECOMES** [1] - 564:8
**BED** [2] - 511:24, 512:1
**BEGAN** [1] - 565:3
**BEGIN** [2] - 540:24, 600:17
**BEGINNING** [5] - 491:7, 532:17, 537:17, 580:4, 605:25
**BEGINS** [7] - 480:19, 485:18, 499:21, 517:8, 518:25, 528:16, 604:11
**BEHIND** [4] - 543:6, 553:12, 556:1, 615:5
**BELL** [1] - 463:18
**BELOW** [6] - 480:20, 482:23, 516:15, 530:11, 594:22, 607:19
**BENEATH** [1] - 554:21
**BENEFIT** [4] - 505:22, 571:6, 571:17, 571:23
**BENIGN** [1] - 466:19
**BERMITE** [7] - 473:19, 488:22, 491:13, 496:11,

497:9, 505:23, 506:1, 506:2, 506:3, 520:14, 521:1, 521:14, 526:18, 526:22, 550:11, 560:5, 589:24, 606:9, 612:17
**BERMITE-WHITTAKER** [1] - 506:1
**BEST** [1] - 555:3
**BETTER** [3] - 498:18, 543:18, 545:21
**BETWEEN** [9] - 471:18, 472:8, 478:15, 544:18, 555:22, 565:8, 575:17, 592:5, 601:24
**BEYOND** [2] - 531:25, 534:10
**BIAS** [2] - 571:16, 571:19
**BIG** [2] - 551:24, 553:11
**BIGGER** [1] - 556:15
**BINDER** [3] - 473:11, 556:21, 581:23
**BIOASSAY** [6] - 608:23, 608:25, 609:1, 609:21, 610:1, 610:4
**BIOLOGICAL** [3] - 609:3, 609:9, 609:22
**BIT** [7] - 485:16, 508:4, 534:16, 539:8, 556:18, 563:6, 588:18
**BLACKED** [2] - 559:6, 559:7
**BLACKED-OUT** [1] - 559:6
**BLANKING** [1] - 496:6
**BLOTCHES** [1] - 565:25
**BLUE** [1] - 497:16
**BLUM** [76] - 463:15, 467:2, 467:8, 468:9, 468:14, 468:18, 468:21, 468:25, 469:2, 469:7, 469:13, 469:19, 470:1, 475:19, 475:25, 481:1, 500:19, 502:5, 502:9, 503:1, 503:4, 505:15, 507:19, 516:1, 524:6, 524:8, 524:13, 530:12, 531:9, 532:9,

532:13, 534:4, 534:7, 534:10, 536:6, 537:19, 538:3, 544:8, 545:1, 545:17, 546:5, 546:13, 547:2, 547:10, 547:13, 547:16, 552:7, 553:6, 558:9, 568:20, 568:23, 569:4, 569:8, 571:11, 572:19, 572:22, 572:25, 573:16, 578:18, 581:21, 581:24, 583:5, 583:6, 586:22, 587:16, 589:4, 589:5, 590:11, 591:24, 591:25, 593:15, 595:8, 597:15, 606:3, 611:17, 614:23
**BLUM** [14] - 463:15, 467:1, 467:20, 468:6, 468:20, 524:7, 524:11, 534:8, 543:19, 547:17, 548:11, 568:19, 569:1, 615:16
**BOARD** [10] - 473:19, 474:4, 521:13, 522:5, 523:12, 577:8, 577:11, 582:11, 582:14, 584:15
**BODY** [4] - 512:1, 577:13, 590:13
**BORINGS** [1] - 539:16
**BOTTOM** [13] - 474:12, 479:14, 479:15, 482:2, 488:19, 504:22, 511:15, 517:7, 527:14, 530:24, 561:14, 566:5
**BOUNDARIES** [1] - 531:25
**BOWL** [33] - 494:1, 494:5, 494:10, 494:13, 494:14, 495:23, 495:25, 496:3, 496:13, 496:20, 497:22, 499:2, 499:4, 499:17, 499:21, 500:6, 500:8, 500:13, 500:16, 501:22, 501:24,

502:4, 502:14, 502:17, 502:22, 538:15, 567:4, 567:5, 567:8, 567:12, 610:12, 610:13, 611:18
**BOX** [4] - 511:3, 512:9, 601:12
**BOXES** [1] - 599:23
**BREAK** [1] - 549:1
**BREAK** [12] - 511:22, 512:11, 512:25, 524:25, 542:24, 543:1, 543:25, 549:4, 556:18, 567:3, 614:21, 614:25
**BREAKS** [4] - 511:22, 512:4, 512:5, 514:4
**BREATHE** [1] - 610:18
**BRIEF** [1] - 494:20
**BRIEFLY** [4] - 471:13, 471:24, 543:22, 561:10
**BRING** [2] - 470:2, 570:21
**BRINGS** [1] - 583:9
**BROKEN** [2] - 529:13, 604:22
**BROUGHT** [8] - 468:7, 468:12, 471:20, 472:21, 509:15, 509:16, 563:16, 563:18
**BROWN** [1] - 567:1
**BUILDING** [3] - 482:15, 577:21, 577:25
**BUILDING** [14] - 481:16, 482:23, 483:8, 501:21, 506:9, 506:12, 507:2, 507:8, 507:15, 508:15, 509:11, 509:25, 557:15, 568:4
**BUILDINGS** [2] - 498:7, 577:23
**BUILT** [1] - 577:24
**BURIED** [1] - 530:22
**BURN** [8] - 472:20, 502:1, 561:18, 562:21, 566:13, 566:15, 566:25, 567:14
**BURN** [13] - 483:16, 483:21, 484:2, 484:5, 484:9, 493:10, 493:13, 493:15, 502:2,

537:17, 538:14, 546:20, 590:3
**BURNED** [3] - 472:22, 502:1, 567:1
**BURNING** [2] - 613:19, 613:25
**BURYING** [1] - 480:3
**BUTAREZ** [1] - 474:14
**BY** [65] - 471:4, 473:17, 475:22, 476:15, 479:6, 479:16, 480:10, 481:6, 485:14, 490:20, 494:3, 499:9, 500:21, 501:7, 502:12, 504:1, 504:11, 505:18, 507:6, 507:24, 510:4, 510:15, 514:3, 516:3, 520:5, 521:12, 524:2, 524:14, 525:2, 525:19, 527:8, 530:15, 531:4, 531:12, 532:11, 532:16, 534:14, 536:9, 537:23, 538:11, 549:9, 549:12, 549:16, 552:9, 553:15, 558:16, 559:21, 565:10, 565:23, 569:8, 571:11, 573:16, 578:18, 581:24, 583:6, 586:22, 587:16, 589:5, 590:11, 591:25, 593:15, 595:8, 597:15, 606:3, 611:17

## C

**CALCULATING** [1] - 597:12
**CALIFORNIA** [1] - 463:2
**CALIFORNIA** [25] - 473:18, 474:4, 504:15, 521:13, 522:5, 523:11, 557:2, 559:25, 583:12, 583:15, 583:16, 583:17, 583:20, 583:25, 584:4, 584:20, 585:8, 585:9, 585:12, 585:17, 585:21, 586:3, 586:6, 597:16,

599:14
**CALLOUT** [1] - 491:19
**CANISTERS** [1] - 486:7
**CANNOT** [5] - 489:21, 590:20, 594:11, 594:13, 595:25
**CANYON** [2] - 486:15, 536:20
**CAPACITY** [6] - 508:5, 508:21, 508:24, 511:3, 569:21
**CAPITALS** [1] - 591:4
**CAPS** [2] - 492:2, 590:25
**CARBONS** [1] - 596:10
**CARE** [2] - 469:14, 490:9
**CAREFUL** [2] - 477:10, 546:8
**CARRIES** [1] - 498:3
**CARRY** [1] - 585:10
**CASE** [61] - 465:24, 466:13, 473:22, 475:24, 476:23, 478:8, 479:7, 480:13, 488:2, 489:7, 489:11, 489:25, 491:2, 493:1, 494:19, 495:6, 496:23, 497:6, 498:14, 501:12, 501:17, 503:8, 504:2, 504:19, 505:5, 507:12, 508:1, 509:9, 513:18, 515:24, 520:17, 521:24, 524:22, 527:12, 533:16, 536:18, 537:8, 538:12, 539:4, 541:15, 543:3, 544:12, 548:16, 549:25, 551:11, 555:7, 556:24, 559:22, 561:8, 561:23, 570:1, 572:11, 573:17, 574:2, 575:11, 576:6, 577:2, 582:9, 603:3, 614:15, 615:2
**CASE** [1] - 463:7
**CASES** [1] - 570:21
**CATCH** [2] - 483:16, 484:8
**CATCH-ALL** [2] - 483:16, 484:8
**CATEGORIES** [2] -

522:7, 536:24
**CATEGORIZE** [1] - 602:22
**CATEGORY** [4] - 492:14, 522:22, 523:11, 538:17
**CAUSED** [1] - 508:8
**CAVEAT** [1] - 545:17
**CC'S** [1] - 509:17
**CDM** [15] - 563:6, 563:9, 563:10, 563:13, 563:16, 564:14, 565:24, 566:8, 566:11, 566:18, 567:7, 567:16, 568:7, 568:9, 568:12
**CENTURY** [1] - 593:16
**CERTAIN** [20] - 486:1, 506:18, 508:20, 522:6, 540:20, 542:20, 545:12, 547:5, 547:8, 555:16, 559:5, 575:9, 597:23, 609:18, 610:7, 613:5, 613:6, 613:10, 614:10
**CERTAINLY** [8] - 491:8, 513:19, 516:5, 516:11, 517:10, 544:17, 576:2, 598:7
**CERTAINTY** [1] - 591:16
**CETERA** [6] - 488:3, 512:2, 518:18, 553:25, 612:1, 613:20
**CHANCE** [2] - 543:21, 615:3
**CHANGE** [8] - 542:10, 550:24, 551:13, 553:10, 580:11, 581:12, 581:17, 583:22
**CHANGED** [2] - 466:6, 488:16
**CHANGES** [2] - 545:18, 575:17
**CHANGING** [2] - 490:12, 500:7
**CHANNELED** [1] - 506:17
**CHAPARRAL** [1] - 614:17
**CHARACTERISTIC** [1] - 598:22
**CHARACTERISTICS** [2] - 598:1, 598:17

**CHARACTERIZATION** [10] - 530:25, 531:20, 540:4, 552:5, 552:11, 552:12, 552:17, 553:5, 563:19, 600:6
**CHARACTERIZE** [6] - 541:9, 552:18, 552:23, 553:9, 553:12, 553:14
**CHARACTERIZED** [1] - 608:5
**CHARACTERIZING** [2] - 533:19, 541:4
**CHARGE** [3] - 498:7, 498:16, 498:20
**CHART** [2] - 565:10, 565:24
**CHECK** [3] - 577:7, 577:21, 587:12
**CHECKED** [4] - 576:21, 577:1, 577:3, 586:16
**CHEMICAL** [9] - 472:3, 474:12, 483:1, 484:18, 484:23, 487:3, 515:19, 597:25, 614:13
**CHEMICALLY** [1] - 523:5
**CHEMICALS** [13] - 483:9, 483:20, 483:23, 484:1, 484:8, 501:16, 522:10, 557:16, 561:8, 561:23, 564:15, 567:25
**CHEMISTRY** [1] - 601:9
**CHLORINATED** [1] - 493:9
**CHRISTOPHER** [1] - 549:13
**CHRONIC** [1] - 477:13
**CIRCLE** [1] - 566:15
**CIRCUMVENT** [1] - 497:10
**CITATION** [5] - 479:18, 479:19, 523:22, 544:14
**CITATIONS** [1] - 545:11
**CITE** [1] - 469:8
**CITED** [6] - 467:3, 467:10, 469:9, 523:18, 544:5, 545:14
**CLARA** [1] - 517:17
**CLARIFY** [2] - 532:14,

545:24
CLARITA [2] - 463:8, 470:7
CLASSIC [1] - 522:25
CLASSIFIED [1] - 604:5
CLAUSE [1] - 589:22
CLAY [6] - 511:14, 511:25, 513:3, 513:5, 540:5
CLEAN [8] - 532:4, 532:6, 532:7, 532:12, 532:19, 532:21, 563:24, 601:18
CLEANED [2] - 500:8, 556:4
CLEANING [3] - 555:22, 563:20
CLEANUP [3] - 497:11, 500:9, 563:21
CLEAR [2] - 548:8, 565:22
CLEARLY [4] - 473:5, 505:13, 544:11, 546:7
CLIENT [5] - 463:13, 463:16, 465:24, 571:17, 571:18
CLIFFHANGER [1] - 471:5
CLOSE [15] - 477:10, 489:8, 498:9, 513:13, 513:20, 516:24, 520:14, 522:12, 530:4, 532:6, 533:8, 533:22, 550:17, 551:7, 555:20
CLOSED [3] - 532:4, 532:6, 536:20
CLOSING [1] - 615:19
CLOSURE [7] - 532:12, 532:19, 532:21, 550:11, 550:15, 557:9, 564:25
CLOSURES [1] - 532:7
CO [1] - 463:16
CO-COUNSEL [1] - 463:16
COINED [1] - 592:1
COLLATERAL [1] - 466:17
COLLECT [4] - 515:16, 539:24, 562:16, 598:21
COLLECTED [5] -

512:13, 554:14, 562:21, 603:21, 603:22
COLLECTING [3] - 539:17, 540:2, 603:18
COLLECTION [2] - 564:22, 566:20
COLOGNE [2] - 584:24, 585:1
COLOR [1] - 566:17
COLUMN [2] - 482:3, 482:15
COMING [1] - 480:25
COMMA [1] - 498:9
COMMENTS [2] - 538:24, 540:22
COMMENTS [2] - 499:4, 507:22
COMMISSION [1] - 586:9
COMMON [2] - 527:4, 541:4
COMMUNITY [3] - 587:21, 587:22, 609:22
COMPANIES [8] - 465:25, 579:11, 579:14, 579:16, 579:17, 579:18, 579:19
COMPANY [4] - 485:17, 579:24, 580:6, 581:2
COMPARE [1] - 580:1
COMPARED [1] - 580:9
COMPILED [1] - 550:10
COMPLETE [13] - 518:7, 518:16, 519:7, 519:13, 519:14, 550:10, 552:5, 552:10, 552:14, 552:17, 553:4, 561:4, 606:8
COMPLETED [2] - 497:11, 561:3
COMPLETELY [1] - 612:7
COMPLEXITY [1] - 556:4
COMPLIANCE [1] - 557:4
COMPLIES [1] - 598:18
COMPLY [9] - 579:13, 580:8, 580:12, 580:15, 580:18, 580:24, 581:7,

598:18
COMPLYING [1] - 596:24
COMPONENT [3] - 562:4, 562:7, 603:4
COMPOSITIONS [1] - 474:13
COMPOUND [1] - 485:3
COMPOUNDS [6] - 540:21, 567:23, 568:3, 601:23, 601:25, 609:18
CONCENTRATION [1] - 493:10
CONCENTRATIONS [4] - 472:9, 493:14, 493:19, 562:12
CONCERN [5] - 500:17, 508:18, 522:3, 546:23, 609:22
CONCERNED [3] - 519:8, 555:18, 555:19
CONCERT [1] - 610:10
CONCLUDE [2] - 594:9, 594:13
CONCLUDED [2] - 612:16, 612:19
CONCLUDES [2] - 489:16, 541:24
CONCLUDING [3] - 503:23, 520:19, 603:25
CONCLUSION [15] - 471:25, 518:24, 519:5, 530:23, 533:3, 533:18, 544:19, 572:6, 572:8, 572:14, 573:7, 573:12, 573:15, 605:19, 612:18
CONCLUSIONS [15] - 465:23, 467:16, 468:5, 471:8, 472:25, 475:6, 477:1, 491:6, 518:6, 543:17, 545:16, 548:10, 548:14, 548:18, 575:23
CONDITION [4] - 500:8, 513:6, 533:15, 557:18
CONDITIONS [4] - 503:24, 517:24, 517:25, 560:8
CONDUCT [3] -

560:13, 561:5
CONDUCTED [6] - 519:18, 527:9, 554:23, 562:4, 564:25, 577:15
CONDUCTING [1] - 518:14
CONFER [1] - 558:13
CONFIDENTIAL [1] - 485:17
CONFIRMATORY [2] - 603:6, 609:12
CONFISCATED [1] - 467:21
CONNECTION [2] - 557:14, 557:20
CONSCIOUS [1] - 555:11
CONSERVATION [2] - 480:16, 480:22
CONSIDER [3] - 467:2, 476:2, 534:19
CONSIDERATION [1] - 509:4
CONSIDERED [4] - 486:22, 582:7, 587:3, 602:7
CONSISTED [2] - 595:14, 600:7
CONSISTENT [7] - 493:11, 493:20, 516:25, 522:18, 546:19, 553:4, 558:1
CONSTANTLY [1] - 583:22
CONSTITUENT [1] - 501:18
CONSTITUENTS [3] - 516:23, 517:12, 597:25
CONSTITUTES [1] - 537:18
CONSTRUCTED [2] - 506:21, 511:13
CONSTRUCTION [2] - 506:14, 563:17
CONSULTANT [6] - 511:21, 525:11, 527:25, 529:10, 531:7, 534:23
CONSULTANTS [4] - 525:4, 549:22, 566:8, 594:13
CONSULTING [4] - 510:5, 549:19, 563:17, 587:22
CONTACT [1] - 487:7
CONTAIN [5] - 492:23, 509:2, 511:15, 511:16, 512:23

CONTAINED [2] - 474:20, 482:10
CONTAINERS [4] - 529:13, 594:16, 594:17, 604:23
CONTAINING [2] - 502:13, 514:5
CONTAINS [1] - 487:2
CONTAMINANT [3] - 481:23, 487:3, 609:2
CONTAMINANTS [7] - 475:12, 476:13, 482:10, 484:5, 487:18, 539:18, 609:3
CONTAMINATED [7] - 493:3, 515:4, 552:1, 562:2, 564:5, 564:7, 564:8
CONTAMINATING [3] - 486:15, 487:25, 529:21
CONTAMINATION [1] - 485:15
CONTAMINATION [41] - 472:8, 472:9, 487:22, 488:21, 489:1, 514:24, 515:4, 515:19, 517:19, 517:21, 521:6, 521:7, 521:21, 522:1, 522:4, 522:17, 522:20, 527:5, 528:9, 541:5, 541:6, 551:21, 551:22, 552:2, 552:5, 552:12, 552:19, 554:15, 554:20, 555:22, 556:3, 556:6, 556:7, 560:7, 563:20, 563:21, 564:2, 564:5, 564:9, 566:21
CONTENTS [5] - 495:25, 506:21, 529:5, 540:20, 613:12
CONTEXT [7] - 474:3, 491:9, 503:7, 510:21, 515:1, 552:13, 553:2
CONTINUE [12] - 470:15, 489:21, 499:24, 523:25, 531:19, 542:8, 543:4, 549:7, 552:1, 559:16, 563:18, 615:2
CONTINUED [2] -

490:13, 498:24
**CONTINUES** [2] - 517:9, 562:25
**CONTINUING** [1] - 481:14
**CONTOURS** [1] - 600:9
**CONTRACT** [3] - 614:2, 614:3
**CONTRACTED** [2] - 491:12, 589:23
**CONTRACTOR** [1] - 469:12
**CONTRACTS** [8] - 467:9, 469:5, 469:9, 469:12, 546:18, 546:20, 614:18
**CONTROL** [13] - 473:19, 474:4, 521:13, 522:5, 523:12, 560:1, 577:8, 577:11, 582:11, 582:14, 584:15, 585:4, 596:15
**CONTROLLING** [1] - 579:1
**CONVERSATION** [2] - 474:6, 548:22
**COPIES** [7] - 464:21, 587:12, 596:11, 596:14, 599:4, 599:8
**COPIOUS** [3] - 486:15, 486:22, 487:19
**COPY** [10] - 465:22, 476:21, 520:10, 569:1, 587:13, 596:16, 596:24, 599:7, 599:18, 605:10
**CORPORATE** [2] - 476:18, 499:13
**CORPORATION** [7] - 463:9, 470:8, 506:4, 521:15, 525:21, 558:19, 560:4
**CORRECT** [64] - 480:24, 487:16, 487:23, 514:6, 514:7, 527:11, 557:21, 566:9, 569:12, 570:24, 571:4, 571:8, 571:22, 571:24, 572:3, 572:5, 572:23, 574:10, 576:23, 577:16, 577:19, 578:25, 579:24, 580:6,

582:5, 582:11, 586:5, 587:20, 588:3, 588:6, 589:7, 590:7, 592:2, 592:10, 592:17, 593:16, 593:22, 594:1, 594:25, 596:15, 597:8, 598:6, 599:2, 599:6, 599:11, 599:21, 601:25, 602:25, 604:1, 604:5, 604:10, 605:1, 607:8, 608:9, 608:18, 608:22, 609:13, 610:2, 610:12, 611:11, 612:5, 613:9, 614:17
**CORRECTLY** [1] - 478:22
**CORRELATE** [1] - 472:14
**CORRELATION** [2] - 472:1, 472:8
**CORRESPONDENC E** [8] - 471:17, 471:18, 478:20, 525:10, 525:13, 560:11, 564:23, 576:17
**COST** [9] - 505:19, 533:19, 533:21, 550:10, 550:15, 550:24, 551:13, 555:13, 556:11
**COSTING** [1] - 534:15
**COSTS** [10] - 533:24, 553:17, 555:3, 555:6, 555:11, 555:16, 555:17, 555:19, 555:22, 556:8
**COUNSEL** [17] - 463:10, 463:11, 463:16, 463:23, 463:24, 464:16, 466:1, 466:7, 470:23, 507:21, 570:10, 576:15, 576:19, 586:20, 587:14, 590:9, 614:21
**COUNT** [2] - 524:17, 557:23
**COUNT** [1] - 558:1
**COUNTED** [1] - 569:19
**COUNTER** [2] - 463:22, 464:13
**COUNTER-**

**DESIGNATION** [1] - 463:22
**COUNTER-DESIGNATIONS** [1] - 464:13
**COUNTY** [1] - 577:22
**COUPLE** [5] - 490:9, 507:1, 540:3, 595:3, 609:14
**COURSE** [15] - 466:6, 470:5, 476:23, 479:7, 480:13, 491:2, 508:7, 528:2, 528:24, 536:4, 541:21, 548:1, 549:25, 556:24, 559:22
**COURT** [21] - 463:21, 465:3, 465:15, 465:18, 465:22, 466:2, 466:25, 467:25, 468:17, 468:22, 468:23, 469:25, 524:11, 544:1, 544:23, 546:15, 547:7, 558:11, 559:11
**COURT** [82] - 463:5, 463:19, 464:24, 465:5, 465:12, 465:15, 466:23, 467:6, 467:14, 468:10, 468:17, 468:20, 468:22, 469:1, 469:6, 469:11, 469:16, 469:23, 470:2, 470:5, 470:7, 470:12, 470:19, 475:20, 476:1, 481:3, 501:4, 502:7, 502:10, 503:2, 503:5, 505:17, 507:20, 514:1, 523:25, 524:7, 524:9, 527:6, 531:10, 532:14, 534:6, 534:8, 534:11, 536:7, 537:21, 538:4, 542:24, 543:12, 543:16, 544:10, 545:15, 545:23, 546:6, 546:21, 547:3, 547:11, 547:14, 547:17, 547:21, 548:7, 549:3, 552:8, 553:7, 558:8, 558:11, 559:3, 565:16,

568:19, 568:22, 568:25, 569:6, 571:9, 578:15, 586:20, 587:14, 590:9, 591:22, 597:13, 611:15, 614:21, 614:24, 615:10
**COURT** [2] - 466:21, 584:13
**COURT'S** [7] - 463:24, 463:25, 464:2, 468:7, 468:12, 571:9, 597:13
**COURTROOM** [1] - 543:14
**COURTROOM** [4] - 463:7, 470:3, 543:9, 615:7
**COURTS** [1] - 584:10
**COVER** [2] - 494:21, 495:11
**CRADLE** [2] - 579:6, 600:2
**CRADLE-TO-GRAVE** [2] - 579:6, 600:2
**CREATED** [4] - 480:1, 485:25, 599:10, 599:13
**CREATURES** [1] - 609:3
**CREEK** [1] - 517:17
**CRIMINAL** [2] - 467:19, 468:2
**CRITERIA** [1] - 603:23
**CRITICAL** [1] - 574:24
**CROSS** [3] - 467:7, 544:6, 547:23
**CROSS** [1] - 569:7
**CROSS-EXAMINATION** [1] - 569:7
**CROSS-EXAMINE** [2] - 467:7, 544:6
**CROSS-EXAMINING** [1] - 547:23
**CRUX** [1] - 488:4
**CRUZ** [2] - 465:15, 543:6
**CUBIC** [3] - 539:6, 539:10, 540:13
**CURRENT** [8] - 480:21, 481:11, 484:13, 484:14, 522:11, 534:21, 535:19, 580:20
**CUT** [2] - 539:2, 542:18
**CUTS** [1] - 575:4
**CV** [1] - 463:8

**D**

**DAILY** [3] - 493:2, 495:21, 523:8
**DAMAGE** [2] - 477:15, 553:14
**DAMAGES** [1] - 551:22
**DANGEROUS** [1] - 547:19
**DANIEL** [1] - 463:17
**DATA** [21] - 471:25, 472:2, 472:4, 472:5, 472:14, 484:3, 493:8, 495:8, 495:9, 538:12, 561:22, 562:21, 563:6, 564:22, 566:20, 571:16, 573:6, 587:2, 603:25
**DATE** [8] - 478:11, 492:10, 552:25, 555:18, 555:23, 560:9, 578:22, 578:24
**DATED** [11] - 476:18, 479:4, 485:17, 489:5, 490:21, 493:25, 507:4, 520:2, 525:19, 552:24, 612:12
**DATES** [1] - 564:20
**DAWSON** [5] - 467:5, 545:4, 547:10, 547:11, 548:3
**DAWSON'S** [7] - 467:3, 467:11, 469:8, 545:11, 545:14, 548:6
**DAYS** [2] - 468:15, 530:7
**DEAL** [2] - 487:9, 492:7
**DEALING** [2] - 551:14, 585:13
**DEALINGS** [1] - 525:4
**DEALS** [2] - 544:22, 613:19
**DEALT** [2] - 614:4, 614:9
**DEATH** [1] - 477:13
**DEBRIS** [1] - 561:18
**DECADES** [2] - 576:3, 593:20
**DECEMBER** [4] - 510:1, 516:6, 520:3, 520:16
**DECIDE** [1] - 596:20
**DECIDED** [3] - 495:1, 542:5, 542:18

DECIDES [1] - 597:9
DECISION [1] - 494:21
DECISIONS [1] - 584:14
DECLARATION [1] - 469:21
DECLARATIONS [1] - 544:3
DECLARED [1] - 533:8
DECREASE [1] - 508:24
DECREASED [1] - 556:11
DEFENSE [2] - 469:12
DEFENSE [5] - 478:9, 613:23, 614:5, 614:7, 614:16
DEFINE [2] - 553:12, 610:5
DEFINED [1] - 606:18
DEFINES [2] - 582:25, 583:7
DEFINITION [6] - 538:7, 538:17, 606:16, 606:21, 606:22, 606:25
DEGREASER [1] - 477:8
DEGREASERS [2] - 477:6, 492:22
DEGREASING [10] - 475:3, 477:16, 485:4, 485:6, 492:10, 492:17, 493:20, 561:11, 562:12, 595:20
DEGREE [6] - 551:5, 552:18, 553:12, 560:18, 563:19, 591:15
DELAY [3] - 504:3, 504:6, 505:12
DELAYED [1] - 473:4
DEMONSTRATE [1] - 516:21
DEMONSTRATION [2] - 475:8, 521:25
DEPARTMENT [3] - 489:21, 577:22, 577:25
DEPARTMENT [9] - 478:9, 504:15, 521:21, 560:1, 596:14, 613:22, 614:5, 614:7, 614:16
DEPOSED [1] - 572:10
DEPOSITION [10] - 463:22, 465:7,

465:8, 465:21, 466:5, 526:10, 545:3, 573:4, 574:6, 586:17
DEPOSITIONS [1] - 544:3
DEPTHS [1] - 552:21
DEPUTY [4] - 463:7, 470:3, 543:9, 615:7
DERIVED [1] - 505:23
DESCRIBE [5] - 518:21, 525:7, 550:22, 564:18, 606:21
DESCRIBED [18] - 492:17, 502:22, 503:16, 504:4, 506:9, 511:10, 514:16, 514:20, 515:11, 522:19, 528:10, 531:21, 553:3, 553:5, 554:23, 558:2, 564:3, 600:15
DESCRIBES [8] - 487:24, 489:1, 495:13, 518:16, 519:14, 527:17, 550:13, 608:15
DESCRIBING [8] - 478:22, 486:19, 487:17, 487:21, 528:7, 541:15, 556:14, 561:25
DESCRIPTION [4] - 507:24, 507:25, 527:1, 530:17
DESIGN [1] - 508:14
DESIGNATED [1] - 585:9
DESIGNATION [3] - 463:22, 613:25
DESIGNATIONS [5] - 464:13, 583:11, 605:2, 608:10
DESIGNED [1] - 509:18
DESPITE [1] - 473:5
DESTROY [1] - 479:25
DESTROYED [2] - 476:14, 544:20
DESTRUCTION [1] - 479:17
DESTRUCTION [5] - 474:8, 474:18, 475:13, 475:23, 613:25
DETAIL [2] - 472:24, 614:11
DETAILED [2] -

580:22, 596:2
DETAILS [2] - 602:21, 603:14
DETECTED [6] - 539:2, 610:15, 610:19, 610:21, 611:3, 611:10
DETECTION [2] - 540:19, 553:3
DETERIORATED [3] - 529:13, 541:23, 604:22
DETERMINATION [2] - 524:4, 604:4
DETERMINATION [2] - 558:22, 561:24
DETERMINE [8] - 518:18, 519:11, 580:2, 580:23, 603:18, 608:5, 609:7
DETERMINED [4] - 529:12, 580:10, 604:16, 604:20
DETERMINES [1] - 608:8
DEVELOP [1] - 573:7
DEVELOPED [1] - 573:5
DEVELOPER [1] - 555:3
DEVICE [3] - 540:19, 601:9, 601:12
DICKEY [1] - 586:9
DICTATING [1] - 557:5
DICTIONARY [1] - 606:22
DIFFERED [1] - 598:23
DIFFERENCE [1] - 555:21
DIFFERENT [24] - 466:8, 474:13, 481:17, 483:12, 485:5, 515:12, 515:21, 536:24, 541:8, 553:21, 563:22, 563:25, 564:1, 569:20, 577:14, 584:9, 599:13, 601:24, 604:14, 604:18, 605:4, 607:3, 612:8, 613:15
DIFFICULT [1] - 603:2
DIG [2] - 541:3, 541:13
DIGGING [1] - 541:21
DILUTED [2] - 588:6, 588:7
DIRECT [4] - 470:13, 486:16, 543:7, 549:7

DIRECT [1] - 471:3
DIRECTING [1] - 543:13
DIRECTION [4] - 513:19, 514:13, 515:25, 516:6
DIRECTIONS [1] - 541:8
DIRECTLY [2] - 511:22, 513:2
DIRECTOR [1] - 520:6
DIRT [1] - 601:17
DIRTY [1] - 500:7
DISASTER [1] - 499:22
DISCHARGE [3] - 488:13, 518:4
DISCHARGED [2] - 482:9, 508:7
DISCHARGES [1] - 488:16
DISCLOSE [1] - 537:12
DISCLOSURE [1] - 473:8
DISCOVER [1] - 560:22
DISCOVERED [9] - 521:7, 530:4, 530:10, 530:17, 530:18, 530:20, 530:21, 540:23, 541:18
DISCOVERY [1] - 485:7
DISCUSS [1] - 550:10
DISCUSSED [5] - 472:17, 533:13, 557:10, 577:24, 589:6
DISCUSSION [2] - 476:7, 477:5
DISCUSSIONS [1] - 560:11
DISPLAYED [1] - 565:14
DISPOSAL [24] - 466:14, 471:12, 472:6, 472:19, 472:22, 473:8, 478:3, 478:13, 478:20, 489:6, 489:14, 493:16, 495:9, 498:11, 498:19, 505:9, 509:20, 512:20, 522:23, 523:3, 537:13, 579:1, 606:9
DISPOSAL [5] - 479:4, 479:11, 480:2,

497:16, 612:11
DISPOSE [2] - 556:10, 598:12
DISPOSED [17] - 484:1, 493:19, 495:18, 495:19, 497:14, 500:4, 500:5, 502:3, 502:6, 523:7, 528:12, 531:23, 538:10, 592:6, 592:8, 592:9, 605:13
DISPOSING [1] - 497:16
DISPOSITION [2] - 493:7, 496:1
DISPUTE [2] - 559:13, 559:14
DISPUTES [1] - 544:12
DISREGARD [1] - 502:11
DISSOLVE [2] - 487:5, 487:8
DISSOLVED [1] - 487:9
DISTINCTION [1] - 592:5
DISTINGUISH [2] - 544:18, 601:24
DISTRIBUTION [1] - 509:17
DIVISION [2] - 506:3, 521:14
DOCTOR [4] - 573:22, 586:3, 611:7, 615:10
DOCUMENT [62] - 465:21, 465:23, 466:11, 473:14, 474:1, 475:5, 475:23, 476:16, 476:20, 476:25, 477:4, 477:18, 478:12, 479:3, 479:6, 479:9, 479:11, 479:19, 481:2, 485:11, 488:18, 490:18, 493:23, 494:17, 494:18, 498:17, 499:1, 504:17, 505:4, 506:3, 507:3, 507:6, 509:25, 516:20, 520:1, 521:23, 524:19, 525:25, 537:20, 537:23, 550:2, 552:14, 559:7, 566:1, 582:2, 582:22, 582:23,

582:25, 583:7,
591:25, 594:7,
606:20, 608:15,
608:20, 611:14,
612:14, 613:5,
613:11, 613:14,
613:16, 613:17,
613:18
**DOCUMENTATION**
[16] - 467:9, 471:22,
486:6, 490:11,
495:21, 496:5,
502:3, 502:13,
502:15, 525:13,
526:1, 536:14,
542:20, 590:16,
592:11, 595:10
**DOCUMENTATIONS**
[1] - 496:10
**DOCUMENTED** [1] -
525:13
**DOCUMENTS** [48] -
467:5, 467:13,
467:18, 467:21,
469:18, 471:15,
471:20, 472:12,
472:13, 472:24,
473:21, 476:22,
477:2, 480:12,
491:1, 493:5, 495:6,
495:24, 496:2,
496:11, 496:15,
504:19, 504:25,
507:1, 507:11,
512:6, 523:13,
523:16, 525:3,
525:15, 544:19,
545:4, 546:2, 546:7,
547:5, 547:25,
549:24, 556:23,
559:6, 568:5, 577:2,
577:21, 578:9,
581:4, 582:4, 582:6,
587:11, 611:12
**DOD** [9] - 469:15,
478:9, 478:16,
479:16, 479:19,
546:20, 613:20,
613:22, 614:2
**DOMESTIC** [1] - 540:8
**DONE** [15] - 486:5,
486:7, 526:7,
545:20, 554:2,
557:10, 568:7,
568:8, 570:7,
590:22, 598:15,
598:17, 607:2,
608:3, 610:9
**DOOR** [3] - 467:18,
468:13, 548:12

**DOORS** [1] - 468:4
**DOWN** [27] - 486:10,
486:14, 486:21,
487:7, 487:19,
487:24, 491:19,
511:24, 512:16,
512:18, 512:22,
513:2, 514:9, 516:4,
517:13, 517:16,
518:3, 547:19,
550:16, 550:21,
567:20, 568:4,
594:22, 597:18,
600:5, 611:5, 615:10
**DOWN-VALLEY** [1] -
517:13
**DOWNGRADIENT** [4]
- 503:17, 503:21,
513:18, 514:8
**DOWNHILL** [2] -
503:18, 503:19
**DOZER** [1] - 600:20
**DR** [28] - 466:2, 466:3,
466:4, 466:10,
467:2, 467:7, 467:8,
469:7, 469:22,
470:12, 470:16,
471:6, 487:13,
489:25, 532:17,
543:13, 544:7,
545:24, 546:6,
547:4, 547:9,
547:24, 548:12,
548:22, 549:5,
565:21, 569:12,
615:14
**DRAFTS** [1] - 579:21
**DRAG** [1] - 615:21
**DRAIN** [6] - 511:23,
512:9, 512:10,
512:12, 512:13,
512:25
**DRAW** [2] - 471:17,
566:14
**DRAWING** [1] - 565:20
**DRAWN** [2] - 544:19,
597:7
**DREW** [1] - 612:18
**DROP** [1] - 590:3
**DRUM** [3] - 592:15,
592:16, 592:19
**DRUMS** [32] - 474:21,
474:23, 494:22,
495:11, 495:15,
495:16, 495:17,
495:18, 495:20,
495:22, 495:24,
497:1, 497:13,
497:16, 500:1,
529:13, 530:3,

530:9, 530:17,
540:23, 541:17,
541:22, 553:24,
554:9, 594:16,
594:17, 604:22
**DRY** [2] - 511:3, 512:9
**DTSC** [5] - 526:6,
537:6, 556:19,
576:23, 577:19
**DUE** [1] - 466:16
**DUG** [3] - 540:24,
541:15, 554:1
**DUMP** [2] - 500:2,
539:9
**DUMPED** [1] - 481:16
**DUMPED** [11] -
481:18, 482:4,
482:20, 483:13,
484:13, 492:13,
494:12, 495:7,
496:12, 500:16,
590:18
**DUMPING** [19] -
471:21, 471:22,
477:23, 477:25,
480:3, 480:23,
481:8, 486:19,
488:3, 490:8, 495:2,
496:3, 496:14,
497:8, 499:3,
504:13, 505:7,
505:13, 592:13
**DUMPING** [1] - 497:1
**DUMPSTER** [3] -
494:23, 498:9,
498:21
**DUMPSTERS** [1] -
497:9
**DUPLICATIVE** [2] -
599:10, 599:12
**DURING** [14] - 466:5,
480:24, 506:18,
508:9, 508:21,
537:1, 539:13,
539:19, 585:11,
585:13, 588:4,
594:8, 595:17,
595:20

**E**

**EARLY** [8] - 500:13,
519:10, 538:6,
555:23, 568:9,
587:23, 593:23,
602:11
**EARLY-ON** [1] -
602:11
**EARTH** [1] - 539:6
**EASEL** [1] - 565:14

**EAST** [6] - 538:15,
538:20, 538:22,
539:20, 567:2, 607:4
**EASY** [1] - 468:3
**EDITED** [1] - 559:1
**EDITS** [1] - 559:5
**EFFECT** [2] - 497:10,
591:23
**EFFECTED** [1] -
584:21
**EFFECTIVE** [2] -
485:5, 486:1
**EFFECTIVELY** [1] -
508:24
**EFFECTS** [3] - 477:15,
485:7, 487:18
**EFFORT** [2] - 504:5,
505:11
**EIGHT** [1] - 557:20
**EITHER** [6] - 465:4,
524:22, 556:5,
556:19, 587:10,
613:24
**ELEVATION** [1] -
515:21
**ELEVATIONS** [1] -
515:12
**EMBANKMENTS** [1] -
527:14
**EMERGENCY** [9] -
474:8, 474:18,
475:13, 475:15,
475:17, 475:23,
476:8, 476:11,
476:14
**EMPLOYEE** [2] -
489:13
**EMPLOYEES** [4] -
471:19, 478:21,
489:1, 550:8
**EMPOWERED** [1] -
585:8
**ENCLOSED** [1] -
524:4
**ENCOUNTERED** [1] -
541:22
**ENCOUNTERING** [1] -
528:9
**END** [5] - 484:9,
534:15, 593:3,
593:5, 601:8
**ENDANGERMENT** [2]
- 558:22, 561:24
**ENDANGERMENT** [1]
- 560:7
**ENDEAVOR** [2] -
587:4, 596:20
**ENDING** [1] - 485:3
**ENFORCE** [3] -
496:12, 585:8,

585:12
**ENFORCED** [2] -
491:22, 498:7
**ENGINEER** [2] -
473:20, 474:3
**ENGINEERING** [1] -
556:5
**ENGINEERS** [1] -
575:3
**ENLARGE** [5] -
479:14, 510:13,
527:19, 531:2,
549:14
**ENLARGED** [1] -
481:11
**ENSURING** [1] - 490:5
**ENTER** [1] - 535:11
**ENTERING** [1] -
467:24
**ENTERS** [1] - 487:9
**ENTIRE** [2] - 468:11,
606:7
**ENTITLED** [1] - 479:3,
480:2, 480:15
**ENTITY** [1] - 497:15
**ENVIRONMENT** [5] -
478:1, 529:21,
552:22, 556:2,
560:19
**ENVIRONMENTAL**
[24] - 487:1, 523:20,
525:11, 531:7,
532:1, 533:15,
538:2, 551:16,
552:20, 563:17,
578:13, 579:8,
579:15, 579:16,
580:8, 583:20,
584:5, 585:17,
587:22, 602:5,
610:1, 610:9, 611:2
**ENVIRONMENTAL** [1]
- 559:25
**ENVIROSTOR** [3] -
576:21, 576:23,
577:3
**EPA** [36] - 499:9,
520:12, 533:21,
533:25, 534:14,
534:17, 534:20,
534:22, 535:3,
535:4, 535:14,
535:19, 536:2,
536:4, 536:15,
536:21, 537:4,
556:20, 576:10,
576:12, 576:13,
576:17, 576:18,
576:25, 577:1,
577:4, 577:5,

577:18, 585:10, 585:11, 586:18, 586:23, 587:7, 587:8, 606:8, 606:12
**EPA'S** [2] - 535:3, 606:11
**EPOXY** [1] - 474:14
**ERIC** [1] - 463:16
**ESPECIALLY** [1] - 575:25
**ESSENTIALLY** [7] - 472:18, 503:7, 511:24, 512:16, 548:12, 559:13, 560:15
**ESTIMATE** [1] - 550:24
**ESTIMATED** [6] - 474:20, 505:19, 528:21, 539:1, 550:10, 550:17
**ESTOPPEL** [1] - 466:17
**ET** [7] - 463:9, 488:3, 512:2, 518:18, 553:25, 612:1, 613:20
**EVALUATE** [8] - 513:12, 517:5, 520:11, 539:17, 560:20, 563:20, 571:19, 573:6
**EVALUATED** [1] - 609:10
**EVALUATING** [1] - 488:2
**EVALUATION** [8] - 495:6, 510:10, 510:11, 510:24, 511:5, 566:20, 582:18, 609:24
**EVALUATION** [1] - 582:13
**EVAPORATION** [1] - 506:16
**EVENT** [2] - 548:11, 548:20
**EVENTUALLY** [2] - 517:17, 520:22
**EVIDENCE** [55] - 466:9, 466:18, 466:20, 467:9, 467:23, 468:3, 469:23, 472:13, 473:16, 479:5, 480:9, 485:13, 488:14, 490:7, 490:13, 490:19, 494:2, 499:8, 501:3, 502:6, 502:9, 504:1,

504:10, 507:5, 510:3, 519:22, 520:4, 521:11, 523:17, 525:17, 542:17, 543:23, 544:3, 544:5, 544:11, 544:14, 544:15, 544:18, 544:19, 547:8, 548:10, 550:19, 553:16, 558:6, 558:14, 559:20, 565:9, 575:2, 581:22, 590:11, 592:18, 615:4
**EVIDENTIARY** [3] - 559:8, 559:12, 615:21
**EVIDENTLY** [3] - 527:17, 592:22, 593:13
**EXACTLY** [5] - 560:25, 565:3, 579:12, 599:11, 603:11
**EXAMINATION** [5] - 470:14, 470:15, 540:6, 545:13, 549:7
**EXAMINATION** [2] - 471:3, 569:7
**EXAMINE** [3] - 466:19, 467:7, 544:6
**EXAMINING** [1] - 547:23
**EXAMPLE** [5] - 497:11, 561:13, 585:24, 595:15, 614:12
**EXAMPLES** [1] - 472:11
**EXCAVATE** [2] - 556:9, 556:15
**EXCAVATING** [3] - 539:16, 541:7, 602:12
**EXCAVATION** [2] - 542:10, 556:17
**EXCEPT** [2] - 494:22, 495:15
**EXCEPTION** [1] - 495:11
**EXCLUDED** [1] - 548:6
**EXCUSE** [4] - 490:4, 524:24, 569:14, 581:15
**EXECUTED** [1] - 490:6
**EXECUTION** [1] - 489:22
**EXECUTIVES** [1] -

542:17
**EXEMPT** [1] - 498:11
**EXERCISE** [1] - 574:23
**EXHAUST** [1] - 572:15
**EXHAUSTED** [6] - 572:6, 573:13, 573:16, 574:1, 574:5, 578:1
**EXHAUSTIVE** [1] - 572:2
**EXHIBIT** [6] - 465:21, 496:17, 537:14, 549:11, 559:20, 589:11
**EXHIBIT** [58] - 473:15, 473:16, 476:17, 477:21, 478:23, 479:2, 479:5, 480:7, 480:9, 481:7, 485:12, 485:13, 490:18, 490:19, 492:12, 493:24, 494:2, 494:6, 499:5, 499:8, 500:25, 501:3, 502:17, 504:8, 504:10, 505:8, 505:18, 507:3, 507:5, 510:1, 510:3, 520:2, 520:4, 520:16, 521:9, 521:11, 524:2, 525:16, 528:15, 530:3, 533:4, 536:10, 538:21, 540:12, 549:10, 556:20, 558:14, 558:16, 559:18, 565:6, 565:9, 565:5, 581:20, 581:22, 589:3, 591:21, 612:9, 612:10
**EXHIBITS** [6] - 464:19, 464:22, 464:25, 568:24, 569:3, 589:5
**EXIST** [7] - 467:22, 485:19, 546:1, 546:3, 547:5, 547:6, 557:18
**EXISTED** [5] - 492:16, 544:20, 546:1, 546:3, 546:8
**EXISTENCE** [1] - 467:18
**EXISTING** [3] - 486:20, 486:23, 487:21
**EXISTS** [2] - 509:1, 561:2
**EXPECT** [3] - 534:22,

535:25, 616:1
**EXPECTED** [1] - 518:2
**EXPENSIVE** [2] - 534:3, 534:19
**EXPERIENCE** [46] - 475:18, 476:8, 484:17, 485:4, 486:22, 487:13, 487:16, 492:22, 500:15, 500:21, 500:24, 502:24, 503:8, 508:19, 514:11, 514:22, 521:5, 522:13, 522:24, 527:4, 528:24, 529:15, 530:15, 531:4, 531:16, 532:7, 532:16, 533:17, 533:23, 534:1, 534:14, 534:17, 534:18, 534:20, 537:18, 537:24, 538:1, 538:7, 555:21, 556:11, 562:15, 564:10, 603:24, 604:4, 614:10, 614:20
**EXPERT** [16] - 476:4, 547:8, 547:9, 569:15, 569:21, 570:9, 571:12, 571:13, 583:18, 583:20, 583:25, 584:4, 585:16, 585:18, 585:22, 587:7
**EXPERTISE** [3] - 583:10, 584:2, 609:25
**EXPLAIN** [17] - 471:13, 479:22, 485:22, 502:21, 508:3, 512:3, 518:24, 519:2, 532:11, 533:9, 535:10, 537:10, 555:25, 559:4, 559:24, 561:10, 561:22
**EXPLAINED** [2] - 477:8, 550:20
**EXPLANATION** [1] - 551:12
**EXPLOSIVES** [5] - 480:1, 480:3, 483:23, 484:1, 484:8
**EXPOSED** [4] - 477:11, 477:16, 487:4, 487:11

**EXPOSURE** [3] - 477:7, 477:13, 477:14
**EXTENSIVE** [2] - 471:22, 614:8
**EXTENT** [11] - 531:24, 541:11, 541:13, 551:21, 552:5, 552:19, 553:13, 554:10, 556:3, 560:18, 563:19
**EXTRA** [2] - 464:20, 465:22
**EXTRACTION** [6] - 564:3, 566:19, 566:23, 567:9, 567:23, 568:8
**EXTREMELY** [1] - 493:13

**F**

**FACILITIES** [3] - 533:20, 579:7, 597:22
**FACILITY** [34] - 471:16, 476:9, 478:11, 492:11, 508:8, 516:23, 517:12, 522:11, 522:21, 526:22, 532:3, 532:6, 533:2, 535:12, 550:11, 560:5, 597:20, 597:21, 598:1, 598:3, 598:5, 598:7, 598:9, 598:10, 598:13, 598:25, 599:17, 599:25, 605:15, 606:6, 606:7, 606:9, 606:12
**FACILITY** [1] - 526:18
**FACILITY'S** [1] - 521:20, 534:21
**FACT** [13] - 465:23, 466:4, 466:13, 466:17, 466:21, 488:7, 489:13, 490:3, 505:13, 519:23, 537:7, 555:15, 609:22
**FACTORS** [1] - 552:20
**FACTS** [2] - 466:8, 503:8
**FACTUALLY** [1] - 548:13
**FAILURE** [1] - 557:24
**FAILURES** [1] - 512:5
**FAIR** [6] - 507:23, 509:21, 527:9,

536:8, 542:12, 546:10
**FAIRLY** [4] - 475:9, 543:22, 544:10, 546:8
**FALL** [1] - 578:23
**FALLS** [1] - 476:11
**FALSE** [2] - 609:19, 609:20
**FAMILIAR** [16] - 484:23, 486:6, 518:9, 518:12, 526:3, 535:6, 535:20, 537:24, 540:25, 545:8, 585:2, 585:6, 586:13, 588:23, 597:9, 597:17
**FAN** [1] - 601:20
**FAR** [9] - 519:7, 519:16, 521:2, 533:5, 546:7, 546:25, 586:10, 593:23, 600:7
**FASHION** [1] - 564:11
**FASTER** [1] - 512:22
**FEASIBILITY** [2] - 560:14, 560:20
**FEDERAL** [4] - 523:20, 579:1, 586:4, 605:3
**FEET** [3] - 517:13, 608:18, 608:19
**FELLOW** [2] - 504:12, 615:4
**FELT** [1] - 555:16
**FEW** [4] - 478:1, 507:7, 532:20, 593:20
**FIELD** [5] - 539:15, 578:13, 602:2, 602:15, 610:25
**FIFTH** [1] - 483:17
**FIGURE** [9] - 529:23, 531:24, 541:11, 541:12, 560:17, 565:14, 579:11, 579:20, 581:7
**FIGURE** [2] - 607:8, 611:20
**FILES** [3] - 576:10, 576:13
**FILING** [1] - 543:21
**FILL** [4] - 538:25, 554:2, 596:9, 596:13
**FILL-SOIL** [1] - 538:25
**FILLED** [1] - 542:1
**FILLING** [2] - 535:13, 596:10
**FILTERS** [1] - 500:7

**FINAL** [3] - 493:7, 496:1, 559:2
**FINDINGS** [24] - 465:23, 466:2, 466:5, 466:8, 466:12, 466:17, 466:20, 467:11, 467:15, 468:5, 534:23, 543:17, 543:24, 544:4, 544:24, 544:25, 545:3, 545:5, 545:11, 545:16, 548:10, 548:14, 548:18
**FINE** [5] - 465:12, 496:8, 568:25, 569:11, 598:24
**FINER** [1] - 586:11
**FINGER** [1] - 565:11
**FINISH** [1] - 495:14
**FIRM** [2] - 549:19, 563:17
**FIRST** [59] - 471:6, 471:7, 473:14, 474:2, 475:5, 478:6, 480:19, 481:10, 482:7, 484:12, 486:24, 492:5, 494:5, 497:24, 500:15, 506:20, 507:14, 507:24, 509:13, 513:10, 514:16, 518:2, 519:1, 522:9, 523:10, 528:22, 540:24, 544:2, 544:10, 544:13, 544:17, 545:2, 548:4, 550:19, 551:1, 553:19, 559:18, 560:12, 562:2, 578:19, 579:3, 579:4, 580:1, 580:5, 580:7, 589:14, 589:16, 592:21, 599:24, 600:8, 601:2, 602:11, 605:6, 605:7, 605:10, 609:14, 609:21, 609:24, 615:24
**FIRST-LEVEL** [1] - 544:13
**FIVE** [8] - 474:13, 530:3, 530:7, 538:16, 556:16, 556:17, 611:24, 615:23
**FIX** [3] - 529:24,

530:1, 560:23
**FIXED** [1] - 529:24
**FIXING** [2] - 560:21
**FLATTENED** [2] - 494:23, 495:16
**FLOW** [5] - 507:16, 509:2, 515:15, 518:1, 552:21
**FLOWED** [2] - 516:10, 516:11
**FLOWING** [4] - 487:7, 515:23, 515:24, 516:4
**FLOWS** [3] - 503:18, 503:19, 515:17
**FLUSH** [1] - 486:8
**FOCUSED** [2] - 593:19, 593:23
**FOIA** [1] - 576:13
**FOLKS** [4] - 490:13, 523:20, 527:12, 550:5
**FOLLOW** [8] - 471:11, 476:10, 522:18, 523:1, 579:25, 581:2, 598:10, 609:12
**FOLLOW-UP** [2] - 522:18, 523:1
**FOLLOWED** [4] - 471:9, 481:8, 489:15, 497:20
**FOLLOWING** [3] - 474:7, 507:25, 509:3
**FOLLOWS** [1] - 471:2
**FORECLOSE** [1] - 544:21
**FOREGOING** [1] - 510:25
**FORGET** [6] - 503:16, 560:25, 565:3, 578:22, 578:24, 586:12
**FORK** [6] - 538:15, 538:20, 538:22, 539:20, 567:2, 607:4
**FORM** [7] - 535:14, 596:4, 596:6, 599:8, 599:22, 600:1
**FORMS** [1] - 596:13
**FORTHCOMING** [1] - 537:12
**FOUNDATION** [4] - 475:25, 503:4, 536:6, 597:14
**FOUR** [9] - 483:12, 483:15, 484:7, 486:17, 503:16, 514:20, 516:9, 550:7, 615:23

**FOURTH** [1] - 488:24
**FRAME** [5] - 504:2, 519:23, 532:18, 556:20, 565:1
**FRAMED** [1] - 503:5
**FRANK** [1] - 546:14
**FRED** [1] - 463:15
**FREE** [4] - 544:11, 544:17, 569:22, 569:23
**FREQUENTLY** [1] - 540:9
**FRESH** [1] - 564:7
**FRIDAY** [1] - 463:1
**FRONT** [2] - 478:23, 565:17
**FRYER** [1] - 463:17
**FULFILL** [1] - 584:2
**FULL** [2] - 495:16, 510:21
**FULLY** [2] - 537:12, 552:18
**FUNCTION** [1] - 588:11
**FUTURE** [1] - 500:5

# G

**GAIN** [3] - 574:23, 576:4, 584:2
**GALLAGHER** [1] - 463:17
**GALLONS** [1] - 510:20
**GATHER** [1] - 522:17
**GATHERED** [1] - 573:6
**GEE** [1] - 463:13
**GENERAL** [12] - 492:14, 502:21, 506:11, 532:18, 535:10, 537:18, 540:1, 547:1, 552:16, 557:1, 557:8, 603:21
**GENERAL** [3] - 479:12, 479:17, 584:10
**GENERALLY** [10] - 469:3, 479:22, 500:22, 511:15, 516:25, 525:7, 539:22, 540:2, 564:18, 570:3
**GENERATED** [3] - 501:14, 523:6, 535:15
**GENERATION** [1] - 493:5
**GENTLEMEN** [4] - 470:10, 470:23,

476:2, 559:3
**GEOLOGIST** [3] - 510:6, 512:8, 520:10
**GEOPHYSICAL** [1] - 561:19
**GEORGE** [1] - 473:19
**GIVEN** [5] - 468:10, 545:4, 548:11, 574:9, 599:5
**GLACIAL** [1] - 540:5
**GLEN** [1] - 557:3
**GORDON** [1] - 550:6
**GOTCHA** [1] - 593:1
**GOVERNING** [1] - 498:11
**GOVERNMENT** [3] - 596:6, 597:9, 597:11
**GOVERNMENT** [5] - 466:13, 488:17, 577:13, 596:4, 596:6
**GOVERNMENTAL** [1] - 599:5
**GRAVE** [2] - 579:6, 600:2
**GRAVITY** [1] - 512:18
**GREASE** [3] - 492:18, 492:19
**GREAT** [2] - 487:9, 614:11
**GREATER** [1] - 486:2
**GRIPS** [1] - 581:2
**GROUND** [1] - 481:16
**GROUND** [42] - 471:21, 471:22, 478:13, 480:23, 481:9, 481:19, 482:4, 482:21, 483:13, 484:2, 484:14, 486:19, 487:11, 488:9, 488:12, 488:13, 492:13, 494:12, 502:7, 503:2, 503:18, 503:19, 505:8, 505:9, 505:14, 506:22, 506:25, 512:14, 512:17, 512:18, 515:12, 515:14, 517:25, 530:11, 557:17, 564:11, 568:2, 568:14, 590:4, 590:18
**GROUNDS** [1] - 534:9
**GROUNDWATER** [1] - 582:12
**GROUNDWATER** [68] - 472:4, 473:5, 475:12, 487:12, 495:9, 500:9,

502:18, 502:23, 503:7, 503:13, 503:20, 503:24, 504:4, 504:6, 504:18, 504:23, 505:12, 505:19, 506:7, 511:25, 513:12, 514:10, 514:14, 514:19, 514:22, 514:23, 514:25, 515:3, 515:6, 515:10, 515:12, 515:17, 515:23, 515:24, 516:10, 516:20, 517:1, 517:6, 517:21, 518:1, 518:4, 519:12, 519:21, 519:24, 520:11, 520:14, 520:20, 520:22, 521:17, 521:19, 522:1, 522:4, 522:20, 532:1, 552:2, 552:21, 554:18, 554:21, 554:25, 556:6, 557:17, 584:22, 585:25
**GUESS** [3] - 465:10, 486:8, 593:4
**GUIDELINE** [1] - 589:1
**GUIDELINES** [4] - 469:15, 478:16, 489:22, 490:4

# H

**H2O** [1] - 482:8
**HALF** [2] - 474:12, 519:6
**HAMPSON** [1] - 473:18
**HAND** [3] - 465:4, 482:3, 482:15
**HANDBOOKS** [1] - 613:2
**HANDLE** [3] - 508:6, 541:9, 547:1
**HANDLED** [2] - 492:2, 591:4
**HANDLED** [8] - 472:18, 476:14, 492:5, 502:1, 535:15, 590:23, 591:13, 613:6
**HANDLING** [16] - 471:9, 471:16, 472:6, 472:10,

493:6, 579:2, 579:6, 580:22, 581:14, 581:15, 590:17, 591:12, 591:14, 600:4, 612:22, 613:3
**HANDWRITTEN** [2] - 496:16, 498:22
**HANG** [1] - 605:22
**HARD** [3] - 476:21, 565:15, 605:10
**HAULED** [1] - 605:15
**HAULER** [8] - 491:12, 491:13, 589:23, 590:6, 590:12, 590:18, 590:21, 590:23
**HAZARDOUS** [92] - 474:8, 474:11, 474:17, 478:3, 497:1, 497:14, 511:23, 513:12, 514:5, 514:12, 516:4, 516:22, 517:11, 518:1, 527:22, 528:5, 528:10, 528:16, 528:19, 529:12, 531:5, 531:18, 533:5, 533:7, 534:23, 536:2, 552:11, 553:1, 553:3, 553:25, 554:5, 554:9, 554:13, 554:16, 579:2, 579:6, 580:22, 594:24, 594:25, 595:7, 595:22, 597:2, 597:4, 597:5, 597:7, 597:15, 597:17, 597:20, 597:21, 598:3, 598:4, 599:14, 599:16, 602:16, 603:18, 604:1, 604:5, 604:8, 604:13, 604:15, 604:17, 604:18, 604:19, 604:21, 604:24, 605:2, 605:4, 605:8, 605:9, 605:14, 605:15, 607:9, 607:12, 607:15, 607:16, 607:17, 607:20, 607:22, 607:24, 608:2, 608:6, 608:24, 611:22, 611:25, 612:2, 612:22, 613:3, 613:11

**HAZARDOUS** [5] - 479:4, 479:11, 585:4, 604:25, 612:11
**HEAD** [3] - 496:7, 570:8, 615:10
**HEADED** [1] - 547:19
**HEALTH** [2] - 504:15, 521:21
**HEALTH** [11] - 477:15, 485:7, 487:13, 487:18, 499:9, 516:18, 560:19, 587:20, 587:23, 602:16
**HEAR** [7] - 465:9, 469:6, 507:22, 524:7, 544:12, 615:3, 615:4
**HEARD** [2] - 467:20, 546:6
**HEARING** [2] - 463:25, 548:4
**HEARS** [1] - 466:12
**HEAVIER** [1] - 512:21
**HEAVILY** [1] - 517:12
**HEAVY** [7] - 508:9, 508:22, 511:19, 562:7, 562:8, 562:9, 608:17
**HELP** [2] - 589:13, 595:14
**HIDE** [1] - 596:17
**HIGH** [5] - 467:24, 472:9, 486:7, 493:14, 493:19
**HIGHEST** [4] - 538:25, 562:20, 562:22, 562:23
**HIGHLIGHT** [2] - 481:21, 605:22
**HIGHLIGHTED** [5] - 481:11, 516:16, 543:23, 544:5, 545:16
**HIGHLIGHTING** [1] - 554:23
**HIGHLY** [1] - 552:1
**HILL** [6] - 486:10, 486:15, 486:22, 487:7, 487:19, 487:24
**HIRED** [5] - 512:8, 513:10, 517:5, 520:11, 527:13
**HIRES** [1] - 571:17
**HISTORICAL** [2] - 522:11, 522:19
**HISTORY** [3] - 578:13, 593:17, 593:19

**HIT** [2] - 513:4, 594:21
**HOG** [13] - 485:15, 485:19, 485:23, 487:6, 488:7, 488:25, 489:8, 490:8, 490:12, 506:16, 506:17, 508:13, 508:15
**HOG-OUT** [11] - 485:15, 485:19, 485:23, 487:6, 488:7, 488:25, 489:8, 490:8, 490:12, 506:16, 506:17
**HOGGING** [1] - 486:4
**HOKKANEN** [1] - 547:9
**HOLD** [2] - 539:15, 601:19
**HOLE** [2] - 541:14, 602:17
**HOLES** [3] - 518:17, 518:21, 554:2
**HOLLOW** [1] - 601:15
**HONOR** [45] - 463:15, 464:15, 465:11, 465:19, 468:9, 468:14, 468:25, 470:1, 470:21, 481:1, 500:19, 501:5, 502:5, 503:1, 503:9, 507:19, 507:23, 516:1, 523:24, 524:6, 524:24, 525:1, 525:17, 530:12, 534:5, 536:8, 537:19, 538:3, 545:1, 545:17, 546:5, 546:13, 548:1, 549:8, 558:5, 558:10, 558:15, 559:1, 559:17, 568:17, 568:20, 568:23, 569:4, 581:21, 591:24
**HONOR'S** [1] - 548:2
**HOPE** [2] - 520:13, 520:19
**HOPING** [1] - 520:21
**HOST** [1] - 559:8
**HOURLY** [1] - 569:24
**HUGHTO** [1] - 471:1
**HUGHTO** [29] - 466:2, 466:3, 466:4, 466:10, 467:2, 467:7, 467:8, 469:7, 469:15, 469:22, 470:12, 470:16,

471:6, 487:13, 489:25, 532:17, 543:13, 544:7, 545:24, 546:6, 547:4, 547:24, 548:12, 548:22, 549:5, 565:21, 569:10, 569:12, 615:14
**HULA** [33] - 494:1, 494:5, 494:10, 494:13, 494:14, 495:23, 495:25, 496:3, 496:13, 496:20, 497:22, 499:2, 499:4, 499:17, 499:21, 500:6, 500:8, 500:13, 500:16, 501:22, 501:24, 502:4, 502:14, 502:17, 502:22, 538:15, 567:4, 567:5, 567:8, 567:12, 610:12, 610:13, 611:18
**HUNDRED** [1] - 595:16
**HYDROGEOLOGIC** [6] - 517:24, 517:25, 518:7, 518:9, 518:13, 518:17
**HYGIENIST** [2] - 476:19, 499:14
**HYPOTHESIS** [1] - 573:5
**HYPOTHETICAL** [1] - 589:1

# I

**I.D** [2] - 524:6, 524:8
**IDEA** [5] - 479:24, 595:8, 596:19, 596:21, 609:8
**IDENTIFICATION** [2] - 466:12, 549:11
**IDENTIFIED** [15] - 465:8, 466:7, 466:8, 478:17, 483:20, 493:3, 506:1, 526:24, 527:13, 531:6, 531:18, 537:16, 552:25, 565:25, 566:18
**IDENTIFIES** [7] - 464:21, 481:17, 496:13, 504:21, 517:4, 527:25, 533:4
**IDENTIFY** [9] - 472:14,

**UNITED STATES DISTRICT COURT**

490:14, 522:3, 528:8, 535:14, 551:21, 567:4, 567:7, 568:13

**IDENTIFYING** [3] - 477:15, 490:15, 504:12

**IGNITABILITY** [1] - 588:16

**IGNITABLE** [4] - 588:3, 588:5, 588:8, 588:22

**IGNORE** [3] - 559:10, 559:11, 571:23

**IGNORED** [1] - 489:7

**II** [2] - 595:18, 595:20

**ILLEGAL** [7] - 497:2, 497:17, 498:23, 498:24, 500:3, 500:18, 500:22

**IMMEDIATE** [1] - 489:20

**IMMEDIATELY** [1] - 500:3

**IMMINENT** [2] - 558:22, 561:24

**IMMINENT** [1] - 560:6

**IMPACT** [29] - 475:6, 476:25, 478:8, 481:7, 487:1, 491:5, 498:13, 503:13, 505:4, 514:17, 514:18, 515:2, 520:16, 521:24, 529:5, 531:24, 533:15, 537:7, 551:8, 551:10, 552:4, 554:25, 560:18, 609:2, 609:9, 609:24

**IMPACTED** [4] - 494:18, 552:22, 554:17, 560:1

**IMPACTS** [5] - 487:14, 505:6, 528:8, 552:23, 587:23

**IMPERMEABLE** [3] - 511:14, 513:2, 513:3

**IMPLEMENT** [3] - 560:22, 563:21, 566:23

**IMPLEMENTATION** [1] - 473:4

**IMPLEMENTED** [3] - 477:24, 551:13, 554:12

**IMPLY** [1] - 591:20

**IMPORTANCE** [1] - 495:6

**IMPORTANT** [11] -

491:16, 516:7, 522:14, 529:6, 529:14, 531:22, 539:4, 560:10, 575:10, 578:14, 578:17

**IMPOSITION** [1] - 504:3

**IMPOUNDMENT** [2] - 557:9, 557:15

**IMPOUNDMENTS** [1] - 472:17

**IMPROPERLY** [1] - 544:20

**IN** [2] - 492:2, 591:4

**INADEQUATE** [1] - 509:10

**INADVERTENTLY** [1] - 548:23

**INCH** [1] - 601:14

**INCLUDE** [7] - 474:11, 481:19, 518:17, 545:21, 558:21, 562:8

**INCLUDED** [6] - 474:23, 481:23, 481:24, 493:17, 545:5, 588:12

**INCLUDES** [2] - 472:3, 511:1

**INCLUDING** [10] - 468:11, 481:24, 505:9, 526:10, 538:12, 543:25, 549:5, 559:9, 580:22, 581:4

**INCOMPLETE** [1] - 554:18

**INCORRECT** [1] - 487:21

**INCREASE** [3] - 556:2, 556:6, 556:7

**INCREASED** [1] - 556:12

**INCREASES** [1] - 556:4

**INCREDIBLE** [1] - 468:10

**INCUR** [1] - 555:3

**INDEED** [1] - 599:16

**INDICATE** [4] - 501:16, 530:10, 542:4, 557:13

**INDICATED** [2] - 607:8, 611:20

**INDICATES** [1] - 518:1

**INDICATING** [1] - 528:11

**INDICATING)** [2] - 567:5, 567:20

**INDICATION** [6] - 515:22, 533:20, 602:12, 609:2, 609:6, 609:21

**INDICATIVE** [1] - 533:6

**INDISCRIMINATE** [1] - 477:25

**INDUSTRIAL** [6] - 476:19, 499:14, 500:3, 500:18, 500:23, 510:7

**INDUSTRY** [1] - 588:10

**INERT** [2] - 495:2, 527:21

**INFORM** [3] - 523:2, 523:4, 595:14

**INFORMALLY** [1] - 497:15

**INFORMATION** [47] - 474:7, 478:19, 510:25, 516:7, 519:19, 520:18, 522:13, 523:1, 529:14, 534:22, 535:2, 536:3, 536:4, 536:11, 537:14, 539:3, 544:4, 544:6, 547:12, 570:25, 571:6, 571:19, 571:21, 571:23, 572:3, 572:7, 572:9, 572:15, 573:6, 573:14, 573:17, 573:18, 573:20, 574:1, 574:14, 574:16, 576:5, 578:2, 578:3, 578:7, 594:4, 594:5, 594:11, 594:12, 597:12

**INFORMS** [1] - 596:6

**INGREDIENTS** [2] - 614:12, 614:13

**INITIAL** [4] - 539:2, 566:18, 600:13, 602:20

**INITIALS** [1] - 613:20

**INITIATED** [1] - 477:23

**INITIATES** [1] - 535:13

**INLAND** [1] - 480:4

**INSIDE** [3] - 501:22, 501:24, 601:9

**INSPECTION** [5] - 582:10, 600:9, 600:14, 600:16, 600:19

**INSPECTION** [1] - 582:13

**INSPECTIONS** [1] - 577:16

**INSPECTORS** [3] - 466:13, 467:9, 488:17

**INSTALL** [2] - 515:11, 557:24

**INSTALLING** [2] - 503:14, 504:6

**INSTANCE** [6] - 546:20, 572:1, 574:17, 575:16, 575:21, 592:20

**INSTANCES** [1] - 614:7

**INSTRUCTIONS** [3] - 489:5, 489:7, 489:15

**INSURANCE** [1] - 465:25

**INTACT** [5] - 529:12, 540:23, 541:17, 541:22, 604:22

**INTEGRITY** [1] - 506:24

**INTEND** [4] - 543:24, 544:6, 544:21, 545:15

**INTENDED** [1] - 548:24

**INTENDING** [2] - 536:16, 544:24

**INTENT** [2] - 464:12, 611:13

**INTERACTION** [1] - 473:3

**INTERCHANGEABLY** [1] - 605:6

**INTERIM** [1] - 504:17, 582:21, 582:23, 583:2, 583:3, 583:7

**INTERJECT** [1] - 615:25

**INTERNAL** [1] - 581:10

**INTERNET** [1] - 574:15

**INTERPRET** [1] - 483:4

**INTERPRETED** [3] - 482:21, 483:5, 584:17

**INTERPRETING** [1] - 584:11

**INTERRUPTING** [1] - 482:1

**INTRODUCES** [1] - 479:24

**INVARIABILITY** [1] - 604:21

**INVARIABLE** [1] -

604:21

**INVARIABLY** [1] - 529:12

**INVENTORIES** [1] - 523:10

**INVESTIGATE** [3] - 522:20, 553:22, 555:13

**INVESTIGATED** [6] - 526:22, 526:23, 527:3, 537:15, 538:25

**INVESTIGATING** [3] - 527:25, 534:17, 600:24

**INVESTIGATION** [42] - 467:20, 468:2, 518:7, 518:17, 519:7, 519:9, 519:13, 519:14, 519:18, 521:17, 526:2, 526:7, 526:25, 528:6, 529:19, 530:24, 530:25, 531:8, 531:17, 531:19, 533:21, 533:24, 537:2, 539:13, 539:20, 541:10, 542:22, 554:22, 560:14, 560:17, 561:21, 600:6, 600:8, 600:14, 600:17, 602:5, 603:15, 605:21, 606:8, 607:2, 610:5, 610:6

**INVESTIGATION** [1] - 526:17

**INVESTIGATIONS** [10] - 518:10, 518:13, 525:10, 525:12, 527:9, 527:24, 531:13, 534:15, 539:15, 561:2

**INVESTIGATORS** [1] - 539:13

**INVESTIGATORY** [1] - 554:10

**INVOLVE** [1] - 556:17

**INVOLVED** [5] - 527:24, 531:12, 543:4, 583:22, 615:2

**INVOLVING** [1] - 465:24

**ION** [1] - 562:3

**IRRELEVANT** [1] - 575:2

**ISD** [3] - 582:21, 582:23, 583:7

ISOLATED [1] - 533:14
ISSUE [21] - 465:17, 467:17, 467:19, 468:2, 469:13, 483:8, 497:19, 501:23, 506:11, 506:13, 506:18, 515:25, 543:17, 543:18, 544:22, 545:10, 548:23, 551:17, 561:8, 561:23, 583:9
ISSUES [9] - 467:24, 490:14, 506:8, 506:14, 506:23, 509:20, 511:11, 527:5, 578:5
ITEM [4] - 463:7, 477:5, 486:9, 510:18
ITEM [4] - 477:22, 482:11, 482:23, 510:22
ITEMS [4] - 486:17, 492:8, 497:9, 538:16

## J

JANUARY [2] - 479:4, 612:12
JATO [1] - 482:5
JETTING [1] - 488:7
JIM [8] - 491:12, 493:25, 496:13, 507:8, 511:7, 511:21, 517:14, 589:23
JISA [12] - 491:12, 493:25, 496:13, 501:2, 507:8, 509:9, 511:7, 511:21, 517:14, 589:17, 589:18, 589:23
JISA'S [1] - 508:25
JOB [3] - 592:4, 593:21, 593:25
JOE [7] - 551:1, 551:4, 553:10, 553:19, 555:1, 555:16
JOHN [4] - 463:23, 465:9, 476:18, 499:13
JOINED [1] - 470:9
JOKES [1] - 565:21
JUDGE [2] - 466:9, 544:25
JUDGMENT [1] - 596:1
JUDGMENTS [3] - 573:25, 575:4, 584:8

JUDICIAL [1] - 468:11
JULY [2] - 489:5, 557:6
JUNE [12] - 490:22, 524:5, 525:20, 526:18, 529:10, 530:2, 537:16, 542:12, 550:3, 551:10, 552:25, 553:16
JURISDICTION [1] - 583:21
JURORS [1] - 615:4
JURY [1] - 470:11
JURY [31] - 463:4, 463:20, 464:23, 465:9, 465:11, 465:16, 466:12, 466:23, 468:12, 469:16, 470:2, 470:6, 470:9, 502:10, 532:11, 543:9, 543:11, 549:2, 549:5, 559:2, 559:19, 565:16, 571:1, 571:5, 586:5, 586:21, 602:9, 613:21, 615:7, 615:9, 615:13
JUSTIFYING [2] - 519:8, 519:16

## K

KEEP [4] - 543:4, 548:17, 564:8, 615:3
KEEPING [1] - 587:5
KEEPS [1] - 518:5
KEPT [1] - 493:3
KILOGRAM [1] - 562:13
KIND [8] - 493:15, 516:19, 527:4, 540:5, 598:14, 601:13, 601:14, 609:5
KINDERGARTEN [1] - 601:10
KINDS [1] - 601:24
KNOWING [6] - 469:17, 516:10, 529:5, 570:12, 570:18, 595:13
KNOWLEDGE [3] - 473:6, 536:21, 609:25
KNOWN [13] - 477:14, 487:14, 531:1, 532:5, 533:6, 552:25, 553:2,

574:1, 574:3, 574:4, 578:1, 578:3
KNOWS [1] - 465:11

## L

L.A [2] - 577:22, 582:11
LAB [1] - 609:19
LABORATORY [2] - 540:9, 608:4
LACK [1] - 597:14
LADIES [4] - 470:10, 470:23, 476:2, 559:3
LAKE [4] - 517:15, 517:16, 518:4, 518:5
LAMPBLACK [1] - 482:15
LAND [1] - 498:10
LANDFILL [33] - 472:19, 495:3, 526:25, 528:20, 531:25, 532:5, 532:21, 532:22, 536:20, 537:18, 537:24, 538:14, 538:21, 538:24, 539:5, 539:20, 540:25, 541:5, 541:13, 554:2, 554:4, 555:2, 567:2, 600:6, 600:14, 600:24, 603:25, 604:10, 605:9, 605:16, 606:16, 606:18, 606:22
LANDFILLED [1] - 539:13
LANDFILLS [53] - 526:2, 526:17, 526:21, 527:2, 527:13, 527:17, 527:20, 528:1, 528:5, 530:16, 531:1, 531:18, 533:4, 533:6, 533:7, 533:21, 534:21, 534:24, 535:19, 536:2, 536:11, 536:12, 536:16, 536:19, 536:25, 537:15, 537:16, 538:7, 538:13, 538:17, 542:21, 551:5, 551:14, 553:1, 553:2, 553:21, 553:22, 554:21, 555:4, 555:17, 592:22, 593:12, 593:15,

594:3, 594:8, 594:10, 594:13, 594:17, 595:9, 595:23, 600:7, 607:3
LANDFILLS [1] - 526:18
LANGUAGE [1] - 591:20
LARDIERE [1] - 463:16
LARGE [13] - 475:9, 488:7, 509:2, 509:20, 531:17, 539:12, 541:25, 551:6, 551:15, 552:3, 553:24, 554:5, 554:8
LARGELY [1] - 544:22
LARGER [1] - 556:16
LASER [1] - 565:13
LAST [4] - 468:19, 489:17, 530:4, 597:19
LATE [2] - 546:22, 568:8
LATEST [1] - 520:12
LAW [16] - 465:23, 480:16, 580:8, 580:18, 583:20, 583:25, 584:5, 584:21, 585:17, 585:18, 585:21, 585:23, 586:3, 586:4, 586:6, 598:10
LAWS [5] - 498:11, 583:21, 584:6, 586:9
LEAD [1] - 534:17
LEAK [2] - 512:11, 513:1
LEAKED [1] - 512:12
LEARNED [1] - 527:10
LEAST [11] - 486:5, 488:15, 504:13, 506:24, 521:3, 528:8, 575:22, 588:20, 597:12, 599:1, 599:4
LEAVE [7] - 543:6, 543:13, 551:6, 551:24, 553:13, 554:2, 615:5
LEAVING [4] - 553:11, 554:4, 555:2, 556:1
LECTERN [2] - 543:20, 568:24
LEFT [4] - 471:5, 482:3, 533:4, 590:18
LEFT-HAND [1] - 482:3
LEGAL [3] - 502:7,

503:2, 534:9
LEGEND [1] - 566:17
LENGTH [3] - 594:10, 594:14, 608:18
LENGTHY [3] - 608:15, 608:20, 613:17
LESSER [1] - 576:2
LETTER [11] - 473:17, 504:11, 506:6, 510:5, 510:23, 511:20, 520:12, 521:12, 522:16, 524:4
LEVEL [4] - 544:13, 544:16, 547:1, 601:10
LEVELS [3] - 518:18, 521:20, 521:22
LIABILITY [1] - 555:15
LIKELY [4] - 500:9, 502:23, 516:10, 611:3
LIMIT [1] - 545:12
LIMITED [6] - 476:3, 503:6, 545:22, 587:22, 587:23, 594:12
LINE [20] - 464:5, 464:6, 464:7, 464:8, 464:9, 464:10, 480:20, 484:12, 488:3, 497:24, 509:1, 572:18, 589:14, 589:16
LINED [1] - 506:22
LINER [13] - 506:23, 506:24, 511:3, 511:10, 511:11, 511:12, 511:22, 512:4, 512:5, 512:11, 514:4
LINES [5] - 464:3, 508:17, 546:11, 572:20, 572:21
LIQUID [24] - 472:18, 490:21, 491:5, 491:10, 491:15, 491:18, 505:9, 505:14, 508:17, 523:5, 527:22, 528:1, 528:4, 528:10, 591:12, 591:14, 594:24, 594:25, 595:7, 595:9, 595:22, 597:24
LIQUIDS [3] - 491:23, 522:23, 523:4
LIST [6] - 480:21,

480:24, 536:23, 581:8, 587:2
**LISTED** [9] - 482:3, 482:8, 482:11, 492:12, 492:14, 505:8, 545:6, 550:5, 587:7
**LISTING** [1] - 537:1
**LISTS** [7] - 478:1, 483:8, 491:20, 511:1, 587:10, 605:4, 607:20
**LIVED** [2] - 583:14, 583:16
**LIVER** [1] - 477:14
**LOCAL** [1] - 605:16
**LOCATED** [1] - 589:12
**LOCATION** [5] - 528:12, 530:21, 533:11, 592:16, 596:5
**LOCATION** [1] - 481:16
**LOCATIONS** [3] - 481:18, 529:8, 566:18
**LOGISTICS** [1] - 464:14
**LOGS** [4] - 493:1, 493:2, 495:21, 523:9
**LOOK** [36] - 474:2, 475:10, 477:3, 478:6, 479:12, 480:7, 483:3, 483:18, 486:9, 490:17, 493:23, 500:25, 504:8, 507:1, 520:1, 521:9, 523:23, 524:2, 525:15, 536:9, 540:11, 541:14, 550:25, 561:13, 571:15, 575:2, 576:10, 576:12, 577:25, 580:1, 583:24, 587:8, 590:24, 593:21, 597:11, 612:9
**LOOKED** [16] - 485:16, 494:6, 498:17, 499:1, 507:6, 561:20, 575:4, 575:6, 576:7, 576:13, 577:5, 580:9, 584:9, 584:13, 584:14, 586:18
**LOOKING** [8] - 475:6, 475:14, 481:10, 483:11, 547:18,

565:24, 572:25, 586:23
**LOOKS** [2] - 494:13, 496:25
**LOS** [1] - 463:2
**LOST** [2] - 506:24, 580:5
**LOUTTIT** [1] - 550:6
**LOW** [3] - 511:24, 516:22, 604:15
**LOWER** [1] - 518:2
**LUCE** [28] - 476:19, 480:11, 481:13, 482:19, 483:12, 483:25, 485:18, 486:18, 487:16, 487:20, 488:3, 488:6, 488:14, 490:3, 490:14, 494:10, 497:19, 501:1, 504:11, 505:7, 505:19, 510:6, 510:24, 513:9, 520:3, 520:15, 520:18
**LUCE'S** [1] - 490:9
**LUNCH** [1] - 601:12

---

# M

**M.T.V** [1] - 508:17
**MACHINE** [5] - 477:10, 601:18, 601:20, 601:21
**MACHINES** [3] - 492:18, 493:20, 539:14
**MAGNITUDE** [2] - 529:6, 534:15
**MAIN** [3] - 553:24, 554:8, 567:22
**MAINTENANCE** [1] - 521:14
**MAJORITY** [4] - 475:10, 567:25, 568:3, 604:15
**MANAGED** [2] - 491:25, 492:20
**MANAGEMENT** [10] - 476:9, 488:22, 489:22, 490:5, 491:21, 492:7, 498:18, 504:14, 533:13, 581:15
**MANIFEST** [11] - 595:12, 596:3, 596:4, 596:6, 596:9, 596:11, 596:23, 598:11, 599:17, 599:18

**MANIFEST** [1] - 597:19
**MANIFESTED** [4] - 595:11, 604:8, 605:8, 605:14
**MANIFESTING** [3] - 596:18, 596:23, 599:9
**MANIFESTS** [3] - 596:1, 597:8, 597:11
**MANNER** [2] - 518:5, 605:13
**MANUAL** [3] - 478:7, 478:10, 612:22
**MANUALS** [5] - 478:2, 478:7, 478:14, 478:16, 478:19
**MANUFACTURED** [4] - 485:25, 614:5, 614:9, 614:11
**MANUFACTURER** [2] - 580:12, 580:15
**MANUFACTURING** [10] - 562:4, 562:7, 562:10, 579:16, 579:18, 579:19, 579:24, 580:6, 591:7, 614:13
**MAP** [1] - 567:19
**MAPO** [1] - 474:15
**MARCH** [3] - 507:4, 508:19, 509:19
**MARKER** [1] - 565:12
**MARSHES** [1] - 480:4
**MATERIAL** [37] - 475:9, 475:11, 482:4, 482:20, 487:23, 488:13, 494:22, 495:17, 497:1, 501:13, 508:6, 511:15, 514:5, 529:20, 532:21, 532:22, 539:1, 539:7, 539:8, 539:12, 540:8, 541:25, 551:15, 551:25, 552:1, 553:20, 554:8, 562:18, 564:10, 575:2, 590:20, 595:11, 604:4, 604:25, 608:5, 609:2
**MATERIAL** [3] - 479:4, 479:11, 612:12
**MATERIALS** [2] - 481:15, 604:25
**MATERIALS** [60] - 472:20, 473:10, 474:8, 474:11, 480:23, 481:18,

481:19, 481:20, 490:10, 492:13, 494:11, 495:7, 495:12, 497:14, 506:9, 527:20, 528:1, 528:8, 528:11, 529:11, 531:5, 531:18, 533:16, 535:15, 536:18, 538:8, 538:9, 538:12, 542:1, 542:9, 551:6, 551:15, 552:3, 553:23, 553:24, 553:25, 554:6, 554:9, 554:13, 554:15, 554:16, 554:17, 556:10, 558:18, 558:21, 563:14, 568:12, 589:12, 594:23, 597:22, 600:10, 604:16, 604:18, 604:20, 605:2, 605:4, 605:5, 605:12, 613:6, 613:7
**MATTER** [8] - 463:6, 475:7, 508:7, 524:15, 543:4, 549:4, 584:11, 615:2
**MEAN** [25] - 483:5, 515:7, 515:8, 531:15, 536:17, 538:2, 541:3, 545:25, 546:8, 552:10, 552:12, 567:22, 579:15, 579:16, 586:24, 591:6, 591:9, 599:12, 600:12, 600:22, 601:7, 609:17, 609:23, 610:20, 611:24
**MEANING** [7] - 481:12, 492:6, 495:16, 506:23, 553:12, 611:3, 611:13
**MEANS** [14] - 484:15, 491:16, 495:2, 503:22, 512:5, 532:12, 534:2, 547:24, 559:5, 562:16, 598:4, 608:4, 608:8, 611:1
**MEANT** [12] - 483:6, 491:13, 493:15, 532:19, 534:7, 537:20, 579:12, 591:10, 591:16,

601:15, 611:5, 611:6
**MEASURE** [3] - 515:21, 539:17, 540:20
**MEASURED** [2] - 539:14, 564:11
**MEASUREMENTS** [1] - 564:15
**MEASURES** [2] - 555:12, 581:8
**MECHANISM** [1] - 472:22
**MEDIA** [2] - 472:4, 532:1
**MEET** [2] - 466:18, 558:12
**MEETING** [6] - 494:14, 494:20, 550:2, 550:9, 550:14
**MEMO** [50] - 480:10, 481:13, 481:15, 484:12, 485:14, 485:16, 488:15, 488:20, 489:16, 490:10, 490:22, 491:4, 491:19, 491:25, 494:13, 494:20, 499:3, 501:1, 501:7, 502:25, 509:17, 511:20, 516:18, 519:11, 520:3, 520:15, 525:19, 526:1, 526:13, 529:10, 530:2, 532:2, 533:18, 536:22, 536:24, 537:3, 537:5, 549:12, 550:22, 552:24, 557:20, 590:14, 590:19, 591:12, 591:16, 591:19, 592:1, 599:10, 603:14, 607:17
**MEMORIALIZE** [1] - 464:1
**MEMORY** [3] - 477:3, 560:6, 570:22
**MEMOS** [3] - 561:20, 581:1, 581:10
**MENTION** [4] - 512:6, 563:3, 586:18, 586:22
**MENTIONED** [9] - 472:25, 492:13, 508:13, 511:9, 513:6, 533:2, 540:19, 563:6, 613:23

**UNITED STATES DISTRICT COURT**

**MENTIONS**[2] - 474:13, 474:19
**MERELY**[1] - 466:11
**MET**[1] - 511:24
**METAL**[11] - 497:1, 500:1, 500:17, 500:22, 527:21, 529:13, 562:6, 594:16, 594:24, 601:15, 604:22
**METALLIC**[1] - 561:18
**METALS**[5] - 562:7, 562:8, 562:9, 608:17
**METHOD**[1] - 486:5
**METHODS**[4] - 560:20, 563:20, 608:11, 614:12
**MICEVYCH**[1] - 463:14
**MICROPHONE**[1] - 524:12
**MIDDLE**[5] - 510:11, 528:15, 533:3, 542:13, 605:20
**MIGHT**[1] - 571:16
**MIGRATE**[3] - 487:11, 514:10, 556:2
**MIGRATED**[1] - 513:1
**MIGRATION**[7] - 516:15, 516:22, 517:11, 556:7, 556:13, 556:14
**MIKE**[1] - 463:17
**MILD**[1] - 477:13
**MILLIGRAMS**[1] - 562:13
**MILLION**[2] - 550:17, 550:21
**MIND**[5] - 488:16, 532:9, 543:5, 545:18, 615:3
**MINE**[1] - 572:25
**MINIMIZE**[1] - 555:12
**MINIMUM**[2] - 514:20, 516:9
**MINUTE**[5] - 466:23, 472:24, 497:18, 513:8, 528:13
**MINUTES**[2] - 464:17, 543:8
**MISCHIEF**[1] - 548:2
**MISLED**[2] - 473:6, 473:7
**MISSILE**[1] - 485:25
**MISSILES**[1] - 614:17
**MISSPELLED**[1] - 562:5
**MISSPELLINGS**[1] - 481:24

**MISTAKEN**[1] - 549:21
**MITIGATE**[5] - 551:22, 553:14, 553:17, 556:6, 561:4
**MIX**[1] - 482:5
**MIXED**[2] - 569:2, 569:4
**MIXTURE**[2] - 588:13, 609:3
**MODEL**[1] - 573:14
**MOMENT**[5] - 544:12, 568:20, 587:17, 589:10, 605:5
**MONETARY**[1] - 494:24
**MONITOR**[2] - 515:10, 584:21
**MONITORING**[47] - 473:5, 500:9, 502:19, 502:23, 503:7, 503:14, 503:15, 503:16, 503:24, 504:4, 504:7, 504:18, 504:24, 505:12, 505:20, 506:7, 513:12, 514:14, 514:19, 514:21, 514:22, 514:23, 514:25, 515:6, 516:12, 516:13, 516:20, 517:1, 517:6, 518:22, 519:8, 519:12, 519:16, 519:21, 519:24, 520:11, 520:14, 520:20, 534:19, 557:24, 558:3, 560:12, 579:6, 584:17, 584:19, 584:20, 585:25
**MONITORING**[1] - 582:12
**MONTH**[3] - 530:4, 530:7, 530:9
**MONTHLY**[3] - 493:2, 495:21, 523:9
**MONTHS**[1] - 507:7
**MOORE**[1] - 480:11
**MORNING**[16] - 463:5, 463:12, 463:13, 463:15, 463:19, 470:10, 470:11, 470:22, 470:23, 543:21, 569:9, 569:11, 581:5, 601:16, 616:4
**MOST**[7] - 517:15,

544:8, 545:19, 565:2, 574:13, 606:21, 611:2
**MOSTLY**[1] - 573:20
**MOTOR**[1] - 508:15
**MOVE**[20] - 485:10, 487:5, 505:15, 511:23, 512:16, 513:17, 514:8, 518:3, 534:4, 535:17, 557:17, 558:6, 571:9, 587:14, 590:9, 594:22, 606:15, 612:7
**MOVES**[2] - 517:16, 564:5
**MOVING**[7] - 499:5, 514:5, 514:12, 514:13, 525:2, 555:2, 558:16
**MR**[166] - 463:12, 463:15, 464:15, 465:2, 465:6, 465:14, 465:19, 467:2, 467:8, 468:9, 468:14, 468:18, 468:21, 468:25, 469:2, 469:7, 469:13, 469:19, 470:1, 470:21, 471:4, 473:17, 475:19, 475:21, 475:22, 475:25, 476:15, 479:6, 479:14, 479:16, 480:10, 481:1, 481:5, 481:6, 485:14, 490:20, 494:3, 499:9, 500:19, 500:20, 500:21, 501:5, 501:7, 502:5, 502:9, 502:12, 503:1, 503:4, 503:9, 504:1, 504:11, 505:15, 505:18, 507:6, 507:19, 507:23, 507:24, 510:4, 510:13, 510:15, 514:3, 516:1, 516:2, 516:3, 520:5, 521:12, 524:1, 524:2, 524:6, 524:8, 524:13, 524:14, 524:24, 525:2, 525:17, 525:19, 527:7, 527:8, 530:12, 530:14, 530:15, 531:2,

531:4, 531:9, 531:11, 531:12, 532:9, 532:11, 532:13, 532:15, 532:16, 534:4, 534:7, 534:10, 534:13, 534:14, 536:6, 536:8, 536:9, 537:19, 537:22, 537:23, 538:3, 538:11, 544:8, 545:1, 545:17, 546:5, 546:13, 547:2, 547:10, 547:13, 547:16, 547:19, 548:1, 549:8, 549:9, 549:12, 549:14, 549:16, 552:7, 552:9, 553:6, 553:15, 558:5, 558:9, 558:15, 558:16, 558:23, 559:17, 559:21, 565:7, 565:10, 565:21, 565:23, 568:16, 568:20, 568:23, 569:4, 569:8, 571:11, 572:18, 572:19, 572:21, 572:22, 572:24, 572:25, 573:16, 578:18, 581:21, 581:24, 583:5, 583:6, 586:22, 587:16, 589:4, 589:5, 590:11, 591:24, 591:25, 593:15, 595:8, 597:15, 606:3, 611:17, 614:23
**MUD**[1] - 511:25
**MULTICOPY**[1] - 596:12
**MULTIFORM**[1] - 596:12
**MULTIPLE**[7] - 484:14, 506:13, 509:17, 515:20, 541:8, 596:11
**MUST**[7] - 500:1, 500:2, 500:4, 500:5, 500:7, 500:10, 500:11
**MYSTERY**[3] - 526:1, 526:13, 592:1

## N

**NAME**[1] - 522:10

**NAMES**[1] - 586:13
**NATURAL**[3] - 518:4, 552:20, 552:22
**NATURALLY**[2] - 562:3, 562:6
**NATURE**[4] - 471:25, 523:10, 529:21, 597:24
**NEAR**[2] - 568:4, 600:19
**NEAR-SURFACE**[1] - 600:19
**NECESSARY**[13] - 491:11, 531:1, 532:5, 551:4, 552:18, 552:23, 553:20, 561:6, 568:18, 589:21, 589:23, 590:1, 615:22
**NECESSITY**[1] - 467:6
**NEED**[13] - 465:1, 476:14, 519:12, 527:3, 529:25, 543:25, 545:23, 546:12, 558:9, 566:19, 581:9, 591:22, 605:20
**NEEDED**[2] - 556:3, 584:2
**NEEDS**[4] - 465:22, 477:23, 529:24, 602:17
**NEGATIVE**[14] - 519:7, 519:16, 607:21, 608:22, 608:24, 609:11, 609:15, 609:16, 609:23, 610:1, 610:7, 611:25, 612:3, 612:4
**NEGATIVES**[1] - 609:20
**NET**[1] - 550:14
**NEVER**[10] - 469:18, 488:18, 532:9, 544:20, 546:1, 546:7, 570:14, 583:14, 583:16, 609:15
**NEW**[7] - 497:10, 498:5, 509:21, 511:19, 580:12, 580:21, 581:3
**NEXT**[37] - 476:16, 481:3, 485:11, 497:20, 505:18, 508:10, 508:25, 513:6, 517:21,

522:22, 527:19, 529:3, 531:24, 540:11, 562:5, 562:11, 575:11, 587:15, 590:10, 600:5, 602:16, 602:23, 602:24, 603:1, 603:6, 603:7, 603:10, 604:11, 604:15, 607:1, 607:2, 610:3, 610:9, 610:11, 611:15, 612:1, 612:15
NIGHT [1] - 468:19
NITRATE [2] - 562:2
NON [3] - 521:4, 550:16, 560:21
NON-POTABLE [1] - 521:4
NON-RCRA [1] - 550:16
NON-TECHNICAL [1] - 560:21
NONE [1] - 581:11
NONETHELESS [1] - 548:17
NOT [2] - 492:2, 591:4
NOTE [1] - 529:11
NOTEBOOKS [2] - 543:6, 615:5
NOTES [5] - 496:16, 496:22, 497:21, 498:22, 602:17
NOTHING [2] - 611:10, 613:8
NOTICE [2] - 557:14, 558:17
NOTICES [2] - 524:14, 556:19
NOTIFIED [2] - 536:15, 557:8
NOVEMBER [3] - 521:13, 523:12, 523:18
NOVEMBER [1] - 463:1
NOW [2] - 492:2, 591:4
NUMBER [11] - 483:9, 498:17, 504:21, 526:21, 562:19, 562:20, 562:22, 562:23, 563:25, 569:19, 584:6
NUMBERED [1] - 496:19
NUMBERS [1] - 570:5
NUMEROUS [2] - 534:24, 569:15
NUR [1] - 557:3

**O**

O'CLOCK [2] - 614:25, 615:15
OATH [2] - 470:16, 549:6
OBJECT [2] - 505:15, 513:11
OBJECTION [20] - 464:4, 475:19, 475:25, 502:5, 502:7, 502:8, 502:9, 502:10, 503:1, 503:3, 507:19, 516:1, 534:9, 534:11, 537:19, 547:23, 552:7, 558:8, 572:24, 597:14
OBJECTIONS [1] - 463:21
OBJECTIVE [1] - 541:10
OBJECTIVES [2] - 528:8, 610:4
OBLIGATION [2] - 571:15, 584:21
OBLIGATIONS [1] - 585:19
OBSERVATION [1] - 514:12
OBSERVATIONS [1] - 472:3
OBSERVE [1] - 486:18
OBSERVED [1] - 509:15
OBSERVING [2] - 482:20, 483:12
OBTAIN [4] - 504:3, 517:5, 520:22, 532:19
OBTAINED [3] - 484:4, 510:25, 573:19
OBVIOUS [2] - 551:6, 552:3
OBVIOUSLY [2] - 519:5, 603:22
OCCASIONS [1] - 570:15
OCCUR [1] - 489:23
OCCURRED [6] - 472:12, 494:21, 509:14, 511:22, 539:19, 592:13
OCCURRING [2] - 562:3, 562:6
OCTOBER [8] - 480:10, 481:13,

483:14, 485:17, 494:11, 505:25, 506:6, 507:7
OFFICES [1] - 576:12
OFFICIAL [1] - 526:6
OFFSITE [4] - 590:18, 595:12, 596:5, 600:4
OFTEN [1] - 541:11
OIL [2] - 500:6, 500:7
OLD [2] - 494:22, 495:11, 495:15, 495:20, 495:22, 596:12
OMISSION [1] - 587:8
ONBOARD [1] - 563:18
ONCE [8] - 466:12, 481:24, 527:24, 531:5, 554:1, 573:13, 578:6, 589:12
ONE [77] - 466:23, 469:20, 473:21, 475:3, 475:12, 476:22, 477:5, 478:11, 480:12, 483:2, 483:11, 484:3, 486:5, 486:17, 490:22, 491:1, 492:15, 494:6, 494:11, 499:1, 503:12, 503:15, 504:18, 504:25, 507:11, 509:19, 511:9, 516:9, 517:4, 521:3, 522:9, 523:23, 524:14, 525:4, 525:15, 527:18, 528:7, 529:18, 530:9, 531:22, 538:24, 540:4, 540:12, 545:7, 548:2, 548:24, 549:24, 551:1, 551:12, 556:23, 558:18, 558:21, 562:11, 562:19, 563:13, 563:23, 564:2, 565:2, 566:1, 566:8, 568:20, 572:19, 573:1, 582:4, 582:6, 589:5, 592:21, 592:23, 593:13, 596:5, 596:12, 596:14, 598:21, 599:23, 599:25, 602:14, 602:23
ONE'S [2] - 490:22,

501:2
ONE-MONTH [1] - 530:9
ONE-TENTH [1] - 562:19
ONES [1] - 566:22
OOO [1] - 463:3
OPEN [4] - 498:8, 522:11, 543:5, 615:3
OPENED [1] - 548:12
OPENING [1] - 468:4
OPENS [1] - 467:18
OPERATE [1] - 535:12
OPERATED [4] - 469:14, 575:18, 575:19, 601:14
OPERATING [6] - 477:9, 478:12, 508:8, 524:18, 593:16, 594:3
OPERATION [9] - 485:19, 485:23, 487:6, 488:7, 508:17, 533:12, 533:14, 594:10, 594:14
OPERATIONAL [2] - 493:2, 523:9
OPERATIONS [4] - 471:15, 580:1, 580:9, 580:23
OPERATOR [2] - 516:21, 535:22
OPINE [1] - 575:14, 575:15
OPINING [1] - 503:23
OPINION [16] - 471:6, 471:10, 473:4, 487:23, 537:11, 585:20, 585:23, 586:2, 586:14, 592:9, 592:16, 594:16, 595:21, 611:4, 611:8, 611:13
OPINIONS [12] - 471:7, 548:4, 548:5, 572:2, 574:24, 574:25, 575:9, 578:8, 584:9, 584:11, 592:12, 611:6
OPPORTUNITY [3] - 547:7, 548:15, 556:2
OPPOSED [3] - 555:23, 589:1, 615:18
OPPOSING [2] - 464:16, 570:10
OPTIONS [1] - 581:8
ORDER [3] - 558:23,

561:24
ORDER [18] - 559:21, 559:25, 560:3, 560:13, 560:22, 560:24, 561:5, 561:7, 565:3, 571:6, 572:1, 574:19, 574:22, 580:24, 588:21, 597:11, 598:4
ORDINARY [1] - 604:9
ORGANIC [15] - 521:20, 522:23, 523:4, 539:2, 539:14, 539:18, 540:18, 540:20, 540:21, 557:16, 567:23, 601:5, 601:22, 601:25
ORGANICS [6] - 522:2, 522:3, 539:18, 609:17, 611:10
ORGANISMS [1] - 609:10
ORIGINAL [2] - 508:14, 590:1
OROFINO [1] - 486:15
OUTSIDE [8] - 463:20, 468:13, 476:11, 511:21, 549:19, 610:8, 615:11, 615:13
OVA [24] - 540:16, 540:17, 540:18, 542:7, 542:8, 542:10, 553:25, 554:9, 601:4, 601:6, 601:7, 602:1, 602:5, 602:14, 602:25, 603:3, 603:5, 603:17, 609:5, 609:13, 609:15, 609:16, 610:14, 610:15
OVAS [1] - 609:17
OVERALL [1] - 498:8
OVERFLOW [3] - 506:19, 511:19, 517:15
OVERFLOWING [1] - 507:17
OVERFLOWS [2] - 508:9, 508:24
OVERLYING [1] - 512:1
OVERRULED [7] - 464:6, 464:10, 476:1, 503:5, 505:17, 538:4, 553:7

OVERSIGHT [4] - 498:18, 526:6, 586:19, 587:8
OVERWHELMING [1] - 544:9
OWN [14] - 471:9, 471:11, 478:14, 478:15, 481:8, 498:10, 522:17, 535:12, 547:8, 573:19, 578:8, 597:13, 598:1, 598:2
OWNER [2] - 516:21, 535:22

**P**

P-E-L-O-Q-U-I-N [1] - 463:23
P.M [1] - 616:4
PAGE [67] - 464:3, 464:5, 464:6, 464:7, 464:8, 464:10, 474:12, 477:4, 477:22, 479:12, 479:15, 481:14, 490:23, 497:20, 497:21, 497:24, 498:3, 499:14, 502:18, 504:22, 505:18, 510:5, 510:10, 510:11, 510:16, 510:18, 511:5, 513:9, 513:16, 513:23, 517:8, 517:9, 528:14, 528:15, 530:25, 536:10, 536:17, 538:21, 540:11, 540:12, 559:18, 561:14, 561:15, 566:6, 572:18, 572:20, 582:17, 583:5, 595:23, 605:7, 605:10, 605:19, 606:14, 606:15, 607:1, 607:2, 607:5, 610:11, 610:22, 612:6, 612:15, 613:13, 613:18, 613:19
PAGES [4] - 481:14, 484:22, 525:24
PAID [2] - 570:6, 571:12
PALLETS [2] - 500:17, 500:22
PARAGRAPH [46] - 474:2, 474:19,

479:22, 479:24, 480:20, 481:10, 489:17, 496:25, 497:7, 497:11, 499:15, 499:21, 502:17, 503:22, 504:23, 508:10, 508:14, 513:11, 517:7, 519:6, 519:15, 522:3, 527:19, 528:15, 533:3, 553:18, 555:14, 561:23, 582:17, 589:14, 589:16, 590:24, 592:21, 593:1, 593:3, 593:6, 593:8, 594:19, 594:22, 595:2, 600:5, 600:15, 604:11, 605:11, 605:12
PARAGRAPHS [1] - 496:19
PARALEGAL [2] - 463:14, 463:17
PARE [1] - 542:18
PARED [1] - 550:16
PAREN [2] - 522:11, 522:12
PARING [2] - 542:20, 550:21
PART [13] - 467:11, 492:19, 496:17, 496:22, 516:19, 546:16, 556:9, 567:1, 575:7, 580:5, 586:19, 587:8, 603:25
PART [7] - 506:15, 535:6, 535:7, 535:14, 535:21, 536:1
PARTIALLY [1] - 530:19
PARTICULAR [5] - 523:3, 541:10, 550:2, 590:13, 609:16
PARTICULARLY [3] - 472:8, 514:25, 523:4
PARTIES [7] - 465:8, 468:10, 473:15, 521:10, 558:12, 559:14, 565:8
PARTIES' [1] - 464:12
PARTS [7] - 465:8, 558:9, 585:11, 601:18, 604:8, 604:9, 609:14
PARTY [1] - 465:24

PASSING [1] - 520:18
PAST [8] - 491:17, 497:4, 497:14, 509:15, 522:22, 534:21, 535:19
PAT [1] - 548:17
PATH [1] - 547:19
PATRICK [2] - 463:12, 566:16
PAUSE [3] - 593:11, 595:5, 606:2
PAUSING [1] - 574:11
PAY [1] - 543:22
PB [1] - 473:19
PCE [24] - 475:3, 476:13, 481:22, 481:25, 482:13, 484:7, 485:6, 485:8, 492:9, 492:24, 493:9, 493:14, 539:18, 562:25, 563:1, 564:15, 566:12, 567:7, 567:11, 567:15, 567:21, 568:3, 568:6, 568:13
PELOQUIN [8] - 463:23, 465:7, 465:9, 476:18, 477:7, 477:12, 477:24, 499:13
PELOQUIN'S [1] - 464:20
PEOPLE [12] - 469:19, 485:5, 491:20, 498:6, 498:16, 498:20, 543:4, 550:7, 588:19, 602:15, 611:6, 615:2
PER [2] - 530:3, 562:13
PERCENT [15] - 528:21, 529:7, 529:8, 539:1, 539:7, 539:10, 562:14, 562:17, 562:24, 563:1, 588:20, 588:21, 606:19
PERCENTAGE [6] - 528:16, 528:19, 588:16, 604:12, 604:13, 604:15
PERCENTAGES [2] - 475:10, 533:5
PERCHED [2] - 511:25, 513:5, 518:3
PERCHLORATE [22] - 474:14, 475:11, 476:13, 487:2, 487:9, 487:14,

501:18, 502:14, 561:11, 578:11, 587:17, 587:19, 587:23, 588:2, 588:3, 588:6, 588:7, 588:13, 588:16, 588:20, 614:15
PERCHLOROETHYL ENE [11] - 474:23, 475:1, 475:2, 481:21, 481:25, 482:13, 482:17, 483:6, 483:13, 484:15, 484:16
PERCOLATE [4] - 487:10, 506:21, 506:25, 518:2
PERCOLATION [1] - 511:17
PERFECTLY [1] - 496:8
PERFORM [2] - 534:19, 573:9
PERFORMANCE [1] - 476:4
PERFORMED [4] - 546:19, 561:3, 607:10, 609:1
PERFORMED.. [1] - 561:19
PERFORMING [4] - 539:16, 542:10, 546:19, 552:17
PERHAPS [2] - 548:22, 558:6
PERIOD [18] - 486:1, 508:21, 513:13, 513:19, 520:14, 521:2, 521:23, 530:4, 530:9, 532:6, 533:8, 533:22, 550:17, 551:7, 555:20, 588:1, 588:4, 594:7
PERIODICALLY [2] - 506:22, 564:24
PERIODS [2] - 506:18, 585:13
PERMANENT [1] - 477:14
PERMEABILITY [2] - 511:25, 518:18
PERMIT [4] - 543:25, 597:23, 598:1, 598:16
PERMITS [1] - 577:22
PERMITTED [7] - 597:20, 598:2, 598:9, 598:13, 598:19, 605:14

PERSON [4] - 602:16, 606:23, 610:24, 611:1
PERSPECTIVE [3] - 516:11, 551:16, 562:13
PERSUADE [2] - 547:7, 548:15
PH.D [1] - 471:1
PHOSPHOROUS [2] - 517:14, 562:5
PHOTOGRAPH [3] - 575:17, 575:20, 575:21
PHOTOGRAPHS [10] - 553:23, 574:18, 574:19, 574:21, 574:22, 575:8, 575:9, 575:12, 576:4, 576:9
PHOTOS [3] - 575:6, 575:25, 576:1
PHRASE [1] - 581:19
PHRASED [1] - 552:8
PHYSICAL [4] - 472:3, 540:4, 540:6, 597:24
PHYSICALLY [2] - 583:14, 583:17
PICK [2] - 513:1
PIECE [2] - 539:6, 570:25
PINPOINT [1] - 496:2
PIPES [2] - 515:14, 515:15
PIT [9] - 483:16, 484:2, 493:10, 493:13, 493:15, 502:2, 537:17, 538:14, 590:3
PITS [7] - 480:4, 483:21, 484:5, 484:9, 542:7, 546:20, 554:1
PLACE [8] - 472:10, 492:6, 492:7, 514:15, 516:12, 561:5, 568:23, 586:11
PLACED [7] - 500:16, 511:15, 523:6, 592:19, 595:17, 595:23
PLACERITA [1] - 517:17
PLACES [2] - 480:4, 574:18
PLACING [1] - 493:11
PLAINTIFF [5] - 464:12, 465:17, 569:2, 571:12,

**UNITED STATES DISTRICT COURT**

571:14
PLAINTIFF'S [1] - 471:2
PLAINTIFF'S [5] - 463:11, 574:10, 574:14, 576:15, 576:19
PLAINTIFFS [2] - 570:7, 592:1
PLAN [2] - 554:22, 566:23
PLANNED [5] - 542:1, 542:6, 542:9, 542:15, 606:7
PLANT [7] - 473:20, 474:3, 483:23, 484:1, 484:9, 489:6, 489:14
PLASTIC [2] - 511:14, 511:15
PLAY [3] - 464:13, 464:17, 573:2
PLAY-THROUGH [1] - 464:17
PLAYED [1] - 573:4
POINT [15] - 486:9, 495:10, 501:6, 511:9, 520:13, 521:5, 523:17, 525:3, 528:13, 542:25, 546:4, 583:24, 583:25, 601:3, 615:24
POINTER [1] - 565:13
POINTING [2] - 490:3, 510:22
POINTS [1] - 586:11
POLICED [3] - 488:5, 488:10
POLICIES [2] - 471:11, 478:19
POLICING [2] - 498:18, 581:14
POLICY [7] - 471:9, 471:20, 476:9, 479:21, 481:8, 488:2, 491:22
POND [23] - 506:8, 506:12, 506:14, 506:15, 506:17, 506:18, 506:20, 507:2, 508:20, 509:5, 509:18, 509:24, 511:12, 511:16, 511:18, 512:12, 512:20, 512:25, 513:4, 514:9, 567:18
PONDS [2] - 472:18, 568:4

POPULAR [1] - 485:6
PORTER [2] - 584:24, 585:1
PORTER-COLOGNE [2] - 584:24, 585:1
PORTION [2] - 516:15, 533:11
PORTIONS [8] - 543:23, 545:12, 545:14, 545:16, 548:6, 559:1, 559:6, 563:24
POSED [1] - 488:20
POSITIVE [1] - 610:8
POSITIVES [1] - 609:20
POSSIBILITY [3] - 518:7, 520:11, 575:25
POSSIBLE [4] - 500:2, 526:24, 555:16, 603:7
POSSIBLY [5] - 486:3, 494:25, 527:18, 592:23, 593:13
POST-'67 [1] - 592:14
POST-1967 [1] - 592:6
POTABLE [1] - 521:4
POTENTIAL [14] - 477:15, 485:7, 487:18, 514:24, 516:15, 516:22, 517:11, 517:19, 517:20, 519:11, 531:1, 551:21, 557:17, 588:22
POTENTIALLY [5] - 467:19, 467:25, 514:17, 514:18, 548:16
POUNDS [7] - 474:20, 475:9, 567:13, 567:17, 568:10, 568:13, 568:15
POWDER [1] - 474:14
PRACTICE [4] - 476:10, 493:16, 498:24, 580:19
PRACTICED [2] - 491:22, 566:14
PRACTICES [14] - 466:14, 472:1, 472:10, 472:12, 472:14, 473:9, 490:12, 522:12, 522:23, 523:2, 537:13, 580:20, 606:9
PRE-'67 [1] - 592:14
PRE-1967 [1] - 592:6

PRECHLOROETHYLENE [1] - 483:1
PRECIPITATION [2] - 506:18, 508:8
PRECISE [2] - 578:22, 578:24
PRECLUDE [1] - 467:15
PREFER [1] - 573:8
PREJUDICE [2] - 547:15, 571:16
PREJUDICED [1] - 548:19
PREPARE [1] - 587:4
PREPARED [7] - 481:13, 510:23, 519:10, 536:24, 564:13, 606:23, 612:16
PRESENCE [10] - 463:4, 463:20, 470:6, 528:1, 543:11, 549:2, 600:9, 603:5, 615:9, 615:13
PRESENT [1] - 522:22
PRESENT [12] - 468:22, 500:8, 509:2, 512:1, 517:13, 517:15, 533:20, 549:4, 551:17, 555:20, 601:23
PRESENTATION [1] - 464:11
PRESENTED [3] - 468:17, 525:10, 546:1
PRESENTLY [2] - 488:5, 551:5
PRESIDENT [4] - 510:7, 551:3, 551:9, 553:4
PRESSURE [1] - 486:7
PRESUME [1] - 575:1
PRETTY [4] - 539:6, 541:6, 541:12
PREVENT [1] - 511:16
PREVENTING [1] - 500:10
PREVIOUS [4] - 498:3, 508:5, 509:7, 544:25
PREVIOUSLY [6] - 466:25, 467:20, 468:8, 516:8, 529:2, 549:10
PREVIOUSLY [1] - 471:2

PRIMARILY [2] - 593:23, 593:25
PRIMARY [3] - 475:12, 567:22, 574:16
PRINCIPAL [1] - 513:11
PRIORITIZED [1] - 566:21
PRIORITY [2] - 500:10, 500:11
PRIORITY [4] - 565:25, 566:16, 566:17, 566:22
PROBATIVE [1] - 467:23
PROBE [2] - 601:13, 601:14
PROBLEM [13] - 466:15, 466:16, 466:22, 486:23, 486:24, 488:4, 489:20, 509:14, 529:24, 560:18, 561:2, 588:2, 600:8
PROBLEMATIC [1] - 615:20
PROBLEMS [16] - 480:24, 485:18, 486:20, 487:17, 487:21, 487:22, 488:20, 488:21, 488:25, 490:7, 490:8, 504:12, 560:21, 560:23, 561:1, 561:4
PROBLEMS [1] - 488:25
PROCEDURAL [2] - 546:23, 548:11
PROCEDURALLY [1] - 547:22
PROCEDURE [4] - 497:10, 547:15, 613:22, 613:24
PROCEDURE [1] - 479:11
PROCEDURES [1] - 581:12
PROCEDURES [2] - 479:3, 612:11
PROCEED [2] - 470:19, 477:19
PROCEEDINGS [4] - 593:11, 595:5, 606:2, 616:4
PROCESS [14] - 466:16, 486:4, 527:8, 531:21, 535:13, 535:21, 536:1, 536:5, 537:2,

548:20, 567:24, 591:7, 600:25, 614:14
PROCESSES [3] - 498:19, 501:14, 581:16
PRODUCE [1] - 469:23
PRODUCED [1] - 523:2
PRODUCTS [2] - 562:10, 591:17
PROFESSIONAL [8] - 551:17, 579:9, 579:15, 579:16, 583:11, 610:1, 610:9, 611:2
PROFESSIONALS [1] - 538:2
PROGRAM [3] - 477:23, 500:10, 535:12
PROGRAMS [3] - 584:17, 584:19, 584:20
PROGRESS [1] - 564:23
PROHIBITED [3] - 479:21, 480:5, 497:9
PROHIBITED [1] - 480:2
PROHIBITION [1] - 478:13
PROHIBITIONS [1] - 480:23
PROJECT [2] - 556:5, 584:3
PROJECTS [2] - 550:16, 569:20
PROMULGATE [1] - 489:21
PROMULGATED [1] - 503:11
PROMULGATING [1] - 497:19
PRONE [1] - 609:19
PROPELLANT [19] - 475:11, 485:24, 486:3, 486:5, 486:8, 486:10, 486:14, 486:21, 487:2, 487:8, 489:6, 501:8, 501:11, 501:13, 501:16, 501:23, 501:24, 501:25, 502:13
PROPELLANTS [1] - 501:19
PROPELLENTS [1] - 488:8

UNITED STATES DISTRICT COURT

**PROPER** [7] - 516:12, 600:23, 600:25, 601:3, 602:24, 603:3, 612:22
**PROPERLY** [5] - 488:9, 500:4, 500:5, 546:4, 547:23
**PROPERTY** [21] - 475:4, 480:1, 481:18, 481:20, 484:16, 492:16, 501:14, 521:4, 522:1, 522:4, 526:2, 527:25, 529:5, 531:23, 533:5, 535:16, 560:8, 575:24, 576:11, 577:6, 613:7
**PROPOSED** [2] - 487:22, 550:23
**PROPOSING** [1] - 465:2
**PROPOSITION** [1] - 544:13
**PROTECTION** [1] - 559:25
**PROTECTION** [2] - 523:20, 602:14
**PROVE** [4] - 598:12, 598:14, 598:22, 598:23
**PROVIDE** [3] - 465:12, 519:19, 523:19
**PROVIDED** [17] - 463:23, 488:15, 526:13, 526:14, 534:22, 536:4, 537:4, 537:6, 546:9, 557:14, 564:14, 571:19, 573:19, 578:7, 594:12, 595:25, 596:2
**PROVISIONS** [1] - 532:24
**PUBLIC** [1] - 560:19
**PUBLISH** [3] - 478:25, 556:21, 559:18
**PUBLISHED** [3] - 578:19, 580:1, 580:7
**PULL** [1] - 565:6
**PULLED** [1] - 574:14
**PULLING** [1] - 521:1
**PUMPING** [1] - 518:18
**PURE** [1] - 505:15
**PURPOSE** [2] - 583:4, 583:6
**PURPOSE** [7] - 476:3, 514:23, 514:25, 520:25, 540:2, 550:9, 551:20

**PURPOSELY** [2] - 571:6, 571:21
**PURPOSES** [4] - 466:11, 509:21, 515:11, 560:9
**PURSUANT** [2] - 469:14, 579:22
**PUT** [19] - 473:12, 474:2, 490:21, 491:9, 492:2, 494:23, 512:17, 512:25, 514:15, 515:14, 516:11, 535:22, 560:12, 584:23, 588:17, 592:16, 594:17, 595:9, 595:14

**Q**

**QUALIFIED** [1] - 586:5
**QUALITY** [3] - 515:2, 576:2, 576:3
**QUALITY** [8] - 473:19, 474:4, 521:13, 577:8, 577:11, 582:11, 582:14, 584:15
**QUANTITIES** [1] - 488:8
**QUANTITY** [6] - 475:9, 506:19, 522:10, 553:20, 567:11, 596:8
**QUESTIONS** [10] - 507:22, 534:20, 535:3, 535:21, 536:1, 567:3, 570:22, 570:23, 615:23
**QUICK** [1] - 477:3
**QUICKLY** [3] - 464:1, 487:5, 524:17
**QUITE** [4] - 505:7, 532:20, 534:15, 539:8
**QUOTE** [27] - 486:20, 489:7, 489:9, 498:9, 509:1, 513:13, 513:17, 513:20, 516:19, 516:24, 520:14, 526:21, 530:3, 530:4, 532:6, 533:8, 533:19, 533:22, 540:23, 541:17, 550:9, 550:14, 550:18, 551:7, 555:20, 607:3
**QUOTED** [1] - 545:12
**QUOTES** [2] - 490:21,

498:8

**R**

**RAIN** [1] - 508:22
**RAINS** [2] - 508:9, 511:20
**RAISE** [2] - 466:17, 575:22
**RAISED** [2] - 466:25, 544:22
**RAISES** [1] - 522:3
**RAISING** [1] - 497:19
**RANGE** [3] - 562:24, 610:8
**RANGES** [2] - 609:18, 610:7
**RATE** [2] - 512:22, 569:24
**RATHER** [1] - 547:11
**RATIO** [1] - 538:25
**RAY** [1] - 485:18
**RCRA** [53] - 480:16, 486:16, 503:11, 503:12, 532:8, 532:19, 532:22, 533:2, 533:8, 533:9, 533:11, 533:20, 535:11, 535:12, 535:13, 550:15, 550:16, 578:19, 579:3, 579:4, 580:10, 580:13, 580:15, 581:2, 581:6, 581:11, 581:13, 582:12, 585:8, 585:10, 585:12, 585:25, 606:6, 606:12, 606:17, 606:18, 606:21, 607:9, 607:12, 607:15, 607:16, 607:17, 607:20, 607:22, 607:24, 608:2, 608:7, 608:10, 608:24, 611:22, 611:25, 612:2
**REACH** [6] - 477:1, 533:18, 572:2, 572:6, 572:8, 572:14
**REACHED** [5] - 471:8, 473:1, 475:6, 491:6, 513:2
**READ** [27] - 465:4, 465:5, 465:11, 465:15, 480:19, 486:13, 489:19, 491:7, 498:2, 499:4, 502:17, 517:7,

519:1, 519:10, 526:8, 551:9, 573:24, 581:4, 585:23, 586:1, 589:22, 590:12, 593:8, 604:11, 606:3, 610:22, 613:17
**READILY** [1] - 487:5
**READING** [5] - 509:21, 513:17, 552:14, 595:2, 611:9
**READINGS** [6] - 540:17, 542:7, 542:8, 542:10, 554:1, 554:10
**READS** [1] - 480:21
**READY** [1] - 470:20
**REAL** [2] - 546:14, 596:18
**REALIZE** [1] - 498:10
**REALIZED** [1] - 466:4
**REALLY** [8] - 466:17, 487:14, 546:6, 588:11, 588:17, 608:12, 609:7, 610:20
**REALTIME** [1] - 540:20
**REASON** [9] - 464:24, 532:25, 547:6, 547:14, 548:17, 559:7, 570:13, 570:19, 570:24
**REASONABLE** [4] - 533:17, 533:23, 575:23, 591:15
**REBUTTAL** [2] - 545:6, 586:17
**RECEIVE** [5] - 500:10, 500:11, 558:12, 559:5, 597:22
**RECEIVED** [20] - 473:16, 478:18, 479:5, 480:9, 485:13, 490:19, 494:2, 499:8, 501:3, 504:10, 507:5, 510:3, 520:4, 521:11, 558:14, 559:20, 565:9, 574:13, 581:22, 591:23
**RECEIVING** [2] - 598:9, 599:20
**RECENT** [1] - 521:19
**RECENT** [1] - 565:2
**RECENTLY** [2] - 550:10, 550:16
**RECESS** [4] - 546:22,

548:25, 615:15, 616:3
**RECOGNITION** [1] - 477:6
**RECOGNIZE** [2] - 473:21, 565:24
**RECOGNIZED** [1] - 483:1
**RECOGNIZES** [1] - 555:15
**RECOLLECTION** [6] - 526:14, 532:21, 567:13, 568:15, 612:15, 612:16
**RECOMMEND** [1] - 531:7
**RECOMMENDATIONS** [3] - 509:3, 509:10, 509:13
**RECOMMENDED** [1] - 519:9
**RECOMMENDING** [1] - 553:10
**RECOMMENDS** [1] - 519:17
**RECONNAISSANCE** [1] - 513:11
**RECORD** [9] - 464:1, 465:3, 470:7, 549:3, 598:25, 599:11, 599:17, 612:25, 613:1
**RECORDS** [19] - 464:22, 471:23, 522:6, 522:24, 522:25, 523:8, 523:19, 524:18, 564:19, 576:14, 577:25, 584:13, 594:7, 595:12, 595:24, 599:4, 599:13, 599:20
**RECOVERED** [1] - 530:8
**RECOVERIES** [1] - 592:19
**RECOVERY** [2] - 480:16, 480:22
**RECURRENCE** [1] - 500:10
**RECYCLED** [1] - 494:25
**RED** [3] - 565:25, 566:22, 567:2
**REDACTED** [2] - 558:9, 559:12
**REDACTION** [2] - 558:12, 559:10
**REDACTIONS** [1] - 559:4

REDDISH [1] - 566:17
REDIRECT [1] - 568:18
REFER [9] - 469:2, 479:9, 518:6, 524:17, 532:3, 539:22, 544:25, 553:18, 614:2
REFERENCE [23] - 467:15, 475:23, 479:16, 482:7, 484:18, 484:21, 497:21, 498:13, 498:20, 501:10, 501:15, 502:16, 502:18, 504:17, 510:20, 536:12, 538:22, 539:9, 553:19, 555:5, 557:23, 565:23
REFERENCES [8] - 484:7, 484:15, 498:16, 544:2, 555:5, 581:13, 581:14, 581:15
REFERRED [9] - 466:9, 475:2, 483:20, 484:18, 484:23, 500:22, 540:13, 588:19, 595:22
REFERRING [13] - 474:6, 478:9, 492:4, 508:25, 509:4, 510:15, 533:2, 535:4, 544:5, 551:9, 555:1, 559:4, 605:11
REFERS [14] - 479:22, 489:5, 492:3, 495:13, 495:20, 501:7, 506:2, 510:17, 511:6, 516:18, 520:10, 526:1, 550:2, 613:21
REFRESH [1] - 477:3
REGARD [3] - 464:3, 525:8, 544:2
REGARDING [17] - 465:7, 467:9, 468:2, 471:25, 481:7, 489:6, 494:14, 502:22, 506:8, 507:1, 509:10, 523:10, 524:18, 525:3, 536:11, 564:14, 584:16
REGARDLESS [1] - 508:23
REGION [2] - 577:14, 582:11

REGIONAL [10] - 473:18, 474:4, 521:13, 522:5, 523:11, 577:7, 577:10, 582:10, 582:14, 584:14
REGIONS [1] - 577:14
REGULATED [1] - 580:21
REGULATES [1] - 577:13
REGULATION [4] - 514:17, 578:14, 599:5, 600:2
REGULATIONS [24] - 503:11, 503:12, 503:14, 516:8, 535:13, 578:19, 578:25, 579:1, 579:4, 579:12, 579:21, 579:23, 580:2, 580:10, 580:19, 580:21, 583:22, 584:6, 585:24, 585:25, 596:25, 605:3
REGULATORS [3] - 535:22, 558:19, 610:10
REGULATORY [10] - 471:18, 473:3, 473:7, 537:13, 577:12, 584:10, 587:21, 596:16, 599:8, 610:10
RELATE [2] - 603:15, 614:8
RELATED [15] - 471:11, 471:15, 471:19, 472:4, 473:2, 478:3, 517:25, 542:21, 560:4, 573:20, 577:2, 577:5, 579:5, 586:14, 592:18
RELATING [3] - 577:23, 578:19, 598:25
RELATIONS [1] - 510:7
RELATIONSHIP [2] - 473:3, 478:15
RELATIVE [1] - 613:25
RELATIVELY [2] - 513:3, 613:17
RELEASED [1] - 514:9
RELEASING [1] - 493:11
RELEVANCE [1] -

469:11
RELEVANT [3] - 559:9, 559:15, 572:3
RELIED [5] - 469:21, 507:11, 545:4, 545:19, 582:4
RELOCATION [1] - 501:8
RELY [1] - 544:15
REMAIN [2] - 470:7, 495:19
REMAINDER [1] - 562:18
REMAINING [4] - 533:6, 548:22, 554:5, 554:15
REMAINS [1] - 549:5
REMEDIAL [1] - 558:23
REMEDIAL [2] - 560:14, 560:17
REMEDIATE [1] - 555:13
REMEDIATION [8] - 560:23, 561:1, 561:3, 561:6, 563:25, 564:22, 564:24, 564:25
REMEMBER [6] - 496:8, 534:6, 534:8, 543:3, 593:17, 615:1
REMIND [2] - 470:16, 613:21
REMOTE [1] - 530:21
REMOVAL [3] - 532:4, 532:5, 567:7
REMOVE [14] - 488:8, 491:13, 501:20, 532:22, 532:25, 551:6, 553:20, 553:24, 554:4, 554:8, 554:13, 561:18, 589:24, 590:7
REMOVED [21] - 486:3, 486:5, 500:1, 500:4, 526:22, 526:24, 527:2, 536:12, 536:15, 536:25, 537:1, 537:16, 541:25, 564:15, 567:11, 567:15, 568:6, 568:10, 568:14, 590:21, 605:13
REMOVES [1] - 492:18
REMOVING [1] - 553:21
RENDER [7] - 584:7,

585:23, 586:2, 586:14, 611:4, 611:7, 611:13
RENDERED [3] - 573:25, 578:8, 611:6
RENDERING [4] - 575:9, 584:8, 585:20, 592:9
REPAIRED [1] - 506:23
REPEAT [1] - 580:4
REPEATED [2] - 491:23, 555:5
REPHRASE [10] - 475:20, 500:20, 516:2, 527:6, 530:14, 531:10, 534:13, 537:21, 578:15, 586:20
REPLACE [1] - 601:18
REPLACED [1] - 486:3
REPORT [20] - 467:3, 467:4, 467:11, 469:8, 469:21, 520:10, 545:6, 545:12, 545:14, 546:16, 548:6, 557:3, 558:17, 564:25, 577:24, 586:16, 586:17, 587:4, 587:13, 594:1
REPORT [1] - 582:13
REPORTING [2] - 528:14, 564:23
REPORTS [21] - 525:9, 525:13, 564:13, 564:20, 564:21, 564:22, 564:23, 565:5, 566:1, 566:8, 566:11, 567:6, 567:16, 573:24, 575:13, 586:23, 587:7, 587:10
REPRESENTATIONS [1] - 599:2
REPRESENTATIVE [3] - 463:14, 598:15, 598:20
REPRESENTATIVES [1] - 555:11
REPRESENTED [1] - 466:1
REQUEST [6] - 463:25, 510:23, 510:24, 522:6, 523:11, 576:13
REQUESTS [1] - 535:18

REQUIRE [2] - 504:23, 526:25
REQUIRED [22] - 473:5, 473:6, 474:7, 475:14, 503:14, 504:7, 513:13, 516:9, 516:13, 517:6, 533:21, 533:24, 556:5, 558:2, 561:1, 584:21, 585:21, 586:6, 587:1, 587:2, 610:2, 614:16
REQUIREMENT [2] - 514:20, 520:20
REQUIREMENTS [10] - 503:25, 504:4, 505:13, 516:20, 517:1, 519:21, 584:3, 586:1, 586:10, 614:8
REQUIRES [2] - 489:20, 585:24
RESEARCH [2] - 522:19, 574:15
RESERVE [1] - 558:5
RESIDUAL [2] - 497:14, 538:9
RESIDUALS [1] - 493:17
RESIDUE [1] - 497:1
RESOURCE [2] - 480:15, 480:22
RESPECT [8] - 467:17, 468:1, 471:7, 485:19, 493:8, 539:21, 561:22, 563:14
RESPOND [1] - 467:1
RESPONDENT [1] - 562:1
RESPONSE [5] - 468:18, 534:12, 535:3, 536:1, 546:10
RESPONSIBILITIES [1] - 579:22
RESPONSIBILITY [5] - 476:4, 497:22, 498:6, 498:20, 571:18
RESPONSIBLE [4] - 489:2, 518:14, 526:6, 585:10
RESPONSIVE [1] - 523:14
REST [3] - 466:14, 551:25
RESTRICTIONS [2] - 496:12, 598:2
RESUBMIT [1] - 509:3

**RESUBMITTING** [2] - 509:9, 509:12
**RESULT** [10] - 501:14, 514:4, 519:17, 550:14, 560:7, 562:10, 586:14, 594:9, 609:11, 610:2
**RESULTS** [13] - 519:6, 519:15, 521:19, 525:10, 564:24, 596:2, 607:21, 608:22, 608:23, 609:23, 610:7, 611:25, 612:3
**RESUMED** [1] - 471:3
**RESUSCITATE** [1] - 548:5
**RETURN** [2] - 543:16, 558:7
**REVIEW** [18] - 469:5, 471:17, 478:2, 496:11, 496:22, 505:2, 525:3, 536:10, 543:21, 558:18, 561:7, 564:13, 566:10, 580:20, 581:6, 583:22, 587:6, 613:18
**REVIEWED** [49] - 466:3, 469:9, 471:24, 472:1, 472:5, 472:13, 472:15, 473:11, 473:22, 476:22, 478:8, 478:16, 479:7, 480:13, 484:3, 490:10, 491:1, 504:19, 504:25, 506:9, 524:15, 525:8, 525:9, 525:12, 533:16, 536:18, 538:12, 545:7, 545:11, 549:25, 556:23, 559:22, 563:6, 563:15, 564:19, 566:2, 567:7, 567:16, 568:12, 573:18, 573:24, 578:6, 582:6, 584:6, 587:11, 613:14, 613:16
**REVIEWING** [2] - 560:9, 565:5
**REVISIT** [1] - 468:1
**RFA** [3] - 533:1, 533:4, 606:6
**RICHARD** [91] -

463:12, 464:15, 465:2, 465:6, 465:14, 465:19, 470:21, 471:1, 471:4, 473:17, 475:21, 475:22, 476:15, 479:6, 479:14, 479:16, 480:10, 481:5, 481:6, 485:14, 490:20, 494:3, 499:9, 500:20, 500:21, 501:5, 501:7, 502:12, 503:9, 504:1, 504:11, 505:18, 507:6, 507:23, 507:24, 510:4, 510:13, 510:15, 514:3, 516:2, 516:3, 520:5, 521:12, 524:1, 524:2, 524:14, 524:24, 525:2, 525:17, 525:19, 527:7, 527:8, 530:14, 530:15, 531:2, 531:4, 531:11, 531:12, 532:11, 532:15, 532:16, 534:13, 534:14, 536:8, 536:9, 537:22, 537:23, 538:11, 547:19, 548:1, 549:8, 549:9, 549:12, 549:14, 549:16, 552:9, 553:15, 558:5, 558:15, 558:16, 558:25, 559:17, 559:21, 565:7, 565:10, 565:21, 565:23, 568:16, 572:18, 572:21, 572:24
**RICHARD** [9] - 463:12, 464:12, 470:15, 481:4, 544:12, 547:18, 581:11, 589:6
**RICK** [1] - 463:18
**RID** [2] - 551:15, 552:3
**RIFS** [3] - 560:14, 561:1, 561:5
**RIGHT-HAND** [1] - 482:15
**RISE** [2] - 543:9, 615:7
**RISK** [1] - 587:20
**RIVER** [1] - 517:17
**ROBERT** [3] - 469:20,

469:21, 510:5
**ROLE** [3] - 563:13, 571:18, 610:6
**ROLES** [1] - 563:14
**ROUGHLY** [4] - 464:17, 539:7, 567:19, 602:22
**ROUTINE** [3] - 476:9, 491:21, 522:18
**RULE** [5] - 463:21, 588:20, 588:23, 589:2, 599:5
**RULED** [2] - 468:23, 469:25
**RULES** [8] - 489:22, 490:4, 497:19, 579:25, 580:7, 581:3, 583:21
**RULING** [4] - 463:25, 464:2, 467:15, 468:1
**RULINGS** [4] - 463:24, 548:3, 559:8, 559:12
**RUN** [5] - 508:15, 555:19, 607:13, 611:22, 612:4
**RUNNING** [1] - 546:22
**RUSTED** [1] - 541:23

## S

**SABIN** [1] - 485:18
**SAFETY** [13] - 473:20, 474:3, 478:2, 478:7, 478:10, 478:14, 478:16, 478:18, 489:13, 489:21, 499:9, 520:5
**SAMPLE** [3] - 607:11, 607:19, 608:21
**SAMPLE** [6] - 515:16, 515:18, 540:9, 562:16, 601:23, 602:19
**SAMPLES** [26] - 520:23, 539:17, 539:21, 539:23, 540:1, 542:5, 554:14, 598:20, 598:21, 603:12, 603:13, 603:18, 607:7, 607:8, 607:10, 607:12, 611:17, 611:19, 611:22, 611:24, 612:1, 612:2, 612:4
**SAMPLES** [3] - 607:6, 611:19, 611:23
**SAMPLING** [6] - 521:19, 542:1, 542:9, 561:19,

598:15, 603:6
**SAND** [1] - 540:5
**SANITARY** [3] - 500:4, 500:18, 500:23
**SANITIZED** [2] - 500:2
**SANTA** [3] - 463:8, 470:7, 517:17
**SAT** [1] - 468:16
**SATISFIED** [1] - 546:25
**SAVE** [1] - 568:17
**SAW** [10] - 469:19, 469:20, 478:10, 483:2, 486:18, 502:16, 502:18, 511:18, 512:6, 542:20
**SCHEDULE** [1] - 557:4
**SCHOOL** [1] - 596:12
**SCIENTIFIC** [3] - 572:6, 572:8, 591:15
**SCIENTIST** [9] - 571:3, 571:5, 571:7, 571:12, 571:13, 571:15, 571:22, 575:1, 594:9
**SCIENTISTS** [1] - 575:3
**SCOOPED** [1] - 594:6
**SCOPE** [5] - 534:10, 542:18, 543:18, 548:3, 556:4
**SCOTT** [2] - 463:13, 463:17
**SCRAP** [7] - 494:23, 495:2, 500:1, 500:17, 500:22, 527:21, 594:24
**SCREEN** [11] - 473:12, 476:21, 514:1, 524:10, 554:24, 565:11, 565:16, 565:17, 566:14, 581:25, 594:21
**SCREENING** [22] - 602:3, 602:4, 602:6, 602:7, 602:9, 602:10, 602:19, 602:20, 602:25, 603:2, 603:3, 608:23, 608:25, 609:5, 609:6, 609:8, 609:11, 609:21, 609:23, 610:3, 610:6
**SEARCH** [2] - 467:19, 572:3
**SEARCHES** [1] - 577:5
**SEAT** [3] - 468:23,

468:24, 469:25
**SEATED** [2] - 543:12, 615:12
**SECOND** [20] - 471:25, 474:19, 477:4, 482:11, 488:3, 502:19, 513:10, 519:6, 523:11, 544:16, 572:19, 589:13, 589:14, 589:16, 593:1, 600:18, 600:23, 601:2, 605:19, 605:22
**SECONDS** [3] - 466:24, 467:1, 468:7
**SECTION** [2] - 479:13, 612:1
**SECTIONS** [1] - 613:15
**SEE** [134] - 464:23, 468:3, 469:18, 474:9, 474:12, 474:24, 479:16, 479:17, 479:18, 482:5, 482:11, 482:14, 482:17, 482:24, 483:8, 483:9, 484:7, 484:17, 484:21, 485:20, 486:11, 488:14, 488:21, 488:23, 489:3, 489:17, 490:7, 490:13, 490:24, 490:25, 493:1, 494:3, 494:9, 494:15, 495:20, 496:2, 496:10, 496:17, 496:20, 497:2, 497:23, 498:7, 499:11, 499:15, 501:8, 501:15, 502:12, 502:20, 504:1, 504:14, 505:19, 505:23, 506:2, 507:9, 508:11, 510:7, 510:11, 510:14, 510:18, 511:7, 513:10, 513:14, 513:25, 514:2, 515:18, 516:16, 518:19, 518:22, 519:22, 520:6, 520:13, 521:15, 521:17, 522:6, 523:8, 523:17, 525:21, 526:19, 527:14,

**UNITED STATES DISTRICT COURT**

530:24, 531:3, 532:4, 533:14, 536:11, 536:14, 537:16, 538:22, 540:14, 541:14, 541:18, 542:2, 542:17, 543:8, 549:13, 550:3, 550:11, 550:19, 553:15, 553:16, 557:24, 559:10, 559:11, 559:12, 561:15, 565:10, 565:15, 565:23, 571:11, 574:21, 574:22, 574:23, 577:22, 581:10, 582:2, 583:6, 583:8, 583:24, 584:11, 586:1, 589:18, 590:25, 591:1, 593:2, 593:6, 605:18, 605:19, 605:25, 606:6, 606:10, 606:11, 607:6, 611:23, 616:2

SEEING [8] - 464:23, 496:15, 502:15, 527:1, 592:18, 602:17, 602:23, 606:12

SEEK [2] - 571:21, 587:6

SEEKING [4] - 474:17, 504:3, 506:7, 519:23

SEEM [2] - 555:18, 555:19

SENSE [2] - 610:17, 610:19

SENT [4] - 540:9, 599:14, 604:9, 605:9

SENTENCE [12] - 498:5, 507:14, 513:6, 513:10, 517:21, 540:23, 542:6, 553:19, 554:8, 562:1, 597:19, 604:16

SENTENCES [1] - 551:8

SEPARATE [2] - 577:18

SEPTEMBER [1] - 501:1

SEPTIC [1] - 577:23

SEQUENCE [1] - 603:15

SERIOUS [2] - 488:21, 489:20

SERVE [1] - 518:22

SERVED [1] - 569:20

SERVICES [2] - 516:18, 546:19

SERVICES [2] - 504:15, 521:21

SERVING [1] - 571:13

SET [2] - 585:23, 601:22

SETTING [2] - 537:23, 548:20

SEVEN [4] - 491:20, 492:1, 492:8, 563:12

SEVERAL [10] - 468:15, 489:1, 491:11, 491:18, 509:19, 537:16, 599:13, 601:14, 607:18, 608:19

SEVERAL [1] - 485:18

SEVERAL-INCH-LONG [1] - 601:14

SHALL [1] - 499:24

SHALLOW [1] - 480:4

SHAPE [1] - 541:22

SHARE [1] - 471:7

SHARED [2] - 477:1, 535:2

SHARP [1] - 466:24

SHIP [1] - 599:16

SHIPPED [3] - 595:12, 597:19, 605:14

SHIPPING [1] - 596:5

SHOOTING [1] - 486:7

SHORT [4] - 491:4, 501:7, 548:21, 567:13

SHOW [12] - 469:4, 485:11, 490:17, 499:5, 509:25, 522:4, 549:9, 572:16, 582:25, 587:12, 598:17, 614:18

SHOWED [1] - 581:11

SHOWING [2] - 491:24, 548:5

SHOWN [3] - 514:17, 521:20, 575:17

SHOWS [2] - 489:12, 514:1

SIC [2] - 589:23, 604:21

SIDE [3] - 464:18, 583:9

SIDES [1] - 527:14

SIFT [1] - 551:4

SIFTING [1] - 551:14

SIGNIFICANCE [8] - 475:24, 476:3, 477:20, 488:1,

497:5, 507:25, 509:8, 530:16

SIGNIFICANT [13] - 475:16, 481:23, 489:10, 489:24, 528:2, 528:3, 528:5, 528:11, 528:23, 529:3, 529:4, 529:9, 555:6

SIGNS [1] - 599:23

SIMILAR [4] - 509:7, 560:24, 572:13

SIMMONS [3] - 520:5, 520:8, 520:19

SIMPLE [1] - 541:6

SIMPLY [4] - 548:11, 548:20, 571:23, 615:18

SINGLE [1] - 464:16

SIT [1] - 612:17

SITE [83] - 472:1, 472:2, 472:5, 472:6, 472:7, 472:10, 472:21, 475:13, 476:13, 477:6, 478:4, 481:23, 485:25, 486:1, 490:8, 502:1, 521:1, 522:19, 523:1, 525:12, 526:7, 527:5, 527:8, 527:23, 528:2, 528:6, 528:20, 528:24, 529:15, 529:19, 530:15, 531:5, 531:6, 531:12, 531:17, 531:19, 531:20, 533:11, 533:17, 534:15, 534:18, 535:23, 542:13, 542:19, 552:6, 552:11, 552:24, 553:5, 553:9, 555:13, 560:15, 561:4, 561:6, 562:4, 562:10, 563:14, 563:18, 563:22, 563:24, 566:12, 568:10, 573:21, 574:18, 574:19, 575:17, 576:5, 577:6, 577:16, 583:23, 591:14, 591:18, 593:21, 593:24, 595:19, 597:2, 597:4, 599:11, 599:15, 599:20

SITES [5] - 482:3,

483:19, 526:25, 575:6, 614:4

SITTING [1] - 595:21

SITUATION [4] - 476:11, 500:11, 502:22, 512:8

SIX [1] - 615:23

SIZE [3] - 509:4, 539:6, 601:12

SLOPE [1] - 503:19

SLOTS [1] - 515:14

SLUDGE [10] - 492:3, 492:15, 492:17, 492:19, 492:22, 493:3, 493:6, 493:11, 493:20

SMALL [4] - 493:17, 517:15, 518:3, 601:12

SMITH [12] - 563:6, 563:10, 563:16, 564:14, 565:24, 566:8, 566:11, 567:7, 567:16, 568:7, 568:9, 568:12

SMITH'S [1] - 563:13

SOIL [32] - 472:4, 475:12, 484:5, 495:8, 511:14, 513:2, 514:5, 514:12, 531:25, 538:25, 539:17, 539:23, 540:1, 540:6, 540:7, 541:5, 552:2, 562:2, 562:16, 562:17, 564:3, 564:16, 566:19, 566:23, 567:9, 567:23, 568:8, 603:12, 603:13

SOILS [5] - 493:14, 511:17, 552:21, 554:17, 600:19

SOLD [2] - 494:23, 494:24

SOLICIT [1] - 576:8

SOLID [11] - 527:22, 528:1, 528:4, 528:10, 533:12, 594:24, 594:25, 595:7, 595:9, 595:22, 597:24

SOLUBLE [1] - 487:4

SOLUTION [2] - 556:9, 588:21

SOLVENT [10] - 476:13, 477:9, 481:22, 484:10, 485:4, 492:23,

506:15, 508:7, 512:20, 562:12

SOLVENTS [19] - 475:3, 477:16, 483:21, 484:10, 485:5, 492:3, 492:9, 492:10, 492:11, 492:12, 492:13, 493:8, 493:9, 493:18, 493:19, 512:19, 512:21, 512:23, 561:12

SOMEONE [2] - 477:9, 547:9

SOMETIMES [6] - 479:25, 483:20, 535:21, 541:7, 559:14, 610:10

SOMEWHERE [2] - 492:19, 531:23

SOON [1] - 500:1

SOPHISTICATED [1] - 609:19

SORRY [19] - 477:18, 481:1, 487:20, 501:5, 501:24, 510:16, 513:22, 513:23, 513:24, 541:16, 547:17, 572:19, 572:21, 572:23, 585:4, 589:9, 594:21, 606:4, 606:14

SORSHER [5] - 525:25, 526:4, 526:13, 526:15, 535:18

SORT [2] - 512:5, 569:21

SOUNDS [3] - 507:17, 509:14, 591:13

SOURCE [12] - 469:2, 469:8, 529:20, 529:22, 556:10, 556:13, 556:14, 556:15, 566:5, 566:7

SOURCES [24] - 467:11, 491:11, 491:18, 508:22, 528:9, 551:21, 551:22, 552:19, 572:7, 572:15, 573:13, 573:16, 573:18, 574:1, 574:5, 574:6, 574:9, 574:12, 574:16, 578:2, 578:3, 578:7, 587:2, 587:5

SPARROW [1] - 614:16

SPEAKING [2] - 524:12, 540:2
SPECIALIST [2] - 504:14, 531:7
SPECIFIC [6] - 469:3, 484:7, 503:15, 523:8, 583:23, 606:16
SPECIFICALLY [6] - 467:10, 483:15, 522:1, 536:10, 586:4, 607:4
SPECIFICATIONS [1] - 614:19
SPECIFIED [1] - 614:11
SPECIFY [2] - 468:14, 562:9
SPECULATION [7] - 475:19, 475:25, 500:19, 503:4, 505:15, 536:6, 552:7
SPECULATIVE [2] - 530:13, 553:6
SPENDING [1] - 615:22
SPENT [1] - 570:1
SPILLS [1] - 500:7
SPLIT [1] - 464:17
SPOKEN [1] - 464:15
SPONSOR [1] - 547:12
SPONTE [1] - 615:25
STAND [5] - 467:12, 470:4, 470:13, 548:17, 549:6
STANDARD [1] - 469:13
STANDARDLY [1] - 602:1
STANDARDS [2] - 479:13, 479:17
STANDING [1] - 602:16
STANDPOINT [1] - 615:21
START [4] - 498:4, 526:16, 566:13, 616:2
STARTED [1] - 510:16
STARTING [1] - 463:10
STARTS [2] - 546:18, 594:23
STATE [13] - 504:14, 521:21, 522:15, 522:16, 536:15, 557:2, 557:4, 560:4, 573:20, 585:21, 596:24, 597:1,

599:14
STATE [9] - 463:10, 522:15, 523:19, 527:4, 577:14, 591:22, 596:16, 599:18, 605:3
STATEMENT [3] - 571:8, 592:12, 600:17
STATES [1] - 465:25
STATES [5] - 533:19, 560:5, 560:6, 592:12, 603:19
STATING [1] - 599:14
STATION [1] - 500:7
STATUS [7] - 494:14, 504:17, 582:21, 582:23, 583:2, 583:3, 583:7
STEAM [1] - 508:17
STEP [20] - 528:2, 531:22, 531:24, 546:7, 547:4, 575:11, 600:23, 600:25, 601:2, 601:3, 602:11, 602:24, 603:6, 603:7, 603:10, 609:24, 610:3, 615:10
STEP [2] - 603:23
STEWARD [1] - 580:8
STICK [3] - 601:17, 611:11
STICKING [2] - 509:24, 528:13
STILL [9] - 527:3, 541:22, 553:13, 561:2, 568:14, 569:9, 578:24, 580:2, 586:11
STIP [1] - 479:1
STIPULATED [9] - 464:22, 473:15, 480:8, 485:12, 549:10, 565:8, 581:21, 589:4, 591:21
STIPULATION [18] - 464:19, 464:21, 464:25, 465:4, 465:7, 476:17, 490:18, 493:24, 499:7, 501:4, 504:9, 507:4, 510:2, 520:2, 521:10, 524:3, 525:18, 558:25
STONE [2] - 463:14, 511:25
STOP [6] - 482:1, 527:23, 528:22,

546:21, 548:7, 580:3
STORAGE [1] - 493:6
STORE [1] - 501:21
STORED [7] - 486:2, 490:21, 491:5, 502:14, 522:10, 538:9
STORING [1] - 501:23
STRAIGHT [4] - 466:15, 511:24, 512:16, 512:18
STRAIGHT-UP [1] - 466:15
STRAIGHTFORWARD [1] - 541:12
STREAM [5] - 486:16, 486:25, 487:10, 487:24, 487:25
STREAMS [1] - 480:4
STRICKEN [1] - 534:12
STRICTLY [1] - 589:1
STRIKE [2] - 505:16, 553:17
STRONG [1] - 598:14
STRUCK [2] - 476:12, 477:5
STUDIES [1] - 521:17
STUDY [4] - 512:8, 515:13, 560:15, 560:20
STUFF [3] - 539:11, 551:24, 598:21
SUA [1] - 615:25
SUBJECT [27] - 476:17, 480:20, 485:14, 490:18, 490:20, 493:24, 493:25, 494:13, 499:7, 499:9, 501:4, 504:9, 504:18, 507:3, 507:8, 510:1, 520:2, 520:12, 521:10, 524:3, 525:18, 526:17, 535:12, 543:4, 558:12, 612:8, 615:2
SUBMISSION [1] - 559:2
SUBMITTED [3] - 463:24, 468:15, 474:7
SUBMITTING [1] - 594:6
SUBSEQUENT [2] - 478:11, 495:8
SUBSTANCE [2] - 547:4, 547:21
SUBSTANCES [7] - 474:13, 474:17,

536:2, 553:1, 553:3, 554:5, 588:15
SUBSTANCES [2] - 560:1, 596:15
SUBSTANTIAL [2] - 558:22, 561:24
SUBSTANTIAL [1] - 560:7
SUBSURFACE [1] - 600:18
SUCCEEDING [1] - 576:3
SUCCESSFUL [1] - 577:2
SUCK [1] - 564:7
SUCKED [1] - 568:1
SUCKING [1] - 564:8
SUCKS [1] - 601:21
SUFFICIENT [1] - 575:14
SUFFICIENTLY [2] - 509:20, 584:7
SUGGEST [2] - 467:21, 548:21
SUGGESTED [4] - 545:24, 546:11, 547:1, 548:13
SUGGESTING [1] - 548:9
SUGGESTIONS [1] - 496:20
SUGGESTS [2] - 488:21, 547:5
SUMMARY [1] - 592:21
SUMMER [1] - 578:23
SUMP [17] - 506:8, 506:12, 507:8, 507:14, 508:16, 508:20, 509:1, 509:5, 509:10, 509:25, 510:17, 511:2, 511:9, 511:11, 511:12, 517:14, 518:2
SUMPS [7] - 510:11, 510:12, 510:15, 511:5, 511:6, 513:18, 577:23
SUPERFUND'S [1] - 560:15
SUPERINTENDENT [1] - 521:14
SUPPLY [3] - 516:24, 521:4, 522:17
SUPPLYING [2] - 596:23, 596:24
SUPPORTED [1] - 537:14
SUPPOSED [2] -

524:8, 598:10
SURFACE [19] - 472:19, 478:13, 503:13, 503:18, 512:17, 514:9, 514:18, 516:24, 517:12, 517:18, 517:19, 530:19, 541:25, 557:9, 557:15, 600:9, 600:10, 600:19
SURROUNDING [2] - 488:25, 554:17
SURVEY [2] - 499:10, 561:19
SUSPECT [1] - 544:17
SUSPECTED [6] - 541:5, 552:11, 553:25, 554:9, 554:13, 554:16
SUSTAIN [2] - 507:15, 597:13
SUSTAINED [10] - 464:4, 464:5, 464:7, 464:9, 475:20, 502:10, 507:20, 534:11, 536:7, 552:8
SW [2] - 608:12, 608:13
SWMUS [1] - 533:14
SWORN [1] - 471:2
SYSTEM [2] - 492:2, 591:5
SYSTEM [6] - 492:5, 492:6, 492:7, 591:11, 591:13, 597:16

---

# T

TAB [1] - 524:22
TABLE [1] - 613:12
TALKS [13] - 486:10, 488:20, 494:20, 526:21, 541:24, 591:2, 592:22, 594:15, 594:23, 594:24, 600:7, 605:20, 607:2
TANKS [1] - 577:23
TAX [3] - 597:5, 597:10, 597:16
TAXES [2] - 597:7, 597:12
TAXING [1] - 597:17
TCA [6] - 484:18, 484:19, 484:21, 484:24, 485:2, 493:14
TCE [23] - 485:6,

485:7, 492:9, 492:23, 493:9, 493:14, 539:18, 562:11, 562:12, 562:17, 564:15, 566:11, 567:7, 567:11, 567:15, 567:21, 568:3, 568:6, 568:13, 595:15, 595:17, 595:19

**TEAR** [1] - 599:8

**TEAR-OFF** [1] - 599:8

**TECHNICAL** [3] - 560:21, 601:8, 604:24

**TECHNICIAN** [1] - 463:18

**TECHNIQUES** [3] - 563:23, 603:15, 609:6

**TECHNOLOGIES** [2] - 485:25, 564:1

**TECHNOLOGY** [1] - 567:9

**TEMPORARILY** [1] - 501:21

**TEN** [2] - 468:6, 562:23

**TEND** [1] - 615:17

**TENDS** [1] - 615:21

**TENTH** [1] - 562:19

**TERM** [6] - 488:10, 537:24, 538:1, 560:21, 573:8, 598:14

**TERMS** [9] - 476:3, 478:14, 479:21, 501:11, 528:14, 558:2, 563:5, 567:18, 598:19

**TEST** [10] - 518:17, 518:21, 607:13, 608:8, 608:10, 608:11, 608:16, 608:17, 609:1, 610:4

**TESTED** [3] - 542:5, 608:8, 609:9

**TESTIFIED** [1] - 471:2

**TESTIFIED** [7] - 471:14, 529:2, 545:3, 572:14, 577:3, 581:5, 587:18

**TESTIFY** [5] - 576:20, 586:8, 586:21, 590:20, 612:21

**TESTIFYING** [5] - 470:13, 571:11, 575:13, 578:5, 583:18

**TESTIMONY** [8] - 464:20, 471:19, 478:20, 526:8, 546:14, 548:3, 569:24, 613:24

**TESTING** [8] - 472:3, 554:19, 596:2, 608:16, 608:17, 609:13, 610:2, 610:5

**TESTS** [5] - 518:18, 598:16, 608:3, 609:19

**THE** [105] - 463:5, 463:7, 463:19, 464:24, 465:5, 465:12, 465:15, 466:23, 467:6, 467:14, 468:10, 468:17, 468:20, 468:22, 469:1, 469:6, 469:11, 469:16, 469:23, 470:2, 470:3, 470:5, 470:7, 470:11, 470:12, 470:18, 470:19, 475:20, 476:1, 476:6, 481:3, 492:2, 501:4, 502:7, 502:10, 503:2, 503:5, 503:10, 505:17, 507:20, 510:14, 514:1, 514:2, 523:25, 524:7, 524:9, 527:6, 531:3, 531:10, 532:10, 532:14, 534:6, 534:8, 534:11, 536:7, 537:21, 538:4, 538:6, 542:24, 543:9, 543:12, 543:15, 543:16, 544:10, 545:15, 545:23, 546:6, 546:21, 547:3, 547:11, 547:14, 547:17, 547:21, 548:7, 549:3, 549:15, 552:8, 553:7, 553:9, 558:8, 558:11, 559:3, 565:16, 565:19, 568:19, 568:22, 568:25, 569:6, 571:9, 578:15, 578:16, 581:23, 586:20, 587:14, 590:9, 591:5, 591:22, 593:12, 595:6, 597:13, 611:15, 614:21,

614:24, 615:7, 615:10

**THEMSELVES** [1] - 544:25

**THEREAFTER** [1] - 593:20

**THEREFORE** [1] - 603:10

**THEY'VE** [2] - 498:23, 577:15

**THINKING** [2] - 591:11, 606:24

**THIRD** [10] - 472:25, 473:2, 488:24, 540:22, 561:14, 589:14, 589:16, 590:24, 601:3, 605:12

**THOMPSON** [2] - 549:13, 549:16

**THOUSAND** [1] - 531:17

**THOUSAND-ACRE** [1] - 531:17

**THOUSANDS** [1] - 569:20

**THREE** [6] - 483:12, 510:5, 511:1, 540:24, 541:16

**THREE-PAGE** [1] - 510:5

**THROW** [1] - 498:21

**THRUST** [1] - 467:6

**TIMING** [2] - 502:25, 596:8

**TITLE** [5] - 479:10, 481:1, 481:15, 560:3, 612:14

**TITLE** [4] - 585:3, 585:4, 585:6, 586:12

**TITLED** [1] - 612:11

**TODAY** [7] - 557:10, 567:3, 569:24, 570:22, 570:23, 571:11, 595:21

**TOGETHER** [1] - 584:23

**TOILET** [1] - 507:17

**TOOK** [4] - 472:10, 534:17, 603:12, 604:19

**TOOL** [10] - 602:3, 602:4, 602:6, 602:8, 602:9, 602:10, 602:25, 603:3

**TOP** [12] - 482:14, 488:4, 496:7, 500:10, 500:11, 502:18, 506:2, 513:4, 513:5,

549:13, 570:8, 583:5

**TOPIC** [1] - 509:24

**TOPICS** [3] - 510:10, 574:25, 575:14

**TOTAL** [6] - 474:19, 503:16, 516:9, 550:15, 594:10, 601:22

**TOTALLY** [1] - 530:18

**TOUCHED** [2] - 465:20, 485:22

**TOUCHES** [1] - 599:22

**TOWARDS** [3] - 479:14, 561:14, 593:4

**TOWER** [1] - 540:13

**TOXIC** [2] - 560:1, 596:15

**TRACE** [1] - 474:23

**TRACK** [2] - 493:3, 587:5

**TRACKED** [1] - 493:5

**TRACKING** [1] - 471:15

**TRAILERS** [1] - 501:21

**TRANSCRIPT** [1] - 572:16

**TRANSPORTATION** [1] - 579:2

**TRANSPORTATION** [1] - 605:1

**TRANSPOSED** [1] - 483:7

**TRASH** [3] - 500:2, 500:5, 540:8

**TREATED** [1] - 533:7

**TREATMENT** [1] - 566:19

**TREMENDOUS** [3] - 533:22, 533:25, 534:2

**TRENCH** [4] - 540:25, 541:3, 541:4, 541:7

**TRENCHES** [7] - 540:24, 541:8, 541:16, 541:17, 541:21, 541:25, 542:8

**TRIAL** [2] - 549:3, 615:22

**TRIBUTARY** [1] - 517:16

**TRIED** [1] - 615:25

**TRIGGER** [3] - 500:9, 502:23, 503:24

**TRIGGERED** [2] - 505:13, 514:19

**TRIGGERING** [1] - 502:18

**TRIGGERS** [1] - 503:7

**TROWBRIDGE** [1] - 463:17

**TRUCK** [1] - 539:9

**TRUCKER** [2] - 599:25

**TRUCKLOAD** [1] - 598:21

**TRUE** [5] - 467:13, 469:17, 548:13, 578:20, 585:11

**TRY** [3] - 529:25, 541:8, 542:6

**TRYING** [12] - 476:6, 496:5, 529:18, 529:23, 543:22, 576:16, 579:11, 579:20, 581:2, 593:17, 596:17, 598:12

**TUBE** [1] - 601:15

**TURN** [5] - 471:23, 473:10, 510:10, 511:4, 538:21

**TURNS** [1] - 547:3

**TWICE** [1] - 505:3

**TWO** [14] - 473:13, 481:14, 483:11, 484:21, 504:13, 511:6, 548:4, 551:8, 565:2, 567:22, 586:23, 587:7, 598:21

**TWO-PAGE** [1] - 481:14

**TWOFOLD** [1] - 548:2

**TYPE** [8] - 493:21, 521:6, 522:18, 534:21, 536:3, 547:12, 575:7, 587:22

**TYPES** [17] - 472:11, 472:13, 472:19, 482:4, 509:13, 522:6, 523:19, 535:15, 552:20, 564:1, 564:2, 575:9, 591:2, 597:23, 613:6, 613:7, 613:10

**TYPES** [1] - 481:15

**TYPICALLY** [3] - 500:17, 501:15, 531:7

**TYPO** [1] - 483:5

## U

**ULTIMATELY** [1] - 529:23

**UNCLEAR** [1] - 545:2

**UNCOVERED** [2] -

562:2, 604:4
UNCOVERING [1] - 600:19
UNDER [30] - 470:16, 482:3, 488:9, 497:8, 503:19, 512:11, 512:17, 514:9, 532:7, 532:19, 532:22, 537:15, 538:24, 540:22, 549:6, 557:23, 580:21, 583:4, 583:6, 584:20, 585:21, 585:25, 592:20, 599:17, 604:25, 605:2, 605:3, 606:17, 607:11, 607:19
UNDERGROUND [4] - 513:5, 518:3, 530:19
UNDERLINED [3] - 500:3, 595:1, 595:6
UNDERLYING [1] - 493:15
UNDERNEATH [2] - 511:17, 512:9
UNDERTAKEN [1] - 519:14
UNFORTUNATELY [1] - 517:8
UNFORTUNATELY [1] - 517:10
UNIDENTIFIED [5] - 491:5, 491:10, 491:15, 491:17, 491:23
UNIT [3] - 533:9, 533:11, 533:13
UNITED [1] - 465:25
UNITS [2] - 533:8, 533:20
UNKNOWN [2] - 490:20, 490:21
UNKNOWN [4] - 491:4, 533:6, 552:25, 553:2
UNLESS [2] - 511:22, 592:11
UNLINED [1] - 506:20
UNQUOTE [1] - 607:3
UNUSUAL [2] - 475:18, 476:10
UP [37] - 466:15, 473:12, 482:14, 483:3, 484:9, 488:3, 491:24, 492:10, 494:21, 495:11, 500:8, 513:1, 513:7, 521:1, 522:18, 523:1, 524:6, 529:6,

533:2, 534:15, 539:1, 548:20, 549:13, 555:22, 556:4, 563:20, 563:24, 565:1, 565:6, 573:1, 581:24, 583:9, 594:6, 607:5, 609:25
UPGRADIENT [4] - 503:15, 503:17, 503:20, 516:9
UPPERMOST [1] - 516:23
USES [2] - 488:24, 511:19
USUAL [1] - 570:9

## V

VAGUE [8] - 516:1, 530:12, 531:9, 532:13, 536:7, 537:19, 538:3, 553:6
VALLEY [10] - 463:8, 470:8, 472:20, 502:1, 561:18, 562:21, 566:13, 566:15, 566:25, 567:14
VALLEY [2] - 517:13, 518:3
VALLEYS [1] - 527:14
VALUE [2] - 467:23, 494:24
VAPOR [16] - 472:4, 477:6, 477:8, 477:16, 540:18, 564:3, 566:19, 566:23, 567:9, 567:23, 568:1, 568:2, 568:8, 601:5, 602:20, 610:18
VAPORIZE [1] - 477:9
VAPORS [20] - 477:7, 477:13, 477:14, 539:2, 539:14, 540:21, 601:16, 601:19, 601:20, 601:21, 602:15, 609:6, 609:17, 610:15, 610:17, 610:18, 610:19, 610:20, 611:3, 611:9
VARIED [2] - 527:21, 528:20
VARIES [1] - 604:14
VARIETY [1] - 562:8
VARIOUS [1] - 498:7
VARYING [2] - 576:1
VAST [1] - 568:2

VEGETATED [1] - 517:13
VERBATIM [3] - 467:4, 469:10, 611:12
VERIFIED [1] - 495:9
VERSION [1] - 560:15
VERSUS [6] - 463:8, 470:8, 544:19, 556:16, 592:6, 592:14
VERTICALLY [1] - 514:8
VIA [1] - 516:23
VICE [1] - 510:6
VIDEO [2] - 464:23, 465:7
VIDEOTAPED [2] - 465:8, 573:4
VIEW [5] - 467:17, 467:23, 547:23, 548:12, 582:18
VIEWS [1] - 615:4
VINTAGE [2] - 576:1, 576:2
VIOLATION [7] - 486:16, 524:5, 524:15, 557:11, 557:14, 558:1, 558:17
VIOLATIONS [1] - 480:15
VIOLATIONS [7] - 480:22, 481:12, 484:13, 556:19, 557:4, 581:12, 581:13
VISITED [1] - 511:1
VISUAL [4] - 600:9, 600:14, 600:16, 600:18
VOC [2] - 610:20, 611:3
VOCS [5] - 493:10, 567:15, 603:5, 608:16, 609:13
VOLATILE [4] - 557:16, 567:23, 568:3, 602:15
VOLUME [1] - 540:17
VOLUME [3] - 474:16, 493:10, 539:12
VOLUMES [1] - 597:25

## W

WAITED [1] - 513:23
WAITING [1] - 555:23
WAIVED [1] - 516:21

WAIVER [9] - 504:3, 504:6, 504:18, 506:7, 517:5, 519:8, 519:16, 519:20, 520:21
WALK [2] - 548:24
WANTS [4] - 465:3, 466:10, 580:12, 581:2
WAR [2] - 595:18, 595:20
WARNED [1] - 497:15
WARRANT [1] - 467:19
WARRANTS [1] - 467:24
WASHED [4] - 486:10, 486:14, 487:19, 487:24
WASHING [1] - 486:21
WASHOUT [1] - 508:15
WASTE [1] - 585:4
WASTE [162] - 471:9, 471:11, 471:16, 471:21, 471:22, 472:6, 472:10, 472:18, 472:19, 472:20, 472:22, 473:8, 475:9, 476:9, 477:23, 477:25, 478:3, 478:13, 478:20, 480:3, 480:23, 481:8, 486:10, 486:14, 486:19, 488:13, 489:6, 489:14, 490:21, 491:5, 491:10, 491:13, 491:21, 492:7, 493:16, 493:17, 495:7, 495:9, 498:19, 500:4, 500:18, 500:23, 501:8, 501:11, 501:13, 501:20, 501:24, 501:25, 502:13, 504:14, 505:9, 505:10, 505:14, 506:15, 506:25, 507:15, 508:6, 508:7, 508:16, 508:17, 509:2, 509:18, 509:20, 513:13, 514:12, 516:22, 516:23, 517:11, 517:12, 522:22, 523:3, 523:5, 528:1, 528:5, 528:8, 529:3,

529:4, 529:7, 529:8, 529:20, 531:23, 533:5, 533:12, 534:23, 535:15, 537:12, 538:8, 538:25, 539:1, 539:7, 539:8, 540:7, 541:12, 551:25, 553:11, 556:1, 562:10, 562:18, 564:10, 567:1, 580:22, 581:14, 581:15, 590:12, 590:13, 590:17, 590:21, 590:23, 591:2, 591:12, 591:14, 592:13, 595:14, 595:15, 595:17, 596:5, 596:23, 597:4, 597:5, 597:7, 597:15, 597:17, 597:20, 597:21, 597:22, 598:3, 598:4, 598:5, 598:6, 598:7, 598:11, 598:12, 598:17, 598:18, 599:17, 600:4, 600:10, 604:1, 604:5, 604:19, 605:6, 605:8, 605:9, 605:14, 605:15, 607:9, 607:16, 607:22, 607:24, 608:5, 608:6, 609:2, 613:7, 613:11, 613:25
WASTED [3] - 491:12, 491:13, 589:23
WASTES [30] - 491:15, 491:18, 491:20, 502:3, 527:22, 528:10, 528:20, 532:5, 533:7, 579:2, 579:6, 591:6, 594:25, 595:7, 595:9, 597:23, 599:9, 599:11, 599:15, 603:18, 604:8, 604:14, 604:15, 605:15, 612:22, 613:3, 613:10
WASTES.. [1] - 528:16
WASTEWATER [5] - 511:23, 512:20, 513:17, 516:4, 518:1
WATER [49] - 482:9,

482:10, 486:7, 486:21, 487:4, 487:5, 487:6, 487:7, 487:8, 488:8, 503:13, 503:18, 503:20, 506:17, 508:23, 511:16, 511:17, 512:16, 512:19, 512:21, 512:22, 513:4, 513:5, 514:5, 514:18, 515:15, 515:17, 515:21, 516:24, 517:12, 517:18, 517:19, 518:5, 518:17, 521:1, 521:4, 521:20, 577:13, 588:7, 588:13, 588:16, 588:18, 588:21, 601:17

**WATER** [13] - 463:8, 470:8, 473:19, 474:4, 521:13, 522:5, 523:12, 540:13, 577:7, 577:10, 582:10, 582:14, 584:14

**WATERWAYS** [1] - 480:5

**WAYS** [2] - 559:24, 563:23

**WEAPONS** [1] - 614:5

**WEBSITE** [17] - 573:20, 574:8, 574:14, 576:18, 576:20, 576:21, 576:23, 576:25, 577:1, 577:4, 577:5, 577:7, 577:18, 586:18, 586:24, 587:7, 587:9

**WEBSTER'S** [2] - 606:22, 606:24

**WEEK** [3] - 465:20, 466:1, 530:7

**WEEKLY** [3] - 493:2, 495:21, 523:9

**WEEKS** [2] - 480:25, 490:9

**WEIGHT** [1] - 474:20

**WELL-KNOWN** [1] - 487:14

**WELLS** [17] - 480:4, 503:14, 503:16, 504:7, 514:21, 515:11, 515:13, 515:20, 515:22, 516:12, 516:24, 518:22, 519:8,

557:24, 558:3, 560:12

**WENCK** [10] - 525:5, 525:11, 525:20, 528:14, 530:23, 532:2, 533:19, 542:12, 549:21, 552:24

**WEST** [2] - 517:14, 517:16

**WESTERLY** [4] - 513:19, 514:13, 515:25, 516:5

**WHATEVER'S** [1] - 609:8

**WHITTAKER** [82] - 463:9, 463:16, 465:25, 470:8, 471:8, 471:10, 471:18, 471:19, 472:7, 473:4, 473:7, 473:19, 473:24, 474:17, 474:22, 476:16, 478:3, 478:18, 478:19, 481:8, 482:20, 489:13, 490:11, 490:22, 496:3, 496:11, 504:2, 506:1, 506:4, 506:7, 510:24, 516:4, 519:20, 519:23, 520:8, 520:22, 521:1, 521:15, 522:14, 523:18, 525:12, 525:20, 527:13, 535:2, 536:14, 537:11, 542:18, 546:19, 549:18, 550:8, 551:2, 551:10, 553:4, 554:19, 555:10, 555:15, 557:3, 557:8, 557:13, 558:19, 560:4, 560:5, 563:14, 564:14, 564:16, 571:24, 575:18, 580:25, 585:20, 586:6, 589:11, 596:17, 596:21, 599:9, 603:11, 612:17, 612:19, 612:23, 613:2

**WHITTAKER'S** [9] - 466:7, 473:2, 478:14, 522:17, 525:4, 529:10, 548:4, 555:11, 566:8

**WHITTAKER-BERMITE** [3] - 473:19, 560:5, 612:17

**WHOLE** [2] - 559:8, 595:2

**WIDE** [1] - 562:8

**WINTER** [1] - 578:23

**WISHED** [1] - 465:18

**WITHDRAWAL** [1] - 585:15

**WITHDREW** [1] - 585:12

**WITNESS** [8] - 466:19, 466:20, 467:12, 469:24, 470:3, 470:12, 549:5, 568:24

**WITNESS** [17] - 470:18, 471:2, 476:6, 503:10, 510:14, 514:2, 531:3, 532:10, 538:6, 543:15, 549:15, 553:9, 565:19, 578:16, 581:23, 593:12, 595:6

**WITNESSES** [1] - 615:18

**WONG** [1] - 504:13

**WOOD** [2] - 500:16, 500:22

**WORD** [10] - 481:25, 483:3, 488:25, 491:15, 491:16, 491:24, 492:12, 538:14, 552:12, 598:23

**WORDS** [5] - 481:11, 611:9, 611:12, 612:24

**WORKS** [3] - 477:8, 565:12, 597:16

**WORLD** [2] - 595:18, 595:20

**WORRY** [1] - 488:16

**WRITE** [1] - 565:11

**WRITES** [1] - 488:3

**WRITING** [1] - 474:3

**WRITTEN** [4] - 485:15, 505:6, 612:19, 612:23

**WROTE** [7] - 488:15, 575:13, 590:19, 610:24, 611:1, 611:5, 612:13

## Y

**YARDS** [3] - 539:6, 539:10, 540:14

**YEAR** [3] - 517:15, 578:14, 578:18

**YEARS** [24] - 484:4, 504:13, 518:15, 527:18, 532:17, 532:20, 556:16, 556:17, 557:20, 560:10, 561:20, 563:11, 563:12, 565:2, 569:20, 570:20, 575:7, 578:16, 592:22, 592:23, 593:2, 593:7, 593:13, 595:16

**YELLOW** [1] - 554:23

**YESTERDAY** [19] - 467:12, 471:14, 472:2, 472:17, 477:8, 480:17, 485:23, 492:17, 503:17, 522:20, 528:7, 531:21, 533:13, 538:6, 563:7, 564:3, 579:5, 612:21, 613:8

**YOURSELF** [2] - 538:2, 571:12

## Z

**ZOCH** [1] - 469:20

**ZOCH'S** [1] - 469:21

**ZOYD** [8] - 476:19, 480:11, 485:18, 494:10, 501:1, 504:11, 510:6, 520:3

**UNITED  STATES  DISTRICT  COURT**