1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

4

5  SANTA CLARITA VALLEY WATER AGENCY,     )
                                          )
6                   Plaintiff,            )
                                          )
7      v.                                 )          Case No.
                                          )   CV 18-6825 SB (RAOx)
8  WHITTAKER CORPORATION, et al.,         )
                                          )          Volume 7
9                   Defendants.           )    (Pages 688 - 846)
   _____)

10

11        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                TRIAL DAY 4:  A.M. SESSION
12            MONDAY, NOVEMBER 22, 2021
                    8:03 A.M.
13            LOS ANGELES, CALIFORNIA

14

15

16

17

18

19

20

21

22  _____

23      MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST 1ST STREET, ROOM 4455
            LOS ANGELES, CALIFORNIA  90012
25                  (213) 894-2305

                UNITED STATES DISTRICT COURT

1        APPEARANCES OF COUNSEL:

2

3   FOR THE PLAINTIFF:

4       NOSSAMAN, LLP
        BY:  BYRON P. GEE
5       BY:  RAVEN MCGUANE
        BY:  PATRICK J. RICHARD
6       BY:  FRED FUDACZ
             Attorneys at Law
7       777 South Figueroa Street, 34th Floor
        Los Angeles, California  90017
8       (213) 612-7800

9       NOSSAMAN, LLP
        BY:  ILSE CHANDALAR SCOTT
10           Attorney at Law
        50 California Street, 34th Floor
11      San Francisco, California  94111
        (415) 398-3600

12

13

    FOR THE DEFENDANT WHITTAKER CORPORATION:

14

        EDLIN, GALLAGHER, HUIE & BLUM
15      BY:  MICHAEL E. GALLAGHER, JR.
        BY:  FRED M. BLUM
16      BY:  DANIEL ERIC TROWBRIDGE
             Attorneys at Law
17      500 Washington Street, Suite 700
        San Francisco, California  94111
18      (415) 397-9006

19

20   ALSO PRESENT:

21      MATT STONE
        SCOTT FRYER
22      RON BEATON
        ERIC LARDIERE

23

24

25

UNITED STATES DISTRICT COURT

1                        **INDEX OF WITNESSES**

2

3    PLAINTIFF'S WITNESSES                                    PAGE

4    LARDIERE, Eric

5        Direct Examination by Mr. Richard                    706
         Cross-Examination by Mr. Gallagher                   773
6        Redirect Examination by Mr. Richard                  782

7

8    STANIN, Phyllis

9        Direct Examination by Mr. Gee                        788

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR EVIDENCE PG. |
|--------|-------------|:----------------:|
| 26 | 3/19/2018 e-mail | 721 |
| 45 | 5/8/2018 e-mail | 721 |
| 61 | Map | 823 |
| 158 | Stanin expert report, Figure 1 - site location map | 790 |
| 159 | Stanin expert report, Figure 2 - Santa Clara River Valley East sub-basin | 816 |
| 168 | Stanin expert report, Figure 11 - installation of wells over time | 807 |
| 171 | Stanin expert report, Figure 14 - VOC and perchlorate impacted areas identified by Whittaker | 798 |
| 172 | Stanin expert report, Figure 15 - perchlorate, TCE covariance charts OU-3 | 834 |
| 173 | Stanin expert report, Figure 16 - perchlorate, TCE covariance charts OU-4 | 834 |
| 184 | Stanin expert report, Figure 27 - plausible pathways for VOC migration to water supply wells | 829 |
| 185 | Stanin expert report, Figure 28 - VOC migration pathway profile | 810 |
| 190 | Stanin rebuttal expert report, Figure 2 - AECOM perchlorate and TCE concentration | 825 |
| 194 | Stanin rebuttal expert report, Figure 42 - Figure S-4 from expert report of Gary Hokkanen | 833 |
| 526 | Stanin expert report - Table 8 | 844 |

692

```
                    MONDAY, NOVEMBER 22, 2021; 8:03 A.M.

                        LOS ANGELES, CALIFORNIA

                                -oOo-

                  (Out of the presence of the jury:)

08:03AM    5        THE COURTROOM DEPUTY:  Calling Item No. 1,

       6   Case No. CV 18-06825-SB, Santa Clarita Valley Water Agency

       7   versus Whittaker Corporation, et al.

       8        Counsel, would you please state your appearances,

       9   starting with plaintiff's counsel.

08:03AM   10        MR. RICHARD:  Good morning, Your Honor.

      11   Patrick Richard on behalf of plaintiff.  With me are my

      12   colleagues, Ms. Scott, Mr. Gee, and Ms. Micevych.

      13        THE COURT:  Thank you.  Good morning.

      14        MR. BLUM:  Good morning, Your Honor.  Fred Blum for

08:04AM   15   Defendant Whittaker.  With me are the client representative,

      16   Eric Lardiere, and also Daniel Trowbridge, Scott Fryer, and

      17   Matt Gallagher.

      18        THE COURT:  Good morning.  We are outside the

      19   presence of the jury.

08:04AM   20        And let me hear who are the next witnesses in order,

      21   please, Mr. Richard.

      22        MR. RICHARD:  Yes, Your Honor.  We'll start with

      23   Mr. Lardiere who's here.  So I'm confident we'll start on time.

      24   And then followed by Ms. Stanin.

08:04AM   25        THE COURT:  And who's after her?
```

|   |   |
|---|---|
| 1 | MR. RICHARD:  We have Mr. Mesnada.  But depending on |
| 2 | the timing, we have a video play.  So we would just ask for a |
| 3 | little bit of flexibility on that.  If it appears that after |
| 4 | Ms. Stanin -- the parties have estimated -- we had 240 minutes. |
| 5 | I think they had at least an hour estimate on cross for |
| 6 | Ms. Stanin.  She's probably our principal witness in the case. |
| 7 | So those are the next four witnesses.  I would |
| 8 | suggest or request that, after Ms. Stanin, we visit whether |
| 9 | it's Mr. Mesnada or the video of Mr. Peloquin. |
| 10 | THE COURT:  All right.  I do want to address the |
| 11 | challenged exhibits with respect to Ms. Stanin. |
| 12 | So, first, Exhibit 1064.  I do believe that there |
| 13 | may be a misunderstanding about the Court's ruling in this |
| 14 | regard.  I don't believe the Court was presented with a |
| 15 | question about the appropriate negligence standard with respect |
| 16 | to well siting.  The issue had to do with specific evidence |
| 17 | that was being sought to be admitted, and I only analyzed that |
| 18 | evidence. |
| 19 | So I'll hear from the plaintiff if you wish to be |
| 20 | heard, but it does not appear to me that this evidence would |
| 21 | violate the Court's in limine order.  This is the water well |
| 22 | standards. |
| 23 | Mr. Richard, do you wish to be heard? |
| 24 | MR. RICHARD:  It's Mr. Gee's witness.  We're just |
| 25 | double-checking that particular document. |

08:04AM (line 5)
08:05AM (line 10)
08:05AM (line 15)
08:06AM (line 20)
08:06AM (line 25)

1          No objection to that, Your Honor.

2          THE COURT:  All right.  And then with respect to

3    1417, the plaintiffs object on hearsay grounds.  Their response

4    is that the public record exception applies and also the

08:06AM   5    document was relied upon by expert Stanin.

6          And the documents, Operable Unit 7 Work Plan

7    prepared by Hargis, H-a-r-g-i-s, Associates dated July 2nd,

8    1999, it does not appear to the Court that this is a public

9    record.  For this to be a public record, it would have to be a

08:07AM  10    record or a statement of a public office or official at the

11    very outset, and then there are other requirements.  But it

12    appears to me that this doesn't meet even the threshold.

13          The question is how this was relied upon by

14    Ms. Stanin or Dr. Stanin -- I don't know which -- and what

08:07AM  15    parts of this does the defense intend to rely upon.

16          Mr. Blum?

17          MR. BLUM:  Your Honor, it's Ms. -- it's Ms. Stanin,

18    not doctor.  Basic -- if you give me a moment, Your Honor, I

19    will tell you specifically.

08:08AM  20          Your Honor, there are certain figures that

21    Ms. Stanin used from this report to show locations of VOCs,

22    particularly TCE.  There's only two things I want to use from

23    the report.  It's that figure as well as the figure behind it

24    which shows the locations of TCA.  And frankly, Your Honor, I

08:08AM  25    don't mind if it's designated for the purpose -- for I.D.

purposes only since she clearly relied on it.

THE COURT:  Well, tell me what you mean when you say that you don't mind if it's used for only identification purposes.  The parties have indicated that from time to time,

08:08AM   and it just doesn't translate with the Court.

There shouldn't be any challenged exhibit presented to the Court when all a party is looking to do is identify a document and do nothing more with it, in which case I'm not even sure why it's being identified.

08:09AM   MR. BLUM:  Well, Your Honor, my preference is to be able to admit it into evidence.  And I -- but honestly, this is not a hill that I want to die on.  And there's -- I just want her to be able to say this is what she relied upon and that she did -- and that she also saw that there was something that

08:09AM   has -- that a TCA -- and then I can -- I'm going to take that when I get into our case.

THE COURT:  Well, let me just -- I'll try to conclude it this way.  I doubt that I'm going to hear an objection, but maybe I will, that Mr. Blum is unable to rely or

08:09AM   refer to something that Ms. Stanin relied upon in formulating her opinions.  If that's all he is going to do, he's free to do so and he should do so, in the Court's judgment, without necessarily referring to the document, unless that's particular material.

08:10AM   That is to say, presumably, Mr. Blum, you can ask

the question of Ms. Stanin about whether certain facts that she

has reviewed she has relied upon in formulating her opinions.

If she says "No," then there may be an impeachment issue, in

which case, it seems to me, you present her with whatever

08:10AM   evidence that you have that shows that, in fact, she did,

indeed, rely upon this document and the specific portions that

you're contending she relied upon.

          So let me make sure, first of all, whether

Mr. Richard or Mr. Gee objects to what the Court has set forth.

08:11AM          MR. GEE:  Your Honor, we don't mind having the

document used for I.D.  However, it is a 1999 document

that's -- you know, 22 years old.  And there's been lots and

lots of data collected between then and now.  She may have

reviewed it for historical purposes, but I suspect that she

08:11AM   didn't rely on it.

          THE COURT:  But he's going to establish that as a

foundation.

          So with that, what I'm taking, Mr. Gee, is that you

don't object to what the Court has set forth.  And again, if

08:11AM   I'm putting words in your mouth, let me know.  But sometimes I

have to try to cut to the chase.

          MR. GEE:  Your words were very well taken and, yes,

we agree.

          THE COURT:  All right.  So, Mr. Blum, are you able

08:11AM   to tell the Court that, based upon Ms. Stanin's deposition,

| | | |
|---|---|---|
| | 1 | that she's going to say that she relied upon the specific |
| | 2 | portions of this document that you're claiming she relied upon? |
| | 3 | MR. BLUM:  Your Honor, I believe it's her Figure 19 |
| | 4 | is the location in which she believes there were TCA.  It says |
| 08:12AM | 5 | on the figure taken from the Hargis report. |
| | 6 | THE COURT:  All right.  And so to the extent that |
| | 7 | you can tie portions of this document to her opinions, that is, |
| | 8 | she says she relied upon particular portions like this figure, |
| | 9 | then it seems to me you can proceed in the manner that I have |
| 08:12AM | 10 | described. |
| | 11 | MR. BLUM:  That's fine, Your Honor. |
| | 12 | THE COURT:  And then if you need to impeach her, if |
| | 13 | she says, for example, yes, I relied upon it, and then it turns |
| | 14 | out that she's saying the document says something different |
| 08:12AM | 15 | than what it says, then it seems to me you can present her with |
| | 16 | it. |
| | 17 | MR. BLUM:  Yes, sir. |
| | 18 | THE COURT:  All right.  Then moving on to |
| | 19 | Exhibit 1418, once again, this does not appear to me to be a |
| 08:12AM | 20 | document that was prepared by the Government or adopted by the |
| | 21 | Government within the meaning of Federal Rule of Evidence |
| | 22 | 803-8, but let me hear from the defense, please. |
| | 23 | MR. BLUM:  Your Honor, it's the same issue as we |
| | 24 | had -- as with the other one. |
| 08:13AM | 25 | THE COURT:  All right.  And so the Court's ruling, |

**UNITED STATES DISTRICT COURT**

without objection, will be the same.  To the extent that you

want to reference this, you may.  Or may not need to.  That's

fine.

Let me also just indicate that in the future, if the

parties are simply saying that they're going to introduce

something by way of identification, then this should not be on

the challenged list for the Court.  The parties need to go one

step further and say, well, okay, I'm identifying it for this

purpose.  And if it turns out that I need to present this

document, I'm going to do so.  And then I need to hear whether

there's an objection in that regard because that's what I will

be focused on rather than the identification.

I believe that concludes the issues with regard to

Ms. Stanin.  And previously, I spoke with the parties

concerning any challenged exhibits for Mr. Lardiere.

So then let's take a look at Mr. Masnada,

M-a-s-n-a-d-a.  And Exhibit 478, is this being offered solely

for purposes of the bench trial, or is this intended to go

before the jury?

Let me ask you, Mr. Richard, since this is a

document you intend to introduce.

MR. RICHARD:  This is -- again, I think it's going

to be Mr. Gee's witness, Your Honor.  So just one moment.

THE COURT:  Yes.

MR. RICHARD:  Yeah, I think this is just to -- for

 1    identification and to refresh memory if needed, and I

 2    appreciate Your Honor's guidance.  Sometimes we have documents

 3    that we think we may need to refresh a witness's memory and we

 4    put them on the list.

08:15AM   5          THE COURT:  And what is the relevance of this for

 6    purpose of the jury trial, Mr. Gee?

 7          MR. RICHARD:  Your Honor, there's -- in part, there

 8    is some overlap between jury trial and CERCLA in a sense that

 9    there will be -- there are allegations that Santa Clarita

08:15AM  10    Valley Water Agency did not act appropriately and should be

11    apportioned some liability.  And Mr. Masnada is at the -- now

12    past general manager who has taken great steps to address the

13    contamination coming from the Whittaker-Bermite site.

14          THE COURT:  But how does the procurement of

08:16AM  15    government funding for cleanup or other remedial costs have any

16    relevance to the jury trial?

17          MR. GEE:  Well, Your Honor, the -- the, um, permit

18    of government funds was just one of a number of different steps

19    to -- to abate the contamination.  Back in the early 2000s, the

08:16AM  20    groundwater aquifer was not very well characterized.  And

21    before we could even -- before the parties could even identify

22    or develop a remedy, they had to get funding from somewhere,

23    and $10 million is a lot for a water agency.  So --

24          THE COURT:  What I still don't understand is its

08:16AM  25    relevance.  So what is the relevance of the sourcing of monies

**UNITED STATES DISTRICT COURT**

1  obtained by the agency for purposes of doing whatever

2  contamination cleanup they did?

3          MR. GEE:  Okay.  Yeah, just to show that the agency

4  bent over backwards to try to address the -- the contamination

08:17AM  5  during the pendency of the -- after the lawsuit and before the

6  settlement.

7          THE COURT:  I do not, based upon what I've heard,

8  intend to allow this.  So if there is an objection at trial

9  without any further explanation of its relevance, which means

08:17AM  10  there has to be a sufficient foundation, the Court is going to

11  be strongly inclined to sustain an objection.  I don't see its

12  relevance.

13          Looking at the next document, the 2007 settlement

14  agreement, do you intend to introduce this document?  This

08:17AM  15  says, "marked for identification."

16          MR. GEE:  Yes, Your Honor.

17          THE COURT:  And tell me what the objection is, then,

18  Mr. Blum, since -- I don't have an objection, only that there's

19  no objection if it's only offered for identification purposes.

08:18AM  20          MR. BLUM:  I'm sorry, Your Honor.

21          Your Honor, I'm just trying to pull up the exhibit.

22          THE COURT:  It's Exhibit 483-A, and it's the 2007

23  settlement agreement.

24          MR. BLUM:  Yes, sir.

08:18AM  25          Can I confer with counsel for a minute, Your Honor?

|     |     |
| --- | --- |
|     | 1  THE COURT:  Yes.  What I'll do is I'm going to at |
|     | 2  this point just tentatively indicate that I view this document |
|     | 3  as being not objected to.  It doesn't mean that you can't |
|     | 4  object.  It simply means that, after conferring with counsel, |
| 08:18AM | 5  if you have an objection, the burden is on you to raise it with |
|     | 6  the Court. |
|     | 7  MR. BLUM:  Your Honor, frankly, since we were only |
|     | 8  told it was identified for -- for identification purposes only, |
|     | 9  we never did an admissibility analysis. |
| 08:19AM | 10  THE COURT:  I understand.  And hopefully from this |
|     | 11  point forward -- and I'm sure you will, all counsel will |
|     | 12  proceed to the next step. |
|     | 13  All I'm saying is I'm maintaining the status quo. |
|     | 14  It doesn't mean I'm admitting the document. |
| 08:19AM | 15  MR. BLUM:  And I will try, if we have a moment |
|     | 16  before the jury comes in, to tell counsel what our position is. |
|     | 17  THE COURT:  Very well. |
|     | 18  Then moving on to the next document for |
|     | 19  Mr. Masnada, and this is what the defendant intends to use that |
| 08:19AM | 20  has drawn an objection.  It's Exhibit 1382, the April 19, 2020, |
|     | 21  California Water Resources Control Board Guideline 97-005 |
|     | 22  documentation for Valencia Water Davison -- I'm not sure if |
|     | 23  that's right -- but revised final draft. |
|     | 24  Let me hear from the defense as to more specifically |
| 08:20AM | 25  what the probative value is of this document. |

1          MR. GALLAGHER:  Your Honor, the probative value is

2     they intend to introduce -- I think it's Exhibit 90 which is a

3     prior version of this.  That prior version is missing key

4     information about the proposed remedy to deal with the V-201

08:20AM  5     VOC hits, and specifically this document adds blending as do a

6     number of these documents that come after this.  And so

7     blending is what the plaintiff is proposing to deal with the

8     VOCs at V-201.  And the one that they intend to introduce that

9     predates all of these is missing that language.

08:20AM 10          THE COURT:  All right.  And also, just for guidance

11     for the parties, it is useful for the parties to focus the

12     Court on the specific portions of the document that you're

13     fighting over.  I raise that in connection with this document

14     because this is 30, 40, 50 -- I don't know how many page

08:21AM 15     document.  Put yourself in the Court's shoes.

16          MR. GALLAGHER:  Understood, Your Honor.  I could

17     direct you to the section if you'd like.

18          THE COURT:  I don't think I need to at this point

19     because I think I understand what the purpose of this, the

08:21AM 20     specific item is.  But I'm just -- I'm just asking all

21     counsel -- and I know you're busy -- but to take a look at this

22     document.  I sure -- I'm sure that you all -- that you have

23     someone, a lawyer, who is looking at what you're submitting to

24     the Court.  And put yourself in the Court's shoes and say,

08:21AM 25     okay, this is the information I have.  Am I able to decide this

| | |
|---|---|
| | 1 | issue?  How would I go about deciding this issue? |
| | 2 | And if you want to either avoid some of the |
| | 3 | frustration that the Court has experienced and/or try to get |
| | 4 | more informed rulings and have more of the Court's time, I |
| 08:22AM | 5 | spent time looking through this entire document trying to read |
| | 6 | through it, trying to discern for myself what it is that you |
| | 7 | were fighting about, and it took me 20 times longer than it |
| | 8 | otherwise would have if I simply know what it is that you're |
| | 9 | fighting over. |
| 08:22AM | 10 | And again, I appreciate the fact that you're all |
| | 11 | very busy, but so is this Court, and I would appreciate if you |
| | 12 | would be mindful of the Court's time. |
| | 13 | MR. GALLAGHER:  Understood, Your Honor. |
| | 14 | THE COURT:  Let me hear why I shouldn't allow this |
| 08:22AM | 15 | document, Mr. Gee.  If you're going to be introducing a prior |
| | 16 | iteration of this document, why would I exclude it? |
| | 17 | MR. GEE:  Well, first of all, Your Honor, the |
| | 18 | exhibit that was presented earlier was just the fifth -- the |
| | 19 | cover page to the report and not the entire report.  But more |
| 08:22AM | 20 | importantly, Your Honor, Mr. Masnada retired in 2015, so there |
| | 21 | would be no foundation for him to know what this document is. |
| | 22 | THE COURT:  All right.  Well, I see the objection as |
| | 23 | irrelevant, misleading, and draft report.  Now the objection is |
| | 24 | foundation.  Seems like a fairly good objection to me, |
| 08:23AM | 25 | Mr. Gallagher. |

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 08:23AM | 5 |

              MR. GALLAGHER:  And that may be.  Then the issue
becomes that Exhibit 90 is also -- lacks foundation as
Mr. Masnada was not there in that prior iteration that they
propose to introduce.
              THE COURT:  All right.  And so maybe you can work it
out because I don't intend to sustain an objection on
foundational grounds just to help one party.  So if the Court
is faced with the foundation objection, which it appears to me
would be an appropriate one, if Mr. Masnada has no knowledge of
the particular document that you're seeking to introduce
through him, I'm going to sustain it for both sides unless you
both want to introduce it through him, knowing that, otherwise
perhaps, you're going to have to perhaps introduce it through
some other party.
              All right.  With that, I will -- we now have a few
minutes, and I know you wanted to meet and confer about one
document.  We still have Mr. Trudell, but there will be time to
address those challenged exhibits.
              We'll be in recess until 8:30.
              I am going to have Mr. Cruz bring them in at 8 :30
sharp, so please do be ready by 8:30.  Thank you.
              MR. RICHARD:  Thank you, Your Honor.
              MR. GALLAGHER:  Thank you, Your Honor.
              (Break taken.)
              (In the presence of the jury:)

1          THE COURT:  We are on the record in Santa Clarita

2     Valley Water Agency versus Whittaker Corporation.  And we have

3     all counsel present as well as the jury who has joined us.

4          Good morning, ladies and gentlemen.

08:31AM   5          THE JURY:  Good morning.

6          THE COURT:  I hope you all had a very nice weekend,

7     and on a positive front we have a fairly short week this week.

8     You may recall that we're still in the plaintiff's case in

9     chief, and we're on to their next witness.

08:32AM  10          And so, Mr. Richard, if you would kindly call your

11     next witness.

12          MR. RICHARD:  Yes, Your Honor.  Plaintiff will call

13     Mr. Eric Lardiere.

14          THE COURT:  If you'd please walk around.

08:32AM  15          THE COURTROOM DEPUTY:  Good morning, sir.  Would you

16     please walk around.

17          Sir, would you please raise your right hand to be

18     sworn.

19          Sir, do you solemnly swear that the testimony you

08:32AM  20     shall give in the cause now before this Court shall be the

21     truth, the whole truth, and nothing but the truth, so help you

22     God?

23          THE WITNESS:  Yes.

24          THE COURTROOM DEPUTY:  Thank you, sir.  Would you

08:32AM  25     please be seated.

**UNITED STATES DISTRICT COURT**

1          Sir, for the record, would you please state your

2    name and then spell your last name.

3          THE WITNESS:  Eric Lardiere, L-a-r-d-i-e-r-e.

4          THE COURT:  Mr. Richard, you may proceed.

08:33AM  5          MR. RICHARD:  Thank you, Your Honor.

6                        **ERIC LARDIERE,**

7    **PLAINTIFF'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:**

8                        **DIRECT EXAMINATION**

9    BY MR. RICHARD:

08:33AM  10         Q.    Good morning, Mr. Lardiere.  How are you?

11         A.    Good morning.  Fine.  How are you?

12         Q.    So far so good.

13               Can you please tell us who your current employer is?

14         A.    Meggitt USA, Inc.

08:33AM  15         Q.    And what's the relationship between

16    Meggitt USA, Inc., and Whittaker Corporation?

17         A.    Meggitt USA, Inc., owns the stock of

18    Whittaker Corporation.

19         Q.    And at some point in time, you began work with

08:33AM  20    Whittaker Corporation back in 2000?

21         A.    It was a short amount of time where I was an

22    employee on payroll of Whittaker Corporation, about two years

23    beginning in April 2000.

24         Q.    And with Whittaker, you've been a vice president,

08:34AM  25    secretary, general counsel, and you're currently president of

```
 1    Whittaker; is that right?
 2         A.    My original titles were general counsel, vice
 3    president, and secretary of Whittaker Corporation.  And I'm
 4    currently president and secretary of Whittaker Corporation.
 5         Q.    Okay.  And as of August 2019, is it fair to say you
 6    were not sure if Whittaker Corporation had any other employees?
 7         A.    Yes.  That was the testimony in my deposition.
 8         Q.    I'm sorry?
 9         A.    Yes.  That was my testimony in a deposition in this
10    case.
11         Q.    And that's still true?
12         A.    No, I know the -- I know the status now.
13         Q.    Okay.  And in 2019 -- as of 2019, you believed you
14    were a director of Whittaker Corporation; is that right?
15         A.    Correct.
16         Q.    And do you still believe that?
17         A.    Yes.
18         Q.    And is it fair to say that, as of August 2019, you
19    weren't sure if Whittaker had any other directors?
20         A.    No.
21         Q.    If you --
22         A.    I -- there were other directors in 2019.
23         Q.    Right.  You just weren't sure if there were at that
24    time?
25         A.    I was sure there were others.  I wasn't sure of
```

08:34AM (line 5)
08:34AM (line 10)
08:34AM (line 15)
08:35AM (line 20)
08:35AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   their names.
 2       Q.   Can we look at the -- you mentioned a deposition
 3   from August 2019.  Why don't we look at page 17, lines 2 to 4.
 4           So you were asked, "Who are the other directors,
 5       if any?
 6           "I would have to check our records on that.  I'm
 7       not entirely sure."
 8           And it's your testimony that you knew there were
 9   other directors, you just didn't know their names; is that
10   right?
11       A.   That was the question asked, and that's how I tried
12   to answer it.
13       Q.   Okay.  And at some point -- thank you.
14           At some point your responsibilities for Whittaker
15   included being custodian of records; is that right?
16       A.   I have assumed that status in connection with a
17   bankruptcy case and a declaration in support thereof.
18       Q.   I'm sorry.  Were you not custodian of records
19   through 2019 at least?
20       A.   I think that's a fair comment; although, I only took
21   that formally in one case, I believe.
22       Q.   Didn't you also take that formally in this case?
23       A.   I don't recall.
24       Q.   Do you know Mr. Gaynor Dawson?
25       A.   I'm blanking on Mr. Gaynor Dawson's name.
```

08:35AM (line 5)
08:35AM (line 10)
08:36AM (line 15)
08:36AM (line 20)
08:36AM (line 25)

         1          Q.    Okay.  Do you recall that one or more of the experts

         2    in this case came to you and spoke to you as the custodian of

         3    records to ask about the past records of Whittaker, things like

         4    operational logs and things of that nature?

08:37AM  5          MR. GALLAGHER:  Objection, Your Honor.  Lacks

         6    foundation.

         7          THE WITNESS:  I don't recall Mr. Gaynor --

         8          THE COURT:  The objection is sustained, and the jury

         9    is to disregard the response.

08:37AM 10          Q.    (BY MR. RICHARD:)  Sir, do you -- do you recall any

        11    of the experts hired by Whittaker in this case coming to you to

        12    talk about records that Whittaker maintained?

        13          A.    I'm sorry.  I -- I don't.

        14          Q.    Okay.  So is it fair to say that, if one of those

08:37AM 15    experts does testify that they spoke to you, you just don't

        16    have a memory today one way or the other?  Is that fair?

        17          A.    That's true.

        18          Q.    Okay.  And as of 2001, going back to when you

        19    were -- the first part of your tenure with Whittaker, your

08:37AM 20    responsibilities at that time included overseeing investigation

        21    regarding claims of perchlorate contamination made by the

        22    nearby water agencies.  Is that fair?

        23          A.    I may have missed some of that.  Was it an

        24    investigation by the water agency?  Is that how you phrased

08:38AM 25    that?

```
 1        Q.    Did your responsibilities include overseeing an
 2   investigation regarding claims made by the neighboring water
 3   agencies as to perchlorate contamination?
 4        A.    There had been a lawsuit, and I supervised the
 5   litigation on behalf of Whittaker Corporation.
 6        Q.    Okay.  And currently, is that one of your
 7   responsibilities with Whittaker and Meggitt USA is to be
 8   responsible for claims made by the water agencies?
 9        A.    I don't believe there are any claims against
10   Meggitt USA by the water agencies.  But, otherwise, for
11   Whittaker Corporation, I supervised the litigation, the defense
12   in this case.
13             THE COURT:  Mr. Lardiere, could you kindly move
14   closer to the microphone and make sure that you're speaking
15   into it as you see me doing, please.
16             THE WITNESS:  Okay.
17             THE COURT:  Thank you.
18        Q.    (BY MR. RICHARD:)  And you're aware that
19   representatives of Whittaker and the water agencies have been
20   meeting on a monthly basis to discuss technical issues since at
21   least 2008?
22        A.    That is correct.
23        Q.    And you sometimes attend those meetings at least by
24   phone?
25        A.    Sometimes.
```

08:38AM (line 5)
08:38AM (line 10)
08:39AM (line 15)
08:39AM (line 20)
08:39AM (line 25)

**UNITED STATES DISTRICT COURT**

1    Q.    And do you routinely read correspondence regarding

2    the Whittaker site to or from the California Department of

3    Toxic Substances Control?

4    A.    I receive such correspondence from time to time, and

08:39AM    5    I do read it.

6    Q.    And when you say "from time to time," is it your

7    practice to read all of the correspondence to or from DTSC

8    that's brought to your attention?

9    A.    Yes.

08:39AM    10    Q.    And do you also review reports from Whittaker's

11    consultant, CDM Smith?

12    A.    No.  I'm -- I'm not always privy to those reports.

13    Q.    Okay.  Do you know who CDM Smith is, sir?

14    A.    Yes.

08:40AM    15    Q.    Okay.  And have you read cover letters to any of the

16    reports over the last ten years?

17    A.    If they are sent to me, I will look at them.  I

18    probably won't read them all.  Usually the reports from the

19    consultants are quite lengthy.

08:40AM    20    Q.    And you know Matt Stone, general manager of the

21    water agency; correct?

22    A.    Yes.

23    Q.    And you recall that in 2018, Mr. Stone on behalf of

24    the water agency asked you and Whittaker to take responsibility

08:40AM    25    for all past and future costs to treat for perchlorate and

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| | 1 | other contaminants in their wells? |
| | 2 | MR. GALLAGHER:  Objection, Your Honor.  Assumes |
| | 3 | facts. |
| | 4 | THE COURT:  Sustained as framed. |
| 08:40AM | 5 | Q.    (BY MR. RICHARD:)  Do you recall correspondence from |
| | 6 | Mr. Stone seeking to have Whittaker in early 2018 take |
| | 7 | responsibility for contamination in any of the wells? |
| | 8 | A.    I recall the correspondence.  I'm not sure the words |
| | 9 | were "take responsibility."  But there were various matters |
| 08:41AM | 10 | discussed in the letter. |
| | 11 | Q.    Okay.  So you do recall the letter from March 2018? |
| | 12 | A.    Yes, I do. |
| | 13 | Q.    Well, then, why don't we take a look at that.  I |
| | 14 | believe it's Exhibit 26. |
| 08:41AM | 15 | And this is a letter -- if we can enlarge the |
| | 16 | "to/from" up there.  This is an e-mail attaching a letter, and |
| | 17 | this is March 19th, 2018.  Do you see that? |
| | 18 | A.    I do. |
| | 19 | Q.    And your address at that time was |
| 08:41AM | 20 | Eric.Lardiere@Meggitt.com; is that right? |
| | 21 | A.    Correct. |
| | 22 | Q.    And this is a letter -- or the e-mail is cc'd to a |
| | 23 | number of people.  You mentioned Mr. Stone, general manager of |
| | 24 | the water agency.  The other folks there, Tim Simpson and |
| 08:42AM | 25 | Hassan Amini, those are consultants to Whittaker; is that |

```
 1   right?
 2        A.    Yes.
 3        Q.    If we look at the attached letter from Mr. Stone,
 4   the next page -- do you have that there?  Do you see that on
 5   the screen?
 6        A.    Yes.
 7        Q.    And he's writing to you pursuant to a settlement
 8   agreement, notifying you, in the first paragraph there, quote,
 9   "We are notifying you of the recent perchlorate detection at
10   Saugus Formation Production Well V-205 that exceeded the
11   perchlorate MCL."  Do you see that?
12        A.    Yes.  There's a reference to the settlement
13   agreement that we had entered into with Castaic Lake Water
14   Agency previously.
15        Q.    And is it fair to say, when you received this letter
16   in March 2018, you understood that the water agency was
17   identify -- was giving you notice that they had detected
18   perchlorate in one of the wells at issue in this case?
19        A.    Yes.
20        Q.    And did you understand, when you received this
21   letter and read it, that the water agency was asking Whittaker
22   to reimburse the agency for all past and future costs to treat
23   perchlorate?
24        A.    That is one of the requests in the letter, to
25   reimburse for past and future costs.
```

1    Q.   Okay.  And for perchlorate and other contaminants;

2    is that right?

3    A.   That's what it says.

4    Q.   And you understood that Mr. Stone was, as he says

08:43AM  5    later in the letter towards the bottom, second-to-the-last

6    paragraph, "The settlement agreement also requires that SCVWA

7    meet and confer in good faith with Whittaker, negotiate a

8    resolution of the Well 205 contamination issues.  Please

9    provide Steve Cole with dates and times that Whittaker and are

08:44AM  10   available to meet to discuss the resolution of this matter."

11        Do you recall that invitation at that time?

12   A.   Yes.  There was a procedure for Whittaker and a

13   third party to meet with the water agency.

14   Q.   So I asked you a minute ago if the water agency was

08:44AM  15   asking Whittaker to take responsibility for contamination in

16   this well, and you correctly pointed out that Mr. Stone didn't

17   use those precise words.  But was that your understanding at

18   the time, that Whittaker was -- that Whittaker was being asked,

19   in fact, to take responsibility for the contamination and

08:44AM  20   provide treatment at Well V-205?

21   A.   Well, the letter speaks for itself.  It was a

22   request for cost reimbursement.

23   Q.   Okay.  And is it fair to say that you understood

24   that the water agency was asking Whittaker to take

08:45AM  25   responsibility for the contamination in this particular well,

1    Well V-205?

2              MR. GALLAGHER:  Objection, Your Honor.  Asked and

3    answered.

4              THE COURT:  Sustained.  It's also vague.

08:45AM  5         Q.    (BY MR. RICHARD:)  And you discussed this letter

6    with the other folks who received it who worked for Whittaker,

7    Tim Simpson and Hassan Amini.  Is that fair?

8         A.    Tim Simpson and Hassan Amini are independent

9    environmental consultants.  They do perform work for Whittaker.

08:45AM  10   They're not employees.  And I did discuss this with

11   Mr. Simpson.

12        Q.    And Mr. Simpson's worked with you for what?  14 or

13   15 years?

14             MR. GALLAGHER:  Excuse me, Your Honor.  I don't mean

08:45AM  15   to interrupt.  There's a witness in the courtroom that should

16   not be here.

17             THE COURT:  There is an exclusionary order for

18   witnesses.  So I'm counting on counsel to make sure that

19   they're aware of who's in the courtroom and, if there is a

08:46AM  20   witness, to make sure that they leave the courtroom.  So if you

21   are a witness in this matter, please make sure that you leave.

22   Thank you.

23             MR. RICHARD:  Thank you, Your Honor.

24        Q.    (BY MR. RICHARD:)  So is it fair to say that you've

08:46AM  25   worked with Mr. Tim Simpson on issues related to contamination

at the Whittaker site for the last 14 or 15 years?

A.    Probably been -- been a bit longer than that.  I
can't remember exactly when I first met Tim.

Q.    Okay.  And -- so you received this letter from the
08:46AM   water agency.  It's general manager, Mr. Stone, this
Exhibit 26, in March 2018.  You understand he's asking
Whittaker, pursuant to an agreement, to pay for treatment
costs.

         Is it fair to say you understood what was entailed
08:47AM   in a treatment system, at least in general, for removing
perchlorate from contaminated well water at this time?

A.    There had been treatment systems for perchlorate
installed at plaintiff's water wells over time, and I was
familiar with those systems, yes.

08:47AM   Q.    And in the last sentence of the first paragraph of
Exhibit 26, we see a reference to the last line, "Management
Policy 97-005, for direct domestic use of extremely impaired
sources."  Do you see that?

A.    I -- I see some of the words.  I don't see the full
08:48AM   sentence, but there's -- there's -- it's up at the top of the
screen.

Q.    Okay.  Now we see the full sentence.

         Is that fair?

A.    Yes, I see that.

08:48AM   Q.    Okay.  And my question is Mr. Stone's letter in

1   March 2018 wasn't the first time you had heard of something

2   called 97-005, was it?

3        A.   I had heard references to it.  I don't think I've

4   ever seen it, but I've heard references to it, yes.

08:48AM   5        Q.   And this was the first time you had heard that the

6   wells were considered and deemed by the Division of Drinking

7   Water to be extremely impaired sources of water.  Is that fair?

8        A.   I don't recall when I first heard about extremely

9   impaired sources.  I had heard of the Policy No. 97-005.

08:48AM   10        Q.   So you received this -- is it fair to call this

11   formal correspondence from Mr. Stone, the general manager of

12   the water agency?

13        A.   I would not use the word "formal."  It is a letter,

14   and it's pursuant to a settlement agreement.

08:49AM   15        Q.   Did you think it was important to respond to

16   Mr. Stone?

17        A.   Yes.

18        Q.   And after you discussed this letter with

19   Mr. Simpson, at least, you did not provide a response to

08:49AM   20   Mr. Stone; isn't that correct?

21        A.   Personally, I did not.  I relied upon Mr. Simpson

22   and one of our external attorneys to handle this

23   correspondence.

24        Q.   So you yourself did not send an e-mail or a letter

08:49AM   25   back to Mr. Stone.  Is that what you're saying?

```
 1          A.    No.  My only contact with Mr. Stone was a very brief

 2     conversation at a stakeholder meeting in July.

 3          Q.    So between March and May 2018, you did not provide

 4     any response to the letter we've been talking about,

 5     Exhibit 26.

 6                Is that fair?

 7                MR. GALLAGHER:  Objection, Your Honor.  Asked and

 8     answered.

 9                THE COURT:  It's vague.  So when you say "you," it's

10     vague.  And on that basis, I'm sustaining the objection.

11                MR. RICHARD:  Thank you, Your Honor.

12          Q.    (BY MR. RICHARD:)  You say you ran into Mr. Stone in

13     July.  Is that what you said?

14          A.    I saw Mr. Stone at a -- I call it a stakeholder

15     meeting.  I think it had -- it's a -- it's a task force

16     meeting, which is one of our regular series of task force

17     meetings at the Santa Clarita City Hall.  It's a public

18     meeting.  It's a -- like this courtroom, it has participants

19     and -- and attendees.

20          Q.    Did anyone on behalf of Whittaker respond to

21     Mr. Stone of the water agency in March 2018, to the best of

22     your memory?

23          A.    Our consultant, Mr. Simpson, discussed this matter

24     at a March 8 technical meeting with representatives of the

25     agency.  I was not present, and I don't know if Mr. Stone was
```

08:50AM (line 5)
08:50AM (line 10)
08:50AM (line 15)
08:50AM (line 20)
08:51AM (line 25)

present.

Then one of our attorneys spoke with one of the agency's attorneys in early June about this -- this notice. And then, as I mentioned, I had just a brief conversation with Mr. Stone, not substantive, though.

Q.   So my question was whether anyone from Whittaker responded to Mr. Stone in March 2018, and you said that Mr. Simpson discussed the letter -- or the matter on March 8th. You would agree that March 8th is 11 days before Mr. Stone's letter?

A.   No.  If I said March, I misspoke.  It's May.  May 8. There's a technical meeting.  Well V-205 was on the agenda. Mr. Simpson told the representatives of the agency that we -- we needed more time to review the letter.  And -- and I think they also -- well, I know -- I only know what Mr. Simpson has told me about that meeting.  I wasn't present, so I shouldn't testify as to what was said.

Q.   Okay.  Let's try to go step by step, sir.  I'm just asking about March 2018.

A.   Yes.

Q.   You've told us that you didn't personally respond to Mr. Stone.  And so my question is:  To the best of your memory, did anyone from Whittaker respond to Mr. Stone in March 2018 regarding his letter?  So we're focused on March 2018, not May, June, or July.  Okay?

```
 1        A.    No.  So I'm focused on Mr. Stone.  So you're asking

 2   directly to Mr. Stone.

 3             I don't believe anyone spoke directly to Mr. Stone,

 4   unless he attended one of the technical meetings that began on

 5   May 8, 2018, and they follow monthly.

 6             And then I had one brief conversation with Mr. Stone

 7   at a July task force meeting.  But -- but, otherwise, there

 8   were responses to the agency, not just Mr. Stone, by

 9   Mr. Simpson and by one of our attorneys to the agency's

10   attorney.

11        Q.    Sir, I understand that eventually Whittaker

12   responded to this letter.

13             My question is:  Can you tell the jury upon your

14   oath that anyone from Whittaker responded to Mr. Stone or the

15   water agency in March 2018?

16        A.    The water agency in March 2018, no.  To Mr. Stone

17   in -- in March 2018, no.

18        Q.    Thank you.

19             And in April 2018, did anyone from Whittaker provide

20   any written response to the water agency regarding Exhibit 26?

21        A.    I don't know.  I -- I doubt it.  I'm not aware of

22   it.

23        Q.    You are aware that Mr. Stone wrote to you seven

24   weeks after he sent you the letter in March to tell you that he

25   had not yet received a response to his letter.  Do you recall
```

08:53AM (line 5)
08:53AM (line 10)
08:53AM (line 15)
08:53AM (line 20)
08:54AM (line 25)

**UNITED STATES DISTRICT COURT**

        1    that?

        2         A.    Yes.  On May 8, the same day as the technical

        3    meeting, at which time Mr. Simpson told the agency

        4    representatives that we needed more time to respond to the

08:54AM 5    letter, I received an e-mail a few hours later from Mr. Stone,

        6    asking me to respond to -- to this letter.

        7         Q.    Okay.  Why don't we look at Exhibit 45.

        8              MR. RICHARD:  That is the subject of a stipulation,

        9    Your Honor.

08:54AM 10             (Exhibit 45 received into evidence.)

        11        Q.    (BY MR. RICHARD:)  And you see here this is an

        12   e-mail from the same Matt Stone, general manager of the water

        13   agency, who had sent you the letter in March that we have been

        14   talking about.  And this is an e-mail May 8th, 2018.  Do you

08:55AM 15   see that?

        16        A.    I do.

        17             THE COURT:  For the record, 26 is received.

        18             MR. RICHARD:  Thank you, Your Honor.

        19             (Exhibit 26 received into evidence.)

08:55AM 20        Q.    (BY MR. RICHARD:)  And so he writes to you, "Dear

        21   Mr. Lardiere, Eric, to date we have received no response to our

        22   March 19th notification confirming perchlorate detections at

        23   Well V-205 sent seven weeks ago, nor indication that you have

        24   complied with the requirements of the settlement agreement in

08:55AM 25   this matter," period, close quote.

**UNITED STATES DISTRICT COURT**

```
 1              Is it correct that there was no response to his

 2   letter in March 2018, sir?

 3        A.   No.

 4        Q.   So when you received an e-mail from Mr. Stone that

 5   you're telling the jury you thought had began with a false

 6   statement, did you e-mail him back at his e-mail address and

 7   say, "Sorry, Matt, you got this wrong, we did respond"?

 8        A.   Well, I didn't presume to correct him.  But there --

 9   I had received an e-mail from Mr. Simpson that day telling me

10   that he had told the team that we needed -- "the team" being

11   the agency team -- that we needed more time to respond.

12              So I don't know, you know, when, you know, anybody

13   talked to Mr. Stone about that meeting or if they had -- I --

14   I -- I didn't -- no.  I didn't correct his e-mail.  I assumed

15   that -- well, I answered.

16        Q.   Did you forward Mr. Simpson's e-mail to Mr. Stone

17   and say, "Matt, we're working on it"?

18        A.   No.

19        Q.   Is it a correct statement, when he says at the end

20   of that first paragraph, "Further, we have not heard from you

21   regarding dates to meet and confer, which we requested"?  Do

22   you think that statement was also false, or do you think maybe

23   that one was true?

24        A.   No.  That one is true.

25        Q.   And was it a few months after this May 8th, 2018,
```

08:55AM — line 5
08:56AM — line 10
08:56AM — line 15
08:56AM — line 20
08:57AM — line 25

1    e-mail that the water agency filed the lawsuit against

2    Whittaker?

3         A.    I believe the water agency sued Whittaker in mid or

4    early August.

08:57AM  5         Q.    2018?

6         A.    Correct.

7         Q.    After the March and May attempts to sit down and try

8    to resolve it?

9         A.    Well, I mentioned that there was a conversation in

08:57AM  10   June between counsel for the water agency and counsel for

11   Whittaker to discuss the request for -- and I'll be specific

12   here -- for this meeting.  And I don't want to go further into

13   that.  I gather that there had been some orders from the Court

14   on that.  But there was a discussion directly between our

08:58AM  15   counsel and your counsel.

16        Q.    And when the lawsuit arrived -- by the way, general

17   counsel means you're an attorney for the company; is that

18   right?

19        A.    Correct.

08:58AM  20        Q.    And so when this lawsuit arrives in, you recall,

21   August 2018, did you -- did you read it?  Did you take a look

22   at it?

23        A.    I did.

24        Q.    And that suit included the contaminants TCE and PCE,

08:58AM  25   also sometimes referred to as VOCs.  Is that a fair statement?

1      A.    Correct.

2      Q.    And by March 2018, was it -- who was calling the

3   shots in terms of how to respond to that lawsuit?  You or folks

4   at Meggitt?

08:59AM    5      A.    There was no lawsuit pending in March 2018.

6      Q.    I'm sorry.  In 2018, by the end of 2018, there was a

7   lawsuit pending?

8      A.    The lawsuit was filed in August 2018, yes.

9      Q.    Right.

08:59AM    10           And so at that point, was it you or Meggitt who was

11   calling the shots in how to respond to that?

12      A.    Whittaker Corporation is an independent corporation

13   from Meggitt USA.

14      Q.    And what's Meggitt USA?  That's the holding company

08:59AM    15   for another Meggitt company?

16           MR. GALLAGHER:  Objection, Your Honor.  Relevance.

17           THE COURT:  I'm going to allow just a little bit of

18   this.

19           You can answer that question, but that will be it.

08:59AM    20           THE WITNESS:  Yes.  Meggitt USA, Inc., is a holding

21   company.

22      Q.    (BY MR. RICHARD:)  Right.  And my question is for

23   another Meggitt entity, The Meggitt Group.

24      A.    Meggitt USA, Inc., is a holding company for

09:00AM    25   subsidiaries of Meggitt USA in the United States.  One of those

|     |     |
| --- | --- |
|     | 1 |

subsidiaries, a wholly-owned subsidiary is Whittaker
Corporation.  There are others.

     Q.    Okay.  Thank you.

     And you were in court last Wednesday and you heard
your attorney tell the jury several times that Whittaker,
quote, "accepts the responsibility for the perchlorate
contamination," close quote, in my client's drinking water
wells.  Do you recall that?

     A.    Yes.

     Q.    More than one time he said, quote, "We are
responsible for the perchlorate contamination."  Do you recall
that?

     A.    I don't recall his exact words, but the gist of it,
yes.

     Q.    And was the gist of it correct?

     A.    Yes.

     Q.    And your lawyer also told the jury that the water
agency would rather litigate than investigate.  Do you recall
those comments?

     A.    I heard him say that, yes.

     Q.    But you've been with Whittaker and Meggitt USA long
enough to know that Whittaker refused to take responsibility
for that perchlorate contamination until it was sued and a
federal judge ruled against Whittaker; isn't that correct?

     MR. GALLAGHER:  Objection, Your Honor.

**UNITED STATES DISTRICT COURT**

```
   1        Argumentative.  Assumes facts.  Lacks foundation.

   2                 THE COURT:  Overruled.

   3                 THE WITNESS:  So you're referring here to the 2001

   4        lawsuit against Whittaker?

   5            Q.    (BY MR. RICHARD:)  Yes.  I believe it was actually

   6        late 2000, but we'll call it the 2001 lawsuit.

   7                 Do you recall that lawsuit?

   8            A.    I do.

   9            Q.    And it's correct that, after that lawsuit was filed,

  10        you were -- you had already been with Whittaker for half a year

  11        or more?

  12            A.    Yeah.  I joined in April.  I think the lawsuit came

  13        in, like, November.

  14            Q.    Okay.

  15            A.    Whenever that was.

  16            Q.    And the lawsuit was filed three years after the

  17        water agencies discovered perchlorate in their wells.  Do you

  18        recall that?

  19            A.    I recall the facts slightly differently, but it's

  20        just based on things that I read.  I can tell you my

  21        understanding if you want.

  22            Q.    Okay.  Fair to say it was more than two years after

  23        perchlorate was detected in their wells that the lawsuit was

  24        filed?

  25            A.    The water agencies, I don't believe, were the ones
```

**UNITED STATES DISTRICT COURT**

 1    that did the sampling of the water wells for the agency.

 2           My understanding is the State of California sampled

 3    water wells throughout the state, and plaintiff's Wells S-1 and

 4    S-2 were amongst those wells and that the State of California

09:02AM  5    determined that there were detections of perchlorate in those

 6    wells at the time -- and this is just my understanding -- there

 7    hadn't been a level set yet by any governmental entity,

 8    including the State, as to what is -- for want of a better

 9    word, the contamination level.  But they were detecting

09:03AM 10    perchlorate in the plaintiff's wells.

11        Q.    And is it fair to say that, even after the water

12    agencies sued Whittaker, Whittaker denied any liability for the

13    perchlorate contamination?

14           MR. GALLAGHER:  Objection, Your Honor.  Relevance.

09:03AM 15           THE COURT:  Overruled.

16           THE WITNESS:  Well, we settled, eventually, the

17    case.  So I don't think it's fair to say that we denied

18    liability forever.

19           At the beginning of the case, we served an answer

09:03AM 20    which denied the claims for relief, which is a slightly

21    different subject.  And one of the claims for relief was under

22    CERCLA as to whether or not perchlorate is a hazardous

23    substance, and there was a ruling by the Court on that issue.

24    I think it was the first ruling in the United States on that

09:03AM 25    issue.

1    So, you know, whether it was even a hazardous

2    substance was in play.  I don't think the State of California

3    even decided that issue until about 2008.  And I don't think

4    U.S. EPA has actually done it yet.

09:04AM    5    So we denied the CERCLA claim.  We also asserted

6    that there were other sources of perchlorate in the Santa Clara

7    Valley.  And we sued one of them that we were able to identify,

8    and we got a substantial settlement out of that -- out of that

9    company.  Um --

09:04AM    10    THE COURT:  Ask your next question, please.

11    MR. RICHARD:  Yes, Your Honor.  I didn't want to

12    interrupt the witness.

13    THE WITNESS:  I'm sorry.

14    Q.   (BY MR. RICHARD:)  No.

09:04AM    15    So I understand, Mr. Lardiere, that you didn't

16    deny -- Whittaker didn't deny taking responsibility forever was

17    the term you used.  So I'll ask my question.

18    Did Whittaker take responsibility, from your

19    perspective, in 2001 or 2002 or 2003?

09:04AM    20    A.   Whittaker entered into an interim settlement with

21    the agency in 2003.

22    Q.   Okay.  And that was after a federal judge ruled

23    against Whittaker on the major issues in that case.  Is that

24    fair?

09:04AM    25    A.   There was a summary judgment entered by Judge Matz

**UNITED STATES DISTRICT COURT**

1    of this court that perchlorate, because it is ignitable,

2    constituted a hazardous substance under CERCLA, and that was

3    enough to establish that element of the claim for relief.

4         Q.   Okay.  But I just want to get the timing right.  You

09:05AM  5    said that there was an interim settlement agreement in 2003.

6    That was after a federal judge ruled against Whittaker on some

7    of the issues in that case.  Is that fair?

8         A.   On that issue, there was a ruling, and the interim

9    settlement came after that.

09:05AM  10        Q.   Thank you.

11             And then there were a number of -- the 2003 and then

12   another partial agreement in 2005, and eventually there was an

13   agreement in 2007.  Is that generally correct?

14        A.   I remember the 2003 agreement.  Quite a bit of money

09:05AM  15   was paid for that.  I don't recall the 2005 agreement.

16   That's -- I'm sorry.  I just don't recall it.  I think the

17   final consent agreement was entered by the Court in 2007.

18        Q.   Okay.  And at that point, Whittaker took

19   responsibility for some of the perchlorate contamination in

09:06AM  20   2007?

21             MR. GALLAGHER:  Misstates prior testimony.

22             THE COURT:  You may answer.

23             Overruled.

24             THE WITNESS:  The settlement agreement covered

09:06AM  25   specific wells and certain other wells to be built that would

1  be funded under the settlement agreement.  So when I say

2  "specific wells," I'm talking about the costs of installation

3  of pipelines and wellhead treatment systems and other stuff.

4        Q.    (BY MR. RICHARD:)  So even after it entered into

09:06AM  5  that 2000 settlement agreement with the water agencies, after

6  that ruling from a federal judge against Whittaker, Whittaker

7  delayed and disputed its obligations under even that settlement

8  agreement, leading to more litigation.  Isn't that generally

9  correct?

09:07AM  10        MR. GALLAGHER:  Objection.  Vague and ambiguous and

11  argumentative.

12        THE COURT:  Sustained.

13        THE WITNESS:  So there --

14        THE COURT:  I sustained the objection.

09:07AM  15        THE WITNESS:  I'm sorry.  I didn't hear you.

16        Q.    (BY MR. RICHARD:)  I'll be more specific.

17        Do you recall that, even after Whittaker entered

18  into an agreement in 2007 with the water agency to pay for

19  treatment to remove perchlorate from contaminated wells, there

09:07AM  20  were a number of disputes between the parties after 2007

21  regarding that agreement?

22        A.    Yes.

23        Q.    And let's start with containment.  You know what a

24  containment study is in general; correct?

09:07AM  25        A.    I have a nontechnical understanding, yes.

1    Q.    Isn't that one way that the water agency in this

2  case looks at data to see how well the wells are containing a

3  contamination plume?  Is that generally correct?

4    A.    Yes.  We were told that the -- the water agency had

09:07AM  5  performed a containment study by a consulting firm named Todd.

6    Q.    And Whittaker, at your direction, sir, wouldn't even

7  pay for a containment study required under its agreement with

8  the water agencies; isn't that correct?

9    A.    I don't recall that issue as being disputed.

09:08AM  10    Q.    You don't recall that earlier this year you

11  testified in another proceeding just four or five months ago in

12  which the containment study costs were one of the issues?

13    A.    Uh, I think we're talking about two different

14  things.  There was a containment study that was prepared by

09:08AM  15  Todd, and I think the -- I can't remember, honestly.  There was

16  a dispute -- pursuant to the agreement, we have an arbitration

17  provision.  And there was a dispute regarding certain costs

18  that the agency was seeking.

19    Q.    All right.

09:09AM  20    A.    I think one of those costs could have -- it was a

21  study, for sure.  I can't recall if it was a containment study.

22  But that was, I think, not the same as the Todd study I just

23  mentioned.

24    Q.    Okay.  The -- you recall that the water agency

09:09AM  25  wanted to update its investigation and have Whittaker pay for

```
 1    an updated containment study as required under the 2007

 2    settlement agreement.  Do you generally recall that, sir?

 3         A.    I have actually forgotten that issue.

 4         Q.    Okay.  Do you recall that Whittaker was ordered to

 5    pay for that containment study after the arbitration in which

 6    you and Mr. Simpson testified earlier this year?

 7              MR. GALLAGHER:  Objection, Your Honor.  Asked and

 8    answered.

 9              THE COURT:  Overruled.

10              THE WITNESS:  We lost the arbitration.

11         Q.    (BY MR. RICHARD:)  And then Whittaker -- or rather,

12    Meggitt paid for, among other things, the cost of a containment

13    study; is that correct?

14         A.    Not Meggitt.

15              MR. GALLAGHER:  Objection, Your Honor.  Relevance.

16              THE COURT:  Sustained.

17              Rephrase your question.  Well, state another one.

18              MR. RICHARD:  Yes, Your Honor.

19         Q.    (BY MR. RICHARD:)  Let's talk about Well V-201.  Do

20    you recall that well was shut down in about 2011 due to

21    perchlorate contamination?

22         A.    I'm not sure of when it was shut down.  I know it

23    was shut down for a certain amount of time, yes.

24         Q.    Okay.  You were here when Mr. Abercrombie testified

25    last week?
```

Timestamps in left margin:
09:09AM (line 5)
09:09AM (line 10)
09:10AM (line 15)
09:10AM (line 20)
09:10AM (line 25)

1      A.    I was.

2      Q.    You don't have any reason to tell the jury that the

3   well was not shut down in late 2010 or 2011 due to perchlorate

4   contamination, do you?

09:10AM  5      A.    I don't recall him testifying, and I don't have any

6   reason to doubt it as far as the date.  I just don't know the

7   date.

8      Q.    And isn't it true that Whittaker didn't step up in

9   2011 and take responsibility for that perchlorate contamination

09:11AM 10  in that well even though you had an agreement that identified

11  that well as one of the wells for which Whittaker agreed to

12  take responsibility?

13     A.    The --

14          MR. GALLAGHER:  Argumentative, Your Honor.

09:11AM 15          THE COURT:  Sustained.

16     Q.    (BY MR. RICHARD:)  Is it fair to say that Whittaker

17  did not agree to pay for perchlorate treatment for Well V-201

18  at any point in 2011 or 2012?

19          MR. GALLAGHER:  Lacks foundation.

09:11AM 20          THE COURT:  Overruled.

21          You can answer if you know.

22          THE WITNESS:  Well, we did eventually agree.  We

23  entered into a settlement agreement in 2001 that, um, provided

24  for the reuse of treatment vessels from Well Q-2, which is a

09:11AM 25  different well, that were no longer needed because Well Q-2

```
 1   detections had gone down below the minimum contaminant level.
 2           MR. RICHARD:  I think we're straying from the
 3   question, Your Honor.
 4           THE WITNESS:  I think I'm trying to answer it,
 5   but -- okay.  Sorry.
 6           THE COURT:  And this is largely nonresponsive.  It's
 7   stricken.
 8           The jury is to disregard it.
 9           Ask your question, please.
10           MR. RICHARD:  Thank you, Your Honor.
11       Q.   (BY MR. RICHARD:)  For Well V-201, after it was shut
12   down, isn't it true that Whittaker did not agree to pay for
13   perchlorate treatment, that is, treatment to remove the
14   perchlorate, in either 2011 or 2012 or 2013 or 2014?  Isn't
15   that true?
16           MR. GALLAGHER:  Argumentative.  Lacks foundation.
17           THE COURT:  Overruled.
18           THE WITNESS:  I don't recall the date of our
19   agreement on --
20       Q.   (BY MR. RICHARD:)  Okay.
21       A.   -- Well V-201.
22       Q.   But you recall that, eventually, some number of
23   years later, Whittaker eventually agreed to take responsibility
24   and pay for treatment at that well that had been shut down?
25       A.   Yes.  Whittaker and the agency entered into an
```

735

```
  1    agreement to take care of the costs of the installation of the
  2    treatment system at Well V-201.
  3         Q.   Do you recall that Whittaker did that after a call
  4    to you personally from the general manager of Castaic Water,
  5    one of the water agencies, Dan Mesnada, on Christmas Eve 2014?
  6    Do you recall that conversation?
  7         A.   Well, no, I don't.
  8         Q.   Okay.  You know who Dan Mesnada is?
  9         A.   Yeah, I do.
 10         Q.   Okay.  You spoke to him from time to time?
 11         A.   I did.  I did.
 12         Q.   And so you're not denying that he called you on
 13    Christmas Eve 2014 imploring you to have Whittaker step up so
 14    they could get treatment and get that well running again?  You
 15    don't deny that, do you?
 16              MR. GALLAGHER:  Argumentative.  Assumes facts.
 17              THE COURT:  Sustained.
 18         Q.   (BY MR. RICHARD:)  Sir, you're just saying you don't
 19    recall one way or the other whether Mr. Mesnada called you on
 20    Christmas Eve 2014.  Is that fair?
 21         A.   I don't recall such conversation, no.
 22         Q.   Did Mr. Mesnada say, in effect, in a conversation in
 23    December 2014 regarding Well V-201 that had been shut down for
 24    several years at that point due to perchlorate contamination,
 25    "Eric" -- and I'm just -- words to the effect, "poop or get off
```

09:13AM (line 5)
09:13AM (line 10)
09:13AM (line 15)
09:14AM (line 20)
09:14AM (line 25)

**UNITED STATES DISTRICT COURT**

1    the pot"?

2              MR. GALLAGHER:  Argumentative.  Lacks foundation.

3              THE COURT:  Overruled.

4              Just to -- if it refreshes your memory, since it's

09:14AM   5  particularly colorful, as to having that conversation.

6              THE WITNESS:  I -- I don't recall it.  It could have

7    happened, though.

8         Q.   (BY MR. RICHARD:)  All right.  Sounds like something

9    Mr. Mesnada might say.  Is that fair?

09:14AM  10       A.   I don't -- I wouldn't put words in his mouth.

11        Q.   Okay.  Do you recall that Mr. Mesnada sent you a

12   letter in December, a couple of days before Christmas, of an

13   intent to initiate another arbitration if Whittaker didn't take

14   responsibility for the perchlorate contamination at Well V-201?

09:15AM  15       A.   I don't recall the letter.

16        Q.   Okay.  Wasn't there another dispute when Whittaker

17   refused to pay for replacement water when one of the wells was

18   destroyed, a well near Magic Mountain Parkway?

19             MR. GALLAGHER:  Argumentative.  Assumes facts.

09:15AM  20   Lacks foundation.

21             THE COURT:  Sustained.

22        Q.   (BY MR. RICHARD:)  Do you recall that there was

23   another issue between Whittaker and the water agencies

24   regarding a well near Magic Mountain Parkway?

09:15AM  25             MR. GALLAGHER:  Vague.

```
 1              THE WITNESS:  I wouldn't characterize --

 2              THE COURT:  Overruled.

 3              You can answer.

 4              THE WITNESS:  I wouldn't characterize the dispute

 5   quite that way.  There was a dispute over a change in the well

 6   locations for some large replacement wells that Whittaker had

 7   agreed to pay for.

 8              Under the 2007 agreement, the agency wanted to move

 9   the location from an area that was -- west of Magic Mountain,

10   west of the 405 Freeway to an area that was closer to -- or on

11   the other side of the freeway, closer to the site.  There was

12   this -- there was a dispute over this well relocation issue,

13   and that went through a -- a -- the dispute resolution process

14   with an arbitrator, and we settled that one as well.

15        Q.   (BY MR. RICHARD:)  So you do generally recall that

16   dispute?

17        A.   I do.

18        Q.   And you recall that the water agency -- you said

19   they wanted to move the treatment system or the well.  Isn't it

20   true that they could not obtain an easement from a property

21   owner?  Do you recall that aspect of the dispute?

22        A.   Well, these were new wells.  They were replacement

23   wells.  And there was an issue regarding the well site that

24   they had designated as part of the settlement agreement.  And,

25   you know, our concern -- well, sorry.  I think I've answered
```

09:15AM (line 5)
09:16AM (line 10)
09:16AM (line 15)
09:16AM (line 20)
09:17AM (line 25)

the question.

Q.   Okay.  And my question is -- you're correct, there
was an issue with the replacement well.  But do you also recall
there was an issue not with the water agency wanting to place
09:17AM   the replacement well somewhere else but they had to because
they couldn't get an easement from the property owner?  Do you
recall that aspect of the dispute?

A.   What I recall is probably not completely accurate
over this many years.  But I recall there was an issue with the
09:17AM   ability of the agency to locate the wells and the pipelines
that were part of the replacement well project where they
wanted to west of Magic Mountain.  I -- I don't recall anything
about an easement that -- that's not -- I don't recall that.

Q.   Okay.

09:18AM   A.   There was an issue about the -- the property rights
to install the wells at that location.

Q.   Okay.  And it's fair to say -- I don't want to spend
too much time on this additional dispute.  But after the
initiation of another arbitration, Whittaker ended up agreeing
09:18AM   to pay about $8 million on that one; is that right?

A.   We entered into a settlement agreement that had a
cap of about $8 million with some other provisions in it.
Maybe it's 9 million.  It's somewhere between 8 and 9 million.

Q.   And do you recall another issue with the water
09:18AM   agency -- again, after entering into a 2007 settlement

1    agreement to pay for perchlorate contamination at identified

2    wells, do you recall another dispute regarding costs to

3    rehabilitate the wells at Saugus 1 and Saugus 2?

4        A.    There was a procedure for a cost consultant to

09:19AM   5    review disputes over costs between the parties, and we went

6    through the cost consultant procedure regarding the

7    refurbishment of some equipment on the, um, Saugus 1 and

8    Saugus 2 wells.

9        Q.    So let's see if we have the chronology right on this

09:19AM   10    one.

11           The water agency requested Whittaker to pay to

12    refurbish the cost to rehabilitate those wells.  You go through

13    a cost consultant arbitration or it is at least started, and

14    then Whittaker agrees to pay almost $3 million on that one?

09:19AM   15        A.    I don't recall the amount, but you're right, we did

16    initiate the cost consultant procedure.  And parties met, and

17    consultant got the parties to agree to the costs.  I don't

18    recall 3 million.

19        Q.    Okay.  And then just earlier this year, you were

09:20AM   20    involved in the -- another dispute with the water agencies that

21    you alluded to.  And in that one, Whittaker actually accused

22    the water agency of breaching the 2007 settlement agreement.

23    Do you recall that?

24        A.    I don't.

09:20AM   25        Q.    Okay.  Do you recall that just five or six months

1    ago Whittaker said it had no obligation to pay for the

2    perchlorate treatment system for the contaminated well,

3    Well Q-2, because the water agency had breached the agreement?

4        A.   We already discussed that issue.  We had an

09:20AM   5    arbitration over -- maybe I'm mixing it up.  There was a --

6    that was the arbitration that I said we lost.  It was a dispute

7    over whether Whittaker was required under the settlement

8    agreement to pay for new equipment at Well Q-2 to treat water

9    at that well.

09:21AM   10        Q.   And after the -- is it fair to say that the judge

11    rejected Whittaker's claims that the water agency had breached

12    the agreement and rejected all of Whittaker's other excuses.

13    Then Whittaker paid for a perchlorate treatment system, a

14    containment study, as well as replacement water costs?

09:21AM   15             MR. GALLAGHER:  Objection, Your Honor.

16    Argumentative.

17             THE COURT:  Sustained.

18             THE WITNESS:  We complied with the --

19             THE COURT:  I sustained the objection.

09:21AM   20             THE WITNESS:  Sorry.

21        Q.   (BY MR. RICHARD:)  It's correct that after you, in

22    your words, lost the arbitration, Whittaker agreed to pay for a

23    perchlorate treatment system at Well Q-2?  Is that fair?

24        A.   Yes.

09:22AM   25        Q.   And part of what Whittaker was ordered to pay

```
 1  earlier this year was replacement water costs of over a million

 2  dollars based on the same calculations for Mr. Abercrombie who

 3  testified in this proceeding; isn't that correct?

 4              MR. GALLAGHER:  Assumes facts.  Lacks foundation.

 5  Calls for speculation.

 6              THE COURT:  Do you know the answer to this question?

 7  Yes or no.

 8              THE WITNESS:  No.

 9       Q.    (BY MR. RICHARD:)  Do you have any memory that

10  replacement water was one of the issues in that arbitration a

11  few months ago?

12       A.    Yes.

13       Q.    And you were present when Mr. Abercrombie testified

14  in that proceeding about his calculations?

15              MR. GALLAGHER:  Objection, Your Honor.  Relevance.

16              THE COURT:  Overruled.

17              THE WITNESS:  I thought it was Mr. Cole who

18  testified at that arbitration, not Mr. Abercrombie.

19       Q.    (BY MR. RICHARD:)  Okay.  So you don't -- the answer

20  is you don't recall -- or you're not sure that Mr. Abercrombie

21  also testified in that proceeding.  Is that fair?

22       A.    I don't recall Mr. Abercrombie's testimony in the

23  arbitration.  But replacement water was one of the issues.

24       Q.    Oh.  Okay.  And with respect to replacement water,

25  you recall that Whittaker paid about a million dollars for
```

09:22AM (line 5)
09:22AM (line 10)
09:22AM (line 15)
09:23AM (line 20)
09:23AM (line 25)

742

```
 1    that?
 2         A.    I don't recall the amount, but we did pay it
 3    pursuant to the arbitrator's award.
 4         Q.    So is that what Whittaker means when it tells the
 5    jury that it takes responsibility for perchlorate
 6    contamination; that after it's sued or a claim is made or some
 7    number of years have gone by, then Whittaker takes
 8    responsibility?
 9              MR. GALLAGHER:  Objection, Your Honor.
10    Argumentative.
11              THE COURT:  Sustained.
12         Q.    (BY MR. RICHARD:)  Sir, would you agree that it
13    would be more accurate to say that Whittaker takes
14    responsibility only if and when the water agency threatens to
15    take the agency -- to take Whittaker to court or arbitration?
16              MR. GALLAGHER:  Same objection.
17              THE COURT:  Sustained.
18              Next question.  Different subject.
19         Q.    (BY MR. RICHARD:)  As custodian of records and
20    president of Whittaker, isn't it true that, when Whittaker
21    acquired Bermite and made a division of Whittaker, Whittaker
22    acquired the assets and liabilities of Bermite?
23              MR. GALLAGHER:  Misstates prior testimony.  Assumes
24    facts.  Lacks foundation.
25              THE COURT:  Sustained.
```

09:23AM (line 5)
09:23AM (line 10)
09:23AM (line 15)
09:24AM (line 20)
09:24AM (line 25)

1    Q.    (BY MR. RICHARD:)  You recall that Bermite became a

2    division of Whittaker at some point in time?

3              MR. GALLAGHER:  Lacks foundation.  Calls for

4    speculation.

09:24AM    5              THE COURT:  Do you know the answer to the question?

6              THE WITNESS:  It's vague as to Bermite.

7              THE COURT:  Ask another question, please.

8              MR. RICHARD:  Sure.

9    Q.    (BY MR. RICHARD:)  You told us a few minutes ago

09:24AM   10    that you read the Complaint in this matter.  Do you recall

11    that?

12    A.    Yes.

13    Q.    And you recall that the Complaint in this matter

14    alleged that Whittaker acquired Bermite and Bermite Powder in

09:24AM   15    1967 pursuant to an acquisition agreement?

16    A.    I don't recall that allegation from the Complaint,

17    Counsel.

18    Q.    Okay.  Well, let -- sir, do you recall that in this

19    proceeding, that Whittaker has agreed that it is the -- that it

09:25AM   20    acquired the assets and liabilities of Whittaker-Bermite

21    Corporation and Bermite Powder Company?

22    A.    I deny that.

23    Q.    I'm sorry.  You said what?

24    A.    I deny that.

09:26AM   25    Q.    You know what an answer to a Complaint is, don't

1    you?

2         A.    I do.

3         Q.    In response to a specific allegation that

4    Whittaker Corporation is a successor to the assets and

09:26AM   5    liabilities of its predecessor entities, including Bermite and

6    Bermite Powder Company, Whittaker admitted that allegation, did

7    it not?

8              MR. GALLAGHER:  Misstates the allegation.  Lacks

9    foundation.

09:26AM  10              THE COURT:  I'm going to sustain it on lacking

11    foundation.

12         Q.    (BY MR. RICHARD:)  Okay.  So you read the Complaint

13    in this matter; correct?

14         A.    Yes.

09:27AM  15              MR. RICHARD:  And, Your Honor, may I show the

16    witness a couple of pages from that Complaint that I think are

17    marked as Exhibit 528 or --

18              THE COURT:  Before you do so, establish a foundation

19    with respect to the answer.

09:27AM  20              MR. RICHARD:  Oh.  Very good.

21         Q.    (BY MR. RICHARD:)  And I think -- you know what an

22    answer to a Complaint is; correct?

23         A.    Yes.

24         Q.    And as general counsel, you're aware that Whittaker

09:27AM  25    submitted an answer to the Court in response to the Third

1   Amended Complaint in this proceeding; correct?

2        A.    Yes.

3        Q.    And did you review that answer?

4        A.    I don't recall the review.

09:27AM   5        Q.    You understand, as you sit here, that the answer

6   admitted the allegations regarding Whittaker acquiring the

7   assets and liabilities of Bermite?

8             MR. GALLAGHER:  Assumes facts.  Lacks foundation.

9   Misstates the answer.

09:28AM  10             THE WITNESS:  Well, I've since --

11             THE COURT:  I'm going to overrule the objection.

12   But -- actually, let me ask you a question.

13             THE WITNESS:  Sure.

14             THE COURT:  You said that you don't recall reviewing

09:28AM  15   the answer.  Would you expect, given your practice and given

16   your title, that you would have read the answer in this case?

17             THE WITNESS:  Sometimes I don't read what I --

18   sorry.  Sometimes I don't read what I receive.  I have to be

19   honest about that.

09:28AM  20             THE COURT:  But you did receive the answer in this

21   case or you did not or you don't recall?

22             THE WITNESS:  I did receive the answer, the draft

23   answer from counsel.

24             THE COURT:  All right.  I'm going to find -- thank

09:28AM  25   you, sir.

**UNITED STATES DISTRICT COURT**

1          I'm going to find there's sufficient foundation in

2   this matter.

3          You can -- ask another question, please.

4          MR. RICHARD:  Certainly.

09:28AM   5   Q.   (BY MR. RICHARD:)  As you sit here, you know that

6   Whittaker admitted in its answer that it acquired the assets

7   and liabilities of Bermite pursuant to that 1967 agreement;

8   right?

9          MR. GALLAGHER:  Objection, Your Honor.  Asked and

09:28AM   10   answered.

11          THE COURT:  Overruled.

12          THE WITNESS:  In each claim for relief, which I -- I

13   have looked at the answer since that time, Counsel.  In each

14   claim for relief, there is a -- an allegation in the Complaint

09:29AM   15   and a response to that allegation in the answer.  And in the

16   answer by Whittaker at the beginning of each claim for relief,

17   Whittaker denies that allegation.

18   Q.   (BY MR. RICHARD:)  Well, then, let's -- let's go

19   through it briefly.

09:29AM   20   A.   Sure.

21   Q.   So there was a Third Amended Complaint in this

22   action.  Do you recall that, sir?

23   A.   I have seen it, yes.

24   Q.   Okay.  And paragraph 15 states, quote, "Plaintiff

09:30AM   25   has informed and believes and on that basis alleges that

09:30AM

09:30AM

09:30AM

09:31AM

09:31AM

```
 1  Whittaker Corporation is the successor to the assets and
 2  liabilities of its predecessor entities.  Whittaker's
 3  predecessor entities include, but are not limited to, the
 4  following companies:  Whittaker-Bermite Corporation,
 5  Whittaker Porta Bella, Inc., Bermite Powder Company, and
 6  Los Angeles Powder Company, collectively referred to with the
 7  Whittaker Corporation as," quote, "'Whittaker,'" close quote.
 8  That's paragraph 15.
 9          And then in the answer that you said you are
10  familiar with, it reads for paragraph 15, quote, "Whittaker
11  admits on information and belief the averments of
12  paragraph 15," period, close quote.
13          Do you recall that's the way it works, there's an
14  allegation in a paragraph and then Whittaker has to admit or
15  deny that?
16      A.    The allegation in the paragraph, I do recall that
17  response in the answer.  But, as I just stated, there is a
18  repetition of that allegation in the claim for relief.  Each
19  claim for relief starts off with a repetition of allegations.
20  And in each case, Whittaker denied the allegations.
21      Q.    And paragraph 16 of the Third Amended Complaint
22  alleged, quote, "Plaintiff has informed and believes and on
23  that basis alleges that Whittaker has owned the Whittaker site
24  since at least 1943 and manufactured explosive products at the
25  Whittaker site from 1943 until at least 1987," period, close
```

```
         1    quote.
         2           And Whittaker's answer to that specific paragraph
         3    was, quote, "Whittaker admits on information and belief the
         4    averments of paragraph 16," period, close quote.
09:31AM  5           Isn't that correct?
         6    A.    You've left out some words.
         7           So the allegation in paragraph 15 has two sentences.
         8    The second sentence actually defines the word "Whittaker" to
         9    include an entity that never existed, Whittaker-Bermite
09:32AM 10    Corporation.  Bermite Powder Company, Los Angeles Powder
        11    Company, and one other company, together with Whittaker
        12    Corporation in the Complaint, that was all defined to be,
        13    quote, "Whittaker."
        14           Then in paragraph 16, the one you just read, it
09:32AM 15    alleges that Whittaker, including all of these corporations,
        16    owned the property from 1943 to present.  And that was admitted
        17    on information and belief in the answer.
        18    Q.    Who's Rene Simmons?
        19    A.    He is an attorney at Covington & Burling.
09:32AM 20    Q.    And before that, he was with Pillsbury; is that
        21    right?
        22    A.    Yes.
        23    Q.    And you've worked with him for 10, 15 years?
        24    A.    20.
09:33AM 25    Q.    Okay.  Thank you.  I stand corrected.
```

1           And you recall that, when Mr. Simmons was with

2    Pillsbury, he initiated litigation on behalf of Whittaker

3    against the United States of America.  Do you recall that?

4           A.    He did.

09:33AM  5           Q.    And before Whittaker filed a lawsuit in federal

6    court, in this federal court, Central District of California,

7    wouldn't it have been your practice to become familiar with the

8    allegations in that Complaint?

9           A.    Yes.

09:33AM  10          Q.    And so you recall that in a First Amended Complaint

11   filed in 2013, Whittaker alleged, quote, at paragraph 15,

12   "Whittaker purchased the stock, assets, and liabilities of

13   Bermite in 1967 and owned and operated the site until 1998,"

14   period, close quote.

09:33AM  15          Was that allegation correct when it was in the

16   Complaint filed on behalf of Whittaker in federal court?

17          A.    It is correct, although not detailed.

18          So Whittaker acquired the stock of Bermite Powder

19   Company from its stockholders in September 1967.  So there are

09:34AM  20   four individual stockholders.  Whittaker acquired the stock of

21   Bermite Powder Company from those individuals, shareholders.

22          In October of 1967, Bermite Powder Company, which is

23   still a separate corporation, and Whittaker Corporation entered

24   into an indenture agreement.  And the indenture agreement

09:34AM  25   comprised a grant by the grantor, Bermite Powder Company, to

                 1   the grantee, Whittaker Corporation, of the assets of Bermite
                 2   Powder Company, both real property and personal property.
                 3       Q.    I think you answered my question.  So maybe I'll
                 4   move to strike everything after "yes."
09:35AM          5             THE COURT:  The motion is denied.  The answer will
                 6   stand.
                 7             MR. RICHARD:  Okay.
                 8       Q.    (BY MR. RICHARD:)  And just so we're clear, though,
                 9   the allegation in the Complaint filed by Mr. Simmons on behalf
09:35AM         10   of Whittaker against the United States of America alleging that
                11   Whittaker purchased the stock, assets, and liabilities of
                12   Bermite, that was a correct allegation at the time it was made
                13   in 2013?
                14       A.    Not quite.  It's -- it's oversimplified.
09:35AM         15             As I just testified, Whittaker acquired the stock.
                16   And then pursuant to a separate post-acquisition indenture,
                17   Whittaker acquired the assets of Bermite Powder Company.  So
                18   it's -- maybe I'm being too technical.  I'm sorry.  But it's an
                19   oversimplification in the Complaint.
09:36AM         20       Q.    That's -- let's move on.
                21             We've been talking about perchlorate contamination.
                22   And it's your testimony that Whittaker now acknowledges that
                23   perchlorate contamination in the water agencies' wells is the
                24   responsibility of Whittaker.  Did I get that generally correct?
09:36AM         25       A.    We have acknowledged in this lawsuit that the

allegation that the perchlorate detected in Well 205 is
Whittaker's responsibility.  We're not disputing liability
of -- for that contamination.

Q.    With respect to other contaminants, you learned
shortly after you started with Whittaker over 20 years ago that
Whittaker was finding TCE in the soil at the Bermite-Whittaker
site; is that correct?

A.    Yeah.  Shortly after I started, I read the remedial
investigation of the site by Acton-Mickelson as a consulting
firm, environmental.  And they had surveyed the site for, among
other things, TCE and had found it in the soil at the site.

Q.    Okay.  And fair to say that you learned, for
example, that the State Department of Toxic Substances had also
detected TCE at the Whittaker site, in particular 1993?

MR. GALLAGHER:  Calls for speculation.

THE COURT:  Sustained.  Lack of foundation at this
point.

Q.    (BY MR. RICHARD:)  Oh, okay.

You do recall receiving an order in 2002.  You were
with Whittaker -- Meggitt USA in 2002; is that correct?

A.    I was employed by Meggitt USA, and I had a title of
vice president, secretary, and general counsel of Whittaker
Corporation in 2002.  And I did receive an order from the DTSC
at the time.

Q.    Okay.  And you recall that one of the facts noted in

1   that order was that DTSC had detected TCE in 1993 at the

2   Whittaker site.  Is that fair?

3        A.   I do not recall the statement that you just read.  I

4   don't recall it.

09:38AM  5        Q.   Okay.

6        A.   Whatever -- whatever it says, it says.

7        Q.   Do you recall learning at some point that Whittaker

8   was also detecting TCE in the groundwater beneath the nearly

9   thousand-acre site?

09:38AM 10        A.   My recollection is that Acton-Mickelson had

11   installed five or so groundwater monitoring wells at the site.

12   I -- I don't recall the sample results from those wells.

13        Q.   Do you recall that both TCE and PCE were detected in

14   at least an area known as Burn Valley at some point in the

09:39AM 15   '90s?

16        A.   I don't recall it.

17        Q.   Wasn't there a point in time, say, August 2019, when

18   you concluded that TCE and other contaminants like PCE did not

19   even have the potential to migrate to drinking water supplies,

09:39AM 20   sir?

21        A.   I didn't join the company until April of 2020.  So I

22   don't know what conclusions the company reached on that subject

23   in 2019.

24        Q.   I'm sorry.  You were with the company in 2019?

09:39AM 25        A.   No.  Oh, 2019.  I'm sorry.

1    Q.    That's all right.

2    A.    We've been jumping around.  I'm sorry.  I thought --

3    I was understanding it -- 2019.  Yeah.  20 -- yeah, 2020 --

4    Q.    I'll ask it again.

09:40AM    5    A.    I'm sorry.  I was confusing 1999 with 2019.  Can you

6    restate the question again?

7    Q.    I have to confess, I sometimes do the same thing.

8    A.    You completely threw me off with the "when you

9    became employed."  Okay.  Go ahead.

09:40AM    10    Q.    It was not my intent, sir.

11         Isn't it -- isn't it fair that at some point, while

12    you were with Whittaker -- and I was picking 2019 as a frame of

13    reference --

14    A.    Right.

09:40AM    15    Q.    -- you concluded that TCE and PCE and other

16    contaminants did not even have the potential to migrate to

17    drinking water supplies?

18         MR. GALLAGHER:  Objection.  Vague.  Overbroad.

19    Lacks foundation.

09:40AM    20         THE COURT:  Sustained.

21    Q.    (BY MR. RICHARD:)  So you learned at some point

22    before 2019 that Whittaker and its consultants and the State of

23    California had detected TCE and PCE in the soil; is that

24    correct?

09:41AM    25    A.    In 2019, yes.  The site had been very well

1  characterized, and there was -- there had been detections in

2  prior remedial investigations of TCE and PCE in the soil.  By

3  2019, the soil would have had -- would have been -- would have

4  gone through a remediation process.

09:41AM  5       So I think generally the answer is there was TCE and

6  PCE in the soil, and then it went through a remediation process

7  to remove those chemicals.  I think that's probably the best

8  way to say it.

9       Q.   Is it fair to say that as of 2019, you were not

09:41AM  10  entirely sure about PCE being at the site?

11       A.   Yeah.  PCE, I -- I've -- I wasn't entirely sure

12  about PCE.  I had more understanding on TCE.

13       Q.   But now you know that -- although you weren't

14  entirely sure even in 2019, now you know, as you sit here

09:42AM  15  today, that PCE, in fact, has been detected throughout the

16  site?

17       A.   Oh, I wouldn't say throughout.  There were -- there

18  were 34 -- well, approximately 34 acres of the site that had

19  VOC contamination issues, as identified through the remedial

09:42AM  20  investigations.  The site is like a thousand acres, so it's

21  like three-and-a-half percent.

22       Q.   My question is:  In 2019, I think you just told us,

23  you weren't sure if there was PCE at the site.  And I'm just

24  asking, as you sit here today, whether it's 34 acres or

09:42AM  25  30 acres, you don't deny that PCE has been detected at the

**UNITED STATES DISTRICT COURT**

```
 1   Whittaker site by Whittaker's own consultants?
 2        A.    Correct.  They have detected PCE in soil.
 3        Q.    Right.
 4              And Whittaker's consultants have measured the pounds
 5   of both TCE and PCE that they've been removing from the
 6   Whittaker site.  You're generally aware of that.  Is that fair?
 7        A.    Yes, I am.
 8        Q.    Okay.  And we mentioned the 2002 order.  That's
 9   Exhibit 1 in these proceedings.  And that's an order you've
10   certainly read before today; correct?
11        A.    Yes.
12        Q.    And if you could look at Exhibit 1.  I believe this
13   is already in evidence.  And this is the -- what is this, sir?
14        A.    Imminent and Substantial Endangerment Determination
15   Order and Remedial Action Order.
16        Q.    And this was from the State of California, the --
17   basically the California EPA, Environmental Protection Agency;
18   is that correct?
19        A.    I believe the Department of Toxic Substances Control
20   is one of the divisions of the California EPA.
21        Q.    And the respondent is Whittaker Corporation; right?
22        A.    Correct.
23        Q.    And if you could turn to page 4.  And this is an
24   order you've read prior to today; right?
25        A.    Correct.
```

```
 1        Q.    In fact, you attached it to a declaration you
 2   submitted in another proceeding, stating that there was a true
 3   and correct copy attached to your declaration.  Is that fair?
 4        A.    I don't know if it's the same copy, but, yes, I
 5   attached it to a declaration.
 6        Q.    Okay.  And so certainly by 2002, you've been with
 7   Whittaker for a couple of years.  You became aware that there
 8   was a prior Consent Order between the State of California and
 9   Whittaker Corporation?
10        A.    Yes, I was aware of that.
11        Q.    And we see a reference to that 1994 order in the
12   last sentence of paragraph 1.3 at page 4?
13        A.    Correct.
14        Q.    Respondent remains subject to Consent Order with
15   respect to the site, effective on or about November 21, 1994.
16              And you've reviewed that Consent Order prior to
17   today?
18        A.    Yes.
19        Q.    And if we could go to Exhibit 486, which I believe
20   is already in evidence.  And Exhibit 1 -- I'm sorry.
21   Exhibit 486, page 1, is a cover letter to Mr. Gordon Louttit of
22   Whittaker Corporation.  Do you see that?
23        A.    I do.
24        Q.    And this is attaching that Consent Order.  If we
25   could go to page 4 of the document.  This is the Consent Order,
```

09:44AM  (line 5)
09:45AM  (line 10)
09:45AM  (line 15)
09:45AM  (line 20)
09:46AM  (line 25)

1    sir?

2        A.    Yes.

3        Q.    And so this is a document that Whittaker Corporation

4    agreed to; correct?

09:46AM   5        A.    Correct.

6        Q.    And I want to ask you, by 2002, did you have a

7    general understanding that there were two different types of

8    sites that -- from the perspective of the EPA and California

9    EPA, there were two different types of sites regarding

09:46AM  10    potential contamination at Whittaker, something called

11    hazardous waste management units and something called SWMUs,

12    solid waste management units?

13        A.    I read the distinction between those two different

14    kinds of units in my review of the Consent Order in the last

09:47AM  15    couple of days.  I -- prior to that, I didn't have that

16    understanding.

17        Q.    Okay.  Well, why don't we look at page 11,

18    paragraph 2.3.2, Hazardous Waste Management Units.  Do you see

19    that's the title of this section of 486?

09:47AM  20        A.    Correct.

21        Q.    And then in -- you were here in court last Friday

22    when Mr. Blum asked the witness about this page of this

23    document?

24        A.    I was here in court.  I don't -- I don't recall the

09:47AM  25    examination on this page.

```
 1        Q.    Okay.  Paragraph 2.3.2.2 says, quote, "From

 2   August 15th, 1983, to November 30th, 1983, respondent filed

 3   three letters with the department describing closure activities

 4   of the interim status hazardous waste management units which

 5   had been completed without an approved closure plan."

 6            And my first question is:  Is that generally a

 7   correct statement, that Whittaker in the early '80s closed

 8   certain hazardous waste management areas without an approved

 9   closure plan from the State of California?

10            MR. GALLAGHER:  Objection, Your Honor.  Lacks

11   foundation.  Calls for speculation.

12            THE COURT:  Sustained.

13        Q.    (BY MR. RICHARD:)  If we go down to the next

14   paragraph, paragraph 2.3.2.3, it states, quote, "The closure

15   plan has been implemented for all of the hazardous waste

16   management units.  13 of the 14 units were closed by the

17   department."

18            Do you see that?

19            MR. GALLAGHER:  Same objection, Your Honor.

20            THE COURT:  Sustained.

21            Establish a foundation --

22            MR. RICHARD:  Sure.

23            THE COURT:  -- first, please.

24        Q.    (BY MR. RICHARD:)  I think you told us a minute ago,

25   you have reviewed this Consent Order from 1994; correct?
```

09:48AM (lines 5, 10, 15, 20, 25)

1        MR. GALLAGHER:  Misstates his prior testimony.

2        THE COURT:  And, Counsel, to be clear on the

3   foundation, if you're asking him to state whether certain facts

4   in this document are true and correct, then you need to

09:49AM  5   establish an appropriate foundation.

6        MR. RICHARD:  No, I understand, Your Honor.

7        THE COURT:  Okay.

8        MR. RICHARD:  Yes.  Very good.

9        Q.   (BY MR. RICHARD:)  My question is:  You understood,

09:49AM 10   certainly by 2002, that there were not just 14 areas, 14 units

11   of concern to the State of California that were subject to this

12   Consent Order in 1994; correct?

13        MR. GALLAGHER:  Asked and answered.

14        THE COURT:  Overruled.

09:49AM 15        You can answer that question.

16        THE WITNESS:  Okay.  You're asking about my

17   understanding in 2002.  And I -- I do not recall having that

18   understanding in 2002.

19        Q.   (BY MR. RICHARD:)  Okay.  If we could turn to

09:50AM 20   page 12.

21        Is it fair to say that at some point during your

22   tenure with Whittaker, you understood that there were some

23   things called hazardous waste management units.  And we just

24   talked about 14 of those.  And then there was something else

09:50AM 25   called solid waste management units?  I think you told us a

minute ago you were generally familiar with that distinction. Is that fair?

        MR. GALLAGHER:  Misstates prior testimony, and it was asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  Right.  So I read this document recently.  And I saw that distinction in the document recently, my -- while this trial has been going on.  So I can see the distinction in the document.  I don't recall having had that understanding of there being a distinction at any prior time.

    Q.    (BY MR. RICHARD:)  So if we could look at page 13, paragraph 2.3.3.4.

    A.    Okay.

    Q.    There's a reference to an Exhibit 3.  Do you see that?

    A.    Yes, I see that.

    Q.    And my question is:  Have you seen -- if you jump to page 54 of the document, Exhibit 3 is a list of potential SWMUs.  It begins with, No. 1, former Building 317, that 317 impoundment.  Do you see that?

    A.    Yes.

    Q.    And my question is:  Before 2019, were you aware that there were 77 SWMUs -- this runs through page 56 of the document -- mentioning Orofino Canyon, East Fork landfill, Hula Bowl Canyon, and ends with ravine below former

Building 236, Item No. 77.

Did you understand by at least 2019, that there were not just 14 units of concern but that there were 77 areas called SWMUs, solid waste management units, at the Whittaker site?

09:52AM

A.   Well, this list starts off with the word "potential," which is what it means, potential SWMUs.  And I did read this recently, within the last couple of days.  And that's what I know about it.  I don't recall having had any understanding of SWMUs -- or SWMUs or however it's pronounced -- prior to that time.  I don't recall having that understanding.

09:52AM

But I can read the document, I can see this is a list of potential such units.

Q.   Well, when you started with Whittaker, didn't you understand in April or May or June 2000 that Whittaker was then operating under this Consent Order and was required to investigate these potential areas of contamination?

09:53AM

A.   Well, um, not exactly.  I did understand the Consent Order didn't go away as a result of the sale of the property. But the company had sold the property in -- prior to my time. But I did look at the sale agreement in 1999 to a remediation company called Remediation Financial, Inc.  And they, this remediation company, went into their own agreement with the DTSC in, like, 2001, they call it an enforceable agreement.

09:53AM

```
 1              So I did understand under the enforceable agreement
 2     that that didn't let Whittaker off the hook.  It says that.
 3     But, um -- but nevertheless, because that was the performing
 4     party at the time, that was the company that was doing the
 5     remediation at that time.
 6         Q.   Did you ever call up the -- your predecessor, the
 7     general counsel for Whittaker, Gordon Louttit, and ask him how
 8     come Whittaker hadn't completed the remediation and
 9     investigation at some point in the '80s or '90s or before the
10     1999 sale?
11              MR. GALLAGHER:  Objection, Your Honor.  Assumes
12     facts.  Lacks foundation.
13              THE COURT:  Sustained.
14         Q.   (BY MR. RICHARD:)  You know who Gordon Louttit was;
15     correct?
16         A.   I know who Gordon Louttit was, yes.
17         Q.   And it's fair to say that, when you started with
18     Whittaker, you understood that Whittaker had not completed an
19     investigation and remediation, that is, removal of the
20     contamination by 1999?  Can we agree on that?
21         A.   No, we cannot agree on that.
22              There was a complete -- completed remedial
23     investigation performed by the consultant I mentioned
24     previously, Acton-Mickelson, and that RI -- we call it an RI --
25     it's like 7,000, 10,000 pages, it's huge -- had been completed
```

09:54AM (line 5)
09:54AM (line 10)
09:54AM (line 15)
09:55AM (line 20)
09:55AM (line 25)

```
 1    prior to me joining Whittaker.  And that work was done by

 2    Whittaker.

 3             Now, as far as the remediation, that is true, the

 4    remediation of the site was not completed as of my joining

 5    of -- with Whittaker.

 6       Q.   Okay.  So it's your testimony that you thought when

 7    you started, that the investigation of those 77 solid waste

 8    management units had been completed by 1999?  Did I hear that

 9    right?

10       A.   I can't be that precise.  There was a completed

11    remedial investigation pursuant to the 1994 order that this is

12    an exhibit to and that had been approved by the DTSC.

13             So whatever was required for that remedial

14    investigation by the Government, they -- they got done.  Did it

15    include this list?  I don't know that.  I -- I would only be

16    making guesses.

17       Q.   Well, you -- you certainly knew it by 2002 when you

18    read the order that you just told us about, the Imminent and

19    Substantial Endangerment Determination and Order directed to

20    Whittaker, which attached the same 77 SWMUs; correct?

21       A.   I don't recall that from that order.  If it's there,

22    it's there.

23       Q.   Okay.  Why don't we go back to Exhibit 1.  If we

24    just go to page 1, I think it's page 70 of Exhibit 1.  1.70.

25             MR. RICHARD:  Your Honor, just a moment.  I think
```

09:55AM (line 5)
09:55AM (line 10)
09:56AM (line 15)
09:56AM (line 20)
09:58AM (line 25)

```
 1    the parties swapped out Exhibit 1's in their effort to comply
 2    with the Court order, and the copy we received apparently
 3    didn't have all the pages.  So we'll try to remedy that
 4    promptly.
 5          THE COURT:  Can you move on to another subject?
 6          MR. RICHARD:  Sure, Your Honor.  Yes.
 7          And I apologize.  We had the complete copy up until
 8    yesterday.
 9          Okay.  We'll come back to that.
10          Your Honor, I think we have a hard copy for the
11    witness, the complete copy, because this really is what I'm
12    going to end on.  So I can't effectively move on --
13          THE COURT:  That's fine.
14          MR. RICHARD:  -- without the complete copy.  If it's
15    convenient for the witness or we have an extra copy for the
16    witness, to move matters along --
17          THE COURT:  I don't know if he has Exhibit 1.
18          Do you, Mr. Lardiere?
19          MR. RICHARD:  May we approach to move it along,
20    Your Honor?
21          THE COURT:  Let's go ahead and bring him a copy,
22    please.
23          MR. RICHARD:  Okay.
24     Q.   (BY MR. RICHARD:)  Why don't we go to just page 9 in
25    Exhibit 1.  I think this was in the copy we were provided.
```

Timestamps in left margin:
09:58AM (line 5)
09:59AM (line 10)
09:59AM (line 15)
09:59AM (line 20)
10:00AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1        A.    The -- the exhibit page 9 or the document page 9?

 2        Q.    Well, they're the same.  So --

 3        A.    Okay.  Got it.

 4              THE COURT:  It's Exhibit 1.9.  So it's page 9, and

 5   it also happens to be on the screen.

 6              THE WITNESS:  Oh, okay.  Sorry.

 7              MR. RICHARD:  Thank you, Your Honor.

 8        Q.    (BY MR. RICHARD:)  And so I wanted to ask you about

 9   something we talked about a minute ago.  If you look at the

10   first paragraph at page 9, paragraph 2.5, Hazardous Waste

11   Substances and/or Constituents Found at the Site.

12              And this 2002 order, which, correct me if I'm wrong,

13   you read this order back in 2002, among other times; correct?

14        A.    I did read it in 2002.

15        Q.    Thank you.

16              And so you would have noted where it says, quote,

17   "In 1993, DTSC conducted a sampling investigation of selected

18   portions of the site.  Soil samples were taken from trenches

19   excavated in the Burn Valley portion of the site and near the

20   former lead azide HWMU."  PCE was detected in one sample from

21   the Burn Valley at 92,000 milligrams per kilogram.  Do you see

22   that?

23        A.    I see it.

24        Q.    And again, your own consultants confirmed that there

25   was PCE at the site?
```

1      A.    I don't know who did this detection.

2      Q.    No.  My question is, in addition to the State, in

3 this 2002 order, did your own consultants also detect PCE in

4 samples from the soil at the Whittaker site?

10:02AM  5           MR. GALLAGHER:  Vague as to "consultants" and time.

6           THE COURT:  Vague as to time, sustained.

7      Q.    (BY MR. RICHARD:)  At some point between 2002 and

8 2010, you understood that your consultants had identified PCE

9 in the soil; is that fair?

10:02AM 10      A.    I don't have a recollection of an understanding

11 between 2002 and 2010 regarding PCE.  I'm not denying, though,

12 that our consultants have had samples with PCE detections in

13 soil at the site.

14      Q.    Okay.  And same thing for TCE, at line 8 of page 9,

10:02AM 15 it says, quote, "TCE is present in the soil beneath the former

16 surface impoundment and drum rinsing area near Building 317,"

17 period, close quote.

18           This is in the 2002 order.  So it's fair to say

19 that, by 2002, you understood that TCE had been detected

10:03AM 20 beneath a former surface impoundment at that Building 317?

21      A.    Yeah.  I did understand that.  I -- I had observed

22 that soil vapor extraction system, and I understood it was TCE.

23      Q.    And did you understand, sir, that with respect to

24 that soil vapor extraction system you just mentioned, that the

10:03AM 25 folks hired to do that work removed 50,000 pounds of VOCs,

1     mostly TCE, from that area at Building 317?

2          A.   No, I don't recall that, not in 2002.

3          Q.   I'm sorry.  At some point after the soil vapor

4     extraction system was put in, sometime between 2002 and today,

10:03AM  5   you understand that tens of thousands of pounds of VOCs have

6     been removed from that particular area?

7          A.   I -- I don't.  I don't.

8          Q.   Okay.  You don't deny that, you just don't know one

9     way or the other; is that true?

10:04AM 10        A.   I don't know one way or the other.  The consultants

11    produce very detailed reports.  I'm sure whatever they pulled

12    from the soil, they've reported it.

13         Q.   Okay.  And the 2002 order goes on, at line 17, "In

14    1996, in an attempt to remove metallic debris from the

10:04AM 15   Burn Valley so that a geophysical survey and sampling could be

16    performed, respondent uncovered soil contaminated with" -- and

17    it lists a number of items, and then it identifies TCE.  Do you

18    see that?

19         A.   I see that.

10:04AM 20        Q.   In a concentration from 110 milligrams all the way

21    up to 41,000 milligrams per kilogram.  That's information you

22    learned in 2002; correct?

23         A.   I don't have a specific recollection of that in

24    2002, but I read it here and I heard the testimony the other

10:05AM 25   day.

1    Q.    Okay.  And then the next chemical listed in the 2002

2  order to Whittaker identifies that PCE has also been identified

3  in concentrations in that area up to 25,000 milligrams per

4  kilogram.  Correct?

10:05AM  5    A.    I see that, yes.

6    Q.    Okay.  And if we go to page 13, we see -- and again,

7  it's talking about, at paragraph 2.8, public health and/or

8  environmental risk.  And the paragraphs after that refer to the

9  Burn Valley.  Do you see that?  Line 19, for example, "The

10:05AM  10  Burn Valley is located in a dry stream bed that originates on

11  the site and extends beyond the site boundaries.  Located

12  upgradient from the Burn Valley is the East Fork landfill."

13         You became generally familiar with those areas as

14  being problem areas at the site in 2002?

10:06AM  15    A.    I -- I don't recall what I understood in 2002 about

16  the location of those -- the Burn Valley and East Fork

17  landfill.

18    Q.    Okay.  Well, here's what I'm going to ask you.

19    A.    I just don't recall.

10:06AM  20    Q.    I understand.

21         At the bottom of that page, 13, of this order from

22  2002, it says, at line 26, quote, "The groundwater underlying

23  the site has been a source of drinking water.  Migration of

24  chemicals, such as TCE, PCE, NDMA, and perchlorate to the

10:06AM  25  groundwater creates a potential hazard of exposure to humans

```
 1   from these hazardous substances through drinking water,"
 2   period, close quote.
 3            You recall reading that in 2002, do you not?
 4       A.   I don't.  I see the words, though.
 5       Q.   So sometime after reading this order in 2002, did
 6   you think it was just a little bit of TCE or did you develop
 7   the understanding at some point after 2002 that this was a
 8   serious -- there was a serious amount of TCE and PCE at the
 9   Whittaker site?
10       A.   Well, as I mentioned previously, I've always had a
11   little bit of difficulty on PCE.  But I did understand that
12   this was a site contaminated with TCE.
13       Q.   And when you say you --
14       A.   I understand that.
15       Q.   When you say you had a little bit of difficulty,
16   just to be clear, you really weren't sure if there was PCE in
17   the soil even as late as August of 2019; right?
18       A.   Yeah.  I --
19       Q.   Okay.
20       A.   I get -- I get -- you know, I'm like everybody else,
21   I get these acronyms mixed up.  I don't have a clear
22   recollection in 2019 of what I knew about PCE, but I did have
23   an understanding on TCE.
24       Q.   Okay.  And so at some point after you get this order
25   we've been going through in 2002 and you're talking to your
```

10:07AM (line 5)
10:07AM (line 10)
10:07AM (line 15)
10:08AM (line 20)
10:08AM (line 25)

**UNITED STATES DISTRICT COURT**

```
  1    consultants, you concluded that the TCE contamination simply

  2    posed no risk to drinking water?

  3         A.   Well, I obviously have learned more about the site

  4    since then and I've seen lots of studies.  Um, and the

  5    consultants that we use, um, are of the view that, um, the TCE

  6    in the groundwater is limited to the site itself.  In other

  7    words, they've defined the plume.

  8         Q.   Okay.  And so why don't we take a look at your 2019

  9    deposition, page 69, lines 5 through 14.

 10         A.   Sure.

 11         Q.   You were asked -- 69.

 12              THE COURT:  You're going to display it on the

 13    screen?

 14              MR. RICHARD:  Yes.  And I'll read it to him,

 15    Your Honor.

 16              THE COURT:  All right.  You may do so.

 17              MR. RICHARD:  Thank you.

 18              You were asked:  *Dropping down to line 6,*

 19         *Exhibit 22, states, quote, 'The groundwater underlying*

 20         *the site has been a source of drinking water and'* --

 21              THE COURT:  Slow down, please.

 22              MR. RICHARD:  -- *"'drinking water, migration*

 23         *of chemicals such as TCE, PCE, NDMA, and perchlorate to*

 24         *the groundwater creates a potential hazard of exposure*

 25         *to humans from these hazardous substances through drinking*
```

1        *water,'" period, close quote.*

2                *"QUESTION:  Is that a true statement?*

3                Your answer:  *"I don't believe that.  The*

4        *statement that TCE and PCE creates a potential hazard*

10:10AM  5        *through drinking water, I don't believe that's a correct*

6        *statement.  In fact"* --

7                MR. GALLAGHER:  Objection, Your Honor.  This is

8        improper impeachment.

9                MR. RICHARD:  It's a party --

10:10AM  10               THE COURT:  I don't need a response.  The objection

11       is overruled.

12               MR. RICHARD:  Thank you, Your Honor.

13       Q.    (BY MR. RICHARD:)  In fact, sir, at the time you

14       received this 2002 order, this trial Exhibit No. 1 that we've

10:10AM  15       been talking about, didn't you conclude that it was just some

16       document prepared by the Department of Toxic Substances Control

17       to satisfy some political concerns?

18       A.    No.

19       Q.    Wasn't it your conclusion at some point --

10:10AM  20               THE COURT:  One second.  Your answer is "No"?

21               THE WITNESS:  Yeah.

22               THE COURT:  Next question, please.

23               MR. RICHARD:  Sure.

24       Q.    (BY MR. RICHARD:)  Isn't it true that rather than

10:11AM  25       taking these determinations as accurate and important based on

```
 1    the samples and reports described in the order, you dismiss
 2    these words as just some political fluff?
 3              MR. GALLAGHER:  Argumentative.
 4              THE COURT:  Overruled.  I'm assuming there's a good
 5    faith basis for that question.
 6              MR. RICHARD:  Yes, Your Honor.
 7              THE COURT:  The question is:  Did you dismiss the
 8    words as just some political fluff?
 9              THE WITNESS:  No.
10        Q.    (BY MR. RICHARD:)  If we can take a look at your
11    deposition, the next page, page 70, line 24, through page 71,
12    line 12.
13              MR. RICHARD:  May I proceed, Your Honor?
14              THE COURT:  Yes.
15              MR. RICHARD:  "QUESTION:  At the time that
16         this Imminent and Substantial Endangerment
17         Determination and Order was issued, do you know if
18         Whittaker Corporation did anything to contest that
19         particular finding by DTSC?
20              "ANSWER:  Yes.  We had been negotiating with
21         DTSC a Consent Order.  We would never have included
22         these words in it, not without some sort of
23         qualification or denial or whatever.  So, you know,
24         these are words that are written by some staff person
25         at DTSC and, you know, they're their words.  But yeah,
```

10:11AM (line 5)
10:11AM (line 10)
10:11AM (line 15)
10:12AM (line 20)
10:12AM (line 25)

1      *we were trying to negotiate a consent agreement, and*

2      *they just dropped this on us, as I understand it, in*

3      *order to satisfy some political concerns."*

4          Q.     (BY MR. RICHARD:)  That was your view in August 2019

10:12AM  5  of the State's Imminent and Substantial Endangerment Order from

6      2002; correct?

7          A.    Yes.

8                MR. RICHARD:  All right.  I have no further

9      questions at this time, Your Honor.

10:12AM 10             THE COURT:  Cross-examination, please.

11                MR. GALLAGHER:  Thank you, Your Honor.

12                        **CROSS-EXAMINATION**

13     BY MR. GALLAGHER:

14         Q.    Good morning, Mr. Lardiere.  Are you doing okay?

10:13AM 15         A.    Yes.  Thank you.

16         Q.    Picking up where counsel left off, the Imminent and

17     Substantial Endangerment Order, I'd like to understand a little

18     bit of background as to how that came about.

19                First question to you is:  When you were hired by

10:13AM 20  the company in 2000, I assume you were asked to get up to speed

21     on the status of the Bermite property; correct?

22         A.    Yes.

23         Q.    Okay.  And what did you do in that regard?

24         A.    I read some of the background documents.

10:13AM 25         Q.    And did that include the Consent Order in '94 that

we discussed earlier?

         A.    I believe it did.

         Q.    And the AME, or Acton-Mickelson Environmental,
reports, is it your understanding that that came after the '94
Consent Order?

         A.    Correct.

         Q.    Is it your understanding that they were required as
part of that Consent Order?

         A.    Yeah.  That --

               MR. RICHARD:  Objection.  Leading, Your Honor.

               THE COURT:  Sustained.

               The answer is stricken.  The jurors are to disregard
it.

         Q.    (BY MR. GALLAGHER:)  Do you have an understanding as
to why the AME reports came about?

         A.    The 1994 Consent Order had a series of very orderly
steps that were to be taken.  And the remedial investigation,
or RI, was one of the first steps to be taken by Whittaker
Corporation pursuant to that Consent Order.

         Q.    And during this time, as I understand from your
testimony, the property was sold; correct?

         A.    Yes.  The property was sold in around 1999 to
Remediation Financial, Inc.

         Q.    And what was the intent, if you know, of RFI, or --
I thought the other company was SC, LLC?

```
 1        A.    Right.  You've corrected --
 2              MR. RICHARD:  Objection.  Calls for speculation.
 3    Lacks foundation.
 4              THE COURT:  Sustained.
 5              And the jury is to disregard counsel's testimony.
 6    Remember, he's not allowed to testify.  He's allowed to ask
 7    questions.
 8              So whenever you hear a lawyer saying "I thought
 9    this" or essentially trying to present facts, ignore that
10    because it's not testimony.
11              Ask a question.  Don't testify.
12              MR. GALLAGHER:  Yes, Your Honor.
13        Q.    (BY MR. GALLAGHER:)  And who was the company -- I'm
14    sorry.  Who was the property sold to, if you know?
15        A.    Well, the -- the actual company that takes title to
16    it is Santa Clarita, LLC.  It's a limited liability company,
17    and the managing member and owner is an entity called
18    Remediation Financial, Inc., and then they have some other
19    limited liability owners in that group.  I don't know them.
20        Q.    And do you have an understanding of what it is they
21    had planned to do with respect to the Bermite site?
22        A.    I do.
23        Q.    And what is that understanding?
24        A.    Remediation Financial, Inc., is what they call a
25    Brownfield firm.  So what they'll do is they'll take a
```

Timestamps in left margin: 10:15AM (line 5), 10:15AM (line 10), 10:15AM (line 15), 10:16AM (line 20), 10:16AM (line 25)

|     |                                                                              |
|-----|------------------------------------------------------------------------------|
| 1   | contaminated piece of property and they get it at a really                   |
| 2   | discounted price.  And they will clean it up.  So that's the                 |
| 3   | deal, sort of like a fixer-upper.  Okay?  They're taking the                 |
| 4   | property at a low price, but they are agreeing to clean it up.               |

10:16AM 5     Q.    And do you have an understanding of how far they got
6     in the process of cleaning up the property before the 2002
7     Imminent and Substantial Endangerment Order was entered?

8     A.    I believe they had cleaned up what is called
9     Operable Unit 1, which is the -- it's about a quarter -- the
10:17AM 10    site is about a thousand acres.  Operable Unit 1 is the --
11    about 25 percent on the western boundary of the site.

12    Q.    And at -- at some point, obviously the 2002 Imminent
13    and Substantial Endangerment Order was entered.  Do you have an
14    understanding as to why that happened?

10:17AM 15    A.    Yes.

16    Q.    And what is that understanding?

17    A.    I received a letter from Brian Hembacher, who is
18    Deputy Attorney General, State of California.  And in his
19    letter, he informed Whittaker that RFI, Remedial -- Remediation
10:18AM 20    Financial, Inc., had stopped work, that they had defaulted on
21    their obligations under their enforceable agreement with --
22    with the DTSC, with Department of Toxic Substances Control.
23    And Mr. Hembacher requested Whittaker to voluntarily come back
24    in and clean up the site.

10:18AM 25    Q.    And who is Sara Amir?

1          A.    She was at the time the head of DTSC's Glendale

2     office.  I think she's moved on, but she -- that was her title

3     then.

4          Q.    And at that time, did you have to deal with Ms. Amir

10:18AM   5     and how to handle the transition from SC, LLC, to Whittaker?

6          A.    Yes.

7          Q.    And can you explain to me what the nature of those

8     conversations were and what your understanding was as to how

9     Whittaker was going to take over?

10:18AM  10          A.    Okay.  So, um, the first contact was Ms. Amir called

11    me.  And I had known her from another matter.  She called me

12    and she asked me -- they had -- the department had done some

13    geophysical surveying of an area off the site in one of the

14    little valleys, and they had detected some metal.  And she

10:19AM  15    asked me if I would arrange to have that metal basically

16    investigated and dug up.  And so I -- I told her yes.  And

17    we -- well, I'm doing kind of a narrative.

18               But in any event, that's my first contact.

19               THE COURT:  That's a good time for counsel to

10:19AM  20    interject.

21               MR. RICHARD:  Objection, Your Honor.  Narrative.

22               THE COURT:  Sustained.

23               MR. RICHARD:  Maybe you meant other counsel.  I

24    don't know.

10:19AM  25          Q.    (BY MR. GALLAGHER:)  So we have an understanding of

1    your first meeting with Ms. Amir.

2         A.    Yes.

3         Q.    What's your -- what was your involvement with her in

4    connection with the Imminent and Substantial Endangerment Order

10:20AM    5    that was eventually issued in 2002?

6         A.    Well, we -- we, you know, after Mr. Hembacher

7    contacted us, we had a meeting with the state officials and we

8    had our external counsel, Joe Armao from Heller Ehrman.  And we

9    agreed to come back in.  And the State sent us a draft of what

10:20AM    10    our agreement would look like.  And Joe -- and Joe sent the

11    draft back with some markups.  Sara was part of that review

12    process, Ms. Amir.

13        Q.    And this agreement is not what we're seeing as

14    Exhibit 1, the Imminent and Substantial Endangerment Order;

10:20AM    15    correct?

16        A.    No.  No.

17        Q.    What's this agreement that you're talking about?

18    Can you explain to us what that is and what your understanding

19    of it was?

10:21AM    20        A.    Yeah.  Well, we -- excuse me.  Yes.  We had

21    exchanged at least one markup of the State's draft, and then

22    the Imminent and Substantial Endangerment Order was delivered

23    to us.

24        Q.    Um, is it your understanding that you thought you

10:21AM    25    had an agreement with the DTSC prior to this Imminent and

|    |    |
|----|----|
| 1  | Substantial Endangerment Order being issued? |
| 2  | A.    Yeah.  They had -- |
| 3  | MR. RICHARD:  Objection.  Leading, Your Honor. |
| 4  | Also, Your Honor, can I request that the witness be |
| 5  | instructed to just give me a second for some of these leading |
| 6  | questions to stand up and object. |
| 7  | THE COURT:  Yes.  The objection is sustained. |
| 8  | And you've heard, Mr. Lardiere, you should pause |
| 9  | before you actually give your answer. |
| 10 | THE WITNESS:  Will do. |
| 11 | THE COURT:  Non-leading questions, please. |
| 12 | Q.    (BY MR. GALLAGHER:)  Okay.  What was the status of |
| 13 | this negotiation at the time you received the Imminent and |
| 14 | Substantial Endangerment Order? |
| 15 | A.    It was underway. |
| 16 | Q.    And what do you mean by that? |
| 17 | A.    We exchanged drafts. |
| 18 | Q.    Did you have an understanding that the Imminent and |
| 19 | Substantial Endangerment Order was going to be issued? |
| 20 | A.    No.  That was a surprise. |
| 21 | Q.    Once you received the order, did you have a further |
| 22 | discussion with Ms. Amir? |
| 23 | A.    I called her. |
| 24 | Q.    And what was the nature of that discussion? |
| 25 | A.    I don't recall my exact words.  But, in effect, I |

10:21AM (lines 5)
10:21AM (line 10)
10:22AM (line 15)
10:22AM (line 20)
10:22AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1    asked, "What gives?"  And she told me it was out of her hands,

 2    that it had been directed.

 3         Q.    And directed by who, if you know?

 4         A.    I think she said Sacramento.

 5         Q.    And Sacramento meaning -- is that the headquarters

 6    of DTSC?

 7         A.    State government.

 8         Q.    Okay.  I'm going to fast-forward.  We talked a lot

 9    about the site and what you may or may not recall.

10              Do you have an understanding, as you sit here today,

11    as to what the on-site remediation status is?

12         A.    Yes.

13         Q.    And if you would -- I understand there are several

14    operable units.  Do you have an understanding of how many

15    operable units are designated for this site?

16         A.    Seven.

17         Q.    And does some of -- do some of those operable units

18    have to do with the on-site soil contamination?

19         A.    Operable Units 1 through 6 are soil management

20    operable units that covers the -- the site, and then Operable

21    Unit 7 is the extent of the groundwater.  So that can extend

22    offsite.

23         Q.    And do you have an understanding, as you sit here

24    today, as to what the status is of the OUs 1 through 6 in terms

25    of the status of the cleanup?
```

10:22AM (line 5)
10:23AM (line 10)
10:23AM (line 15)
10:23AM (line 20)
10:24AM (line 25)

781

1      A.     Yes.

2      Q.     Okay.  And what is that status, if you know?

3      A.     Whittaker has achieved approval by the Department of

4    Toxic Substances Control for our completion of the remedial

10:24AM    5    action plan for the site, and our completion report was

6    approved by the Department.

7      Q.     And do you know when that occurred, that approval?

8      A.     Uh, approximately a year ago, maybe two years.

9      Q.     Switching gears real quick, we have heard the name

10:24AM   10   Gordon Louttit.  Do you know who that person is?

11     A.     I know Gordon.

12     Q.     And what was his role at the company?

13     A.     He preceded me.  He was in the legal department.  I

14   think he had several titles, but I believe at one point he was

10:25AM   15   general counsel.

16     Q.     And you have interacted with Mr. Louttit?

17     A.     A few times, yes.

18     Q.     And how many conversations would you say you've had

19   with Mr. Louttit?

10:25AM   20     A.     Two or three face-to-face and probably 20 phone

21   calls.

22     Q.     You were sitting here in court when Mr. Sorsher,

23   former staffer at the DTSC, recounted a conversation he had

24   with Mr. Louttit.  Do you recall that?

10:25AM   25     A.     I do.

**UNITED STATES DISTRICT COURT**

```
          1      Q.    Based on your experience with Mr. Louttit, would

          2   Mr. Louttit ever lie?

          3            MR. RICHARD:  Objection --

          4            THE COURT:  The objection is sustained.

10:25AM   5      Q.    (BY MR. GALLAGHER:)  You heard the testimony of

          6   Mr. Sorsher; correct?

          7      A.    Yes.

          8      Q.    Do you have an understanding -- or do you have any

          9   different interpretation of that conversation, based on your

10:25AM  10   experience with Mr. Louttit?

         11            THE COURT:  Sustained.

         12            Please don't ask questions that he clearly has no

         13   foundation for.

         14      Q.    (BY MR. GALLAGHER:)  Can you describe to me --

10:26AM  15            THE COURT:  No.  Don't go there.  He's not going to

         16   be able to testify as to what Mr. Louttit might or might not

         17   have done based upon his knowledge of Mr. Louttit.

         18            MR. GALLAGHER:  Fair enough.

         19            Thank you, Your Honor.  Nothing further.

10:26AM  20            THE COURT:  Redirect.

         21            MR. RICHARD:  Yes, Your Honor, just very briefly.

         22                    REDIRECT EXAMINATION

         23   BY MR. RICHARD:

         24      Q.    So as I understand your testimony, sir, when you

10:26AM  25   started with Whittaker, you did review some background
```

UNITED STATES DISTRICT COURT

1      documents as to what had been going on at the site for the

2      years before you got there?

3          A.    Yeah, I testified to that in response to your

4      questions.

10:26AM  5          Q.    And so -- and you just testified in response to your

6      attorney's question that some number of these operable units

7      have recently, within the last year or two, been deemed cleaned

8      up to some degree or status.  Did I get that right?

9          A.    Well, not exactly.  The operable unit what?

10:27AM  10          THE COURT:  "Not exactly" is the answer.  What's

11     your next question?

12          MR. RICHARD:  Thank you.

13          Q.    (BY MR. RICHARD:)  My question is:  Whatever the

14     status of the recent cleanup efforts have been, you have no

10:27AM  15     information as to why Whittaker was unable to clean up the

16     property between 1980 and 2010, do you?

17          MR. GALLAGHER:  Assumes facts.  Calls for

18     speculation.

19          MR. RICHARD:  I'll ask a new question.

10:27AM  20          THE COURT:  Thank you.

21          Q.    (BY MR. RICHARD:)  For the period of time before you

22     started at Whittaker, even though you reviewed some of the

23     materials when you started, isn't it fair to say you have no

24     information as to why Whittaker was unable to clean up the

10:27AM  25     property before 2000?

```
 1              MR. GALLAGHER:  Argumentative.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Well, uh, not exactly.  I mean, I read

 4    documents when I joined the company in 2000.  Some of those

 5    documents indicated that Whittaker had clean closed 13 out of

 6    14 RCRA hazardous waste management units.  I read that.  And

 7    that was repeated on the screen we were all looking at

 8    previously.  So I did understand that, and that's remediation.

 9    Certainly that work was done.

10              And pursuant to the 1994 consent agreement, there

11    were certain steps that had to be taken, and one of those steps

12    was to conduct a remedial investigation.  So that's part of the

13    process.  They want to have it fully characterized before you

14    start cleaning it up.  It's the way -- it's the way it works.

15              You have to go through the remedial investigation,

16    they have to approve your work plan, they have to approve the

17    results.  Once that's done, then you submit a remedial action

18    plan.  And that step hadn't been taken as of 2000 when I joined

19    the company.  We had -- the company had sold the property to a

20    remediation company to complete that work.  And it was not done

21    when I joined the company in 2000.

22         Q.   (BY MR. RICHARD:)  And so the sale was in 1999;

23    right?

24         A.   Yes.  I think it was 1999, possibly 1998.  I think

25    it was 1999.
```

```
 1        Q.    Okay.  So you understood that Whittaker -- and it
 2   was Whittaker's responsibility and its consultants to prepare
 3   those remediation plans between 1987 and 1999 before the
 4   property was sold?
 5        A.    Um, well, the -- the Consent Order was 1994, not
 6   1987.  And as I just testified, it -- it has a certain order to
 7   it.  It's just standard.  It's nothing magical about it.  First
 8   you have to define the problem.  That's what remedial
 9   investigation is.
10        Q.    Sure.
11        A.    What's the problem that you're going to try to fix?
12   And then the remedial action plan is:  What are you going to do
13   to fix it?  And then you -- once that's approved, then you
14   implement the wrap.  And if they approve the work you've done,
15   then you get your -- your letter saying that they approve your
16   completion report.
17        Q.    Okay.  Whatever the cause for many, many years going
18   by without the remediation being completed, can we agree that
19   whatever the cause of that delay, it wasn't my client, the
20   water agency's?
21              MR. GALLAGHER:  Calls for speculation.  Lacks
22   foundation.
23        Q.    (BY MR. RICHARD:)  For the work done at the
24   Whittaker site?
25              THE COURT:  Sustained.
```

```
 1          Q.    (BY MR. RICHARD:)  As you sit here, do you believe
 2    that the water agency is responsible for Whittaker not
 3    completing a cleanup of the site before 1999?
 4          MR. GALLAGHER:  Outside the scope.
 5          THE COURT:  Sustained.
 6          Q.    (BY MR. RICHARD:)  You do have the understanding
 7    that the site was not cleaned up by 1999; correct?
 8          A.    Correct.
 9          Q.    And as of 1999, is there anything that you believe
10    the water agency did between 1994 and 1999 that prevented
11    Whittaker from completing the remediation?
12          MR. GALLAGHER:  Outside the scope.  Lacks
13    foundation.  Calls for speculation.
14          THE COURT:  I'll allow this.  This is your last
15    question?
16          MR. RICHARD:  Yes, Your Honor.
17          THE COURT:  Yes.  You can answer the question.
18          THE WITNESS:  No.
19          MR. RICHARD:  Thank you.
20          THE COURT:  All right.
21          MR. GALLAGHER:  Thank you, Your Honor.  Nothing
22    further.
23          THE COURT:  Very well.
24          And we are, ladies and gentlemen, going to take our
25    morning recess.  It's now 10:30.  We will break until 10:45.
```

10:30AM (line 5)
10:31AM (line 10)
10:31AM (line 15)
10:31AM (line 20)
10:31AM (line 25)

**UNITED STATES DISTRICT COURT**

1          Please don't speak to anyone about the case, the

2     people, or the subject matter involved.  Remember to keep an

3     open mind.

4          We're in recess.

10:32AM   5          (Out of the presence of the jury:)

6          We're in recess until 10:45.  Thank you.

7          (Break taken.)

8          (In the presence of the jury:)

9          THE COURT:  We remain on the record in the trial

10:48AM  10     matter.  And we are here with all counsel, as well as the jury.

11     And we are still in the plaintiff's case, and we are at your

12     next witness, Mr. Gee.

13          MR. GEE:  Yes, Your Honor.  Plaintiffs would like to

14     call their next witness, Ms. Phyllis Stanin.

10:48AM  15          THE COURT:  Please step forward.

16          THE COURTROOM DEPUTY:  Would you please walk around

17     and step on the witness platform.

18          Would you please raise your right hand to be sworn.

19          Ma'am, do you solemnly swear that the testimony you

10:49AM  20     shall give in the cause now before this Court shall be the

21     truth, the whole truth, and nothing but the truth, so help you

22     God?

23          THE WITNESS:  Yes.

24          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

10:49AM  25          Ma'am, for the record, would you please state your

1    name and then spell your last name.

2              THE WITNESS:  Phyllis Stanin, S-t-a-n-i-n.

3              THE COURTROOM DEPUTY:  Thank you.

4              There's some fresh water if you need it.

10:49AM    5              THE WITNESS:  Thank you.

6              THE COURT:  Mr. Gee.

7                        **PHYLLIS STANIN**,

8         **PLAINTIFF'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS**:

9                      **DIRECT EXAMINATION**

10:49AM   10    BY MR. GEE:

11         Q.    Ms. Stanin, can you provide us with your educational

12    history?

13         A.    Yes.  I have a bachelor of science degree from the

14    University of North Carolina in geology and a master's of

10:49AM   15    science in environmental management from the University of

16    San Francisco with a hydrogeology thesis.

17         Q.    And do you hold any professional licenses?

18         A.    Yes.  I'm a -- a professional geologist, certified

19    hydrogeologist, certified engineering geologist in California,

10:50AM   20    and I'm also a registered geologist in Arizona.

21         Q.    And you mentioned that you conducted a thesis

22    when -- for your master's degree.  What was the topic of your

23    thesis?

24         A.    The thesis did research on geological faulting and

10:50AM   25    discontinuities in a groundwater system.

**UNITED STATES DISTRICT COURT**

1    Q.    And can you briefly tell us a little bit about your

2  professional experiences?

3    A.    Sure.

4       I'm vice president and principal geologist for

10:50AM  5  Todd Groundwater, a groundwater specialty firm specializing in

6  planning, development, and management and protection, all

7  aspects really of groundwater.

8       My professional expertise involves groundwater basin

9  management, manage aquifer recharge, and, of course, water

10:50AM 10  quality, including contaminant fate and transport in the

11  groundwater.

12    Q.    And, Ms. Stanin, have you worked on any projects, if

13  you will, that are similar to the one that you've just studied?

14    A.    Yes.  I've worked on many small and large projects

10:51AM 15  involving VOCs.  The more similar projects, I think, are the

16  San Gabriel Basin Superfund site where I worked there for

17  almost ten years looking at perchlorate and TCE in groundwater

18  that had migrated 7 or 8 miles downgradient of the source area.

19       There was also a project that I worked on in

10:51AM 20  Rancho Cordova area involving perchlorate and TCE plumes in

21  groundwater that had migrated offsite.  And then another

22  project for Orange County Water District involving perchlorate

23  and TCE and other contaminants that have migrated several miles

24  downsite.  In all of those projects, water supply wells had

10:52AM 25  been impacted.

1      Q.   And, Ms. Stanin, how long have you been practicing?

2      A.   42 years.

3      Q.   Ms. Stanin, what was the scope of your engagement

4  for SCV Water?

5      A.   I was asked to look at the hydrogeological situation

6  near the Whittaker site because water supply wells had been

7  impacted with contaminated groundwater.

8      Q.   And did you prepare an expert report?

9      A.   Yes.

10     Q.   Your -- your report involves the Whittaker site and

11 some contaminated wells.  Um, did you prepare a -- a figure

12 graphic to show where the wells were in comparison to the site?

13     A.   Yes, I did.  It was Figure 1 in my expert report.

14     Q.   Okay.  And can I publish Exhibit 158, which was

15 stipulated to?

16          (Exhibit 158 received into evidence.)

17     Q.   (BY MR. GEE:)  Ms. Stanin, you mentioned a Figure 1

18 in your expert report.  Is this the figure that you were

19 referring to?

20     A.   Yes, it is.

21     Q.   And are these the Santa Clarita Valley wells that

22 you were asked to review?

23     A.   Yes.  In particular -- there are a couple of

24 additional wells on this map.  But in particular, I was looking

25 at Saugus 1, Saugus 2, V-201, V-205.  V-157 that you see there

1    between the Saugus wells and the V-201 I also looked at, but

2    that well has now been destroyed.  Essentially, all of the

3    wells that are now circled in red are downgradient of the

4    Whittaker site and detected perchlorate.

10:53AM  5    Q.    And what -- which of these wells were the focus of

6    your analysis?

7    A.    If we go to the next animation here, we'll see some

8    yellow circles pop up.  And that shows the wells that TCE and

9    other VOCs have been detected in, and they were really the

10:54AM  10   focus of this analysis.

11   Q.    And can you identify those wells by name?

12   A.    Yes.  Saugus 2 and Saugus 1, which are close to the

13   Whittaker site, V-157 that I mentioned that has been destroyed,

14   V-201, and V-205.

10:54AM  15   Q.    And, Ms. Stanin, was that the first time that you

16   evaluated contamination from the Whittaker site?

17   A.    No.  Actually, I worked on this site with

18   Todd Groundwater in 2002 where we were asked to do a

19   hydrogeological investigation for perchlorate at that time.

10:54AM  20   Q.    And was your assignment similar to the assignment

21   that you've undertaken in this engagement?

22   A.    Yes.  Part of that assignment involved developing

23   pathways where the contaminants could migrate from the

24   Whittaker site to the downgradient water supply wells.

10:55AM  25   Q.    And what were the conclusions of your reports in

**UNITED STATES DISTRICT COURT**

1    2003 and 2006?

2        A.    We determined that the perchlorate that had been

3    impacting those water supply wells originated from the

4    Whittaker site.

10:55AM  5        Q.    And during the time that you prepared your expert

6    report, what -- was it uncontested that the Whittaker site was

7    the source of the perchlorate?

8        A.    No.  No.

9        Q.    And is it your understanding that the Whittaker site

10:55AM 10   was ultimately determined to be a source of perchlorate in

11   water supply wells?

12       A.    Yes.  Those were the conclusions of our report, and

13   my understanding is that finding had been affirmed.

14       Q.    And what was your determinations based on for your

10:56AM 15   prior reports?

16       A.    Um, essentially, we were looking at three general

17   things.  You can think of them as sort of buckets.  We were

18   looking at the aquifers in the system that held the

19   groundwater.  We were looking at the water quality in the wells

10:56AM 20   and the determination of what contaminants were there, whether

21   or not that matched back up with the contaminants beneath the

22   Whittaker site and whether or not those aquifers were

23   connected.  And then, finally, we looked at the groundwater

24   flow directions to make sure that there were pathways along

10:56AM 25   groundwater flow, that those contaminants could migrate in the

contaminated aquifer.

Q.    And you mentioned you prepared two expert reports for the prior litigation.  Was the subject of the 2006 report different than the 2003 report?

10:56AM

A.    Um, it was generally the same concepts that we were looking for pathways for perchlorate contamination.  But by 2006, we had noted that there were additional contaminants that had impacted water supply wells.  So we included part of that in the 2006 report.  So really, it was an update of what we had

10:57AM

done in 2003.

Q.    And comparing your work in 2003 to 2006 to now, are there any changes in the approach -- in your approach to analyzing the source of contamination found in SCV Water supply wells?

10:57AM

A.    Well, I would say not so much for the approach, but there were a lot more data.  So we were able to really do a better job at delineating pathways at that time --

Q.    And --

A.    -- than we had in 2003.

10:57AM

Q.    And what data -- what data was important for your -- or what data is different now than it was back in 2003?

A.    Well, from 2003 to 2006, there were really two things that we were able to get that we hadn't had in 2003. One was about 100 more monitoring wells.  So that gives you a

10:58AM

lot more information, a lot more data, as you can imagine.

1          So all of those wells had been sampled from 2003 to

2     2006, so we had a lot more information on the contamination in

3     the groundwater.

4          And then the second sort of piece of information is

10:58AM  5     that Whittaker had begun some of the planning for remedial

6     actions to clean up some of the contamination at the site.  And

7     as a result of that, there had been a lot more onsite

8     investigation.  So there were more soil samples, there were

9     more soil gas samples.  There was just a lot more information

10:58AM 10     with respect to that and, putting all of that together, a

11     better understanding of the hydrogeology.

12          Q.   What is the source -- where did you get the data for

13     your most recent report?

14          A.   Well, we had most of it already compiled, the

10:58AM 15     historical information for the 2003 and the 2006 report.  So we

16     still had some of that information in-house.

17          But we were able to access a wide variety of

18     information that's reported on the Department of Toxic

19     Substances Control.  It's a portal, a website portal.  And they

10:59AM 20     are required to -- that they, of course, are providing

21     oversight for the investigation at the Whittaker site.  And

22     they are required to put all of that information on this public

23     portal so you can access all of the data and information being

24     generated for the site.

10:59AM 25          Q.   And is there anything that you did to determine

whether that data was reliable?

A.   Um, well, there's a variety of things that you would -- you would consider when you download a document and download data.  The first is how it was collected and whether there were QC procedures and protocols in place for the collection of that data.  That would apply to the field data.

And for the documents themselves, they were mostly prepared by the consultants, the hydrogeological and engineering consultants that Whittaker had hired.  And as a result of that, these are firms that I know, colleagues in those firms that I know, and the firms are reputable firms.

So I believe that their analysis and their putting together the compilation of the information in these documents can be relied on.

Q.   Okay.  Ms. Stanin, what was the approach that you took for your -- for the expert report that you prepared in -- I think it's 2020?

A.   Yes.  It was August, I think, 2020.

Um, it was very similar to the same approach that we took for 2003 and 2006.  So again, sort of thinking in terms of the three main things that we look at.

One is on the Whittaker site, source areas and environmental data.  And when I say "environmental data," I mean are the contaminants in the soil?  Are the contaminants in other aspects?  Are there contaminants in groundwater?  So it's

a sort of matching up of those environmental data that indicate

a release of contamination and the contamination in the

groundwater.

        The next thing, of course, is to understand which

aquifers are contaminated.

        And then the last piece of that is looking at the

contaminated aquifers and how groundwater, within those aquifer

layers, move off of the site.

        Q.    And, Ms. Stanin, I note on your Figure 1 that the

wells that you studied are not located directly beneath the

Whittaker site.  How does contamination get to those water

supply wells?

        A.    Once groundwater -- once the contaminants move

through the soils down to the water table, once they hit the

water table, they move.  Um, groundwater is always in motion.

It's in motion below us right now.  It doesn't move very fast,

it's not like surface water.  So it moves a little slower than

that, but it moves.

        It moves from high -- we call it upgradient, high

elevation of the groundwater surface to the low elevations of

the groundwater surface.  So you can think of it sort of as an

uphill/downhill situation where water is flowing downhill.  We

call that upgradient and downgradient because it is the

hydraulic gradient that you're looking at.

        Q.    And, Ms. Stanin, how do you determine what direction

groundwater flows -- flows in?

A.    Well, you use the monitoring wells and other wells in the area to measure groundwater elevations in the various aquifer units.  Once you get those elevations compiled, you can plot them on a map and you can connect -- we call them contour lines.  You can connect the same elevations.  And then that gives you lines of elevation.  And flow would be perpendicular to those lines.  So that's the general process.

Q.    Okay.  And you mentioned that you looked at -- for your first step was to take a look at the source areas.  Let's see.  How did you go about conducting the -- your assessment of the source areas of contamination at the Whittaker site?

A.    Well, again, we already had a lot of that information compiled.  So I reviewed that information as well as additional information about the areas that contaminants were used, stored, disposed of, spilled, et cetera, and, um, sort of lined those up on the map and compared those back to the environmental data.

Q.    And did you create any kind of depiction of where the source areas are in your expert report?

A.    I bothered -- I borrowed from others for that because CDM Smith had done a detailed assessment of VOC and perchlorate-impacted areas.  So I used that information that had been provided in those reports.

MR. GEE:  I'd like to publish Exhibit 171, which was

1    stipulated to.

2              (Exhibit 171 received into evidence.)

3         Q.    (BY MR. GEE:)  Ms. Stanin, is this a -- the

4    foundation drawing for which -- for which you have drawn

11:05AM  5    contamination -- contamination source spots?

6         A.    Yes.  This is the Whittaker site with the operable

7    units labeled there "OU" on the map.

8         Q.    And what is an operable unit?

9         A.    Oftentimes a -- a site that is doing some

11:05AM  10   environmental investigations will divide up their area based on

11   a variety of things.  They might be divided up based on

12   topography, groundwater flow, types of contaminants, et cetera.

13   It allows for a more focused look at what's going on in a

14   specific area when the site is this big.

11:05AM  15        Q.    Okay.  And whereabouts was contamination found on

16   the Whittaker -- at the Whittaker-Bermite site?

17        A.    Well, if we go to this first animation here, you can

18   see these green areas.  The legend identifies these as

19   VOC-impacted areas.  Again, this was done by a Whittaker

11:06AM  20   consultant, CDM Smith, as part of the remedial actions on the

21   site.

22              The green areas represent areas where soil has been

23   contaminated with VOCs, and those soil concentrations actually

24   exceed screening levels.  In other words, they're too high to

11:06AM  25   be left in place without remediation.  So these are their

priority areas of VOC impacts.

Q.   Okay.  And did you do the same thing for other
contaminants?

A.   Yes.  We -- if you go to this next animation, you
can now see pink areas showing up.  Those are labeled in the
legend "perchlorate-impacted area."  So these two, similar to
the green areas, are areas where contaminants have been
detected in soil.  And, um, one of the things that you'll see
is that the pink areas and the green areas in many parts of the
site line up, indicating that both contaminants were used in
the same area.

Q.   And why was it important to you to know that the
contamination -- contaminants were located in the same source
areas?

A.   Well, we had already done quite a bit of work with
perchlorate, so we knew something about the pathways for
perchlorate.  And because the scope of work was to determine
plausible pathways for the VOCs, the fact that they overlay
some of the source areas gave us an early indication that they
may be following the same pathways.

Q.   And in reviewing all of the other expert reports, is
there any disagreement that -- that the source areas for VOCs
and perchlorate are similar or the same?

A.   No, I don't think there's any disagreement about
that.

1       Q.    Okay.  And so once you determine what the source

2  areas were at the Whittaker-Bermite site, what -- what did you

3  do next?

4       A.    Well, this is limited to areas where we have seen it

5  in soil and soil gas.  And, of course, we're interested in

6  seeing what the concentrations are in groundwater.

7           So we began to focus in on the groundwater data,

8  looking specifically in these source areas but also offsite,

9  recognizing that groundwater moves.

10      Q.    Okay.  And you mentioned groundwater moves.  Where

11  does groundwater -- what is the -- what is the mechanism for

12  which groundwater moves?

13      A.    Groundwater motion is controlled by gravity and

14  pressure.  And in most cases where we see an upland area, we

15  see that it's also an area of high groundwater elevation.

16           So in general, groundwater is moving from these

17  upland areas in the hills on the Whittaker site down toward the

18  valley where the water supply wells are located.

19      Q.    Okay.  And you mentioned groundwater.  Is

20  groundwater different than surface water?

21      A.    Yes, of course.  Groundwater is beneath the surface,

22  for one thing.

23           The main difference, really, is that there's no

24  underground river or underground lake.  There's sediments and

25  rocks beneath us.  So the water is actually moving through

sands and gravels.  You can think of how water moves through

sand at a beach.

        And as a result of that, the water is moving slower

than surface water because it's hitting sand grains and going

11:09AM   around the sand grains and -- and moves through pores of the

sediment rather than simply flowing on top of the earth.

        Q.   And you mentioned the term "aquifer."  Is that the

groundwater streams that you're -- that you just discussed?

        A.   Yes.  So the aquifers are really defined here as the

11:10AM   more permeable units in the subsurface.  They hold the most

groundwater.  And groundwater can move more easily through the

aquifer layers.  And as a result of that, if the groundwater is

contaminated, then the contaminants can also move easier

through the aquifer system.

11:10AM         Q.   Okay.  And you mentioned that before it gets to

groundwater, it has to percolate through the soil.  Did you

consider how long it takes to -- for the contamination to

percolate through the soil to get to groundwater?

        A.   Um, yes, we did consider that.  I mean, the first

11:10AM   process, of course, is to look for information that had been

done on the Whittaker site by the consultants for that.  But

there was essentially nothing that had estimated any kind of

travel time through the unsaturated zone as the contaminants

moved down to the water table.

11:11AM         I looked at that as -- you know, from the standpoint

of is this going to be a limiting factor.  But the terrace

deposits that are on the site, at the Whittaker site are

relatively permeable.  It's mostly sands.  They have some fine

grain sands and a little bit of clay fraction to them.  But

11:11AM  they shouldn't impede the downward movement of recharge or

contaminants to the extent, you know, I think -- I had made

some early estimates of somewhere around 2 feet a day, you

know, moving down through the vadose stone.  So it didn't seem

to be a controlling factor.

11:12AM       Q.    Excuse me.  I'm sorry.  Did you finish your answer?

I didn't mean to cut you off.

              But did you include any information about soil

travel time in your expert report?

              A.    No, we didn't.  As I said, I didn't see it to be a

11:12AM  significant limiting factor.  So it's not included.

              Q.    And based on your 2-feet-per-day estimate --

              MR. BLUM:  Objection, Your Honor.  This is beyond

the scope of her report and of her deposition.

              THE COURT:  Is it?

11:12AM       MR. GEE:  It is.  I just --

              THE COURT:  Sustained.

              MR. BLUM:  I would move to strike the testimony

about 2 feet per day.

              THE COURT:  It is stricken.

11:13AM       Q.    (BY MR. GEE:)  Ms. Stanin, on this graphic, you show

that there are a number of different source areas where
contamination was found at the Whittaker-Bermite site.  Do you
have any -- any way of knowing how much contamination was
released to the site?

11:13AM      A.   Well, there really weren't complete historical
records going back to the 1930s in this area.  And, um, as a
result of that, we are really just relying on what's being done
now with respect to soil and soil gas remediation.

In some of the CDM reports -- and I believe I
11:14AM  included some of this in my expert report -- there had been a
report of -- I think 260,000 pounds of VOCs that had been in
place in the Burn Valley.  That is the green area with the pink
overlay and OU-3, you can kind of see from the topography of
that map, the sort of valley area that was called the
11:14AM  Burn Valley.

So that's -- that's an estimate.

Q.   Okay.  And do you have an estimate as to the order
of magnitude of waste material that was -- or wastes that was
found in the soil beneath the site?

11:14AM      A.   Well, it's a little difficult.  Some of it had
already been removed, and the records for the amount removed
were not great.  We did see from the CDM Smith report that
there was an extra -- maybe 40,000 pounds of contamination that
had also been removed prior to the CDM Smith estimate of
11:15AM  260,000 pounds.  So maybe, you know, 300,000 pounds of

1    contaminants associated with that one area.

2         Q.    Okay.  And is 300,000 pounds a lot?  And can you

3    give me sort of a -- a way of understanding how much

4    300,000 pounds is?

11:15AM   5         A.    Yeah.  Um, so a gallon of TCE varies in weight,

6    depends on temperature, et cetera, but weighs about 12 pounds.

7    So if you think about 300,000 pounds and 12 pounds per gallon,

8    then that comes out to about 25,000-gallon jugs you can think

9    of as contamination.  So a lot.

11:16AM  10         Q.    And is there a basis for believing as to whether

11   that 300,000 pounds is the total amount of VOCs that were

12   disposed of at the site?

13        A.    Well, certainly not.  It's just one area.  It's

14   just -- just that one area, and it's what's left now.  It's

11:16AM  15   hard to know if there were other removal activities in that

16   area.

17        Q.    And has there been any kind of assessment as to the

18   contamination beneath the Whittaker-Bermite site?

19        A.    Um, yes, of course, um, in terms of groundwater

11:16AM  20   wells.  We have a lot of information on contamination in the

21   groundwater system beneath the Whittaker-Bermite site.

22        Q.    And the wells that you mentioned, are those

23   monitoring wells?

24        A.    Um, yes.  On the Whittaker site specifically, there

11:17AM  25   are about 200 monitoring wells that have been installed in the

1   various aquifer units beneath the site.

2        Q.    And what type of information can you gather from

3   monitoring wells?

4        A.    Well, the two primary data that you get from a

11:17AM   5   monitoring well are elevations of groundwater and the

6   concentrations of contaminants in that groundwater.

7        Q.    And did -- has Whittaker been -- well, when do you

8   understand the Whittaker site was shut -- suspended their

9   operation?

11:17AM   10        A.    I can't remember for sure what the year was, but I

11   have that on the timeline in my expert report.

12        Q.    But it was quite a while ago, was it not?

13        A.    Yes.

14        Q.    Okay.  And during the groundwater monitoring wells

11:18AM   15   that -- that are beneath the Whittaker site, have they been

16   monitoring groundwater contamination for the last 35 -- or the

17   last several decades?

18        A.    Um, they -- they've been monitoring groundwater --

19   the first groundwater wells went in in 1985, but they really

11:18AM   20   were not helpful.  They were located in certain areas, and

21   they -- they just weren't capable of defining the

22   contamination.  It wasn't really until about 2002 that there

23   was an effort made to install a sufficient amount of wells to

24   look at the contaminants in all of the different aquifer units.

11:19AM   25        Q.    And do you have -- do you have a graphic that

1    demonstrates the location of groundwater monitoring wells at

2    the Whittaker site?

3         A.   Yes.  We've looked at it over time, and I included

4    that in my expert report.

11:19AM  5         Q.   And let's see.  Can we -- can we pull up Figure 11

6    from your expert report, which has been stipulated for

7    publication.

8              MR. BLUM:  Just the figure?  Just the figure,

9    Your Honor?

11:19AM  10             THE COURT:  So please describe what it is that

11   you --

12             MR. GEE:  Oh, I'm sorry.

13             THE COURT:  -- that you're planning on presenting

14   before you present it.

11:19AM  15             MR. GEE:  Okay.

16        Q.   (BY MR. GEE:)  And you did --

17             MR. GEE:  I'll lay a foundation again.

18        Q.   (BY MR. GEE:)  You did -- you did plot the location

19   of the monitoring wells at the Whittaker-Bermite site as part

11:20AM  20   of your evaluation?

21        A.   Yes.  We looked at it over time to illustrate what

22   we knew when, thinking in terms of when contaminants might be

23   migrating.

24        Q.   And that would be Figure 11 from your expert report

11:20AM  25   that shows the location of the -- of the monitoring wells?

**UNITED STATES DISTRICT COURT**

1     A.    Yes.  That sounds right.

2           MR. GEE:  May I publish the Figure 11, Your Honor?

3           THE COURT:  Is this part of an exhibit?

4           MR. GEE:  This is -- yes.  This is -- I'm sorry.

11:20AM  5  Stipulated Exhibit No. 168.

6           MR. BLUM:  Your Honor, we have no objection.  My

7     issue was, was he going to do the whole report?  But as to this

8     exhibit, we have nothing to object to.

9           THE COURT:  Okay.  So you can present the figure as

11:20AM 10  you intend to do.

11          (Exhibit 168 received into evidence.)

12          Q.    (BY MR. GEE:)  Okay.  Ms. Stanin, what -- what do

13    the black dots on this diagram represent?

14          A.    The black dots that are shown on the Whittaker site

11:21AM 15  are monitoring wells.  So it gives us an understanding of how

16    many monitoring wells were on the site prior to 1989.  If you

17    look in that upper left-hand corner of these maps, you'll see

18    the time period that corresponds to the -- how many wells were

19    located where at what time.

11:21AM 20          Q.    And was this around the time that the Whittaker site

21    ceased operation?

22          A.    Yes.  I think it was in 1987, but I'm -- I'd have to

23    check to be sure.

24          Q.    And what do you know about the monitoring wells that

11:21AM 25  were installed back in -- prior to 1989?

**UNITED STATES DISTRICT COURT**

             1        A.    Well, you can see that they're clustered in sort of

             2   two areas.  You can see the two black dots in the sort of

             3   southeastern lower right-hand corner of the site and the one

             4   dot up in the northern portion of the site.  And they really

11:22AM      5   weren't in any of the areas where most of the contaminants are

             6   migrating downgradient.

             7        The two black dots are in an area of contamination,

             8   but the early wells weren't sited well and they weren't

             9   constructed in order to be able to determine the -- the levels

11:22AM     10   of contaminants in that area.

            11        Q.    And when you say they weren't constructed to

            12   determine the -- the levels of contamination, what do you mean

            13   by that?

            14        A.    Well, most of those early wells were below the water

11:22AM     15   table.  Some of them weren't screened in aquifer materials.  So

            16   they were just -- they were just not as helpful as the

            17   remaining 200 wells were that were ultimately drilled.

            18        Q.    And as time went on, did Whittaker install more --

            19   additional wells at the site?

11:23AM     20        A.    Yes, of course.  And we have those animated.  All

            21   we've done is take Figure 11 and animate it.

            22        And this next time period, we go sort of by decades,

            23   about ten years here.  So this next map that you see here is

            24   the wells that were on the site as of 2001.  You can see even

11:23AM     25   up to 2001, there really weren't wells throughout the entire

site that were capable of better understanding the groundwater

conditions, either flow or contamination.

Q.   And are these wells placed in which you earlier

called the source areas that -- that -- of concern?

11:23AM   A.   Well, the -- both of the clusters are in source

areas.  They're just not in the source areas that we've talked

about.  The source area in that lower right-hand portion of the

site, it was an impoundment.  And that was a source of

contamination, in addition to the other source areas that we've

11:24AM   talked about.

The wells that are all the way on that northern

portion of the site, that's near the Metrolink area.  Those

wells are -- are also sited to look at contaminants that were

migrating offsite in that area.

11:24AM   Q.   And in your opinion, was -- were the wells that were

in place in 2001 sufficient to characterize the contaminant --

groundwater contamination beneath the Whittaker site?

A.   No.

Q.   And did Whittaker install additional wells following

11:24AM   2001?

A.   Yes.  In particular, there was an Imminent and

Substantial Endangerment Order, they call it.  The Department

of Toxic Substances Control required that Whittaker site do

additional investigation.  And after the order was there, there

11:24AM   were a significant number of wells that were installed.

**UNITED STATES DISTRICT COURT**

1          We can go to the next animation.  Now we're looking

2     at a lot of dots between 2002 and 2009.  A lot of information

3     was added on the site.

4          Q.   So is it true, then, that -- until -- until all

11:25AM  5     these wells were -- were installed after 2002, was -- was --

6     were professionals in your area able to characterize

7     contamination beneath the Whittaker site?

8          A.   No.

9          Q.   Okay.  Now, Ms. Stanin, earlier you discussed the --

11:25AM  10    or you used the term "aquifer."  Is there just one single

11    aquifer beneath the Whittaker-Bermite site?

12         A.   No.  There are actually several aquifer layers that

13    have been delineated beneath the site.

14         Q.   And did you -- did you generate a demonstrative to

11:26AM  15    show us the layers beneath the Whittaker-Bermite site?

16         A.   Yes.  I had several what we call cross-sections in

17    my expert report that showed various wells along the aquifer

18    units.

19         MR. GEE:  Your Honor, I'd like to display

11:26AM  20    Exhibit 185, which has been stipulated to, that shows the

21    aquifers as they stand, just briefly described.

22         MR. BLUM:  No objection.

23         THE COURT:  Received.

24         (Exhibit 185 received into evidence.)

11:26AM  25         THE COURT:  Remember the procedure.  Don't need to

1    ask permission.  You've indicated stipulated.  Move with it,

2    please.

3              MR. GEE:  All right.  Thank you, sir.

4         Q.   (BY MR. GEE:)  Now, Ms. Stanin, this drawing seems

11:27AM  5    to have quite a bit of information on it.  You have on the

6    left-hand side what looks like Saugus 1 and Saugus 2.  What are

7    Saugus 1 and Saugus 2?

8         A.   So let me just explain that this is a slice of the

9    earth.  So instead of looking down on top of a map, we've now

11:27AM  10   sort of looked into the earth so that we can see what these

11   aquifers look like with depth.

12             And the two wells that are labeled Saugus 1 and

13   Saugus 2 represent the water supply wells.  So these are these

14   vertical lines that have been drilled down into the earth more

11:27AM  15   than a thousand feet in this case.  And you can see that they

16   intersect the yellow areas and the -- sort of the gray areas on

17   this figure.

18        Q.   And what do the yellow areas and gray areas depict

19   on this figure?

11:28AM  20        A.   The yellow areas have been determined to be, um, the

21   layers that are more permeable, so more sands in the yellow

22   layers.  So we refer to the yellow layers as the aquifers

23   units.  And they've actually been named.

24             In this particular case, they are named with S, S-1,

11:28AM  25   S-3A, S-3C, S-5A, 5C, and 7.  And what that designation refers

**UNITED STATES DISTRICT COURT**

to is that this is -- geologically, this is called the Saugus

formation.  So "S" stands for Saugus, and each one of those

yellow layers represents a separate aquifer in the system.

        Q.    Okay.  And so just so I understand, there are

multiple aquifers that are separated by -- I'm sorry.  What is

the gray -- the gray colorings in this drawing?

        A.    In many cases, the gray area is less permeable

material.  It might be what we refer to as silts or clays.

        In some areas, the gray is simply a marker that we

use from well to well to make sure we're tracing the aquifers

correctly.  It doesn't mean that groundwater can't move through

the clay layers, but it just means that it moves more easily

through the yellow layers.

        Q.    Okay.  And it looks like there are -- there is what

are -- what appear to be wells that are along the Whittaker

site, which is -- between the middle and the right of the -- of

this drawing?

        A.    Yes.  So you can see the hills of the Whittaker

site.  So they're represented there by the top of the graph,

and then you can see these vertical wells that go down into the

various aquifer layers.  And beneath the Whittaker site, you

can see that the wells look a little different than the way

they're depicted at the Saugus 1, Saugus 2.  And that's because

they are monitoring wells.

        And so if you look in some of the yellow layers, you

can see little black squares.  What that means is that that one

well is capable of pulling water and groundwater contamination

from that one aquifer layer.  So these are clusters of wells

that are screened, we call them.  It's an open area within the

11:30AM   monitoring well where water can move into the well and we can

sample the different aquifers.

    Q.   Now, were all -- all of these aquifer -- aquifers --

did all of the aquifers have contamination?

    A.   Um, yes, there were VOC and perchlorate

11:31AM   contamination discovered in all of the aquifer units.

    Q.   And -- and did any -- any of these aquifers have

more contamination than the others?

    A.   Yes.  Definitely S-3s are where most of the

contamination resides.

11:31AM       Q.   Okay.  I'd like to pull up Table 5.

    Let's see.

    THE COURT:  Is this from the same exhibit, Mr. Gee?

    MR. GEE:  Yes.  This is from Ms. Stanin's expert

report.

11:32AM       Q.   (BY MR. GEE:)  And, Ms. Stanin, is this a diagram

that came out of your expert report?

    A.   Yes.

    Q.   And the "S" designations that -- that you show in

the left-hand column, are those the designation of the aquifers

11:32AM   that you -- that you showed in the previous drawing?

1      A.     Yes.

2      Q.     And let's see.  You have three contaminants, I

3  believe they are TCE, PCE, and perchlorate.  Are those

4  contaminants of concern in this case?

11:32AM   5      A.     Yes.

6      Q.     And what does this -- what does this table show --

7  show the -- well, first, what does this table demonstrate?

8      A.     Well, I think the first thing it shows is that each

9  of the aquifer units, which we just talked about, have both VOC

11:33AM  10  contamination as well as perchlorate contamination.  The

11  highest concentrations in any of those monitoring wells for

12  each one of these aquifer units is shown on the table.

13          So this gives you an understanding about the

14  elevation -- I mean, the concentrations of VOCs and perchlorate

11:33AM  15  that have been detected in some of the monitoring wells.

16      Q.     Okay.  And, for example, you have a figure for S-3A,

17  TCE of 4,700.  Is that a big number?

18      A.     Well, for contamination, we think of big and small

19  as being related to the drinking water standard.  And so the

11:34AM  20  drinking water standard is sometimes referred to as a maximum

21  contaminant level, or MCL.  And I have that on the table as

22  well.  So you can see for TCE, the maximum contaminant level in

23  drinking water is only 5 parts per billion.  So 4,700 is almost

24  a thousand times the MCL.  So in that context, yes, it's a very

11:34AM  25  big number.

1    Q.   Okay.  And similarly, it looks like for perchlorate

2    there is a big number in S-3A.  Ms. -- is it -- is that a large

3    number compared to the MCL?

4    A.   Yes.  Again, with perchlorate, the MCL is a little

11:34AM  5    bit different, but it's very similar.  It's 6 parts per billion

6    rather than 5.  So that's pretty close.  So again, you know,

7    82,000 is a very large number with respect to safe drinking

8    water.

9    Q.   Okay.  And you're -- can you just -- you said there

11:35AM  10   are multiple aquifers beneath the site.  Is there a reason that

11   you chose Saugus 3 and Saugus 5 to show in this table?

12   A.   Well, those are the aquifers that are contaminated

13   in the areas of interest, so that's the reason for including

14   those on the table.

11:35AM  15        I will mention that that last aquifer -- yeah,

16   that's right.  That's -- these are the aquifers beneath our

17   area of interest.  There are other aquifers in other areas that

18   are also contaminated, but I haven't included them here.

19   Q.   Okay.  So you've -- you basically looked at the

11:35AM  20   contamination in the soil at the site.  Now we're looking at

21   the groundwater beneath the site.

22        What did you do next?

23   A.   So now that we know where the concentrations of the

24   contaminants are beneath the Whittaker site, the next step is

11:36AM  25   to look at groundwater flow directions to see where those

contaminants might migrate in groundwater.

1    Q.    And you mentioned that there are methods that you
can use to determine the direction of groundwater flow?

A.    Yes.

Q.    And did you go through that exercise?

A.    Yes, of course.

Q.    And in general, what are the characteristics of the
Whittaker site and the aquifers beneath the Whittaker site that
helped you to determine which direction the groundwater flowed?

A.    Well, one of the first things that you might do in
any problem of this magnitude is to look at where you are with
respect to the groundwater basin.

So there are 500 or so groundwater basins in the
state of California.  And within those basins, there's a
regional groundwater flow regime.  Those basins drain
groundwater.  And as a result of that, there are already known
groundwater flow directions associated with those groundwater
basins.  So looking at the basin was really one of the first
steps that we took.

Q.    When you looked at the groundwater basin, did you
have a figure in your expert report that showed the overall
groundwater basin, would that be Exhibit 159?

A.    I'm sorry.  I don't have the number memorized, but
that sounds right.

(Exhibit 159 received into evidence.)

| | | |
|---|---|---|
| | 1 | THE WITNESS:  That's not it. |
| | 2 | That's it. |
| | 3 | Q.    (BY MR. GEE:)  And for what did you generate this |
| | 4 | Exhibit 159? |
| 11:38AM | 5 | A.    So we have really changed scale on everyone here. |
| | 6 | So let me orient you for a second. |
| | 7 | You can see the Whittaker site that's located there |
| | 8 | in sort of the -- the southeastern portion of this large blue |
| | 9 | outlined area.  The blue outlined area is the groundwater basin |
| 11:38AM | 10 | that's been defined by the State of California. |
| | 11 | And what we were doing is trying to better |
| | 12 | understand what was going on with the groundwater basin and |
| | 13 | where we were within it.  You can see the water supply wells |
| | 14 | there are in the valley area, which is indicated by the lighter |
| 11:38AM | 15 | colors. |
| | 16 | Q.    And how does this help us understand how groundwater |
| | 17 | flows in a general vicinity? |
| | 18 | A.    Well, the basin from a surface water perspective is |
| | 19 | drained by the Santa Clara River.  You can see that running |
| 11:38AM | 20 | right through the center portion of the groundwater basin. |
| | 21 | And so groundwater is mimicking the surface water |
| | 22 | drainage in this basin.  So it flows from the upland areas, |
| | 23 | down toward the valley floor, and then mirrors underneath the |
| | 24 | ground the Santa Clara River drainage which exits the basin |
| 11:39AM | 25 | down there at the Los Angeles-Ventura County line. |

**UNITED STATES DISTRICT COURT**

|         |    |                                                                  |
|---------|----|------------------------------------------------------------------|
|         | 1  | Q.    Are there any arrows that we have that might |
|         | 2  | demonstrate what you had just articulated? |
|         | 3  | A.    Yes.  I did add arrows.  You can see that these are |
|         | 4  | just -- added them locally from the uplands on the Whittaker |
| 11:39AM | 5  | site, downgradient toward the valley.  And then if you continue |
|         | 6  | on with the arrows, you can see that, after they get to the |
|         | 7  | valley, then the natural flow direction moves northwestward |
|         | 8  | toward the Santa Clara River and then drains out the basin with |
|         | 9  | the surface water. |
| 11:39AM | 10 | Q.    Okay.  And how does the regional groundwater flow |
|         | 11 | help you determine how -- the direction of local groundwater |
|         | 12 | flow? |
|         | 13 | A.    Well, it provides the context.  It provides you with |
|         | 14 | an understanding of where you are within a larger system.  The |
| 11:40AM | 15 | groundwater is being recharged over this entire area and, as a |
|         | 16 | result of that, there is a larger sort of flow system that |
|         | 17 | controls both regional and local flow. |
|         | 18 | Q.    Okay.  Now, you mentioned in your prior slides that |
|         | 19 | you have groundwater monitoring wells and production wells. |
| 11:40AM | 20 | Are there differences in -- did the groundwater monitoring |
|         | 21 | wells and production wells influence groundwater flow direction |
|         | 22 | at all? |
|         | 23 | A.    Um, yes, they can.  Certainly pumping wells will |
|         | 24 | change groundwater flow within the area impacted by that well. |
| 11:41AM | 25 | Q.    And do you have a demonstrative that shows this? |

1      A.    Yes.  I thought it was an important concept, so I

2  prepared a little diagram, some conceptual diagrams to look at

3  groundwater flow going into a non-pumping well and groundwater

4  flow going into a pumping well.

11:41AM  5      Q.    And would a monitoring well be a non-pumping well?

6      A.    That's correct.  So you can think about this little

7  diagram for the well not pumping as a monitoring well.  For

8  this example, you can see the fat blue arrow there.  That's the

9  overall groundwater flow direction.

11:41AM  10      So just for the purposes of this little diagram,

11  groundwater's flowing from the right side of the slide to the

12  left side of the slide.  And I've got little flow arrows that

13  go through what looks like little horizontal lines on that

14  well.  So those little horizontal lines are screens.  This is

11:42AM  15  where the groundwater can come into the well.

16      And so when the well's not pumping, the groundwater

17  flow system just flows by the well and then through the well

18  through those openings that are screened in the well.

19      Q.    Okay.  And how does that compare to a pumping well?

11:42AM  20      A.    Well, things change with a pumping well because, as

21  you pump a well, you pull the groundwater area around you down

22  so you lower the groundwater level.  It's called a cone of

23  depression.  And it happens relatively radially around the

24  well.

11:42AM  25      And what that does is cause lower elevations near

the well.  Remember, we talked about groundwater flows from
high elevations to low elevations.  So now you've made low
elevations around the pumping well, and you can pull water in
from a much larger area than if you are just a static
11:42AM   monitoring well and water's just flowing by you.

       Q.    Okay.  And why is this important to -- to your
evaluation of the -- of the contamination at the site?

       A.    Well, the contaminant evaluation is looking for
plausible pathways of how contaminants might reach the water
11:43AM   supply wells.  So if you are a pathway going to a water supply
well, you need to have some kind of an understanding about
where you will be captured by that well.  So you don't have
to -- you don't have to have a pathway that hits the well
dead-on.  The pathway can be near the well and then the
11:43AM   contaminants be drawn into the well.

       Q.    And do you have a demonstrative to show us the
impact of pumping?

       A.    I do.  So I started with this profile, but now let's
look at a map view.  And again, we're looking at well not
11:43AM   pumping and then the well pumping.  So let's look at the not
pumping first.

             So on the not pumping side, you see sort of a grid
that goes up and down, vertical lines that are black.  Those
are the groundwater elevation contours that we measure from the
11:44AM   wells and we put this together, and that helps us know the

direction of groundwater flow.  Again, we're flowing from the right-hand side of the slide to the left-hand side of the slide on this diagram.

So the flow lines are shown there going just parallel to the groundwater elevations.  That's -- that's the way we do it.  And when the well's not pumping, again just like we saw in that cross-section, they go right by the well.

Q.  And the well not pumping, that -- that would be more -- more demonstrative of what happens at monitoring wells; is that right?

A.  I'm -- so the well not pumping would be similar to what would happen in a monitoring well.  But for a pumping well -- and we've been -- pop that up.

So again, water levels are being lowered at that well.  So it makes a little circle sort of around that well.  And it's not perfectly circle, it's a little asymmetric because groundwater's kind of flowing from uphill to downhill so you can catch what's coming downhill a little bit better than you can pulling back something that has already flown by you.

But I think you can see that the elevation contours now, they're not just straight lines.  They're circling around the pumping well because the pumping well is drawing more and more groundwater into it.  And the flow lines indicate that a much larger area is going into the well than if the well was not pumping.

                    You can see at the bottom there, we think of this as

capture.  We call it "captures."  So the pumping well captures

groundwater from a much larger area than a non-pumping well.

And, of course, if the groundwater is contaminated, that means

11:45AM     that the pumping well can capture a much larger area of

contamination as well.

        Q.    That was my next question, is that if -- if you have

a pumping well, does it -- does -- does the act of pumping draw

contaminants in from a greater area?

11:46AM         A.    Yes, a much greater area than for a well that's just

sitting there waiting for contamination to come from upgradient

to downgradient.

        Q.    And so the contamination levels that you see at a

pumping well is not necessarily a good measure of where that

11:46AM     contamination is coming from?  Is that --

        A.    No.  I think you can say where it's coming from.

The pathway goes near the well.  But you have to anticipate

that the well was pumping, so then you better understand how --

how much of an area can be drawn in by that well.

11:46AM         Q.    Okay.  All right.  So -- and does the pumping well

influence the rate of groundwater flow?

        A.    Yes.  It increases the velocity near the well

because the water is being drawn down.  So the gradient from

high elevation to low elevation is exaggerated with a pumping

11:47AM     well.

1    Q.    Okay.  A couple of minutes ago, you showed -- we

2   looked at the regional groundwater flow for the -- around the

3   Santa Clara Water Basin.  Did you do a -- or did you analyze

4   the groundwater flow as it relates to the Whittaker-Bermite

11:47AM  5   site?

6         A.    Yes, of course.

7         Q.    And I'd like to publish Exhibit 61.

8              (Exhibit 61 received into evidence.)

9         Q.    (BY MR. GEE:)  Is this something that you prepared,

11:47AM  10   Ms. Stanin?

11        A.    The map actually is from a published document by

12   other hydrogeologists, but I am using it for the purposes of

13   overall local flow in the south fork of the Santa Clara Valley

14   in this area.

11:48AM  15        Q.    And so taking a look, I see some -- some blue lines

16   that have numbers written on it, like 1300, 1250 -- or 1200,

17   1100.  Well, what are those lines?

18        A.    Those lines are the groundwater elevation lines.  So

19   these -- this is the elevation of the groundwater beneath the

11:48AM  20   surface.

21        Q.    And did you previously refer to those as contour

22   lines?

23        A.    Yes.  I did.

24        Q.    And again, what was the importance of contour lines?

11:48AM  25        A.    The contour lines give you some sort of framework so

1   that you can draw flow lines perpendicular to those and have an

2   understanding of the direction the groundwater's flowing.

3          THE COURT:  And, Mr. Gee, when you're referring to

4   exhibits that are attached to her report, please make sure that

11:49AM  5   you're not just referring to the exhibit but also referring to

6   the fact that it's attached to her report so the record is

7   clear.

8          MR. GEE:  I will do so, Your Honor.  Thank you.

9      Q.   (BY MR. GEE:)  And once you drew the contour lines,

11:49AM  10  did you do anything else with this -- this exhibit?

11     A.   I think there are some flow arrows that I just

12  simply added to give us a little bit of understanding that,

13  again, groundwater's flowing from the upland areas toward the

14  South Fork Valley and then toward the Santa Clara River.  There

11:49AM  15  aren't any flow arrows on the Whittaker site at this point.

16  This is only sort of these regional flow lines.

17         But after Whittaker installed a lot of the wells,

18  especially after 2002 and going forward, that provided a lot

19  more detail for on-site flow lines to be drawn.

11:49AM  20     Q.   Okay.  And once you have the groundwater flow near

21  the Whittaker-Bermite site, did you take a closer look at the

22  impacted areas at the groundwater -- at the Whittaker-Bermite

23  site?

24     A.   Yes, to look at groundwater flow for those areas.

11:50AM  25     Q.   And did you use the same concept of drawing contour

```
          1    lines and drawing flow arrows and -- in your analysis?

          2         A.   Yes.  I used the contour maps that are published

          3    quarterly by Whittaker consultants.

          4              MR. GEE:  Okay.  I'd like to introduce Exhibit 190,

11:50AM   5    which is stipulated and was part of Ms. Stanin's expert report.

          6              (Exhibit 190 received into evidence.)

          7              THE COURT:  And again, for clarity purposes, is this

          8    a standalone exhibit or is this part of her expert report

          9    exhibit?

11:51AM  10              MR. GEE:  We identified this as being a standalone

         11    exhibit.

         12              THE COURT:  And if you would use that term, that

         13    would be clear, standalone exhibit versus it's an exhibit to

         14    her report.

11:51AM  15              MR. GEE:  Okay.  Yeah.

         16              THE COURT:  Thank you.

         17              MR. GEE:  Thank you.

         18         Q.   (BY MR. GEE:)  And, Ms. Stanin, what does this

         19    drawing represent?

11:51AM  20         A.   So now we've sort of focused in on the western

         21    portion of the Whittaker site.  And these are contours,

         22    groundwater elevation contours drawn by Whittaker.  And they

         23    measure the elevation of the groundwater in each one of those

         24    black dots.  And then they post that data and draw these blue

11:51AM  25    contours to help us understand local groundwater flow.
```

**UNITED STATES DISTRICT COURT**

1    Q.    And again, you have -- looks like you have flow

2    direction arrows.  And are those flow direction arrows

3    perpendicular again to the contour lines?

4    A.    They are.  And I reproduced those from the Whittaker

11:51AM  5    report, just so that we would all understand that this is not

6    my interpretation.  This is Whittaker's maps.  So I agree with

7    it.  But the flow lines were put onto the map by Whittaker.

8    Q.    Okay.  And what did you do next?

9    A.    Um, so the, um -- you have a good understanding at

11:52AM  10   this point with the contour map on potential groundwater

11   pathways.  And so you can draw perpendicular lines to begin to

12   develop pathways moving from the areas of contamination offsite

13   so you can get some kind of understanding about direction.

14        And I've got two of the pathways indicated here by

11:52AM  15   these green arrows.  So again, the process is sort of following

16   perpendicular to the groundwater elevation contours and seeing

17   where that leads you in an offsite direction.

18        Again, I left the blue flow line arrows on to

19   demonstrate that I'm being consistent with the flow directions

11:53AM  20   indicated by Whittaker.

21   Q.    And did you do anything else with this diagram to --

22   that may help us understand whether or not these flow

23   directions are, indeed, the flow directions of groundwater?

24   A.    Well, in this particular case, we also had some of

11:53AM  25   the contaminants shown with these maps.  And so I reproduced

UNITED STATES DISTRICT COURT

1    that in order to show that the groundwater quality data also is

2    consistent with these pathways.

3              So what has just been popped up is this -- these

4    pink areas, which are concentrations of perchlorate in

11:53AM  5   groundwater.

6         Q.    And just for clarification, Ms. Stanin, which of the

7    aquifers did you choose to make this depiction?

8         A.    This is in one of the S-3 aquifer layers.  Again,

9    it's where most of the contamination resides.

11:54AM 10        Q.    Okay.  And I notice that the flow lines and the

11   contamination flow both to the north and south of OU-4.  Is

12   that the predominant flow pattern?

13        A.    Yes.  You see that northwesterly pathway in a lot of

14   the groundwater elevation data, even going back to the 1990s.

11:54AM 15   I think we had in our 2003 expert report that pathway

16   delineated at that time as well.

17        Q.    So does this demonstrate that most of the

18   groundwater flow and contamination -- contaminants flow around

19   the western border of the Whittaker-Bermite site?

11:55AM 20             MR. BLUM:  Objection.  Leading.

21             THE COURT:  Sustained.

22        Q.    (BY MR. GEE:)  What does this tell you about

23   groundwater flow along the western portion of the

24   Whittaker-Bermite site?

11:55AM 25        A.    Well, the -- as indicated by the two green pathway

**UNITED STATES DISTRICT COURT**

lines, we see that groundwater is flowing to the northwest off

of the site, migrating off of the site.  And to the west --

almost southwest in some portions of the site, they are turning

back toward the northwest.

11:55AM    Q.    Okay.  And once you established that -- the flow

direction leaving the Whittaker-Bermite site, did you do

anything to determine as to possible pathways to the production

wells that were -- were part of your study?

A.    Yes.  So you can see that both of those example

11:56AM  pathways that I have plotted on this map go toward the water

supply wells.  You can see that that northerly pathway that

I've drawn, that green line sort of pointing toward the

Saugus 1 and Saugus 2 wells and the southerly green line is

pointing sort of toward the V-201 well.

11:56AM    Q.    Okay.  And were the Saugus 1 and 2 and V-201 wells,

were they the only ones that were impacted from the

Whittaker-Bermite site?

A.    Um, well, with respect to perchlorate, all four

wells have been impacted.  And with respect to TCE, all four

11:56AM  wells have been impacted.  When I say "four wells," I mean the

Saugus 1, Saugus 2, V-201 and V-205.

Q.    Okay.  And once you establish the flow pattern off

of the Whittaker-Bermite site, what did you do next?

A.    Well, the delineation of pathways exercise goes a

11:57AM  little bit further than just these two green lines.  So we

1    looked at additional pathways at various times and plotted

2    those as well.

3        Q.    And would that be the stipulated Exhibit 184 that --

4    from your expert report that I would like to publish at this

11:57AM    5    time?

6            (Exhibit 184 received into evidence.)

7            THE WITNESS:   Yeah.   So there are -- there are --

8    the first thing that you see on this animation here is just

9    sort of a dot map.   And we haven't talked about this yet --

11:58AM    10            (Telephonic interruption.)

11            MR. BLUM:   Sorry, Your Honor.

12            THE WITNESS:   What we see on the map are colored

13   dots, and these are the monitoring wells.   And I've color coded

14   these wells with respect to TCE concentration.

11:58AM    15        So the highest concentration that had been seen in

16   that well got a color code.   And the purple and the red are

17   higher concentrations than the yellow.   And then you go down to

18   green.   And then the white dots have not detected

19   perchlorate -- I'm sorry, have not detected TCE.

11:58AM    20        So you can see from the map that there are very few

21   wells that have not detected the VOC contamination with respect

22   to TCE.   And you can see the areas where the -- the

23   concentrations are the highest.

24        Q.    (BY MR. GEE:)   And the concentrations that are

11:58AM    25   highest, just looking at the table, is the ones that are in

```
 1    purple; is that correct?

 2         A.    Yes.

 3         Q.    And how much -- and what did you compare the -- the

 4    concentrations to when you -- when you made this drawing?

 5         A.    Again, we're comparing these two, the drinking water

 6    standard.  So the MCL, which is shown there on the legend.  So

 7    the concentrations that are purple are greater than 100 times

 8    the MCL, for example.  So when you see a purple dot, then that

 9    concentration was 500 parts per billion or micrograms per liter

10    in groundwater in that well at one time.

11         Q.    And approximately what is -- what was the highest

12    reading that -- that you picked up in any one of these

13    monitoring wells?  Do you remember?

14         A.    Yeah.  I think for TCE, it was almost a thousand

15    times the MCL.  We just saw that on a table.  My recollection

16    is 4,700 micrograms per liter.

17         Q.    Okay.  And once you -- once you plotted the

18    concentrations in the onsite monitoring wells, what did you do

19    next?

20         A.    Well, as a check for the TCE, I took a look at where

21    we had seen perchlorate.  So there was the comparison of

22    where's perchlorate in groundwater to where is TCE in

23    groundwater.

24         Q.    And what does this -- what does this, I guess,

25    yellowish orange shading represent?
```

     1          A.     So you can see by the label that's in that upper

     2   left-hand corner there, this is the max -- the approximate

     3   extent of perchlorate that's been detected above the reporting

     4   level in the Saugus aquifer.  So this is a sort of way of

12:00PM  5   looking at the contaminant -- I mean, the coming of plumes of

     6   perchlorate in the area.

     7          And the reason for comparing my dot map, I'll call

     8   it, to the orange extent area is I was seeing, you know, are

     9   there areas where the TCE has been detected and are those the

12:01PM 10   areas within the perchlorate plume?  And I think you can see

    11   that the answer to that is generally yes.

    12          Q.     And I believe you testified earlier that the

    13   contaminants move from the Whittaker site in the same general

    14   direction, meaning that -- I guess TCE and PCE move in the same

12:01PM 15   direction as perchlorate?

    16          A.     Yes.

    17          Q.     Would the TCE and PCE ultimately move into the areas

    18   that you have depicted in the orange yellowish plume?

    19          MR. BLUM:  Objection, Your Honor.  Assumes facts not

12:01PM 20   in evidence and speculation.

    21          THE COURT:  Rephrase your question, please.

    22          Q.     (BY MR. GEE:)  Ms. Stanin, is there any dispute

    23   among the expert witnesses as to whether TCE and PCE flow in

    24   the same direction, general direction as perchlorate?

12:02PM 25          A.     No, I don't think so.

1      Q.    Has any of Whittaker's experts argued that the TCE

2   and PCE do not flow in the same direction as perchlorate?

3      A.    Not that I'm aware of.

4      Q.    Okay.  So would you expect TCE and PCE to ultimately

12:02PM   5   reach the areas where perchlorate has reached?

6            MR. BLUM:  Speculation.

7            THE COURT:  Rephrase your questions in terms of

8   expert opinion, please.

9            MR. GEE:  Okay.

12:02PM  10      Q.    (BY MR. GEE:)  As an expert, would you conclude that

11   the TCE and PCE would ultimately match or develop a plume, if

12   you will, that is similar to the plume that we see in orange

13   and yellow -- orange-ish yellow?

14      A.    Well, the analysis is specifically to the water

12:03PM  15   supply well.  So it would definitely reach the water supply

16   wells.  And my opinion is that it has.

17      Q.    Okay.  And once you -- once you've -- once you've

18   developed this plume map, what did you do next?

19      A.    Well, I don't know if it was actually next, but I

12:03PM  20   did a lot of additional things to corroborate and to support

21   the analysis going forward.  Um, I -- I did check the

22   pathway -- the pathways that I had delineated and specifically

23   for the most contaminated aquifer layer, and those are these

24   arrows now.

12:04PM  25            So we've been looking at blue arrows before as flow

1    lines, and that's generally what these still are except for

2    that I interpreted these lines based on a series of water level

3    contour maps over time.

4             And so, again, I think you can see that the blue

12:04PM 5    arrows fall within the orange area of perchlorate, indicating

6    that the pathways of TCE are similar to the pathways for

7    perchlorate.

8        Q.    These drawings of pathway arrows, I believe they

9    come from trial Exhibit 194 that was stipulated.  Is that

12:04PM 10   correct, Ms. Stanin?

11       A.    That -- that may be right.  I'm not 100 percent sure

12   of the trial exhibit.  But it's Figure 20-7, I believe, in my

13   expert report.

14            (Exhibit 194 received into evidence.)

12:05PM 15       Q.    (BY MR. GEE:)  Okay.  Now, when we mention pathways

16   and these depictions, are you suggesting that the contaminants

17   flow exactly on these blue arrows?

18       A.    No.  You can see the blue arrows themselves have a

19   little bit of thickness.  There's a little bit of sinuosity in

12:05PM 20   the groundwater system.  So that occurs over time.  And

21   groundwater changes flow directions just a little bit here and

22   there with respect to flood years and drought years and -- and

23   that kind of thing.

24            But in general, the pathways are reasonable for

12:05PM 25   getting from the Whittaker site to the water supply wells.

1      Q.    Okay.  Ms. Stanin, once you drew these pathways, did

2    you do anything to -- what was the next step of your analysis?

3      A.    Well, just keeping along the same lines of looking

4    at the comparison of where perchlorate is and where TCE is, I

12:06PM    5    did look at about 20 or so graphs of contamination

6    concentration over time and compared those graphs for TCE to

7    the graphs for perchlorate to see if those two contaminants

8    seem to be varying together, in other words, fluctuating

9    together.  When the TCE goes up, does the perchlorate go up?

12:06PM   10    When the TCE goes down, does the perchlorate go down?  So we

11    call those covariance charts.

12      Q.    And did you have covariance charts in your expert

13    report?

14      A.    Yes, we did, three large figures of multiple graphs.

12:06PM   15    I think there are 20 or so in the expert report.  I didn't

16    think everybody wanted to see every single graph from that

17    report, so I selected three of them as examples.

18      Q.    And were these figures from your expert report

19    marked separately as Exhibits 172 and 173?

12:07PM   20         THE COURT:  Why don't you just present them to her.

21    She's not going to remember what the exhibit numbers are.

22         MR. GEE:  Okay.  All right.  I'd like to present

23    Exhibit 172 and 173.

24         (Exhibits 172 and 173 received into evidence.)

12:07PM   25      Q.    (BY MR. GEE:)  Are these figures from your expert

835

report, Ms. Stanin?

A.    Yes.  They're a combination of two figures but yes.

Q.    And what do these figures represent?

A.    So I just mentioned the graphs.  So let's take a
look at these graphs so we can see what we're doing here.

So these are graphs of concentrations of TCE, green,
and perchlorate, red, over time.  And the graph's concentration
levels are shown on the left there on a logarithmic scale.  And
time from about 2006 to -- through 2020 is shown there as the
date on the X axis.

And so the point of taking a look at these graphs is
to see whether or not the graphs are similarly varying for the
two different contaminants.  Again, if one goes up, does the
other one go up?  If one goes down, does the other one go down?

It isn't perfect because the concentrations in
groundwater are going to vary a little bit more than this over
time.  But I think you can generally see and agree with me that
the two curves that you see in each one of these graphs seem to
indicate that they are varying together.  And because they're
varying together, then that indicates that at these locations,
they're migrating together in the groundwater.

Q.    Okay.  So after you establish that the contaminants
covaried at the Whittaker site, what did you do next?

A.    I looked offsite as well, and there was good
covariance in a variety of the areas.  Essentially what I'm

1    trying to do with the entire process is to see whether or not

2    TCE and perchlorate are migrating together because we know that

3    perchlorate is already in the water supply wells.

4            So if TCE is migrating along the same pathways and

12:09PM   5    with the perchlorate, then the TCE in the water supply wells

6    may also be from Whittaker.

7        Q.    Okay.  And once you establish the groundwater flow

8    direction and look at the contamination, did you look again at

9    the cross-section of the -- of the -- of the land beneath -- or

12:10PM   10    of the Whittaker site?  And what -- what did you -- what did

11    you conclude with respect to the pattern for which

12    contamination flows beneath the site?

13        A.    Well, so everything that we've been looking at with

14    respect to these concentrations so far have been on maps.  And

12:10PM   15    so, again, I wanted to go back to the slice of the earth and

16    make sure that it made sense with respect to the contaminated

17    aquifers.

18            So this is the profile that we saw before, remember

19    the yellow layers are the primary aquifers that we see beneath

12:11PM   20    the site and they are the wells beneath the Whittaker site and

21    the water supply wells.  And so our overlay here on this is the

22    contamination that we saw from the monitoring wells has been

23    plotted and adhered to on this diagram and the contamination

24    that we see in the water supply wells as well.

12:11PM   25            So what this represents in this subsurface is an

```
               1    area of the TCE plumes that I'm mapping with respect to the

               2    pathways.  This is a profile along with those pathways.  And

               3    you can see that the TCE contamination that's been seen in the

               4    water supply wells are in the same aquifer areas.  They're on

12:11PM        5    the same pathway.  And they're upgradient with respect to

               6    groundwater flow.

               7         So it makes a lot of sense, I think, that the TCE

               8    that's seen in Saugus 1 and Saugus 2 originated from the

               9    Whittaker site.

12:12PM       10         Q.   And does this diagram -- is this document consistent

              11    with the table that you had, Table 5, that showed the highest

              12    levels of contamination in HSU-3 and HSU-5?

              13         A.   Yes.

              14         Q.   And, Ms. Stanin, did you conduct any analysis in

12:12PM       15    terms of groundwater flow rates?

              16         A.   Um --

              17         Q.   Or contamination flow rates?  I'm sorry.

              18         A.   Yes.  Um, only -- only as an order of magnitude

              19    estimate to make sure that the groundwater velocities were not

12:12PM       20    going to be a controlling factor in the analysis.  Other

              21    experts are doing more detailed work on that, so I didn't have

              22    to cover all of that in the scope of my work.

              23         But I did want to include some of the information

              24    and data that we had to make sure that, you know, it wasn't

12:13PM       25    something that was going to say that the contamination didn't
```

**UNITED STATES DISTRICT COURT**

```
 1    leave the site until, you know -- at the middle ages, for

 2    example.  You have to kind of make sure you're in the ballpark

 3    with respect to the groundwater flow times.

 4         Q.    And did you calculate the groundwater velocities in

 5    the most impacted zones of S-3 and S-5?

 6         A.    Yes, we did.

 7         Q.    And was that in your expert report?

 8         A.    Yes, it was.

 9         Q.    And I'd like to display Table 8 from your expert

10    report, which is Exhibit 526.

11               MR. GEE:  Which is stipulated.

12               THE COURT:  So this is a standalone Exhibit 526?

13               MR. GEE:  Yes.

14               THE COURT:  Thank you.

15         Q.    (BY MR. GEE:)  And, Ms. Stanin, what do we see in

16    this table?  What is on the left-hand side -- or left-hand

17    column?

18         A.    Those are the aquifer designations.  So you can see

19    that I've included S-3, S-5, and S7, the details on this table.

20         Q.    And in the second column you have "Area," why did

21    you -- and what does onsite and offsite refer to?

22         A.    Onsite is -- is the Whittaker site.  So the data

23    that's incorporated into the rest of the calculations for the

24    onsite came from onsite well data, and the offsite came from

25    the offsite water supply well data.
```

12:13PM (line 5)
12:13PM (line 10)
12:14PM (line 15)
12:14PM (line 20)
12:14PM (line 25)

Q.   And hydraulic conductivity?  What is that, just in very general terms?

A.   It's representative of the properties of an aquifer. It has to do with how fast water would drain from an aquifer if you turned it up and gave it a gradient of 1.  So it just gives you some kind of an idea about the permeability and properties of the aquifer.

Q.   And similarly, hydraulic gradient.  What -- in very general terms, what is a hydraulic gradient?

A.   Well, remember we talked about groundwater flowing from high elevation to low elevation.  And so if you take those two numbers, that represents a gradient.  So that's how you get the groundwater gradient.

Q.   And the last column you have, Average Linear Groundwater Velocity, what does that number represent?

A.   Um, it's pretty self-explanatory.  It talks about it being an average velocity, which is correct, that's what the equation is -- is meant to look at.  And it's linear in that there are a lot of kind of little sinuous ways that water would move around the sand grains, but we're talking about a velocity that is sort of average, just in a linear direction.  So it might be moving faster in the subsurface.  But overall, it takes a while just to get from Point A to Point B, and that linear portion is what's embedded in the equation.

Q.   And I notice that, for example, in HSU No. 3, you

UNITED STATES DISTRICT COURT

1   have both an onsite and offsite groundwater velocity.  Is there

2   an explanation as to why the onsite groundwater velocity is so

3   much higher than the offsite groundwater velocity?

4          A.    Yes.  It's a function of how you determine what's

12:16PM  5   going on with respect to the velocity.  So the hydraulic

6   conductivity is field data.  You pump a well.  You do

7   measurements.  You get some understanding of the properties of

8   the aquifer from that process.  And so onsite wells, remember

9   those groundwater monitoring wells give you the opportunity to

12:17PM  10  look just at an aquifer layer.  But the water supply wells are

11  screened over multiple layers.  So when you pump that well,

12  you're getting water from all of the aquifer layers that are in

13  that well.

14          And so that's sort of averaging.  We call it a bulk

12:17PM  15  average.  And that's sort of averaging all of the information

16  from all of those various aquifers.  And as a result of that,

17  you're combining the really fast aquifers with the really slow

18  aquifers.  So you get this sort of averaged number.

19         Q.    Okay.  And I notice a similar pattern for Saugus --

12:17PM  20  the S-5.  Did you also use field data to -- to make these

21  calculations?

22         A.    Yes.  Everything on this table is based on measured

23  data from the field.

24         Q.    Okay.  I'd like to go back to the -- what was called

12:18PM  25  Exhibit 190.

1            Ms. Stanin, when you took a look at the travel -- or

2    the distance, the travel from, let's say, the burn area, which

3    I believe was one of the heavily impacted areas, to Saugus 2,

4    about what percentage of the migration pathways -- pathway is

12:18PM    5    onsite in HSU-3?

6        A.    Um, almost all of it.  Um, you know, maybe 80,

7    90 percent.  You can't exactly see that on this figure because

8    it doesn't include OU-3 on here.  Maybe if you go to the

9    exhibit that we looked at just after this one, we'll have the

12:19PM    10    whole Whittaker site on that one and you maybe can see it a

11    little bit better.

12            Yeah.  Thank you.  So --

13            THE COURT:  Let's just make sure you have a record

14    of what --

12:19PM    15            MR. GEE:  I'm sorry.

16            -- what we're looking at what was previously

17    displayed as Exhibit 184, which is a diagram from Ms. Stanin's

18    expert report.

19            THE WITNESS:  Right.

12:19PM    20            THE COURT:  Please continue.

21            THE WITNESS:  And if you could pop up the flow

22    lines, the pathways arrows that I think are on here as well.

23            So the -- the Burn Valley that you were talking

24    about, OU-3, is actually the -- in the central portion -- oh.

12:20PM    25    I was told I could draw on this.  Is that correct?

**UNITED STATES DISTRICT COURT**

1      Q.    (BY MR. GEE:)  Yes.  I believe you could.

2      A.    Okay.  So here's the burn area.

3            And the question that you asked me was if I am going

4      from the purple burn area up to the Saugus 1 well along this

12:20PM    5      pathway here, which doesn't extend all the way down there on

6      just this map, then how much of that is actually onsite versus

7      offsite?

8            So if I do just a little bit of a drawing here --

9      hang with me -- and then I connect up my pathway and I go to

12:20PM   10      these wells, you can see that from this area to this area, we

11      are on site from here (indicating) to the beginning.  And then

12      the offsite area is this last little portion going toward the

13      well.

14      Q.    Okay.  And can we go back to Table No. 8, which was

12:20PM   15      Exhibit 526.

16      A.    Oh, dear.  Can I get rid of that now?

17      Q.    So, Ms. Stanin, are you saying that the -- the --

18      from the burn area to Saugus 2, the proper groundwater velocity

19      to apply would be the onsite groundwater?

12:21PM   20      A.    Correct.

21      Q.    And that would be 6.65 feet per day?

22      A.    Correct.

23      Q.    Based on 6.65 feet per day, approximately how long

24      would it take for contamination in the Burn Valley area to

12:21PM   25      reach the -- the border of the Whittaker-Bermite site?

**UNITED STATES DISTRICT COURT**

1          MR. BLUM:  Objection.  Beyond the scope of the

2     report and her deposition.

3          Q.    (BY MR. GEE:)  Did you do a calculation, Ms. Stanin,

4     in terms of -- in your expert report on the amount of time it

12:22PM  5     would take for materials to travel to the border of the

6     Whittaker-Bermite site?

7          A.    So I believe the expert report had the, um,

8     estimation of feet per year of onsite for average onsite

9     groundwater velocities.

12:22PM  10          Q.    And based on your average, what was the average

11     onsite groundwater velocity that you used in your expert

12     report?

13          A.    Onsite, I think it was 5.6, perhaps, something like

14     that.

12:22PM  15          Q.    Okay.  And based on that 5.6 feet per day, did you

16     make a rough estimate in terms of how long it would take for

17     contamination on the Whittaker-Bermite site to reach the

18     boundary of a Whittaker-Bermite site in your expert report?

19          MR. BLUM:  Your Honor, this is not in the expert

12:23PM  20     report.

21          THE COURT:  Overruled.  She's asked the question

22     that you're objecting to.

23          THE WITNESS:  I think what I did is show that the

24     movement of groundwater would be consistent with about

12:23PM  25     3,000 feet per year.  And so you can just determine -- you

1   can -- it's just simple math after that.  If you want to go

2   from the burn area and it's 10,000 feet, then three-and-a-half

3   years, something like that.  It's an estimate.

4        MR. GEE:  Okay.  Your Honor, I would like to enter

12:23PM  5   Exhibit 526 into evidence.

6        THE COURT:  It will be received.

7        (Exhibit 526 received into evidence.)

8        Q.   (BY MR. GEE:)  Ms. Stanin, did you do anything else

9   in your expert report that would be helpful to understand the

12:24PM  10  flow paths and the flow velocity of contamination from the

11  Whittaker site to the groundwater wells?

12        A.   Well, there were a variety of other things in the

13  expert report, but I think we've covered most of the pathway

14  analysis.

12:24PM  15        MR. GEE:  Okay.  Your Honor, I'm finished with my

16  examination.

17        THE COURT:  All right.  What we'll do, since it's

18  now 12:25, is we'll go ahead and break until -- we'll take a

19  30-minute break, and that will take us to just five minutes to

12:24PM  20  1:00.

21        So please remember, do not speak to anyone about the

22  case, the people, or the subject matter involved.  Continue to

23  keep an open mind.

24        Please leave your notebooks behind and take

12:24PM  25  everything else with you and enjoy your lunch.  See you back

```
 1    here in -- at 12:55.  Thank you.

 2                THE COURTROOM DEPUTY:  All rise for the jury,

 3    please.

 4                (Out of the presence of the jury:)

 5                THE COURT:  We're in recess until 12:55.

 6                (Morning proceedings adjourned at 12:24 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

12:25PM

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


          I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.




          DATED THIS 23RD DAY OF NOVEMBER, 2021.




          /S/ MYRA L. PONCE

          _____
          MYRA L. PONCE, CSR NO. 11544, CRR, RDR
          FEDERAL OFFICIAL COURT REPORTER




**UNITED STATES DISTRICT COURT**

# $

**$10** [1] - 699:23

# '

**'80S** [2] - 758:7, 762:9
**'90S** [2] - 752:15, 762:9
**'94** [2] - 773:25, 774:4
**'DRINKING** [1] - 770:22
**'THE** [1] - 770:19
**'WHITTAKER** [1] - 747:7

# 1

**1** [34] - 692:5, 739:3, 739:7, 755:9, 755:12, 756:20, 756:21, 760:19, 763:23, 763:24, 764:17, 764:25, 771:14, 776:9, 776:10, 778:14, 780:19, 780:24, 790:13, 790:17, 790:25, 791:12, 796:9, 811:6, 811:7, 811:12, 812:23, 828:13, 828:15, 828:21, 837:8, 839:5, 842:4
**1'S** [1] - 764:1
**1.3** [1] - 756:12
**1.70** [1] - 763:24
**1.9** [1] - 765:4
**10** [1] - 748:23
**10,000** [2] - 762:25, 844:2
**100** [3] - 793:24, 830:7, 833:11
**1064** [1] - 693:12
**10:30** [1] - 786:25
**10:45** [2] - 786:25, 787:6
**11** [6] - 719:9, 757:17, 806:5, 806:24, 807:2, 808:21
**110** [1] - 767:20
**1100** [1] - 823:17
**12** [4] - 759:20, 772:12, 804:6, 804:7
**1200** [1] - 823:16
**1250** [1] - 823:16
**12:24** [1] - 845:6
**12:25** [1] - 844:18
**12:55** [2] - 845:1, 845:5

**13** [5] - 758:16, 760:11, 768:6, 768:21, 784:5
**1300** [1] - 823:16
**1382** [1] - 701:20
**14** [9] - 715:12, 716:1, 758:16, 759:10, 759:24, 761:3, 770:9, 784:6
**1417** [1] - 694:3
**1418** [1] - 697:19
**15** [9] - 715:13, 716:1, 746:24, 747:8, 747:10, 747:12, 748:7, 748:23, 749:11
**158** [2] - 790:14, 790:16
**159** [3] - 816:22, 816:25, 817:4
**15TH** [1] - 758:2
**16** [3] - 747:21, 748:4, 748:14
**168** [2] - 807:5, 807:11
**17** [2] - 708:3, 767:13
**171** [2] - 797:25, 798:2
**172** [3] - 834:19, 834:23, 834:24
**173** [3] - 834:19, 834:23, 834:24
**18-06825-SB** [1] - 692:6
**184** [3] - 829:3, 829:6, 841:17
**185** [2] - 810:20, 810:24
**19** [3] - 697:3, 701:20, 768:9
**190** [3] - 825:4, 825:6, 840:25
**1930S** [1] - 803:6
**194** [2] - 833:9, 833:14
**1943** [3] - 747:24, 747:25, 748:16
**1967** [5] - 743:15, 746:7, 749:13, 749:19, 749:22
**1980** [1] - 783:16
**1983** [2] - 758:2
**1985** [1] - 805:19
**1987** [4] - 747:25, 785:3, 785:6, 807:22
**1989** [2] - 807:16, 807:25
**1990S** [1] - 827:14
**1993** [3] - 751:14, 752:1, 765:17
**1994** [5] - 756:11, 756:15, 758:25, 759:12, 763:11,

**774:16, 784:10, 785:5, 786:10
**1996** [1] - 767:14
**1998** [2] - 749:13, 784:24
**1999** [16] - 694:8, 696:11, 753:5, 761:22, 762:10, 762:20, 763:8, 774:22, 784:22, 784:24, 784:25, 785:3, 786:3, 786:7, 786:9, 786:10
**19TH** [2] - 712:17, 721:22
**1:00** [1] - 844:20

# 2

**2** [17] - 708:3, 739:3, 739:8, 790:25, 791:12, 802:7, 802:23, 811:6, 811:7, 811:13, 812:23, 828:13, 828:15, 828:21, 837:8, 841:3, 842:18
**2-FEET-PER-DAY** [1] - 802:16
**2.3.2** [1] - 757:18
**2.3.2.2** [1] - 758:1
**2.3.2.3** [1] - 758:14
**2.3.3.4** [1] - 760:12
**2.5** [1] - 765:10
**2.8** [1] - 768:7
**20** [7] - 703:7, 748:24, 751:5, 753:3, 781:20, 834:5, 834:15
**20-7** [1] - 833:12
**200** [2] - 804:25, 808:17
**2000** [10] - 706:20, 706:23, 726:6, 730:5, 761:16, 773:20, 783:25, 784:4, 784:18, 784:21
**2000S** [1] - 699:19
**2001** [10] - 709:18, 726:3, 726:6, 728:19, 733:23, 761:25, 808:24, 808:25, 809:16, 809:20
**2002** [42] - 728:19, 751:19, 751:20, 751:23, 755:8, 756:6, 757:6, 759:10, 759:17,

**759:18, 763:17, 765:12, 765:13, 765:14, 766:3, 766:7, 766:11, 766:18, 766:19, 767:2, 767:4, 767:13, 767:22, 767:24, 768:1, 768:14, 768:15, 768:22, 769:3, 769:5, 769:7, 769:25, 771:14, 773:6, 776:6, 776:12, 778:5, 791:18, 805:22, 810:2, 810:5, 824:18
**2003** [17] - 728:19, 728:21, 729:5, 729:11, 729:14, 792:1, 793:4, 793:10, 793:11, 793:19, 793:21, 793:22, 793:23, 794:1, 794:15, 795:20, 827:15
**2005** [2] - 729:12, 729:15
**2006** [10] - 792:1, 793:3, 793:7, 793:9, 793:11, 793:22, 794:2, 794:15, 795:20, 835:9
**2007** [11] - 700:13, 700:22, 729:13, 729:17, 729:20, 730:18, 730:20, 732:1, 737:8, 738:25, 739:22
**2008** [2] - 710:21, 728:3
**2009** [1] - 810:2
**2010** [4] - 733:3, 766:8, 766:11, 783:16
**2011** [5] - 732:20, 733:3, 733:9, 733:18, 734:14
**2012** [2] - 733:18, 734:14
**2013** [3] - 734:14, 749:11, 750:13
**2014** [5] - 734:14, 735:5, 735:13, 735:20, 735:23
**2015** [1] - 703:20
**2018** [28] - 711:23, 712:6, 712:11, 712:17, 713:16, 716:6, 717:1, 718:3, 718:21, 719:7,

**719:19, 719:23, 719:24, 720:5, 720:15, 720:16, 720:17, 720:19, 721:14, 722:2, 722:25, 723:5, 723:21, 724:2, 724:5, 724:6, 724:8
**2019** [26] - 707:5, 707:13, 707:18, 707:22, 708:3, 708:19, 752:17, 752:23, 752:24, 752:25, 753:3, 753:5, 753:12, 753:22, 753:25, 754:3, 754:9, 754:14, 754:22, 760:22, 761:2, 769:17, 769:22, 770:8, 773:4
**2020** [6] - 701:20, 752:21, 753:3, 795:17, 795:18, 835:9
**2021** [1] - 692:1
**205** [2] - 714:8, 751:1
**21** [1] - 756:15
**22** [3] - 692:1, 696:12, 770:19
**236** [1] - 761:1
**24** [1] - 772:11
**240** [1] - 693:4
**25** [1] - 776:11
**25,000** [1] - 768:3
**25,000-GALLON** [1] - 804:8
**26** [8] - 712:14, 716:6, 716:16, 718:5, 720:20, 721:17, 721:19, 768:22
**260,000** [2] - 803:11, 803:25
**2ND** [1] - 694:7

# 3

**3** [6] - 739:14, 739:18, 760:14, 760:18, 815:11, 839:25
**3,000** [1] - 843:25
**30** [3] - 702:14, 704:20, 754:25
**30-MINUTE** [1] - 844:19
**300,000** [5] - 803:25, 804:2, 804:4, 804:7, 804:11
**30TH** [1] - 758:2
**317** [5] - 760:19,

766:16, 766:20,
767:1
**34** [3] - 754:18, 754:24
**35** [1] - 805:16

## 4

**4** [4] - 708:3, 755:23,
756:12, 756:25
**4,700** [3] - 814:17,
814:23, 830:16
**40** [1] - 702:14
**40,000** [1] - 803:23
**405** [1] - 737:10
**41,000** [1] - 767:21
**42** [1] - 790:2
**45** [2] - 721:7, 721:10
**478** [1] - 698:17
**483-A** [1] - 700:22
**486** [3] - 756:19,
756:21, 757:19

## 5

**5** [6] - 770:9, 813:15,
814:23, 815:6,
815:11, 837:11
**5.6** [2] - 843:13,
843:15
**50** [1] - 702:14
**50,000** [1] - 766:25
**500** [2] - 816:13, 830:9
**526** [5] - 838:10,
838:12, 842:15,
844:5, 844:7
**528** [1] - 744:17
**54** [1] - 760:18
**56** [1] - 760:23
**5C** [1] - 811:25

## 6

**6** [4] - 770:18, 780:19,
780:24, 815:5
**6.65** [2] - 842:21,
842:23
**61** [2] - 823:7, 823:8
**69** [2] - 770:9, 770:11

## 7

**7** [4] - 694:6, 780:21,
789:18, 811:25
**7,000** [1] - 762:25
**70** [2] - 763:24, 772:11
**71** [1] - 772:11
**77** [5] - 760:23, 761:1,
761:3, 763:7, 763:20

## 8

**8** [12] - 704:20, 718:24,
719:11, 720:5,
721:2, 738:20,
738:22, 738:23,
766:14, 789:18,
838:9, 842:14
**80** [1] - 841:6
**803-8** [1] - 697:22
**82,000** [1] - 815:7
**8:03** [1] - 692:1
**8:30** [2] - 704:19,
704:21
**8TH** [4] - 719:8, 719:9,
721:14, 722:25

## 9

**9** [8] - 738:23, 764:24,
765:1, 765:4,
765:10, 766:14
**90** [3] - 702:2, 704:2,
841:7
**92,000** [1] - 765:21
**97-005** [4] - 701:21,
716:17, 717:2, 717:9

## A

**A.M** [1] - 692:1
**ABATE** [1] - 699:19
**ABERCROMBIE** [5] -
732:24, 741:2,
741:13, 741:18,
741:20
**ABERCROMBIE'S** [1]
- 741:22
**ABILITY** [1] - 738:10
**ABLE** [11] - 695:11,
695:13, 696:24,
702:25, 728:7,
782:16, 793:16,
793:23, 794:17,
808:9, 810:6
**ACCEPTS** [1] - 725:6
**ACCESS** [2] - 794:17,
794:23
**ACCURATE** [3] -
738:8, 742:13,
771:25
**ACCUSED** [1] -
739:21
**ACHIEVED** [1] - 781:3
**ACKNOWLEDGED** [1]
- 750:25
**ACKNOWLEDGES** [1]
- 750:22
**ACQUIRED** [9] -
742:21, 742:22,

743:14, 743:20,
746:6, 749:18,
749:20, 750:15,
750:17
**ACQUIRING** [1] -
745:6
**ACQUISITION** [2] -
743:15, 750:16
**ACRE** [1] - 752:9
**ACRES** [5] - 754:18,
754:20, 754:24,
754:25, 776:10
**ACRONYMS** [1] -
769:21
**ACT** [2] - 699:10,
822:8
**ACTION** [4] - 746:22,
781:5, 784:17,
785:12
**ACTION** [1] - 755:15
**ACTIONS** [2] - 794:6,
798:20
**ACTIVITIES** [2] -
758:3, 804:15
**ACTON** [4] - 751:9,
752:10, 762:24,
774:3
**ACTON-MICKELSON**
[4] - 751:9, 752:10,
762:24, 774:3
**ACTUAL** [1] - 775:15
**ADD** [1] - 818:3
**ADDED** [3] - 810:3,
818:4, 824:12
**ADDITION** [2] - 766:2,
809:9
**ADDITIONAL** [9] -
738:18, 790:24,
793:7, 797:15,
808:19, 809:19,
809:24, 829:1,
832:20
**ADDRESS** [6] -
693:10, 699:12,
700:4, 704:18,
712:19, 722:6
**ADDS** [1] - 702:5
**ADHERED** [1] -
836:23
**ADJOURNED** [1] -
845:6
**ADMISSIBILITY** [1] -
701:9
**ADMIT** [2] - 695:11,
747:14
**ADMITS** [2] - 747:11,
748:3
**ADMITTED** [5] -
693:17, 744:6,
745:6, 746:6, 748:16

**ADMITTING** [1] -
701:14
**ADOPTED** [1] - 697:20
**AFFIRMED** [1] -
792:13
**AGENCIES** [13] -
709:22, 710:3,
710:8, 710:10,
710:19, 726:17,
726:25, 727:12,
730:5, 731:8, 735:5,
736:23, 739:20
**AGENCIES'** [1] -
750:23
**AGENCY** [5] - 692:6,
699:10, 705:2,
713:14, 755:17
**AGENCY** [50] -
699:23, 700:1,
700:3, 709:24,
711:21, 711:24,
712:24, 713:16,
713:21, 713:22,
714:13, 714:14,
714:24, 716:5,
717:12, 718:21,
718:25, 719:13,
720:8, 720:15,
720:16, 720:20,
721:3, 721:13,
722:11, 723:1,
723:3, 723:10,
725:18, 727:1,
728:21, 730:18,
731:1, 731:4,
731:18, 731:24,
734:25, 737:8,
737:18, 738:4,
738:10, 738:25,
739:11, 739:22,
740:3, 740:11,
742:14, 742:15,
786:2, 786:10
**AGENCY'S** [3] - 719:3,
720:9, 785:20
**AGENDA** [1] - 719:12
**AGES** [1] - 838:1
**AGO** [13] - 714:14,
721:23, 731:11,
740:1, 741:11,
743:9, 751:5,
758:24, 760:1,
765:9, 781:8,
805:12, 823:1
**AGREE** [12] - 696:23,
719:9, 733:17,
733:22, 734:12,
739:17, 742:12,
762:20, 762:21,
785:18, 826:6,

835:17
**AGREED** [7] - 733:11,
734:23, 737:7,
740:22, 743:19,
757:4, 778:9
**AGREEING** [2] -
738:19, 776:4
**AGREEMENT** [50] -
700:14, 700:23,
713:8, 713:13,
714:6, 716:7,
717:14, 721:24,
729:5, 729:12,
729:13, 729:14,
729:15, 729:17,
729:24, 730:1,
730:5, 730:8,
730:18, 730:21,
731:7, 731:16,
732:2, 733:10,
733:23, 734:19,
735:1, 737:8,
737:24, 738:21,
739:1, 739:22,
740:3, 740:8,
740:12, 743:15,
746:7, 749:24,
761:22, 761:24,
761:25, 762:1,
773:1, 776:21,
778:10, 778:13,
778:17, 778:25,
784:10
**AGREES** [1] - 739:14
**AHEAD** [3] - 753:9,
764:21, 844:18
**AL** [1] - 692:7
**ALLEGATION** [15] -
743:16, 744:3,
744:6, 744:8,
746:14, 746:15,
746:17, 747:14,
748:7, 749:15,
750:9, 750:12, 751:1
**ALLEGATIONS** [5] -
699:9, 745:6,
747:19, 747:20,
749:8
**ALLEGED** [3] -
743:14, 747:22,
749:11
**ALLEGES** [3] -
746:25, 747:23,
748:15
**ALLEGING** [1] -
750:10
**ALLOW** [4] - 700:8,
703:14, 724:17,
786:14

**ALLOWED** [2] - 775:6
**ALLOWS** [1] - 798:13
**ALLUDED** [1] - 739:21
**ALMOST** [6] - 739:14, 789:17, 814:23, 828:3, 830:14, 841:6
**AMBIGUOUS** [1] - 730:10
**AME** [2] - 774:3, 774:15
**AMENDED** [4] - 745:1, 746:21, 747:21, 749:10
**AMERICA** [2] - 749:3, 750:10
**AMINI** [3] - 712:25, 715:7, 715:8
**AMIR** [6] - 776:25, 777:4, 777:10, 778:1, 778:12, 779:22
**AMOUNT** [9] - 706:21, 732:23, 739:15, 742:2, 769:8, 803:21, 804:11, 805:23, 843:4
**ANALYSIS** [11] - 701:9, 791:6, 791:10, 795:12, 825:1, 832:14, 832:21, 834:2, 837:14, 837:20, 844:14
**ANALYZE** [1] - 823:3
**ANALYZED** [1] - 693:17
**ANALYZING** [1] - 793:13
**AND** [2] - 706:7, 788:8
**AND'** [1] - 770:20
**ANGELES** [3] - 747:6, 748:10, 817:25
**ANGELES** [1] - 692:2
**ANGELES-VENTURA** [1] - 817:25
**ANIMATE** [1] - 808:21
**ANIMATED** [1] - 808:20
**ANIMATION** [5] - 791:7, 798:17, 799:4, 810:1, 829:8
**ANSWER** [1] - 772:20
**ANSWER** [41] - 708:12, 724:19, 727:19, 729:22, 733:21, 734:4, 737:3, 741:6, 741:19, 743:5, 743:25, 744:19,

744:22, 744:25, 745:3, 745:5, 745:9, 745:15, 745:16, 745:20, 745:22, 745:23, 746:6, 746:13, 746:15, 746:16, 747:9, 747:17, 748:2, 748:17, 750:5, 754:5, 759:15, 771:3, 771:20, 774:12, 779:9, 783:10, 786:17, 802:10, 831:11
**ANSWERED** [9] - 715:3, 718:8, 722:15, 732:8, 737:25, 746:10, 750:3, 759:13, 760:4
**ANTICIPATE** [1] - 822:17
**APOLOGIZE** [1] - 764:7
**APPEAR** [4] - 693:20, 694:8, 697:19, 812:15
**APPEARANCES** [1] - 692:8
**APPLIES** [1] - 694:4
**APPLY** [2] - 795:6, 842:19
**APPORTIONED** [1] - 699:11
**APPRECIATE** [3] - 699:2, 703:10, 703:11
**APPROACH** [6] - 764:19, 793:12, 793:15, 795:15, 795:19
**APPROPRIATE** [3] - 693:15, 704:9, 759:5
**APPROPRIATELY** [1] - 699:10
**APPROVAL** [2] - 781:3, 781:7
**APPROVE** [4] - 784:16, 785:14, 785:15
**APPROVED** [5] - 758:5, 758:8, 763:12, 781:6, 785:13
**APPROXIMATE** [1] - 831:2
**APRIL** [6] - 701:20, 706:23, 720:19, 726:12, 752:21, 761:16
**AQUIFER** [34] -

699:20, 789:9, 793:1, 796:7, 797:4, 801:7, 801:12, 801:14, 805:1, 805:24, 808:15, 810:10, 810:11, 810:12, 810:17, 812:3, 812:21, 813:3, 813:7, 813:10, 814:9, 814:12, 815:15, 827:8, 831:4, 832:23, 837:4, 838:18, 839:3, 839:4, 839:7, 840:8, 840:10, 840:12
**AQUIFERS** [26] - 792:18, 792:22, 796:5, 796:7, 801:9, 810:21, 811:11, 811:22, 812:5, 812:10, 813:6, 813:7, 813:8, 813:11, 813:24, 815:10, 815:12, 815:16, 815:17, 816:8, 827:7, 836:17, 836:19, 840:16, 840:17, 840:18
**ARBITRATION** [13] - 731:16, 732:5, 732:10, 736:13, 738:19, 739:13, 740:5, 740:6, 740:22, 741:10, 741:18, 741:23, 742:15
**ARBITRATOR** [1] - 737:14
**ARBITRATOR'S** [1] - 742:3
**AREA** [1] - 838:20
**AREA** [60] - 737:9, 737:10, 752:14, 766:16, 767:1, 767:6, 768:3, 777:13, 789:18, 789:20, 797:3, 798:10, 798:14, 799:6, 799:11, 800:14, 800:15, 803:6, 803:12, 803:14, 804:1, 804:13, 804:14, 804:16, 808:7, 808:10, 809:7, 809:12, 809:14, 810:6, 812:7, 813:4, 815:17, 817:9,

817:14, 818:15, 818:24, 819:21, 820:4, 821:24, 822:3, 822:5, 822:9, 822:10, 822:19, 823:14, 831:6, 831:8, 833:5, 837:1, 841:2, 842:2, 842:4, 842:10, 842:12, 842:18, 842:24, 844:2
**AREAS** [59] - 758:8, 759:10, 761:3, 761:18, 768:13, 768:14, 795:22, 797:10, 797:12, 797:15, 797:20, 797:23, 798:18, 798:19, 798:22, 799:1, 799:5, 799:7, 799:9, 799:14, 799:19, 799:22, 800:2, 800:4, 800:8, 800:17, 803:1, 805:20, 808:2, 808:5, 809:4, 809:6, 809:9, 811:16, 811:18, 811:20, 812:9, 815:13, 815:17, 817:22, 824:13, 824:22, 824:24, 826:12, 827:4, 829:22, 831:9, 831:10, 831:17, 832:5, 835:25, 837:4, 841:3
**ARGUED** [1] - 832:1
**ARGUMENTATIVE** [1] - 726:1, 730:11, 733:14, 734:16, 735:16, 736:2, 736:19, 740:16, 742:10, 772:3, 784:1
**ARIZONA** [1] - 788:20
**ARMAO** [1] - 778:8
**ARRANGE** [1] - 777:15
**ARRIVED** [1] - 723:16
**ARRIVES** [1] - 723:20
**ARROW** [1] - 819:8
**ARROWS** [18] - 818:1, 818:3, 818:6, 819:12, 824:11, 824:15, 825:1, 826:2, 826:15, 826:18, 832:24, 832:25, 833:5, 833:8, 833:17, 833:18, 841:22
**ARTICULATED** [1] -

818:2
**AS** [2] - 706:7, 788:8
**ASPECT** [2] - 737:21, 738:7
**ASPECTS** [2] - 789:7, 795:25
**ASSERTED** [1] - 728:5
**ASSESSMENT** [3] - 797:11, 797:22, 804:17
**ASSETS** [10] - 742:22, 743:20, 744:4, 745:7, 746:6, 747:1, 749:12, 750:1, 750:11, 750:17
**ASSIGNMENT** [3] - 791:20, 791:22
**ASSOCIATED** [2] - 804:1, 816:17
**ASSOCIATES** [1] - 694:7
**ASSUME** [1] - 773:20
**ASSUMED** [2] - 708:16, 722:14
**ASSUMES** [9] - 712:2, 726:1, 735:16, 741:4, 742:23, 745:8, 762:11, 783:17, 831:19
**ASSUMES** [1] - 736:19
**ASSUMING** [1] - 772:4
**ASYMMETRIC** [1] - 821:16
**ATTACHED** [7] - 713:3, 756:1, 756:3, 756:5, 763:20, 824:4, 824:6
**ATTACHING** [2] - 712:16, 756:24
**ATTEMPT** [1] - 767:14
**ATTEMPTS** [1] - 723:7
**ATTEND** [1] - 710:23
**ATTENDED** [1] - 720:4
**ATTENDEES** [1] - 718:19
**ATTENTION** [1] - 711:8
**ATTORNEY** [4] - 720:10, 723:17, 725:5, 748:19
**ATTORNEY** [1] - 776:18
**ATTORNEY'S** [1] - 783:6
**ATTORNEYS** [4] - 717:22, 719:2, 719:3, 720:9
**AUGUST** [11] - 707:5, 707:18, 708:3,

723:4, 723:21,
724:8, 752:17,
758:2, 769:17,
773:4, 795:18
**AVAILABLE**[1] -
714:10
**AVERAGE**[1] -
839:14
**AVERAGE**[6] -
839:17, 839:21,
840:15, 843:8,
843:10
**AVERAGED**[1] -
840:18
**AVERAGING**[2] -
840:14, 840:15
**AVERMENTS**[2] -
747:11, 748:4
**AVOID**[1] - 703:2
**AWARD**[1] - 742:3
**AWARE**[10] - 710:18,
715:19, 720:21,
720:23, 744:24,
755:6, 756:7,
756:10, 760:22,
832:3
**AXIS**[1] - 835:10
**AZIDE**[1] - 765:20

# B

**BACHELOR**[1] -
788:13
**BACKGROUND**[3] -
773:18, 773:24,
782:25
**BACKWARDS**[1] -
700:4
**BALLPARK**[1] -
838:2
**BANKRUPTCY**[1] -
708:17
**BASED**[17] - 696:25,
700:7, 726:20,
741:2, 771:25,
782:1, 782:9,
782:17, 792:14,
798:10, 798:11,
802:16, 833:2,
840:22, 842:23,
843:10, 843:15
**BASIC**[1] - 694:18
**BASIN**[12] - 789:8,
816:12, 816:18,
816:20, 816:22,
817:9, 817:12,
817:18, 817:20,
817:22, 817:24,
818:8
**BASIN**[2] - 789:16,

823:3
**BASINS**[4] - 816:13,
816:14, 816:15,
816:18
**BASIS**[6] - 710:20,
718:10, 746:25,
747:23, 772:5,
804:10
**BEACH**[1] - 801:2
**BECAME**[4] - 743:1,
753:9, 756:7, 768:13
**BECOME**[1] - 749:7
**BECOMES**[1] - 704:2
**BED** - 768:10
**BEGAN**[4] - 706:19,
720:4, 722:5, 800:7
**BEGIN**[1] - 826:11
**BEGINNING**[4] -
706:23, 727:19,
746:16, 842:11
**BEGINS**[1] - 760:19
**BEGUN**[1] - 794:5
**BEHALF**[7] - 692:11,
710:5, 711:23,
718:20, 749:2,
749:16, 750:9
**BEHIND**[2] - 694:23,
844:24
**BELIEF**[3] - 747:11,
748:3, 748:17
**BELIEVES**[3] - 697:4,
746:25, 747:22
**BELLA**[1] - 747:5
**BELOW**[4] - 734:1,
760:25, 796:16,
808:14
**BENCH**[1] - 698:18
**BENEATH**[28] -
752:8, 766:15,
766:20, 792:21,
796:10, 800:21,
800:25, 803:19,
804:18, 804:21,
805:1, 805:15,
809:17, 810:7,
810:11, 810:13,
810:15, 812:21,
815:10, 815:16,
815:21, 815:24,
816:8, 823:19,
836:9, 836:12,
836:19, 836:20
**BENT**[1] - 700:4
**BERMITE**[48] -
699:13, 742:21,
742:22, 743:1,
743:6, 743:14,
743:20, 743:21,
744:5, 744:6, 745:7,
746:7, 747:4, 747:5,

748:9, 748:10,
749:13, 749:18,
749:21, 749:22,
749:25, 750:1,
750:12, 750:17,
751:6, 773:21,
775:21, 798:16,
800:2, 803:2,
804:18, 804:21,
806:19, 810:11,
810:15, 823:4,
824:21, 824:22,
827:19, 827:24,
828:6, 828:17,
828:23, 842:25,
843:6, 843:17,
843:18
**BERMITE-
WHITTAKER**[1] -
751:6
**BEST**[3] - 718:21,
719:22, 754:7
**BETTER**[8] - 727:8,
793:17, 794:11,
809:1, 817:11,
821:18, 822:18,
841:11
**BETWEEN**[21] -
696:13, 699:8,
706:15, 718:3,
723:10, 723:14,
730:20, 736:23,
738:23, 739:5,
756:8, 757:13,
766:7, 766:11,
767:4, 783:16,
785:3, 786:10,
791:1, 810:2, 812:16
**BEYOND**[3] - 768:11,
802:17, 843:1
**BIG**[5] - 798:14,
814:17, 814:18,
814:25, 815:2
**BILLION**[3] - 814:23,
815:5, 830:9
**BIT**[22] - 693:3, 716:2,
724:17, 729:14,
769:6, 769:11,
769:15, 773:18,
789:1, 799:15,
802:4, 811:5, 815:5,
821:18, 824:12,
828:25, 833:19,
833:21, 835:16,
841:11, 842:8
**BLACK**[7] - 807:13,
807:14, 808:2,
808:7, 813:1,
820:23, 825:24
**BLANKING**[1] -

708:25
**BLENDING**[2] -
702:5, 702:7
**BLUE**[10] - 817:8,
817:9, 819:8,
823:15, 825:24,
826:18, 832:25,
833:4, 833:17,
833:18
**BLUM**[22] - 692:14,
694:17, 695:10,
697:3, 697:11,
697:17, 697:23,
700:20, 700:24,
701:7, 701:15,
802:17, 802:22,
806:8, 807:6,
810:22, 827:20,
829:11, 831:19,
832:6, 843:1, 843:19
**BLUM**[7] - 692:14,
694:16, 695:19,
695:25, 696:24,
700:18, 757:22
**BOARD**[1] - 701:21
**BORDER**[3] - 827:19,
842:25, 843:5
**BORROWED**[1] -
797:21
**BOTHERED**[1] -
797:21
**BOTTOM**[3] - 714:5,
768:21, 822:1
**BOUNDARIES**[1] -
768:11
**BOUNDARY**[2] -
776:11, 843:18
**BOWL**[1] - 760:25
**BREACHED**[2] -
740:3, 740:11
**BREACHING**[1] -
739:22
**BREAK**[2] - 704:24,
787:7
**BREAK**[3] - 786:25,
844:18, 844:19
**BRIAN**[1] - 776:17
**BRIEF**[3] - 718:1,
719:4, 720:6
**BRIEFLY**[4] - 746:19,
782:21, 789:1,
810:21
**BRING**[2] - 704:20,
764:21
**BROUGHT**[1] - 711:8
**BROWNFIELD**[1] -
775:25
**BUCKETS**[1] - 792:17
**BUILDING**[5] -
760:19, 761:1,

766:16, 766:20,
767:1
**BUILT**[1] - 729:25
**BULK**[1] - 840:14
**BURDEN**[1] - 701:5
**BURLING**[1] - 748:19
**BURN**[5] - 841:2,
842:2, 842:4,
842:18, 844:2
**BURN**[12] - 752:14,
765:19, 765:21,
767:15, 768:9,
768:10, 768:12,
768:16, 803:12,
803:15, 841:23,
842:24
**BUSY**[2] - 702:21,
703:11
**BY**[87] - 706:9,
709:10, 710:18,
712:5, 715:5,
715:24, 718:12,
721:11, 721:20,
724:22, 726:5,
728:14, 730:4,
730:16, 732:11,
732:19, 733:16,
734:11, 734:20,
735:18, 736:8,
736:22, 737:15,
740:21, 741:9,
741:19, 742:12,
742:19, 743:1,
743:9, 744:12,
744:21, 746:5,
746:18, 750:8,
751:18, 753:21,
758:13, 758:24,
759:9, 759:19,
760:11, 762:14,
764:24, 765:8,
766:7, 771:13,
771:24, 772:10,
773:4, 773:13,
774:14, 775:13,
777:25, 779:12,
782:5, 782:14,
782:23, 783:13,
783:21, 784:22,
785:23, 786:1,
786:6, 788:10,
790:17, 798:3,
802:25, 806:16,
806:18, 807:12,
811:4, 813:20,
817:3, 823:9, 824:9,
825:18, 827:22,
829:24, 831:22,
832:10, 833:15,
834:25, 838:15,

842:1, 843:3, 844:8

# C

**CALCULATE** [1] - 838:4
**CALCULATION** [1] - 843:3
**CALCULATIONS** [4] - 741:2, 741:14, 838:23, 840:21
**CALIFORNIA** [1] - 692:2
**CALIFORNIA** [18] - 701:21, 711:2, 727:2, 727:4, 728:2, 749:6, 753:23, 755:16, 755:17, 755:20, 756:8, 757:8, 758:9, 759:11, 776:18, 788:19, 816:14, 817:10
**CANNOT** [1] - 762:21
**CANYON** [2] - 760:24, 760:25
**CAP** [1] - 738:22
**CAPABLE** [3] - 805:21, 809:1, 813:2
**CAPTURE** [2] - 822:2, 822:5
**CAPTURED** [1] - 820:12
**CAPTURES** [2] - 822:2
**CARE** [1] - 735:1
**CAROLINA** [1] - 788:14
**CASE** [28] - 693:6, 695:8, 695:16, 696:4, 705:8, 707:10, 708:17, 708:21, 708:22, 709:2, 709:11, 710:12, 713:18, 727:17, 727:19, 728:23, 729:7, 731:2, 745:16, 745:21, 747:20, 787:1, 787:11, 811:15, 811:24, 814:4, 826:24, 844:22
**CASE** [1] - 692:6
**CASES** [2] - 800:14, 812:7
**CASTAIC** [2] - 713:13, 735:4
**CATCH** [1] - 821:18
**CC'D** [1] - 712:22

**CDM** [7] - 711:11, 711:13, 797:22, 798:20, 803:9, 803:22, 803:24
**CEASED** [1] - 807:21
**CENTER** [1] - 817:20
**CENTRAL** [1] - 749:6
**CENTRAL** [1] - 841:24
**CERCLA** [4] - 699:8, 727:22, 728:5, 729:2
**CERTAIN** [10] - 694:20, 696:1, 729:25, 731:17, 732:23, 758:8, 759:3, 784:11, 785:6, 805:20
**CERTAINLY** [8] - 746:4, 755:10, 756:6, 759:10, 763:17, 784:9, 804:13, 818:23
**CERTIFIED** [2] - 788:18, 788:19
**CETERA** [3] - 797:16, 798:12, 804:6
**CHALLENGED** [5] - 693:11, 695:6, 698:7, 698:15, 704:18
**CHANGE** [3] - 737:5, 818:24, 819:20
**CHANGED** [1] - 817:5
**CHANGES** [2] - 793:12, 833:21
**CHARACTERISTICS** [1] - 816:7
**CHARACTERIZE** [4] - 737:1, 737:4, 809:16, 810:6
**CHARACTERIZED** [3] - 699:20, 754:1, 784:13
**CHARTS** [2] - 834:11, 834:12
**CHASE** [1] - 696:21
**CHECK** [4] - 708:6, 807:23, 830:20, 832:21
**CHECKING** [1] - 693:25
**CHEMICAL** [1] - 768:1
**CHEMICALS** [3] - 754:7, 768:24, 770:23
**CHIEF** [1] - 705:9
**CHOOSE** [1] - 827:7
**CHOSE** [1] - 815:11
**CHRISTMAS** [4] - 735:5, 735:13, 735:20, 736:12

**CHRONOLOGY** [1] - 739:9
**CIRCLE** [2] - 821:15, 821:16
**CIRCLED** [1] - 791:3
**CIRCLES** [1] - 791:8
**CIRCLING** [1] - 821:21
**CITY** [1] - 718:17
**CLAIM** [8] - 728:5, 729:3, 742:6, 746:12, 746:14, 746:16, 747:18, 747:19
**CLAIMING** [1] - 697:2
**CLAIMS** [7] - 709:21, 710:2, 710:8, 710:9, 727:20, 727:21, 740:11
**CLARA** [7] - 728:6, 817:19, 817:24, 818:8, 823:3, 823:13, 824:14
**CLARIFICATION** [1] - 827:6
**CLARITA** [6] - 692:6, 699:9, 705:1, 718:17, 775:16, 790:21
**CLARITY** [1] - 825:7
**CLAY** [2] - 802:4, 812:12
**CLAYS** [1] - 812:8
**CLEAN** [7] - 776:2, 776:4, 776:24, 783:15, 783:24, 784:5, 794:6
**CLEANED** [3] - 776:8, 783:7, 786:7
**CLEANING** [2] - 776:6, 784:14
**CLEANUP** [5] - 699:15, 700:2, 780:25, 783:14, 786:3
**CLEAR** [6] - 750:8, 759:2, 769:16, 769:21, 824:7, 825:13
**CLEARLY** [2] - 695:1, 782:12
**CLIENT** [2] - 692:15, 785:19
**CLIENT'S** [1] - 725:7
**CLOSE** [12] - 721:25, 725:7, 747:7, 747:12, 747:25, 748:4, 749:14, 766:17, 769:2, 771:1, 791:12, 815:6
**CLOSED** [3] - 758:7,

758:16, 784:5
**CLOSER** [4] - 710:14, 737:10, 737:11, 824:21
**CLOSURE** [4] - 758:3, 758:5, 758:9, 758:14
**CLUSTERED** [1] - 808:1
**CLUSTERS** [2] - 809:5, 813:3
**CODE** [1] - 829:16
**CODED** [1] - 829:13
**COLE** [2] - 714:9, 741:17
**COLLEAGUES** [2] - 692:12, 795:10
**COLLECTED** [2] - 696:13, 795:4
**COLLECTION** [1] - 795:6
**COLLECTIVELY** [1] - 747:6
**COLOR** [2] - 829:13, 829:16
**COLORED** [1] - 829:12
**COLORFUL** [1] - 736:5
**COLORINGS** [1] - 812:6
**COLORS** [1] - 817:15
**COLUMN** [4] - 813:24, 838:17, 838:20, 839:14
**COMBINATION** [1] - 835:2
**COMBINING** [1] - 840:17
**COMING** [6] - 699:13, 709:11, 821:18, 822:15, 822:16, 831:5
**COMMENT** [1] - 708:20
**COMMENTS** [1] - 725:19
**COMPANIES** [1] - 747:4
**COMPANY** [25] - 723:17, 724:14, 724:15, 724:21, 724:24, 728:9, 748:11, 752:21, 752:22, 752:24, 761:21, 761:23, 761:24, 762:4, 773:20, 774:25, 775:13, 775:15, 775:16, 781:12, 784:4, 784:19,

784:20, 784:21
**COMPANY** [12] - 743:21, 744:6, 747:5, 747:6, 748:10, 748:11, 749:19, 749:21, 749:22, 749:25, 750:2, 750:17
**COMPARE** [2] - 819:19, 830:3
**COMPARED** [3] - 797:17, 815:3, 834:6
**COMPARING** [3] - 793:11, 830:5, 831:7
**COMPARISON** [3] - 790:12, 830:21, 834:4
**COMPILATION** [1] - 795:13
**COMPILED** [3] - 794:14, 797:4, 797:14
**COMPLAINT** [17] - 743:10, 743:13, 743:16, 743:25, 744:12, 744:16, 744:22, 745:1, 746:14, 746:21, 747:21, 748:12, 749:8, 749:10, 749:16, 750:9, 750:19
**COMPLETE** [6] - 762:22, 764:7, 764:11, 764:14, 784:20, 803:5
**COMPLETED** [9] - 758:5, 762:8, 762:18, 762:22, 762:25, 763:4, 763:8, 763:10, 785:18
**COMPLETELY** [2] - 738:8, 753:8
**COMPLETING** [2] - 786:3, 786:11
**COMPLETION** [3] - 781:4, 781:5, 785:16
**COMPLIED** [2] - 721:24, 740:18
**COMPLY** [1] - 764:1
**COMPRISED** [1] - 749:25
**CONCENTRATION** [6] - 767:20, 829:14, 829:15, 830:9, 834:6, 835:7
**CONCENTRATIONS** [17] - 768:3, 798:23, 800:6, 805:6,

814:11, 814:14, 815:23, 827:4, 829:17, 829:23, 829:24, 830:4, 830:7, 830:18, 835:6, 835:15, 836:14
**CONCEPT** [2] - 819:1, 824:25
**CONCEPTS** [1] - 793:5
**CONCEPTUAL** [1] - 819:2
**CONCERN** [5] - 737:25, 759:11, 761:3, 809:4, 814:4
**CONCERNING** [1] - 698:15
**CONCERNS** [2] - 771:17, 773:3
**CONCLUDE** [4] - 695:18, 771:15, 832:10, 836:11
**CONCLUDED** [3] - 752:18, 753:15, 770:1
**CONCLUDES** [1] - 698:13
**CONCLUSION** [1] - 771:19
**CONCLUSIONS** [3] - 752:22, 791:25, 792:12
**CONDITIONS** [1] - 809:2
**CONDUCT** [2] - 784:12, 837:14
**CONDUCTED** [2] - 765:17, 788:21
**CONDUCTING** [1] - 797:11
**CONDUCTIVITY** [2] - 839:1, 840:6
**CONE** [1] - 819:22
**CONFER** [4] - 700:25, 704:16, 714:7, 722:21
**CONFERRING** [1] - 701:4
**CONFESS** [1] - 753:7
**CONFIDENT** [1] - 692:23
**CONFIRMED** [1] - 765:24
**CONFIRMING** [1] - 721:22
**CONFUSING** [1] - 753:5
**CONNECT** [3] - 797:5, 797:6, 842:9

**CONNECTED** [1] - 792:23
**CONNECTION** [3] - 702:13, 708:16, 778:4
**CONSENT** [3] - 729:17, 773:1, 784:10
**CONSENT** [17] - 756:8, 756:14, 756:16, 756:24, 756:25, 757:14, 758:25, 759:12, 761:17, 761:19, 772:21, 773:25, 774:5, 774:8, 774:16, 774:19, 785:5
**CONSIDER** [3] - 795:3, 801:17, 801:19
**CONSIDERED** [1] - 717:6
**CONSISTENT** [4] - 826:19, 827:2, 837:10, 843:24
**CONSTITUENTS** [1] - 765:11
**CONSTITUTED** [1] - 729:2
**CONSTRUCTED** [2] - 808:9, 808:11
**CONSULTANT** [9] - 711:11, 718:23, 739:4, 739:6, 739:13, 739:16, 739:17, 762:23, 798:20
**CONSULTANTS** [19] - 711:19, 712:25, 715:9, 753:22, 755:1, 755:4, 765:24, 766:3, 766:5, 766:8, 766:12, 767:10, 770:1, 770:5, 785:2, 795:8, 795:9, 801:21, 825:3
**CONSULTING** [2] - 731:5, 751:9
**CONTACT** [3] - 718:1, 777:10, 777:18
**CONTACTED** [1] - 778:7
**CONTAINING** [1] - 731:2
**CONTAINMENT** [11] - 730:23, 730:24, 731:5, 731:7, 731:12, 731:14,

731:21, 732:1, 732:5, 732:12, 740:14
**CONTAMINANT** [7] - 734:1, 789:10, 809:16, 814:21, 814:22, 820:8, 831:5
**CONTAMINANTS** [46] - 712:1, 714:1, 723:24, 751:4, 752:18, 753:16, 789:23, 791:23, 792:20, 792:21, 792:25, 793:7, 795:24, 795:25, 796:13, 797:15, 798:12, 799:3, 799:7, 799:10, 799:13, 801:13, 801:23, 802:6, 804:1, 805:6, 805:24, 806:22, 808:5, 808:10, 809:13, 814:2, 814:4, 815:24, 816:1, 820:9, 820:15, 822:9, 826:25, 827:18, 831:13, 833:16, 834:7, 835:13, 835:22
**CONTAMINATED** [18] - 716:11, 730:19, 740:2, 767:16, 769:12, 776:1, 790:7, 790:11, 793:1, 796:5, 796:7, 798:23, 801:13, 815:12, 815:18, 822:4, 832:23, 836:16
**CONTAMINATION** [94] - 699:13, 699:19, 700:2, 700:4, 709:21, 710:3, 712:7, 714:8, 714:15, 714:19, 714:25, 715:25, 725:7, 725:11, 725:23, 727:9, 727:13, 729:19, 731:3, 732:21, 733:4, 733:9, 735:24, 736:14, 739:1, 742:6, 750:21, 750:23, 751:3, 754:19, 757:10, 761:18, 762:20, 770:1, 780:18, 791:16, 793:6, 793:13,

794:2, 794:6, 796:2, 796:11, 797:12, 798:5, 798:15, 799:13, 801:17, 803:2, 803:3, 803:23, 804:9, 804:18, 804:20, 805:16, 805:22, 808:7, 808:12, 809:2, 809:9, 809:17, 810:7, 813:2, 813:8, 813:10, 813:12, 813:14, 814:10, 814:18, 815:20, 820:7, 822:6, 822:11, 822:13, 822:15, 826:12, 827:9, 827:11, 827:18, 829:21, 834:5, 836:8, 836:12, 836:22, 836:23, 837:3, 837:12, 837:17, 837:25, 842:24, 843:17, 844:10
**CONTENDING** [1] - 696:7
**CONTEST** [1] - 772:18
**CONTEXT** [2] - 814:24, 818:13
**CONTINUE** [3] - 818:5, 841:20, 844:22
**CONTOUR** [10] - 797:5, 823:21, 823:24, 823:25, 824:9, 824:25, 825:2, 826:3, 826:10, 833:3
**CONTOURS** [6] - 820:24, 821:20, 825:21, 825:22, 825:25, 826:16
**CONTROL** [8] - 701:21, 711:3, 755:19, 771:16, 776:22, 781:4, 794:19, 809:23
**CONTROLLED** [1] - 800:13
**CONTROLLING** [2] - 802:9, 837:20
**CONTROLS** [1] - 818:17
**CONVENIENT** [1] - 764:15
**CONVERSATION** [10] - 718:2, 719:4, 720:6, 723:9, 735:6,

735:21, 735:22, 736:5, 781:23, 782:9
**CONVERSATIONS** [2] - 777:8, 781:18
**COPY** [10] - 756:3, 756:4, 764:2, 764:7, 764:10, 764:11, 764:14, 764:15, 764:21, 764:25
**CORDOVA** [1] - 789:20
**CORNER** [3] - 807:17, 808:3, 831:2
**CORPORATION** [2] - 724:12, 749:23
**CORPORATION** [30] - 692:7, 705:2, 706:16, 706:18, 706:20, 706:22, 707:3, 707:4, 707:6, 707:14, 710:5, 710:11, 724:12, 725:2, 743:21, 744:4, 747:1, 747:4, 747:7, 748:10, 748:12, 749:23, 750:1, 751:23, 755:21, 756:9, 756:22, 757:3, 772:18, 774:19
**CORPORATIONS** [1] - 748:15
**CORRECT** [71] - 707:15, 710:22, 711:21, 712:21, 717:20, 722:1, 722:8, 722:14, 722:19, 723:6, 723:19, 724:1, 725:15, 725:24, 726:9, 729:13, 730:9, 730:24, 731:3, 731:8, 732:13, 738:2, 740:21, 741:3, 744:13, 744:22, 745:1, 748:5, 749:15, 749:17, 750:12, 750:24, 751:7, 751:20, 753:24, 755:2, 755:10, 755:18, 755:22, 755:25, 756:3, 756:13, 757:4, 757:5, 757:20, 758:7, 758:25, 759:4, 759:12, 762:15, 763:20, 765:12, 765:13, 767:22,

768:4, 771:5, 773:6, 773:21, 774:6, 774:21, 778:15, 782:6, 786:7, 786:8, 819:6, 830:1, 833:10, 839:17, 841:25, 842:20, 842:22
**CORRECTED** [2] - 748:25, 775:1
**CORRECTLY** [2] - 714:16, 812:11
**CORRESPONDENC E** [7] - 711:1, 711:4, 711:7, 712:5, 712:8, 717:11, 717:23
**CORRESPONDS** [1] - 807:18
**CORROBORATE** [1] - 832:20
**COST** [7] - 714:22, 732:12, 739:4, 739:6, 739:12, 739:13, 739:16
**COSTS** [15] - 699:15, 711:25, 713:22, 713:25, 716:8, 730:2, 731:12, 731:17, 731:20, 735:1, 739:2, 739:5, 739:17, 740:14, 741:1
**COUNSEL** [3] - 743:17, 746:13, 759:2
**COUNSEL** [26] - 692:8, 692:9, 700:25, 701:4, 701:11, 701:16, 702:21, 705:3, 706:25, 707:2, 715:18, 723:10, 723:15, 723:17, 744:24, 745:23, 751:22, 762:7, 773:16, 777:19, 777:23, 778:8, 781:15, 787:10
**COUNSEL'S** [1] - 775:5
**COUNTING** [1] - 715:18
**COUNTY** [2] - 789:22, 817:25
**COUPLE** [7] - 736:12, 744:16, 756:7, 757:15, 761:8, 790:23, 823:1
**COURSE** [11] - 789:9, 794:20, 796:4,

800:5, 800:21, 801:20, 804:19, 808:20, 816:6, 822:4, 823:6
**COURT** [9] - 725:4, 729:1, 742:15, 749:6, 749:16, 757:21, 757:24, 781:22
**COURT** [148] - 692:13, 692:18, 692:25, 693:10, 694:2, 695:2, 695:17, 696:16, 696:24, 697:6, 697:12, 697:18, 697:25, 698:24, 699:5, 699:14, 699:24, 700:7, 700:17, 700:22, 701:1, 701:10, 701:17, 702:10, 702:18, 703:14, 703:22, 704:5, 705:1, 705:6, 705:14, 706:4, 709:8, 710:13, 710:17, 712:4, 715:4, 715:17, 718:9, 721:17, 724:17, 726:2, 727:15, 728:10, 729:22, 730:12, 730:14, 732:9, 732:16, 733:15, 733:20, 734:6, 734:17, 735:17, 736:3, 736:21, 737:2, 740:17, 740:19, 741:6, 741:16, 742:11, 742:17, 742:25, 743:5, 743:7, 744:10, 744:18, 745:11, 745:14, 745:20, 745:24, 746:11, 750:5, 751:16, 753:20, 758:12, 758:20, 758:23, 759:2, 759:7, 759:14, 760:5, 762:13, 764:5, 764:13, 764:17, 764:21, 765:4, 766:6, 770:12, 770:16, 770:21, 771:10, 771:20, 772:4, 772:7, 772:14, 773:10, 774:11, 775:4, 777:19, 777:22,

779:7, 779:11, 782:4, 782:11, 782:15, 782:20, 783:10, 783:20, 784:2, 785:25, 786:5, 786:14, 786:17, 786:20, 786:23, 787:9, 787:15, 788:6, 802:19, 802:21, 802:24, 806:10, 806:13, 807:3, 807:9, 810:23, 810:25, 813:17, 824:3, 825:7, 825:12, 825:16, 827:21, 831:21, 832:7, 834:20, 838:12, 838:14, 841:13, 841:20, 843:21, 844:6, 844:17, 845:5
**COURT** [22] - 693:14, 694:8, 695:5, 695:7, 696:9, 696:19, 696:25, 698:7, 700:10, 701:6, 702:12, 702:24, 703:3, 703:11, 704:7, 705:20, 723:13, 727:23, 729:17, 744:25, 764:2, 787:20
**COURT'S** [8] - 693:13, 693:21, 695:22, 697:25, 702:15, 702:24, 703:4, 703:12
**COURTROOM** [4] - 715:15, 715:19, 715:20, 718:18
**COURTROOM** [7] - 692:5, 705:15, 705:24, 787:16, 787:24, 788:3, 845:2
**COVARIANCE** [3] - 834:11, 834:12, 835:25
**COVARIED** [1] - 835:23
**COVER** [4] - 703:19, 711:15, 756:21, 837:22
**COVERED** [2] - 729:24, 844:13
**COVERS** [1] - 780:20
**COVINGTON** [1] - 748:19
**CREATE** [1] - 797:19
**CREATES** [3] -

768:25, 770:24, 771:4
**CROSS** [1] - 773:12
**CROSS** [5] - 693:5, 773:10, 810:16, 821:7, 836:9
**CROSS-EXAMINATION** [1] - 773:10
**CROSS-EXAMINATION** [1] - 773:12
**CROSS-SECTION** [1] - 821:7, 836:9
**CROSS-SECTIONS** [1] - 810:16
**CRUZ** [1] - 704:20
**CURRENT** [1] - 706:13
**CURVES** [1] - 835:18
**CUSTODIAN** [4] - 708:15, 708:18, 709:2, 742:19
**CUT** [2] - 696:21, 802:11
**CV** [1] - 692:6

# D

**DAN** [2] - 735:5, 735:8
**DANIEL** [1] - 692:16
**DATA** [29] - 696:13, 731:2, 793:16, 793:20, 793:21, 793:25, 794:12, 794:23, 795:1, 795:4, 795:6, 795:23, 796:1, 797:18, 800:7, 805:4, 825:24, 827:1, 827:14, 837:24, 838:22, 838:24, 838:25, 840:6, 840:20, 840:23
**DATE** [5] - 721:21, 733:6, 733:7, 734:18, 835:10
**DATED** [1] - 694:7
**DATES** [2] - 714:9, 722:21
**DAVISON** [1] - 701:22
**DAWSON** [1] - 708:24
**DAWSON'S** [1] - 708:25
**DAYS** [4] - 719:9, 736:12, 757:15, 761:8
**DEAD** [1] - 820:14
**DEAD-ON** [1] - 820:14
**DEAL** [4] - 702:4,

702:7, 776:3, 777:4
**DEAR** [1] - 842:16
**DEAR** [1] - 721:20
**DEBRIS** [1] - 767:14
**DECADES** [2] - 805:17, 808:22
**DECEMBER** [2] - 735:23, 736:12
**DECIDE** [1] - 702:25
**DECIDED** [1] - 728:3
**DECIDING** [1] - 703:1
**DECLARATION** [4] - 708:17, 756:1, 756:3, 756:5
**DEEMED** [2] - 717:6, 783:7
**DEFAULTED** [1] - 776:20
**DEFENDANT** [1] - 692:15
**DEFENDANT** [1] - 701:19
**DEFENSE** [4] - 694:15, 697:22, 701:24, 710:11
**DEFINE** [1] - 785:8
**DEFINED** [4] - 748:12, 770:7, 801:9, 817:10
**DEFINES** [1] - 748:8
**DEFINING** [1] - 805:21
**DEFINITELY** [2] - 813:13, 832:15
**DEGREE** [3] - 783:8, 788:13, 788:22
**DELAY** [1] - 785:19
**DELAYED** [1] - 730:7
**DELINEATED** [3] - 810:13, 827:16, 832:22
**DELINEATING** [1] - 793:17
**DELINEATION** [1] - 828:24
**DELIVERED** [1] - 778:22
**DEMONSTRATE** [4] - 814:7, 818:2, 826:19, 827:17
**DEMONSTRATES** [1] - 806:1
**DEMONSTRATIVE** [4] - 810:14, 818:25, 820:16, 821:9
**DENIAL** [1] - 772:23
**DENIED** [6] - 727:12, 727:17, 727:20, 728:5, 747:20, 750:5
**DENIES** [1] - 746:17
**DENY** [8] - 728:16, 735:15, 743:22,

743:24, 747:15, 754:25, 767:8
**DENYING** [2] - 735:12, 766:11
**DEPARTMENT** [9] - 711:2, 751:13, 755:19, 771:16, 776:22, 781:3, 781:6, 794:18, 809:22
**DEPARTMENT** [4] - 758:3, 758:17, 777:12, 781:13
**DEPICT** [1] - 811:18
**DEPICTED** [2] - 812:23, 831:18
**DEPICTION** [2] - 797:19, 827:7
**DEPICTIONS** [1] - 833:16
**DEPOSITION** [8] - 696:25, 707:7, 707:9, 708:2, 770:9, 772:11, 802:18, 843:2
**DEPOSITS** [1] - 802:2
**DEPRESSION** [1] - 819:23
**DEPTH** [1] - 811:14
**DEPUTY** [7] - 692:5, 705:15, 705:24, 787:16, 787:24, 788:3, 845:2
**DEPUTY** [1] - 776:18
**DESCRIBE** [2] - 782:14, 806:10
**DESCRIBED** [3] - 697:10, 772:1, 810:21
**DESCRIBING** [1] - 758:3
**DESIGNATED** [3] - 694:25, 737:24, 780:15
**DESIGNATION** [2] - 811:25, 813:24
**DESIGNATIONS** [2] - 813:23, 838:18
**DESTROYED** [3] - 736:18, 791:2, 791:13
**DETAIL** [1] - 824:19
**DETAILED** [4] - 749:17, 767:11, 797:22, 837:21
**DETAILS** [1] - 838:19
**DETECT** [1] - 766:3
**DETECTED** [22] - 713:17, 726:23, 751:1, 751:14,

752:1, 752:13, 753:23, 754:15, 754:25, 755:2, 765:20, 766:19, 777:14, 791:4, 791:9, 799:8, 814:15, 829:18, 829:19, 829:21, 831:3, 831:9
**DETECTING** [2] - 727:9, 752:8
**DETECTION** [2] - 713:9, 766:1
**DETECTIONS** [5] - 721:22, 727:5, 734:1, 754:1, 766:12
**DETERMINATION** [3] - 755:14, 763:19, 772:17
**DETERMINATION** [1] - 792:20
**DETERMINATIONS** [2] - 771:25, 792:14
**DETERMINE** [12] - 794:25, 796:25, 799:17, 800:1, 808:9, 808:12, 816:3, 816:9, 818:11, 828:7, 840:4, 843:25
**DETERMINED** [4] - 727:5, 792:2, 792:10, 811:20
**DEVELOP** [4] - 699:22, 769:6, 826:12, 832:11
**DEVELOPED** [1] - 832:18
**DEVELOPING** [1] - 791:22
**DEVELOPMENT** [1] - 789:6
**DIAGRAM** [10] - 807:13, 813:20, 819:2, 819:7, 819:10, 821:3, 826:21, 836:23, 837:10, 841:17
**DIAGRAMS** [1] - 819:2
**DIE** [1] - 695:12
**DIFFERENCE** [1] - 800:23
**DIFFERENCES** [1] - 818:20
**DIFFERENT** [19] - 697:14, 699:18, 727:21, 731:13, 733:25, 742:18, 757:7, 757:9, 757:13, 782:9,

793:4, 793:21, 800:20, 803:1, 805:24, 812:22, 813:6, 815:5, 835:13
**DIFFERENTLY** [1] - 726:19
**DIFFICULT** [1] - 803:20
**DIFFICULTY** [2] - 769:11, 769:15
**DIRECT** [2] - 706:8, 788:9
**DIRECT** [2] - 702:17, 716:17
**DIRECTED** [3] - 763:19, 780:2, 780:3
**DIRECTION** [21] - 731:6, 796:25, 816:3, 816:9, 818:7, 818:11, 818:21, 819:9, 821:1, 824:2, 826:2, 826:13, 826:17, 831:14, 831:15, 831:24, 832:2, 836:8, 839:21
**DIRECTIONS** [8] - 792:24, 815:25, 816:17, 826:19, 826:23, 826:6, 833:21
**DIRECTLY** [4] - 720:2, 720:3, 723:14, 796:10
**DIRECTOR** [1] - 707:14
**DIRECTORS** [4] - 707:19, 707:22, 708:4, 708:9
**DISAGREEMENT** [2] - 799:22, 799:24
**DISCERN** [1] - 703:6
**DISCONTINUITIES** [1] - 788:25
**DISCOUNTED** [1] - 776:2
**DISCOVERED** [2] - 726:17, 813:10
**DISCUSS** [4] - 710:20, 714:10, 715:10, 723:11
**DISCUSSED** [9] - 712:10, 715:5, 717:18, 718:23, 719:8, 740:4, 774:1, 801:8, 810:9
**DISCUSSION** [3] - 723:14, 779:22, 779:24
**DISMISS** [2] - 772:1, 772:7

**DISPLAY** [3] - 770:12, 810:19, 838:9
**DISPLAYED** [1] - 841:17
**DISPOSED** [2] - 797:16, 804:12
**DISPUTE** [15] - 731:16, 731:17, 736:16, 737:4, 737:5, 737:12, 737:13, 737:16, 737:21, 738:7, 738:18, 739:2, 739:20, 740:6, 831:22
**DISPUTED** [2] - 730:7, 731:9
**DISPUTES** [2] - 730:20, 739:5
**DISPUTING** [1] - 751:2
**DISREGARD** [4] - 709:9, 734:8, 774:12, 775:5
**DISTANCE** [1] - 841:2
**DISTINCTION** [5] - 757:13, 760:1, 760:7, 760:9, 760:10
**DISTRICT** [2] - 749:6, 789:22
**DIVIDE** [1] - 798:10
**DIVIDED** [1] - 798:11
**DIVISION** [2] - 742:21, 743:2
**DIVISION** [1] - 717:6
**DIVISIONS** [1] - 755:20
**DOCTOR** [1] - 694:18
**DOCUMENT** [45] - 693:25, 694:5, 695:8, 695:23, 696:6, 696:11, 697:2, 697:7, 697:14, 697:20, 698:10, 698:21, 700:13, 700:14, 701:2, 701:14, 701:18, 701:25, 702:5, 702:12, 702:13, 702:15, 702:22, 703:5, 703:15, 703:16, 703:21, 704:10, 704:17, 756:25, 757:3, 757:23, 759:4, 760:6, 760:7, 760:9, 760:18, 760:24, 761:13, 765:1, 771:16, 795:3, 823:11,

837:10
**DOCUMENTATION** [1] - 701:22
**DOCUMENTS** [9] - 694:6, 699:2, 702:6, 773:24, 783:1, 784:4, 784:5, 795:7, 795:13
**DOLLARS** [2] - 741:2, 741:25
**DOMESTIC** [1] - 716:17
**DONE** [17] - 728:4, 763:1, 763:14, 777:12, 782:17, 784:9, 784:17, 784:20, 785:14, 785:23, 793:10, 797:22, 798:19, 799:15, 801:21, 803:7, 808:21
**DOT** [4] - 808:4, 829:9, 830:8, 831:7
**DOTS** [8] - 807:13, 807:14, 808:2, 808:7, 810:2, 825:24, 829:13, 829:18
**DOUBLE** [1] - 693:25
**DOUBLE-CHECKING** [1] - 693:25
**DOUBT** [3] - 695:18, 720:21, 733:6
**DOWN** [30] - 723:7, 732:20, 732:22, 732:23, 733:3, 734:1, 734:12, 734:24, 735:23, 758:13, 770:18, 770:21, 796:14, 800:17, 801:24, 802:8, 811:9, 811:14, 812:20, 817:23, 817:25, 819:21, 820:23, 822:23, 829:17, 834:10, 835:14, 842:5
**DOWNGRADIENT** [7] - 789:18, 791:3, 791:24, 796:23, 808:6, 818:5, 822:12
**DOWNHILL** [3] - 796:22, 821:17, 821:18
**DOWNLOAD** [2] - 795:3, 795:4
**DOWNSITE** [1] - 789:24

DOWNWARD [1] - 802:5
DR [1] - 694:14
DRAFT [6] - 701:23, 703:23, 745:22, 778:9, 778:11, 778:21
DRAFTS [1] - 779:17
DRAIN [2] - 816:15, 839:4
DRAINAGE [2] - 817:22, 817:24
DRAINED [1] - 817:19
DRAINS [1] - 818:8
DRAW [5] - 822:8, 824:1, 825:24, 826:11, 841:25
DRAWING [11] - 798:4, 811:4, 812:6, 812:17, 813:25, 821:22, 824:25, 825:1, 825:19, 830:4, 842:8
DRAWINGS [1] - 833:8
DRAWN [8] - 701:20, 798:4, 820:15, 822:19, 822:23, 824:19, 825:22, 828:12
DREW [2] - 824:9, 834:1
DRILLED [2] - 808:17, 811:14
DRINKING [1] - 717:6
DRINKING [14] - 725:7, 752:19, 753:17, 768:23, 769:1, 770:2, 770:20, 770:25, 771:5, 814:19, 814:20, 814:23, 815:7, 830:5
DROPPED [1] - 773:2
DROPPING [1] - 770:18
DROUGHT [1] - 833:22
DRUM [1] - 766:16
DRY [1] - 768:10
DTSC [13] - 711:7, 751:23, 752:1, 761:25, 763:12, 765:17, 772:19, 772:21, 772:25, 776:22, 778:25, 780:6, 781:23
DTSC'S [1] - 777:1
DUE [3] - 732:20, 733:3, 735:24

DUG [1] - 777:16
DURING [5] - 700:5, 759:21, 774:20, 792:5, 805:14

## E

E-MAIL [13] - 712:16, 712:22, 717:24, 721:5, 721:12, 721:14, 722:4, 722:6, 722:9, 722:14, 722:16, 723:1
EARLY [9] - 699:19, 712:6, 719:3, 723:4, 758:7, 799:19, 802:7, 808:8, 808:14
EARTH [5] - 801:6, 811:9, 811:10, 811:14, 836:15
EASEMENT [3] - 737:20, 738:6, 738:13
EASIER [1] - 801:13
EASILY [2] - 801:11, 812:12
EAST [3] - 760:24, 768:12, 768:16
EDUCATIONAL [1] - 788:11
EFFECT [3] - 735:22, 735:25, 779:25
EFFECTIVE [1] - 756:15
EFFECTIVELY [1] - 764:12
EFFORT [2] - 764:1, 805:23
EFFORTS [1] - 783:14
EHRMAN [1] - 778:8
EITHER [3] - 703:2, 734:14, 809:2
ELEMENT [1] - 729:3
ELEVATION [16] - 796:20, 797:7, 800:15, 814:14, 820:24, 821:20, 822:24, 823:18, 823:19, 825:22, 825:23, 826:16, 827:14, 839:11
ELEVATIONS [10] - 796:20, 797:3, 797:4, 797:6, 805:5, 819:25, 820:2, 820:3, 821:5
EMBEDDED [1] - 839:24
EMPLOYED [2] -

751:21, 753:9
EMPLOYEE [1] - 706:22
EMPLOYEES [2] - 707:6, 715:10
EMPLOYER [1] - 706:13
END [3] - 722:19, 724:6, 764:12
ENDANGERMENT [14] - 755:14, 763:19, 772:16, 773:5, 773:17, 776:7, 776:13, 778:4, 778:14, 778:22, 779:1, 779:14, 779:19, 809:22
ENDED [1] - 738:19
ENDS [1] - 760:25
ENFORCEABLE [3] - 761:25, 762:1, 776:21
ENGAGEMENT [2] - 790:3, 791:21
ENGINEERING [2] - 788:19, 795:9
ENJOY [1] - 844:25
ENLARGE [1] - 712:15
ENTAILED [1] - 716:9
ENTER [1] - 844:4
ENTERED [12] - 713:13, 728:20, 728:25, 729:17, 730:4, 730:17, 733:23, 734:25, 738:21, 749:23, 776:7, 776:13
ENTERING [1] - 738:25
ENTIRE [5] - 703:5, 703:19, 808:25, 818:15, 836:1
ENTIRELY [4] - 708:7, 754:10, 754:11, 754:14
ENTITIES [3] - 744:5, 747:2, 747:3
ENTITY [4] - 724:23, 727:7, 748:9, 775:17
ENVIRONMENTAL [9] - 715:9, 751:10, 768:8, 788:15, 795:23, 796:1, 797:18, 798:10
ENVIRONMENTAL [2] - 755:17, 774:3
EPA [5] - 728:4, 755:17, 755:20, 757:8, 757:9
EQUATION [2] -

839:18, 839:24
EQUIPMENT [2] - 739:7, 740:8
ERIC [1] - 706:6
ERIC [5] - 692:16, 705:13, 706:3, 721:21, 735:25
ERIC.LARDIERE@ MEGGITT.COM [1] - 712:20
ESPECIALLY [1] - 824:18
ESSENTIALLY [5] - 775:9, 791:2, 792:16, 801:22, 835:25
ESTABLISH [8] - 696:16, 729:3, 744:18, 758:21, 759:5, 828:22, 835:22, 836:7
ESTABLISHED [1] - 828:5
ESTIMATE [8] - 693:5, 802:16, 803:16, 803:17, 803:24, 837:19, 843:16, 844:3
ESTIMATED [2] - 693:4, 801:22
ESTIMATES [1] - 802:7
ESTIMATION [1] - 843:8
ET [4] - 692:7, 797:16, 798:12, 804:6
EVALUATED [1] - 791:16
EVALUATION [3] - 806:20, 820:7, 820:8
EVE [3] - 735:5, 735:13, 735:20
EVENT [1] - 777:18
EVENTUALLY [7] - 720:11, 727:16, 729:12, 733:22, 734:22, 734:23, 778:5
EVIDENCE [1] - 697:21
EVIDENCE [22] - 693:16, 693:18, 693:20, 695:11, 696:5, 721:10, 721:19, 755:13, 756:20, 790:16, 798:2, 807:11, 810:24, 816:25, 823:8, 825:6, 829:6, 831:20, 833:14,

834:24, 844:5, 844:7
EXACT [2] - 725:13, 779:25
EXACTLY [7] - 716:3, 761:19, 783:9, 783:10, 784:3, 833:17, 841:7
EXAGGERATED [1] - 822:24
EXAMINATION [3] - 757:25, 773:10, 844:16
EXAMINATION [4] - 706:8, 773:12, 782:22, 788:9
EXAMPLE [9] - 697:13, 751:13, 768:9, 814:16, 819:8, 828:9, 830:8, 838:2, 839:25
EXAMPLES [1] - 834:17
EXCAVATED [1] - 765:19
EXCEED [1] - 798:24
EXCEEDED [1] - 713:10
EXCEPT [1] - 833:1
EXCEPTION [1] - 694:4
EXCHANGED [2] - 778:21, 779:17
EXCLUDE [1] - 703:16
EXCLUSIONARY [1] - 715:17
EXCUSE [3] - 715:14, 778:20, 802:10
EXCUSES [1] - 740:12
EXERCISE [2] - 816:5, 828:24
EXHIBIT [59] - 693:12, 697:19, 698:17, 700:22, 701:20, 702:2, 704:2, 712:14, 716:6, 716:16, 718:5, 720:20, 721:7, 721:10, 721:19, 744:17, 755:9, 755:12, 756:19, 756:20, 756:21, 760:14, 760:18, 763:23, 763:24, 764:1, 764:17, 764:25, 765:4, 770:19, 771:14, 778:14, 790:14, 790:16, 797:25, 798:2, 807:5, 807:11, 810:20,

810:24, 816:22, 816:25, 817:4, 823:7, 823:8, 825:4, 825:6, 829:3, 829:6, 833:9, 833:14, 834:23, 838:10, 838:12, 840:25, 841:17, 842:15, 844:5, 844:7
**EXHIBIT** [18] - 695:6, 700:21, 703:18, 763:12, 765:1, 807:3, 807:8, 813:17, 824:5, 824:10, 825:8, 825:9, 825:11, 825:13, 833:12, 834:21, 841:9
**EXHIBITS** [4] - 693:11, 698:15, 704:18, 824:4
**EXHIBITS** [2] - 834:19, 834:24
**EXISTED** [1] - 748:9
**EXITS** [1] - 817:24
**EXPECT** [2] - 745:15, 832:4
**EXPERIENCE** [2] - 782:1, 782:10
**EXPERIENCED** [1] - 703:3
**EXPERIENCES** [1] - 789:2
**EXPERT** [41] - 694:5, 790:8, 790:13, 790:18, 792:5, 793:2, 795:16, 797:20, 799:21, 802:13, 803:10, 805:11, 806:4, 806:6, 806:24, 810:17, 813:18, 813:21, 816:21, 825:5, 825:8, 827:15, 829:4, 831:23, 832:8, 832:10, 833:13, 834:12, 834:15, 834:18, 834:25, 838:7, 838:9, 841:18, 843:4, 843:7, 843:11, 843:18, 843:19, 844:9, 844:13
**EXPERTISE** [1] - 789:8
**EXPERTS** [5] - 709:1, 709:11, 709:15, 832:1, 837:21
**EXPLAIN** [3] - 777:7,

778:18, 811:8
**EXPLANATION** [2] - 700:9, 840:2
**EXPLANATORY** [1] - 839:16
**EXPLOSIVE** [1] - 747:24
**EXPOSURE** [2] - 768:25, 770:24
**EXTEND** [2] - 780:21, 842:5
**EXTENDS** [1] - 768:11
**EXTENT** [6] - 697:6, 698:1, 780:21, 802:6, 831:3, 831:8
**EXTERNAL** [2] - 717:22, 778:8
**EXTRA** [2] - 764:15, 803:23
**EXTRACTION** [3] - 766:22, 766:24, 767:4
**EXTREMELY** [3] - 716:17, 717:7, 717:8

# F

**FACE** [2] - 781:20
**FACE-TO-FACE** [1] - 781:20
**FACED** [1] - 704:8
**FACT** [9] - 696:5, 703:10, 714:19, 754:15, 756:1, 771:6, 771:13, 799:18, 824:6
**FACTOR** [4] - 802:1, 802:9, 802:15, 837:20
**FACTS** [15] - 696:1, 712:3, 726:1, 726:19, 735:16, 736:19, 741:4, 742:24, 745:8, 751:25, 759:3, 762:12, 775:9, 783:17, 831:19
**FAIR** [41] - 707:5, 707:18, 708:20, 709:14, 709:16, 709:22, 713:15, 714:23, 715:7, 715:24, 716:9, 716:23, 717:7, 717:10, 718:6, 723:25, 726:22, 727:11, 727:17, 728:24, 729:7, 733:16, 735:20, 736:9, 738:17,

740:10, 740:23, 741:21, 751:12, 752:2, 753:11, 754:9, 755:6, 756:3, 759:21, 760:2, 762:17, 766:9, 766:18, 782:18, 783:23
**FAIRLY** [2] - 703:24, 705:7
**FAITH** [2] - 714:7, 772:5
**FALL** [1] - 833:5
**FALSE** [2] - 722:5, 722:22
**FAMILIAR** [5] - 716:14, 747:10, 747:9, 760:1, 768:13
**FAR** [5] - 706:12, 733:6, 763:3, 776:5, 836:14
**FAST** [4] - 780:8, 796:16, 839:4, 840:17
**FAST-FORWARD** [1] - 780:8
**FASTER** [1] - 839:22
**FAT** [1] - 819:8
**FATE** [1] - 789:10
**FAULTING** [1] - 788:24
**FEDERAL** [1] - 697:21
**FEDERAL** [7] - 725:24, 728:22, 729:6, 730:6, 749:5, 749:6, 749:16
**FEET** [9] - 802:7, 802:23, 811:15, 842:21, 842:23, 843:8, 843:15, 843:25, 844:2
**FEW** [7] - 704:15, 721:5, 722:25, 741:11, 743:9, 781:17, 829:20
**FIELD** [4] - 795:6, 840:6, 840:20, 840:23
**FIFTH** [1] - 703:18
**FIGHTING** [3] - 702:13, 703:7, 703:9
**FIGURE** [14] - 694:23, 697:5, 697:8, 790:11, 790:18, 806:8, 807:9, 811:17, 811:19, 814:16, 816:21, 841:7
**FIGURE** [9] - 697:3, 790:13, 790:17,

796:9, 806:5, 806:24, 807:2, 808:21, 833:12
**FIGURES** [6] - 694:20, 834:14, 834:18, 834:25, 835:2, 835:3
**FILED** [10] - 723:1, 724:8, 726:9, 726:16, 726:24, 749:5, 749:11, 749:16, 750:9, 758:2
**FINAL** [2] - 701:23, 729:17
**FINALLY** [1] - 792:23
**FINANCIAL** [5] - 761:23, 774:23, 775:18, 775:24, 776:20
**FINE** [5] - 697:11, 698:3, 706:11, 764:13, 802:3
**FINISH** [1] - 802:10
**FINISHED** [1] - 844:15
**FIRM** [4] - 731:5, 751:10, 775:25, 789:5
**FIRMS** [4] - 795:10, 795:11
**FIRST** [1] - 749:10
**FIRST** [33] - 693:12, 696:8, 703:17, 709:19, 713:8, 716:3, 716:15, 717:1, 717:5, 717:8, 722:20, 727:24, 758:6, 758:23, 765:10, 773:19, 774:18, 777:10, 777:18, 778:1, 785:7, 791:15, 795:4, 797:10, 798:17, 801:19, 805:19, 814:7, 814:8, 816:10, 816:18, 820:21, 829:8
**FIVE** [4] - 731:11, 739:25, 752:11, 844:19
**FIX** [2] - 785:11, 785:13
**FIXER** [1] - 776:3
**FIXER-UPPER** [1] - 776:3
**FLEXIBILITY** [1] - 693:3
**FLOOD** [1] - 833:22
**FLOOR** [1] - 817:23
**FLOW** [65] - 792:24, 792:25, 797:7,

798:12, 809:2, 815:25, 816:3, 816:6, 816:17, 818:7, 818:10, 818:12, 818:16, 818:17, 818:21, 818:24, 819:3, 819:4, 819:9, 819:12, 819:17, 821:1, 821:4, 821:23, 822:21, 823:2, 823:4, 823:13, 824:1, 824:11, 824:15, 824:16, 824:19, 824:20, 824:24, 825:1, 825:25, 826:1, 826:2, 826:7, 826:18, 826:19, 826:22, 826:23, 827:10, 827:11, 827:12, 827:18, 827:23, 828:5, 828:22, 831:23, 832:2, 832:25, 833:17, 833:21, 836:7, 837:6, 837:15, 837:17, 838:3, 841:21, 844:10
**FLOWED** [1] - 816:9
**FLOWING** [10] - 796:22, 801:6, 819:11, 820:5, 821:1, 821:17, 824:2, 824:13, 828:1, 839:10
**FLOWN** [1] - 821:19
**FLOWS** [7] - 797:1, 817:17, 817:22, 819:17, 820:1, 836:12
**FLUCTUATING** [1] - 834:8
**FLUFF** [2] - 772:2, 772:8
**FOCUS** [4] - 702:11, 791:5, 791:10, 800:7
**FOCUSED** [5] - 698:12, 719:24, 720:1, 798:13, 825:20
**FOLKS** [4] - 712:24, 715:6, 724:3, 766:25
**FOLLOW** [1] - 720:5
**FOLLOWED** [1] - 692:24
**FOLLOWING** [4] - 747:4, 799:20, 809:19, 826:15

FOLLOWS [2] - 706:7,
788:8
FORCE [3] - 718:15,
718:16, 720:7
FOREVER [2] -
727:18, 728:16
FORGOTTEN [1] -
732:3
FORK [1] - 823:13
FORK [4] - 760:24,
768:12, 768:16,
824:14
FORMAL [2] - 717:11,
717:13
FORMALLY [2] -
708:21, 708:22
FORMATION [1] -
713:10
FORMATION [1] -
812:2
FORMER [6] - 760:19,
760:25, 765:20,
766:15, 766:20,
781:23
FORMULATING [2] -
695:20, 696:2
FORTH [2] - 696:9,
696:19
FORWARD [6] -
701:11, 722:16,
780:8, 787:15,
824:18, 832:21
FOUNDATION [33] -
696:17, 700:10,
703:21, 703:24,
704:2, 704:8, 709:6,
726:1, 733:19,
734:16, 736:2,
736:20, 741:4,
742:24, 743:3,
744:9, 744:11,
744:18, 745:8,
746:1, 751:16,
753:19, 758:11,
758:21, 759:3,
759:5, 762:12,
775:3, 782:13,
785:22, 786:13,
798:4, 806:17
FOUNDATIONAL [1] -
704:7
FOUR [6] - 693:7,
731:11, 749:20,
828:18, 828:19,
828:20
FRACTION [1] - 802:4
FRAME [1] - 753:12
FRAMED [1] - 712:4
FRAMEWORK [1] -
823:25

FRANCISCO [1] -
788:16
FRANKLY [2] -
694:24, 701:7
FRED [1] - 692:14
FREE [1] - 695:21
FREEWAY [1] -
737:10
FREEWAY [1] -
737:11
FRESH [1] - 788:4
FRIDAY [1] - 757:21
FRONT [1] - 705:7
FRUSTRATION [1] -
703:3
FRYER [1] - 692:16
FULL [2] - 716:19,
716:22
FULLY [1] - 784:13
FUNCTION [1] - 840:4
FUNDED [1] - 730:1
FUNDING [2] - 699:15,
699:22
FUNDS [1] - 699:18
FUTURE [4] - 698:4,
711:25, 713:22,
713:25

# G

GABRIEL [1] - 789:16
GALLAGHER [2] -
692:17, 703:25
GALLAGHER [61] -
702:1, 702:16,
703:13, 704:1,
704:23, 709:5,
712:2, 715:2,
715:14, 718:7,
724:16, 725:25,
727:14, 729:21,
730:10, 732:7,
732:15, 733:14,
733:19, 734:16,
735:16, 736:2,
736:19, 736:25,
740:15, 741:4,
741:15, 742:9,
742:16, 742:23,
743:3, 744:8, 745:8,
746:9, 751:15,
753:18, 758:10,
758:19, 759:1,
759:13, 760:3,
762:11, 766:5,
771:7, 772:3,
773:11, 773:13,
774:14, 775:12,
775:13, 777:25,
779:12, 782:5,

782:14, 782:18,
783:17, 784:1,
785:21, 786:4,
786:12, 786:21
GALLON [2] - 804:5,
804:7
GAS [3] - 794:9,
800:5, 803:8
GATHER [2] - 723:13,
805:2
GAYNOR [3] - 708:24,
708:25, 709:7
GEARS [1] - 781:9
GEE [52] - 696:10,
696:22, 699:17,
700:3, 700:16,
703:17, 787:13,
788:10, 790:17,
797:25, 798:3,
802:20, 802:25,
806:12, 806:15,
806:16, 806:17,
806:18, 807:2,
807:4, 807:12,
810:19, 811:3,
811:4, 813:18,
813:20, 817:3,
823:9, 824:8, 824:9,
825:4, 825:10,
825:15, 825:17,
825:18, 827:22,
829:24, 831:22,
832:9, 832:10,
833:15, 834:22,
834:25, 838:11,
838:13, 838:15,
841:15, 842:1,
843:3, 844:4, 844:8,
844:15
GEE [9] - 692:12,
696:9, 696:18,
699:6, 703:15,
787:12, 788:6,
813:17, 824:3
GEE'S [2] - 693:24,
698:23
GENERAL [1] - 776:18
GENERAL [27] -
699:12, 706:25,
707:2, 711:20,
712:23, 716:5,
716:10, 717:11,
721:12, 723:16,
730:24, 735:4,
744:24, 751:22,
757:7, 762:7,
781:15, 792:16,
797:8, 800:16,
816:7, 817:17,
831:13, 831:24,

833:24, 839:2, 839:9
GENERALLY [15] -
729:13, 730:8,
731:3, 732:2,
737:15, 750:24,
754:5, 755:6, 758:6,
760:1, 768:13,
793:5, 831:11,
833:1, 835:17
GENERATE [2] -
810:14, 817:3
GENERATED [1] -
794:24
GENTLEMEN [2] -
705:4, 786:24
GEOLOGICAL [1] -
788:24
GEOLOGICALLY [1] -
812:1
GEOLOGIST [4] -
788:18, 788:19,
788:20, 789:4
GEOLOGY [1] -
788:14
GEOPHYSICAL [2] -
767:15, 777:13
GIST [2] - 725:13,
725:15
GIVEN [2] - 745:15
GLENDALE [1] -
777:1
GOD [2] - 705:22,
787:22
GORDON [6] - 756:21,
762:7, 762:14,
762:16, 781:10,
781:11
GOVERNMENT [3] -
697:20, 697:21,
763:14
GOVERNMENT [3] -
699:15, 699:18,
780:7
GOVERNMENTAL [1]
- 727:7
GRADIENT [7] -
796:24, 822:23,
839:5, 839:8, 839:9,
839:12, 839:13
GRAIN [1] - 802:4
GRAINS [3] - 801:4,
801:5, 839:20
GRANT [1] - 749:25
GRANTEE [1] - 750:1
GRANTOR [1] -
749:25
GRAPH [2] - 812:19,
834:16
GRAPH'S [1] - 835:7
GRAPHIC [3] - 790:12,

802:25, 805:25
GRAPHS [10] - 834:5,
834:6, 834:7,
834:14, 835:4,
835:5, 835:6,
835:11, 835:12,
835:18
GRAVELS [1] - 801:1
GRAVITY [1] - 800:13
GRAY [6] - 811:16,
811:18, 812:6,
812:7, 812:9
GREAT [2] - 699:12,
803:22
GREATER [3] - 822:9,
822:10, 830:7
GREEN [12] - 798:18,
798:22, 799:7,
799:9, 803:12,
826:15, 827:25,
828:12, 828:13,
828:25, 829:18,
835:6
GRID [1] - 820:22
GROUND [1] - 817:24
GROUNDS [2] - 694:3,
704:7
GROUNDWATER [3] -
789:5, 791:18,
839:15
GROUNDWATER
[146] - 699:20, 752:8,
752:11, 768:22,
768:25, 770:6,
770:19, 770:24,
780:21, 788:25,
789:5, 789:7, 789:8,
789:11, 789:17,
789:21, 790:7,
792:19, 792:23,
792:25, 794:3,
795:25, 796:3,
796:7, 796:13,
796:15, 796:20,
796:21, 797:1,
797:3, 798:12,
800:6, 800:7, 800:9,
800:10, 800:11,
800:12, 800:13,
800:15, 800:16,
800:19, 800:20,
800:21, 801:8,
801:11, 801:12,
801:16, 801:18,
804:19, 804:21,
805:5, 805:6,
805:14, 805:16,
805:18, 805:19,
806:1, 809:1,
809:17, 812:11,

813:2, 815:21,
815:25, 816:1,
816:3, 816:9,
816:12, 816:13,
816:15, 816:16,
816:17, 816:20,
816:22, 817:9,
817:12, 817:16,
817:20, 817:21,
818:10, 818:11,
818:15, 818:19,
818:20, 818:21,
818:24, 819:3,
819:9, 819:15,
819:16, 819:21,
819:22, 820:1,
820:24, 821:1,
821:5, 821:23,
822:3, 822:4,
822:21, 823:2,
823:4, 823:18,
823:19, 824:20,
824:22, 824:24,
825:22, 825:23,
825:25, 826:10,
826:16, 826:23,
827:1, 827:5,
827:14, 827:18,
827:23, 828:1,
830:10, 830:22,
830:23, 833:20,
833:21, 835:16,
835:21, 836:7,
837:6, 837:15,
837:19, 838:3,
838:4, 839:10,
839:13, 840:1,
840:2, 840:3, 840:9,
842:18, 842:19,
843:9, 843:11,
843:24, 844:11
**GROUNDWATER'S**
[4] - 819:11, 821:17,
824:2, 824:13
**GROUP** [1] - 775:19
**GROUP** [1] - 724:23
**GUESS** [2] - 830:24,
831:14
**GUESSES** [1] - 763:16
**GUIDANCE** [2] -
699:2, 702:10
**GUIDELINE** [1] -
701:21

# H

**HALF** [3] - 726:10,
754:21, 844:2
**HALL** [1] - 718:17
**HAND** [12] - 705:17,

787:18, 807:17,
808:3, 809:7, 811:6,
813:24, 821:2,
831:2, 838:16
**HANDLE** [2] - 717:22,
777:5
**HANDS** [1] - 780:1
**HANG** [1] - 842:9
**HARD** [2] - 764:10,
804:15
**HARGIS** [2] - 694:7,
697:5
**HARGIS** [1] - 694:7
**HASSAN** [3] - 712:25,
715:7, 715:8
**HAZARD** [3] - 768:25,
770:24, 771:4
**HAZARDOUS** [2] -
757:18, 765:10
**HAZARDOUS** [11] -
727:22, 728:1,
729:2, 757:11,
758:4, 758:8,
758:15, 759:23,
769:1, 770:25, 784:6
**HEAD** [1] - 777:1
**HEADQUARTERS** [1]
- 780:5
**HEALTH** [1] - 768:7
**HEAR** [10] - 692:20,
693:19, 695:18,
697:22, 698:10,
701:24, 703:14,
730:15, 763:8, 775:8
**HEARD** [16] - 693:20,
693:23, 700:7,
717:1, 717:3, 717:4,
717:5, 717:8, 717:9,
722:20, 725:4,
725:20, 767:24,
779:8, 781:9, 782:5
**HEARSAY** [1] - 694:3
**HEAVILY** [1] - 841:3
**HELD** [1] - 792:18
**HELLER** [1] - 778:8
**HELP** [7] - 704:7,
705:21, 787:21,
817:16, 818:11,
825:25, 826:22
**HELPED** [1] - 816:9
**HELPFUL** [3] -
805:20, 808:16,
844:9
**HELPS** [1] - 820:25
**HEMBACHER** [3] -
776:17, 776:23,
778:6
**HIGH** [5] - 796:19,
798:24, 800:15,
820:2, 822:24,

839:11
**HIGHER** [2] - 829:17,
840:3
**HIGHEST** [6] - 814:11,
829:15, 829:23,
829:25, 830:11,
837:11
**HILL** [1] - 695:12
**HILLS** [2] - 800:17,
812:18
**HIRED** [4] - 709:11,
766:25, 773:19,
795:9
**HISTORICAL** [3] -
696:14, 794:15,
803:5
**HISTORY** [1] - 788:12
**HIT** [1] - 796:14
**HITS** [2] - 702:5,
820:13
**HITTING** [1] - 801:4
**HOLD** [2] - 788:17,
801:10
**HOLDING** [3] -
724:14, 724:20,
724:24
**HONEST** [1] - 745:19
**HONESTLY** [2] -
695:11, 731:15
**HONOR** [91] - 692:10,
692:14, 692:22,
694:1, 694:17,
694:18, 694:20,
694:24, 695:10,
696:10, 697:3,
697:11, 697:23,
698:23, 699:7,
699:17, 700:16,
700:20, 700:21,
700:25, 701:7,
702:1, 702:16,
703:13, 703:17,
703:20, 704:22,
704:23, 705:12,
706:5, 709:5, 712:2,
715:2, 715:14,
715:23, 718:7,
718:11, 721:9,
721:18, 724:16,
725:25, 727:14,
728:11, 732:7,
732:15, 732:18,
733:14, 734:3,
734:10, 740:15,
741:15, 742:9,
744:15, 746:9,
758:10, 758:19,
759:6, 762:11,
763:25, 764:6,
764:10, 764:20,

765:7, 770:15,
771:7, 771:12,
772:6, 772:13,
773:9, 773:11,
774:10, 775:12,
777:21, 779:3,
779:4, 782:19,
782:21, 786:16,
786:21, 787:13,
802:17, 806:9,
807:2, 807:6,
810:19, 824:8,
829:11, 831:19,
843:19, 844:4,
844:15
**HONOR'S** [1] - 699:2
**HOOK** [1] - 762:2
**HOPE** [1] - 705:6
**HOPEFULLY** [1] -
701:10
**HORIZONTAL** [2] -
819:13, 819:14
**HOUR** [1] - 693:5
**HOURS** [1] - 721:5
**HOUSE** [1] - 794:16
**HSU** [1] - 839:25
**HSU-3** [2] - 837:12,
841:5
**HSU-5** [1] - 837:12
**HUGE** [1] - 762:25
**HULA** [1] - 760:25
**HUMANS** [2] - 768:25,
770:25
**HWMU** [1] - 765:20
**HYDRAULIC** [5] -
796:24, 839:1,
839:8, 839:9, 840:5
**HYDROGEOLOGICA
L** [3] - 790:5, 791:19,
795:8
**HYDROGEOLOGIST**
[1] - 788:19
**HYDROGEOLOGIST
S** [1] - 823:12
**HYDROGEOLOGY** [2]
- 788:16, 794:11

# I

**I.D** [2] - 694:25,
696:11
**IDEA** [1] - 839:6
**IDENTIFICATION** [7] -
695:3, 698:6,
698:12, 699:1,
700:15, 700:19,
701:8
**IDENTIFIED** [8] -
695:9, 701:8,
733:10, 739:1,

754:19, 766:8,
768:2, 825:10
**IDENTIFIES** [3] -
767:17, 768:2,
798:18
**IDENTIFY** [5] - 695:7,
699:21, 713:17,
728:7, 791:11
**IDENTIFYING** [1] -
698:8
**IGNITABLE** [1] - 729:1
**IGNORE** [1] - 775:9
**ILLUSTRATE** [1] -
806:21
**IMAGINE** [1] - 793:25
**IMMINENT** [14] -
755:14, 763:18,
772:16, 773:5,
773:16, 776:7,
776:12, 778:4,
778:14, 778:22,
778:25, 779:13,
779:18, 809:21
**IMPACT** [1] - 820:17
**IMPACTED** [13] -
789:25, 790:7,
793:8, 797:23,
798:19, 799:6,
818:24, 824:22,
828:16, 828:19,
828:20, 838:5, 841:3
**IMPACTING** [1] -
792:3
**IMPACTS** [1] - 799:1
**IMPAIRED** [3] -
716:17, 717:7, 717:9
**IMPEACH** [1] - 697:12
**IMPEACHMENT** [2] -
696:3, 771:8
**IMPEDE** [1] - 802:5
**IMPLEMENT** [1] -
785:14
**IMPLEMENTED** [1] -
758:15
**IMPLORING** [1] -
735:13
**IMPORTANCE** [1] -
823:24
**IMPORTANT** [6] -
717:15, 771:25,
793:20, 799:12,
819:1, 820:6
**IMPORTANTLY** [1] -
703:20
**IMPOUNDMENT** [4] -
760:20, 766:16,
766:20, 809:8
**IMPROPER** [1] - 771:8
**IN-HOUSE** [1] -
794:16

**INC** [11] - 706:14,
706:16, 706:17,
724:20, 724:24,
747:5, 761:23,
774:23, 775:18,
775:24, 776:20
**INCLINED** [1] - 700:11
**INCLUDE** [8] - 710:1,
747:3, 748:9,
763:15, 773:25,
802:12, 837:23,
841:8
**INCLUDED** [10] -
708:15, 709:20,
723:24, 772:21,
793:8, 802:15,
803:10, 806:3,
815:18, 838:19
**INCLUDING** [5] -
727:8, 744:5,
748:15, 789:10,
815:13
**INCORPORATED** [1] -
838:23
**INCREASES** [1] -
822:22
**INDEED** [2] - 696:6,
826:23
**INDENTURE** [3] -
749:24, 750:16
**INDEPENDENT** [2] -
715:8, 724:12
**INDICATE** [5] - 698:4,
701:2, 796:1,
821:23, 835:19
**INDICATED** [7] -
695:4, 784:5, 811:1,
817:14, 826:14,
826:20, 827:25
**INDICATES** [1] -
835:20
**INDICATING** [3] -
799:10, 833:5,
842:11
**INDICATION** [2] -
721:23, 799:19
**INDIVIDUAL** [1] -
749:20
**INDIVIDUALS** [1] -
749:21
**INFLUENCE** [2] -
818:21, 822:21
**INFORMATION** [30] -
702:4, 702:25,
747:11, 748:3,
748:17, 767:21,
783:15, 783:24,
793:25, 794:2,
794:4, 794:9,
794:15, 794:16,

794:18, 794:22,
794:23, 795:13,
797:14, 797:15,
797:23, 801:20,
802:12, 804:20,
805:2, 810:2, 811:5,
837:23, 840:15
**INFORMED** [4] -
703:4, 746:25,
747:22, 776:19
**INITIATE** [2] - 736:13,
739:16
**INITIATED** [1] - 749:2
**INITIATION** [1] -
738:19
**INSTALL** [4] - 738:16,
805:23, 808:18,
809:19
**INSTALLATION** [2] -
730:2, 735:1
**INSTALLED** [7] -
716:13, 752:11,
804:25, 807:25,
809:25, 810:5,
824:17
**INSTEAD** [1] - 811:9
**INSTRUCTED** [1] -
779:5
**INTEND** [8] - 694:15,
698:21, 700:8,
700:14, 702:2,
702:8, 704:6, 807:10
**INTENDED** [1] -
698:18
**INTENDS** [1] - 701:19
**INTENT** [3] - 736:13,
753:10, 774:24
**INTERACTED** [1] -
781:16
**INTEREST** [2] -
815:13, 815:17
**INTERESTED** [1] -
800:5
**INTERIM** [4] - 728:20,
729:5, 729:8, 758:4
**INTERJECT** [1] -
777:20
**INTERPRETATION** [2]
- 782:9, 826:6
**INTERPRETED** [1] -
833:2
**INTERRUPT** [2] -
715:15, 728:12
**INTERRUPTION** [1] -
829:10
**INTERSECT** [1] -
811:16
**INTRODUCE** [10] -
698:5, 698:21,
700:14, 702:2,

702:8, 704:4,
704:10, 704:12,
704:13, 825:4
**INTRODUCING** [1] -
703:15
**INVESTIGATE** [2] -
725:18, 761:18
**INVESTIGATED** [1] -
777:16
**INVESTIGATION** [20] -
709:20, 709:24,
710:2, 731:25,
751:9, 762:9,
762:19, 762:23,
763:7, 763:11,
763:14, 765:17,
774:17, 784:12,
784:15, 785:9,
791:19, 794:8,
794:21, 809:24
**INVESTIGATIONS** [3]
- 754:2, 754:20,
798:10
**INVITATION** [1] -
714:11
**INVOLVED** [4] -
739:20, 787:2,
791:22, 844:22
**INVOLVEMENT** [1] -
778:3
**INVOLVES** [2] - 789:8,
790:10
**INVOLVING** [3] -
789:15, 789:20,
789:22
**IRRELEVANT** [1] -
703:23
**ISH** [1] - 832:13
**ISSUE** [23] - 693:16,
696:3, 697:23,
703:1, 704:1,
713:18, 727:23,
727:25, 728:3,
729:8, 731:9, 732:3,
736:23, 737:12,
737:23, 738:3,
738:4, 738:9,
738:15, 738:24,
740:4, 807:7
**ISSUED** [4] - 772:17,
778:5, 779:1, 779:19
**ISSUES** [10] - 698:13,
710:20, 714:8,
715:25, 728:23,
729:7, 731:12,
741:10, 741:23,
754:19
**ITEM** [1] - 702:20
**ITEM** [2] - 692:5, 761:1
**ITEMS** [1] - 767:17

**ITERATION** [2] -
703:16, 704:3
**ITSELF** [2] - 714:21,
770:6

## J

**JOB** [1] - 793:17
**JOE** [3] - 778:8,
778:10
**JOIN** [1] - 752:21
**JOINED** [5] - 705:3,
726:12, 784:4,
784:18, 784:21
**JOINING** [2] - 763:1,
763:4
**JUDGE** [1] - 728:25
**JUDGE** [5] - 725:24,
728:22, 729:6,
730:6, 740:10
**JUDGMENT** [2] -
695:22, 728:25
**JUGS** [1] - 804:8
**JULY** [5] - 694:7,
718:2, 718:13,
719:25, 720:7
**JUMP** [1] - 760:17
**JUMPING** [1] - 753:2
**JUNE** [4] - 719:3,
719:25, 723:10,
761:16
**JURORS** [1] - 774:12
**JURY** [23] - 692:4,
692:19, 698:19,
699:6, 699:8,
699:16, 701:16,
704:25, 705:3,
709:8, 720:13,
722:5, 725:5,
725:17, 733:2,
734:8, 742:5, 775:5,
787:5, 787:8,
787:10, 845:2, 845:4
**JURY** [1] - 705:5

## K

**KEEP** [2] - 787:2,
844:23
**KEEPING** [1] - 834:3
**KEY** [1] - 702:3
**KILOGRAM** [3] -
765:21, 767:21,
768:4
**KIND** [12] - 777:17,
797:19, 801:22,
803:13, 804:17,
820:11, 821:17,
826:13, 833:23,
838:2, 839:6, 839:19

**KINDLY** [2] - 705:10,
710:13
**KINDS** [1] - 757:14
**KNOWING** [2] -
704:12, 803:3
**KNOWLEDGE** [2] -
704:9, 782:17
**KNOWN** [3] - 752:14,
777:11, 816:16

## L

**L-A-R-D-I-E-R-E** [1] -
706:3
**LABEL** [1] - 831:1
**LABELED** [3] - 798:7,
799:5, 811:12
**LACK** [1] - 751:16
**LACKING** [1] - 744:10
**LACKS** [1] - 736:20
**LACKS** [17] - 704:2,
709:5, 726:1,
733:19, 734:16,
736:2, 741:4,
742:24, 743:3,
744:8, 745:8,
753:19, 758:10,
762:12, 775:3,
785:21, 786:12
**LADIES** [2] - 705:4,
786:24
**LAKE** [1] - 800:24
**LAKE** [1] - 713:13
**LAND** [1] - 836:9
**LANDFILL** [3] -
760:24, 768:12,
768:17
**LANGUAGE** [1] -
702:9
**LARDIERE** [1] - 706:6
**LARDIERE** [12] -
692:16, 692:23,
698:15, 705:13,
706:3, 706:10,
710:13, 721:21,
728:15, 764:18,
773:14, 779:8
**LARGE** [6] - 737:6,
789:14, 815:2,
815:7, 817:8, 834:14
**LARGELY** [1] - 734:6
**LARGER** [6] - 818:14,
818:16, 820:4,
821:24, 822:3, 822:5
**LAST** [21] - 706:2,
711:16, 714:5,
716:1, 716:15,
716:16, 725:4,
732:25, 756:12,
757:14, 757:21,

761:8, 783:7, 786:14, 788:1, 796:6, 805:16, 805:17, 815:15, 839:14, 842:12
**LATE** [3] - 726:6, 733:3, 769:17
**LAWSUIT** [18] - 700:5, 710:4, 723:1, 723:16, 723:20, 724:3, 724:5, 724:7, 724:8, 726:4, 726:6, 726:7, 726:9, 726:12, 726:16, 726:23, 749:5, 750:25
**LAWYER** [3] - 702:23, 725:17, 775:8
**LAY** [1] - 806:17
**LAYER** [3] - 813:3, 832:23, 840:10
**LAYERS** [16] - 796:8, 801:12, 810:12, 810:15, 811:21, 811:22, 812:3, 812:12, 812:13, 812:21, 812:25, 827:8, 836:19, 840:11, 840:12
**LEAD** [1] - 765:20
**LEADING** [6] - 730:8, 774:10, 779:3, 779:5, 779:11, 827:20
**LEADS** [1] - 826:17
**LEARNED** [5] - 751:4, 751:12, 753:21, 767:22, 770:3
**LEARNING** [1] - 752:7
**LEAST** [12] - 693:5, 708:19, 710:21, 710:23, 716:10, 717:19, 739:13, 747:24, 747:25, 752:14, 761:2, 778:21
**LEAVE** [4] - 715:20, 715:21, 838:1, 844:24
**LEAVING** [1] - 828:6
**LEFT** [14] - 748:6, 773:16, 798:25, 804:14, 807:17, 811:6, 813:24, 819:12, 821:2, 826:18, 831:2, 835:8, 838:16
**LEFT-HAND** [1] - 807:17, 811:6, 813:24, 821:2,

831:2, 838:16
**LEGAL** [1] - 781:13
**LEGEND** [3] - 798:18, 799:6, 830:6
**LENGTHY** [1] - 711:19
**LESS** [1] - 812:7
**LETTER** [35] - 712:10, 712:11, 712:15, 712:16, 712:22, 713:3, 713:15, 713:21, 713:24, 714:5, 714:21, 715:5, 716:4, 716:25, 717:13, 717:18, 717:24, 718:4, 719:8, 719:10, 719:14, 719:24, 720:12, 720:24, 720:25, 721:5, 721:6, 721:13, 722:2, 736:12, 736:15, 756:21, 776:17, 776:19, 785:15
**LETTERS** [2] - 711:15, 758:3
**LEVEL** [8] - 727:7, 727:9, 734:1, 814:21, 814:22, 819:22, 831:4, 833:2
**LEVELS** [7] - 798:24, 808:9, 808:12, 821:14, 822:13, 835:8, 837:12
**LIABILITIES** [8] - 742:22, 743:20, 744:5, 745:7, 746:7, 747:2, 749:12, 750:11
**LIABILITY** [6] - 699:11, 727:12, 727:18, 751:2, 775:16, 775:19
**LICENSES** [1] - 788:17
**LIE** [1] - 782:2
**LIGHTER** [1] - 817:14
**LIMINE** [1] - 693:21
**LIMITED** [5] - 747:3, 770:6, 775:16, 775:19, 800:4
**LIMITING** [2] - 802:1, 802:15
**LINE** [13] - 716:16, 766:14, 767:13, 768:9, 768:22, 770:18, 772:11, 772:12, 799:10, 817:25, 826:18, 828:12, 828:13

**LINEAR** [1] - 839:14
**LINEAR** [3] - 839:18, 839:21, 839:24
**LINED** [1] - 797:17
**LINES** [34] - 708:3, 770:9, 797:6, 797:7, 797:8, 811:14, 819:13, 819:14, 820:23, 821:4, 821:21, 821:23, 823:15, 823:17, 823:18, 823:22, 823:24, 823:25, 824:1, 824:9, 824:16, 824:19, 825:1, 826:3, 826:7, 826:11, 827:10, 828:1, 828:25, 833:1, 833:2, 834:3, 841:22
**LIST** [6] - 698:7, 699:4, 760:18, 761:6, 761:14, 763:15
**LISTED** [1] - 768:1
**LISTS** [1] - 767:17
**LITER** [2] - 830:9, 830:16
**LITIGATE** [1] - 725:18
**LITIGATION** [5] - 710:5, 710:11, 730:8, 749:2, 793:3
**LLC** [3] - 774:25, 775:16, 777:5
**LOCAL** [4] - 818:11, 818:17, 823:13, 825:25
**LOCALLY** [1] - 818:4
**LOCATE** [1] - 738:10
**LOCATED** [8] - 768:10, 768:11, 796:10, 799:13, 800:18, 805:20, 807:19, 817:7
**LOCATION** [7] - 697:4, 737:9, 738:16, 768:16, 806:1, 806:18, 806:25
**LOCATIONS** [4] - 694:21, 694:24, 737:6, 835:20
**LOGARITHMIC** [1] - 835:8
**LOGS** [1] - 709:4
**LOOK** [45] - 698:16, 702:21, 708:2, 708:3, 711:17, 712:13, 713:3, 721:7, 723:21,

755:12, 757:17, 760:11, 761:22, 765:9, 770:8, 772:10, 778:10, 790:5, 795:21, 797:10, 798:13, 801:20, 805:24, 807:17, 809:13, 811:11, 812:22, 812:25, 815:25, 816:11, 819:2, 820:19, 820:20, 823:15, 824:21, 824:24, 830:20, 834:5, 835:5, 835:11, 836:8, 839:18, 840:10, 841:1
**LOOKED** [14] - 746:13, 791:1, 792:23, 797:9, 801:25, 806:3, 806:21, 811:10, 815:19, 816:20, 823:2, 829:1, 835:24, 841:9
**LOOKING** [26] - 695:7, 700:13, 702:23, 703:5, 784:7, 789:17, 790:24, 792:16, 792:18, 792:19, 793:6, 796:6, 796:24, 800:8, 810:1, 811:9, 815:20, 816:18, 820:8, 820:19, 829:25, 831:5, 832:25, 834:3, 836:13, 841:16
**LOOKS** [6] - 731:2, 811:6, 812:14, 815:1, 819:13, 826:1
**LOS** [1] - 692:2
**LOS** [3] - 747:6, 748:10, 817:25
**LOST** [3] - 732:10, 740:6, 740:22
**LOUTTIT** [13] - 756:21, 762:7, 762:14, 762:16, 781:10, 781:16, 781:19, 781:24, 782:1, 782:2, 782:10, 782:16, 782:17
**LOW** [6] - 776:4, 796:20, 820:2, 822:24, 839:11
**LOWER** [4] - 808:3, 809:7, 819:22,

819:25
**LOWERED** [1] - 821:14
**LUNCH** [1] - 844:25

## M

**M-A-S-N-A-D-A** [1] - 698:17
**MA'AM** [2] - 787:19, 787:25
**MAGIC** [4] - 736:18, 736:24, 737:9, 738:12
**MAGICAL** [1] - 785:7
**MAGNITUDE** [3] - 803:18, 816:11, 837:18
**MAIL** [13] - 712:16, 712:22, 717:24, 721:5, 721:12, 721:14, 722:4, 722:6, 722:9, 722:14, 722:16, 723:1
**MAIN** [2] - 795:21, 800:23
**MAINTAINED** [1] - 709:12
**MAINTAINING** [1] - 701:13
**MAJOR** [1] - 728:23
**MANAGE** [1] - 789:9
**MANAGEMENT** [2] - 716:16, 757:18
**MANAGEMENT** [14] - 757:11, 757:12, 758:4, 758:8, 758:16, 759:23, 759:25, 761:4, 763:8, 780:19, 784:6, 788:15, 789:6, 789:9
**MANAGER** [7] - 699:12, 711:20, 712:23, 716:5, 717:11, 721:12, 735:4
**MANAGING** [1] - 775:17
**MANNER** [1] - 697:9
**MANUFACTURED** [1] - 747:24
**MAP** [18] - 790:24, 797:5, 797:17, 798:7, 803:14, 808:23, 811:9, 820:19, 823:11, 826:7, 826:10, 828:10, 829:9,

829:12, 829:20, 831:7, 832:18, 842:6
**MAPPING** [1] - 837:1
**MAPS** [6] - 807:17, 825:2, 826:6, 826:25, 833:3, 836:14
**MARCH** [25] - 712:11, 712:17, 713:16, 716:6, 717:1, 718:3, 718:21, 718:24, 719:7, 719:8, 719:9, 719:11, 719:19, 719:23, 719:24, 720:15, 720:16, 720:17, 720:24, 721:13, 721:22, 722:2, 723:7, 724:2, 724:5
**MARKED** [3] - 700:15, 744:17, 834:19
**MARKER** [1] - 812:9
**MARKUP** [1] - 778:21
**MARKUPS** [1] - 778:11
**MASNADA** [6] - 698:16, 699:11, 701:19, 703:20, 704:3, 704:9
**MASTER'S** [2] - 788:14, 788:22
**MATCH** [1] - 832:11
**MATCHED** [1] - 792:21
**MATCHING** [1] - 796:1
**MATERIAL** [3] - 695:24, 803:18, 812:8
**MATERIALS** [3] - 783:23, 808:15, 843:5
**MATH** [1] - 844:1
**MATT** [5] - 692:17, 711:20, 721:12, 722:7, 722:17
**MATTER** [13] - 714:10, 715:21, 718:23, 719:8, 721:25, 743:10, 743:13, 744:13, 746:2, 777:11, 787:2, 787:10, 844:22
**MATTERS** [2] - 712:9, 764:16
**MATZ** [1] - 728:25
**MAX** [1] - 831:2
**MAXIMUM** [2] - 814:20, 814:22
**MCL** [8] - 713:11, 814:21, 814:24,

815:3, 815:4, 830:6, 830:8, 830:15
**MEAN** [14] - 695:2, 701:3, 701:14, 715:14, 779:16, 784:3, 795:24, 801:19, 802:11, 808:12, 812:11, 814:14, 828:20, 831:5
**MEANING** [3] - 697:21, 780:5, 831:14
**MEANS** [8] - 700:9, 701:4, 723:17, 742:4, 761:7, 812:12, 813:1, 822:4
**MEANT** [2] - 777:23, 839:18
**MEASURE** [4] - 797:3, 820:24, 822:14, 825:23
**MEASURED** [2] - 755:4, 840:22
**MEASUREMENTS** [1] - 840:7
**MECHANISM** [1] - 800:11
**MEET** [6] - 694:12, 704:16, 714:7, 714:10, 714:13, 722:21
**MEETING** [14] - 710:20, 718:2, 718:15, 718:16, 718:18, 718:24, 719:12, 719:16, 720:7, 721:3, 722:13, 723:12, 778:1, 778:7
**MEETINGS** [3] - 710:23, 718:17, 720:4
**MEGGITT** [20] - 706:14, 706:16, 706:17, 710:7, 710:10, 724:4, 724:10, 724:13, 724:14, 724:15, 724:20, 724:23, 724:24, 724:25, 725:21, 732:12, 732:14, 751:20, 751:21
**MEMBER** [1] - 775:17
**MEMORIZED** [1] - 816:23
**MEMORY** [7] - 699:1, 699:3, 709:16, 718:22, 719:22,

736:4, 741:9
**MENTION** [2] - 815:15, 833:15
**MENTIONED** [22] - 708:2, 712:23, 719:4, 723:9, 731:23, 755:8, 762:23, 766:24, 769:10, 788:21, 790:17, 791:13, 793:2, 797:9, 800:10, 800:19, 801:7, 801:15, 804:22, 816:2, 818:18, 835:4
**MENTIONING** [1] - 760:24
**MESNADA** [8] - 693:1, 693:9, 735:5, 735:8, 735:19, 735:22, 736:9, 736:11
**MET** [2] - 716:3, 739:16
**METAL** [2] - 777:14, 777:15
**METALLIC** [1] - 767:14
**METHODS** [1] - 816:2
**METROLINK** [1] - 809:12
**MICEVYCH** [1] - 692:12
**MICKELSON** [4] - 751:9, 752:10, 762:24, 774:3
**MICROGRAMS** [2] - 830:9, 830:16
**MICROPHONE** [1] - 710:14
**MID** [1] - 723:3
**MIDDLE** [2] - 812:16, 838:1
**MIGHT** [11] - 736:9, 782:16, 798:11, 806:22, 812:8, 816:1, 816:10, 818:1, 820:9, 839:22
**MIGRATE** [5] - 752:19, 753:16, 791:23, 792:25, 816:1
**MIGRATED** [3] - 789:18, 789:21, 789:23
**MIGRATING** [7] - 806:23, 808:6, 809:14, 828:2, 835:21, 836:2, 836:4
**MIGRATION** [3] - 768:23, 770:22, 841:4

**MILES** [2] - 789:18, 789:23
**MILLIGRAMS** [4] - 765:21, 767:20, 767:21, 768:3
**MILLION** [9] - 699:23, 738:20, 738:22, 738:23, 739:14, 739:18, 741:1, 741:25
**MIMICKING** [1] - 817:21
**MIND** [5] - 694:25, 695:3, 696:10, 787:3, 844:23
**MINDFUL** [1] - 703:12
**MINIMUM** [1] - 734:1
**MINUTE** [5] - 700:25, 714:14, 758:24, 760:1, 765:9
**MINUTES** [5] - 693:4, 704:16, 743:9, 823:1, 844:19
**MIRRORS** [1] - 817:23
**MISLEADING** [1] - 703:23
**MISSED** [1] - 709:23
**MISSING** [2] - 702:3, 702:9
**MISSPOKE** [1] - 719:11
**MISSTATES** [6] - 729:21, 742:23, 744:8, 745:9, 759:1, 760:3
**MISUNDERST ANDING** [1] - 693:13
**MIXED** [1] - 769:21
**MIXING** [1] - 740:5
**MOMENT** [4] - 694:18, 698:23, 701:15, 763:25
**MONDAY** [1] - 692:1
**MONEY** [1] - 729:14
**MONIES** [1] - 699:25
**MONITORING** [32] - 752:11, 793:24, 797:2, 804:23, 804:25, 805:3, 805:5, 805:14, 805:16, 805:18, 806:1, 806:19, 806:25, 807:15, 807:16, 807:24, 812:24, 813:5, 814:11, 814:15, 818:19, 818:20, 819:5, 819:7, 820:5, 821:9, 821:12, 829:13, 830:13,

830:18, 836:22, 840:9
**MONTHLY** [2] - 710:20, 720:5
**MONTHS** [4] - 722:25, 731:11, 739:25, 741:11
**MORNING** [12] - 692:10, 692:13, 692:14, 692:18, 705:4, 705:5, 705:15, 706:10, 706:11, 773:14, 786:25, 845:6
**MOST** [12] - 794:13, 794:14, 800:14, 801:10, 808:5, 808:14, 813:13, 827:9, 827:17, 832:23, 838:5, 844:13
**MOSTLY** [3] - 767:1, 795:7, 802:3
**MOTION** [4] - 750:5, 796:15, 796:16, 800:13
**MOUNTAIN** [4] - 736:18, 736:24, 737:9, 738:12
**MOUTH** [2] - 696:20, 736:10
**MOVE** [23] - 710:13, 737:8, 737:19, 750:4, 750:20, 764:5, 764:12, 764:16, 764:19, 796:8, 796:13, 796:15, 796:16, 801:11, 801:13, 802:22, 811:1, 812:11, 813:5, 831:13, 831:14, 831:17, 839:20
**MOVED** [2] - 777:2, 801:24
**MOVEMENT** [2] - 802:5, 843:24
**MOVES** [10] - 796:17, 796:18, 796:19, 800:9, 800:10, 800:12, 801:1, 801:5, 812:12, 818:7
**MOVING** [8] - 697:18, 701:18, 800:16, 800:25, 801:3, 802:8, 826:12, 839:22
**MR** [245] - 692:10, 692:14, 692:22, 693:1, 693:24,

694:17, 695:10, 696:10, 696:22, 697:3, 697:11, 697:17, 697:23, 698:22, 698:25, 699:7, 699:17, 700:3, 700:16, 700:20, 700:24, 701:7, 701:15, 702:1, 702:16, 703:13, 703:17, 704:1, 704:22, 704:23, 705:12, 706:5, 706:9, 709:5, 709:10, 710:18, 712:2, 712:5, 715:2, 715:5, 715:14, 715:23, 715:24, 718:7, 718:11, 718:12, 721:8, 721:11, 721:18, 721:20, 724:16, 724:22, 725:25, 726:5, 727:14, 728:11, 728:14, 729:21, 730:4, 730:10, 730:16, 732:7, 732:11, 732:15, 732:18, 732:19, 733:14, 733:16, 733:19, 734:2, 734:10, 734:11, 734:16, 734:20, 735:16, 735:18, 736:2, 736:8, 736:19, 736:22, 736:25, 737:15, 740:15, 740:21, 741:4, 741:9, 741:15, 741:19, 742:9, 742:12, 742:16, 742:19, 742:23, 743:1, 743:3, 743:8, 743:9, 744:8, 744:12, 744:15, 744:20, 744:21, 745:8, 746:4, 746:5, 746:9, 746:18, 750:7, 750:8, 751:15, 751:18, 753:18, 753:21, 758:10, 758:13, 758:19, 758:22, 758:24, 759:1, 759:6, 759:8, 759:9, 759:13, 759:19, 760:3, 760:11, 762:11, 762:14, 763:25, 764:6, 764:14, 764:19,

764:23, 764:24, 765:7, 765:8, 766:5, 766:7, 770:14, 770:17, 770:22, 771:7, 771:9, 771:12, 771:13, 771:23, 771:24, 772:3, 772:6, 772:10, 772:13, 772:15, 773:4, 773:8, 773:11, 773:13, 774:10, 774:14, 775:2, 775:12, 775:13, 777:21, 777:23, 777:25, 779:3, 779:12, 782:3, 782:5, 782:14, 782:18, 782:21, 782:23, 783:12, 783:13, 783:17, 783:19, 783:21, 784:1, 784:22, 785:21, 785:23, 786:1, 786:4, 786:6, 786:12, 786:16, 786:19, 786:21, 787:13, 788:10, 790:17, 797:25, 798:3, 802:17, 802:20, 802:22, 802:25, 806:8, 806:12, 806:15, 806:16, 806:17, 806:18, 807:2, 807:4, 807:6, 807:12, 810:19, 810:22, 811:3, 811:4, 813:18, 813:20, 817:3, 823:9, 824:8, 824:9, 825:4, 825:10, 825:15, 825:17, 825:18, 827:20, 827:22, 829:11, 829:24, 831:19, 831:22, 832:6, 832:9, 832:10, 833:15, 834:22, 834:25, 838:11, 838:13, 838:15, 841:15, 842:1, 843:1, 843:3, 843:19, 844:4, 844:8, 844:15
**MULTIPLE**[4] - 812:5, 815:10, 834:14, 840:11

**N**

**NAME**[7] - 706:2, 708:25, 781:9, 788:1, 791:11
**NAMED**[3] - 731:5, 811:23, 811:24
**NAMES**[2] - 708:1, 708:9
**NARRATIVE**[2] - 777:17, 777:21
**NATURAL**[1] - 818:7
**NATURE**[3] - 709:4, 777:7, 779:24
**NDMA**[2] - 768:24, 770:23
**NEAR**[11] - 736:18, 736:24, 765:19, 766:16, 790:6, 809:12, 819:25, 820:14, 822:17, 822:22, 824:20
**NEARBY**[1] - 709:22
**NEARLY**[1] - 752:8
**NECESSARILY**[2] - 695:23, 822:14
**NEED**[12] - 697:12, 698:2, 698:7, 698:9, 698:10, 699:3, 702:18, 759:4, 771:10, 788:4, 810:25, 820:11
**NEEDED**[6] - 699:1, 719:14, 721:4, 722:10, 722:11, 733:25
**NEGLIGENCE**[1] - 693:15
**NEGOTIATE**[2] - 714:7, 773:1
**NEGOTIATING**[1] - 772:20
**NEGOTIATION**[1] - 779:13
**NEIGHBORING**[1] - 710:2
**NEVER**[3] - 701:9, 748:9, 772:21
**NEVERTHELESS**[1] - 762:3
**NEW**[3] - 737:22, 740:8, 783:19
**NEXT**[34] - 692:20, 693:7, 700:13, 701:12, 701:18, 705:9, 705:11, 713:4, 728:10, 742:18, 758:13, 768:1, 771:22, 772:11, 783:11,

787:12, 787:14, 791:7, 796:4, 799:4, 800:3, 808:22, 808:23, 810:1, 815:22, 815:24, 822:7, 826:8, 828:23, 830:19, 832:18, 832:19, 834:2, 835:23
**NICE**[1] - 705:6
**NON**[4] - 779:11, 819:3, 819:5, 822:3
**NON-LEADING**[1] - 779:11
**NON-PUMPING**[3] - 819:3, 819:5, 822:3
**NONRESPONSIVE** - 734:6
**NONTECHNICAL**[1] - 730:25
**NORTH**[1] - 827:11
**NORTH**[1] - 788:14
**NORTHERLY**[1] - 828:11
**NORTHERN**[2] - 808:4, 809:11
**NORTHWEST**[2] - 828:1, 828:4
**NORTHWESTERLY**[1] - 827:13
**NORTHWESTWARD**[1] - 818:7
**NOTE**[1] - 796:9
**NOTEBOOKS**[1] - 844:24
**NOTED**[3] - 751:25, 765:16, 793:7
**NOTHING**[8] - 695:8, 705:21, 782:19, 785:7, 786:21, 787:21, 801:22, 807:8
**NOTICE**[5] - 713:17, 719:3, 827:10, 839:25, 840:19
**NOTIFICATION**[1] - 721:22
**NOTIFYING**[2] - 713:8, 713:9
**NOVEMBER**[3] - 726:13, 756:15, 758:2
**NOVEMBER**[1] - 692:1
**NUMBER**[19] - 699:18, 702:6, 712:23, 729:11, 730:20, 734:22, 742:7, 767:17, 783:6, 803:1,

809:25, 814:17, 814:25, 815:2, 815:3, 815:7, 816:23, 839:15, 840:18
**NUMBERS**[3] - 823:16, 834:21, 839:12

**O**

**OATH**[1] - 720:14
**OBJECT**[5] - 694:3, 696:19, 701:4, 779:6, 807:8
**OBJECTED**[1] - 701:3
**OBJECTING**[1] - 843:22
**OBJECTION**[55] - 694:1, 695:19, 698:1, 698:11, 700:8, 700:11, 700:17, 700:18, 700:19, 701:5, 701:20, 703:22, 703:23, 703:24, 704:6, 704:8, 709:5, 709:8, 712:2, 715:2, 718:7, 718:10, 724:16, 725:25, 727:14, 730:10, 730:14, 732:7, 732:15, 740:15, 740:19, 741:15, 742:9, 742:16, 745:11, 746:9, 753:18, 758:10, 758:19, 762:11, 771:7, 771:10, 774:10, 775:2, 777:21, 779:3, 779:7, 782:3, 782:4, 802:17, 807:6, 810:22, 827:20, 831:19, 843:1
**OBJECTS**[1] - 696:9
**OBLIGATION**[1] - 740:1
**OBLIGATIONS**[2] - 730:7, 776:21
**OBSERVED**[1] - 766:21
**OBTAIN**[1] - 737:20
**OBTAINED**[1] - 700:1
**OBVIOUSLY**[2] - 770:3, 776:12
**OCCURRED**[1] - 781:7
**OCCURS**[1] - 833:20
**OCTOBER**[1] -

749:22
**OFFERED** [2] - 698:17, 700:19
**OFFICE** [2] - 694:10, 777:2
**OFFICIAL** [1] - 694:10
**OFFICIALS** [1] - 778:7
**OFFSITE** [14] - 780:22, 789:21, 800:8, 809:14, 826:12, 826:17, 835:24, 838:21, 838:24, 838:25, 840:1, 840:3, 842:7, 842:12
**OFTENTIMES** [1] - 798:9
**OLD** [1] - 696:12
**ON-SITE** [3] - 780:11, 780:18, 824:19
**ONCE** [20] - 697:19, 779:21, 784:17, 785:13, 796:13, 796:14, 797:4, 800:1, 824:9, 824:20, 828:5, 828:22, 830:17, 832:17, 834:1, 836:7
**ONE** [84] - 697:24, 698:7, 698:23, 699:18, 702:8, 704:7, 704:9, 704:16, 708:21, 709:1, 709:14, 709:16, 710:6, 713:18, 713:24, 717:22, 718:16, 719:2, 720:4, 720:6, 720:9, 722:23, 722:24, 724:25, 725:10, 727:21, 728:7, 731:1, 731:12, 731:20, 732:17, 733:11, 735:5, 735:19, 736:17, 737:14, 738:20, 739:10, 739:14, 739:21, 741:10, 741:23, 748:11, 748:14, 751:25, 755:20, 765:20, 767:8, 767:10, 771:20, 774:18, 777:13, 778:21, 781:14, 784:11, 789:13, 793:24, 795:22, 799:8, 800:22, 804:1, 804:13, 804:14, 808:3,

810:10, 812:2, 813:1, 813:3, 814:12, 816:10, 816:18, 825:23, 827:8, 830:10, 830:12, 835:13, 835:14, 835:18, 841:3, 841:9, 841:10
**ONES** [3] - 726:25, 828:16, 829:25
**ONSITE** [16] - 794:7, 830:18, 838:21, 838:22, 838:24, 840:1, 840:2, 840:8, 841:5, 842:6, 842:19, 843:8, 843:11, 843:13
**OOO** [1] - 692:3
**OPEN** [3] - 787:3, 813:4, 844:23
**OPENINGS** [1] - 819:18
**OPERABLE** [4] - 694:6, 776:9, 780:19, 780:20
**OPERABLE** [9] - 776:10, 780:14, 780:15, 780:17, 780:20, 783:6, 783:9, 798:6, 798:8
**OPERATED** [1] - 749:13
**OPERATING** [1] - 761:17
**OPERATION** [2] - 805:9, 807:21
**OPERATIONAL** [1] - 709:4
**OPINION** [3] - 809:15, 832:8, 832:16
**OPINIONS** [3] - 695:21, 696:2, 697:7
**OPPORTUNITY** [1] - 840:9
**ORANGE** [1] - 789:22
**ORANGE** [6] - 830:25, 831:8, 831:18, 832:12, 832:13, 833:5
**ORANGE-ISH** [1] - 832:13
**ORDER** [32] - 755:15, 756:8, 756:14, 756:16, 756:24, 756:25, 757:14, 758:25, 759:12, 761:17, 761:20, 763:19, 772:17, 772:21, 773:5, 773:17, 773:25,

774:5, 774:8, 774:16, 774:19, 776:7, 776:13, 778:4, 778:14, 778:22, 779:1, 779:14, 779:19, 785:5, 809:22
**ORDER** [33] - 692:20, 693:21, 715:17, 751:19, 751:23, 752:1, 755:8, 755:9, 755:24, 756:11, 763:11, 763:18, 763:21, 764:2, 765:12, 765:13, 766:3, 766:18, 767:13, 768:2, 768:21, 769:5, 769:24, 771:14, 772:1, 773:3, 779:21, 785:6, 803:17, 808:9, 809:24, 827:1, 837:18
**ORDERED** [2] - 732:4, 740:25
**ORDERLY** [1] - 774:16
**ORDERS** [1] - 723:13
**ORIENT** [1] - 817:6
**ORIGINAL** [1] - 707:2
**ORIGINATED** [2] - 792:3, 837:8
**ORIGINATES** [1] - 768:10
**OROFINO** [1] - 760:24
**OTHERWISE** [4] - 703:8, 704:12, 710:10, 720:7
**OU** [1] - 798:7
**OU-3** [3] - 803:13, 841:8, 841:24
**OU-4** [1] - 827:11
**OUS** [1] - 780:24
**OUTLINED** [2] - 817:9
**OUTSET** [1] - 694:11
**OUTSIDE** [3] - 692:18, 786:4, 786:12
**OVERALL** [4] - 816:21, 819:9, 823:13, 839:22
**OVERBROAD** [1] - 753:18
**OVERLAP** [1] - 699:8
**OVERLAY** [3] - 799:18, 803:13, 836:21
**OVERRULE** [1] - 745:11
**OVERRULED** [16] -

726:2, 727:15, 729:23, 732:9, 733:20, 734:17, 736:3, 737:2, 741:16, 746:11, 759:14, 760:5, 771:11, 772:4, 784:2, 843:21
**OVERSEEING** [2] - 709:20, 710:1
**OVERSIGHT** [1] - 794:21
**OVERSIMPLIFICATION** [1] - 750:19
**OVERSIMPLIFIED** [1] - 750:14
**OWN** [4] - 755:1, 761:24, 765:24, 766:3
**OWNED** [4] - 725:1, 747:23, 748:16, 749:13
**OWNER** [2] - 737:21, 738:6, 775:17
**OWNERS** [1] - 775:19
**OWNS** [1] - 706:17

## P

**P.M** [1] - 845:6
**PAGE** [29] - 702:14, 703:19, 708:3, 713:4, 755:23, 756:12, 756:21, 756:25, 757:17, 757:22, 757:25, 759:20, 760:11, 760:18, 760:23, 763:24, 764:24, 765:1, 765:4, 765:10, 766:14, 768:6, 768:21, 770:9, 772:11
**PAGES** [3] - 744:16, 762:25, 764:3
**PAID** [4] - 729:15, 732:12, 740:13, 741:25
**PARAGRAPH** [25] - 713:8, 714:6, 716:15, 722:20, 746:24, 747:8, 747:10, 747:12, 747:14, 747:16, 747:21, 748:2, 748:4, 748:7, 748:14, 749:11, 756:12, 757:18, 758:1, 758:14, 760:12, 765:10,

768:7
**PARAGRAPHS** [1] - 768:8
**PARALLEL** [1] - 821:5
**PARKWAY** [2] - 736:18, 736:24
**PART** [16] - 699:7, 709:19, 737:24, 738:11, 740:25, 774:8, 778:11, 784:12, 791:22, 793:8, 798:20, 806:19, 807:3, 825:5, 825:8, 828:8
**PARTIAL** [1] - 729:12
**PARTICIPANTS** [1] - 718:18
**PARTICULAR** [13] - 693:25, 695:23, 697:8, 704:10, 714:25, 751:14, 767:6, 772:19, 790:23, 790:24, 809:21, 811:24, 826:24
**PARTICULARLY** [2] - 694:22, 736:5
**PARTIES** [13] - 693:4, 695:4, 698:5, 698:7, 698:14, 699:21, 702:11, 730:20, 739:5, 739:16, 739:17, 764:1
**PARTS** [5] - 694:15, 799:9, 814:23, 815:5, 830:9
**PARTY** [6] - 695:7, 704:7, 704:14, 714:13, 762:4, 771:9
**PAST** [5] - 699:12, 709:3, 711:25, 713:22, 713:25
**PATHS** [1] - 844:10
**PATHWAY** [15] - 820:10, 820:13, 820:14, 822:17, 827:13, 827:15, 827:25, 828:11, 832:22, 833:8, 837:5, 841:4, 842:5, 842:9, 844:13
**PATHWAYS** [27] - 791:23, 792:24, 793:6, 793:17, 799:16, 799:18, 799:20, 820:9, 826:11, 826:12, 826:14, 827:2, 828:7, 828:10, 828:24, 829:1,

832:22, 833:6, 833:15, 833:24, 834:1, 836:4, 837:2, 841:4, 841:22
**PATRICK** [1] - 692:11
**PATTERN** [4] - 827:12, 828:22, 836:11, 840:19
**PAUSE** [1] - 779:8
**PAY** [19] - 716:7, 730:18, 731:7, 731:25, 732:5, 733:17, 734:12, 734:24, 736:17, 737:7, 738:20, 739:1, 739:11, 739:14, 740:1, 740:8, 740:22, 740:25, 742:2
**PAYROLL** [1] - 706:22
**PCE** [36] - 723:24, 752:13, 752:18, 753:15, 753:23, 754:2, 754:6, 754:10, 754:11, 754:12, 754:15, 754:23, 754:25, 755:2, 755:5, 765:20, 765:25, 766:3, 766:8, 766:11, 766:12, 768:2, 768:24, 769:8, 769:11, 769:16, 769:22, 770:23, 771:4, 814:3, 831:14, 831:17, 831:23, 832:2, 832:4, 832:11
**PELOQUIN** [1] - 693:9
**PENDENCY** [1] - 700:5
**PENDING** [2] - 724:5, 724:7
**PEOPLE** [3] - 712:23, 787:2, 844:22
**PER** [15] - 765:21, 767:21, 768:3, 802:23, 804:7, 814:23, 815:5, 830:9, 830:16, 842:21, 842:23, 843:8, 843:15, 843:25
**PERCENT** [4] - 754:21, 776:11, 833:11, 841:7
**PERCENTAGE** [1] - 841:4
**PERCHLORATE** [84] - 709:21, 710:3,

711:25, 713:9, 713:11, 713:18, 713:23, 714:1, 716:11, 716:12, 721:22, 725:6, 725:11, 725:23, 726:17, 726:23, 727:5, 727:10, 727:13, 727:22, 728:6, 729:1, 729:19, 730:19, 732:21, 733:3, 733:9, 733:17, 734:13, 734:14, 735:24, 736:14, 739:1, 740:2, 740:13, 740:23, 742:5, 750:21, 750:23, 751:1, 768:24, 770:23, 789:17, 789:20, 789:22, 791:4, 791:19, 792:2, 792:7, 792:10, 793:6, 797:23, 799:6, 799:16, 799:17, 799:23, 813:9, 814:3, 814:10, 814:14, 815:1, 815:4, 827:4, 828:18, 829:19, 830:21, 830:22, 831:3, 831:6, 831:10, 831:15, 831:24, 832:2, 832:5, 833:5, 833:7, 834:4, 834:7, 834:9, 834:10, 835:7, 836:2, 836:3, 836:5
**PERCHLORATE-IMPACTED** [2] - 797:23, 799:6
**PERCOLATE** [2] - 801:16, 801:18
**PERFECT** [1] - 835:15
**PERFECTLY** [1] - 821:16
**PERFORM** [1] - 715:9
**PERFORMED** [3] - 731:5, 762:23, 767:16
**PERFORMING** [1] - 762:3
**PERHAPS** [3] - 704:13, 843:13
**PERIOD** [11] - 721:25, 747:12, 747:25, 748:4, 749:14, 766:17, 769:2, 771:1, 783:21,

807:18, 808:22
**PERMEABILITY** [1] - 839:6
**PERMEABLE** [4] - 801:10, 802:3, 811:21, 812:7
**PERMISSION** [1] - 811:1
**PERMIT** [1] - 699:17
**PERPENDICULAR** [5] - 797:7, 824:1, 826:3, 826:11, 826:16
**PERSON** [2] - 772:24, 781:10
**PERSONAL** [1] - 750:2
**PERSONALLY** [3] - 717:21, 719:21, 735:4
**PERSPECTIVE** [3] - 728:19, 757:8, 817:18
**PHONE** [2] - 710:24, 781:20
**PHRASED** [1] - 709:24
**PHYLLIS** [2] - 787:14, 788:2
**PHYLLIS** [1] - 788:7
**PICKED** [1] - 830:12
**PICKING** [2] - 753:12, 773:16
**PIECE** [3] - 776:1, 794:4, 796:6
**PILLSBURY** [2] - 748:20, 749:2
**PINK** [4] - 799:5, 799:9, 803:12, 827:4
**PIPELINES** [2] - 730:3, 738:10
**PLACE** [5] - 738:4, 795:5, 798:25, 803:12, 809:16
**PLACED** [1] - 809:3
**PLAINTIFF** [2] - 746:24, 747:22
**PLAINTIFF** [4] - 692:11, 693:19, 702:7, 705:12
**PLAINTIFF'S** [2] - 706:7, 788:8
**PLAINTIFFS** [6] - 692:9, 705:8, 716:13, 727:3, 727:10, 787:11
**PLAINTIFFS** [2] - 694:3, 787:13
**PLAN** [7] - 758:5, 758:9, 758:15, 781:5, 784:16,

784:18, 785:12
**PLAN** [1] - 694:6
**PLANNED** [1] - 775:21
**PLANNING** [3] - 789:6, 794:5, 806:13
**PLANS** [1] - 785:3
**PLATFORM** [1] - 787:17
**PLAUSIBLE** [2] - 799:18, 820:9
**PLAY** [2] - 693:2, 728:2
**PLOT** [2] - 797:5, 806:18
**PLOTTED** [4] - 828:10, 829:1, 830:17, 836:23
**PLUME** [7] - 731:3, 770:7, 831:10, 831:18, 832:11, 832:12, 832:18
**PLUMES** [3] - 789:20, 831:5, 837:1
**POINT** [2] - 839:23
**POINT** [29] - 701:2, 701:11, 702:18, 706:19, 708:13, 708:14, 724:10, 729:18, 733:18, 735:24, 743:2, 751:17, 752:7, 752:14, 752:17, 753:11, 753:21, 759:21, 762:9, 766:7, 767:3, 769:7, 769:24, 771:19, 776:12, 781:14, 824:15, 826:10, 835:11
**POINTED** [1] - 714:16
**POINTING** [2] - 828:12, 828:14
**POLICY** [2] - 716:17, 717:9
**POLITICAL** [4] - 771:17, 772:2, 772:8, 773:3
**POOP** [1] - 735:25
**POP** [3] - 791:8, 821:13, 841:21
**POPPED** [1] - 827:3
**PORES** [1] - 801:5
**PORTA** [1] - 747:5
**PORTAL** [3] - 794:19, 794:23
**PORTION** [11] - 765:19, 808:4, 809:7, 809:12, 817:8, 817:20, 825:21, 827:23,

839:24, 841:24, 842:12
**PORTIONS** [7] - 696:6, 697:2, 697:7, 697:8, 702:12, 765:18, 828:3
**POSED** [1] - 770:2
**POSITION** [1] - 701:16
**POSITIVE** [1] - 705:7
**POSSIBLE** [1] - 828:7
**POSSIBLY** [1] - 784:24
**POST** [2] - 750:16, 825:24
**POST-ACQUISITION** [1] - 750:16
**POT** [1] - 736:1
**POTENTIAL** [12] - 752:19, 753:16, 757:10, 760:18, 761:7, 761:14, 761:18, 768:25, 770:24, 771:4, 826:10
**POUNDS** [13] - 755:4, 766:25, 767:5, 803:11, 803:23, 803:25, 804:2, 804:4, 804:6, 804:7, 804:11
**POWDER** [13] - 743:14, 743:21, 744:6, 747:5, 747:6, 748:10, 749:18, 749:21, 749:22, 749:25, 750:2, 750:17
**PRACTICE** [3] - 711:7, 745:15, 749:7
**PRACTICING** [1] - 790:1
**PRECEDED** [1] - 781:13
**PRECISE** [2] - 714:17, 763:10
**PREDATES** [1] - 702:9
**PREDECESSOR** [4] - 744:5, 747:2, 747:3, 762:6
**PREDOMINANT** [1] - 827:12
**PREFERENCE** [1] - 695:10
**PREPARE** [3] - 785:2, 790:8, 790:11
**PREPARED** [10] - 694:7, 697:20, 731:14, 771:16, 792:5, 793:2, 795:8, 795:16, 819:2, 823:9

**PRESENCE** [6] - 692:4, 692:19, 704:25, 787:5, 787:8, 845:4
**PRESENT** [15] - 696:4, 697:15, 698:9, 705:3, 718:25, 719:1, 719:16, 741:13, 748:16, 766:15, 775:9, 806:14, 807:9, 834:20, 834:22
**PRESENTED** [3] - 693:14, 695:6, 703:18
**PRESENTING** [1] - 806:13
**PRESIDENT** [7] - 706:24, 706:25, 707:3, 707:4, 742:20, 751:22, 789:4
**PRESSURE** [1] - 800:14
**PRESUMABLY** [1] - 695:25
**PRESUME** [1] - 722:8
**PRETTY** [2] - 815:6, 839:16
**PREVENTED** [1] - 786:10
**PREVIOUS** [1] - 813:25
**PREVIOUSLY** [7] - 698:14, 713:14, 762:24, 769:10, 784:8, 823:21, 841:16
**PRICE** [2] - 776:2, 776:4
**PRIMARY** [2] - 805:4, 836:19
**PRINCIPAL** [2] - 693:6, 789:4
**PRIORITY** [1] - 799:1
**PRIVY** [1] - 711:12
**PROBATIVE** [2] - 701:25, 702:1
**PROBLEM** [4] - 768:14, 785:8, 785:11, 816:11
**PROCEDURE** [5] - 714:12, 739:4, 739:6, 739:16, 810:25
**PROCEDURES** [1] - 795:5
**PROCEED** [4] - 697:9, 701:12, 706:4, 772:13

**PROCEEDING** [7] - 731:11, 741:3, 741:14, 741:21, 743:19, 745:1, 756:2
**PROCEEDINGS** [2] - 755:9, 845:6
**PROCESS** [11] - 737:13, 754:4, 754:6, 776:6, 778:12, 784:13, 797:8, 801:20, 826:15, 836:1, 840:8
**PROCUREMENT** [1] - 699:14
**PRODUCE** [1] - 767:11
**PRODUCTION** [1] - 713:10
**PRODUCTION** [3] - 818:19, 818:21, 828:7
**PRODUCTS** [1] - 747:24
**PROFESSIONAL** [4] - 788:17, 788:18, 789:2, 789:8
**PROFESSIONALS** [1] - 810:6
**PROFILE** [3] - 820:18, 836:18, 837:2
**PROJECT** [3] - 738:11, 789:19, 789:22
**PROJECTS** [4] - 789:12, 789:14, 789:15, 789:24
**PROMPTLY** [1] - 764:4
**PRONOUNCED** [1] - 761:11
**PROPER** [1] - 842:18
**PROPERTIES** [3] - 839:3, 839:6, 840:7
**PROPERTY** [19] - 737:20, 738:6, 738:15, 748:16, 750:2, 761:20, 761:21, 773:21, 774:21, 774:22, 775:14, 776:1, 776:4, 776:6, 783:16, 783:25, 784:19, 785:4
**PROPOSE** [1] - 704:4
**PROPOSED** [1] - 702:4
**PROPOSING** [1] - 702:7
**PROTECTION** [1] - 789:6

**PROTECTION** [1] - 755:17
**PROTOCOLS** [1] - 795:5
**PROVIDE** [6] - 714:9, 714:20, 717:19, 718:3, 720:19, 788:11
**PROVIDED** [4] - 733:23, 764:25, 797:24, 824:18
**PROVIDES** [2] - 818:13
**PROVIDING** [1] - 794:20
**PROVISION** [1] - 731:17
**PROVISIONS** [1] - 738:22
**PUBLIC** [7] - 694:4, 694:8, 694:9, 694:10, 718:17, 768:7, 794:22
**PUBLICATION** [1] - 806:7
**PUBLISH** [5] - 790:14, 797:25, 807:2, 823:7, 829:4
**PUBLISHED** [2] - 823:11, 825:2
**PULL** [5] - 700:21, 806:5, 813:15, 819:21, 820:3
**PULLED** [1] - 767:11
**PULLING** [2] - 813:2, 821:19
**PUMP** [3] - 819:21, 840:6, 840:11
**PUMPING** [30] - 818:23, 819:3, 819:4, 819:5, 819:7, 819:16, 819:19, 819:20, 820:3, 820:17, 820:20, 820:21, 820:22, 821:6, 821:8, 821:11, 821:12, 821:22, 821:25, 822:2, 822:3, 822:5, 822:8, 822:14, 822:18, 822:20, 822:24
**PURCHASED** [2] - 749:12, 750:11
**PURPLE** [5] - 829:16, 830:1, 830:7, 830:8, 842:4
**PURPOSE** [4] - 694:25, 698:9, 699:6, 702:19

**PURPOSES** [10] - 695:1, 695:4, 696:14, 698:18, 700:1, 700:19, 701:8, 819:10, 823:12, 825:7
**PURSUANT** [11] - 713:7, 716:7, 717:14, 731:16, 742:3, 743:15, 746:7, 750:16, 763:11, 774:19, 784:10
**PUT** [8] - 699:4, 702:15, 702:24, 736:10, 767:4, 794:22, 820:25, 826:7
**PUTTING** [3] - 696:20, 794:10, 795:12

**Q**

**Q-2** [5] - 733:24, 733:25, 740:3, 740:8, 740:23
**QC** [1] - 795:5
**QUALIFICATION** [1] - 772:23
**QUALITY** [3] - 789:10, 792:19, 827:1
**QUARTER** [1] - 776:9
**QUARTERLY** [1] - 825:3
**QUESTION** [2] - 771:2, 772:15
**QUESTIONS** [7] - 773:9, 775:7, 779:6, 779:11, 782:12, 783:4, 832:7
**QUICK** [1] - 781:9
**QUITE** [7] - 711:19, 729:14, 737:5, 750:14, 799:15, 805:12, 811:5
**QUO** [1] - 701:13
**QUOTE** [26] - 713:8, 721:25, 725:6, 725:7, 725:10, 746:24, 747:7, 747:10, 747:12, 747:22, 748:1, 748:3, 748:4, 748:13, 749:11, 749:14, 758:1, 758:14, 765:16, 766:15, 766:17, 768:22, 769:2, 770:19, 771:1

**R**

**RADIALLY** [1] - 819:23
**RAISE** [4] - 701:5, 702:13, 705:17, 787:18
**RAN** [1] - 718:12
**RANCHO** [1] - 789:20
**RATE** [1] - 822:21
**RATES** [2] - 837:15, 837:17
**RATHER** [6] - 698:12, 725:18, 732:11, 771:24, 801:6, 815:6
**RAVINE** [1] - 760:25
**RCRA** [1] - 784:6
**REACH** [5] - 820:9, 832:5, 832:15, 842:25, 843:17
**REACHED** [2] - 752:22, 832:5
**READ** [31] - 703:5, 711:1, 711:5, 711:7, 711:15, 711:18, 713:21, 723:21, 726:20, 743:10, 744:12, 745:16, 745:17, 745:18, 748:14, 751:8, 752:3, 755:10, 755:24, 757:13, 760:6, 761:8, 761:13, 763:18, 765:13, 765:14, 767:24, 770:14, 773:24, 784:3, 784:6
**READING** [3] - 769:3, 769:5, 830:12
**READS** [1] - 747:10
**READY** [1] - 704:21
**REAL** [2] - 750:2, 781:9
**REALLY** [20] - 764:11, 769:16, 776:1, 789:7, 791:9, 793:9, 793:16, 793:22, 800:23, 801:9, 803:5, 803:7, 805:19, 805:22, 808:4, 808:25, 816:18, 817:5, 840:17
**REASON** [5] - 733:2, 733:6, 815:10, 815:13, 831:7
**REASONABLE** [1] - 833:24
**RECEIVE** [5] - 711:4, 745:18, 745:20,

745:22, 751:23
**RECEIVED** [31] - 713:15, 713:20, 715:6, 716:4, 717:10, 720:25, 721:5, 721:10, 721:17, 721:19, 721:21, 722:4, 722:9, 764:2, 771:14, 776:17, 779:13, 779:21, 790:16, 798:2, 807:11, 810:23, 810:24, 816:25, 823:8, 825:6, 829:6, 833:14, 834:24, 844:6, 844:7
**RECEIVING** [1] - 751:19
**RECENT** [3] - 713:9, 783:14, 794:13
**RECENTLY** [4] - 760:7, 761:8, 783:7
**RECESS** [5] - 704:19, 786:25, 787:4, 787:6, 845:5
**RECHARGE** [2] - 789:9, 802:5
**RECHARGED** [1] - 818:15
**RECOGNIZING** [1] - 800:9
**RECOLLECTION** [5] - 752:10, 766:10, 767:23, 769:22, 830:15
**RECORD** [11] - 694:4, 694:9, 694:10, 705:1, 706:1, 721:17, 787:9, 787:25, 824:6, 841:13
**RECORDS** [9] - 708:6, 708:15, 708:18, 709:3, 709:12, 742:19, 803:6, 803:21
**RECOUNTED** [1] - 781:23
**RED** [3] - 791:3, 829:16, 835:7
**REDIRECT** [1] - 782:20
**REDIRECT** [1] - 782:22
**REFER** [6] - 695:20, 768:8, 811:22, 812:8, 823:21, 838:21
**REFERENCE** [6] -

698:2, 713:12, 716:16, 753:13, 756:11, 760:14
**REFERENCES** [2] - 717:3, 717:4
**REFERRED** [3] - 723:25, 747:6, 814:20
**REFERRING** [6] - 695:23, 726:3, 790:19, 824:3, 824:5
**REFERS** [1] - 811:25
**REFRESH** [2] - 699:1, 699:3
**REFRESHES** [1] - 736:4
**REFURBISH** [1] - 739:12
**REFURBISHMENT** [1] - 739:7
**REFUSED** [2] - 725:22, 736:17
**REGARD** [4] - 693:14, 698:11, 698:13, 773:23
**REGARDING** [16] - 709:21, 710:2, 711:1, 719:24, 720:20, 722:21, 730:21, 731:17, 735:23, 736:24, 737:23, 739:2, 739:6, 745:6, 757:9, 766:11
**REGIME** [1] - 816:15
**REGIONAL** [5] - 816:15, 818:10, 818:17, 823:2, 824:16
**REGISTERED** [1] - 788:20
**REGULAR** [1] - 718:16
**REHABILITATE** [2] - 739:3, 739:12
**REIMBURSE** [2] - 713:22, 713:25
**REIMBURSEMENT** [1] - 714:22
**REJECTED** [2] - 740:11, 740:12
**RELATED** [2] - 715:25, 814:19
**RELATES** [1] - 823:4
**RELATIONSHIP** [1] - 706:15
**RELATIVELY** [2] - 802:3, 819:23
**RELEASE** [1] - 796:2
**RELEASED** [1] - 803:4

**RELEVANCE** [10] - 699:5, 699:16, 699:25, 700:9, 700:12, 724:16, 727:14, 732:15, 741:15
**RELIABLE** [1] - 795:1
**RELIED** [13] - 694:5, 694:13, 695:1, 695:13, 695:20, 696:2, 696:7, 697:1, 697:2, 697:8, 697:13, 717:21, 795:14
**RELIEF** [8] - 727:20, 727:21, 729:3, 746:12, 746:14, 746:16, 747:18, 747:19
**RELOCATION** [1] - 737:12
**RELY** [4] - 694:15, 695:19, 696:6, 696:15
**RELYING** [1] - 803:7
**REMAIN** [1] - 787:9
**REMAINING** [1] - 808:17
**REMAINS** [1] - 756:14
**REMEDIAL** [16] - 699:15, 751:8, 754:2, 754:19, 762:22, 763:11, 763:13, 774:17, 781:4, 784:12, 784:15, 784:17, 785:8, 785:12, 794:5, 798:20
**REMEDIAL** [2] - 755:15, 776:19
**REMEDIATION** [5] - 761:23, 774:23, 775:18, 775:24, 776:19
**REMEDIATION** [17] - 754:4, 754:6, 761:22, 761:24, 762:5, 762:8, 762:19, 763:3, 763:4, 780:11, 784:8, 784:20, 785:3, 785:18, 786:11, 798:25, 803:8
**REMEDY** [3] - 699:22, 702:4, 764:3
**REMEMBER** [14] - 716:3, 729:14, 731:15, 775:6, 787:2, 805:10,

810:25, 820:1, 830:13, 834:21, 836:18, 839:10, 840:8, 844:21
**REMOVAL** [2] - 762:19, 804:15
**REMOVE** [4] - 730:19, 734:13, 754:7, 767:14
**REMOVED** [5] - 766:25, 767:6, 803:21, 803:24
**REMOVING** [2] - 716:10, 755:5
**RENE** [1] - 748:18
**REPEATED** [1] - 784:7
**REPETITION** [2] - 747:18, 747:19
**REPHRASE** [3] - 732:17, 831:21, 832:7
**REPLACEMENT** [11] - 736:17, 737:6, 737:22, 738:3, 738:5, 738:11, 740:14, 741:1, 741:10, 741:23, 741:24
**REPORT** [60] - 694:21, 694:23, 697:5, 703:19, 703:23, 781:5, 785:16, 790:8, 790:10, 790:13, 790:18, 792:6, 792:12, 793:3, 793:4, 793:9, 794:13, 794:15, 795:16, 797:20, 802:13, 802:18, 803:10, 803:11, 803:22, 805:11, 806:4, 806:6, 806:24, 807:7, 810:17, 813:19, 813:21, 816:21, 824:4, 824:6, 825:5, 825:8, 825:14, 826:5, 827:15, 829:4, 833:13, 834:13, 834:15, 834:17, 834:18, 835:1, 838:7, 838:10, 841:18, 843:2, 843:4, 843:7, 843:12, 843:18, 843:20, 844:9, 844:13
**REPORTED** [2] - 767:12, 794:18
**REPORTING** [1] -

831:3
**REPORTS** [14] - 711:10, 711:12, 711:16, 711:18, 767:11, 772:1, 774:4, 774:15, 791:25, 792:15, 793:2, 797:24, 799:21, 803:9
**REPRESENT** [7] - 798:22, 807:13, 811:13, 825:19, 830:25, 835:3, 839:15
**REPRESENTATIVE** [2] - 692:15, 839:3
**REPRESENTATIVES** [4] - 710:19, 718:24, 719:13, 721:4
**REPRESENTED** [1] - 812:19
**REPRESENTS** [3] - 812:3, 836:25, 839:12
**REPRODUCED** [2] - 826:4, 826:25
**REPUTABLE** [1] - 795:11
**REQUEST** [4] - 693:8, 714:22, 723:11, 779:4
**REQUESTED** [3] - 722:21, 739:11, 776:23
**REQUESTS** [1] - 713:24
**REQUIRED** [9] - 731:7, 732:1, 740:7, 761:17, 763:13, 774:7, 794:20, 794:22, 809:23
**REQUIREMENTS** [2] - 694:11, 721:24
**REQUIRES** [1] - 714:6
**RESEARCH** [1] - 788:24
**RESIDES** [2] - 813:14, 827:9
**RESOLUTION** [3] - 714:8, 714:10, 737:13
**RESOLVE** [1] - 723:8
**RESOURCES** [1] - 701:21
**RESPECT** [25] - 693:11, 693:15, 694:2, 741:24, 744:19, 751:4, 756:15, 766:23, 775:21, 794:10,

803:8, 815:7, 816:12, 828:18, 828:19, 829:14, 829:21, 833:22, 836:11, 836:14, 836:16, 837:1, 837:5, 838:3, 840:5
**RESPOND** [10] - 717:15, 718:20, 719:21, 719:23, 721:4, 721:6, 722:7, 722:11, 724:3, 724:11
**RESPONDED** [3] - 719:7, 720:12, 720:14
**RESPONDENT** [4] - 755:21, 756:14, 758:2, 767:16
**RESPONSE** [15] - 694:3, 709:9, 717:19, 718:4, 720:20, 720:25, 721:21, 722:1, 744:3, 744:25, 746:15, 747:17, 771:10, 783:3, 783:5
**RESPONSES** [1] - 720:8
**RESPONSIBILITIES** [4] - 708:14, 709:20, 710:1, 710:7
**RESPONSIBILITY** [21] - 711:24, 712:7, 712:9, 714:15, 714:19, 714:25, 725:6, 725:22, 728:16, 728:18, 729:19, 733:9, 733:12, 734:23, 736:14, 742:5, 742:8, 742:14, 750:24, 751:2, 785:2
**RESPONSIBLE** [3] - 710:8, 725:11, 786:2
**REST** [1] - 838:23
**RESTATE** [1] - 753:6
**RESULT** [9] - 761:20, 794:7, 795:10, 801:3, 801:12, 803:7, 816:16, 818:16, 840:16
**RESULTS** [2] - 752:12, 784:17
**RETIRED** [1] - 703:20
**REUSE** [1] - 733:24
**REVIEW** [9] - 711:10, 719:14, 739:5, 745:3, 745:4, 757:14, 778:11,

782:25, 790:22
**REVIEWED** [6] - 696:2, 696:14, 756:16, 758:25, 783:22, 797:14
**REVIEWING** [2] - 745:14, 799:21
**REVISED** [1] - 701:23
**RFI** [2] - 774:24, 776:19
**RI** [3] - 762:24, 774:18
**RICHARD** [110] - 692:10, 692:22, 693:1, 693:24, 698:22, 698:25, 699:7, 704:22, 705:12, 706:5, 706:9, 709:10, 710:18, 712:5, 715:5, 715:23, 715:24, 718:11, 718:12, 721:8, 721:11, 721:18, 721:20, 724:22, 726:5, 728:11, 728:14, 730:4, 730:16, 732:11, 732:18, 732:19, 733:16, 734:2, 734:10, 734:11, 734:20, 735:18, 736:8, 736:22, 737:15, 740:21, 741:9, 741:19, 742:12, 742:19, 743:1, 743:8, 743:9, 744:12, 744:15, 744:20, 744:21, 746:4, 746:5, 746:18, 750:7, 750:8, 751:18, 753:21, 758:13, 758:22, 758:24, 759:6, 759:8, 759:9, 759:19, 760:11, 762:14, 763:25, 764:6, 764:14, 764:19, 764:23, 764:24, 765:7, 765:8, 766:7, 770:14, 770:17, 770:22, 771:9, 771:12, 771:13, 771:23, 771:24, 772:6, 772:10, 772:13, 772:15, 773:4, 773:8, 774:10, 775:2, 777:21, 777:23, 779:3, 782:3,

782:21, 782:23, 783:12, 783:13, 783:19, 783:21, 784:22, 785:23, 786:1, 786:6, 786:16, 786:19
**RICHARD** [7] - 692:11, 692:21, 693:23, 696:9, 698:20, 705:10, 706:4
**RID** [1] - 842:16
**RIGHT-HAND** [3] - 808:3, 809:7, 821:2
**RIGHTS** [1] - 738:15
**RINSING** [1] - 766:16
**RISE** [1] - 845:2
**RISK** [2] - 768:8, 770:2
**RIVER** [1] - 800:24
**RIVER** [4] - 817:19, 817:24, 818:8, 824:14
**ROCKS** [1] - 800:25
**ROLE** [1] - 781:12
**ROUGH** [1] - 843:16
**ROUTINELY** [1] - 711:1
**RULE** [1] - 697:21
**RULED** [3] - 725:24, 728:22, 729:6
**RULING** [6] - 693:13, 697:25, 727:23, 727:24, 729:8, 730:6
**RULINGS** [1] - 703:4
**RUNNING** [2] - 735:14, 817:19
**RUNS** [1] - 760:23

---

## S

**S-1** [2] - 727:3, 811:24
**S-2** [1] - 727:4
**S-3** [3] - 827:8, 838:5, 838:19
**S-3A** [3] - 811:25, 814:16, 815:2
**S-3C** [1] - 811:25
**S-3S** [1] - 813:13
**S-5** [3] - 838:5, 838:19, 840:20
**S-5A** [1] - 811:25
**S-T-A-N-I-N** [1] - 788:2
**S7** [1] - 838:19
**SACRAMENTO** [2] - 780:4, 780:5
**SAFE** [1] - 815:7
**SALE** [4] - 761:20, 761:22, 762:10, 784:22
**SAMPLE** [3] - 752:12,

765:20, 813:6
**SAMPLED** [2] - 727:2, 794:1
**SAMPLES** [6] - 765:18, 766:4, 766:12, 772:1, 794:8, 794:9
**SAMPLING** [3] - 727:1, 765:17, 767:15
**SAN** [2] - 788:16, 789:16
**SAND** [4] - 801:2, 801:4, 801:5, 839:20
**SANDS** [4] - 801:1, 802:3, 802:4, 811:21
**SANTA** [13] - 692:6, 699:9, 705:1, 718:17, 728:6, 775:16, 790:21, 817:19, 817:24, 818:8, 823:3, 823:13, 824:14
**SARA** [2] - 776:25, 778:11
**SATISFY** [2] - 771:17, 773:3
**SAUGUS** [34] - 713:10, 739:3, 739:7, 739:8, 790:25, 791:1, 791:12, 811:6, 811:7, 811:12, 811:13, 812:1, 812:2, 812:23, 815:11, 828:13, 828:15, 828:21, 831:4, 837:8, 840:19, 841:3, 842:4, 842:18
**SAW** [7] - 695:14, 718:14, 760:7, 821:7, 830:15, 836:18, 836:22
**SC** [2] - 774:25, 777:5
**SCALE** [2] - 817:5, 835:8
**SCIENCE** [2] - 788:13, 788:15
**SCOPE** [7] - 786:4, 786:12, 790:3, 799:17, 802:18, 837:22, 843:1
**SCOTT** [2] - 692:12, 692:16
**SCREEN** [5] - 713:5, 716:21, 765:5, 770:13, 784:7
**SCREENED** [4] - 808:15, 813:4,

819:18, 840:11
**SCREENING** [1] - 798:24
**SCREENS** [1] - 819:14
**SCV** [2] - 790:4, 793:13
**SCVWA** [1] - 714:6
**SEATED** [2] - 705:25, 787:24
**SECOND** [7] - 714:5, 748:8, 771:20, 779:5, 794:4, 817:6, 838:20
**SECOND-TO-THE-LAST** [1] - 714:5
**SECRETARY** [4] - 706:25, 707:3, 707:4, 751:22
**SECTION** [4] - 702:17, 757:19, 821:7, 836:9
**SECTIONS** [1] - 810:16
**SEDIMENT** [1] - 801:6
**SEDIMENTS** [1] - 800:24
**SEE** [101] - 700:11, 703:22, 710:15, 712:17, 713:4, 713:11, 716:16, 716:18, 716:19, 716:22, 716:24, 721:11, 721:15, 731:2, 739:9, 756:11, 756:22, 757:18, 758:18, 760:8, 760:14, 760:16, 760:20, 761:13, 765:21, 765:23, 767:18, 767:19, 768:5, 768:6, 768:9, 769:4, 790:25, 791:7, 797:11, 798:18, 799:5, 799:8, 800:14, 800:15, 802:14, 803:13, 803:22, 806:5, 807:17, 808:1, 808:2, 808:23, 808:24, 811:10, 811:15, 812:18, 812:20, 812:22, 813:1, 813:16, 814:2, 814:22, 815:25, 817:7, 817:13, 817:19, 818:3, 818:6, 819:8, 820:22, 821:20, 822:1, 822:13, 823:15, 827:13,

828:1, 828:9, 828:11, 829:8, 829:12, 829:20, 829:22, 830:8, 831:1, 831:10, 832:12, 833:4, 833:18, 834:7, 834:16, 835:5, 835:12, 835:17, 835:18, 836:1, 836:19, 836:24, 837:3, 838:15, 838:18, 841:7, 841:10, 842:10, 844:25

**SEEING** [4] - 778:13, 800:6, 826:16, 831:8

**SEEKING** [3] - 704:10, 712:6, 731:18

**SEEM** [3] - 802:8, 834:8, 835:18

**SELECTED** [2] - 765:17, 834:17

**SELF** [1] - 839:16

**SELF-EXPLANATORY** [1] - 839:16

**SEND** [1] - 717:24

**SENSE** [3] - 699:8, 836:16, 837:7

**SENT** [7] - 711:17, 720:24, 721:13, 721:23, 736:11, 778:9, 778:10

**SENTENCE** [5] - 716:15, 716:20, 716:22, 748:8, 756:12

**SENTENCES** [1] - 748:7

**SEPARATE** [3] - 749:23, 750:16, 812:3

**SEPARATED** [1] - 812:5

**SEPARATELY** [1] - 834:19

**SEPTEMBER** [1] - 749:19

**SERIES** [3] - 718:16, 774:16, 833:2

**SERIOUS** [2] - 769:8

**SERVED** [1] - 727:19

**SET** [3] - 696:9, 696:19, 727:7

**SETTLED** [2] - 727:16, 737:14

**SETTLEMENT** [23] - 700:6, 700:13, 700:23, 713:7,

713:12, 714:6, 717:14, 721:24, 728:8, 728:20, 729:5, 729:9, 729:24, 730:1, 730:5, 730:7, 732:2, 733:23, 737:24, 738:21, 738:25, 739:22, 740:7

**SEVEN** [3] - 720:23, 721:23, 780:16

**SEVERAL** [8] - 725:5, 735:24, 780:13, 781:14, 789:23, 805:17, 810:12, 810:16

**SHADING** [1] - 830:25

**SHALL** [4] - 705:20, 787:20

**SHAREHOLDERS** [1] - 749:21

**SHARP** [1] - 704:21

**SHOES** [2] - 702:15, 702:24

**SHORT** [2] - 705:7, 706:21

**SHORTLY** [2] - 751:5, 751:8

**SHOTS** [2] - 724:3, 724:11

**SHOW** [13] - 694:21, 700:3, 744:15, 790:12, 802:25, 810:15, 813:23, 814:6, 814:7, 815:11, 820:16, 827:1, 843:23

**SHOWED** [5] - 810:17, 813:25, 816:21, 823:1, 837:11

**SHOWING** [1] - 799:5

**SHOWN** [7] - 807:14, 814:12, 821:4, 826:25, 830:6, 835:8, 835:9

**SHOWS** [7] - 694:24, 696:5, 791:8, 806:25, 810:20, 814:8, 818:25

**SHUT** [8] - 732:20, 732:22, 732:23, 733:3, 734:11, 734:24, 735:23, 805:8

**SIDE** [8] - 737:11, 811:6, 819:11, 819:12, 820:22, 821:2, 838:16

**SIDES** [1] - 704:11

**SIGNIFICANT** [2] -

802:15, 809:25

**SILTS** [1] - 812:8

**SIMILAR** [11] - 789:13, 789:15, 791:20, 795:19, 799:6, 799:23, 815:5, 821:11, 832:12, 833:6, 840:19

**SIMILARLY** [3] - 815:1, 835:12, 839:8

**SIMMONS** [3] - 748:18, 749:1, 750:9

**SIMPLE** [1] - 844:1

**SIMPLY** [7] - 698:5, 701:4, 703:8, 770:1, 801:6, 812:9, 824:12

**SIMPSON** [15] - 712:24, 715:7, 715:8, 715:11, 715:25, 717:19, 717:21, 718:23, 719:8, 719:13, 719:15, 720:9, 721:3, 722:9, 732:6

**SIMPSON'S** [2] - 715:12, 722:16

**SINGLE** [2] - 810:10, 834:16

**SINUOSITY** [1] - 833:19

**SINUOUS** [1] - 839:19

**SIT** [8] - 723:7, 745:5, 746:5, 754:14, 754:24, 780:10, 780:23, 786:1

**SITE** [159] - 699:13, 711:2, 716:1, 737:11, 737:23, 747:23, 747:25, 749:13, 751:7, 751:9, 751:10, 751:11, 751:14, 752:2, 752:9, 752:11, 753:25, 754:10, 754:16, 754:18, 754:20, 754:23, 755:1, 755:6, 756:15, 761:5, 763:4, 765:18, 765:19, 765:25, 766:4, 766:13, 768:11, 768:14, 768:23, 769:9, 769:12, 770:3, 770:6, 770:20, 775:21, 776:10, 776:11, 776:24, 777:13, 780:9, 780:11, 780:15, 780:18,

780:20, 781:5, 783:1, 785:24, 786:3, 786:7, 789:16, 790:6, 790:10, 790:12, 791:4, 791:13, 791:16, 791:17, 791:24, 792:4, 792:6, 792:9, 792:22, 794:6, 794:21, 794:24, 795:22, 796:8, 796:11, 797:12, 798:6, 798:9, 798:14, 798:16, 798:21, 799:10, 800:2, 800:17, 801:21, 802:2, 803:2, 803:4, 803:19, 804:12, 804:18, 804:21, 804:24, 805:1, 805:8, 805:15, 806:2, 806:19, 807:14, 807:16, 807:20, 808:3, 808:4, 808:19, 808:24, 809:1, 809:8, 809:12, 809:17, 809:23, 810:3, 810:7, 810:11, 810:13, 810:15, 812:16, 812:19, 812:21, 815:10, 815:20, 815:21, 815:24, 816:8, 817:7, 818:5, 820:7, 823:5, 824:15, 824:19, 824:21, 824:23, 825:21, 827:19, 827:24, 828:2, 828:3, 828:6, 828:17, 828:23, 831:13, 833:25, 835:23, 836:10, 836:12, 836:20, 837:9, 838:1, 838:22, 841:10, 842:11, 842:25, 843:6, 843:17, 843:18, 844:11

**SITE** [1] - 765:11

**SITED** [2] - 808:8, 809:13

**SITES** [2] - 757:8, 757:9

**SITING** [1] - 693:16

**SITTING** [2] - 781:22, 822:11

**SITUATION** [2] - 790:5, 796:22

**SIX** [1] - 739:25

**SLICE** [2] - 811:8, 836:15

**SLIDE** [4] - 819:11, 819:12, 821:2

**SLIDES** [1] - 818:18

**SLIGHTLY** [2] - 726:19, 727:20

**SLOW** [2] - 770:21, 840:17

**SLOWER** [2] - 796:17, 801:3

**SMALL** [2] - 789:14, 814:18

**SMITH** [6] - 711:11, 711:13, 797:22, 798:20, 803:22, 803:24

**SOIL** [35] - 751:6, 751:11, 753:23, 754:2, 754:3, 754:6, 755:2, 765:18, 766:4, 766:9, 766:13, 766:15, 766:22, 766:24, 767:3, 767:12, 767:16, 769:17, 780:18, 780:19, 794:8, 794:9, 795:24, 798:22, 798:23, 799:8, 800:5, 801:16, 801:18, 802:12, 803:8, 803:19, 815:20

**SOILS** [1] - 796:14

**SOLD** [6] - 761:21, 774:21, 774:22, 775:14, 784:19, 785:4

**SOLELY** [1] - 698:17

**SOLEMNLY** [2] - 705:19, 787:19

**SOLID** [4] - 757:12, 759:25, 761:4, 763:7

**SOMEONE** [1] - 702:23

**SOMETIME** [2] - 767:4, 769:5

**SOMETIMES** [9] - 696:20, 699:2, 710:23, 710:25, 723:25, 745:17, 745:18, 753:7, 814:20

**SOMEWHERE** [4] - 699:22, 738:5, 738:23, 802:7

**SORRY** [1] - 722:7
**SORRY** [31] - 700:20, 707:8, 708:18, 709:13, 724:6, 728:13, 729:16, 730:15, 734:5, 737:25, 740:20, 743:23, 745:18, 750:18, 752:24, 752:25, 753:2, 753:5, 756:20, 765:6, 767:3, 775:14, 802:10, 806:12, 807:4, 812:5, 816:23, 829:11, 829:19, 837:17, 841:15
**SORSHER** [2] - 781:22, 782:6
**SORT** [31] - 772:22, 776:3, 792:17, 794:4, 795:20, 796:1, 796:21, 797:17, 803:14, 804:3, 808:1, 808:2, 808:22, 811:10, 811:16, 817:8, 818:16, 820:22, 821:15, 823:25, 824:16, 825:20, 826:15, 828:12, 828:14, 829:9, 831:4, 839:21, 840:14, 840:15, 840:18
**SOUGHT** [1] - 693:17
**SOUNDS** [3] - 736:8, 807:1, 816:24
**SOURCE** [24] - 768:23, 770:20, 789:18, 792:7, 792:10, 793:13, 794:12, 795:22, 797:10, 797:12, 797:20, 798:5, 799:13, 799:19, 799:22, 800:1, 800:8, 803:1, 809:4, 809:5, 809:6, 809:7, 809:8, 809:9
**SOURCES** [4] - 716:18, 717:7, 717:9, 728:6
**SOURCING** [1] - 699:25
**SOUTH** [2] - 823:13, 827:11
**SOUTH** [1] - 824:14
**SOUTHEASTERN** [2] - 808:3, 817:8

**SOUTHERLY** [1] - 828:13
**SOUTHWEST** [1] - 828:3
**SPEAKING** [1] - 710:14
**SPEAKS** [1] - 714:21
**SPECIALIZING** [1] - 789:5
**SPECIALTY** [1] - 789:5
**SPECIFIC** [13] - 693:16, 696:6, 697:1, 702:12, 702:20, 723:11, 729:25, 730:2, 730:16, 744:3, 748:2, 767:23, 798:14
**SPECIFICALLY** [7] - 694:19, 701:24, 702:5, 800:8, 804:24, 832:14, 832:22
**SPECULATION** [10] - 741:5, 743:4, 751:15, 758:11, 775:2, 783:18, 785:21, 786:13, 831:20, 832:6
**SPEED** [1] - 773:20
**SPELL** [2] - 706:2, 788:1
**SPEND** [1] - 738:17
**SPENT** [1] - 703:5
**SPILLED** [1] - 797:16
**SPOTS** [1] - 798:5
**SQUARES** [1] - 813:1
**STAFF** [1] - 772:24
**STAFFER** [1] - 781:23
**STAKEHOLDER** [2] - 718:2, 718:14
**STAND** [4] - 748:25, 750:6, 779:6, 810:21
**STANDALONE** [4] - 825:8, 825:10, 825:13, 838:12
**STANDARD** [5] - 693:15, 785:7, 814:19, 814:20, 830:6
**STANDARDS** [1] - 693:22
**STANDPOINT** [1] - 801:25
**STANDS** [1] - 812:2
**STANIN** [1] - 788:7
**STANIN** [43] - 692:24, 693:4, 693:6, 693:8, 693:11, 694:5,

694:14, 694:17, 694:21, 695:20, 696:1, 698:14, 787:14, 788:2, 788:11, 789:12, 790:1, 790:3, 790:17, 791:15, 795:15, 796:9, 796:25, 798:3, 802:25, 807:12, 810:9, 811:4, 813:20, 823:10, 825:18, 827:6, 831:22, 833:10, 834:1, 835:1, 837:14, 838:15, 841:1, 842:17, 843:3, 844:8
**STANIN'S** [4] - 696:25, 813:18, 825:5, 841:17
**START** [4] - 692:22, 692:23, 730:23, 784:14
**STARTED** [10] - 739:13, 751:5, 751:8, 761:15, 762:17, 763:7, 782:25, 783:22, 783:23, 820:18
**STARTING** [1] - 692:9
**STARTS** [2] - 747:19, 761:6
**STATE** [15] - 727:2, 727:4, 727:8, 728:2, 751:13, 753:22, 755:16, 756:8, 758:9, 759:11, 766:2, 776:18, 778:9, 780:7, 817:10
**STATE** [8] - 692:8, 706:1, 727:3, 732:17, 759:3, 778:7, 787:25, 816:14
**STATE'S** [2] - 773:5, 778:21
**STATEMENT** [10] - 694:10, 722:6, 722:19, 722:22, 723:25, 752:3, 758:7, 771:2, 771:4, 771:6
**STATES** [4] - 724:25, 727:24, 749:3, 750:10
**STATES** [3] - 746:24, 758:14, 770:19
**STATIC** [1] - 820:4
**STATING** [1] - 756:2

**STATUS** [12] - 701:13, 707:12, 708:16, 758:4, 773:21, 779:12, 780:11, 780:24, 780:25, 781:2, 783:8, 783:14
**STEP** [12] - 698:8, 701:12, 719:18, 733:8, 735:13, 784:18, 787:15, 787:17, 797:10, 815:24, 834:2
**STEPS** [7] - 699:12, 699:18, 774:17, 774:18, 784:11, 816:19
**STEVE** [1] - 714:9
**STILL** [9] - 699:24, 704:17, 705:8, 707:11, 707:16, 749:23, 787:11, 794:16, 833:1
**STIPULATED** [10] - 790:15, 798:1, 806:6, 807:5, 810:20, 811:1, 825:5, 829:3, 833:9, 838:11
**STIPULATION** [1] - 721:8
**STOCK** [6] - 706:17, 749:12, 749:18, 749:20, 750:11, 750:15
**STOCKHOLDERS** [2] - 749:19, 749:20
**STONE** [2] - 711:20, 721:12
**STONE** [33] - 711:23, 712:6, 712:23, 713:3, 714:4, 714:16, 716:5, 717:11, 717:16, 717:20, 717:25, 718:1, 718:12, 718:14, 718:21, 718:25, 719:5, 719:7, 719:22, 719:23, 720:1, 720:2, 720:3, 720:6, 720:8, 720:14, 720:16, 720:23, 721:5, 722:4, 722:13, 722:16, 802:8
**STONE'S** [2] - 716:25, 719:9
**STOPPED** [1] - 776:20
**STORED** [1] - 797:16
**STRAIGHT** [1] -

821:21
**STRAYING** [1] - 734:2
**STREAM** [1] - 768:10
**STREAMS** [1] - 801:8
**STRICKEN** [3] - 734:7, 774:12, 802:24
**STRIKE** [2] - 750:4, 802:22
**STRONGLY** [1] - 700:11
**STUDIED** [2] - 789:13, 796:10
**STUDIES** [1] - 770:4
**STUDY** [13] - 730:24, 731:5, 731:7, 731:12, 731:14, 731:21, 731:22, 732:1, 732:5, 732:13, 740:14, 828:8
**STUFF** [1] - 730:3
**SUBJECT** [10] - 721:8, 727:21, 742:18, 752:22, 756:14, 759:11, 764:5, 787:2, 793:3, 844:22
**SUBMIT** [1] - 784:17
**SUBMITTED** [2] - 744:25, 756:2
**SUBMITTING** [1] - 702:23
**SUBSIDIARIES** [2] - 724:25, 725:1
**SUBSIDIARY** [1] - 725:1
**SUBSTANCE** [3] - 727:23, 728:2, 729:2
**SUBSTANCES** [2] - 769:1, 770:25
**SUBSTANCES** [9] - 711:3, 751:13, 755:19, 765:11, 771:16, 776:22, 781:4, 794:19, 809:23
**SUBSTANTIAL** [1] - 728:8
**SUBSTANTIAL** [14] - 755:14, 763:19, 772:16, 773:5, 773:17, 776:7, 776:13, 778:4, 778:14, 778:22, 779:1, 779:14, 779:19, 809:22
**SUBSTANTIVE** [1] - 719:5
**SUBSURFACE** [3] - 801:10, 836:25, 839:22

**SUCCESSOR** [2] - 744:4, 747:1

**SUED** [5] - 723:3, 725:23, 727:12, 728:7, 742:6

**SUFFICIENT** [4] - 700:10, 746:1, 805:23, 809:16

**SUGGEST** [1] - 693:8

**SUGGESTING** [1] - 833:16

**SUIT** [1] - 723:24

**SUMMARY** [1] - 728:25

**SUPERFUND** [1] - 789:16

**SUPERVISED** [2] - 710:4, 710:11

**SUPPLIES** [2] - 752:19, 753:17

**SUPPLY** [24] - 789:24, 790:6, 791:24, 792:3, 792:11, 793:8, 793:13, 796:12, 800:18, 811:13, 817:13, 820:10, 828:11, 832:15, 833:25, 836:3, 836:5, 836:21, 836:24, 837:4, 838:25, 840:10

**SUPPORT** [2] - 708:17, 832:20

**SURFACE** [12] - 766:16, 766:20, 796:17, 796:20, 796:21, 800:20, 800:21, 801:4, 817:18, 817:21, 818:9, 823:20

**SURPRISE** [1] - 779:20

**SURVEY** [1] - 767:15

**SURVEYED** [1] - 751:10

**SURVEYING** [1] - 777:13

**SUSPECT** [1] - 696:14

**SUSPENDED** [1] - 805:8

**SUSTAIN** [4] - 700:11, 704:6, 704:11, 744:10

**SUSTAINED** [30] - 709:8, 712:4, 715:4, 730:12, 730:14, 732:16, 733:15, 735:17, 736:21, 740:17, 740:19,

742:11, 742:17, 742:25, 751:16, 753:20, 758:12, 758:20, 762:13, 766:6, 774:11, 775:4, 777:22, 779:7, 782:4, 782:11, 785:25, 786:5, 802:21, 827:21

**SUSTAINING** [1] - 718:10

**SWAPPED** [1] - 764:1

**SWEAR** [2] - 705:19, 787:19

**SWITCHING** [1] - 781:9

**SWMUS** [8] - 757:11, 760:19, 760:23, 761:4, 761:7, 761:10, 763:20

**SWORN** [2] - 705:18, 787:18

**SWORN** [2] - 706:7, 788:8

**SYSTEM** [18] - 716:10, 735:2, 737:19, 740:2, 740:13, 740:23, 766:22, 766:24, 767:4, 788:25, 792:18, 801:14, 804:21, 812:3, 818:14, 818:16, 819:17, 833:20

**SYSTEMS** [3] - 716:12, 716:14, 730:3

---

# T

**TABLE** [16] - 796:14, 796:15, 801:24, 808:15, 814:6, 814:7, 814:12, 814:21, 815:11, 815:14, 829:25, 830:15, 837:11, 838:16, 838:19, 840:22

**TABLE** [4] - 813:15, 837:11, 838:9, 842:14

**TALKS** [1] - 839:16

**TASK** [3] - 718:15, 718:16, 720:7

**TCA** [3] - 694:24, 695:15, 697:4

**TCE** [64] - 694:22, 723:24, 751:6,

751:11, 751:14, 752:1, 752:8, 752:13, 752:18, 753:15, 753:23, 754:2, 754:5, 754:12, 755:5, 766:14, 766:15, 766:19, 766:22, 767:1, 767:17, 768:24, 769:6, 769:8, 769:12, 769:23, 770:1, 770:5, 770:23, 771:4, 789:17, 789:20, 789:23, 791:8, 804:5, 814:3, 814:17, 814:22, 828:19, 829:14, 829:19, 829:22, 830:14, 830:20, 830:22, 831:9, 831:14, 831:17, 831:23, 832:1, 832:4, 832:11, 833:6, 834:4, 834:6, 834:9, 834:10, 835:6, 836:2, 836:4, 836:5, 837:1, 837:3, 837:7

**TEAM** [3] - 722:10, 722:11

**TECHNICAL** [6] - 710:20, 718:24, 719:12, 720:4, 721:2, 750:18

**TELEPHONIC** [1] - 829:10

**TEMPERATURE** [1] - 804:6

**TEN** [3] - 711:16, 789:17, 808:23

**TENS** [1] - 767:5

**TENTATIVELY** [1] - 701:2

**TENURE** [2] - 709:19, 759:22

**TERM** [4] - 728:17, 801:7, 810:10, 825:12

**TERMS** [11] - 724:3, 780:24, 795:20, 804:19, 806:22, 832:7, 837:15, 839:2, 839:9, 843:4, 843:16

**TERRACE** [1] - 802:1

**TESTIFIED** [2] - 706:7, 788:8

**TESTIFIED** [12] - 731:11, 732:6,

732:24, 741:3, 741:13, 741:18, 741:21, 750:15, 783:3, 783:5, 785:6, 831:12

**TESTIFY** [5] - 709:15, 719:17, 775:6, 775:11, 782:16

**TESTIFYING** [1] - 733:5

**TESTIMONY** [19] - 705:19, 707:7, 707:9, 708:8, 729:21, 741:22, 742:23, 750:22, 759:1, 760:3, 763:6, 767:24, 774:21, 775:5, 775:10, 782:5, 782:24, 787:19, 802:22

**THE** [201] - 692:5, 692:13, 692:18, 692:25, 693:10, 694:2, 695:2, 695:17, 696:16, 696:24, 697:6, 697:12, 697:18, 697:25, 698:24, 699:5, 699:14, 699:24, 700:7, 700:17, 700:22, 701:1, 701:10, 701:17, 702:10, 702:18, 703:14, 703:22, 704:5, 705:1, 705:5, 705:6, 705:14, 705:15, 705:23, 705:24, 706:3, 706:4, 709:7, 709:8, 710:13, 710:16, 710:17, 712:4, 715:4, 715:17, 718:9, 721:17, 724:17, 724:20, 726:2, 726:3, 727:15, 727:16, 728:10, 728:13, 729:22, 729:24, 730:12, 730:13, 730:14, 730:15, 732:9, 732:10, 732:16, 733:15, 733:20, 733:22, 734:4, 734:6, 734:17, 734:18, 735:17, 736:3, 736:6, 736:21, 737:1, 737:2, 737:4, 740:17, 740:18, 740:19, 740:20,

741:6, 741:8, 741:16, 741:17, 742:11, 742:17, 742:25, 743:5, 743:6, 743:7, 744:10, 744:18, 745:10, 745:11, 745:13, 745:14, 745:17, 745:20, 745:22, 745:24, 746:11, 746:12, 750:5, 751:16, 753:20, 758:12, 758:20, 758:23, 759:2, 759:7, 759:14, 759:16, 760:5, 760:6, 762:13, 764:5, 764:13, 764:17, 764:21, 765:4, 765:6, 766:6, 770:12, 770:16, 770:21, 771:10, 771:20, 771:21, 771:22, 772:4, 772:7, 772:9, 772:14, 773:10, 774:11, 775:4, 777:19, 777:22, 779:7, 779:10, 779:11, 782:4, 782:11, 782:15, 782:20, 783:10, 783:20, 784:2, 784:3, 785:25, 786:5, 786:14, 786:17, 786:18, 786:20, 786:23, 787:9, 787:15, 787:16, 787:23, 787:24, 788:2, 788:3, 788:5, 788:6, 802:19, 802:21, 802:24, 806:10, 806:13, 807:3, 807:9, 810:23, 810:25, 813:17, 817:1, 824:3, 825:7, 825:12, 825:16, 827:21, 829:7, 829:12, 831:21, 832:7, 834:20, 838:12, 838:14, 841:13, 841:19, 841:20, 841:21, 843:21, 843:23, 844:6, 844:17, 845:2, 845:5

**THEMSELVES** [2] - 795:7, 833:18

**THEREOF** [1] - 708:17

THESIS [4] - 788:16, 788:21, 788:23, 788:24
THEY'VE [5] - 755:5, 767:12, 770:7, 805:18, 811:23
THICKNESS [1] - 833:19
THINKING [2] - 795:20, 806:22
THIRD [1] - 714:13
THIRD [3] - 744:25, 746:21, 747:21
THOUSAND [6] - 752:9, 754:20, 776:10, 811:15, 814:24, 830:14
THOUSAND-ACRE [1] - 752:9
THOUSANDS [1] - 767:5
THREATENS [1] - 742:14
THREE [10] - 726:16, 754:21, 758:3, 781:20, 792:16, 795:21, 814:2, 834:14, 834:17, 844:2
THREE-AND-A-HALF [2] - 754:21, 844:2
THRESHOLD [1] - 694:12
THREW [1] - 753:8
THROUGHOUT [4] - 727:3, 754:15, 754:17, 808:25
TIE [1] - 697:7
TIM [5] - 712:24, 715:7, 715:8, 715:25, 716:3
TIMELINE [1] - 805:11
TIMING [2] - 693:2, 729:4
TITLE [5] - 745:16, 751:21, 757:19, 775:15, 777:2
TITLES [2] - 707:2, 781:14
TO/FROM [1] - 712:16
TODAY [9] - 709:16, 754:15, 754:24, 755:10, 755:24, 756:17, 767:4, 780:10, 780:24
TODD [5] - 731:5, 731:15, 731:22, 789:5, 791:18
TOGETHER [10] - 748:11, 794:10,

795:13, 820:25, 834:8, 834:9, 835:19, 835:20, 835:21, 836:2
TOOK [8] - 703:7, 708:20, 729:18, 795:16, 795:20, 816:19, 830:20, 841:1
TOP [4] - 716:20, 801:6, 811:9, 812:19
TOPIC [1] - 788:22
TOPOGRAPHY [2] - 798:12, 803:13
TOTAL [1] - 804:11
TOWARD [11] - 800:17, 817:23, 818:5, 818:8, 824:13, 824:14, 828:4, 828:10, 828:12, 828:14, 842:12
TOWARDS [1] - 714:5
TOXIC [8] - 711:3, 751:13, 755:19, 771:16, 776:22, 781:4, 794:18, 809:23
TRACING [1] - 812:10
TRANSITION [1] - 777:5
TRANSLATE [1] - 695:5
TRANSPORT [1] - 789:10
TRAVEL [5] - 801:23, 802:13, 841:1, 841:2, 843:5
TREAT [3] - 711:25, 713:22, 740:8
TREATMENT [17] - 714:20, 716:7, 716:10, 716:12, 730:3, 730:19, 733:17, 733:24, 734:13, 734:24, 735:2, 735:14, 737:19, 740:2, 740:13, 740:23
TRENCHES [1] - 765:18
TRIAL [10] - 698:18, 699:6, 699:8, 699:16, 700:8, 760:8, 771:14, 787:9, 833:9, 833:12
TRIED [1] - 708:11
TROWBRIDGE [1] - 692:16
TRUDELL [1] - 704:17

TRUE [16] - 707:11, 709:17, 722:23, 722:24, 733:8, 734:12, 734:15, 737:20, 742:20, 756:2, 759:4, 763:3, 767:9, 771:2, 771:24, 810:4
TRUTH [6] - 705:21, 787:21
TRY [9] - 695:17, 696:21, 700:4, 701:15, 703:3, 719:18, 723:7, 764:3, 785:11
TRYING [8] - 700:21, 703:5, 703:6, 734:4, 773:1, 775:9, 817:11, 836:1
TURN [2] - 755:23, 759:19
TURNED [1] - 839:5
TURNING [1] - 828:3
TURNS [2] - 697:13, 698:9
TWO [28] - 694:22, 706:22, 726:22, 731:13, 748:7, 757:7, 757:9, 757:13, 781:8, 781:20, 783:7, 793:2, 793:22, 799:6, 805:4, 808:2, 808:7, 811:12, 826:14, 827:25, 828:25, 830:5, 834:7, 835:2, 835:13, 835:18, 839:12
TYPE [1] - 805:2
TYPES [3] - 757:7, 757:9, 798:12

## U

U.S [1] - 728:4
ULTIMATELY [5] - 792:10, 808:17, 831:17, 832:4, 832:11
UNABLE [3] - 695:19, 783:15, 783:24
UNCONTESTED [1] - 792:6
UNCOVERED [1] - 767:16
UNDER [11] - 727:21, 729:2, 730:1, 730:7, 731:7, 732:1, 737:8, 740:7, 761:17,

762:1, 776:21
UNDERGROUND [2] - 800:24
UNDERLYING [2] - 768:22, 770:19
UNDERNEATH [1] - 817:23
UNDERSTOOD [14] - 702:16, 703:13, 713:16, 714:4, 714:23, 716:9, 759:9, 759:22, 762:18, 766:8, 766:19, 766:22, 768:15, 785:1
UNDERTAKEN [1] - 791:21
UNDERWAY [1] - 779:15
UNIT [2] - 783:9, 798:8
UNIT [4] - 694:6, 776:9, 776:10, 780:21
UNITED [4] - 724:25, 727:24, 749:3, 750:10
UNITS [29] - 757:11, 757:12, 757:14, 758:4, 758:16, 759:10, 759:23, 759:25, 761:3, 761:4, 761:14, 763:8, 780:14, 780:15, 780:17, 780:20, 783:6, 784:6, 797:4, 798:7, 801:10, 805:1, 805:24, 810:18, 811:23, 813:10, 814:9, 814:12
UNITS [2] - 757:18, 780:19
UNIVERSITY [2] - 788:14, 788:15
UNLESS [3] - 695:23, 704:11, 720:4
UNSATURATED [1] - 801:23
UP [51] - 700:21, 712:16, 716:20, 733:8, 735:13, 738:19, 740:5, 762:6, 764:7, 767:21, 768:3, 769:21, 773:16, 773:20, 776:2, 776:4, 776:6, 776:8, 776:24, 777:16, 779:6, 783:8, 783:15, 783:24,

784:14, 786:7, 791:8, 792:21, 794:6, 796:1, 797:17, 798:10, 798:11, 799:5, 799:10, 806:5, 808:4, 808:25, 813:15, 820:23, 821:13, 827:3, 830:12, 834:9, 835:13, 835:14, 839:5, 841:21, 842:4, 842:9
UPDATE [2] - 731:25, 793:9
UPDATED [1] - 732:1
UPGRADIENT [5] - 768:12, 796:19, 796:23, 822:11, 837:5
UPHILL [1] - 821:17
UPHILL/DOWNHILL [1] - 796:22
UPLAND [4] - 800:14, 800:17, 817:22, 824:13
UPLANDS [1] - 818:4
UPPER [3] - 776:3, 807:17, 831:1
USA [13] - 706:14, 706:16, 706:17, 710:7, 710:10, 724:13, 724:14, 724:13, 724:24, 724:25, 725:21, 751:20, 751:21
USEFUL [1] - 702:11

## V

V-157 [2] - 790:25, 791:13
V-201 [15] - 702:4, 702:8, 732:19, 733:17, 734:11, 734:21, 735:2, 735:23, 736:14, 790:25, 791:1, 791:14, 828:14, 828:15, 828:21
V-205 [8] - 713:10, 714:20, 715:1, 719:12, 721:23, 790:25, 791:14, 828:21
VADOSE [1] - 802:8
VAGUE [9] - 715:4, 718:9, 718:10, 730:10, 736:25, 743:6, 753:18,

766:5, 766:6
**VALENCIA** [1] - 701:22
**VALLEY** [19] - 692:6, 699:10, 705:2, 728:7, 752:14, 765:19, 765:21, 767:15, 768:9, 768:10, 768:12, 768:16, 790:21, 803:12, 803:15, 823:13, 824:14, 841:23, 842:24
**VALLEY** [6] - 800:18, 803:14, 817:14, 817:23, 818:5, 818:7
**VALLEYS** [1] - 777:14
**VALUE** [2] - 701:25, 702:1
**VAPOR** [3] - 766:22, 766:24, 767:3
**VARIES** [1] - 804:5
**VARIETY** [5] - 794:17, 795:2, 798:11, 835:25, 844:12
**VARIOUS** [7] - 712:9, 797:3, 805:1, 810:17, 812:21, 829:1, 840:16
**VARY** [1] - 835:16
**VARYING** [4] - 834:8, 835:12, 835:19, 835:20
**VELOCITIES** [3] - 837:19, 838:4, 843:9
**VELOCITY** [10] - 822:22, 839:17, 839:20, 840:1, 840:2, 840:3, 840:5, 842:18, 843:11, 844:10
**VELOCITY** [1] - 839:15
**VENTURA** [1] - 817:25
**VERSION** [2] - 702:3
**VERSUS** [4] - 692:7, 705:2, 825:13, 842:6
**VERTICAL** [3] - 811:14, 812:20, 820:23
**VESSELS** [1] - 733:24
**VICE** [4] - 706:24, 707:2, 751:22, 789:4
**VICINITY** [1] - 817:17
**VIDEO** [2] - 693:2, 693:9
**VIEW** [4] - 701:2, 770:5, 773:4, 820:19
**VIOLATE** [1] - 693:21
**VISIT** [1] - 693:8

**VOC** [8] - 702:5, 754:19, 797:22, 798:19, 799:1, 813:9, 814:9, 829:21
**VOC-IMPACTED** [1] - 798:19
**VOCS** [13] - 694:21, 702:8, 723:25, 766:25, 767:5, 789:15, 791:9, 798:23, 799:18, 799:22, 803:11, 804:11, 814:14
**VOLUNTARILY** [1] - 776:23

# W

**WAITING** [1] - 822:11
**WALK** [3] - 705:14, 705:16, 787:16
**WAS** [2] - 706:7, 788:8
**WASTE** [11] - 757:11, 757:12, 758:4, 758:8, 758:15, 759:23, 759:25, 761:4, 763:7, 784:6, 803:18
**WASTE** [2] - 757:18, 765:10
**WASTES** [1] - 803:18
**WATER** [12] - 692:6, 699:10, 701:21, 701:22, 705:2, 713:13, 717:7, 735:4, 789:22, 790:4, 793:13, 823:3
**WATER** [127] - 693:21, 699:23, 709:22, 709:24, 710:2, 710:8, 710:10, 710:19, 711:21, 711:24, 712:24, 713:16, 713:21, 714:13, 714:14, 714:24, 716:5, 716:11, 716:13, 717:7, 717:12, 718:21, 720:15, 720:16, 720:20, 721:12, 723:1, 723:3, 723:10, 725:7, 725:17, 726:17, 726:25, 727:1, 727:3, 727:11, 730:5, 730:18, 731:1, 731:4, 731:8, 731:24, 735:5, 736:17, 736:23,

737:18, 738:4, 738:24, 739:11, 739:20, 739:22, 740:3, 740:8, 740:11, 740:14, 741:1, 741:10, 741:23, 741:24, 742:14, 750:23, 752:19, 753:17, 768:23, 769:1, 770:2, 770:20, 770:22, 771:1, 771:5, 785:20, 786:2, 786:10, 788:4, 789:9, 789:24, 790:6, 791:24, 792:3, 792:11, 792:19, 793:8, 796:11, 796:14, 796:15, 796:17, 796:22, 800:18, 800:20, 800:25, 801:1, 801:3, 801:4, 801:24, 808:14, 811:13, 813:2, 813:5, 814:19, 814:20, 814:23, 815:8, 817:13, 817:18, 817:21, 818:9, 820:3, 820:9, 820:10, 821:14, 822:23, 828:10, 830:5, 832:14, 832:15, 833:2, 833:25, 836:3, 836:5, 836:21, 836:24, 837:4, 838:25, 839:4, 839:19, 840:10, 840:12
**WATER'S** [1] - 820:5
**WAYS** [1] - 839:19
**WEBSITE** [1] - 794:19
**WEDNESDAY** [1] - 725:4
**WEEK** [3] - 705:7, 732:25
**WEEKEND** [1] - 705:6
**WEEKS** [2] - 720:24, 721:23
**WEIGHS** [1] - 804:6
**WEIGHT** [1] - 804:5
**WELL'S** [2] - 819:16, 821:6
**WELLHEAD** [1] - 730:3
**WELLS** [130] - 712:1, 712:7, 713:18, 716:13, 717:6,

725:8, 726:17, 726:23, 727:1, 727:3, 727:4, 727:6, 727:10, 729:25, 730:2, 730:19, 731:2, 733:11, 736:17, 737:6, 737:22, 737:23, 738:10, 738:16, 739:2, 739:3, 739:8, 739:12, 750:23, 752:11, 752:12, 789:24, 790:6, 790:11, 790:12, 790:21, 790:24, 791:1, 791:3, 791:5, 791:8, 791:11, 791:24, 792:3, 792:11, 792:19, 793:8, 793:14, 793:24, 794:1, 796:10, 796:12, 797:2, 800:18, 804:20, 804:22, 804:23, 804:25, 805:3, 805:14, 805:19, 805:23, 806:1, 806:19, 806:25, 807:15, 807:16, 807:18, 807:24, 808:8, 808:14, 808:17, 808:19, 808:24, 808:25, 809:3, 809:11, 809:13, 809:15, 809:19, 809:25, 810:5, 810:17, 811:12, 811:13, 812:15, 812:20, 812:22, 812:24, 813:3, 814:11, 814:15, 817:13, 818:19, 818:21, 818:23, 820:10, 820:25, 821:9, 824:17, 828:8, 828:11, 828:13, 828:15, 828:19, 828:20, 829:13, 829:14, 829:21, 830:13, 830:18, 832:16, 833:25, 836:3, 836:5, 836:20, 836:21, 836:22, 836:24, 837:4, 840:8, 840:9, 840:10, 842:10, 844:11
**WELLS** [1] - 727:3
**WEST** [4] - 737:9,

737:10, 738:12, 828:2
**WESTERN** [4] - 776:11, 825:20, 827:19, 827:23
**WHEREABOUTS** [1] - 798:15
**WHITE** [1] - 829:18
**WHITTAKER** [275] - 692:7, 692:15, 699:13, 705:2, 706:16, 706:18, 706:20, 706:22, 706:24, 707:1, 707:3, 707:4, 707:6, 707:14, 707:19, 708:14, 709:3, 709:11, 709:12, 709:19, 710:5, 710:7, 710:11, 710:19, 711:2, 711:24, 712:6, 712:25, 713:21, 714:7, 714:9, 714:12, 714:15, 714:18, 714:24, 715:6, 715:9, 716:1, 716:7, 718:20, 719:6, 719:23, 720:11, 720:14, 720:19, 723:2, 723:3, 723:11, 724:12, 725:1, 725:5, 725:21, 725:22, 725:24, 726:4, 726:10, 727:12, 728:16, 728:18, 728:20, 728:23, 729:6, 729:18, 730:6, 730:17, 731:6, 731:25, 732:4, 732:11, 733:8, 733:11, 733:16, 734:12, 734:23, 734:25, 735:3, 735:13, 736:13, 736:16, 736:23, 737:6, 738:19, 739:11, 739:14, 739:21, 740:1, 740:7, 740:13, 740:22, 740:25, 741:25, 742:4, 742:7, 742:13, 742:15, 742:20, 742:21, 743:2, 743:14, 743:19, 743:20, 744:4, 744:6, 744:24, 745:6, 746:6,

746:16, 746:17, 747:1, 747:4, 747:5, 747:7, 747:10, 747:14, 747:20, 747:23, 747:25, 748:3, 748:8, 748:9, 748:11, 748:13, 748:15, 749:2, 749:5, 749:11, 749:12, 749:16, 749:18, 749:20, 749:23, 750:1, 750:10, 750:11, 750:15, 750:17, 750:22, 750:24, 751:5, 751:6, 751:14, 751:20, 751:22, 752:2, 752:7, 753:12, 753:22, 755:1, 755:6, 755:21, 756:7, 756:9, 756:22, 757:3, 757:10, 758:7, 759:22, 761:4, 761:15, 761:16, 762:2, 762:7, 762:8, 762:18, 763:1, 763:2, 763:5, 763:20, 766:4, 768:2, 769:9, 772:18, 774:18, 776:19, 776:23, 777:5, 777:9, 781:3, 782:25, 783:15, 783:22, 783:24, 784:5, 785:1, 785:24, 786:2, 786:11, 790:6, 790:10, 791:4, 791:13, 791:16, 791:24, 792:4, 792:6, 792:9, 792:22, 794:5, 794:21, 795:9, 795:22, 796:11, 797:12, 798:6, 798:16, 798:19, 800:2, 800:17, 801:21, 802:2, 803:2, 804:18, 804:21, 804:24, 805:7, 805:8, 805:15, 806:2, 806:19, 807:14, 807:20, 808:18, 809:17, 809:19, 809:23, 810:7, 810:11, 810:15, 812:15, 812:18, 812:21, 815:24,

816:8, 817:7, 818:4, 823:4, 824:15, 824:17, 824:21, 824:22, 825:3, 825:21, 825:22, 826:4, 826:7, 826:20, 827:19, 827:24, 828:6, 828:17, 828:23, 831:13, 833:25, 835:23, 836:6, 836:10, 836:20, 837:9, 838:22, 841:10, 842:25, 843:6, 843:17, 843:18, 844:11
**WHITTAKER'S** [11] - 711:10, 740:11, 740:12, 747:2, 748:2, 751:2, 755:1, 755:4, 785:2, 826:6, 832:1
**WHITTAKER-BERMITE** [24] - 699:13, 743:20, 747:4, 748:9, 798:16, 800:2, 803:2, 804:18, 804:21, 806:19, 810:11, 810:15, 823:4, 824:21, 824:22, 827:19, 827:24, 828:6, 828:17, 828:23, 842:25, 843:6, 843:17, 843:18
**WHOLE** [4] - 705:21, 787:21, 807:7, 841:10
**WHOLLY** [1] - 725:1
**WHOLLY-OWNED** [1] - 725:1
**WIDE** [1] - 794:17
**WISH** [2] - 693:19, 693:23
**WITNESS** [47] - 705:23, 706:3, 706:7, 709:7, 710:16, 724:20, 726:3, 727:16, 728:13, 729:24, 730:13, 730:15, 732:10, 733:22, 734:4, 734:18, 736:6, 737:1, 737:4, 740:18, 740:20, 741:8, 741:17, 743:6, 745:10, 745:13, 745:17, 745:22, 746:12,

759:16, 760:6, 765:6, 771:21, 772:9, 779:10, 784:3, 786:18, 787:23, 788:2, 788:5, 788:8, 817:1, 829:7, 829:12, 841:19, 841:21, 843:23
**WITNESS** [18] - 693:6, 693:24, 698:23, 705:9, 705:11, 715:15, 715:20, 715:21, 728:12, 744:16, 757:22, 764:11, 764:15, 764:16, 779:4, 787:12, 787:14, 787:17
**WITNESS'S** [1] - 699:3
**WITNESSES** [4] - 692:20, 693:7, 715:18, 831:23
**WORD** [4] - 717:13, 727:9, 748:8, 761:6
**WORDS** [20] - 696:20, 696:22, 712:8, 714:17, 716:19, 725:13, 735:25, 736:10, 740:22, 748:6, 769:4, 770:7, 772:2, 772:8, 772:22, 772:24, 772:25, 779:25, 798:24, 834:8
**WORKS** [2] - 747:13, 784:14
**WRAP** [1] - 785:14
**WRITES** [1] - 721:20
**WRITING** [1] - 713:7
**WRITTEN** [3] - 720:20, 772:24, 823:16
**WROTE** [1] - 720:23

## Y

**YEAR** [10] - 726:10, 731:10, 732:6, 739:19, 741:1, 781:8, 783:7, 805:10, 843:8, 843:25
**YEARS** [23] - 696:12, 706:22, 711:16, 715:13, 716:1, 726:16, 726:22, 734:23, 735:24, 738:9, 742:7, 748:23, 751:5,

756:7, 781:8, 783:2, 785:17, 789:17, 790:2, 808:23, 833:22, 844:3
**YELLOW** [13] - 791:8, 811:16, 811:18, 811:20, 811:21, 811:22, 812:3, 812:13, 812:25, 829:17, 832:13, 836:19
**YELLOWISH** [2] - 830:25, 831:18
**YESTERDAY** [1] - 764:8
**YOURSELF** [3] - 702:15, 702:24, 717:24

## Z

**ZONE** [1] - 801:23
**ZONES** [1] - 838:5

**UNITED STATES DISTRICT COURT**