1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

4

5   SANTA CLARITA VALLEY WATER AGENCY,      )
                                            )
6                       Plaintiff,          )
                                            )
7      v.                                   )        Case No.
                                            )  CV 18-6825 SB (RAOx)
8   WHITTAKER CORPORATION, et al.,          )
                                            )        Volume 12
9                       Defendants.         )    (Pages 1250 - 1422)
    _____)

10

11           REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                     TRIAL DAY 7:  A.M. SESSION
12                MONDAY, NOVEMBER 29, 2021
                          8:11 A.M.
13                LOS ANGELES, CALIFORNIA

14

15

16

17

18

19

20

21

22   _____

23         MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                    (213) 894-2305

1       **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        NOSSAMAN, LLP
         BY:  BYRON P. GEE
5        BY:  RAVEN MCGUANE
         BY:  PATRICK J. RICHARD
6        BY:  FRED FUDACZ
              Attorneys at Law
7        777 South Figueroa Street, 34th Floor
         Los Angeles, California  90017
8        (213) 612-7800

9        NOSSAMAN, LLP
         BY:  ILSE CHANDALAR SCOTT
10            Attorney at Law
         50 California Street, 34th Floor
11       San Francisco, California  94111
         (415) 398-3600
12

13
     **FOR THE DEFENDANT WHITTAKER CORPORATION:**
14
         EDLIN, GALLAGHER, HUIE & BLUM
15       BY:  MICHAEL E. GALLAGHER, JR.
         BY:  FRED M. BLUM
16       BY:  DANIEL ERIC TROWBRIDGE
              Attorneys at Law
17       500 Washington Street, Suite 700
         San Francisco, California  94111
18       (415) 397-9006

19

20   **ALSO PRESENT:**

21       MATT STONE
         SCOTT FRYER
22       RON BEATON
         ERIC LARDIERE
23

24

25

**UNITED STATES DISTRICT COURT**

1252

1   **INDEX OF WITNESSES**

2

3   DEFENDANT'S WITNESSES                                    PAGE

4   STEFFEY, Ph.D., Duane

5       Direct Examination by Mr. Blum                       1271
        Cross-Examination by Mr. Richard                     1295
6       Redirect Examination by Mr. Blum                     1323
        Recross-Examination by Mr. Richard                   1325
7

8   ALVORD, Michael

9       Direct Examination by Mr. Blum                       1329
10      Cross-Examination by Mr. Gee                         1407

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1    **INDEX OF EXHIBITS**

2                                                           FOR
                                                          EVIDENCE
3    NUMBER    DESCRIPTION                                    PG.

4     472  -  V-205 photo                                   1416

5     533  -  Schematic map                                 1407

6     537  -  Photograph                                    1321

7    1370  -  3/21/2013 investigation into elevated PCE     1410
              levels at CLWA SC-1 turnout
8
     1371  -  6/2011 - Saugus Perchlorate Treatment         1391
9             Facility - Distribution System Monitoring

10   1372  -  9/2011 - Saugus Perchlorate Treatment         1386
              Facility

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1        MONDAY, NOVEMBER 29, 2021; 8:11 A.M.

2            LOS ANGELES, CALIFORNIA

3                  -oOo-

4        (Out of the presence of the jury:)

5        THE COURTROOM DEPUTY:  Calling Item No. 1, Case

6   No. CV 18-06825 SB, Santa Clarita Valley Water Agency versus

7   Whittaker Corporation, et al.

8        Counsel, please state your appearance, starting with

9   plaintiff's counsel.

10       MR. RICHARD:  Good morning.  Patrick Richard.  And

11  with me is Ms. McGuane, Mr. Gee, and Ms. Micevych.

12       THE COURT:  Good morning.

13       MR. BLUM:  Good morning, Your Honor.  Fred Blum for

14  defendants.  With me is the client representative,

15  Eric Lardiere, and Mr. Trowbridge.

16       THE COURT:  Good morning.  We are outside the

17  presence of the jury.

18       There are a number of issues that arose -- let me

19  hear, first of all, what the order of your witnesses are today,

20  Mr. Blum.

21       MR. BLUM:  Yes, Your Honor.  We will begin with

22  Dr. Steffey who I confirmed was in the -- about to get in the

23  security line around 8:00 o'clock this morning.  And then after

24  that, it will be Mr. Alvord, then Mr. Leserman.  And if we have

25  to fill time, we're hoping to review -- or read -- or sorry,

 1    play the video deposition of Meredith Durant.

 2                THE COURT:  Of who?

 3                MR. BLUM:  Of Meredith Durant, Your Honor.  I

 4    believe as to her, there are three or four objections.  And I

 5    think the binders have been given to the Court.

 6                THE COURT:  All right.  Do you have Mr. Alvord and

 7    Mr. Leserman here this morning as well?

 8                MR. BLUM:  I just confirmed with plaintiffs.

 9    They're under subpoena, and they will be here this morning.

10                THE COURT:  All right.  Because there is a threshold

11    issue with Dr. Steffey.  So let me hear, starting with you,

12    Mr. Richard -- and you could take the lectern, please -- and

13    explain to the Court what the issue is.

14                MR. RICHARD:  Yes, Your Honor.  Thank you.

15                The issue with Duane Steffey is the -- relates to

16    our motion in limine on other sources.  And so this is where

17    the issue now comes to the fore, and that is that the Court had

18    drawn a line at speculation regarding other sources would be

19    inadmissible and that defendants would need to lay a --

20    defendant would need to provide a foundation.

21                The problem with Dr. Steffey is he does not provide

22    that foundation.  He provides no statistical analysis at all.

23                THE COURT:  You're going to need to back up for the

24    Court.

25                MR. RICHARD:  Oh.

 1          THE COURT:  This -- no, no.  Not back up physically.

 2          MR. RICHARD:  Sorry.

 3          THE COURT:  I have not been presented with anything

 4    concerning Dr. Steffey.  As best I can recall, there was a --

 5    an in limine motion that was brought -- that was procedural in

 6    nature.  It was a question of whether or not he was presenting

 7    a rebuttal report.  I ruled on that.

 8          MR. RICHARD:  Yes, Your Honor.

 9          THE COURT:  That's the extent of my understanding of

10    Dr. Steffey.

11          MR. RICHARD:  Right.  Well, we have -- we had filed

12    a motion on other sources, and this falls under that general

13    ruling of in defendant's case they have a number of different

14    ways they want to raise this issue, beginning with Dr. Steffey.

15          So I had simply requested either the opportunity to

16    conduct voir dire before he offers his opinions or reserve my

17    right to move to strike after he testifies.  So I don't want to

18    delay proceedings, but it's -- you know, there are only so many

19    motions in limine we could file.  And I believe this fell

20    within the Court's ruling on other sources, speculation, lack

21    of foundation.

22          THE COURT:  Perhaps you can just give me a 30- to

23    60-second preview as to what Dr. Steffey is going to testify

24    that you find to be objectionable.

25          MR. RICHARD:  Yes, Your Honor.

1    Basically, he looked at test data from the turnouts

2 for the VOCs and compared it to test data from the effluent of

3 the SPTF treatment system and made some -- put some dots to

4 visualize the data and then to offer an opinion that sometimes

5 downstream we have higher hits than we do upstream and,

6 therefore, one of the potential explanations for that

7 phenomenon could be another source of these contaminants.

8    THE COURT:  All right.  And your objection,

9 essentially, is that, without a foundation that demonstrates

10 who these other sources are, it's speculative and irrelevant

11 and should be barred under 403?

12    MR. RICHARD:  Yes, Your Honor.  And in addition to

13 the fact that he just didn't do a -- what statisticians do, an

14 inferential analysis.

15    But yeah, the basic problem at this point is there's

16 no foundation which will become apparent when -- I asked him

17 all of these same questions in deposition to establish what he

18 didn't do and what he doesn't know.

19    THE COURT:  And how much time do you anticipate on

20 cross-examination?

21    MR. RICHARD:  30 to 40 minutes.

22    THE COURT:  All right.  Let me hear from -- thank

23 you.

24    Let me hear from you, Mr. Blum, please.

25    MR. BLUM:  Good morning, Your Honor.

 1          Your Honor, first, we disagree with the plaintiff's

 2   interpretation of your ruling on their MIL No. 1.  That had

 3   nothing to do with Mr. Steffey.  It had to do mostly with

 4   Dr. Shoup.  And as to those issues, we've respected that ruling

 5   and haven't transgressed.

 6          But you were very clear in that ruling that proof of

 7   other sources or sources other than Whittaker -- and I think

 8   you used the term, quote, "fair game," end quote.  And

 9   Dr. Steffey lays the foundation for that argument on the

10   turnouts.

11          I would make the offer of proof that both Mr. --

12   that Mr. Alvord at least will testify that it is the spot in

13   the turnouts that is the critical testing location to determine

14   whether or not there's compliance with permits and what the DDW

15   will do.  And they have argued that what is at the turnouts is

16   the sole cause by Whittaker.

17          What Dr. Steffey will testify is that, when you look

18   at the data, if you assume that the calculations that the

19   plaintiff did are correct, that it is impossible from a

20   mathematical point for the -- for Whittaker to be the source

21   because either --

22          THE COURT:  To be the source or the only source?

23          MR. BLUM:  The only source.

24          And that in some instances, the numbers are so

25   high -- for instance, there's some times when it's been seven

1    to ten times what we find at the effluent.  And that -- so that

2    has relevancy not only to the issue of -- excuse me -- of it's

3    not Whittaker, it's somebody else, but it also goes to the

4    issue of the restoration damages since it's the turnouts

5    themselves that are the critical testing point.  What -- even

6    if -- even if all of the -- excuse me -- all of the VOCs was

7    eliminated from Saugus 1 and Saugus 2, they were treated to

8    zero, you would still have problems at the turnouts.

9              And since it's the turnouts that count, the

10   restoration or the treatment, as they argue, wouldn't work.

11   There's no need to do it because it's not going to solve the

12   problem that the plaintiffs have, which is VOCs at the

13   turnouts.

14             THE COURT:  Why not?

15             MR. BLUM:  Because you're still going to get

16   readings of positives at the turnouts.

17             THE COURT:  Why?

18             MR. BLUM:  Because Whittaker is -- there is clearly

19   evidence that, even if Whittaker is a source, there's other

20   sources there.

21             THE COURT:  So what?

22             MR. BLUM:  So you're still going to get the numbers

23   and they're still going to have the same problems.

24             THE COURT:  Why?

25             MR. BLUM:  Because the turnouts will still be

1    positive.

2           THE COURT:  I hear you saying all this, but tell me

3    why, given the restoration treatment that's being sought, that

4    what you're telling me is true.

5           MR. BLUM:  Because DDW -- because the restoration

6    will resolve -- okay.  If I can back up, Your Honor.

7           What the water does is it comes from Saugus 1 and

8    Saugus 2 to the SPTF to be treated for perchlorate.  It's then

9    tested for -- in the effluent tank at the SPTF for VOCs, for

10   perchlorate, and other stuff.  Then it is mixed with water from

11   the State Water Project.  After the mixing, it then flows to

12   the five different turnouts.

13          The DDW and the regulators care about what the

14   number is at the turnouts.  They don't care what the number is

15   at Saugus 1 and Saugus 2.  So even if that number is zero, if

16   there's still contamination at the turnouts, nothing changes.

17   It's still a problem for them.  And --

18          THE COURT:  I understand that.  But why is it not

19   feasible to do treatment, including soil vapor extraction, in

20   order to eliminate the VOCs?

21          MR. BLUM:  Because as to the non-Whittaker parts,

22   nobody knows what the source is.  There's a source out there of

23   VOCs, which is proven by the fact that we find additional

24   contamination in the turnouts which cannot be explained by

25   Whittaker.

1261

1    And there is admissions from Mr. Koelewyn who is

2    the -- head of the director of the plaintiffs for Mr. Al- --

3    and Mr. Alvord who is the head of operations and Mr. Leserman

4    who is the senior engineer, that they find contamination at the

5    turnouts which is not from Whittaker.  That's not in dispute.

6    THE COURT:  And what is the scope of the non-  --

7    purportedly non-Whittaker contamination?

8    MR. BLUM:  I'm -- Your Honor, I'm sorry.  I'm not

9    sure I understand.

10   THE COURT:  What is the scope of the contamination?

11   Is it a drop, essentially?

12   MR. BLUM:  No, no.  It's 10 percent -- it's enough

13   to affect 10 percent of the water that's delivered.

14   THE COURT:  And you don't have any evidence as to

15   who this other source is?

16   MR. BLUM:  No, Your Honor.  But I don't think we

17   need the evidence to show that other sources are relevant

18   because the argument that they're trying to make and the

19   argument that actually -- that Ms. Stanin made, well, you find

20   contaminant in these wells; therefore, it's Whittaker's.

21   THE COURT:  From an apportionment standpoint, you

22   can't just point to other sources, can you?

23   MR. BLUM:  Well, for Superfund we can.  That becomes

24   an orphan share.

25   THE COURT:  Not for Superfund, for the jury trial.

**UNITED STATES DISTRICT COURT**

1          MR. BLUM:  We can't point it for apportionment, but

2     we can for causation.

3          THE COURT:  So this goes to causation and

4     restoration damages?

5          MR. BLUM:  Yes.  And for Superfund, it goes to the

6     actual apportionment under 113.

7          THE COURT:  Now, turn to the foundational issues as

8     to whether -- is it Mr. or Dr. Steffey?

9          MR. BLUM:  It's Dr. Steffey.

10         THE COURT:  -- whether Dr. Steffey has -- has

11    complied with appropriate statistical methodology in arriving

12    at his conclusions.

13         MR. BLUM:  Your Honor, he's -- first of all, there's

14    no doubt that he's qualified.  He's taught statistics as a

15    professor at university.  He's a member -- he's a fellow of all

16    the statistic --

17         THE COURT:  Move away from qualifications for

18    purposes of my question, please.

19         MR. BLUM:  Dr. Steffey will lay the foundation that

20    it's proper statistical analysis.  Part of statistics is not

21    only doing regression analysis and all of the basically, you

22    know, complicated stuff that statisticians do.  But part of the

23    statistical analysis is making sense of what the statistics

24    mean and placing them in a way in which can be understood.

25    That's what Dr. Steffey did.

1    And Dr. Steffey's testimony would be a great aid for
2  the jury under -- I think it's 702 because he will be able to
3  take all of this data which is basically -- otherwise would
4  just be presented to the jury in over 300 pages of information.
5  And he will explain what the data means, and he will explain
6  where -- where and why the data supports the conclusion that
7  there's other sources that is affecting the turnout data other
8  than Whittaker.
9         THE COURT:  All right.  Mr. Richard --
10        Thank you.
11        -- you can take to the lectern, please.  We don't
12 have much time.  And I mean, the Court has set aside afternoon
13 sessions in order to provide the parties with more time when
14 issues were larger.  I think, as a practical matter, I'm going
15 to have to grant your alternative request, and I'll hear the
16 evidence and potentially strike it if the Court concludes that
17 there is a problem with -- with the methodology and the like.
18        But, otherwise, it's now almost 8:30.  The Court is
19 going to have to delay the proceedings for however long in
20 order to conduct this voir dire outside the presence of the
21 jury.
22        MR. RICHARD:  Yes, Your Honor.  And I wasn't
23 suggesting it be outside the presence of the jury.  I've done
24 it in front of the jury.
25        But I think as a practical matter, the only point I

1  would make is -- and Your Honor picked up on this -- we've

2  never argued that Whittaker is the only source, the substantial

3  factor instruction.  It's actually irrelevant if there are

4  other sources for the issues before the jury, unless there are

5  superseding intervening causes preventing liability for

6  Whittaker.  And that's just not an issue in this case.

7          So we'll return to that when we discuss jury

8  instructions and the verdict form, but this whole notion of the

9  sole cause and -- for these claims, that's just not a relevant

10 consideration.  But we look forward to talking to Dr. Steffey

11 on these issues.

12          THE COURT:  And before you step down, let me -- or

13 leave the lectern, let me address the issues that you have with

14 the documents.

15          You had suggested that there is a fundamental

16 question about whether the Court is going to issue a ruling on

17 403.  Why don't you briefly explain that to the Court in the

18 few minutes that we have.

19          MR. RICHARD:  Yes.  The 403 objection is basically

20 anything having to do with the turnouts and this notion of

21 downstream/upstream is total speculation and irrelevant for

22 reasons that will become apparent by about 9:30 this morning.

23          The other 403 objections, I don't believe that they

24 pertain to Dr. Steffey.  There are a couple of e-mails for the

25 other witnesses today that -- where they forwarded

```
 1   attorney-client communications.  And while that ship has sailed
 2   as to the privilege being provided to DDW, there's still a very
 3   serious 403 issue.  And there's simply no need to go into
 4   e-mails where Mr. Gee told the client something and then they
 5   sent it as an FYI to the department of -- the Division of
 6   Drinking Water.
 7               THE COURT:  Which exhibit number or numbers are
 8   those?
 9               MR. RICHARD:  I'd have to grab my binder.
10               THE COURT:  I did review the challenged exhibits
11   over the weekend, including this morning, the additional
12   information that was provided to the Court.  There were some
13   exhibits that are referenced that the Court simply wasn't
14   provided with.  I don't believe I had Exhibit 1438 with
15   Mr. Alvord and Exhibit 1441.
16               And the way we're going to proceed when the Court is
17   not given the exhibits to be able to make a ruling is the party
18   who neglects to provide it to the Court will not be able to use
19   it with that witness.  It doesn't mean at all.  It just means
20   you won't be able to use it until the Court's had a chance to
21   review it.
22               MR. RICHARD:  Those are the two exhibits,
23   Your Honor.
24               THE COURT:  I did not receive those.  I'm looking at
25   Mr. Alvord's exhibit right now, exhibit binder, and I do not
```

**UNITED STATES DISTRICT COURT**

1   see 1438 or 1441.  And so the Court is not going to permit that

2   to be used with Mr. Alvord at this point.  When the Court is

3   provided with those exhibits and I have time to review them,

4   then I will rule on the issue in due course.

5         MR. RICHARD:  Thank you, Your Honor.

6         THE COURT:  But until such time -- and this applies

7   to both sides.  If I don't have the exhibits, I'm taking the

8   time to look at them, we have a process.  It doesn't mean that

9   you will forever be precluded, but you will have to essentially

10  work on the Court's time, as I have time available to review

11  the documents.

12        MR. RICHARD:  Thank you, Your Honor.

13        THE COURT:  Thank you.

14        All right.  And with regard to the SPTF blending

15  locations summary -- and, Mr. Richard, I think this is your

16  objection.  The Court is -- or strike that.  This is a document

17  you intend to use with Dr. Steffey, as I understand it.

18        MR. RICHARD:  We've actually withdrawn it.  We had a

19  meet and confer yesterday.  I thought the Court had been

20  advised.  I apologize.

21        THE COURT:  I might have been.  But in any event, so

22  that's no longer an issue?

23        MR. RICHARD:  Yes, Your Honor.

24        THE COURT:  And then with regard to Mr. Leserman,

25  the Court will want to hear a foundation for all of the

1    exhibits that the parties intend to introduce -- one moment,

2    please.

3            The reason for the pause is I didn't receive 1438

4    and 1441 with Mr. Alvord.  It appears that I did receive them

5    with respect to Mr. Leserman.  And so the Court will want to

6    hear a foundation, but I do not see that there is work product

7    in 14 -- let's see here.  Let me just quickly go through

8    Leserman, then.

9            So for 1341, 1348, 1349, 1370, 1371, 1372, 1373,

10   1383, 1384, 1419, I will want to see an appropriate foundation.

11   And if there's an authentication issue, I will want to see that

12   properly established for 1371.  But otherwise, I'm not inclined

13   to agree with the plaintiff that these documents are

14   inadmissible.  I think they largely go to weight.

15           Is there any particular one, before we bring the

16   jury in, or ones, Mr. Richard, that you wish to address?  I'm

17   not making a final ruling.  As I've said from the beginning of

18   this trial, you have to make the objections contemporaneously

19   so I can see that there's a proper foundation.  But at least,

20   based upon the information that was presented -- and the

21   plaintiff's information is very basic, it's just 403,

22   misleading, and things of that nature -- I'm not seeing it at

23   this point.

24           MR. RICHARD:  Yes, Your Honor.  On -- and first of

25   all, for the Court's records, defendant withdrew 1419 last

1    night during our meet and confer and 1420.  And there may be a

2    couple of others.

3            But just briefly, on 1341, the bottom half of the

4    first page, there's a reference to counsel.  "Fred indicated in

5    discussions prior to the meeting with Whittaker that once a

6    plausible pathway is identified, this is proven, the burden of

7    proof shifts," et cetera.

8            And so the concern is that, you know, that will

9    require, then, that we call Fred Fudacz to explain -- I mean,

10   it's tenuous relevance and --

11           THE COURT:  Let me hear if there's an objection to

12   redacting that.

13           MR. BLUM:  No.

14           THE COURT:  All right.  That will be ordered

15   redacted.

16           MR. RICHARD:  Okay.  I think that deals with that

17   one, Your Honor.  Just a moment.

18           I think the issue with 1348 was just speculations

19   and musings about what DDW had said it would or wouldn't do.

20   But there is one other one that does raise the attorney-client

21   issue.

22           I don't see it in this particular binder,

23   Your Honor.  So if I find that, I'll just make an objection

24   real-time.  But I appreciate Your Honor's indulgence.  Thank

25   you.

```
 1                THE COURT:  Very well.
 2                And just to come back for clarification, on
 3   Mr. Alvord.  So the one exhibit that I did have, even though I
 4   don't believe it was with Mr. Alvord's exhibit binder, was
 5   1384.  So that's fine to attempt to introduce that with
 6   Mr. Alvord.
 7                I did not receive 1438 or 1441.  And I did look in
 8   other exhibits for exhibit binders for today and did not see
 9   that.  So those you'll have to wait until the Court has had an
10   opportunity to review them.
11                All right.  The jury is ready, so we are going to
12   bring them in.
13                Let's bring the jury in, please.
14                THE COURTROOM DEPUTY:  Yes, Your Honor.
15                THE COURT:  Thank you.
16                (In the presence of the jury:)
17                THE COURT:  We remain on the record in Santa Clarita
18   Valley Water Agency versus Whittaker Corporation, now joined by
19   our jury.
20                Good morning, ladies and gentlemen.
21                THE JURY:  Good morning.
22                THE COURT:  And I hope you all had a very pleasant
23   holiday weekend.  And you all should have received the e-mail
24   over the weekend.  I did send it to you as soon as the Court
25   received it.  That is with respect to Juror No. 7 and the
```

1  negative test.  So hopefully, to the extent that you were at

2  all on edge, that was able to smooth things out for you.

3          So with that, you will recall we concluded with the

4  plaintiff's case on Wednesday, and now we're into the

5  defendant's case.  So with that, we will have Whittaker's first

6  witness.

7          And so, Mr. Blum, if -- or, Mr. Gallagher, if you

8  can call your first witness.

9          MR. BLUM:  Your Honor, we would call

10 Dr. Duane Steffey.

11         THE COURTROOM DEPUTY:  Good morning, Doctor.  Would

12 you please come forward.  Sir, would you please walk around to

13 the witness platform.

14         Before you have a seat, would you please raise your

15 right hand to be sworn.

16         Do you solemnly swear that the testimony you shall

17 give in the cause now before this Court shall be the truth, the

18 whole truth, and nothing but the truth, so help you God?

19         THE WITNESS:  Yes, I do.

20         THE COURTROOM DEPUTY:  Thank you.  Please be seated.

21         Sir, for the record, would you please state your

22 name and then spell your last name.

23         THE WITNESS:  Certainly.  My name is Duane Steffey.

24 The last name is spelled S, t as in Tom, e, f as in Frank, f as

25 in Frank, e-y.

1      THE COURTROOM DEPUTY:  Thank you.  There's some

2  fresh water.

3      THE COURT:  And if you would please remove your mask

4  while you're testifying, and please move your chair closer to

5  the microphone.  Speak into the microphone as you see me doing,

6  please.

7      And, Mr. Blum, you may begin your direct

8  examination.

9      MR. BLUM:  Thank you, Your Honor.

10                    **DUANE STEFFEY, Ph.D.,**

11      **DEFENDANT'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:**

12                      **DIRECT EXAMINATION**

13  BY MR. BLUM:

14      Q.    Now, Doctor -- Dr. Steffey; correct?

15      A.    Yes.

16      Q.    What do you have your doctorate in?

17      A.    I have my Ph.D. in statistics.

18      Q.    And where was that received, Dr. Steffey?

19      A.    I earned that degree from Carnegie Mellon University

20  in Pittsburgh, Pennsylvania.

21      Q.    Can you give the jury the 25-cent version of your

22  education?

23      A.    Well, after growing up in eastern Pennsylvania, I --

24  I went to college at Carnegie Mellon and actually took all

25  three of my degrees there, my bachelor's degree.  I worked for

1  a few years at Westinghouse in the area there and then earned a

2  master's and a Ph.D. degree, both in statistics from

3  Carnegie Mellon.

4      Q.   And when was that?

5      A.   The Ph.D. was in 1988.

6      Q.   And since then, have you taught statistics anywhere?

7      A.   Yes.  Yes.  After finishing my Ph.D., I accepted a

8  faculty position at San Diego State.

9      Q.   And what was that position, Doctor?

10     A.   Well, I started as a -- an assistant professor and

11 was ultimately tenured and promoted to full professor of

12 statistics at San Diego State.

13     Q.   And what kind of subjects did you teach?

14     A.   Uh, well, primarily statistics courses at all

15 levels, from the introductory undergraduate lower division

16 classes to upper division classes for juniors and seniors and

17 also graduate classes for -- for the graduate students in the

18 program.

19     Q.   Can you -- can you explain to the jury what

20 statistic -- when you say you teach statistics, what does that

21 mean?  What is the field of statistics?

22     A.   Well, statistics is the science that is concerned

23 with how to collect and analyze data to draw conclusions about

24 problems of interest and questions of interest.  And so it's --

25 it's math you can use is the way I like to think about it.  I

1  was a -- growing up, I was a kid who liked to do math, but I

2  also liked to be able to engage and address real problems.  And

3  I found that statistics is really the science about how to

4  collect and analyze data to draw conclusions.

5        Q.    Okay.  And, sir, are you a member of any

6  professional organizations that you believe are relevant?

7        A.    Yes.  I'm a member of the American Statistical

8  Association, the Institute of Mathematical Statistics, Society

9  for Risk Analysis, and the International Statistical Institute.

10       Q.    And are you a fellow in any of these organizations?

11       A.    Yes.  I'm a fellow of the American Statistical

12 Association and elected member of the International Statistical

13 Institute.

14       Q.    What does it mean to be a fellow?

15       A.    A fellow of the American Statistical Association,

16 the ASA, is a -- it's a mark of distinction in the profession.

17 We have an association of nearly 20,000 members, and each year

18 three-tenths of a percent of the members can be named as

19 fellows.  So that's about 60 people a year.  So it is -- it

20 certainly was something that I appreciated the recognition of

21 my colleagues.

22       Q.    And generally, what is the criteria for being named

23 a fellow?

24       A.    Well, there's a nomination process, and you're put

25 forward by colleagues.  And there is a committee that reviews

1    the applications and makes decisions each year.

2        Q.    Okay.  Sir, are you a peer reviewer for any

3    publications?

4        A.    Yes.  I'm frequently asked to review articles for

5    journals to judge their scientific merit and whether they're

6    worthy of publication.

7        Q.    Can you explain what a peer reviewer is?

8        A.    Well, a peer reviewer is someone with the relevant

9    expertise to judge research that's been conducted and -- and

10   where an article has been prepared to publish that research and

11   make it public.  And we're asked to evaluate the merits of that

12   work, is it sound and is it worthy of publication and

13   introduction into the -- into the research literature.

14       Q.    And what are the -- what types of publications have

15   you been a peer reviewer for?

16       A.    Well, I've -- I've been a peer reviewer for most of

17   the prominent journals in my field in statistics.  I've also

18   reviewed proposals for the National Science Foundation and have

19   also been asked to look at articles in journals of

20   applications.  So where -- in fields other than statistics

21   where there's a prominent statistical aspect to the work.

22       Q.    Okay.  Sir, in this case, what was your assignment?

23       A.    Here, I was asked to evaluate the -- the water

24   quality monitoring data that's been collected on the system

25   over -- well, nearly ten -- nine years, to evaluate that data

1   and, in particular, to assess whether it was consistent with

2   some of the questions or to what extent the data could address

3   questions of causation that I understood to be relevant for

4   this matter.

5           MR. BLUM:  All right.  If we could put up

6   Exhibit 1449 for demonstrative purposes only.

7       Q.   (BY MR. BLUM:)  Sir, what is Exhibit 1449?

8       A.    Figure 1449 here is a -- essentially a schematic or

9   a simplified diagram of the system that shows the -- the

10  upstream sources of water for the -- for the water agency

11  system, the Saugus perchlorate treatment plant and Castaic Lake

12  being two upstream sources from which water is drawn.  And then

13  the water downstream would arrive at what we call the turnouts.

14  And the -- the treatment plant receives water from the Saugus

15  wells that are also shown in the lower left corner of the

16  diagram.

17      Q.   If you see where I'm circling, Doctor, the

18  Castaic Lake water, what is the significance of that in your

19  analysis?

20      A.    Well, the significance of that is that the -- I've

21  understood that the water -- water agency draws water from

22  Castaic Lake and blends it with the water from the perchlorate

23  treatment plant.  And, you know, my understanding is that those

24  were the -- the sources that they considered to be the sources

25  that they were using and blending in the water that was sent

1    downstream to the turnouts.

2        Q.   And is it -- do you have an understanding as to

3    whether or not there's VOCs in the water that comes from

4    Castaic Lake?

5        A.   I have not seen any indication that there are VOCs,

6    these volatile organic constituents.  I haven't seen any data

7    suggesting that Castaic Lake was the source of those

8    constituents.

9        Q.   And have you seen any data that shows whether or not

10   there was VOCs in the water that was mixed with the VOC-free

11   water from the SPTF?  Or did that -- let me withdraw the

12   question.  It made no sense to me either.

13            Did you see any data showing what VOC concentrations

14   there were in water that was coming from the SPTF?

15       A.   Yes.

16       Q.   And from a statistical -- from a math or statistical

17   point of view, if water with VOCs from the SPTF is mixed with

18   water without VOCs from Castaic Lake, what effect would that

19   have on the level of VOCs?

20       A.   Well, the effect would be one of dilution, and it

21   would reduce the level of VOCs that you would see in the

22   blended water.

23       Q.   And if we then look at the water at the turnouts,

24   from a statistical point of view, as long as water from the

25   SPTF is mixed with clean water from the Castaic Lake, can the

1  levels of VOCs at the turnouts ever be greater than the levels

2  of VOCs that's coming from the plant?

3      A.    Uh, if this is the closest and where the only two

4  sources of water are the treatment plant and Castaic Lake,

5  then -- then, no, it shouldn't be possible to have higher

6  readings of VOCs at the downstream turnout than you have at the

7  upstream effluent from the perchlorate treatment plant.

8      Q.    Okay.  Now, if -- I want to go on to a different

9  line of questioning.

10        Did the water agency prepare a calculation to

11  determine -- or a formula to determine when there was a mixture

12  of water from Castaic Lake and the SPTF, what were the

13  percentages of Castaic Lake water versus SPTF water?

14      A.    Yes, they did.

15      Q.    And what is your understanding of that formula?

16      A.    Well, my understanding is that what the agency did

17  was to -- there were a couple of constituents that they

18  considered to be good constituents for the purpose of

19  estimating what the percentage of -- I'll call it Saugus water

20  which is the water from the perchlorate treatment plant, that's

21  the term they use -- they thought there were a couple of

22  constituents that were good markers to -- to estimate the

23  percentage of Saugus water that was downstream at the turnouts.

24  They used chloride, and they used sulfate.

25        And the idea is basically that you can take -- if

1    you believe you have two upstream sources, you can take

2    measurements of chloride at the -- the Saugus perchlorate

3    treatment plant and get a Saugus value.  You can take a

4    measurement from the surface plants that draw the water from

5    Castaic Lake and get a chloride value there.  And then if

6    you're looking downstream and you have a blend, you would

7    expect that chloride value to be somewhere in between the

8    Saugus value and the -- and the Castaic Lake value.

9              And, you know, the closer it is to the

10   Castaic Lake -- the closer it is to the Saugus value, then that

11   would be a greater percentage of Saugus water that was at the

12   turnout.  That was -- that's basically the idea.  And they --

13   they produced those estimates based on chloride.  They also

14   produced those estimates based on sulfate.

15        Q.   And the -- did the water agency ever -- excuse me --

16   to your knowledge, submit data to the Department of Drinking

17   Water based on these formulas?

18        A.   Yes.  My understanding is they have.

19        Q.   And have you seen anything that would suggest that

20   the water agency didn't believe that the formulas were valid?

21              MR. RICHARD:  Objection.  Lacks foundation,

22   Your Honor.

23              THE COURT:  Sustained.

24        Q.   (BY MR. BLUM:)  For the rest of the questions,

25   Doctor, I want you to assume that the formulas are valid.  Do

**UNITED STATES DISTRICT COURT**

1    you understand that?

2         A.    Yes.

3         Q.    All right.  Now, um, what type of data did you get

4    in order to do your -- to do an analysis?

5         A.    For my analysis, I received data that had been

6    produced by the water agency in this matter, files that had

7    readings of the constituents that were being monitored from

8    both upstream and downstream locations in the system, as well

9    as the records of what they refer to as blending studies, which

10   were these measurements that were taken to estimate the

11   percentage of Saugus water that was at the downstream turnouts.

12        Q.    And what did you do with that data?

13        A.    I integrated that data and -- and created --

14   developed some metrics to -- to understand, um, both the

15   percentages of water at the turnouts and also really to address

16   the question of whether -- to what extent the data are coherent

17   and consistent.  And what I mean by that is that, if there are

18   downstream detections of volatile organic constituents, when

19   those detections occur, do the data suggest that those

20   downstream detections of VOCs can consistently be attributed

21   solely to the existence of VOCs at the upstream source at the

22   Saugus perchlorate treatment plant.

23        Q.    Okay.  And when you say "integrate," for

24   non-statisticians, what does that mean?

25        A.    Well, in this case, I just simply mean putting the

**UNITED STATES DISTRICT COURT**

1    data together so that you have a time history that you can

2    understand.  We were getting data from separate files.  But the

3    data were consistent in that typically the -- we have a very

4    rich history of -- about nine years of data for the VOCs, the

5    monitoring of the VOCs.  And then the blending studies occurred

6    a couple of years after we started getting data for the -- the

7    VOCs.

8              And so from about seven years of data, these samples

9    are being taken on -- on pretty much a weekly basis.  And so we

10   have weekly data where we're understanding:  Are there

11   detections of VOCs upstream?  Are there detections of VOCs

12   downstream?  And then at the same time we're getting these

13   weekly estimates of -- at the downstream location, what is the

14   estimated percentage of Saugus water at that downstream

15   location.

16        Q.   Okay.  And then once you got all this data and you

17   integrated it, what did you then do?

18        A.   Uh, what -- what I did was to essentially visualize

19   that data and look at the time history, look at the instances

20   where there are detections, and look at the relationship

21   between the measured values downstream and the measured values

22   upstream and is it -- are they consistent with the notion that

23   anything that's occurring downstream at the turnouts must be

24   attributable to the Saugus upstream location?

25        Q.   Before I move on, I forgot a question.

1           You didn't do this work for free, did you?

2      A.    No.

3      Q.    Do you have an estimate of how much you've been paid

4  to do the work?

5      A.    Yes.  Our firm has invoiced our client, your firm, a

6  little over $50,000 for -- for a little over maybe a year and a

7  half's worth of work.

8      Q.    And in terms of volume, can you describe for the

9  jury how much data you had to integrate and then analyze?

10     A.    Well, we had -- as I said, we have weekly --

11  approximately weekly measurements of VOC data over almost a

12  nine-year period.  So we have -- the total records are

13  approaching about 500 records of measurements being taken at

14  upstream and downstream locations.

15         And with regard to the percentage of Saugus water,

16  that's not quite as much, but it's over -- over 300

17  observations that we -- we essentially pulled together from --

18  from multiple files.

19     Q.    And when you said you visualize it, did you prepare

20  anything that -- anything that is actually you can look at in

21  terms of what your visualization was?

22     A.    Yes.

23     Q.    And were those different figures in your report?

24     A.    Yes, they were.

25         MR. BLUM:  If we could bring up Exhibit 1450 for

1   identification purposes only.  Sorry -- yeah.  For

2   demonstrative purposes only.

3       Q.    (BY MR. BLUM:)  Could you explain to the jury what

4   Exhibit 1450 is?

5       A.    Exhibit 1450 is a -- a time history of measurements

6   taken, and it's -- and what it's comparing are the -- this

7   particular figure, Figure 2 from my report, the particular

8   constituent that's being measured here is -- I'm a

9   statistician, not a chemist, but I think PCE is shorthand for

10  tetrachloroethylene, I think.  But anyway, so that's the

11  constituent being monitored, the PCE.

12          What we're looking at is on a particular day when

13  sampling was made of the upstream location, which is the

14  effluent, the output from the perchlorate treatment facility,

15  what was that value and what was the value observed downstream

16  at one of the five particular turnouts.

17          So this figure is actually five separate charts.

18  There's one chart for each of the five downstream locations

19  where measurements were taken.  And those turnouts are labeled

20  F SC-1, SC-2, V-5, and V-7.  And what -- one thing to -- to

21  notice here is that most of the time these VOCs are not being

22  detected downstream.

23          And so what we're looking at is the -- the ratio of

24  the downstream value to the upstream value.  And so if the

25  downstream value is not detected, we're calling that a zero.

 1   And so you'll see that what looks like a green line running

 2   horizontally across these charts are actually a series of

 3   individual zero measurements.  So those are individual weeks in

 4   which the PCE constituent was not detected at the downstream

 5   turnout.

 6           So what -- what -- what I was particularly

 7   interested in were the occasions where there was a detection of

 8   the VOC downstream at the turnout.  And so those would be the

 9   values here depicted as the green dots.  When you have a green

10   dot above zero, that would indicate that you had a detection of

11   the VOC at that downstream location, and what's being plotted

12   is what was the magnitude of that detection relative to the

13   magnitude of the value of that constituent that was measured on

14   that same day at the upstream location.

15           MR. BLUM:  Okay.  Can you put Exhibit 1449 back up?

16       Q.   (BY MR. BLUM:)  So, Doctor, if I have it correct,

17   you were basically comparing concentrations at the Saugus plant

18   before the dilution to the concentrations at the turnouts after

19   the dilution?

20       A.   Correct.

21           MR. BLUM:  And if we can go back to the other one.

22       Q.   (BY MR. BLUM:)  Now, you see that --

23           MR. BLUM:  If we can blow up, Rick, for -- the

24   second one, SC-1.

25       Q.   (BY MR. BLUM:)  Okay.  There's a red dotted line.

1    What does that mean?

2        A.    Yes.  That -- that red dashed line running

3    horizontally is -- that is occurring at the value of 1 on the

4    vertical axis.  And so if you have a value at that red dashed

5    line, that would correspond to an instance where the value

6    measured at the downstream location exactly matches the

7    measured value at the upstream location.

8        Q.    So --

9        A.    So the ratio is 1.

10       Q.    If this is the Saugus plant and this is the turnout,

11   the number -- the values of PCE was the same before and after

12   dilution; correct?

13       A.    Correct.  If -- if -- if we have a value along that

14   red dashed line, that's what that means, that those values were

15   the same, both upstream -- at the upstream and downstream

16   locations.

17       Q.    And how about, for instance, these dots right there

18   (indicating), the ones that are above the red line?  What does

19   that demonstrate?

20       A.    Well, if you have values above the line, those are

21   instances where the magnitude of the constituent was measured

22   downstream -- the value measured downstream is actually greater

23   in magnitude than the value measured upstream.

24       Q.    So, in other words, the concentrations of PCE at the

25   turnout was greater than the concentrations before the

1  dilution?

2      A.    Yes.  And in this case, in the period during 2015

3  that you've circled here, in some cases they were as --

4  approaching five times greater in magnitude downstream than the

5  values that were measured upstream at the same time.

6      Q.    From a statistical point of view, what does that

7  tell you regarding whether or not the source at the -- of the

8  PCE at the turnouts is solely that of the Saugus plant?

9      A.    These data are inconsistent with that

10  interpretation.  It -- it -- if -- it's -- it could --

11          THE COURT:  I'm going to ask -- I'm actually going

12  to strike his answer and ask you to establish a foundation that

13  he has expertise with respect to sourcing.

14      Q.    (BY MR. BLUM:)  Okay.  Doctor, I'm only asking you

15  from a statistical point of view, not in terms of physics or

16  engineering but simply by the numbers.

17          THE COURT:  And unless you're planning on doing more

18  than just having him testify as to comparing numbers, upstream

19  versus numbers downstream, the Court is going to sustain the

20  objection as lack of foundation as to the significance of what

21  that means.

22          MR. BLUM:  Okay.  Your Honor, I'll establish it

23  another time, then.

24      Q.    (BY MR. BLUM:)  All right.  Did you also look at the

25  predicted numbers using the formula that plaintiff used versus

1  the actual numbers?

2      A.    Yes.  I -- I did calculations that addressed the

3  question of what level of VOCs would we expect downstream if we

4  had observed certain values upstream and we -- and we estimated

5  that the water downstream contained some percentage of that

6  upstream water at the Saugus location.

7           MR. BLUM:  If we can -- Exhibit 15 -- I'm sorry,

8  1452 for demonstrative purposes.

9      Q.    (BY MR. BLUM:)  And can you explain to the jury what

10  this exhibit is?

11      A.    Yes.  This is a comparison -- this is another ratio,

12  but what we're comparing here is the ratio of the actual value

13  measured at the downstream turnout and comparing that to what

14  we would expect based on what we measured upstream on that day

15  and what we estimate the percentage of Saugus water was at that

16  downstream location.

17      Q.    And to be clear, Doctor, the estimation of the

18  percentage of downstream water was you used the formula

19  prepared by the plaintiff; correct?

20      A.    Yes.  These values were all -- these charts were

21  generated using data that had been generated and produced by

22  the water agency.

23      Q.    All right.  And I'm going to talk about a couple of

24  things on this.

25           The red line that I'm circling -- I'm sorry -- yeah,

1    the red dotted line, what does it mean?

2         A.    Well, for this set of charts, this would -- values

3    on the red line would be instances where what we observed

4    downstream exactly matched what we would expect to see based on

5    the upstream value and the percentage of Saugus water.

6              So, for example, if we observed the value of -- for

7    a constituent, if we observed the value of 3 up -- upstream and

8    we believed that the water downstream has -- is one-third

9    Saugus water and two-thirds water from Castaic Lake, then we

10   would expect the downstream value to be one-third of the

11   upstream value.  And if the upstream value was 3 and the

12   downstream value was 1, then that would be consistent.  And --

13   and the ratio in the chart here would be right on that -- that

14   dashed line at the 1 value.

15        Q.    In other words, then it's sort of like one-to-one.

16   It's the predicted value at down -- at the turnouts based on

17   the concentrations at the plant using the formula plaintiff

18   used; correct?

19        A.    Correct.

20        Q.    All right.

21             THE COURT:  And, Mr. Blum -- and this applies to all

22   counsel -- whenever you're having a witness actually do any

23   annotation or markings on a document, since they're going to be

24   cleared, for the record, you need to make sure that you're

25   making clear what the witness is doing.

**UNITED STATES DISTRICT COURT**

1       So translated here, he's circled the first chart.
2   There are five charts.  This is the one in the upper left-hand
3   corner.
4       So just make some identification so the record is
5   clear, please.
6       MR. BLUM:  All right.  Thank you, Your Honor.
7       Now, if we can go to the next one.  And, Rick, if
8   you could blow up SC-1.  Yeah, 1452, the one you have.
9       Q.   (BY MR. BLUM:)  Okay.  Now, this is turnout SC-1 for
10  PCE; correct?
11      A.   Correct.
12      Q.   Now, what I'm going to circle is some black lines
13  that move laterally from the top to the bottom -- I'm sorry --
14  vertically from the top to the bottom.  Can you explain what
15  those lines mean?
16      A.   Yes.  These are lines that essentially are --
17  correspond to points where we effectively have a division by
18  zero.  And -- and what I mean by that is that these vertical
19  bars correspond to dates on which a detection -- where the VOC
20  was detected downstream and -- but the -- the agency's estimate
21  is that on that date, that essentially none of that water at
22  the turnout was coming from the Saugus location.
23      So it's an instance where essentially there -- the
24  estimate is that there's essentially no Saugus water at that
25  turnout but, nonetheless, there is a detection of the VOC on

1    that day at the turnout.

2        Q.    Why is that significant from a statistical point of

3    view?

4        A.    Well, it's at great odds with what you would expect.

5    There's no reason to expect -- you know, if -- if -- if the

6    Saugus location is the only source of the VOC and -- and the --

7    but there is -- there's virtually no Saugus water at that

8    turnout on that date, then there should be no -- no VOC there.

9            THE COURT:  Dr. Steffey, is that a statistical

10   conclusion?

11           THE WITNESS:  It is a -- it is a conclusion -- yes,

12   it is a conclusion consistent with the metric.  The metric is

13   comparing the observed value -- it's a ratio.  It's a ratio of

14   the observed value at the -- at the downstream turnout divided

15   by the expected value.

16           THE COURT:  But the conclusions that you're drawing

17   from it, please make sure that you're sticking with statistical

18   conclusions that you're drawing without venturing into

19   hydrogeology and other areas of expertise, please.

20           THE WITNESS:  Yes.  Well, it is -- it is an instance

21   where, um -- the metric essentially is infinite, and that's why

22   there's a vertical bar there.

23           MR. BLUM:  All right.  You can take that down.

24           Actually, can you put that full exhibit back up

25   again?  The one we just saw, yeah.

1      Q.     (BY MR. BLUM:)  Now, before we move on to the next

2  one, can you read what -- what it says after "Figure 6"?

3      A.     Figure 6 is the label.  Caption is "The ratio of

4  actual to expected PCE value, estimated from SPTF value and

5  chloride ratio."

6      Q.     What do you mean by "chloride ratio"?

7      A.     What I mean by "chloride ratio" is that these are --

8  these charts are using the estimate of the percent of Saugus

9  water at the turnout based on the chloride constituent.

10     Q.     Okay.  And that's the constituent that was used in

11  the plaintiff's formula?

12     A.     It was -- it was one of the two that they used and

13  that they felt were reliable to -- to provide estimates of the

14  percent of Saugus water.  I had mentioned earlier in my

15  testimony that they look -- they felt that chloride and sulfate

16  were the two constituents that would serve as the best basis

17  for estimating percent of Saugus water at the turnouts.

18             MR. BLUM:  All right.  Why don't we take this down,

19  and let's move to Exhibit 1453 for demonstrative purposes.

20     Q.     (BY MR. BLUM:)  Could you explain to the jury, other

21  than the -- where the lorem, which is -- unfortunately I

22  accidentally put in -- what the exhibit means?

23     A.     Well, this figure is -- is a similar set of charts,

24  set of five charts, one for each turnout.  The -- the

25  differences here is that, instead of PCE, the constituent that

1  we're looking at is TCE, which is trichloroethylene.  And then

2  instead of using the estimate for the percent of Saugus water

3  at the turnout, instead of using the estimate based on

4  chloride, these charts are using the estimate that the water

5  agency made based on sulfate.

6         MR. BLUM:  And if we could look at the one in the

7  middle which is for SC-1.  Upper middle.

8     Q.    (BY MR. BLUM:)  Okay.  Doctor, other than the lorem

9  ipsum, which is unfortunately a mistake I made, the black and

10  the red lines, do they mean the same thing as they meant in the

11  prior exhibit?

12     A.    Yes.  If you mean -- I mean, the red dashed line

13  running horizontally and located at 1 on the vertical axis

14  would correspond to an instance -- a dot on that line would

15  correspond to an instance where what was measured downstream

16  corresponds exactly to what we would expect based on the

17  upstream value and the estimate of the percent of Saugus water.

18         And when you say "the black line," I think you're

19  referring to that -- that vertical bar.  And that, again, would

20  be an instance where there is a detection in this case of TCE

21  downstream on a day when it's estimated that there's no Saugus

22  water at that location.

23     Q.    Okay.  Now, just to be -- to be clear, what the

24  formula allows you to do is predict how diluted the water from

25  the effluent plant would be with clean water; correct?

1    A.    Well, I guess I would -- I mean, I think that's

2 essentially right.  What we're essentially doing is checking to

3 see whether the -- the expected dilution effect is being

4 observed here.  That is, if we have an upstream concentration

5 and we have an estimated dilution factor, that's the percent of

6 Saugus water, is the downstream value consistent with that?

7 You know, if I believe that the water downstream is only

8 one-third Saugus water, am I getting a value that's

9 one-third -- a measured concentration downstream that's

10 one-third of the measured concentration upstream.  That's

11 essentially what these charts are looking at.

12    Q.    But the data that's represented in these charts,

13 what's the -- in the chart for SC-1, what's the time period

14 that it represents?

15    A.    Well, the -- these charts are developed using not

16 only the data on the monitored constituents but also the data

17 from the blending studies that give us the estimated percent of

18 Saugus water.  And those blending studies began in the spring

19 of 2013.  And so you see the horizontal axis is the time axis.

20 And so the measurements start in -- essentially in the second

21 quarter of 2013, in the spring of 2013, and they run through

22 the end of 2019.

23    Q.    Did you have any data to look at in 2020?

24    A.    No.  At the time I created this report, I -- I

25 didn't.

1    Q.    All right.  Now, I want to -- I'm going to circle

2  the area that's at approximately 2019.  And how many dots do

3  you see above the dotted red line?

4    A.    It's -- well, it's a little hard to be precise

5  there, but I would say that I would see at least six or seven

6  dots above the horizontal red line.

7    Q.    So what does that tell you about the concentrations

8  of TCE in 2019?

9    A.    It would tell me that at this particular turnout,

10  SC-1, the downstream location, in 2019, we are seeing values

11  measured downstream that in some cases are -- well, they're

12  greater than what we would expect, and I think in the most

13  extreme cases about 50 percent greater.  This value there looks

14  to be around 1.5.  So we're getting a value downstream that is

15  50 percent greater than what we would expect based on the

16  upstream value in the estimated dilution factor.

17        MR. BLUM:  Okay.  If we can go back to 1449, please.

18    Q.    (BY MR. BLUM:)  So if we go back to the last part

19  that we just talked about, the values for TCE in 2019, and we

20  look at Exhibit 1449 which is the schematic, using the formula

21  that was used by and developed by the plaintiff, you're able to

22  predict what the concentrations of TCE were after the dilution

23  with clean water; correct?

24    A.    We're able to -- to calculate what the predicted

25  value would be at a downstream turnout based on the upstream

1    value and the -- and the -- what I'm calling now the estimated

2    dilution factor, the percent Saugus water.

3         Q.    And then you compared it to the actual values for

4    TCE that was found at the turnout; correct?

5         A.    Correct.

6         Q.    And in at least several cases, you found that it was

7    greater than what the predicted value would be?

8         A.    Yes.

9         Q.    Okay.  Now, you're not a hydrogeologist; correct?

10        A.    Correct.

11        Q.    You're not a geologist.  You're -- what you do is

12   you work with numbers.  You're a statistician; correct?

13        A.    Correct.

14        Q.    From a pure statistical analysis, do you have an

15   opinion as to whether or not the concentrations of TCE at the

16   turnouts can be wholly explained by VOCs emanating from the

17   Saugus perchlorate treatment plant?

18             MR. RICHARD:  Objection.  Vague and lacks foundation

19   as to -- from a statistical perspective or analysis.

20             THE COURT:  Sustained.

21        Q.    (BY MR. BLUM:)  Well, looking at the dilution

22   factors that are -- you talked about, looking and comparing the

23   different concentrations, can the concentrations of TCE found

24   at the turnouts from a mathematical perspective be explained by

25   the concentrations of TCE that were found at -- emanating from

1 the plant?

2    A.    Not consistently.  That is, the -- the -- when I

3 look at the data overall, the downstream detections cannot

4 be -- the data are inconsistent with the downstream

5 locations -- the detections of VOCs at downstream locations

6 being consistently and solely attributed to a single source,

7 that being the effluent of the perchlorate treatment plant.

8    Q.    And to be clear, you're rendering no opinions about

9 what the other source might or might not be?

10    A.    Correct.

11         MR. BLUM:  That's all, Your Honor.

12         THE COURT:  Mr. Richard?

13         MR. RICHARD:  Thank you, Your Honor.

14                   **CROSS-EXAMINATION**

15 BY MR. RICHARD:

16    Q.    You were -- your role in this case, Dr. Steffey, was

17 to respond or rebut to what you thought other experts in this

18 case -- the opinions they were offering; is that right?

19    A.    That was -- that was an element of my assignment.

20 And, yes, initially that was the -- that was my role, and it

21 included the analysis of data that I -- on which I've just been

22 testifying.

23    Q.    And you note in your report -- that's called a

24 rebuttal report because you thought you were rebutting what

25 some other expert had said; is that right?  You prepared a

1   rebuttal report?

2        A.    Yes, I prepared a rebuttal report.

3        Q.    And in your report, you note that plaintiff's

4   experts, quote, "Note the detection of TCE in the Saugus 1 and

5   2 water supply wells."  Do you recall that?

6        A.    Yes.

7        Q.    And I'd like to show what was previously admitted as

8   Exhibit 522.  And Exhibit 522 is a figure from one of the

9   experts in this case, referring to test data.  And it says,

10  "TCE and PCE levels in Saugus 1 well water."  Do you see that?

11       A.    Yes.

12       Q.    And so my first question is:  Nothing in the work

13  you've done in this case disputes that there are VOCs,

14  including TCE and PCE, in the Saugus wells; is that fair?

15       A.    That's correct.

16       Q.    And you did not, for example, compare how frequently

17  VOCs detected in the Saugus 1 well, you didn't compare that to

18  how frequently VOCs were detected after that water was blended

19  with other water, did you?

20       A.    No.

21       Q.    You can't tell us what percentage of the total

22  samples that you talked about result in PCE that cannot be

23  attributed to Saugus 1 and 2.  That's not a calculation you

24  made; correct?

25       A.    Well, my analyses and the charts that I was just

1    speaking of were looking at the measurements of the effluent of

2    the perchlorate treatment facility.  So the charts you're

3    showing here pertain to the Saugus 1 well and values that would

4    be observed prior to the water entering the treatment facility.

5         Q.    Sure.  We can take this one down.  I didn't mean to

6    confuse you.

7              You didn't make a calculation comparing the

8    percentage of occurrence from total samples regarding PCE --

9    comparing anything, whether it was before blend, after blend,

10   at the turnout, you did not apply statistical tools to develop

11   a percentage calculation; correct?

12        A.    Well, I -- I don't recall making a numerical

13   calculation.  But -- but all of the values are included in the

14   charts.  I mean, all of the sample points are -- are depicted

15   in the charts.

16        Q.    Okay.  Just so we're clear, you can't tell us what

17   percentage of the total samples -- and you referred to weekly

18   samples.  Do you recall that?

19        A.    Yes.

20        Q.    And you can't tell us what percentage of the total

21   samples result in PCE that cannot be attributed to Saugus 1 and

22   Saugus 2 contamination, can you?

23        A.    I can, as I sit here, give you a numerical

24   percentage.  But it's clear that the -- in the majority of

25   instances, the VOCs are not being detected downstream.  That's

1    why we have those horizontal dot -- that string of horizontal

2    dots at zero on those charts.

3         Q.    Okay.  Let's just jump to that for a minute.

4              On those charts that you did, if there was a

5    detection of TCE or PCE at the SPTF that you talked about, the

6    upstream detection --

7         A.    Yes.

8         Q.    -- assume that it was 2 or 3 parts per billion.

9              If there were no detection after blending, then

10   nowhere in your charts do you reflect the positive detection

11   before blending; correct?  That counts as a zero in your chart?

12        A.    Yes.  If -- if the VOC is not detected at the

13   downstream location, that -- that would correspond to a zero on

14   the charts.

15        Q.    Okay.  And you didn't look at any data related to

16   perchlorate in the groundwater from the Whittaker site;

17   correct?

18        A.    That's correct.

19        Q.    And you don't have any opinion about whether GAC

20   treatment or some other form of treatment of the contaminated

21   well water would be effective to remove VOCs from the well;

22   correct?

23        A.    No, I do not.

24        Q.    And if -- even when PCE is detected at one of the

25   five turnouts you talked about for the Saugus system, wouldn't

1    you have to speculate as to the possible explanations for that

2    detection?

3         A.    Well, I -- I'd prefer not to speculate, but it's

4    outside the scope of my assignment.

5         Q.    It's outside the scope of your expertise as a

6    statistician; correct?

7         A.    I -- yes.  I think that's a fair statement.

8         Q.    Also fair to say that you did not apply any

9    statistical principles or any statistical analysis to any

10   aspect of the contaminated aquifers in this case; correct?

11        A.    No, I would disagree with that statement.

12        Q.    You think that's something you studied, the aquifers

13   in this case?

14        A.    Oh, excuse me.  The aquifers?  I'm sorry.  No, I

15   was -- I was focused on the -- the data from the water quality

16   monitoring data.  So I was not looking at any data beyond that.

17        Q.    You have some general understanding that other

18   experts in this case have testified at length about what

19   aquifers are and how contamination in aquifers travels?  Do you

20   have that general understanding?

21        A.    I -- I'm certainly prepared to believe that's the

22   case here.

23        Q.    Okay.  But that's not something you've -- you've

24   studied in this case; correct?

25        A.    Correct.

1    Q.   And fair to say that at the time you worked on this

2    case and prepared your rebuttal report, you had never heard of

3    something called the policy memo 97-005?

4    A.   Correct.

5    Q.   You don't know whether the aquifers have been or are

6    an extremely impaired source of drinking water?

7    A.   No.

8    Q.   And you're not offering any opinion on damages in

9    this case; correct?

10   A.   Correct.

11   Q.   And you've never been an employee with the

12   United States Environmental Protection Agency; correct?

13   A.   Correct.

14   Q.   You've never worked for a water agency?  Have you

15   ever been employed by a water agency?

16   A.   No.

17   Q.   Have you ever designed or operated any aspect of a

18   water distribution system for drinking water?

19   A.   No.

20   Q.   And with respect to blending, is it fair to say that

21   you're actually not in a position to testify as to what the

22   agency's purpose in blending water from the treatment facility

23   was?

24   A.   No.  I don't -- I don't believe so.  I've seen some

25   of the correspondence from the agency about the blending, but

 1    I -- I was mostly concerned with the data they were generating

 2    from those studies.

 3        Q.    And you don't know if blending is done pursuant to a

 4    permit, for example, do you?

 5        A.    No, I don't know.

 6        Q.    Fair to say that's another issue outside the scope

 7    of the work you did in this case?

 8        A.    Yes, I would say that.

 9        Q.    You didn't review any of the permits to see what

10    they said about blending or the formula that the agency may

11    have been using to estimate its blending?

12        A.    Well, I -- I certainly know the formula they were

13    using to estimate the blending.  But beyond that, um, no, I

14    don't -- I don't recall looking at any other documents.

15        Q.    You didn't look at any permits that referred to

16    either the purpose or limitations of that -- what you call a

17    formula?

18        A.    Correct.

19        Q.    And you don't know the role of any state agency in

20    the blending or blending studies done by the water agency;

21    correct?

22        A.    Correct.

23        Q.    Now, you relied -- and Mr. Blum referred to the

24    plaintiff's formula repeatedly.  And that's something that you

25    relied on, in part, for some of the work you did in this case;

1   right?

2       A.    Well, I relied on it because that was -- that was

3   what they used to calculate the percent of Saugus water that

4   was included in the data files that I was integrating and --

5   and -- in my analysis.

6       Q.    Right.

7             And do you have some knowledge that the water agency

8   recognizes that those blending studies are of limited utility?

9       A.    I don't recall seeing any statements to that effect

10  by the agency.

11      Q.    Fair to say that you yourself concluded that the

12  blending studies were an unreliable method based on your review

13  of those blending studies?

14      A.    Well, I -- I think there are reasons to -- there are

15  certainly curious aspects to those estimates, and I did comment

16  on those in my report.

17      Q.    Well, you didn't just comment on them.  Wasn't that

18  your second opinion, unreliable estimates of water ratios from

19  constituent analysis?  I'm reading from page 1 of your report,

20  quote, "SCVWA's method of estimating the ratio of SPTF water to

21  imported water based on measured quantities of chloride,

22  sulfate, or other constituents is not sufficiently reliable to

23  assist in interpreting the recorded detections of TCE and PCE."

24            That was one of the two opinions you formed in this

25  case and set out in your report last year; correct?

1    A.    That is correct.  And it's based, among other

2  things, as stated in my report, that the agency would

3  occasionally produce negative estimates based on their formula.

4  And it's -- you know, it raises questions about whether there

5  are implicit assumptions in that formula, namely, that there

6  are just two sources of -- of water coming into the -- to the

7  downstream location.  One of the reasons you might have

8  negative estimates is because there are more than two sources.

9    Q.    Right.

10    But at the time you prepared your report and gave

11  your deposition, you did not have any opinion as to whether

12  there is any other source of water into the distribution

13  system; correct?

14    A.    I -- that is correct.  And --

15    Q.    What you did, sir, was to identify --

16    MR. BLUM:  Objection, Your Honor.  The witness --

17    THE COURT:  The objection is overruled.  He answered

18  the question.

19    MR. RICHARD:  Thank you.

20    THE COURT:  The answer was "That's correct."

21    Q.    (BY MR. RICHARD:)  What you did, Dr. Steffey, in

22  this case was identify what you called some anomalies in the

23  data, and you identified -- one potential explanation is the

24  presence of an additional source of water; right?

25    A.    I -- I would say, yes, that's certainly one possible

1    explanation for these anomalies.

2         Q.    And it wasn't within the scope of your work to

3    evaluate the potential causes of the anomalies in the sampling

4    data you described in your work; correct?

5         A.    That's correct.

6         Q.    And, in fact, you used the phrase in your deposition

7    that you just used here, that you were prepared to believe

8    there are any number of possible explanations for such

9    anomalies or unexpected readings at a turnout; correct?

10        A.    I -- again, I'm -- that's outside my area of

11   expertise in terms of what might be causing these -- these

12   discrepancies.

13        Q.    But at the time you prepared your report and gave

14   your deposition, you were prepared to believe that there were

15   any number of explanations for the anomalies in the data that

16   you saw; correct?

17        A.    I think that's consistent with what I just said.  It

18   wasn't a question that was part of my assignment.

19        Q.    And fair to say it would be outside the area of your

20   expertise to tell us whether the -- after the blending, whether

21   the transmission pipeline is a closed distribution system?

22        A.    I don't have an opinion on that question.

23        Q.    And you don't know whether the system is, in fact,

24   pressurized to some hundreds of pounds per square inch or some

25   other measurement?

```
 1        A.    I don't -- I don't know that.

 2             THE COURT:  Before you move on, there's been

 3   reference now at least twice about a closed distribution

 4   system.  What do you understand -- or what is your

 5   understanding of what that means?  What is a closed

 6   distribution system as you have previously testified?

 7             THE WITNESS:  Well, in -- in the context of this

 8   case, a closed system would be one in which you're drawing

 9   water from two sources and then that water proceeds to multiple

10   downstream locations without any -- without the introduction of

11   water from any other source.

12             THE COURT:  Thank you.

13        Q.    (BY MR. RICHARD:)  Let's talk a little bit about

14   sampling.

15             You would agree that a fundamental concept in your

16   line of work, statistics, is the concept of sampling to learn

17   about a population of interest?

18        A.    That is, you know, a fundamental concept in -- in my

19   work and often applicable in -- in the work I do.

20        Q.    And that typically would entail a sampling plan to

21   address selection of a sample so that it provides useful

22   information about that broader population?

23        A.    Uh, certainly there are -- are occasions when I've

24   been asked to develop sampling plans for clients.

25        Q.    And normally there are at least three main
```

considerations that you begin with when you're asked to do that

beginning with:  What is the question you're trying to address,

correct?

    A.    Yes.

    Q.    And the other key considerations of a sampling plan

are:  How reliable do you want that answer to be and how

variable is the population you're studying; right?

    A.    Correct.

    Q.    And by "population," we're not just talking about

people, but you're referring to any large group of data;

correct?

    A.    Yes.  A population could be a set of people, a set

of other living things or -- or a set of objects of interest.

    Q.    Defective products, for example.  You've worked on

matters involving a large number of defective -- or allegedly

defective products; correct?

    A.    Correct.

    Q.    And for the data obtained from the turnouts

themselves, those five turnouts you talked about, is it fair to

say you did not evaluate the water agency's purpose in

obtaining those samples?

    A.    I did not evaluate the agency's purpose in

collecting those samples.  I -- I was concerned with the data

they had generated from that program.

    Q.    You didn't evaluate the water agency's objectives,

1307

1   though, the way you would if you were conducting a sampling

2   plan or developing a sampling plan yourself; right?

3       A.   Yes.  Correct.  Here -- obviously my assignment here

4   was very different than assignments I've had to develop

5   sampling plans.

6       Q.   Was it within the scope of your work, sir, to -- for

7   the anomalies you identified to evaluate how or whether the

8   water agency investigated those anomalies?

9       A.   Well, I -- I did receive documents, included data

10  and some correspondence from the agency.  And if -- had they

11  done -- I didn't see anything in the documents that I reviewed

12  that reflected an investigation of those unusual measurements.

13      Q.   Let's focus on whatever documents you reviewed at

14  the time of your report and your deposition in this matter.  Is

15  it fair to say that you did not identify, wasn't within the

16  scope of your work to understand whether or how the agency

17  investigated those anomalies?

18      A.   It -- I did not -- I did not -- in my review of the

19  documents, I didn't see any indication -- or any reports of an

20  agency investigation of anomalies.

21      Q.   So was it or was it not part of the scope of the

22  work you did in this case, to investigate or evaluate the water

23  agency's investigation of those same anomalies?

24      A.   It -- if there had been documents that the agency

25  had included that would have been a basis for adjusting or

1    omitting some of the reported values, then I certainly would

2    have considered them.  I didn't find any such amendments to

3    the -- to the monitoring data in the materials that I reviewed

4    and used.

5         Q.    And I'm sorry if my question wasn't clear.  You

6    identified anomalies.  The water agency identified anomalies.

7    An anomaly is something that someone can't explain without

8    further investigation.  Is that fair?

9         A.    Well, I -- I would say -- I think that's a fair

10   characterization.  I would just say I don't know to what extent

11   the agency identified those anomalies or investigated them

12   because I didn't see -- I mean, I had -- what were produced

13   were the reports of the weekly monitoring data.  And -- and

14   whether those values, you know, were -- were consistent and

15   coherent with one another or if they were instances where they

16   were not inconsistent --

17        Q.    Sir --

18        A.    -- or where they were not consistent, I mean, the --

19   the data provided were in the same format.  There was no

20   supplemental documents that followed any unusual sampling

21   events.

22        Q.    Isn't the reason you didn't see such documents is it

23   wasn't within the scope of your work in this case to look for

24   such documents?  You have no idea what the agency did to

25   investigate any of the anomalies.  Isn't that -- it was outside

1   the scope of what you were asked to do.  True or false?

2       A.    I'm not -- I don't think I'd fully subscribe to

3   that.  I was interested in obtaining, you know, all the

4   relevant information that existed about the water quality

5   monitoring that was going on at -- of the system over this

6   period.

7           And certainly, if there were anomalies that prompted

8   investigations and there were -- and those investigations led

9   to qualifications, led to modifications to the data, then I

10  certainly would have expected to see those and they would have

11  been part of my general request for information about the --

12  what was known about the water quality from the monitoring of

13  the system.

14      Q.    So you don't know whether the -- well, let's take a

15  look at your deposition, page 34, lines 12 to 17 on this issue

16  of what was or wasn't within the scope of your work.

17          THE COURT:  You may proceed.

18          MR. RICHARD:  Thank you.

19          *"QUESTION:  For the anomalies you identified,*

20      *was it within the scope of your work to try to*

21      *understand what the water agency, how it*

22      *investigated those anomalies?*

23          *"ANSWER:  No.  Not -- I mean, that wasn't*

24      *something that was part of my scope.  And I wasn't*

25      *led to consider that by my review of the expert*

1    *reports,*" period, close quote.

2        Q.    (BY MR. RICHARD:)   And you, in fact -- you

3    understood that you gave a deposition in this case in

4    October 2020; right, Dr. Steffey?

5        A.    Correct.

6        Q.    And you actually reviewed and made some spelling

7    corrections to your deposition once you were provided a copy;

8    correct?

9        A.    I recall making corrections to the transcript.

10       Q.    Right.

11            And you didn't make any corrections to the five

12   lines I just read; correct?

13       A.    I don't recall.

14       Q.    And so you don't know whether the water agency, in

15   fact, investigated anomalies in, say, 2012; correct?

16       A.    If they did, there was no documentation of that in

17   the materials that I reviewed.

18       Q.    Okay.  Now, with respect to staying on this sample

19   methodology, you didn't actually evaluate the water agency's

20   sampling methodology for how it collected any of the data for

21   any of the turnouts; correct?

22       A.    That's correct.

23       Q.    You don't know how the samples were collected?

24       A.    Not with any precision.

25       Q.    You don't know the volume of the samples, for

1    example?

2        A.    That's true.

3        Q.    And you actually haven't seen the turnouts?

4        A.    I have not.

5        Q.    You haven't seen any photos of the turnouts, at

6    least at the time you did your work in this case?

7        A.    Correct.

8        Q.    And for the work you did, at the time you did it,

9    you believe that the samples were collected -- I think we saw

10   the word "contemporaneous" in one of your charts.  You believe

11   that the samples were collected at the same time; correct?

12       A.    On the same day, certainly.

13       Q.    Well, you don't know whether it was one person going

14   from location to location over the course of many, many hours

15   or whether it was five people simultaneously collecting five

16   samples, do you?

17       A.    No, I don't.

18       Q.    Fair to say you were not looking at the actual

19   sampling procedures at all in this case?

20       A.    No.  I was looking at the data that was obtained and

21   reported by the agency.

22       Q.    And so you're not in this case drawing any

23   conclusions from a small sample, say it was 110 milliliters or

24   a tenth of a liter, you're not drawing any conclusions as to

25   whether or not that sample tells us anything about the

UNITED STATES DISTRICT COURT

1    concentration of any of the water in the system; correct?

2        A.    Well, I -- I'm using it as -- I'm using those data

3    as a -- essentially a snapshot, a weekly snapshot of the

4    system.  And so that -- that's the extent of my use of the

5    data.

6        Q.    So, for example, if there's a detection of 1.5 parts

7    per billion at a particular turnout in the system, you don't

8    know for how long that concentration was present at that

9    turnout; correct?

10       A.    I -- yes.  I think that's true.

11       Q.    And you're not offering an opinion as to what the

12   concentration of PCE for the tens of thousands of gallons of

13   water that passed by that turnout is based on that sample.

14   That's not an analysis you made in this case; correct?

15       A.    The -- correct.  If I understand your question, I'm

16   not developing an estimate of the volume of water that would

17   have been containing that concentration of constituent.

18       Q.    Well, you're not -- you didn't do any calculation or

19   any estimation or any probability analysis of the concentration

20   for any water in the system other than whatever was tested in

21   the small sample; correct?

22       A.    Well, I think that's right.  I mean --

23       Q.    In fact --

24       A.    Yes.  I mean, I -- again, the -- the mission here

25   was to see if -- if the -- if the downstream dots could be

1313

1   connected consistently to the upstream dots.

2       Q.   All right.  In terms of whether -- because you were

3   asked several questions about concentration, almost as though

4   you had an opinion as to what the concentration of

5   contamination was in the distribution system after blending.

6   But that actually wasn't a relevant consideration for the work

7   you did in this case.  You were focused on the data and a small

8   sample and did not attempt to draw conclusions over a broader

9   volume of water; correct?

10              MR. BLUM:  Compound.

11              THE COURT:  Sustained.

12      Q.   (BY MR. RICHARD:)  Is it fair to say that, among the

13  potential explanations for these upstream/downstream

14  differences that you talked about, you did not evaluate the

15  impact of potential hydraulic pressure issues in your analysis?

16      A.   That's correct.

17      Q.   You didn't evaluate at all the physical conditions

18  of the system?

19      A.   Correct.

20      Q.   You don't know whether there are physical blending

21  occurrences that account for differences at each of the five

22  turnouts?

23      A.   Correct.  The -- certainly the estimates of the

24  percent of Saugus water varies from turnout to turnout on any

25  particular day.  But as to why that occurs, I -- that's outside

1314

1    the scope of my work.

2         Q.    Right.

3         And it would also be outside the scope of your work

4    to understand fluctuations in the delivery of the water from

5    either the Saugus perchlorate treatment system or the

6    Castaic Lake source?  You don't know if those rates are

7    constant or variable; correct?

8         A.    That's true.  Yes.

9         Q.    And you don't know the difference between direct

10    blending and the water distribution and indirect blending?

11         A.    Uh, that's not a distinction that I recall

12    encountering in my work.

13         Q.    And you don't know if Mr. Alvord or others at the

14    water agency actually discussed with the regulator, DDW, the

15    difference between direct complete blending and indirect

16    blending; is that fair?

17         A.    I think that's fair.  I mean, the communication I

18    recall was simply that if they were -- I mean, the statement I

19    recall is that if -- if a constituent like TCE, for example,

20    was present at a level of 1.5 at the Saugus facility, as long

21    as the agency kept its blending ratio below one-third, then

22    they expected that the resulting concentration at the -- at the

23    turnouts would be less than .5, which is the detection limit.

24    And so it would be a non-detect.

25         So that's the extent to which I recall

1  correspondence about their -- you know, their reliance on

2  blending but --

3      Q.   Does water quality fluctuate over a short period of

4  time in the water distribution system?

5      A.   Well, the data that was reported suggests that it

6  does.

7      Q.   Well, when I say "short period of time," does the

8  water quality within the system fluctuate over a period of

9  hours?

10     A.   I don't know.

11     Q.   All right.  And so you assume that water samples

12 taken at different points of the water distribution on the same

13 day, quote, "would bear the greatest relationship to one

14 another," close quote.

15          Is that a fair statement?

16     A.   Yes.  Yes.  Certainly recall that what I was working

17 with were weekly data.  And so I certainly felt it was more

18 valid to compare downstream and upstream values measured on the

19 same day rather than a week apart in time.

20     Q.   But doesn't that assumption that -- that those

21 samples would bear the greatest relationship to one another,

22 wouldn't you have to actually understand the effect of

23 blending, whether there was uniform dispersion of contaminants,

24 behavior of various constituents of the water?  Wouldn't you

25 need to know some of those things to know whether your 24-hour

1  period sampling was -- was a valid basis for your assumptions?

2      A.   Well, I think if that -- that information could be

3  helpful.  But it certainly, from the documents I reviewed,

4  including the agency's correspondence, it seemed to me that

5  they were implicitly making the same judgment.

6      Q.   And for the work you did in this case, you talked

7  about visualizing the data, you did not actually make the types

8  of formal inferences in the way a statistician would use the

9  term "formal inferences"; correct?

10      A.   Correct.  In this assignment, those really

11  weren't -- weren't relevant.

12      Q.   So, for example, you're familiar with something

13  called a confidence interval?

14      A.   Well, certainly.

15      Q.   An error bar?

16      A.   Yes.

17      Q.   And those are tools that a statistician uses when

18  you're actually doing a formal inferential analysis where you

19  look at a set of data and you're trying to draw conclusions

20  about a broader set of information; correct?

21      A.   Well, I -- a confidence interval issue, say, your

22  error bars are typically what a statistician would use to

23  convey the reliability of an estimate when the task is to

24  estimate a population characteristic based on sample data that

25  you have.

1          And so that -- that's sometimes part of my

2    assignment but not always, and it wasn't really part of my

3    assignment in this matter.

4          Q.    You would agree that statistical significance for a

5    statistician is linked or depends on sample size?

6          A.    Yes.  I think that's -- that's certainly true.

7    There is a relationship between sample size and statistical

8    significance.

9          Q.    And because you didn't do that kind of analysis in

10   this case and because you're not relying on random sampling to

11   draw conclusions about the data, you're not offering an opinion

12   as to the statistical significance of any differences in

13   testing at the well and testing at the turnouts; correct?

14         A.    Correct.  I think that you would -- you'd have to --

15   the research question would have to be framed in such a way

16   that the notion of statistical significance would make sense.

17         Q.    You were familiar with the concept at the time you

18   gave your deposition -- and probably for many years before

19   that -- that a statistician can be asked to compare two groups

20   of data and determine whether the measured concentration at one

21   location is statistically significantly different from the

22   other; right?  That's something you've done.  You have two sets

23   of data, and you're looking for statistically significant

24   differences?

25         A.    Certainly that's a context that often arises in

1318

1    statistical work.

2         Q.    And in that situation where you actually are

3    providing a statistical analysis, you would agree that the

4    larger the sample size, the more likely you are to find that

5    the difference between the two groups is statistically

6    significant; correct?

7         A.    That is -- that is true.  And that's one of the

8    reasons that you have to also think about physical significance

9    and to make sure that you're not in a position where your

10   sample sizes are so large that you can detect differences that

11   are statistically significant but maybe not -- maybe not

12   physically significant.

13        Q.    Well, sir, you would agree that often the real power

14   of statistics, certainly a lot of the work you do, is to

15   develop those sort of formal inferential analyses based on

16   statistical principles from a sampling protocol; correct?

17        A.    Well, certainly in many assignments, that is the

18   role I'm asked to play.  Not always.  There are certainly

19   assignments I have where I don't calculate confidence intervals

20   because it's not part of the scope of my assignment.

21        Q.    Right.

22              And in this case, it wasn't part of the scope of

23   your assignment; correct?

24        A.    No.  No, here the assignment was really to evaluate

25   the data with a view toward causation because it was my

1  understanding that causation was a question, there were

2  concerns about detections downstream.  And -- and, really, the

3  overall statistical question was to what extent would the data

4  support a sole attribution of causation.

5      Q.    So let's look at -- because you mentioned

6  visualization.  So a lot of what you did was take data and then

7  put -- you created some charts that we looked at earlier?

8      A.    Correct.

9      Q.    And by visualization, you mean you're putting dots

10 on a chart and labeling the chart?

11     A.    Well, doing that but also developing the metrics

12 that are -- are -- that are being expressed and --

13     Q.    Well, let's take a look at what was previously

14 marked today as Exhibit 1450.  This is Figure 2 from your

15 expert report, which is trial Exhibit 1056.

16         Do you have 1450 in front of you?

17     A.    Yes, I do.

18     Q.    Now, with respect to SC-1, we see a number of values

19 above -- well, let's take 5 or 10.  But in looking at the

20 values for SC-1 -- and that's one of the turnouts in this case;

21 is that right?

22     A.    That's correct.

23     Q.    And on this chart, over a period of -- from 2011 to

24 2020, all of the dots at 10 or more occurred in 2012; is that

25 correct?

1320

1    A.    That is correct.  This is -- yeah.  This is -- this

2    is going -- I think probably of the charts and this set of

3    figures, this is the most extreme.  The vertical axis -- I

4    guess the point I would make is the vertical axis here changes

5    from chart to chart.  And this one, because of those really

6    extreme points in 2012 where we were seeing downstream values

7    that were more than 20 times greater in magnitude than what was

8    seen upstream, then the rest of the chart is compressed.

9          So -- but you're right, the value is greater than

10   10, are all occurring, it looks -- by my eye, it looks like

11   they're all occurring in 2012.

12   Q.    You called it the most extreme example for what you

13   were talking about.  That's the most consistent example of

14   readings from the turnouts being higher than what you would

15   have expected; correct?

16   A.    Well, I think it's instances where the -- the

17   downstream values are -- are the greatest in terms of being --

18   well, at the most extreme is 20 times greater.  But even in

19   2015, you know, almost five times greater.  And then there's

20   also -- it's a little hard to see because of the compression of

21   the scale.  But right around the beginning of 2019, there are

22   also some values there that are -- that are greater.  And it's

23   a little hard to -- a little hard to understand how much

24   greater there.  But they could be 50 percent greater.

25   Q.    Let's stick with 2012 for a minute.

1          At the time you prepared your report and developed

2     your opinions in this case, what did you think caused those

3     most extreme examples that show up on your chart here,

4     Exhibit 1450?  Again, focusing on 2012.

5          A.   I don't know.

6          Q.   Did the water agency investigate what caused those

7     most extreme, most consistently high data reports from that

8     turnout, SC-1?

9          A.   I don't know.  If they did, those investigations

10    weren't included in the documents that I reviewed.

11         Q.   So you don't -- even today, you don't know that the

12    water agency investigated and found an abandoned pipe and

13    capped it off in 2012?

14         A.   No.  I don't believe I know that.

15         Q.   So, for example, I'll show you what the parties have

16    stipulated to as a photo in this case.  I think it's

17    Exhibit 537.

18              (Exhibit 537 received into evidence.)

19         Q.   (BY MR. RICHARD:)  You haven't seen this photo of

20    some folks working on -- looks like a big flange with a bunch

21    of bolts.  You've never seen this photo before today?

22         A.   I have not seen this photo before today.

23         Q.   So --

24              MR. RICHARD:  That's fine.  You can take that down.

25              MR. BLUM:  That's okay.

1        Your Honor, we have no objection to showing the

2   jury.

3        MR. RICHARD:  No, I'm done.  I think it was

4   stipulated to.

5        THE COURT:  Yes.  It has been received.

6        MR. RICHARD:  Thank you.

7   Q.   (BY MR. RICHARD:)  And, sir, we've been talking

8   about the work that you've done in this case that did not

9   involve those statistical tools of developing a sampling plan

10  and confidence interval and that type of statistical analysis.

11       Wasn't there another case where a federal judge

12  found that your work was too general and didn't fit the facts

13  of the case?

14       MR. BLUM:  Irrelevant, Your Honor.

15       THE COURT:  I'm going to sustain it on 403 grounds.

16  Q.   (BY MR. RICHARD:)  Did you do work for a company

17  called Electrolux?

18  A.   Yes.

19  Q.   And that was litigation work?

20  A.   Yes, it was.

21  Q.   And just to be clear, for the mathematical work you

22  did in this case, you're not offering the opinion that there

23  were no VOCs in the Saugus well at the time the test data were

24  obtained; correct?

25  A.   That's correct.

1      MR. RICHARD:  I have nothing further, Your Honor.

2      THE COURT:  Mr. Blum.

3      MR. BLUM:  Thank you, Your Honor.

4                    **REDIRECT EXAMINATION**

5   BY MR. BLUM:

6      Q.    Dr. Steffey, when you talked about confidence levels

7   and scope of assignment, what did you mean?

8      A.    Uh, well, the -- if -- what I mean is, um,

9   confidence levels and confidence intervals are the tools -- one

10  of the most common tools that statisticians use to convey the

11  reliability of -- of what I'll call point estimates so that

12  if -- if we're trying to estimate a characteristic of a

13  population and -- rather than just calculating a single value

14  based on a sample, what we -- what we typically like to do is

15  to say, oh, yeah, here's my estimate and then here's an

16  interval that expresses -- that conveys the reliability.  And

17  one of the most common examples is if you do a survey and then

18  you provide a margin of error.

19          And so, you know, you might estimate a percentage

20  that favor a particular candidate and then say, yeah, then the

21  margin of error on this survey was plus or minus 3 percent.

22  And so that's an interval.

23          And typically when you hear reference to a margin of

24  error, it usually refers to what a statistician would call a

25  95 percent confidence interval.

1    Q.   And was that relevant to what you were doing here?

2    A.   No.

3    Q.   Why not?

4    A.   Well, because the task here wasn't really

5    estimation.  The task was really assessing whether -- to what

6    extent the data were supportive of a particular -- of a sole

7    attribution of causation.

8    Q.   Okay.  Now, Mr. Richard talked to you a little bit

9    about 2012 and the numbers that were at times 20 times higher.

10   Do you recall that?

11   A.   Yes.

12   Q.   Now, I want you to assume that an investigation was

13   done by the water agency and they found that the source of the

14   contamination was a lateral that was connected to the system

15   that introduced the PCE.  Is that a closed system?

16   A.   Uh, well, if -- if your system didn't include the

17   lateral, then it wasn't a closed system.

18   Q.   All right.  Last couple of questions.

19        The data that you relied upon, was it solely data

20   that was prepared and generated by the water agency?

21   A.   That's correct.

22   Q.   And was this data that -- that was to some -- to a

23   major extent given to the Department of Drinking Water?

24   A.   That's my understanding, yes.

25   Q.   And the calculations that -- that we talked about in

1   terms of percentages of water based on chloride and sulfates,

2   were those conclusions sent to the Department of Drinking

3   Water?

4        A.   Yes.  That's my understanding.

5        Q.   And in the data you reviewed that was generated by

6   the plaintiff -- let me back up.

7           In your career, you've reviewed a lot of lab data,

8   have you not?

9        A.   Yeah, probably at this stage I have.

10       Q.   And is it your experience that when the lab doubts

11  the accuracy of the data, the lab does something to make sure

12  the reader knows it?

13       MR. RICHARD:  Beyond the scope, Your Honor.  Lacks

14  foundation.

15       THE COURT:  Sustained.

16       Q.   (BY MR. BLUM:)  Did you see anything in the data you

17  reviewed that led you to believe that the agency distrusted the

18  data?

19       A.   No.

20       MR. BLUM:  That's all, Your Honor.

21       THE COURT:  Mr. Richard.

22                  **RECROSS-EXAMINATION**

23  BY MR. RICHARD:

24       Q.   I think you told us, but you're actually not

25  familiar with the water agency's sampling method for the

1    samples collected in this case; correct?

2         A.    No.  Not -- not in any detail.

3         Q.    And you're also not familiar with how they run tests

4    on the data that they do collect from those samples; correct?

5         A.    Uh, no.  Not -- only to the extent that would be

6    reflected in the data reports.

7         Q.    So I am correct?

8         A.    Yes, I believe you're correct.

9         Q.    So, for example, if, when there's an anomaly, the

10   chemist runs a second test if he thinks the anomaly is

11   significant, you're not aware of that methodology for running a

12   test on a -- on another sample taken at the same time; correct?

13             MR. BLUM:  Objection.  Assumes facts not in

14   evidence.

15             THE COURT:  Sustained.

16        Q.    (BY MR. RICHARD:)  Have you heard of something

17   called second sample testing?

18        A.    I have -- I'm familiar certainly with the idea of

19   doing discrete retests.  And I actually have some personal

20   experience with that in other work I've done.

21        Q.    Okay.  And you don't know if that occurred in this

22   case; correct?

23        A.    I didn't see any indications in the data reports

24   that I received.  I didn't see any indications of discrete

25   retests of unusual observations.

```
 1        Q.    Okay.  And do you know anything as to the limit, the

 2   range of accuracy of any of the tests, say, guidance put out by

 3   the U.S. EPA addressing the type of methodology for testing

 4   VOCs?

 5        A.    I don't recall seeing reference to that in the

 6   materials I reviewed.

 7             MR. RICHARD:  Okay.  I have nothing further.  Thank

 8   you.

 9             MR. BLUM:  Nothing further, Your Honor.

10             THE COURT:  You're excused, sir.  Please watch your

11   step going down.

12             THE WITNESS:  Thank you.

13             THE COURT:  And, Mr. Blum, your next witness.

14             MR. BLUM:  Your Honor, the defense would call

15   Michael Alvord.

16             THE COURT:  All right.  Please present him.

17             MR. RICHARD:  He's outside the courtroom,

18   Your Honor.

19             THE COURT:  Let's have him brought in, please.

20             MR. RICHARD:  Sure.  We're fetching him now.  Just

21   wanted to make sure he wasn't in the courtroom.

22             THE COURT:  Very well.

23             THE COURTROOM DEPUTY:  Good morning, sir.  Would you

24   please come forward.

25             Good morning.  Would you please walk around to the
```

**UNITED STATES DISTRICT COURT**

```
 1   witness platform.
 2            Would you, please -- before you sit down, would you
 3   please stop and raise your right hand to be sworn.
 4            Do you solemnly swear that the testimony you shall
 5   give in the cause now before this Court shall be the truth, the
 6   whole truth, and nothing but the truth, so help you God?
 7            THE WITNESS:  I do.
 8            THE COURTROOM DEPUTY:  Thank you.  Please be seated,
 9   sir.
10            Sir, for the record, would you please state your
11   name and then spell your last name.
12            THE WITNESS:  Michael Alvord.  Last name is A-l, v
13   as in Victor, o-r, d as in David.
14            THE COURTROOM DEPUTY:  Thank you, sir.
15            THE COURT:  Mr. Alvord, you may remove your mask.
16   If you would please make sure that you speak into the
17   microphone similarly to how you see me doing.  Thank you.
18            THE WITNESS:  Thank you, Your Honor.
19            THE COURT:  Mr. Blum.
20            MR. BLUM:  Thank you, Your Honor.
21            Your Honor, just for planning purposes, are we going
22   to take the morning break at the same time?
23            THE COURT:  Yes.
24            MR. BLUM:  Thank you, Your Honor.
25   ///
```

1      **MICHAEL ALVORD,**

2      **DEFENDANT'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:**

3      **DIRECT EXAMINATION**

4   BY MR. BLUM:

5      Q.    Mr. Alvord, where are you employed?

6      A.    Santa Clarita Valley Water Agency.

7      Q.    And how long have you been employed there?

8      A.    Since the agency merged three years.  But in total,

9   um, 11.

10      Q.    Now, when you say "merged," what do you mean by

11   that?

12      A.    So in 2018, I think it's Senate Bill 634 brought all

13   the water agencies in Santa Clarita Valley together as one

14   under SCV Water, Santa Clarita Valley Water Agency.

15      Q.    And when you say "all the agencies," what agencies

16   are those?

17      A.    Well, the predecessor, Valencia Water Company, where

18   I was actually at in 1996 through 2010, Newhall County Water

19   District where I was at until 2018, Santa Clarita Water

20   Division, and Castaic Lake Water Agency, all four of those

21   merged into Santa Clarita Valley Water Agency.

22      Q.    Okay.  And now, currently you are the director of

23   operations for the water agency?

24      A.    Director of operations and maintenance.

25      Q.    All right.  And that means you oversee what's called

1    the water quality group?

2        A.    That is one department underneath the operations and

3    maintenance department.

4        Q.    All right.  What is the water quality group?

5        A.    It is a staff of seven, and then there's our

6    laboratory which has another four.

7        Q.    Okay.  And who's the director of the laboratory?

8        A.    We don't have a director of the laboratory.  We have

9    a laboratory manager.

10       Q.    Okay.  Have you ever heard him referred to as the

11   laboratory director?

12       A.    No.

13       Q.    Well, who's the manager of the laboratory?

14       A.    Jeff Koelewyn.

15       Q.    Koelewyn?

16       A.    Yeah.  I'll try to spell it.  K-o-e-l-e-w-y-n, I

17   believe.

18       Q.    And does he also have job responsibilities in terms

19   of regulatory issues?

20       A.    He submits reports.  I don't know if I would

21   classify it as regulatory issues.

22       Q.    And Mr. Koelewyn, do you believe he is a, um -- a

23   good director or manager of the laboratory?

24       A.    Jeff Koelewyn is a great laboratory manager.

25       Q.    He understands the science behind the job he has to

1    do?

2        A.    Yes.  I believe he does.

3        Q.    And he's somebody whose opinion you rely upon;

4    correct?

5        A.    I rely on all my staff for their opinion.

6        Q.    You rely specifically on Mr. Koelewyn's opinions?

7        A.    It depends on what he -- what I'm asking him.

8        Q.    Okay.  Well, what opinions of his would you not rely

9    upon?

10            MR. GEE:  Objection.

11            THE WITNESS:  Whether or not wells should be

12   operating or not.

13            THE COURT:  Hold -- I'm going to sustain the

14   objection, not on argumentive grounds.  But ask him a different

15   question, please.

16       Q.    (BY MR. BLUM:)  Okay.  Now, what are the other

17   groups -- what are the other parts within the water quality

18   group?

19       A.    We have samplers and we have permit writers and we

20   have water quality scientists who do the analysis in our

21   laboratory.

22       Q.    Do you have any toxicologists?

23       A.    No.

24       Q.    Do you have any people that have a background in --

25   let me rephrase it.

1    Do you have what you believe would be experts in the

2  health effects of contaminated water?

3    A.    That is employed with SCV Water?

4    Q.    Yes, sir.

5    A.    Not that I'm aware of.

6    Q.    All right.  Now, you also -- part of your job also

7  deals with operations; correct?

8    A.    Correct.

9    Q.    And what part of operations do you manage?

10    A.    All aspects of bringing water, treating it, and

11  distributing it and bringing it to our customers.

12    Q.    All right.  So, for instance, sources, would that be

13  part of your job?

14    A.    Groundwater supply and treatment.

15    Q.    Okay.  So the different sources that go into the

16  distribution system would be part of your bailiwick; correct?

17    A.    Correct.

18    Q.    Alrighty.

19    The pumping and the moving of water through the

20  system, is that part of your responsibility?

21    A.    It's under my oversight, yes.

22    Q.    Storage of water?

23    A.    Yes.

24    Q.    Okay.  And also safety; correct?

25    A.    Correct.

1333

1      Q.   All right.  And then you also deal with maintenance;

2  correct?

3      A.   Correct.

4      Q.   Do you -- so the maintenance and the -- well, let me

5  back up.

6          Would the integrity of the distribution system be

7  part of your job responsibilities?

8      A.   Can you clarify what you mean by "integrity"?

9      Q.   Whether or not pipes are leaking.

10     A.   Yes.  We repair leaks.

11     Q.   And you also -- is it part of it discovering leaks?

12     A.   Yeah.  We can discover leaks, yes.

13     Q.   Well, now, I'm talking about -- I want to talk about

14  the system -- you know, I'll deal with that later.

15          I want to ask -- first of all, I want to move to

16  something relating to water quality.  That's part of your job;

17  correct?

18     A.   Yes.  The water quality department is under my

19  purview.

20     Q.   And when it's -- if I say "water quality," what does

21  "water quality" mean to you?

22     A.   There's a variety of things.  Um, sampling, um,

23  making sure that we have appropriate disinfectant residual,

24  making sure we're complying with whatever regulations are in

25  place, treatment of water.  Water quality is a pretty big

1   umbrella, if you will.

2        Q.    Now, are you familiar with the term "MCL"?

3        A.    Yes.

4        Q.    What is an MCL?

5        A.    It's a maximum contaminant level.

6        Q.    And does it have a regulatory meaning?

7        A.    It has several, yes.

8        Q.    Are you aware that the MCLs were created by what's

9   called the federal Safe Drinking Water Act?

10       A.    Correct.  And there's more to it than that.  It's --

11  Division of Drinking Water has Title 22 in California.

12       Q.    What's Title 22?

13       A.    So the Safe Drinking Water Act is a federal act that

14  regulates water, and then the states can either adopt that or

15  draft their own and make the water quality regulations more

16  stringent.  They can't make them less.  So Title 22 is

17  California's Safe Drinking Water Act.

18       Q.    And is there presently an MCL for TCE and PCE?

19       A.    Yes.

20       Q.    And is that .5 parts per billion?

21       A.    No.

22       Q.    What is it?

23       A.    So it depends.  If it's part of an impaired water

24  supply, such as the Saugus formation, the MCL is different and

25  it's calculated based on a maximum contaminant level equivalent

 1    than it would be if it was just a solitary source.

 2         Q.    Well, does the State of California in terms of

 3    regulations use an MCL or an MCL equivalent?

 4         A.    If it's an impaired source, they use a combination.

 5         Q.    Now, the MCL equivalent, is that in a regulation

 6    that's -- that's been published by the State of California?

 7         A.    In 1975, there was the 97-005 memo that DDW put out.

 8    Back then, it was California Department of Public Health.

 9    Actually, it was Department of Health Services.  Then it became

10    Department of Public Health, and they released a draft

11    guidance.  It was either in 2013 --

12              THE COURT:  A little slower, please.

13              THE WITNESS:  I'm sorry.

14              -- 2013 or 2015, and then they issued the policy

15    guide 97-005 in, um -- I believe it was August of 2020.

16         Q.    (BY MR. BLUM:)  All right.  Now, is that -- that's a

17    policy statement by the DDW.  That hasn't been put into a

18    regulation that's been adopted by the State, has it?

19              MR. GEE:  Objection.  Calls for a legal conclusion.

20              THE COURT:  Sustained.

21         Q.    (BY MR. BLUM:)  Do you know what the California Code

22    of Regulations is?

23         A.    Yes.  Title 22 is part of the California Code of

24    Regulations.

25         Q.    All right.  And that has -- is there anywhere that

1    you know of where an MCL equivalent is included in any of the

2    regulations that you have to follow as the director of water

3    quality?

4        A.    Well, I'm the director of operation maintenance, but

5    thank you.

6            Um, the 97-005 policy that was passed in 2020, we

7    also have to comply with, but I'm not aware that any such

8    language is written in Title 22.

9        Q.    All right.  Now, let's deal with -- let's deal just

10   with -- now, is an MCL the same as an MCL equivalent?

11       A.    No.

12       Q.    Let's deal with the MCLs only.  What is the MCL

13   for -- in the state for PCE or TCE?

14       A.    For a non-impaired source, it's 5 parts per billion.

15       Q.    Okay.  Now, does the MCL that's within the

16   California regulations discuss or state that this is the MCL

17   for a non-impaired source?

18       A.    Specifically in Title 22?

19       Q.    Correct.

20       A.    I don't believe the language is in there.

21       Q.    Under the federal MCL, is there any mention of MCL

22   equivalence?

23       A.    Not that I'm aware of.

24       Q.    All right.  So just what's in the regulations for

25   MCLs, what is the MCL in the State of California for PCE?

1337

1    A.    5 parts per billion or micrograms per liter.

2    Q.    All right.  How about for TCE?

3    A.    It would be the same.

4    Q.    And the federal has -- is the same numbers; correct?

5    A.    That is correct.

6    Q.    All right.  Isn't it correct that in determining

7    whether or not to send water to the customers, you use the MCL;

8    and in terms of the agency, if it's below the MCL, it's okay to

9    send to the customer?

10   A.    Not in impaired sources.  But in other wells, we

11   would use that.

12   Q.    Okay.  Do you -- now, you recall being deposed in

13   this case; correct?

14   A.    Four times.

15   Q.    Okay.  And three -- three of the four times you were

16   testifying not individually but as a corporate -- as a

17   representative for the water agency; correct?

18   A.    Person most knowledgeable.  Right?

19   Q.    Yeah.

20         And when you were testifying as -- what you call the

21   person most knowledgeable, your understanding was you were

22   required to basically amass all of the information that the

23   water agency had; correct?

24   A.    I did the best I could.  And I think as our

25   depositions progressed, I gained more information, just like I

1   have more information now.  I just -- I keep gaining

2   information.

3            MR. BLUM:  Okay.  All right.  Let me have a moment,

4   Your Honor.

5            THE COURT:  Yes.

6            And counsel will not be able to use a deposition,

7   generally speaking, unless I have it.  But please proceed.

8            THE WITNESS:  May I?

9            THE COURT:  Yes, you may.

10       Q.    (BY MR. BLUM:)  Sir, I want to talk about another

11   term, "operational" -- "operational goal."  What's an

12   operational goal as it relates to the water agency being able

13   to serve water that comes from Saugus -- well, Saugus 1 or

14   Saugus 2?

15       A.    So we have something referred to as the SPTF, Saugus

16   Perchlorate Treatment Facility.  And that has an amended water

17   supply permit to require treatment for perchlorate.  And in it,

18   it says there's an operational goal of non-detect for VOCs,

19   volatile organic compounds.

20       Q.    All right.  Now, is an operational goal the same as

21   a permit requirement?

22       A.    It's a permit condition in that specific permit.

23       Q.    Well, is it different than a requirement?

24       A.    I guess it's a requirement.  I guess you would call

25   it that, condition.  We have to comply with the conditions of

1  the permit.

2      Q.    Well, for instance, if water is above an operational

3  goal, does that mean you can't serve the water?

4      A.    It means we are out of compliance with our permit.

5      Q.    That wasn't my question, Mr. Alvord.  My question

6  was:  If the water is above an operational goal, does that mean

7  the permit says you cannot serve the water?

8      A.    Division of Drinking Water has told us they do not

9  approve of us not in compliance with our operational goal.

10     Q.    That's not, again, my question.  Let me ask it

11  again.

12          If the water is above the operational goal, does

13  that mean you, as the water agency, are prohibited from serving

14  that water?

15          THE COURT:  Please clarify your question.  What does

16  it mean to be prohibited to serve the water?

17     Q.    (BY MR. BLUM:)  Does the permit say the water cannot

18  be delivered to the customers?

19     A.    It states we must meet the operational goal of

20  non-detect.

21     Q.    Well, isn't it clear that at least in 10 percent of

22  the time, the water that is delivered to your customers

23  contains VOCs?

24     A.    Coming out of that plant, I would say 10 percent is

25  probably the number.

1    Q.    All right.  So 10 percent of the time the water

2    doesn't meet the operational goal; correct?

3    A.    10 percent of the time we're serving VOCs.

4    Q.    And not meeting what you said is the operational

5    goal; correct?

6    A.    Correct.

7    Q.    Now, by doing that, is the agency in violation of

8    the permit?

9    A.    In conversations that I've had with staff at

10   Division of Drinking Water, they are not happy with us dealing

11   with that and they've talked about the possibility of issuing a

12   compliance order.

13   Q.    And have they ever done that?

14   A.    Not as of yet.

15   Q.    Has the agency made any attempt not to serve water

16   coming out of the Saugus treatment plant and going to its --

17   the distribution of the customers that contains VOCs?

18   A.    We do not want to serve our customers VOCs.  We do

19   whatever we can to comply with that permit.

20   Q.    Has -- can you point to any occasion when the agency

21   has refused to serve water or taken steps not to produce water

22   to -- in the distribution system from S-1 or S-2 because it

23   didn't meet an operational goal?

24   A.    We operated and we try to be in compliance with that

25   permit.

1    Q.    Well, what -- when you get a reading at a turnout

2  that has -- shows VOCs in it, in your opinion, that doesn't

3  meet an operational goal, does it?

4    A.    That's not my opinion.  That is what it says in the

5  permit.

6    Q.    But that water is still served or sent to be

7  distributed to homeowners; correct?

8    A.    We're required to notify DDW and we still serve that

9  water, correct.

10    Q.    Well, does the agency do anything to send

11  information to the users of that water, say, hey, wait a

12  minute, this water is dangerous?

13    A.    Every year we submit a -- what used to be called

14  water quality report.  It is now called a consumer confidence

15  report.  And in that, we have to report all of the detections

16  of any contaminant, including VOCs.  And then there's health

17  effects language in there that says it's a potential

18  carcinogen.  So yes, we do notify our customers.

19    Q.    Don't those reports also state that the water meets

20  all state and federal regulations and guidelines -- sorry --

21  regulations and laws?

22    A.    It states that it meets MCLs when we meet them and

23  it states when we don't.

24    Q.    And is the -- the water coming from the Saugus

25  treatment plant, has -- has it ever been -- well, has it ever

1    been above the MCLs?

2         A.    For?

3         Q.    VOCs.

4         A.    For TCE, the highest was 4.2.  So it's just under

5    but close to the MCL.  But again, it's an impaired source, so

6    it is treated differently.

7         Q.    Okay.  Now --

8               MR. BLUM:  If we can put up Exhibit 1449, please.

9         Q.    (BY MR. BLUM:)  I want to talk about the system

10   before we get any further.

11              Now, the water originally from Saugus 1 and

12   Saugus 2, it's tested at the -- there's tests done for the

13   water that is coming from the actual wells; correct?

14        A.    This picture is not correct.  The Saugus 1 -- that's

15   not Saugus Wells 1 or 2.  Maybe it's --

16        Q.    It's just demonstrative.

17        A.    All right.  Correct.

18        Q.    What was found on Google.

19        A.    Yes.  We do sample our water at each source prior to

20   treatment.

21        Q.    All right.  That water is then pumped to the SPTF --

22   correct? -- or the -- SPTP?

23        A.    It's SPTF.  But yes, the Saugus Perchlorate

24   Treatment Facility.  You can call it a plant.

25        Q.    Okay.  And it's tested, I think, at least in two to

1343

1     three different locations; correct?

2          A.    Yes.

3          Q.    But one of the locations is when the water gets to

4     what's called the effluent tank; correct?

5          A.    Yes.

6          Q.    And that -- and the effluent tank is the spot that

7     is -- where the water is collected right before it's put into

8     the distribution system; correct?

9          A.    It's collected for perchlorate, VOCs, and others on

10    a weekly basis.

11         Q.    All right.  And it's tested; correct?

12         A.    Correct.

13         Q.    All right.  Now, the tests that are done, that's

14    done by Mr. Koelewyn in the laboratory; correct?

15         A.    The analysis is run in his lab.

16         Q.    Do you trust those numbers?

17         A.    Yes.  I mean, we have an accredited laboratory.  But

18    labs make errors.  So for the most part, when they come out, we

19    look at the QA/QC.  And if he issues a report, then we accept

20    that.

21         Q.    You trust Mr. Koelewyn to know when those numbers

22    can be trusted and when they can't?

23         A.    His staff keeps track of all the quality

24    control/quality assurance required for every single sample.

25         Q.    Do you trust the accuracy of the numbers and that

1  you will be told when the numbers are not reliable?

2       A.   When there's something that is an anomaly or looks

3  out of -- or looks suspect, we do look into it, yes.

4       Q.   Okay.  And the reason you know about it is because

5  you're told that by the laboratory; correct?

6       A.   Yes.

7       Q.   When you say it's accredited, what does that mean?

8       A.   There's something called ELAP, Environmental

9  Laboratory Accreditation Program.  And you have to go through a

10  number of testing and audits to make sure that you're operating

11  the lab in accordance with the methods that you say you're

12  going to -- you're going to use.  Because each contaminant has

13  different methods that you have to run.

14       Q.   Okay.  It's called an ELP program?

15       A.   ELAP, E-L-A-P.

16       Q.   And is that federal or state?

17       A.   State.

18       Q.   Are you accredited by the EPA?

19       A.   It's California EPA.

20       Q.   Okay.  Now, just to be sure, California EPA is a

21  state agency; correct?

22       A.   Correct.

23       Q.   All right.  And then EPA is the feds; correct?

24       A.   Correct.

25       Q.   All right.  Now, after it's tested at the effluent

1345

1    tank -- and I've circled where the effluent would be tested,

2    the last spot at the plant; correct?

3         A.    Yes.

4         Q.    It's then put into a distribution system; correct?

5         A.    It's put into a transmission pipeline.

6         Q.    Okay.  And after it's put in, is it then mixed with

7    water coming from another source?

8         A.    So it goes through what's called indirect blending

9    with another source.

10         Q.    Okay.  And what's that source?

11         A.    It's -- it's either one or both of our surface water

12    treatment plants.

13         Q.    All right.  And what is the source of the water from

14    the surface water treatment plants?

15         A.    The State Water Project.

16         Q.    Okay.

17         A.    Which originates in, I think, Lake Oroville.

18         Q.    And it's your understanding that the water that

19    comes from the State Water program has no VOCs in it; correct?

20         A.    Correct.  We test that water for VOCs, among other

21    things.

22         Q.    All right.  So clean water is mixed with water from

23    the perchlorate treatment plant that may have VOCs in it;

24    correct?

25         A.    Non-VOC water is indirectly blended with water that

**UNITED STATES DISTRICT COURT**

1  has VOCs in it, correct.

2       Q.    Now, when the two pipes merge and the water from the

3  plant is sent into the same pipes with the water from

4  Castaic Lake, that creates what's called turbulence; correct?

5       A.    Well, water enters pipes, sure.  If two -- two

6  sources are entering pipe, I guess you would get some

7  turbulence.  It depends.  It depends on the direction of the

8  flow.  There's a lot of hydraulic dynamics that happens when

9  water is put into --

10      Q.    Well, doesn't that process cause mixing?

11      A.    Indirectly.

12      Q.    But whether it's indirect or not, it causes the

13  water from the two sources to mix together; correct?

14      A.    There's a big difference between indirect blending

15  and direct blending.

16      Q.    That wasn't my question, though.

17      A.    I could not tell you how well it is mixing in that

18  pipe.

19      Q.    But it does cause mixing; correct?

20      A.    It can, it should, but it doesn't always.

21      Q.    Well, isn't the intent of it for it to mix?

22      A.    That's what the permit has allowed for.

23      Q.    Okay.  And the intent of having the two different

24  water sources combined is that they mix and blend together;

25  correct?

1    A.    And unfortunately, at times it doesn't.

2    Q.    All right.  But the permit requires you to blend

3  those two water sources; correct?

4    A.    The permit allows for blending.

5    Q.    Well, doesn't it require blending?

6    A.    It requires non-detect for VOCs, but it allows

7  blending as -- as an option.  Treatment would be the best

8  option.

9    Q.    All right.  Well, the water agency for how long has

10  used blending as the option?

11    A.    This permit, I think, went into effect in 2011,

12  2010.

13    Q.    Okay.  And --

14    A.    So ten years, roughly.

15    Q.    All right.  And when the permit went into effect,

16  did the water agency believe that the blending would be enough

17  to cause non-detect at the turnouts?

18    A.    We were trying to comply with that permit condition,

19  but we also received a letter from DDW in 2011 that they

20  weren't satisfied with the way the blending was operating

21  because there were detections.

22    Q.    Well, and in the ten years since you received that

23  letter, you're still blending; right?

24    A.    We're still trying to comply with this permit.

25    Q.    And in those ten years, has the water agency ever

1    sent you a letter that said you can't use the water anymore

2    because you're getting detections at the turnouts?

3         A.    You meant DDW sent us a letter.

4         Q.    Yes.  DDW.

5         A.    They sent the 2011 letter.  I'm not aware of another

6    letter.

7         Q.    Has EPA said, hey, you've got a problem here, stop

8    serving the water?

9         A.    Federal EPA?

10        Q.    Yes.

11        A.    That's not under their purview.

12        Q.    Well, has any agency in the world sent you a letter

13   that says that the water you are serving shouldn't be served

14   because it creates a health risk?

15        A.    That 2011 letter was the only one I'm aware of.

16        Q.    Okay.

17              THE COURT:  We're going to break at this point.

18              Ladies and gentlemen, it's now 10:30.  We'll break

19   until 10:45.

20              Please remember, do not speak to anyone about the

21   case, the people, or the subject matter involved.  Continue to

22   keep an open mind.

23              We'll see you at 10:45.

24              THE COURTROOM DEPUTY:  All rise for the jury,

25   please.

1    (Out of the presence of the jury:)

2    THE COURT:  We're in recess until 10:45.  Thank you.

3    (Break taken.)

4    (Out of the presence of the jury:)

5    THE COURT:  We are on the record in the trial

6    matter.

7    Mr. Richard.

8    MR. RICHARD:  Thank you, Your Honor.

9    THE COURT:  And we're outside the presence of the

10   jury.  Yes.

11   MR. RICHARD:  I found the exhibit.  I was looking at

12   the wrong one this morning.  This 1438 exhibit that defendant

13   would like to show Mr. Alvord --

14   THE COURT:  I believe I indicated that the Court was

15   not allowing that since it wasn't presented to the Court.

16   There were two exhibits.  And I did look at the chart and spent

17   the time looking at the chart and the information.

18   MR. BLUM:  Your Honor --

19   THE COURT:  And I was not, I believe, given 1438 or

20   1441.

21   MR. BLUM:  The objections we received were after we

22   submitted the material to the Court, Your Honor.

23   THE COURT:  I still don't have the documents.  And

24   so what would be helpful is when you -- when you provide the

25   Court with the chart, even if that happens, to give me a PDF of

UNITED STATES DISTRICT COURT

```
 1    the document.  Otherwise, I'm simply not in a position in the
 2    abstract to make a ruling.
 3              MR. BLUM:  I agree, Your Honor.  I'm not -- I'm not
 4    disputing that.
 5              THE COURT:  And so the Court is going to stand on
 6    what it's indicated.
 7              I'm going to take this up -- I'm not going to get
 8    involved in the jury's time at this point.
 9              MR. BLUM:  Sure.  That's fine.
10              THE COURT:  That's what -- that's what counsel, all
11    counsel have to do.  We have a process in place.  It imposes
12    upon the Court to make sure that I'm doing my job to give you
13    the best informed judgments that I can.  It requires counsel to
14    make sure that I can do that.
15              MR. BLUM:  Yes, sir.
16              THE COURT:  And that will apply to both sides, not
17    just to you, Mr. Blum.
18              MR. BLUM:  Your Honor, I'm not arguing with the
19    Court.
20              THE COURT:  No, I know.  I appreciate your
21    professionalism in response.
22              (In the presence of the jury:)
23              THE COURT:  And please be seated, everyone.
24              We remain on the record now in the presence of the
25    jury.  And we have Mr. Alvord who is still on the stand.
```

1        And you understand, sir, that you remain under oath?

2        THE WITNESS:  I do.

3        THE COURT:  And you may continue with your

4   examination, Mr. Blum, when you're ready.

5        MR. BLUM:  Excuse me.

6    Q.   (BY MR. BLUM:)  Mr. Alvord, if water from any of the

7   wells that the agency operates meets the MCL for TCE or PCE, it

8   would be okay to send into the distribution system; isn't that

9   correct?

10   A.   If it's not an impaired source.

11        MR. BLUM:  Okay.  Your Honor, I'd refer the Court to

12   Mr. Alvord's deposition on December 5th, 2019, page 5 -- I'm

13   sorry.  Page 31, lines 5 through 8, and 31:19 through 32:9.

14        THE COURT:  All right.  You may proceed.

15        MR. BLUM:  Page 31, lines 5 through 8.

16        "QUESTION:  If it met the -- if it met the

17     MCLs for TCE or PCE, it would be okay to send into

18     the distribution system; is that correct?

19        "ANSWER:  Yes."

20        MR. BLUM:  Now, moving to line 19 on the same page

21   through line 9 on page 32.

22        THE COURT:  You may proceed, Mr. Blum.

23        MR. BLUM:  Starting line 19 through the end.

24        "All right.  The -- the water is -- that comes

25     from the production wells, okay, is that water tested

1    *before it goes into the distribution system?*

2            "ANSWER:  Yes.

3            "QUESTION:  Okay.  And what -- and what is

4    *that -- what tests are run on the water?  Same*

5    *Title 22?*

6            ANSWER:  Correct."

7            And go to the next page, 1 through 8.

8            "*And if the water from the production wells*

9    *meets the MCL for any of the Title 22 constituents,*

10   *it's then considered fine to put into the*

11   *distribution system?*

12           "ANSWER:  Yes.

13           "QUESTION:  And that's true for both water

14   *from the alluvial formation or the Saugus formation;*

15   *is that correct?"*

16           And I'll represent the answer was:  Yes.

17       Q.   (BY MR. BLUM:)  You remember testifying under oath

18   on December 5th, 2019?

19       A.   That was my first deposition.  I remember it, and I

20   know a lot more now than I did then.

21       Q.   All right.  But at the time, you took the same oath

22   that you took in this courtroom; correct?

23       A.   Absolutely.

24       Q.   And at the time, you told the truth as you

25   understood it; correct?

1    A.    And in this specific context.

2    Q.    You told the truth as you understood it; correct?

3    A.    In this specific context, yes.

4    Q.    At the time you gave this deposition, you were aware

5    that the aquifer had been deemed an -- what's the term?

6    A.    Impaired source.

7    Q.    Impaired source?

8    A.    Extremely impaired source.

9    Q.    That's information you had when you answered that

10   question; right?

11   A.    Yes.  I knew the Saugus formation was an extremely

12   impaired source.

13   Q.    Okay.  All right.  Now, if we go to -- I want to go

14   to just generally issues with the water that you -- that is

15   served.

16         Isn't it correct that the water -- the water agency

17   has issues in which it's had to close wells because of

18   magnesium in the well?

19   A.    There's a specific well, I think it's Castaic 2,

20   that we have a manganese issue.

21   Q.    Is that NC-10, actually?

22   A.    NC-10 also has a manganese issue, but NC-10 is not

23   in operation and hasn't been for years.

24   Q.    It was closed down because of high levels of

25   manganese; correct?

1    A.    So when I spoke with the former general manager of

2   Newhall County Water District, we discussed the operation of

3   NC-10.  And since it's relatively close to the

4   Whittaker-Bermite property and since there's been detections in

5   NC-13 of perchlorate and the fact that it had high levels of

6   manganese, they decided to shut the well down to prevent

7   further plume migration of the perchlorate but also because it

8   had manganese.  So it wasn't necessarily needed.

9    Q.    Well, isn't it correct, sir, that your testimony was

10   that it was shut down because of high levels of manganese?

11    A.    I think if I remember correctly, when I spoke with

12   Steve Cole who was the general manager there, that was the main

13   reason, but it also had to do with plume migration from the

14   Whittaker property.  So I may have only stated manganese in my

15   deposition.  But again, as I mentioned earlier this morning,

16   that my knowledge has increased tremendously since my first

17   deposition on December 5th.

18    Q.    Okay.  And there's also a problem in the wells with

19   something called PFAS or PFOAs; correct?

20    A.    PFAS.

21    Q.    PFAS?

22    A.    But which wells --

23    Q.    I'm talking just in general.

24    A.    In general, yes.

25    Q.    And PFAS, had they caused the agency to shut down

 1   any wells?

 2       A.   We voluntarily shut down wells that have

 3   contamination of PFAS in them.

 4       Q.   Doesn't -- haven't you found in Saugus 1 and

 5   Saugus 2 low levels of PFAS?

 6       A.   I don't recall offhand.  But if they're low levels,

 7   they're well below the notification level.

 8       Q.   All right.  If we can go, again, to the deposition

 9   on 12/5/19, page 100, lines 16 through 23.

10           MR. GEE:  Yeah.  We're fine with that.

11           THE COURT:  You may proceed.

12           MR. BLUM:  "*QUESTION.  Okay.  Have you found*

13       *them in S-1, Saugus 1?*"  It's referring to PFAS.

14           "*ANSWER:  We found very low levels in one*

15       *of those two wells.  I don't remember offhand.*

16           "*QUESTION:  And when you say very low*

17       *levels, what --*

18           "*ANSWER:  They're above the method*

19       *detection -- method reporting limits of 2 parts*

20       *per trillion, somewhere around less than 3-ish.*"

21       Q.   (BY MR. BLUM:)  Is that your understanding?

22       A.   Yes.  And that's consistent with what I just

23   testified.

24       Q.   When you say 3-ish, what are you saying?

25       A.   So the detect -- the method limit for reporting is

1    2 parts per trillion or nanograms per liter.  The notification

2    level is 5 parts per trillion or nanograms per liter.  So 3-ish

3    would be somewhere around 3.2, 3.1-ish.

4         Q.   Now, Mr. Alvord, isn't it correct that one of the

5    recognized treatments for PFAS is granulated -- what's called

6    GAC, granulated activated charcoal?

7         A.   Yes.

8         Q.   That's the remedy that you're asking to be installed

9    for the VOCs; correct?

10        A.   That's a treatment method that can be used to remove

11   VOCs.

12        Q.   Is it just a coincidence that the method that you

13   were asking the Court to impose for the treatment of VOCs below

14   the MCLs also solves your PFAS problem?

15        A.   So the Saugus 1 and 2 are not impacted by PFAS.

16        Q.   Well, they have PFAS in it; correct?

17        A.   Below the notification level.

18        Q.   Is it a coincidence that the remedy you're asking

19   for deals with your PFAS problem?

20        A.   Coincidence?  It's technology; right?  There's

21   treatment technologies to remove contaminants.  It happens to

22   be that granular activated carbon removes both VOCs and it also

23   does remove PFAS chemicals.

24        Q.   All right.  Now, in terms of the system that you

25   have for -- and sources of water, what's banked water?

1     A.    You're getting a little bit out of my knowledge

2  base.  This is water resources.  But it's -- the general

3  understanding that I have of banked water is where you take

4  excess state import water and you bank it in an aquifer in

5  Central California for withdrawal later when you need it.

6     Q.    And it's water that can be withdrawn at the request

7  of the water agency; correct?

8          MR. GEE:  Objection.  Foundation.

9          THE COURT:  Sustained.

10     Q.    (BY MR. BLUM:)  Well, you're -- you were -- when you

11  testified in your deposition, do you recall whether or not you

12  were aware that there was contracts that the agency had for

13  banked water?

14     A.    If I recall my deposition, I said that we have

15  multiple sources of supply.  We have local groundwater, the

16  alluvium in the Saugus, we have state imported water, and we

17  also have banked water contracts.

18     Q.    Can we see Exhibit 88, please.

19     A.    And recycled water.

20     Q.    What is Exhibit 88?

21     A.    You're asking me this --

22     Q.    Yes.

23     A.    Oh, yeah.  This is the Santa Clarita Valley Water

24  report.  It's not a water quality report.  It's an annual

25  report that we put out that discusses the sources of supply and

1358

1   just general aspects of our system.

2       Q.   Okay.  And sources of supply, I think you testified,

3   come within the bailiwick of your job as head of operations;

4   correct?

5       A.   Well, if I -- if I gave that impression, sources of

6   supply meaning once it's treated at our surface water treatment

7   plants and pumping it out of the ground, those are the two

8   sources that I deal with that bring it into the distribution

9   system to serve to the customers.

10           I'm not involved with bringing water through the

11  State Water Project through our banking project.  That is our

12  water resources department.

13           MR. BLUM:  Can you put up page 79, please.

14      Q.   (BY MR. BLUM:)  Now, if you look at page 79, are you

15  aware as part of your job about the different sources of water

16  that goes into the distribution system that you have to deal

17  with?

18      A.   Yes.  In general, we have local groundwater, as I

19  mentioned, and then the imported supply, which is made up of

20  State Water Project and our bank sources.

21      Q.   All right.  Well, doesn't -- if you can -- hold on,

22  please.

23           MR. BLUM:  I'm sorry, Your Honor.  I had the wrong

24  file open.

25      Q.   (BY MR. BLUM:)  All right.  Now, if we look at this,

1  do you have any reason to believe that the information

2  contained in here isn't true?

3      A.    No.

4      Q.    In fact, you would assume it's correct because it's

5  something that the agency allows to be distributed to the

6  public; correct?

7      A.    Correct.

8      Q.    And if you take a look for 2019, when it says

9  80,000 acre-feet, that was the total demand that was projected

10  for 2019; correct?

11     A.    That's what it says there.

12     Q.    All right.  And of that, there was -- local

13  groundwater was able to produce 88,000 acre-feet; correct?

14     A.    Local groundwater?  No.  40,000.

15     Q.    Okay.  What does it mean by "acre-feet"?

16     A.    So it's one acre of land -- there's 325,859 gallons

17  in one acre of land, one foot deep.  So if you have one acre of

18  land, one foot deep, you can put that many gallons and that's

19  considered one acre foot of water.

20     Q.    Okay.  And that's just the way water is measured?

21     A.    Otherwise, you'd have a lot more zeros on this page.

22     Q.    All right.  And there was -- there was access or was

23  there actually the imported water?  Was it fully set into the

24  system?

25            MR. GEE:  Objection.  Lacks foundation.

1           THE COURT:  Sustained.

2      Q.    (BY MR. BLUM:)  Okay.  And there was also several --

3  a lot of imported water that was available; correct?

4           MR. GEE:  Same objection.

5           THE COURT:  Sustained.

6           Establish a foundation first, please.

7      Q.    (BY MR. BLUM:)  All right.  Are you aware whether or

8  not the allocation from the State Water Project for what --

9  what it is for this year, whether it's your full allocation or

10  a percentage?

11     A.    My understanding, this year it's zero.

12     Q.    Now, that would be for 2020; correct?

13     A.    No.  2021.  I don't know what the allocation is for

14  this calendar year.

15     Q.    Isn't it true, sir, that what the initial allocation

16  is can change as the years -- as the year progresses?

17           MR. GEE:  Objection.  Foundation.

18     Q.    (BY MR. BLUM:)  Do you know?

19     A.    Yes.  It can -- it can increase or decrease

20  depending on the weather.

21     Q.    For instance, if you go to Footnote 4 on this page,

22  it shows that in 2019, it started at 10 percent.  And by March,

23  it was up to 75 percent; correct?

24     A.    It says 70 percent.  But yes, that's what it says on

25  this page.

1     Q.    So the 5 percent that we -- that you believe the

2  year is going to start out with doesn't necessarily mean -- or

3  the zero that the year will start out doesn't necessarily mean

4  that's what it ends with at the end of the year; correct?

5     A.    I think only God knows that if it's going to snow.

6     Q.    All right.  Now, when -- I'm going to go to a

7  totally separate subject and back to Exhibit 1449.

8           Is it correct, sir, that in terms of determining

9  whether or not the Saugus -- the water coming from S-1 and S-2

10  that's distributed to the customers eventually meets the DDW

11  requirements, the key determination is what the readings are at

12  the turnouts?

13     A.    It's beyond that.  It's -- you have to have no

14  detection of perchlorate coming from the Saugus Perchlorate

15  Treatment Facility.  And then at our turnout sampling

16  locations, which there are five of them, our permit condition

17  No. 20 says we have to have non-detect for VOCs.

18     Q.    All right.  But when they determine whether

19  there's -- it's below the MCLs and when it's -- when any

20  determination is made as an operational goal, what the DDW

21  wants to know is what the reading is at the turnout; correct?

22     A.    For VOCs.

23     Q.    Right.  Correct.  For VOCs?

24     A.    Correct.

25     Q.    So if there's VOCs at another sampling point prior

1  to the turnouts, that's not the criteria that DDW uses;

2  correct?

3       A.    For this specific permit, we have the sample

4  locations at the Saugus Perchlorate Treatment Facility, which

5  we test for VOCs, perchlorate, a bunch of other things, and

6  then we're also required to sample five turnout locations for

7  VOCs.

8       Q.    And the sampling results at those turnouts is what

9  is used to determine compliance; correct?

10      A.    Compliance with our operational goal of non-detect,

11 correct.

12      Q.    And compliance with certain water below the MCLs;

13 correct?

14      A.    It doesn't state anything about the MCL at the

15 sample locations in our permit.

16      Q.    Okay.  But when you -- so what does the water agency

17 look to as -- to determine whether or not it's in compliance

18 with the MCL requirement?  What test or what testing location?

19      A.    So, again, since this is an extremely impaired

20 source, there's different criteria.  So we have to follow what

21 the permit says.  We don't follow necessarily what Title 22

22 says.

23            The permit says we have to have non-detect for

24 perchlorate at the effluent of the treatment plant and we have

25 to have non-detect at the turnouts for VOCs.  And so that

**UNITED STATES DISTRICT COURT**

1  information, then we provide that to Division of Drinking Water

2  every month.

3      Q.    Right.

4           But when you're looking -- I just want to talk about

5  MCLs.  Okay?  Not MCL equivalent.  We're going to talk about

6  MCLs.  Okay?  Are you with me, sir?

7      A.    Yeah.

8      Q.    Okay.  For determination as to whether or not

9  something -- the water is below an MCL, what is the point that

10  you test to determine whether or not the water is below an MCL?

11           MR. GEE:  Objection.  Asked and answered.

12           THE COURT:  It has been.  We've gone around this

13  many times.

14      Q.    (BY MR. BLUM:)  All right.  So -- by the way, is

15  the -- never mind.

16           Let's go back to the extremely impaired source

17  issues.  That's pursuant to a guidance document that was

18  created by the Department of Drinking Water called Rule 97-005?

19      A.    So 97-005 is their guidance memo that you use to

20  create your permit application documentation when you're

21  applying for an amended permit.

22      Q.    Now, what is an MCL equivalent?

23      A.    So under the 97-005 guidance document, there's a

24  section, among other sections, source control and a variety of

25  things, has to do with adding up the detection levels of

1   contaminants, a whole host of them, including VOCs, um, and you

2   calculate this ratio compared to the MCL.

3        Q.   So it's supposed to take into account not only the

4   VOCs but other things in the water that might create a problem;

5   correct?

6        A.   Correct.

7        Q.   And then it adds them all up, and it gets an

8   ultimate number; correct?

9        A.   Yes.

10       Q.   What's the significance of the MCL equivalent being

11  below 1?

12       A.   Well, what it says in the guidance document is that

13  DDW likes to see an MCL equivalent less than 1 -- 1 or less or

14  even zero -- and this is a specific section out of it -- for

15  when determining what they will require in the permit that they

16  give you.  It's one tool among many in the 97-005.

17       Q.   And in April of 2020, did the agency submit an

18  application to -- or actually, it was a revised application to

19  the DDW in order to obtain the permit pursuant to 97-005?

20       A.   In April 2020?

21       Q.   Yes.  I'm sorry.  2020.

22       A.   2020.  We did not submit anything to them in April

23  2020.  We submitted a letter on May 11th, 2020, that documented

24  four points that they had provided questions and

25  clarifications.  One of them was source contamination control.

1    One of them was a revision of the MCL equivalent.  One of them

2    was CEQA documentation, which is California Environmental

3    Quality Act.  And the other one is an OMMP, Operational

4    Maintenance and Management Plan -- or Monitoring Plan.

5           So we didn't submit the actual document.  We

6    submitted a letter stating that.

7      Q.    All right.  In -- did the water agency through a

8    company called Kennedy Jenks on April 19th, 2020, submit

9    something entitled "California Water Resources Control Board,

10   Division of Drinking Water Guidelines 97-005, Documentation for

11   Valencia Water District, Well V-201, Revised Final Draft"?

12          MR. GEE:  Objection.  Asked and answered.

13          THE COURT:  Overruled.

14          But you can answer the question yes or no.  Do you

15   know whether that happened?

16          THE WITNESS:  What was the date again?

17     Q.    (BY MR. BLUM:)  April 19, 2020.

18     A.    I don't recall.  I know we submitted a complete

19   draft document in October 2019, but I don't recall if we did

20   one in April.  We may have.

21     Q.    Okay.  Now, sir, who's Meredith Durant?

22     A.    She was an employee of Kennedy Jenks and the person

23   who started the 97-005 technical documentation for the former

24   Valencia Water Company, I think in 2012.

25     Q.    Now, would you -- would you agree that you rely upon

1    her for the interpretation of MCL equivalency?

2        A.   She's one of many.  So when we create a document for

3    an amended permit, we have a number of staff and consultants

4    that we look to to help prepare the documentation.

5        Q.   All right.  The deposition on December 5th, 2019,

6    page 105, lines 5 through 8.

7             MR. GEE:  No objection.

8             THE COURT:  Please proceed.

9             MR. BLUM:  *"QUESTION:  So Meredith Durant*

10      *is the person you rely upon to interpret and tell*

11      *you that the MCL equivalent of .5 means X or 1.5*

12      *means something else.*

13      *"ANSWER:  Yes."*

14        Q.   (BY MR. BLUM:)  Was that a correct statement?

15        A.   I wish you would go to a different deposition.  That

16    was my first one.  But yes, that's -- we did rely on her, among

17    other people.

18        Q.   All right.  Is there a reason why in your deposition

19    you didn't mention those other people?

20        A.   That was a while ago, and it was my first

21    deposition.  So chalk it up to nerves maybe.  I don't know.

22        Q.   Well, you understood, even though it was your first,

23    you still had to tell the truth; right?

24        A.   Absolutely.  And we do rely upon her, among others.

25    So technically that statement is correct.  It may be not

1    complete.

2         Q.   Okay.  Do you -- now, do you ever recall approving

3    an April 2020 97-005 permit application?

4         A.   So I think you're misstating.  The permit

5    application -- the permit process is a little convoluted.  I

6    can explain it if you'd like.

7              THE COURT:  Mr. Blum?

8         Q.   (BY MR. BLUM:)  No.  The question is:  Do you

9    remember approving the creation and the submittal of an April

10   2020 permit request for documentation for the permit for

11   Well V-201?

12        A.   So I think you're -- you're referencing the 97-005

13   technical document, not the actual application.

14        Q.   All right.  Let's try that, the application itself.

15        A.   So in April 2020, we never submitted that one to

16   DDW.

17        Q.   But do you remember approving it for creation and

18   submittal?

19        A.   If I remember correctly -- and I believe I testified

20   to this in my deposition -- that me, among others, had reviewed

21   it, but we never submitted it to DDW.

22        Q.   Did you approve it?

23        A.   I guess if you want to use the word "approve."  I

24   reviewed it and it was -- had the information -- so what we

25   were doing at the time is we were trying to streamline and

1  expedite the permitting process with DDW.  It had taken -- at

2  that point, it would have been -- what? -- five years roughly,

3  now we're going on nine.

4       And instead of submitting the entire 97-005

5  document, because what was happening is they would re- -- come

6  up with new questions.  And so what we did was we took their

7  specific questions, we identified what questions we were

8  responding to, we sent a letter to them saying these are the

9  four -- that was the May 11th letter I was talking about.  And

10  we said we would incorporate that into the 97-005 document when

11  we resubmitted that for actual final.

12       So when you say did I approve the April 20th, I

13  approved those four sections -- that we revised the MCL

14  equivalent, that we beefed up the source protection, that we

15  provided documentation for CEQA, and that we provided an OMMP,

16  Operation Manual -- Operation Maintenance and Monitoring Plan.

17       Q.   Referring to your deposition on August 21st, 2020,

18  page 33, lines 1 through 11.

19            THE COURT:  You may proceed.

20            MR. BLUM:  I'm sorry, Your Honor?

21            THE COURT:  You may proceed.

22            (Videotaped deposition was played:)

23       Q.   *"What role did you play in the creation and*

24       *submittal of the April 2020 permit request for --*

25       *documentation for the permit for Well V-201?*

1     A.    "I may have written this -- these two
2     paragraphs in conjunction with Meredith Durant.
3     I don't recall exactly.  I know it was a
4     collaboration for sure.
5     Q.    "Would it be correct, Mr. Alvord, that
6     whether you wrote it or not, you approved it?
7     A.    "Yes."
8     Q.    (BY MR. BLUM:)  Now, Mr. Alvord, you said that the
9     April 2020 application you just testified to was never
10    submitted?
11            THE COURT:  And you were referring to two
12    paragraphs, were you not, in the deposition?
13            MR. BLUM:  Yes, sir.
14            THE COURT:  So you're asking whether those two
15    paragraphs were submitted?
16            MR. BLUM:  No.
17    Q.    (BY MR. BLUM:)  Whether the application itself,
18    that -- what you just described as the backup data for the
19    application.
20    A.    I do not believe we submitted the 97-005 document in
21    April 2020.  We -- we sent a letter on May 11th.
22    Q.    Okay.  Now, if I -- if we can go to -- I don't
23    believe this has been designated.  But it's from the 8/21
24    deposition, page 27, lines 3 through 5.
25            MR. GEE:  No objections.

1370

```
1              THE COURT:  You may proceed.

2              MR. BLUM:  All right.  Your Honor, is it okay if I

3    just read it?

4              THE COURT:  Yes.

5              MR. BLUM:  All right.

6              "QUESTION:  And then in April, you then

7         submitted what is Exhibit 255; correct?

8              "ANSWER:  Correct."

9              And I'll represent to you that Exhibit 255 is the

10   document that's dated April 19, 2020.

11       Q.    (BY MR. BLUM:)  So did you submit that document?

12       A.    Are you going to show me something or --

13       Q.    I'm reading from the deposition.

14              "QUESTION:  And then in April you" -- you

15         were the deponent -- "submitted what is Exhibit 255;

16         correct?"  And that's the document dated April 19, 2020.

17              And your answer was:  Correct.

18       A.    I don't know what that document is.  But if I said I

19   submitted it, I guess I submitted it.  But --

20       Q.    Okay.  So you wouldn't submit something to the DDW

21   that you didn't believe was accurate; correct?

22       A.    We submitted -- excuse me.  I'm sorry.  We did a

23   number of things with -- you know, we would not submit anything

24   not factual to DDW.  But we also submitted a number of things

25   to try to get the permit so we can use the source V-201.
```

**UNITED STATES DISTRICT COURT**

1    Q.    All right.  Now, do you recall in the latest

2    submittal to the DDW -- and just to be clear, that's the agency

3    that either grants or denies the permit for using your wells

4    for drinking water, so you can sell it for drinking water;

5    correct?

6    A.    They don't deny.  They either grant a permit or

7    don't issue a permit.

8    Q.    Okay.  Now, the latest material submitted, it calls

9    for blending; correct?

10   A.    So a number of things that we had to deal with with

11   DDW in their questions, blending was one of them.

12   Q.    Right.

13        Now, does it also deal with blending for something

14   called TDS?

15   A.    So we've had a number of iterations with DDW.  One

16   of the questions that they had had to do with secondary

17   contaminants -- TDS, sulfate, chlorides, a number of those

18   things.  It goes back into that whole calculation of MCL

19   equivalent.

20        And so we asked them:  Is blending satisfactory for

21   the secondary contaminants?  Verbally they told us no because

22   it's indirect blending.  They wanted direct blending.

23   Q.    Wasn't it correct that in the material that was

24   presented in 2020, the water agency proposed to DDW that it

25   blend in order to resolve problems with total dissolved solids?

1    A.    Yes, among other things.

2    Q.    All right.  And what are total dissolved solids?

3    A.    So TDS, or total dissolved solids, is a combination

4    of a variety of salts and minerals in the water, naturally

5    occurring primarily -- calcium, magnesium, sulfate, chloride,

6    sodium, things of that nature.  So they combine it all

7    together, and you get a value of TDS, total dissolved solids.

8    Q.    And you proposed that because you thought that's

9    what the agency wanted?

10   A.    Correct.

11   Q.    And did you also state in the application or the

12   material you provided that, when you dealt with TDS by

13   blending, that would also have the side effect of resolving

14   your VOC problems?

15   A.    That was one among many things that we asked them,

16   and they denied it.  They -- they said this does not work for

17   them.

18   Q.    When did they deny it?

19   A.    Through meetings, through calls with them.

20   Q.    Anything in writing?

21   A.    I don't believe so.  There might be an e-mail from

22   Shu-Fang talking about indirect and direct, but I don't recall.

23   I'm sorry, Shu-Fang Orr is one of the Division of Drinking

24   Water engineers.

25   Q.    Let's get back to what you proposed.  The proposal

1    you made said we'll blend to resolve the TDS problems and, by

2    the way, that will also have the side effect of resolving the

3    VOC problems; correct?

4         A.   She said that because we were --

5         Q.   That's what you proposed?

6         A.   It is one of the things that we proposed.  But she

7    said that it was not acceptable for VOCs because the water --

8    the source water for blend could also have VOCs in it.

9         Q.   And what was the source water?

10        A.   The turnout water that has VOCs occasionally from

11   Saugus Perchlorate Treatment Facility.

12        Q.   So it's correct, then, that one of the reasons

13   you're having trouble getting a permit for V-201 is because

14   there's VOCs at the turnouts; correct?

15        A.   No.  We have a problem with getting a permit for

16   V-201 because we have VOCs in V-201.

17        Q.   But the reason they rejected the blending plan for

18   TDS that would -- that would also impact VOCs was because you

19   proposed using water that had VOCs at the turnouts, Saugus 1

20   and Saugus 2 plant?

21        A.   So what Ms. Shu-Fang Orr said was that type of

22   indirect blending is not acceptable.

23        Q.   Well, didn't you just testify that one of the

24   problems was that the source you were using for blending had

25   VOCs at the turnouts?

1    A.    That's what she had stated.

2    Q.    Okay.  So if there was no VOCs at the turnouts, that

3    would resolve one of the problems, wouldn't it?

4    A.    It's still indirect blending, and she doesn't like

5    that.

6    Q.    All right.  Now -- now, isn't it correct that you

7    testified at your depositions that you have no idea what

8    ultimately DDW is going to order?  Isn't that true?

9    A.    I don't know if those are the exact words, but I

10   don't know what DDW is going to tell us to do.

11   Q.    Okay.  Now, I want to turn to the -- to the

12   turnouts.  And if we can put back up -- I think it's 1449.

13   Now, prior to the water getting to the turnouts,

14   it's -- there is indirect mixing, as you describe it, between

15   water from the SPTF and Castaic Lake; correct?

16   A.    Well, it's not Castaic Lake.  It's our treatment

17   plants, indirect blending.

18   Q.    Would you agree with me just as a matter of physics

19   that the concentrations of water at the turnouts can never be

20   greater than that that was found to be emanating from the

21   effluent tank at the SPTF?

22   A.    Could you restate that?

23   Q.    Would you agree just as a matter of physics that the

24   water found at the turnouts, the VOC concentrations, could

25   never be greater than the VOCs found in the effluent tank at

1   the SPTF?

2        A.   Not necessarily because with indirect blending and

3   with sampling at different times -- you've got to realize, we

4   don't take samples all at the exact same time.  We take a

5   sample, it takes us 15, 20 minutes, a half hour.  We go to

6   another location, take a sample.  We go to a third location,

7   fourth, fifth.

8             So by the sheer difference in time of sampling and

9   by the hydraulics, you cannot necessarily predict -- and again,

10  that's one of the reasons why they sent the letter in 2011 --

11  that this indirect blending is not sufficient for them because

12  we have detections at our turnouts.

13       Q.   Well, if we forget about timing of when sampling is

14  done -- let's just forget about that, take that issue away.

15  The water that the -- that is combined with that from the SPTF

16  is clean -- correct? -- as to VOCs?

17       A.   "Clean," meaning that the --

18       Q.   There's no VOCs.

19       A.   -- the water has no VOCs in it?  That is correct.

20       Q.   Then it's mixed with water -- whether it's mixing

21  100 percent or not -- with water that has VOCs in it; correct?

22       A.   Correct.  That's part of the blending plan.

23       Q.   When that water is combined and it gets to the

24  turnouts, can water at the turnout ever contain VOCs greater

25  than that water when it was at the SPTF?

```
 1       A.    Well, one, I don't think you can throw out the

 2  sampling issue.  But if you want me to indulge you on that, the

 3  answer is we have seen higher levels at our turnouts from time

 4  to time.

 5       Q.    It's --

 6       A.    So it's happened.

 7       Q.    It's happened.

 8       A.    It's happened.

 9       Q.    And other than in 2012, has there ever been an

10  investigation of why?

11       A.    Other than 2012?

12       Q.    Other than 2012.

13       A.    Yes.

14       Q.    When?

15       A.    Well, the investigation is -- what we normally do

16  with a detection is take the confirmation sample.  And so if

17  the confirmation sample is non-detect, then, in general, you

18  assume that there was either an anomaly or something happened,

19  as I -- I think I testified in my deposition as well as I just

20  did here between the sampling differences, the indirect

21  blending.  There's a variety of reasons.

22            But in terms of investigation, it's the -- it's the

23  repeat sample is the first step, the confirmation sample.

24       Q.    Well, other than the confirmation sample, has

25  anybody said I'm going to look at the -- at the distribution
```

1    system, I'm going to investigate why there are readings at

2    the -- at the turnouts that are greater than they should be or

3    even greater than what's at the SPTF?

4            THE COURT:  Other than in 2012.

5            MR. BLUM:  Other than in 2012.

6            THE WITNESS:  Like I said, we took a repeat sample.

7    And the other -- I can only think of one, but there might have

8    been another -- that if the repeat sample doesn't confirm it,

9    then there's no other investigation done.

10        Q.    (BY MR. BLUM:)  Okay.  And has there ever been an

11   investigation other than the repeat sample?

12        A.    Other than 2012 and the repeat sample?  No.

13        Q.    Now, how long after the -- the first sample was

14   taken is the repeat sample taken?

15        A.    In general, it takes -- it just depends.  So we take

16   the sample on a Wednesday.  You have to have several days for

17   the lab to analyze it.  So maybe you get the result Monday.

18   We're then going to re-sample on Wednesday.  So that would be

19   the time.  So that's what we have done for this particular

20   permit.

21        Q.    So it isn't a repeat sample.  It's just taking

22   another sample on a date that you were going to take a sample

23   anyway?

24        A.    Yeah, but it's the second sample.

25        Q.    So, in other words, if on Week 1 it's too high and

1378

1    on Week 2 it's not, you're okay with that, as the operations --

2    head of operations?

3              THE COURT:   Rephrase your question as to what "okay"

4    means.

5        Q.    (BY MR. BLUM:)   If on Week 1 it's higher than it

6    should be and on Week 2 it's not, does that mean the reading on

7    Week 1 was wrong?

8        A.    So I look at the data; right?

9        Q.    That's my -- does that mean the sample -- the

10   reading on Week 1 was wrong?

11       A.    If the results prior to that sample are non-detect,

12   then you have a detection that is an anomaly or you don't think

13   is right and the following subsequent sample and continuing

14   samples are not, yes, to me, there -- something happened with

15   that sample.

16       Q.    What do you mean?   Lab error?

17       A.    It can be any number of things.   It could be

18   sampling time differences, that's one.   It could be indirect

19   blending, hydraulic issues, two.   It could be the sampler did

20   something different when they collected that sample.   It could

21   be artifacts in the analytical equipment at the lab.   So

22   there's a number of things that create false positives or

23   anomalies.

24       Q.    Is there ever a consideration that it's not a false

25   positive?

```
 1        A.    Sure.  That's a possibility.  And that's why we
 2   investigated it in 2012 much further.
 3        Q.    And in 2012, there -- there was readings of PCE
 4   20 times the -- what you would have expected; correct?
 5        A.    I don't remember the exact time -- amount, but I do
 6   recall 17 parts per trillion -- I mean, parts per billion.
 7        Q.    And the MCL was .5; correct?
 8        A.    5.
 9        Q.    5.  So that's three -- three-and-a-half times the
10   MCL?
11        A.    I do recall that in 2012, yes.
12        Q.    And was there an investigation as to the cause of
13   those high readings?
14        A.    Yes.
15        Q.    What was the result of the investigation?
16        A.    So when we saw the value and we had subsequent
17   samples that were high, we investigated into it.  We noticed
18   that the turnout, the specific turnout, one of the sampling
19   locations per the permit, SC-1, was shut down for mechanical
20   work.  They were installing motor control cabinets and panels.
21   Then they, um, looked at it.  They started it up again.  And
22   they had some more detections.
23             And so what ultimately happened is they dug up --
24   they realized -- they looked at some plans.  There was an old
25   pipe connection to the pipe next to the sample location called
```

1   the Honby lateral, Honby named after a street in Santa Clarita,

2   that was improperly abandoned.  It was a valve that was left

3   open that was connected to the pipeline next to the sample tab.

4           And so when they discovered that, they dug it out --

5   they hired a contractor, installed what's called a blind

6   flange.  They just put a piece of metal, bolted in to close it

7   so there's absolutely no way anything can get it, and

8   re-sampled and the values resolved.

9       Q.    Okay.  Now, before you -- before there was readings

10  of PCE of 17 parts per billion, is it correct that nobody had

11  any idea that the Honby lateral even existed?

12      A.    Oh, no, people knew.  They didn't look at the plan.

13  So they had to relocate it, I believe, in the '90s.  There's a

14  report that was done.  There -- the Honby lateral was a

15  pipeline to bring water from the central area of town, SC-1

16  area, to the east.  And there was some construction being done

17  with the shopping center and such, and so they had to relocate

18  that pipe.  And it was improperly abandoned at the connection

19  point.

20      Q.    Let me, then, rephrase the question.

21          Prior to those readings, nobody at the water agency

22  knew that there was an improper abandonment of that lateral;

23  correct?

24      A.    Nobody knew until they dug it up.

25      Q.    Right.

**UNITED STATES DISTRICT COURT**

1          And the only reason they went to dig it up was

2    because of the readings -- the high readings of PCE, I think it

3    was at SC-1; correct?

4          A.    Correct.

5          Q.    And by the way, wasn't it true that the agency

6    concluded that the Whittaker contamination had nothing to do

7    with those PCE levels?

8          A.    So because it was a shallow pipe, because it was a

9    valve that was left open connected to the distribution system,

10   and because there was a nearby cleaners that was found to have

11   either disposed of or leaked out PCE chemicals, that, yes,

12   there was no -- there was a determination in that report that

13   it wasn't Whittaker responsible for that.

14         Q.    And although the source was never actually

15   pinpointed, the most likely source was contamination emanating

16   from something called Flamingo Dry Cleaners; correct?

17         A.    Yes, at the surface to ground surface.

18         Q.    Which then seeped into the ground, and eventually

19   the PCE entered the Honby lateral; correct?

20         A.    Entered the abandoned pipe but entered the main

21   distribution pipe through that open valve.

22         Q.    All right.  So after the Honby lateral was

23   discovered, was there a recognition by the water agency that

24   says, hey, there may be stuff buried that we don't know about

25   that may contribute VOCs, so let's do an investigation to see

1    what else we don't know?

2        A.    So, you assume when you, um, just abandon a pipe or

3    abandon a connection, that it was done correctly.

4            So the system is under pressure.  So, in essence,

5    it's pushing out.  Nothing can come into your closed system, a

6    pipe that has -- that's bolted together with gaskets and

7    everything.  If this valve was properly abandoned with a blind

8    flange, that surface contamination would never get into the

9    pipe, into that sample location.

10       Q.    But my question that -- that wasn't my question,

11   Mr. Alvord.

12           My question was:  Was there an investigation done

13   that, if we could miss an improperly abandoned lateral once,

14   maybe we've done it more than once and let's go investigate and

15   see whether or not there's other ways in which VOCs could enter

16   the system from the outside?

17       A.    That's sort -- I don't know where you would look.

18   Saugus 1 and Saugus 2 have VOCs in it, PCE and TCE.  So we know

19   that's a fact.  And the only way to get that out of there,

20   other than trying to meet this blending goal that DDW had

21   allowed us, is to have treatment.  But if you -- you can't just

22   dig up the entire world and find potentially something that

23   wasn't done correctly.

24           I don't really understand the question.

25       Q.    Did you -- was there any discussion within the water

1    agency, What can we do to find out if we have other problems

2    such as the one we had in 2012?

3         A.   Well, as I previously testified, if you have a

4    detection that is not expected, you do investigative work.  You

5    take confirmation samples.  Okay, that didn't work.  It's still

6    high.  You look at plans.  You change -- they change the host

7    spigot -- not the host spigot, the sample tap from a -- I think

8    a brass to a stainless steel.  That didn't work.  They finally

9    looked at the plans.  They dug it up.  They said, wow, we

10   didn't properly abandon this or whoever was contracted to

11   abandon it, and that was the solution.

12        So I'm not sure what else beyond that -- when you

13   have a detection, the first thing to do is a confirmation

14   sample.  If that confirmation sample confirms it, then you go

15   on.

16        Q.   Let's get it straight, Mr. Alvord.  You don't do

17   confirmation sampling, you just take the sample at the next

18   scheduled opportunity; correct?

19             THE COURT:  This has been asked and answered.  Let's

20   move on to another question.

21        Q.   (BY MR. BLUM:)  All right.  Now --

22             MR. BLUM:  I'm sorry, Your Honor.  I just needed to

23   find something.

24        Q.   (BY MR. BLUM:)  Now, sir, in looking at the

25   concentrations found at the turnouts, the five of them, would

1    you agree that the concentrations of VOCs found at the turnouts

2    has to be less than the concentrations of VOCs found in the

3    effluent?

4                MR. GEE:  Objection.  Asked and answered.

5                THE COURT:  Sustained.

6        Q.    (BY MR. BLUM:)  You answered no, they don't; isn't

7    that correct?

8        A.    I said they haven't.  We have had detections higher.

9    So to say that they can't, they have.

10       Q.    And as the head of operations, when you find those

11   numbers at the turnouts greater, don't you assume that they

12   could not be from the Saugus treatment plant?

13       A.    I think I've already testified we do -- we have a

14   methodology that we follow.  We take confirmation samples.  If

15   a confirmation sample doesn't confirm that there was a

16   detection, then there's not much more to do.

17       Q.    All right.  If we can go to page -- the deposition

18   on 12/12/19, page 33, line 6, through 34, line 7.

19                MR. BLUM:  Actually, Your Honor, we'd stop on

20   line 20 on page 33.

21                THE COURT:  You start or stop there?

22                MR. BLUM:  Go from line 6 through 20.

23                MR. GEE:  No objections.

24                THE COURT:  You may proceed.

25                (Videotaped deposition was played:)

1    Q.    "*In looking at the concentrations found at*

2    *the turnouts that we talked about, those five of*

3    *them, would -- would you agree that the*

4    *concentrations of VOCs found at those turnouts has*

5    *to be less than the concentrations of VOCs found*

6    *in the effluent?*

7    A.    "*I would assume so.*

8    Q.    "*Yeah, because it's blended with clean*

9    *water; correct?*

10    A.    "*Correct.*"

11    Q.    (BY MR. BLUM:)  Was that the truth?

12    A.    At the time, my understanding, yes.

13    Q.    Okay.  And you recall that on that deposition, you

14    were testifying as a representative of the water agency;

15    correct?

16    A.    Yes, but my knowledge continues.

17    Q.    Well, you're required, as part of your obligation,

18    to talk to all the people that had relevant knowledge and

19    worked at the agency and also reviewed the documents that were

20    relevant; correct?

21    A.    Yes.  I talked to quite a few people in that

22    one-week time span but not everybody.

23    Q.    Well, did you believe that you were able to testify

24    on that date as a representative of the knowledge of the water

25    department, water agency?

1    A.    I felt confident that at the time I was the person

2    most knowledgeable.

3    Q.    And that you had done proper work in order to gain

4    the information of the agency as a whole?

5    A.    Well, I have much more responsibilities than just

6    that one item.  But yes, you know, as I testified in the

7    beginning, my knowledge and understanding of this has continued

8    to grow.

9    Q.    Okay.  All right.  Now, Mr. Alvord, have you seen

10   any report about source contamination at the turnouts?

11   A.    Source contamination at the turnouts?  I mentioned

12   the one for SC-1.  That's the only -- that's the only report

13   that I have seen.

14   Q.    Alrighty.  If we could put up Exhibit 1372.

15        (Exhibit 1372 received into evidence.)

16        THE COURT:  Is this a stipulated document?

17        MR. BLUM:  Yes, sir.

18   Q.    (BY MR. BLUM:)  What is Exhibit 1372?

19   A.    It is a report, I believe, that we submitted to

20   Division of Drinking Water regarding our results at the five

21   turnouts.

22   Q.    Okay.  Would you -- do you agree that because it's

23   submitted to the DDW, that the water agency does everything

24   to -- to make sure that it's accurate?

25   A.    Yes.

1       Q.   Okay.  And there's a signature at the bottom.  Whose

2  signature is that?

3       A.   It looks like Jim R. Leserman.

4       Q.   Is his signature required on these documents?

5       A.   I don't know if his is.  I know a signature.

6       Q.   All right.  What's the date of the document?

7       A.   It says April 15th, 2013.

8       Q.   Well, doesn't it say at the top that -- data --

9  September of 2011?

10      A.   I'm sorry.  I didn't catch that, but I think I know

11 what you said.  Yes, it says September 2011 at the top.

12      Q.   Do you know why this wasn't signed by Mr. Leserman

13 about two years later?

14      A.   I don't.

15      Q.   Okay.  Do you have any reason to believe that the

16 information on the document is inaccurate?

17      A.   No.

18      Q.   All right.  Now, if you can go to -- you see where

19 it says --

20           THE COURT:  Please be mindful of the mic.

21           MR. BLUM:  I'm sorry.

22      Q.   (BY MR. BLUM:)  -- "surface water"?

23      A.   Yes.  I see that.

24      Q.   Okay.  That's water from the State Water Project;

25 correct?

1    A.    Yes.

2    Q.    All right.  And that's the blending that we talked

3 about; correct?

4    A.    That's the blend water.

5    Q.    All right.  Now, see where it says "SPTF effluent"?

6    A.    Yes.

7    Q.    And if you go to the far right, in the effluent,

8 what was the levels of PCE?

9    A.    Based on this document, less than .5.

10   Q.    Okay.  That's below the detection limit; correct?

11   A.    The detection limit is .5 micrograms per liter.

12   Q.    And just for clarification, what does "detection

13 limit" mean?

14   A.    So you can detect lower.  But EPA and Division of

15 Drinking Water have methods for each analyte contaminant.  And

16 it's statistically accurate down to this level.  They can get

17 lower, but this is the level that they set in the regulations.

18   Q.    All right.  Now, if you -- let's go -- do you see

19 where it's 1A, Week 1A?

20   A.    Yes.

21   Q.    And there is sample points at five different points;

22 correct?

23   A.    Correct.

24   Q.    And these are each turnouts; correct?

25   A.    Yes.

1       Q.   All right.  Let's take a look at the readings for

2  PCE on -- if you can pull it up, please -- on Week 1A, which is

3  at 9/1/2011.

4       A.   PCE is on 9/6/2011.

5       Q.   Oh, I'm sorry.  You're right.

6            What is it?

7       A.   It says 3.0 parts per billion or micrograms per

8  liter.

9       Q.   That's much greater than non-detect; correct?

10      A.   I don't know if it's much greater.  It's greater.

11      Q.   Well, if the effluent had no PCE in it, how could

12  the turnout have 3 parts per billion?

13      A.   Well, as I previously testified, the sample time

14  that is collected as well as the indirect blending, um, it

15  could be possible.  And then the following week, six days

16  later, it was less than five, .5.

17      Q.   Well, if we go back to the end of the month on 9/26,

18  it's back up -- correct? -- to 1.6?

19      A.   Three samples later, it went back to 1.6, correct.

20      Q.   Okay.  So does that mean that the samples that

21  showed readings above the detection limit were error?

22      A.   Could have been.  It could be that we -- the time we

23  sampled the effluent, it was lower and, right after, it was

24  higher.  It could be the indirect blending, the hydraulics of

25  the system, which way the water is flowing.  There's a lot to

**UNITED STATES DISTRICT COURT**

1    it.

2         Q.    Could be that there's a source that's adding VOCs to

3    the distribution system that you're not aware of; right?

4         A.    If there were multiple samples like in 2012, we

5    would have investigated.  But since it wasn't, there was no

6    need to investigate.

7         Q.    Two -- two, in your mind, is multiple.  Two within a

8    month is a multiple?

9              THE COURT:  Ask another question, please.

10        Q.    (BY MR. BLUM:)  What percentage does it have to be

11   before you believe it's significant enough to investigate?

12        A.    Well, if I remember correctly, the -- I think the

13   highest level -- and I could be wrong, this is purely going off

14   memory -- of PCE is around the 1 microgram per liter level.

15   And so, to me, something at 1.6 is within reason.  To me, 3.0,

16   maybe it's a little high, but it could be.

17             Um, but for the fact that the samples before it and

18   the subsequent samples after the 1.6 were less than the DLR,

19   detection limit, it came up as an anomaly.  But it could be any

20   number of things that I've already testified.

21        Q.    Could one of the possibilities be a source of

22   contamination that you're just not aware of?

23        A.    If it would have continued, possibly.  Since it was

24   one hit and then one quite a bit lower, half of it.

25        Q.    All right.  Let's go to Exhibit 1371.

1    (Exhibit 1371 received into evidence.)

2    Q.    (BY MR. BLUM:)  Now --

3    THE COURT:  Again, please make sure that you're

4    identifying, if it's a new document, whether it's stipulated

5    to.

6    MR. BLUM:  It's stipulated, Your Honor.

7    THE COURT:  Thank you.

8    Q.    (BY MR. BLUM:)  Now, what's the date of this?

9    A.    June 2011.

10   Q.    Now, there's some more information here, um.  Do you

11   see where it says "theoretical blend"?

12   A.    Yes, at the top.

13   Q.    How was the theoretical blend determined?

14   A.    So after we started up the Saugus Perchlorate

15   Treatment Facility in early 2011, DDW sent us a letter asking

16   us to come up with some blending calculations to help determine

17   whether or not -- what we can anticipate as a tool of the VOC

18   levels at the turnouts.

19   So we used a variety of different constituents

20   because, since there are no VOCs in the surface water, we

21   looked at electrical conductance, we looked at chloride, and we

22   looked at sulfate because they're relatively stable but they do

23   vary, um, in the Saugus 1 and 2 water compared to the state

24   import water from the treatment plants.

25   And so you use that to calculate a blend ratio, and

UNITED STATES DISTRICT COURT

1  then you can try and predict it as a tool, um, for VOCs.

2      Q.    And, in fact, that's what the agency did, using --

3  used the chloride and the sulfates in the water to predict what

4  the blend ratios were?

5      A.    Initially it was electrical conductance, chloride,

6  and sulfate.  But sulfate seemed to be the closest, but it's --

7  again, it's an imperfect tool.  And when you're dealing with

8  indirect blending -- it's a tool.

9      Q.    Is it a tool that was used by the agency?

10     A.    To help predict at the request of DDW.

11     Q.    Okay.  And do you see where it says right here --

12         MR. BLUM:  Rick, if you can blow that area up,

13  "theoretical blend."

14     Q.    (BY MR. BLUM:)  The bottom -- you were able to

15  predict what you believed the theoretical plan would be;

16  correct?

17     A.    It's what the blending calculations calculated.

18     Q.    And based upon that, how much of the water at the

19  turnouts would be from the Saugus treatment plant?

20     A.    Well, you sort of know what you're getting from the

21  Saugus treatment plant based on the production that's -- the

22  meter that's reading that, those wells.  But you don't know

23  exactly what the effluent is from the -- or the treated water

24  from the surface water.  And so what you do is you use these

25  calculations to try and help predict that.

1       Q.    Basically, if you know the treated water has X, the

2   plant water has Y, and the water at the turnout is K, you

3   can -- you can then determine basically with an equation what

4   percentage of X and Y was needed to get the readings of K?

5       A.    Theoretically.

6       Q.    Well, it's simple math, isn't it?  It's actually not

7   complicated math.

8       A.    Well, the math is not complicated, but the

9   hydraulics are complicated.

10      Q.    These are hydraulics that were developed by

11  Mr. Leserman with the help of the agency to -- at the request

12  of the DDW; isn't that true?

13           MR. GEE:  Objection.  Lacks foundation.

14           THE COURT:  Sustained.

15      Q.    (BY MR. BLUM:)  Do you know who developed these

16  calculations?

17      A.    I don't.  It's -- but it's blending calculations.  I

18  mean, it's pretty -- it's not -- like you said, it's fairly

19  simple, but it's predicting.  It's not actual.

20      Q.    Well --

21      A.    I mean --

22      Q.    Aren't you aware that, before these calculations

23  were used, that the agency went through a process to determine

24  whether or not the calculations were accurate?

25      A.    Not that I'm aware of.  They're -- like I said, if

1  you had a glass of water here and a glass of water here and you

2  mix them, you'd be able to determine what that blend is.

3  That's direct blending.

4       When you're dealing with hydraulics of a system with

5  demands in different directions, with concentrations that vary

6  over time, that you're not sampling all at the same time, it's

7  a -- it's a tool that DDW asked us to come up with to help

8  predict.  But it's not always accurate.

9       Q.    Do you recall anything ever written to the DDW that

10  says, hey, these aren't -- this is not an accurate estimation

11  of what the theoretical blend will be?

12       A.    I'm not aware of any written document that was sent.

13       Q.    Do you recall any internal document where you're

14  saying, hey, we can't rely upon these calculations, they're not

15  accurate?

16            THE COURT:  Mr. Blum, this is argumentative.  Let's

17  move on.

18       Q.    (BY MR. BLUM:)  All right.  Sir, if we can go -- so

19  the anticipation was that the water at the turnouts would be

20  90 percent from the water project and 10 percent from the

21  plant; correct?

22       A.    When is that?  On this particular one?

23       Q.    Yes.

24       A.    Yes.  That's what that calculation shows.

25            MR. BLUM:  Okay.  So can we go -- can you bring it

1    back to the full document, Rick?  And can we go to -- right

2    there.  For TCE.

3        Q.    (BY MR. BLUM:)  Now, on June 27th, 2011, there's a

4    reading of TCE at .69; correct?

5        A.    That's what it says here, yes.

6        Q.    Wouldn't it be correct that if the -- using the data

7    here, knowing what the percentage was in the 90/10, and knowing

8    what the TCE reading was at the effluent, that you can predict

9    what that reading should be on 6/27/2011?

10       A.    It has to do with the system hydraulics and the

11   demand.  You know, why this one came up when the -- the tool

12   said -- it's only as good as it is.  But you're not getting

13   direct blending.  You're getting indirect blending.  And

14   demands are different.  Different sources are pulling different

15   ways.

16       Q.    If we can go to your deposition, please.  We're on

17   12 -- 12/12/19 where you're testifying as a corporate

18   representative, page 38:15 to page 40:18.

19            MR. GEE:  No objections.

20            THE COURT:  You may proceed.

21            (Videotaped deposition was played:)

22       Q.    "All right.  Now, you looked at the

23       theoretical blend.  Is that the blend that is -- of

24       the water once it's blended with the material or the

25       water from the effluent, from the treatment plant?

```
 1       A.    "That's what it looks like in this calculation.

 2   I would -- again, I would have to calculate it.  But

 3   based on the numbers and the percentages, that's what

 4   it looks like.

 5       Q.    "Okay.  So the total -- if you look at the --

 6   90 percent of the water comes from Castaic Lake and

 7   10 percent comes from the treatment plant; correct?

 8       A.    "Yes.  Approximately.

 9       Q.    "All right.  And then you're combining pretty

10   much equal amounts of water between Saugus 1 and

11   Saugus 2; correct?

12       A.    "Correct.

13       Q.    "And that -- and you're -- which is a total

14   production of -- what is it? -- about 90 --

15   90 million?

16       A.    "Close enough.

17       Q.    "All right.  And it's pretty close in terms

18   of the amounts; right?

19       A.    "Yes.

20       Q.    "So if you look at the TCE, that TCE up to

21   3.1 would be blended with 1.2, and you divide --

22   you combine it at 2 point -- what is it? -- 4.3 and

23   divide it in half.  So it's about 2.1 and a half;

24   correct?

25       A.    "Correct.
```

1  Q.    "So we have 2.1 and a half.  10 percent of

2  the water is 2.15 ppb; correct?

3  A.    "Correct.

4  Q.    "And that's combined with 90 percent of clean

5  water; correct?

6  A.    "Correct.

7  Q.    "Which would mean that the concentrations of

8  TCE should be about .2; correct?

9  A.    "If you use zero as the less than .5.

10  Q.    "Okay.  But we have no reason to believe that

11  it's not zero, do we?

12  A.    "There's no such thing as zero.

13  Q.    "Okay.  Well, it could be -- it could be in a

14  non- -- it's a nonmeasurable amount?

15  A.    "Correct.

16  Q.    "Well, is there a rule of thumb that you use

17  when it's below a detection limit?  Do you use zero?

18  Do you -- what do you use?

19  A.    "Typically zero is used, yes.

20  Q.    "So it's not inappropriate to use zero?

21  A.    "No.

22  Q.    "Okay.  So you would calculate that any

23  concentration of TCE as a result of this blend would

24  be below the detection limit; correct?

25  A.    "Correct."

1    Q.    (BY MR. BLUM:)  Is that a correct statement?

2    A.    Based on my knowledge then, yeah.  I have no

3  reason not to believe that.

4    Q.    Sir, when did you gain all this additional knowledge

5  that you've been talking about?

6    A.    So, there's --

7    Q.    I want when.

8    A.    I always gain knowledge.  I am -- I am a student of

9  life.

10    Q.    Okay.  So -- okay.  So when did you gain the

11  knowledge that you talked about repeatedly in this examination,

12  that -- where you said you -- you didn't have that knowledge

13  when the depositions were taken?

14         THE COURT:  Could you be specific about this

15  particular deposition testimony?

16    Q.    (BY MR. BLUM:)  When you testified in your

17  deposition and -- let's see.  That date was December of 2019.

18  When did you gain knowledge that the number shouldn't have been

19  zero?

20    A.    You were asking me to speculate then, just like

21  you're asking me to speculate now.  So I have a better

22  understanding of the system hydraulics, a better understanding

23  of how the SPTF operates, a better understanding of the

24  locations of all the turnouts, a better understanding of how

25  the system hydraulics and dynamics work, a better understanding

1    of indirect blending versus direct blending.  So all of this, I

2    think, I have gained and I continue to gain from that day until

3    now and will continue.

4        Q.    Well, so this was -- this depo was in December of

5    2019; correct?

6        A.    Correct.

7        Q.    How long had you been working for the -- either

8    Valencia or the combined agencies?

9        A.    So the new agency started in 2018.

10       Q.    Right.

11             How about for the Valencia?

12       A.    Well, Valencia, before that, I started in '96.  But

13   these particular, um, results and this data that you're asking

14   me are more system hydraulics of the former Castaic Lake Water

15   Agency, which I wasn't as knowledgeable as I am now.

16       Q.    Prior to you being designated as a deponent in this

17   case, had you even reviewed the theoretical blend calculations?

18       A.    I'm sure I have.  To what extent, I don't know.

19       Q.    Were you aware that there were theoretical blend

20   calculations that, I think, in -- the first exhibit is 1372

21   that showed concentrations above -- concentrations in the

22   turnouts above what was found in the effluent prior to being a

23   deposition -- prior to being a deponent in this case?

24       A.    I'm assuming -- I don't recall when I gained

25   knowledge of that, but I am assuming I gained it prior to that

UNITED STATES DISTRICT COURT

1   first deposition, yes.

2       Q.    All right.  And was it because you were preparing

3   for the deposition that you gained that knowledge?

4       A.    Of course.

5       Q.    Okay.  What do you mean "of course"?

6       A.    Well, when I was -- when I was put in charge of

7   operations and maintenance, I take it very seriously.  And when

8   I was designated as the person most knowledgeable for this, I

9   started reviewing.  Like I continued -- I was up until pretty

10  late last night still reviewing.  This is a lot of information.

11      Q.    All right.  Now, Mr. Alvord, isn't it true -- and

12  let me just -- I want to make sure I get this right.

13            Now, the source of the VOCs that was found in 4A --

14  I think it was 4 on Exhibit 1371 -- is it plausible that the

15  source could be from a -- from something -- from an additional

16  source other than the SPTF?

17      A.    Are you talking about SC-2 or SC-1?  I don't

18  recall --

19      Q.    If we can put up 1371 again.

20      A.    If it was the 3 parts per billion that we just

21  looked at --

22      Q.    I'm looking at 4A here (indicating).

23      A.    4A.  TCE.  Yes.

24            So what is the question now?

25            MR. BLUM:  You can blow that up, Rick.

1    Q.   (BY MR. BLUM:)   The question is:   Is it plausible

2    that the reason there is contamination above the detection

3    limit is because there's a source of VOCs, TCE in particular,

4    that you're not aware of?

5    A.   So if you look back on the top, it said the TCE was

6    3.1, I think, from Saugus 1 and 1 point or -- I didn't

7    remember, you moved it too quickly -- that would lead me to

8    believe that this came from Saugus 1 and 2.

9    Q.   This is the one where we just went through the math.

10   A.   Right.   But if you can zoom out -- I don't know if

11   that's --

12   Q.   Yeah.   Go ahead and zoom out.

13   A.   It shows Saugus 1, TCE, 3.1; Saugus 2, TCE, 1.2.

14   The effluent was 2.1.   So I have no reason to believe that that

15   .69 at this time, looking at this data, would come from

16   anywhere else but the Saugus 1 and 2.

17   Q.   And you don't believe it's even plausible that it's

18   from another source?

19   A.   Anything is plausible.   But based on this data,

20   based what I'm looking at right now, I have no reason to

21   believe it came from anywhere else other than Saugus 1 and 2.

22        Now, you've got to remember, this is rewinding to

23   2011.   In 2012, we detected higher levels and we found what we

24   thought was the source, the Flamingo Cleaners, in the soil.

25   Q.   All right.   If we can go to the deposition on

1  December 12th, page 40, line 19, through page 41, line 5.

2         THE COURT:  And, Mr. Blum, how much more time do you

3  have with this witness?

4         MR. BLUM:  Half hour, Your Honor.  I'll make sure

5  it's a half hour.

6         THE COURT:  All right.

7         MR. GEE:  No objections, Your Honor.

8         THE COURT:  You may proceed.

9         (Videotaped deposition was played:)

10    Q.  *"And so if we look down, do we find*

11    *concentrations of TCE above the detection limit?*

12    *And I'll -- and I'll tell you look at 6/27/11.*

13    A.  *"Yes.  4A.*

14    Q.  *"Where did that come from?*

15    A.  *"I don't know.*

16    Q.  *"Could it be another -- could that mean*

17    *that you have another source that you haven't taken*

18    *into account?*

19    A.  *"I would have to speculate, but it's*

20    *plausible."*

21    Q.  (BY MR. BLUM:)  What information -- well, when

22  you -- on December 12th, 2019, when you said you don't know the

23  source, was that the truth?

24    A.  Well, I think I just stated here a few minutes ago

25  that it's plausible, anything is plausible.

UNITED STATES DISTRICT COURT

 1           So, yes, that was the truth.  But looking at the

 2    data again right now and from December 12th, 2019, until

 3    10:00 o'clock, 11:00 o'clock last night, all that information I

 4    have gathered is still that.

 5           But, yes, it's still plausible.  If you want to pin

 6    me down to what I said there, it's plausible, I said it here,

 7    it's plausible.

 8       Q.    Well, the question, though -- that wasn't my

 9    question.

10           When you said you didn't know the source, under

11    oath, as the corporate representative, on December 12th, 2019,

12    was that the truth?

13       A.    I don't think I said I didn't know the source.  Did

14    I?  I thought I said it's plausible.  You asked the question --

15       Q.    Well, let me read that part again.

16       A.    And I said I would have to speculate.

17           THE COURT:  Let's move on, please.

18       Q.    (BY MR. BLUM:)  All right.  Now, are you aware of

19    any instance in which Mr. Koelewyn prepared e-mails to his

20    superiors after reviewing data where he concluded that, based

21    on the data that he saw, that the source of VOCs at the

22    turnouts could not be Whittaker?

23       A.    I know there was one e-mail that I reviewed.  Um, I

24    don't specifically remember the details.  I'm sure you're going

25    to pull it up and I'll be able to read it again.

1    Um, he may have speculated that.

2    Q.  Did he use the word "speculation," or is that a word

3    you added?

4    A.  I would have to read the e-mail again.  I know I

5    read an e-mail between Mr. Koelewyn and Mr. Leserman about a

6    detection at a turnout, if that's the one you're referring to.

7    MR. BLUM:  Is there -- is there any objection to

8    1383?

9    MR. GEE:  Just a second.

10    Objection.  Lacks foundation.

11    MR. BLUM:  He's testifying as the corporate

12    representative, Your Honor.

13    THE COURT:  I understand.  But the objection is

14    sustained.

15    MR. BLUM:  Okay.

16    Q.  (BY MR. BLUM:)  Do you recall a situation in which

17    the response to a statement from Mr. Koelewyn about the source

18    of contamination was that we should blame it on lab error or

19    sampling error?

20    A.  I do recall in that e-mail saying that it could

21    possibly be laboratory artifacts.

22    Q.  Okay.  And isn't it correct that, as the corporate

23    representative, you investigated that and you found no factual

24    basis for concluding that Mr. Koelewyn's results were the

25    result of lab error?

1    A.   So I think I've testified about what we do when we

2    find anomalies in our sample sites.  This particular one, I

3    don't recall what the data is.  I think you're referring to the

4    3.0 in June of 2011 at SC-2.  Um, but, again, no, since it was

5    non-detect prior and non-detect after, there wasn't a lot more

6    investigation that was done, to my knowledge.

7    Q.   Well, that wasn't my question.  First of all, that

8    is what I'm referring to, the level -- the 3.

9         But isn't it correct that, based on Mr. Leserman

10   saying I'll blame it on lab error, you investigated it as part

11   of your responsibilities as a 30(b)(6) witness, which is a

12   corporate representative, and you found no basis for concluding

13   that lab error was the reason for the number?

14   A.   If I recall my discussions with Mr. Leserman and

15   Mr. Koelewyn, they speculated that that was the issue at the

16   time.  But since it was non-detect, the following sample, it

17   never went anywhere.

18   Q.   Was there any factual basis for the assertion that

19   the reason for the readings was lab error?

20   A.   Not that I'm aware of.

21   Q.   But yet Mr. Leserman said let's blame it on lab

22   error; correct?

23        THE COURT:  Mr. Blum, next.

24   Q.   (BY MR. BLUM:)  Now, in the 2012 situation, the one

25   we talked about, wasn't the first reaction of the agency blame

1    it on lab error?

2        A.    That's not to my knowledge.  I -- I don't know.

3        Q.    Now, just a couple questions and then we're done.

4              Would you agree that in 1997, the water agency was

5    aware of perchlorate as a problem in the groundwater?

6        A.    In 1997, I was the water quality specialist for

7    Valencia Water Company.  I got a -- either an e-mail or a call

8    from Department of Health Services, which is now DDW, asking if

9    they could come out with me and collect samples for a

10   contaminant called perchlorate.

11       Q.    And at least one of the wells, V-157, was found to

12   have perchlorate in 1997; correct?

13       A.    Correct.

14       Q.    And how far is V-157 from V-205?

15       A.    V-205?

16       Q.    Yeah.

17       A.    Um, the way the crow flies, maybe a mile or so --

18       Q.    Okay.

19       A.    -- to the west.

20       Q.    When was V-205 -- started to be drilled?

21       A.    I think V-205 was drilled in early 2000s, maybe

22   2004-ish.

23       Q.    Now, prior to drilling 2005, do you recall any

24   analysis being done as to whether or not it was in the path of

25   a perchlorate plume?

1    A.    So prior to the drilling of V-205, we did something

2    called a drinking water source assessment.  And that looks at

3    various contaminants within two -- two -- two-year, five-year,

4    and ten-year zone of that well.  I don't recall the result of

5    it, but we completed that -- that information and provided that

6    to DDW prior to drilling.

7    Q.    Was there analysis done that, if perchlorate can get

8    to V-157, that why couldn't it get to V-205?

9    A.    In the context of the drinking water source

10   assessment, I'm sure it was in there.

11   Q.    Do you know or you're just assuming?

12   A.    I don't recall.

13        MR. BLUM:  That's it, Your Honor.

14        THE COURT:  Mr. Gee.

15                     **CROSS-EXAMINATION**

16   BY MR. GEE:

17   Q.    Good afternoon -- yes, good afternoon, Mr. Alvord.

18        MR. GEE:  I would like to display Exhibit No. 533,

19   which was stipulated to.

20        (Exhibit 533 received into evidence.)

21   Q.    (BY MR. GEE:)  Mr. Alvord, do you recognize this --

22   this schematic map?

23   A.    Yes.

24   Q.    And what is it?

25   A.    The dark blue line shows our treated water.  It's

1    called "import."  It's the surface -- coming from the two

2    surface water treatment plants getting distributed to the

3    various turnouts throughout the service area boundary.  And

4    each of those colors represents the legacy service area.  And

5    then the black dotted line is the service area boundary.

6         Q.    Okay.  And approximately how many miles of pipeline

7    are we talking about?

8         A.    Yeah.  Of this line, I know we have, as an agency,

9    almost 900 miles of pipe.  This would be a good 15 to 20, if

10   not more.

11        Q.    Okay.  And I'd like to show -- or display

12   Exhibit 537, which was displayed during Mr. Steffey's

13   examination.

14             Do you recognize this photograph, Mr. Alvord?

15        A.    Yes.

16        Q.    And what does this photograph show?

17        A.    That is the blind flange being installed on the

18   improperly abandoned pipeline.

19        Q.    And does it show the pipeline being above ground or

20   underground?

21        A.    It's underground.

22        Q.    Are most of the agency's pipelines underground?

23        A.    All of our distribution and transmission lines are

24   underground.

25        Q.    And looking at this -- this photograph, this appears

1  to be a rather laborious activity in the sense that you

2  actually had to dig out the -- the lateral.  Is that correct?

3      A.    Correct.

4           MR. BLUM:  Leading.

5      Q.    (BY MR. GEE:)  Okay.  And --

6           THE COURT:  When there's an objection, I need to

7  rule.

8           And the objection is sustained.  The answer is

9  stricken.

10     Q.    (BY MR. GEE:)  Okay.  Um, if -- if you were to

11 conduct an investigation similar to this over a 15-mile time --

12 or span, would that be a costly venture?

13     A.    Quite.

14     Q.    Okay.  Let's go back to Exhibit 533.  Can you point

15 out -- and you can use your finger on the map -- where the SC-1

16 turnout is?

17     A.    Yes.  It is there (indicating).

18     Q.    And where is it written in relationship to the

19 Saugus Perchlorate Treatment Facility?

20     A.    That's where that dot is.  That's the SPTF.

21     Q.    Okay.  And earlier you discussed an investigation of

22 the source that -- of VOC detection and SC-1 turnout.  Do you

23 recall that?

24     A.    Yes.

25     Q.    Can we take -- well, let's see.  Yeah, can we take a

1    look at Exhibit 1370, which is now stipulated.

2              (Exhibit 1370 received into evidence.)

3         Q.    (BY MR. GEE:)  Is this the report that you were

4    talking about for the investigation?

5         A.    Yes.

6         Q.    And can you take -- can you walk me through what was

7    done in that investigation?

8         A.    Sure.

9              THE COURT:  And just to orient everyone, this is the

10   2012 investigation that was previously referred to?

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  Even though it has a date of March 21 of

13   2013?

14             THE WITNESS:  Yes, Your Honor.

15             THE COURT:  All right.  That's fine.

16             Now, your question once again?

17        Q.    (BY MR. GEE:)  Can you take us through the steps

18   that the agency went through in this investigation?

19        A.    Yes.  They found detections that were -- what we

20   considered anomalies, high detections that we wouldn't expect.

21   Um, we discovered that the SC-1 turnout was shut down because

22   they were installing the MCC panels, the motor control panels,

23   and doing some work.

24             Um, at that time, they had -- that's when they had

25   these high levels.  They restarted the SC-1.  I think it was --

1  it was either August or October -- and flushed it and sampled,

2  and the detections weren't there.  But then they came back, I

3  think it was around September, still high.  Um, they replaced

4  what at the time was a brass sample tap, um, to stainless steel

5  because they thought it could have been something associated

6  with that.

7          They then reviewed plans and discovered that this is

8  the location where the Honby lateral, that pipe I spoke of

9  earlier, was relocated and abandoned because of development.

10  So they decided to excavate this area to see how it was

11  abandoned.  And that's when they discovered that the valve was

12  left open, connected to the pipeline where the sample tap is

13  connected to.

14          Um, they then put a blind flange, which has a gasket

15  and -- it's just a flat plate, and they bolted it on.  They

16  flushed everything.  They re-sampled.  And the detections came

17  back in either non-detect or in levels that they expected.

18      Q.    Okay.  I think you mentioned the SC-1 sample tap.

19  Is that located near the Honby lateral?

20      A.    Right next to it.

21      Q.    Okay.  I'd like to go back to -- well, while it's

22  still fresh in your mind, these blend ratios that -- gosh, what

23  exhibit was that?  I believe it's -- let's take a look at 1372

24  to start.

25          And, Mr. Alvord, when was -- what month was this --

1412

1    was this report for?

2        A.    September 2011, but it -- yeah, it was for the

3    September data.

4        Q.    Okay.  And was that before you found the -- that the

5    anomaly -- the Honby lateral detection?

6        A.    Yes.

7        Q.    Okay.  I'd also like to take -- take -- I'd like you

8    to take a look at what is called the theoretical blend

9    calculation.  Up on Header No. 1, there's words in parentheses

10   that says "monthly."  How often is -- how -- what -- what does

11   the data in this -- does that suggest that the data here is

12   actually not a daily but, rather, monthly collection of data?

13       A.    Correct.

14       Q.    And is there a basis for someone to compare the

15   monthly data to a specific date?  I think counsel pointed to

16   9/6/2011 and drew a comparison of what the PCE on that date

17   for -- I believe it's SC-2.

18            Do you have any data on that specific date from the

19   Saugus 1 and Saugus 2 turn -- or SPTF?

20            MR. BLUM:  Compound and vague.

21            THE COURT:  Sustained on vagueness grounds.

22       Q.    (BY MR. GEE:)  Okay.  Mr. Alvord, do you have any

23   specific data from Table 1 that is specific to 9/6/2011?

24       A.    I was waiting for an objection.

25            No, not for what's coming out of Saugus 1 and 2.

**UNITED STATES DISTRICT COURT**

1    The Saugus 1 and 2 and theoretical blend calculation is done on

2    a monthly basis.  The data down below is actual data coming at

3    each individual week.

4        Q.    Okay.  And do you know if -- if you kept data that

5    would allow you to compare the -- the concentrations taken on

6    9/6/2011?

7        A.    Yes.  We have all that data.

8        Q.    But it's not represented here; is that correct?

9        A.    Correct.

10       Q.    Okay.  You mentioned that after you isolated -- or

11   the Honby lateral, that there were -- that the issue -- that

12   the issue was resolved.  Did you have any further anomalistic

13   hits after you blinded the Honby lateral?

14       A.    Not at those levels, not that I can recall.

15       Q.    Okay.  And you've already described your process

16   for -- for getting a high reading.  Has that process been in --

17   has that process been followed for a number of years?  Or when

18   did that process go into effect?

19       A.    Yeah.  So we always collect confirmation samples.

20   And depending on the contaminant that we're collecting, because

21   there are different rules and regulations, the repeat sample or

22   the confirmation sample can vary from time to time when you

23   take it.  But yes, we still follow that.

24       Q.    Okay.  Earlier you mentioned that the agency's water

25   system is pressurized.  What does that mean?

1    A.    So when you open your tap at your house, water comes

2  out.  It -- there's pumps and there's tanks that water flows

3  into and it -- it's keeping the water in the pipe and allowing

4  it to move throughout the distribution system.

5    Q.    And so does a pressurized system make any difference

6  in keeping out contaminants?

7    A.    Yes.  If your system was non-pressurized, then

8  potentially contaminants can come in.  But if it's a

9  pressurized system, that's completely closed, then contaminants

10 stay out.

11   Q.    Okay.  And you mentioned that in your investigation

12 process the high readings came after you started up

13 pipelines -- did I understand that correctly?

14   A.    We shut down the turnout which, in essence, that

15 section would have been depressurized.  And then when we

16 started it up, we pressurized it and flushed it and sampled it.

17   Q.    And -- okay.  So at that point, the system pressure

18 would not be keeping the TCE in the Honby lateral out.  Is

19 that --

20        MR. BLUM:  Leading, Your Honor.

21        THE COURT:  Sustained.

22   Q.    (BY MR. GEE:)  Okay.  We did go over these

23 theoretical blend reports.  Does the agency use these

24 theoretical blend reports to actually conduct its blending?

25   A.    No.  It's just something that Division of Drinking

 1   Water asked if we can come up with a tool to help us predict.

 2   We just submit a report to them.

 3       Q.   Okay.  And other than reporting this information to

 4   DDW, is it used for anything else?

 5       A.   No.

 6       Q.   And you went into a -- or you described indirect

 7   blending in your testimony.  What is -- what is the difference

 8   between indirect and direct blending?

 9       A.   So Division of Drinking Water has told us that they

10   don't approve of indirect blending.  So indirect blending is

11   when you take a pipe that has a contaminant and you connect it

12   to a pipe that doesn't have a contaminant and allow it to go

13   into the distribution system.  There's no way to determine how

14   that water is mixing or if it's mixing because of the system

15   hydraulics.  It could be pulling it in different directions.

16            Direct blending is when you take both sources of

17   supply, put it in a container, a tank, allow it to thoroughly

18   mix, and then sample it and then pump it into the distribution

19   system.  So direct blending is what they would prefer.

20       Q.   And what would it take to implement a direct

21   blending process?

22       A.   For which location?

23       Q.   Um, for -- for the entire distribution system.

24       A.   It would be impossible.  Um, at V-201 specifically,

25   there's just not enough land.  You would need a very large

**UNITED STATES DISTRICT COURT**

```
 1    storage reservoir.

 2              I did some backwards calculations.  And, I mean,

 3    it's upwards of 8 million gallons of a storage tank based on

 4    the flows that would have to go in.  Same with SPTF.  There's

 5    just not enough land to -- to do something like that.

 6        Q.   Okay.  You mentioned that earlier -- I'm jumping

 7    back and forth.  But we discussed this theoretical blend

 8    calculation.  How does an agency actually decide how to -- how

 9    much water to blend to reach that non-detect goal at the

10    turnouts?

11        A.   It doesn't.  It's based on which treatment plant is

12    operating.  It's based on how much water is in that pipeline

13    coming through, and we have no way of determining that and --

14    other than this calculation to help theoretically understand

15    what might be happening in the system.

16        Q.   Okay.  I'd like to display trial Exhibit 472, which

17    was previously admitted.

18              (Exhibit 472 received into evidence.)

19        Q.   (BY MR. GEE:)  Do you recognize this photograph?

20        A.   Yeah.  This is V-205.  It was previously owned by

21    Valencia Water Company.  Now it's owned and operated and the

22    land associated with it have the exclusive operational rights

23    to it to pump groundwater, so -- as with all of our wells.

24        Q.   And is this -- is this one of the impacted wells

25    that's the subject of this litigation?
```

**UNITED STATES DISTRICT COURT**

1     A.    Yes.

2     Q.    And has the agency began the design for -- design of

3     the remedy for this -- for this well?

4     A.    Yes.

5     Q.    And has the agency submitted any paperwork to DDW

6     for -- for a water supply permit?

7     A.    I believe we submitted --

8          MR. BLUM:  Objection, Your Honor.  It's beyond the

9     scope of the direct.

10         THE COURT:  I'm going to allow it so as not to have

11    to have him recalled in his case.  So this will be considered

12    essentially in their case for the purposes of these questions.

13         MR. BLUM:  Your Honor, they rested.

14         THE COURT:  I'm going to allow it.

15         MR. BLUM:  Thank you, Your Honor.

16    Q.    (BY MR. GEE:)  Okay.  And you also mentioned the

17    importance of V-201.

18    A.    I don't think I answered that question.

19    Q.    Oh.  Go ahead.  I'm sorry.

20    A.    Can I?

21         THE COURT:  You can answer the question.

22         THE WITNESS:  The application, permit application,

23    which is just a one-page application.  We haven't submitted the

24    97-005 documents.

25    Q.    (BY MR. GEE:)  Okay.  Did you ask at any time or

**UNITED STATES DISTRICT COURT**

1  earlier -- prior to your earlier deposition, did you ask

2  whether or not -- DDW whether or not -- what it would take to

3  obtain a permit for V-201?

4        A.    Yes.  We presented a number of things to them --

5              MR. BLUM:  Objection, Your Honor.  It's -- the

6  answer is yes or no.

7              THE COURT:  I'm going to need to hear you better, so

8  if you could please speak into the microphone.

9              MR. BLUM:  Your Honor, I object after the word

10  "Yes," we did.  It's not -- there's --

11             THE COURT:  He's answered the question.

12             Next question.

13       Q.    (BY MR. GEE:)  And what did the agency do?

14             MR. BLUM:  Hearsay, Your Honor.

15             THE COURT:  Not as asked.

16             You can answer.

17             THE WITNESS:  Yeah.  We've asked them -- I

18  specifically have asked them if we blend, if we --

19             THE COURT:  Wait.  Hold on.  So the answer is that

20  you -- without saying what you asked, what did you actually do?

21  You went to the agency?  What did you do?

22             THE WITNESS:  We asked DDW --

23             THE COURT:  All right.  So you went to DDW to

24  inquire.

25             MR. GEE:  Okay.  Let me -- let me -- I'm sorry,

1    Your Honor.  Let me ask a foundational question.

2         Q.    (BY MR. GEE:)  Do you meet with DDW on a periodic

3    basis?

4         A.    Yes.

5         Q.    And how often?

6         A.    Currently, we have standing quarterly meetings, but

7    we exchange e-mails and phone calls periodically.  But we do

8    have routine meetings at this point.

9         Q.    And is V-201 one of the topics of your quarterly

10   meetings?

11        A.    Yes.

12        Q.    And is it discussed pretty regularly?

13        A.    Every single quarterly meeting that we have, we

14   discuss 201.

15        Q.    Okay.  At any time did you ask DDW what it would

16   take to get a permit for V-201?

17        A.    Yes.

18        Q.    And what -- do you remember what DDW's response was?

19             MR. BLUM:  Hearsay.

20             THE COURT:  Overruled.

21             And it's not being offered necessarily for the truth

22   but, rather, what, in fact, the agency is doing and why it is

23   doing what it is doing.

24             THE WITNESS:  We've asked if we implemented

25   treatment for VOCs, could that expedite the permit, as well as

UNITED STATES DISTRICT COURT

 1    other things.

 2         Q.    (BY MR. GEE:)  And what -- do you recall what the

 3    response was?

 4         A.    They said it would help us get a permit quicker if

 5    we implemented treatment.

 6         Q.    Okay.  And, um -- are you aware of whether the

 7    agency has conducted any type of study or evaluation to

 8    determine what -- what the best course of action would be for

 9    V-201?

10         A.    So we conducted what's referred to as an EE-CA.

11    EE-CA, engineering evaluation cost analysis.

12         Q.    And about when -- when was that completed, if you

13    recall?

14         A.    Within the last year and a half.

15         Q.    Okay.  And do you recall what the -- what the

16    purpose of the EE-CA was?

17              THE COURT:  This is going to take a little bit, it's

18    okay.  And we're going to take our break at this point.

19              So it's now 12:30.  We're going to break until

20    1:00 o'clock.

21              Please remember, do not speak to anyone about the

22    case, the people, or the subject matter involved.  Continue to

23    keep an open mind.

24              We will see you back at 1:00 o'clock.

25              Thank you.

1        THE COURTROOM DEPUTY:  All rise for the jury,

2   please.

3            (Out of the presence of the jury:)

4            THE COURT:  We're in recess until 1:00.

5            (Morning proceedings adjourned at 12:25 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6            I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17           DATED THIS 30TH DAY OF NOVEMBER, 2021.

18

19

20               /S/ MYRA L. PONCE
     _____
21        MYRA L. PONCE, CSR NO. 11544, CRR, RDR
              FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**

**$**

**$50,000** [1] - 1281:6

**'**

**'90S** [1] - 1380:13
**'96** [1] - 1399:12

**1**

**1** [49] - 1254:5, 1258:2, 1259:7, 1260:7, 1260:15, 1284:3, 1284:9, 1287:12, 1287:14, 1291:13, 1296:4, 1296:10, 1296:17, 1296:23, 1297:3, 1297:21, 1302:19, 1338:13, 1342:11, 1342:14, 1342:15, 1352:7, 1355:4, 1355:13, 1356:15, 1364:11, 1364:13, 1368:18, 1373:19, 1377:25, 1378:5, 1378:7, 1378:10, 1382:18, 1390:14, 1391:23, 1396:10, 1401:6, 1401:8, 1401:13, 1401:16, 1401:21, 1412:9, 1412:19, 1412:23, 1412:25, 1413:1
**1.2** [2] - 1396:21, 1401:13
**1.5** [4] - 1293:14, 1312:6, 1314:20, 1366:11
**1.6** [4] - 1389:18, 1389:19, 1390:15, 1390:18
**10** [13] - 1261:12, 1261:13, 1319:19, 1319:24, 1320:10, 1339:21, 1339:24, 1340:1, 1340:3, 1360:22, 1394:20, 1396:7, 1397:1
**100** [2] - 1355:9, 1375:21
**105** [1] - 1366:6
**1056** [1] - 1319:15
**10:00** [1] - 1403:3
**10:30** [1] - 1348:18
**10:45** [3] - 1319:9, 1348:23, 1349:2
**11** [2] - 1329:9, 1368:18

**110** [1] - 1311:23
**113** [1] - 1262:6
**11:00** [1] - 1403:3
**11TH** [3] - 1364:23, 1368:9, 1369:21
**12** [2] - 1309:15, 1395:17
**12/12/19** [2] - 1384:18, 1395:17
**12/5/19** [1] - 1355:9
**12:25** [1] - 1421:5
**12:30** [1] - 1420:19
**12TH** [4] - 1402:1, 1402:22, 1403:2, 1403:11
**1341** [2] - 1267:9, 1268:3
**1348** [2] - 1267:9, 1268:18
**1349** [1] - 1267:9
**1370** [3] - 1267:9, 1410:1, 1410:2
**1371** [6] - 1267:9, 1267:12, 1390:25, 1391:1, 1400:14, 1400:19
**1372** [6] - 1267:9, 1386:14, 1386:15, 1386:18, 1399:20, 1411:23
**1373** [1] - 1267:9
**1383** [2] - 1267:10, 1404:8
**1384** [2] - 1267:10, 1269:5
**14** [1] - 1267:7
**1419** [2] - 1267:10, 1267:25
**1420** [1] - 1268:1
**1438** [6] - 1265:14, 1266:1, 1267:3, 1269:7, 1349:12, 1349:19
**1441** [5] - 1265:15, 1266:1, 1267:4, 1269:7, 1349:20
**1449** [9] - 1275:6, 1275:7, 1275:8, 1283:15, 1293:17, 1293:20, 1342:8, 1361:7, 1374:12
**1450** [6] - 1281:25, 1282:4, 1282:5, 1319:14, 1319:16, 1321:4
**1452** [2] - 1286:8, 1288:8
**1453** [1] - 1290:19
**15** [3] - 1286:7, 1375:5, 1408:9

**15-MILE** [1] - 1409:11
**15TH** [1] - 1387:7
**16** [1] - 1355:9
**17** [3] - 1309:15, 1379:6, 1380:10
**18-06825** [1] - 1254:6
**19** [6] - 1351:20, 1351:23, 1365:17, 1370:10, 1370:16, 1402:1
**1975** [1] - 1335:7
**1988** [1] - 1272:5
**1996** [1] - 1329:18
**1997** [3] - 1406:4, 1406:6, 1406:12
**19TH** [1] - 1365:8
**1:00** [3] - 1420:20, 1420:24, 1421:4
**1A** [3] - 1388:19, 1389:2

**2**

**2** [32] - 1259:7, 1260:8, 1260:15, 1282:7, 1296:5, 1296:23, 1297:22, 1298:8, 1319:14, 1338:14, 1342:12, 1342:15, 1353:19, 1355:5, 1355:19, 1356:1, 1356:15, 1373:20, 1378:1, 1378:6, 1382:18, 1391:23, 1396:11, 1396:22, 1397:8, 1401:8, 1401:13, 1401:16, 1401:21, 1412:19, 1412:25, 1413:1
**2.1** [3] - 1396:23, 1397:1, 1401:14
**2.15** [1] - 1397:2
**20** [9] - 1320:7, 1320:18, 1324:9, 1361:17, 1375:5, 1379:4, 1384:20, 1384:22, 1408:9
**20,000** [1] - 1273:17
**2000S** [1] - 1406:21
**2004-ISH** [1] - 1406:22
**2005** [1] - 1406:23
**201** [1] - 1419:14
**2010** [2] - 1329:18, 1347:12
**2011** [14] - 1319:23, 1347:11, 1347:19, 1348:5, 1348:15, 1375:10, 1387:9, 1387:11, 1391:9, 1391:15, 1395:3,

**1401:23, 1405:4, 1412:2
**2012** [23] - 1310:15, 1319:24, 1320:6, 1320:11, 1320:25, 1321:4, 1321:13, 1324:9, 1365:24, 1376:9, 1376:11, 1376:12, 1377:4, 1377:5, 1377:12, 1379:2, 1379:3, 1379:11, 1383:2, 1390:4, 1401:23, 1405:24, 1410:10
**2013** [7] - 1292:19, 1292:21, 1335:11, 1335:14, 1387:7, 1410:13
**2015** [3] - 1285:2, 1320:19, 1335:14
**2018** [3] - 1329:12, 1329:19, 1399:9
**2019** [18] - 1292:22, 1293:2, 1293:8, 1293:10, 1293:19, 1320:21, 1351:12, 1352:18, 1359:8, 1359:10, 1360:22, 1365:19, 1366:5, 1398:17, 1399:5, 1402:22, 1403:2, 1403:11
**2020** [24] - 1292:23, 1310:4, 1319:24, 1335:15, 1336:6, 1360:12, 1364:17, 1364:20, 1364:21, 1364:22, 1364:23, 1365:8, 1365:17, 1367:3, 1367:10, 1367:15, 1368:17, 1368:24, 1369:9, 1369:21, 1370:10, 1370:16, 1371:24
**2021** [2] - 1254:1, 1360:13
**20TH** [1] - 1368:12
**21** [1] - 1410:12
**21ST** [1] - 1368:17
**22** [9] - 1334:11, 1334:12, 1334:16, 1335:23, 1336:8, 1336:18, 1352:5, 1352:9, 1362:21
**23** [1] - 1355:9
**24-HOUR** [1] - 1315:25
**25-CENT** [1] - 1271:21
**255** [3] - 1370:7, 1370:9, 1370:15

**27** [1] - 1369:24
**27TH** [1] - 1395:3
**29** [1] - 1254:1

**3**

**3** [8] - 1287:7, 1287:11, 1298:8, 1323:21, 1369:24, 1389:12, 1400:20, 1405:8
**3-ISH** [3] - 1355:20, 1355:24, 1356:2
**3.0** [3] - 1389:7, 1390:15, 1405:4
**3.1** [3] - 1396:21, 1401:6, 1401:13
**3.1-ISH** [1] - 1356:3
**3.2** [1] - 1356:3
**30** [2] - 1256:22, 1257:21
**30(B)(6)** [1] - 1405:11
**300** [2] - 1263:4, 1281:16
**31** [2] - 1351:13, 1351:15
**31:19** [1] - 1351:13
**32** [1] - 1351:21
**325,859** [1] - 1359:16
**32:9** [1] - 1351:13
**33** [3] - 1368:18, 1384:18, 1384:20
**34** [2] - 1309:15, 1384:18
**38:15** [1] - 1395:18

**4**

**4** [2] - 1360:21, 1400:14
**4.2** [1] - 1342:4
**4.3** [1] - 1396:22
**40** [2] - 1257:21, 1402:1
**40,000** [1] - 1359:14
**403** [7] - 1257:11, 1264:17, 1264:19, 1264:23, 1265:3, 1267:21, 1322:15
**40:18** [1] - 1395:18
**41** [1] - 1402:1
**472** [2] - 1416:16, 1416:18
**4A** [4] - 1400:13, 1400:22, 1400:23, 1402:13

**5**

**5** [21] - 1314:23,

**9**

9 [1] - 1351:21
9/1/2011 [1] - 1389:3
9/26 [1] - 1389:17
9/6/2011 [4] - 1389:4, 1412:16, 1412:23, 1413:6
90 [5] - 1394:20, 1396:6, 1396:14, 1396:15, 1397:4
90/10 [1] - 1395:7
900 [1] - 1408:9
95 [1] - 1323:25
97-005 [17] - 1300:3, 1335:7, 1335:15, 1336:6, 1363:18, 1363:19, 1363:23, 1364:16, 1364:19, 1365:10, 1365:23, 1367:3, 1367:12, 1368:4, 1368:10, 1369:20, 1417:24
9:30 [1] - 1264:22

**A**

A.M [1] - 1254:1
ABANDON [4] - 1382:2, 1382:3, 1383:10, 1383:11
ABANDONED [9] - 1321:12, 1380:2, 1380:18, 1381:20, 1382:7, 1382:13, 1408:18, 1411:9, 1411:11
ABANDONMENT [1] - 1380:22
ABLE [15] - 1263:2, 1265:17, 1265:18, 1265:20, 1270:2, 1273:2, 1293:21, 1293:24, 1338:6, 1338:12, 1359:13, 1385:23, 1392:14, 1394:2, 1403:25
ABSOLUTELY [3] - 1352:23, 1366:24, 1380:7
ABSTRACT [1] - 1350:2
ACCEPT [1] - 1343:19
ACCEPTABLE [2] - 1373:7, 1373:22
ACCEPTED [1] - 1272:7
ACCESS [1] - 1359:22
ACCIDENTALLY [1] - 1290:22

**Left column 1**

1319:19, 1334:20, 1336:14, 1337:1, 1351:12, 1351:13, 1351:15, 1356:2, 1361:1, 1366:6, 1366:11, 1369:24, 1379:7, 1379:8, 1379:9, 1388:9, 1388:11, 1389:16, 1397:9, 1402:1
50 [3] - 1293:13, 1293:15, 1320:24
500 [1] - 1281:13
522 [2] - 1296:8
533 [3] - 1407:18, 1407:20, 1409:14
537 [3] - 1321:17, 1321:18, 1408:12
5TH [4] - 1351:12, 1352:18, 1354:17, 1366:5

**6**

6 [4] - 1290:2, 1290:3, 1384:18, 1384:22
6/27/11 [1] - 1402:12
6/27/2011 [1] - 1395:9
60 [1] - 1273:19
60-SECOND [1] - 1256:23
634 [1] - 1329:12
69 [2] - 1395:4, 1401:15

**7**

7 [2] - 1269:25, 1384:18
70 [1] - 1360:24
702 [1] - 1263:2
75 [1] - 1360:23
79 [2] - 1358:13, 1358:14

**8**

8 [5] - 1351:13, 1351:15, 1352:7, 1366:6, 1416:3
8/21 [1] - 1369:23
80,000 [1] - 1359:9
88 [2] - 1357:18, 1357:20
88,000 [1] - 1359:13
8:00 [1] - 1254:23
8:11 [1] - 1254:1
8:30 [1] - 1263:18

ACCORDANCE [1] - 1344:11
ACCOUNT [3] - 1313:21, 1364:3, 1402:18
ACCREDITATION [1] - 1344:9
ACCREDITED [3] - 1343:17, 1344:7, 1344:18
ACCURACY [3] - 1325:11, 1327:2, 1343:25
ACCURATE [7] - 1370:21, 1386:24, 1388:16, 1393:24, 1394:8, 1394:10, 1394:15
ACRE [7] - 1359:9, 1359:13, 1359:15, 1359:16, 1359:17, 1359:19
ACRE-FEET [1] - 1359:9, 1359:13, 1359:15
ACT [4] - 1334:9, 1334:13, 1334:17, 1365:3
ACT [1] - 1334:13
ACTION [1] - 1420:8
ACTIVATED [2] - 1356:6, 1356:22
ACTIVITY [1] - 1409:1
ACTUAL [12] - 1262:6, 1286:1, 1286:12, 1290:4, 1294:3, 1311:18, 1342:13, 1365:5, 1367:13, 1368:11, 1393:19, 1413:2
ADDED [1] - 1404:3
ADDING [2] - 1363:25, 1390:2
ADDITION [1] - 1257:12
ADDITIONAL [5] - 1260:23, 1265:11, 1303:24, 1398:4, 1400:15
ADDRESS [7] - 1264:13, 1267:16, 1273:2, 1275:2, 1279:15, 1305:21, 1306:2
ADDRESSED [1] - 1286:2
ADDRESSING [1] - 1327:3
ADDS [1] - 1364:7
ADJOURNED [1] -

1421:5
ADJUSTING [1] - 1307:25
ADMISSIONS [1] - 1261:1
ADMITTED [2] - 1296:7, 1416:17
ADOPT [1] - 1334:14
ADOPTED [1] - 1335:18
ADVISED [1] - 1266:20
AFFECT [1] - 1261:13
AFFECTING [1] - 1263:7
AFTERNOON [3] - 1263:12, 1407:17
AGENCIES [2] - 1329:13, 1329:15, 1399:8
AGENCY [8] - 1254:6, 1269:18, 1300:12, 1329:6, 1329:14, 1329:20, 1329:21, 1399:15
AGENCY [90] - 1275:10, 1275:21, 1277:10, 1277:16, 1278:15, 1278:20, 1279:6, 1286:22, 1291:5, 1300:14, 1300:15, 1300:25, 1301:10, 1301:19, 1301:20, 1302:7, 1302:10, 1303:2, 1307:8, 1307:10, 1307:16, 1307:20, 1307:24, 1308:6, 1308:11, 1308:24, 1309:21, 1310:14, 1311:21, 1314:14, 1314:21, 1321:6, 1321:12, 1324:13, 1324:20, 1325:17, 1329:8, 1329:23, 1337:8, 1337:17, 1337:23, 1338:12, 1339:13, 1340:7, 1340:15, 1340:20, 1341:10, 1344:21, 1347:9, 1347:16, 1347:25, 1348:12, 1351:7, 1353:16, 1354:25, 1357:7, 1357:12, 1359:5, 1362:16, 1364:17, 1365:7, 1371:2, 1371:24, 1372:9, 1380:21, 1381:5, 1381:23, 1383:1,

1385:14, 1385:19, 1385:25, 1386:4, 1386:23, 1392:2, 1392:9, 1393:11, 1393:23, 1399:9, 1405:25, 1406:4, 1408:8, 1410:18, 1414:23, 1416:8, 1417:2, 1417:5, 1418:13, 1418:21, 1419:22, 1420:7
AGENCY'S [11] - 1288:20, 1300:22, 1306:20, 1306:22, 1306:25, 1307:23, 1310:19, 1316:4, 1325:25, 1408:22, 1413:24
AGO [2] - 1366:20, 1402:24
AGREE [13] - 1267:13, 1305:15, 1317:4, 1318:3, 1318:13, 1350:3, 1365:25, 1374:18, 1374:23, 1384:1, 1385:3, 1386:22, 1406:4
AHEAD [2] - 1401:12, 1417:19
AID [1] - 1263:1
AL [1] - 1261:2
AL [1] - 1328:12
AL [1] - 1254:7
ALLEGEDLY [1] - 1306:15
ALLOCATION [4] - 1360:8, 1360:9, 1360:13, 1360:15
ALLOW [5] - 1413:5, 1415:12, 1415:17, 1417:10, 1417:14
ALLOWED [2] - 1346:22, 1382:21
ALLOWING [2] - 1349:15, 1414:3
ALLOWS [4] - 1291:24, 1347:4, 1347:6, 1359:5
ALLUVIAL [1] - 1352:14
ALLUVIUM [1] - 1357:16
ALMOST [5] - 1263:18, 1281:11, 1313:3, 1320:19, 1408:9
ALRIGHTY [2] - 1332:18, 1386:14
ALTERNATIVE [1] - 1263:15

ALVORD[1] - 1329:1
ALVORD[30] - 1254:24, 1255:6, 1258:12, 1261:3, 1265:15, 1266:2, 1267:4, 1269:3, 1269:6, 1314:13, 1327:15, 1328:12, 1328:15, 1329:5, 1339:5, 1349:13, 1350:25, 1351:6, 1356:4, 1369:5, 1369:8, 1382:11, 1383:16, 1386:9, 1400:11, 1407:17, 1407:21, 1408:14, 1411:25, 1412:22
ALVORD'S[3] - 1265:25, 1269:4, 1351:12
AMASS[1] - 1337:22
AMENDED[3] - 1338:16, 1363:21, 1366:3
AMENDMENTS[1] - 1308:2
AMERICAN[3] - 1273:7, 1273:11, 1273:15
AMOUNT[2] - 1379:5, 1397:14
AMOUNTS[2] - 1396:10, 1396:18
ANALYSES[2] - 1296:25, 1318:15
ANALYSIS[1] - 1273:9
ANALYSIS[26] - 1255:22, 1257:14, 1262:20, 1262:21, 1262:23, 1275:19, 1279:4, 1279:5, 1294:14, 1294:19, 1295:21, 1299:9, 1302:5, 1302:19, 1312:14, 1312:19, 1313:15, 1316:18, 1317:9, 1318:3, 1322:10, 1331:20, 1343:15, 1406:24, 1407:7, 1420:11
ANALYTE[1] - 1388:15
ANALYTICAL[1] - 1378:21
ANALYZE[4] - 1272:23, 1273:4, 1281:9, 1377:17
AND[2] - 1271:11, 1329:2

ANGELES[1] - 1254:2
ANNOTATION[1] - 1287:23
ANNUAL[1] - 1357:24
ANOMALIES[21] - 1303:22, 1304:1, 1304:3, 1304:9, 1304:15, 1307:7, 1307:8, 1307:17, 1307:20, 1307:23, 1308:6, 1308:11, 1308:25, 1309:7, 1309:19, 1309:22, 1310:15, 1378:23, 1405:2, 1410:20
ANOMALISTIC[1] - 1413:12
ANOMALY[8] - 1308:7, 1326:9, 1326:10, 1344:2, 1376:18, 1378:12, 1390:19, 1412:5
ANSWER[9] - 1309:23, 1351:19, 1352:2, 1352:6, 1352:12, 1355:14, 1355:18, 1366:13, 1370:8
ANSWER[12] - 1285:12, 1303:20, 1306:6, 1352:16, 1365:14, 1370:17, 1376:3, 1409:8, 1417:21, 1418:6, 1418:16, 1418:19
ANSWERED[9] - 1303:17, 1353:9, 1363:11, 1365:12, 1383:19, 1384:4, 1384:6, 1417:18, 1418:11
ANTICIPATE[2] - 1257:19, 1391:17
ANTICIPATION[1] - 1394:19
ANYWAY[2] - 1282:10, 1377:23
APART[1] - 1315:19
APOLOGIZE[1] - 1266:20
APPARENT[2] - 1257:16, 1264:22
APPEARANCE[1] - 1254:8
APPLICABLE[1] - 1305:19
APPLICATION[14] - 1363:20, 1364:18, 1367:3, 1367:5, 1367:13, 1367:14,

1369:9, 1369:17, 1369:19, 1372:11, 1417:22, 1417:23
APPLICATIONS[2] - 1274:1, 1274:20
APPLIES[2] - 1266:6, 1287:21
APPLY[3] - 1297:10, 1299:8, 1350:16
APPLYING[1] - 1363:21
APPORTIONMENT[3] - 1261:21, 1262:1, 1262:6
APPRECIATE[2] - 1268:24, 1350:20
APPRECIATED[1] - 1273:20
APPROACHING[2] - 1281:13, 1285:4
APPROPRIATE[3] - 1262:11, 1267:10, 1333:23
APPROVE[5] - 1339:9, 1367:22, 1367:23, 1368:12, 1415:10
APPROVED[2] - 1368:13, 1369:6
APPROVING[3] - 1367:2, 1367:9, 1367:17
APRIL[18] - 1364:17, 1364:20, 1364:22, 1365:8, 1365:17, 1365:20, 1367:3, 1367:9, 1367:15, 1368:12, 1368:24, 1369:9, 1369:21, 1370:6, 1370:10, 1370:14, 1370:16, 1387:7
AQUIFER[2] - 1353:5, 1357:4
AQUIFERS[6] - 1299:10, 1299:12, 1299:14, 1299:19, 1300:5
AREA[11] - 1272:1, 1293:2, 1304:10, 1304:19, 1380:15, 1380:16, 1392:12, 1408:3, 1408:4, 1408:5, 1411:10
AREAS[1] - 1289:19
ARGUE[1] - 1259:10
ARGUED[2] - 1258:15, 1264:2
ARGUING[1] - 1350:18

ARGUMENT[3] - 1258:9, 1261:18, 1261:19
ARGUMENTATIVE[1] - 1394:16
ARGUMENTIVE[1] - 1331:14
ARISES[1] - 1317:25
AROSE[1] - 1254:18
ARRIVE[1] - 1275:13
ARRIVING[1] - 1262:11
ARTICLE[1] - 1274:10
ARTICLES[2] - 1274:4, 1274:19
ARTIFACTS[2] - 1378:21, 1404:21
AS[2] - 1271:11, 1329:2
ASA[1] - 1273:16
ASIDE[1] - 1263:12
ASPECT[3] - 1274:21, 1299:10, 1300:17
ASPECTS[3] - 1302:15, 1332:10, 1358:1
ASSERTION[1] - 1405:18
ASSESS[1] - 1275:1
ASSESSING[1] - 1324:5
ASSESSMENT[2] - 1407:2, 1407:10
ASSIGNMENT[12] - 1274:22, 1295:19, 1299:4, 1304:18, 1307:3, 1316:10, 1317:2, 1317:3, 1318:20, 1318:23, 1318:24, 1323:7
ASSIGNMENTS[3] - 1307:4, 1318:17, 1318:19
ASSIST[1] - 1302:23
ASSISTANT[1] - 1272:10
ASSOCIATED[2] - 1411:5, 1416:22
ASSOCIATION[3] - 1273:8, 1273:12, 1273:15
ASSOCIATION[1] - 1273:17
ASSUME[10] - 1258:18, 1278:25, 1298:8, 1315:11, 1324:12, 1359:4, 1376:18, 1382:2, 1384:11, 1385:7
ASSUMES[1] -

1326:13
ASSUMING[3] - 1399:24, 1399:25, 1407:11
ASSUMPTION[1] - 1315:20
ASSUMPTIONS[2] - 1303:5, 1316:1
ASSURANCE[1] - 1343:24
ATTEMPT[3] - 1269:5, 1313:8, 1340:15
ATTORNEY[2] - 1265:1, 1268:20
ATTORNEY-CLIENT[2] - 1265:1, 1268:20
ATTRIBUTABLE[1] - 1280:24
ATTRIBUTED[4] - 1279:20, 1295:6, 1296:23, 1297:21
ATTRIBUTION[2] - 1319:4, 1324:7
AUDITS[1] - 1344:10
AUGUST[3] - 1335:15, 1368:17, 1411:1
AUTHENTICATION[1] - 1267:11
AVAILABLE[2] - 1266:10, 1360:3
AWARE[22] - 1326:11, 1332:5, 1334:8, 1336:7, 1336:23, 1348:5, 1348:15, 1353:4, 1357:12, 1358:15, 1360:7, 1390:3, 1390:22, 1393:22, 1393:25, 1394:12, 1399:19, 1401:4, 1403:18, 1405:20, 1406:5, 1420:6
AXIS[4] - 1284:4, 1291:13, 1292:19, 1320:3, 1320:4

## B

BACHELOR'S[1] - 1271:25
BACKGROUND[1] - 1331:24
BACKUP[1] - 1369:18
BACKWARDS[1] - 1416:2
BAILIWICK[2] - 1332:16, 1358:3
BANK[2] - 1357:4,

1358:20
**BANKED** [4] - 1356:25, 1357:3, 1357:13, 1357:17
**BANKING** [1] - 1358:11
**BAR** [3] - 1289:22, 1291:19, 1316:15
**BARRED** [1] - 1257:11
**BARS** [2] - 1288:19, 1316:22
**BASE** [1] - 1357:2
**BASED** [35] - 1267:20, 1278:13, 1278:14, 1278:17, 1286:14, 1287:4, 1287:16, 1290:9, 1291:3, 1291:5, 1291:16, 1293:15, 1293:25, 1302:12, 1302:21, 1303:1, 1303:3, 1312:13, 1316:24, 1318:15, 1323:14, 1325:1, 1334:25, 1388:9, 1392:18, 1392:21, 1396:3, 1398:2, 1401:19, 1401:20, 1403:20, 1405:9, 1416:3, 1416:11, 1416:12
**BASIC** [2] - 1257:15, 1267:21
**BASIS** [11] - 1280:9, 1290:16, 1307:25, 1316:1, 1343:10, 1404:24, 1405:12, 1405:18, 1412:14, 1413:2, 1419:3
**BEAR** [2] - 1315:13, 1315:21
**BECAME** [1] - 1335:9
**BECOME** [2] - 1257:16, 1264:22
**BECOMES** [1] - 1261:23
**BEEFED** [1] - 1368:14
**BEGAN** [2] - 1292:18, 1417:2
**BEGIN** [3] - 1254:21, 1271:7, 1306:1
**BEGINNING** [5] - 1256:14, 1267:17, 1306:2, 1320:21, 1386:7
**BEHAVIOR** [1] - 1315:24
**BEHIND** [1] - 1330:25
**BELOW** [14] - 1314:21, 1337:8, 1355:7, 1356:13,

1356:17, 1361:19, 1362:12, 1363:9, 1363:10, 1364:11, 1388:10, 1397:17, 1397:24, 1413:2
**BERMITE** [1] - 1354:4
**BEST** [6] - 1256:4, 1290:16, 1337:24, 1347:7, 1350:13, 1420:8
**BETTER** [6] - 1398:21, 1398:22, 1398:23, 1398:24, 1398:25, 1418:7
**BETWEEN** [12] - 1278:7, 1280:21, 1314:9, 1314:15, 1317:7, 1318:5, 1346:14, 1374:14, 1376:20, 1396:10, 1404:5, 1415:8
**BEYOND** [6] - 1299:16, 1301:13, 1325:13, 1361:13, 1383:12, 1417:8
**BIG** [3] - 1321:20, 1333:25, 1346:14
**BILL** [1] - 1329:12
**BILLION** [10] - 1298:8, 1312:7, 1334:20, 1336:14, 1337:1, 1379:6, 1380:10, 1389:7, 1389:12, 1400:20
**BINDER** [4] - 1265:9, 1265:25, 1268:22, 1269:4
**BINDERS** [2] - 1255:5, 1269:8
**BIT** [5] - 1305:13, 1324:8, 1357:1, 1390:24, 1420:17
**BLACK** [4] - 1288:12, 1291:9, 1291:18, 1420:18
**BLAME** [4] - 1404:18, 1405:10, 1405:21, 1405:25
**BLEND** [29] - 1278:6, 1297:9, 1346:24, 1347:2, 1371:25, 1373:1, 1373:8, 1388:4, 1391:11, 1391:13, 1391:25, 1392:4, 1392:13, 1394:2, 1394:11, 1395:23, 1397:23, 1399:17, 1399:19, 1411:22, 1412:8, 1413:1, 1414:23,

1414:24, 1416:7, 1416:9, 1418:18
**BLENDED** [6] - 1276:22, 1296:18, 1345:25, 1385:8, 1395:24, 1396:21
**BLENDING** [78] - 1266:14, 1275:25, 1279:9, 1280:5, 1292:17, 1292:18, 1298:9, 1298:11, 1300:20, 1300:22, 1300:25, 1301:3, 1301:10, 1301:11, 1301:13, 1301:20, 1302:8, 1302:12, 1302:13, 1304:20, 1313:5, 1313:20, 1314:10, 1314:15, 1314:16, 1314:21, 1315:2, 1315:23, 1345:8, 1346:14, 1346:15, 1347:4, 1347:5, 1347:7, 1347:10, 1347:16, 1347:20, 1347:23, 1371:9, 1371:11, 1371:13, 1371:20, 1371:22, 1372:13, 1373:17, 1373:22, 1373:24, 1374:4, 1374:17, 1375:2, 1375:11, 1375:22, 1376:21, 1378:19, 1382:20, 1388:2, 1389:14, 1389:24, 1391:16, 1392:8, 1392:17, 1393:17, 1394:3, 1395:13, 1399:1, 1414:24, 1415:7, 1415:8, 1415:10, 1415:16, 1415:19, 1415:21
**BLENDS** [1] - 1275:22
**BLIND** [4] - 1380:5, 1382:7, 1408:17, 1411:14
**BLINDED** [1] - 1413:13
**BLOW** [4] - 1283:23, 1288:8, 1392:12, 1400:25
**BLUE** [1] - 1407:25
**BLUM** [158] - 1254:13, 1254:21, 1255:3, 1255:8, 1257:25, 1258:23, 1259:15, 1259:18, 1259:22, 1259:25, 1260:5, 1260:21, 1261:8,

1261:12, 1261:16, 1261:23, 1262:1, 1262:5, 1262:9, 1262:13, 1262:19, 1268:13, 1270:9, 1271:9, 1271:13, 1275:5, 1275:7, 1278:24, 1281:25, 1282:3, 1283:15, 1283:16, 1283:21, 1283:22, 1283:23, 1283:25, 1285:14, 1285:22, 1285:24, 1286:7, 1286:9, 1288:6, 1288:9, 1289:23, 1290:1, 1290:18, 1290:20, 1291:6, 1291:8, 1293:17, 1293:18, 1294:21, 1295:11, 1303:16, 1313:10, 1321:25, 1322:14, 1323:3, 1323:5, 1325:16, 1325:20, 1326:13, 1327:9, 1327:14, 1328:20, 1328:24, 1329:4, 1331:16, 1335:16, 1335:21, 1338:3, 1338:10, 1339:17, 1342:8, 1342:9, 1349:18, 1349:21, 1350:3, 1350:9, 1350:15, 1350:18, 1351:5, 1351:6, 1351:11, 1351:15, 1351:20, 1351:23, 1352:17, 1355:12, 1355:21, 1357:10, 1358:13, 1358:14, 1358:23, 1358:25, 1360:2, 1360:7, 1360:18, 1363:14, 1365:17, 1366:9, 1366:14, 1367:8, 1368:20, 1369:8, 1369:13, 1369:16, 1369:17, 1370:2, 1370:5, 1370:11, 1377:5, 1377:10, 1378:5, 1383:21, 1383:22, 1383:24, 1384:6, 1384:19, 1384:22, 1385:11, 1386:17, 1386:18, 1387:21, 1387:22, 1390:10, 1391:2, 1391:6, 1391:8, 1392:12, 1392:14, 1393:15, 1394:18, 1394:25, 1395:3,

1398:1, 1398:16, 1400:25, 1401:1, 1402:4, 1402:21, 1403:18, 1404:7, 1404:11, 1404:15, 1404:16, 1405:24, 1407:13, 1409:4, 1412:20, 1414:20, 1417:8, 1417:13, 1417:15, 1418:5, 1418:9, 1418:14, 1419:19
**BLUM** [17] - 1254:13, 1254:20, 1257:24, 1270:7, 1271:7, 1287:21, 1301:23, 1323:2, 1327:13, 1328:19, 1350:17, 1351:4, 1351:22, 1367:7, 1394:16, 1402:2, 1405:23
**BOARD** [1] - 1365:9
**BOLTED** [3] - 1380:6, 1382:6, 1411:15
**BOLTS** [1] - 1321:21
**BOTTOM** [5] - 1268:3, 1288:13, 1288:14, 1387:1, 1392:14
**BOUNDARY** [2] - 1408:3, 1408:5
**BRASS** [2] - 1383:8, 1411:4
**BREAK** [1] - 1349:3
**BREAK** [5] - 1328:22, 1348:17, 1348:18, 1420:18, 1420:19
**BRIEFLY** [2] - 1264:17, 1268:3
**BRING** [7] - 1267:15, 1269:12, 1269:13, 1281:25, 1358:8, 1380:15, 1394:25
**BRINGING** [3] - 1332:10, 1332:11, 1358:10
**BROADER** [3] - 1305:22, 1313:8, 1316:20
**BROUGHT** [3] - 1256:5, 1327:19, 1329:12
**BUNCH** [2] - 1321:20, 1362:5
**BURDEN** [1] - 1268:6
**BURIED** [1] - 1381:24
**BY** [87] - 1271:13, 1275:7, 1278:24, 1282:3, 1283:16, 1283:22, 1283:25, 1285:14, 1285:24,

1286:9, 1288:9, 1290:1, 1290:20, 1291:8, 1293:18, 1294:21, 1295:15, 1303:21, 1305:13, 1310:2, 1313:12, 1321:19, 1322:7, 1322:16, 1323:5, 1325:16, 1325:23, 1326:16, 1329:4, 1331:16, 1335:16, 1335:21, 1338:10, 1339:17, 1342:9, 1351:6, 1352:17, 1355:21, 1357:10, 1358:14, 1358:25, 1360:2, 1360:7, 1360:18, 1363:14, 1365:17, 1366:14, 1367:8, 1369:8, 1369:17, 1370:11, 1377:10, 1378:5, 1383:21, 1383:24, 1384:6, 1385:11, 1386:18, 1387:22, 1390:10, 1391:2, 1391:8, 1392:14, 1393:15, 1394:18, 1395:3, 1398:1, 1398:16, 1401:1, 1402:21, 1403:18, 1404:16, 1405:24, 1407:16, 1407:21, 1409:5, 1409:10, 1410:3, 1410:17, 1412:22, 1414:22, 1416:19, 1417:16, 1417:25, 1418:13, 1419:2, 1420:2

## C

**CA** [3] - 1420:10, 1420:11, 1420:16
**CABINETS** [1] - 1379:20
**CALCIUM** [1] - 1372:5
**CALCULATE** [7] - 1293:24, 1302:3, 1318:19, 1364:2, 1391:25, 1396:2, 1397:22
**CALCULATED** [2] - 1334:25, 1392:17
**CALCULATING** [1] - 1323:13
**CALCULATION** [13] - 1277:10, 1296:23, 1297:7, 1297:11, 1297:13, 1312:18, 1371:18, 1394:24,

1396:1, 1412:9, 1413:1, 1416:8, 1416:14
**CALCULATIONS** [14] - 1258:18, 1286:2, 1324:25, 1391:16, 1392:17, 1392:25, 1393:16, 1393:17, 1393:22, 1393:24, 1394:14, 1399:17, 1399:20, 1416:2
**CALENDAR** [1] - 1360:14
**CALIFORNIA** [1] - 1254:2
**CALIFORNIA** [13] - 1334:11, 1335:2, 1335:6, 1335:8, 1335:21, 1335:23, 1336:16, 1336:25, 1344:19, 1344:20, 1357:5, 1365:2, 1365:9
**CALIFORNIA'S** [1] - 1334:17
**CANDIDATE** [1] - 1323:20
**CANNOT** [7] - 1260:24, 1295:3, 1296:22, 1297:21, 1339:7, 1339:17, 1375:9
**CAPPED** [1] - 1321:13
**CAPTION** [1] - 1290:3
**CARBON** [1] - 1356:22
**CARCINOGEN** [1] - 1341:18
**CARE** [2] - 1260:13, 1260:14
**CAREER** [1] - 1325:7
**CARNEGIE** [3] - 1271:19, 1271:24, 1272:3
**CASE** [51] - 1256:13, 1264:6, 1270:4, 1270:5, 1274:22, 1279:25, 1285:2, 1291:20, 1295:16, 1295:18, 1296:9, 1296:13, 1299:10, 1299:13, 1299:18, 1299:22, 1299:24, 1300:2, 1300:9, 1301:7, 1301:25, 1302:25, 1303:22, 1305:8, 1307:22, 1308:23, 1310:3, 1311:6, 1311:19, 1311:22, 1312:14,

1313:7, 1316:6, 1317:10, 1318:22, 1319:20, 1321:2, 1321:16, 1322:8, 1322:11, 1322:13, 1322:22, 1326:1, 1326:22, 1337:13, 1348:21, 1399:17, 1399:23, 1417:11, 1417:12, 1420:22
**CASE** [1] - 1254:5
**CASES** [4] - 1285:3, 1293:11, 1293:13, 1294:6
**CASTAIC** [22] - 1275:11, 1275:18, 1275:22, 1276:4, 1276:7, 1276:18, 1276:25, 1277:4, 1277:12, 1277:13, 1278:5, 1278:8, 1278:10, 1287:9, 1314:6, 1329:20, 1346:4, 1353:19, 1374:15, 1374:16, 1396:6, 1399:14
**CATCH** [1] - 1387:10
**CAUSATION** [7] - 1262:2, 1262:3, 1275:3, 1318:25, 1319:1, 1319:4, 1324:7
**CAUSED** [3] - 1321:2, 1321:6, 1354:25
**CAUSES** [3] - 1264:5, 1304:3, 1346:12
**CAUSING** [1] - 1304:11
**CENTER** [1] - 1380:17
**CENTRAL** [1] - 1357:5
**CENTRAL** [1] - 1380:15
**CEQA** [2] - 1365:2, 1368:15
**CERTAIN** [2] - 1286:4, 1362:12
**CERTAINLY** [22] - 1270:23, 1273:20, 1299:21, 1301:12, 1302:15, 1303:25, 1305:23, 1308:1, 1309:7, 1309:10, 1311:12, 1313:23, 1315:16, 1315:17, 1316:3, 1316:14, 1317:6, 1317:25, 1318:14, 1318:17, 1318:18, 1326:18
**CETERA** [1] - 1268:7
**CHAIR** [1] - 1271:4

**CHALK** [1] - 1366:21
**CHALLENGED** [1] - 1265:10
**CHANCE** [1] - 1265:20
**CHANGE** [3] - 1360:16, 1383:6
**CHANGES** [2] - 1260:16, 1320:4
**CHARACTERISTIC** [2] - 1316:24, 1323:12
**CHARACTERIZATION** [1] - 1308:10
**CHARCOAL** [1] - 1356:6
**CHARGE** [1] - 1400:6
**CHART** [15] - 1282:18, 1287:13, 1288:1, 1292:13, 1298:11, 1319:10, 1319:23, 1320:5, 1320:8, 1321:3, 1349:16, 1349:17, 1349:25
**CHARTS** [23] - 1282:17, 1283:2, 1286:20, 1287:2, 1288:2, 1290:8, 1290:23, 1290:24, 1291:4, 1292:11, 1292:12, 1292:15, 1296:25, 1297:2, 1297:14, 1297:15, 1298:2, 1298:4, 1298:10, 1298:14, 1311:10, 1319:7, 1320:2
**CHECKING** [1] - 1292:2
**CHEMICALS** [2] - 1356:23, 1381:11
**CHEMIST** [2] - 1282:9, 1326:10
**CHLORIDE** [17] - 1277:24, 1278:2, 1278:5, 1278:7, 1278:13, 1290:5, 1290:6, 1290:7, 1290:9, 1290:15, 1291:4, 1302:21, 1325:1, 1372:5, 1391:21, 1392:3, 1392:5
**CHLORIDES** [1] - 1371:17
**CIRCLE** [2] - 1288:12, 1293:1
**CIRCLED** [3] - 1285:3, 1288:1, 1345:1
**CIRCLING** [2] - 1275:17, 1286:25
**CLAIMS** [1] - 1264:9

**CLARIFICATION** [2] - 1269:2, 1388:12
**CLARIFICATIONS** [1] - 1364:25
**CLARIFY** [2] - 1333:8, 1339:15
**CLARITA** [9] - 1254:6, 1269:17, 1329:6, 1329:13, 1329:14, 1329:19, 1329:21, 1357:23, 1380:1
**CLASSES** [3] - 1272:16, 1272:17
**CLASSIFY** [1] - 1330:21
**CLEAN** [8] - 1276:25, 1291:25, 1293:23, 1345:22, 1375:16, 1375:17, 1385:8, 1397:4
**CLEANERS** [1] - 1381:10
**CLEANERS** [2] - 1381:16, 1401:24
**CLEAR** [12] - 1258:6, 1286:17, 1287:25, 1288:5, 1291:23, 1295:8, 1297:16, 1297:24, 1308:5, 1322:21, 1339:21, 1371:2
**CLEARED** [1] - 1287:24
**CLEARLY** [1] - 1259:18
**CLIENT** [5] - 1254:14, 1265:1, 1265:4, 1268:20, 1281:5
**CLIENTS** [1] - 1305:24
**CLOSE** [8] - 1310:1, 1315:14, 1342:5, 1353:17, 1354:3, 1380:6, 1396:16, 1396:17
**CLOSED** [9] - 1304:21, 1305:3, 1305:5, 1305:8, 1324:15, 1324:17, 1353:24, 1382:5, 1414:9
**CLOSER** [3] - 1271:4, 1278:9, 1278:10
**CLOSEST** [1] - 1277:3, 1392:6
**CODE** [3] - 1335:21, 1335:23
**COHERENT** [2] - 1279:16, 1308:15
**COINCIDENCE** [3] - 1356:12, 1356:18,

1356:20
**COLE** [1] - 1354:12
**COLLABORATION** [1] - 1369:4
**COLLEAGUES** [2] - 1273:21, 1273:25
**COLLECT** [5] - 1272:23, 1273:4, 1326:4, 1406:9, 1413:19
**COLLECTED** [10] - 1274:24, 1310:20, 1310:23, 1311:9, 1311:11, 1326:1, 1343:7, 1343:9, 1378:20, 1389:14
**COLLECTING** [3] - 1306:23, 1311:15, 1413:20
**COLLECTION** [1] - 1412:12
**COLLEGE** [1] - 1271:24
**COLORS** [1] - 1408:4
**COMBINATION** [2] - 1335:4, 1372:3
**COMBINE** [2] - 1372:6, 1396:22
**COMBINED** [5] - 1346:24, 1375:15, 1375:23, 1397:4, 1399:8
**COMBINING** [1] - 1396:9
**COMING** [15] - 1276:14, 1277:2, 1288:22, 1303:6, 1339:24, 1340:16, 1341:24, 1342:13, 1345:7, 1361:9, 1361:14, 1408:1, 1412:25, 1413:2, 1416:13
**COMMENT** [2] - 1302:15, 1302:17
**COMMITTEE** [1] - 1273:25
**COMMON** [2] - 1323:10, 1323:17
**COMMUNICATION** [1] - 1314:17
**COMMUNICATIONS** [1] - 1265:1
**COMPANY** [4] - 1329:17, 1365:24, 1406:7, 1416:21
**COMPANY** [2] - 1322:16, 1365:8
**COMPARE** [6] - 1296:16, 1296:17,

1315:18, 1317:19, 1412:14, 1413:5
**COMPARED** [4] - 1257:2, 1294:3, 1364:2, 1391:23
**COMPARING** [9] - 1282:6, 1283:17, 1285:18, 1286:12, 1286:13, 1289:13, 1294:22, 1297:7, 1297:9
**COMPARISON** [2] - 1286:11, 1412:16
**COMPLETE** [3] - 1314:15, 1365:18, 1367:1
**COMPLETED** [2] - 1407:5, 1420:12
**COMPLETELY** [1] - 1414:9
**COMPLIANCE** [9] - 1258:14, 1339:4, 1339:9, 1340:12, 1340:24, 1362:9, 1362:10, 1362:12, 1362:17
**COMPLICATED** [4] - 1262:22, 1393:7, 1393:8, 1393:9
**COMPLIED** [1] - 1262:11
**COMPLY** [5] - 1336:7, 1338:25, 1340:19, 1347:18, 1347:24
**COMPLYING** [1] - 1333:24
**COMPOUND** [2] - 1313:10, 1412:20
**COMPOUNDS** [1] - 1338:19
**COMPRESSED** [1] - 1320:8
**COMPRESSION** [1] - 1320:20
**CONCENTRATION** [13] - 1292:4, 1292:9, 1292:10, 1312:1, 1312:8, 1312:12, 1312:17, 1312:19, 1313:3, 1313:4, 1314:22, 1317:20, 1397:23
**CONCENTRATIONS** [26] - 1276:13, 1283:17, 1283:18, 1284:24, 1284:25, 1287:17, 1293:7, 1293:22, 1294:15, 1294:23, 1294:25, 1374:19, 1374:24,

1383:25, 1384:1, 1384:2, 1385:1, 1385:4, 1385:5, 1394:5, 1397:7, 1399:21, 1402:11, 1413:5
**CONCEPT** [4] - 1305:15, 1305:16, 1305:18, 1317:17
**CONCERN** [1] - 1268:8
**CONCERNED** [3] - 1272:22, 1301:1, 1306:23
**CONCERNING** [1] - 1256:4
**CONCERNS** [1] - 1319:2
**CONCLUDED** [4] - 1270:3, 1302:11, 1381:6, 1403:20
**CONCLUDES** [1] - 1263:16
**CONCLUDING** [2] - 1404:24, 1405:12
**CONCLUSION** [5] - 1263:6, 1289:10, 1289:11, 1289:12, 1335:19
**CONCLUSIONS** [11] - 1262:12, 1272:23, 1273:4, 1289:16, 1289:18, 1311:23, 1311:24, 1313:8, 1316:19, 1317:11, 1325:2
**CONDITION** [4] - 1338:22, 1338:25, 1347:18, 1361:16
**CONDITIONS** [2] - 1313:17, 1338:25
**CONDUCT** [4] - 1256:16, 1263:20, 1409:11, 1414:24
**CONDUCTANCE** [2] - 1391:21, 1392:5
**CONDUCTED** [3] - 1274:9, 1420:7, 1420:10
**CONDUCTING** [1] - 1307:1
**CONFER** [2] - 1266:19, 1268:1
**CONFIDENCE** [9] - 1316:13, 1316:21, 1318:19, 1322:10, 1323:6, 1323:9, 1323:25, 1341:14
**CONFIDENT** [1] - 1386:1

**CONFIRM** [2] - 1377:8, 1384:15
**CONFIRMATION** [12] - 1376:16, 1376:17, 1376:23, 1376:24, 1383:5, 1383:13, 1383:14, 1383:17, 1384:14, 1384:15, 1413:19, 1413:22
**CONFIRMED** [2] - 1254:22, 1255:8
**CONFIRMS** [1] - 1383:14
**CONFUSE** [1] - 1297:6
**CONJUNCTION** [1] - 1369:2
**CONNECT** [1] - 1415:11
**CONNECTED** [6] - 1313:1, 1324:14, 1380:3, 1381:9, 1411:12, 1411:13
**CONNECTION** [3] - 1379:25, 1380:18, 1382:3
**CONSIDER** [1] - 1309:25
**CONSIDERATION** [3] - 1264:10, 1313:6, 1378:24
**CONSIDERATIONS** [2] - 1306:1, 1306:5
**CONSIDERED** [7] - 1275:24, 1277:18, 1308:2, 1352:10, 1359:19, 1410:20, 1417:11
**CONSISTENT** [12] - 1275:1, 1279:17, 1280:3, 1280:22, 1287:12, 1289:12, 1292:6, 1304:17, 1308:14, 1308:18, 1320:13, 1355:22
**CONSISTENTLY** [5] - 1279:20, 1295:2, 1295:6, 1313:1, 1321:7
**CONSTANT** [1] - 1314:7
**CONSTITUENT** [12] - 1282:8, 1282:11, 1283:4, 1283:13, 1284:21, 1287:7, 1290:9, 1290:10, 1290:25, 1302:19, 1312:17, 1314:19
**CONSTITUENTS** [13] - 1276:6, 1276:8,

1277:17, 1277:18, 1277:22, 1279:7, 1279:18, 1290:16, 1292:16, 1302:22, 1315:24, 1352:9, 1391:19
**CONSTRUCTION** [1] - 1380:16
**CONSULTANTS** [1] - 1366:3
**CONSUMER** [1] - 1341:14
**CONTAIN** [1] - 1375:24
**CONTAINED** [2] - 1286:5, 1359:2
**CONTAINER** [1] - 1415:17
**CONTAINING** [1] - 1312:17
**CONTAINS** [2] - 1339:23, 1340:17
**CONTAMINANT** [10] - 1261:20, 1334:5, 1334:25, 1341:16, 1344:12, 1388:15, 1406:10, 1413:20, 1415:11, 1415:12
**CONTAMINANTS** [10] - 1257:7, 1315:23, 1356:21, 1364:1, 1371:17, 1371:21, 1407:3, 1414:6, 1414:8, 1414:9
**CONTAMINATED** [3] - 1298:20, 1299:10, 1332:2
**CONTAMINATION** [19] - 1260:16, 1260:24, 1261:4, 1261:7, 1261:10, 1297:22, 1299:19, 1313:5, 1324:14, 1355:3, 1364:25, 1381:6, 1381:15, 1382:8, 1386:10, 1386:11, 1390:22, 1401:2, 1404:18
**CONTEMPORANEOUS** [1] - 1311:10
**CONTEMPORANEOUSLY** [1] - 1267:18
**CONTEXT** [5] - 1305:7, 1317:25, 1353:1, 1353:3, 1407:9
**CONTINUE** [5] - 1348:21, 1351:3, 1399:2, 1399:3, 1420:22

CONTINUED [3] - 1386:7, 1390:23, 1400:9
CONTINUES [1] - 1385:16
CONTINUING [1] - 1378:13
CONTRACTED [1] - 1383:10
CONTRACTOR [1] - 1380:5
CONTRACTS [2] - 1357:12, 1357:17
CONTRIBUTE [1] - 1381:25
CONTROL [4] - 1363:24, 1364:25, 1379:20, 1410:22
CONTROL [1] - 1365:9
CONTROL/QUALITY [1] - 1343:24
CONVERSATIONS [1] - 1340:9
CONVEY [2] - 1316:23, 1323:10
CONVEYS [1] - 1323:16
CONVOLUTED [1] - 1367:5
COPY [1] - 1310:7
CORNER [2] - 1275:15, 1288:3
CORPORATE [6] - 1337:16, 1395:17, 1403:11, 1404:11, 1404:22, 1405:12
CORPORATION [2] - 1254:7, 1269:18
CORRECT [253] - 1258:19, 1271:14, 1283:16, 1283:20, 1284:12, 1284:13, 1286:19, 1287:18, 1287:19, 1288:10, 1288:11, 1291:25, 1293:23, 1294:4, 1294:5, 1294:9, 1294:10, 1294:12, 1294:13, 1295:10, 1296:15, 1296:24, 1297:11, 1298:11, 1298:17, 1298:18, 1298:22, 1299:6, 1299:10, 1299:24, 1299:25, 1300:4, 1300:9, 1300:10, 1300:12, 1300:13, 1301:18, 1301:21, 1301:22, 1302:25,

1303:1, 1303:13, 1303:14, 1303:20, 1304:4, 1304:5, 1304:9, 1304:16, 1306:3, 1306:8, 1306:11, 1306:16, 1306:17, 1307:3, 1310:5, 1310:8, 1310:12, 1310:15, 1310:21, 1310:22, 1311:7, 1311:11, 1312:1, 1312:9, 1312:14, 1312:15, 1312:21, 1313:9, 1313:16, 1313:19, 1313:23, 1314:7, 1316:9, 1316:10, 1316:20, 1317:13, 1317:14, 1318:6, 1318:16, 1318:23, 1319:8, 1319:22, 1319:25, 1320:1, 1320:15, 1322:24, 1322:25, 1324:21, 1326:1, 1326:4, 1326:7, 1326:8, 1326:12, 1326:22, 1331:4, 1332:7, 1332:8, 1332:16, 1332:17, 1332:24, 1332:25, 1333:2, 1333:3, 1333:17, 1334:10, 1336:19, 1337:4, 1337:5, 1337:6, 1337:13, 1337:17, 1337:23, 1340:2, 1340:5, 1340:6, 1341:7, 1341:9, 1342:13, 1342:14, 1342:17, 1342:22, 1343:1, 1343:4, 1343:8, 1343:11, 1343:12, 1343:14, 1344:5, 1344:21, 1344:22, 1344:23, 1344:24, 1345:2, 1345:4, 1345:19, 1345:20, 1345:24, 1346:1, 1346:4, 1346:13, 1346:19, 1346:25, 1347:3, 1351:9, 1351:18, 1352:6, 1352:15, 1352:22, 1352:25, 1353:2, 1353:16, 1353:25, 1354:9, 1354:19, 1356:4, 1356:9, 1356:16, 1357:7, 1358:4, 1359:4, 1359:6, 1359:7,

1359:10, 1359:13, 1360:3, 1360:12, 1360:23, 1361:4, 1361:8, 1361:21, 1361:23, 1361:24, 1362:2, 1362:9, 1362:11, 1362:13, 1364:5, 1364:6, 1364:8, 1366:14, 1366:25, 1369:5, 1370:7, 1370:8, 1370:16, 1370:17, 1370:21, 1371:5, 1371:9, 1371:23, 1372:10, 1373:3, 1373:12, 1373:14, 1374:6, 1374:15, 1375:16, 1375:19, 1375:21, 1375:22, 1379:4, 1379:7, 1380:10, 1380:23, 1381:3, 1381:4, 1381:16, 1381:19, 1383:18, 1384:7, 1385:9, 1385:10, 1385:15, 1385:20, 1387:25, 1388:3, 1388:10, 1388:22, 1388:23, 1388:24, 1389:9, 1389:18, 1389:19, 1392:16, 1394:21, 1395:4, 1395:6, 1396:7, 1396:11, 1396:12, 1396:24, 1396:25, 1397:2, 1397:3, 1397:5, 1397:6, 1397:8, 1397:15, 1397:24, 1397:25, 1398:1, 1399:5, 1399:6, 1404:22, 1405:9, 1405:22, 1406:12, 1406:13, 1409:2, 1409:3, 1412:13, 1413:8, 1413:9
CORRECTIONS [3] - 1310:7, 1310:9, 1310:11
CORRECTLY [6] - 1354:11, 1367:19, 1382:3, 1382:23, 1390:12, 1414:13
CORRESPOND [6] - 1284:5, 1288:17, 1288:19, 1291:14, 1291:15, 1298:13
CORRESPONDENCE [4] - 1300:25, 1307:10, 1315:1,

1316:4
CORRESPONDS [1] - 1291:16
COST [1] - 1420:11
COSTLY [1] - 1409:12
COUNSEL [9] - 1254:8, 1254:9, 1268:4, 1287:22, 1338:6, 1350:10, 1350:11, 1350:13, 1412:15
COUNT [1] - 1259:9
COUNTS [1] - 1298:11
COUNTY [2] - 1329:18, 1354:2
COUPLE [8] - 1264:24, 1268:2, 1277:17, 1277:21, 1280:6, 1286:23, 1324:18, 1406:3
COURSE [5] - 1266:4, 1311:14, 1400:4, 1400:5, 1420:8
COURSES [1] - 1272:14
COURT [33] - 1255:5, 1255:13, 1255:17, 1255:24, 1263:12, 1263:16, 1263:18, 1264:16, 1264:17, 1265:12, 1265:13, 1265:16, 1265:18, 1266:1, 1266:2, 1266:16, 1266:19, 1266:25, 1267:5, 1269:9, 1269:24, 1270:17, 1285:19, 1328:5, 1349:14, 1349:15, 1349:22, 1349:25, 1350:5, 1350:12, 1350:19, 1351:11, 1356:13
COURT [147] - 1254:12, 1254:16, 1255:2, 1255:6, 1255:10, 1255:23, 1256:1, 1256:3, 1256:9, 1256:22, 1257:8, 1257:19, 1257:22, 1258:22, 1259:14, 1259:17, 1259:21, 1259:24, 1260:2, 1260:18, 1261:6, 1261:10, 1261:14, 1261:21, 1261:25, 1262:3, 1262:7, 1262:10, 1262:17, 1263:9, 1264:12, 1265:7, 1265:10, 1265:24,

1266:6, 1266:13, 1266:21, 1266:24, 1268:11, 1268:14, 1269:1, 1269:15, 1269:17, 1269:22, 1271:3, 1278:23, 1285:11, 1285:17, 1287:21, 1289:9, 1289:16, 1294:20, 1295:12, 1303:17, 1303:20, 1305:2, 1305:12, 1309:17, 1313:11, 1322:5, 1322:15, 1323:2, 1325:15, 1325:21, 1326:15, 1327:10, 1327:13, 1327:16, 1327:19, 1327:22, 1328:15, 1328:19, 1328:23, 1331:13, 1335:12, 1335:20, 1338:5, 1338:9, 1339:15, 1348:17, 1349:2, 1349:5, 1349:9, 1349:14, 1349:19, 1349:23, 1350:5, 1350:10, 1350:16, 1350:20, 1350:23, 1351:3, 1351:14, 1351:22, 1355:11, 1357:9, 1360:1, 1360:5, 1363:12, 1365:13, 1366:8, 1367:7, 1368:19, 1368:21, 1369:11, 1369:14, 1370:1, 1370:4, 1377:4, 1378:3, 1383:19, 1384:5, 1384:21, 1384:24, 1386:16, 1387:20, 1390:9, 1391:3, 1391:7, 1393:14, 1394:16, 1395:20, 1398:14, 1402:2, 1402:6, 1402:8, 1403:17, 1404:13, 1405:23, 1407:14, 1409:6, 1410:9, 1410:12, 1410:15, 1412:21, 1414:21, 1417:10, 1417:14, 1417:21, 1418:7, 1418:11, 1418:15, 1418:19, 1418:23, 1419:20, 1420:17, 1421:4
COURT'S [4] - 1256:20, 1265:20, 1266:10, 1267:25
COURTROOM [3] -

1327:17, 1327:21, 1352:22
**COURTROOM** [10] - 1254:5, 1269:14, 1270:11, 1270:20, 1271:1, 1327:23, 1328:8, 1328:14, 1348:24, 1421:1
**CREATE** [4] - 1363:20, 1364:4, 1366:2, 1378:22
**CREATED** [5] - 1279:13, 1292:24, 1319:7, 1334:8, 1363:18
**CREATES** [2] - 1346:4, 1348:14
**CREATION** [3] - 1367:9, 1367:17, 1368:23
**CRITERIA** [3] - 1273:22, 1362:1, 1362:20
**CRITICAL** [2] - 1258:13, 1259:5
**CROSS** [2] - 1295:14, 1407:15
**CROSS** [1] - 1257:20
**CROSS-EXAMINATION** [2] - 1295:14, 1407:15
**CROSS-EXAMINATION** [1] - 1257:20
**CROW** [1] - 1406:17
**CURIOUS** [1] - 1302:15
**CUSTOMER** [1] - 1337:9
**CUSTOMERS** [9] - 1332:11, 1337:7, 1339:18, 1339:22, 1340:17, 1340:18, 1341:18, 1358:9, 1361:10
**CV** [1] - 1254:6

**D**

**DAILY** [1] - 1412:12
**DAMAGES** [3] - 1259:4, 1262:4, 1300:8
**DANGEROUS** [1] - 1341:12
**DARK** [1] - 1407:25
**DASHED** [5] - 1284:2, 1284:4, 1284:14, 1287:14, 1291:12
**DATA** [113] - 1257:1,

1257:2, 1257:4, 1258:18, 1263:3, 1263:5, 1263:6, 1263:7, 1272:23, 1273:4, 1274:24, 1274:25, 1275:2, 1276:6, 1276:9, 1276:13, 1278:16, 1279:3, 1279:5, 1279:12, 1279:13, 1279:16, 1279:19, 1280:1, 1280:2, 1280:3, 1280:4, 1280:6, 1280:8, 1280:10, 1280:16, 1280:19, 1281:9, 1281:11, 1285:9, 1286:21, 1292:12, 1292:16, 1292:23, 1295:3, 1295:4, 1295:21, 1296:9, 1298:15, 1299:15, 1299:16, 1301:1, 1302:4, 1303:23, 1304:4, 1304:15, 1306:10, 1306:18, 1306:23, 1307:9, 1308:3, 1308:13, 1308:19, 1309:9, 1310:20, 1311:20, 1312:2, 1312:5, 1313:7, 1315:5, 1315:17, 1316:7, 1316:19, 1316:24, 1317:11, 1317:20, 1317:23, 1318:25, 1319:3, 1319:6, 1321:7, 1322:23, 1324:6, 1324:19, 1324:22, 1325:5, 1325:7, 1325:11, 1325:16, 1325:18, 1326:4, 1326:6, 1326:23, 1369:18, 1378:8, 1387:8, 1395:6, 1399:13, 1401:15, 1401:19, 1403:2, 1403:20, 1403:21, 1405:3, 1412:3, 1412:11, 1412:12, 1412:15, 1412:18, 1412:23, 1413:2, 1413:4, 1413:7
**DATE** [12] - 1288:21, 1289:8, 1365:16, 1377:22, 1385:24, 1387:6, 1391:8, 1398:17, 1410:12, 1412:15, 1412:16, 1412:18

**DATED** [2] - 1370:10, 1370:16
**DATES** [1] - 1288:19
**DAVID** [1] - 1328:13
**DAYS** [2] - 1377:16, 1389:15
**DDW** [44] - 1258:14, 1260:5, 1260:13, 1265:2, 1268:19, 1314:14, 1335:7, 1335:17, 1341:8, 1347:19, 1348:3, 1348:4, 1361:10, 1361:20, 1362:1, 1364:13, 1364:19, 1367:16, 1367:21, 1368:1, 1370:20, 1370:24, 1371:2, 1371:11, 1371:15, 1371:24, 1374:8, 1374:10, 1382:20, 1386:23, 1391:15, 1392:10, 1393:12, 1394:7, 1394:9, 1406:8, 1407:6, 1415:4, 1417:5, 1418:2, 1418:22, 1418:23, 1419:2, 1419:15
**DDW'S** [1] - 1419:18
**DEAL** [9] - 1333:1, 1333:14, 1336:9, 1336:12, 1358:8, 1358:16, 1371:10, 1371:13
**DEALING** [3] - 1340:10, 1392:7, 1394:4
**DEALS** [3] - 1268:16, 1332:7, 1356:19
**DEALT** [1] - 1372:12
**DECEMBER** [10] - 1351:12, 1352:18, 1354:17, 1366:5, 1398:17, 1399:4, 1402:1, 1402:22, 1403:2, 1403:11
**DECIDE** [1] - 1416:8
**DECIDED** [2] - 1354:6, 1411:10
**DECISIONS** [1] - 1274:1
**DECREASE** [1] - 1360:19
**DEEMED** [1] - 1353:5
**DEEP** [2] - 1359:17, 1359:18
**DEFECTIVE** [3] - 1306:14, 1306:15, 1306:16

**DEFENDANT** [3] - 1255:20, 1267:25, 1349:12
**DEFENDANT'S** [2] - 1271:11, 1329:2
**DEFENDANT'S** [2] - 1256:13, 1270:5
**DEFENDANTS** [2] - 1254:14, 1255:19
**DEFENSE** [1] - 1327:14
**DEGREE** [3] - 1271:19, 1271:25, 1272:2
**DEGREES** [1] - 1271:25
**DELAY** [2] - 1256:18, 1263:19
**DELIVERED** [3] - 1261:13, 1339:18, 1339:22
**DELIVERY** [1] - 1314:4
**DEMAND** [2] - 1359:9, 1395:11
**DEMANDS** [2] - 1394:5, 1395:14
**DEMONSTRATE** [1] - 1284:19
**DEMONSTRATES** [1] - 1257:9
**DEMONSTRATIVE** [5] - 1275:6, 1282:2, 1286:8, 1290:19, 1342:16
**DENIED** [1] - 1372:16
**DENIES** [1] - 1371:3
**DENY** [2] - 1371:6, 1372:18
**DEPARTMENT** [6] - 1265:5, 1330:2, 1330:3, 1333:18, 1358:12, 1385:25
**DEPARTMENT** [8] - 1278:16, 1324:23, 1325:2, 1335:8, 1335:9, 1335:10, 1363:18, 1406:8
**DEPICTED** [2] - 1283:9, 1297:14
**DEPO** [1] - 1399:4
**DEPONENT** [3] - 1370:15, 1399:16, 1399:23
**DEPOSED** [1] - 1337:12
**DEPOSITION** [43] - 1255:1, 1257:17, 1303:11, 1304:6, 1304:14, 1307:14,

**DEPOSITIONS** [3] - 1337:25, 1374:7, 1398:13
**DEPRESSURIZED** [1] - 1414:15
**DEPUTY** [10] - 1254:5, 1269:14, 1270:11, 1270:20, 1271:1, 1327:23, 1328:8, 1328:14, 1348:24, 1421:1
**DESCRIBE** [2] - 1281:8, 1374:14
**DESCRIBED** [4] - 1304:4, 1369:18, 1413:15, 1415:6
**DESIGN** [2] - 1417:2
**DESIGNATED** [3] - 1369:23, 1399:16, 1400:8
**DESIGNED** [1] - 1300:17
**DETAIL** [1] - 1326:2
**DETAILS** [1] - 1403:24
**DETECT** [20] - 1314:24, 1318:10, 1338:18, 1339:20, 1347:6, 1347:17, 1355:25, 1361:17, 1362:10, 1362:23, 1362:25, 1376:17, 1378:11, 1388:14, 1389:9, 1405:5, 1405:16, 1411:17, 1416:9
**DETECTED** [10] - 1282:22, 1282:25, 1283:4, 1288:20, 1296:17, 1296:18, 1297:25, 1298:12, 1298:24, 1401:23

1309:15, 1310:3, 1310:7, 1317:18, 1338:6, 1351:12, 1352:19, 1353:4, 1354:15, 1354:17, 1355:8, 1357:11, 1357:14, 1366:5, 1366:15, 1366:18, 1366:21, 1367:20, 1368:17, 1368:22, 1369:12, 1369:24, 1370:13, 1376:19, 1384:17, 1384:25, 1385:13, 1395:16, 1395:21, 1398:15, 1398:17, 1399:23, 1400:1, 1400:3, 1401:25, 1402:9, 1418:1

**DETECTION** [34] - 1283:7, 1283:10, 1283:12, 1288:19, 1288:25, 1291:20, 1296:4, 1298:5, 1298:6, 1298:9, 1298:10, 1299:2, 1312:6, 1314:23, 1355:19, 1361:14, 1363:25, 1376:16, 1378:12, 1383:4, 1383:13, 1384:16, 1388:10, 1388:11, 1388:12, 1389:21, 1390:19, 1397:17, 1397:24, 1401:2, 1402:11, 1404:6, 1409:22, 1412:5

**DETECTIONS** [21] - 1279:18, 1279:19, 1279:20, 1280:11, 1280:20, 1295:3, 1295:5, 1302:23, 1319:2, 1341:15, 1347:21, 1348:2, 1354:4, 1375:12, 1379:22, 1384:8, 1410:19, 1410:20, 1411:2, 1411:16

**DETERMINATION** [4] - 1361:11, 1361:20, 1363:8, 1381:12

**DETERMINE** [14] - 1258:13, 1277:11, 1317:20, 1361:18, 1362:9, 1362:17, 1363:10, 1391:16, 1393:3, 1393:23, 1394:2, 1415:13, 1420:8

**DETERMINED** [1] - 1391:13

**DETERMINING** [4] - 1337:6, 1361:8, 1364:15, 1416:13

**DEVELOP** [4] - 1297:10, 1305:24, 1307:4, 1318:15

**DEVELOPED** [6] - 1279:14, 1292:15, 1293:21, 1321:1, 1393:10, 1393:15

**DEVELOPING** [4] - 1307:2, 1312:16, 1319:11, 1322:9

**DEVELOPMENT** [1] - 1411:9

**DIAGRAM** [2] - 1275:9, 1275:16

**DIEGO** [2] - 1272:8,

1272:12

**DIFFERENCE** [7] - 1314:9, 1314:15, 1318:5, 1346:14, 1375:8, 1414:5, 1415:7

**DIFFERENCES** [8] - 1290:25, 1313:14, 1313:21, 1317:12, 1317:24, 1318:10, 1376:20, 1378:18

**DIFFERENT** [28] - 1256:13, 1260:12, 1277:8, 1281:23, 1294:23, 1307:4, 1315:12, 1317:21, 1331:14, 1332:15, 1334:24, 1338:23, 1343:1, 1344:13, 1346:23, 1358:15, 1362:20, 1366:15, 1375:3, 1378:20, 1388:21, 1391:19, 1394:5, 1395:14, 1413:21, 1415:15

**DIFFERENTLY** [1] - 1342:6

**DIG** [3] - 1381:1, 1382:22, 1409:2

**DILUTED** [1] - 1291:24

**DILUTION** [11] - 1276:20, 1283:18, 1283:19, 1284:12, 1285:1, 1292:3, 1292:5, 1293:16, 1293:22, 1294:2, 1294:21

**DIRE** [2] - 1256:16, 1263:20

**DIRECT** [14] - 1271:7, 1314:9, 1314:15, 1346:15, 1371:22, 1372:22, 1394:3, 1395:13, 1399:1, 1415:8, 1415:16, 1415:19, 1415:20, 1417:9

**DIRECT** [2] - 1271:12, 1329:3

**DIRECTION** [1] - 1346:7

**DIRECTIONS** [2] - 1394:5, 1415:15

**DIRECTOR** [9] - 1261:2, 1329:22, 1329:24, 1330:7, 1330:8, 1330:11, 1330:23, 1336:2, 1336:4

**DISAGREE** [2] -

1258:1, 1299:11

**DISCOVER** [1] - 1333:12

**DISCOVERED** [5] - 1380:4, 1381:23, 1410:21, 1411:7, 1411:11

**DISCOVERING** [1] - 1333:11

**DISCREPANCIES** [1] - 1304:12

**DISCRETE** [2] - 1326:19, 1326:24

**DISCUSS** [3] - 1264:7, 1336:16, 1419:14

**DISCUSSED** [5] - 1314:14, 1354:2, 1409:21, 1416:7, 1419:12

**DISCUSSES** [1] - 1357:25

**DISCUSSION** [1] - 1382:25

**DISCUSSIONS** [2] - 1268:5, 1405:14

**DISINFECTANT** [1] - 1333:23

**DISPERSION** [1] - 1315:23

**DISPLAY** [3] - 1407:18, 1408:11, 1416:16

**DISPLAYED** [1] - 1408:12

**DISPOSED** [1] - 1381:11

**DISPUTE** [1] - 1261:5

**DISPUTES** [1] - 1296:13

**DISPUTING** [1] - 1350:4

**DISSOLVED** [4] - 1371:25, 1372:2, 1372:3, 1372:7

**DISTINCTION** [2] - 1273:16, 1314:11

**DISTRIBUTED** [4] - 1341:7, 1359:5, 1361:10, 1408:2

**DISTRIBUTING** [1] - 1332:11

**DISTRIBUTION** [30] - 1300:18, 1303:12, 1304:21, 1305:3, 1305:6, 1313:5, 1314:10, 1315:4, 1315:12, 1332:16, 1333:6, 1340:17, 1340:22, 1343:8, 1345:4, 1351:8,

1351:18, 1352:1, 1352:11, 1358:8, 1358:16, 1376:25, 1381:9, 1381:21, 1390:3, 1408:23, 1414:4, 1415:13, 1415:18, 1415:23

**DISTRICT** [3] - 1329:19, 1354:2, 1365:11

**DISTRUSTED** [1] - 1325:17

**DIVIDE** [2] - 1396:21, 1396:23

**DIVIDED** [1] - 1289:14

**DIVISION** [12] - 1265:5, 1329:20, 1334:11, 1339:8, 1340:10, 1363:1, 1365:10, 1372:23, 1386:20, 1388:14, 1414:25, 1415:9

**DIVISION** [3] - 1272:15, 1272:16, 1288:17

**DLR** [1] - 1390:18

**DOCTOR** [2] - 1285:14, 1291:8

**DOCTOR** [7] - 1270:11, 1271:14, 1272:9, 1275:17, 1278:25, 1283:16, 1286:17

**DOCTORATE** [1] - 1271:16

**DOCUMENT** [25] - 1266:16, 1287:23, 1350:1, 1363:17, 1363:23, 1364:12, 1365:5, 1365:19, 1366:2, 1367:13, 1368:5, 1368:10, 1369:20, 1370:10, 1370:11, 1370:16, 1370:18, 1386:16, 1387:6, 1387:16, 1388:9, 1391:4, 1394:12, 1394:13, 1395:1

**DOCUMENTATION** [1] - 1365:10

**DOCUMENTATION** [8] - 1310:16, 1363:20, 1365:2, 1365:23, 1366:4, 1367:10, 1368:15, 1368:25

**DOCUMENTED** [1] - 1364:23

**DOCUMENTS** [18] -

1264:14, 1266:11, 1267:13, 1301:14, 1307:9, 1307:11, 1307:13, 1307:19, 1307:24, 1308:20, 1308:22, 1308:24, 1316:3, 1321:10, 1349:23, 1385:19, 1387:4, 1417:24

**DONE** [30] - 1263:23, 1296:13, 1301:3, 1301:20, 1307:11, 1317:22, 1322:3, 1322:8, 1324:13, 1326:20, 1340:13, 1342:12, 1343:13, 1343:14, 1375:14, 1377:9, 1377:19, 1380:14, 1380:16, 1382:3, 1382:12, 1382:14, 1382:23, 1386:3, 1405:6, 1406:3, 1406:24, 1407:7, 1410:7, 1413:1

**DOT** [4] - 1283:10, 1291:14, 1298:1, 1409:20

**DOTS** [10] - 1257:3, 1283:9, 1284:17, 1293:2, 1293:6, 1298:2, 1312:25, 1313:1, 1319:9, 1319:24

**DOTTED** [4] - 1283:25, 1287:1, 1293:3, 1408:5

**DOUBT** [1] - 1262:14

**DOUBTS** [1] - 1325:10

**DOWN** [20] - 1264:12, 1287:16, 1289:23, 1290:18, 1297:5, 1321:24, 1327:11, 1328:2, 1353:24, 1354:6, 1354:10, 1354:25, 1355:2, 1379:19, 1388:16, 1402:10, 1403:6, 1410:21, 1413:2, 1414:14

**DOWNSTREAM** [62] - 1257:5, 1275:13, 1276:1, 1277:6, 1277:23, 1278:6, 1279:8, 1279:11, 1279:18, 1279:20, 1280:12, 1280:13, 1280:14, 1280:21, 1280:23, 1281:14, 1282:15, 1282:18,

1282:22, 1282:24, 1282:25, 1283:4, 1283:8, 1283:11, 1284:6, 1284:15, 1284:22, 1285:4, 1285:19, 1286:3, 1286:5, 1286:13, 1286:16, 1286:18, 1287:4, 1287:8, 1287:10, 1287:12, 1288:20, 1289:14, 1291:15, 1291:21, 1292:6, 1292:7, 1292:9, 1293:10, 1293:11, 1293:14, 1293:25, 1295:3, 1295:4, 1295:5, 1297:25, 1298:13, 1303:7, 1305:10, 1312:25, 1315:18, 1319:2, 1320:6, 1320:17

**DOWNSTREAM/ UPSTREAM** [1] - 1264:21

**DR** [27] - 1254:22, 1255:11, 1255:21, 1256:4, 1256:10, 1256:14, 1256:23, 1258:4, 1258:9, 1258:17, 1262:8, 1262:9, 1262:10, 1262:19, 1262:25, 1263:1, 1264:10, 1264:24, 1266:17, 1270:10, 1271:14, 1271:18, 1289:9, 1295:16, 1303:21, 1310:4, 1323:6

**DRAFT** [3] - 1334:15, 1335:10, 1365:19

**DRAFT** [1] - 1365:11

**DRAW** [6] - 1272:23, 1273:4, 1278:4, 1313:8, 1316:19, 1317:11

**DRAWING** [5] - 1289:16, 1289:18, 1305:8, 1311:22, 1311:24

**DRAWN** [2] - 1255:18, 1275:12

**DRAWS** [1] - 1275:21

**DREW** [1] - 1412:16

**DRILLED** [2] - 1406:20, 1406:21

**DRILLING** [3] - 1406:23, 1407:1, 1407:6

**DRINKING** [6] -

1300:6, 1300:18, 1371:4, 1407:2, 1407:9

**DRINKING** [18] - 1265:6, 1278:16, 1324:23, 1325:2, 1334:9, 1334:11, 1334:13, 1334:17, 1339:8, 1340:10, 1363:1, 1363:18, 1365:10, 1372:23, 1386:20, 1388:15, 1414:25, 1415:9

**DROP** [1] - 1261:11

**DRY** [1] - 1381:16

**DUANE** [1] - 1271:10

**DUANE** [3] - 1255:15, 1270:10, 1270:23

**DUE** [1] - 1266:4

**DUG** [4] - 1379:23, 1380:4, 1380:24, 1383:9

**DURANT** [5] - 1255:1, 1255:3, 1365:21, 1366:9, 1369:2

**DURING** [3] - 1268:1, 1285:2, 1408:12

**DYNAMICS** [2] - 1346:8, 1398:25

## E

**E-L-A-P** [1] - 1344:15

**E-MAIL** [7] - 1269:23, 1372:21, 1403:23, 1404:4, 1404:5, 1404:20, 1406:7

**E-MAILS** [4] - 1264:24, 1265:4, 1403:19, 1419:7

**E-Y** [1] - 1270:25

**EARLY** [2] - 1391:15, 1406:21

**EARNED** [2] - 1271:19, 1272:1

**EAST** [1] - 1380:16

**EASTERN** [1] - 1271:23

**EDGE** [1] - 1270:2

**EDUCATION** [1] - 1271:22

**EE** [3] - 1420:10, 1420:11, 1420:16

**EE-CA** [3] - 1420:10, 1420:11, 1420:16

**EFFECT** [10] - 1276:18, 1276:20, 1292:3, 1302:9, 1315:22, 1347:11, 1347:15, 1372:13,

1373:2, 1413:18

**EFFECTIVE** [1] - 1298:21

**EFFECTIVELY** [1] - 1288:17

**EFFECTS** [2] - 1332:2, 1341:17

**EFFLUENT** [26] - 1257:2, 1259:1, 1260:9, 1277:7, 1282:14, 1291:25, 1295:7, 1297:1, 1343:4, 1343:6, 1344:25, 1345:1, 1362:24, 1374:21, 1374:25, 1384:3, 1385:6, 1388:5, 1388:7, 1389:11, 1389:23, 1392:23, 1395:8, 1395:25, 1399:22, 1401:14

**EITHER** [16] - 1256:15, 1258:21, 1276:12, 1301:16, 1314:5, 1334:14, 1335:11, 1345:11, 1371:3, 1371:6, 1376:18, 1381:11, 1399:7, 1406:7, 1411:1, 1411:17

**ELAP** [2] - 1344:8, 1344:15

**ELECTED** [1] - 1273:12

**ELECTRICAL** [2] - 1391:21, 1392:5

**ELECTROLUX** [1] - 1322:17

**ELEMENT** [1] - 1295:19

**ELIMINATE** [1] - 1260:20

**ELIMINATED** [1] - 1259:7

**ELP** [1] - 1344:14

**EMANATING** [4] - 1294:16, 1294:25, 1374:20, 1381:15

**EMPLOYED** [4] - 1300:15, 1329:5, 1329:7, 1332:3

**EMPLOYEE** [2] - 1300:11, 1365:22

**ENCOUNTERING** [1] - 1314:12

**END** [2] - 1258:8, 1292:22, 1351:23, 1361:4, 1389:7

**ENDS** [1] - 1361:4

**ENGAGE** [1] - 1273:2

**ENGINEER** [1] - 1261:4

**ENGINEERING** [2] - 1285:16, 1420:11

**ENGINEERS** [1] - 1372:24

**ENTAIL** [1] - 1305:20

**ENTER** [1] - 1382:15

**ENTERED** [3] - 1381:19, 1381:20

**ENTERING** [2] - 1297:4, 1346:6

**ENTERS** [1] - 1346:5

**ENTIRE** [3] - 1368:4, 1382:22, 1415:23

**ENTITLED** [1] - 1365:9

**ENVIRONMENTAL** [3] - 1300:12, 1344:8, 1365:2

**EPA** [8] - 1327:3, 1344:18, 1344:19, 1344:20, 1344:23, 1348:7, 1348:9, 1388:14

**EQUAL** [1] - 1396:10

**EQUATION** [1] - 1393:3

**EQUIPMENT** [1] - 1378:21

**EQUIVALENCE** [1] - 1336:22

**EQUIVALENCY** [1] - 1366:1

**EQUIVALENT** [13] - 1334:25, 1335:3, 1335:5, 1336:1, 1336:10, 1363:5, 1363:22, 1364:10, 1364:13, 1365:1, 1366:11, 1368:14, 1371:19

**ERIC** [1] - 1254:15

**ERROR** [6] - 1316:15, 1316:22, 1323:18, 1323:21, 1323:24, 1378:16, 1389:21, 1404:18, 1404:19, 1404:25, 1405:10, 1405:13, 1405:19, 1405:22, 1406:1

**ERRORS** [1] - 1343:18

**ESSENCE** [2] - 1382:4, 1414:14

**ESSENTIALLY** [17] - 1257:9, 1261:11, 1266:9, 1275:8, 1280:18, 1281:17, 1288:16, 1288:21, 1288:23, 1288:24, 1289:21, 1292:2,

1292:11, 1292:20, 1312:3, 1417:12

**ESTABLISH** [4] - 1257:17, 1285:12, 1285:22, 1360:6

**ESTABLISHED** [1] - 1267:12

**ESTIMATE** [19] - 1277:22, 1279:10, 1281:3, 1286:15, 1288:20, 1288:24, 1290:8, 1291:2, 1291:4, 1291:17, 1301:11, 1301:13, 1312:16, 1316:23, 1316:24, 1323:12, 1323:15, 1323:19

**ESTIMATED** [8] - 1280:14, 1286:4, 1290:4, 1291:21, 1292:5, 1292:17, 1293:16, 1294:1

**ESTIMATES** [10] - 1278:13, 1278:14, 1280:13, 1290:13, 1302:15, 1302:18, 1303:3, 1303:8, 1313:23, 1323:11

**ESTIMATING** [3] - 1277:19, 1290:17, 1302:20

**ESTIMATION** [4] - 1286:17, 1312:19, 1324:5, 1394:10

**ET** [2] - 1254:7, 1268:7

**EVALUATE** [13] - 1274:11, 1274:23, 1274:25, 1304:3, 1306:20, 1306:22, 1306:25, 1307:7, 1307:22, 1310:19, 1313:14, 1313:17, 1318:24

**EVALUATION** [2] - 1420:7, 1420:11

**EVENT** [1] - 1266:21

**EVENTS** [1] - 1308:21

**EVENTUALLY** [2] - 1361:10, 1381:18

**EVIDENCE** [11] - 1259:19, 1261:14, 1261:17, 1263:16, 1321:18, 1326:14, 1386:15, 1391:1, 1407:20, 1410:2, 1416:18

**EXACT** [3] - 1374:9, 1375:4, 1379:5

**EXACTLY** [5] -

1284:6, 1287:4, 1291:16, 1369:3, 1392:23
**EXAMINATION** [6] - 1271:12, 1295:14, 1323:4, 1325:22, 1329:3, 1407:15
**EXAMINATION** [5] - 1257:20, 1271:8, 1351:4, 1398:11, 1408:13
**EXAMPLE** [12] - 1287:6, 1296:16, 1301:4, 1306:14, 1311:1, 1312:6, 1314:19, 1316:12, 1320:12, 1320:13, 1321:15, 1326:9
**EXAMPLES** [2] - 1321:3, 1323:17
**EXCAVATE** [1] - 1411:10
**EXCESS** [1] - 1357:4
**EXCHANGE** [1] - 1419:7
**EXCLUSIVE** [1] - 1416:22
**EXCUSE** [6] - 1259:2, 1259:6, 1278:15, 1299:14, 1351:5, 1370:22
**EXCUSED** [1] - 1327:10
**EXHIBIT** [14] - 1265:7, 1265:25, 1269:3, 1269:4, 1269:8, 1286:10, 1289:24, 1290:22, 1291:11, 1349:11, 1349:12, 1399:20, 1411:23
**EXHIBIT** [39] - 1265:14, 1265:15, 1275:6, 1275:7, 1281:25, 1282:4, 1282:5, 1283:15, 1286:7, 1290:19, 1293:20, 1296:8, 1319:14, 1319:15, 1321:4, 1321:17, 1321:18, 1342:8, 1357:18, 1357:20, 1361:7, 1370:7, 1370:9, 1370:15, 1386:14, 1386:15, 1386:18, 1390:25, 1391:1, 1400:14, 1407:18, 1407:20, 1408:12, 1409:14, 1410:1, 1410:2, 1416:16, 1416:18

**EXHIBITS** [9] - 1265:10, 1265:13, 1265:17, 1265:22, 1266:3, 1266:7, 1267:1, 1269:8, 1349:16
**EXISTED** [2] - 1309:4, 1380:11
**EXISTENCE** [1] - 1279:21
**EXPECT** [11] - 1278:7, 1286:3, 1286:14, 1287:4, 1287:10, 1289:4, 1289:5, 1291:16, 1293:12, 1293:15, 1410:20
**EXPECTED** [9] - 1289:15, 1290:4, 1292:3, 1309:10, 1314:22, 1320:15, 1379:4, 1383:4, 1411:17
**EXPEDITE** [2] - 1368:1, 1419:25
**EXPERIENCE** [2] - 1325:10, 1326:20
**EXPERT** [3] - 1295:25, 1309:25, 1319:15
**EXPERTISE** [6] - 1274:9, 1285:13, 1289:19, 1299:5, 1304:11, 1304:20
**EXPERTS** [5] - 1295:17, 1296:4, 1296:9, 1299:18, 1332:1
**EXPLAIN** [13] - 1255:13, 1263:5, 1264:17, 1268:9, 1272:19, 1274:7, 1282:3, 1286:9, 1288:14, 1290:20, 1308:7, 1367:6
**EXPLAINED** [3] - 1260:24, 1294:16, 1294:24
**EXPLANATION** [2] - 1303:23, 1304:1
**EXPLANATIONS** [5] - 1257:6, 1299:1, 1304:8, 1304:15, 1313:13
**EXPRESSED** [1] - 1319:12
**EXPRESSES** [1] - 1323:16
**EXTENT** [12] - 1256:9, 1270:1, 1275:2, 1279:16, 1308:10, 1312:4, 1314:25,

1319:3, 1324:6, 1324:23, 1326:5, 1399:18
**EXTRACTION** [1] - 1260:19
**EXTREME** [7] - 1293:13, 1320:3, 1320:6, 1320:12, 1320:18, 1321:3, 1321:7
**EXTREMELY** [5] - 1300:6, 1353:8, 1353:11, 1362:19, 1363:16
**EYE** [1] - 1320:10

# F

**FACILITY** [7] - 1338:16, 1342:24, 1361:15, 1362:4, 1373:11, 1391:15, 1409:19
**FACILITY** [5] - 1282:14, 1297:2, 1297:4, 1300:22, 1314:20
**FACT** [13] - 1257:13, 1260:23, 1304:6, 1304:23, 1310:2, 1310:15, 1312:23, 1354:5, 1359:4, 1382:19, 1390:17, 1392:2, 1419:22
**FACTOR** [4] - 1264:3, 1292:5, 1293:16, 1294:2
**FACTORS** [1] - 1294:22
**FACTS** [2] - 1322:12, 1326:13
**FACTUAL** [3] - 1370:24, 1404:23, 1405:18
**FACULTY** [1] - 1272:8
**FAIR** [18] - 1258:8, 1296:14, 1299:7, 1299:8, 1300:1, 1300:20, 1301:6, 1302:11, 1304:19, 1306:19, 1307:15, 1308:8, 1308:9, 1311:18, 1313:12, 1314:16, 1314:17, 1315:15
**FAIRLY** [1] - 1393:18
**FALLS** [1] - 1256:12
**FALSE** [3] - 1309:1, 1378:22, 1378:24
**FAMILIAR** [6] -

1316:12, 1317:17, 1325:25, 1326:3, 1326:18, 1334:2
**FANG** [3] - 1372:22, 1372:23, 1373:21
**FAR** [2] - 1388:7, 1406:14
**FAVOR** [1] - 1323:20
**FEASIBLE** [1] - 1260:19
**FEDERAL** [8] - 1322:11, 1334:9, 1334:13, 1336:21, 1337:4, 1341:20, 1344:16, 1348:9
**FEDS** [1] - 1344:23
**FEET** [3] - 1359:9, 1359:13, 1359:15
**FELL** [1] - 1256:19
**FELLOW** [6] - 1262:15, 1273:10, 1273:11, 1273:14, 1273:15, 1273:23
**FELLOWS** [1] - 1273:19
**FELT** [4] - 1290:13, 1290:15, 1315:17, 1386:1
**FETCHING** [1] - 1327:20
**FEW** [4] - 1264:18, 1272:1, 1385:21, 1402:24
**FIELD** [2] - 1272:21, 1274:17
**FIELDS** [1] - 1274:20
**FIFTH** [1] - 1375:7
**FIGURE** [3] - 1282:7, 1290:2, 1319:14
**FIGURE** [6] - 1275:8, 1282:7, 1282:17, 1290:3, 1290:23, 1296:8
**FIGURES** [2] - 1281:23, 1320:3
**FILE** [2] - 1256:19, 1358:24
**FILED** [1] - 1256:11
**FILES** [4] - 1279:6, 1280:2, 1281:18, 1302:4
**FILL** [1] - 1254:25
**FINAL** [2] - 1267:17, 1368:11
**FINAL** [1] - 1365:11
**FINALLY** [1] - 1383:8
**FINE** [6] - 1269:5, 1321:24, 1350:9, 1352:10, 1355:10, 1410:15

**FINGER** [1] - 1409:15
**FINISHING** [1] - 1272:7
**FIRM** [2] - 1281:5
**FIRST** [23] - 1254:19, 1258:1, 1262:13, 1267:24, 1268:4, 1270:5, 1270:8, 1288:1, 1296:12, 1333:15, 1352:19, 1354:16, 1360:6, 1366:16, 1366:20, 1366:22, 1376:23, 1377:13, 1383:13, 1399:20, 1400:1, 1405:7, 1405:25
**FIT** [1] - 1322:12
**FIVE** [23] - 1260:12, 1282:16, 1282:17, 1282:18, 1285:4, 1288:2, 1290:24, 1298:25, 1306:19, 1310:11, 1311:15, 1313:21, 1320:19, 1361:16, 1362:6, 1368:2, 1383:25, 1385:2, 1386:20, 1388:21, 1389:16, 1407:3
**FIVE-YEAR** [1] - 1407:3
**FLAMINGO** [2] - 1381:16, 1401:24
**FLANGE** [5] - 1321:20, 1380:6, 1382:8, 1408:17, 1411:14
**FLAT** [1] - 1411:15
**FLIES** [1] - 1406:17
**FLOW** [1] - 1346:8
**FLOWING** [1] - 1389:25
**FLOWS** [3] - 1260:11, 1414:2, 1416:4
**FLUCTUATE** [2] - 1315:3, 1315:8
**FLUCTUATIONS** [1] - 1314:4
**FLUSHED** [3] - 1411:1, 1411:16, 1414:16
**FOCUS** [1] - 1307:13
**FOCUSED** [2] - 1299:15, 1313:7
**FOCUSING** [1] - 1321:4
**FOLKS** [1] - 1321:20
**FOLLOW** [5] - 1336:2, 1362:20, 1362:21, 1384:14, 1413:23

**FOLLOWED** [2] - 1308:20, 1413:17

**FOLLOWING** [3] - 1378:13, 1389:15, 1405:16

**FOLLOWS** [2] - 1271:11, 1329:2

**FOOT** [3] - 1359:17, 1359:18, 1359:19

**FOOTNOTE** [1] - 1360:21

**FORE** [1] - 1255:17

**FOREVER** [1] - 1266:9

**FORGET** [2] - 1375:13, 1375:14

**FORGOT** [1] - 1280:25

**FORM** [2] - 1264:8, 1298:20

**FORMAL** [4] - 1316:8, 1316:9, 1316:18, 1318:15

**FORMAT** [1] - 1308:19

**FORMATION** [4] - 1334:24, 1352:14, 1353:11

**FORMED** [1] - 1302:24

**FORMER** [3] - 1354:1, 1365:23, 1399:14

**FORMULA** [14] - 1277:11, 1277:15, 1285:25, 1286:18, 1287:17, 1290:11, 1291:24, 1293:20, 1301:10, 1301:12, 1301:17, 1301:24, 1303:3, 1303:5

**FORMULAS** [3] - 1278:17, 1278:20, 1278:25

**FORTH** [1] - 1416:7

**FORWARD** [4] - 1264:10, 1270:12, 1273:25, 1327:24

**FORWARDED** [1] - 1264:25

**FOUNDATION** [22] - 1255:20, 1255:22, 1256:21, 1257:9, 1257:16, 1258:9, 1262:19, 1266:25, 1267:6, 1267:10, 1267:19, 1278:21, 1285:12, 1285:20, 1294:18, 1325:14, 1357:8, 1359:25, 1360:6, 1360:17, 1393:13, 1404:10

**FOUNDATION** [1] - 1274:18

**FOUNDATIONAL** [2] -

1262:7, 1419:1

**FOUR** [8] - 1255:4, 1329:20, 1330:6, 1337:14, 1337:15, 1364:24, 1368:9, 1368:13

**FOURTH** [1] - 1375:7

**FRAMED** [1] - 1317:15

**FRANK** [2] - 1270:24, 1270:25

**FRED** [3] - 1254:13, 1268:4, 1268:9

**FREE** [2] - 1276:10, 1281:1

**FREQUENTLY** [3] - 1274:4, 1296:16, 1296:18

**FRESH** [2] - 1271:2, 1411:22

**FRONT** [2] - 1263:24, 1319:16

**FUDACZ** [1] - 1268:9

**FULL** [4] - 1272:11, 1289:24, 1360:9, 1395:1

**FULLY** [2] - 1309:2, 1359:23

**FUNDAMENTAL** [3] - 1264:15, 1305:15, 1305:18

**FYI** [1] - 1265:5

## G

**GAC** [2] - 1298:19, 1356:6

**GAIN** [6] - 1386:3, 1398:4, 1398:8, 1398:10, 1398:18, 1399:2

**GAINED** [5] - 1337:25, 1399:2, 1399:24, 1399:25, 1400:3

**GAINING** [1] - 1338:1

**GALLAGHER** [1] - 1270:7

**GALLONS** [4] - 1312:12, 1359:16, 1359:18, 1416:3

**GAME** [1] - 1258:8

**GASKET** [1] - 1411:14

**GASKETS** [1] - 1382:6

**GATHERED** [1] - 1403:4

**GEE** [33] - 1331:10, 1335:19, 1355:10, 1357:8, 1359:25, 1360:4, 1360:17, 1363:11, 1365:12, 1366:7, 1369:25,

1384:4, 1384:23, 1393:13, 1395:19, 1402:7, 1404:9, 1407:16, 1407:18, 1407:21, 1409:5, 1409:10, 1410:3, 1410:17, 1412:22, 1414:22, 1416:19, 1417:16, 1417:25, 1418:13, 1418:25, 1419:2, 1420:2

**GEE** [3] - 1254:11, 1265:4, 1407:14

**GENERAL** [14] - 1256:12, 1299:17, 1299:20, 1309:11, 1322:12, 1354:1, 1354:12, 1354:23, 1354:24, 1357:2, 1358:1, 1358:18, 1376:17, 1377:15

**GENERALLY** [3] - 1273:22, 1338:7, 1353:14

**GENERATED** [5] - 1286:21, 1306:24, 1324:20, 1325:5

**GENERATING** [1] - 1301:1

**GENTLEMEN** [2] - 1269:20, 1348:18

**GEOLOGIST** [1] - 1294:11

**GIVEN** [5] - 1255:5, 1260:3, 1265:17, 1324:23, 1349:19

**GLASS** [2] - 1394:1

**GOAL** [17] - 1338:11, 1338:12, 1338:18, 1338:20, 1339:3, 1339:6, 1339:9, 1339:12, 1339:19, 1340:2, 1340:5, 1340:23, 1341:3, 1361:20, 1362:10, 1382:20, 1416:9

**GOD** [3] - 1270:18, 1328:6, 1361:5

**GOOGLE** [1] - 1342:18

**GOSH** [1] - 1411:22

**GRAB** [1] - 1265:9

**GRADUATE** [2] - 1272:17

**GRANT** [2] - 1263:15, 1371:6

**GRANTS** [1] - 1371:3

**GRANULAR** [1] - 1356:22

**GRANULATED** [2] -

1356:5, 1356:6

**GREAT** [3] - 1263:1, 1289:4, 1330:24

**GREATER** [25] - 1277:1, 1278:11, 1284:22, 1284:25, 1285:4, 1293:12, 1293:13, 1293:15, 1294:7, 1320:7, 1320:9, 1320:18, 1320:19, 1320:22, 1320:24, 1374:20, 1374:25, 1375:24, 1377:2, 1377:3, 1384:11, 1389:9, 1389:10

**GREATEST** [3] - 1315:13, 1315:21, 1320:17

**GREEN** [3] - 1283:1, 1283:9

**GROUND** [4] - 1358:7, 1381:17, 1381:18, 1408:19

**GROUNDS** [3] - 1322:15, 1331:14, 1412:21

**GROUNDWATER** [8] - 1298:16, 1332:14, 1357:15, 1358:18, 1359:13, 1359:14, 1406:5, 1416:23

**GROUP** [4] - 1306:10, 1330:1, 1330:4, 1331:18

**GROUPS** [3] - 1317:19, 1318:5, 1331:17

**GROW** [1] - 1386:8

**GROWING** [2] - 1271:23, 1273:1

**GUESS** [7] - 1292:1, 1320:4, 1338:24, 1346:6, 1367:23, 1370:19

**GUIDANCE** [6] - 1327:2, 1335:11, 1363:17, 1363:19, 1363:23, 1364:12

**GUIDE** [1] - 1335:15

**GUIDELINES** [1] - 1365:10

**GUIDELINES** [1] - 1341:20

## H

**HALF** [10] - 1268:3, 1375:5, 1379:9, 1390:24, 1396:23,

1356:5, 1356:6

**GREAT** [3] - 1263:1,

1397:1, 1402:4, 1402:5, 1420:14

**HALF'S** [1] - 1281:7

**HAND** [3] - 1270:15, 1288:2, 1328:3

**HAPPY** [1] - 1340:10

**HARD** [4] - 1293:4, 1320:20, 1320:23

**HEAD** [5] - 1261:2, 1261:3, 1358:3, 1378:2, 1384:10

**HEADER** [1] - 1412:9

**HEALTH** [4] - 1335:8, 1335:9, 1335:10, 1406:8

**HEALTH** [3] - 1332:2, 1341:16, 1348:14

**HEAR** [11] - 1254:19, 1255:11, 1257:22, 1257:24, 1260:2, 1263:15, 1266:25, 1267:6, 1268:11, 1323:23, 1418:7

**HEARD** [3] - 1300:2, 1326:16, 1330:10

**HEARSAY** [2] - 1418:14, 1419:19

**HELP** [11] - 1270:18, 1328:6, 1366:4, 1391:16, 1392:10, 1392:25, 1393:11, 1394:7, 1415:1, 1416:14, 1420:4

**HELPFUL** [2] - 1316:3, 1349:24

**HIGH** [16] - 1258:25, 1321:7, 1353:24, 1354:5, 1354:10, 1377:25, 1379:13, 1379:17, 1381:2, 1383:6, 1390:16, 1410:20, 1410:25, 1411:3, 1413:16, 1414:12

**HIGHER** [9] - 1257:5, 1277:5, 1320:14, 1324:9, 1376:3, 1378:5, 1384:8, 1389:24, 1401:23

**HIGHEST** [2] - 1342:4, 1390:13

**HIRED** [1] - 1380:5

**HISTORY** [4] - 1280:1, 1280:4, 1280:19, 1282:5

**HIT** [1] - 1390:24

**HITS** [2] - 1257:5, 1413:13

**HOLD** [3] - 1331:13, 1358:21, 1418:19

HOLIDAY [1] - 1269:23
HOMEOWNERS [1] - 1341:7
HONBY [12] - 1380:1, 1380:11, 1380:14, 1381:19, 1381:22, 1411:8, 1411:19, 1412:5, 1413:11, 1413:13, 1414:18
HONOR [71] - 1254:13, 1254:21, 1255:3, 1255:14, 1256:8, 1256:25, 1257:12, 1257:25, 1258:1, 1260:6, 1261:8, 1261:16, 1262:13, 1263:22, 1264:1, 1265:23, 1266:5, 1266:12, 1266:23, 1267:24, 1268:17, 1268:23, 1269:14, 1270:9, 1271:9, 1278:22, 1285:22, 1288:6, 1295:11, 1295:13, 1303:16, 1322:1, 1322:14, 1323:1, 1323:3, 1325:13, 1325:20, 1327:9, 1327:14, 1327:18, 1328:18, 1328:20, 1328:21, 1328:24, 1338:4, 1349:8, 1349:18, 1349:22, 1350:3, 1350:18, 1351:11, 1358:23, 1368:20, 1370:2, 1383:22, 1384:19, 1391:6, 1402:4, 1402:7, 1404:12, 1407:13, 1410:11, 1410:14, 1414:20, 1417:8, 1417:13, 1417:15, 1418:5, 1418:9, 1418:14, 1419:1
HONOR'S [1] - 1268:24
HOPE [1] - 1269:22
HOPEFULLY [1] - 1270:1
HOPING [1] - 1254:25
HORIZONTAL [4] - 1292:19, 1293:6, 1298:1
HORIZONTALLY [3] - 1283:2, 1284:3, 1291:13
HOST [3] - 1364:1,

1383:6, 1383:7
HOUR [3] - 1375:5, 1402:4, 1402:5
HOURS [2] - 1311:14, 1315:9
HOUSE [1] - 1414:1
HUNDREDS [1] - 1304:24
HYDRAULIC [3] - 1313:15, 1346:8, 1378:19
HYDRAULICS [10] - 1375:9, 1389:24, 1393:9, 1393:10, 1394:4, 1395:10, 1398:22, 1398:25, 1399:14, 1415:15
HYDROGEOLOGIST [1] - 1294:9
HYDROGEOLOGY [1] - 1289:19

**I**

IDEA [6] - 1277:25, 1278:12, 1308:24, 1326:18, 1374:7, 1380:11
IDENTIFICATION [2] - 1282:1, 1288:4
IDENTIFIED [8] - 1268:6, 1303:23, 1307:7, 1308:6, 1308:11, 1309:19, 1368:7
IDENTIFY [3] - 1303:15, 1303:22, 1307:15
IDENTIFYING [1] - 1391:4
IMPACT [2] - 1313:15, 1373:18
IMPACTED [2] - 1356:15, 1416:24
IMPAIRED [14] - 1300:6, 1334:23, 1335:4, 1336:14, 1336:17, 1337:10, 1342:5, 1351:10, 1353:6, 1353:7, 1353:8, 1353:12, 1362:19, 1363:16
IMPERFECT [1] - 1392:7
IMPLEMENT [1] - 1415:20
IMPLEMENTED [2] - 1419:24, 1420:5
IMPLICIT [1] - 1303:5
IMPLICITLY [1] -

1316:5
IMPORT [3] - 1357:4, 1391:24, 1408:1
IMPORTANCE [1] - 1417:17
IMPORTED [5] - 1302:21, 1357:16, 1358:19, 1359:23, 1360:3
IMPOSE [1] - 1356:13
IMPOSES [1] - 1350:11
IMPOSSIBLE [2] - 1258:19, 1415:24
IMPRESSION [1] - 1358:5
IMPROPER [1] - 1380:22
IMPROPERLY [4] - 1380:2, 1380:18, 1382:13, 1408:18
INACCURATE [1] - 1387:16
INADMISSIBLE [2] - 1255:19, 1267:14
INAPPROPRIATE [1] - 1397:20
INCH [1] - 1304:24
INCLINED [1] - 1267:12
INCLUDE [1] - 1324:16
INCLUDED [7] - 1295:21, 1297:13, 1302:4, 1307:9, 1307:25, 1321:10, 1336:1
INCLUDING [6] - 1260:19, 1265:11, 1296:14, 1316:4, 1341:16, 1364:1
INCONSISTENT [3] - 1285:9, 1295:4, 1308:16
INCORPORATE [1] - 1368:10
INCREASE [1] - 1360:19
INCREASED [1] - 1354:16
INDICATE [1] - 1283:10
INDICATED [3] - 1268:4, 1349:14, 1350:6
INDICATING [1] - 1284:18
INDICATING) [2] - 1400:22, 1409:17
INDICATION [2] -

1276:5, 1307:19
INDICATIONS [2] - 1326:23, 1326:24
INDIRECT [24] - 1314:10, 1314:15, 1345:8, 1346:12, 1346:14, 1371:22, 1372:22, 1373:22, 1374:4, 1374:14, 1374:17, 1375:2, 1375:11, 1376:20, 1378:18, 1389:14, 1389:24, 1392:8, 1395:13, 1399:1, 1415:6, 1415:8, 1415:10
INDIRECTLY [2] - 1345:25, 1346:11
INDIVIDUAL [3] - 1283:3, 1413:3
INDIVIDUALLY [1] - 1337:16
INDULGE [1] - 1376:2
INDULGENCE [1] - 1268:24
INFERENCES [2] - 1316:8, 1316:9
INFERENTIAL [3] - 1257:14, 1316:18, 1318:15
INFINITE [1] - 1289:21
INFORMATION [27] - 1263:4, 1265:12, 1267:20, 1267:21, 1305:22, 1309:4, 1309:11, 1316:2, 1316:20, 1337:22, 1337:25, 1338:1, 1338:2, 1341:11, 1349:17, 1353:9, 1359:1, 1363:1, 1367:24, 1386:4, 1387:16, 1391:10, 1400:10, 1402:21, 1403:3, 1407:5, 1415:3
INFORMED [1] - 1350:13
INITIAL [1] - 1360:15
INQUIRE [1] - 1418:24
INSTALLED [3] - 1356:8, 1380:5, 1408:17
INSTALLING [2] - 1379:20, 1410:22
INSTANCE [12] - 1258:25, 1284:5, 1284:17, 1288:23, 1289:20, 1291:14, 1291:15, 1291:20,

1332:12, 1339:2, 1360:21, 1403:19
INSTANCES [7] - 1258:24, 1280:19, 1284:21, 1287:3, 1297:25, 1308:15, 1320:16
INSTEAD [4] - 1290:25, 1291:2, 1291:3, 1368:4
INSTITUTE [3] - 1273:8, 1273:9, 1273:13
INSTRUCTION [1] - 1264:3
INSTRUCTIONS [1] - 1264:8
INTEGRATE [2] - 1279:23, 1281:9
INTEGRATED [2] - 1279:13, 1280:17
INTEGRATING [1] - 1302:4
INTEGRITY [2] - 1333:6, 1333:8
INTEND [2] - 1266:17, 1267:1
INTENT [2] - 1346:21, 1346:23
INTEREST [4] - 1272:24, 1305:17, 1306:13
INTERESTED [2] - 1283:7, 1309:3
INTERNAL [1] - 1394:13
INTERNATIONAL [2] - 1273:9, 1273:12
INTERPRET [1] - 1366:10
INTERPRETATION [3] - 1258:2, 1285:10, 1366:1
INTERPRETING [1] - 1302:23
INTERVAL [6] - 1316:13, 1316:21, 1322:10, 1323:16, 1323:22, 1323:25
INTERVALS [2] - 1318:19, 1323:9
INTERVENING [1] - 1264:5
INTRODUCE [2] - 1267:1, 1269:5
INTRODUCED [1] - 1324:15
INTRODUCTION [2] - 1274:13, 1305:10
INTRODUCTORY [1] -

1272:15
**INVESTIGATE**[7] - 1307:22, 1308:25, 1321:6, 1377:1, 1382:14, 1390:6, 1390:11
**INVESTIGATED**[11] - 1307:8, 1307:17, 1308:11, 1309:22, 1310:15, 1321:12, 1379:2, 1379:17, 1390:5, 1404:23, 1405:10
**INVESTIGATION**[22] - 1307:12, 1307:20, 1307:23, 1308:8, 1324:12, 1376:10, 1376:15, 1376:22, 1377:9, 1377:11, 1379:12, 1379:15, 1381:25, 1382:12, 1405:6, 1409:11, 1409:21, 1410:4, 1410:7, 1410:10, 1410:18, 1414:11
**INVESTIGATIONS**[3] - 1309:8, 1321:9
**INVESTIGATIVE**[1] - 1383:4
**INVOICED**[1] - 1281:5
**INVOLVE**[1] - 1322:9
**INVOLVED**[4] - 1348:21, 1350:8, 1358:10, 1420:22
**INVOLVING**[1] - 1306:15
**IPSUM**[1] - 1291:9
**IRRELEVANT**[4] - 1257:10, 1264:3, 1264:21, 1322:14
**ISOLATED**[1] - 1413:10
**ISSUE**[26] - 1255:11, 1255:13, 1255:15, 1255:17, 1256:14, 1259:2, 1259:4, 1264:6, 1264:16, 1265:3, 1266:4, 1266:22, 1267:11, 1268:18, 1268:21, 1301:6, 1309:15, 1316:21, 1353:20, 1353:22, 1371:7, 1375:14, 1376:2, 1405:15, 1413:11, 1413:12
**ISSUED**[1] - 1335:14
**ISSUES**[15] - 1254:18, 1258:4, 1262:7, 1263:14,

1264:4, 1264:11, 1264:13, 1313:15, 1330:19, 1330:21, 1343:19, 1353:14, 1353:17, 1363:17, 1378:19
**ISSUING**[1] - 1340:11
**ITEM**[1] - 1386:6
**ITEM**[1] - 1254:5
**ITERATIONS**[1] - 1371:15
**ITSELF**[2] - 1367:14, 1369:17

### J

**JEFF**[2] - 1330:14, 1330:24
**JENKS**[2] - 1365:8, 1365:22
**JIM**[1] - 1387:3
**JOB**[9] - 1330:18, 1330:25, 1332:6, 1332:13, 1333:7, 1333:16, 1350:12, 1358:3, 1358:15
**JOINED**[1] - 1269:18
**JOURNALS**[3] - 1274:5, 1274:17, 1274:19
**JUDGE**[3] - 1274:5, 1274:9, 1322:11
**JUDGMENT**[1] - 1316:5
**JUDGMENTS**[1] - 1350:13
**JUMP**[1] - 1298:3
**JUMPING**[1] - 1416:6
**JUNE**[3] - 1391:9, 1395:3, 1405:4
**JUNIORS**[1] - 1272:16
**JUROR**[1] - 1269:25
**JURY**[30] - 1254:4, 1254:17, 1261:25, 1263:2, 1263:4, 1263:21, 1263:23, 1263:24, 1264:4, 1264:7, 1267:16, 1269:11, 1269:13, 1269:16, 1269:19, 1271:21, 1272:19, 1281:9, 1282:3, 1286:9, 1290:20, 1322:2, 1348:24, 1349:1, 1349:4, 1349:10, 1350:22, 1350:25, 1421:1, 1421:3
**JURY**[1] - 1269:21

**JURY'S**[1] - 1350:8

### K

**KEEP**[3] - 1338:1, 1348:22, 1420:23
**KEEPING**[3] - 1414:3, 1414:6, 1414:18
**KEEPS**[1] - 1343:23
**KENNEDY**[2] - 1365:8, 1365:22
**KEPT**[2] - 1314:21, 1413:4
**KEY**[2] - 1306:5, 1361:11
**KID**[1] - 1273:1
**KIND**[2] - 1272:13, 1317:9
**KNOWING**[2] - 1395:7
**KNOWLEDGE**[18] - 1278:16, 1302:7, 1354:16, 1357:1, 1385:16, 1385:18, 1385:24, 1386:7, 1398:2, 1398:4, 1398:8, 1398:11, 1398:12, 1398:18, 1399:25, 1400:3, 1405:6, 1406:2
**KNOWLEDGEABLE**[5] - 1337:18, 1337:21, 1386:2, 1399:15, 1400:8
**KNOWN**[1] - 1309:12
**KNOWS**[3] - 1260:22, 1325:12, 1361:5
**KOELEWYN**[1] - 1330:16
**KOELEWYN**[11] - 1261:1, 1330:14, 1330:15, 1330:22, 1330:24, 1343:14, 1343:21, 1403:19, 1404:5, 1404:17, 1405:15
**KOELEWYN'S**[2] - 1331:6, 1404:24

### L

**LAB**[15] - 1325:7, 1325:10, 1325:11, 1343:15, 1344:11, 1377:17, 1378:16, 1378:21, 1404:18, 1404:25, 1405:10, 1405:13, 1405:19, 1405:21, 1406:1
**LABEL**[1] - 1290:3

**LABELED**[1] - 1282:19
**LABELING**[1] - 1319:10
**LABORATORY**[13] - 1330:6, 1330:7, 1330:8, 1330:9, 1330:11, 1330:13, 1330:23, 1330:24, 1331:21, 1343:14, 1343:17, 1344:5, 1404:21
**LABORATORY**[1] - 1344:9
**LABORIOUS**[1] - 1409:1
**LABS**[1] - 1343:18
**LACK**[2] - 1256:20, 1285:20
**LACKS**[6] - 1278:21, 1294:18, 1325:13, 1359:25, 1393:13, 1404:10
**LADIES**[2] - 1269:20, 1348:18
**LAKE**[22] - 1275:11, 1275:18, 1275:22, 1276:4, 1276:7, 1276:18, 1276:25, 1277:4, 1277:12, 1277:13, 1278:5, 1278:8, 1278:10, 1287:9, 1314:6, 1329:20, 1345:17, 1346:4, 1374:15, 1374:16, 1396:6, 1399:14
**LAND**[6] - 1359:16, 1359:17, 1359:18, 1415:25, 1416:5, 1416:22
**LANGUAGE**[3] - 1336:8, 1336:20, 1341:17
**LARDIERE**[1] - 1254:15
**LARGE**[4] - 1306:10, 1306:15, 1318:10, 1415:25
**LARGELY**[1] - 1267:14
**LARGER**[2] - 1263:14, 1318:4
**LAST**[12] - 1267:25, 1270:22, 1270:24, 1293:18, 1302:25, 1324:18, 1328:11, 1328:12, 1345:2, 1400:10, 1403:3, 1420:14

**LATE**[1] - 1400:10
**LATERAL**[16] - 1324:14, 1324:17, 1380:1, 1380:11, 1380:14, 1380:22, 1381:19, 1381:22, 1382:13, 1409:2, 1411:8, 1411:19, 1412:5, 1413:11, 1413:13, 1414:18
**LATERALLY**[1] - 1288:13
**LATEST**[2] - 1371:1, 1371:8
**LAWS**[1] - 1341:21
**LAY**[2] - 1255:19, 1262:19
**LAYS**[1] - 1258:9
**LEAD**[1] - 1401:7
**LEADING**[2] - 1409:4, 1414:20
**LEAKED**[1] - 1381:11
**LEAKING**[1] - 1333:9
**LEAKS**[3] - 1333:10, 1333:11, 1333:12
**LEARN**[1] - 1305:16
**LEAST**[10] - 1258:12, 1267:19, 1293:5, 1294:6, 1305:3, 1305:25, 1311:6, 1339:21, 1342:25, 1406:11
**LEAVE**[1] - 1264:13
**LECTERN**[3] - 1255:12, 1263:11, 1264:13
**LED**[4] - 1309:8, 1309:9, 1309:25, 1325:17
**LEFT**[5] - 1275:15, 1288:2, 1380:2, 1381:9, 1411:12
**LEFT-HAND**[1] - 1288:2
**LEGACY**[1] - 1408:4
**LEGAL**[1] - 1335:19
**LENGTH**[1] - 1299:18
**LESERMAN**[13] - 1254:24, 1255:7, 1261:3, 1266:24, 1267:5, 1267:8, 1387:3, 1387:12, 1393:11, 1404:5, 1405:9, 1405:14, 1405:21
**LESS**[11] - 1314:23, 1334:16, 1355:20, 1364:13, 1384:2, 1385:5, 1388:9, 1389:16, 1390:18,

1397:9
LETTER [15] - 1347:19, 1347:23, 1348:1, 1348:3, 1348:5, 1348:6, 1348:12, 1348:15, 1364:23, 1365:6, 1368:8, 1368:9, 1369:21, 1375:10, 1391:15
LEVEL [14] - 1276:19, 1276:21, 1286:3, 1314:20, 1334:5, 1334:25, 1355:7, 1356:2, 1356:17, 1388:16, 1388:17, 1390:13, 1390:14, 1405:8
LEVELS [22] - 1272:15, 1277:1, 1296:10, 1323:6, 1323:9, 1353:24, 1354:5, 1354:10, 1355:5, 1355:6, 1355:14, 1355:17, 1363:25, 1376:3, 1381:7, 1388:8, 1391:18, 1401:23, 1410:25, 1411:17, 1413:14
LIABILITY [1] - 1264:5
LIFE [1] - 1398:9
LIKELY [2] - 1318:4, 1381:15
LIMINE [3] - 1255:16, 1256:5, 1256:19
LIMIT [12] - 1314:23, 1327:1, 1355:25, 1388:10, 1388:11, 1388:13, 1389:21, 1390:19, 1397:17, 1397:24, 1401:3, 1402:11
LIMITATIONS [1] - 1301:16
LIMITED [1] - 1302:8
LIMITS [1] - 1355:19
LINE [32] - 1254:23, 1255:18, 1277:9, 1283:1, 1283:25, 1284:2, 1284:5, 1284:14, 1284:18, 1284:20, 1286:25, 1287:1, 1287:3, 1287:14, 1291:12, 1291:14, 1291:18, 1293:3, 1293:6, 1305:16, 1351:20, 1351:21, 1351:23, 1384:18, 1384:20,

1384:22, 1402:1, 1407:25, 1408:5, 1408:8
LINES [13] - 1288:12, 1288:15, 1288:16, 1291:10, 1309:15, 1310:12, 1351:13, 1351:15, 1355:9, 1366:6, 1368:18, 1369:24, 1408:23
LINKED [1] - 1317:5
LITER [7] - 1311:24, 1337:1, 1356:1, 1356:2, 1388:11, 1389:8, 1390:14
LITERATURE [1] - 1274:13
LITIGATION [2] - 1322:19, 1416:25
LIVING [1] - 1306:13
LOCAL [4] - 1357:15, 1358:18, 1359:12, 1359:14
LOCATED [2] - 1291:13, 1411:19
LOCATION [7] - 1258:13, 1280:13, 1280:15, 1280:24, 1282:13, 1283:11, 1283:14, 1284:6, 1284:7, 1286:6, 1286:16, 1288:22, 1289:6, 1291:22, 1293:10, 1298:13, 1303:7, 1311:14, 1317:21, 1362:18, 1375:6, 1379:25, 1382:9, 1411:8, 1415:22
LOCATIONS [16] - 1266:15, 1279:8, 1281:14, 1282:18, 1284:16, 1295:5, 1305:10, 1343:1, 1343:3, 1361:16, 1362:4, 1362:6, 1362:15, 1379:19, 1398:24
LOOK [45] - 1258:17, 1264:10, 1266:8, 1269:7, 1274:19, 1276:23, 1280:19, 1280:20, 1281:20, 1285:24, 1290:15, 1291:6, 1292:23, 1293:20, 1295:3, 1298:15, 1301:15, 1308:23, 1309:15, 1316:19, 1319:5, 1319:13, 1343:19,

1344:3, 1349:16, 1358:14, 1358:25, 1359:8, 1362:17, 1366:4, 1376:25, 1378:8, 1380:12, 1382:17, 1383:6, 1389:1, 1396:5, 1396:20, 1401:5, 1402:10, 1402:12, 1410:1, 1411:23, 1412:8
LOOKED [10] - 1257:1, 1319:7, 1379:21, 1379:24, 1383:9, 1391:21, 1391:22, 1395:22, 1400:21
LOOKING [25] - 1265:24, 1278:6, 1282:12, 1282:23, 1291:1, 1292:11, 1294:21, 1294:22, 1297:1, 1299:16, 1301:14, 1311:18, 1311:20, 1317:23, 1319:19, 1349:11, 1349:17, 1363:4, 1383:24, 1385:1, 1400:22, 1401:15, 1401:20, 1403:1, 1408:25
LOOKS [11] - 1283:1, 1293:13, 1320:10, 1321:20, 1344:2, 1344:3, 1387:3, 1396:1, 1396:4, 1407:2
LOREM [2] - 1290:21, 1291:8
LOS [1] - 1254:2
LOW [4] - 1355:5, 1355:6, 1355:14, 1355:16
LOWER [6] - 1272:15, 1275:15, 1388:14, 1388:17, 1389:23, 1390:24

M

MAGNESIUM [2] - 1353:18, 1372:5
MAGNITUDE [6] - 1283:12, 1283:13, 1284:21, 1284:23, 1285:4, 1320:7
MAIL [7] - 1269:23, 1372:21, 1403:23, 1404:4, 1404:5, 1404:20, 1406:7

MAILS [4] - 1264:24, 1265:4, 1403:19, 1419:7
MAIN [3] - 1305:25, 1354:12, 1381:20
MAINTENANCE [2] - 1365:4, 1368:16
MAINTENANCE [6] - 1329:24, 1330:3, 1333:1, 1333:4, 1336:4, 1400:7
MAJOR [1] - 1324:23
MAJORITY [1] - 1297:24
MANAGE [1] - 1332:9
MANAGEMENT [1] - 1365:4
MANAGER [6] - 1330:9, 1330:13, 1330:23, 1330:24, 1354:1, 1354:12
MANGANESE [7] - 1353:20, 1353:22, 1353:25, 1354:6, 1354:8, 1354:10, 1354:14
MANUAL [1] - 1368:16
MAP [2] - 1407:22, 1409:15
MARCH [2] - 1360:22, 1410:12
MARGIN [3] - 1323:18, 1323:21, 1323:23
MARK [1] - 1273:16
MARKED [1] - 1319:14
MARKERS [1] - 1277:22
MARKINGS [1] - 1287:23
MASK [2] - 1271:3, 1328:15
MASTER'S [1] - 1272:2
MATCHED [1] - 1287:4
MATCHES [1] - 1284:6
MATERIAL [5] - 1349:22, 1371:8, 1371:23, 1372:12, 1395:24
MATERIALS [3] - 1308:3, 1310:17, 1327:6
MATH [7] - 1272:25, 1273:1, 1276:16, 1393:6, 1393:7, 1393:8, 1401:9
MATHEMATICAL [3] -

1258:20, 1294:24, 1322:21
MATHEMATICAL [1] - 1273:8
MATTER [11] - 1263:14, 1263:25, 1275:4, 1279:6, 1307:14, 1317:3, 1348:21, 1349:6, 1374:18, 1374:23, 1420:22
MATTERS [1] - 1306:15
MAXIMUM [2] - 1334:5, 1334:25
MCC [1] - 1410:22
MCGUANE [1] - 1254:11
MCL [37] - 1334:2, 1334:4, 1334:18, 1334:24, 1335:3, 1335:5, 1336:1, 1336:10, 1336:12, 1336:15, 1336:16, 1336:21, 1336:25, 1337:7, 1337:8, 1342:5, 1351:7, 1352:9, 1362:14, 1362:18, 1363:5, 1363:9, 1363:10, 1363:22, 1364:2, 1364:10, 1364:13, 1365:1, 1366:1, 1366:11, 1368:13, 1371:18, 1379:7, 1379:10
MCLS [11] - 1334:8, 1336:12, 1336:25, 1341:22, 1342:1, 1351:17, 1356:14, 1361:19, 1362:12, 1363:5, 1363:6
MEAN [57] - 1262:24, 1263:12, 1265:19, 1266:8, 1268:9, 1272:21, 1273:14, 1279:17, 1279:24, 1279:25, 1284:1, 1287:1, 1288:15, 1288:18, 1290:6, 1290:7, 1291:10, 1291:12, 1292:1, 1297:5, 1297:14, 1308:12, 1308:18, 1309:23, 1312:22, 1312:24, 1314:17, 1314:18, 1319:9, 1323:7, 1323:8, 1329:10, 1333:8, 1333:21, 1339:3,

1339:6, 1339:13, 1339:16, 1343:17, 1344:7, 1359:15, 1361:2, 1361:3, 1378:6, 1378:9, 1378:16, 1379:6, 1388:13, 1389:20, 1393:18, 1393:21, 1397:7, 1400:5, 1402:16, 1413:25, 1416:2

**MEANING** [3] - 1334:6, 1358:6, 1375:17

**MEANS** [11] - 1263:5, 1265:19, 1284:14, 1285:21, 1290:22, 1305:5, 1329:25, 1339:4, 1366:11, 1366:12, 1378:4

**MEANT** [2] - 1291:10, 1348:3

**MEASURED** [20] - 1280:21, 1282:8, 1283:13, 1284:6, 1284:7, 1284:21, 1284:22, 1284:23, 1285:5, 1286:13, 1286:14, 1291:15, 1292:9, 1292:10, 1293:11, 1302:21, 1315:18, 1317:20, 1359:20

**MEASUREMENT** [2] - 1278:4, 1304:25

**MEASUREMENTS** [10] - 1278:2, 1279:10, 1281:11, 1281:13, 1282:5, 1282:19, 1283:3, 1292:20, 1297:1, 1307:12

**MECHANICAL** [1] - 1379:19

**MEET** [9] - 1266:19, 1268:1, 1339:19, 1340:2, 1340:23, 1341:3, 1341:22, 1382:20, 1419:2

**MEETING** [3] - 1268:5, 1340:4, 1419:13

**MEETINGS** [4] - 1372:19, 1419:6, 1419:8, 1419:10

**MEETS** [5] - 1341:19, 1341:22, 1351:7, 1352:9, 1361:10

**MELLON** [3] - 1271:19, 1271:24, 1272:3

**MEMBER** [4] - 1262:15, 1273:5, 1273:7, 1273:12

**MEMBERS** [2] - 1273:17, 1273:18

**MEMO** [3] - 1300:3, 1335:7, 1363:19

**MEMORY** [1] - 1390:14

**MENTION** [2] - 1336:21, 1366:19

**MENTIONED** [11] - 1290:14, 1319:5, 1354:15, 1358:19, 1386:11, 1411:18, 1413:10, 1413:24, 1414:11, 1416:6, 1417:16

**MEREDITH** [5] - 1255:1, 1255:3, 1365:21, 1366:9, 1369:2

**MERGE** [1] - 1346:2

**MERGED** [3] - 1329:8, 1329:10, 1329:21

**MERIT** [1] - 1274:5

**MERITS** [1] - 1274:11

**MET** [2] - 1351:16

**METAL** [1] - 1380:6

**METER** [1] - 1392:22

**METHOD** [8] - 1302:12, 1302:20, 1325:25, 1355:18, 1355:19, 1355:25, 1356:10, 1356:12

**METHODOLOGY** [7] - 1262:11, 1263:17, 1310:19, 1310:20, 1326:11, 1327:3, 1384:14

**METHODS** [3] - 1344:11, 1344:13, 1388:15

**METRIC** [3] - 1289:12, 1289:21

**METRICS** [2] - 1279:14, 1319:11

**MIC** [1] - 1387:20

**MICEVYCH** [1] - 1254:11

**MICHAEL** [2] - 1327:15, 1328:12

**MICHAEL** [1] - 1329:1

**MICROGRAM** [1] - 1390:14

**MICROGRAMS** [3] - 1337:1, 1388:11, 1389:7

**MICROPHONE** [4] - 1271:5, 1328:17,

1418:8

**MIDDLE** [2] - 1291:7

**MIGHT** [10] - 1266:21, 1295:9, 1303:7, 1304:11, 1323:19, 1364:4, 1372:21, 1377:7, 1416:15

**MIGRATION** [2] - 1354:7, 1354:13

**MIL** [1] - 1258:2

**MILE** [1] - 1406:17

**MILES** [2] - 1408:6, 1408:9

**MILLILITERS** [1] - 1311:23

**MILLION** [2] - 1396:15, 1416:3

**MIND** [5] - 1348:22, 1363:15, 1390:7, 1411:22, 1420:23

**MINDFUL** [1] - 1387:20

**MINERALS** [1] - 1372:4

**MINUS** [1] - 1323:21

**MINUTE** [3] - 1298:3, 1320:25, 1341:12

**MINUTES** [4] - 1257:21, 1264:18, 1375:5, 1402:24

**MISLEADING** [1] - 1267:22

**MISS** [1] - 1382:13

**MISSION** [1] - 1312:24

**MISSTATING** [1] - 1367:4

**MISTAKE** [1] - 1291:9

**MIX** [5] - 1346:13, 1346:21, 1346:24, 1394:2, 1415:18

**MIXED** [7] - 1260:10, 1276:10, 1276:17, 1276:25, 1345:6, 1345:22, 1375:20

**MIXING** [8] - 1260:11, 1346:10, 1346:17, 1346:19, 1374:14, 1375:20, 1415:14

**MIXTURE** [1] - 1277:11

**MODIFICATIONS** [1] - 1309:9

**MOMENT** [3] - 1267:1, 1268:17, 1338:3

**MONDAY** [1] - 1377:17

**MONDAY** [1] - 1254:1

**MONITORED** [3] - 1279:7, 1282:11, 1292:16

**MONITORING** [2] - 1365:4, 1368:16

**MONITORING** [7] - 1274:24, 1280:5, 1299:16, 1308:3, 1308:13, 1309:5, 1309:12

**MONTH** [4] - 1363:2, 1389:17, 1390:8, 1411:25

**MONTHLY** [4] - 1412:10, 1412:12, 1412:15, 1413:2

**MORNING** [19] - 1254:10, 1254:12, 1254:13, 1254:16, 1254:23, 1255:7, 1255:9, 1257:25, 1264:22, 1265:11, 1269:20, 1269:21, 1270:11, 1327:23, 1327:25, 1328:22, 1349:12, 1354:15, 1421:5

**MOST** [19] - 1274:16, 1282:21, 1293:12, 1320:3, 1320:12, 1320:13, 1320:18, 1321:3, 1321:7, 1323:10, 1323:17, 1337:18, 1337:21, 1343:18, 1381:15, 1386:2, 1400:8, 1408:22

**MOSTLY** [2] - 1258:3, 1301:1

**MOTION** [3] - 1255:16, 1256:5, 1256:12

**MOTIONS** [1] - 1256:19

**MOTOR** [2] - 1379:20, 1410:22

**MOVE** [13] - 1256:17, 1262:17, 1271:4, 1280:25, 1288:13, 1290:1, 1290:19, 1305:2, 1333:15, 1383:20, 1394:17, 1403:17, 1414:4

**MOVED** [1] - 1401:7

**MOVING** [2] - 1332:19, 1351:20

**MR** [235] - 1254:10, 1254:13, 1254:21, 1255:3, 1255:8, 1255:14, 1255:25, 1256:2, 1256:8, 1256:11, 1256:25, 1257:12, 1257:21, 1257:25, 1258:23,

1259:15, 1259:18, 1259:22, 1259:25, 1260:5, 1260:21, 1261:8, 1261:12, 1261:16, 1261:23, 1262:1, 1262:5, 1262:9, 1262:13, 1262:19, 1263:22, 1264:19, 1265:9, 1265:22, 1266:5, 1266:12, 1266:18, 1266:23, 1267:24, 1268:13, 1268:16, 1270:9, 1271:9, 1271:13, 1275:5, 1275:7, 1278:21, 1278:24, 1281:25, 1282:3, 1283:15, 1283:16, 1283:21, 1283:22, 1283:23, 1283:25, 1285:14, 1285:22, 1285:24, 1286:7, 1286:9, 1288:6, 1288:9, 1289:23, 1290:1, 1290:18, 1290:20, 1291:6, 1291:8, 1293:17, 1293:18, 1294:18, 1294:21, 1295:11, 1295:13, 1295:15, 1303:16, 1303:19, 1303:21, 1305:13, 1309:18, 1310:2, 1313:10, 1313:12, 1321:19, 1321:24, 1321:25, 1322:3, 1322:6, 1322:7, 1322:14, 1322:16, 1323:1, 1323:3, 1323:5, 1325:13, 1325:16, 1325:20, 1325:23, 1326:13, 1326:16, 1327:7, 1327:9, 1327:14, 1327:17, 1327:20, 1328:20, 1328:24, 1329:4, 1331:10, 1331:16, 1335:16, 1335:19, 1335:21, 1338:3, 1338:10, 1339:17, 1342:8, 1342:9, 1349:8, 1349:11, 1349:18, 1349:21, 1350:3, 1350:9, 1350:15, 1350:18, 1351:5, 1351:6, 1351:11, 1351:15, 1351:20, 1351:23, 1352:17, 1355:10, 1355:12, 1355:21,

1357:8, 1357:10, 1358:13, 1358:14, 1358:23, 1358:25, 1359:25, 1360:2, 1360:4, 1360:7, 1360:17, 1360:18, 1363:11, 1363:14, 1365:12, 1365:17, 1366:7, 1366:9, 1366:14, 1367:8, 1368:20, 1369:8, 1369:13, 1369:16, 1369:17, 1369:25, 1370:2, 1370:5, 1370:11, 1377:5, 1377:10, 1378:5, 1383:21, 1383:22, 1383:24, 1384:4, 1384:6, 1384:19, 1384:22, 1384:23, 1385:11, 1386:17, 1386:18, 1387:21, 1387:22, 1390:10, 1391:2, 1391:6, 1391:8, 1392:12, 1392:14, 1393:13, 1393:15, 1394:18, 1394:25, 1395:3, 1395:19, 1398:1, 1398:16, 1400:25, 1401:1, 1402:4, 1402:7, 1402:21, 1403:18, 1404:7, 1404:9, 1404:11, 1404:15, 1404:16, 1405:24, 1407:13, 1407:16, 1407:18, 1407:21, 1409:4, 1409:5, 1409:10, 1410:3, 1410:17, 1412:20, 1412:22, 1414:20, 1414:22, 1416:19, 1417:8, 1417:13, 1417:15, 1417:16, 1417:25, 1418:5, 1418:9, 1418:13, 1418:14, 1418:25, 1419:2, 1419:19, 1420:2

**MULTIPLE** [6] - 1281:18, 1305:9, 1357:15, 1390:4, 1390:7, 1390:8

**MUSINGS** [1] - 1268:19

**MUST** [2] - 1280:23, 1339:19

# N

**NAME** [7] - 1270:22,

1270:23, 1270:24, 1328:11, 1328:12

**NAMED** [3] - 1273:18, 1273:22, 1380:1

**NAMELY** [1] - 1303:5

**NANOGRAMS** [2] - 1356:1, 1356:2

**NATIONAL** [1] - 1274:18

**NATURALLY** [1] - 1372:4

**NATURE** [3] - 1256:6, 1267:22, 1372:6

**NC-10** [4] - 1353:21, 1353:22, 1354:3

**NC-13** [1] - 1354:5

**NEAR** [1] - 1411:19

**NEARBY** [1] - 1381:10

**NEARLY** [2] - 1273:17, 1274:25

**NECESSARILY** [7] - 1354:8, 1361:2, 1361:3, 1362:21, 1375:2, 1375:9, 1419:21

**NEED** [13] - 1255:19, 1255:20, 1255:23, 1259:11, 1261:17, 1265:3, 1287:24, 1315:25, 1357:5, 1390:6, 1409:6, 1415:25, 1418:7

**NEEDED** [3] - 1354:8, 1383:22, 1393:4

**NEGATIVE** [3] - 1270:1, 1303:3, 1303:8

**NEGLECTS** [1] - 1265:18

**NERVES** [1] - 1366:21

**NEVER** [14] - 1264:2, 1300:2, 1300:11, 1300:14, 1321:21, 1363:15, 1367:15, 1367:21, 1369:9, 1374:19, 1374:25, 1381:14, 1382:8, 1405:17

**NEW** [3] - 1368:6, 1391:4, 1399:9

**NEWHALL** [2] - 1329:18, 1354:2

**NEXT** [10] - 1288:7, 1290:1, 1327:13, 1352:7, 1379:25, 1380:3, 1383:17, 1405:23, 1411:20, 1418:12

**NIGHT** [3] - 1268:1, 1400:10, 1403:3

**NINE** [4] - 1274:25, 1280:4, 1281:12, 1368:3

**NINE-YEAR** [1] - 1281:12

**NOBODY** [4] - 1260:22, 1380:10, 1380:21, 1380:24

**NOMINATION** [1] - 1273:24

**NON** [26] - 1260:21, 1261:6, 1261:7, 1279:24, 1314:24, 1336:14, 1336:17, 1338:18, 1339:20, 1345:25, 1347:6, 1347:17, 1361:17, 1362:10, 1362:23, 1362:25, 1376:17, 1378:11, 1389:9, 1397:14, 1405:5, 1405:16, 1411:17, 1414:7, 1416:9

**NON-DETECT** [17] - 1314:24, 1338:18, 1339:20, 1347:6, 1347:17, 1361:17, 1362:10, 1362:23, 1362:25, 1376:17, 1378:11, 1389:9, 1405:5, 1405:16, 1411:17, 1416:9

**NON-IMPAIRED** [2] - 1336:14, 1336:17

**NON-PRESSURIZED** [1] - 1414:7

**NON-STATISTICIANS** [1] - 1279:24

**NON-VOC** [1] - 1345:25

**NON-WHITTAKER** [2] - 1260:21, 1261:7

**NONE** [1] - 1288:21

**NONETHELESS** [1] - 1288:25

**NONMEASURABLE** [1] - 1397:14

**NORMALLY** [2] - 1305:25, 1376:15

**NOTE** [2] - 1295:23, 1296:3

**NOTE** [1] - 1296:4

**NOTHING** [10] - 1258:3, 1260:16, 1270:18, 1296:12, 1323:1, 1327:7, 1327:9, 1328:6, 1381:6, 1382:5

**NOTICE** [1] - 1282:21

**NOTICED** [1] - 1379:17

**NOTIFICATION** [3] - 1355:7, 1356:1, 1356:17

**NOTIFY** [2] - 1341:8, 1341:18

**NOTION** [4] - 1264:8, 1264:20, 1280:22, 1317:16

**NOVEMBER** [1] - 1254:1

**NOWHERE** [1] - 1298:10

**NUMBER** [27] - 1254:18, 1256:13, 1260:14, 1260:15, 1265:7, 1284:11, 1304:8, 1304:15, 1306:15, 1319:18, 1339:25, 1344:10, 1364:8, 1366:3, 1370:23, 1370:24, 1371:10, 1371:15, 1371:17, 1378:17, 1378:22, 1390:20, 1398:18, 1405:13, 1413:17, 1418:4

**NUMBERS** [17] - 1258:24, 1259:22, 1265:7, 1285:16, 1285:18, 1285:19, 1285:25, 1286:1, 1294:12, 1324:9, 1337:4, 1343:16, 1343:21, 1343:25, 1344:1, 1384:11, 1396:3

**NUMERICAL** [2] - 1297:12, 1297:23

# O

**O'CLOCK** [5] - 1254:23, 1403:3, 1420:20, 1420:24

**OATH** [4] - 1351:1, 1352:17, 1352:21, 1403:11

**OBJECT** [1] - 1418:9

**OBJECTION** [32] - 1257:8, 1264:19, 1266:16, 1268:11, 1268:23, 1278:21, 1285:20, 1294:18, 1303:16, 1303:17, 1322:1, 1326:13, 1331:10, 1331:14, 1335:19, 1357:8, 1359:25, 1360:4,

1360:17, 1363:11, 1365:12, 1366:7, 1384:4, 1393:13, 1404:7, 1404:10, 1404:13, 1409:6, 1409:8, 1412:24, 1417:8, 1418:5

**OBJECTIONABLE** [1] - 1256:24

**OBJECTIONS** [8] - 1255:4, 1264:23, 1267:18, 1349:21, 1369:25, 1384:23, 1395:19, 1402:7

**OBJECTIVES** [1] - 1306:25

**OBJECTS** [1] - 1306:13

**OBLIGATION** [1] - 1385:17

**OBSERVATIONS** [2] - 1281:17, 1326:25

**OBSERVED** [9] - 1282:15, 1286:4, 1287:3, 1287:6, 1287:7, 1289:13, 1289:14, 1292:4, 1297:4

**OBTAIN** [2] - 1364:19, 1418:3

**OBTAINED** [3] - 1306:18, 1311:20, 1322:24

**OBTAINING** [2] - 1306:21, 1309:3

**OBVIOUSLY** [1] - 1307:3

**OCCASION** [1] - 1340:20

**OCCASIONALLY** [2] - 1303:3, 1373:10

**OCCASIONS** [2] - 1283:7, 1305:23

**OCCUR** [1] - 1279:19

**OCCURRED** [3] - 1280:5, 1319:24, 1326:21

**OCCURRENCE** [1] - 1297:8

**OCCURRENCES** [1] - 1313:21

**OCCURRING** [5] - 1280:23, 1284:3, 1320:10, 1320:11, 1372:5

**OCCURS** [1] - 1313:25

**OCTOBER** [3] - 1310:4, 1365:19, 1411:1

**ODDS** [1] - 1289:4
**OFFER** [2] - 1257:4, 1258:11
**OFFERED** [1] - 1419:21
**OFFERING** [5] - 1295:18, 1300:8, 1312:11, 1317:11, 1322:22
**OFFERS** [1] - 1256:16
**OFFHAND** [2] - 1355:6, 1355:15
**OFTEN** [5] - 1305:19, 1317:25, 1318:13, 1412:10, 1419:5
**OLD** [1] - 1379:24
**OMITTING** [1] - 1308:1
**OMMP** [2] - 1365:3, 1368:15
**ONCE** [8] - 1268:5, 1280:16, 1310:7, 1358:6, 1382:13, 1382:14, 1395:24, 1410:16
**ONE** [102] - 1257:6, 1267:1, 1267:15, 1268:17, 1268:20, 1269:3, 1276:20, 1282:16, 1282:18, 1282:20, 1283:21, 1283:24, 1287:8, 1287:10, 1287:15, 1288:2, 1288:7, 1288:8, 1289:25, 1290:2, 1290:12, 1290:24, 1291:6, 1292:8, 1292:9, 1292:10, 1296:8, 1297:5, 1298:24, 1302:24, 1303:7, 1303:23, 1303:25, 1305:8, 1308:15, 1311:10, 1311:13, 1314:21, 1315:13, 1315:21, 1317:20, 1318:7, 1319:20, 1320:5, 1323:9, 1323:17, 1329:13, 1330:2, 1343:3, 1345:11, 1348:15, 1349:12, 1355:14, 1356:4, 1359:16, 1359:17, 1359:18, 1359:19, 1364:16, 1364:25, 1365:1, 1365:3, 1365:20, 1366:2, 1366:16, 1367:15, 1371:11, 1371:15, 1372:15, 1372:23, 1373:6,

1373:12, 1373:23, 1374:3, 1375:10, 1376:1, 1377:7, 1378:18, 1379:18, 1383:2, 1385:22, 1386:6, 1386:12, 1390:21, 1390:24, 1394:22, 1395:11, 1401:9, 1403:23, 1404:6, 1405:2, 1405:24, 1406:11, 1416:24, 1417:23, 1419:9
**ONE-PAGE** [1] - 1417:23
**ONE-THIRD** [6] - 1287:8, 1287:10, 1292:8, 1292:9, 1292:10, 1314:21
**ONE-TO-ONE** [1] - 1287:15
**ONE-WEEK** [1] - 1385:22
**ONES** [2] - 1267:16, 1284:18
**OOO** [1] - 1254:3
**OPEN** [8] - 1348:22, 1358:24, 1380:3, 1381:9, 1381:21, 1411:12, 1414:1, 1420:23
**OPERATED** [3] - 1300:17, 1340:24, 1416:21
**OPERATES** [2] - 1351:7, 1398:23
**OPERATING** [4] - 1331:12, 1344:10, 1347:20, 1416:12
**OPERATION** [2] - 1368:16
**OPERATION** [3] - 1336:4, 1353:23, 1354:2
**OPERATIONAL** [1] - 1365:3
**OPERATIONAL** [17] - 1338:11, 1338:12, 1338:18, 1338:20, 1339:2, 1339:6, 1339:9, 1339:12, 1339:19, 1340:2, 1340:4, 1340:23, 1341:3, 1361:20, 1362:10, 1416:22
**OPERATIONS** [11] - 1261:3, 1329:23, 1329:24, 1330:2, 1332:7, 1332:9, 1358:3, 1378:1,

1378:2, 1384:10, 1400:7
**OPINION** [15] - 1257:4, 1294:15, 1298:19, 1300:8, 1302:18, 1303:11, 1304:22, 1312:11, 1313:4, 1317:11, 1322:22, 1331:3, 1331:5, 1341:2, 1341:4
**OPINIONS** [7] - 1256:16, 1295:8, 1295:18, 1302:24, 1321:2, 1331:6, 1331:8
**OPPORTUNITY** [3] - 1256:15, 1269:10, 1383:18
**OPTION** [3] - 1347:7, 1347:8, 1347:10
**OR** [1] - 1328:13
**ORDER** [10] - 1254:19, 1260:20, 1263:13, 1263:20, 1279:4, 1340:12, 1364:19, 1371:25, 1374:8, 1386:3
**ORDERED** [1] - 1268:14
**ORGANIC** [3] - 1276:6, 1279:18, 1338:19
**ORGANIZATIONS** [2] - 1273:6, 1273:10
**ORIENT** [1] - 1410:9
**ORIGINALLY** [1] - 1342:11
**ORIGINATES** [1] - 1345:17
**OROVILLE** [1] - 1345:17
**ORPHAN** [1] - 1261:24
**ORR** [2] - 1372:23, 1373:21
**OTHERWISE** [5] - 1263:3, 1263:18, 1267:12, 1350:1, 1359:21
**OUTPUT** [1] - 1282:14
**OUTSIDE** [14] - 1254:16, 1263:20, 1263:23, 1299:4, 1299:5, 1301:6, 1304:10, 1304:19, 1308:25, 1313:25, 1314:3, 1327:17, 1349:9, 1382:16
**OVERALL** [2] - 1295:3, 1319:3

**OVERRULED** [3] - 1303:17, 1365:13, 1419:20
**OVERSEE** [1] - 1329:25
**OVERSIGHT** [1] - 1332:21
**OWN** [1] - 1334:15
**OWNED** [2] - 1416:20, 1416:21

## P

**P.M** [1] - 1421:5
**PAGE** [26] - 1268:4, 1302:19, 1309:15, 1351:12, 1351:13, 1351:15, 1351:20, 1351:21, 1352:7, 1355:9, 1358:13, 1358:14, 1359:21, 1360:21, 1360:25, 1366:6, 1368:18, 1369:24, 1384:17, 1384:18, 1384:20, 1395:18, 1402:1, 1417:23
**PAGES** [1] - 1263:4
**PAID** [1] - 1281:3
**PANELS** [3] - 1379:20, 1410:22
**PAPERWORK** [1] - 1417:5
**PARAGRAPHS** [3] - 1369:2, 1369:12, 1369:15
**PARENTHESES** [1] - 1412:9
**PART** [28] - 1262:20, 1262:22, 1293:18, 1301:25, 1304:18, 1307:21, 1309:11, 1309:24, 1317:1, 1317:2, 1318:20, 1318:22, 1332:6, 1332:9, 1332:13, 1332:16, 1332:20, 1333:7, 1333:11, 1333:16, 1334:23, 1335:23, 1343:18, 1358:15, 1375:22, 1385:17, 1403:15, 1405:10
**PARTICULAR** [18] - 1267:15, 1268:22, 1275:1, 1282:7, 1282:12, 1282:16, 1293:9, 1312:7, 1313:25, 1323:20, 1324:6, 1377:19,

1394:22, 1398:15, 1399:13, 1401:3, 1405:2
**PARTICULARLY** [1] - 1283:6
**PARTIES** [3] - 1263:13, 1267:1, 1321:15
**PARTS** [16] - 1260:21, 1298:8, 1312:6, 1331:17, 1334:20, 1336:14, 1337:1, 1355:19, 1356:1, 1356:2, 1379:6, 1380:10, 1389:7, 1389:12, 1400:20
**PARTY** [1] - 1265:17
**PASSED** [2] - 1312:13, 1336:6
**PATH** [1] - 1406:24
**PATHWAY** [1] - 1268:6
**PATRICK** [1] - 1254:10
**PAUSE** [1] - 1267:3
**PCE** [37] - 1282:9, 1282:11, 1283:4, 1284:11, 1284:24, 1285:8, 1288:10, 1290:4, 1290:25, 1296:10, 1296:14, 1296:22, 1297:8, 1297:21, 1298:5, 1298:24, 1302:23, 1312:12, 1324:15, 1334:18, 1336:13, 1336:25, 1351:7, 1351:17, 1379:3, 1380:10, 1381:2, 1381:7, 1381:11, 1381:19, 1382:18, 1388:8, 1389:2, 1389:4, 1389:11, 1390:14, 1412:16
**PDF** [1] - 1349:25
**PEER** [5] - 1274:2, 1274:7, 1274:8, 1274:15, 1274:16
**PENNSYLVANIA** [2] - 1271:20, 1271:23
**PEOPLE** [12] - 1273:19, 1306:10, 1306:12, 1311:15, 1331:24, 1348:21, 1366:17, 1366:19, 1380:12, 1385:18, 1385:21, 1420:22
**PER** [22] - 1298:8, 1304:24, 1312:7, 1334:20, 1336:14,

1337:1, 1355:20, 1356:1, 1356:2, 1379:6, 1379:19, 1380:10, 1388:11, 1389:7, 1389:12, 1390:14, 1400:20

**PERCENT** [33] - 1261:12, 1261:13, 1273:18, 1290:8, 1290:14, 1290:17, 1291:2, 1291:17, 1292:5, 1292:17, 1293:13, 1293:15, 1294:2, 1302:3, 1313:24, 1320:24, 1323:21, 1323:25, 1339:21, 1339:24, 1340:1, 1340:3, 1360:22, 1360:23, 1360:24, 1361:1, 1375:21, 1394:20, 1396:6, 1396:7, 1397:1, 1397:4

**PERCENTAGE** [21] - 1277:19, 1277:23, 1278:11, 1279:11, 1280:14, 1281:15, 1286:5, 1286:15, 1286:18, 1287:5, 1296:21, 1297:8, 1297:11, 1297:17, 1297:20, 1297:24, 1323:19, 1360:10, 1390:10, 1393:4, 1395:7

**PERCENTAGES** [4] - 1277:13, 1279:15, 1325:1, 1396:3

**PERCHLORATE** [27] - 1260:8, 1260:10, 1275:11, 1275:22, 1277:7, 1277:20, 1278:2, 1279:22, 1282:14, 1294:17, 1295:7, 1297:2, 1298:16, 1314:5, 1338:17, 1343:9, 1345:23, 1354:5, 1354:7, 1361:14, 1362:5, 1362:24, 1406:5, 1406:10, 1406:12, 1406:25, 1407:7

**PERCHLORATE** [7] - 1338:16, 1342:23, 1361:14, 1362:4, 1373:11, 1391:14, 1409:19

**PERHAPS** [1] - 1256:22

**PERIOD** [10] - 1281:12, 1285:2, 1292:13, 1309:6, 1310:1, 1315:3, 1315:7, 1315:8, 1316:1, 1319:23

**PERIODIC** [1] - 1419:2

**PERIODICALLY** [1] - 1419:7

**PERMIT** [53] - 1266:1, 1301:4, 1331:19, 1338:17, 1338:21, 1338:22, 1339:1, 1339:4, 1339:7, 1339:17, 1340:8, 1340:19, 1340:25, 1341:5, 1346:22, 1347:2, 1347:4, 1347:11, 1347:15, 1347:18, 1347:24, 1361:16, 1362:3, 1362:15, 1362:21, 1362:23, 1363:20, 1363:21, 1364:15, 1364:19, 1366:3, 1367:3, 1367:4, 1367:5, 1367:10, 1368:24, 1368:25, 1370:25, 1371:3, 1371:6, 1371:7, 1373:13, 1373:15, 1377:20, 1379:19, 1417:6, 1417:22, 1418:3, 1419:16, 1419:25, 1420:4

**PERMITS** [3] - 1258:14, 1301:9, 1301:15

**PERMITTING** [1] - 1368:1

**PERSON** [7] - 1311:13, 1337:18, 1337:21, 1365:22, 1366:10, 1386:1, 1400:8

**PERSONAL** [1] - 1326:19

**PERSPECTIVE** [2] - 1294:19, 1294:24

**PERTAIN** [2] - 1264:24, 1297:3

**PFAS** [13] - 1354:19, 1354:20, 1354:21, 1354:25, 1355:3, 1355:5, 1355:13, 1356:5, 1356:14, 1356:15, 1356:16, 1356:19, 1356:23

**PFOAS** [1] - 1354:19

**PH.D** [5] - 1271:10,

1271:17, 1272:2, 1272:5, 1272:7

**PHENOMENON** [1] - 1257:7

**PHONE** [1] - 1419:7

**PHOTO** [4] - 1321:16, 1321:19, 1321:21, 1321:22

**PHOTOGRAPH** [4] - 1408:14, 1408:16, 1408:25, 1416:19

**PHOTOS** [1] - 1311:5

**PHRASE** [1] - 1304:6

**PHYSICAL** [3] - 1313:17, 1313:20, 1318:8

**PHYSICALLY** [2] - 1256:1, 1318:12

**PHYSICS** [3] - 1285:15, 1374:18, 1374:23

**PICKED** [1] - 1264:1

**PICTURE** [1] - 1342:14

**PIECE** [1] - 1380:6

**PIN** [1] - 1403:5

**PINPOINTED** [1] - 1381:15

**PIPE** [17] - 1321:12, 1346:6, 1346:18, 1379:25, 1380:18, 1381:8, 1381:20, 1381:21, 1382:2, 1382:6, 1382:9, 1408:9, 1411:8, 1414:3, 1415:11, 1415:12

**PIPELINE** [9] - 1304:21, 1345:5, 1380:3, 1380:15, 1408:6, 1408:18, 1408:19, 1411:12, 1416:12

**PIPELINES** [2] - 1408:22, 1414:13

**PIPES** [4] - 1333:9, 1346:2, 1346:3, 1346:5

**PITTSBURGH** [1] - 1271:20

**PLACE** [2] - 1333:25, 1350:11

**PLACING** [1] - 1262:24

**PLAINTIFF** [7] - 1258:19, 1267:13, 1285:25, 1286:19, 1287:17, 1293:21, 1325:6

**PLAINTIFF'S** [7] -

1254:9, 1258:1, 1267:21, 1270:4, 1290:11, 1296:3, 1301:24

**PLAINTIFFS** [3] - 1255:8, 1259:12, 1261:2

**PLAN** [3] - 1365:4, 1368:16

**PLAN** [9] - 1305:20, 1306:5, 1307:2, 1322:9, 1373:17, 1375:22, 1380:12, 1392:15

**PLANNING** [2] - 1285:17, 1328:21

**PLANS** [6] - 1305:24, 1307:5, 1379:24, 1383:6, 1383:9, 1411:7

**PLANT** [34] - 1275:11, 1275:14, 1275:23, 1277:2, 1277:4, 1277:7, 1277:20, 1278:3, 1279:22, 1283:17, 1284:10, 1285:8, 1287:17, 1291:25, 1294:17, 1295:1, 1295:7, 1339:24, 1340:16, 1341:25, 1342:24, 1345:2, 1345:23, 1346:3, 1362:24, 1373:20, 1384:12, 1392:19, 1392:21, 1393:2, 1394:21, 1395:25, 1396:7, 1416:11

**PLANTS** [7] - 1278:4, 1345:12, 1345:14, 1358:7, 1374:17, 1391:24, 1408:2

**PLATE** [1] - 1411:15

**PLATFORM** [2] - 1270:13, 1328:1

**PLAUSIBLE** [12] - 1268:6, 1400:14, 1401:1, 1401:17, 1401:19, 1402:20, 1402:25, 1403:5, 1403:6, 1403:7, 1403:14

**PLAY** [3] - 1255:1, 1318:18, 1368:23

**PLAYED** [4] - 1368:22, 1384:25, 1395:21, 1402:9

**PLEASANT** [1] - 1269:22

**PLOTTED** [1] -

1283:11

**PLUME** [3] - 1354:7, 1354:13, 1406:25

**PLUS** [1] - 1323:21

**POINT** [28] - 1257:15, 1258:20, 1259:5, 1261:22, 1262:1, 1263:25, 1266:2, 1267:23, 1276:17, 1276:24, 1285:6, 1285:15, 1289:2, 1320:4, 1323:11, 1340:20, 1348:17, 1350:8, 1361:25, 1363:9, 1368:2, 1380:19, 1396:22, 1401:6, 1409:14, 1414:17, 1419:8, 1420:18

**POINTED** [1] - 1412:15

**POINTS** [7] - 1288:17, 1297:14, 1315:12, 1320:6, 1364:24, 1388:21

**POLICY** [4] - 1300:3, 1335:14, 1335:17, 1336:6

**POPULATION** [7] - 1305:17, 1305:22, 1306:7, 1306:9, 1306:12, 1316:24, 1323:13

**POSITION** [5] - 1272:8, 1272:9, 1300:21, 1318:9, 1350:1

**POSITIVE** [3] - 1260:1, 1298:10, 1378:25

**POSITIVES** [2] - 1259:16, 1378:22

**POSSIBILITIES** [1] - 1390:21

**POSSIBILITY** [2] - 1340:11, 1379:1

**POSSIBLE** [5] - 1277:5, 1299:1, 1303:25, 1304:8, 1389:15

**POSSIBLY** [2] - 1390:23, 1404:21

**POTENTIAL** [6] - 1257:6, 1303:23, 1304:3, 1313:13, 1313:15, 1341:17

**POTENTIALLY** [3] - 1263:16, 1382:22, 1414:8

**POUNDS** [1] - 1304:24

POWER [1] - 1318:13
PPB [1] - 1397:2
PRACTICAL [2] - 1263:14, 1263:25
PRECISE [1] - 1293:4
PRECISION [1] - 1310:24
PRECLUDED [1] - 1266:9
PREDECESSOR [1] - 1329:17
PREDICT [11] - 1291:24, 1293:22, 1375:9, 1392:1, 1392:3, 1392:10, 1392:15, 1392:25, 1394:8, 1395:8, 1415:1
PREDICTED [4] - 1285:25, 1287:16, 1293:24, 1294:7
PREDICTING [1] - 1393:19
PREFER [2] - 1299:3, 1415:19
PREPARE [3] - 1277:10, 1281:19, 1366:4
PREPARED [13] - 1274:10, 1286:19, 1295:25, 1296:2, 1299:21, 1300:2, 1303:10, 1304:7, 1304:13, 1304:14, 1321:1, 1324:20, 1403:19
PREPARING [1] - 1400:2
PRESENCE [12] - 1254:4, 1254:17, 1263:20, 1263:23, 1269:16, 1303:24, 1349:1, 1349:4, 1349:9, 1350:22, 1350:24, 1421:3
PRESENT [3] - 1312:8, 1314:20, 1327:16
PRESENTED [6] - 1256:3, 1263:4, 1267:20, 1349:15, 1371:24, 1418:4
PRESENTING [1] - 1256:6
PRESENTLY [1] - 1334:18
PRESSURE [3] - 1313:15, 1382:4, 1414:17
PRESSURIZED [6] -

1304:24, 1413:25, 1414:5, 1414:7, 1414:9, 1414:16
PRETTY [7] - 1280:9, 1333:25, 1393:18, 1396:9, 1396:17, 1400:9, 1419:12
PREVENT [1] - 1354:6
PREVENTING [1] - 1264:5
PREVIEW [1] - 1256:23
PREVIOUSLY [8] - 1296:7, 1305:6, 1319:13, 1383:3, 1389:13, 1410:10, 1416:17, 1416:20
PRIMARILY [2] - 1272:14, 1372:5
PRINCIPLES [2] - 1299:9, 1318:16
PRIVILEGE [1] - 1265:2
PROBABILITY [1] - 1312:19
PROBLEM [12] - 1255:21, 1257:15, 1259:12, 1260:17, 1263:17, 1348:7, 1354:18, 1356:14, 1356:19, 1364:4, 1373:15, 1406:5
PROBLEMS [1] - 1259:8, 1259:23, 1272:24, 1273:2, 1371:25, 1372:14, 1373:1, 1373:3, 1373:24, 1374:3, 1383:1
PROCEDURAL [1] - 1256:5
PROCEDURES [1] - 1311:19
PROCEED [13] - 1265:16, 1309:17, 1338:7, 1351:14, 1351:22, 1355:11, 1366:8, 1368:19, 1368:21, 1370:1, 1384:24, 1395:20, 1402:8
PROCEEDINGS [3] - 1256:18, 1263:19, 1421:5
PROCEEDS [1] - 1305:9
PROCESS [13] - 1266:8, 1273:24, 1346:10, 1350:11, 1367:5, 1368:1,

1393:23, 1413:15, 1413:16, 1413:17, 1413:18, 1414:12, 1415:21
PRODUCE [3] - 1303:3, 1340:21, 1359:13
PRODUCED [5] - 1278:13, 1278:14, 1279:6, 1286:21, 1308:12
PRODUCT [1] - 1267:6
PRODUCTION [4] - 1351:25, 1352:8, 1392:21, 1396:14
PRODUCTS [2] - 1306:14, 1306:16
PROFESSION [1] - 1273:16
PROFESSIONAL [1] - 1273:6
PROFESSIONALISM [1] - 1350:21
PROFESSOR [3] - 1262:15, 1272:10, 1272:11
PROGRAM [1] - 1344:9
PROGRAM [4] - 1272:18, 1306:24, 1344:14, 1345:19
PROGRESSED [1] - 1337:25
PROGRESSES [1] - 1360:16
PROHIBITED [2] - 1339:13, 1339:16
PROJECT [2] - 1358:11, 1394:20
PROJECT [6] - 1260:11, 1345:15, 1358:11, 1358:20, 1360:8, 1387:24
PROJECTED [1] - 1359:9
PROMINENT [2] - 1274:17, 1274:21
PROMOTED [1] - 1272:11
PROMPTED [1] - 1309:7
PROOF [2] - 1258:6, 1258:11, 1268:7
PROPER [3] - 1262:20, 1267:19, 1386:3
PROPERLY [3] - 1267:12, 1382:7, 1383:10

PROPERTY [2] - 1354:4, 1354:14
PROPOSAL [1] - 1372:25
PROPOSALS [1] - 1274:18
PROPOSED [6] - 1371:24, 1372:8, 1372:25, 1373:5, 1373:6, 1373:19
PROTECTION [1] - 1300:12
PROTECTION [1] - 1368:14
PROTOCOL [1] - 1318:16
PROVEN [2] - 1260:23, 1268:6
PROVIDE [8] - 1255:20, 1255:21, 1263:13, 1265:18, 1290:13, 1323:18, 1349:24, 1363:1
PROVIDED [11] - 1265:2, 1265:12, 1265:14, 1266:3, 1308:19, 1310:7, 1364:24, 1368:15, 1372:12, 1407:5
PROVIDES [2] - 1255:22, 1305:21
PROVIDING [1] - 1318:3
PUBLIC [2] - 1335:8, 1335:10
PUBLIC [2] - 1274:11, 1359:6
PUBLICATION [2] - 1274:6, 1274:12
PUBLICATIONS [2] - 1274:3, 1274:14
PUBLISH [1] - 1274:10
PUBLISHED [1] - 1335:6
PULL [2] - 1389:2, 1403:25
PULLED [1] - 1281:17
PULLING [2] - 1395:14, 1415:15
PUMP [2] - 1415:18, 1416:23
PUMPED [1] - 1342:21
PUMPING [2] - 1332:19, 1358:7
PUMPS [1] - 1414:2
PURE [1] - 1294:14
PURELY [1] - 1390:13
PURPORTEDLY [1] - 1261:7

PURPOSE [6] - 1277:18, 1300:22, 1301:16, 1306:20, 1306:22, 1420:16
PURPOSES [8] - 1262:18, 1275:6, 1282:1, 1282:2, 1286:8, 1290:19, 1328:21, 1417:12
PURSUANT [3] - 1301:3, 1363:17, 1364:19
PURVIEW [2] - 1333:19, 1348:11
PUSHING [1] - 1382:5
PUT [27] - 1257:3, 1273:24, 1275:5, 1283:15, 1289:24, 1290:22, 1319:7, 1327:2, 1335:7, 1335:17, 1342:8, 1343:7, 1345:4, 1345:5, 1345:6, 1346:9, 1352:10, 1357:25, 1358:13, 1359:18, 1374:12, 1380:6, 1386:14, 1400:6, 1400:19, 1411:14, 1415:17
PUTTING [2] - 1279:25, 1319:9

**Q**

QA/QC [1] - 1343:19
QUALIFICATIONS [2] - 1262:17, 1309:9
QUALIFIED [1] - 1262:14
QUALITY [1] - 1365:3
QUALITY [21] - 1274:24, 1299:15, 1309:4, 1309:12, 1315:3, 1315:8, 1330:1, 1330:4, 1331:17, 1331:20, 1333:16, 1333:18, 1333:20, 1333:21, 1333:25, 1334:15, 1336:3, 1341:14, 1343:23, 1357:24, 1406:6
QUANTITIES [1] - 1302:21
QUARTER [1] - 1292:21
QUARTERLY [3] - 1419:6, 1419:9, 1419:13
QUESTION [9] -

1309:19, 1351:16, 1352:3, 1352:13, 1355:12, 1355:16, 1366:9, 1370:6, 1370:14

**QUESTIONING** [1] - 1277:9

**QUESTIONS** [16] - 1257:17, 1272:24, 1275:2, 1275:3, 1278:24, 1303:4, 1313:3, 1324:18, 1364:24, 1368:6, 1368:7, 1371:11, 1371:16, 1406:3, 1417:12

**QUICKER** [1] - 1420:4

**QUICKLY** [2] - 1267:7, 1401:7

**QUITE** [4] - 1281:16, 1385:21, 1390:24, 1409:13

**QUOTE** [7] - 1258:8, 1296:4, 1302:20, 1310:1, 1315:13, 1315:14

## R

**RAISE** [4] - 1256:14, 1268:20, 1270:14, 1328:3

**RAISES** [1] - 1303:4

**RANDOM** [1] - 1317:10

**RANGE** [1] - 1327:2

**RATES** [1] - 1314:6

**RATHER** [5] - 1315:19, 1323:13, 1409:1, 1412:12, 1419:22

**RATIO** [15] - 1282:23, 1284:9, 1286:11, 1286:12, 1287:13, 1289:13, 1290:3, 1290:5, 1290:6, 1290:7, 1302:20, 1314:21, 1364:2, 1391:25

**RATIOS** [3] - 1302:18, 1392:4, 1411:22

**RE** [4] - 1368:5, 1377:18, 1380:8, 1411:16

**RE-SAMPLE** [1] - 1377:18

**RE-SAMPLED** [2] - 1380:8, 1411:16

**REACH** [1] - 1416:9

**REACTION** [1] -

1405:25

**READ** [8] - 1254:25, 1290:2, 1310:12, 1370:3, 1403:15, 1403:25, 1404:4, 1404:5

**READER** [1] - 1325:12

**READING** [11] - 1302:19, 1341:1, 1361:21, 1370:13, 1378:6, 1378:10, 1392:22, 1395:4, 1395:8, 1395:9, 1413:16

**READINGS** [18] - 1259:16, 1277:6, 1279:7, 1304:9, 1320:14, 1361:11, 1377:1, 1379:3, 1379:13, 1380:9, 1380:21, 1381:2, 1389:1, 1389:21, 1393:4, 1405:19, 1414:12

**READY** [2] - 1269:11, 1351:4

**REAL** [3] - 1268:24, 1273:2, 1318:13

**REAL-TIME** [1] - 1268:24

**REALIZE** [1] - 1375:3

**REALIZED** [1] - 1379:24

**REALLY** [10] - 1273:3, 1279:15, 1316:10, 1317:2, 1318:24, 1319:2, 1320:5, 1324:4, 1324:5, 1382:24

**REASON** [18] - 1267:3, 1289:5, 1308:22, 1344:4, 1354:13, 1359:1, 1366:18, 1373:17, 1381:1, 1387:15, 1390:15, 1397:10, 1398:3, 1401:2, 1401:14, 1401:20, 1405:13, 1405:19

**REASONS** [7] - 1264:22, 1302:14, 1303:7, 1318:8, 1373:12, 1375:10, 1376:21

**REBUT** [1] - 1295:17

**REBUTTAL** [5] - 1256:7, 1295:24, 1296:1, 1296:2, 1300:2

**REBUTTING** [1] -

1295:24

**RECALLED** [1] - 1417:11

**RECEIVE** [5] - 1265:24, 1267:3, 1267:4, 1269:7, 1307:9

**RECEIVED** [15] - 1269:23, 1269:25, 1271:18, 1279:5, 1321:18, 1322:5, 1326:24, 1347:19, 1347:22, 1349:21, 1386:15, 1391:1, 1407:20, 1410:2, 1416:18

**RECEIVES** [1] - 1275:14

**RECESS** [2] - 1349:2, 1421:4

**RECOGNITION** [2] - 1273:20, 1381:23

**RECOGNIZE** [3] - 1407:21, 1408:14, 1416:19

**RECOGNIZED** [1] - 1356:5

**RECOGNIZES** [1] - 1302:8

**RECORD** [7] - 1269:17, 1270:21, 1287:24, 1288:4, 1328:10, 1349:5, 1350:24

**RECORDED** [1] - 1302:23

**RECORDS** [4] - 1267:25, 1279:9, 1281:12, 1281:13

**RECROSS** [1] - 1325:22

**RECROSS-EXAMINATION** [1] - 1325:22

**RECYCLED** [1] - 1357:19

**RED** [12] - 1283:25, 1284:2, 1284:4, 1284:14, 1284:18, 1286:25, 1287:1, 1287:3, 1291:10, 1291:12, 1293:3, 1293:6

**REDACTED** [1] - 1268:15

**REDACTING** [1] - 1268:12

**REDIRECT** [1] - 1323:4

**REDUCE** [1] - 1276:21

**REFER** [2] - 1279:9, 1351:11

**REFERENCE** [4] - 1268:4, 1305:3, 1323:23, 1327:5

**REFERENCED** [1] - 1265:13

**REFERENCING** [1] - 1367:12

**REFERRED** [7] - 1297:17, 1301:15, 1301:23, 1330:10, 1338:15, 1410:10, 1420:10

**REFERRING** [9] - 1291:19, 1296:9, 1306:10, 1355:13, 1368:17, 1369:11, 1404:6, 1405:3, 1405:8

**REFERS** [1] - 1323:24

**REFLECT** [1] - 1298:10

**REFLECTED** [2] - 1307:12, 1326:6

**REFUSED** [1] - 1340:21

**REGARD** [3] - 1266:14, 1266:24, 1281:15

**REGARDING** [4] - 1255:18, 1285:7, 1297:8, 1386:20

**REGRESSION** [1] - 1262:21

**REGULARLY** [1] - 1419:12

**REGULATES** [1] - 1334:14

**REGULATION** [2] - 1335:5, 1335:18

**REGULATIONS** [2] - 1335:22, 1335:24

**REGULATIONS** [10] - 1333:24, 1334:15, 1335:3, 1336:2, 1336:16, 1336:24, 1341:20, 1341:21, 1388:17, 1413:21

**REGULATOR** [1] - 1314:14

**REGULATORS** [1] - 1260:13

**REGULATORY** [3] - 1330:19, 1330:21, 1334:6

**REJECTED** [1] - 1373:17

**RELATED** [1] - 1298:15

**RELATES** [2] - 1255:15, 1338:12

**RELATING** [1] - 1333:16

**RELATIONSHIP** [5] - 1280:20, 1315:13, 1315:21, 1317:7, 1409:18

**RELATIVE** [1] - 1283:12

**RELATIVELY** [2] - 1354:3, 1391:22

**RELEASED** [1] - 1335:10

**RELEVANCE** [1] - 1268:10

**RELEVANCY** [1] - 1259:2

**RELEVANT** [11] - 1261:17, 1264:9, 1273:6, 1274:8, 1275:3, 1309:4, 1313:6, 1316:11, 1324:1, 1385:18, 1385:20

**RELIABILITY** [3] - 1316:23, 1323:11, 1323:16

**RELIABLE** [4] - 1290:13, 1302:22, 1306:6, 1344:1

**RELIANCE** [1] - 1315:1

**RELIED** [4] - 1301:23, 1301:25, 1302:2, 1324:19

**RELOCATE** [2] - 1380:13, 1380:17

**RELOCATED** [1] - 1411:9

**RELY** [9] - 1331:3, 1331:5, 1331:6, 1331:8, 1365:25, 1366:10, 1366:16, 1366:24, 1394:14

**RELYING** [1] - 1317:10

**REMAIN** [3] - 1269:17, 1350:24, 1351:1

**REMEDY** [3] - 1356:8, 1356:18, 1417:3

**REMEMBER** [15] - 1348:20, 1352:17, 1352:19, 1354:11, 1355:15, 1367:9, 1367:17, 1367:19, 1379:5, 1390:12, 1401:7, 1401:22, 1403:24, 1419:18, 1420:21

**REMOVE** [6] - 1271:3, 1298:21, 1328:15, 1356:10, 1356:21, 1356:23
**REMOVES** [1] - 1356:22
**RENDERING** [1] - 1295:8
**REPAIR** [1] - 1333:10
**REPEAT** [8] - 1376:23, 1377:6, 1377:8, 1377:11, 1377:12, 1377:14, 1377:21, 1413:21
**REPEATEDLY** [2] - 1301:24, 1398:13
**REPHRASE** [3] - 1331:25, 1378:3, 1380:20
**REPLACED** [1] - 1411:3
**REPORT** [34] - 1256:7, 1281:23, 1282:7, 1292:24, 1295:23, 1295:24, 1296:1, 1296:2, 1296:3, 1300:2, 1302:16, 1302:19, 1302:25, 1303:2, 1303:10, 1304:13, 1307:14, 1319:15, 1321:1, 1341:14, 1341:15, 1343:19, 1357:24, 1357:25, 1380:14, 1381:12, 1386:10, 1386:12, 1386:19, 1410:3, 1412:1, 1415:2
**REPORTED** [3] - 1308:1, 1311:21, 1315:5
**REPORTING** [3] - 1355:19, 1355:25, 1415:3
**REPORTS** [10] - 1307:19, 1308:13, 1310:1, 1321:7, 1326:6, 1326:23, 1330:20, 1341:19, 1414:23, 1414:24
**REPRESENT** [2] - 1352:16, 1370:9
**REPRESENTATIVE** [9] - 1254:14, 1337:17, 1385:14, 1385:24, 1395:18, 1403:11, 1404:12, 1404:23, 1405:12
**REPRESENTED** [2] - 1292:12, 1413:8

**REPRESENTS** [2] - 1292:14, 1408:4
**REQUEST** [7] - 1263:15, 1309:11, 1357:6, 1367:10, 1368:24, 1392:10, 1393:11
**REQUESTED** [1] - 1256:15
**REQUIRE** [4] - 1268:9, 1338:17, 1347:5, 1364:15
**REQUIRED** [6] - 1337:22, 1341:8, 1343:24, 1362:6, 1385:17, 1387:4
**REQUIREMENT** [4] - 1338:21, 1338:23, 1338:24, 1362:18
**REQUIREMENTS** [1] - 1361:11
**REQUIRES** [3] - 1347:2, 1347:6, 1350:13
**RESEARCH** [4] - 1274:9, 1274:10, 1274:13, 1317:15
**RESERVE** [1] - 1256:16
**RESERVOIR** [1] - 1416:1
**RESIDUAL** [1] - 1333:23
**RESOLVE** [4] - 1260:6, 1371:25, 1373:1, 1374:3
**RESOLVED** [2] - 1380:8, 1413:12
**RESOLVING** [2] - 1372:13, 1373:2
**RESOURCES** [1] - 1365:9
**RESOURCES** [2] - 1357:2, 1358:12
**RESPECT** [6] - 1267:5, 1269:25, 1285:13, 1300:20, 1310:18, 1319:18
**RESPECTED** [1] - 1258:4
**RESPOND** [1] - 1295:17
**RESPONDING** [1] - 1368:8
**RESPONSE** [4] - 1350:21, 1404:17, 1419:18, 1420:3
**RESPONSIBILITIES** [4] - 1330:18, 1333:7, 1386:5, 1405:11

**RESPONSIBILITY** [1] - 1332:20
**RESPONSIBLE** [1] - 1381:13
**REST** [2] - 1278:24, 1320:8
**RESTARTED** [1] - 1410:25
**RESTATE** [1] - 1374:22
**RESTED** [1] - 1417:13
**RESTORATION** [5] - 1259:4, 1259:10, 1260:3, 1260:5, 1262:4
**RESUBMITTED** [1] - 1368:11
**RESULT** [7] - 1296:22, 1297:21, 1377:17, 1379:15, 1397:23, 1404:25, 1407:4
**RESULTING** [1] - 1314:22
**RESULTS** [5] - 1362:8, 1378:11, 1386:20, 1399:13, 1404:24
**RETESTS** [1] - 1326:19, 1326:25
**RETURN** [1] - 1264:7
**REVIEW** [11] - 1254:25, 1265:10, 1265:21, 1266:3, 1266:10, 1269:10, 1274:4, 1301:9, 1302:12, 1307:18, 1309:25
**REVIEWED** [18] - 1274:18, 1307:11, 1307:13, 1308:3, 1310:6, 1310:17, 1316:3, 1321:10, 1325:5, 1325:7, 1325:17, 1327:6, 1367:20, 1367:24, 1385:19, 1399:17, 1403:23, 1411:7
**REVIEWER** [5] - 1274:2, 1274:7, 1274:8, 1274:15, 1274:16
**REVIEWING** [3] - 1400:9, 1400:10, 1403:20
**REVIEWS** [1] - 1273:25
**REVISED** [2] - 1364:18, 1368:13
**REVISED** [1] - 1365:11

**REVISION** [1] - 1365:1
**REWINDING** [1] - 1401:22
**RICH** [1] - 1280:4
**RICHARD** [44] - 1254:10, 1255:14, 1255:25, 1256:2, 1256:8, 1256:11, 1256:25, 1257:12, 1257:21, 1263:22, 1264:19, 1265:9, 1265:22, 1266:5, 1266:12, 1266:18, 1266:23, 1267:24, 1268:16, 1278:21, 1294:18, 1295:13, 1295:15, 1303:19, 1303:21, 1305:13, 1309:18, 1310:2, 1313:12, 1321:19, 1321:24, 1322:3, 1322:6, 1322:7, 1322:16, 1323:1, 1325:13, 1325:23, 1326:16, 1327:7, 1327:17, 1327:20, 1349:8, 1349:11
**RICHARD** [9] - 1254:10, 1255:12, 1263:9, 1266:15, 1267:16, 1295:12, 1324:8, 1325:21, 1349:7
**RICK** [5] - 1283:23, 1288:7, 1392:12, 1395:1, 1400:25
**RIGHTS** [1] - 1416:22
**RISE** [2] - 1348:24, 1421:1
**RISK** [1] - 1273:9
**RISK** [1] - 1348:14
**ROLE** [5] - 1295:16, 1295:20, 1301:19, 1318:18, 1368:23
**ROUGHLY** [2] - 1347:14, 1368:2
**ROUTINE** [1] - 1419:8
**RULE** [1] - 1363:18
**RULE** [3] - 1266:4, 1397:16, 1409:7
**RULED** [1] - 1256:7
**RULES** [1] - 1413:21
**RULING** [9] - 1256:13, 1256:20, 1258:2, 1258:4, 1258:6, 1264:16, 1265:17, 1267:17, 1350:2
**RUN** [5] - 1292:21, 1326:3, 1343:15, 1344:13, 1352:4

**RUNNING** [4] - 1283:1, 1284:2, 1291:13, 1326:11
**RUNS** [1] - 1326:10

**S**

**S-1** [3] - 1340:22, 1355:13, 1361:9
**S-2** [2] - 1340:22, 1361:9
**SAFE** [3] - 1334:9, 1334:13, 1334:17
**SAFETY** [1] - 1332:24
**SAILED** [1] - 1265:1
**SALTS** [1] - 1372:4
**SAMPLE** [63] - 1297:14, 1305:21, 1310:18, 1311:23, 1311:25, 1312:13, 1312:21, 1313:8, 1316:24, 1317:5, 1317:7, 1318:4, 1318:10, 1323:14, 1326:12, 1326:17, 1342:19, 1343:24, 1362:3, 1362:6, 1362:15, 1375:5, 1375:6, 1376:16, 1376:17, 1376:23, 1376:24, 1377:6, 1377:8, 1377:11, 1377:12, 1377:13, 1377:14, 1377:16, 1377:18, 1377:21, 1377:22, 1377:24, 1378:9, 1378:11, 1378:13, 1378:15, 1378:20, 1379:25, 1380:3, 1382:9, 1383:7, 1383:14, 1383:17, 1384:15, 1388:21, 1389:13, 1405:2, 1405:16, 1411:4, 1411:12, 1411:18, 1413:21, 1413:22, 1415:18
**SAMPLED** [5] - 1380:8, 1389:23, 1411:1, 1411:16, 1414:16
**SAMPLER** [1] - 1378:19
**SAMPLERS** [1] - 1331:19
**SAMPLES** [29] - 1280:8, 1296:22, 1297:8, 1297:17, 1297:18, 1297:21, 1306:21, 1306:23,

1310:23, 1310:25, 1311:9, 1311:11, 1311:16, 1315:11, 1315:21, 1326:1, 1326:4, 1375:4, 1378:14, 1379:17, 1383:5, 1384:14, 1389:19, 1389:20, 1390:4, 1390:17, 1390:18, 1406:9, 1413:19

**SAMPLING** [32] - 1282:13, 1304:3, 1305:14, 1305:16, 1305:20, 1305:24, 1306:5, 1307:1, 1307:2, 1307:5, 1308:20, 1310:20, 1311:19, 1316:1, 1317:10, 1318:16, 1322:9, 1325:25, 1333:22, 1361:15, 1361:25, 1362:8, 1375:3, 1375:8, 1375:13, 1376:2, 1376:20, 1378:18, 1379:18, 1383:17, 1394:6, 1404:19

**SAN** [2] - 1272:8, 1272:12

**SANTA** [9] - 1254:6, 1269:17, 1329:6, 1329:13, 1329:14, 1329:19, 1329:21, 1357:23, 1380:1

**SATISFACTORY** [1] - 1371:20

**SATISFIED** [1] - 1347:20

**SAUGUS** [101] - 1259:7, 1260:7, 1260:8, 1260:15, 1275:11, 1275:14, 1277:19, 1277:23, 1278:2, 1278:3, 1278:8, 1278:10, 1278:11, 1279:11, 1279:22, 1280:14, 1280:24, 1281:15, 1283:17, 1284:10, 1285:8, 1286:6, 1286:15, 1287:5, 1287:9, 1288:22, 1288:24, 1289:6, 1289:7, 1290:8, 1290:14, 1290:17, 1291:2, 1291:17, 1291:21, 1292:6, 1292:8, 1292:18, 1294:2, 1294:17,

1296:4, 1296:10, 1296:14, 1296:17, 1296:23, 1297:3, 1297:21, 1297:22, 1298:25, 1302:3, 1313:24, 1314:5, 1314:20, 1322:23, 1334:24, 1338:13, 1338:14, 1338:15, 1340:16, 1341:24, 1342:11, 1342:12, 1342:14, 1342:15, 1342:23, 1352:14, 1353:11, 1355:4, 1355:5, 1355:13, 1356:15, 1357:16, 1361:9, 1361:14, 1362:4, 1373:11, 1373:19, 1373:20, 1382:18, 1384:12, 1391:14, 1391:23, 1392:19, 1392:21, 1396:10, 1396:11, 1401:6, 1401:8, 1401:13, 1401:16, 1401:21, 1409:19, 1412:19, 1412:25, 1413:1

**SAW** [5] - 1289:25, 1304:16, 1311:9, 1379:16, 1403:21

**SB** [1] - 1254:6

**SC-1** [20] - 1282:20, 1283:24, 1288:8, 1288:9, 1291:7, 1292:13, 1293:10, 1319:18, 1319:20, 1321:8, 1379:19, 1380:15, 1381:3, 1386:12, 1400:17, 1409:15, 1409:22, 1410:21, 1410:25, 1411:18

**SC-2** [4] - 1282:20, 1400:17, 1405:4, 1412:17

**SCALE** [1] - 1320:21

**SCHEDULED** [1] - 1383:18

**SCHEMATIC** [3] - 1275:8, 1293:20, 1407:22

**SCIENCE** [1] - 1274:18

**SCIENCE** [3] - 1272:22, 1273:3, 1330:25

**SCIENTIFIC** [1] - 1274:5

**SCIENTISTS** [1] -

1331:20

**SCOPE** [21] - 1261:6, 1261:10, 1299:4, 1299:5, 1301:6, 1304:2, 1307:6, 1307:16, 1307:21, 1308:23, 1309:1, 1309:16, 1309:20, 1309:24, 1314:1, 1314:3, 1318:20, 1318:22, 1323:7, 1325:13, 1417:9

**SCV** [2] - 1329:14, 1332:3

**SCVWA'S** [1] - 1302:20

**SEAT** [1] - 1270:14

**SEATED** [3] - 1270:20, 1328:8, 1350:23

**SECOND** [7] - 1283:24, 1292:20, 1302:18, 1326:10, 1326:17, 1377:24, 1404:9

**SECONDARY** [2] - 1371:16, 1371:21

**SECTION** [3] - 1363:24, 1364:14, 1414:15

**SECTIONS** [2] - 1363:24, 1368:13

**SECURITY** [1] - 1254:23

**SEE** [48] - 1266:1, 1267:6, 1267:7, 1267:10, 1267:11, 1267:19, 1268:22, 1269:8, 1271:5, 1275:17, 1276:13, 1276:21, 1283:1, 1283:22, 1287:4, 1292:3, 1292:19, 1293:3, 1293:5, 1296:10, 1301:9, 1307:11, 1307:19, 1308:12, 1308:22, 1309:10, 1312:25, 1319:18, 1320:20, 1325:16, 1326:23, 1326:24, 1328:17, 1348:23, 1357:18, 1364:13, 1381:25, 1382:15, 1387:18, 1387:23, 1388:5, 1388:18, 1391:11, 1392:11, 1398:17, 1409:25, 1411:10, 1420:24

**SEEING** [5] - 1267:22, 1293:10, 1302:9,

1320:6, 1327:5

**SEEPED** [1] - 1381:18

**SELECTION** [1] - 1305:21

**SELL** [1] - 1371:4

**SENATE** [1] - 1329:12

**SEND** [6] - 1269:24, 1337:7, 1337:9, 1341:10, 1351:8, 1351:17

**SENIOR** [1] - 1261:4

**SENIORS** [1] - 1272:16

**SENSE** [4] - 1262:23, 1276:12, 1317:16, 1409:1

**SENT** [14] - 1265:5, 1275:25, 1325:2, 1341:6, 1346:3, 1348:1, 1348:3, 1348:5, 1348:12, 1368:8, 1369:21, 1375:10, 1391:15, 1394:12

**SEPARATE** [3] - 1280:2, 1282:17, 1361:7

**SEPTEMBER** [5] - 1387:9, 1387:11, 1411:3, 1412:2, 1412:3

**SERIES** [1] - 1283:2

**SERIOUS** [1] - 1265:3

**SERIOUSLY** [1] - 1400:7

**SERVE** [10] - 1290:16, 1338:13, 1339:3, 1339:7, 1339:16, 1340:15, 1340:18, 1340:21, 1341:8, 1358:9

**SERVED** [3] - 1341:6, 1348:13, 1353:15

**SERVICE** [3] - 1408:3, 1408:4, 1408:5

**SERVICES** [2] - 1335:9, 1406:8

**SERVING** [4] - 1339:13, 1340:3, 1348:8, 1348:13

**SESSIONS** [1] - 1263:13

**SET** [13] - 1263:12, 1287:2, 1290:23, 1290:24, 1302:25, 1306:12, 1306:13, 1316:19, 1316:20, 1320:2, 1359:23, 1388:17

**SETS** [1] - 1317:22

**SEVEN** [4] - 1258:25, 1280:8, 1293:5, 1330:5

**SEVERAL** [5] - 1294:6, 1313:3, 1334:7, 1360:2, 1377:16

**SHALL** [4] - 1270:16, 1270:17, 1328:4, 1328:5

**SHALLOW** [1] - 1381:8

**SHARE** [1] - 1261:24

**SHEER** [1] - 1375:8

**SHIFTS** [1] - 1268:7

**SHIP** [1] - 1265:1

**SHOPPING** [1] - 1380:17

**SHORT** [2] - 1315:3, 1315:7

**SHORTHAND** [1] - 1282:9

**SHOUP** [1] - 1258:4

**SHOW** [9] - 1261:17, 1296:7, 1321:3, 1321:15, 1349:13, 1370:12, 1408:11, 1408:16, 1408:19

**SHOWED** [2] - 1389:21, 1399:21

**SHOWING** [3] - 1276:13, 1297:3, 1322:1

**SHOWN** [1] - 1275:15

**SHOWS** [7] - 1275:9, 1276:9, 1341:2, 1360:22, 1394:24, 1401:13, 1407:25

**SHU** [3] - 1372:22, 1372:23, 1373:21

**SHU-FANG** [3] - 1372:22, 1372:23, 1373:21

**SHUT** [7] - 1354:6, 1354:10, 1354:25, 1355:2, 1379:19, 1410:21, 1414:14

**SIDE** [2] - 1372:13, 1373:2

**SIDES** [2] - 1266:7, 1350:16

**SIGNATURE** [4] - 1387:1, 1387:2, 1387:4, 1387:5

**SIGNED** [1] - 1387:12

**SIGNIFICANCE** [9] - 1275:18, 1275:20, 1285:20, 1317:4, 1317:8, 1317:12, 1317:16, 1318:8,

1364:10

**SIGNIFICANT** [7] - 1289:2, 1317:23, 1318:6, 1318:11, 1318:12, 1326:11, 1390:11

**SIGNIFICANTLY** [1] - 1317:21

**SIMILAR** [2] - 1290:23, 1409:11

**SIMILARLY** [1] - 1328:17

**SIMPLE** [2] - 1393:6, 1393:19

**SIMPLIFIED** [1] - 1275:9

**SIMPLY** [7] - 1256:15, 1265:3, 1265:13, 1279:25, 1285:16, 1314:18, 1350:1

**SIMULTANEOUSLY** [1] - 1311:15

**SINGLE** [4] - 1295:6, 1323:13, 1343:24, 1419:13

**SIT** [2] - 1297:23, 1328:2

**SITE** [1] - 1298:16

**SITES** [1] - 1405:2

**SITUATION** [3] - 1318:2, 1404:16, 1405:24

**SIX** [2] - 1293:5, 1389:15

**SIZE** [3] - 1317:5, 1317:7, 1318:4

**SIZES** [1] - 1318:10

**SLOWER** [1] - 1335:12

**SMALL** [3] - 1311:23, 1312:21, 1313:7

**SMOOTH** [1] - 1270:2

**SNAPSHOT** [2] - 1312:3

**SNOW** [1] - 1361:5

**SOCIETY** [1] - 1273:8

**SODIUM** [1] - 1372:6

**SOIL** [2] - 1260:19, 1401:24

**SOLE** [4] - 1258:16, 1264:9, 1319:4, 1324:6

**SOLELY** [4] - 1279:21, 1285:8, 1295:6, 1324:19

**SOLEMNLY** [2] - 1270:16, 1328:4

**SOLIDS** [4] - 1371:25, 1372:2, 1372:3, 1372:7

**SOLITARY** [1] - 1335:1

**SOLUTION** [1] - 1383:11

**SOLVE** [1] - 1259:11

**SOLVES** [1] - 1356:14

**SOMEONE** [3] - 1274:8, 1308:7, 1412:14

**SOMETIMES** [2] - 1257:4, 1317:1

**SOMEWHERE** [3] - 1278:7, 1355:20, 1356:3

**SOON** [1] - 1269:24

**SORRY** [23] - 1254:25, 1256:2, 1261:8, 1282:1, 1286:7, 1286:25, 1288:13, 1299:14, 1308:5, 1335:13, 1341:20, 1351:13, 1358:23, 1364:21, 1368:20, 1370:22, 1372:23, 1383:22, 1387:10, 1387:21, 1389:5, 1417:19, 1418:25

**SORT** [4] - 1287:15, 1318:15, 1382:17, 1392:20

**SOUGHT** [1] - 1260:3

**SOUND** [1] - 1274:12

**SOURCE** [67] - 1257:7, 1258:20, 1258:22, 1258:23, 1259:19, 1260:22, 1261:15, 1264:2, 1276:7, 1279:21, 1285:7, 1289:6, 1295:6, 1295:9, 1300:6, 1303:12, 1303:24, 1305:11, 1314:6, 1324:13, 1335:1, 1335:4, 1336:14, 1336:17, 1342:5, 1342:19, 1345:7, 1345:9, 1345:10, 1345:13, 1351:10, 1353:6, 1353:7, 1353:8, 1353:12, 1362:20, 1363:16, 1363:24, 1364:25, 1368:14, 1370:25, 1373:8, 1373:9, 1373:24, 1381:14, 1381:15, 1386:10, 1386:11, 1390:2, 1390:21, 1400:13, 1400:15, 1400:16, 1401:3,

1401:18, 1401:24, 1402:17, 1402:23, 1403:10, 1403:13, 1403:21, 1404:17, 1407:2, 1407:9, 1409:22

**SOURCES** [38] - 1255:16, 1255:18, 1256:12, 1256:20, 1257:10, 1258:7, 1259:20, 1261:17, 1261:22, 1263:7, 1264:4, 1275:10, 1275:12, 1275:24, 1277:4, 1278:1, 1303:6, 1303:8, 1305:9, 1332:12, 1332:15, 1337:10, 1346:6, 1346:13, 1346:24, 1347:3, 1356:25, 1357:15, 1357:25, 1358:2, 1358:5, 1358:8, 1358:15, 1358:20, 1395:14, 1415:16

**SOURCING** [1] - 1285:13

**SPAN** [2] - 1385:22, 1409:12

**SPEAKING** [2] - 1297:1, 1338:7

**SPECIALIST** [1] - 1406:6

**SPECIFIC** [13] - 1338:22, 1353:1, 1353:3, 1353:19, 1362:3, 1364:14, 1368:7, 1379:18, 1398:14, 1412:15, 1412:18, 1412:23

**SPECIFICALLY** [5] - 1331:6, 1336:18, 1403:24, 1415:24, 1418:18

**SPECULATE** [6] - 1299:1, 1299:3, 1398:20, 1398:21, 1402:19, 1403:16

**SPECULATED** [2] - 1404:1, 1405:15

**SPECULATION** [4] - 1255:18, 1256:20, 1264:21, 1404:2

**SPECULATIONS** [1] - 1268:18

**SPECULATIVE** [1] - 1257:10

**SPELL** [3] - 1270:22, 1328:11, 1330:16

**SPELLED** [1] -

1270:24

**SPELLING** [1] - 1310:6

**SPENT** [1] - 1349:16

**SPIGOT** [2] - 1383:7

**SPOT** [3] - 1258:12, 1343:6, 1345:2

**SPRING** [2] - 1292:18, 1292:21

**SPTF** [28] - 1257:3, 1260:8, 1260:9, 1266:14, 1276:11, 1276:14, 1276:17, 1276:25, 1277:12, 1277:13, 1290:4, 1298:5, 1302:20, 1338:15, 1342:21, 1342:23, 1374:15, 1374:21, 1375:1, 1375:15, 1375:25, 1377:3, 1388:5, 1398:23, 1400:16, 1409:20, 1412:19, 1416:4

**SPTP** [1] - 1342:22

**SQUARE** [1] - 1304:24

**STABLE** [1] - 1391:22

**STAFF** [5] - 1330:5, 1331:5, 1340:9, 1343:23, 1366:3

**STAGE** [1] - 1325:9

**STAINLESS** [2] - 1383:8, 1411:4

**STAND** [2] - 1350:5, 1350:25

**STANDING** [1] - 1419:6

**STANDPOINT** [1] - 1261:21

**STANIN** [1] - 1261:19

**START** [5] - 1292:20, 1361:2, 1361:3, 1384:21, 1411:24

**STARTED** [12] - 1272:10, 1280:6, 1360:22, 1365:23, 1379:21, 1391:14, 1399:9, 1399:12, 1400:9, 1406:20, 1414:12, 1414:16

**STARTING** [3] - 1254:8, 1255:11, 1351:23

**STATE** [13] - 1260:11, 1272:8, 1272:12, 1335:2, 1335:6, 1335:18, 1336:25, 1345:15, 1345:19, 1358:11, 1358:20, 1360:8, 1387:24

**STATE** [16] - 1254:8, 1270:21, 1301:19, 1330:10, 1336:13, 1336:16, 1341:19, 1341:20, 1344:16, 1344:17, 1344:21, 1357:4, 1357:16, 1362:14, 1372:11, 1391:23

**STATEMENT** [9] - 1299:7, 1299:11, 1314:18, 1315:15, 1335:17, 1366:14, 1366:25, 1398:1, 1404:17

**STATEMENTS** [1] - 1302:9

**STATES** [4] - 1334:14, 1339:19, 1341:22, 1341:23

**STATES** [1] - 1300:12

**STATING** [1] - 1365:6

**STATISTIC** [2] - 1262:16, 1272:20

**STATISTICAL** [28] - 1255:22, 1262:11, 1262:20, 1262:23, 1274:21, 1276:16, 1276:24, 1285:6, 1285:15, 1289:2, 1289:9, 1289:17, 1294:14, 1294:19, 1297:10, 1299:9, 1317:4, 1317:7, 1317:12, 1317:16, 1318:1, 1318:3, 1318:16, 1319:3, 1322:9, 1322:10

**STATISTICAL** [5] - 1273:7, 1273:9, 1273:11, 1273:12, 1273:15

**STATISTICALLY** [5] - 1317:21, 1317:23, 1318:5, 1318:11, 1388:16

**STATISTICIAN** [9] - 1282:9, 1294:12, 1299:6, 1316:8, 1316:17, 1316:22, 1317:5, 1317:19, 1323:24

**STATISTICIANS** [4] - 1257:13, 1262:22, 1279:24, 1323:10

**STATISTICS** [1] - 1273:8

**STATISTICS** [16] - 1262:14, 1262:20, 1262:23, 1271:17,

1272:2, 1272:6, 1272:12, 1272:14, 1272:20, 1272:21, 1272:22, 1273:3, 1274:17, 1274:20, 1305:16, 1318:14
**STAY** [1] - 1414:10
**STAYING** [1] - 1310:18
**STEEL** [2] - 1383:8, 1411:4
**STEFFEY** [1] - 1271:10
**STEFFEY** [28] - 1254:22, 1255:11, 1255:15, 1255:21, 1256:4, 1256:10, 1256:14, 1256:23, 1258:3, 1258:9, 1258:17, 1262:8, 1262:9, 1262:10, 1262:19, 1262:25, 1264:10, 1264:24, 1266:17, 1270:10, 1270:23, 1271:14, 1271:18, 1289:9, 1295:16, 1303:21, 1310:4, 1323:6
**STEFFEY'S** [2] - 1263:1, 1408:12
**STEP** [3] - 1264:12, 1327:11, 1376:23
**STEPS** [2] - 1340:21, 1410:17
**STEVE** [1] - 1354:12
**STICK** [1] - 1320:25
**STICKING** [1] - 1289:17
**STILL** [23] - 1259:8, 1259:15, 1259:22, 1259:23, 1259:25, 1260:16, 1260:17, 1265:2, 1341:6, 1341:8, 1347:23, 1347:24, 1349:23, 1350:25, 1366:23, 1374:4, 1383:5, 1400:10, 1403:4, 1403:5, 1411:3, 1411:22, 1413:23
**STIPULATED** [7] - 1321:16, 1322:4, 1386:16, 1391:4, 1391:6, 1407:19, 1410:1
**STOP** [4] - 1328:3, 1348:7, 1384:19, 1384:21
**STORAGE** [3] - 1332:22, 1416:1,

1416:3
**STRAIGHT** [1] - 1383:16
**STREAMLINE** [1] - 1367:25
**STREET** [1] - 1380:1
**STRICKEN** [1] - 1409:9
**STRIKE** [4] - 1256:17, 1263:16, 1266:16, 1285:12
**STRING** [1] - 1298:1
**STRINGENT** [1] - 1334:16
**STUDENT** [1] - 1398:8
**STUDENTS** [1] - 1272:17
**STUDIED** [2] - 1299:12, 1299:24
**STUDIES** [9] - 1279:9, 1280:5, 1292:17, 1292:18, 1301:2, 1301:20, 1302:8, 1302:12, 1302:13
**STUDY** [1] - 1420:7
**STUDYING** [1] - 1306:7
**STUFF** [3] - 1260:10, 1262:22, 1381:24
**SUBJECT** [4] - 1348:21, 1361:7, 1416:25, 1420:22
**SUBJECTS** [1] - 1272:13
**SUBMIT** [10] - 1278:16, 1341:13, 1364:17, 1364:22, 1365:5, 1365:8, 1370:11, 1370:20, 1370:23, 1415:2
**SUBMITS** [1] - 1330:20
**SUBMITTAL** [4] - 1367:9, 1367:18, 1368:24, 1371:2
**SUBMITTED** [21] - 1349:22, 1364:23, 1365:6, 1365:18, 1367:15, 1367:21, 1369:10, 1369:15, 1369:20, 1370:7, 1370:15, 1370:19, 1370:22, 1370:24, 1371:8, 1386:19, 1386:23, 1417:5, 1417:7, 1417:23
**SUBMITTING** [1] - 1368:4
**SUBPOENA** [1] - 1255:9

**SUBSCRIBE** [1] - 1309:2
**SUBSEQUENT** [3] - 1378:13, 1379:16, 1390:18
**SUBSTANTIAL** [1] - 1264:2
**SUFFICIENT** [1] - 1375:11
**SUFFICIENTLY** [1] - 1302:22
**SUGGEST** [3] - 1278:19, 1279:19, 1412:11
**SUGGESTED** [1] - 1264:15
**SUGGESTING** [2] - 1263:23, 1276:7
**SUGGESTS** [1] - 1315:5
**SULFATE** [10] - 1277:24, 1278:14, 1290:15, 1291:5, 1302:22, 1371:17, 1372:5, 1391:22, 1392:6
**SULFATES** [2] - 1325:1, 1392:3
**SUMMARY** [1] - 1266:15
**SUPERFUND** [3] - 1261:23, 1261:25, 1262:5
**SUPERIORS** [1] - 1403:20
**SUPERSEDING** [1] - 1264:5
**SUPPLEMENTAL** [1] - 1308:20
**SUPPLY** [11] - 1296:5, 1332:14, 1334:24, 1338:17, 1357:15, 1357:25, 1358:2, 1358:6, 1358:19, 1415:17, 1417:6
**SUPPORT** [1] - 1319:4
**SUPPORTIVE** [1] - 1324:6
**SUPPORTS** [1] - 1263:6
**SUPPOSED** [1] - 1364:3
**SURFACE** [12] - 1278:4, 1345:11, 1345:14, 1358:6, 1381:17, 1382:8, 1387:22, 1391:20, 1392:24, 1408:1, 1408:2
**SURVEY** [2] -

1323:17, 1323:21
**SUSPECT** [1] - 1344:3
**SUSTAIN** [3] - 1285:19, 1322:15, 1331:13
**SUSTAINED** [15] - 1278:23, 1294:20, 1313:11, 1325:15, 1326:15, 1335:20, 1357:9, 1360:1, 1360:5, 1384:5, 1393:14, 1404:14, 1409:8, 1412:21, 1414:21
**SWEAR** [2] - 1270:16, 1328:4
**SWORN** [2] - 1270:15, 1328:3
**SWORN** [2] - 1271:11, 1329:2
**SYSTEM** [68] - 1257:3, 1274:24, 1275:9, 1275:11, 1278:9, 1298:25, 1300:18, 1303:13, 1304:21, 1304:23, 1305:4, 1305:6, 1305:8, 1309:5, 1309:13, 1312:1, 1312:4, 1312:7, 1312:20, 1313:5, 1313:18, 1314:5, 1315:4, 1315:8, 1324:14, 1324:15, 1324:16, 1324:17, 1332:16, 1332:20, 1333:6, 1333:14, 1340:22, 1342:9, 1343:8, 1345:4, 1351:8, 1351:18, 1352:1, 1352:11, 1356:24, 1358:1, 1358:9, 1358:16, 1359:24, 1377:1, 1381:9, 1382:4, 1382:5, 1382:16, 1389:25, 1390:3, 1394:4, 1395:10, 1398:22, 1398:25, 1399:14, 1413:25, 1414:4, 1414:5, 1414:7, 1414:9, 1414:17, 1415:13, 1415:14, 1415:19, 1415:23, 1416:15

---

# T

**TAB** [1] - 1380:3
**TABLE** [1] - 1412:23

**TANK** [8] - 1260:9, 1343:4, 1343:6, 1345:1, 1374:21, 1374:25, 1415:17, 1416:3
**TANKS** [1] - 1414:2
**TAP** [5] - 1383:7, 1411:4, 1411:12, 1411:18, 1414:1
**TASK** [3] - 1316:23, 1324:4, 1324:5
**TAUGHT** [2] - 1262:14, 1272:6
**TCE** [36] - 1291:1, 1291:20, 1293:8, 1293:19, 1293:22, 1294:4, 1294:15, 1294:23, 1294:25, 1296:4, 1296:10, 1296:14, 1298:5, 1302:23, 1314:19, 1334:18, 1336:13, 1337:2, 1342:4, 1351:7, 1351:17, 1382:18, 1395:2, 1395:4, 1395:8, 1396:20, 1397:8, 1397:23, 1400:23, 1401:3, 1401:5, 1401:13, 1402:11, 1414:18
**TDS** [7] - 1371:14, 1371:17, 1372:3, 1372:7, 1372:12, 1373:1, 1373:18
**TEACH** [1] - 1272:13, 1272:20
**TECHNICAL** [2] - 1365:23, 1367:13
**TECHNICALLY** [1] - 1366:25
**TECHNOLOGIES** [1] - 1356:21
**TECHNOLOGY** [1] - 1356:20
**TEN** [6] - 1259:1, 1274:25, 1347:14, 1347:22, 1347:25, 1407:4
**TEN-YEAR** [1] - 1407:4
**TENS** [1] - 1312:12
**TENTH** [1] - 1311:24
**TENTHS** [1] - 1273:18
**TENUOUS** [1] - 1268:10
**TENURED** [1] - 1272:11
**TERM** [6] - 1258:8, 1277:21, 1316:9,

1334:2, 1338:11, 1353:5

**TERMS** [14] - 1281:8, 1281:21, 1285:15, 1304:11, 1313:2, 1320:17, 1325:1, 1330:18, 1335:2, 1337:8, 1356:24, 1361:8, 1376:22, 1396:17

**TEST** [11] - 1257:1, 1257:2, 1270:1, 1296:9, 1322:23, 1326:10, 1326:12, 1345:20, 1362:5, 1362:18, 1363:10

**TESTED** [8] - 1260:9, 1312:20, 1342:12, 1342:25, 1343:11, 1344:25, 1345:1, 1351:25

**TESTIFIED** [16] - 1299:18, 1305:6, 1355:23, 1357:11, 1358:2, 1367:19, 1369:9, 1374:7, 1376:19, 1383:3, 1384:13, 1386:6, 1389:13, 1390:20, 1398:16, 1405:1

**TESTIFIED** [2] - 1271:11, 1329:2

**TESTIFIES** [1] - 1256:17

**TESTIFY** [7] - 1256:23, 1258:12, 1258:17, 1285:18, 1300:21, 1373:23, 1385:23

**TESTIFYING** [8] - 1271:4, 1295:22, 1337:16, 1337:20, 1352:17, 1385:14, 1395:17, 1404:11

**TESTIMONY** [7] - 1263:1, 1270:16, 1290:15, 1328:4, 1354:9, 1398:15, 1415:7

**TESTING** [8] - 1258:13, 1259:5, 1317:13, 1326:17, 1327:3, 1344:10, 1362:18

**TESTS** [5] - 1326:3, 1327:2, 1342:12, 1343:13, 1352:4

**TETRACHLOROETHYLENE** [1] - 1282:10

**THE** [179] - 1254:5,

1254:12, 1254:16, 1255:2, 1255:6, 1255:10, 1255:23, 1256:1, 1256:3, 1256:9, 1256:22, 1257:8, 1257:19, 1257:22, 1258:22, 1259:14, 1259:17, 1259:21, 1259:24, 1260:2, 1260:18, 1261:6, 1261:10, 1261:14, 1261:21, 1261:25, 1262:3, 1262:7, 1262:10, 1262:17, 1263:9, 1264:12, 1265:7, 1265:10, 1265:24, 1266:6, 1266:13, 1266:21, 1266:24, 1268:11, 1268:14, 1269:1, 1269:14, 1269:15, 1269:17, 1269:21, 1269:22, 1270:11, 1270:19, 1270:20, 1270:23, 1271:1, 1271:3, 1278:23, 1285:11, 1285:17, 1287:21, 1289:9, 1289:11, 1289:16, 1289:20, 1294:20, 1295:12, 1303:17, 1303:20, 1305:2, 1305:7, 1305:12, 1309:17, 1313:11, 1322:5, 1322:15, 1323:2, 1325:15, 1325:21, 1326:15, 1327:10, 1327:12, 1327:13, 1327:16, 1327:19, 1327:22, 1327:23, 1328:7, 1328:8, 1328:12, 1328:14, 1328:15, 1328:18, 1328:19, 1328:23, 1331:11, 1331:13, 1335:12, 1335:13, 1335:20, 1338:5, 1338:8, 1338:9, 1339:15, 1348:17, 1348:24, 1349:2, 1349:5, 1349:9, 1349:14, 1349:19, 1349:23, 1350:5, 1350:10, 1350:16, 1350:20, 1350:23, 1351:2, 1351:3, 1351:14, 1351:22, 1355:11, 1357:9, 1360:1, 1360:5, 1363:12, 1365:13,

1365:16, 1366:8, 1367:7, 1368:19, 1368:21, 1369:11, 1369:14, 1370:1, 1370:4, 1377:4, 1377:6, 1378:3, 1383:19, 1384:5, 1384:21, 1384:24, 1386:16, 1387:20, 1390:9, 1391:3, 1391:7, 1393:14, 1394:16, 1395:20, 1398:14, 1402:2, 1402:6, 1402:8, 1403:17, 1404:13, 1405:23, 1407:14, 1409:6, 1410:9, 1410:11, 1410:12, 1410:14, 1410:15, 1412:21, 1414:21, 1417:10, 1417:14, 1417:21, 1417:22, 1418:7, 1418:11, 1418:15, 1418:17, 1418:19, 1418:22, 1418:23, 1419:20, 1419:24, 1420:17, 1421:1, 1421:4

**THEMSELVES** [2] - 1259:5, 1306:19

**THEORETICAL** [13] - 1391:11, 1391:13, 1392:13, 1392:15, 1394:11, 1395:23, 1399:17, 1399:19, 1412:8, 1413:1, 1414:23, 1414:24, 1416:7

**THEORETICALLY** [2] - 1393:5, 1416:14

**THEREFORE** [2] - 1257:6, 1261:20

**THEY'VE** [1] - 1340:11

**THINKS** [1] - 1326:10

**THIRD** [7] - 1287:8, 1287:10, 1292:8, 1292:9, 1292:10, 1314:21, 1375:6

**THIRDS** [1] - 1287:9

**THOROUGHLY** [1] - 1415:17

**THOUSANDS** [1] - 1312:12

**THREE** [11] - 1255:4, 1271:25, 1273:18, 1305:25, 1329:8, 1337:15, 1343:1, 1379:9, 1389:19

**THREE-AND-A-HALF** [1] - 1379:9

**THREE-TENTHS** [1] - 1273:18

**THRESHOLD** [1] - 1255:10

**THROUGHOUT** [2] - 1408:3, 1414:4

**THROW** [1] - 1376:1

**THUMB** [1] - 1397:16

**TIMING** [1] - 1375:13

**TITLE** [9] - 1334:11, 1334:12, 1334:16, 1335:23, 1336:8, 1336:18, 1352:5, 1352:9, 1362:21

**TODAY** [7] - 1254:19, 1264:25, 1269:8, 1319:14, 1321:11, 1321:21, 1321:22

**TOGETHER** [7] - 1280:1, 1281:17, 1329:13, 1346:13, 1346:24, 1372:7, 1382:6

**TOM** [1] - 1270:24

**TOOK** [5] - 1271:24, 1352:21, 1352:22, 1368:6, 1377:6

**TOOL** [9] - 1364:16, 1391:17, 1392:1, 1392:7, 1392:8, 1392:9, 1394:7, 1395:11, 1415:1

**TOOLS** [5] - 1297:10, 1316:17, 1322:9, 1323:9, 1323:10

**TOP** [6] - 1288:13, 1288:14, 1387:8, 1387:11, 1391:12, 1401:5

**TOPICS** [1] - 1419:9

**TOTAL** [14] - 1264:21, 1281:12, 1296:21, 1297:8, 1297:17, 1297:20, 1329:8, 1359:9, 1371:25, 1372:2, 1372:3, 1372:7, 1396:5, 1396:13

**TOTALLY** [1] - 1361:7

**TOWARD** [1] - 1318:25

**TOWN** [1] - 1380:15

**TOXICOLOGISTS** [1] - 1331:22

**TRACK** [1] - 1343:23

**TRANSCRIPT** [1] - 1310:9

**TRANSGRESSED** [1] - 1258:5

**TRANSLATED** [1] -

1288:1

**TRANSMISSION** [3] - 1304:21, 1345:5, 1408:23

**TRAVELS** [1] - 1299:19

**TREATED** [7] - 1259:7, 1260:8, 1342:6, 1358:6, 1392:23, 1393:1, 1407:25

**TREATING** [1] - 1332:10

**TREATMENT** [7] - 1338:16, 1342:24, 1361:15, 1362:4, 1373:11, 1391:15, 1409:19

**TREATMENT** [48] - 1257:3, 1259:10, 1260:3, 1260:19, 1275:11, 1275:14, 1275:23, 1277:4, 1277:7, 1277:20, 1278:3, 1279:22, 1282:14, 1294:17, 1295:7, 1297:2, 1297:4, 1298:20, 1300:22, 1314:5, 1332:14, 1333:25, 1338:17, 1340:16, 1341:25, 1342:20, 1345:12, 1345:14, 1345:23, 1347:7, 1356:10, 1356:13, 1356:21, 1358:6, 1362:24, 1374:16, 1382:21, 1384:12, 1391:24, 1392:19, 1392:21, 1395:25, 1396:7, 1408:2, 1416:11, 1419:25, 1420:5

**TREATMENTS** [1] - 1356:5

**TREMENDOUSLY** [1] - 1354:16

**TRIAL** [5] - 1261:25, 1267:18, 1319:15, 1349:5, 1416:16

**TRICHLOROETHYLENE** [1] - 1291:1

**TRILLION** [4] - 1355:20, 1356:1, 1356:2, 1379:6

**TROUBLE** [1] - 1373:13

**TROWBRIDGE** [1] - 1254:15

**TRUE** [14] - 1260:4,

1309:1, 1311:2, 1312:10, 1314:8, 1317:6, 1318:7, 1352:13, 1359:2, 1360:15, 1374:8, 1381:5, 1393:12, 1400:11
**TRUST** [3] - 1343:16, 1343:21, 1343:25
**TRUSTED** [1] - 1343:22
**TRUTH** [14] - 1270:17, 1270:18, 1328:5, 1328:6, 1352:24, 1353:2, 1366:23, 1385:11, 1402:23, 1403:1, 1403:12, 1419:21
**TRY** [7] - 1309:20, 1330:16, 1340:24, 1367:14, 1370:25, 1392:1, 1392:25
**TRYING** [8] - 1261:18, 1306:2, 1316:19, 1323:12, 1347:18, 1347:24, 1367:25, 1382:20
**TURBULENCE** [2] - 1346:4, 1346:7
**TURN** [3] - 1262:7, 1374:11, 1412:19
**TURNOUT** [43] - 1263:7, 1277:6, 1278:12, 1283:5, 1283:8, 1284:10, 1284:25, 1286:13, 1288:9, 1288:22, 1288:25, 1289:1, 1289:8, 1289:14, 1290:9, 1290:24, 1291:3, 1293:9, 1293:25, 1294:4, 1297:10, 1304:9, 1312:7, 1312:9, 1312:13, 1313:24, 1321:8, 1341:1, 1361:15, 1361:21, 1362:6, 1373:10, 1375:24, 1379:18, 1389:12, 1393:2, 1404:6, 1409:16, 1409:22, 1410:21, 1414:14
**TURNOUTS** [78] - 1257:1, 1258:10, 1258:13, 1258:15, 1259:4, 1259:8, 1259:9, 1259:13, 1259:16, 1259:25, 1260:12, 1260:14,

1260:16, 1260:24, 1261:5, 1264:20, 1275:13, 1276:1, 1276:23, 1277:1, 1277:23, 1279:11, 1279:15, 1280:23, 1282:16, 1282:19, 1283:18, 1285:8, 1287:16, 1290:17, 1294:16, 1294:24, 1298:25, 1306:18, 1306:19, 1310:21, 1311:3, 1311:5, 1313:22, 1314:23, 1317:13, 1319:20, 1320:14, 1347:17, 1348:2, 1361:12, 1362:1, 1362:8, 1362:25, 1373:14, 1373:19, 1373:25, 1374:2, 1374:12, 1374:13, 1374:19, 1374:24, 1375:12, 1375:24, 1376:3, 1377:2, 1383:25, 1384:1, 1384:11, 1385:2, 1385:4, 1386:10, 1386:11, 1386:21, 1388:24, 1391:18, 1392:19, 1394:19, 1398:24, 1399:22, 1403:22, 1408:3, 1416:10
**TWICE** [1] - 1305:3
**TWO** [36] - 1265:22, 1275:12, 1277:3, 1278:1, 1287:9, 1290:12, 1290:16, 1302:24, 1303:6, 1303:8, 1305:9, 1317:19, 1317:22, 1318:5, 1342:25, 1346:2, 1346:5, 1346:13, 1346:23, 1347:3, 1349:16, 1355:15, 1358:7, 1369:1, 1369:11, 1369:14, 1378:19, 1387:13, 1390:7, 1407:3, 1408:1
**TWO-THIRDS** [1] - 1287:9
**TWO-YEAR** [1] - 1407:3
**TYPE** [5] - 1279:3, 1322:10, 1327:3, 1373:21, 1420:7
**TYPES** [2] - 1274:14, 1316:7
**TYPICALLY** [6] -

1280:3, 1305:20, 1316:22, 1323:14, 1323:23, 1397:19

## U

**U.S** [1] - 1327:3
**ULTIMATE** [1] - 1364:8
**ULTIMATELY** [3] - 1272:11, 1374:8, 1379:23
**UMBRELLA** [1] - 1334:1
**UNDER** [16] - 1255:9, 1256:12, 1257:11, 1262:6, 1263:2, 1329:14, 1332:21, 1333:18, 1336:21, 1342:4, 1348:11, 1351:1, 1352:17, 1363:23, 1382:4, 1403:10
**UNDERGRADUATE** [1] - 1272:15
**UNDERGROUND** [4] - 1408:20, 1408:21, 1408:22, 1408:24
**UNDERNEATH** [1] - 1330:2
**UNDERSTOOD** [7] - 1262:24, 1275:3, 1275:21, 1310:3, 1352:25, 1353:2, 1366:22
**UNEXPECTED** [1] - 1304:9
**UNFORTUNATELY** [3] - 1290:21, 1291:9, 1347:1
**UNIFORM** [1] - 1315:23
**UNITED** [1] - 1300:12
**UNIVERSITY** [1] - 1262:15
**UNIVERSITY** [1] - 1271:19
**UNLESS** [3] - 1264:4, 1285:17, 1338:7
**UNRELIABLE** [2] - 1302:12, 1302:18
**UNUSUAL** [3] - 1307:12, 1308:20, 1326:25
**UP** [51] - 1255:23, 1256:1, 1260:6, 1264:1, 1271:23, 1273:1, 1275:5, 1281:25, 1283:15, 1283:23, 1287:7,

1288:8, 1289:24, 1321:3, 1325:6, 1333:5, 1342:8, 1350:7, 1358:13, 1358:19, 1360:23, 1363:25, 1364:7, 1366:21, 1368:6, 1368:14, 1374:12, 1379:21, 1379:23, 1380:24, 1381:1, 1382:22, 1383:9, 1386:14, 1389:2, 1389:18, 1390:19, 1391:14, 1391:16, 1392:12, 1394:7, 1395:11, 1396:20, 1400:9, 1400:19, 1400:25, 1403:25, 1412:9, 1414:12, 1414:16, 1415:1
**UPPER** [3] - 1272:16, 1288:2, 1291:7
**UPSTREAM** [36] - 1257:5, 1275:10, 1275:12, 1277:7, 1278:1, 1279:8, 1279:21, 1280:11, 1280:22, 1280:24, 1281:14, 1282:13, 1282:24, 1283:14, 1284:7, 1284:15, 1284:23, 1285:5, 1285:18, 1286:4, 1286:6, 1286:14, 1287:5, 1287:7, 1287:11, 1291:17, 1292:4, 1292:10, 1293:16, 1293:25, 1298:6, 1313:1, 1315:18, 1320:8
**UPSTREAM/ DOWNSTREAM** [1] - 1313:13
**UPWARDS** [1] - 1416:3
**USEFUL** [1] - 1305:21
**USERS** [1] - 1341:11
**USES** [2] - 1316:17, 1362:1
**UTILITY** [1] - 1302:8

## V

**V-157** [3] - 1406:11, 1406:14, 1407:8
**V-201** [13] - 1365:11, 1367:11, 1368:25, 1370:25, 1373:13, 1373:16, 1415:24, 1417:17, 1418:3,

1419:9, 1419:16, 1420:9
**V-205** [7] - 1406:14, 1406:15, 1406:20, 1406:21, 1407:1, 1407:8, 1416:20
**V-5** [1] - 1282:20
**V-7** [1] - 1282:20
**VAGUE** [2] - 1294:18, 1412:20
**VAGUENESS** [1] - 1412:21
**VALENCIA** [8] - 1329:17, 1365:11, 1365:24, 1399:8, 1399:11, 1399:12, 1406:7, 1416:21
**VALID** [4] - 1278:20, 1278:25, 1315:18, 1316:1
**VALLEY** [7] - 1254:6, 1269:18, 1329:6, 1329:13, 1329:14, 1329:21, 1357:23
**VALUE** [47] - 1278:3, 1278:5, 1278:7, 1278:8, 1278:10, 1282:15, 1282:24, 1282:25, 1283:13, 1284:3, 1284:4, 1284:5, 1284:7, 1284:13, 1284:22, 1284:23, 1286:12, 1287:5, 1287:6, 1287:7, 1287:10, 1287:11, 1287:12, 1287:14, 1287:16, 1289:13, 1289:14, 1289:15, 1290:4, 1291:17, 1292:6, 1292:8, 1293:13, 1293:14, 1293:16, 1293:25, 1294:1, 1294:7, 1320:9, 1323:13, 1372:7, 1379:16
**VALUES** [24] - 1280:21, 1283:9, 1284:11, 1284:14, 1284:20, 1285:5, 1286:4, 1286:20, 1287:2, 1293:10, 1293:19, 1294:3, 1297:3, 1297:13, 1308:1, 1308:14, 1315:18, 1319:18, 1319:20, 1320:6, 1320:17, 1320:22, 1380:8
**VALVE** [5] - 1380:2,

1381:9, 1381:21, 1382:7, 1411:11
**VAPOR** [1] - 1260:19
**VARIABLE** [2] - 1306:7, 1314:7
**VARIES** [1] - 1313:24
**VARIETY** [5] - 1333:22, 1363:24, 1372:4, 1376:21, 1391:19
**VARIOUS** [3] - 1315:24, 1407:3, 1408:3
**VARY** [3] - 1391:23, 1394:5, 1413:22
**VENTURE** [1] - 1409:12
**VENTURING** [1] - 1289:18
**VERBALLY** [1] - 1371:21
**VERDICT** [1] - 1264:8
**VERSION** [1] - 1271:21
**VERSUS** [6] - 1254:6, 1269:18, 1277:13, 1285:19, 1285:25, 1399:1
**VERTICAL** [7] - 1284:4, 1288:18, 1289:22, 1291:13, 1291:19, 1320:3, 1320:4
**VERTICALLY** [1] - 1288:14
**VICTOR** [1] - 1328:13
**VIDEO** [1] - 1255:1
**VIDEOTAPED** [4] - 1368:22, 1384:25, 1395:21, 1402:9
**VIEW** [6] - 1276:17, 1276:24, 1285:6, 1285:15, 1289:3, 1318:25
**VIOLATION** [1] - 1340:7
**VIRTUALLY** [1] - 1289:7
**VISUALIZATION** [3] - 1281:21, 1319:6, 1319:9
**VISUALIZE** [3] - 1257:4, 1280:18, 1281:19
**VISUALIZING** [1] - 1316:7
**VOC** [16] - 1276:10, 1276:13, 1281:11, 1283:8, 1283:11, 1288:19, 1288:25,

1289:6, 1289:8, 1298:12, 1345:25, 1372:14, 1373:3, 1374:24, 1391:17, 1409:22
**VOC-FREE** [1] - 1276:10
**VOCS** [90] - 1257:2, 1259:6, 1259:12, 1260:9, 1260:20, 1260:23, 1276:3, 1276:5, 1276:10, 1276:17, 1276:18, 1276:19, 1276:21, 1277:1, 1277:2, 1277:6, 1279:20, 1279:21, 1280:4, 1280:5, 1280:7, 1280:11, 1282:21, 1286:3, 1294:16, 1295:5, 1296:13, 1296:17, 1296:18, 1297:25, 1298:21, 1322:23, 1327:4, 1338:18, 1339:23, 1340:3, 1340:17, 1340:18, 1341:2, 1341:16, 1342:3, 1343:9, 1345:19, 1345:20, 1345:23, 1346:1, 1347:6, 1356:9, 1356:11, 1356:13, 1356:22, 1361:17, 1361:22, 1361:23, 1361:25, 1362:5, 1362:7, 1362:25, 1364:1, 1364:4, 1373:7, 1373:8, 1373:10, 1373:14, 1373:16, 1373:18, 1373:19, 1373:25, 1374:2, 1374:25, 1375:16, 1375:18, 1375:19, 1375:21, 1375:24, 1381:25, 1382:15, 1382:18, 1384:1, 1384:2, 1385:4, 1385:5, 1390:2, 1391:20, 1392:1, 1400:13, 1401:3, 1403:21, 1419:25
**VOIR** [2] - 1256:16, 1263:20
**VOLATILE** [3] - 1276:6, 1279:18, 1338:19
**VOLUME** [4] - 1281:8, 1310:25, 1312:16, 1313:9

**VOLUNTARILY** [1] - 1355:2

## W

**WAIT** [3] - 1269:9, 1341:11, 1418:19
**WAITING** [1] - 1412:24
**WALK** [3] - 1270:12, 1327:25, 1410:6
**WANTS** [1] - 1361:21
**WAS** [2] - 1271:11, 1329:2
**WATCH** [1] - 1327:10
**WATER** [44] - 1254:6, 1260:11, 1265:6, 1269:18, 1278:17, 1324:23, 1325:3, 1329:6, 1329:14, 1329:17, 1329:18, 1329:19, 1329:20, 1329:21, 1332:3, 1334:9, 1334:11, 1334:13, 1334:17, 1339:8, 1340:10, 1345:15, 1345:19, 1354:2, 1357:23, 1358:11, 1358:20, 1360:8, 1363:1, 1363:18, 1365:9, 1365:10, 1365:11, 1365:24, 1372:24, 1386:20, 1387:24, 1388:15, 1399:14, 1406:7, 1415:1, 1415:9, 1416:21
**WATER** [305] - 1260:7, 1260:10, 1261:13, 1271:2, 1274:23, 1275:10, 1275:12, 1275:13, 1275:14, 1275:18, 1275:21, 1275:22, 1275:25, 1276:3, 1276:10, 1276:11, 1276:14, 1276:17, 1276:18, 1276:22, 1276:23, 1276:24, 1276:25, 1277:4, 1277:10, 1277:12, 1277:13, 1277:19, 1277:20, 1277:23, 1278:4, 1278:11, 1278:15, 1278:20, 1279:6, 1279:11, 1279:15, 1280:14, 1281:15, 1286:5, 1286:6, 1286:15, 1286:18, 1286:22, 1287:5, 1287:8, 1287:9,

1288:21, 1288:24, 1289:7, 1290:9, 1290:14, 1290:17, 1291:2, 1291:4, 1291:17, 1291:22, 1291:24, 1291:25, 1292:6, 1292:7, 1292:8, 1292:18, 1293:23, 1294:2, 1296:5, 1296:10, 1296:18, 1296:19, 1297:4, 1298:21, 1299:15, 1300:6, 1300:14, 1300:15, 1300:18, 1300:22, 1301:20, 1302:3, 1302:7, 1302:18, 1302:20, 1302:21, 1303:6, 1303:12, 1303:24, 1305:9, 1305:11, 1306:20, 1306:25, 1307:8, 1307:22, 1308:6, 1309:4, 1309:12, 1309:21, 1310:14, 1310:19, 1312:1, 1312:13, 1312:16, 1312:20, 1313:9, 1313:24, 1314:4, 1314:10, 1314:14, 1315:3, 1315:4, 1315:8, 1315:11, 1315:12, 1315:24, 1321:6, 1321:12, 1324:13, 1324:20, 1325:1, 1325:25, 1329:13, 1329:23, 1330:1, 1330:4, 1331:17, 1331:20, 1332:2, 1332:10, 1332:19, 1332:22, 1333:16, 1333:18, 1333:20, 1333:21, 1333:25, 1334:14, 1334:15, 1334:23, 1336:2, 1337:7, 1337:17, 1337:23, 1338:12, 1338:13, 1338:16, 1339:2, 1339:3, 1339:6, 1339:7, 1339:12, 1339:13, 1339:14, 1339:16, 1339:17, 1339:22, 1340:1, 1340:15, 1340:21, 1341:6, 1341:9, 1341:11, 1341:12, 1341:14, 1341:19, 1341:24, 1342:11, 1342:13, 1342:19, 1342:21, 1343:3,

1343:7, 1345:7, 1345:11, 1345:13, 1345:14, 1345:18, 1345:20, 1345:22, 1345:25, 1346:2, 1346:3, 1346:5, 1346:9, 1346:13, 1346:24, 1347:3, 1347:9, 1347:16, 1347:25, 1348:1, 1348:8, 1348:13, 1351:6, 1351:24, 1351:25, 1352:4, 1352:8, 1352:13, 1353:14, 1353:16, 1356:25, 1357:2, 1357:3, 1357:4, 1357:6, 1357:7, 1357:13, 1357:16, 1357:17, 1357:19, 1357:24, 1358:6, 1358:10, 1358:12, 1358:15, 1359:19, 1359:20, 1359:23, 1360:3, 1361:9, 1362:12, 1362:16, 1363:9, 1363:10, 1364:4, 1365:7, 1371:4, 1371:24, 1372:4, 1373:7, 1373:8, 1373:9, 1373:10, 1373:19, 1374:13, 1374:15, 1374:19, 1374:24, 1375:15, 1375:19, 1375:20, 1375:21, 1375:23, 1375:24, 1375:25, 1380:15, 1380:21, 1381:23, 1382:25, 1385:9, 1385:14, 1385:24, 1385:25, 1386:23, 1387:22, 1387:24, 1388:4, 1389:25, 1391:20, 1391:23, 1391:24, 1392:3, 1392:18, 1392:23, 1392:24, 1393:1, 1393:2, 1394:1, 1394:19, 1394:20, 1395:24, 1395:25, 1396:6, 1396:10, 1397:2, 1397:5, 1406:4, 1406:6, 1407:2, 1407:9, 1407:25, 1408:2, 1413:24, 1414:1, 1414:2, 1414:3, 1415:14, 1416:9, 1416:12, 1417:6
**WAYS** [3] - 1256:14,

1382:15, 1395:15
**WEATHER** [1] - 1360:20
**WEDNESDAY** [3] - 1270:4, 1377:16, 1377:18
**WEEK** [4] - 1315:19, 1385:22, 1389:15, 1413:3
**WEEK** [8] - 1377:25, 1378:1, 1378:5, 1378:6, 1378:7, 1378:10, 1388:19, 1389:2
**WEEKEND** [3] - 1265:11, 1269:23, 1269:24
**WEEKLY** [10] - 1280:9, 1280:10, 1280:13, 1281:10, 1281:11, 1297:17, 1308:13, 1312:3, 1315:17, 1343:10
**WEEKS** [1] - 1283:3
**WEIGHT** [1] - 1267:14
**WELLS** [21] - 1261:20, 1275:15, 1296:5, 1296:14, 1331:11, 1337:10, 1342:13, 1351:7, 1351:25, 1352:8, 1353:17, 1354:18, 1354:22, 1355:1, 1355:2, 1355:15, 1371:3, 1392:22, 1406:11, 1416:23, 1416:24
**WELLS** [1] - 1342:15
**WEST** [1] - 1406:19
**WESTINGHOUSE** [1] - 1272:1
**WHITTAKER** [22] - 1254:7, 1258:7, 1258:16, 1258:20, 1259:3, 1259:18, 1259:19, 1260:21, 1260:25, 1261:5, 1261:7, 1263:8, 1264:2, 1264:6, 1268:5, 1269:18, 1298:16, 1354:4, 1354:14, 1381:6, 1381:13, 1403:22
**WHITTAKER'S** [2] - 1261:20, 1270:5
**WHITTAKER-BERMITE** [1] - 1354:4
**WHOLE** [6] - 1264:8, 1270:18, 1328:6, 1364:1, 1371:18,

1386:4
**WHOLLY** [1] - 1294:16
**WISH** [2] - 1267:16, 1366:15
**WITHDRAW** [1] - 1276:11
**WITHDRAWAL** [1] - 1357:5
**WITHDRAWN** [2] - 1266:18, 1357:6
**WITHDREW** [1] - 1267:25
**WITNESS** [23] - 1270:19, 1270:23, 1271:11, 1289:11, 1289:20, 1305:7, 1327:12, 1328:7, 1328:12, 1328:18, 1329:2, 1331:11, 1335:13, 1338:8, 1351:2, 1365:16, 1377:6, 1410:11, 1410:14, 1417:22, 1418:17, 1418:22, 1419:24
**WITNESS** [11] - 1265:19, 1270:6, 1270:8, 1270:13, 1287:22, 1287:25, 1303:16, 1327:13, 1328:1, 1402:3, 1405:11
**WITNESSES** [2] - 1254:19, 1264:25
**WORD** [5] - 1311:10, 1367:23, 1404:2, 1418:9
**WORDS** [5] - 1284:24, 1287:15, 1374:9, 1377:25, 1412:9
**WORLD** [2] - 1348:12, 1382:22
**WORTH** [1] - 1281:7
**WORTHY** [2] - 1274:6, 1274:12
**WOW** [1] - 1383:9
**WRITERS** [1] - 1331:19
**WRITING** [1] - 1372:20
**WRITTEN** [5] - 1336:8, 1369:1, 1394:9, 1394:12, 1409:18
**WROTE** [1] - 1369:6

## Y

**YEAR** [18] - 1273:17, 1273:19, 1274:1,

1281:6, 1281:12, 1302:25, 1341:13, 1360:9, 1360:11, 1360:14, 1360:16, 1361:2, 1361:3, 1361:4, 1407:3, 1407:4, 1420:14
**YEARS** [15] - 1272:1, 1274:25, 1280:4, 1280:6, 1280:8, 1317:18, 1329:8, 1347:14, 1347:22, 1347:25, 1353:23, 1360:16, 1368:2, 1387:13, 1413:17
**YESTERDAY** [1] - 1266:19
**YOURSELF** [2] - 1302:11, 1307:2

## Z

**ZERO** [19] - 1259:8, 1260:15, 1282:25, 1283:3, 1283:10, 1288:18, 1298:2, 1298:11, 1298:13, 1360:11, 1361:3, 1364:14, 1397:9, 1397:11, 1397:12, 1397:17, 1397:19, 1397:20, 1398:19
**ZEROS** [1] - 1359:21
**ZONE** [1] - 1407:4
**ZOOM** [2] - 1401:10, 1401:12

**UNITED STATES DISTRICT COURT**