1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3    HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

4

5    SANTA CLARITA VALLEY WATER AGENCY,    )
                                          )
6                   PLAINTIFF,            )CASE NO.
                                          )
7            vs.                          )CV 18-06825-SB
                                          )
8    WHITTAKER CORPORATION, et al.,       )VOLUME 13
                                          )PAGES 1423 TO 1513
9                   DEFENDANTS.           )
     _____ )

10

11

12

13                   REPORTER'S TRANSCRIPT OF
                         TRIAL DAY 7
14               MONDAY, NOVEMBER 29, 2021
                         1:04 P.M.
15               LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22

23   _____

24        MIRANDA ALGORRI, CSR 12743, RPR, CRR
              FEDERAL OFFICIAL COURT REPORTER
25            350 WEST 1ST STREET, SUITE 4455
              LOS ANGELES, CALIFORNIA 90012
                 MIRANDAALGORRI@GMAIL.COM

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4          NOSSAMAN, LLP
           BY:  BYRON P. GEE
5          BY:  RAVEN MCGUANE
           BY:  PATRICK J. RICHARD
6          BY:  FRED FUDACZ
           777 South Figueroa Street
7          34th Floor
           Los Angeles, California 90017

8

9          NOSSAMAN, LLP
           BY:  ILSE CHANDALAR SCOTT
10         50 California Street
           34th Floor
11         San Francisco, California 94111

12

     **FOR THE DEFENDANTS:**
13
           EDLIN GALLAGHER HUIE & BLUM
14         BY:  MICHAEL E. GALLAGHER, JR.
           BY:  FRED M. BLUM
15         BY:  DANIEL ERIC TROWBRIDGE
           500 Washington Street
16         Suite 700
           San Francisco, California 94111
17

18   **ALSO PRESENT:**

19         Matt Stone
           Scott Fryer
20         Ron Beaton
           Eric Lardiere
21

22

23

24

25

1       **INDEX OF WITNESSES**

2

3       **WITNESSES**                                                    **PAGE**

4       ALVORD, Michael

5            Redirect examination by Mr. Blum                    1427

6

7       LESERMAN, James

8            Direct examination by Mr. Blum                      1436

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 1343 | Letter | 1450 | 1450 |
| 1353 | Letter | 1467 | 1467 |
| 1383 | E-mail | 1460 | 1460 |
| 1384 | E-mail | 1464 | 1464 |

1     **MONDAY, NOVEMBER 29, 2021; 1:04 P.M.**

2     **LOS ANGELES, CALIFORNIA**

3     -oOo-

4

5     (The following proceedings were held in

6     open court in the presence of the jury:)

7     THE COURT:  We remain on the case in the -- on

8     the record in the trial matter with Mr. Alvord who has rejoined

9     us and is on the witness stand.

01:04PM    10     You understand you are under oath, sir?

11     THE WITNESS:  I do, Your Honor.

12     THE COURT:  We are also in the presence of the

13     jury.

14     Mr. Gee, you may continue with your examination.

01:04PM    15     MR. GEE:  Your Honor, that's all I have for now.

16     THE COURT:  All right.  Mr. Blum?

17     MR. BLUM:  Thank you, Your Honor.

18     **MICHAEL ALVORD,**

19     **CALLED BY THE DEFENDANT, WAS PREVIOUSLY SWORN.**

01:04PM    20     **REDIRECT EXAMINATION**

21     BY MR. BLUM:

22     Q     Mr. Alvord, the discussion you had with somebody

23     at the DDW where they talked about treatment for VOCs would be

24     helpful, when did that take place?

01:05PM    25     A     The actual date I don't recall.

```
 1          Q       Can you give me the year?

 2          A       It was in one of our discussions.  It could have

 3   been last year or this year.

 4          Q       Could have been before August of last year?

 5          A       I just don't recall.

 6          Q       Okay.  Do you recall testifying in August that

 7   you had no idea that -- what the remedy would be?

 8          A       Until we have an actual permit from DDW, we will

 9   not know what we're supposed to do.

10          Q       So today you don't know if whether or not

11   treatment is going to be required, do you?

12          A       No.  I don't know if treatment is going to be

13   required, but they said, if it was implemented, we would get a

14   permit quicker.

15          Q       Well, you originally said that -- that it would

16   be helpful.  What does "helpful" mean?

17          A       Helpful, quicker, expedite.  Like I said in prior

18   testimony, we have been working with DDW since 2012 to get a

19   permit for this well.

20          Q       But I'm interested.  Did they use the word

21   "helpful"?  Is that their word?

22          A       That's just the word that came out of my mouth.

23   I don't know if they used it, if I used it.

24          Q       So you don't know if they said helpful or they

25   said it would -- it would make the permit -- you getting your
```

01:05PM (line 5)
01:05PM (line 10)
01:05PM (line 15)
01:06PM (line 20)
01:06PM (line 25)

1429

1    permit quicker?  You don't recall what was said?

2         A       I just recall discussing with Jeff O'Keefe,

3    Ms. Shu-Fang Orr, and probably Bill Yang, which is another

4    associate of theirs, what the various options would be to

01:06PM 5    expedite a permit, and treatment was one of them.

6         Q       Now, was that at one of the technical meetings

7    that's held between all the parties where this discussion took

8    place?

9         A       The technical meetings with Whittaker and

01:07PM 10   Department of Toxic Substances Control --

11        Q       Yeah.

12        A       No.

13        Q       Who else was at this meeting?

14        A       It could have been on the phone.  It could have

01:07PM 15   been with other staff at SCV Water, but it would have only been

16   staff at SCV Water or staff at DDW.

17        Q       Now, you don't remember when.  You don't remember

18   the year.  You don't remember exactly what was said.  And you

19   don't remember who was present.  Am I correct in that?

01:07PM 20        A       I can speculate on who was in meetings because we

21   have typical staff that shows up at these meetings.  But yeah.

22   Over the last two, three years that we have been working

23   closely with DDW, I do not recall the actual language that was

24   used or the specific people that were in the meeting.

01:07PM 25        Q       And it was never put in writing; correct?

1    A    Much of what DDW has told us regarding this has

2 not been in writing.

3    Q    Whatever they said, whether it was helpful or

4 whatever, that was not put in writing; correct?

01:08PM    5    A    Correct.

6    Q    All right.  There's other issues that you have

7 with DDW regarding V-201 that have nothing to do with VOCs;

8 correct?

9    A    What do you mean by "other issues"?

01:08PM    10    Q    Well, didn't -- wasn't one of the things DDW

11 wanted more information on was contaminants in the water that

12 were not VOCs or perchlorate?

13    A    So we resolved the secondary contaminant issue

14 with them during one of our many iterations of the 97-005

01:08PM    15 document.

16    Q    And when was that?

17    A    Well, again, they haven't issued a permit, so I

18 don't know whether or not they're going to make us do anything

19 about it.

01:08PM    20    Q    So you don't know if it's been resolved; correct?

21    A    Correct.

22    Q    So when you said these issues were resolved, that

23 wasn't a correct statement, was it?

24    A    Correct.

01:08PM    25    Q    All right.  Now, I want to discuss with you

```
 1   Exhibit -- if you could put it up, Rick -- 1370.

 2            Now, Mr. Alvord, when you testified as the

 3   corporate representative on investigations of the turnouts,

 4   this is one of the documents you reviewed; correct?

 5        A    Correct.

 6        Q    All righty.  And this is already in evidence, but

 7   let's go to the introduction.

 8            Do you see where it says, "PCE is widely used for

 9   dry cleaning fabrics, metal degreasing, and other industrial

10   applications.  PCE is a common soil and groundwater

11   contaminant."

12            You agree with that statement; right?

13        A    Do I agree with it?

14        Q    Yeah.  Yes.

15        A    I agree with the first part, that is, widely used

16   for dry cleaning fabrics, metal degreasing, and other

17   industrial applications.  In terms of a common soil and

18   groundwater contaminant, I guess it would have to depend on

19   where the location is.  That's a pretty general statement.

20        Q    Well, who's the author of this document?

21        A    I don't know.

22        Q    Isn't it James Leserman?

23        A    It could be.  I don't know.

24        Q    Well, all right.  Now, if you go to the second

25   page under paragraph 3, do you see where it says "Responses"?
```

```
 1          A       Yes.

 2          Q       All right.  Now, you talk -- you testified under

 3    questioning from Mr. Gee about the response, but I want to go

 4    over some of it.

 5                  Now, it was in April or May of 2012 when the

 6    first high readings of PCE were found in SC-1; correct?

 7          A       That's what it says here, yes.

 8          Q       And that the immediate conclusion was the SPTF

 9    was not the source because the reading was higher than what was

10    found at the turnouts; right?

11          A       You paraphrased what that sentence says, yes.

12          Q       And I paraphrased it correctly.

13          A       I could read it.  But it says it was clear that

14    the Saugus wells and the SPTF were not the source.

15          Q       The immediate reaction of the agency was to say,

16    well, it's lab error; correct?

17          A       I don't know that it said that in here, but that

18    might have been one of the many reasons or one of the many

19    assessments they thought of initially.

20          Q       Doesn't it say, quote, "Consequently CLWA staff

21    initially attributed the detections to laboratory or sampling

22    artifacts"?

23          A       Yes.  That's what the sentence says.

24          Q       That means their immediate reaction was it must

25    be lab error or sampling error.
```

01:10PM (line 5)
01:10PM (line 10)
01:11PM (line 15)
01:11PM (line 20)
01:11PM (line 25)

1    A        Sounds like the immediate response was that.

2    Q        Okay.  And at that point this area was already

3    shut down for routine maintenance; correct?

4    A        The SC-1 turnout connection was shut down.

01:11PM   5    Q        Okay.  When that work was completed, wasn't

6    the -- wasn't it put back into service?

7    A        Yes.  It was pressurized and flushed and sampled.

8    Q        Okay.  And then for -- between July, August,

9    September, and almost the end of October, PCE was non-detect;

01:12PM  10    is that correct?

11    A        That's what it says there, yes.

12    Q        Now, between that time, what had the agency done

13    to determine whether or not lab error had actually occurred?

14    A        Based on what I'm reading here and based on my

01:12PM  15    recollection is that they must have thought it was just a

16    laboratory or sampling artifact that caused it.

17    Q        Well, doesn't it say, if you go to the second

18    paragraph --

19    A        Yes.  It says it there.

01:12PM  20    Q        Doesn't it say right -- well, can you read what

21    it says about that lab error?

22    A        It says, "So even though it had not been

23    confirmed that sampling or laboratory artifacts caused the

24    problem, CWLA believed it was no longer an issue because

01:13PM  25    the --"

1      THE COURT:  Slow down while you're reading,

2  please.

3      THE WITNESS:  I'm sorry.

4      Q    BY MR. BLUM:  So they thought it was lab error,

01:13PM  5  they didn't confirm that it was, they put it back into service,

6  and after several months what happened?

7      A    It was non-detect because the system was now

8  pressurized.

9      Q    And subsequent to that, wasn't -- wasn't it

01:13PM  10  subsequently found PCE again spiked?

11      A    Yes.  When the station was shut down again.

12      Q    Okay.  And it was after the second spike that

13  they realized, oh, it wasn't lab error.

14      A    That's what it says here, yes.

01:13PM  15      Q    Okay.  So it was only after the -- only after

16  there were hits and several months later there were more hits

17  that an investigation was done to determine what the source

18  was; correct?

19      A    The way I read this is that the investigation

01:13PM  20  started in the April and May timeframe in 2012.

21      Q    Well, in April or May, it was just blamed on lab

22  error; correct?

23      THE COURT:  Mr. Blum, I don't think you need to

24  argue with the witness.  It says what it states.

01:14PM  25      Q    BY MR. BLUM:  Okay.  Let's go to the end of it

1  under "Conclusions and Recommendations."  Do you see that?

2  It's on page 4.

3         A      Yes.  Now I do.

4         Q      What is the sixth recommendation?

01:14PM  5     A      It says, "If a VOC is" -- excuse me.  It says,

6  "If a VOC is detected higher than the maximum concentration at

7  Saugus well 1 or Saugus well 2, the turnout shall be taken out

8  of service and another investigation shall be undertaken."

9         Q      Was that recommendation followed?

01:14PM  10    A      Specifically, I don't know.

11                MR. BLUM:  That's all I have, Your Honor.

12                THE COURT:  Anything further, Mr. Gee?

13                MR. GEE:  No, Your Honor.

14                THE COURT:  All right.  You are excused,

01:15PM  15 Mr. Alvord.  Please watch your step going down.

16                THE WITNESS:  Thank you very much.

17                THE COURT:  Mr. Blum, your next witness.

18                MR. BLUM:  We would call James Leserman,

19  Your Honor.

01:16PM  20                THE CLERK:  Good afternoon, sir.  Would you

21  please come forward.  Sir, would you please walk around and

22  stand up on the witness platform.

23                Please raise your right hand to be sworn.

24                Do you solemnly swear that the testimony you

01:16PM  25  shall give in the cause now before this Court shall be the

1    truth, the whole truth, and nothing but the truth, so help you

2    God?

3              THE WITNESS:  I do.

4              THE CLERK:  Thank you, sir.  Please be seated.

01:16PM    5              Sir, for the record, would you please state your

6    name and spell your last name.

7              THE WITNESS:  James Leserman, L-e-s-e-r-m-a-n.

8              THE COURT:  And, Mr. Leserman, if you would

9    please remove your mask and make sure that you are speaking

01:16PM   10   into the microphone as you see me doing.

11             THE WITNESS:  Okay.

12             THE COURT:  Thank you very much.

13             Mr. Blum, whenever you're ready.

14                         **JAMES LESERMAN,**

01:16PM   15   **CALLED BY THE DEFENDANT, WAS SWORN.**

16                      **DIRECT EXAMINATION**

17   BY MR. BLUM:

18        Q    Mr. Leserman, where are you now employed?

19        A    The Santa Clarita Valley Water Agency.

01:16PM   20        Q    And how long have you worked there?

21        A    Worked there for 15 years.

22        Q    And what's your current position?

23        A    Senior engineer.

24        Q    What is a senior engineer?

01:16PM   25        A    Performing various engineering type of projects.

1        Q        Okay.  Sir, as -- what was your position in 2013?

2        A        Senior engineer.

3        Q        And in 2013, were you tasked with investigating

4   the cause of certain high levels of PCE found at turnout SC-1?

01:17PM   5        A        I worked on that project, yes.

6                 MR. BLUM:  Okay.  Can we see Exhibit 1370,

7   please.

8        Q        Sir, do you recognize Exhibit 1370?

9        A        I do.

01:17PM  10        Q        You're the author of it; correct?

11        A        That's correct.

12        Q        And prior to finishing it, did you believe what

13   you stated in it was true and correct?

14        A        I believed what I said at the time.

01:17PM  15        Q        Okay.  Now, if we can go to page 4, do you see

16   under paragraph 4 where it says, "Conclusions and

17   Recommendations"?

18        A        Yes.

19        Q        What was the purpose of including a section on

01:18PM  20   conclusions and recommendations?

21        A        It's a standard component of a technical memo.

22        Q        In other words, you didn't want what happened

23   that you were investigating to happen again; correct?  Let me

24   rephrase the question.

01:18PM  25                 THE COURT:  Are you referring to the reason why

1    he put conclusions and recommendations, or is this more general

2    now?

3                    MR. BLUM:  Let me rephrase it, Your Honor.

4                    THE COURT:  All right.

01:18PM    5    Q        BY MR. BLUM:  Mr. Leserman, the reason there are

6    specific conclusions and recommendations in this report was

7    because you wanted to take the lessons you learned as a result

8    of doing the report and see what changes could be made so that

9    the water agency could better operate.

01:19PM   10    A        We were investigating a specific problem here

11    which was an increased level of contamination that we weren't

12    expecting.  And this report dealt with that particular issue.

13    And certainly we were hoping to resolve it.

14    Q        Were you also hoping to make sure the problem

01:19PM   15    didn't happen again?

16    A        By resolving it.

17    Q        Well, can you look at conclusion and

18    recommendation No. 6?  Now, you don't know -- so this was just

19    read by Mr. Alvord, so we don't have to read it again.

01:19PM   20                    Why was that recommendation in there?

21    A        So that, if there was a repeat of this situation,

22    we would investigate again to see what the problem might be.

23    Q        And what you were recommending was that anytime

24    the readings of VOCs at the turnouts were greater than the

01:20PM   25    readings of the VOCs at either Saugus 1 or Saugus 2, that the

1  turnout should be shut down and another investigation should be

2  undertaken; correct?

3       A      Well, it depends.  There are circumstances where

4  there could be unusual results that might be related to

01:20PM  5  something else.  So we certainly would want to have a

6  confirmation type sample and not necessarily one isolated

7  event.

8       Q      Well, where do you say, before you shut it down,

9  do a confirmatory sample?

01:20PM  10      A      It's not stated in this particular report.

11      Q      Is the reason why you stated that, if it's

12  larger, the numbers are greater at the turnouts than they were

13  at the Saugus -- either Saugus wells for any VOCs was because,

14  if they're greater at the turnouts, it means the Saugus 1 or

01:21PM  15  Saugus 2 wells can't be the source?

16      A      That would be the logic behind it.

17      Q      Okay.  All right.  Thank you.

18             Now, was -- did the agency adopt a policy

19  identical to what you recommended in No. 6?

01:21PM  20      A      That was taken care of by our operations group,

21  so I'm not able to tell you.

22      Q      That would be the operations group headed by

23  Mr. Alvord; correct?

24      A      It's the operations group.  Now, at the time it

01:22PM  25  was overseen by somebody else.

1    Q        Now, since -- this report was written in March of

2  2013; correct?

3    A        Yes.

4    Q        Since March of 2013, has the -- has any

01:22PM  5  concentration at any of the turnouts ever been higher than

6  the -- any of the VOC ratings at either Saugus 1 or Saugus 2?

7    A        I understand that there has been at least one

8  occasion where there was an incident in which it was higher.

9    Q        And in that incident, was the turnouts -- was

01:22PM  10  that turnout shut down and an investigation of the source

11  commenced?

12    A        Again, I'm not involved in operations, so I can't

13  tell you.

14        MR. BLUM:  All right.  Before we leave the

01:22PM  15  document, can we go to the first page, please?

16    Q        Now, do you see under "Introduction and

17  Background," the first paragraph?

18    A        Yes.

19    Q        Okay.  You state, "PCE is widely used for dry

01:23PM  20  cleaning fabrics, metal degreasing, and other industrial

21  applications."  And then you go on to say, "PCE is a common

22  soil and groundwater contaminant."

23        That's a correct statement, is it not?

24    A        I believe it's correct.

01:23PM  25    Q        In fact, your belief was that the most likely

1441

1     source of the contamination was leaking PCE from Flamingo Dry

2     Cleaners; correct?

3          A     Flamingo is close by.  I believe it's about

4     200 yards from the turnout where the connection was.  It's

01:23PM  5     certainly a distinct possibility, but I wouldn't -- I can't

6     conclude.  I don't have the tools or the expertise to know that

7     as a certainty.  It seems possible.

8          Q     Was it the most likely source?

9          A     I don't know.

01:24PM  10         Q     Okay.  Now, sir, I apologize.  There is one other

11    question.

12               On page 2 under "Responses," when the -- when the

13    concentrations of PCE was first discovered, isn't it correct

14    that the initial conclusion was that it was the result of lab

01:24PM  15    error?

16         A     No.

17         Q     Well, don't you say -- doesn't it say that CLWA

18    staff initially attributed the detections to laboratory or

19    sampling artifacts?

01:24PM  20         A     Attributing, which perhaps is a possibility, is,

21    in my view, not the same thing as concluding.  That was the

22    source.  It's a possibility.  It's a common one along with

23    sampling error, other human error that can cause inaccuracies

24    in laboratory results.

01:25PM  25         Q     Okay.  What was done between the time that the

1442

VOCs were initially discovered in April or May of 2012 and when
the second round of VOCs were discovered after
October 22, 2012, to determine whether or not it was lab error
that caused the problem?

01:25PM

    A       That was nine years ago.  I -- I don't remember.
But I -- I do believe that there were normal results following
that.

    Q       So -- well, how do you explain, then, that first
there were -- now, the results that you initially found were
01:25PM  really, really high.  They were above the MCL; is that correct?

    A       Yes.

    Q       And several months later after non-detects,
again, there were results that were above the MCLs; correct?

    A       Yes.

01:26PM      Q       Um, before the second results, had you concluded
that the first time you found these results above the MCL was
just an error, that they really weren't there?

    A       I don't remember.

    Q       Well, you knew that it wasn't -- you already
01:26PM  concluded that it wasn't Whittaker and the Saugus wells that
are causing it; correct?  That you knew.

    A       Of course.

    Q       And there was no -- was there any evidence that
the lab just messed up and really -- and there was really
01:26PM  nothing there but they found the PCE anyway?

1      A      Not that I can recall.

2      Q      Okay.  So you basically -- after you got the --

3  after you got the non-detect for several months decided, it's

4  not something we've got to worry about.

01:27PM   5      A      Again, I don't remember what we were thinking at

6  the time.

7      Q      Okay.  All right.  Let's go back to the very

8  beginning.

9          Now, as senior engineer, you were involved in all

01:27PM  10  aspects of the remediation and treatment system for Saugus 1

11  and Saugus 2; correct?

12      A      I came on as the design was being completed.  I

13  started my job.  So I was involved in finishing that up,

14  overseeing the bidding of the construction jobs and the

01:27PM  15  construction of the facilities and then the startup --

16      Q      Okay.

17      A      -- testing.

18      Q      And you were also -- part of your job, wasn't it,

19  was to advise the water agency on the type of remediation

01:27PM  20  needed at the site; correct?  The Bermite site.

21          MR. GEE:  Objection.  Lacks foundation.

22          THE COURT:  I think the question is were you?

23  Was that part of your job?  You can answer that question.

24          THE WITNESS:  The design and the remedy was

01:28PM  25  already in place before I started work with the agency.

1        Q        BY MR. BLUM:  Again, when was that?

2        A        In 2006.

3        Q        So by 2006 the remedy for the site was in place

4    and was already being performed?

01:28PM   5        A        No.  It was being designed.

6        Q        Designed.  Okay.  When you say it was being

7    designed, it was being designed by Whittaker and its

8    consultants; correct?

9        A        No.  That was by the agency's consultants.

01:28PM  10        Q        Okay.  You also, as part of your job, deal with

11   determining the sources of contamination that might be

12   impacting the different water wells that are owned by the --

13   let me rephrase it.

14              Part of your job is determining the source of

01:28PM  15   contamination at the wells that are at issue in this case which

16   is S-1 and S-2 and V-201 and V-205.

17        A        It became part of the job.  It wasn't initially.

18        Q        Okay.  Now, when did it become part of the job?

19        A        I suppose it was when we were looking to find the

01:29PM  20   source of the VOCs.

21        Q        And when did that start?

22        A        Sometime after I -- a few years after I started.

23   So let's say in the 2010 to 2015 range.

24        Q        Wasn't that because the Department of Public

01:29PM  25   Health, which is now DTSC, had requested that the water agency

make a determination as to what the source of the VOCs was?

A       The Division of Drinking Water who regulates our system and issues our permits was concerned about the detection of VOCs at our turnouts.

01:30PM    Q       Okay.  Then the DDW also wanted to know what the source was; correct?

A       I don't recall that.

Q       Do you recall having a conversation in about 2013 -- let me back up.

01:30PM        Do you know an individual named BJ Lechler?

A       Yes.

Q       Who is Mr. Lechler?

A       He is a hydrogeologist who has worked for CH2M Hill, West Yost, and now with Jacobs Engineers.

01:31PM    Q       What relationship, if any, does he have to the VOCs at issue in this case?

A       Well, he has worked on the issues for many years, first as a consultant to the Army Corps of Engineers and more recently to the agency.

01:31PM    Q       Do you recall a conversation with Mr. Lechler in or about 2013 where you told Mr. Lechler something to the effect that you were going to start an investigation into the sources of the VOCs even though you knew that Whittaker may not be the source?

01:31PM    A       I don't recall specifically the conversation, but

1    it's something I may have undertaken.

2         Q       Do you recall -- let me make sure I have this.

3                 Do you recall that in 2010 -- did you believe at

4    that point it had been shown that Whittaker was the source of

01:32PM    5    the VOCs?

6         A       I don't recall.

7         Q       All righty.  Now, in terms of the water quality,

8    isn't it your understanding of the policy of the agency that,

9    if the contaminants like VOCs are below the MCL, that the

01:32PM   10    agency is going to serve that water to its customers?

11        A       We adhere to the requirements of our permits

12   which require compliance with the MCL, under the MCL.  But also

13   to other permit conditions such as complying with the

14   conditions of 97-005 for sources or extremely impaired sources

01:32PM   15   which in our case requires that the VOCs be non-detect at the

16   connections.  And in order to remedy that, there has to be

17   treatment.

18                MR. BLUM:  Referring to Mr. Leserman's deposition

19   on December 4th, 2019, page 103, lines 2 through 9.

01:33PM   20                THE COURT:  Is this on December 12th or

21   December 4th?

22                MR. BLUM:  The 4th, Your Honor.  There's two of

23   them on that date, I believe.

24                THE COURT:  I have two volumes.  Both suggest

01:33PM   25   they're on the 12th.

```
 1              MR. BLUM:  It's the one that's not as a 30(b)(6),
 2   Your Honor.
 3              THE COURT:  Still, they both say the 12th.  In
 4   any event, I don't know that this needs to detain us.  Tell me
 5   what the page and line number is again.
 6              MR. BLUM:  103, lines 2 through 9.
 7              THE COURT:  I'm sorry.  You're going to have to
 8   continue.  I was given two volumes.  So unless I'm missing one,
 9   I have two volumes.  I don't have the one that you're referring
10   to.
11              MR. BLUM:  Can I see if there's an objection from
12   counsel?
13              THE COURT:  Yes.  Let's see if there is an
14   objection.
15              MR. GEE:  No objections.
16              THE COURT:  Then you may proceed, Mr. Blum.
17              MR. BLUM:  Your Honor, I will just read it.  How
18   is that?
19              THE COURT:  That's fine.
20              MR. BLUM:  "Question:  What is the
21          policy of the current water agency as to
22          that?
23              "Answer:  To serve water that meets
24          drinking water standards.
25              "Question:  So the current policy
```

1       of your employer is that, if the

2       concentrations of the VOCs are below

3       MCL, it can be delivered to customers;

4       correct?

01:35PM  5       "Answer:  I believe so."

6       Q       Do you recall your deposition in December of

7   2019?

8       A       Yes.

9       Q       When you made the statement that the policy was

01:35PM  10  to deliver water to customers below the MCLs, was that a

11  correct statement?

12      A       At the time it was my first time testifying, and

13  sometimes I tend to get flustered.  I was asked a question

14  about the agency policy.  Didn't really have time -- much time

01:35PM  15  to reflect upon that.  There are agency policies, for example,

16  we have a personnel policy where we get ten days' vacation a

17  year.  There's a purchasing policy where we get --

18              MR. BLUM:  Your Honor, beyond the scope of the

19  question.

01:36PM  20              THE COURT:  Ask your next question, please.

21      Q       BY MR. BLUM:  Mr. Leserman, did somebody tell you

22  that, when you answer those questions and you want to change

23  your answer, you should say, it was my first deposition and I

24  was flustered?

01:36PM  25              THE COURT:  That is argumentative.  Ask another

1        question, please.

2                        MR. BLUM:  All right.

3            Q       Now, would you agree with me, Mr. Leserman, that

4        there is no risk of the agency providing water in the future

01:36PM  5        that did not meet all applicable standards?

6            A       I'm not a toxicologist.  I don't perform risk

7        analysis, and it's beyond my purview.  I can't tell you.

8            Q       All right.  Let's go back to your deposition,

9        sir.

01:36PM  10                       Same deposition, page 72, lines 6 through 13.

11                       THE COURT:  Any objection?

12                       MR. GEE:  No objections.

13                       THE COURT:  You may proceed.

14                   (The video commenced playing before the jury.)

01:37PM  15           Q       BY MR. BLUM:  Were you telling the truth then?

16           A       That was my understanding at the time.

17           Q       All right.  Now, what's a sentinel well?

18           A       It's a monitoring well that is upgradient of a

19        water production well.

01:38PM  20           Q       And what's the purpose of a sentinel well?

21           A       To provide water quality samples that can give

22        warning or notice if there is a threat to the drinking water

23        wells, either new contaminants or increased concentration of

24        known contaminants.

01:38PM  25           Q       Isn't it correct that you're not aware of

1  anything or any information derived from those wells that would

2  lead you to believe that VOCs in Saugus 1 or 2 will ever exceed

3  the MCLs?

4            MR. GEE:  Objection.  Calls for speculation.

01:38PM   5            THE COURT:  Sustained.

6       Q       BY MR. BLUM:  As the senior -- as a senior

7  engineer who has been tasked to advise the agency as to the

8  contamination at the site and its results, did you ever form

9  the opinion that there was no information based on the sentinel

01:39PM   10  wells that VOCs in S-1 or S-2 will ever exceed the MCLs?

11       A       I haven't looked at the water quality data

12  recently, but as I recall, the water quality results have by

13  and large been fairly uniform, fairly constant.  But again, I

14  haven't looked at it recently, and I wouldn't want to make any

01:39PM   15  conclusions.

16       Q       We will go to your deposition, same one on

17  page 77, lines 17 through 23.

18            MR. GEE:  No objections.

19            THE COURT:  You may proceed.

01:40PM   20       (The video commenced playing before the jury.)

21       Q       BY MR. BLUM:  Sir, if we can take a look at

22  Exhibit 1343 which I believe has been stipulated to.  If we can

23  go to I think it's the last page, page 4.

24            (Marked for identification and received

01:41PM   25            into evidence Exhibit No. 1343.)

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | Q       BY MR. BLUM:  Is that your signature?                         |
|        | 2  | A       Yes, sir.                                                    |
|        | 3  | Q       Do you recall this letter?                                   |
|        | 4  | A       No.                                                          |
| 01:41PM| 5  | MR. BLUM:  Can you go to the first page then,                        |
|        | 6  | please?                                                              |
|        | 7  | Q       Who was the letter written to?                               |
|        | 8  | A       Shu-Fang Orr.                                                |
|        | 9  | Q       Who is she?                                                  |
| 01:41PM| 10 | A       I believe her position is district engineer with            |
|        | 11 | what is now the Division of Drinking Water.                          |
|        | 12 | Q       Is it your policy, when writing to the DDW, to be           |
|        | 13 | truthful and honest?                                                 |
|        | 14 | A       Yes.                                                         |
| 01:41PM| 15 | Q       Again, can we go back to -- I'm sorry.  Before we           |
|        | 16 | do that, the date is December 21, 2016; right?                       |
|        | 17 | A       Yes.                                                         |
|        | 18 | MR. BLUM:  Can we go to the last page, please.                      |
|        | 19 | Can you blow up the part where it says "Conclusions"?               |
| 01:42PM| 20 | Q       Can you read the conclusion to the jury, please?            |
|        | 21 | A       Certainly.  "Although some of these wells have              |
|        | 22 | detectible concentrations of constituents of concern, no            |
|        | 23 | discernible trends can be observed at this time that would          |
|        | 24 | suggest a water quality change or any new imminent threat to        |
| 01:42PM| 25 | Saugus 1 and 2 wells."                                               |

1452

```
 1              Q       Was that a correct statement at the time?
 2              A       Yes.
 3              Q       And is it true that, since the time of this
 4       letter to today, the VOCs in Saugus 1 and Saugus 2 haven't
01:42PM  5       increased, have they?
 6              A       Not to my knowledge.
 7              Q       So you would still agree there is no imminent
 8       threat to Saugus 1 or Saugus 2?
 9              A       I believe you used the term "risk," and I was
01:42PM 10       looking at it as a risk to health which I couldn't really
11       render an opinion on.  But a threat to the wells, as I
12       previously just testified, we have seen fairly consistent
13       results which is similar to the conclusions in this letter.
14              Q       Would you then conclude that there is no imminent
01:43PM 15       threat to the wells, to Saugus 1 and Saugus 2 from VOCs?
16              A       Based on the current information.
17              Q       You answer it with a "yes."
18              A       Well, I would qualify it, though, because there
19       could be a new slug of contamination that might come.  So based
01:43PM 20       on the current trends, I would say there is no new threat.
21              Q       New threat.  And there was no threat in 2016;
22       correct?
23              A       There was no new imminent threat; correct.
24              Q       Does that mean that as of today there is no
01:43PM 25       imminent threat as to S-1 and S-2?
```

```
 1          A        Based on the current monitoring trend.

 2          Q        Okay.  All righty.  Sir, let's move on to another

 3     subject.

 4                   Do you remember a time when the water agency was

 5     attempting to obtain grants in order to install treatment

 6     systems for some of the wells at issue here?

 7          A        Yes.

 8          Q        All right.  And it was grants from the State;

 9     correct?

10          A        Yes.

11          Q        All right.  And do you recall that the grants

12     were denied?  That's a correct statement, isn't it?

13          A        I recall that we were disqualified after

14     submitting a pre-application for one of the grants.

15          Q        The reason you were disqualified was that a

16     condition of the grant was that there actually be an order in

17     place requiring the treatment.

18          A        I don't recall that.

19          Q        Do you recall asking the State -- asking the DDW

20     if they could order -- issue an order to remediate the site --

21                   MR. GEE:  Objection.  403 objection.

22                   THE COURT:  Overruled.

23                   You can answer.

24          Q        BY MR. BLUM:  Do you recall asking the DDW if

25     they could order treatment of the site -- I'm sorry --
```

1454

 1    treatment at the wells for VOCs so that you could get a grant?

 2         A       I recall the communication.  I think it was by

 3    e-mail.  We were frustrated by the fact that we had what I

 4    called a de facto MCL.  And I'm referring to the operational

 5    goal of non-detect.  We were looking to the DDW staff to assist

 6    us in passing on their requirement -- their operational goal to

 7    emphasize the importance of that to the -- the portion of their

 8    agency that issues the grants.

 9         Q       Isn't it correct that the DDW refused to state

10    that you were required to treat the VOCs?

11         A       I don't recall.  I don't know that they

12    responded.  To use the word "refuse" is something that I can't

13    concur with.

14         Q       Would you agree that they did not acquiesce, they

15    did not give in to your request, that they informed the part of

16    the State that was going to issue the grant that you were being

17    required to treat for VOCs?

18         A       To my knowledge, they didn't follow up.

19         Q       All right.  Now, isn't that correct, sir, that

20    for Saugus 1 and Saugus 2, the permit doesn't require that VOCs

21    be non-detect?

22         A       The permit has a condition setting an operational

23    goal for non-detect.

24         Q       Is that a requirement or a goal?

25         A       It's a condition of the permit.  One of the many

1455

                conditions.

         2      Q     Again, your deposition page 199, lines 6 through

         3   16.

         4            MR. GEE:  No objections.

01:48PM  5            THE COURT:  Proceed, please.

         6            (The video commenced playing before the jury.)

         7      Q     BY MR. BLUM:  Is that the truth?

         8      A     I said that.  That's the truth.

         9      Q     All righty.  Now, what the -- what is required,

01:49PM 10   though, is, if the VOCs are detected at the turnouts, that you

        11   have to report that to the DDW; correct?

        12      A     I believe so.  That sounds correct.

        13      Q     But there's -- but you don't report that same

        14   information regularly to the customers, do you?

01:49PM 15      A     I don't handle that part of the agency.

        16      Q     Okay.  All right.  Now, Mr. Leserman, what's a

        17   theoretical blend calculation?

        18      A     I haven't dealt with that in many, many years, so

        19   I don't recall.

01:50PM 20            MR. BLUM:  If you can put up 1341, please.  I'm

        21   sorry.  That's not it.  I have it wrong.

        22            Your Honor, may I just check the number?

        23            THE COURT:  Yes.

        24      Q     BY MR. BLUM:  The document Exhibit 1372, what is

01:51PM 25   it?

1456

```
 1        A       The Saugus perchlorate treatment facility

 2   distribution system monitoring.

 3        Q       Do you see a signature on the bottom?

 4        A       Yes.

 5        Q       Is that yours?

 6        A       It is.

 7        Q       All right.  Can you tell me what the document is?

 8        A       Okay.  No. 1 is that theoretical blend

 9   calculation taken monthly.

10        Q       Okay.  And what is the theoretical blend?

11   Blending of what?

12        A       As I recall, that would be the -- it reminds me

13   it is the blend that would be or the ratio of blend water from

14   the -- our surface water plants or imported water treatment

15   plants with the well water.

16        Q       And is it correct, Mr. Leserman, that what you

17   did was you looked at things like chloride or sulfate since

18   they were both in the water from the State Water Project as

19   well as the plant and you looked at those ratios in the turnout

20   to determine what was the percentage of water from the two

21   sources?

22        A       I don't believe that's the case on this

23   particular exhibit.

24        Q       Okay.  Do you know, is that -- but regardless of

25   this exhibit, is that generally how it was done?
```

01:51PM (line 5)
01:51PM (line 10)
01:52PM (line 15)
01:52PM (line 20)
01:52PM (line 25)

1    A       At some point I believe after April or midyear

2   2013 there was a calculation related to that that was inserted,

3   yes.

4    Q       And that calculation, was it tested to see if it

01:53PM   5   was actually accurate?

6    A       I wasn't handling it, so I can't tell you.

7    Q       All right.  So if you go to the top, the document

8   is dated September 2011; correct?

9    A       Yes.

01:53PM   10    Q       And you look at the signature is April 2013;

11   correct?

12    A       Yes.

13    Q       Why did it take you two years to sign the

14   document?

01:53PM   15    A       I don't remember.

16    Q       Okay.  Was it your regular practice to wait two

17   years to sign these?

18    A       No.

19    Q       What was your regular practice?

01:53PM   20    A       To do what -- if I recall, the 25th of the month

21   following the analyses.

22    Q       And where did you get the information to put into

23   the document?

24    A       These were monitoring results.

01:54PM   25    Q       And were the -- these were monitoring results

1  prepared by the laboratory that was operated by the water

2  agency; correct?

3        A        I believe so.  We have a laboratory, and there is

4  a good chance they performed these analyses.

01:54PM  5        Q        Do you know who Jeff Koelewyn is?

6        A        Yes.

7        Q        Who is he?

8        A        He's our laboratory supervisor.

9        Q        Now, when you get lab results from Mr. Koelewyn,

01:54PM 10  do you assume they are accurate?

11        A        Assume they are accurate?  The lab is

12  performed -- run in accordance with all of the standards set by

13  the state for environmental laboratories.  So yes, I would have

14  confidence in them.

01:55PM 15        Q        Don't those standards require that, if the

16  reading is inaccurate, that the lab identify it as such?

17        A        I don't know.

18        Q        Well, in any of the readings that you've got and

19  you've put into these theoretical blend calculations, were you

01:55PM 20  ever told by anybody at the lab they're not reliable results?

21        A        No.  I can't remember any.

22              MR. BLUM:  If we can go to 1372, please.

23        Q        All right.  Now, the date of this is what?

24  September of -- I'm sorry.  No.  We need 1372.  It's the next

01:55PM 25  one.  You're right.  Sorry.  Let's go to a different exhibit.

1          How long have you been filling out these

2    theoretical blend calculations?

3          A     How long have I?

4          Q     Yes.

01:56PM  5          A     I haven't been doing it for years.

6          Q     When was the last time you did it?

7          A     I don't remember.  Certainly I did it in -- for

8    results that came out in 2011.

9          Q     Okay.  Sir, I think there's a notebook in front

01:57PM  10   of you that has Exhibit 1383.  Tell me when you have it.

11         A     I have 1382 and then 1432.

12               MR. BLUM:  Your Honor, may we approach with the

13   exhibit?

14               THE COURT:  Yes.

01:58PM  15         Q     BY MR. BLUM:  Mr. Leserman, do you recall an

16   e-mail exchange in February of 2014 with Mr. Koelewyn about

17   some sampling results that he reviewed from the Saugus

18   perchlorate treatment facility and the turnouts?

19         A     I do not recall the e-mail.

01:58PM  20         Q     All right.  Do you have any doubt that the

21   e-mail -- that the e-mail was sent to you?

22         A     No.

23         Q     Do you see your response on February 10, 2014?

24         A     I do.

01:58PM  25         Q     Do you have any reason to believe that this

1    e-mail is not the one that you sent in reply?

2         A     I have no reason not to.

3              MR. BLUM:  Okay.  Your Honor, I would move the

4    e-mail into evidence.

01:58PM  5              THE COURT:  It will be received.

6              (Marked for identification and received

7              into evidence Exhibit No. 1383.)

8              MR. BLUM:  All right.  If we can blow up the

9    bottom portion.

01:59PM  10        Q     All right.  Mr. Koelewyn sent you an e-mail in

11   February of 2014, and -- where he talked about some VOC results

12   from the SPTF and the turnouts; correct?

13        A     Correct.

14        Q     And he found that the TCE levels at the turnout

01:59PM  15   were three times what was predicted by the blending studies

16   that you created; correct?

17              THE COURT:  Could you just rephrase that?  You

18   said the blending studies that he created?

19        Q     BY MR. BLUM:  That you prepared.

01:59PM  20        A     Well, I didn't prepare that blending study.  I

21   believe it was Jeff who did it at that point.

22        Q     All right.  But he told you that the results were

23   three times what was expected from the blending study; correct?

24        A     Let me see here.

02:00PM  25              (Witness reviewing document.)

```
 1          Q     Do you see --

 2          A     He said it was measured at 1.2, and the

 3     calculated version would be .44.

 4          Q     Which is about three times higher.

 5          A     Okay.

 6          Q     Right?

 7          A     Yes.

 8          Q     What he wanted to know was what does he tell

 9     Dmitriy about this; correct?

10          A     Yes.

11          Q     And Dmitriy works or worked at the time for the

12     Department of Drinking Water; correct?

13          A     Yes.

14          Q     And he was the person who you were supposed to

15     report the results to; correct?

16          A     Yes.

17          Q     And what did you tell him?

18          A     Well, I made, I suppose, what was a flippant

19     remark that we could blame it on the lab.  What I meant was --

20          Q     That doesn't answer the question.  What did you

21     tell him?

22          A     What did I tell Jeff?

23          Q     Yes.

24          A     Okay.

25          Q     Let me help you.  Didn't you say, "I will blame
```

02:00PM  5

02:00PM  10

02:01PM  15

02:01PM  20

02:01PM  25

1462

1       it on," quote, "'laboratory or sampling artifacts,'" end quote,

2       "and hope that it is lowered by the next reading."

3                   Isn't that what you told him?

4            A       That's what it says there.  Like I say, it was an

02:01PM 5       unfortunate choice of words, but it refers to the fact that

6       there can be errors even in the best of labs.  There can be

7       contamination.  There can be errors in sampling.  Sampling --

8       because it can be done wrong.  There can be switching of

9       samples inadvertently.  So that's what I referred to.  If the

02:02PM 10      next results came back normal, then we can look at it as some

11      anomaly.  Like I say, it happens to the best and most reputable

12      of the labs.

13                  And furthermore, Dmitriy at DDW was aware of the

14      results.  It wasn't as if we were hiding anything from him.

02:02PM 15           Q       When you told Mr. Koelewyn, "I will blame it on

16      laboratory or sampling artifacts," in fact, you had no basis

17      for concluding that was the reason the numbers were so high,

18      didn't you?

19           A       I said it was an unfortunate choice of words.

02:03PM 20           Q       That wasn't my question, Mr. Leserman.

21                  When you said it, you had no reason to believe it

22      was true; is that correct?

23           A       It could have been anything that caused that --

24      that -- that increase in the concentration, and certainly it

02:03PM 25      was our hope that it would come back down to normal like we had

been expecting with the next results.  In fact, it did.

Q       Isn't that -- in 2012 isn't that exactly what
happened also?  You had high readings.  You said, let's blame
it on lab results.  And you hoped it would come down to zero,
and it did for a while until it didn't.  Isn't that basically
what the go-to position is of the water agency, blame it on lab
error and hope for the best?

A       Absolutely not.  If there is an anomalous result,
we will wait for a confirmation sample which is, as far as I
know, my understanding is standard in the industry.  And if
it's repeated, then it's investigated.  And that's what
happened in 2012.

Q       Now --

A       It was repeated, and we investigated the problem,
found out that there was a -- a different source, and we cut
off and flanged off the pipeline that caused that problem in
2012.

Q       This isn't the only time that Mr. Koelewyn has
sent you an e-mail where he said, hey, we got readings here
that are a problem or words to that effect, is it?

A       I don't know.

Q       Can you take a look at Exhibit 1384?

THE COURT:  Please do not publish this unless
it's been agreed to.

MR. BLUM:  We're not going to, Your Honor.

| | | |
|---|---|---|
| | 1 | THE COURT:  All right. |
| | 2 | Q      BY MR. BLUM:  Do you recall getting an e-mail |
| | 3 | from Mr. Koelewyn in October of 2015? |
| | 4 | A      No. |
| 02:05PM | 5 | Q      Do you recall -- do you have any reason to doubt |
| | 6 | you didn't get it? |
| | 7 | A      I don't see any e-mail on the screen here. |
| | 8 | Q      It should be in one of the books.  I'm sorry, |
| | 9 | sir.  It's 1384. |
| 02:05PM | 10 | A      I have it. |
| | 11 | Q      Do you recall getting this e-mail from |
| | 12 | Mr. Koelewyn in October of 2015? |
| | 13 | A      No. |
| | 14 | Q      Do you have any reason to believe you did not |
| 02:06PM | 15 | receive it? |
| | 16 | A      No. |
| | 17 | MR. BLUM:  Your Honor, I'd like to admit it into |
| | 18 | evidence. |
| | 19 | THE COURT:  It will be received. |
| 02:06PM | 20 | (Marked for identification and received |
| | 21 | into evidence Exhibit No. 1384.) |
| | 22 | MR. BLUM:  If you can blow up the first paragraph |
| | 23 | where it says, "Beginning." |
| | 24 | Q      All right.  Sir, in October of 2015, Mr. Koelewyn |
| 02:06PM | 25 | wrote you and Brian Folsom and Gary Haggin; correct? |

|   |   |   |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Who is Brian Folsom? |
| 3 | A | He was the manager of engineering and operations |

4  at the time.

02:07PM 5  Q    Was he your boss?

6  A    Yes.

7  Q    All right.  And who is Gary Haggin, H-a-g-g-i-n?

8  A    He was the operations superintendent.

9  Q    Okay.  And in the first paragraph Mr. Koelewyn

02:07PM 10  says, "Beginning about April of this year, there had been

11  random detections of PCE at SC-1, see below.  The effluent from

12  the Saugus plant was about .6 to .8 PPB of PCE.  And after

13  blending, the source of the PCE would not be the Saugus plant."

14        Do you see that?

02:07PM 15  A    Yes.

16  Q    Was Mr. Koelewyn right?

17  A    I would agree.

18  Q    Sorry?  I apologize.  I didn't hear you.

19  A    I would agree.

02:07PM 20  Q    So you knew that in October of 2015 there were

21  hits of PCE at the turnouts that could not have been from the

22  Saugus plant; correct?

23  A    Yes.

24  Q    And it's correct, sir, that no investigation was

02:08PM 25  done to follow up on this e-mail and to find what the source

1    was of those PCEs.

2         A      I don't recall.

3         Q      You know of no investigation; correct?

4         A      I know of none.

02:08PM    5    Q      All right.  Now, Mr. Koelewyn then went on to

6    say, "Since the September 26 had a level of 3.6 PPB, I thought

7    we should take some action before we have an MCL exceedance."

8    In parentheses, "MCL for PCE equals 5 PPB."

9              Mr. Koelewyn was concerned that these numbers

02:09PM   10    were going to rise and eventually exceed the MCLs; correct?

11        A      That's what it says.

12        Q      So what did you do when he sent this e-mail to

13    you?

14        A      I don't remember.

02:09PM   15    Q      All righty.  Now, I want to move on to

16    Mr. Lechler and the investigation.

17              You were in charge of investigating what the

18    sources were of VOCs at the wells; correct?

19        A      I oversaw the work of the consultant.

02:09PM   20    Q      All right.  And do you recall that in 2013 the

21    water agency asked for bids from different consultants to

22    investigate the source?

23        A      I do.

24              MR. BLUM:  All right.  If we could see

02:09PM   25    Exhibit 1353.

1    THE COURT:  Is this a stipulated exhibit?

2    MR. BLUM:  Yes, sir.  I'm sorry.  Yes,

3  Your Honor.  It's stipulated.

4    (Marked for identification and received

02:10PM  5    into evidence Exhibit No. 1353.)

6    Q    BY MR. BLUM:  Do you recall this letter to you

7  from Todd Engineers?

8    A    I don't recall it.

9    Q    Do you recall that you received proposals for an

02:10PM  10  investigation?

11    A    Yes.

12    Q    Do you recall one of them was from

13  Todd Engineers?

14    A    Yes.

02:10PM  15    Q    Todd Engineers had been working for the water

16  agency a long time previous to 2013; correct?

17    A    For a few years.

18    Q    Well, wasn't Todd, the guy whose name is up

19  there, wasn't he an expert in another lawsuit for the water

02:10PM  20  agency?

21    MR. GEE:  Objection.  Lacks foundation.

22    Q    BY MR. BLUM:  Or would you know?

23    THE COURT:  Sustained.  Another question, please.

24    MR. BLUM:  All right.

02:10PM  25    Q    Sir, if we can go to -- excuse me, Your Honor.

```
 1              All right.  Now, if we can go to the second

 2   paragraph that begins "Groundwater pumped from CLWA," all

 3   right.  And do you see where it says, "The potential sources of

 4   VOCs in the Saugus wells have not been conclusively

 5   identified"?

 6        A    Yes.

 7        Q    Would you agree that, as of October 14, 2013,

 8   they had not been?

 9        A    Yes.

10        Q    Okay.  If we go to page -- if we go to page 3,

11   the first paragraph, do you see where it says, "However, there

12   is evidence of -- that VOCs have been transported in

13   groundwater from upgradient sources to downgradient areas

14   including the Saugus wells.  Several upgradient VOC sources

15   have been identified including the Whittaker Bermite, Whittaker

16   site and the Saugus Industrial Center, SIC site.  Other sources

17   of TCE may also exist near the production wells probably

18   contributing to VOCs in the wells."

19              THE COURT:  Potentially.

20              MR. BLUM:  I'm sorry.

21        Q    "Potentially contributing to VOCs in the wells"

22   as of 2013.  Would you agree with that?

23        A    That's what it says there.

24        Q    Do you agree it's a correct statement?

25              THE COURT:  The Court is going to sustain its on
```

02:11PM (5)
02:11PM (10)
02:12PM (15)
02:12PM (20)
02:12PM (25)

1469

```
 1    objection as lack of foundation.
 2                    MR. BLUM:  All right.
 3         Q       And what you were trying -- is it correct that
 4    the purpose that you were asking for the proposal was to
 5    evaluate existing geologic groundwater flow and groundwater
 6    quality information and, if possible, identify the sources of
 7    VOCs detected in the Saugus wells?  Is that the purpose that
 8    you were seeking information?
 9         A       We were trying to find out what the sources of
10    the contamination were, and those characteristics you described
11    certainly are consistent with that.
12         Q       Now, this letter was dated October 2013.  When
13    did that investigation begin?
14         A       I don't recall.  Sometime after that.
15         Q       Well, wasn't -- Todd was never hired to do
16    anything that they -- the proposal -- within the proposal;
17    correct?
18         A       It went to CH2M Hill who had been performing work
19    on the site for -- and in the valley for years.
20         Q       Okay.  But they weren't hiring until 2015;
21    correct?
22                    THE COURT:  Who is the "they"?
23         Q       BY MR. BLUM:  CH2M Hill.
24         A       I don't know for sure, but I have no reason to
25    doubt that.
```

02:12PM (line 5)
02:13PM (line 10)
02:13PM (line 15)
02:14PM (line 20)
02:14PM (line 25)

1    Q     All right.  Weren't you -- didn't you have a role

2    in 2015 relating to CH2M Hill's report -- never mind.  Let me

3    rephrase it.

4           In 2015, was -- did CH2M Hill, were they retained

02:14PM   5    to identify what was going to be needed in order to evaluate

6    what the sources of the VOCs were?

7    A     I'd have to take a look at the documents to

8    confirm or deny that.

9    Q     All right.  Just a second.

02:15PM   10          All right.  Your deposition 12/4 at page 112,

11   lines 1 through 11.

12          THE COURT:  Are you just looking to confirm what

13   the date was?

14          MR. BLUM:  No.  And that that was the purpose for

02:15PM   15   the retention.

16          MR. GEE:  No objection.

17          THE COURT:  Proceed, please.

18          MR. BLUM:  All right.

19          "Question:  Did you play any role

02:15PM   20          in the creation of the 2015 report?

21          "Answer:  Yes.

22          "Question:  What was your role?

23          "Answer:  My role was to identify

24          what should be done to prepare

02:16PM   25          requests for proposals to circulate

```
              1          it and then I'd manage the effort

              2          to evaluate the proposals.

              3              "Uh-huh.

              4              "Answer:  And then we selected

02:16PM       5          CH2M Hill, and I was the project manager

              6          or the liaison with CH2M Hill when the report

              7          was performed."

              8     Q       Does that refresh your recollection?

              9              THE COURT:  About what?

02:16PM      10     Q       BY MR. BLUM:  About what your role was in

             11     relation to the CH2M Hill report?

             12     A       Yes.

             13     Q       All right.  Is that statement correct?

             14     A       Yes.

02:16PM      15     Q       All right.  And then it goes on.

             16              "Question:  And the purpose of the

             17          report was a source identification study.

             18              "Answer:  Correct.

             19              "Question:  Any other purposes for

02:16PM      20          the report?

             21              "Answer:  No.

             22              "Question:  And now the next sentence

             23          says --

             24              "Answer:  Or I should say, in

02:16PM      25          addition to that, to perhaps identify
```

1        any other work that would need to be

2        performed in order to determine perhaps

3        the extent of the contamination or what

4        would need to be done in order to more

02:17PM  5        readily identify who the source might be."

6            Is that a correct statement?

7    A     Yes.

8    Q     Now, am I right that the purpose of a 2015 report

9  by CH2M Hill was to identify potential sources in which a

02:17PM 10  follow-up report would then specify as to what the real sources

11  were?

12   A     That's what I said during the deposition.  But

13  really, I would want to see the report again to see what the

14  goals and objectives were.

02:17PM 15   Q     Mr. Leserman, wasn't the budget for the 2015

16  report limited to only existing data and material available on

17  a computer since there was supposed to be a follow-up report?

18   A     There was the possibility of a follow-up report

19  depending upon what was -- what the findings were on this

02:18PM 20  initial report.

21   Q     All right.  So it's your testimony that, whether

22  or not there was going to be a follow-up report, an additional

23  report hadn't been determined yet?

24           THE COURT:  At what point?

02:18PM 25   Q     BY MR. BLUM:  At the point -- at the time you

1    hired CH2M Hill, was it the intent they do two reports, a

2    preliminary one and a follow-up one?

3         A     The report was to do -- the purpose was to do one

4    report and see what follows.

02:18PM  5         Q     Okay.  And didn't Mr. Lechler, who was the

6    project manager and actually wrote the report, conclude in the

7    report that he did, that potentially SIC or Whittaker could be

8    the sources of the VOCs?

9         A     The findings and reports said that Whittaker was

02:19PM 10    the likely source.  SIC was a possible one but less likely.

11         Q     Didn't Mr. Lechler say, in order to make a

12    determination that either were the source, more information and

13    more investigation needed to be done?

14         A     More information may have provided additional

02:19PM 15    insight.  It seems that every technical memo always has a

16    recommendation that more work could be done to increase

17    certainty.

18         Q     All right.  Now, you participated in discussion

19    with your superiors as to whether or not an additional report

02:20PM 20    should be done; correct?

21         A     I don't remember.

22         Q     Do you remember that the reason -- that one of

23    the reasons an additional report wasn't done is because, after

24    talking to your lawyers, the conclusion was reached that it was

02:20PM 25    best to just proceed with litigation?

|   |   |
|---|---|
| 1 | MR. GEE:  Objection.  Calls for speculation. |
| 2 | THE COURT:  Overruled on that ground. |
| 3 | THE WITNESS:  We discussed this internally with |
| 4 | my superiors and our technical consultants, and we looked at |
02:20PM 5 | the history we had with Whittaker and their cooperation in |
| 6 | undertaking further studies and paying for further studies. |
| 7 | That very often was an exercise in futility. |
| 8 | An example was a containment evaluation we wanted |
| 9 | to have done for years.  There was reluctance, if not refusal, |
02:21PM 10 | to approve it and to pay for it.  So we internally thought that |
| 11 | litigation was a possibility that perhaps should be pursued. |
| 12 | Q     BY MR. BLUM:  And that's what counsel |
| 13 | recommended; correct? |
| 14 | MR. GEE:  Objection.  Calls for attorney/client |
02:21PM 15 | privilege. |
| 16 | THE COURT:  Sustained. |
| 17 | MR. BLUM:  We can go to the deposition on 12/4, |
| 18 | page 116, lines 5 through 14. |
| 19 | MR. GEE:  I'm sorry, counsel.  What page? |
02:22PM 20 | MR. BLUM:  116, lines 5 through 14. |
| 21 | MR. GEE:  No objection. |
| 22 | THE COURT:  You may proceed. |
| 23 | (The video commenced playing before the jury.) |
| 24 | Q     BY MR. BLUM:  Is that the truth? |
02:23PM 25 | A     As I just testified, discussions took place |

internally with the consultants, with my superiors.  I suppose

at that point we thought that litigation was a possibility that

should be considered.  At that point obviously we're going to

consult with attorneys before we make that decision, the real

02:23PM  need for it and the pros and cons where they were all discussed

internally.

Q       But the rationale as to why the decision was

made, the deposition portion we read, is that accurate?

A       We made the decision based on our experience and

02:24PM  the technical issues, and what I said in the deposition

certainly was true, but the lawyers did not make the decision.

Q       Okay.  Sir, what's -- do you know what

fingerprinted is when it relates to VOCs?

A       I'm familiar with the concept.

02:24PM  Q       What's the concept?

A       The concept is that certain isotopes might be

unique to one sample of chemicals as compared to others.

Q       Okay.  And at one point in time is it true that

the water agency considered doing fingerprinting to determine

02:25PM  whether or not the VOCs were from the Whittaker site versus

another site?  Correct?

A       The idea was brought to our attention.  We

considered it.  We mentioned it to our consultants who are

experts in it.  They determined that it would be likely

02:25PM  inconclusive and it would be a dead end.

1    Q       Isn't one of the other things that they told you

2    is one reason you shouldn't do it is because it could exonerate

3    Whittaker?

4    A       There was one consultant who mentioned that.

02:25PM    5    Q       It was Lynn Takaichi; correct?

6    A       It was.

7    Q       Mr. Takaichi had been employed by the district

8    for numerous years prior to determining or prior to stating

9    that it shouldn't be done because it might exonerate Whittaker.

02:26PM    10   A       He had.  But he also said it would be likely

11   inconclusive, as did the other consultants, the other experts.

12   And furthermore, Whittaker had the opportunity to suggest it.

13   That never happened.  And they could have implemented it.  That

14   never happened, to my knowledge.

02:26PM    15   Q       Was the primary reason it wasn't done was because

16   you knew the results could be to exonerate Whittaker?

17   A       Absolutely not.  It was because it was a

18   dead-end.

19   Q       Didn't you also discuss this issue with your

02:26PM    20   counsel?  Yes or no.

21            MR. GEE:  Objection.  Attorney/client.

22            THE COURT:  I'm going to sustain the objection.

23   It's also going to be on 403 grounds.

24            MR. BLUM:  All right.  That's all, Your Honor.

02:26PM    25            THE COURT:  All right.  Mr. Gee, approximately

```
 1   how long do you have?
 2               MR. GEE:  Approximately half an hour.
 3               THE COURT:  All right.  Since it's almost 2:30,
 4   we will go ahead and pick this up tomorrow then.
 5               Ladies and gentlemen, it is now 2:30.  We will
 6   break as we have been doing at 2:30.
 7               Please remember, don't speak to anyone about the
 8   case, the people, or the subject matter involved.  Continue to
 9   keep an open mind.  And we will see you tomorrow at 8:30.
10               (The following proceedings were held in
11               open court outside the presence of the jury:)
12               THE COURT:  Mr. Leserman, you are ordered back
13   here tomorrow at 8:30, sir.
14               All right.  We are going to take about a
15   13-minute break, and then we will return.  I do want to start
16   addressing jury instructions and also, to the extent there are
17   other issues to discuss before tomorrow morning, I want to hear
18   about them rather than being presented with them tomorrow at
19   8:00 o'clock if at all possible to avoid.  So everyone is
20   ordered back here at 2:40.
21               (A recess was taken at 2:28 p.m.)
22               (The following proceedings were held in
23               open court outside the presence of the jury:)
24               THE COURT:  Back on the record in the trial
25   matter outside the presence of the jury.
```

1            I do want to discuss with counsel some of the

2    jury instruction issues.  I don't intend to get through all of

3    the disputed jury instructions that have been presented to the

4    Court.  I understand we did receive some briefing from

02:47PM   5    Whittaker with regard to the issues that were discussed last

6    week concerning some of the instructions including restoration

7    damages as well as other issues concerning negligence, per se.

8    We have not yet received anything from the plaintiff.  So I

9    will give you an opportunity to file that before we take it up.

02:47PM   10            Let me start with successor liability.  I did

11    hear Mr. Blum indicate that he intends largely to respond to

12    this, if I remember correctly, with the judgment for motion or

13    judgment as a matter of law.  And I did receive -- I have not

14    yet reviewed -- the briefing on that.

02:48PM   15            Beyond that, let me hear whether you have

16    anything further that you wish to add, Mr. Blum.

17            MR. BLUM:  Your Honor, we conclude for the

18    purposes of the JMOL it is irrelevant.

19            THE COURT:  All right.  But if the Court either

02:48PM   20    denies or defers ruling on your motion, then you're not

21    objecting to the Court providing the instruction?

22            MR. BLUM:  We do object to the Court instructing

23    the jury that we are the successor.  We believe that at a

24    minimum --

02:48PM   25            THE COURT:  I'm going to need you to go to the

1    lectern, please.

2             MR. BLUM:  Your Honor, we believe that at a

3    minimum it's an open question and that there's no basis for the

4    Court -- well, let me back up.

02:49PM   5             If the Court determines from a factual basis that

6    we are the successor, then I have not reviewed the instruction

7    recently, but then the Court should instruct the jury on what

8    the Court has decided.

9             THE COURT:  But the issue I think for the jury on

02:49PM   10   this is whether you, in effect, or your client admitted that it

11   was the successor.  And you may recall we had a discussion

12   where I told you I was not persuaded by your procedural

13   argument that simply by admitting on information and belief

14   that it wasn't an admission.  And I think you either conceded

02:49PM   15   that or submitted to it.  That's my interpretation.

16             MR. BLUM:  We believe the issue had been argued

17   out.

18             THE COURT:  Fair enough.  And so without further

19   argument, the Court is not persuaded by your procedural

02:49PM   20   argument about information and belief.

21             In light of that, what is left to your argument?

22             MR. BLUM:  Well, the Court -- I understand the

23   rule is, if you believe we admitted in the Answer, we are bound

24   by it.  That is the rule.  Then you need to instruct the jury.

02:50PM   25             The only thing I haven't done -- I would ask the

1   opportunity to -- is to take a look again at the actual

2   instruction to see if we have a problem with the exact wording.

3           THE COURT:  That is fine.  I will allow you to do

4   it.  It essentially just states -- actually, I can probably

02:50PM  5   turn to it in just a second.

6           MR. BLUM:  I'm grabbing it, Your Honor.

7           THE COURT:  Yes.  I have it.  It simply says that

8   Whittaker Corporation is the successor in interest to the

9   Bermite Powder Company and Whittaker Bermite Corporation as

02:50PM  10  Whittaker Corp. assumed control of the Whittaker Bermite site

11  after a merger or acquisition of its predecessor companies.

12  And here's the key part.  Therefore, you should consider the

13  conduct of Bermite Powder Company, Whittaker Bermite

14  Corporation, and Whittaker Corporation as if they were one and

02:51PM  15  the same company.

16          MR. BLUM:  That I disagree with because that's

17  not the way it works.

18          THE COURT:  All right.  Why don't you tell me how

19  you'd like me to modify it.

02:51PM  20         MR. BLUM:  Your Honor, first of all, the use of

21  the word predecessor in interest is not correct verbiage.

22          THE COURT:  It says, "Successor in interest and

23  after a merger or acquisition of its predecessor companies."

24          MR. BLUM:  I apologize.  A successor in interest

02:51PM  25  only relates to the land.  But that's a little technical, I

 1    understand.  But maybe it's one of my faux pas.

 2            THE COURT:  So I did give the parties an

 3    opportunity -- I'm not going to hold you to it -- I gave you an

 4    opportunity, if you had objected to an instruction and had a

02:51PM  5    competing one in the event that you lost, you can give it to

 6    me.  I don't think Whittaker did that.  I'm going to give you

 7    that opportunity right now if you want to tell me how I should

 8    modify it to conform to your admission.

 9            MR. BLUM:  Your Honor, I'm just trying to find

02:52PM 10    the instruction.  Page 40.  Okay.

11            I think all the instruction needs to say is that

12    Whittaker is the successor to Bermite Water Corporation and is,

13    therefore, liable for any wrongs that Bermite committed.  They

14    still gotta prove that Bermite did something wrong.

02:52PM 15            THE COURT:  You don't mean Bermite Water.  You're

16    saying Bermite Powder?

17            MR. BLUM:  Yes.  Yes, Your Honor.

18            THE COURT:  All right.  Any objection to that

19    modification?

02:53PM 20            MR. RICHARD:  As I understand it -- I mean, I --

21    probably not, Your Honor.  I also haven't seen the competing

22    instruction.

23            THE COURT:  All right.  I'm a little reluctant to

24    do this because I haven't always been successful, but I'm going

02:53PM 25    to do it and see if you will simply meet and confer and give me

1    the agreed-upon language.

2              MR. BLUM:  Yes, sir.

3              THE COURT:  Not competing language.  But the

4    agreed-upon language that conveys what the admission was.

02:53PM    5              MR. BLUM:  Your Honor, if we can't decide, we

6    will arm wrestle for it.

7              THE COURT:  All right.  Let's move on, please, to

8    the next disputed instruction.  One moment.

9              So the next one I'm going to pass is the

02:53PM   10    negligence, per se.

11              Then there's one about the SIC and the settlement

12    deduction.  Let me first start with you, Mr. Richard, on this

13    one.  I'm going to treat this one -- and this one, I think, is

14    plaintiff's proposed Instruction No. 43 and defendant's

02:54PM   15    proposed Instruction No. 44.  I'm going to treat this one

16    together with the apportionment of responsibility instruction

17    that is in dispute, and that is proposed Instruction No. 50.

18              So I'm going to start with you, and I'm going to

19    start with proposed Instruction No. 50 on apportionment of

02:54PM   20    responsibility.  This appears to the Court to be a standard

21    CACI instruction.  Even though there's a contribution bar, I'm

22    not understanding why there's an objection by the plaintiff to

23    an apportionment, putting aside the issue of apportionment for

24    some undefined category of other sources.

02:55PM   25              So, first of all, are you taking issue,

1    Mr. Richard, with an apportionment instruction, CACI 406, that

2    would at least include SIC?

3            MR. RICHARD:  No, Your Honor.  I believe our

4    concern was with the reference to non-party.  I'm just trying

02:55PM  5    to reorient myself to what I was thinking a couple months ago.

6    It seemed overbroad as drafted.

7            THE COURT:  All right.  Because I then will turn

8    to you, Mr. Blum, because it appears to me that, without

9    dispute, there ought to be CACI 406.  An instruction ought to

02:56PM  10    be given allowing the jury to apportion.  I have certainly

11    heard about SIC as potentially responsible for the VOCs.

12            It seems to the Court, Mr. Blum, that you want to

13    have this undefined category of other sources.  And so perhaps

14    you can explain to me what it is that you have in mind and why

02:56PM  15    it is that the Court lawfully can give it.

16            MR. BLUM:  Well, Your Honor, one of the big

17    differences between apportionment under the torts that we are

18    dealing with and that under Superfund is that under Superfund

19    you have to actually have the party in the case or settled out

02:56PM  20    to have an apportionment under 113.

21            Under the torts in California, California law

22    doesn't require that the party be named or --

23            THE COURT:  Let me just go ahead and advance this

24    a step.

02:57PM  25            MR. BLUM:  Sure.

1          THE COURT:  You're presenting to the Court basic

2    apportionment principles.

3          MR. BLUM:  Uh-huh.

4          THE COURT:  And I am familiar with basic

02:57PM  5    apportionment principles.  So clearly SIC is no longer a party,

6    and they could be included.  And we could have ABC company, if

7    there's evidence that ABC company is responsible, and even

8    though they're not a party, never were a party, they could be

9    subject to the apportionment principle.  That much I

02:57PM  10   understand, and I don't think there is a dispute about that.

11          I think the question and the dispute is over this

12   undefined nondescript category of other sources.

13          So, first of all, tell me, are you asking for the

14   jury to apportion other sources, some nondescript category for

02:57PM  15   apportionment purposes?

16          MR. BLUM:  I'm not sure I would use those exact

17   words, but yes.

18          THE COURT:  All right.  So tell me what the

19   authority is that you would cite to the Court and then also

02:58PM  20   what evidence is.

21          MR. BLUM:  Well, Your Honor, the authority that

22   we cited is the *DaFonte* case.  All we have to show is that

23   there's other tortfeasors.  We don't have to name them.  They

24   don't have to be part of the case.

02:58PM  25          THE COURT:  Well, *DaFonte* doesn't address this

1   specific issue, does it?  Again, I broke these out from the

2   basics where you're trying to educate the Court

3   appropriately -- I love to be educated -- on basic

4   apportionment principles.  You have educated me.  I understand

02:58PM   5   basic apportionment principles.  That's what *DaFonte* addresses.

6   It doesn't address the question about having a category of

7   potential nondescribed or undescribed tortfeasors, does it?

8              MR. BLUM:  *DaFonte* not directly, Your Honor, but

9   it does talk about the fact that there is a right to

02:59PM   10   apportionment for all tortfeasors, and there is no requirement

11   that they be specifically named.  The best example I can give

12   the Court and the simplest one is, for instance, in asbestos

13   cases.  The defendant has the ability to say unknown suppliers

14   of asbestos to this facility apportioned to them.  That's

02:59PM   15   always done.

16              THE COURT:  So even if -- when you say it's

17   always done, let's be more precise, Mr. -- are you an -- have

18   you tried asbestos cases where you're telling the Court that

19   you have had an issue go to the jury where you don't even

02:59PM   20   define who these other potential asbestos suppliers were, you

21   have no evidence as to who they were, but you simply give it to

22   the jury as to a -- a nondescript categorization?

23              MR. BLUM:  Your Honor, I have done the jury

24   instructions.  The two cases of asbestos I had I settled before

03:00PM   25   it went to the jury.  But we had done the instructions.

1       This is what the difference is.  You can't just

2   say where there's no evidence.  If there's -- for instance, if

3   there was evidence that there was an exposure because the

4   supplier is at a facility and we don't know who the suppliers

03:00PM   5   were, that's specific enough.  I think we have specific

6   evidence of different sources.  And a lot of the evidence is

7   going to be laid tomorrow and the day after.

8       THE COURT:  All right.  So I think, first of all,

9   this is helpful because now we are on the same page.  You would

03:00PM   10   agree that perhaps you don't have to know that the company's

11   name is ABC company, but you do have to specify that there was

12   a particular source and there's evidence of that particular

13   source.

14       MR. BLUM:  Yes.  Yes.

03:00PM   15       THE COURT:  You can't just have a broad category

16   of others.

17       MR. BLUM:  Right.  And we're not asking the Court

18   to do that.

19       THE COURT:  So tell me what are the other

03:00PM   20   specific sources?  Because that's not what you provided to the

21   Court in the proposed jury instruction.

22       MR. BLUM:  Well, Your Honor, part of it was

23   because we weren't 100 percent sure what the evidence was going

24   to show, and we wanted to give ourselves honestly some

03:01PM   25   flexibility how the evidence was going to go in.  And we

1   weren't sure some of the evidentiary rulings you were going to

2   make based on the objections plaintiffs were raising.

3               THE COURT:  So tell me who are the other sources

4   that you would like to have apportionment for.

03:01PM  5               MR. BLUM:  We believe there is a known -- there

6   is a source of VOCs that we find near the mall wells and DW

7   wells and that that contamination has been drawn to V-201, and

8   we do not know who is the source.

9               We also believe there is a source for PCE in I

03:01PM  10  believe it's Saugus 1 that is unknown, but Mr. Hokkanen will

11  identify that it is not from SIC and it's not from us.

12              THE COURT:  What I'm going to have you do is

13  you're going to have to provide to the Court a revised

14  instruction that specifies --

03:02PM  15              MR. BLUM:  Yes, sir.

16              THE COURT:  With regard to the mall wells or some

17  other source, you're going to have to provide the Court with

18  something more specific as to who the source is.  Just to say

19  we don't know the source is not going to be sufficient in the

03:02PM  20  Court's judgment.

21              MR. BLUM:  Well, Your Honor, for the mall walls,

22  there's testimony from Mr. Trudell we're not the source.  The

23  evidence we're not that source comes from both sides.

24              THE COURT:  Who is the source?  It's your

03:02PM  25  affirmative defense.

```
 1              MR. BLUM:  Your Honor, we don't know because

 2  as -- as we just heard today, to some extent, VOCs are

 3  ubiquitous.  They are used everywhere.  It would be impossible

 4  for us to identify the source.  But we know there is a specific

 5  disposal at a specific location.  We're not saying -- we're not

 6  being -- we're not saying somewhere within a 40-mile radius.

 7  We're going to be able to talk about, for instance, for AL-6,

 8  there is a specific spot of contamination for AL-6 that is not

 9  from either us or SIC.  So it's not going to be like the jury

10  is going to have to guess on where we are or what we are doing.

11  We will be specific.

12              THE COURT:  What will be the specific evidence,

13  by way of offer of proof, as to the allocation as between or as

14  among the defendants including Whittaker in this case?

15              MR. BLUM:  A lot will be supplied by Mr. Hokkanen

16  tomorrow.

17              THE COURT:  What is the offer of proof on the

18  allocation?

19              MR. BLUM:  I don't want -- Your Honor, I'm not

20  100 percent sure, and I do not want to make a misrepresentation

21  to the Court.

22              THE COURT:  Did this -- did your expert testify

23  in deposition or expert reports as to an allocation?

24              MR. BLUM:  No.

25              THE COURT:  So how do you intend to introduce it?
```

03:02PM — line 5
03:03PM — line 10
03:03PM — line 15
03:03PM — line 20
03:04PM — line 25

1    MR. BLUM:  Because he did testify these are

2    sources and they have -- and that, for instance, for the AL-6,

3    it's -- all of the PCE there in that well -- and I believe it's

4    Saugus 1 -- is from somebody else.  So that's easy.

03:04PM   5    THE COURT:  Well, it may be easy theoretically

6    for him to say that.  But what expert report or deposition did

7    you proffer -- is it Dr. Hokkanen?

8    MR. BLUM:  No.  It's Mr.

9    THE COURT:  -- Mr. Hokkanen to provide an

03:04PM   10   allocation?

11   MR. BLUM:  Your Honor, I don't think we have

12   anybody that has a specific percentage, but I don't believe

13   that somebody has to give a percentage.

14   THE COURT:  So when you tell the jury this is the

03:04PM   15   percentage that the evidence shows you can fill in, here's

16   Whittaker, here's SIC, here's the mall well contributor, here's

17   the AL-6 contributor, tell me what's the evidence that you're

18   going to present to the jury that will enable them to do that

19   other than through guesswork?

03:05PM   20   MR. BLUM:  There will be evidence about different

21   concentrations.  There will be evidence about whose VOCs it is,

22   when it got there, what part we contributed versus what other

23   people contributed.  And from that evidence, the jury is able

24   to draw their own conclusions.

03:05PM   25   In fact, as I planned it out because, you know,

1       closing is this week, I was going to basically leave it up to

2       the jury.  I was not going to give a number, partly because my

3       experts didn't, and I didn't want to run afoul of anything that

4       the Court was going to do.

03:05PM   5       But I think there's sufficient -- there's

6       sufficient evidence for the jury to.  First, the jury could

7       believe that, yeah, Whittaker is a source but it's just a tiny

8       bit and the problems are from the stuff that's being drawn in

9       from the mall wells.

03:06PM  10       THE COURT:  So the descriptor that you intend to

11      use will be something along the lines, as the Court just

12      articulated, the mall wells contributor?

13      MR. BLUM:  It's the mall wells, actually,

14      Your Honor.  M-a-l-l.  Not mull.

03:06PM  15      THE COURT:  M-a-l-l.

16      MR. BLUM:  Yes.  And the DW wells.

17      THE COURT:  That's what I intended to say.  I

18      don't know if you just misunderstood me or I misspoke.

19      MR. BLUM:  It's been a long day, Your Honor.  I'm

03:06PM  20      sorry.

21      THE COURT:  In any event, it's not important.

22      But putting aside the way the Court has

23      pronounced the name, is it your intention -- I will use AL-6 --

24      to say that the -- the line item for the apportionment will be

03:06PM  25      the LA-6 -- AL-6 contributor?

1          MR. BLUM:  Yes.

2          THE COURT:  And do you have any contributors

3    other than the mall well and the AL-6 contributors?

4          MR. BLUM:  DCE contributors to Saugus 2 and 1.

03:07PM   5          THE COURT:  And you're just going to leave it up

6    to the jury to make the percentage allocations among all of the

7    potential contributors?

8          MR. BLUM:  After we go over the evidence that

9    supports it, yes.

03:07PM  10          THE COURT:  All right.  I will hear further from

11   you, Mr. Richard.

12          MR. RICHARD:  My concern, Your Honor, was that

13   the Court ruled on motions in limine some time ago including

14   opinion No. 9 from Mr. Hokkanen on this whole other sources

03:07PM  15   thing.  So the idea that we're now going to be talking about

16   contamination of alluvium wells -- when you hear AL, we're

17   talking about shallow aquifer wells -- we're really backing

18   into all this speculation of other sources.

19          So I think Your Honor had suggested or admonished

03:07PM  20   that I raise issues.  This is an issue.  It sounds like

21   Mr. Hokkanen is going to go well beyond both his report and his

22   deposition as well as his opinion No. 9 which has been

23   stricken.  I can represent that to the Court now.  When I go

24   back and do my homework tonight, I have a fear I will be

03:08PM  25   popping up every other question that they're asking him.

1          THE COURT:  Well, there has been some evidence,

2    has there not, about potential contributors that are not either

3    Whittaker or SIC with respect to these other wells, or at least

4    there will be?

03:08PM  5          MR. RICHARD:  Well, those are two very different

6    things.  I listened today.  There's been reference to SIC, but

7    there's no connect the dots to any scientific methodology.  It

8    wasn't in Mr. Hokkanen's report at the time we filed the motion

9    in limine.  It can't mysteriously appear now.  It wasn't there.

03:08PM  10   They're limited to that report.

11         So we have heard the words, but for all the

12   reasons it was inadmissible two months ago, it's still junk

13   science or speculation.

14         THE COURT:  And you're referring to the Court's

03:09PM  15   ruling on Mr. Hokkanen's opinion No. 9 that, based on the

16   available data, other previously identified sources could be

17   contributing VOCs in the water agency's distribution system?

18         MR. RICHARD:  I believe that was opinion No. 9.

19   I could be wrong.  I don't have it in front of me, Your Honor.

03:09PM  20         THE COURT:  Well, I'm looking at at least the

21   Court's notes on its rulings.  And I believe I denied without

22   prejudice because you were challenging Mr. Hokkanen's

23   conclusions rather than his methodology.

24         MR. RICHARD:  Might be opinion No. 8, Your Honor.

03:09PM  25   As I said, I don't have it in front of me.  We can laugh but I

1493

```
 1    don't --

 2                 THE COURT:  Whoever just laughed, if I hear

 3    that -- Mr. Blum, was that you, sir?

 4                 MR. BLUM:  It was.  I apologize, Your Honor.

 5                 THE COURT:  Next time it happens, expect that I

 6    will sanction you on the spot.

 7                 And this is No. 8?

 8                 MR. RICHARD:  Yes.  If I can confer with my

 9    colleague, Mr. Gee.

10                 THE COURT:  Yes.

11                 MR. GEE:  It was included in Motion in

12    Limine No. 1.  I don't have the opinion in front of me.

13                 THE COURT:  All right.  So it is opinion No. 8

14    that there are other potential sources that could be

15    contributing VOCs.  And I believe that I granted that because

16    it was based largely on Mr. Shoup's report.  So if that is the

17    basis, that was the Court's ruling, and Mr. Blum is going to

18    have to come up with something else.

19                 So you would agree, though, that, if he is able

20    to establish that there is some other source that was not SIC

21    or Whittaker, that it is at least legally proper to provide the

22    jury with the ability to apportion without providing the name

23    specifically of the company?

24                 MR. RICHARD:  Yeah.  The instruction, Your Honor,

25    says name or description.  So Your Honor is getting at you need
```

03:09PM (line 5)
03:10PM (line 10)
03:10PM (line 15)
03:10PM (line 20)
03:11PM (line 25)

1   to sufficiently describe, you know, what that other source is.

2   But the -- so far this is an instruction that the evidence does

3   not support.

4          So I don't know how Mr. Hokkanen, since he relied

5   on Mr. Shoup, the historian, can now go beyond his report and

6   deposition to say, well, I meant to rely on someone else who is

7   more reliable.  We will wait to see, but I think --

8          THE COURT:  We're not going to wait to see.  I'm

9   going to hear something very specific from Mr. Blum right now

10  or he's not going to be permitted.

11         MR. BLUM:  Your Honor, Mr. Hokkanen in his report

12  discussed the -- and in his deposition -- discussed the mall

13  wells and the DW wells that they were being drawn into V-201.

14  He also discussed the fact there is a source of PCE for -- that

15  we talked about for the -- for the Saugus wells that has not

16  been identified.  These are all things he discussed.

17         What you ruled upon was his general statements

18  that VOCs could be the result of unknown -- generally unknown

19  dry cleaners and all of those things, and you ruled that he

20  couldn't -- that that was impermissible.

21         He's going to be very specific, and he's going to

22  relate to things that were disclosed and were part of his --

23  and there was an opportunity to depose him on.

24         THE COURT:  And tell me very specifically.

25         MR. BLUM:  Mall wells.  He may not have used the

1  words AL-6, but it's basically those wells.  The PCE found -- I

2  believe it's in Saugus 2.  And I believe, although I'm not

3  positive, the DCE issue that we talked about.  Those are all

4  things that were brought up.

03:13PM  5       THE COURT:  And he's going to say what with

6  respect to those wells?

7       MR. BLUM:  All of those, the -- the mall wells

8  were not us, and they were -- they had an effect of

9  contaminating V-201.  He's going to say that the source of PCE

03:13PM  10  that was drawn into -- I believe it's Saugus 2 -- was not us

11  and it was not SIC but it was some unknown source.  And he's

12  going to say that the fact that you have DCE and it's not from

13  either site means there is another source of VOCs there because

14  there's got to be some way it got there.  That's just common

03:13PM  15  sense.

16       THE COURT:  Is Mr. Hokkanen going to acknowledge

17  that Whittaker is responsible for any VOC contamination of any

18  supply well or production well?

19       MR. BLUM:  Not of the four we're dealing with,

03:14PM  20  Your Honor.  He will say that it's not us based on the

21  groundwater data.

22       THE COURT:  So how does that then lead to it was

23  fill in the blank?

24       MR. BLUM:  Well, Your Honor, the jury doesn't

03:14PM  25  have to believe -- it's not -- Mr. Hokkanen is going to rely on

1496

                the groundwater data.  So it's -- it's not speculation.  It's

                the data itself that he will rely upon.  The jury doesn't have

                to believe either side.  In a sense, either side is arguing an

                all or nothing position.  The jury is able to believe that, you

    03:14PM     know, Whittaker was a source but an infinitesimal source or

                Whittaker is a source of the TCE but not the PCE.

                        They're able to reach any conclusion they want

                based on the evidence.  They don't have to believe Mr. Hokkanen

                100 percent, and they can also not believe Mr. Trudell --

    03:15PM     Dr. Trudell or Ms. Stanin 100 percent.

                        So the fact that we each take an absolutist

                position doesn't mean the jury has to.

                        THE COURT:  Certainly not, nor can they throw

                darts up against a wall and try to determine what percentage

    03:15PM     allocation to give to an undescribed or unidentified

                contributor, can they?

                        MR. BLUM:  Well, it depends what you mean by

                "unidentified."  We do not know who supplied the contamination

                for the mall wells or the DW wells, but it's not unidentified.

    03:15PM     It's identified with a lot of particularity.  We know exactly

                where they are.  We know what is in it.  And there is evidence

                as to what the impact was.  That's more than you have for a lot

                of actual defendants.

                        THE COURT:  So who did it?  Who contributed it?

    03:15PM     MR. BLUM:  Again, it's an unidentified party that

1      we are describing with precision.

2                      THE COURT:  And "with precision" means what?

3                      MR. BLUM:  Where it is, how much of it is there,

4      and what the impact is.

03:16PM    5                      THE COURT:  And is that because Mr. Hokkanen is

6      saying it couldn't have been Whittaker and it couldn't have

7      been SIC?

8                      MR. BLUM:  Well, Dr. Trudell also says it

9      couldn't be Whittaker, so it's not just Mr. Hokkanen.  So we

03:16PM   10      have two experts saying it wasn't Whittaker, it was another

11      source.

12                      So if the issue is not whether there is evidence

13      that it's not Whittaker because there is already and there will

14      be more after tomorrow.  The issue is whether or not -- since

03:16PM   15      knowing it's not Whittaker, whether or not the jury can

16      consider it.

17                      THE COURT:  All right.  Here's what I'm going to

18      require.  Mr. Richard, if you want to say something further, I

19      may invite further argument on this after I hear the evidence.

03:16PM   20                      MR. RICHARD:  I was just going to -- as a

21      practical matter, we may be experiencing opinion creep, and it

22      would be helpful for us if we have the actual page that

23      Mr. Blum believes these opinions were expressed, not the

24      penumbra, but -- so that I can go look at page 2 or 3.

03:17PM   25                      THE COURT:  I'm going to order that you meet and

1    confer when we're done, and I'm going to direct Mr. Blum to

2    provide you with the specifics that you are requesting.

3           And I would suggest, Mr. Blum, that you be quite

4    generous in speaking with him and providing him with the

5    information that he is requesting.

6           MR. BLUM:  Not a problem, Your Honor.

7           THE COURT:  And then, Mr. Blum, you can provide

8    the Court with the specifics in the instruction that you are

9    requesting.  And you can also provide the Court with citations

10   to the evidence and offers of proof as to what the evidence is

11   going to be that will support this instruction.  And what I

12   will do is I will give you -- when is Mr. Hokkanen expected to

13   testify?

14          MR. BLUM:  Right after Mr. Leserman.  Tomorrow,

15   Your Honor.

16          THE COURT:  All right.  And how much time do you

17   anticipate with Mr. Hokkanen?

18          MR. BLUM:  My goal is 45 minutes to an hour for

19   the direct.

20          THE COURT:  All right.  And so what I will do is

21   I will give you until -- is it unrealistic to give you till the

22   end of the day tomorrow or maybe the beginning of Wednesday?

23   I'm just trying to thread a needle here because I don't know

24   exactly when I'm going to need to be prepared to instruct.

25          MR. BLUM:  If you give me until -- tomorrow is

1    Tuesday?

2                    THE COURT:  Yes.

3                    MR. BLUM:  Sorry, Your Honor.  If you give me

4    until Wednesday morning, I can get that done.

03:18PM  5                    THE COURT:  That should be sufficient.

6                    You will have an opportunity, Mr. Richard, to

7    respond.  I don't know that you will have it in writing;

8    although, you're free to.  You get it Wednesday morning, you

9    want to provide something in writing, do so.  Otherwise, I will

03:18PM 10   give you an opportunity at least orally before I submit it to

11   the jury.

12                    All right.  This has been helpful to the Court.

13   I think it's as far as I can take this issue at this point.

14   Let me move on to a couple other instructions.

03:19PM 15                    Mr. Richard, this one is for you on the abatable

16   nuisance.  Is there anything left at this point?  It seems to

17   me that with Mr. Blum's withdrawal of the statute of

18   limitations defense, that there really isn't an issue for the

19   jury to decide about whether the nuisance is abatable and

03:19PM 20   instruct the Court that perhaps that you were confusing the

21   idea of reasonableness with something being abatable.  And the

22   jury is going to be instructed on issues concerning factors

23   with regard to reasonableness.

24                    MR. RICHARD:  Is there a number?  Let's see.

03:20PM 25                    THE COURT:  Yes.  It's plaintiff's Instruction

1        No. 39.

2                    MR. RICHARD:  My notes show we withdrew it, so we

3        might be in vigorous agreement.

4                    THE COURT:  So this is withdrawn?

03:20PM  5                    MR. RICHARD:  I'm just double-checking our

6        copies.

7                         It is withdrawn.

8                    THE COURT:  All right.  And then defendant's

9        proposed Instruction No. 29 on custom and practice.  Just so

03:20PM  10       that the issue is framed correctly, my understanding, Mr. Blum,

11       is that your objection will rise or fall depending upon the

12       Court's determination regarding negligence per se.  So if I --

13       if I exclude the negligence per se instruction, this issue goes

14       away.  The Court is not going to include the language about

03:21PM  15       custom or practice having no bearing on liability for

16       negligence per se.

17                         Conversely, if the Court allows negligence

18       per se, then you would effectively withdraw your objection to

19       this particular instruction while preserving your overall

03:21PM  20       objection about negligence per se.  This is defendant's

21       proposed Instruction No. 29.

22                    MR. BLUM:  Your Honor, just give me a second,

23       please.

24                    THE COURT:  Yes.

03:22PM  25                    MR. BLUM:  Your Honor, my concern is that -- I

1    generally agree with you on the state of the law.  They have a

2    cause of action in the special verdict form, both for regular

3    negligence and for negligence per se.  So even if negligence

4    per se is there, the custom and practice is relevant to the

03:22PM  5    plain -- to the 100 percent negligence claim.  So that's my

6    concern here.

7              THE COURT:  I may not be following.

8              So the proposed sentence in the custom and

9    practice instruction that's in dispute is as follows -- and I

03:22PM  10   quote -- "Custom or practice has no bearing on liability for

11   negligence per se."  And so my understanding is you don't want

12   that in there because you believe negligence per se should not

13   be in the instruction.

14             MR. BLUM:  Yes.

03:23PM  15             THE COURT:  And all I'm saying is this issue

16   rises or falls on the Court's determination about whether

17   negligence per se goes to the jury.

18             MR. BLUM:  Yes, sir.

19             THE COURT:  All right.  Thank you.

03:23PM  20             And actually, why don't you stay up there because

21   the next instruction is for you that I want to address and that

22   is defendant's proposed Instruction No. 30, which is following

23   U.S. direction.

24             You're not offering this for Government

03:23PM  25   contractor defense but still say that this is relevant, and I'm

1502

```
 1    not following its relevance.
 2              I will read it for you.  "A violation of a law is
 3    excused if Whittaker proves that the violation was caused by
 4    Whittaker following the instructions of the U.S. Government for
 5    whom it was manufacturing air-to-air missiles and other
 6    armaments exclusively for the United States military from
 7    approximately 1964 to 1986."
 8              So how is that relevant to anything other than
 9    the Government contractor defense, for which you're not
10    offering it?
11              MR. BLUM:  Could I consult with co-counsel for a
12    moment?
13              THE COURT:  Yes.
14              MR. BLUM:  Your Honor, I thought that was
15    withdrawn.
16              THE COURT:  I don't have it as withdrawn, but
17    that's fine.  I will indicate that Whittaker has withdrawn it.
18    So that resolves the issue.
19              I did not come back to the issue that I said I
20    would return to related to apportionment and that is the
21    consequence of the SIC settlement in this matter.  And this is
22    plaintiff's proposed Instruction No. 43 and defendant's
23    proposed Instruction No. 44.
24              I realize the parties were following up on the
25    Court's suggestion that, if there was an issue concerning how
```

03:23PM (line 5)
03:24PM (line 10)
03:24PM (line 15)
03:24PM (line 20)
03:25PM (line 25)

1    the jury might construe or evaluate evidence of the SIC

2    settlement, that perhaps that could be addressed by way of an

3    instruction that essentially told them, as I had contemplated

4    it, that the jury need not consider the fact of settlement

03:25PM    5    itself but, rather, the jury may consider SIC's potential

6    liability solely for purposes of the apportionment analysis or

7    words to that effect.

8             That, of course, was before I heard the evidence,

9    and the evidence is not yet all in.  But the parties are

03:26PM    10   fighting over now burden of proof and the like and making this

11   more complicated than the Court had anticipated.

12            So my first threshold question is:  Is it

13   necessary to have an instruction, given the evidence thus far,

14   for the plaintiff?

03:26PM    15            MR. RICHARD:  No, Your Honor.  Obviously,

16   instructions not supported by the evidence should not be given.

17   And so far, this falls into that category.

18            THE COURT:  Mr. Blum?

19            MR. BLUM:  Your Honor, I don't believe it's

03:26PM    20   necessary but for a different reason.  There is no evidence we

21   have on SIC settlement.

22            THE COURT:  That was my general sense, is either

23   we have not had the evidence or it's been so incidental that

24   this instruction would probably just call attention to an issue

03:27PM    25   that the jury would otherwise not take into account.

1       But whatever the reason, the parties are both

2   agreeing to withdraw their respective instructions, as I

3   understand it.  Plaintiff's proposed Instruction 43 is

4   withdrawn; correct, Mr. Richard?

03:27PM   5       MR. RICHARD:  Well, the evidence isn't closed.  I

6   don't know what they're going to ask their witnesses,

7   Your Honor.  But if the evidence doesn't change on the issue,

8   then it's withdrawn.  If we're surprised, then we will revisit.

9       THE COURT:  Understood.

03:27PM   10       Same for you, Mr. Blum?

11       MR. BLUM:  We don't intend to introduce it.  But

12   if it comes in by accident -- that's the only way, and I don't

13   think it will -- but no, we don't think it's necessary.

14       THE COURT:  So this is going to be the state of

03:27PM   15   the record.  Both parties are withdrawing their respective

16   instruction on this, so plaintiff's proposed Instruction 43 and

17   defendant's proposed Instruction 44.  That is, of course,

18   without prejudice to the party who believes that the issue has

19   appeared subsequent to the Court's settling of this instruction

03:28PM   20   requires revisiting.

21       Absent this being raised, Mr. Richard, either by

22   you or by you, Mr. Blum, that will be the state of the record,

23   that these instructions have been withdrawn and are not going

24   to be given.

03:28PM   25       Let me see if there's anything else that we can

1    profitably address.

2              I believe all that remains, then, is successor

3    liability.  And all that needs to be done is providing the

4    Court with the agreed-upon language.

03:28PM    5              The Court still has to decide the negligence

6    per se issue, and I will await receipt of plaintiff's papers.

7    The abatable nuisance issue has been withdrawn.  The Court

8    still needs to decide the apportionment issue; although, we

9    have now, in my view, narrowed this down.  Everyone appears to

03:29PM   10    agree on the legal principle.  The only question is whether

11    there is going to be sufficient evidence to allow for

12    additional potential tortfeasors.  The custom and practice

13    add-on will go the way of the negligence per se ruling.  The

14    defense Instruction No. 30 on following U.S. direction has been

03:29PM   15    withdrawn.  And the competing instructions about the SIC

16    settlement instructions, No. 43 for the plaintiff -- or

17    Instruction No. 43 for the plaintiff and No. 44 for the defense

18    have been withdrawn.

19              Has the Court omitted any disputed instructions,

03:30PM   20    Mr. Richard?

21              MR. RICHARD:  There is at least one, maybe more

22    of defendant's proposed instructions that I cannot tell the

23    Court have been withdrawn.  They have a long instruction,

24    proposed Instruction No. 60 on appropriative rights and

03:30PM   25    groundwater and a host of things that are not appropriate for

1506

1    the jury.  So that one is outstanding.

2              I'd have to check my notes.  I know we are

3    briefing a couple others.  I believe we are submitting a brief

4    on negligence per se as well as restoration damages.

03:30PM   5              THE COURT:  Well, let's do this, since it's

6    getting late and you will probably want to review your --

7    review the record on this.

8              The parties should meet and confer and just

9    provide me with a list that you should send to the Court's

03:30PM  10    chambers e-mail by the end of today.  It can even be this

11    evening so that I have it first thing tomorrow morning.  And

12    it's just a list of outstanding jury instructions so that the

13    Court doesn't miss anything.  This should be based upon what

14    already has been presented in the record is what I have in

03:31PM  15    mind.

16              The parties do not intend to introduce further

17    instructions, at least based upon what you know thus far in

18    terms of the state of the record.

19              Is that true for you, Mr. Richard?

03:31PM  20              MR. RICHARD:  No new instructions.  I'm reviewing

21    the wording of a couple that have been submitted based on the

22    evidence.

23              THE COURT:  All right.  Well, you will put that

24    on the list.

03:31PM  25              Mr. Blum, is that also true for you?

1    MR. BLUM:  No, it's not, Your Honor.  We have --

2  after the testimony today, we intend to submit a jury

3  instruction on the statute of limitations for negligence and

4  ask the Court to amend the answer to proof.

03:32PM  5    THE COURT:  This is the statute of limitations.

6  Have you previously withdrawn this particular --

7    MR. BLUM:  We had withdrawn it, and -- but we

8  believe that the -- but we believe we can conform to proof.  We

9  had anticipated that this would happen, and we notified

03:32PM  10  plaintiff three months -- two months ago that, if the evidence

11  supported it, we would move to conform.  And now we believe the

12  evidence supports it.

13    THE COURT:  And what is the evidence that you're

14  referring to?

03:32PM  15    MR. BLUM:  That the plaintiffs knew about the

16  risks of perchlorate more than three years prior to the date

17  the first Complaint was filed.

18    THE COURT:  All right.  You can propose the

19  instruction.  And you are to -- have you drafted the

03:32PM  20  instruction and sent it over to Mr. Richard?

21    MR. BLUM:  Your Honor, the instruction is the

22  standard CACI.  What I wanted to do is go back today and check

23  my notes to make sure we dotted the i's and crossed the t's

24  because I don't want to submit it if we're wrong.

03:33PM  25    THE COURT:  Mr. Richard?

1     MR. RICHARD:  Yes.  When he raised this issue

2     three months ago, I pointed out the law that motions to conform

3     to proof -- I think Rule 15 -- he can't meet the requirements.

4     So we would oppose, if that's what they are making now, an oral

03:33PM   5     motion to conform to something they heard today, we oppose

6     that.  And I'm happy to brief that.

7     MR. BLUM:  Your Honor, I'm not making the motion

8     now, but you asked me what our intent was.

9     THE COURT:  All right.  That's fine.  And I

03:33PM   10    appreciate that.  But you're going to have to disclose to

11    Mr. Richard -- you will stay -- after this, you are to meet and

12    confer and tell him whether you're going to -- whether you

13    intend to propose that so that he can provide the Court with

14    briefing on it.

03:33PM   15    MR. BLUM:  Yes, sir.

16    THE COURT:  And to the extent that you intend to

17    propose it, I'm going to want to understand why you withdrew it

18    and why I should allow it.

19    And this is the question that I have, is -- I

03:33PM   20    didn't hear anything today that was likely very surprising that

21    you couldn't have anticipated the possibility of.  And so if

22    you're saying that that question can be addressed, then please

23    be prepared to address it to the Court.

24    MR. BLUM:  Yes, sir.

03:34PM   25    THE COURT:  I don't like the idea, candidly, of

```
 1   we withdraw something, we're putting it back in the case, we're

 2   now putting it back, we're withdrawing it.  And I'm going to

 3   understand why it is that you did that.  I specifically went

 4   over with you -- and I recall it -- going over -- I told you
03:34PM
 5   that I would allow you to reintroduce certain affirmative

 6   defenses.  We had that discussion.  We turned the page on the

 7   issue, and now you're turning the page over again.

 8            So I'm not going to make a ruling on it.  I'm

 9   just going to let you know that you're going to need to address
03:34PM
10   that question I have in addition to whatever Mr. Richard is

11   also suggesting.

12            MR. BLUM:  Your Honor, that's, frankly, why I

13   would have preferred going over the evidence before I brought

14   it up to the Court.
03:35PM
15            THE COURT:  I understand that, and I appreciate

16   your introducing it.  To the extent you decide after you review

17   the evidence that you're not proposing it, that's fine.  I just

18   am simply giving you the benefit of a concern I'm going to have

19   especially as we get closer to the end, if you're trying to
03:35PM
20   reintroduce things that have been withdrawn.  There may be a

21   perfectly good reason for it.  I don't know.

22            MR. BLUM:  I understand we have an uphill battle.

23            THE COURT:  In any event, let's see where we are.

24   With that we are going to conclude for the day.  Unless there
03:35PM
25   is anything further that the parties needed to address, you
```

1510

```
 1    will be ordered back here at 8:00 o'clock tomorrow morning.
 2                 MR. BLUM:  Your Honor, may I bring up one quick
 3    issue?
 4                 THE COURT:  Yes.
 5                 MR. BLUM:  Your Honor, going over my notes with
 6    Mr. Leserman, I neglected to ask him about one exhibit,
 7    Exhibit 1419.
 8                 THE COURT:  So you're requesting to reopen for
 9    that purpose?
10                 MR. BLUM:  I don't need any more than five
11    minutes.
12                 THE COURT:  I will hear from you, Mr. Gee, but
13    I'm usually in the habit of allowing parties to reopen unless I
14    see prejudice.
15                 MR. GEE:  No objection, Your Honor.  We haven't
16    started our cross.
17                 THE COURT:  You will be allowed.
18                 MR. BLUM:  Thank you, Your Honor.
19                 THE COURT:  Anything -- any other issues that the
20    Court needs to focus on before we start tomorrow at
21    8:00 o'clock?
22                 MR. RICHARD:  I don't think so, Your Honor.
23                 THE COURT:  Are there going to be any exhibit
24    issues or the like that the Court needs to address?  If there
25    are no issues, I will have you come back at 8:30.
```

03:35PM (line 5)
03:35PM (line 10)
03:36PM (line 15)
03:36PM (line 20)
03:36PM (line 25)

1511

1       I also am just recalling now that I have a couple

2    of criminal matters.  So the earliest I'm going to be done is

3    going to be by 8:15.

4       Let's leave it this way.  The parties are ordered

03:36PM  5    back here at -- let's make it at 8:15.  I'm not positive I will

6    be done by 8:15 but possibly.  Send me, if there are issues

7    that are outstanding for the Court to consider so that you can

8    proceed tomorrow without any type of interruption, let me know

9    that as well.  I'm not inviting new issues.  If there are

03:37PM  10   other -- if there are outstanding issues that I have not yet

11   adjudicated, please.

12       MR. BLUM:  Your Honor, there is one issue I know

13   that might come up, and that is I believe --

14       THE COURT:  Speak into the microphone, please.

03:37PM  15       MR. BLUM:  Your Honor, I believe as to the

16   deposition transcript for Ms. Durant, I believe there are three

17   to four objections that both parties have made.

18       THE COURT:  Do I have the designations like I did

19   with John Peloquin?

03:37PM  20       MR. BLUM:  I believe you do, Your Honor.

21       THE COURT:  All right.

22       MR. BLUM:  I will submit it with your clerk to

23   make sure.

24       THE COURT:  Please do, and I will make sure I

03:37PM  25   look at it this evening.

1512

1       We are off the record.

2       (Proceedings concluded at 3:37 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5            I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                    DATED THIS  29TH  DAY OF NOVEMBER, 2021.

16

17

18                    /S/ MIRANDA ALGORRI

19                    _____
                      MIRANDA ALGORRI, CSR NO. 12743, CRR
20                    FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```

**'**

**'LABORATORY** [1] - 1462:1

**/**

**/S** [1] - 1513:18

**1**

**1** [17] - 1435:7, 1438:25, 1439:14, 1440:6, 1443:10, 1450:2, 1451:25, 1452:4, 1452:8, 1452:15, 1454:20, 1456:8, 1470:11, 1487:10, 1489:4, 1491:4, 1493:12
**1.2** [1] - 1461:2
**10** [1] - 1459:23
**100** [5] - 1486:23, 1488:20, 1496:9, 1496:10, 1501:5
**103** [2] - 1446:19, 1447:6
**11** [1] - 1470:11
**112** [1] - 1470:10
**113** [1] - 1483:20
**116** [2] - 1474:18, 1474:20
**12/4** [2] - 1470:10, 1474:17
**12743** [2] - 1423:23, 1513:19
**12TH** [3] - 1446:20, 1446:25, 1447:3
**13** [2] - 1423:8, 1449:10
**13-MINUTE** [1] - 1477:15
**1341** [1] - 1455:20
**1343** [3] - 1426:4, 1450:22, 1450:25
**1353** [3] - 1426:5, 1466:25, 1467:5
**1370** [3] - 1431:1, 1437:6, 1437:8
**1372** [3] - 1455:24, 1458:22, 1458:24
**1382** [1] - 1459:11
**1383** [3] - 1426:6, 1459:10, 1460:7
**1384** [4] - 1426:7, 1463:22, 1464:9, 1464:21
**14** [3] - 1468:7, 1474:18, 1474:20
**1419** [1] - 1510:7

**1423** [1] - 1423:8
**1427** [1] - 1425:5
**1432** [1] - 1459:11
**1436** [1] - 1425:8
**1450** [2] - 1426:4
**1460** [2] - 1426:6
**1464** [2] - 1426:7
**1467** [2] - 1426:5
**15** [2] - 1436:21, 1508:3
**1513** [1] - 1423:8
**16** [1] - 1455:3
**17** [1] - 1450:17
**18-06825-SB** [1] - 1423:7
**1964** [1] - 1502:7
**1986** [1] - 1502:7
**199** [1] - 1455:2
**1:04** [2] - 1423:14, 1427:1
**1ST** [1] - 1423:24

**2**

**2** [18] - 1435:7, 1438:25, 1439:15, 1440:6, 1441:12, 1443:11, 1446:19, 1447:6, 1450:2, 1451:25, 1452:4, 1452:8, 1452:15, 1454:20, 1491:4, 1495:2, 1495:10, 1497:24
**200** [1] - 1441:4
**2006** [2] - 1444:2, 1444:3
**2010** [2] - 1444:23, 1446:3
**2011** [2] - 1457:8, 1459:8
**2012** [8] - 1428:18, 1432:5, 1434:20, 1442:1, 1442:3, 1463:2, 1463:12, 1463:17
**2013** [13] - 1437:1, 1437:3, 1440:2, 1440:4, 1445:9, 1445:21, 1457:2, 1457:10, 1466:20, 1467:16, 1468:7, 1468:22, 1469:12
**2014** [3] - 1459:16, 1459:23, 1460:11
**2015** [11] - 1444:23, 1464:3, 1464:12, 1464:24, 1465:20, 1469:20, 1470:2, 1470:4, 1470:20,

**1472**:8, 1472:15
**2016** [2] - 1451:16, 1452:21
**2019** [2] - 1446:19, 1448:7
**2021** [3] - 1423:14, 1427:1, 1513:15
**21** [1] - 1451:16
**22** [1] - 1442:3
**23** [1] - 1450:17
**25TH** [1] - 1457:20
**26** [1] - 1466:6
**28** [1] - 1513:8
**29** [4] - 1423:14, 1427:1, 1500:9, 1500:21
**29TH** [1] - 1513:15
**2:28** [1] - 1477:21
**2:30** [3] - 1477:3, 1477:5, 1477:6
**2:40** [1] - 1477:20

**3**

**3** [3] - 1431:25, 1468:10, 1497:24
**3.6** [1] - 1466:6
**30** [2] - 1501:22, 1505:14
**30(B)(6** [1] - 1447:1
**34TH** [2] - 1424:7, 1424:10
**350** [1] - 1424:8
**39** [1] - 1500:1
**3:37** [1] - 1512:2

**4**

**4** [4] - 1435:2, 1437:15, 1437:16, 1450:23
**40** [1] - 1481:10
**40-MILE** [1] - 1488:6
**403** [2] - 1453:21, 1476:23
**406** [2] - 1483:1, 1483:9
**43** [6] - 1482:14, 1502:22, 1504:3, 1504:16, 1505:16, 1505:17
**44** [5] - 1461:3, 1482:15, 1502:23, 1504:17, 1505:17
**4455** [1] - 1423:24
**45** [1] - 1498:18
**4TH** [3] - 1446:19, 1446:21, 1446:22

**5**

**5** [3] - 1466:8, 1474:18, 1474:20
**50** [3] - 1424:10, 1482:17, 1482:19
**500** [1] - 1424:15

**6**

**6** [5] - 1438:18, 1439:19, 1449:10, 1455:2, 1465:12
**60** [1] - 1505:24

**7**

**7** [1] - 1423:13
**700** [1] - 1424:16
**72** [1] - 1449:10
**753** [1] - 1513:8
**77** [1] - 1450:17
**777** [1] - 1424:6

**8**

**8** [4] - 1465:12, 1492:24, 1493:7, 1493:13
**8:00** [3] - 1477:19, 1510:1, 1510:21
**8:15** [3] - 1511:3, 1511:5, 1511:6
**8:30** [3] - 1477:9, 1477:13, 1510:25

**9**

**9** [6] - 1446:19, 1447:6, 1491:14, 1491:22, 1492:15, 1492:18
**90012** [1] - 1423:25
**90017** [1] - 1424:7
**94111** [2] - 1424:11, 1424:16
**97-005** [2] - 1430:14, 1446:14

**A**

**ABATABLE** [4] - 1499:15, 1499:19, 1499:21, 1505:7
**ABC** [3] - 1484:6, 1484:7, 1486:11
**ABILITY** [2] - 1485:13, 1493:22
**ABLE** [6] - 1439:21, 1488:7, 1489:23,

1493:19, 1496:4, 1496:7
**ABOVE** [1] - 1513:11
**ABOVE-ENTITLED** [1] - 1513:11
**ABSENT** [1] - 1504:21
**ABSOLUTELY** [2] - 1463:8, 1476:17
**ABSOLUTIST** [1] - 1496:11
**ACCIDENT** [1] - 1504:12
**ACCORDANCE** [1] - 1458:12
**ACCOUNT** [1] - 1503:25
**ACCURATE** [4] - 1457:5, 1458:10, 1458:11, 1475:8
**ACKNOWLEDGE** [1] - 1495:16
**ACQUIESCE** [1] - 1454:14
**ACQUISITION** [2] - 1480:11, 1480:23
**ACTION** [2] - 1466:7, 1501:2
**ACTUAL** [6] - 1427:25, 1428:8, 1429:23, 1480:1, 1496:23, 1497:22
**ADD** [2] - 1478:16, 1505:13
**ADD-ON** [1] - 1505:13
**ADDITION** [2] - 1471:25, 1509:10
**ADDITIONAL** [5] - 1472:22, 1473:14, 1473:19, 1473:23, 1505:12
**ADDRESS** [8] - 1484:25, 1485:6, 1501:21, 1505:1, 1508:23, 1509:9, 1509:25, 1510:24
**ADDRESSED** [2] - 1503:2, 1508:22
**ADDRESSES** [1] - 1485:5
**ADDRESSING** [1] - 1477:16
**ADHERE** [1] - 1446:11
**ADJUDICATED** [1] - 1511:11
**ADMISSION** [3] - 1479:14, 1481:8, 1482:4
**ADMIT** [1] - 1464:17
**ADMITTED** [2] - 1479:10, 1479:23

ADMITTING [1] - 1479:13
ADMONISHED [1] - 1491:19
ADOPT [1] - 1439:18
ADVANCE [1] - 1483:23
ADVISE [2] - 1443:19, 1450:7
AFOUL [1] - 1490:3
AFTERNOON [1] - 1435:20
AGENCY [1] - 1423:5
AGENCY [24] - 1432:15, 1433:12, 1438:9, 1439:18, 1443:19, 1443:25, 1444:25, 1445:19, 1446:8, 1446:10, 1447:21, 1448:14, 1448:15, 1444:4, 1450:7, 1453:4, 1454:8, 1455:15, 1458:2, 1463:6, 1466:21, 1467:16, 1467:20, 1475:19
AGENCY [1] - 1436:19
AGENCY'S [2] - 1444:9, 1492:17
AGO [6] - 1442:5, 1483:5, 1491:13, 1492:12, 1507:10, 1508:2
AGREE [15] - 1431:12, 1431:13, 1431:15, 1449:3, 1452:7, 1454:14, 1465:17, 1465:19, 1468:7, 1468:22, 1468:24, 1486:10, 1493:19, 1501:1, 1505:10
AGREED [4] - 1463:24, 1482:1, 1482:4, 1505:4
AGREED-UPON [3] - 1482:1, 1482:4, 1505:4
AGREEING [1] - 1504:2
AGREEMENT [1] - 1500:3
AHEAD [2] - 1477:4, 1483:23
AIR [2] - 1502:5
AIR-TO-AIR [1] - 1502:5
AL [1] - 1491:16
AL [1] - 1423:8
AL-6 [8] - 1488:7, 1488:8, 1489:2,

1489:17, 1490:23, 1490:25, 1491:3, 1495:1
ALGORRI [4] - 1423:23, 1513:5, 1513:18, 1513:19
ALLOCATION [5] - 1488:13, 1488:18, 1488:23, 1489:10, 1496:15
ALLOCATIONS [1] - 1491:6
ALLOW [4] - 1480:3, 1505:11, 1508:18, 1509:5
ALLOWED [1] - 1510:17
ALLOWING [2] - 1483:10, 1510:13
ALLOWS [1] - 1500:17
ALLUVIUM [1] - 1491:16
ALMOST [2] - 1433:9, 1477:3
ALSO [1] - 1424:18
ALVORD [6] - 1427:8, 1427:22, 1431:2, 1435:15, 1438:19, 1439:23
ALVORD [2] - 1425:4, 1427:18
AMEND [1] - 1507:4
ANALYSES [2] - 1457:21, 1458:4
ANALYSIS [2] - 1449:7, 1503:6
AND [3] - 1513:6, 1513:9, 1513:11
ANGELES [3] - 1423:15, 1423:25, 1427:2
ANGELES [1] - 1424:7
ANOMALOUS [1] - 1463:8
ANOMALY [1] - 1462:11
ANSWER [15] - 1443:23, 1447:23, 1448:5, 1448:22, 1448:23, 1452:17, 1453:23, 1461:20, 1470:21, 1470:23, 1471:4, 1471:18, 1471:21, 1471:24, 1507:4
ANSWER [1] - 1479:23
ANTICIPATE [1] - 1498:17
ANTICIPATED [3] -

1503:11, 1507:9, 1508:21
ANYTIME [1] - 1438:23
ANYWAY [1] - 1442:25
APOLOGIZE [4] - 1441:10, 1465:18, 1480:24, 1493:4
APPEAR [1] - 1492:9
APPEARANCES [1] - 1424:1
APPEARED [1] - 1504:19
APPLICABLE [1] - 1449:5
APPLICATION [1] - 1453:14
APPLICATIONS [3] - 1431:10, 1431:17, 1440:21
APPORTION [3] - 1483:10, 1484:14, 1493:22
APPORTIONED [1] - 1485:14
APPORTIONMENT [19] - 1482:16, 1482:19, 1482:23, 1483:1, 1483:17, 1483:20, 1484:2, 1484:5, 1484:9, 1484:15, 1485:4, 1485:5, 1485:10, 1487:4, 1490:24, 1502:20, 1503:6, 1505:8
APPRECIATE [2] - 1508:10, 1509:15
APPROACH [1] - 1459:12
APPROPRIATE [1] - 1505:25
APPROPRIATELY [1] - 1485:3
APPROPRIATIVE [1] - 1505:24
APPROVE [1] - 1474:10
APRIL [7] - 1432:5, 1434:20, 1434:21, 1442:1, 1457:1, 1457:10, 1465:10
AQUIFER [1] - 1491:17
AREA [1] - 1433:2
AREAS [1] - 1468:13
ARGUE [1] - 1434:24
ARGUED [1] - 1479:16
ARGUING [1] - 1496:3

ARGUMENT [5] - 1479:13, 1479:19, 1479:20, 1479:21, 1497:19
ARGUMENTATIVE [1] - 1448:25
ARM [1] - 1482:6
ARMAMENTS [1] - 1502:6
ARMY [1] - 1445:18
ARTICULATED [1] - 1490:12
ARTIFACT [1] - 1433:16
ARTIFACTS [5] - 1432:22, 1433:23, 1441:19, 1462:1, 1462:16
ASBESTOS [5] - 1485:12, 1485:14, 1485:18, 1485:20, 1485:24
ASIDE [2] - 1482:23, 1490:22
ASPECTS [1] - 1443:10
ASSESSMENTS [1] - 1432:19
ASSIST [1] - 1454:5
ASSOCIATE [1] - 1429:4
ASSUME [2] - 1458:10, 1458:11
ASSUMED [1] - 1480:10
ATTEMPTING [1] - 1453:5
ATTENTION [2] - 1475:22, 1503:24
ATTORNEY/CLIENT [2] - 1474:14, 1476:21
ATTORNEYS [1] - 1475:4
ATTRIBUTED [2] - 1432:21, 1441:18
ATTRIBUTING [1] - 1441:20
AUGUST [3] - 1428:4, 1428:6, 1433:8
AUTHOR [2] - 1431:20, 1437:10
AUTHORITY [2] - 1484:19, 1484:21
AVAILABLE [2] - 1472:16, 1492:16
AVOID [1] - 1477:19
AWAIT [1] - 1505:6
AWARE [2] - 1449:25, 1462:13

**B**

BACKGROUND [1] - 1440:17
BACKING [1] - 1491:17
BAR [1] - 1482:21
BASED [15] - 1433:14, 1450:9, 1452:16, 1452:19, 1453:1, 1475:9, 1487:2, 1492:15, 1493:16, 1495:20, 1496:8, 1506:13, 1506:17, 1506:21
BASIC [4] - 1484:1, 1484:4, 1485:3, 1485:5
BASICS [1] - 1485:2
BASIS [4] - 1462:16, 1479:3, 1479:5, 1493:17
BATTLE [1] - 1509:22
BEARING [2] - 1500:15, 1501:10
BEATON [1] - 1424:20
BECAME [1] - 1444:17
BECOME [1] - 1444:18
BEGIN [1] - 1469:13
BEGINNING [2] - 1464:23, 1465:10
BEGINNING [1] - 1443:8, 1498:22
BEGINS [1] - 1468:2
BEHIND [1] - 1439:16
BELIEF [3] - 1440:25, 1479:13, 1479:20
BELIEVES [2] - 1497:23, 1504:18
BELOW [4] - 1446:9, 1448:2, 1448:10, 1465:11
BENEFIT [1] - 1509:18
BERMITE [12] - 1443:20, 1468:15, 1480:9, 1480:10, 1480:13, 1481:12, 1481:13, 1481:14, 1481:15, 1481:16
BEST [5] - 1462:6, 1462:11, 1463:7, 1473:25, 1485:11
BETTER [1] - 1438:9
BETWEEN [6] - 1429:7, 1433:8, 1433:12, 1441:25, 1483:17, 1488:13
BEYOND [5] - 1448:18, 1449:7,

1478:15, 1491:21, 1494:5
**BIDDING** [1] - 1443:14
**BIDS** [1] - 1466:21
**BIG** [1] - 1483:16
**BILL** [1] - 1429:3
**BIT** [1] - 1490:8
**BJ** [1] - 1445:10
**BLAME** [5] - 1461:19, 1461:25, 1462:15, 1463:3, 1463:6
**BLAMED** [1] - 1434:21
**BLANK** [1] - 1495:23
**BLEND** [7] - 1455:17, 1456:8, 1456:10, 1456:13, 1458:19, 1459:2
**BLENDING** [6] - 1456:11, 1460:15, 1460:18, 1460:20, 1460:23, 1465:13
**BLOW** [3] - 1451:19, 1460:8, 1464:22
**BLUM** [141] - 1424:13, 1424:14, 1427:17, 1427:21, 1434:4, 1434:25, 1435:11, 1435:18, 1436:17, 1437:6, 1438:3, 1438:5, 1440:14, 1444:1, 1446:18, 1446:22, 1447:1, 1447:6, 1447:11, 1447:17, 1447:20, 1448:18, 1448:21, 1449:2, 1449:15, 1450:6, 1450:21, 1451:1, 1451:5, 1451:18, 1453:24, 1455:7, 1455:20, 1455:24, 1458:22, 1459:12, 1459:15, 1460:3, 1460:8, 1460:19, 1463:25, 1464:2, 1464:17, 1464:22, 1466:24, 1467:2, 1467:6, 1467:22, 1467:24, 1468:20, 1469:2, 1469:23, 1470:14, 1470:18, 1471:10, 1472:25, 1474:12, 1474:17, 1474:20, 1474:24, 1476:24, 1478:17, 1478:22, 1479:2, 1479:16, 1479:22, 1480:6, 1480:16, 1480:20, 1480:24, 1481:9, 1481:17, 1482:2,
1482:5, 1483:16, 1483:25, 1484:3, 1484:16, 1484:21, 1485:8, 1485:23, 1486:14, 1486:17, 1486:22, 1487:5, 1487:15, 1487:21, 1488:1, 1488:15, 1488:19, 1488:24, 1489:1, 1489:8, 1489:11, 1489:20, 1490:13, 1490:16, 1490:19, 1491:1, 1491:4, 1491:8, 1493:4, 1494:11, 1494:25, 1495:7, 1495:19, 1495:24, 1496:17, 1496:25, 1497:3, 1497:8, 1498:6, 1498:14, 1498:18, 1498:25, 1499:3, 1500:22, 1500:25, 1501:14, 1501:18, 1502:11, 1502:14, 1503:19, 1504:11, 1507:1, 1507:7, 1507:15, 1507:21, 1508:7, 1508:15, 1508:24, 1509:12, 1509:22, 1510:2, 1510:5, 1510:10, 1510:18, 1511:12, 1511:15, 1511:20, 1511:22
**BLUM** [23] - 1425:5, 1425:8, 1427:16, 1434:23, 1435:17, 1436:13, 1447:16, 1478:11, 1478:16, 1483:8, 1483:12, 1493:3, 1493:17, 1494:9, 1497:23, 1498:1, 1498:3, 1498:7, 1500:10, 1503:18, 1504:10, 1504:22, 1506:25
**BLUM'S** [1] - 1499:17
**BLUMENFELD** [1] - 1423:3
**BOOKS** [1] - 1464:8
**BOSS** [1] - 1465:5
**BOTTOM** [2] - 1456:3, 1460:9
**BOUND** [1] - 1479:23
**BREAK** [2] - 1477:6, 1477:15
**BRIAN** [2] - 1464:25, 1465:2
**BRIEF** [2] - 1506:3, 1508:6

**BRIEFING** [4] - 1478:4, 1478:14, 1506:3, 1508:14
**BRING** [1] - 1510:2
**BROAD** [1] - 1486:15
**BROKE** [1] - 1485:1
**BROUGHT** [3] - 1475:22, 1495:4, 1509:13
**BUDGET** [1] - 1472:15
**BURDEN** [1] - 1503:10
**BY** [34] - 1424:4, 1424:5, 1424:5, 1424:6, 1424:9, 1424:14, 1424:14, 1424:15, 1427:19, 1427:21, 1434:4, 1434:25, 1436:15, 1436:17, 1438:5, 1444:1, 1448:21, 1449:15, 1450:6, 1450:21, 1451:1, 1453:24, 1455:7, 1455:24, 1459:15, 1460:19, 1464:2, 1467:6, 1467:22, 1469:23, 1471:10, 1472:25, 1474:12, 1474:24
**BYRON** [1] - 1424:4

---

## C

**CACI** [4] - 1482:21, 1483:1, 1483:9, 1507:22
**CALCULATED** [1] - 1461:3
**CALCULATION** [4] - 1455:17, 1456:9, 1457:2, 1457:4
**CALCULATIONS** [2] - 1458:19, 1459:2
**CALIFORNIA** [5] - 1423:2, 1423:15, 1423:25, 1427:2, 1513:7
**CALIFORNIA** [6] - 1424:7, 1424:10, 1424:11, 1424:16, 1483:21
**CALLED** [2] - 1427:19, 1436:15
**CANDIDLY** [1] - 1508:25
**CANNOT** [1] - 1505:22
**CARE** [1] - 1439:20
**CASE** [11] - 1427:7, 1444:15, 1445:16, 1446:15, 1456:22,

1477:8, 1483:19, 1484:22, 1484:24, 1488:14, 1509:1
**CASE** [1] - 1423:6
**CASES** [3] - 1485:13, 1485:18, 1485:24
**CATEGORIZATION** [1] - 1485:22
**CATEGORY** [7] - 1482:24, 1483:13, 1484:12, 1484:14, 1485:6, 1486:15, 1503:17
**CAUSED** [6] - 1433:16, 1433:23, 1442:4, 1462:23, 1463:16, 1502:3
**CAUSING** [1] - 1442:21
**CENTER** [1] - 1468:16
**CENTRAL** [2] - 1423:2, 1513:7
**CERTAIN** [3] - 1437:4, 1475:16, 1509:5
**CERTAINLY** [10] - 1438:13, 1439:5, 1441:5, 1451:21, 1459:7, 1462:24, 1469:11, 1475:11, 1483:10, 1496:13
**CERTAINTY** [2] - 1441:7, 1473:17
**CERTIFICATE** [1] - 1513:1
**CERTIFY** [1] - 1513:7
**CH2M** [10] - 1445:14, 1469:18, 1469:23, 1470:2, 1470:4, 1471:5, 1471:6, 1471:11, 1472:9, 1473:1
**CHALLENGING** [1] - 1492:22
**CHAMBERS** [1] - 1506:10
**CHANCE** [1] - 1458:4
**CHANDALAR** [1] - 1424:9
**CHANGE** [3] - 1448:22, 1451:24, 1504:7
**CHANGES** [1] - 1438:8
**CHARACTERISTICS** [1] - 1469:10
**CHARGE** [1] - 1466:17
**CHECK** [3] - 1455:22, 1506:2, 1507:22
**CHECKING** [1] - 1500:5

**CHEMICALS** [1] - 1475:17
**CHLORIDE** [1] - 1456:17
**CHOICE** [2] - 1462:5, 1462:19
**CIRCULATE** [1] - 1470:25
**CIRCUMSTANCES** [1] - 1439:3
**CITATIONS** [1] - 1498:9
**CITE** [1] - 1484:19
**CITED** [1] - 1484:22
**CLAIM** [1] - 1501:5
**CLARITA** [1] - 1436:19
**CLARITA** [1] - 1423:5
**CLEANERS** [1] - 1441:2
**CLEANERS** [1] - 1494:19
**CLEANING** [3] - 1431:9, 1431:16, 1440:20
**CLEAR** [1] - 1432:13
**CLEARLY** [1] - 1484:5
**CLERK** [2] - 1435:20, 1436:4
**CLERK** [1] - 1511:22
**CLIENT** [1] - 1479:10
**CLOSE** [1] - 1441:3
**CLOSED** [1] - 1504:5
**CLOSELY** [1] - 1429:23
**CLOSER** [1] - 1509:19
**CLOSING** [1] - 1490:1
**CLWA** [3] - 1432:20, 1441:17, 1468:2
**CO** [1] - 1502:11
**CO-COUNSEL** [1] - 1502:11
**CODE** [1] - 1513:8
**COLLEAGUE** [1] - 1493:9
**COMMENCED** [5] - 1440:11, 1449:14, 1450:20, 1455:6, 1474:23
**COMMITTED** [1] - 1481:13
**COMMON** [5] - 1431:10, 1431:17, 1440:21, 1441:22, 1495:14
**COMMUNICATION** [1] - 1454:2
**COMPANIES** [2] - 1480:11, 1480:23
**COMPANY** [2] - 1480:9, 1480:13

**COMPANY** [5] - 1480:15, 1484:6, 1484:7, 1486:11, 1493:23

**COMPANY'S** [1] - 1486:10

**COMPARED** [1] - 1475:17

**COMPETING** [4] - 1481:5, 1481:21, 1482:3, 1505:15

**COMPLAINT** [1] - 1507:17

**COMPLETED** [2] - 1433:5, 1443:12

**COMPLIANCE** [1] - 1446:12

**COMPLICATED** [1] - 1503:11

**COMPLYING** [1] - 1446:13

**COMPONENT** [1] - 1437:21

**COMPUTER** [1] - 1472:17

**CONCEDED** [1] - 1479:14

**CONCENTRATION** [4] - 1435:6, 1440:5, 1449:23, 1462:24

**CONCENTRATIONS** [4] - 1441:13, 1448:2, 1451:22, 1489:21

**CONCEPT** [3] - 1475:14, 1475:15, 1475:16

**CONCERN** [6] - 1451:22, 1483:4, 1491:12, 1500:25, 1501:6, 1509:18

**CONCERNED** [2] - 1445:3, 1466:9

**CONCERNING** [4] - 1478:6, 1478:7, 1499:22, 1502:25

**CONCLUDE** [5] - 1441:6, 1452:14, 1473:6, 1478:17, 1509:24

**CONCLUDED** [3] - 1442:15, 1442:20, 1512:2

**CONCLUDING** [2] - 1441:21, 1462:17

**CONCLUSION** [6] - 1432:8, 1438:17, 1441:14, 1451:20, 1473:24, 1496:7

**CONCLUSIONS** [3] - 1435:1, 1437:16,

**CONCLUSIONS** [7] - 1437:20, 1438:1, 1438:6, 1450:15, 1452:13, 1489:24, 1492:23

**CONCLUSIVELY** [1] - 1468:4

**CONCUR** [1] - 1454:13

**CONDITION** [3] - 1453:16, 1454:22, 1454:25

**CONDITIONS** [3] - 1446:13, 1446:14, 1455:1

**CONDUCT** [1] - 1480:13

**CONFER** [5] - 1481:25, 1493:8, 1498:1, 1506:8, 1508:12

**CONFERENCE** [1] - 1513:12

**CONFIDENCE** [1] - 1458:14

**CONFIRM** [3] - 1434:5, 1470:8, 1470:12

**CONFIRMATION** [2] - 1439:6, 1463:9

**CONFIRMATORY** [1] - 1439:9

**CONFIRMED** [1] - 1433:23

**CONFORM** [5] - 1481:8, 1507:8, 1507:11, 1508:2, 1508:5

**CONFORMANCE** [1] - 1513:12

**CONFUSING** [1] - 1499:20

**CONNECT** [1] - 1492:7

**CONNECTION** [2] - 1433:4, 1441:4

**CONNECTIONS** [1] - 1446:16

**CONS** [1] - 1475:5

**CONSEQUENCE** [1] - 1502:21

**CONSEQUENTLY** [1] - 1432:20

**CONSIDER** [5] - 1480:12, 1497:16, 1503:4, 1503:5, 1511:7

**CONSIDERED** [3] - 1475:3, 1475:19,

1475:23

**CONSISTENT** [2] - 1452:12, 1469:11

**CONSTANT** [1] - 1450:13

**CONSTITUENTS** [1] - 1451:22

**CONSTRUCTION** [2] - 1443:14, 1443:15

**CONSTRUE** [1] - 1503:1

**CONSULT** [2] - 1475:4, 1502:11

**CONSULTANT** [3] - 1445:18, 1466:19, 1476:4

**CONSULTANTS** [7] - 1444:8, 1444:9, 1466:21, 1474:4, 1475:1, 1475:23, 1476:11

**CONTAINMENT** [1] - 1474:8

**CONTAMINANT** [4] - 1430:13, 1431:11, 1431:18, 1440:22

**CONTAMINANTS** [4] - 1430:11, 1446:9, 1449:23, 1449:24

**CONTAMINATING** [1] - 1495:9

**CONTAMINATION** [14] - 1438:11, 1441:1, 1444:11, 1444:15, 1450:8, 1452:19, 1462:7, 1469:10, 1472:3, 1487:7, 1488:8, 1491:16, 1495:17, 1496:18

**CONTEMPLATED** [1] - 1503:3

**CONTINUE** [3] - 1427:14, 1447:8, 1477:8

**CONTRACTOR** [2] - 1501:25, 1502:9

**CONTRIBUTED** [3] - 1489:22, 1489:23, 1496:24

**CONTRIBUTING** [4] - 1468:18, 1468:21, 1492:17, 1493:15

**CONTRIBUTION** [1] - 1482:21

**CONTRIBUTOR** [5] - 1489:16, 1489:17, 1490:12, 1490:25, 1496:16

**CONTRIBUTORS** [5] -

1491:2, 1491:3, 1491:4, 1491:7, 1492:2

**CONTROL** [1] - 1480:10

**CONTROL** [1] - 1429:10

**CONVERSATION** [3] - 1445:8, 1445:20, 1445:25

**CONVERSELY** [1] - 1500:17

**CONVEYS** [1] - 1482:4

**COOPERATION** [1] - 1474:5

**COPIES** [1] - 1500:6

**CORP** [1] - 1480:10

**CORPORATE** [1] - 1431:3

**CORPORATION** [5] - 1480:8, 1480:9, 1480:14, 1481:12

**CORPORATION** [1] - 1423:8

**CORPS** [1] - 1445:18

**CORRECT** [1] - 1513:9

**CORRECT** [79] - 1429:19, 1429:25, 1430:4, 1430:5, 1430:8, 1430:20, 1430:21, 1430:23, 1430:24, 1431:4, 1431:5, 1432:6, 1432:16, 1433:3, 1433:10, 1434:18, 1434:22, 1437:10, 1437:11, 1437:13, 1437:23, 1439:2, 1439:23, 1440:2, 1440:23, 1440:24, 1441:2, 1441:13, 1442:10, 1442:13, 1442:21, 1443:11, 1443:20, 1444:8, 1445:6, 1448:4, 1448:11, 1449:25, 1452:1, 1452:22, 1452:23, 1453:9, 1453:12, 1454:9, 1454:19, 1455:11, 1455:12, 1456:16, 1457:8, 1457:11, 1458:2, 1460:12, 1460:13, 1460:16, 1460:23, 1461:9, 1461:12, 1461:15, 1462:22, 1464:25, 1465:22, 1465:24, 1466:3, 1466:10,

1466:18, 1467:16, 1468:24, 1469:3, 1469:17, 1469:21, 1471:13, 1471:18, 1472:6, 1473:20, 1474:13, 1475:21, 1476:5, 1480:21, 1504:4

**CORRECTLY** [3] - 1432:12, 1478:12, 1500:10

**COUNSEL** [1] - 1424:1

**COUNSEL** [6] - 1447:12, 1474:12, 1474:19, 1476:20, 1478:1, 1502:11

**COUPLE** [5] - 1483:5, 1499:14, 1506:3, 1506:21, 1511:1

**COURSE** [3] - 1442:22, 1503:8, 1504:17

**COURT** [50] - 1435:25, 1468:25, 1478:4, 1478:19, 1478:21, 1478:22, 1479:4, 1479:5, 1479:7, 1479:8, 1479:19, 1479:22, 1482:20, 1483:12, 1483:15, 1484:1, 1484:19, 1485:2, 1485:12, 1485:18, 1486:17, 1486:21, 1487:13, 1487:17, 1488:21, 1490:4, 1490:11, 1490:22, 1491:13, 1491:23, 1498:8, 1498:9, 1499:12, 1499:20, 1500:14, 1500:17, 1503:11, 1505:4, 1505:5, 1505:7, 1505:19, 1505:23, 1506:13, 1507:4, 1508:13, 1508:23, 1509:14, 1510:20, 1510:24, 1511:7

**COURT** [3] - 1427:6, 1477:11, 1477:23

**COURT** [156] - 1423:1, 1423:24, 1427:7, 1427:12, 1427:16, 1434:1, 1434:23, 1435:12, 1435:14, 1435:17, 1436:8, 1436:12, 1437:25, 1438:4, 1443:22, 1446:20, 1446:24,

1447:3, 1447:7, 1447:13, 1447:16, 1447:19, 1448:20, 1448:25, 1449:11, 1449:13, 1450:5, 1450:19, 1453:22, 1455:5, 1455:23, 1459:14, 1460:5, 1460:17, 1463:23, 1464:1, 1464:19, 1467:1, 1467:23, 1468:19, 1468:25, 1469:22, 1470:12, 1470:17, 1471:9, 1472:24, 1474:2, 1474:16, 1474:22, 1476:22, 1476:25, 1477:3, 1477:12, 1477:24, 1478:19, 1478:25, 1479:9, 1479:18, 1480:3, 1480:7, 1480:18, 1480:22, 1481:2, 1481:15, 1481:18, 1481:23, 1482:3, 1482:7, 1483:7, 1483:23, 1484:1, 1484:4, 1484:18, 1484:25, 1485:16, 1486:8, 1486:15, 1486:19, 1487:3, 1487:12, 1487:16, 1487:24, 1488:12, 1488:17, 1488:22, 1488:25, 1489:5, 1489:9, 1489:14, 1490:10, 1490:15, 1490:17, 1490:21, 1491:2, 1491:5, 1491:10, 1492:1, 1492:14, 1492:20, 1493:2, 1493:5, 1493:10, 1493:13, 1494:8, 1494:24, 1495:5, 1495:16, 1495:22, 1496:13, 1496:24, 1497:2, 1497:5, 1497:17, 1497:25, 1498:7, 1498:16, 1498:20, 1499:2, 1499:5, 1499:25, 1500:4, 1500:8, 1500:24, 1501:7, 1501:15, 1501:19, 1502:13, 1502:16, 1503:18, 1503:22, 1504:9, 1504:14, 1506:5, 1506:23, 1507:5, 1507:13, 1507:18, 1507:25, 1508:9,

1508:16, 1508:25, 1509:15, 1509:23, 1510:4, 1510:8, 1510:12, 1510:17, 1510:19, 1510:23, 1511:14, 1511:18, 1511:21, 1511:24, 1513:6, 1513:19
**COURT'S** [9] - 1487:20, 1492:14, 1492:21, 1493:17, 1500:12, 1501:16, 1502:25, 1504:19, 1506:9
**CREATED** [2] - 1460:16, 1460:18
**CREATION** [1] - 1470:20
**CREEP** [1] - 1497:21
**CRIMINAL** [1] - 1511:2
**CROSS** [1] - 1510:16
**CROSSED** [1] - 1507:23
**CRR** [2] - 1423:23, 1513:19
**CSR** [2] - 1423:23, 1513:19
**CURRENT** [6] - 1436:22, 1447:21, 1447:25, 1452:16, 1452:20, 1453:1
**CUSTOM** [5] - 1500:9, 1500:15, 1501:4, 1501:8, 1505:12
**CUSTOM** [1] - 1501:10
**CUSTOMERS** [4] - 1446:10, 1448:3, 1448:10, 1455:14
**CUT** [1] - 1463:15
**CV** [1] - 1423:7
**CWLA** [1] - 1433:24

## D

**DAFONTE** [4] - 1484:22, 1484:25, 1485:5, 1485:8
**DAMAGES** [2] - 1478:7, 1506:4
**DANIEL** [1] - 1424:15
**DARTS** [1] - 1496:14
**DATA** [6] - 1450:11, 1472:16, 1492:16, 1495:21, 1496:1, 1496:2
**DATE** [6] - 1427:25, 1446:23, 1451:16, 1458:23, 1470:13, 1507:16
**DATED** [2] - 1457:8,

1469:12
**DATED** [1] - 1513:15
**DAY** [2] - 1423:13, 1513:15
**DAYS'** [1] - 1448:16
**DCE** [3] - 1491:4, 1495:3, 1495:12
**DDW** [16] - 1427:23, 1428:8, 1428:18, 1429:16, 1429:23, 1430:1, 1430:7, 1430:10, 1445:5, 1451:12, 1453:19, 1453:24, 1454:5, 1454:9, 1455:11, 1462:13
**DE** [1] - 1454:4
**DEAD** [2] - 1475:25, 1476:18
**DEAD-END** [1] - 1476:18
**DEAL** [1] - 1444:10
**DEALING** [2] - 1483:18, 1495:19
**DEALT** [2] - 1438:12, 1455:18
**DECEMBER** [5] - 1446:19, 1446:20, 1446:21, 1448:6, 1451:16
**DECIDE** [5] - 1482:5, 1499:19, 1505:5, 1505:8, 1509:16
**DECIDED** [2] - 1443:3, 1479:8
**DECISION** [4] - 1475:4, 1475:7, 1475:9, 1475:11
**DEDUCTION** [1] - 1482:12
**DEFENDANT** [2] - 1427:19, 1436:15
**DEFENDANT** [1] - 1485:13
**DEFENDANT'S** [7] - 1482:14, 1500:8, 1500:20, 1501:22, 1502:22, 1504:17, 1505:22
**DEFENDANTS** [2] - 1423:9, 1424:12
**DEFENDANTS** [2] - 1488:14, 1496:23
**DEFENSE** [6] - 1487:25, 1499:18, 1501:25, 1502:9, 1505:14, 1505:17
**DEFENSES** [1] - 1509:6
**DEFERS** [1] - 1478:20

**DEFINE** [1] - 1485:20
**DEGREASING** [3] - 1431:9, 1431:16, 1440:20
**DELIVER** [1] - 1448:10
**DELIVERED** [1] - 1448:3
**DENIED** [2] - 1453:12, 1492:21
**DENIES** [1] - 1478:20
**DENY** [1] - 1470:8
**DEPARTMENT** [3] - 1429:10, 1444:24, 1461:12
**DEPOSE** [1] - 1494:23
**DEPOSITION** [18] - 1446:18, 1448:6, 1448:23, 1449:8, 1449:10, 1450:16, 1455:2, 1470:10, 1472:12, 1474:17, 1475:8, 1475:10, 1488:23, 1489:6, 1491:22, 1494:6, 1494:12, 1511:16
**DERIVED** [1] - 1450:1
**DESCRIBE** [1] - 1494:1
**DESCRIBED** [1] - 1469:10
**DESCRIBING** [1] - 1497:1
**DESCRIPTION** [1] - 1426:3
**DESCRIPTION** [1] - 1493:25
**DESCRIPTOR** [1] - 1490:10
**DESIGN** [2] - 1443:12, 1443:24
**DESIGNATIONS** [1] - 1511:18
**DESIGNED** [4] - 1444:5, 1444:6, 1444:7
**DETAIN** [1] - 1447:4
**DETECT** [7] - 1433:9, 1434:7, 1443:3, 1446:15, 1454:5, 1454:21, 1454:23
**DETECTED** [3] - 1435:6, 1455:10, 1469:7
**DETECTIBLE** [1] - 1451:22
**DETECTION** [1] - 1445:3
**DETECTIONS** [3] - 1432:21, 1441:18,

1465:11
**DETECTS** [1] - 1442:12
**DETERMINATION** [4] - 1445:1, 1473:12, 1500:12, 1501:16
**DETERMINE** [7] - 1433:13, 1434:17, 1442:3, 1456:20, 1472:2, 1475:19, 1496:14
**DETERMINED** [2] - 1472:23, 1475:24
**DETERMINES** [1] - 1479:5
**DETERMINING** [3] - 1444:11, 1444:14, 1476:8
**DIFFERENCE** [1] - 1486:1
**DIFFERENCES** [1] - 1483:17
**DIFFERENT** [8] - 1444:12, 1458:25, 1463:15, 1466:21, 1486:6, 1489:20, 1492:5, 1503:20
**DIRECT** [2] - 1498:1, 1498:19
**DIRECT** [1] - 1425:8
**DIRECT** [1] - 1436:16
**DIRECTION** [2] - 1501:23, 1505:14
**DIRECTLY** [1] - 1485:8
**DISAGREE** [1] - 1480:16
**DISCERNIBLE** [1] - 1451:23
**DISCLOSE** [1] - 1508:10
**DISCLOSED** [1] - 1494:22
**DISCOVERED** [3] - 1441:13, 1442:1, 1442:2
**DISCUSS** [4] - 1430:25, 1476:19, 1477:17, 1478:1
**DISCUSSED** [7] - 1474:3, 1475:5, 1478:5, 1494:12, 1494:14, 1494:16
**DISCUSSING** [1] - 1429:2
**DISCUSSION** [5] - 1427:22, 1429:7, 1473:18, 1479:11, 1509:6
**DISCUSSIONS** [2] -

1428:2, 1474:25
**DISPOSAL** [1] - 1488:5
**DISPUTE** [5] - 1482:17, 1483:9, 1484:10, 1484:11, 1501:9
**DISPUTED** [3] - 1478:3, 1482:8, 1505:19
**DISQUALIFIED** [2] - 1453:13, 1453:15
**DISTINCT** [1] - 1441:5
**DISTRIBUTION** [2] - 1456:2, 1492:17
**DISTRICT** [2] - 1451:10, 1476:7
**DISTRICT** [5] - 1423:1, 1423:2, 1423:3, 1513:6, 1513:7
**DIVISION** [2] - 1445:2, 1451:11
**DIVISION** [1] - 1423:2
**DMITRIY** [3] - 1461:9, 1461:11, 1462:13
**DO** [1] - 1513:7
**DOCUMENT** [9] - 1430:15, 1431:20, 1440:15, 1455:24, 1456:7, 1457:7, 1457:14, 1457:23, 1460:25
**DOCUMENTS** [2] - 1431:4, 1470:7
**DONE** [25] - 1433:12, 1434:17, 1441:25, 1456:25, 1462:8, 1465:25, 1470:24, 1472:4, 1473:13, 1473:16, 1473:20, 1473:23, 1474:9, 1476:9, 1476:15, 1479:25, 1485:15, 1485:17, 1485:23, 1485:25, 1498:1, 1499:4, 1505:3, 1511:2, 1511:6
**DOTS** [1] - 1492:7
**DOTTED** [1] - 1507:23
**DOUBLE** [1] - 1500:5
**DOUBLE-CHECKING** [1] - 1500:5
**DOUBT** [3] - 1459:20, 1464:5, 1469:25
**DOWN** [11] - 1433:3, 1433:4, 1434:1, 1434:11, 1435:15, 1439:1, 1439:8, 1440:10, 1462:25,

1463:4, 1505:9
**DOWNGRADIENT** [1] - 1468:13
**DR** [3] - 1489:7, 1496:10, 1497:8
**DRAFTED** [2] - 1483:6, 1507:19
**DRAW** [1] - 1489:24
**DRAWN** [4] - 1487:7, 1490:8, 1494:13, 1495:10
**DRINKING** [2] - 1447:24, 1449:22
**DRINKING** [3] - 1445:2, 1451:11, 1461:12
**DRY** [1] - 1441:1
**DRY** [4] - 1431:9, 1431:16, 1440:19, 1494:19
**DTSC** [1] - 1444:25
**DURANT** [1] - 1511:16
**DURING** [2] - 1430:14, 1472:12
**DW** [4] - 1487:6, 1490:16, 1494:13, 1496:19

**E**

**E-MAIL** [2] - 1426:6, 1426:7
**E-MAIL** [15] - 1454:3, 1459:16, 1459:19, 1459:21, 1460:1, 1460:4, 1460:10, 1463:19, 1464:2, 1464:7, 1464:11, 1465:25, 1466:12, 1506:10
**EARLIEST** [1] - 1511:2
**EASY** [2] - 1489:4, 1489:5
**EDLIN** [1] - 1424:13
**EDUCATE** [1] - 1485:2
**EDUCATED** [2] - 1485:3, 1485:4
**EFFECT** [5] - 1445:22, 1463:20, 1479:10, 1495:8, 1503:7
**EFFECTIVELY** [1] - 1500:18
**EFFLUENT** [1] - 1465:11
**EFFORT** [1] - 1471:1
**EITHER** [14] - 1438:25, 1439:13, 1440:6, 1449:23, 1473:12, 1478:19,

1479:14, 1488:9, 1492:2, 1495:13, 1496:3, 1503:22, 1504:21
**EMPHASIZE** [1] - 1454:7
**EMPLOYED** [2] - 1436:18, 1476:7
**EMPLOYER** [1] - 1448:1
**ENABLE** [1] - 1489:18
**END** [8] - 1433:9, 1434:25, 1462:1, 1475:25, 1476:18, 1498:22, 1506:10, 1509:19
**ENGINEER** [6] - 1436:23, 1436:24, 1437:2, 1443:9, 1450:7, 1451:10
**ENGINEERING** [2] - 1436:25, 1465:3
**ENGINEERS** [5] - 1445:14, 1445:18, 1467:7, 1467:13, 1467:15
**ENTITLED** [1] - 1513:11
**ENVIRONMENTAL** [1] - 1458:13
**EQUALS** [1] - 1466:8
**ERIC** [1] - 1424:15
**ERIC** [1] - 1424:20
**ERROR** [14] - 1432:16, 1432:25, 1433:13, 1433:21, 1434:4, 1434:13, 1434:22, 1441:15, 1441:23, 1442:3, 1442:17, 1463:7
**ERRORS** [2] - 1462:6, 1462:7
**ESPECIALLY** [1] - 1509:19
**ESSENTIALLY** [2] - 1480:4, 1503:3
**ESTABLISH** [1] - 1493:20
**ET** [1] - 1423:8
**EVALUATE** [4] - 1469:5, 1470:5, 1471:2, 1503:1
**EVALUATION** [1] - 1474:8
**EVENING** [2] - 1506:11, 1511:25
**EVENT** [5] - 1439:7, 1447:4, 1481:5, 1490:21, 1509:23
**EVENTUALLY** [1] -

1466:10
**EVERYWHERE** [1] - 1488:3
**EVIDENCE** [1] - 1426:2
**EVIDENCE** [52] - 1431:6, 1442:23, 1450:25, 1460:4, 1460:7, 1464:18, 1464:21, 1467:5, 1468:12, 1484:7, 1484:20, 1485:21, 1486:2, 1486:3, 1486:6, 1486:12, 1486:23, 1486:25, 1487:23, 1488:12, 1489:15, 1489:17, 1489:20, 1489:21, 1489:23, 1490:6, 1491:8, 1492:1, 1494:2, 1496:8, 1496:21, 1497:12, 1497:19, 1498:10, 1503:1, 1503:8, 1503:9, 1503:13, 1503:16, 1503:20, 1503:23, 1504:5, 1504:7, 1505:11, 1506:22, 1507:10, 1507:12, 1507:13, 1509:13, 1509:17
**EVIDENTIARY** [1] - 1487:1
**EXACT** [2] - 1480:2, 1484:16
**EXACTLY** [4] - 1429:18, 1463:2, 1496:20, 1498:24
**EXAMINATION** [2] - 1427:20, 1436:16
**EXAMINATION** [3] - 1425:5, 1425:8, 1427:14
**EXAMPLE** [3] - 1448:15, 1474:8, 1485:11
**EXCEED** [3] - 1450:2, 1450:10, 1466:10
**EXCEEDANCE** [1] - 1466:7
**EXCHANGE** [1] - 1459:16
**EXCLUDE** [1] - 1500:13
**EXCLUSIVELY** [1] - 1502:6
**EXCUSE** [2] - 1435:5, 1467:25
**EXCUSED** [2] - 1435:14, 1502:3

**EXERCISE** [1] - 1474:7
**EXHIBIT** [7] - 1456:23, 1456:25, 1458:25, 1459:13, 1467:1, 1510:6, 1510:23
**EXHIBIT** [13] - 1431:1, 1437:6, 1437:8, 1450:22, 1450:25, 1455:24, 1459:10, 1460:7, 1463:22, 1464:21, 1466:25, 1467:5, 1510:7
**EXHIBITS** [1] - 1426:1
**EXIST** [1] - 1468:17
**EXISTING** [2] - 1469:5, 1472:16
**EXONERATE** [3] - 1476:2, 1476:9, 1476:16
**EXPECT** [1] - 1493:5
**EXPECTED** [2] - 1460:23, 1498:12
**EXPECTING** [2] - 1438:12, 1463:1
**EXPEDITE** [2] - 1428:17, 1429:5
**EXPERIENCE** [1] - 1475:9
**EXPERIENCING** [1] - 1497:21
**EXPERT** [4] - 1467:19, 1488:22, 1488:23, 1489:6
**EXPERTISE** [1] - 1441:6
**EXPERTS** [4] - 1475:24, 1476:11, 1490:3, 1497:10
**EXPLAIN** [2] - 1442:8, 1483:14
**EXPOSURE** [1] - 1486:3
**EXPRESSED** [1] - 1497:23
**EXTENT** [5] - 1472:3, 1477:16, 1488:2, 1508:16, 1509:16
**EXTREMELY** [1] - 1446:14

**F**

**FABRICS** [3] - 1431:9, 1431:16, 1440:20
**FACILITIES** [1] - 1443:15
**FACILITY** [4] - 1456:1, 1459:18, 1485:14, 1486:4

**FACT** [11] - 1440:25, 1454:3, 1462:5, 1462:16, 1463:1, 1485:9, 1489:25, 1494:14, 1495:12, 1496:11, 1503:4
**FACTO** [1] - 1454:4
**FACTORS** [1] - 1499:22
**FACTUAL** [1] - 1479:5
**FAIR** [1] - 1479:18
**FAIRLY** [3] - 1450:13, 1452:12
**FALL** [1] - 1500:11
**FALLS** [2] - 1501:16, 1503:17
**FAMILIAR** [2] - 1475:14, 1484:4
**FANG** [2] - 1429:3, 1451:8
**FAR** [6] - 1463:9, 1494:2, 1499:13, 1503:13, 1503:17, 1506:17
**FAUX** [1] - 1481:1
**FEAR** [1] - 1491:24
**FEBRUARY** [3] - 1459:16, 1459:23, 1460:11
**FEDERAL** [3] - 1423:24, 1513:5, 1513:19
**FEW** [2] - 1444:22, 1467:17
**FIGHTING** [1] - 1503:10
**FIGUEROA** [1] - 1424:6
**FILE** [1] - 1478:9
**FILED** [2] - 1492:8, 1507:17
**FILL** [2] - 1489:15, 1495:23
**FILLING** [1] - 1459:1
**FINDINGS** [2] - 1472:19, 1473:9
**FINE** [5] - 1447:19, 1480:3, 1502:17, 1508:9, 1509:17
**FINGERPRINTED** [1] - 1475:13
**FINGERPRINTING** [1] - 1475:19
**FINISHING** [2] - 1437:12, 1443:13
**FIRST** [23] - 1431:15, 1432:6, 1440:15, 1440:17, 1441:13, 1442:8, 1442:16, 1445:18, 1448:12,

1448:23, 1451:5, 1464:22, 1465:9, 1468:11, 1480:20, 1482:12, 1482:25, 1484:13, 1486:8, 1490:6, 1503:12, 1506:11, 1507:17
**FIVE** [1] - 1510:10
**FLAMINGO** [1] - 1441:1
**FLAMINGO** [1] - 1441:3
**FLANGED** [1] - 1463:16
**FLEXIBILITY** [1] - 1486:25
**FLIPPANT** [1] - 1461:18
**FLOOR** [2] - 1424:7, 1424:10
**FLOW** [1] - 1469:5
**FLUSHED** [1] - 1433:7
**FLUSTERED** [2] - 1448:13, 1448:24
**FOCUS** [1] - 1510:20
**FOLLOW** [7] - 1454:18, 1465:25, 1472:10, 1472:17, 1472:18, 1472:22, 1473:2
**FOLLOW-UP** [5] - 1472:10, 1472:17, 1472:18, 1472:22, 1473:2
**FOLLOWED** [1] - 1435:9
**FOLLOWING** [11] - 1427:5, 1442:6, 1457:21, 1477:10, 1477:22, 1501:7, 1501:22, 1502:1, 1502:4, 1502:24, 1505:14
**FOLLOWS** [2] - 1473:4, 1501:9
**FOLSOM** [2] - 1464:25, 1465:2
**FOR** [6] - 1424:3, 1424:12, 1426:2, 1513:6
**FOREGOING** [1] - 1513:9
**FORM** [2] - 1450:8, 1501:2
**FORMAT** [1] - 1513:11
**FORWARD** [1] - 1435:21
**FOUNDATION** [3] - 1443:21, 1467:21, 1469:1

**FOUR** [2] - 1495:19, 1511:17
**FRAMED** [1] - 1500:10
**FRANCISCO** [2] - 1424:11, 1424:16
**FRANKLY** [1] - 1509:12
**FRED** [2] - 1424:6, 1424:14
**FREE** [1] - 1499:8
**FRONT** [4] - 1459:9, 1492:19, 1492:25, 1493:12
**FRUSTRATED** [1] - 1454:3
**FRYER** [1] - 1424:19
**FUDACZ** [1] - 1424:6
**FURTHERMORE** [2] - 1462:13, 1476:12
**FUTILITY** [1] - 1474:7
**FUTURE** [1] - 1449:4

## G

**GALLAGHER** [2] - 1424:13, 1424:14
**GARY** [2] - 1464:25, 1465:7
**GEE** [20] - 1424:4, 1427:15, 1435:13, 1443:21, 1447:15, 1449:12, 1450:4, 1450:18, 1453:21, 1455:4, 1467:21, 1470:16, 1474:1, 1474:14, 1474:19, 1474:21, 1476:21, 1477:2, 1493:11, 1510:15
**GEE** [6] - 1427:14, 1432:3, 1435:12, 1476:25, 1493:9, 1510:12
**GENERAL** [4] - 1431:19, 1438:1, 1494:17, 1503:22
**GENERALLY** [3] - 1456:25, 1494:18, 1501:1
**GENEROUS** [1] - 1498:4
**GENTLEMEN** [1] - 1477:5
**GEOLOGIC** [1] - 1469:5
**GIVEN** [5] - 1447:8, 1483:10, 1503:13, 1503:16, 1504:24
**GO-TO** [1] - 1463:6
**GOAL** [5] - 1454:5,

1454:6, 1454:23, 1454:24, 1498:18
**GOALS** [1] - 1472:14
**GOD** [1] - 1436:2
**GOTTA** [1] - 1481:14
**GOVERNMENT** [3] - 1501:24, 1502:4, 1502:9
**GRABBING** [1] - 1480:6
**GRANT** [3] - 1453:16, 1454:1, 1454:16
**GRANTED** [1] - 1493:15
**GRANTS** [5] - 1453:5, 1453:8, 1453:11, 1453:14, 1454:8
**GREATER** [3] - 1438:24, 1439:12, 1439:14
**GROUND** [1] - 1474:2
**GROUNDS** [1] - 1476:23
**GROUNDWATER** [9] - 1431:10, 1431:18, 1440:22, 1468:13, 1469:5, 1495:21, 1496:1, 1505:25
**GROUNDWATER** [1] - 1468:2
**GROUP** [3] - 1439:20, 1439:22, 1439:24
**GUESS** [3] - 1431:18, 1488:10
**GUESSWORK** [1] - 1489:19
**GUY** [1] - 1467:18

## H

**HABIT** [1] - 1510:13
**HAGGIN** [2] - 1464:25, 1465:7
**HAGGIN** [1] - 1465:7
**HALF** [1] - 1477:2
**HAND** [1] - 1435:23
**HANDLE** [1] - 1455:15
**HANDLING** [1] - 1457:6
**HAPPY** [1] - 1508:6
**HEADED** [1] - 1439:22
**HEALTH** [1] - 1452:10
**HEALTH** [1] - 1444:25
**HEAR** [11] - 1465:18, 1477:17, 1478:11, 1478:15, 1491:10, 1491:16, 1493:2, 1494:9, 1497:19, 1508:20, 1510:12
**HEARD** [5] - 1483:11,

**HELD** [4] - 1427:5, 1429:7, 1477:10, 1477:22
**HELD** [1] - 1513:10
**HELP** [2] - 1436:1, 1461:25
**HELPFUL** [10] - 1427:24, 1428:16, 1428:17, 1428:21, 1428:24, 1430:3, 1486:9, 1497:22, 1499:12
**HEREBY** [1] - 1513:7
**HIDING** [1] - 1462:14
**HIGH** [5] - 1432:6, 1437:4, 1442:10, 1462:17, 1463:3
**HIGHER** [5] - 1432:9, 1435:6, 1440:5, 1440:8, 1461:4
**HILL** [9] - 1445:14, 1469:18, 1469:23, 1470:4, 1471:5, 1471:6, 1471:11, 1472:9, 1473:1
**HILL'S** [1] - 1470:2
**HIRED** [2] - 1469:15, 1473:1
**HIRING** [1] - 1469:20
**HISTORIAN** [1] - 1494:5
**HISTORY** [1] - 1474:5
**HITS** [3] - 1434:16, 1465:21
**HOKKANEN** [15] - 1487:10, 1488:15, 1489:7, 1489:9, 1491:14, 1491:21, 1494:4, 1494:11, 1495:16, 1495:25, 1496:8, 1497:5, 1497:9, 1498:12, 1498:17
**HOKKANEN'S** [3] - 1492:8, 1492:15, 1492:22
**HOLD** [1] - 1481:3
**HOMEWORK** [1] - 1491:24
**HONEST** [1] - 1451:13
**HONESTLY** [1] - 1486:24
**HONOR** [70] - 1427:11, 1427:15, 1427:17, 1435:11, 1435:13, 1435:19, 1438:3, 1446:22, 1447:2, 1447:17,

1448:18, 1455:22, 1459:12, 1460:3, 1463:25, 1464:17, 1467:3, 1467:25, 1476:24, 1478:17, 1479:2, 1480:6, 1480:20, 1481:9, 1481:17, 1481:21, 1482:5, 1483:3, 1483:16, 1484:21, 1485:8, 1485:23, 1486:22, 1487:21, 1488:1, 1488:19, 1489:11, 1490:14, 1490:19, 1491:12, 1491:19, 1492:19, 1492:24, 1493:4, 1493:24, 1493:25, 1494:11, 1495:20, 1495:24, 1498:6, 1498:15, 1499:3, 1500:22, 1500:25, 1502:14, 1503:15, 1503:19, 1504:7, 1507:1, 1507:21, 1508:7, 1509:12, 1510:2, 1510:5, 1510:15, 1510:18, 1510:22, 1511:12, 1511:15, 1511:20

**HONORABLE** [1] - 1423:3
**HOPE** [3] - 1462:2, 1462:25, 1463:7
**HOPED** [1] - 1463:4
**HOPING** [2] - 1438:13, 1438:14
**HOST** [1] - 1505:25
**HOUR** [2] - 1477:2, 1498:18
**HUIE** [1] - 1424:13
**HUMAN** [1] - 1441:23
**HYDROGEOLOGIST** [1] - 1445:13

**I**

**I'S** [1] - 1507:23
**IDEA** [5] - 1428:7, 1475:22, 1491:15, 1499:21, 1508:25
**IDENTICAL** [1] - 1439:19
**IDENTIFICATION** [5] - 1450:24, 1460:6, 1464:20, 1467:4, 1471:17
**IDENTIFICATION** [1] - 1426:2
**IDENTIFIED** [5] -

1468:5, 1468:15, 1492:16, 1494:16, 1496:20
**IDENTIFY** [9] - 1458:16, 1469:6, 1470:5, 1470:23, 1471:25, 1472:5, 1472:9, 1487:11, 1488:4
**ILSE** [1] - 1424:9
**IMMEDIATE** [4] - 1432:8, 1432:15, 1432:24, 1433:1
**IMMINENT** [5] - 1451:24, 1452:7, 1452:14, 1452:23, 1452:25
**IMPACT** [2] - 1496:22, 1497:4
**IMPACTING** [1] - 1444:12
**IMPAIRED** [1] - 1446:14
**IMPERMISSIBLE** [1] - 1494:20
**IMPLEMENTED** [2] - 1428:13, 1476:13
**IMPORTANCE** [1] - 1454:7
**IMPORTANT** [1] - 1490:21
**IMPORTED** [1] - 1456:14
**IMPOSSIBLE** [1] - 1488:3
**IN** [3] - 1513:6, 1513:10, 1513:11
**INACCURACIES** [1] - 1441:23
**INACCURATE** [1] - 1458:16
**INADMISSIBLE** [1] - 1492:12
**INADVERTENTLY** [1] - 1462:9
**INCIDENT** [2] - 1440:8, 1440:9
**INCIDENTAL** [1] - 1503:23
**INCLUDE** [2] - 1483:2, 1500:14
**INCLUDED** [2] - 1484:6, 1493:11
**INCLUDING** [6] - 1437:19, 1468:14, 1468:15, 1478:6, 1488:14, 1491:13
**INCONCLUSIVE** [2] - 1475:25, 1476:11
**INCREASE** [2] -

1462:24, 1473:16
**INCREASED** [3] - 1438:11, 1449:23, 1452:5
**INDEX** [2] - 1425:1, 1426:1
**INDICATE** [2] - 1478:11, 1502:17
**INDIVIDUAL** [1] - 1445:10
**INDUSTRIAL** [1] - 1468:16
**INDUSTRIAL** [3] - 1431:9, 1431:17, 1440:20
**INDUSTRY** [1] - 1463:10
**INFINITESIMAL** [1] - 1496:5
**INFORMATION** [13] - 1430:11, 1450:1, 1450:9, 1452:16, 1455:14, 1457:22, 1469:6, 1469:8, 1473:12, 1473:14, 1479:13, 1479:20, 1498:5
**INFORMED** [1] - 1454:15
**INITIAL** [2] - 1441:14, 1472:20
**INSERTED** [1] - 1457:2
**INSIGHT** [1] - 1473:15
**INSTALL** [1] - 1453:5
**INSTANCE** [4] - 1485:12, 1486:2, 1488:7, 1489:2
**INSTRUCT** [4] - 1479:7, 1479:24, 1498:24, 1499:20
**INSTRUCTED** [1] - 1499:22
**INSTRUCTING** [1] - 1478:22
**INSTRUCTION** [16] - 1482:14, 1482:15, 1482:17, 1482:19, 1499:25, 1500:9, 1500:21, 1501:22, 1502:22, 1502:23, 1504:3, 1504:16, 1504:17, 1505:14, 1505:17, 1505:24
**INSTRUCTION** [34] - 1478:2, 1478:21, 1479:6, 1480:2, 1481:4, 1481:10, 1481:11, 1481:22, 1482:8, 1482:16,

1482:21, 1483:1, 1483:9, 1486:21, 1487:14, 1493:24, 1494:2, 1498:8, 1498:11, 1500:13, 1500:19, 1501:9, 1501:13, 1501:21, 1503:3, 1503:13, 1503:24, 1504:16, 1504:19, 1505:23, 1507:3, 1507:19, 1507:20, 1507:21
**INSTRUCTIONS** [17] - 1477:16, 1478:3, 1478:6, 1485:24, 1485:25, 1499:14, 1502:4, 1503:16, 1504:2, 1504:23, 1505:15, 1505:16, 1505:19, 1505:22, 1506:12, 1506:17, 1506:20
**INTEND** [8] - 1478:2, 1488:25, 1490:10, 1504:11, 1506:16, 1507:2, 1508:13, 1508:16
**INTENDED** [1] - 1490:17
**INTENDS** [1] - 1478:11
**INTENT** [2] - 1473:1, 1508:8
**INTENTION** [1] - 1490:23
**INTEREST** [4] - 1480:8, 1480:21, 1480:22, 1480:24
**INTERESTED** [1] - 1428:20
**INTERNALLY** [4] - 1474:3, 1474:10, 1475:1, 1475:6
**INTERPRETATION** [1] - 1479:15
**INTERRUPTION** [1] - 1511:8
**INTRODUCE** [3] - 1488:25, 1504:11, 1506:16
**INTRODUCING** [1] - 1509:16
**INTRODUCTION** [1] - 1431:7
**INTRODUCTION** [1] - 1440:16
**INVESTIGATE** [2] - 1438:22, 1466:22
**INVESTIGATED** [2] - 1463:11, 1463:14

**INVESTIGATING** [4] - 1437:3, 1437:23, 1438:10, 1466:17
**INVESTIGATION** [12] - 1434:17, 1434:19, 1435:8, 1439:1, 1440:10, 1445:22, 1465:24, 1466:3, 1466:16, 1467:10, 1469:13, 1473:13
**INVESTIGATIONS** [1] - 1431:3
**INVITE** [1] - 1497:19
**INVITING** [1] - 1511:9
**INVOLVED** [4] - 1440:12, 1443:9, 1443:13, 1477:8
**IRRELEVANT** [1] - 1478:18
**IS** [2] - 1513:9, 1513:11
**ISOLATED** [1] - 1439:6
**ISOTOPES** [1] - 1475:16
**ISSUE** [37] - 1430:13, 1433:24, 1438:12, 1444:15, 1445:16, 1453:6, 1453:20, 1454:16, 1476:19, 1479:9, 1479:16, 1482:23, 1482:25, 1485:1, 1485:19, 1491:20, 1495:3, 1497:12, 1497:14, 1499:13, 1499:18, 1500:10, 1500:13, 1501:15, 1502:18, 1502:19, 1502:25, 1503:24, 1504:7, 1504:18, 1505:6, 1505:7, 1505:8, 1508:1, 1509:7, 1510:3, 1511:12
**ISSUED** [1] - 1430:17
**ISSUES** [19] - 1430:6, 1430:9, 1430:22, 1445:3, 1445:17, 1454:8, 1475:10, 1477:17, 1478:2, 1478:5, 1478:7, 1491:20, 1499:22, 1510:19, 1510:24, 1510:25, 1511:6, 1511:9, 1511:10
**ITEM** [1] - 1490:24
**ITERATIONS** [1] - 1430:14
**ITSELF** [2] - 1496:2, 1503:5

**J**

JACOBS [1] - 1445:14
JAMES [4] - 1425:7, 1431:22, 1435:18, 1436:7
JAMES [1] - 1436:14
JEFF [4] - 1429:2, 1458:5, 1460:21, 1461:22
JMOL [1] - 1478:14
JOB [7] - 1443:13, 1443:18, 1443:23, 1444:10, 1444:14, 1444:17, 1444:18
JOBS [1] - 1443:14
JOHN [1] - 1511:19
JR [2] - 1423:3, 1424:14
JUDGE [1] - 1423:3
JUDGMENT [3] - 1478:12, 1478:13, 1487:20
JUDICIAL [1] - 1513:12
JULY [1] - 1433:8
JUNK [1] - 1492:12
JURY [49] - 1427:6, 1427:13, 1449:14, 1450:20, 1451:20, 1455:6, 1474:23, 1477:11, 1477:16, 1477:23, 1477:25, 1478:2, 1478:3, 1478:23, 1479:7, 1479:9, 1479:24, 1483:10, 1484:14, 1485:19, 1485:22, 1485:23, 1485:25, 1486:21, 1488:9, 1489:14, 1489:18, 1489:23, 1490:2, 1490:6, 1491:6, 1493:22, 1495:24, 1496:2, 1496:4, 1496:12, 1497:15, 1499:11, 1499:19, 1499:22, 1501:17, 1503:1, 1503:4, 1503:5, 1503:25, 1506:1, 1506:12, 1507:2

**K**

KEEP [1] - 1477:9
KEY [1] - 1480:12
KNOWING [1] - 1497:15
KNOWLEDGE [3] -

1452:6, 1454:18, 1476:14
KNOWN [2] - 1449:24, 1487:5
KOELEWYN [13] - 1458:5, 1458:9, 1459:16, 1460:10, 1462:15, 1463:18, 1464:3, 1464:12, 1464:24, 1465:9, 1465:16, 1466:5, 1466:9

**L**

L-E-S-E-R-M-A-N [1] - 1436:7
LA-6 [1] - 1490:25
LAB [17] - 1432:16, 1432:25, 1433:13, 1433:21, 1434:4, 1434:13, 1434:21, 1441:14, 1442:3, 1442:24, 1458:9, 1458:11, 1458:16, 1458:20, 1461:19, 1463:4, 1463:6
LABORATORIES [1] - 1458:13
LABORATORY [9] - 1432:21, 1433:16, 1433:23, 1441:18, 1441:24, 1458:1, 1458:3, 1458:8, 1462:16
LABS [2] - 1462:6, 1462:12
LACK [1] - 1469:1
LACKS [2] - 1443:21, 1467:21
LADIES [1] - 1477:5
LAID [1] - 1486:7
LAND [1] - 1480:25
LANGUAGE [6] - 1429:23, 1482:1, 1482:3, 1482:4, 1500:14, 1505:4
LARDIERE [1] - 1424:20
LARGE [1] - 1450:13
LARGELY [2] - 1478:11, 1493:16
LARGER [1] - 1439:12
LAST [8] - 1428:3, 1428:4, 1429:22, 1436:6, 1450:23, 1451:18, 1459:6, 1478:5
LATE [1] - 1506:6
LAUGH [1] - 1492:25

LAUGHED [1] - 1493:2
LAW [5] - 1478:13, 1483:21, 1501:1, 1502:2, 1508:2
LAWFULLY [1] - 1483:15
LAWSUIT [1] - 1467:19
LAWYERS [2] - 1473:24, 1475:11
LEAD [2] - 1450:2, 1495:22
LEAKING [1] - 1441:1
LEARNED [1] - 1438:7
LEAST [8] - 1440:7, 1483:2, 1492:3, 1492:20, 1493:21, 1499:10, 1505:21, 1506:17
LEAVE [4] - 1440:14, 1490:1, 1491:5, 1511:4
LECHLER [7] - 1445:10, 1445:12, 1445:20, 1445:21, 1466:16, 1473:5, 1473:11
LECTERN [1] - 1479:1
LEFT [2] - 1479:21, 1499:16
LEGAL [1] - 1505:10
LEGALLY [1] - 1493:21
LESERMAN [16] - 1431:22, 1435:18, 1436:7, 1436:8, 1436:18, 1438:5, 1448:21, 1449:3, 1455:16, 1456:16, 1459:15, 1462:20, 1472:15, 1477:12, 1498:14, 1510:6
LESERMAN [2] - 1425:7, 1436:14
LESERMAN'S [1] - 1446:18
LESS [1] - 1473:10
LESSONS [1] - 1438:7
LETTER [2] - 1426:4, 1426:5
LETTER [6] - 1451:3, 1451:7, 1452:4, 1452:13, 1467:6, 1469:12
LEVEL [2] - 1438:11, 1466:6
LEVELS [2] - 1437:4, 1460:14
LIABILITY [5] -

1478:10, 1500:15, 1501:10, 1503:6, 1505:3
LIABLE [1] - 1481:13
LIAISON [1] - 1471:6
LIGHT [1] - 1479:21
LIKELY [7] - 1440:25, 1441:8, 1473:10, 1475:24, 1476:10, 1508:20
LIMINE [2] - 1491:13, 1492:9
LIMINE [1] - 1493:12
LIMITATIONS [3] - 1499:18, 1507:3, 1507:5
LIMITED [2] - 1472:16, 1492:10
LINE [2] - 1447:5, 1490:24
LINES [3] - 1446:19, 1447:6, 1449:10, 1450:17, 1455:2, 1470:11, 1474:18, 1474:20, 1490:11
LIST [3] - 1506:9, 1506:12, 1506:24
LISTENED [1] - 1492:6
LITIGATION [3] - 1473:25, 1474:11, 1475:2
LLP [2] - 1424:4, 1424:9
LOCATION [2] - 1431:19, 1488:5
LOGIC [1] - 1439:16
LOOK [9] - 1438:17, 1450:21, 1457:10, 1462:10, 1463:22, 1470:7, 1480:1, 1497:24, 1511:25
LOOKED [5] - 1450:11, 1450:14, 1456:17, 1456:19, 1474:4
LOOKING [5] - 1444:19, 1452:10, 1454:5, 1470:12, 1492:20
LOS [3] - 1423:15, 1423:25, 1427:2
LOS [1] - 1424:7
LOST [1] - 1481:5
LOVE [1] - 1485:3
LOWERED [1] - 1462:2
LYNN [1] - 1476:5

**M**

M-A-L-L [2] - 1490:14, 1490:15
MAIL [17] - 1426:6, 1426:7, 1454:3, 1459:16, 1459:19, 1459:21, 1460:1, 1460:4, 1460:10, 1463:19, 1464:2, 1464:7, 1464:11, 1465:25, 1466:12, 1506:10
MAINTENANCE [1] - 1433:3
MALL [12] - 1487:6, 1487:16, 1487:21, 1489:16, 1490:9, 1490:12, 1490:13, 1491:3, 1494:12, 1494:25, 1495:7, 1496:19
MANAGE [1] - 1471:1
MANAGER [3] - 1465:3, 1471:5, 1473:6
MANUFACTURING [1] - 1502:5
MARCH [2] - 1440:1, 1440:4
MARKED [4] - 1450:24, 1460:6, 1464:20, 1467:4
MASK [1] - 1436:9
MATERIAL [1] - 1472:16
MATT [1] - 1424:19
MATTER [6] - 1427:8, 1477:8, 1477:25, 1478:13, 1497:21, 1502:21
MATTER [1] - 1513:11
MATTERS [1] - 1511:2
MAXIMUM [1] - 1435:6
MCGUANE [1] - 1424:5
MCL [9] - 1442:10, 1442:16, 1446:9, 1446:12, 1448:3, 1454:4, 1466:7, 1466:8
MCLS [5] - 1442:13, 1448:10, 1450:3, 1450:10, 1466:10
MEAN [7] - 1428:16, 1430:9, 1452:24, 1481:15, 1481:20, 1496:12, 1496:17
MEANS [4] - 1432:24, 1439:14, 1495:13,

1497:2
**MEANT** [2] - 1461:19, 1494:6
**MEASURED** [1] - 1461:2
**MEET** [6] - 1449:5, 1481:25, 1497:25, 1506:8, 1508:3, 1508:11
**MEETING** [2] - 1429:13, 1429:24
**MEETINGS** [4] - 1429:6, 1429:9, 1429:20, 1429:21
**MEETS** [1] - 1447:23
**MEMO** [2] - 1437:21, 1473:15
**MENTIONED** [2] - 1475:23, 1476:4
**MERGER** [2] - 1480:11, 1480:23
**MESSED** [1] - 1442:24
**METAL** [3] - 1431:9, 1431:16, 1440:20
**METHODOLOGY** [2] - 1492:7, 1492:23
**MICHAEL** [2] - 1424:14, 1427:18
**MICHAEL** [1] - 1425:4
**MICROPHONE** [2] - 1436:10, 1511:14
**MIDYEAR** [1] - 1457:1
**MIGHT** [12] - 1432:18, 1438:22, 1439:4, 1444:11, 1452:19, 1472:5, 1475:16, 1476:9, 1492:24, 1500:3, 1503:1, 1511:13
**MILITARY** [1] - 1502:6
**MIND** [4] - 1470:2, 1477:9, 1483:14, 1506:15
**MINIMUM** [2] - 1478:24, 1479:3
**MINUTES** [2] - 1498:18, 1510:11
**MIRANDA** [4] - 1423:23, 1513:5, 1513:18, 1513:19
**MIRANDAALGORRI @GMAIL.COM** [1] - 1423:25
**MISREPRESENTATI ON** [1] - 1488:20
**MISS** [1] - 1506:13
**MISSILES** [1] - 1502:5
**MISSING** [1] - 1447:8
**MISSPOKE** [1] - 1490:18

**MISUNDERSTOOD** [1] - 1490:18
**MODIFICATION** [1] - 1481:19
**MODIFY** [2] - 1480:19, 1481:8
**MOMENT** [2] - 1482:8, 1502:12
**MONDAY** [2] - 1423:14, 1427:1
**MONITORING** [5] - 1449:18, 1453:1, 1456:2, 1457:24, 1457:25
**MONTH** [1] - 1457:20
**MONTHLY** [1] - 1456:9
**MONTHS** [9] - 1434:6, 1434:16, 1442:12, 1443:3, 1483:5, 1492:12, 1507:10, 1508:2
**MORNING** [5] - 1477:17, 1499:4, 1499:8, 1506:11, 1510:1
**MOST** [3] - 1440:25, 1442:8, 1462:11
**MOTION** [5] - 1478:12, 1478:20, 1492:8, 1508:5, 1508:7
**MOTION** [1] - 1493:11
**MOTIONS** [2] - 1491:13, 1508:2
**MOUTH** [1] - 1428:22
**MOVE** [6] - 1453:2, 1460:3, 1466:15, 1482:7, 1499:14, 1507:11
**MR** [176] - 1427:15, 1427:17, 1427:21, 1434:4, 1434:25, 1435:11, 1435:13, 1435:18, 1436:17, 1437:6, 1438:3, 1438:5, 1440:14, 1443:21, 1444:1, 1446:18, 1446:22, 1447:1, 1447:6, 1447:11, 1447:15, 1447:17, 1447:20, 1448:18, 1448:21, 1449:2, 1449:12, 1449:15, 1450:4, 1450:6, 1450:18, 1450:21, 1451:1, 1451:5, 1451:18, 1453:21, 1453:24, 1455:4, 1455:7, 1455:20, 1455:24,

1458:22, 1459:12, 1459:15, 1460:3, 1460:8, 1460:19, 1463:25, 1464:2, 1464:17, 1464:22, 1466:24, 1467:2, 1467:6, 1467:21, 1467:22, 1467:24, 1468:20, 1469:2, 1469:23, 1470:14, 1470:16, 1470:18, 1471:10, 1472:25, 1474:1, 1474:12, 1474:14, 1474:17, 1474:19, 1474:20, 1474:21, 1474:24, 1476:21, 1476:24, 1477:2, 1478:17, 1478:22, 1479:2, 1479:16, 1479:22, 1480:6, 1480:16, 1480:20, 1480:24, 1481:9, 1481:17, 1481:20, 1482:2, 1482:5, 1483:3, 1483:16, 1483:25, 1484:3, 1484:16, 1484:21, 1485:8, 1485:23, 1486:14, 1486:17, 1486:22, 1487:5, 1487:15, 1487:21, 1488:1, 1488:15, 1488:19, 1488:24, 1489:1, 1489:8, 1489:11, 1489:20, 1490:13, 1490:16, 1490:19, 1491:1, 1491:4, 1491:8, 1491:12, 1492:5, 1492:18, 1492:24, 1493:4, 1493:8, 1493:11, 1493:24, 1494:11, 1494:25, 1495:7, 1495:19, 1495:24, 1496:17, 1496:25, 1497:3, 1497:8, 1497:20, 1498:6, 1498:14, 1498:18, 1498:25, 1499:3, 1499:24, 1500:2, 1500:5, 1500:22, 1500:25, 1501:14, 1501:18, 1502:11, 1502:14, 1503:15, 1503:19, 1504:5, 1504:11, 1505:21, 1506:20, 1507:1, 1507:7, 1507:15, 1507:21, 1508:1, 1508:7, 1508:15,

1508:24, 1509:12, 1509:22, 1510:2, 1510:5, 1510:10, 1510:15, 1510:18, 1510:22, 1511:12, 1511:15, 1511:20, 1511:22
**MULL** [1] - 1490:14
**MUST** [2] - 1432:24, 1433:15
**MYSTERIOUSLY** [1] - 1492:9

---

## N

**NAME** [8] - 1436:6, 1467:18, 1484:23, 1486:11, 1490:23, 1493:22, 1493:25
**NAMED** [3] - 1445:10, 1483:22, 1485:11
**NARROWED** [1] - 1505:9
**NEAR** [2] - 1468:17, 1487:6
**NECESSARILY** [1] - 1439:6
**NECESSARY** [3] - 1503:13, 1503:20, 1504:13
**NEED** [12] - 1434:23, 1458:24, 1472:1, 1472:4, 1475:5, 1478:25, 1479:24, 1493:25, 1498:24, 1503:4, 1509:9, 1510:10
**NEEDED** [4] - 1443:20, 1470:5, 1473:13, 1509:25
**NEEDLE** [1] - 1498:23
**NEEDS** [6] - 1447:4, 1481:11, 1505:3, 1505:8, 1510:20, 1510:24
**NEGLECTED** [1] - 1510:6
**NEGLIGENCE** [18] - 1478:7, 1482:10, 1500:12, 1500:13, 1500:16, 1500:17, 1500:20, 1501:3, 1501:5, 1501:11, 1501:12, 1501:17, 1505:5, 1505:13, 1506:4, 1507:3
**NEVER** [6] - 1429:25, 1469:15, 1470:2, 1476:13, 1476:14, 1484:8

**NEW** [8] - 1449:23, 1451:24, 1452:19, 1452:20, 1452:21, 1452:23, 1506:20, 1511:9
**NEXT** [11] - 1435:17, 1448:20, 1458:24, 1462:2, 1462:10, 1463:1, 1471:22, 1482:8, 1482:9, 1493:5, 1501:21
**NINE** [1] - 1442:5
**NO** [2] - 1423:6, 1513:19
**NON** [9] - 1433:9, 1434:7, 1442:12, 1443:3, 1446:15, 1454:5, 1454:21, 1454:23, 1483:4
**NON-DETECT** [7] - 1433:9, 1434:7, 1443:3, 1446:15, 1454:5, 1454:21, 1454:23
**NON-DETECTS** [1] - 1442:12
**NON-PARTY** [1] - 1483:4
**NONDESCRIBED** [1] - 1485:7
**NONDESCRIPT** [3] - 1484:12, 1484:14, 1485:22
**NONE** [1] - 1466:4
**NORMAL** [3] - 1442:6, 1462:10, 1462:25
**NOSSAMAN** [2] - 1424:4, 1424:9
**NOTEBOOK** [1] - 1459:9
**NOTES** [5] - 1492:21, 1500:2, 1506:2, 1507:23, 1510:5
**NOTHING** [4] - 1430:7, 1436:1, 1442:25, 1496:4
**NOTICE** [1] - 1449:22
**NOTIFIED** [1] - 1507:9
**NOVEMBER** [3] - 1423:14, 1427:1, 1513:15
**NUISANCE** [3] - 1499:16, 1499:19, 1505:7
**NUMBER** [1] - 1426:3
**NUMBER** [4] - 1447:5, 1455:22, 1490:2, 1499:24
**NUMBERS** [3] - 1439:12, 1462:17,

1466:9
**NUMEROUS** [1] - 1476:8

**O**

**O'CLOCK** [3] - 1477:19, 1510:1, 1510:21
**O'KEEFE** [1] - 1429:2
**OATH** [1] - 1427:10
**OBJECT** [1] - 1478:22
**OBJECTED** [1] - 1481:4
**OBJECTING** [1] - 1478:21
**OBJECTION** [21] - 1443:21, 1447:11, 1447:14, 1449:11, 1450:4, 1453:21, 1467:21, 1469:1, 1470:16, 1474:1, 1474:14, 1474:21, 1476:21, 1476:22, 1481:18, 1482:22, 1500:11, 1500:18, 1500:20, 1510:15
**OBJECTIONS** [6] - 1447:15, 1449:12, 1450:18, 1455:4, 1487:2, 1511:17
**OBJECTIVES** [1] - 1472:14
**OBSERVED** [1] - 1451:23
**OBTAIN** [1] - 1453:5
**OBVIOUSLY** [2] - 1475:3, 1503:15
**OCCASION** [1] - 1440:8
**OCCURRED** [1] - 1433:13
**OCTOBER** [8] - 1433:9, 1442:3, 1464:3, 1464:12, 1464:24, 1465:20, 1468:7, 1469:12
**OF** [11] - 1423:2, 1423:13, 1424:1, 1425:1, 1426:1, 1513:1, 1513:7, 1513:9, 1513:12, 1513:15
**OFFER** [2] - 1488:13, 1488:17
**OFFERING** [2] - 1501:24, 1502:10
**OFFERS** [1] - 1498:10
**OFFICIAL** [4] - 1423:24, 1513:1,

1513:5, 1513:19
**OFTEN** [1] - 1474:7
**OMITTED** [1] - 1505:19
**ONE** [50] - 1428:2, 1429:5, 1429:6, 1430:10, 1430:14, 1431:4, 1432:18, 1439:6, 1440:7, 1441:10, 1441:22, 1447:1, 1447:8, 1447:9, 1450:16, 1453:14, 1454:25, 1458:25, 1460:1, 1464:8, 1467:12, 1473:2, 1473:3, 1473:10, 1473:22, 1475:17, 1475:18, 1476:1, 1476:2, 1476:4, 1480:14, 1481:1, 1481:5, 1482:8, 1482:9, 1482:11, 1482:13, 1482:15, 1483:16, 1485:12, 1499:15, 1505:21, 1506:1, 1510:2, 1510:6, 1511:12
**OOO** [1] - 1427:3
**OPEN** [5] - 1427:6, 1477:9, 1477:11, 1477:23, 1479:3
**OPERATE** [1] - 1438:9
**OPERATED** [1] - 1458:1
**OPERATIONAL** [3] - 1454:4, 1454:6, 1454:22
**OPERATIONS** [6] - 1439:20, 1439:22, 1439:24, 1440:12, 1465:3, 1465:8
**OPINION** [10] - 1450:9, 1452:11, 1491:14, 1491:22, 1492:15, 1492:18, 1492:24, 1493:12, 1493:13, 1497:21
**OPINIONS** [1] - 1497:23
**OPPORTUNITY** [9] - 1476:12, 1478:9, 1480:1, 1481:3, 1481:4, 1481:7, 1494:23, 1499:6, 1499:10
**OPPOSE** [2] - 1508:4, 1508:5
**OPTIONS** [1] - 1429:4
**ORAL** [1] - 1508:4

**ORALLY** [1] - 1499:10
**ORDER** [11] - 1446:16, 1453:5, 1453:16, 1453:20, 1453:25, 1470:5, 1472:2, 1472:4, 1473:11, 1497:25
**ORDERED** [4] - 1477:12, 1477:20, 1510:1, 1511:4
**ORIGINALLY** [1] - 1428:15
**ORR** [2] - 1429:3, 1451:8
**OTHERWISE** [2] - 1499:9, 1503:25
**OUGHT** [2] - 1483:9
**OURSELVES** [1] - 1486:24
**OUTSIDE** [3] - 1477:11, 1477:23, 1477:25
**OUTSTANDING** [4] - 1506:1, 1506:12, 1511:7, 1511:10
**OVERALL** [1] - 1500:19
**OVERBROAD** [1] - 1483:6
**OVERRULED** [2] - 1453:22, 1474:2
**OVERSAW** [1] - 1466:19
**OVERSEEING** [1] - 1443:14
**OVERSEEN** [1] - 1439:25
**OWN** [1] - 1489:24
**OWNED** [1] - 1444:12

**P**

**P.M** [2] - 1477:21, 1512:2
**P.M** [2] - 1423:14, 1427:1
**PAGE** [25] - 1431:25, 1435:2, 1437:15, 1440:15, 1441:12, 1446:19, 1447:5, 1449:10, 1450:17, 1450:23, 1451:5, 1451:18, 1455:2, 1468:10, 1470:10, 1474:18, 1474:19, 1481:10, 1486:9, 1497:22, 1497:24, 1509:6, 1509:7
**PAGE** [2] - 1425:3, 1513:11

**PAGES** [1] - 1423:8
**PAPERS** [1] - 1505:6
**PARAGRAPH** [8] - 1431:25, 1433:18, 1437:16, 1440:17, 1464:22, 1465:9, 1468:2, 1468:11
**PARAPHRASED** [2] - 1432:11, 1432:12
**PARENTHESES** [1] - 1466:8
**PART** [15] - 1431:15, 1443:18, 1443:23, 1444:10, 1444:14, 1444:17, 1444:18, 1451:19, 1454:15, 1455:15, 1480:12, 1484:24, 1486:22, 1489:22, 1494:22
**PARTICIPATED** [1] - 1473:18
**PARTICULAR** [7] - 1438:12, 1439:10, 1456:23, 1486:12, 1500:19, 1507:6
**PARTICULARITY** [1] - 1496:20
**PARTIES** [12] - 1429:7, 1481:2, 1502:24, 1503:9, 1504:1, 1504:15, 1506:8, 1506:16, 1509:25, 1510:13, 1511:4, 1511:17
**PARTLY** [1] - 1490:2
**PARTY** [8] - 1483:4, 1483:19, 1483:22, 1484:5, 1484:8, 1496:25, 1504:18
**PAS** [1] - 1481:1
**PASS** [1] - 1482:9
**PASSING** [1] - 1454:6
**PATRICK** [1] - 1424:5
**PAY** [1] - 1474:10
**PAYING** [1] - 1474:6
**PCE** [22] - 1431:8, 1431:10, 1432:6, 1433:9, 1434:10, 1437:4, 1440:19, 1440:21, 1441:1, 1441:13, 1442:25, 1465:11, 1465:12, 1465:13, 1465:21, 1466:8, 1487:9, 1489:3, 1494:14, 1495:1, 1495:9, 1496:6
**PCES** [1] - 1466:1
**PELOQUIN** [1] - 1511:19

**PENUMBRA** [1] - 1497:24
**PEOPLE** [3] - 1429:24, 1477:8, 1489:23
**PER** [15] - 1478:7, 1482:10, 1500:12, 1500:13, 1500:16, 1500:18, 1500:20, 1501:3, 1501:4, 1501:11, 1501:12, 1501:17, 1505:6, 1505:13, 1506:4
**PERCENT** [5] - 1486:23, 1488:20, 1496:9, 1496:10, 1501:5
**PERCENTAGE** [6] - 1456:20, 1489:12, 1489:13, 1489:15, 1491:6, 1496:14
**PERCHLORATE** [4] - 1430:12, 1456:1, 1459:18, 1507:16
**PERFECTLY** [1] - 1509:21
**PERFORM** [1] - 1449:6
**PERFORMED** [5] - 1444:4, 1458:4, 1458:12, 1471:7, 1472:2
**PERFORMING** [2] - 1436:25, 1469:18
**PERHAPS** [8] - 1441:20, 1471:25, 1472:2, 1474:11, 1483:13, 1486:10, 1499:20, 1503:2
**PERMIT** [11] - 1428:8, 1428:14, 1428:19, 1428:25, 1429:1, 1429:5, 1430:17, 1446:13, 1454:20, 1454:22, 1454:25
**PERMITS** [1] - 1445:3, 1446:11
**PERMITTED** [1] - 1494:10
**PERSON** [1] - 1461:14
**PERSONNEL** [1] - 1448:16
**PERSUADED** [2] - 1479:12, 1479:19
**PG** [2] - 1426:3
**PHONE** [1] - 1429:14
**PICK** [1] - 1477:4
**PIPELINE** [1] - 1463:16
**PLACE** [6] - 1427:24,

1429:8, 1443:25, 1444:3, 1453:17, 1474:25
**PLAIN** [1] - 1501:5
**PLAINTIFF** [2] - 1423:6, 1424:3
**PLAINTIFF** [6] - 1478:8, 1482:22, 1503:14, 1505:16, 1505:17, 1507:10
**PLAINTIFF'S** [6] - 1482:14, 1499:25, 1502:22, 1504:3, 1504:16, 1505:6
**PLAINTIFFS** [2] - 1487:2, 1507:15
**PLANNED** [1] - 1489:25
**PLANT** [4] - 1456:19, 1465:12, 1465:13, 1465:22
**PLANTS** [2] - 1456:14, 1456:15
**PLATFORM** [1] - 1435:22
**PLAY** [1] - 1470:19
**PLAYING** [4] - 1449:14, 1450:20, 1455:6, 1474:23
**POINT** [11] - 1433:2, 1446:4, 1457:1, 1460:21, 1472:24, 1472:25, 1475:2, 1475:3, 1475:18, 1499:13, 1499:16
**POINTED** [1] - 1508:2
**POLICIES** [1] - 1448:15
**POLICY** [9] - 1439:18, 1446:8, 1447:21, 1447:25, 1448:9, 1448:14, 1448:16, 1448:17, 1451:12
**POPPING** [1] - 1491:25
**PORTION** [3] - 1454:7, 1460:9, 1475:8
**POSITION** [6] - 1436:22, 1437:1, 1451:10, 1463:6, 1496:4, 1496:12
**POSITIVE** [2] - 1495:3, 1511:5
**POSSIBILITY** [7] - 1441:5, 1441:20, 1441:22, 1472:18, 1474:11, 1475:2, 1508:21
**POSSIBLE** [4] - 1441:7, 1469:6,

1473:10, 1477:19
**POSSIBLY** [1] - 1511:6
**POTENTIAL** [9] - 1468:3, 1472:9, 1485:7, 1485:20, 1491:7, 1492:2, 1493:14, 1503:5, 1505:12
**POTENTIALLY** [4] - 1468:19, 1468:21, 1473:7, 1483:11
**POWDER** [3] - 1480:9, 1480:13, 1481:16
**PPB** [3] - 1465:12, 1466:6, 1466:8
**PRACTICAL** [1] - 1497:21
**PRACTICE** [8] - 1457:16, 1457:19, 1500:9, 1500:15, 1501:4, 1501:9, 1501:10, 1505:12
**PRE** [1] - 1453:14
**PRE-APPLICATION** [1] - 1453:14
**PRECISE** [1] - 1485:17
**PRECISION** [2] - 1497:1, 1497:2
**PREDECESSOR** [3] - 1480:11, 1480:21, 1480:23
**PREDICTED** [1] - 1460:15
**PREFERRED** [1] - 1509:13
**PREJUDICE** [3] - 1492:22, 1504:18, 1510:14
**PRELIMINARY** [1] - 1473:2
**PREPARE** [2] - 1460:20, 1470:24
**PREPARED** [4] - 1458:1, 1460:19, 1498:24, 1508:23
**PRESENCE** [5] - 1427:6, 1427:12, 1477:11, 1477:23, 1477:25
**PRESENT** [1] - 1424:18
**PRESENT** [2] - 1429:19, 1489:18
**PRESENTED** [3] - 1477:18, 1478:3, 1506:14
**PRESENTING** [1] - 1484:1

**PRESERVING** [1] - 1500:19
**PRESSURIZED** [2] - 1433:7, 1434:8
**PRETTY** [1] - 1431:19
**PREVIOUS** [1] - 1467:16
**PREVIOUSLY** [1] - 1427:19
**PREVIOUSLY** [3] - 1452:12, 1492:16, 1507:6
**PRIMARY** [1] - 1476:15
**PRINCIPLE** [2] - 1484:9, 1505:10
**PRINCIPLES** [4] - 1484:2, 1484:5, 1485:4, 1485:5
**PRIVILEGE** [1] - 1474:15
**PROBLEM** [10] - 1433:24, 1438:10, 1438:14, 1438:22, 1442:4, 1463:14, 1463:16, 1463:20, 1480:2, 1498:6
**PROBLEMS** [1] - 1490:8
**PROCEDURAL** [2] - 1479:12, 1479:19
**PROCEED** [8] - 1447:16, 1449:13, 1450:19, 1455:5, 1470:17, 1473:25, 1474:22, 1511:8
**PROCEEDINGS** [4] - 1427:5, 1477:10, 1477:22, 1512:2
**PROCEEDINGS** [1] - 1513:10
**PRODUCTION** [3] - 1449:19, 1468:17, 1495:18
**PROFFER** [1] - 1489:7
**PROFITABLY** [1] - 1505:1
**PROJECT** [1] - 1456:18
**PROJECT** [3] - 1437:5, 1471:5, 1473:6
**PROJECTS** [1] - 1436:25
**PRONOUNCED** [1] - 1490:23
**PROOF** [7] - 1488:13, 1488:17, 1498:10, 1503:10, 1507:4, 1507:8, 1508:3

**PROPER** [1] - 1493:21
**PROPOSAL** [3] - 1469:4, 1469:16
**PROPOSALS** [3] - 1467:9, 1470:25, 1471:2
**PROPOSE** [3] - 1507:18, 1508:13, 1508:17
**PROPOSED** [16] - 1482:14, 1482:15, 1482:17, 1482:19, 1486:21, 1500:9, 1500:21, 1501:8, 1501:22, 1502:22, 1502:23, 1504:3, 1504:16, 1504:17, 1505:22, 1505:24
**PROPOSING** [1] - 1509:17
**PROS** [1] - 1475:5
**PROVE** [1] - 1481:14
**PROVES** [1] - 1502:3
**PROVIDE** [11] - 1449:21, 1487:13, 1487:17, 1489:9, 1493:21, 1498:2, 1498:7, 1498:9, 1499:9, 1506:9, 1508:13
**PROVIDED** [2] - 1473:14, 1486:20
**PROVIDING** [5] - 1449:4, 1478:21, 1493:22, 1498:4, 1505:3
**PUBLIC** [1] - 1444:24
**PUBLISH** [1] - 1463:23
**PUMPED** [1] - 1468:2
**PURCHASING** [1] - 1448:17
**PURPOSE** [9] - 1437:19, 1449:20, 1469:4, 1469:7, 1470:14, 1471:16, 1472:8, 1473:3, 1510:9
**PURPOSES** [4] - 1471:19, 1478:18, 1484:15, 1503:6
**PURSUANT** [1] - 1513:8
**PURSUED** [1] - 1474:11
**PURVIEW** [1] - 1449:7
**PUT** [10] - 1429:25, 1430:4, 1431:1, 1433:6, 1434:5, 1438:1, 1455:20,

1457:22, 1458:19, 1506:23
**PUTTING** [4] - 1482:23, 1490:22, 1509:1, 1509:2

**Q**

**QUALIFY** [1] - 1452:18
**QUALITY** [6] - 1446:7, 1449:21, 1450:11, 1450:12, 1451:24, 1469:6
**QUESTIONING** [1] - 1432:3
**QUESTIONS** [1] - 1448:22
**QUICK** [1] - 1510:2
**QUICKER** [3] - 1428:14, 1428:17, 1429:1
**QUITE** [1] - 1498:3
**QUOTE** [4] - 1432:20, 1462:1, 1501:10

**R**

**RADIUS** [1] - 1488:6
**RAISE** [2] - 1435:23, 1491:20
**RAISED** [2] - 1504:21, 1508:1
**RAISING** [1] - 1487:2
**RANDOM** [1] - 1465:11
**RANGE** [1] - 1444:23
**RATHER** [3] - 1477:18, 1492:23, 1503:5
**RATINGS** [1] - 1440:6
**RATIO** [1] - 1456:13
**RATIONALE** [1] - 1475:7
**RATIOS** [1] - 1456:19
**RAVEN** [1] - 1424:5
**REACH** [1] - 1496:7
**REACHED** [1] - 1473:24
**REACTION** [2] - 1432:15, 1432:24
**READ** [9] - 1432:13, 1433:20, 1434:19, 1438:19, 1447:17, 1451:20, 1475:8, 1502:2
**READILY** [1] - 1472:5
**READING** [5] - 1432:9, 1433:14, 1434:1, 1458:16, 1462:2

**READINGS** [6] - 1432:6, 1438:24, 1438:25, 1458:18, 1463:3, 1463:19
**READY** [1] - 1436:13
**REAL** [2] - 1472:10, 1475:4
**REALIZE** [1] - 1502:24
**REALIZED** [1] - 1434:13
**REALLY** [10] - 1442:10, 1442:17, 1442:24, 1448:14, 1452:10, 1472:13, 1491:17, 1499:18
**REALTIME** [1] - 1513:5
**REASON** [17] - 1437:25, 1438:5, 1439:11, 1453:15, 1459:25, 1460:2, 1462:17, 1462:21, 1464:5, 1464:14, 1469:24, 1473:22, 1476:2, 1476:15, 1503:20, 1504:1, 1509:21
**REASONABLENESS** [2] - 1499:21, 1499:23
**REASONS** [3] - 1432:18, 1473:23, 1492:12
**RECALLING** [1] - 1511:1
**RECEIPT** [1] - 1505:6
**RECEIVE** [3] - 1464:15, 1478:4, 1478:13
**RECEIVED** [8] - 1450:24, 1460:5, 1460:6, 1464:19, 1464:20, 1467:4, 1467:9, 1478:8
**RECENTLY** [4] - 1445:19, 1450:12, 1450:14, 1479:7
**RECESS** [1] - 1477:21
**RECOGNIZE** [1] - 1437:8
**RECOLLECTION** [2] - 1433:15, 1471:8
**RECOMMENDATION** [5] - 1435:4, 1435:9, 1438:18, 1438:20, 1473:16
**RECOMMENDATIONS** [3] - 1437:20, 1438:1, 1438:6
**RECOMMENDATION**

**S** [2] - 1435:1, 1437:17
**RECOMMENDED** [2] - 1439:19, 1474:13
**RECOMMENDING** [1] - 1438:23
**RECORD** [9] - 1427:8, 1436:5, 1477:24, 1504:15, 1504:22, 1506:7, 1506:14, 1506:18, 1512:1
**REDIRECT** [1] - 1425:5
**REDIRECT** [1] - 1427:20
**REFERENCE** [2] - 1483:4, 1492:6
**REFERRED** [1] - 1462:9
**REFERRING** [6] - 1437:25, 1446:18, 1447:9, 1454:4, 1492:14, 1507:14
**REFERS** [1] - 1462:5
**REFLECT** [1] - 1448:15
**REFRESH** [1] - 1471:8
**REFUSAL** [1] - 1474:9
**REFUSE** [1] - 1454:12
**REFUSED** [1] - 1454:9
**REGARD** [3] - 1478:5, 1487:16, 1499:23
**REGARDING** [3] - 1430:1, 1430:7, 1500:12
**REGARDLESS** [1] - 1456:24
**REGULAR** [3] - 1457:16, 1457:19, 1501:2
**REGULARLY** [1] - 1455:14
**REGULATES** [1] - 1445:2
**REGULATIONS** [1] - 1513:12
**REINTRODUCE** [2] - 1509:5, 1509:20
**REJOINED** [1] - 1427:8
**RELATE** [1] - 1494:22
**RELATED** [3] - 1439:4, 1457:2, 1502:20
**RELATES** [2] - 1475:13, 1480:25
**RELATING** [1] - 1470:2
**RELATION** [1] - 1471:11

**RELATIONSHIP** [1] - 1445:15
**RELEVANCE** [1] - 1502:1
**RELEVANT** [3] - 1501:4, 1501:25, 1502:8
**RELIABLE** [1] - 1458:20, 1494:7
**RELIED** [1] - 1494:4
**RELUCTANCE** [1] - 1474:9
**RELUCTANT** [1] - 1481:23
**RELY** [3] - 1494:6, 1495:25, 1496:2
**REMAIN** [1] - 1427:7
**REMAINS** [1] - 1505:2
**REMARK** [1] - 1461:19
**REMEDIATE** [1] - 1453:20
**REMEDIATION** [2] - 1443:10, 1443:19
**REMEDY** [4] - 1428:7, 1443:24, 1444:3, 1446:16
**REMEMBER** [16] - 1429:17, 1429:18, 1429:19, 1442:5, 1442:18, 1443:5, 1453:4, 1457:15, 1458:21, 1459:7, 1466:14, 1473:21, 1473:22, 1477:7, 1477:12
**REMINDS** [1] - 1456:12
**REMOVE** [1] - 1436:9
**RENDER** [1] - 1452:11
**REOPEN** [2] - 1510:8, 1510:13
**REORIENT** [1] - 1483:5
**REPEAT** [1] - 1438:21
**REPEATED** [2] - 1463:11, 1463:14
**REPHRASE** [5] - 1437:24, 1438:3, 1444:13, 1460:17, 1470:3
**REPLY** [1] - 1460:1
**REPORT** [36] - 1438:6, 1438:8, 1438:12, 1439:10, 1440:1, 1455:11, 1455:13, 1461:15, 1470:2, 1470:20, 1471:6, 1471:11, 1471:17, 1471:20, 1472:8,

1472:10, 1472:13, 1472:16, 1472:17, 1472:18, 1472:20, 1472:22, 1472:23, 1473:3, 1473:4, 1473:6, 1473:7, 1473:19, 1473:23, 1489:6, 1491:21, 1492:8, 1492:10, 1493:16, 1494:5, 1494:11
**REPORTED** [1] - 1513:10
**REPORTER** [4] - 1423:24, 1513:1, 1513:6, 1513:19
**REPORTER'S** [1] - 1423:13
**REPORTS** [3] - 1473:1, 1473:9, 1488:23
**REPRESENT** [1] - 1491:23
**REPRESENTATIVE** [1] - 1431:3
**REPUTABLE** [1] - 1462:11
**REQUEST** [1] - 1454:15
**REQUESTED** [1] - 1444:25
**REQUESTING** [4] - 1498:2, 1498:5, 1498:9, 1510:8
**REQUESTS** [1] - 1470:25
**REQUIRE** [5] - 1446:12, 1454:20, 1458:15, 1483:22, 1497:18
**REQUIRED** [5] - 1428:11, 1428:13, 1454:10, 1454:17, 1455:9
**REQUIREMENT** [3] - 1454:6, 1454:24, 1485:10
**REQUIREMENTS** [2] - 1446:11, 1508:3
**REQUIRES** [2] - 1446:15, 1504:20
**REQUIRING** [1] - 1453:17
**RESOLVE** [1] - 1438:13
**RESOLVED** [3] - 1430:13, 1430:20, 1430:22
**RESOLVES** [1] - 1502:18

**RESOLVING** [1] - 1438:16
**RESPECT** [2] - 1492:3, 1495:6
**RESPECTIVE** [2] - 1504:2, 1504:15
**RESPOND** [2] - 1478:11, 1499:7
**RESPONDED** [1] - 1454:12
**RESPONSE** [3] - 1432:3, 1433:1, 1459:23
**RESPONSES** [2] - 1431:25, 1441:12
**RESPONSIBILITY** [1] - 1482:16, 1482:20
**RESPONSIBLE** [3] - 1483:11, 1484:7, 1495:17
**RESTORATION** [2] - 1478:6, 1506:4
**RESULT** [4] - 1438:7, 1441:14, 1463:8, 1494:18
**RESULTS** [24] - 1439:4, 1441:24, 1442:6, 1442:9, 1442:13, 1442:15, 1442:16, 1450:8, 1450:12, 1452:13, 1457:24, 1457:25, 1458:9, 1458:20, 1459:8, 1459:17, 1460:11, 1460:22, 1461:15, 1462:10, 1462:14, 1463:1, 1463:4, 1476:16
**RETAINED** [1] - 1470:4
**RETENTION** [1] - 1470:15
**RETURN** [2] - 1477:15, 1502:20
**REVIEW** [3] - 1506:6, 1506:7, 1509:16
**REVIEWED** [4] - 1431:4, 1459:17, 1478:14, 1479:6
**REVIEWING** [2] - 1460:25, 1506:20
**REVISED** [1] - 1487:13
**REVISIT** [1] - 1504:8
**REVISITING** [1] - 1504:20
**RICHARD** [14] - 1482:12, 1483:1, 1491:11, 1497:18, 1499:6, 1499:15,

1504:4, 1504:21, 1505:20, 1506:19, 1507:20, 1507:25, 1508:11, 1509:10
**RICHARD** [19] - 1424:5, 1481:20, 1483:3, 1491:12, 1492:5, 1492:18, 1492:24, 1493:8, 1493:24, 1497:20, 1499:24, 1500:2, 1500:5, 1503:15, 1504:5, 1505:21, 1506:20, 1508:1, 1510:22
**RICK** [1] - 1431:1
**RIGHTS** [1] - 1505:24
**RIGHTY** [5] - 1431:6, 1446:7, 1453:2, 1455:9, 1466:15
**RISE** [2] - 1466:10, 1500:11
**RISES** [1] - 1501:16
**RISK** [4] - 1449:4, 1449:6, 1452:9, 1452:10
**RISKS** [1] - 1507:16
**ROLE** [5] - 1470:1, 1470:19, 1470:22, 1470:23, 1471:10
**RON** [1] - 1424:20
**ROUND** [1] - 1442:2
**ROUTINE** [1] - 1433:3
**RPR** [1] - 1423:23
**RULE** [1] - 1508:3
**RULE** [2] - 1479:23, 1479:24
**RULED** [3] - 1491:13, 1494:17, 1494:19
**RULING** [5] - 1478:20, 1492:15, 1493:17, 1505:13, 1509:8
**RULINGS** [2] - 1487:1, 1492:21
**RUN** [2] - 1458:12, 1490:3

# S

**S-1** [3] - 1444:16, 1450:10, 1452:25
**S-2** [3] - 1444:16, 1450:10, 1452:25
**SAMPLE** [4] - 1439:6, 1439:9, 1463:9, 1475:17
**SAMPLED** [1] - 1433:7
**SAMPLES** [2] - 1449:21, 1462:9
**SAMPLING** [11] -

1432:21, 1432:25, 1433:16, 1433:23, 1441:19, 1441:23, 1459:17, 1462:1, 1462:7, 1462:16
**SAN** [2] - 1424:11, 1424:16
**SANCTION** [1] - 1493:6
**SANTA** [1] - 1423:5
**SANTA** [1] - 1436:19
**SAUGUS** [39] - 1432:14, 1435:7, 1438:25, 1439:13, 1439:14, 1439:15, 1440:6, 1442:20, 1443:10, 1443:11, 1450:2, 1451:25, 1452:4, 1452:8, 1452:15, 1454:20, 1456:1, 1459:17, 1465:12, 1465:13, 1465:22, 1468:4, 1468:14, 1468:16, 1469:7, 1487:10, 1489:4, 1491:4, 1494:15, 1495:2, 1495:10
**SC-1** [4] - 1432:6, 1433:4, 1437:4, 1465:11
**SCIENCE** [1] - 1492:13
**SCIENTIFIC** [1] - 1492:7
**SCOPE** [1] - 1448:18
**SCOTT** [1] - 1424:9
**SCOTT** [1] - 1424:19
**SCREEN** [1] - 1464:7
**SCV** [2] - 1429:15, 1429:16
**SE** [15] - 1478:7, 1482:10, 1500:12, 1500:13, 1500:16, 1500:18, 1500:20, 1501:3, 1501:4, 1501:11, 1501:12, 1501:17, 1505:6, 1505:13, 1506:4
**SEATED** [1] - 1436:4
**SECOND** [9] - 1431:24, 1433:17, 1434:12, 1442:2, 1442:15, 1468:1, 1470:9, 1480:5, 1500:22
**SECONDARY** [1] - 1430:13
**SECTION** [1] - 1437:19

**SECTION** [1] - 1513:8
**SEE** [34] - 1431:8, 1431:25, 1435:1, 1436:10, 1437:6, 1437:15, 1438:8, 1438:22, 1440:16, 1447:11, 1447:13, 1456:3, 1457:4, 1459:23, 1460:24, 1461:1, 1464:7, 1465:11, 1465:14, 1466:24, 1468:3, 1468:11, 1472:13, 1473:4, 1477:9, 1480:2, 1481:25, 1494:7, 1494:8, 1499:24, 1504:25, 1509:23, 1510:14
**SEEKING** [1] - 1469:8
**SELECTED** [1] - 1471:4
**SEND** [2] - 1506:9, 1511:6
**SENIOR** [6] - 1436:23, 1436:24, 1437:2, 1443:9, 1450:6
**SENSE** [3] - 1495:15, 1496:3, 1503:22
**SENT** [6] - 1459:21, 1460:1, 1460:10, 1463:19, 1466:12, 1507:20
**SENTENCE** [4] - 1432:11, 1432:23, 1471:22, 1501:8
**SENTINEL** [1] - 1449:17, 1449:20, 1450:9
**SEPTEMBER** [4] - 1433:9, 1457:8, 1458:24, 1466:6
**SERVE** [2] - 1446:10, 1447:23
**SERVICE** [3] - 1433:6, 1434:5, 1435:8
**SET** [1] - 1458:12
**SETTING** [1] - 1454:22
**SETTLED** [2] - 1483:19, 1485:24
**SETTLEMENT** [6] - 1482:11, 1502:21, 1503:2, 1503:4, 1503:21, 1505:16
**SETTLING** [1] - 1504:19
**SEVERAL** [5] - 1434:6, 1434:16, 1442:12, 1443:3, 1468:14
**SHALL** [4] - 1435:7,

1435:8, 1435:25
**SHALLOW** [1] - 1491:17
**SHOUP** [1] - 1494:5
**SHOUP'S** [1] - 1493:16
**SHOW** [3] - 1484:22, 1486:24, 1500:2
**SHOWN** [1] - 1446:4
**SHOWS** [2] - 1429:21, 1489:15
**SHU** [2] - 1429:3, 1451:8
**SHU-FANG** [2] - 1429:3, 1451:8
**SHUT** [6] - 1433:3, 1433:4, 1434:11, 1439:1, 1439:8, 1440:10
**SIC** [19] - 1468:16, 1473:7, 1473:10, 1482:11, 1483:2, 1483:11, 1484:5, 1487:11, 1488:9, 1489:16, 1492:3, 1492:6, 1493:20, 1495:11, 1497:7, 1502:21, 1503:1, 1503:21, 1505:15
**SIC'S** [1] - 1503:5
**SIDE** [2] - 1496:3
**SIDES** [1] - 1487:23
**SIGN** [2] - 1457:13, 1457:17
**SIGNATURE** [3] - 1451:1, 1456:3, 1457:10
**SIMILAR** [1] - 1452:13
**SIMPLEST** [1] - 1485:12
**SIMPLY** [5] - 1479:13, 1480:7, 1481:25, 1485:21, 1509:18
**SITE** [13] - 1443:20, 1444:3, 1450:8, 1453:20, 1453:25, 1468:16, 1469:19, 1475:20, 1475:21, 1480:10, 1495:13
**SITUATION** [1] - 1438:21
**SIXTH** [1] - 1435:4
**SLOW** [1] - 1434:1
**SLUG** [1] - 1452:19
**SOIL** [3] - 1431:10, 1431:17, 1440:22
**SOLELY** [1] - 1503:6
**SOLEMNLY** [1] - 1435:24
**SOMEONE** [1] -

1494:6
**SOMETIME** [2] - 1444:22, 1469:14
**SOMETIMES** [1] - 1448:13
**SOMEWHERE** [1] - 1488:6
**SORRY** [14] - 1434:3, 1447:7, 1451:15, 1453:25, 1455:21, 1458:24, 1458:25, 1464:8, 1465:18, 1467:2, 1468:20, 1474:19, 1490:20, 1499:3
**SOUNDS** [3] - 1433:1, 1455:12, 1491:20
**SOURCE** [45] - 1432:9, 1432:14, 1434:17, 1439:15, 1440:10, 1441:1, 1441:8, 1441:22, 1444:14, 1444:20, 1445:1, 1445:6, 1445:24, 1446:4, 1463:15, 1465:13, 1465:25, 1466:22, 1471:17, 1472:5, 1473:10, 1473:12, 1486:12, 1486:13, 1487:6, 1487:8, 1487:9, 1487:17, 1487:18, 1487:19, 1487:22, 1487:23, 1487:24, 1488:4, 1490:7, 1493:20, 1494:1, 1494:14, 1495:9, 1495:11, 1495:13, 1496:5, 1496:6, 1497:11
**SOURCES** [28] - 1444:11, 1445:23, 1446:14, 1456:21, 1466:18, 1468:3, 1468:13, 1468:14, 1468:16, 1469:6, 1469:9, 1470:6, 1472:9, 1472:10, 1473:8, 1482:24, 1483:13, 1484:12, 1484:14, 1486:6, 1486:20, 1487:3, 1489:2, 1491:14, 1491:18, 1492:16, 1493:14
**SOUTH** [1] - 1424:6
**SPEAKING** [2] - 1436:9, 1498:4
**SPECIAL** [1] - 1501:2
**SPECIFIC** [16] -

1429:24, 1438:6, 1438:10, 1485:1, 1486:5, 1486:20, 1487:18, 1488:4, 1488:5, 1488:8, 1488:11, 1488:12, 1489:12, 1494:9, 1494:21

**SPECIFICALLY** [6] - 1435:10, 1445:25, 1485:11, 1493:23, 1494:24, 1509:3

**SPECIFICS** [2] - 1498:2, 1498:8

**SPECIFIES** [1] - 1487:14

**SPECIFY** [2] - 1472:10, 1486:11

**SPECULATE** [1] - 1429:20

**SPECULATION** [5] - 1450:4, 1474:1, 1491:18, 1492:13, 1496:1

**SPELL** [1] - 1436:6

**SPIKE** [1] - 1434:12

**SPIKED** [1] - 1434:10

**SPOT** [2] - 1488:8, 1493:6

**SPTF** [3] - 1432:8, 1432:14, 1460:12

**STAFF** [7] - 1429:15, 1429:16, 1429:21, 1432:20, 1441:18, 1454:5

**STAND** [2] - 1427:9, 1435:22

**STANDARD** [4] - 1437:21, 1463:10, 1482:20, 1507:22

**STANDARDS** [4] - 1447:24, 1449:5, 1458:12, 1458:15

**STANIN** [1] - 1496:10

**STANLEY** [1] - 1423:3

**START** [8] - 1444:21, 1445:22, 1477:15, 1478:10, 1482:12, 1482:18, 1482:19, 1510:20

**STARTED** [5] - 1434:20, 1443:13, 1443:25, 1444:22, 1510:16

**STARTUP** [1] - 1443:15

**STATE** [4] - 1453:8, 1453:19, 1454:16, 1456:18

**STATE** [8] - 1436:5,

1440:19, 1454:9, 1458:13, 1501:1, 1504:14, 1504:22, 1506:18

**STATEMENT** [11] - 1430:23, 1431:12, 1431:19, 1440:23, 1448:9, 1448:11, 1452:1, 1453:12, 1468:24, 1471:13, 1472:6

**STATEMENTS** [1] - 1494:17

**STATES** [1] - 1502:6

**STATES** [4] - 1423:1, 1513:6, 1513:8, 1513:13

**STATES** [2] - 1434:24, 1480:4

**STATING** [1] - 1476:8

**STATION** [1] - 1434:11

**STATUTE** [3] - 1499:17, 1507:3, 1507:5

**STAY** [2] - 1501:20, 1508:11

**STENOGRAPHICAL LY** [1] - 1513:10

**STEP** [2] - 1435:15, 1483:24

**STILL** [7] - 1447:3, 1452:7, 1481:14, 1492:12, 1501:25, 1505:5, 1505:8

**STIPULATED** [3] - 1450:22, 1467:1, 1467:3

**STONE** [1] - 1424:19

**STREET** [1] - 1423:24

**STREET** [3] - 1424:6, 1424:10, 1424:15

**STRICKEN** [1] - 1491:23

**STUDIES** [4] - 1460:15, 1460:18, 1474:6

**STUDY** [3] - 1460:20, 1460:23, 1471:17

**STUFF** [1] - 1490:8

**SUBJECT** [3] - 1453:3, 1477:8, 1484:9

**SUBMIT** [4] - 1499:10, 1507:2, 1507:24, 1511:22

**SUBMITTED** [2] - 1479:15, 1506:21

**SUBMITTING** [2] - 1453:14, 1506:3

**SUBSEQUENT** [2] - 1434:9, 1504:19

**SUBSEQUENTLY** [1] - 1434:10

**SUBSTANCES** [1] - 1429:10

**SUCCESSFUL** [1] - 1481:24

**SUCCESSOR** [8] - 1478:10, 1478:23, 1479:6, 1479:11, 1480:8, 1480:24, 1481:12, 1505:2

**SUCCESSOR** [1] - 1480:22

**SUFFICIENT** [5] - 1487:19, 1490:5, 1490:6, 1499:5, 1505:11

**SUFFICIENTLY** [1] - 1494:1

**SUGGEST** [4] - 1446:24, 1451:24, 1476:12, 1498:3

**SUGGESTED** [1] - 1491:19

**SUGGESTING** [1] - 1509:11

**SUGGESTION** [1] - 1502:25

**SUITE** [1] - 1423:24

**SUITE** [1] - 1424:16

**SULFATE** [1] - 1456:17

**SUPERFUND** [2] - 1483:18

**SUPERINTENDENT** [1] - 1465:8

**SUPERIORS** [3] - 1473:19, 1474:4, 1475:1

**SUPERVISOR** [1] - 1458:8

**SUPPLIED** [2] - 1488:15, 1496:18

**SUPPLIER** [1] - 1486:4

**SUPPLIERS** [3] - 1485:13, 1485:20, 1486:4

**SUPPLY** [1] - 1495:18

**SUPPORT** [2] - 1494:3, 1498:11

**SUPPORTED** [2] - 1503:16, 1507:11

**SUPPORTS** [2] - 1491:9, 1507:12

**SUPPOSE** [3] - 1444:19, 1461:18, 1475:1

**SUPPOSED** [3] - 1428:9, 1461:14, 1472:17

**SURFACE** [1] - 1456:14

**SURPRISED** [1] - 1504:8

**SURPRISING** [1] - 1508:20

**SUSTAIN** [2] - 1468:25, 1476:22

**SUSTAINED** [3] - 1450:5, 1467:23, 1474:16

**SWEAR** [1] - 1435:24

**SWITCHING** [1] - 1462:8

**SWORN** [1] - 1435:23

**SWORN** [2] - 1427:19, 1436:15

**SYSTEM** [5] - 1434:7, 1443:10, 1445:3, 1456:2, 1492:17

**SYSTEMS** [1] - 1453:6

**T**

**T'S** [1] - 1507:23

**TAKAICHI** [2] - 1476:5, 1476:7

**TASKED** [2] - 1437:3, 1450:7

**TCE** [3] - 1460:14, 1468:17, 1496:6

**TECHNICAL** [7] - 1429:6, 1429:9, 1437:21, 1473:15, 1474:4, 1475:10, 1480:25

**TEN** [1] - 1448:16

**TEND** [1] - 1448:13

**TERM** [1] - 1452:9

**TERMS** [3] - 1431:17, 1446:7, 1506:18

**TESTED** [1] - 1457:4

**TESTIFIED** [4] - 1431:2, 1432:2, 1452:12, 1474:25

**TESTIFY** [3] - 1488:22, 1489:1, 1498:13

**TESTIFYING** [2] - 1428:6, 1448:12

**TESTIMONY** [5] - 1428:18, 1435:24, 1472:21, 1487:22, 1507:2

**TESTING** [1] - 1443:17

**THAT** [3] - 1513:7, 1513:8, 1513:11

**THE** [174] - 1424:3, 1424:12, 1427:7, 1427:11, 1427:12, 1427:16, 1427:19, 1434:1, 1434:3, 1434:23, 1435:12, 1435:14, 1435:16, 1435:17, 1435:20, 1436:3, 1436:4, 1436:7, 1436:8, 1436:11, 1436:12, 1436:15, 1437:25, 1438:4, 1443:22, 1443:24, 1446:20, 1446:24, 1447:3, 1447:7, 1447:13, 1447:16, 1447:19, 1448:20, 1448:25, 1449:11, 1449:13, 1450:5, 1450:19, 1453:22, 1455:5, 1455:23, 1459:14, 1460:5, 1460:17, 1463:23, 1464:1, 1464:19, 1467:1, 1467:23, 1468:19, 1468:25, 1469:22, 1470:12, 1470:17, 1471:9, 1472:24, 1474:2, 1474:3, 1474:16, 1474:22, 1476:22, 1476:25, 1477:3, 1477:12, 1477:24, 1478:19, 1478:25, 1479:9, 1479:18, 1480:3, 1480:7, 1480:18, 1480:22, 1481:2, 1481:15, 1481:18, 1481:23, 1482:3, 1482:7, 1483:7, 1483:23, 1484:1, 1484:4, 1484:18, 1484:25, 1485:16, 1486:8, 1486:15, 1486:19, 1487:3, 1487:12, 1487:16, 1487:24, 1488:12, 1488:17, 1488:22, 1488:25, 1489:5, 1489:9, 1489:14, 1490:10, 1490:15, 1490:17, 1490:21, 1491:2, 1491:5, 1491:10, 1492:1, 1492:14, 1492:20, 1493:2, 1493:5, 1493:10, 1493:13, 1494:8, 1494:24, 1495:5, 1495:16, 1495:22, 1496:13,

1496:24, 1497:2, 1497:5, 1497:17, 1497:25, 1498:7, 1498:16, 1498:20, 1499:2, 1499:5, 1499:25, 1500:4, 1500:8, 1500:24, 1501:7, 1501:15, 1501:19, 1502:13, 1502:16, 1503:18, 1503:22, 1504:9, 1504:14, 1506:5, 1506:23, 1507:5, 1507:13, 1507:18, 1507:25, 1508:9, 1508:16, 1508:25, 1509:15, 1509:23, 1510:4, 1510:8, 1510:12, 1510:17, 1510:19, 1510:23, 1511:14, 1511:18, 1511:21, 1511:24, 1513:6, 1513:7, 1513:8, 1513:9, 1513:10, 1513:11, 1513:12, 1513:13

**THEIRS** [1] - 1429:4
**THEORETICAL** [5] - 1455:17, 1456:8, 1456:10, 1458:19, 1459:2
**THEORETICALLY** [1] - 1489:5
**THEREFORE** [2] - 1480:12, 1481:13
**THINKING** [2] - 1443:5, 1483:5
**THIS** [1] - 1513:15
**THREAD** [1] - 1498:23
**THREAT** [10] - 1449:22, 1451:24, 1452:8, 1452:11, 1452:15, 1452:20, 1452:21, 1452:23, 1452:25
**THREE** [8] - 1429:22, 1460:15, 1460:23, 1461:4, 1507:10, 1507:16, 1508:2, 1511:16
**THRESHOLD** [1] - 1503:12
**THROW** [1] - 1496:13
**TIMEFRAME** [1] - 1434:20
**TINY** [1] - 1490:7
**TITLE** [1] - 1513:8
**TO** [2] - 1423:8, 1513:8
**TODAY** [10] - 1428:10,

1452:4, 1452:24, 1488:2, 1492:6, 1506:10, 1507:2, 1507:22, 1508:5, 1508:20
**TODD** [5] - 1467:7, 1467:13, 1467:15, 1467:18, 1469:15
**TOGETHER** [1] - 1482:16
**TOMORROW** [15] - 1477:4, 1477:9, 1477:13, 1477:17, 1477:18, 1486:7, 1488:16, 1497:14, 1498:14, 1498:22, 1498:25, 1506:11, 1510:1, 1510:20, 1511:8
**TONIGHT** [1] - 1491:24
**TOOK** [2] - 1429:7, 1474:25
**TOOLS** [1] - 1441:6
**TOP** [1] - 1457:7
**TORTFEASORS** [4] - 1484:23, 1485:7, 1485:10, 1505:12
**TORTS** [2] - 1483:17, 1483:21
**TOXIC** [1] - 1429:10
**TOXICOLOGIST** [1] - 1449:6
**TRANSCRIPT** [1] - 1511:16
**TRANSCRIPT** [3] - 1423:13, 1513:9, 1513:11
**TRANSPORTED** [1] - 1468:12
**TREAT** [4] - 1454:10, 1454:17, 1482:13, 1482:15
**TREATMENT** [13] - 1427:23, 1428:11, 1428:12, 1429:5, 1443:10, 1446:17, 1453:5, 1453:17, 1453:25, 1454:1, 1456:1, 1456:14, 1459:18
**TREND** [1] - 1453:1
**TRENDS** [2] - 1451:23, 1452:20
**TRIAL** [1] - 1423:13
**TRIAL** [2] - 1427:8, 1477:24
**TRIED** [1] - 1485:18
**TROWBRIDGE** [1] - 1424:15

**TRUDELL** [4] - 1487:22, 1496:9, 1496:10, 1497:8
**TRUE** [7] - 1437:13, 1452:3, 1462:22, 1475:11, 1475:18, 1506:19, 1506:25
**TRUE** [1] - 1513:9
**TRUTH** [7] - 1436:1, 1449:15, 1455:7, 1455:8, 1474:24
**TRUTHFUL** [1] - 1451:13
**TRY** [1] - 1496:14
**TRYING** [7] - 1469:3, 1469:9, 1481:9, 1483:4, 1485:2, 1498:23, 1509:19
**TUESDAY** [1] - 1499:1
**TURN** [2] - 1480:5, 1483:7
**TURNED** [1] - 1509:6
**TURNING** [1] - 1509:7
**TURNOUT** [8] - 1433:4, 1435:7, 1437:4, 1439:1, 1440:10, 1441:4, 1456:19, 1460:14
**TURNOUTS** [12] - 1431:3, 1432:10, 1438:24, 1439:12, 1439:14, 1440:5, 1440:9, 1445:4, 1455:10, 1459:18, 1460:12, 1465:21
**TWO** [14] - 1429:22, 1446:22, 1446:24, 1447:8, 1447:9, 1456:20, 1457:13, 1457:16, 1473:1, 1485:24, 1492:5, 1492:12, 1497:10, 1507:10
**TYPE** [4] - 1436:25, 1439:6, 1443:19, 1511:8
**TYPICAL** [1] - 1429:21

## U

**U.S** [4] - 1423:3, 1501:23, 1502:4, 1505:14
**UBIQUITOUS** [1] - 1488:3
**UNDEFINED** [3] - 1482:24, 1483:13, 1484:12
**UNDER** [13] - 1427:10, 1431:25, 1432:2,

1435:1, 1437:16, 1440:16, 1441:12, 1446:12, 1483:17, 1483:18, 1483:20, 1483:21
**UNDERSTOOD** [1] - 1504:9
**UNDERTAKEN** [3] - 1435:8, 1439:2, 1446:1
**UNDERTAKING** [1] - 1474:6
**UNDESCRIBED** [2] - 1485:7, 1496:15
**UNFORTUNATE** [2] - 1462:5, 1462:19
**UNIDENTIFIED** [4] - 1496:15, 1496:18, 1496:19, 1496:25
**UNIFORM** [1] - 1450:13
**UNIQUE** [1] - 1475:17
**UNITED** [4] - 1423:1, 1513:6, 1513:8, 1513:13
**UNITED** [1] - 1502:6
**UNKNOWN** [5] - 1485:13, 1487:10, 1494:18, 1495:11
**UNLESS** [4] - 1447:8, 1463:23, 1509:24, 1510:13
**UNREALISTIC** [1] - 1498:21
**UNUSUAL** [1] - 1439:4
**UP** [32] - 1429:21, 1431:1, 1435:22, 1442:24, 1443:13, 1445:9, 1451:19, 1454:18, 1455:20, 1460:8, 1464:22, 1465:25, 1467:18, 1472:10, 1472:17, 1472:18, 1472:22, 1473:2, 1477:4, 1478:9, 1479:4, 1490:1, 1491:5, 1491:25, 1493:18, 1495:4, 1496:14, 1501:20, 1502:24, 1509:14, 1510:2, 1511:13
**UPGRADIENT** [3] - 1449:18, 1468:13, 1468:14
**UPHILL** [1] - 1509:22

## V

**V-201** [5] - 1430:7,

1444:16, 1487:7, 1494:13, 1495:9
**V-205** [1] - 1444:16
**VACATION** [1] - 1448:16
**VALLEY** [1] - 1436:19
**VALLEY** [1] - 1423:5
**VALLEY** [1] - 1469:19
**VARIOUS** [2] - 1429:4, 1436:25
**VERBIAGE** [1] - 1480:21
**VERDICT** [1] - 1501:2
**VERSION** [1] - 1461:3
**VERSUS** [2] - 1475:20, 1489:22
**VIDEO** [4] - 1449:14, 1450:20, 1455:6, 1474:23
**VIEW** [2] - 1441:21, 1505:9
**VIGOROUS** [1] - 1500:3
**VIOLATION** [2] - 1502:2, 1502:3
**VOC** [6] - 1435:5, 1435:6, 1440:6, 1460:11, 1468:14, 1495:17
**VOCS** [44] - 1427:23, 1430:7, 1430:12, 1438:24, 1438:25, 1439:13, 1442:1, 1442:2, 1444:20, 1445:1, 1445:4, 1445:16, 1445:23, 1446:5, 1446:9, 1446:15, 1448:2, 1450:2, 1450:10, 1452:4, 1452:15, 1454:1, 1454:10, 1454:17, 1454:20, 1455:10, 1466:18, 1468:4, 1468:12, 1468:18, 1468:21, 1469:7, 1470:6, 1473:8, 1475:13, 1475:20, 1483:11, 1487:6, 1488:2, 1489:21, 1492:17, 1493:15, 1494:18, 1495:13
**VOLUME** [1] - 1423:8
**VOLUMES** [3] - 1446:24, 1447:8, 1447:9
**VS** [1] - 1423:7

## W

**WAIT** [4] - 1457:16, 1463:9, 1494:7, 1494:8
**WALK** [1] - 1435:21
**WALL** [1] - 1496:14
**WALLS** [1] - 1487:21
**WARNING** [1] - 1449:22
**WAS** [2] - 1427:19, 1436:15
**WASHINGTON** [1] - 1424:15
**WATCH** [1] - 1435:15
**WATER** [32] - 1430:11, 1438:9, 1443:19, 1444:12, 1444:25, 1446:7, 1446:10, 1447:21, 1447:23, 1447:24, 1448:10, 1449:4, 1449:19, 1449:21, 1449:22, 1450:11, 1450:12, 1451:24, 1453:4, 1456:13, 1456:14, 1456:15, 1456:18, 1456:20, 1458:1, 1463:6, 1466:21, 1467:15, 1467:19, 1475:19, 1492:17
**WATER** [9] - 1429:15, 1429:16, 1436:19, 1445:2, 1451:11, 1456:18, 1461:12, 1481:12, 1481:15
**WATER** [1] - 1423:5
**WEDNESDAY** [3] - 1498:22, 1499:4, 1499:8
**WEEK** [2] - 1478:6, 1490:1
**WELLS** [41] - 1432:14, 1439:13, 1439:15, 1442:20, 1444:12, 1444:15, 1449:23, 1450:1, 1450:10, 1451:21, 1451:25, 1452:11, 1452:15, 1453:6, 1454:1, 1466:18, 1468:4, 1468:14, 1468:17, 1468:18, 1468:21, 1469:7, 1487:6, 1487:7, 1487:16, 1490:9, 1490:12, 1490:13, 1490:16, 1491:16, 1491:17, 1492:3, 1494:13, 1494:15, 1494:25,

1495:1, 1495:6, 1495:7, 1496:19
**WEST** [1] - 1445:14
**WEST** [1] - 1423:24
**WESTERN** [1] - 1423:2
**WHITTAKER** [40] - 1429:9, 1442:20, 1444:7, 1445:23, 1446:4, 1468:15, 1473:7, 1473:9, 1474:5, 1475:20, 1476:3, 1476:9, 1476:12, 1476:16, 1478:5, 1480:8, 1480:9, 1480:10, 1480:13, 1480:14, 1481:6, 1481:12, 1488:14, 1489:16, 1490:7, 1492:3, 1493:21, 1495:17, 1496:5, 1496:6, 1497:6, 1497:9, 1497:10, 1497:13, 1497:15, 1502:3, 1502:4, 1502:17
**WHITTAKER** [1] - 1423:8
**WHOLE** [2] - 1436:1, 1491:14
**WIDELY** [3] - 1431:8, 1431:15, 1440:19
**WISH** [1] - 1478:16
**WITH** [1] - 1513:12
**WITHDRAW** [3] - 1500:18, 1504:2, 1509:1
**WITHDRAWAL** [1] - 1499:17
**WITHDRAWING** [2] - 1504:15, 1509:2
**WITHDRAWN** [15] - 1500:4, 1500:7, 1502:15, 1502:16, 1502:17, 1504:4, 1504:8, 1504:23, 1505:7, 1505:15, 1505:18, 1505:23, 1507:6, 1507:7, 1509:20
**WITHDREW** [2] - 1500:2, 1508:17
**WITNESS** [5] - 1427:9, 1434:24, 1435:17, 1435:22, 1460:25
**WITNESS** [8] - 1427:11, 1434:3, 1435:16, 1436:3, 1436:7, 1436:11, 1443:24, 1474:3

**WITNESSES** [2] - 1425:1, 1425:3
**WITNESSES** [1] - 1504:6
**WORD** [5] - 1428:20, 1428:21, 1428:22, 1454:12, 1480:21
**WORDING** [2] - 1480:2, 1506:21
**WORDS** [8] - 1437:22, 1462:5, 1462:19, 1463:20, 1484:17, 1492:11, 1495:1, 1503:7
**WORKS** [2] - 1461:11, 1480:17
**WORRY** [1] - 1443:4
**WRESTLE** [1] - 1482:6
**WRITING** [6] - 1429:25, 1430:2, 1430:4, 1451:12, 1499:7, 1499:9
**WRITTEN** [2] - 1440:1, 1451:7
**WRONGS** [1] - 1481:13
**WROTE** [2] - 1464:25, 1473:6

## Y

**YANG** [1] - 1429:3
**YARDS** [1] - 1441:4
**YEAR** [7] - 1428:1, 1428:3, 1428:4, 1429:18, 1448:17, 1465:10
**YEARS** [14] - 1429:22, 1436:21, 1442:5, 1444:22, 1445:17, 1455:18, 1457:13, 1457:17, 1459:5, 1467:17, 1469:19, 1474:9, 1476:8, 1507:16
**YOST** [1] - 1445:14

## Z

**ZERO** [1] - 1463:4