1      UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3    HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

4

5  SANTA CLARITA VALLEY WATER AGENCY,        )
                                            )
6                        Plaintiff,         )
                                            )
7       v.                                  )        Case No.
                                            )  CV 18-6825 SB (RAOx)
8  WHITTAKER CORPORATION, et al.,           )
                                            )        Volume 16
9                        Defendants.        )   (Pages 1754 - 1907)
   _____    )

10

11      REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
             TRIAL DAY 9:  A.M. SESSION
12         WEDNESDAY, DECEMBER 1, 2021
                    8:29 A.M.
13          LOS ANGELES, CALIFORNIA

14

15

16

17

18

19

20

21

22  _____

23      MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
           FEDERAL OFFICIAL COURT REPORTER
24          350 WEST 1ST STREET, ROOM 4455
           LOS ANGELES, CALIFORNIA  90012
25                 (213) 894-2305

| | |
|---|---|
| 1 | **APPEARANCES OF COUNSEL:** |
| 2 | |
| 3 | **FOR THE PLAINTIFF:** |
| 4 | NOSSAMAN, LLP<br>BY:  BYRON P. GEE |
| 5 | BY:  RAVEN MCGUANE<br>BY:  PATRICK J. RICHARD |
| 6 | BY:  FRED FUDACZ<br>        Attorneys at Law |
| 7 | 777 South Figueroa Street, 34th Floor<br>Los Angeles, California  90017 |
| 8 | (213) 612-7800 |
| 9 | NOSSAMAN, LLP<br>BY:  ILSE CHANDALAR SCOTT |
| 10 |        Attorney at Law<br>50 California Street, 34th Floor |
| 11 | San Francisco, California  94111<br>(415) 398-3600 |
| 12 | |
| 13 | |
| | **FOR THE DEFENDANT WHITTAKER CORPORATION:** |
| 14 | |
| | EDLIN, GALLAGHER, HUIE & BLUM |
| 15 | BY:  MICHAEL E. GALLAGHER, JR.<br>BY:  FRED M. BLUM |
| 16 | BY:  DANIEL ERIC TROWBRIDGE<br>        Attorneys at Law |
| 17 | 500 Washington Street, Suite 700<br>San Francisco, California  94111 |
| 18 | (415) 397-9006 |
| 19 | |
| 20 | **ALSO PRESENT:** |
| 21 | MATT STONE<br>SCOTT FRYER |
| 22 | RON BEATON<br>ERIC LARDIERE |
| 23 | |
| 24 | |
| 25 | |

**UNITED STATES DISTRICT COURT**

1    **INDEX OF WITNESSES**

2

3    DEFENDANT'S WITNESSES                                    PAGE

4    SIMPSON, Timothy

5        Direct Examination (Resumed) by Mr. Gallagher       1764
         Cross-Examination by Mr. Richard                    1792
6        Redirect Examination by Mr. Gallagher               1819
         Recross-Examination by Mr. Richard                  1825
7

8
     LECHLER, Benjamin
9
         Direct Examination by Mr. Blum                      1827
10       Cross-Examination by Mr. Gee                        1869
         Redirect Examination by Mr. Blum                    1890

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                                       **INDEX OF EXHIBITS**

2                                                    FOR

                                                EVIDENCE

3 NUMBER    DESCRIPTION                                      PG.

4   12  -  2/12/2016 letter                         1851

5 1410  -  12/9/2010 e-mail                      1844

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1758

| | |
|---|---|
| 1 | WEDNESDAY, DECEMBER 1, 2021; 8:29 A.M. |
| 2 | LOS ANGELES, CALIFORNIA |
| 3 | -oOo- |
| 4 | (Out of the presence of the jury:) |
| 08:29AM   5 | THE COURTROOM DEPUTY:  Calling Item No. 2, Case |
| 6 | No. CV 18-06825-SB, Santa Clarita Valley Water Agency versus |
| 7 | Whittaker Corporation. |
| 8 | Counsel, please state your appearances starting with |
| 9 | plaintiff's counsel. |
| 08:30AM  10 | MR. RICHARD:  Good morning.  Patrick Richard for |
| 11 | plaintiff.  With me today is Ms. McGuane, Mr. Gee, and |
| 12 | Ms. Micevych. |
| 13 | MR. BLUM:  Good morning, Your Honor.  Fred Blum for |
| 14 | defendant.  With me is Mr. Trowbridge, Mr. Gallagher, as well |
| 08:30AM  15 | as Mr. Fryer.  Mr. Lardiere will be here later this morning. |
| 16 | THE COURT:  Very well. |
| 17 | Good morning, everyone.  Please be seated. |
| 18 | We are outside the presence of the jury, and I |
| 19 | believe we're waiting on a couple of jurors, and we'll get |
| 08:30AM  20 | started as soon as we can. |
| 21 | In the meantime, I did want to provide the Court |
| 22 | with the -- the parties, rather, with the Court's ruling on |
| 23 | Ms. Durant's deposition.  And there were a number of |
| 24 | objections, and I'm simply going to give you the Court's ruling |
| 08:30AM  25 | so that you can properly prepare for the presentation of this |

UNITED STATES DISTRICT COURT

```
 1   evidence.
 2            So I'll just indicate the page and line numbers and
 3   the ruling:
 4            29:13 to 30:25, the objection is overruled.
 5            31:3 to 31:5, the objection is sustained.
 6            Same ruling, sustained for 31:22 to 32:23.
 7            Same ruling, sustained for 50:8 to 50:24.
 8            And sustained for 103:18 to 104:8.
 9            I'm now moving to the disputed exhibits for
10   Benjamin Lechler.  And my interpretation, since I have a binder
11   that only has four exhibits, is that there are only objections
12   to these four exhibits.  And otherwise, the exhibits are not
13   going to be able to be used consistent with the Court's
14   direction to the parties previously.
15            MR. BLUM:  Your Honor, I believe the other exhibits
16   have been agreed to.
17            THE COURT:  I'm sorry?
18            MR. BLUM:  I believe the other exhibits we intend to
19   use have been agreed to.
20            THE COURT:  That's perfectly fine.  And I perhaps
21   misstated what I intended.  I assumed that I have the -- the
22   only ones that I have are the ones that are challenged.  All I
23   mean to suggest is, if you've given me four and there are eight
24   that are challenged, you wouldn't be able to use the four.  To
25   the extent that I have the universe -- when I say you wouldn't
```

08:31AM (line 5)
08:32AM (line 10)
08:32AM (line 15)
08:32AM (line 20)
08:33AM (line 25)

```
 1    be able to use, just not at this time until I've had an

 2    opportunity to review them.

 3              MR. BLUM:  Yes, Your Honor.

 4              THE COURT:  But that's an academic point it sounds

 5    like.  The parties only have four challenged documents.

 6              MR. BLUM:  That's -- that is my understanding,

 7    Your Honor.

 8              THE COURT:  All right.  So with that, I'm just going

 9    to give you the benefit of the Court's tentative thinking, but

10    as has been true throughout this trial, the parties need to

11    make the objections contemporaneously after an appropriate

12    foundation has been laid.

13              And so at least tentatively, if an appropriate

14    foundation and the like -- I don't limit it to foundation.  If

15    everything necessary to introduce these exhibits are provided

16    at trial, the Court likely will overrule the objections on the

17    grounds stated, and that applies to all four of these exhibits.

18              What I'm generally finding -- and -- is this you,

19    Mr. Gee?

20              MR. GEE:  Yes, it is, Your Honor.

21              THE COURT:  Is that -- and we're nearing the end,

22    but just to give you at least the benefit of the Court's

23    thought process -- is that you're objecting to a lot of things

24    that really go to the weight where you have an argument about

25    why it doesn't necessarily mean what it means or shouldn't be
```

**UNITED STATES DISTRICT COURT**

1    construed in the way it's being offered.  A lot of that really

2    just goes to the weight.  It's not a question of admissibility.

3           And so you probably have been noticing my tentative

4    thoughts have gone a lot that way, and that has been the

08:34AM  5    Court's thought process.  Okay?

6           MR. GEE:  Yes.

7           THE COURT:  All right.  Is there anything else that

8    the Court needs to address?  We still have jury instructions,

9    of course, and the JMOL still is pending.  But is there

08:35AM  10   anything for purposes of the witnesses who will be testifying

11   that the Court needs to address that I have not?  Let me

12   start -- I'm going to start with the plaintiff, please,

13   Mr. Richard.

14          MR. RICHARD:  Yes.  In our rebuttal case, we

08:35AM  15   identified -- I think it's 7 minutes and 20 seconds of Mr. Daus

16   who was their 30(b)(6) witness who I understood up until Sunday

17   they would be calling live.  So we've designated a portion of

18   that.  We've just received counter-designations.  There's going

19   to be an issue because those designations go well beyond

08:35AM  20   completeness.  And so he's their witness.  If they want to call

21   him, they can call him live.  But to have a bunch of hearsay

22   that they want to play from this long deposition, I haven't had

23   a chance to further meet and confer, but that's my position.  I

24   think that's a correct statement of the law.

08:35AM  25          Other than that, that's in our rebuttal case, so we

```
 1   won't get to that this morning for sure.
 2          THE COURT:  All right.  And where is that currently
 3   physically?  Do I have the designations and cross-designations?
 4          MR. RICHARD:  I don't know if Your Honor has the
 5   cross-designations.  I believe binders have or will be
 6   delivered of all of that.  I would assume that it's going to be
 7   at the 10:30 break, Your Honor, that we'll sort that out.
 8          THE COURT:  All right.  Mr. Blum or -- yes?
 9          MR. BLUM:  Your Honor, oh, I'm sorry.
10          MR. GALLAGHER:  You can.
11          MR. BLUM:  We believe we can work it out.  We agree
12   that we could only designate for completeness.  That's not at
13   issue.  We'll just -- ten minutes we can resolve it.
14          I have a logistical question, Your Honor.  We've
15   agreed on the -- what needs to be read from the three
16   depositions.  My preference is to have Mr. Fryer on the witness
17   stand and Mr. Trowbridge read question, answer, question,
18   answer.  Is that okay with the Court?
19          THE COURT:  Yes.  This is in the instance where we
20   just have the transcript?
21          MR. BLUM:  Yes, sir.
22          THE COURT:  That's fine.
23          MR. BLUM:  All right.  Thank you.
24          THE COURT:  And the jury is now all here.  So it
25   will just be a moment, but they should be coming in shortly.
```

08:36AM (line 5)
08:36AM (line 10)
08:36AM (line 15)
08:36AM (line 20)
08:37AM (line 25)

**UNITED STATES DISTRICT COURT**

|   | 1 | MR. BLUM:  Your Honor, there is one issue that -- |
|---|---|---|
|   | 2 | never mind.  We might -- see if we can resolve it first. |
|   | 3 | THE COURT:  All right. |
|   | 4 | And do we have Mr. Simpson? |
| 08:38AM | 5 | MR. GALLAGHER:  We do. |
|   | 6 | THE COURT:  Let's please have him resume the witness |
|   | 7 | stand. |
|   | 8 | MR. BLUM:  Your Honor, does the Court have a problem |
|   | 9 | if I absence myself during Mr. Simpson's testimony? |
| 08:38AM | 10 | THE COURT:  I do not. |
|   | 11 | (In the presence of the jury:) |
|   | 12 | THE COURT:  We remain on the record in Santa Clarita |
|   | 13 | Valley Water Agency versus Whittaker Corporation.  We are now |
|   | 14 | joined by the jury. |
| 08:39AM | 15 | Good morning, ladies and gentlemen. |
|   | 16 | THE JURY:  Good morning. |
|   | 17 | THE COURT:  And you may recall, we are still in the |
|   | 18 | defense case, and Mr. Simpson was testifying in direct. |
|   | 19 | And so, Mr. Simpson, if you would kindly resume the |
| 08:39AM | 20 | witness stand. |
|   | 21 | Good morning.  And please be seated. |
|   | 22 | You are not going to be sworn in again because you |
|   | 23 | have previously been sworn, but you do understand that you |
|   | 24 | continue to testify under oath? |
| 08:39AM | 25 | THE WITNESS:  I do, yes. |

```
 1              THE COURT:  All right.  And please make sure that
 2   you do what you were doing yesterday which is please speak into
 3   the microphone so that everyone is able to clearly hear you.
 4              And, Mr. Gallagher, as soon as Mr. Simpson is
 5   ready -- give him a moment -- you may proceed.
 6              MR. GALLAGHER:  Thank you, Your Honor.
 7              THE WITNESS:  I'm ready, thank you.
 8                         TIMOTHY SIMPSON,
 9   DEFENDANT'S WITNESS, PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:
10                  DIRECT EXAMINATION (RESUMED)
11   BY MR. GALLAGHER:
12        Q.   Mr. Simpson, yesterday we were, I think, delving
13   into the DDW permitting situation.  Before we get into that, I
14   wanted to make sure, because it was getting late in the day
15   yesterday, going back to the 205 notice.
16              Do you recall that conversation?
17        A.   I do.
18        Q.   Okay.  And I just want to make it clear, the notice,
19   as you understand it, was provided to Whittaker and
20   Mr. Lardiere; correct?
21        A.   Yes.
22        Q.   Now, did Mr. Lardiere instruct you to respond on
23   Whittaker's behalf, if you know?
24        A.   He did.  He asked --
25              MR. RICHARD:  Objection, Your Honor.  Hearsay.
```

08:39AM  5

08:40AM  10

08:40AM  15

08:40AM  20

08:40AM  25

UNITED STATES DISTRICT COURT

1    THE COURT:  I'm going to overrule the objection but

2  limit its relevance.

3    You're not to take this for the truth of the matter

4  but just in terms of the actions, if any, that were taken based

5  upon what you're going to be hearing.

6    Go ahead.

7    Q.    (BY MR. GALLAGHER:)  You may answer.

8    A.    Yes.  Mr. Lardiere asked us to prepare a written

9  response to the notice of perchlorate detections at 205.

10   Q.    And did you do that?

11   A.    We tried.  We -- as I think I testified yesterday,

12 our -- our hope was that the operation of 201, Well 201, which

13 is upgradient of 205, would be sufficient to protect

14 Well V-205.  And we were awaiting the results of a containment

15 study by Castaic Lake's consultant --

16   Q.    Castaic Lake now being the agency; correct?

17   A.    Yeah, the water agency's consultant on the

18 sufficiency of the hydraulic capture at 201.  We had just put

19 that well into service, and we were waiting to see that the

20 benefit at the 205 well, whether that would be sufficient to

21 contain the perchlorate plume.

22   Q.    And the containment study would help you -- assist

23 in making that determination?

24   A.    That's correct.

25   Q.    And did you ever receive that containment study?

08:40AM (lines 5, 10)
08:41AM (lines 15, 20)
08:42AM (line 25)

1    A.    It -- it was a -- we finally received it but only

2  after the litigation -- after the lawsuit was filed.  It was

3  something -- it was a topic of our monthly meetings.  And they

4  would ask us, What is your response to 205?

08:42AM  5    Q.    And did you, in your technical meetings, advise the

6  agency and its consultants of your request that you were

7  waiting for this containment study before you could respond to

8  the 205 notice?

9    A.    Indeed, I did.  It was something that we would

08:42AM 10  request at every meeting.  They would ask about 205.  We'd say

11  we need the containment study so we can really evaluate what

12  the state of capture is.  And -- and it kept being promised.

13  It kept being delayed.  And only after litigation -- the

14  litigation was filed were we able to receive that report.

08:43AM 15    Q.    Thank you.

16    Back to the discussion where we left off last night,

17  the DDW permitting status for 201.  Do you recall that?  We

18  started getting into it.

19    A.    I do.

08:43AM 20    Q.    Okay.  And what's your understanding, prior to this

21  litigation, of the status of that DDW permitting process as it

22  related to 201?

23    A.    Well, documents had been submitted to DDW by the

24  water agency's consultants, and there was back-and-forth about

08:43AM 25  various technical items.  We did not have a seat at the table

**UNITED STATES DISTRICT COURT**

          1    in those discussions.  We were not copied on correspondence

          2    between the water agency and DDW.  So we were a bit -- well, we

          3    were very much out of the loop on that.

          4              THE COURT:  Let me stop you and -- I don't think

08:43AM   5    there's a foundation for a lot of this.  So you're going to

          6    have to make sure that you establish a foundation before asking

          7    him about the process.  He's now repeatedly stated they didn't

          8    have a seat at the table.

          9         Q.   (BY MR. GALLAGHER:)  Okay.  So how were you

08:44AM  10    involved, if at all, in the DDW permitting process?  How do you

         11    have any knowledge about what the status is?

         12         A.   Well, what we learned from the technical meetings --

         13    again, it was another agenda item.  In every meeting we had the

         14    status of permitting, and -- and the technical folks from the

08:44AM  15    water agency would report on the status.

         16         Q.   And why is that relevant to V-201, just if you can

         17    explain?

         18         A.   Well, certainly --

         19              MR. RICHARD:  Objection.  Vague, Your Honor.

08:44AM  20              THE COURT:  Sustained.

         21         Q.   (BY MR. GALLAGHER:)  Why is it relevant to the V-201

         22    wellhead treatment in this containment effort?

         23              MR. RICHARD:  I'm not sure what the "it" is.

         24    Objection, vague.

08:44AM  25              THE COURT:  It is vague.

**UNITED STATES DISTRICT COURT**

```
 1        Q.    (BY MR. GALLAGHER:)  Why is this permitting process
 2   important to the V-201 wellhead treatment containment effort?
 3        A.    So the original intent of putting wellhead treatment
 4   at 201 was, first, to provide containment and, second, to
 5   restore water supply.  And so --
 6        Q.    How were you involved in this process, you know, in
 7   terms of the wellhead treatment, the permitting process, and
 8   getting this well back online for containment and potable
 9   water?
10        A.    Well, there's a lot there in that question.
11              So we were involved in the actual implementation of
12   wellhead treatment at 201.  We worked with the agency to -- to
13   implement, to -- to make that happen and to get the tanks
14   installed as quickly as possible to restore water supply.  We
15   were very motivated.  We saw the need to get 201 operating as
16   quickly as possible to provide protection for downgradient
17   wells.
18              THE COURT:  I'm going to stop you.  The question was
19   very general, and so this is now a narrative.
20              BY MR. GALLAGHER:  Okay.  I'll hone in on it.
21        Q.    (BY MR. GALLAGHER:)  So in terms of not having a
22   seat at the table, did you mean -- well, what did you mean by
23   that with respect to the permitting process?
24        A.    Sorry if I confused you.
25              Only in regards to the permitting, you know, the
```

discussions with DDW.  We were not involved in the actual, you

know -- I'm sorry, preparing the documents needed to obtain the

permit to operate that well for potable purposes.

     Q.    In your technical meetings, did you have any

discussions with the agency and/or its consultants about what

was being done, being prepared as part of this permitting

process?

     A.    We were told that -- that they were either waiting

for comments back from DDW or that we are in the process of

updating our documents to resubmit to DDW.  So we were -- we

were told that the process was ongoing.

     Q.    And were you ever told what the nature of those

discussions were between the agency, its consultants, and the

DDW?

     A.    Well, these are -- these are fairly involved

reports.  There's a lot to them.  And we didn't know the

particulars as to what was -- what issues were at hand in terms

of additional information that DDW was requesting.

     Q.    Did the agency or its consultants ever articulate to

you what the concerns were with the DDW and this permitting

process?

     A.    They told us that there were concerns about VOCs

in -- in the water and in the -- the water extracted from the

wells and that that was something that they had to deal with.

     Q.    And do you have an understanding of how the agency

1770

```
 1    was responding to those concerns?

 2              MR. RICHARD:  Objection.  Lacks foundation,

 3    Your Honor.

 4              THE COURT:  Sustained.

 5       Q.   (BY MR. GALLAGHER:)  Did you have any conversations

 6    with the agency or the technical folks about how they were

 7    going to address those concerns raised by the agency?

 8              MR. RICHARD:  I think that misstates the testimony,

 9    Your Honor.  Objection.

10              THE COURT:  Overruled.

11              You can answer.  Did you have such discussions with

12    the agency representatives?

13              THE WITNESS:  They -- they did tell us that VOCs

14    were a concern and that they were trying to address that

15    concern.  There was no mention of installing treatment for

16    VOCs, that -- that they were addressing it through their MCL

17    equivalent calculations.  They did tell us that.

18       Q.   (BY MR. GALLAGHER:)  And do you have an

19    understanding in your conversations with the agency what that

20    meant, how are they dealing with it through the MCL equivalency

21    calculations?

22       A.    There was some back-and-forth, we were told, by the

23    agency representatives that -- that they had to redo the MCL

24    calculations.  And the results of those revised calculations,

25    when they account for some of the naturally occurring
```

08:48AM   (line 5)
08:48AM   (line 10)
08:48AM   (line 15)
08:49AM   (line 20)
08:49AM   (line 25)

contaminants -- and I think the other two contaminants were

hexavalent chrom and uranium, the MCL calculation was below 1.

THE COURT:  Did you say hexavalent chrom?

THE WITNESS:  I did, yes, hexavalent chrom.

Q.    (BY MR. GALLAGHER:)  And do you have an

understanding of the significance of the MCL equivalency being

below 1?

A.    It -- it means that the -- if the MCL equivalent is

below 1, it means that a treatment for --

THE COURT:  I'm going to have you ask him another

question because now it's not clear whether he's reporting his

own knowledge as opposed to what he was being told, which is

the subject of this discussion.

Q.    (BY MR. GALLAGHER:)  Did you ever have a discussion

with the agency and/or its representatives as to the

significance of the MCL equivalency being -- that number being

below 1?

MR. RICHARD:  Your Honor, I'm just going to raise a

relevance objection in light of the permit not having issued to

this whole line at this point.

THE COURT:  Overruled.

You can answer that question.  And please make sure

that you have a recollection, if so, of a specific

conversation.

THE WITNESS:  I -- I have a general knowledge that

```
  1    the -- just in my profession as a consulting engineer.
  2             THE COURT:  All right.  That's not the question.
  3             Ask another question, please.
  4        Q.    (BY MR. GALLAGHER:)  Backtracking a little bit,
08:51AM  5    after -- I believe you testified earlier that the wellhead
  6    treatment at 201 was installed and 201 was back online in
  7    approximately 2017.  Is that accurate?
  8        A.    That's correct.
  9        Q.    Okay.  And between 2017 and to date, do you have an
08:51AM 10    understanding that the permitting process is still ongoing?
 11        A.    Yes.  That's correct.
 12        Q.    Okay.  And in your -- and you had conversations
 13    about the status of this permitting process during these
 14    technical meetings with the agency and its consultants.  Is
08:51AM 15    that fair?
 16        A.    That's correct.
 17        Q.    Do you have an understanding, based on those
 18    technical meetings, what the cause or the reason for the delay
 19    is in issuing the permit based on your conversations with the
08:51AM 20    agency and its technical folks?
 21        A.    As I said earlier, these are involved permits.  The
 22    technical reports that are needed to support the -- the
 23    permit -- issuing the permit are involved.  And I'm not aware
 24    of the particular comments from DDW that had to be responded
08:52AM 25    to.
```

1       Q.    Did you take any efforts on your own on behalf of

2    Whittaker to make contact with the DDW to find out for yourself

3    what the status is of the permitting process?

4       A.    I -- I did.

08:52AM   5       Q.    Okay.  And did you talk to anybody at the agency in

6    particular to find out what the status is of the permitting

7    process?

8       A.    I -- I did.

9             MR. RICHARD:  I'm just -- vague as to "agency."  I'm

08:52AM  10    not sure he's talking about the water agency or the state

11    agency.

12             THE COURT:  Sustained.

13             MR. GALLAGHER:  I apologize.  I'll clear that up.

14       Q.    (BY MR. GALLAGHER:)  When I asked that -- if you

08:52AM  15    took it upon yourself to talk to anybody at the agency, I meant

16    the DDW.  Did you take it upon yourself to speak with the DDW

17    to find out the status of the permitting process?

18       A.    I did.

19       Q.    Okay.  And did you speak to anybody in particular at

08:52AM  20    the DDW regarding the status of the permitting process?

21       A.    I spoke to Bill Lang of DDW.

22       Q.    And as you sit here today, do you have an

23    understanding as to what the delay is in the status of issuing

24    this permit for V-201?

08:53AM  25       A.    As of last week when I talked to Mr. Lang, I was

1774

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 08:53AM | 5 |

told that they're still awaiting documents --

        THE COURT:  Hold on, please.

        MR. RICHARD:  Hearsay, Your Honor.

        THE COURT:  Sustained.  Sustained.

    Q.    (BY MR. GALLAGHER:)  Not going into the specifics of the conversation, do you have an understanding, as you sit here, as to the delay in issuing the DDW -- excuse me -- issuing the 201 permit by the DDW?

    A.    It's my understanding that DDW is still waiting for documents from the water agency.

    Q.    Do you have any understanding, as you sit here today, based on those conversations, whether or not the VOCs are the holdup or cause for why the V-201 permit has not been issued?

    A.    They are not.

    Q.    Okay.  Switching gears.

    Your history with the Whittaker-Bermite site, as you sit here today, it involves dealing with aspects of the onsite and offsite remedy, does it not?

    A.    It does.

    Q.    Okay.  And I believe we testified -- you testified yesterday a little bit about the OUs involved.  Do you remember that?

    A.    I don't remember, but I'm -- I'm aware of the -- of the seven OUs at the site.

**UNITED STATES DISTRICT COURT**

1    Q.    Okay.  And can you generally describe the OUs that

2  pertain to onsite versus offsite?

3    A.    Well, OUs 1 through 6 are onsite, and OU-7 is

4  groundwater.  And groundwater is onsite and offsite.  So OU-7

08:54AM 5  extends to the extent of the plume.

6    Q.    Okay.  And for the onsite OUs 1 through 6, did the

7  remedy involve both soil and groundwater treatment?

8    A.    It did, yes.

9    Q.    And for the OU-7 -- what's the status of that

08:55AM 10  remedy, if you will?

11    A.    So there is a remedial action plan -- we call it a

12  RAP -- for offsite groundwater, and that has been approved by

13  Department of Toxic Substances Control, DTSC.  It's a state

14  agency.  And the strategy for offsite groundwater is -- is the

08:55AM 15  containment achieved through these production wells.

16    Q.    As part of the OU-7 RAP, are monitoring wells

17  discussed?

18    A.    They are.

19    Q.    Okay.  And do you have an understanding of what the

08:55AM 20  current status of the discussion of monitoring wells is?

21         MR. RICHARD:  Objection.  Vague, Your Honor.

22         THE COURT:  Sustained.

23    Q.    (BY MR. GALLAGHER:)  Monitoring wells, are they a

24  part of the RAP for OU-7?

08:56AM 25    A.    They are, yes.

1    Q.   And can you describe for us what the process is of

2  deciding whether or not monitoring wells should be installed as

3  part of the OU-7 RAP?

4        THE COURT:  Are you asking historically what

08:56AM  5  occurred since -- or are you asking what's going to occur?

6        MR. GALLAGHER:  I'm asking what's currently his

7  understanding.

8        THE COURT:  So you're asking him the extent to which

9  monitoring wells have been installed as part of the OU-7 RAP?

08:56AM 10        MR. GALLAGHER:  And the plan, if any, for future

11  monitoring wells and what that process is.

12        THE COURT:  Why don't you break that down into two

13  parts.  Monitoring wells that currently have been installed

14  pursuant to the RAP and then, next, future monitoring wells.

08:56AM 15        THE WITNESS:  Okay.  So there are a number of

16  monitoring wells, offsite monitoring wells.  There's many

17  onsite monitoring wells, and there are offsite monitoring wells

18  that were installed in consultation with Department of Toxic

19  Substances Control, with their approval.  And there are also

08:57AM 20  what we would call sentry wells, and the sentry wells are

21  located upgradient of the production wells, intended to be

22  early warning signs.

23        You don't want your production well to be the first

24  time you see a contaminant that you weren't aware of.  So you

08:57AM 25  put these -- these monitoring wells upgradient so that you have

```
         1   an idea of what would be eventually drawn into the production
         2   well.
         3        Q.    (BY MR. GALLAGHER:)  So -- so for moving forward,
         4   if -- is there a process in connection with this RAP and OU-7
08:57AM  5   if there is a need or a suggestion that additional monitoring
         6   wells are needed?  Is there a process for deciding whether that
         7   should happen?
         8        A.    There is.  Well, first of all, there is a very
         9   significant effort in monitoring these wells, the onsite wells
08:58AM 10   and the offsite wells.  And Whittaker actually works with the
        11   water agency and -- and coordinates those efforts.
        12        Q.    So if --
        13        A.    And it's also an adaptive management where you learn
        14   from the data and you -- from there, you decide if additional
08:58AM 15   monitoring wells are needed.
        16        Q.    So if there's a suggestion or recommendation or
        17   request by anybody that additional monitoring wells or a well
        18   is needed, what is that process?  How -- what's involved in
        19   that process?
08:58AM 20        A.    Well, this is a public process.  You know, all of
        21   the -- the, um -- the work that's done at the Bermite site and
        22   for OU-7 is a public process.  And the public is -- is able to
        23   comment on -- on the various reports, and there's also -- I
        24   would call the public process for this project sort of public
08:59AM 25   participation on steroids because they -- they have these
```

1778

1    multi-jurisdictional task force meetings that are held -- that

2    were held monthly for a while.  With COVID, it certainly has

3    tapered -- tapered down.

4         Q.   So, for example, if the agency wanted to request --

08:59AM   5    excuse me -- an additional monitoring well or ten monitoring

6    wells, is there a process by which it could go through to

7    request that of the DTSC in connection with this OU-7 route?

8         A.   They could.  They certainly have an audience with

9    DTSC at these multi-jurisdictional task force meetings.  The

08:59AM   10   agency participates, as does DTSC.  So that would be the forum

11   if there was a concern about the sufficiency of the monitoring

12   well network to make those concerns -- to make DTSC aware of

13   those concerns.

14        Q.   And as you sit here today, have you participated in

09:00AM   15   any of those discussions with the DTSC about the need for

16   additional monitoring wells or any activity as it relates to

17   OU-7?

18        A.   I do not participate in the multi-jurisdictional

19   task force meetings.  My colleague, Dr. Amini, does.  But DTSC

09:00AM   20   does participate in our monthly technical meetings, and they

21   have not brought up concerns about the sufficiency of the

22   monitoring well network.

23        Q.   And "they" being the agency?

24        A.   Department of Toxic Substances Control, that's

09:00AM   25   correct.

**UNITED STATES DISTRICT COURT**

1779

```
 1          Q.    Now, going back to 201 for a minute.  As you
 2   mentioned, the well is online, it has wellhead treatment, and
 3   is treating for perchlorate; correct?
 4          A.    That's correct.
 5          Q.    And there's no permit --
 6          A.    Hold on.  I'm sorry.
 7          Q.    Sorry.
 8          A.    I answered too quickly.  It is a -- it is able to
 9   treat water, but it's my understanding it's currently not
10   operating.  It's been shut down for about the last three months
11   for -- for maintenance.
12          Q.    And prior to that, was it treating water from the
13   Saugus --
14          A.    It was.
15          Q.    -- for perchlorate?  Sorry.
16                Because the -- the water agency does not have a
17   permit, what does it do with the water after it's treated, if
18   you know?
19          A.    I do.  The water is, um -- is discharged to a local
20   storm drain where it eventually goes to the Santa Clara River.
21   And so the water is basically discharged to surface water
22   with -- under authorization with what they call NPDES permit,
23   National Pollutant Discharge Elimination System permit, that
24   allows them to discharge to surface water.
25                And in order to meet the discharge limits of that
```

09:00AM — 5
09:01AM — 10
09:01AM — 15
09:01AM — 20
09:02AM — 25

**UNITED STATES DISTRICT COURT**

1    permit, the water has to be dechlorinated and -- I'm sorry.  It

2    has to be blended.  And -- and because it's being blended with

3    treated surface water, the surface water contains chlorine, and

4    they have to dechlorinate that in order to discharge.  And the

09:02AM  5    reason they're blending that water is because the natural

6    sulfate concentrations are above the discharge standards.

7        Q.    Does the NPDES or NPDES permit require the agency to

8    treat the water before it's discharged to the river for VOCs?

9        A.    No, it does not.

09:02AM  10       Q.    Let's turn to your opinions.

11            So you're also retained as an expert in this matter.

12   You understand that; right?

13       A.    I do.

14       Q.    Okay.  And can you tell us, generally speaking, the

09:03AM  15   scope of that retention, what you were asked to do?

16       A.    I was asked to prepare a rebuttal report to

17   Dr. Najm's cost estimate for VOC treatment and perchlorate

18   treatment at Saugus 1 and 2 wells, V-201, and V-205.  And

19   specifically, I was asked to assume that VOC treatment would be

09:03AM  20   needed at Saugus 1 and 2 and 201 and to come up with a cost

21   estimate to do that.  And then for 205, I was asked to assume

22   that treatment for both perchlorate and VOCs would be required

23   and to come up with a cost estimate to do that.

24       Q.    Now, you said you assumed treatment would be

09:04AM  25   required.  You were asked to assume treatment would be required

1   for VOCs; correct?

2        A.    That's correct.

3        Q.    As you sit here today, do you have any -- what's

4   your opinion on whether or not the treatment will even be

09:04AM  5   needed for VOCs?

6        A.    Well, that -- that's my first opinion, is that

7   Dr. Najm assumes that VOC treatment is needed at the -- you

8   know, for Saugus 1 and 2, for V-201 and 205.  And there is no

9   regulatory requirement to install treatment for VOCs at any of

09:04AM  10  those wells.

11       Q.    As part of your analysis into those costs, what did

12  you do to prepare your opinions to rebut Mr. Najm's estimates?

13       A.    So to come up with our cost estimate, my cost

14  estimate, to implement treatment at these wells, we looked at

09:05AM  15  what we had just recently completed in 2017 for V-201.  We

16  thought that that's a real-life example, it's a real well that

17  was -- you know, we installed -- we worked with the water

18  agency to implement wellhead treatment at that site.

19            And we were very involved in that project.  We

09:05AM  20  actually -- we were sort of the financial manager of that

21  project.  The invoices came to us.  They were first approved by

22  the water agency, and then we would approve those and process

23  them for payment.

24       Q.    In your time with -- working for Whittaker at the

09:05AM  25  Bermite site, this isn't the first wellhead treatment that's

1782

```
 1   been installed there -- right? -- on behalf of the agency?
 2           THE COURT:  When you say "wellhead treatment that's
 3   been installed there," define "there," please.
 4           MR. GALLAGHER:  Well, let me just rephrase the
 5   question.
 6       Q.   (BY MR. GALLAGHER:)  Wellhead treatment isn't the --
 7   it's not the first time that wellhead treatment has been
 8   utilized by the agency in connection with its production wells.
 9       A.   That's correct.  Wellhead treatment was installed at
10   Well Q-2 as well.
11       Q.   Okay.  And the Saugus Perchlorate Treatment
12   Facility, it's a form of wellhead treatment, is it not?
13       A.   Well, you're pushing water through ion exchange
14   vessels to remove the perchlorate.  That is similar.  But much
15   different project, I think I testified about this yesterday,
16   that the Saugus 1 and 2 treatment plant -- the treatment
17   vessels are at a separate location, and that project was much
18   more complicated because you had to convey water from the wells
19   to the central treatment plant.
20       Q.   And as opposed to what happened at 201, for example?
21       A.   201, they built an enclosure and -- and put
22   treatment vessels in.  It was a much simpler project.
23       Q.   And was the same true for Q-2?
24       A.   At the time, yes.  When -- when Q-2 -- when
25   perchlorate detections were found at Q-2, the water agency very
```

09:06AM (lines 5, 10, 15, 20)
09:07AM (line 25)

1783

```
 1    quickly installed vessels to treat for perchlorate.
 2         Q.   So when you're preparing your -- excuse me.  In
 3    preparing your opinions, why is that so relevant, the fact that
 4    you had V-201 and Q-2 wellhead treatment?  Why is that relevant
 5    to your analysis?
 6         A.   Well, I guess very simply we know what things cost.
 7    We did it.  You know, on behalf of Whittaker, we managed the
 8    technical -- I mean, the -- the financial aspects of this
 9    project.  And we -- we actually had a seat at the table in that
10    regard in that we were involved in -- in monitoring the
11    progress of the project and processing the payments.
12              So we had a very good idea of what wellhead
13    treatment should cost.
14         Q.   So in terms of what Mr. Najm did, what do you
15    disagree with?  I mean, you have real costs.  What -- what's
16    the problem with what Dr. Najm did?
17         A.   Well, first of all, he added a lot of contingency to
18    his estimates.  And he used a -- an estimating guide that
19    assumes a high degree of uncertainty.  And in an engineering
20    project, when something is unknown and you're trying to
21    estimate the cost, you would -- you would add contingency for
22    the potential unknowns.
23              And in looking at his cost, it looks like he added a
24    substantial amount of contingency that really drove up the
25    price.  And -- and these are fairly simple projects.  You know,
```

1784

this is -- this is very much a commodity.

Q.   When you say "a commodity," what do you mean?  Can I go to the store and just say, hey, I want this system, and buy it full price?  I don't understand what you mean.

09:09AM

A.   It's probably not -- there is engineering involved because you have to figure out how you're going to hook it up and the size pumps you need and whether you need a slab and the seismic tie-downs for that.  It's not going to the store and buying it.  You can't go to Home Depot and buy a treatment system.

09:09AM

But this is a commodity in that there are numerous vendors that sell these tanks and -- and the main difference, really, between the -- the Saugus 1 and 2 project that we were involved in and the -- the V-201 wellhead treatment project is the way the project was executed.

09:10AM

For -- for 201, it was -- I would say a design-build approach where we -- we said let's just deal directly with the -- the vendors that sell the tanks and -- and have a contractor come in, and let's not over-engineer it.  Let's just do enough engineering so we can execute the project quickly, and that's what we did.

09:10AM

And so the -- that formed the basis for my -- my cost comparison to what Dr. Najm assumed.

Q.   Now, I know you prepared some tables.  And if I may, I'd like to publish this for demonstrative purposes only.

09:10AM

1454.

          MR. RICHARD:  No objection, Your Honor.

     Q.    (BY MR. GALLAGHER:)  And so you prepared this table as part of your expert report.  Can you explain to us what this is and how it served as the foundation of what you think the cost estimate should be for wellhead treatment at these wells?

     A.    Certainly.

          So the way I came up with a cost estimate for -- in this case, this is adding granular activated carbon to treat for VOCs at Well V-201.

     Q.    Mr. Simpson, let's take a step back.

          When we're talking treating perchlorate or treating PCE or VOCs or whatever, can you -- are the systems similar?

     A.    The -- the contact time is different, but, you know, the principle of using vessels filled with media is -- is similar.  The -- the media is the main difference.  For -- for perchlorate, the water is treated with ion exchange media.  And then for VOCs, we use carbon, granular activated carbon.

     Q.    But just, generally speaking, you're still dealing with vessels.  They're still generally of the same size.  There's still electrical.  There's still foundation.  I mean, is it fundamentally the same in that regard?

     A.    Yes.  It's pumps, piping, control equipment, tanks filled with vessels -- vessels filled with media.

     Q.    And the only difference between the two contaminants

1    are the type of media you're going to use?

2         A.   And the contact time.

3         Q.   And the contact time.

4              So -- okay.  So when you prepared this estimate,

09:12AM  5    what were you relying on, then, foundationally?  You're just

6    relying on the same basic concept of treatment systems are

7    interchangeable?

8              MR. RICHARD:  Objection.  Leading, Your Honor.

9              THE COURT:  Sustained.

09:13AM 10         Q.   (BY MR. GALLAGHER:)  Explain to me why it is you're

11   using certain numbers here based on wellhead treatment for

12   perchlorate.

13        A.   Okay.  So what Dr. Najm put together was

14   theoretical, you know, going line item by line item through

09:13AM 15   what costs could be incurred.  And we realized that, instead of

16   doing that, taking that approach and adding all the contingency

17   that he added, why don't we look at what was actually incurred

18   in a very recent project that, you know, I would view as very

19   successful and use that same approach for installing additional

09:13AM 20   treatment at Saugus 1 and 2, 201, and then new treatment at

21   205.

22              And so --

23        Q.   If I heard you right, you're taking the recent

24   perchlorate wellhead treatment at 201 and Q-2, and you're using

09:14AM 25   that as a baseline to run out these estimates for VOC

treatment?

A.   That's correct because it's similar.  You know, it's installing tanks, pumps, pipes.  We took the realized costs from the 201 project, which was $1.9 million, and then we adjusted for additional vessels, additional foundation that would be required.  For VOC treatment, you need a backwash system, so we added that.

And then we subtracted things that are redundant that we already have at the site.  That could be -- you know, that we don't want to double count, such as the connection to the main waterline, the electrical controls and the SCADA system.  The SCADA system is used to control the -- to monitor the treatment and to control it.  And then we -- we made adjustments as shown on the -- the jury can see the table.

Q.   So this 1.9, when you said that was the cost for the V-201 perchlorate treatment system, anything built into that?  Is that all in?  Can you explain what that number is and how you got there?

A.   Sure.  So the original estimate before we -- you know, as we started this project working with the water agency to implement treatment at 201, the original estimate was about 1.3 million.  And then there are extras.  Extras happen in construction, you know.

And -- and so the 1.9 is the actual cost, that we have invoices that were paid by Whittaker.  So what's built

```
  1   into the 1.9 million is the contingency, and that's the factor

  2   that Dr. Najm added multiple times in his estimates -- well,

  3   it's already built into our starting point.  We already assume

  4   that -- that 1.9 includes a half a million dollars in extras

  5   that was incurred.

  6        Q.   So as you get through this table, you finally get to

  7   the ultimate price or ultimate estimate for V-201 VOC treatment

  8   cost of 2. -- let's round up -- $2 million?

  9        A.   $2.2 million.

 10        Q.   Let's move on to the next exhibit, 1455.  It has

 11   been stipulated for demonstrative only.

 12        A.   Before you move on, could I --

 13        Q.   Yeah.  We can go back.

 14        A.   That also -- we made -- we're assuming that that

 15   same number, that 2.2 million, would also apply for installing

 16   tanks for treating VOCs at the Saugus 1 and 2 treatment plant.

 17   So it's the same -- that cost would be similar.

 18        Q.   So that cost would be similar for treatment at

 19   Saugus 1 and 2, obviously 201, and 205?

 20        A.   No.  205 requires more vessels.  So that's --

 21        Q.   We'll get there.

 22        A.   The final table is my estimate for 205.

 23        Q.   So let's skip to -- back to 1455, please.

 24             Okay.  Can you walk us through this estimate and

 25   what it's for?
```

09:16AM (line 5)
09:16AM (line 10)
09:16AM (line 15)
09:17AM (line 20)
09:17AM (line 25)

1    A.    Sure.  Very similar approach.  The starting point is

2    the realized cost for treatment at 201, which includes a

3    contingency already.  It's built in because of the extras that

4    occurred.  We said, okay, we'll make -- we'll assume that those

09:17AM    5    same extras will be needed or could happen for 205.

6          And then we added additional vessels to account for

7    the flow rate.  We made the same assumption as Dr. Najm, that

8    the flow rate would be 2700 gallons per minute.  And then --

9    and so we -- we -- we added additional vessels, and we end up

09:18AM    10   with a cost of 2.2 million for the treatment capital and

11   then --

12   Q.    Can you pause there?

13         Is that the 2.2, then, total cost for V-205

14   treatment, or am I just misunderstanding your table?

09:18AM    15   A.    I'm sorry.  So --

16   Q.    What I want you to focus on, if you can, in going

17   through your estimates for 205, I'd like you to break out, if

18   possible, the cost for V-205 VOC treatment versus perchlorate

19   treatment.

09:18AM    20   A.    Okay.  Thank you.  And I think I misspoke.  Thank

21   you for stopping me there.

22         So the first number here of -- of 1.225 million is

23   the -- is the additional cost for perchlorate because for --

24   perchlorate treatment, which would be additional ion exchange

09:19AM    25   vessels.

1    And for that estimate, we assumed the cost for the

2    Q-2 vessels.  And that's a very recent project that was done --

3    I think it was completed earlier this year -- where new vessels

4    were installed to treat perchlorate at Q-2.  And so those

09:19AM  5    are -- those are the actual incurred cost.

6    And so we use those costs to come up with the tank

7    cost and the additional foundation and -- and additional

8    construction cost to implement perchlorate treatment at 205.

9    And so the additional cost on top of the 1.9 would be 2.2 --

09:20AM  10   1.225 million for that.

11       Q.   Can you --

12       A.   And then we go on to look at -- assuming that VOC

13   treatment is needed, we would have to add additional wells -- I

14   mean, I'm sorry, additional activated carbon vessels and there

09:20AM  15   will be additional construction and engineering, and that would

16   add an additional 1.3 million.

17       And so when we add all that together, we end up with

18   a $6.625 million estimate.

19       Q.   So looking at this table, if I'm adding it up right,

09:20AM  20   for VOC treatment capital costs only at 205, we're looking at

21   the 1 -- excuse me.  Start over.

22       If I'm breaking this up between perchlorate

23   treatment and VOC treatment, focusing on perchlorate treatment,

24   if I'm adding this up right, the capital cost for V-205

09:20AM  25   perchlorate treatment is the 1.9 plus the 1.225 number?

1791

1        A.    That's correct.

2        Q.    Okay.  And then for VOC treatment only, capital

3   costs, at 205, we're looking at the 2.2 plus the 1.3?

4        A.    That's correct.

09:21AM  5        Q.    Okay.  Let's move on to the next slide, 1456.  And

6   it has been stipulated to, demonstrative only.

7             Now, this is your ultimate total cost for -- excuse

8   me -- ultimate capital costs for all the treatment, assuming

9   it's required; correct?

09:21AM  10        A.    That's correct.

11        Q.    Okay.  Now, did you look at Dr. Najm's O&M costs as

12   it relates to this treatment?

13        A.    I did.

14        Q.    And what does O&M --

09:21AM  15             MR. RICHARD:  Objection, Your Honor.  Beyond the

16   scope.  This is not in his report.

17             THE COURT:  Sustained.

18             MR. GALLAGHER:  Actually, it was testified to.

19             THE COURT:  The objection is sustained if it wasn't

09:22AM  20   in his report.

21             MR. GALLAGHER:  Fair enough.

22             Nothing further.

23             THE COURT:  Mr. Richard.

24             MR. RICHARD:  Thank you, Your Honor.

09:22AM  25             THE COURT:  Actually, before you begin your

```
 1    questioning, let me just understand your opinion.

 2           So your opinion is that there isn't a need for

 3    additional VOC treatment; correct?

 4           THE WITNESS:  That -- that's correct.  There is no

 5    agency requiring that.

 6           THE COURT:  All right.  And did you render or did

 7    you provide an opinion about the necessity for perchlorate

 8    treatment at V-205?  You could just answer the question yes or

 9    no whether you rendered an opinion in this case on that.

10           THE WITNESS:  I'm assuming that's required, yes.

11           THE COURT:  All right.  Thank you.

12           You could proceed.

13                        CROSS-EXAMINATION

14    BY MR. RICHARD:

15      Q.    Well, you're assuming it's required because you

16    understand that Whittaker has agreed that it has an obligation

17    to pay for perchlorate treatment at V-205?

18           MR. GALLAGHER:  Beyond the scope.  Lacks foundation.

19           THE COURT:  I asked the question very narrowly for

20    that reason to see whether it was within the scope.  So I am

21    going to sustain the objection.

22           MR. RICHARD:  Your Honor, I'm going to ask for a

23    little leeway, given that this witness is both a percipient and

24    an expert.  So I'll lay the proper foundation, if we can come

25    back to that.
```

1    THE COURT:  Yes.  That's fine.

2    Q.   (BY MR. RICHARD:)  And before we get to your

3 opinions, Mr. Simpson, first, you would agree that a GAC

4 system, this granular activated carbon treatment system, is, in

09:23AM  5 fact, an effective way to remove VOCs from groundwater;

6 correct?

7    A.   Yes.

8    Q.   And before we talk about your expert opinions that

9 you just ran through, I wanted to ask you about some of the

09:24AM 10 comments you made yesterday regarding your history with

11 Whittaker, this site, and dealing with the water agency.

12    And you recall yesterday and then again today

13 Mr. Gallagher asked you a number of questions about Well V-201?

14    A.   Yes.

09:24AM 15    Q.   Okay.  And that's the one that was shut down --

16 when? -- 2010 or 2011, after the agency discovered perchlorate?

17    A.   I think I have the exact date in my -- it was

18 removed from service in 2010.

19    Q.   Okay.  And then you said yesterday and again -- I

09:24AM 20 think you said today but I want to make sure I heard it right,

21 that Whittaker agreed that we needed to put treatment in as

22 quickly as possible.  Is that -- did I get that right?  Were

23 you talking about V-201?

24    A.   I would say the technical representatives for

09:25AM 25 Whittaker agreed that wellhead treatment should be installed as

```
  1    quickly as possible in 201, yes.

  2         Q.    Okay.  The technical representatives agreed to that.

  3    But you're aware that Whittaker, Mr. Lardiere didn't agree to

  4    that?

  5              MR. GALLAGHER:  Lacks foundation.  Calls for

  6    speculation.

  7              MR. RICHARD:  I'll lay a foundation, Your Honor.

  8              THE COURT:  Please do.

  9         Q.    (BY MR. RICHARD:)  Yesterday you were asked a number

 10    of conversations -- you were asked a number of questions about

 11    your conversations with Mr. Lardiere.  Do you know who

 12    Mr. Lardiere is?

 13         A.    I do.

 14         Q.    And you've worked with -- Whittaker has been a

 15    client of your firm for -- did you say 17 years?

 16         A.    Approximately, yes.

 17         Q.    And your principal contact at Whittaker has been

 18    Mr. Lardiere during those 17 years?

 19         A.    That's correct.

 20         Q.    And you told us yesterday and again today that you

 21    discussed with Mr. Lardiere aspects of V-201 and V-205 when

 22    those wells -- when perchlorate was detected in those wells; is

 23    that correct?

 24         A.    Yes.

 25         Q.    And the well went down -- Well V-201 in 2010.  And
```

09:25AM (line 5), 09:25AM (line 10), 09:25AM (line 15), 09:26AM (line 20), 09:26AM (line 25)

**UNITED STATES DISTRICT COURT**

an agreement wasn't reached between Whittaker and the water

agency until 2015; is that correct?

          A.    That's correct.

          Q.    And so is it correct that there are occasions

09:26AM  where -- and you were familiar with the -- I think you told us

yesterday, you attend technical meetings monthly pursuant to --

required by the 2007 settlement agreement between Whittaker and

the water agency; is that correct?

          A.    That's correct.

09:27AM        Q.    And you understood that that 2007 settlement

agreement covered Well V-201 perchlorate contamination; is that

correct?

          A.    That's correct.

          Q.    So you didn't mean to suggest to the jury that

09:27AM  Whittaker -- or Mr. Lardiere agreed that Whittaker should move

quickly to pay for treatment of perchlorate at Well V-201, did

you?

          A.    We -- we were aware of -- I'm not answering the

question directly.  I'm sorry.

09:27AM        So the question was:  Was I aware that Mr. Lardiere

was -- I'm sorry.  Could you repeat the question?

          Q.    Sure.

          Yesterday you testified that if we told him he would

pay for it, in talking about wellhead treatment, can you tell

09:28AM  us what you were referring to?  Was that V-201 or is that

1796

1       Well V-205 or was that something else?

2            A.   Well, if -- if -- if we believe from a technical

3       perspective that it was appropriate to install wellhead

4       treatment at either 201 or 205, my experience with Mr. Lardiere

09:28AM  5      is that he would support that because it protects him in the

6       long run from additional perchlorate impacts with additional

7       wells.

8            Q.   Right.

9                 But in the short run, you understand he's concerned

09:28AM 10      about costs?

11                MR. GALLAGHER:  Calls for speculation.  Lacks

12      foundation.

13                THE COURT:  Overruled.

14                Based upon your discussions with him as you've

09:28AM 15      testified.

16                THE WITNESS:  Like any businessman, he's going to be

17      concerned about cost.  But it's not preventing him from moving

18      forward with projects that protect him in the long run.

19           Q.   (BY MR. RICHARD:)  Okay.  Well, so you knew -- you

09:29AM 20      personally knew, Mr. Simpson, that perchlorate's detected and

21      the agency shuts down Well V-201 in 2010; correct?

22           A.   That's correct.

23           Q.   And you decide that wellhead treatment is needed

24      quickly; correct?

09:29AM 25           A.   I think there's a timing issue here.

**UNITED STATES DISTRICT COURT**

1797

1    Q.    Okay.

2    A.    You know, the agency has a lot of wells.

3    Q.    Let me ask you another question.

4          At what point did you decide -- after the well was

09:29AM  5    shut down and the agency lost production from that well in

6    2010, at what point did you decide that wellhead treatment

7    should be installed quickly?

8    A.    When the agency decided they were going to move

9    forward with wellhead treatment.

09:29AM 10    Q.    Were you aware of the general manager of Valencia,

11   Mr. Masnada, contacting Whittaker and Mr. Lardiere in

12   particular a couple of days before Christmas 2014 requesting

13   that he agree to pay for treatment at Well V-201 that had gone

14   down four years earlier?

09:30AM 15         MR. GALLAGHER:  Calls for speculation.

16         THE COURT:  Overruled.

17         THE WITNESS:  I'm vaguely aware, yes.

18   Q.    (BY MR. RICHARD:)  So does your vague awareness

19   include Mr. Lardiere telling you that Mr. Masnada was pretty

09:30AM 20   hot under the collar about the delay from Whittaker in agreeing

21   to pay for treatment at Well V-201?

22   A.    I don't know the substance of the conversation and

23   whether Whittaker was refusing to fund it.  I was always under

24   the impression that if it was needed pursuant to the agreement,

09:30AM 25   the Castaic Lake Water Agency agreement, that Whittaker would

UNITED STATES DISTRICT COURT

1798

```
 1    fund it.
 2         Q.    Eventually.
 3         A.    Pardon me?
 4         Q.    You were under the impression that Whittaker would
 5    eventually fund it?
 6         A.    I -- I'm not sure about eventually.  I -- I --
 7         Q.    Okay.  Are you the -- you're a principal at your
 8    firm; is that right?
 9         A.    I am.
10         Q.    And one of your responsibilities is to be
11    responsible for creating new business for the firm?
12         A.    That is one of my responsibilities, yes.
13         Q.    And Whittaker has at times accounted for as much as
14    10 percent of your business, at least that's what you thought
15    at the time of your deposition?  Is that fair?
16         A.    That's not what I said.  I -- I think what I said in
17    my -- personally in the time that I spend on Whittaker projects
18    is probably 5 to 10 percent of my overall project load.
19         Q.    Right.
20               And you have staff that helps you with your overall
21    project load involving Whittaker; right?
22         A.    I do.
23         Q.    And you have -- you're busier when you're involved
24    in arbitrations and trials.  Do you recall talking about that
25    in your deposition?
```

09:31AM  5
09:31AM  10
09:31AM  15
09:31AM  20
09:32AM  25

```
 1              A.    Yes.

 2              Q.    And by "busier," I mean busier for Whittaker.

 3              A.    That's correct.

 4              Q.    And in addition to this project, you have at least

 5    two other projects involving Whittaker, you or your firm?

 6              A.    I do.

 7              Q.    One of those is the Hollister project?

 8              A.    That's correct.

 9              Q.    And one of them is the North Hollywood project?

10              A.    That's correct.

11              Q.    So yesterday you talked about in connection with

12    Well V-205 that Whittaker was taking a wait-and-see approach.

13    Did I get that right?

14              A.    That's correct.

15              Q.    And wasn't it your understanding at the time that

16    Whittaker had actually agreed in the 2007 settlement agreement

17    to have a certain response when notified of perchlorate

18    detections in that well above a certain level?

19              MR. GALLAGHER:  Lacks foundation.  Calls for

20    speculation.

21              THE COURT:  Overruled.

22              Do you have an understanding of the responsibilities

23    of Whittaker under the 2007 settlement agreement?

24              THE WITNESS:  Yes.  I am aware that -- that if there

25    is a notice made, that Whittaker was required to do certain
```

09:32AM (line 5)
09:32AM (line 10)
09:32AM (line 15)
09:33AM (line 20)
09:33AM (line 25)

1    things based on that notice.

2        Q.    (BY MR. RICHARD:)   And one of those things was to

3    meet and confer in good faith to -- to discuss funding of

4    treatment to address the perchlorate contamination?

09:33AM  5                MR. GALLAGHER:  Vague as with who.

6                THE COURT:  Overruled.

7                THE WITNESS:  As I sit here, I don't -- I don't want

8    to guess what the requirements were.  So I -- I'm not sure.

9        Q.    (BY MR. RICHARD:)   And is it fair to say that you

09:33AM  10   were aware at the time that Mr. Matt Stone of the water agency

11   sends a letter to Mr. Lardiere, a formal notice in March 2018,

12   then Mr. Lardiere talks to you about -- was it that letter or a

13   later letter?  Or do you recall?

14       A.    I think it's the letter -- the notification of

09:34AM  15   perchlorate detections that we discussed.

16       Q.    Okay.  And you recall that Mr. Stone had to send a

17   follow-up notice to Mr. Lardiere in May 2018 after his letter

18   in March 2018?  Were you in the loop on that one?

19       A.    I probably saw it, but I -- I don't want to mislead

09:34AM  20   anybody.  I don't remember specifically.

21       Q.    Sure.

22            And you don't remember any written response from

23   Whittaker between March 18th and -- and mid-May 2018 on V-205,

24   do you?

09:34AM  25       A.    Mr. Lardiere had tasked us to come up with a

UNITED STATES DISTRICT COURT

1  technical response to the detections in 205.  And I reported

2  back to him that --

3       Q.    I understand -- I don't mean to interrupt, but let's

4  go step by step, if I could.

09:35AM  5       You're not aware of a written response -- let's

6  start with Mr. Lardiere.  You didn't help him draft a written

7  response that was actually sent to Mr. Stone between March and

8  May 2018; is that fair?

9       A.    We intended to, but we didn't have the supporting

09:35AM  10  information in -- from which to develop the response.

11       Q.    So it's your memory that, in fact, no response

12  was -- was sent; correct?

13       A.    That I'm aware of, that's correct.

14       Q.    For example, Mr. Lardiere did not write back, um, we

09:35AM  15  can't respond to your March request because we're waiting for

16  some information from you even though you've already notified

17  us of the perchlorate contamination?  You don't recall that

18  kind of response?

19       A.    I don't know what responses Mr. Lardiere would have

09:36AM  20  made.  But in the technical meetings, this was an agenda item

21  and it was discussed.

22       Q.    Right.

23       But, sir, you were very clear with the agency that

24  in the technical meetings, you had no authority to bind

09:36AM  25  Whittaker; correct?

1        A.    That's correct.

2        Q.    Mr. Lardiere can bind Whittaker but not you?

3        A.    That's correct.

4        Q.    In fact, when you testified that if we told him he

09:36AM  5  would pay for it -- and again, you've described here generally

6  that Mr. Lardiere would be willing to pay for wellhead

7  treatment -- that's not even true for Well Q-2 that you talked

8  about, is it?

9              MR. GALLAGHER:  Argumentative.

09:36AM  10             THE COURT:  Overruled.  I'll allow it.

11             THE WITNESS:  Well, Whittaker originally paid for

12  wellhead treatment at Q-2.

13       Q.    (BY MR. RICHARD:)  You recall that there was an

14  arbitration earlier this year regarding treatment for -- was

09:37AM  15  the treatment at the wellhead of Q-2?

16       A.    Originally, yes.

17       Q.    Okay.  Then what happened?

18       A.    Then those treatment vessels were -- were repurposed

19  for the V-201 project.  And then when perchlorate showed up

09:37AM  20  again at Q-2, additional treatment vessels were installed at

21  the Saugus 1 and 2 treatment plant.

22       Q.    Right.

23             And so when perchlorate shows up again at Well Q-2,

24  there were no vessels there to treat it; correct?

09:37AM  25       A.    Well, there were vessels there, but they weren't

1803

```
 1    there to treat water from Q-2.
 2         Q.    Okay.  Hadn't the vessels been moved to Well V-201
 3    treatment?
 4         A.    That's correct.
 5         Q.    And so you -- when perchlorate was again detected at
 6    Q-2, wasn't there a point in time where you thought that
 7    Whittaker should cooperate in installing treatment for the new
 8    detection of perchlorate at Well Q-2?
 9         A.    In my deposition, I said -- I believed that
10    Whittaker was going to pay for that.  I was unaware at that
11    time that there was a legal dispute.
12         Q.    Okay.  So you thought that Whittaker should pay for
13    it.  You testified that Whittaker would pay for it.  Whittaker
14    didn't pay for it until there was an arbitration earlier this
15    year.  Is that generally consistent with your memory of how
16    those events developed?
17         A.    That is generally correct, yes.
18         Q.    And you testified in that arbitration regarding Q-2
19    earlier this year; correct?
20         A.    I did.
21         Q.    And you testified that the estimates from
22    Mr. Abercrombie in that proceeding were too high, in your
23    opinion; correct?
24         A.    I actually don't remember that particular testimony.
25         Q.    Okay.  But you do recall that after the arbitration
```

09:37AM (line 5)
09:38AM (line 10)
09:38AM (line 15)
09:38AM (line 20)
09:39AM (line 25)

**UNITED STATES DISTRICT COURT**

1804

 1 that Whittaker lost, it paid for, among other things, a

 2 containment study, replacement water, and other costs.  Do you

 3 recall that?

 4   A. I recall that, yes.

09:39AM 5   Q. Okay.  And -- so would you say that Whittaker more

 6 broadly has a wait-and-see approach when it comes to a request

 7 by the agency to have Whittaker fulfill its obligations under

 8 that 2007 settlement agreement?

 9   A. No.  I don't think that Q-2 is comparable to 205 or

09:39AM 10 to 201.  You know, Q-2 is an alluvial well, and there's very

 11 little containment benefit from Q-2.  You know, it's the

 12 alluvial -- alluvial aquifer, the shallower aquifer.

 13   The containment benefit is from the Saugus

 14 production wells.  And that would be Saugus 1 and 2, V-201, and

09:40AM 15 V-205.

 16   And so when I told -- when I said yesterday that --

 17 that I -- that if we told Whittaker from a -- from --

 18 Mr. Lardiere from a technical perspective that it -- it's in

 19 his best interest to install treatment at 205, I believe he

09:40AM 20 would listen to us and he would move forward with it.

 21   Q. There's -- so let me -- let me understand that.

 22   So if it's -- if Whittaker ended up paying for

 23 treatment at Well Q-2 because it had an obligation to do so --

 24 is that generally your understanding?

09:40AM 25   A. That's correct.

```
 1        Q.    And you just testified, but the treatment at Q-2 was
 2   in the alluvial and not Saugus; therefore, it's not really
 3   providing a containment benefit to Whittaker.  Did I hear that
 4   right?
 5        A.    Well, that's -- I mean, from a technical
 6   perspective, it's just a different -- in a different location.
 7        Q.    Okay.  So in your discussions with Mr. Lardiere, did
 8   you have that discussion, that, well, this well really -- if we
 9   provide treatment, that won't really help us on containment so
10   let's take a wait-and-see approach on that one --
11        A.    No.
12        Q.    -- until we get sued?
13        A.    No.  We never took that approach for Q-2.
14        Q.    Okay.  Do you recall, you testified to a number of
15   technical meetings.  It's fair you don't recall over the last
16   many years -- you don't take notes at those meetings, do you?
17        A.    No, I don't.
18        Q.    Okay.  And --
19        A.    Well, let me back up.  I keep some notes, but I'm
20   not a great notetaker.
21        Q.    Do you know if you ever provided those notes in the
22   course of this litigation to anyone?
23        A.    I'm not sure that I did.
24        Q.    You do recall -- you were talking about a permit for
25   V-201.  Do you recall attending one or more meetings with
```

09:41AM  (line 5)
09:41AM  (line 10)
09:41AM  (line 15)
09:41AM  (line 20)
09:42AM  (line 25)

**UNITED STATES DISTRICT COURT**

1    Matt Stone, the general manager of the water agency, regarding

2    that topic?  Correct?

3         A.    I'm sorry.  Could you repeat the question?

4         Q.    Sure.

5               You recall attending one or more meetings with

6    Matt Stone, these monthly technical meetings, where the issue

7    of a permit for V-201 came up?

8         A.    That's correct.

9         Q.    And you recall one meeting where he let you know

10   that getting a permit for V-201 was a big priority so that the

11   well could be used for drinking water; correct?

12        A.    That's correct.

13        Q.    And he was -- I forget exactly.  Would it be fair to

14   say he was expressing concern or anger at that point in the

15   meeting, that that well was not available for drinking water?

16        A.    It appeared to me that he was upset with his own

17   consulting team in delaying providing the response DDW needed

18   to issue the permit for that well.

19        Q.    And the well for V-201 has -- had perchlorate

20   treatment available since -- what? -- 2017?

21        A.    That's correct.

22        Q.    And construction was completed, I think you said,

23   sometime in 2017?

24        A.    That's correct.

25        Q.    And you would agree that, even though that well has

```
 1    perchlorate treatment, which was the original reason the well

 2    was shut down, it still does not have a permit from DDW to

 3    serve drinking water?  Did I get that right?

 4         A.    That's correct.

 5         Q.    And do you know whether one of the reasons -- first

 6    of all, you know that -- I think you testified to this

 7    yesterday -- that the aquifer from which that well draws water

 8    has been deemed to be an extremely impaired water source?

 9         A.    I'm aware of that, yes.

10         Q.    And one of the reasons is because of VOCs?  Do you

11    know one way or the other?

12         A.    I -- I think it's for perchlorate.  I'm not sure

13    if -- if VOCs are driving that designation as well.

14         Q.    You testified around this morning, I think around

15    9:00 o'clock when Mr. Gallagher was asking you some questions

16    about the process, as to whether someone ever articulated a

17    concern about VOCs.  You testified that that was something you

18    understood that they had to deal with.  Do you recall that?

19    "They" being the water agency.

20         A.    Well, there's low-level detections -- there were

21    in -- at 201.  TCE has been detected, generally right at the

22    detection limit.  Very low concentrations, nothing above the

23    MCL.

24         Q.    Sir, I'm just asking you about your testimony from

25    less than an hour ago.  You were talking about a meeting
```

09:43AM  (line 5)
09:43AM  (line 10)
09:44AM  (line 15)
09:44AM  (line 20)
09:45AM  (line 25)

**UNITED STATES DISTRICT COURT**

1   involving V-201 and VOCs.  And I thought I heard you say, yes,

2   I understood that the -- that VOCs were something the agency

3   had to deal with.

4       A.    Well, they have to deal with all contaminants, both

09:45AM   5   naturally occurring and -- and anthropogenic, or man-made

6   compounds, yes.

7       Q.    Sir, you understand that in the -- at least from

8   your discussions with the agency and with DDW, that VOCs are

9   something that the water agency has to deal with in terms of

09:45AM   10   their discussions with DDW and trying to get Well V-201 back

11   online; isn't that correct?

12      A.    That's correct.

13      Q.    All right.  Thank you.

14            Now let's turn to your role as a cost estimator

09:45AM   15   expert for Whittaker.

16            Is it fair to say that you do not routinely prepare

17   cost estimations for water treatment facilities?

18      A.    Actually, I -- I do quite a bit of water treatment

19   and prepare estimates for clients.

09:46AM   20      Q.    You recall our discussion at your deposition where

21   you talked about inspecting and reviewing other -- other folks'

22   cost estimates?

23      A.    What I said in my deposition is that I wouldn't

24   consider myself a -- a sharp pencil engineer, the one that

09:46AM   25   would design the piping, you know, specify the pumps and, you

know, the actual tanks.  But the concept of -- of, you know,
how we would treat the water, what the appropriate treatment
method would be is -- is what I do.

        Q.    Right.

              But focusing on the cost estimation, as a discipline
and exercise, is it fair to say you have not heard of something
called the equipment factored approach for cost estimation
before this case?

        A.    I don't -- I don't use that in my practice.  So, no,
I -- I was not familiar with that.

        Q.    You don't teach courses in cost estimation; is that
fair?

        A.    I do not.

        Q.    You do not routinely use the principles or guidance
from a group called, you know, AACE, the group of cost
estimating engineers, do you?

        A.    I'm familiar with the document, but I don't use it
in my estimating practice.

        Q.    And you're not offering the opinion here today that
the approach, the methodology used by Dr. Najm is not the
generally accepted approach used in the industry, are you?

        A.    Well, I think it is a method of coming up with cost.

        Q.    Okay.

        A.    But it is -- because of the various contingencies
that are added to it, it -- it increase -- it results in a --

1    in a very high cost relative to a different approach in

2    executing a project, more of a design-build approach that can

3    save, you know, substantial money.

4         Q.   Right.  Let's just go step by step, though.

09:48AM    5              In terms of the methodology Dr. Najm uses, you would

6    agree that's a recognized approach to address cost estimation,

7    especially at early stage of project consideration; is that

8    fair?  You said it's an approach.

9         A.   I'm not sure I agree with the early stage of project

09:48AM   10    execution because this project is pretty well defined.

11    Installing wellhead treatment at an existing well site is -- is

12    a fairly straightforward effort.

13         Q.   No, I understood you to say that.  And we'll get to

14    those pieces.

09:49AM   15              But your approach in this case was not to follow the

16    principles set forth by any recognized group of cost estimating

17    experts or engineers; correct?  There's no published literature

18    to support your approach of starting with a project that was

19    completed four years ago.  Can we agree on that?

09:49AM   20         A.   I -- I don't know that I would say that it's not an

21    approach that would be accepted or recognized by others in my

22    profession.  I mean, I have a project that was recently

23    completed.  To me, that's a much more -- that provides much

24    more certainty about what the potential cost would be rather

09:49AM   25    than using an approach that really has no familiarity with the

```
         1   site itself, with, um, what's been done recently and doesn't

         2   take into account the design-build approach that we did for

         3   201.

         4        Q.   So let's talk about that.

09:50AM  5             So for your approach in this case, as you've just

         6   described it, was to start with a project completed four years

         7   ago that did not involve buying any new vessels and did not

         8   involve GAC treatment; is that right?

         9        A.   Well, that --

09:50AM 10        Q.   Is that right?

        11        A.   No.  Not necessarily.  I mean, they are -- the

        12   projects are different, indeed.  And we accounted for that in

        13   the estimate I put together.

        14             MR. RICHARD:  Your Honor, if I could just get an

09:50AM 15   answer, if possible, to that question.  And I'll ask it again.

        16        Q.   (BY MR. RICHARD:)  Your approach was to start with

        17   the cost for a project completed four years ago, for a project

        18   that did not require purchasing new vessels and that did not

        19   involve GAC treatment; is that correct?

09:51AM 20             THE COURT:  You can answer that yes or no.

        21             THE WITNESS:  That's correct.

        22        Q.   (BY MR. RICHARD:)  And then you took that number and

        23   you made some adjustments and extrapolations; correct?

        24        A.   That's correct.  Based on --

09:51AM 25        Q.   I understand.
```

**UNITED STATES DISTRICT COURT**

1812

```
 1        A.    Based on new information that we received from --

 2   from vendors, including the -- the largest expense are the

 3   tanks.

 4        Q.    Right.

 5        A.    The pressure vessels.

 6        Q.    Okay.  And on that point, you and Dr. Najm agree

 7   that, at least as of a few months ago, those vessels are about

 8   $200,000 each?

 9        A.    That's correct.

10        Q.    You haven't checked the current market as of today

11   for those vessels, if you wanted to get those delivered in the

12   next month or so, have you?

13        A.    I -- I have not checked recently.  That estimate, I

14   think, from our vendor was in April of this year.

15        Q.    Right.

16              And you're aware that there's some turmoil in the

17   markets for the delivery of goods, including large metal

18   vessels manufactured somewhere?

19        A.    I -- I'm aware of the supply chain challenges, yes.

20        Q.    And one of the wells you mentioned but I don't

21   recall you going into much detail on, something about treatment

22   for an end well.  Do you recall that?

23        A.    I think -- yes.  There are -- I think there are

24   three end wells that have treatment.

25        Q.    Okay.  And you're aware -- or do you know whether
```

09:51AM (line 5)
09:51AM (line 10)
09:52AM (line 15)
09:52AM (line 20)
09:52AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   any of those treatment systems involved a six-vessel
 2   configuration?
 3       A.   I don't know much about that, just aware that they
 4   were -- that project was recently completed.
 5       Q.   Okay.  And before coming -- well, are you aware --
 6   assume that Dr. Najm testified that in that project for just
 7   those six vessels cost about $7.5 million.  Do you have any
 8   information to suggest that he was incorrect in that regard?
 9       A.   I have no way of knowing one way or another what was
10   included and how relevant that is to a wellhead treatment
11   project.
12       Q.   Okay.  I'm just asking you about the $7.5 million.
13   You don't know one way or the other?
14       A.   I just don't know.
15       Q.   And this approach you had in this case of looking at
16   a project completed four years ago that did not involve
17   purchasing new vessels and then making some adjustments and
18   extrapolations, you would agree that that approach to cost
19   estimation is not the standard approach?
20       A.   I -- I'm not sure that there is a standard.  It's
21   what -- what is -- what is the number you should rely on or
22   would be appropriate for executing a project like this.  And
23   to -- to me, if we take a design-build approach, similar to
24   what we did at 201, we could realize costs similar to what my
25   estimate is in my report.
```

09:52AM (line 5)
09:53AM (line 10)
09:53AM (line 15)
09:53AM (line 20)
09:54AM (line 25)

1814

```
  1        Q.    Right.
  2              My question is just whether you would agree that
  3   that was not a standard approach.
  4        A.    It's not the approach that Dr. Najm used but --
09:54AM  5        Q.    That wasn't my question, Mr. Simpson.
  6              MR. RICHARD:  Your Honor, I would propose that we
  7   read to the witness from his deposition.  I believe that was
  8   delivered, probably without a spine label for Your Honor, but
  9   page 46, line 17 through line 3, page 47.
09:54AM 10              MR. GALLAGHER:  Page 46, line?
 11              MR. RICHARD:  Line 17.
 12              MR. GALLAGHER:  No objection.
 13              THE COURT:  You may proceed.
 14        Q.    (BY MR. RICHARD:)  And you recall giving a
09:55AM 15   deposition just a few weeks ago in this case?
 16        A.    I -- I recall.
 17        Q.    And you were asked -- I don't know if you have this.
 18   Okay.  I'll just read it to you.
 19              "QUESTION:  Did you make adjustments and
09:55AM 20        extrapolations to come up with your cost estimates?
 21              "ANSWER:  I did.
 22              "QUESTION:  And as you sit here, can you point
 23        to any literature that says an approach that begins
 24        with costs of a project at a different point in time
09:55AM 25        to treat a different chemical in the groundwater than
```

1          *that -- that that is an acceptable approach to cost*

2          *estimation, this adjustment and extrapolation*

3          *approach.*

4                    *"ANSWER:  I would say it is a nonstandard*

09:55AM   5          *method,"* period.  And then you went on to explain your

6          answer.

7                    That was correct at the time you testified a few

8          weeks ago, that your approach in this case, you would say, was

9          a nonstandard approach?

09:55AM   10         A.     That's what I testified to, but it doesn't make it

11         an unreliable number.  In fact, to me, it makes it even more of

12         a reliable number because it was what was actually realized at

13         a recent project.

14         Q.     So your $11 million all in for all of the four

09:56AM   15         treatment projects, that does not include any amount for

16         management costs; is that correct?  You don't have a line item

17         for that?

18         A.     It would be a similar level of management of what

19         occurred at V-201.

09:56AM   20         Q.     Legal fees, you don't have a line item for legal

21         fees?

22         A.     Again, it's not line-itemed out because it's based

23         on the actual or realized cost that Whittaker paid for 201.

24         Q.     And you do not include a line item for

09:56AM   25         contingencies; correct?

```
        1        A.    As I said earlier, the contingency's built into the
        2   starting point.
        3        Q.    Right.
        4              It's your view that whatever supply, pricing,
09:57AM 5   project, construction, contingencies could occur in the future
        6   for these four projects going forward have all been accounted
        7   for in that V-201 project from four years ago; correct?
        8        A.    Well, it's -- it's -- it's not just the project four
        9   years ago.  It's also the Q-2 project that we -- that Whittaker
09:57AM 10  funded.  And we're aware of those costs, and those were used as
       11   well.  And that was a much more recent project.
       12        Q.    Right.
       13              But you would agree that you're not taking into
       14   account new contingencies in the future that could arise either
09:57AM 15  because of site conditions, supply chain issues, increased
       16   construction costs?
       17        A.    We assume that those contingencies are built into
       18   the estimate, that's correct.
       19        Q.    Now, your firm does cost estimates from time to
09:57AM 20  time; right?
       21        A.    We do.
       22        Q.    And it typically includes a line item for
       23   contingencies; correct?
       24        A.    Often.  Or if there's no contingency, we let the
09:58AM 25  client -- we make them aware of that.
```

**UNITED STATES DISTRICT COURT**

1    Q.    Doesn't your firm typically include contingencies

2    because stuff can happen, stuff you didn't expect?

3    A.    That's correct.

4    Q.    You can have unexpected conditions during execution

09:58AM  5    of the project, such as this.  Would you agree with that?

6    A.    I would.  Similar to what happened at Q -- at V-201

7    where about a half a million dollars of extras was -- was

8    incurred -- were incurred.  And that's why we used that

9    starting point as our -- that estimate of what was actually --

09:58AM  10   I'm sorry.  We actually used what was realized at 201 as our

11   starting point in our estimate.

12   Q.    And how many vessels did you estimate would be

13   needed to install GAC treatment at Saugus 1 and Saugus 2?

14   A.    Four vessels.

09:59AM  15   Q.    And the consultant that you reached out to to check

16   on prices, didn't she identify that for the GAC treatment that

17   would be needed, given the volumes being pumped, that you would

18   need six vessels?

19   A.    I -- I know that this came up in my deposition.  And

09:59AM  20   I went back and -- and checked and consulted with my -- one of

21   the engineers that works for me, Miae Jeon.

22   MR. RICHARD:  Your Honor, if I could get an answer

23   to the question first.  I'm just asking about -- I'll rephrase

24   it.

09:59AM  25   Q.    (BY MR. RICHARD:)  Before you prepared and provided

1   your report, you reached out to another consultant regarding

2   costs for these GAC vessels; correct?

3       A.    That's correct.

4       Q.    And at that time, that consultant that you reached

09:59AM  5   out to identified, based on the metrics of ten minutes' contact

6   time and the pumping rates for Saugus 1 and 2, that you would

7   need six vessels, three systems and lead-lag; is that correct?

8       A.    To meet the -- the standard ten-minute detention

9   time, that's correct.

10:00AM  10      Q.    Okay.  So you do have other folks in your firm -- I

11  think you mentioned folks in your deposition -- in Sacramento

12  and Houston who routinely prepare cost estimates for these

13  types of projects?

14      A.    That's correct.

10:00AM  15      Q.    And your firm manages these types of projects;

16  correct?

17      A.    Well, could you define "these types of projects"?

18      Q.    Projects involving GAC treatment or removal of

19  chemicals from groundwater.

10:00AM  20      A.    That -- that's correct.

21      Q.    Okay.  And -- but is it fair to say that neither you

22  or your firm would be willing to guarantee you're staying

23  behind the $11 million number you shared with us, in part,

24  because it does not include any contingencies?

10:01AM  25      A.    That's not correct.

**UNITED STATES DISTRICT COURT**

```
       1        Q.    Is it correct that your firm -- that's what?  GSI

       2   Consulting?

       3        A.    GSI Environmental.

       4        Q.    Environmental.

10:01AM 5              For the estimate you came up with in this case, your

       6   firm is not submitting that as a bid or guaranteeing that it

       7   could deliver these four treatment projects for $11 million?

       8   You haven't done that; is that fair?

       9        A.    I have not done that.

10:01AM 10        Q.    So you're not -- your firm would not guarantee the

      11   $11 million based on your cost estimate?

      12        A.    We're not in the fixed fee guarantee business.  So,

      13   no, that's not what our firm does.

      14        Q.    Right.

10:01AM 15              But if the jury were to use your number of

      16   $11 million, then my client, the water agency, would be capped

      17   at $11 million, regardless of whatever market conditions or

      18   uncertainties occurred after that; right?

      19        A.    I suppose so, yes.

10:02AM 20              MR. RICHARD:  That's all I have, Your Honor.

      21              THE COURT:  Mr. Gallagher.

      22                       **REDIRECT EXAMINATION**

      23   BY MR. GALLAGHER:

      24        Q.    The end wells that Mr. Najm relied on, do you

10:02AM 25   understand what kind of -- what chemical it was treating?
```

1       A.    They were originally installed to treat PFAS.

2       Q.    So not perchlorate, not VOCs; correct?

3       A.    Originally, they were installed to treat PFAS

4    detections in those wells.  Subsequent to that, low levels of

10:02AM  5    perchlorate have shown up in those wells.  And so they also are

6    treating for -- for perchlorate.

7       Q.    And in the end well situation, that scenario, the

8    setup, it's not a single wellhead treatment; correct?

9             MR. RICHARD:  Objection.  Leading, Your Honor.

10:03AM 10             THE COURT:  Sustained.

11       Q.    (BY MR. GALLAGHER:)  Do you know if it's a single

12    wellhead treatment at the end well project?

13       A.    There are three wells that are tied together, and

14    there's a single treatment plant.  So it -- it appears to me

10:03AM 15    that that is much more -- that's much more similar to the

16    Saugus 1 and 2 project than it is the V-201 wellhead treatment

17    project.

18       Q.    Fair enough.

19             Have you -- we talked briefly about this cost

10:03AM 20    estimating classification system.  Are you familiar with the

21    AACE guide or booklet?

22       A.    I am.

23       Q.    Is that the Bible for cost estimating?

24       A.    Well, we prepare cost estimates all the time for our

10:03AM 25    clients and we don't -- we don't use that.

1       Q.    So --

2       A.    It is -- it's a tool people could use.  But in our

3    practice, we don't.

4       Q.    It's not the only tool to use; correct?

10:04AM  5      A.    No.

6       Q.    And your practice for your opinion today, how

7    would -- how would you describe your analysis in terms of

8    reliability?

9             MR. RICHARD:  Objection.  Vague, Your Honor.

10:04AM 10             THE COURT:  Sustained.

11      Q.    (BY MR. GALLAGHER:)  There's a number -- taking a

12   step back.  When you looked at 201 and Q-2, you developed

13   these -- what did you rely on to come up with a total cost?

14      A.    The invoices that Whittaker paid.

10:04AM 15      Q.    And did those invoices involve cost overruns?

16      A.    They did.

17      Q.    Okay.  And you said you reached out to vendors;

18   correct?

19      A.    Correct.

10:04AM 20      Q.    And that -- those vendors in connection with

21   installing wellhead treatment; correct?

22      A.    Yes.

23      Q.    All right.  And what did you discuss with those

24   vendors?  What were the costs that you may have discussed?

10:05AM 25      A.    Uh, the cost for treatment vessels.

1          Q.    And did you -- when you talk about design-build

2     approach, in your opinion, why is that more reliable than what

3     Mr. Najm did in his cost estimating?

4          A.    Well, I guess the best analogy would be if you buy a

10:05AM   5     car, you can go to a dealership and buy a car.  It's hard to do

6     these days, but you could if you wanted to.  Or you could pay

7     someone to design a car and then you could buy the various

8     parts of that car and then pay someone to assemble the car.

9     And that would -- you know, it could be done and it could --

10:05AM  10     you get a car at the end.

11          But that kind of shows you the difference between

12     the approach of hiring a contractor that does this day in, day

13     out, you know, they -- they -- it's their main business, is to

14     install these vessels.  And so they do it very effectively and

10:06AM  15     it doesn't require a tremendous amount of engineering versus a

16     more -- you know, I would say an approach similar to what we

17     did at the Saugus 1 and 2 treatment plant which involved

18     preparing very detailed plans and specs, put it out to bid, a

19     ton of construction oversight.  Some of that was needed because

10:06AM  20     of the complications of being in the public right-of-way and

21     having to install pipelines.

22          Q.    Understood.

23          With Mr. Najm's estimates, does he still have to

24     actually go out and put this project to bid in order -- in

10:06AM  25     order to actually install this wellhead treatment?  In other

UNITED STATES DISTRICT COURT

```
 1   words, Mr. Najm is not building this wellhead treatment?

 2        A.   No.  No.  He is -- he -- the approach he took would

 3   be much more similar to what we did for Saugus 1 and 2.

 4        Q.   So in order for the agency to actually know what it

 5   may cost, would they have to actually put it out to bid, then?

 6        A.   That's correct.

 7        Q.   And then they'd actually have to go through and

 8   realize the cost that would actually incur to install wellhead

 9   treatment; is that true?

10        A.   That's correct.

11        Q.   Until -- until they do, how reliable are, then,

12   Mr. Najm's estimates, in your opinion?

13             MR. RICHARD:  Objection.  Vague, Your Honor.

14             THE COURT:  Sustained.

15        Q.   (BY MR. GALLAGHER:)  Going back to the DDW, I think

16   counsel brought it up in your discussions about the VOCs.  Do

17   you recall that, that it was a concern?

18        A.   Correct.

19        Q.   Can you put that into context?  Why were the VOCs a

20   concern to the DDW, as you understand it?  And I'll hone you

21   in, did it involve the 97-005 application process?

22        A.   That's correct.  It requires a complete source water

23   assessment.

24        Q.   And so in that complete source water assessment,

25   they are considering VOCs; correct?
```

1824

1          A.     That's correct.

2          Q.     They also have to factor in perchlorate, I assume;

3     correct?

4                 MR. RICHARD:   Objection.   Leading.   Lacks

10:08AM  5     foundation.

6                 THE COURT:   Sustained.

7          Q.     (BY MR. GALLAGHER:)   In terms of your discussions

8     with the agency and the 97-005 process, did they discuss the

9     impact that a severely impaired aquifer has in this process, in

10:08AM 10    this application, permit application process?

11         A.     Not -- I mean, we're already engaged in the 97-005

12    permitting process.   And I should -- not Whittaker but the

13    water agency.   So, no, we didn't talk about in my discussions

14    with them -- we -- we already knew that that was going on.

10:09AM 15         Q.     Right.

16                And in your discussions with the DDW, do you have an

17    understanding of the chemicals that are being discussed as part

18    of the 97-005 process?

19                MR. RICHARD:   I'm going to object as beyond the

10:09AM 20    scope, Your Honor, and 403 at this point.

21                THE COURT:   I'm going to sustain it on 403.   We've

22    had lots of discussions concerning this issue.

23                MR. GALLAGHER:   Sure enough.

24                Nothing further.

10:09AM 25                THE COURT:   Mr. Richard.

**RECROSS-EXAMINATION**

BY MR. RICHARD:

    Q.   You were just asked about whether any of these treatment facility projects have been put out to bid.  You would agree that, until there are engineering plans unique to each site, the project can't be put out to bid -- correct? -- in an effective way; is that fair?

    A.   I think a plan showing the configuration of the tanks would be needed.  But if you take a design-build approach, the contractor can do a lot of that work.  You don't necessarily have to do all the engineering upfront.  You get the -- you get the benefit of the contractor, their experience, the fact that this is what they do day in, day out to -- to do a lot of that engineering work.

    Q.   In referring to Dr. Najm, you didn't mean to suggest that day in, day out he's not working with this and many other water agencies on these exact type of projects, did you?

    A.   I don't know what he does.  I'm sorry.

    Q.   Oh, okay.

    MR. RICHARD:  That's all I have, Your Honor.

    THE COURT:  All right.  You're excused.  Please watch your step going down.

    THE WITNESS:  Thank you.

    THE COURT:  We're still on the defense case.  Your next witness?

1    MR. BLUM:  Your Honor, the defendants would call

2    Mr. B.J. Lechler.

3         THE COURT:  Very well.  Please present him.

4         THE COURTROOM DEPUTY:  Good morning, sir.  Would you

10:11AM  5    please come forward.  Sir, would you please walk around, stand

6    up on the witness platform.  Thank you.

7         Would you please raise your right hand to be sworn.

8         Sir, do you solemnly swear that the testimony you

9    shall give in the cause now before this Court shall be the

10:11AM 10   truth, the whole truth, and nothing but the truth, so help you

11   God?

12        THE WITNESS:  I do.

13        THE COURTROOM DEPUTY:  Thank you.  Please be seated.

14        Sir, for the record, would you please state your

10:11AM 15   name and then spell your last name.

16        THE WITNESS:  Benjamin Lechler, L-e-c-h-l-e-r, also

17   referred to as B.J., which are my initials, Benjamin James.

18        THE COURT:  Please remove your mask, sir, and speak

19   into the microphone.

10:12AM 20   And you may begin your direct examination.

21        MR. GEE:  Your Honor, just -- can we -- can my

22   associate approach the witness to give him the witness binder?

23        THE COURT:  Yes.

24        MR. BLUM:  Your Honor, while that's being done, are

10:12AM 25   we going to be taking our normal break at the normal time?

**UNITED STATES DISTRICT COURT**

1    THE COURT:  Yes.

2    MR. BLUM:  Thank you.

3    THE COURT:  Mr. Blum?

4    MR. BLUM:  Mr. Lechler, are you ready?

10:13AM  5                    **BENJAMIN LECHLER,**

6    **DEFENDANT'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:**

7                        **DIRECT EXAMINATION**

8    BY MR. BLUM:

9        Q.    Mr. Lechler, where do you currently work?

10:13AM  10       A.    Jacobs.

11       Q.    And what is Jacobs?

12       A.    It's an engineering firm.

13       Q.    And what do you do there?

14       A.    I'm a hydrogeologist.

10:13AM  15       Q.    And have you ever done work for the Santa Clara

16   Valley Water Agency or any of its predecessors?

17       A.    I have, yes.

18       Q.    When did you start, sir?

19       A.    I believe the first project that I worked on

10:13AM  20   directly for the agency would have been in the late 2013 or

21   early 2014 time frame.

22       Q.    Prior to that, did you work on -- for the Army Corps

23   of Engineers on projects that related to the water agency?

24       A.    I did, yes.

10:14AM  25       Q.    And the -- what was that project?

**UNITED STATES DISTRICT COURT**

         1        A.    It was a -- the name of the project was officially

         2  the Eastern Santa Clara Sub-basin Groundwater Investigation, I

         3  believe.  But it was -- it was essentially related to regional

         4  perchlorate contamination in the Santa Clarita Valley.

10:14AM  5        Q.    You were actually a contractor for the Army Corps;

         6  correct?

         7        A.    Correct.  Yes.

         8        Q.    But half of the funding for the project was done by

         9  the water agency; right?

10:14AM  10       A.    The water agency, I believe, provided in-kind

        11  matching funding for that project, yes.

        12       Q.    Now, as of the last month or two, do you have any

        13  responsibilities relating to the water agency?

        14       A.    The last month or two, yeah.  I -- I've worked on

10:14AM  15  some other projects related to groundwater modeling in the

        16  recent past.

        17       Q.    Prior to your testimony today, did you meet with

        18  anybody at the water agency to prepare?

        19       A.    Anybody at the water agency?

10:15AM  20       Q.    Or their counsel.

        21       A.    Uh, I -- I spoke with Nossaman who is my counsel as

        22  well.

        23       Q.    And what did you guys talk about?

        24             MR. GEE:  Objection.  Attorney-client privilege.

10:15AM  25             THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

```
 1        Q.    (BY MR. BLUM:)  Is the firm that Mr. Gee represents

 2   providing you counsel in this case?

 3             THE COURT:  He responded "Yes."  Ask another

 4   question, please.

 5        Q.    (BY MR. BLUM:)  Did you review your deposition

 6   before you testified?

 7        A.    I did, yes.

 8        Q.    Why?

 9        A.    Because I figured it was relevant to my testimony.

10        Q.    Okay.  Sir, do you recall in approximately October

11   of 2010 having a conversation with James Leserman concerning an

12   investigation that might be done into the source of VOC

13   contamination?

14        A.    I can't recall a specific conversation, but we had

15   conversations on that -- on that subject.

16        Q.    All right.  One of the -- in one of the notebooks in

17   front of you, there's an Exhibit 1410.  If you could take a

18   look at it, please.

19        A.    Uh, I need to figure out how to --

20        Q.    Sure.

21        A.    -- get to the appropriate one.  So the exhibits here

22   go up to 1409.

23             THE COURT:  There should be another volume.

24             THE COURTROOM DEPUTY:  May I assist, Your Honor?

25             THE COURT:  Please do.  Thank you.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURTROOM DEPUTY:  He's correct.  The last
 2    exhibit here is 1409.
 3              THE COURT:  Maybe you can move to another subject,
 4    please.
 5       Q.   (BY MR. BLUM:)  In 2015, did you prepare a written
 6    report of an investigation you did?
 7       A.   Yes.
 8       Q.   And that's -- isn't that in the binder that you were
 9    given by counsel for -- by the water agency?
10       A.   I have not looked at it yet so -- I can look.
11    And -- and there's two reports that I authored in 2015.  One
12    was for the agency, and one was for the Army Corps of
13    Engineers.  I assume you're referring to the one for the
14    agency?
15       Q.   Yes, sir.
16            What's the title of that report?
17       A.   Saugus Formation Volatile Organic Compound
18    Investigation Report.
19       Q.   Okay.  And, sir, are you the author of that report?
20       A.   Yes.
21       Q.   Okay.  And prior to that report being finalized, did
22    you send a copy to the water agency so they could comment on
23    it?
24       A.   I believe I did, yes.
25       Q.   And they did comment on it; right?
```

UNITED STATES DISTRICT COURT

```
 1        A.    I believe I received comments.  I don't recall who
 2   from.  But yeah, I received some comments.
 3        Q.    And those comments were incorporated into the final
 4   version?
 5        A.    I would believe that we addressed the comments in
 6   some way, yes.
 7        Q.    Okay.  And the report was prepared for the agency,
 8   but you were aware that it was being -- that it was probably
 9   going to be sent to the Department of Toxic Substances Control
10   also?
11        A.    Yes.
12        Q.    And, sir, at the time you wrote that report and sent
13   it off as the final form to the agency, you believed that there
14   was nothing in the report that was incorrect or misleading;
15   isn't that right?
16        A.    That's correct.
17        Q.    Okay.  And at the time of your deposition, you also
18   believed that there was nothing in the report that was
19   incorrect or misleading; is that correct?
20        A.    That's correct.
21        Q.    And when was your deposition, sir?
22        A.    I don't remember the exact date.  I believe it was
23   in 2019 at some point.
24        Q.    Does September 25th, 2019, refresh your
25   recollection?
```

**UNITED STATES DISTRICT COURT**

1      A.    That sounds appropriate.

2      Q.    Okay.  Alrighty.

3            And wasn't the conclusion of the report that it was

4      possible that either SIC or Whittaker was the source of the

10:19AM    5      VOCs in the wells at issue but that more information needed to

6      be gathered before any further conclusions could be made?

7      A.    Uh, can I refer to the report?

8      Q.    Well, do you know without referring to the report,

9      Mr. Lechler?

10:19AM   10      A.    I -- I know in general, um, but I'm not exactly sure

11      how it was phrased in the report.  And I prefer to go with how

12      my report was prepared as far as the phrasing of --

13      Q.    Well, regardless of the phrasing, was the gist of

14      your conclusion as to who was the source, was that you could

10:20AM   15      determine possible sources but that you needed to gather more

16      information to go anywhere beyond possible?

17      A.    The gist of the conclusion was that Whittaker was

18      the source of TCE to the Saugus wells, likely source of PCE to

19      the Saugus wells, and that Saugus Industrial Center is also a

10:20AM   20      potential source.  But in order to characterize the VOCs from

21      either site, there was additional work that was recommended for

22      both facilities to conduct to understand the full extent of

23      their VOC contamination.

24            MR. BLUM:  If we could go to page 61, line 5,

10:20AM   25      through 62, line 1 of Mr. Lechler's deposition, please.

```
 1          MR. RICHARD:  Whoa.  Hold on.  Your Honor?

 2          THE COURT:  Yes.  One moment, please.

 3          MR. BLUM:  I'm waiting, Your Honor, for them.

 4          MR. RICHARD:  No, it came up.

 5          THE COURT:  Please don't respond, Mr. Blum.

 6          MR. BLUM:  I apologize, Your Honor.

 7          MR. RICHARD:  May I have the page and line again?  I

 8  didn't catch it from Mr. Blum.

 9          MR. BLUM:  61, line 5, through 62, line 1, with a

10  break to excise out counsel objections.

11          MR. GEE:  Objection.  Improper impeachment.

12          THE COURT:  One moment.

13          I'm going to sustain the objection.

14      Q.   (BY MR. BLUM:)  Mr. Lechler, did you -- did you

15  conclude that it was only possible that the VOCs were caused by

16  either SIC or Whittaker?

17      A.   What I just said prior to this was -- was what I

18  believe is -- how it's phrased in the report.  During my

19  deposition, I may have said that it was a possibility, but I

20  stand by what's in my report.

21      Q.   Would you agree with me in your deposition when you

22  were asked the question, you said that what you concluded was

23  that it was possible?

24          MR. GEE:  Objection.  Asked and answered.

25          THE COURT:  I'm going to sustain this on 403 grounds
```

1    as well, given its probative value.

2        Q.    (BY MR. BLUM:)  Sir, wasn't the conclusion -- didn't

3    you conclude that you used the words -- that you couldn't even

4    say that it was probable that it was Whittaker?

10:23AM  5        THE COURT:  Are you talking about his report or his

6    deposition?

7        Q.    (BY MR. BLUM:)  Your deposition.  Didn't you say

8    that you couldn't even conclude that it was probable that it

9    was Whittaker?

10:23AM 10        A.    Again, I may have said something in my deposition,

11   but I do stand by what's in my report here.

12        Q.    Did you say in your deposition that you couldn't

13   even say that it was probable?

14        THE COURT:  Ask another question, please.

10:23AM 15        Q.    (BY MR. BLUM:)  Sir, didn't you describe Whittaker

16   and SIC as potential sources?

17        THE COURT:  Again, is this the deposition you're

18   talking about?

19        MR. BLUM:  Yes, sir.

10:23AM 20        THE WITNESS:  I may have said that in my deposition,

21   yes.

22        Q.    (BY MR. BLUM:)  Okay.  Today do you believe that

23   Whittaker is more than a potential source of VOCs?

24        A.    I have not -- excuse me.  I have not seen any

10:23AM 25   information since I prepared this report to change any of the

conclusions of the report.  And as I said before, the report

does state that Whittaker is a source of TCE in the two Saugus

wells.  And I -- I stand by the findings of the report.

Q.    All right.  Now, if you look at the report, if you

can go to page 1, please, Exhibit 34.

A.    Page 1?

Q.    I'm sorry.  It's not page 1.  It's page 34.6.

A.    Okay.

Q.    And you see where it says the section under Purpose

and Objectives?

        MR. GEE:  Excuse me, Counsel.  Did you say 34.6 or

34.8?

        MR. BLUM:  .6, Purpose and Objectives.

        THE WITNESS:  Yeah, I have different numbering in

the hard copy that I have up here.

Q.    (BY MR. BLUM:)  All right.  Well, it's --

Introduction, Section 1, Section 1.1.

A.    I see it on the screen here, yes.

Q.    All right.  And this is a section you wrote;

correct?

A.    Yes.

Q.    And the purpose of this section was to identify why

the report was being written; correct?

A.    I believe so.  Yes.

Q.    And didn't you write in the second-to-the-last

```
          1    sentence -- do you see where it says, "The purpose of this

          2    investigation"?  Can you read that -- that sentence, please?

          3         A.    "The purpose of this investigation is to identify

          4    potential sources of VOCs detected in the Saugus formation

10:25AM   5    wells."

          6         Q.    So the reason the report was written was to identify

          7    potential sources; correct?

          8         A.    That's what it says, yes.

          9         Q.    And was that why you wrote the report?

10:25AM  10         A.    Yes.  That was the object -- one of the objectives

         11    of the report.

         12         Q.    Wasn't it true that was your understanding that,

         13    after this report was written, there was going to be a

         14    follow-up report to deal with something -- who was -- something

10:26AM  15    beyond a potential source?

         16              MR. GEE:  Objection.  Lacks foundation.

         17              THE COURT:  You can answer the question.  Did you

         18    have an understanding on that subject?

         19              THE WITNESS:  I did not.  To me, this was a

10:26AM  20    standalone document.

         21         Q.    (BY MR. BLUM:)  All right.  Now, in Section 3 of the

         22    report where it says -- at least my page 34.14, but it's

         23    page 3-1, if that helps.

         24              What was the purpose of that section?

10:26AM  25         A.    I believe the purpose -- excuse me.  The purpose of
```

**UNITED STATES DISTRICT COURT**

this section was to outline the process that was used to arrive at the potential sources of VOCs.

Q.   Alrighty.  And then you identified Whittaker as one of the potential sources; correct?

A.   During the screening process, yes.

Q.   And all you did was identify them as a potential source, nothing beyond that; right?

A.   During the screening process, yes.  And then subsequent to that, there was additional looks at each of the potential sources to evaluate the data with respect to each of those potential sources to arrive at some conclusion as to if they were a source.

Q.   And one of the things you did is you identified what's called data gaps; correct?

A.   That is correct.  I believe there's a summary of the data gaps that were identified in the conclusions -- or the last section of the report.

Q.   What is a data gap, sir?

A.   It's an area -- I guess I most simply could describe it as an area where additional data would provide more information.

Q.   And what was the purpose of your report in identifying these data gaps?

A.   I believe the data gaps were identified specifically with -- with respect to the distribution of VOCs relating to

UNITED STATES DISTRICT COURT

1838

```
  1    each of the potential sources and areas that they could collect

  2    additional data or information to better characterize the

  3    distribution of those VOCs in groundwater.

  4        Q.   Okay.  And, um, now, if you can go to Section 6 of

  5    your report, please.  Tell me when you're there.

  6        A.   I'm there.

  7        Q.   I'm sorry.  It's 34.32.

  8             All right.  What's -- and this is about a

  9    discussion.  And please tell me what's the purpose of this

 10    section.

 11        A.   Well, I think the two areas that are -- the two main

 12    subsections within this section are summary of the findings of

 13    the overall investigation and then recommendations and

 14    conclusions, I think, specifically focused on those data gaps

 15    we discussed and future work.

 16        Q.   Now, how did you refer to the sources that there

 17    were data gaps for?  Did you refer to them as actual sources or

 18    potential sources?

 19        A.   I -- I'd have to look in the report to see how they

 20    were referred to.

 21        Q.   Well, let me help you.  If you see under Discussion,

 22    do you see where it says, "Recommendations for investigation of

 23    potential sources of VOCs"?  Now, who were these potential

 24    sources you were referring to?

 25        A.   Again, going back to the -- to the screening
```

10:28AM — line 5
10:29AM — line 10
10:29AM — line 15
10:29AM — line 20
10:30AM — line 25

**UNITED STATES DISTRICT COURT**

```
  1    process, the potential sources were Whittaker and Saugus
  2    Industrial Center.
  3         Q.   Okay.  Now, didn't you conclude that Whittaker and
  4    SIC are considered the potential sources for TCE and PCE
  5    detected in Saugus 1 and Saugus 2?
  6         A.   Uh, I don't know if that's -- I know in the summary
  7    of the findings there was a conclusion that there's multiple
  8    lines of evidence to suggest that Whittaker -- the former
  9    Whittaker-Bermite facility is the source of TCE in Saugus 1 and
 10    Saugus 2.
 11         And then the following paragraph goes on to explain
 12    that Saugus Industrial Center, though a less likely source, is
 13    still a potential -- still a potential source.  And there was
 14    additional investigation required in order to, I guess, rule
 15    them out as a contributing source.
 16         Q.   All right.  Now, if -- let's go to page -- well,
 17    it's Bates stamp 34.33, but it's page 6.2 of the report.
 18         A.   Yep.
 19         MR. BLUM:  And if you can highlight the whole first
 20    paragraph, please, Rick.
 21         Q.   (BY MR. BLUM:)  Now, there may be lines of evidence
 22    to support the conclusion that Whittaker is a source.  But
 23    isn't it true you also -- when you refer to Whittaker, you
 24    refer to them as a potential source?
 25         A.   When referring to the screening process, yes.
```

10:30AM — line 5
10:31AM — line 10
10:31AM — line 15
10:31AM — line 20
10:32AM — line 25

1840

1    Q.    Okay.  And you said that -- the last sentence,

2  "Saugus Industrial Center and former Whittaker-Bermite facility

3  are considered the potential sources of TCE and PCE"; correct?

4    A.    That's what's said here in the summary of the

10:32AM  5  screening process, yes.

6    Q.    Now, the information that you've said -- where you

7  said they are the source, where was that?

8    A.    Where is that -- where is that said in the report?

9    Q.    Sure.  Exactly.

10:32AM  10    A.    It would be on the -- the previous page, um,

11  Section -- Section 6.1, looks like the second paragraph under

12  that section heading.  There's -- there's one paragraph

13  regarding Whittaker, and then there's a following paragraph

14  regarding Saugus Industrial Center.  So it would be on 34- --

10:33AM  15  or 34.32.

16    Q.    Okay.

17    A.    Middle -- middle of the page.

18    Q.    And that talks about lines of evidence in support of

19  your conclusion; correct?

10:33AM  20    A.    That's right.

21    Q.    Do you ever say they're not a potential source,

22  they're an actual source -- words to that effect, that we don't

23  have to imply anything into it?

24    A.    I think the first sentence of that second paragraph

10:33AM  25  says that -- that Whittaker-Bermite is a source of TCE.

1841

```
          1        Q.    Now, one of the things you also did --
          2              MR. BLUM:  Your Honor, I'm going to move on to a
          3    different subject.  If you want to take a break, it's a good
          4    time.
10:33AM   5              THE COURT:  Oh, yes.  Thank you, Counsel.
          6              It is now 10:33.  We'll break until 10:48.  We'll
          7    take our 15-minute break.
          8              Please remember not to speak to anyone about the
          9    case, the people, or the subject matter involved.  Continue to
10:33AM  10    keep an open mind.
         11              See you in 15 minutes.
         12              THE COURTROOM DEPUTY:  All rise for the jury,
         13    please.
         14              (Out of the presence of the jury:)
10:34AM  15              THE COURT:  We're in recess until 10:48.
         16              (Break taken.)
         17              (In the presence of the jury:)
         18              THE COURT:  We remain on the record in the trial
         19    matter with all present who were present before the break,
10:52AM  20    including the witness.
         21              And you understand you remain under oath?
         22              THE WITNESS:  I do.
         23              THE COURT:  You may continue with your direct
         24    examination.
10:52AM  25              MR. BLUM:  Thank you, Your Honor.
```

```
 1          Q.    (BY MR. BLUM:)  I think now you have Exhibit 1410 in

 2    front of you -- or in one of the binders?

 3          A.    Yes.

 4          Q.    Can you take a look at it, please.  And particularly

 5    to the e-mail that has a subject entitled, "conversation with

 6    Jim L."  I believe it's from you; correct?

 7          A.    I -- I'm looking at the e-mail now, yes, there's --

 8    there's an e-mail and a response and the original e-mail came

 9    from me.  Yes.

10          Q.    The original e-mail was from you to who?

11          A.    To my co-worker Yueh Chuang.

12          Q.    And who is that?

13          A.    He was my -- a co-worker of mine.  He was the

14    project manager for the -- the Army Corps of Engineers project

15    that we talked about earlier.

16          Q.    And for the court reporter's sake, can you spell it?

17          A.    Spell --

18          Q.    Chuang.

19          A.    Oh.  First name Yueh, Y-u-e-h.  Last name is Chuang,

20    C-h-u-a-n-g.

21          Q.    Okay.  And you --

22          MR. GEE:  Objection, Your Honor.  Hearsay.

23          MR. BLUM:  I haven't asked a question.

24          MR. GEE:  Sorry.

25          THE COURT:  Is there an objection?
```

**UNITED STATES DISTRICT COURT**

1           MR. GEE:  No, Your Honor.  I'm sorry.

2           THE COURT:  You may proceed.

3      Q.    (BY MR. BLUM:)  And in that e-mail, you summarized a

4  conversation you had with Jim L.; correct?

10:54AM  5      A.    Yes.

6      Q.    And Jim L. is James Leserman; correct?

7      A.    That's correct, yes.

8      Q.    Did Mr. Leserman tell you anything that's summarized

9  in this e-mail concerning whether or not the Department of

10:54AM  10 Public Health wanted the water agency to conduct an

11  investigation as to the sources of VOCs?

12     A.    I believe -- I believe in my e-mail I -- I

13  summarized that he expressed concern -- or that DPH, the

14  Department of Public Health, expressed concern about VOCs.  I

10:54AM  15 did not say anything about the Department of Public Health

16  requesting an investigation.

17           I -- I go on to summarize that Castaic Lake Water

18  Agency would potentially like to investigate the VOC source.

19           MR. BLUM:  Your Honor, may I publish Exhibit 1410?

10:55AM  20          THE COURT:  Yes.

21           MR. BLUM:  If we can blow up the bottom part.

22     Q.    (BY MR. BLUM:)  Alrighty.  And did Mr. Leserman also

23  tell you that at the time he wasn't sure whether Whittaker was

24  the source?

10:55AM  25     A.    Uh, yeah.  I think in the e-mail I summarized that

1844

| | |
|---|---|
| 1 | he acknowledged that it may or may not be Whittaker. |
| 2 | Q.   That was the source of the VOCs and the wells |
| 3 | operated by the water agency; correct? |
| 4 | A.   That's correct. |
| 10:56AM 5 | MR. BLUM:  Your Honor, this may be technical.  I |
| 6 | would move 1410 into evidence. |
| 7 | THE COURT:  It's received. |
| 8 | (Exhibit 1410 received into evidence.) |
| 9 | Q.   (BY MR. BLUM:)  Now, I want to move back to your |
| 10:56AM 10 | report and I want to move beyond the report to the date of your |
| 11 | deposition in September of 2019. |
| 12 | On that date, looking at the totality of the |
| 13 | information you had at that moment, not just the report but |
| 14 | everything you had at your disposal, isn't it true that the |
| 10:56AM 15 | only thing you could conclude based on all that information was |
| 16 | that Whittaker was a -- was that there was a possibility that |
| 17 | Whittaker was a source? |
| 18 | A.   It sounds accurate that I said that in my |
| 19 | deposition. |
| 10:56AM 20 | Q.   So was that -- when you said in your deposition in |
| 21 | 2019 that, based on all the information at your disposal, that |
| 22 | there was only a possibility that Whittaker was a source, was |
| 23 | that the truth? |
| 24 | A.   That's what I said in my deposition.  But I, again, |
| 10:57AM 25 | do stand by the -- the report that I prepared and do believe |

UNITED STATES DISTRICT COURT

1845

```
 1    that nothing has changed my mind on the findings about either.
 2         Q.    Was it the truth -- let me back up.
 3               In 2019, you had already published the report;
 4    correct?
 5         A.    Correct.
 6         Q.    So when you said at your deposition under oath that
 7    there was only a possibility that Whittaker was the source, you
 8    were taking into account the report you wrote four years
 9    earlier; right?
10               MR. GEE:  Objection.  Asked and answered.
11    Argumentative.
12               THE COURT:  Overruled.
13               You may answer.
14               THE WITNESS:  Again, I believe that, you know, the
15    semantics around adjectives I may have said in my deposition.
16    But again, reviewing my report in its current state -- or in my
17    current state of the knowledge of data in that area, I stand by
18    what's said in the report.
19         Q.    (BY MR. BLUM:)  Sir, when you say semantics as to
20    language, are you saying that the word "possible" and the word
21    "likely" are the same thing, they mean the same thing?
22         A.    I -- I'm saying that maybe I said something in my
23    deposition that I didn't have time to quite think through.
24    Looking back at the findings in the report, I agree with them.
25         Q.    Isn't it true that in your deposition, you were
```

10:57AM (line 5)
10:57AM (line 10)
10:57AM (line 15)
10:58AM (line 20)
10:58AM (line 25)

1846

```
 1   asked -- several times you repeated the word that your

 2   conclusions were only that Whittaker was a possible source.

 3   This wasn't a one-off.

 4        A.   I -- I don't recall how many times I may have said

 5   that in my deposition.

 6             MR. BLUM:  Your Honor, may I refresh the witness's

 7   recollection on that issue?

 8             THE COURT:  Under 403, I think we've gotten as much

 9   as you're going to get on this.

10        Q.   (BY MR. BLUM:)  Now, Mr. Lechler, as a

11   hydrogeologist, would you agree with me that in order for

12   Whittaker to be the source of the contamination at the wells at

13   issue, there has to be a pathway for the VOCs to travel from

14   Whittaker to those wells?

15        A.   Uh, I'm not exactly sure what you're asking, but,

16   yes, I mean, the VOCs -- if Whittaker is the source, they need

17   to somehow get from the property to the well.

18        Q.   And isn't it correct in your report, when you

19   discuss those pathways, you describe them as potential

20   pathways?

21        A.   Yes.  Because there's -- there's -- there's not one

22   given pathway that's been necessarily confirmed, um, and I also

23   believe that there could be more than one pathway for

24   contamination to arrive at those wells.

25        Q.   Well, isn't it true that each pathway you discussed,
```

10:58AM   5
10:58AM   10
10:59AM   15
10:59AM   20
10:59AM   25

the only reference you made to it was that a -- either as a

conceptual pathway or a potential pathway?

        A.    I -- I'd have to refer to the report as far as how

I'd describe it to them.  But, yes, the intent of those

11:00AM pathways that were outlined in the report was to show

conceptually how contamination could arrive at the wells from

various sources.  And it was not meant to illustrate an actual

physical pathway because those are very complicated underground

pathways that, you know, can't be -- can't be described or

11:00AM understood as simply as showing them in that conceptual manner.

        Q.    Well, to go further, isn't it correct that all of

the pathways for the travel of VOCs from the Whittaker site to

the wells were only hypotheticals?  Every single one.

        A.    Uh, I -- again, I don't -- I don't know about

11:01AM hypothetical.  I think it was more of a conceptual -- you know,

conceptualization as to how it could get there from various

areas.

        MR. BLUM:  Your Honor, I'd like to refer to his

deposition, page 210, lines 3 through 13.

11:01AM        MR. RICHARD:  I'm sorry.  What lines?

        MR. BLUM:  3 through 13.

        MR. RICHARD:  Thank you.

        THE COURT:  You may proceed.

        Perhaps you can read it, Mr. Blum.

11:02AM        MR. BLUM:  Sure.

1848

|  |  |
|---|---|
|  | 1 |
|  | 2 |
|  | 3 |
| 11:02AM | 4 |
|  | 5 |

THE COURT:  It happens with technology.  If he has it ready, he can play it.  Otherwise, maybe you should read it.

MR. BLUM:  All right.

"QUESTION:  Mr. Lechler, you talked in some of the questions relating to SIC's counsel that the pathways described in Figure 4-3 were actually -- I think you said hypothetical pathways.

"But you can't say one way or another whether they actually are occurring.

"ANSWER:  That's true.

"QUESTION:  That would be true for all the different pathways that you looked at in this report; correct?  They're hypotheticals?

"ANSWER:  That's true, yes."

Q.  (BY MR. BLUM:)  Were all of the pathways you looked at in -- were all the pathways you looked at in your report purely hypotheticals?

A.  I mean, that's what I said here in my deposition. Again, I believe this is a case of semantics to some degree and that the intent of what was presented in the report was to show conceptually, hypothetically, whatever word you want to use, how things could get from one area to another, um, and it was not meant to illustrate an exact pathway because that's essentially impossible due to the underground nature of this migrating contamination.

UNITED STATES DISTRICT COURT

1848

```
          1              THE COURT:  It happens with technology.  If he has
          2     it ready, he can play it.  Otherwise, maybe you should read it.
          3              MR. BLUM:  All right.
          4              "QUESTION:  Mr. Lechler, you talked in some
11:02AM   5       of the questions relating to SIC's counsel that the
          6       pathways described in Figure 4-3 were actually --
          7       I think you said hypothetical pathways.
          8              "But you can't say one way or another whether
          9       they actually are occurring.
11:03AM  10              "ANSWER:  That's true.
         11              "QUESTION:  That would be true for all the
         12       different pathways that you looked at in this report;
         13       correct?  They're hypotheticals?
         14              "ANSWER:  That's true, yes."
11:03AM  15         Q.    (BY MR. BLUM:)  Were all of the pathways you looked
         16     at in -- were all the pathways you looked at in your report
         17     purely hypotheticals?
         18         A.    I mean, that's what I said here in my deposition.
         19     Again, I believe this is a case of semantics to some degree and
11:03AM  20     that the intent of what was presented in the report was to show
         21     conceptually, hypothetically, whatever word you want to use,
         22     how things could get from one area to another, um, and it was
         23     not meant to illustrate an exact pathway because that's
         24     essentially impossible due to the underground nature of this
11:04AM  25     migrating contamination.
```

UNITED STATES DISTRICT COURT

         1        Q.   All right.  Now, I want to look at one of your

         2   diagrams that discussed one of those hypothetical pathways,

         3   Figure 5-5.  I'm sorry.  It's on page 34-63 -- .63.

         4            MR. BLUM:  And if we can blow up the one to the

11:04AM  5   left.

         6        Q.   (BY MR. BLUM:)  All right.  Sir, this is one of the

         7   hypothetical pathways that you disclosed in your report; isn't

         8   that true?

         9        A.   Yes.  This is from the report.

11:04AM  10       Q.   And didn't you describe this in your deposition as a

         11  cartoonish depiction?

         12       A.   I believe I probably did, yeah.

         13       Q.   But you're not saying that the VOCs actually

         14  traveled along this pathway, are you?

11:05AM  15       A.   Again, not this exact pathway.  This is meant to

         16  illustrate conceptually in a large scale, big picture, how

         17  water could flow from one area to another.

         18       Q.   And in order to determine whether this is anything

         19  more than a hypothetical, you recommended a further

11:05AM  20  investigation be done; correct?

         21       A.   Uh, the recommendation was more based on, um,

         22  delineating the extent of the contamination.  And along with

         23  that, you would, I guess, provide some more certainty as to

         24  whether or not some of these potential pathways existed.

11:05AM  25       Q.   All right.  And, sir, in your conclusion, in your

```
 1   report, you recommended that if this additional work verified
 2   that Whittaker was a source and a pathway existed, only then
 3   should a request made -- be made to DTSC to order a further
 4   investigation; correct?
 5        A.   Uh, I'd have to refer to the report to know exactly
 6   how I -- what I said.
 7        Q.   If we can put up page 34.36, which is page 6-5.
 8             And "If additional characterization activities," if
 9   you could read that to yourself, please.
10        A.   Uh, yeah.  It says -- read it out loud or --
11        Q.   Well, when you say, "If additional characterization
12   activities," does that refer to the subsequent investigation
13   that you recommended?
14        A.   I believe it does, yes.
15        Q.   Was that ever done?
16        A.   Um, not to my knowledge, no.
17        Q.   And if those confirm that the former Whittaker site
18   VOCs are migrating, then DTSC should require certain things;
19   correct?
20        A.   It says that, yes, if -- if those confirm the
21   contamination is related to the facility, that DTSC should
22   require amending Whittaker's RAP, remedial action plan, to
23   address those VOCs.
24        Q.   And would you then agree, since those recommended
25   activities have never been done, there should be no reason for
```

```
 1    DTSC to amend anything?
 2         A.   Well, I -- I believe -- or earlier in the report, it
 3    was also stated that the intent of the report was to outline --
 4    it was either in the report or the cover letter for -- you
 5    know, this report to be a basis to work with DTSC to have these
 6    potential sources do these investigations that were
 7    recommended.
 8         Q.   Well, didn't DTSC actually respond to this report?
 9         A.   They did, yes.
10         Q.   And -- did you read the letter actually that you got
11    that was sent to the water agency about the report?
12         A.   I believe I did, yes.
13         Q.   All right.
14              MR. BLUM:  Your Honor, that letter is Exhibit 12.
15    May I publish it?
16              MR. GEE:  No objection.
17              THE COURT:  You may.
18              (Exhibit 12 received into evidence.)
19         Q.   (BY MR. BLUM:)  And is this the letter dated
20    September 12th, 2017 -- 2016, that was written to Mr. Stone
21    relating to your investigation?
22         A.   It does look like it, yeah.
23         Q.   Okay.  Now, did DTSC after looking at your report
24    recommend anything further should be investigated as to
25    Whittaker -- as to the Whittaker site?
```

11:08AM (line 5)
11:08AM (line 10)
11:08AM (line 15)
11:08AM (line 20)
11:09AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1        A.     I believe they have not made any -- any -- they have

 2   not issued any orders to either Whittaker or Saugus Industrial

 3   Center to do any investigation.  And in the closing of this

 4   letter or somewhere in the letter they recommend that the

 5   agency be the one to approach each of these parties and try to

 6   essentially solve the problem themselves, which, to me, is

 7   surprising because in these cases, typically it's the

 8   responsibility of -- of the polluter to characterize the full

 9   extent, both vertically and laterally, where they've impacted

10   groundwater.

11        Q.     That wasn't my question.

12        My question was:  Did DTSC suggest to Mr. Stone that

13   any further investigation of the Whittaker site was required?

14        A.     I would need to read through the letter to -- to

15   decide if -- if they did or not.  I don't recall.

16        Q.     It's only two pages.

17        A.     Okay.  I can -- I can read it.

18        THE COURT:  I'm going to -- this is in evidence.

19   Let's move on under 403.

20        Q.     (BY MR. BLUM:)  Let's go to the second page.

21        All right.  DTSC recognized that SIC and Whittaker

22   were the most likely sources; correct?

23        A.     That's what it says, yes.

24        Q.     All right.  And they -- they suggested that further

25   investigation needed to be done of the SIC site; correct?
```

**UNITED STATES DISTRICT COURT**

 1    A.    I believe they have that in there, yes.

 2    Q.    Okay.  And in that suggestion, didn't they conclude

 3 that the highest levels of TCE in the groundwater were

 4 emanating not from Whittaker but from SIC?

11:10AM   5    A.    That says that there, yeah.  I don't know if I would

 6 agree with that but --

 7    Q.    Now, after Mr. Stone received this letter, did the

 8 water agency take any efforts to do the investigation suggested

 9 by Mr. Diaz of the Department of Toxic Substances Control?

11:11AM  10         MR. GEE:  Objection.  Lacks foundation.

11         THE COURT:  Sustained.

12    Q.    (BY MR. BLUM:)  Do you know whether Mr. Stone or

13 anybody at the water agency took any actions to do the further

14 investigation recommended by the department?

11:11AM  15         MR. GEE:  Objection.  Calls for speculation.

16         THE COURT:  I'll allow the answer.

17         Yes or no, do you know one way or the other?

18         THE WITNESS:  I do not.

19    Q.    (BY MR. BLUM:)  All right.  Now, the investigation

11:11AM  20 you did relate --

21         MR. BLUM:  Hold on a minute, Your Honor.

22    Q.    (BY MR. BLUM:)  I want to talk about SIC.  Now,

23 before we do that, I want to talk about some terms so that

24 we're -- we're using the -- the same meaning.

11:12AM  25         Contamination can reach a -- an underground source,

```
 1   either moving horizontally or vertically; correct?  I'm not

 2   suggesting those are the only ways, but those are two of the

 3   options.

 4        A.   I -- yeah.  I -- I think there's a lot of variations

 5   on that, but yes.  Those -- those would be the two main -- main

 6   directions.

 7        Q.   So, for instance, if in the Whittaker site, if there

 8   was a spill on the surface at Whittaker that migrated down to

 9   the groundwater, theoretically that contamination can move

10   horizontally with the aquifer and contaminate S-1 or S-2;

11   correct?

12        A.   Yes.

13        Q.   Isn't it also true that if there is a spill at SIC

14   and the water -- in the water above the well, that water can

15   move vertically down to the well?  Correct?  I'm sorry.  That

16   contamination can move vertically down to the well.

17        A.   That's a possibility, yes.

18        Q.   All right.  Now, you would agree with me that there

19   are documented releases of VOCs, specifically TCE, at the, um,

20   SIC site?

21        A.   Based on the reports that I've read, yes.

22        Q.   Okay.  And wouldn't you agree with me that the

23   pathway -- sorry -- or the way it's migrating is west, towards

24   the Saugus wells?

25        A.   I would agree that the regional groundwater flow
```

The timestamps in the left margin:
- Line 5: 11:12AM
- Line 10: 11:12AM
- Line 15: 11:13AM
- Line 20: 11:13AM
- Line 25: 11:14AM

**UNITED STATES DISTRICT COURT**

1855

```
  1    direction is west throughout the entire area.

  2         Q.    Okay.  And you would also agree with me that it has

  3    migrated at least to the location where the Saugus wells exist;

  4    correct?

  5         A.    I think there's -- I believe in the report it's

  6    outlined that there's a -- there's a likely chance that there's

  7    contamination detected across the street from SIC related to

  8    SIC, yeah.

  9         Q.    Well, if we can go to your report, page 34.58.  It's

 10    actually Figure 4-2.  Can you describe for the jury what

 11    Figure 4-2 is?

 12         A.    Uh, well, the intent of this figure is to show the

 13    recommended monitoring wells which are shown in the four --

 14    four circles numbered 1 through 4.  Under that is contours

 15    of -- what's the page?

 16         Q.    It's -- it's the wrong page.  I had it wrong.

 17              MR. GEE:  Counsel, did you want him to complete his

 18    answer?

 19              MR. BLUM:  Yes.

 20              THE COURT:  Let's go ahead and put the figure up

 21    that he was describing for now.

 22              MR. BLUM:  Go ahead and put that figure back.

 23    Sorry.  Okay.

 24              THE WITNESS:  So, again, there's four areas where

 25    there's additional investigation recommended.  Below that is an
```

11:14AM (line 5)
11:14AM (line 10)
11:15AM (line 15)
11:15AM (line 20)
11:15AM (line 25)

UNITED STATES DISTRICT COURT

1   interpreted plume of TCE, I believe -- yes, TCE concentrations

2   that show, as interpreted, TCE exit -- you know, leaving the

3   SIC site and flowing to the west.

4           MR. BLUM:  All right.  If we could put up 34.56,

11:16AM  5   which is Figure 4-2.  And if you can blow up the one to the

6   left.

7        Q.   (BY MR. BLUM:)  Now, these are contour lines;

8   correct?

9        A.   Um, that's -- yeah.  That's a way to refer to them.

11:16AM 10        Q.   And does it show -- and you're contouring in this

11   diagram the extent of the TCE contamination emanating from SIC;

12   correct?

13        A.   That's correct.  Yes.

14        Q.   And is Saugus 1 within the contour for TCE emanating

11:16AM 15   from SIC?

16        A.   Yes, in plan view.

17        Q.   Can you show the jury where Saugus 1 is?

18        A.   Um --

19        Q.   Just draw with your finger.

11:17AM 20        A.   (Indicating.)

21        Q.   Okay.  And where is Saugus 2?

22        A.   (Indicating.)

23        Q.   Okay.  Now, when these wells are operating, they

24   produce something called a capture zone; correct?

11:17AM 25        A.   Yeah.

1857

```
 1          Q.    What is a capture zone?

 2          A.    It's basically the area -- the area that -- that I

 3    guess water flows towards the well from.

 4          Q.    In other words --

 5          A.    But the -- but the -- I guess there's two issues

 6    here, is we have what -- what you see in map view and then

 7    there's also what is happening in cross sectional view.

 8          Q.    Sir, my question was -- did you answer the question

 9    fully what a capture zone is?

10          A.    Yeah.  I believe so.  Yeah.

11          Q.    And would you agree that the -- that you have

12    described the capture zone for well S-1 as large?

13          A.    "Large" is a relative term.  I mean, it's -- yeah.

14    I mean, it influences -- water flows to it from a large area,

15    yes.

16          Q.    Didn't you testify at your deposition that SIC is

17    within the capture zone for S-1?

18          A.    I don't recall if I did.  If I did, I guess I did.

19          Q.    All right.  If we could go to page 119, lines 15

20    through --

21                MR. GEE:  Objection.  Improper impeachment.

22                THE COURT:  Sustained.

23                You can have him -- you could refresh his memory.

24          Q.    (BY MR. BLUM:)  All right.  Do you have your

25    deposition in front of you, sir?
```

```
 1            A.    I -- it may be.  I don't know.  There's a lot of

 2      binders up here.  If somebody knows that it's in one of them,

 3      if they could --

 4                 THE COURT:  Is it a binder, Counsel?

 5                 MR. BLUM:  It is, Your Honor.

 6                 THE COURT:  All right.  Mr. Cruz, can you assist,

 7      please?

 8                 THE COURTROOM DEPUTY:  What number is it again?

 9                 THE WITNESS:  Yeah, I don't know what number it is.

10                 THE COURT:  It won't be a number.  It should have

11      its own subject name of deposition.

12                 THE COURTROOM DEPUTY:  I'm sorry, Your Honor.  I

13      didn't hear it.

14                 THE COURT:  It's the deposition.

15                 THE COURTROOM DEPUTY:  I don't know if he has the

16      deposition up here.

17                 THE COURT:  Have him use this, please.

18                 THE COURTROOM DEPUTY:  Yes, Your Honor.

19                 THE WITNESS:  I'm sorry.

20                 THE COURT:  Give him the page and the lines, please,

21      Mr. Blum.

22                 MR. BLUM:  Okay.  119, lines 15 through 18.

23                 THE COURT:  Just read it to yourself and see if it

24      refreshes your recollection, and he'll ask you a question when

25      you're done.
```

Timestamps in left margin: 11:19AM (line 5), 11:19AM (line 10), 11:19AM (line 15), 11:19AM (line 20), 11:20AM (line 25)

UNITED STATES DISTRICT COURT

```
 1              THE WITNESS:  Yeah, I --
 2              THE COURT:  So if you've reviewed it, ask your
 3    question, please.
 4         Q.   (BY MR. BLUM:)  Does that refresh your recollection
 5    that in your deposition you testified that SIC was in the
 6    capture zone for Saugus 1?
 7         A.   Yeah, but I believe we were referring to a figure.
 8    And then I go on in my deposition to explain that this is in
 9    two dimensional view but, if viewed in three dimensions, it's a
10    different story.
11         Q.   All right.  Now -- so your answer is yes, you did,
12    and then you tried to explain it?
13         A.   In my deposition?
14              MR. GEE:  Objection.  Argumentative.
15         Q.   (BY MR. BLUM:)  Is that correct?
16              THE COURT:  Ask another question, Mr. Blum.
17         Q.   (BY MR. BLUM:)  All right.  Now, the -- isn't it
18    correct, sir, that the contamination above the Saugus wells
19    emanating from SIC, at least hypothetically or conceptually,
20    could move down vertically and get to the well?
21         A.   Yeah.  I believe that's shown as a figure in the --
22    in the report.
23         Q.   So you would agree that's a possibility; correct?
24         A.   That's how it's presented, I believe.
25         Q.   Okay.  And, sir, isn't it correct that in 2013, you
```

11:20AM (line 5)
11:20AM (line 10)
11:20AM (line 15)
11:21AM (line 20)
11:21AM (line 25)

1       did what's called a pumping study to determine whether or not

2       the pumping of S-1 was strong enough to influence wells above

3       it?

4            A.    In 2013?  I don't believe so.  No.

11:21AM  5            Q.    Can you look at Exhibit 1397?

6                 MR. BLUM:  I'm sorry.  Let me get the right number,

7       Your Honor.  I think it's -- 1397.

8                 THE WITNESS:  I see that, yes.  The memo is dated

9       2013.  This work was done in 2010.

11:22AM 10            Q.    (BY MR. BLUM:)  And this is a memo describing work

11      done by you; correct?

12            A.    That's correct.  Yes.  Me and my colleagues at

13      CH2M Hill.

14            Q.    And you're -- when you wrote this -- this report,

11:22AM 15      you believed that it was true and correct and fairly

16      represented what you were seeking to investigate; right?

17            A.    Yeah.

18                 MR. BLUM:  Your Honor, I'd ask to publish the

19      exhibit.

11:22AM 20                 MR. GEE:  Objection.  Hearsay.

21                 THE COURT:  I'm going to overrule it on that ground.

22      But let me -- let me hear, what is the purpose of this?

23      Because there may be another reason to sustain the objection.

24                 MR. BLUM:  To show that he concluded in this

11:23AM 25      report --

```
 1              THE COURT:  All right.  Then I'm going to sustain
 2     it.
 3              Go ahead and ask him some foundational questions.
 4         Q.   (BY MR. BLUM:)  Did you conclude in the report that
 5     when Saugus 1 was pumped, that there was a delayed response
 6     where the groundwater above it in certain alluvial wells drew
 7     down?
 8         A.   Uh, I -- I'd have to -- to look at it.
 9         Q.   Well, I can help you.  Look at page 8 under the
10     section called "Quaternary Alluvium."
11         A.   Okay.  It said, "Water levels monitored in the" --
12     "in the alluvium at two locations declined by certain amounts
13     across the evaluation period, but there was no indications of
14     direct hydrologic response to pumping of Saugus 1 and 2."
15         Q.   Now, the wells -- one of them was AL-6; right?
16         A.   That's correct.  Yes.
17         Q.   AL-6, during the time that S-1 was pumping, the
18     water level decreased almost 5 feet; correct?
19         A.   That's correct.  Yes.
20         Q.   Doesn't that mean that at least indirectly, when
21     Saugus 1 is pumping, it is drawing and affecting water in AL-6?
22         A.   I don't believe necessarily.  That's -- that's the
23     only conclusion.
24         Q.   Well, isn't that one of the reasonable conclusions
25     that could be drawn from that?
```

11:23AM (line 5)
11:23AM (line 10)
11:24AM (line 15)
11:24AM (line 20)
11:24AM (line 25)

1862

1    A.    That's a potential conclusion.  It's also that the

2    monitoring period for this -- this study was -- was done from

3    the spring until, I believe, the late summer.  And seasonally,

4    the water levels in the alluvium fluctuate quite a bit just due

11:25AM  5    to rainfall.  So it could also be another explanation.

6    Q.    Well, did you compare the drawdown from -- at AL-6

7    to what was being -- what was happening at other wells to see

8    if it was greater or lesser?

9    A.    I don't recall if we did or not.  Um --

11:25AM  10   Q.    Isn't that something a good scientist would do?

11   A.    I -- again, it depends on what the intent of

12   understanding -- what the intent of the memo was.  And I don't

13   know that there was a focus on the alluvium necessarily.

14   Q.    Well, what was the intent of the memo -- or the

11:25AM  15   study?  Let's make it easier.

16   A.    Well, I'd have to go back and see what we said at

17   the beginning of the document.

18         Um, basically the study was done as Saugus 1 and

19   Saugus 2 were returned to service to monitor water levels

11:26AM  20   regionally to see how the water levels in various wells may

21   change with response to -- to their pumping.

22   Q.    So you wanted to know what effect would the pumping

23   of Saugus 1 have on other wells such as AL-6; correct?

24   A.    AL-6 would be one of the wells that we monitored.

11:26AM  25   Q.    And you found that when you pumped Saugus 1, AL-6

**UNITED STATES DISTRICT COURT**

drew down 5 feet; right?

A.   During the period that we monitored it, the water

level went down 5 feet, yes.

Q.   How long did you monitor it for?  I don't need exact

11:26AM  time.

A.   I -- I want to say it was close to a six-month

period, four-month, six-month.

Q.   As a hydrogeologist, if there was a drawdown for

5 feet in six months, would there have been a greater drawdown

11:27AM  for 10 years?

A.   Well, again, the water levels in -- you know, in

this particular unit, as well as all of the units, vary with a

number of different factors, pumping being one of them,

recharge from rainfall being another.  So it's not as simple as

11:27AM  coming up with, you know, one explanation to why a water level

changes.

Q.   Sir, didn't you conclude in a subsequent report in

2015 that, as a result of the study that we just talked about,

you couldn't conclude whether or not this contamination in the

11:27AM  Saugus wells were the result of horizontal or lateral

contamination moving from Whittaker or vertical contamination

moving from surface contamination?

A.   I don't know what report you're referring to.  But

if -- again, if -- if it was put in a report that we prepared,

11:28AM  then that's what we did.

1     Q.    Well, the other -- you said you had two reports in

2     that binder.  And the second one was done for the Army Corps;

3     correct?

4     A.    Yes, in 2015, there was two major reports that were

11:28AM   5     prepared related to this -- this entity.

6     Q.    Okay.  And that is Exhibit 1398.  If you can -- if

7     you can take a look at it, please.

8           And is that a report that you published?

9           MR. GEE:  Counsel, was that included in your

11:28AM  10     designations?  I'm not finding it in my binder.

11           MR. BLUM:  I believe it was.

12           THE COURT:  The Court doesn't have it either.

13           MR. BLUM:  Well, then I won't publish it,

14     Your Honor, but if I can just lay the foundation for it.

11:28AM  15           THE COURT:  All right.

16     Q.    (BY MR. BLUM:)  Is that a report that you wrote?

17     A.    I was an author of this report with some other

18     coworkers of mine, yes.

19     Q.    Okay.

11:29AM  20           THE COURT:  Let me ask.  Was this stipulated to or

21     is this challenged?

22           MR. GEE:  Stipulated to, Your Honor.

23           MR. BLUM:  Oh.

24           THE COURT:  All right.  Then go ahead and proceed.

11:29AM  25           MR. BLUM:  All right.  You can put it up, please.

```
 1          Q.    (BY MR. BLUM:)  This is a report that you authored;
 2    correct?
 3          A.    I was an author on this, yes.
 4          Q.    And now, the company isn't Jacobs.  It's CH2M Hill;
 5    correct?
 6          A.    Which Jacobs acquired a few years back, yes.
 7          Q.    But that's the company at the time that you were
 8    working for; right?
 9          A.    Correct.
10          Q.    And what was the purpose of this report?
11          A.    This was the final report that we prepared for the
12    Army Corps of Engineers for the -- the study that we had been
13    conducting that started in the -- 2000/2001 time frame.  We
14    published one initial report in 2005, which was fairly
15    extensive.  And this was kind of a summary of all of the work
16    that had been completed between 2000 -- that 2005 report and
17    this date here.
18          Q.    And, sir, was one of the purposes of the report to
19    discuss, for instance, what additional work needed to be done?
20          A.    I think, again, similar to the VOC investigation
21    report, there is some recommendations as to areas where
22    additional wells would assist in better delineating
23    contamination, yes.
24          Q.    All right.  And you actually had a section called
25    "Data Gaps"; correct?  It's on page ES9, which is the executive
```

11:29AM   (line 5)
11:29AM   (line 10)
11:30AM   (line 15)
11:30AM   (line 20)
11:30AM   (line 25)

```
 1   summary, 9.  It's .11, page .11.
 2        A.    Yeah.  So this is -- this is an executive summary of
 3   the larger section that probably covered this topic in the --
 4   in the report.
 5        Q.    Okay.  And under Data Gaps, you see west of the
 6   site?
 7        A.    I do, yeah.
 8        Q.    And the second sentence says, "The existing data."
 9              MR. BLUM:  Can you blow it up?
10        Q.    (BY MR. BLUM:)  Now, "The existing data suggests
11   that the distribution of PCE and TCE detections in the base of
12   the quaternary" --
13              Did I pronounce that right, by the way?
14        A.    I think it's pronounced -- that's one way, yeah.
15        Q.    -- "alluvium in the HSU S-1 are not adequately
16   characterized to determine if PCE and TCE in production wells
17   are the result of vertical migration of shallow nearby impacts
18   or lateral migration from a different area."  Did I read that
19   correctly?
20        A.    That's -- yeah.  Yes.
21        Q.    Now, what's HSU S-1?
22        A.    It's the -- I'm not sure how much HSUs have been
23   discussed during this.  I don't really want to go into the full
24   description.  But HSU S-1 is a portion of the Saugus formation
25   that is beneath -- typically beneath the alluvium, at least in
```

the vicinity of the production wells.  It's shallow Saugus
formation.

        Q.    All right.  And production wells are the wells that
the water agency uses to draw water for its customers from;
11:32AM    correct?

        A.    Yes.

        Q.    All right.  And vertical migration is the migration
we talked about that comes from the surface and moves down;
correct?

11:33AM    A.    Yes.

        Q.    And lateral migration is one that moves with the
groundwater; correct?

        A.    Correct.

        Q.    So were you saying that in 2015, when you did this
11:33AM    report for the Army Corps of Engineers, that there wasn't
enough information to determine whether the contamination of
VOCs in the S-1 or S-2 came from the top or the surface or had
moved laterally in the groundwater?

        A.    I mean, the main point of the statement is that it's
11:33AM    not adequately characterized being a data gap.

        Q.    And the -- the data gap was a large number to create
an inability to determine the source of the contamination for
the production wells; isn't that correct?

        A.    I mean, it's -- there's not necessarily any source
11:34AM    identification context here.  It's basically saying that -- you

know, is this -- you know, are things flowing vertically to these wells or laterally.

Q.   Okay.  And vertical would mean SIC and lateral would mean Whittaker; right?

11:34AM   A.   I would have to -- I mean, based on this geography, that's a fair statement maybe.  But, I mean, there's vertical migration and lateral migration.  And I believe that in the VOC investigation report, there's -- you know, there's, again, a conceptual migration pathway from SIC that would include both lateral and vertical migration.
11:35AM

Q.   Last couple of questions.

Do you recall at some point an e-mail chain or thread regarding whether or not there should be -- whether or not the water agency should try to perform fingerprinting of VOCs?
11:35AM

A.   Yeah.  I recall that it came up in my deposition.

Q.   Is that -- did you review those e-mails to prepare for your testimony here today?

A.   I -- I believe I looked at it.  I can't say that I studied it.
11:35AM

Q.   And you -- you commented on whether or not the agency should go ahead with fingerprinting; right?

A.   I believe I commented that I agreed with somebody else's comments that it would be an inconclusive evaluation and, therefore, not likely worthwhile.
11:35AM

1     Q.    Isn't -- didn't you also agree that -- that was with

2  Mr. Takaichi -- or I think it's Dr. Takaichi, isn't it?

3     A.    I -- I'm not sure if he was a Ph.D. or not.

4     Q.    But it was Mr. Takaichi; correct?

11:36AM  5     A.    Lynn Takaichi, yes.

6     Q.    Would you also agree that one of the things that you

7  concurred with for -- of Dr. Takaichi was that a reason not to

8  do it was that it might exonerate Whittaker?

9     A.    I believe that's what I said in my deposition, yes.

11:36AM  10     Q.    Is that the truth?

11     A.    Again, I -- I agree with what he said.  And the

12  main -- the main point of my agreement was that it would be

13  inconclusive.

14          MR. BLUM:  That's all I have, Your Honor.

11:36AM  15          THE COURT:  Mr. Gee.

16                       **CROSS-EXAMINATION**

17  BY MR. GEE:

18     Q.    Mr. Lechler, I'd like to just briefly go over some

19  of your background, if that's okay.

11:37AM  20          What -- can you briefly describe your education

21  background?

22     A.    Sure.  So I -- I have a bachelor's degree in geology

23  and a master's degree in hydrogeology, both acquired in the

24  late '90s, early 2000s.

11:37AM  25     Q.    And do you have any professional licenses?

1   A.   I'm registered in the state of California as a

2   professional geologist and a certified hydrogeologist.

3   Q.   Okay.  Counsel referenced three studies that you

4   were involved in.  How many studies did you do in the area of

11:38AM  5   the Whittaker site related to perchlorate contamination?

6   A.   Um, the -- the main -- the main study would -- would

7   have been the Army Corps work that was related to a compilation

8   of a number of -- I guess there was one large characterization

9   study that, again, was kind of completed in 2005, started in

11:38AM  10   the early 2000s.

11        And -- and then after that, between 2005 and 2015

12   when the -- when the study was officially completed, there was

13   a number of small projects related to contamination --

14   perchlorate contamination in the production wells and

11:38AM  15   regionally.

16   Q.   Okay.  So you've been basically studying the -- the

17   area for -- between 10, 15 years.  Is that about right?

18   A.   Essentially my entire professional career, that was

19   the first project that I started working on when I was hired by

11:39AM  20   CH2M Hill.

21   Q.   Okay.  And counsel mentioned a pump test that was

22   conducted around -- I think you said the test itself was

23   conducted in 2010.  Is that correct?

24   A.   The test that was referred to is when Saugus 1 and

11:39AM  25   Saugus 2 were returned to service after being out of service

for ten or so years.  And I believe that occurred in the spring of 2010.

Q.    Okay.  And what exactly is a pump -- pump test?

A.    Well, in general, a pump test is -- is where you would pump a -- a well and monitor the response of that pumping in -- both in the well that you're pumping as well as other wells that are surrounding that.  And one of the things that you do is you look to see how the water levels in those wells respond to that pumping.

And from that -- from that information, you know, the amount of water level changed due to the pumping, the rate that you're pumping, you can make some inferences and do some calculations to figure out how quickly groundwater flows.

It also tells you something about the interconnectedness between one -- from one well to the -- those pumping wells and -- and, essentially, if they're hydraulically communicating with one another.

Q.    Okay.  And you mentioned that you conducted this test during the start-up of S-1 and S-2.  Was that -- was the pump test to determine whether or not other wells were hydraulically connected to Saugus 1 and Saugus 2?

A.    Uh, I mean, that was -- I mean, that would have been one of the objectives.  I think, you know, a number of -- I don't recall the exact number.  But, I mean, there was -- water levels were monitored in -- in wells -- I want to say 30 to 50

```
         1   different wells scattered anywhere from probably a half mile

         2   away from the Saugus wells, all the way up to within tens of

         3   feet from the wells and then also wells that are screened or,

         4   you know, have water coming into them from various depths so

11:41AM  5   you can kind of see how far away the pumping influences water

         6   levels, as well as how -- vertically where there's a -- an

         7   influence of that pumping.

         8       Q.   Okay.  And is it important to know whether a

         9   monitoring well is hydrogeologically connected to Saugus 1 and

11:42AM  10  Saugus 2 in order to generate, for example, flow contour data?

         11      A.   Yeah.  I think one -- one of the main objectives

         12  would have been to -- to further refine and characterize these

         13  HSUs, or hydrostratigraphic units, to better understand the

         14  groundwater flow paths within the -- within the larger area.

11:42AM  15      Q.   And what wells were connected to the Saugus wells

         16  during -- as determined through your pump test?

         17      A.   I mean, I think -- in general terms, the -- you

         18  know, the wells -- I believe that the -- the memo that was

         19  referenced earlier, there was a -- there was a categorization

11:43AM  20  of whether or not wells responded immediately to pumping.  So

         21  you basically saw a very quick water level change when pumping

         22  started to occur or if -- whether or not there was not an

         23  immediate response.

         24           And typically the wells that showed an immediate

11:43AM  25  response to pumping were within the HSU's S-3C and deeper, so
```

**UNITED STATES DISTRICT COURT**

```
 1    S-3C, 5A, and other higher numbered HSUs.

 2         Q.    And was there any monitoring wells that -- of

 3    significance that was not connected to the Saugus 1 and 2 or

 4    HSU-3?

 5               MR. BLUM:  Vague.

 6               THE COURT:  Sustained.

 7         Q.    (BY MR. GEE:)  I'd like to display TE 34.65.  And --

 8               MR. GEE:  Your Honor, for the record, we're dealing

 9    with two different sets of Exhibit 34.  And the page numbers

10    that I'm referencing are two pages off from the one that

11    counsel for Whittaker is using.

12               THE COURT:  Why don't we use the one that's actually

13    been admitted or will be admitted into evidence, please.

14               MR. GEE:  Okay.  I'm going to presume that that

15    would be mine.

16               THE COURT:  Okay.  So let's go ahead and use that.

17         Q.    (BY MR. GEE:)  Okay.  Mr. Lechler, was CW-1 one of

18    the wells that -- that you evaluated during the pump test?

19         A.    Um, so CW-1 has -- at that location, there's three

20    different wells at separate depths.  And during this pumping,

21    we monitored the deepest of those three wells, CW-1C.

22               MR. GEE:  Okay.  And can you blow up the left-hand

23    graphic?

24         Q.    (BY MR. GEE:)  And, Mr. Lechler, can you use your

25    finger and point out where CW-1 is?
```

11:43AM (line 5)
11:44AM (line 10)
11:44AM (line 15)
11:45AM (line 20)
11:45AM (line 25)

            1    A.     (Indicating.)

            2    Q.     Why was this well significant?

            3    A.     Um, well, this well -- I mean, it's -- we did not

            4    observe any -- any immediate responses to pumping in this -- in

11:45AM     5    this well, um, which suggests that it's in shallower HSUs, S-1

            6    or S-3A potentially.  It is in the Saugus formation.

            7          And that's really the only offsite monitoring

            8    location in that area.  So there's -- there's really no

            9    monitoring of -- of the portion of the aquifers that are

11:46AM    10    supplying the wells at that location.

           11          MR. GEE:  Okay.  Can you display the right hand --

           12    display the right-hand graphic on that page?

           13    Q.     (BY MR. GEE:)  Mr. Lechler, can you explain how the

           14    VOC plume can bypass CW-1?

11:46AM    15    A.     Well, I think it's essentially shown here

           16    graphically.  I mean, we have a red area that is represent --

           17    you know, an interpreted interval of VOC contamination that is

           18    detected on the Whittaker site at these three locations,

           19    33 MW-1A through C, PC-4A through C, and RN-W4A through C all

11:47AM    20    have one -- it looks like one may not have VOCs in it.

           21          But -- so those -- those wells have VOCs in them.

           22    And between them is CW-1.  And then further to the west you

           23    have the Saugus production wells.  And again, there's -- at

           24    CW-1, there's -- there's really just not any wells that are

11:47AM    25    deep enough to be within that interval that -- that is where

1    the contamination is -- is likely to be.

2           We did see at the Whittaker site on the -- on the --

3    on the east side of this diagram one of those wells, I believe

4    it was 33 MW-1 was monitored during -- during that pumping.

11:48AM  5  And we did see a response in that well.

6           So -- so there is a response farther away than CW-1.

7    And we didn't see anything at CW-1 which would indicate that

8    it's in the shallower portion of the aquifer.

9           MR. GEE:  Okay.  And let's go back to the left-hand

11:48AM  10  figure.

11          Q.   (BY MR. GEE:)  And does this mean that VOC

12   contamination from the Whittaker site can flow to the north of

13   this site without being detected in CW-1?

14          A.   I -- yeah, that's what I just tried to explain, I

11:48AM  15  think.  But yeah.

16          Q.   Okay.  And looking at this drawing, is there any

17   other information other than contour lines that you can use to

18   determine groundwater flow north of OU-4?  Directly north of

19   OU-4.  Sorry.

11:49AM  20          A.   Um, I'm sorry.  Could you repeat your question?

21          Q.   Okay.  Does this mean that other than contour lines,

22   that no information -- that there is no information regarding

23   groundwater flow directly north of OU-4?  Is that correct?

24          A.   I mean, there's no -- there's no groundwater quality

11:49AM  25  or contaminant information within the -- again, the portion of

1876

```
 1    the aquifer that the wells are pumping from in that area, no.

 2         Q.   And does this mean that no contamination can get

 3    into CW-01?

 4         A.   Not necessarily, no.  I mean, I -- my recollection

 5    is that CW-1 does contain perchlorate, at least -- I'm not sure

 6    about -- again, there's three wells there.  I believe the

 7    shallowest one has been dry for some time now.

 8         And the two deeper ones, um, my recollection is that

 9    there is some perchlorate that's been detected there

10    historically.  But, um, you know, there's a number of different

11    locations within the -- you know, in the area where there had

12    been releases.  So just because there's perchlorate in the well

13    doesn't necessarily mean that VOCs would be there if there was

14    a release of just perchlorate.

15         Q.   Okay.  And this morning we jumped around quite a

16    bit, you know, went through your Saugus 1 and Saugus 2 -- or

17    your VOC investigation report.  Just in a sentence or two, what

18    was the purpose of the 2015 VOC investigation study?

19         A.   Basically, Saugus 1 and Saugus 2 had been detecting

20    low levels of VOCs.  And there's not treatment for VOCs at the

21    treatment plant.  And the agency was looking for someone to

22    investigate the source of VOCs in those wells.

23         Q.   Okay.  And what was the first step of your

24    investigation?

25         A.   Uh, the first step would have been identifying
```

11:49AM (line 5)
11:50AM (line 10)
11:50AM (line 15)
11:51AM (line 20)
11:51AM (line 25)

**UNITED STATES DISTRICT COURT**

1877

1    facilities in the area surrounding the wells, online using

2    publicly available databases from the State and going through

3    those -- that listing of facilities, using a process to, I

4    guess, categorize and screen out facilities that did not have

11:51AM  5    contamination in them that's relevant to this study, the type

6    of contamination that is, VOCs, and then using other

7    professional judgment, whittle down that list to, you know,

8    the -- the set of potential sources that additional evaluation

9    was performed on.

11:52AM  10       Q.   Okay.  And after you conducted the initial

11   screening, what -- what did you do after that?

12       A.   So the -- you know, the screening process

13   essentially arrived at two potential sources, one being

14   Whittaker and one being SIC.

11:52AM  15           And at that point, after that, we did a couple of

16   things, looked at the VOCs that are detected in Saugus 1 and

17   Saugus 2 and compared those to the VOCs -- because it's not

18   just one VOC that are detected in either of those production

19   wells.  I think there's a list of 15 or 20 different ones that

11:52AM  20   had been detected over time.

21           So compared that list to the VOCs that have been

22   detected in the monitoring wells related to each of those sites

23   to see, you know, if -- if a similar set or subset of VOCs have

24   been detected.  And then kind of the flip side of that was to

11:53AM  25   look and see what were the main contaminants detected on each

1    of these sites and if those contaminants are -- are detected in

2    the production wells.

3        Q.   Okay.  And did you also conduct a hydrogeological

4    evaluation?

11:53AM  5        A.   Yeah.  I mean, that's -- the other component to that

6    would be looking at, you know, hydrogeologically where the

7    wells from those two sites -- where they're getting their water

8    from and if -- if those wells are, again, coming back to the --

9    you know, whether or not they're responding to pumping or if

11:54AM  10   they're in hydraulic connection or within a certain portion of

11   the aquifer that the production wells are producing from.

12       Q.   Okay.  And did you -- did you use available

13   hydrogeological data in order to conduct your evaluation?

14       A.   Yeah.  So we used data both that had been prepared

11:54AM  15   and presented by Saugus Industrial Center and their

16   consultants.  We used data and reports prepared by Whittaker

17   and their consultants.  We used the work that was prepared on

18   behalf of the Army Corps.  And we used the data that was

19   available publicly to look at all of those things.

11:54AM  20       Q.   Okay.  And I'd like to focus a little bit on the

21   Whittaker site.

22            MR. GEE:  Can we publish 34.64?

23       Q.   (BY MR. GEE:)  Mr. Lechler, do you recognize this

24   figure?

11:55AM  25       A.   Yeah.  I believe that's -- this is a figure from the

**UNITED STATES DISTRICT COURT**

1    Saugus VOC investigation report.

2         Q.    And can you briefly discuss what this figure shows?

3         A.    So the figure shows wells that are -- excuse me --

4    in the Saugus formation along with the distribution of where

11:55AM    5    perchlorate has been detected in the Saugus formation.  And

6    that would be the -- kind of the orange-ish yellow shaded area.

7              There's also groundwater flow arrows showing the

8    general groundwater flow direction in the Saugus formation

9    throughout this area.  And then there's -- there's a blue line

11:55AM   10    that -- that shows -- well, let me back up.

11             So the -- the monitoring wells on here are shaded

12    based on the concentration of TCE in them, with the red -- the

13    red dots being higher concentrations of TCE, the -- the green

14    being lower, and the yellow and orange being somewhere in

11:56AM   15    between.  The dots with the -- or the circles without any fill

16    in them were non-detect -- or there was no TCE detected there.

17    And then the blue line kind of contours the interval where

18    those detections are shown.

19         Q.    And I'm sorry, the yellow blob, again, represents --

11:56AM   20         A.    The -- yeah, the orange-yellow shaded area

21    represents the area where perchlorate has been detected.  Um,

22    and I'm looking at the -- I don't -- I'd have to look at the

23    report to see what the time frame was on that.  But if that was

24    a maximum -- or, you know, extent or if that was a -- based on

11:57AM   25    a certain time frame.  But that's where perchlorate has

UNITED STATES DISTRICT COURT

1    regionally been detected in those wells.

2        Q.   And can I just -- can I display page 61 of this

3    report.

4             Mr. Lechler, what does this drawing represent?

11:57AM   5        A.   So this is another figure in that VOC investigation

6    report.  And what it shows is the Whittaker-Bermite site with

7    different shaded areas representing -- looks like the areas

8    that are shaded blue are VOC impacted areas.  And these --

9    these areas were, I guess, delineated by -- by Whittaker

11:58AM  10    consultants during investigations that have been done on the

11    site.  These are not areas that we identified.  So this is --

12    this is some additional data from another source that we put

13    onto this figure.

14             But -- so the blue shaded areas is where there are

11:58AM  15    VOC impacts.  And I believe that's in soil.  And then, um,

16    the -- the red shading is where there's perchlorate impacted

17    areas.  Then they further subdivide it into -- with these

18    dashed yellow lines kind of categorized into three areas -- the

19    northern alluvium, the northern Saugus, and then the

11:58AM  20    southern -- southern Saugus area, kind of -- where they're kind

21    of all clumped together.

22             And I think the intent of the figure in the report

23    was to show that there's many -- there's many sites where both

24    of these types of chemicals were released and that some of them

11:59AM  25    are, you know, at the same locations where -- both of them, and

1    then there's also some locations where one or the other was --

2    was found to be impacting.

3         Q.    Okay.  And did the -- did the -- did you use this

4    figure to help you determine the plume that was -- that was

11:59AM  5    displayed --

6              MR. GEE:  And can you display Figure 64 again,

7    page 64.

8         Q.    (BY MR. GEE:)  Did you use this information to help

9    generate this plume map?

11:59AM  10        A.    I mean, I -- I think the interpretation of this map

11   as it's -- as it's outlined in the report interprets that

12   there's potentially -- you know, that the result -- the

13   resultant perchlorate impacted area that we're looking at and

14   the resultant TCE contour that is shown here is not from a

12:00PM  15   single release area and it's potentially and likely that --

16   that this is a composite plume that involves migration of each

17   of those contaminants from various areas on the site with

18   the -- and I can kind of draw here.

19             You know, there's potentially a source area here

12:00PM  20   (indicating) that could be attributable to a portion of the

21   plume and then another source area where you have a -- a plume

22   coming out this way (indicating).  And like -- so this could be

23   over -- and this is still simplifying the -- the overall

24   picture.  But what we could have here is overlapping plumes

12:01PM  25   that were the result of releases from numerous areas on the

1        site.

2                Q.    Thank you.

3                      MR. GEE:  Can you clear that?

4                Q.    (BY MR. GEE:)  You described -- there's a lot going

12:01PM   5     on in this drawing.  And you earlier described this blue dash

6        line.  Can you tell us again what that blue dash line

7        represents?

8                A.    Uh, so, I mean, you see again the -- the circles

9        that have the shading inside of them.  So the ones that are

12:01PM  10     shaded kind of a grayish color, there's no data for the time

11       frame that we prepared this map.  So I guess you can

12       essentially ignore those.  It's just for reference that there

13       is a well there.

14                      But really what it does is it kind of encircles the

12:01PM  15     area where there's detections of TCE.

16               Q.    Okay.  And within the larger bluer area, there's a

17       couple of question marks.  What does that represent?

18               A.    Uh, an area of uncertainty.  Um, again, this kind of

19       relates to an area where we have a data gap that there's --

12:02PM  20     there's concentrations, um, surrounding that area and -- and no

21       data to -- to kind of fill that gap.

22               Q.    Okay.  And are those the data gaps that you've

23       referenced in your conclusion?

24               A.    Yeah.  There was a -- one of the recommendations was

12:02PM  25     additional wells in that area to go deeper, to look within the

**UNITED STATES DISTRICT COURT**

         1   deeper portion of the Saugus formation where the wells are

         2   producing their water.

         3       Q.    Okay.  And you mentioned that you've reviewed data

         4   recently.  Is it your understanding -- or in the data that you

12:02PM  5   reviewed, did you see any new data associated with wells that

         6   are represented by those question marks, if there were wells

         7   installed?

         8       A.    Again, to my knowledge, none of the recommendations

         9   that are in the VOC -- excuse me, the VOC investigation report

12:03PM 10   have been, um -- none of that work has been done.  So, yeah,

        11   there's -- to my knowledge, no additional wells, excuse me,

        12   where those question marks are.

        13       Q.    Okay.  Can you clear that?

        14            And over to the right here, you have an additional

12:03PM 15   dotted line.  And again, there appears to be some question

        16   marks around it.  Can you tell us what that dot -- that -- this

        17   next dotted blue line is?

        18       A.    Again, similarly, it -- it encircles an area where

        19   we have TCE detected and, you know, it's been detected in all

12:03PM 20   of the production wells that are within there, Saugus 1 -- or

        21   Saugus 2, Saugus 1, V-201, V-205, V-157 which has been

        22   destroyed, I believe had TCE in it.  There's monitoring wells

        23   out here with TCE.  There's another one here (indicating).

        24            And then we have this area where there's -- there's

12:04PM 25   no TCE detections, but then we have -- again, some uncertainty

                        UNITED STATES DISTRICT COURT

1   up here (indicating) and we have some uncertainty down here

2   (indicating) because there's no wells as to whether or not some

3   of these concentrations here could be following these flow --

4   these flow arrows into those -- into those areas.

12:04PM   5      Q.   Okay.  And you have a flow area -- or a flow line

6   within -- within the plume, this one.  What's the import of

7   that -- that flow arrow?

8      A.   What's the importance?  I mean, just generally shows

9   where the -- in the absence of pumping to capture the water, it

12:05PM   10   generally shows the direction that that water's going to -- to

11   flow.  So further -- further into uncontaminated areas,

12   basically.

13      Q.   Okay.  And you have question marks around this --

14   around this blue plume.  So is this blue plume actually drawn

12:05PM   15   based on -- on data?  And which data did you use?

16      A.   Well, yeah.  It's drawn based on the data that's

17   presented on the map.  So the colored circles.  And then it's

18   interpreted based on groundwater flow directions and -- you

19   know, and the areas where there's lacking data was where you

12:06PM   20   see the -- the question marks.

21          MR. GEE:  Okay.  And let's see.  Can you display

22   page 55?  Let's take a look at the left-hand side.

23      Q.   (BY MR. GEE:)  This is page 55 from your report.

24   What -- what are we looking at on page 55 here, Mr. Lechler?

12:07PM   25      A.   It looks like the -- the portion of this page that's

blown up right now is the concentration of chloroform in

monitoring wells that are screened within the alluvium.  And

this looks like the maximum.  So this is the maximum

concentration that's been detected in these wells.

12:07PM

Q.    Okay.  So does it show that there's multiple --

multiple potential sources of chloroform that -- chloroform

sources in the area?

A.    I mean, it shows chloroform scattered in the -- I

mean, the only -- the only portion of the Whittaker site that's

12:08PM

in the alluvium is in that northern portion there.  And it

shows some chloroform detections up there.  It shows chloroform

detections throughout the -- the alluvium as groundwater flows

in the alluvium to the west.  It shows, you know, a couple of

detections up there.  And then it shows a smattering of

12:08PM

detections throughout the Saugus Industrial Center and

surrounding alluvial monitoring wells there.

Q.    Okay.  And if you -- was chloroform detected in

Saugus 1 and Saugus 2?

A.    I believe it was, yes.  I don't recall if it was

12:08PM

both wells -- I know there were some chemicals that were

detected more prevalently in Saugus 1 versus Saugus 2.  But it

was detected in at least one of them.

Q.    Okay.  And what -- did you know about what

concentrations were detected in the Saugus wells?

12:09PM

A.    Off of the top of my head, I don't know.

UNITED STATES DISTRICT COURT

1886

```
 1          Q.   Okay.  Do you have an order of magnitude?  Is it --
 2          A.   Um, again, it's not shown on the map here.  I
 3     believe they were all relatively low.  I -- I -- my
 4     recollection is that the only compounds that were detected in
12:09PM  5     those two wells consistently above reporting limits were TCE
 6     and PCE.  So they would have been near or below laboratory
 7     reporting limits which would mean that they were -- most likely
 8     had a -- had a "J" flag, which means it's an estimated
 9     concentration.
12:09PM 10          Q.   Okay.  And with all those chloroform in the wells,
11     is that -- does that allow you to determine the source of
12     chloroform?
13          A.   Um, I mean, we didn't really try to determine the
14     source of chloroform.  But yeah, with low concentrations, both
12:10PM 15     in the wells as well as in these various areas, it would maybe
16     be difficult to determine a source.
17               I mean, chloroform is, I think, used in its native
18     form.  But it is also a byproduct of the breakdown of other
19     VOCs.  And so it could be -- it could be coming from a number,
12:10PM 20     I guess, of different potential processes.
21          Q.   Okay.  And you mentioned that you also did a
22     chemical comparison of contaminants in the Saugus well versus
23     the other sites.
24               MR. GEE:  Can you publish page 27 and highlight the
12:11PM 25     table there?
```

            1        Q.    (BY MR. GEE:)   Mr. Lechler, what did you do for

            2    the -- in the chemical comparison portion of your report?

            3        A.    So it looks like here, this is a comparison of -- so

            4    on the left is the listing of VOCs that had been detected,

12:11PM     5    either in Saugus 1 or Saugus 2.  The next two columns show how

            6    frequently -- based on the data that we used at the time the

            7    report was prepared, how frequently they were detected.  And

            8    then the third column shows whether or not -- just with a

            9    checkmark, whether or not that same VOC had been detected on

12:12PM    10    the Whittaker-Bermite property.  And there's a corresponding

           11    table similar to this one for SIC.

           12        Q.    Okay.  And what does this -- the information in this

           13    table tell you, other than the -- what's represented here?

           14    What -- what's the importance of this table?

12:12PM    15        A.    Well, I think we use this table for a couple of

           16    different things.  One thing we -- we used it to help kind of

           17    narrow our focus on which VOCs to focus on.  There were some

           18    that were either not detected in Saugus 1 or Saugus 2 or

           19    detected -- you know, for instance, there's a number that were

12:12PM    20    detected 1 percent of the time in I don't know how many total

           21    samples.  But that was probably, for instance, 1 out of 100

           22    samples where it was detected and so not really going to be

           23    something that we wanted to invest an extraordinary amount of

           24    time into looking at if it was only detected once.

12:12PM    25             So it helped narrow the focus of the VOCs to focus

1888

```
      1   on.  And it also told us something about whether or not, you
      2   know, those -- what we've kind of refined more important list
      3   of VOCs, whether or not they're detected on the various sites.
      4              THE COURT:  Mr. Gee, approximately how much longer
12:13PM  5   do you have with this witness?
      6              MR. GEE:  Maybe about 15 minutes.
      7              THE COURT:  All right.
      8              MR. GEE:  Can you display page 22?  And highlight.
      9        Q.    (BY MR. GEE:)  Mr. Lechler, is this the -- the table
12:13PM 10   that -- that you referenced for SIC?
     11        A.    It is, yes.  So I think everything in -- everything
     12   in this table should be the same as the one we previously
     13   looked at, except for the checkmarks in the -- in the last
     14   column of the table.
12:13PM 15        Q.    Okay.  And based on your comparison of chemicals
     16   found in the wells versus chemicals identified at the site, did
     17   you -- did this help you reach any kind of conclusions
     18   regarding the more likely -- the likely sources of VOCs and --
     19   in the Saugus 1, Saugus 2?
12:14PM 20        A.    I mean, I think it was -- it was considered as a --
     21   as one of the lines of evidence that -- you know, there was
     22   more of these VOCs that were detected in the wells, than had
     23   been detected on the Whittaker site, than on the Saugus
     24   Industrial Center site.
12:14PM 25        Q.    Okay.  And the Saugus Industrial Center, were there
```

1 chemicals detected at Saugus Industrial Center that did not --

2 or that were not detected in Saugus 1 and Saugus 2?

3   A. Yes.  So I believe in the report for each of the

4 sites early on -- and there's a section dedicated to each

12:14PM 5 side -- early on in that discussion, there's a -- a summary of

6 the prevalent chemicals -- or maybe it's in the background

7 section.  I don't -- I can find it, but -- it discusses the

8 chemicals that are prevalent at each of these sites, most

9 frequently detected at high concentrations.

12:15PM 10    And Saugus Industrial Center -- I believe the three

11 that were identified were TCE, vinyl chloride, and 1,2-DCA.

12 And I don't believe that vinyl chloride or 1,2-DCA at the time

13 the report was prepared had been detected in Saugus 1 or

14 Saugus 2.

12:15PM 15   Q. And were vinyl chloride and 1,2-DCA found in high

16 concentrations in the Saugus Industrial Center monitoring

17 wells?

18   A. Again, I don't have numbers for you, but I believe

19 that, yes, that was the -- kind of the summary in the report

12:15PM 20 was that those were two of the -- those were two of the three

21 chemicals that were detected at the highest concentrations on

22 the facility.

23   Q. Okay.

24   MR. GEE:  Your Honor, I guess my 15 minutes was an

12:16PM 25 overestimate.

|    |    |
|----|----|
| | 1 |

            THE COURT:  That's often welcome.  That's it for

your questions?

            MR. GEE:  Yes.  Yes, Your Honor.

            THE COURT:  All right.  Any redirect, Mr. Blum?

12:16PM   5            MR. BLUM:  Yes, sir.

                    **REDIRECT EXAMINATION**

BY MR. BLUM:

      Q.    Mr. Lechler, the investigation you did that resulted

in your report, do you recall describing it as a desktop or

12:16PM  10  tabletop investigation?

      A.    I believe that I may have said that, yeah.

      Q.    What is a desktop investigation?

      A.    It would be one that does not necessarily involve

going into the field and collecting new -- new data.  It's

12:17PM  15  using existing data to -- you know, again, essentially sitting

at your desk to -- to do the study as opposed to going out -- I

mean, a tremendous amount of work is involved to install all

those wells that we've been talking about.  So there was none

of that included in this -- in the report, her study.

12:17PM  20      Q.    Doesn't it also mean that when you're dealing with

the -- the hydrology -- hydraulic conductivity, that you try to

use averages instead of trying to plot out actual numbers in

order to make it simpler?

      A.    I guess I don't understand the question.

12:17PM  25      Q.    Let's see if I can be more specific.

1891

```
 1            For instance, isn't one of the things that you
 2   looked at, the hydrostratigraphic division of the different --
 3   of the Saugus formation?  Is that correct?
 4       A.    Yeah.  That was -- that was a component, yeah.  We
 5   looked at the various HSUs.
 6       Q.    And isn't it true, in looking at these components,
 7   you used what is called a simpler hydrostratigraphic division
 8   of the Saugus formation?
 9       A.    Yeah.  I -- I believe in this report we simplified
10   the various Saugus HSUs that had been numbered 1 through 8
11   and -- and put them into two separate categories, A and B;
12   whereas A was -- the Saugus unit where we did not see
13   responses -- immediate responses to pumping, and Saugus B being
14   the intervals where we -- we do see these immediate responses
15   to pumping.
16       Q.    Now, just because a response is immediate -- is not
17   immediate doesn't mean there's no response; correct?
18       A.    Correct.
19       Q.    So the division you made was -- and one of the
20   reasons you made it was because you didn't have the budget for
21   a more complicated division?
22       A.    That's not the reason, no.
23       Q.    Well, how about -- one of the issues you looked at
24   was the conductivity; correct?
25       A.    I believe there's some use of hydraulic conductivity
```

12:18PM (line 5)
12:18PM (line 10)
12:19PM (line 15)
12:19PM (line 20)
12:19PM (line 25)

1    values in the report to demonstrate travel times.

2        Q.    All right.  And each different strata actually has a

3    different conductivity -- correct? -- or can have one?

4        A.    I guess theoretically it could, yes.

12:19PM  5    Q.    All right.  And you didn't use the conductivity for

6    each strata, you just created an average for conductivity;

7    correct?

8        A.    Uh, I believe so.  Yeah.

9        Q.    All right.  And isn't it correct that because you

12:20PM 10   just use an average that didn't take into account the strata,

11   it's one of the reasons why your conclusions were hypothetical?

12       A.    No.  I don't think so.

13       Q.    Well, what's the fastest strata?

14       A.    I -- I believe the alluvium.

12:20PM 15   Q.    Well, how about within the Saugus formation?  Isn't

16   it S-1?

17       A.    I don't think so.  I don't -- I don't know off the

18   top of my head, but I -- if I had to guess, it would probably

19   be something in S-3.  I -- honestly, I don't -- I don't know.

12:20PM 20   Q.    While using an average, don't you minimize the

21   travel time for faster stratas and maximize the travel time for

22   slower stratas?

23       A.    That's what an average would do, yes.

24       Q.    And isn't it correct that it was your belief that in

12:20PM 25   your next investigation, one of the steps would be to use

actual data to determine the strata conductivity rather than an
average?

          A.    There was never any next investigation planned as
part of this.

12:21PM          Q.    Was there next steps planned?

          A.    There was recommendations to do additional
characterization of groundwater quality, but there was never
any -- nothing as far as hydraulic conductivity values that I
can recall.

12:21PM          Q.    All right.  Now, Mr. Lechler, the -- you discussed
with Mr. Gee about how you went about determining which were
the potential sources and how you got it down to two.  Do you
recall that?

          A.    Yes.

12:21PM          Q.    Now, isn't it correct that the first cut of what
could be sources, you limited those sources that were already
determined to be VOC sources by either the Regional Quality
Control Board or DTSC and which were reported on either
GeoTracker or EnviroStor?

12:22PM          A.    I don't believe it was just VOC sources.  I believe
what we did was we looked at all release sites within a certain
geographic area that were open cases -- or actually, closed
cases too, I believe -- cases with the Regional Board or DTSC,
yes.

12:22PM          Q.    And what's EnviroStor?



          1          A.    It's -- it's an online database for various

          2    facilities that are regulated by DTSC, GeoTracker would be

          3    the -- the same thing for sites that are regulated by the

          4    Regional Water Quality Control Board.

12:22PM   5          Q.    And isn't it true that you excluded sites that in --

          6    based on your experience, could be VOC sources simply because

          7    they weren't on one of those two lists?

          8          A.    Well, we didn't exclude -- we started with those

          9    lists.  We didn't exclude anything intentionally, no.

12:23PM  10          Q.    Well, for instance, area sites such as the Newhall

         11    Airport.  Based upon your experience, you knew that airports

         12    were traditionally a source of VOCs, but you didn't look at

         13    that site as a potential site because it wasn't on EnviroStor

         14    or GeoStar [sic]?

12:23PM  15          A.    It was, actually.  It was included in the first

         16    list.

         17          Q.    Well --

         18          A.    It was screened out because there was no data to

         19    look at for that site.

12:23PM  20          Q.    And it was screened out no data even though you knew

         21    from your experience that airports are traditionally, again,

         22    sources of VOC contamination?

         23          A.    There's VOCs at airports, there's VOCs at gas

         24    stations.  Gas stations were screened out as well because

12:24PM  25    they're -- you know, the VOCs detected there weren't VOCs that

                         UNITED STATES DISTRICT COURT

1   were detected in the Saugus wells.  So, yeah, I mean, we didn't

2   include it because there was no data to -- to include.

3        Q.   And you also excluded dry cleaners, which you

4   testified to were notorious contaminators of PCE; isn't that

12:24PM  5   true?

6        A.   We excluded -- there was two dry cleaners that

7   were -- that were in the initial listing of sites.  And they

8   were -- they were -- they were excluded from the final list of

9   potential sites for various reasons that are outlined in the

12:24PM  10   report, yeah.

11        Q.   You would agree that dry cleaners are notorious

12   sources of PCE?

13        A.   I would agree that PCE is very commonly found at

14   dry-cleaning facilities, yes.

12:24PM  15        Q.   All right.  And because you couldn't go out and

16   collect field data, you excluded them because you didn't have

17   data at that point?

18        A.   That's not true.

19        Q.   Well, you couldn't get --

12:25PM  20        A.   There was data for those two facilities on

21   EnviroStor and GeoTracker based on that data and based on other

22   considerations, such as distance from the Saugus wells.  They

23   were excluded, and it's outlined in the report.

24        Q.   But one of the dry cleaners you excluded was

12:25PM  25   Flamingo Dry Cleaners; right?

**UNITED STATES DISTRICT COURT**

1896

```
 1        A.    That's correct, yes.

 2        Q.    Were you told by anybody at the water agency that

 3   they believed that the Flamingo Dry Cleaners was a source of

 4   contamination for their distribution system?

 5        A.    No.

 6        Q.    All right.  Now, we looked at two tables, I think it

 7   was Table 4-1 and 5-1.  That's contamination that was found at

 8   Saugus 1 and Saugus 2 and also that was found at SIC and

 9   Whittaker; correct?

10        A.    Yes.

11        Q.    Did you ever take a look at all of the contamination

12   that was found at either SIC or Whittaker and compare that to

13   all the contamination that was found at the Saugus -- either

14   Saugus 1 or Saugus 2 and see whether or not Whittaker and SIC

15   explained all the contamination that they found at Saugus 1 or

16   Saugus 2?

17        A.    Again, I -- I think I explained there was a couple

18   of VOCs or -- actually, it's almost close to half of the ones

19   that were detected in Saugus 1 and Saugus 2 that were detected

20   at such a low frequency that they were not -- they were not --

21   they were not looked at in detail.

22        Q.    Isn't it true that you did do that comparison and

23   you found several VOCs that could not be explained by either

24   contamination found at SIC or Whittaker?

25        A.    No.  I -- I mean, I -- there's -- there's a -- there
```

12:25PM — line 5
12:25PM — line 10
12:26PM — line 15
12:26PM — line 20
12:26PM — line 25

**UNITED STATES DISTRICT COURT**

1   are VOCs on that list that probably were not detected at either

2   of the sites.  But again, they were not the VOCs that are

3   detected every time that the well is sampled.  And, you know,

4   going in to try and, I guess, develop an explanation for every

12:27PM  5   detection of something in that well wasn't the intent.  We were

6   looking at the -- at the concentrations and the -- and the

7   sources of the VOCs that were consistently detected and causing

8   issues at their treatment plant.

9       Q.   All right.  Now, does that mean that there were VOCs

12:27PM  10  found in the wells that couldn't be explained by Whittaker or

11  SIC?

12      A.   There's VOCs that were detected at -- at least one

13  sample that may not have been detected at either SIC or -- or

14  Whittaker.  But if it was something that was a chronic issue,

12:27PM  15  it would have been detected every time the well was sampled.

16           So as to how to explain why that very low level of

17  VOCs of some -- some specific VOC was detected, I don't have an

18  explanation for you.

19      Q.   But isn't one of the possible explanations that the

12:28PM  20  VOCs that weren't from SIC or from Whittaker were from a third

21  source that you didn't know about?

22      A.   There's a world of possibilities out there.

23      Q.   And that's one of them, isn't it?

24      A.   Sure.

12:28PM  25  Q.   And by the way, you didn't exclude that as a

UNITED STATES DISTRICT COURT

possibility, did you?

A.    Again, those -- those -- those VOCs that were not detected at a -- at a high frequency were not -- there was no focus on those in the report.  We very quickly got down to TCE being the primary concern because TCE was -- was -- was the VOC that was detected most frequently and consistently in both of the wells and at highest concentrations.

Q.    Does that mean you did nothing to exclude the possibility that there was a third source?

THE COURT:  We've gone around this.  Ask another question, please.

Q.    (BY MR. BLUM:)  Sir, you talked about Figure 5-4 and the CW well.  Do you recall that?

A.    I don't remember which figure that is, but -- which figure are we talking about?

Q.    5-4.

THE COURT:  How much more time do you have, Mr. Blum?

MR. BLUM:  If you give me five minutes, Your Honor, I can finish it up.  Maybe six.

THE COURT:  All right.  I'm going to hold you to five minutes.

Q.    (BY MR. BLUM:)  Can you look at 5-4?

A.    Yes.

Q.    Figure 5-4 is based on your hypothetical pathways;

1899

 1    right?

 2         A.    Uh, not necessarily.  I don't -- I guess --

 3              MR. BLUM:  All right.  Could we go to Figure 5-5,

 4    which is the -- which is the plume map?  34.62, but I want

 5    to -- it's Figure 5-4.

 6         Q.    (BY MR. BLUM:)  All right.  Now, I just want to

 7    focus here.

 8         A.    Okay.

 9         Q.    Those border wells right there.

10         A.    Yeah.

11         Q.    And -- you know what?  Let me get a better -- I want

12    to focus on that line, that blue line there and these border

13    wells.

14         A.    Okay.

15         Q.    You drew this map; correct?

16         A.    Yeah.

17         Q.    And for the onsite VOC plume, you stopped it short

18    of those three border wells; correct?

19         A.    For the -- for the VOCs in the OU-4 right there,

20    yes.

21         Q.    That was because, in your interpretation looking at

22    the data, you believed there was no VOCs detected in those

23    border wells; correct?

24         A.    Well, that's what the figure shows.  There's no VOCs

25    detected in them, right.

```
 1         Q.    And that -- and you were true to the data when you
 2    drew this figure?
 3         A.    Correct.
 4               MR. BLUM:  I have nothing further, Your Honor.
 5               THE COURT:  Anything further of this witness,
 6    Mr. Gee?
 7               MR. GEE:  No.  No, Your Honor.
 8               THE COURT:  All right.  And so we will take our
 9    break.  It is now 12:31.  We will break for 30 minutes or until
10    just past 1:00 o'clock.
11               Remember, do not speak about the case, the people or
12    the subject matter involved.  Continue to keep an open mind.
13               We'll see you back in 30 minutes.
14               THE COURTROOM DEPUTY:  All rise for the jury,
15    please.
16               (Out of the presence of the jury:)
17               THE COURT:  You're excused, Mr. Lechler.  Please
18    watch your step going down.  Thank you.
19               Please be seated.
20               Just before we conclude, I want to make sure that
21    everything is in order with respect to the depositions.  We
22    just have depositions remaining at this point for the defense?
23               MR. BLUM:  Yes, sir.
24               There is one question I have for you on the
25    depositions.
```

12:31PM (line 5)
12:31PM (line 10)
12:31PM (line 15)
12:31PM (line 20)
12:32PM (line 25)

```
 1              THE COURT:  Yes.
 2              MR. BLUM:  There was an exhibit that there was an
 3    objection to that you haven't ruled on.
 4              THE COURT:  Which exhibit are you referring to?
 5              MR. BLUM:  1378.
 6              THE COURT:  And where would I find this exhibit?
 7              MR. BLUM:  It was in the Durant binder, Your Honor.
 8              THE COURT:  One moment.
 9              I'll let the parties know.  I may have the binder
10    back in chambers.  I'm not locating it out here.
11              Is there anything else besides that, 1378?
12              MR. BLUM:  I don't believe so, Your Honor.
13              THE COURT:  All right.  And otherwise, the parties
14    have resolved the issues with respect to -- is it Mr. Dawson?
15    Who -- who raised the issue?  It was you, Mr. Richard, I think
16    as to Dawson.
17              MR. RICHARD:  We haven't had a chance to meet and
18    confer regarding -- I think it was just this morning at
19    9:00 o'clock, we got their counter designation.  So we'll do
20    that over the lunch hour -- I'm sorry, Your Honor.
21              Mr. Blum agreed in principle earlier today that any
22    counter designations would be limited to context only.  And so
23    for some of their counter designations, we have no objections.
24    So I'm hopeful that with that principle in mind, we can resolve
25    that issue.
```

1       THE COURT:  All right.  I'll let the parties know

2  about 1378.

3       MR. BLUM:  Your Honor, may I just for the record, I

4  am -- we would normally object that it is not actually rebuttal

12:34PM  5  because we didn't introduce any testimony on the issue.  I'm

6  just making the objection because I think it's proper, and I'm

7  assuming you're going to overrule the objection.

8       THE COURT:  Well, I don't know why you're assuming

9  that.  But what is the basis for characterizing this as

12:34PM  10  rebuttal?

11       MR. RICHARD:  Yes, Your Honor.  We asked

12  Mr. Hokkanen yesterday about records he reviewed or did not

13  review.  And so that came out in their case.  And Mr. Dawson

14  was their 30(b)(6) witness for Whittaker on that issue.  And so

12:34PM  15  we have seven minutes of him talking about his discussions on

16  that topic.  I think that's the only reference in that --

17       THE COURT:  Tell me how that's rebuttal.

18       MR. RICHARD:  It shows that -- it responds --

19  provides a reason, because Mr. Hokkanen wasn't clear on why he

12:35PM  20  didn't review those.  He didn't directly speak to Mr. Lardiere,

21  but this witness did.

22       THE COURT:  It's not -- it's still not clear how

23  it's rebuttal.  So tell me what he -- what he said that you

24  think this is rebutting.

12:35PM  25       MR. RICHARD:  Well, both Mr. Dawson and Mr. Hokkanen

gave testimony about the history and source areas at the site.
And I had asked what records he had looked at, and he was
rather vague on that.  And this explains that the records
weren't there for him to review and why.

12:35PM

So I think it's rebutting the notion that he did a
complete and thorough review as part of his opinions.

THE COURT:  But how does that rebut that?  It sounds
like he did, except that there weren't documents for him to
review, if I'm understanding you correctly.

12:35PM

MR. RICHARD:  Right.  But I think it underscores --
I guess the inference is if an expert says I reviewed
everything I needed to review versus there were records that I
could not review because they didn't exist and haven't been
provided.  So, to me, it goes to the weight of their testimony

12:36PM

that it was incomplete because a whole category of records --

THE COURT:  Do you intend to use this for closing
argument?  If so, tell me what your closing argument point is
going to be because it's still getting lost on me and I suspect
it may get lost on the jury as well.

12:36PM

MR. RICHARD:  Sure, Your Honor.

It augments some of the other testimony already in
the record on this point, that there were logs and daily
operational records and the types of documents one would have
as to where the hazardous substances, the TCE and the PCE, were

12:36PM

stored, used, and disposed of.

**UNITED STATES DISTRICT COURT**

1        And it's Whittaker Corporation speaking to that

2   issue.  And so had they called Mr. Dawson, I would have used it

3   in cross-examination, but they told me a couple of days ago

4   they weren't calling him.  So I think it fairly rebuts the

12:36PM   5   notion that their experts relied on the data, the data, the

6   data as they argued and counsel has argued.

7        So is it going to be a big part of my closing?  No.

8   But it will be part of my closing, Your Honor.

9        THE COURT:  Let me see the portion that you're

12:37PM  10   looking to designate, and I'll make a determination.

11        So proceed on the assumption -- although, this

12   doesn't reflect any inclination.  But proceed on the assumption

13   that it's going to be admitted.  And the only reason you're

14   proceeding on that assumption is to give me the option so that

12:37PM  15   you then don't have to meet and confer.  It's not a

16   predisposition, to say the least.

17        All right.  Also, I am going to want to hear a

18   response.  I know we just got it, and I'll hold comment on it.

19   But I'm going to need a response from the plaintiff on the

12:37PM  20   issue of the statute of limitations.

21        Also, I'm warning Whittaker that if I receive

22   another document in violation of a Court's order, I will

23   sanction counsel.  I received, I believe, a supplemental brief

24   with respect to Mr. Alvord.  And so I'll take a closer look.

12:38PM  25   But if, in fact, that is a supplement that was not invited by

1       the Court, I'm going to likely want to hear from counsel who

2       has submitted it.

3               MR. BLUM:  Your Honor, that was the brief you asked

4       for that we could do on the issue of property --

12:38PM   5             THE COURT:  My understanding is that you

6       supplemented that.  I'm getting this information on the fly, so

7       it may be inaccurate.

8               So you're saying that you didn't provide the Court

9       with a further supplement?  This was just simply in response?

12:38PM  10             MR. BLUM:  Your Honor --

11              THE COURT:  If that's the case, the Court

12       apologizes.

13              MR. BLUM:  I understand -- Your Honor, things have

14       been moving really fast for everybody here.

12:38PM  15             I don't believe so, Your Honor.  But if we did, we

16       shouldn't have and there's no reason -- but I -- I confirmed

17       this morning that we only filed one.

18              THE COURT:  It's entitled "Supplemental JMOL Brief."

19              MR. BLUM:  It supplemented our original JMOL brief,

12:38PM  20      Your Honor.  It wasn't supplementing another one.  That's why

21       we named it "Supplement."

22              THE COURT:  I understand.  But on what ground did

23       you have the authority to issue a supplemental JMOL brief?

24              MR. BLUM:  I asked you yesterday if I could file a

12:39PM  25      three-page brief.

**UNITED STATES DISTRICT COURT**

1906

```
 1              THE COURT:  Oh, it's -- it's limited to that -- the
 2     three pages the Court permitted?
 3              MR. BLUM:  Yes, sir.
 4              THE COURT:  All right.  Then the apology stands.
 5              Thank you.  We're in recess.
 6              (Morning proceedings adjourned at 12:39 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

12:39PM (line 5)

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6            I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17           DATED THIS 2ND DAY OF DECEMBER, 2021.

18

19

20               /S/ MYRA L. PONCE
                 _____
21               MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                 FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**

**$**

**$11** [6] - 1815:14, 1818:23, 1819:7, 1819:11, 1819:16, 1819:17
**$200,000** [1] - 1812:8
**$6.625** [1] - 1790:18

**'**

**'90S** [1] - 1869:24

**1**

**1** [64] - 1758:1, 1771:2, 1771:7, 1771:9, 1771:17, 1775:3, 1775:6, 1780:18, 1780:20, 1781:8, 1782:16, 1784:13, 1786:20, 1788:16, 1788:19, 1790:21, 1802:21, 1804:14, 1817:13, 1818:6, 1820:16, 1822:17, 1823:3, 1832:25, 1833:9, 1835:5, 1835:6, 1835:7, 1835:17, 1839:5, 1839:9, 1855:14, 1856:14, 1856:17, 1859:6, 1861:5, 1861:14, 1861:21, 1862:18, 1862:23, 1862:25, 1870:24, 1871:21, 1872:9, 1873:3, 1876:16, 1876:19, 1877:16, 1883:20, 1883:21, 1885:18, 1885:21, 1887:5, 1887:18, 1887:20, 1887:21, 1888:19, 1889:2, 1889:13, 1891:10, 1896:8, 1896:14, 1896:15, 1896:19
**1,2-DCA** [3] - 1889:11, 1889:12, 1889:15
**1.1** [1] - 1835:17
**1.225** [3] - 1789:22, 1790:10, 1790:25
**1.3** [3] - 1787:22, 1790:16, 1791:3
**1.9** [7] - 1787:4, 1787:15, 1787:24, 1788:1, 1788:4, 1790:9, 1790:25
**10** [4] - 1798:14, 1798:18, 1863:10,

1870:17
**100** [1] - 1887:21
**103:18** [1] - 1759:8
**104:8** [1] - 1759:8
**10:30** [1] - 1762:7
**10:33** [1] - 1841:6
**10:48** [2] - 1841:6, 1841:15
**11** [2] - 1866:1
**119** [2] - 1857:19, 1858:22
**12** [2] - 1851:14, 1851:18
**12:31** [1] - 1900:9
**12:39** [1] - 1906:6
**12TH** [1] - 1851:20
**13** [2] - 1847:19, 1847:21
**1378** [3] - 1901:5, 1901:11, 1902:2
**1397** [2] - 1860:5, 1860:7
**1398** [1] - 1864:6
**1409** [2] - 1829:22, 1830:2
**1410** [5] - 1829:17, 1842:1, 1843:19, 1844:6, 1844:8
**1454** [1] - 1785:1
**1455** [2] - 1788:10, 1788:23
**1456** [1] - 1791:5
**15** [7] - 1841:11, 1857:19, 1858:22, 1870:17, 1877:19, 1888:6, 1889:24
**15-MINUTE** [1] - 1841:7
**17** [4] - 1794:15, 1794:18, 1814:9, 1814:11
**18** [1] - 1858:22
**18-06825-SB** [1] - 1758:6
**18TH** [1] - 1800:23
**1:00** [1] - 1900:10

**2**

**2** [42] - 1758:5, 1780:18, 1780:20, 1781:8, 1782:16, 1784:13, 1786:20, 1788:8, 1788:16, 1788:19, 1802:21, 1804:14, 1817:13, 1818:6, 1820:16, 1822:17, 1823:3, 1839:5, 1839:10, 1856:21, 1861:14,

1862:19, 1870:25, 1871:21, 1872:10, 1873:3, 1876:16, 1876:19, 1877:17, 1883:21, 1885:18, 1885:21, 1887:5, 1887:18, 1888:19, 1889:2, 1889:14, 1896:8, 1896:14, 1896:16, 1896:19
**2.2** [6] - 1788:9, 1788:15, 1789:10, 1789:13, 1790:9, 1791:3
**20** [2] - 1761:15, 1877:19
**2000** [1] - 1865:16
**2000/2001** [1] - 1865:13
**2000S** [2] - 1869:24, 1870:10
**2005** [4] - 1865:14, 1865:16, 1870:9, 1870:11
**2007** [5] - 1795:7, 1795:10, 1799:16, 1799:23, 1804:8
**201** [31] - 1765:12, 1765:18, 1766:17, 1766:22, 1768:4, 1768:12, 1768:15, 1772:6, 1774:8, 1779:1, 1780:20, 1782:20, 1782:21, 1784:16, 1786:20, 1786:24, 1787:4, 1787:21, 1788:19, 1789:2, 1794:1, 1796:4, 1804:10, 1807:21, 1811:3, 1813:24, 1815:23, 1817:10, 1821:12
**2010** [9] - 1793:16, 1793:18, 1794:25, 1796:21, 1797:6, 1829:11, 1860:9, 1870:23, 1871:2
**2011** [1] - 1793:16
**2013** [4] - 1827:20, 1859:25, 1860:4, 1860:9
**2014** [2] - 1797:12, 1827:21
**2015** [8] - 1795:2, 1830:5, 1830:11, 1863:18, 1864:4, 1867:14, 1870:11, 1876:18
**2016** [1] - 1851:20
**2017** [6] - 1772:7,

1772:9, 1781:15, 1806:20, 1806:23, 1851:20
**2018** [5] - 1800:11, 1800:17, 1800:18, 1800:23, 1801:8
**2019** [5] - 1831:23, 1831:24, 1844:11, 1844:21, 1845:3
**2021** [1] - 1758:1
**205** [2] - 1764:15, 1765:9, 1765:13, 1765:20, 1766:4, 1766:8, 1766:10, 1780:21, 1781:8, 1786:21, 1788:19, 1788:20, 1788:22, 1789:5, 1789:17, 1790:8, 1790:20, 1791:3, 1796:4, 1801:1, 1804:9, 1804:19
**210** [1] - 1847:19
**22** [1] - 1888:8
**25TH** [1] - 1831:24
**27** [1] - 1886:24
**2700** [1] - 1789:8
**29:13** [1] - 1759:4

**3**

**3** [4] - 1814:9, 1836:21, 1847:19, 1847:21
**3-1** [1] - 1836:23
**30** [3] - 1871:25, 1900:9, 1900:13
**30(B)6** [2] - 1761:16, 1902:14
**30:25** [1] - 1759:4
**31:22** [1] - 1759:6
**31:3** [1] - 1759:5
**31:5** [1] - 1759:5
**32:23** [1] - 1759:6
**33** [2] - 1874:19, 1875:4
**34** [3] - 1835:5, 1840:14, 1873:9
**34-63** [1] - 1849:3
**34.14** [1] - 1838:7, 1840:15
**34.32** [2] - 1838:7, 1840:15
**34.33** [1] - 1839:17
**34.36** [1] - 1850:7
**34.56** [1] - 1856:4
**34.58** [1] - 1855:9
**34.6** [2] - 1835:7, 1835:11
**34.62** [1] - 1899:4
**34.64** [1] - 1878:22

**34.65** [1] - 1873:7
**34.8** [1] - 1835:12

**4**

**4** [1] - 1855:14
**4-1** [1] - 1896:7
**4-2** [3] - 1855:10, 1855:11, 1856:5
**4-3** [1] - 1848:6
**403** [5] - 1824:20, 1824:21, 1833:25, 1846:8, 1852:19
**46** [2] - 1814:9, 1814:10
**47** [1] - 1814:9

**5**

**5** [7] - 1798:18, 1832:24, 1833:9, 1861:18, 1863:1, 1863:3, 1863:9
**5-1** [1] - 1896:7
**5-4** [5] - 1898:12, 1898:16, 1898:23, 1898:25, 1899:5
**5-5** [2] - 1849:3, 1899:3
**50** [1] - 1871:25
**50:24** [1] - 1759:7
**50:8** [1] - 1759:7
**55** [3] - 1884:22, 1884:23, 1884:24
**5A** [1] - 1873:1

**6**

**6** [4] - 1775:3, 1775:6, 1835:13, 1838:4
**6-5** [1] - 1850:7
**6.1** [1] - 1840:11
**6.2** [1] - 1839:17
**61** [3] - 1832:24, 1833:9, 1880:2
**62** [2] - 1832:25, 1833:9
**63** [1] - 1849:3
**64** [2] - 1881:6, 1881:7

**7**

**7** [1] - 1761:15
**7.5** [2] - 1813:7, 1813:12

**8**

**8** [2] - 1861:9, 1891:10
**8:29** [1] - 1758:1

**9**

**9** [1] - 1866:1
**97-005** [4] - 1823:21, 1824:8, 1824:11, 1824:18
**9:00** [2] - 1807:15, 1901:19

**A**

**A.M** [1] - 1758:1
**AACE** [2] - 1809:15, 1820:21
**ABERCROMBIE** [1] - 1803:22
**ABLE** [7] - 1759:13, 1759:24, 1760:1, 1764:3, 1766:14, 1777:22, 1779:8
**ABSENCE** [2] - 1763:9, 1884:9
**ACADEMIC** [1] - 1760:4
**ACCEPTABLE** [1] - 1815:1
**ACCEPTED** [2] - 1809:21, 1810:21
**ACCOUNT** [6] - 1770:25, 1789:6, 1811:2, 1816:14, 1845:8, 1892:10
**ACCOUNTED** [3] - 1798:13, 1811:12, 1816:6
**ACCURATE** [2] - 1772:7, 1844:18
**ACHIEVED** [1] - 1775:15
**ACKNOWLEDGED** [1] - 1844:1
**ACQUIRED** [2] - 1865:6, 1869:23
**ACTION** [2] - 1775:11, 1850:22
**ACTIONS** [2] - 1765:4, 1853:13
**ACTIVATED** [4] - 1785:9, 1785:18, 1790:14, 1793:4
**ACTIVITIES** [3] - 1850:8, 1850:12, 1850:25
**ACTIVITY** [1] - 1778:16
**ACTUAL** [11] - 1768:11, 1769:1, 1787:24, 1790:5, 1809:1, 1815:23, 1838:17, 1840:22,

1847:7, 1890:22, 1893:1
**ADAPTIVE** [1] - 1777:13
**ADD** [4] - 1783:21, 1790:13, 1790:16, 1790:17
**ADDED** [8] - 1783:17, 1783:23, 1786:17, 1787:7, 1788:2, 1789:6, 1789:9, 1809:25
**ADDING** [4] - 1785:9, 1786:16, 1790:19, 1790:24
**ADDITION** [1] - 1799:4
**ADDITIONAL** [41] - 1769:18, 1777:5, 1777:14, 1777:17, 1778:5, 1778:16, 1786:19, 1787:5, 1789:6, 1789:9, 1789:23, 1789:24, 1790:7, 1790:9, 1790:13, 1790:14, 1790:15, 1790:16, 1792:3, 1796:6, 1802:20, 1832:21, 1837:9, 1837:20, 1838:2, 1839:14, 1850:1, 1850:8, 1850:11, 1855:25, 1865:19, 1865:22, 1877:8, 1880:12, 1882:25, 1883:11, 1883:14, 1893:6
**ADDRESS** [7] - 1761:8, 1761:11, 1770:7, 1770:14, 1800:4, 1810:6, 1850:23
**ADDRESSED** [1] - 1831:5
**ADDRESSING** [1] - 1770:16
**ADEQUATELY** [2] - 1866:15, 1867:20
**ADJECTIVES** [1] - 1845:15
**ADJOURNED** [1] - 1906:6
**ADJUSTED** [1] - 1787:5
**ADJUSTMENT** [1] - 1815:2
**ADJUSTMENTS** [4] - 1787:14, 1811:23, 1813:17, 1814:19
**ADMISSIBILITY** [1] - 1761:2

**ADMITTED** [3] - 1873:13, 1904:13
**ADVISE** [1] - 1766:5
**AFFECTING** [1] - 1861:21
**AGENCIES** [1] - 1825:17
**AGENCY** [5] - 1758:6, 1763:13, 1797:25, 1827:16, 1843:18
**AGENCY** [81] - 1765:16, 1766:6, 1767:2, 1767:15, 1768:12, 1769:5, 1769:13, 1769:19, 1769:25, 1770:6, 1770:7, 1770:12, 1770:19, 1770:23, 1771:15, 1772:14, 1772:20, 1773:5, 1773:9, 1773:10, 1773:11, 1773:15, 1774:10, 1775:14, 1777:11, 1778:4, 1778:10, 1778:23, 1779:16, 1780:7, 1781:18, 1781:22, 1782:1, 1782:8, 1782:25, 1787:20, 1792:5, 1793:11, 1793:16, 1795:2, 1795:8, 1796:21, 1797:2, 1797:5, 1797:8, 1800:10, 1801:23, 1804:7, 1806:1, 1807:19, 1808:2, 1808:8, 1808:9, 1819:16, 1823:4, 1824:8, 1824:13, 1827:20, 1827:23, 1828:9, 1828:10, 1828:13, 1828:18, 1828:19, 1830:9, 1830:12, 1830:14, 1830:22, 1831:7, 1831:13, 1843:10, 1844:3, 1851:11, 1852:5, 1853:8, 1853:13, 1867:4, 1868:14, 1868:22, 1876:21, 1896:2
**AGENCY'S** [2] - 1765:17, 1766:24
**AGENDA** [2] - 1767:13, 1801:20
**AGO** [11] - 1807:25, 1810:19, 1811:7, 1811:17, 1812:7, 1813:16, 1814:15,

1815:8, 1816:7, 1816:9, 1904:3
**AGREE** [30] - 1762:11, 1793:3, 1794:3, 1797:13, 1806:25, 1810:6, 1810:9, 1810:19, 1812:6, 1813:18, 1814:2, 1816:13, 1817:5, 1825:5, 1833:21, 1845:24, 1846:11, 1850:24, 1853:6, 1854:18, 1854:22, 1854:25, 1855:2, 1857:11, 1859:23, 1869:1, 1869:6, 1869:11, 1895:11, 1895:13
**AGREED** [11] - 1759:16, 1759:19, 1762:15, 1792:16, 1793:21, 1793:25, 1794:2, 1795:15, 1799:16, 1868:23, 1901:21
**AGREEING** [1] - 1797:20
**AGREEMENT** [9] - 1795:1, 1795:7, 1795:11, 1797:24, 1797:25, 1799:16, 1799:23, 1804:8, 1869:12
**AHEAD** [7] - 1765:6, 1855:20, 1855:22, 1861:3, 1864:24, 1868:22, 1873:16
**AIRPORT** [1] - 1894:11
**AIRPORTS** [3] - 1894:11, 1894:21, 1894:23
**AL-6** [7] - 1861:15, 1861:17, 1861:21, 1862:6, 1862:23, 1862:24, 1862:25
**ALLOW** [3] - 1802:10, 1853:16, 1886:11
**ALLOWS** [1] - 1779:24
**ALLUVIAL** [6] - 1804:10, 1804:12, 1805:2, 1861:6, 1885:16
**ALLUVIUM** [1] - 1861:10
**ALLUVIUM** [11] - 1861:12, 1862:4, 1862:13, 1866:15, 1866:25, 1880:19, 1885:2, 1885:10,

1885:12, 1885:13, 1892:14
**ALMOST** [2] - 1861:18, 1896:18
**ALRIGHTY** [3] - 1832:2, 1837:3, 1843:22
**ALVORD** [1] - 1904:24
**AMEND** [1] - 1851:1
**AMENDING** [1] - 1850:22
**AMINI** [1] - 1778:19
**AMOUNT** [6] - 1783:24, 1815:15, 1822:15, 1871:11, 1887:23, 1890:17
**AMOUNTS** [1] - 1861:12
**ANALOGY** [1] - 1822:4
**ANALYSIS** [3] - 1781:11, 1783:5, 1821:7
**AND** [1] - 1827:6
**ANGELES** [1] - 1758:2
**ANGER** [1] - 1806:14
**ANSWER** [4] - 1814:21, 1815:4, 1848:10, 1848:14
**ANSWER** [16] - 1762:17, 1762:18, 1765:7, 1770:11, 1771:22, 1792:8, 1811:15, 1811:20, 1815:6, 1817:22, 1836:17, 1845:13, 1853:16, 1855:18, 1857:8, 1859:11
**ANSWERED** [3] - 1779:8, 1833:24, 1845:10
**ANSWERING** [1] - 1795:18
**ANTHROPOGENIC** [1] - 1808:5
**APOLOGIZE** [2] - 1773:13, 1833:6
**APOLOGIES** [1] - 1905:12
**APOLOGY** [1] - 1906:4
**APPEARANCES** [1] - 1758:8
**APPEARED** [1] - 1806:16
**APPLICATION** [3] - 1823:21, 1824:10
**APPLIES** [1] - 1760:17
**APPLY** [1] - 1788:15
**APPROACH** [40] -

1784:17, 1786:16, 1786:19, 1789:1, 1799:12, 1804:6, 1805:10, 1805:13, 1809:7, 1809:20, 1809:21, 1810:1, 1810:2, 1810:6, 1810:8, 1810:15, 1810:18, 1810:21, 1811:5, 1811:16, 1813:15, 1813:18, 1813:19, 1813:23, 1814:3, 1814:4, 1814:23, 1815:1, 1815:3, 1815:8, 1815:9, 1822:2, 1822:12, 1822:16, 1823:2, 1825:10, 1826:22, 1852:5
APPROPRIATE[7] - 1760:11, 1760:13, 1796:3, 1809:2, 1813:22, 1829:21, 1832:1
APPROVAL[1] - 1776:19
APPROVE[1] - 1781:22
APPROVED[2] - 1775:12, 1781:21
APRIL[1] - 1812:14
AQUIFER[8] - 1804:12, 1807:7, 1824:9, 1854:10, 1875:8, 1876:1, 1878:11
AQUIFERS[1] - 1874:9
ARBITRATION[4] - 1802:14, 1803:14, 1803:18, 1803:25
ARBITRATIONS[1] - 1798:24
AREA[39] - 1837:19, 1837:20, 1845:17, 1848:22, 1849:17, 1855:1, 1857:2, 1857:14, 1866:18, 1870:4, 1870:17, 1872:14, 1874:8, 1874:16, 1876:1, 1876:11, 1877:1, 1879:6, 1879:9, 1879:20, 1879:21, 1880:20, 1881:13, 1881:15, 1881:19, 1881:21, 1882:15, 1882:16, 1882:18, 1882:19, 1882:20,

1882:25, 1883:18, 1883:24, 1884:5, 1885:7, 1893:22, 1894:10
AREAS[20] - 1838:1, 1838:11, 1847:17, 1855:24, 1865:21, 1880:7, 1880:8, 1880:9, 1880:11, 1880:14, 1880:17, 1880:18, 1881:17, 1881:25, 1884:4, 1884:11, 1884:19, 1886:15, 1903:1
ARGUED[2] - 1904:6
ARGUMENT[3] - 1760:24, 1903:17
ARGUMENTATIVE[3] - 1802:9, 1845:11, 1859:14
ARISE[1] - 1816:14
ARMY[9] - 1827:22, 1828:5, 1830:12, 1842:14, 1864:2, 1865:12, 1867:15, 1870:7, 1878:18
ARRIVE[4] - 1837:1, 1837:11, 1846:24, 1847:6
ARRIVED[1] - 1877:13
ARROW[1] - 1884:7
ARROWS[2] - 1879:7, 1884:4
ARTICULATE[1] - 1769:19
ARTICULATED[1] - 1807:16
AS[2] - 1764:9, 1827:6
ASPECTS[3] - 1774:18, 1783:8, 1794:21
ASSEMBLE[1] - 1822:8
ASSESSMENT[2] - 1823:23, 1823:24
ASSIST[4] - 1765:22, 1829:24, 1858:6, 1865:22
ASSOCIATE[1] - 1826:22
ASSOCIATED[1] - 1883:5
ASSUME[10] - 1762:6, 1780:19, 1780:21, 1780:25, 1788:3, 1789:4, 1813:6, 1816:17, 1824:2, 1830:13

ASSUMED[4] - 1759:21, 1780:24, 1784:23, 1790:1
ASSUMES[2] - 1781:7, 1783:19
ASSUMING[7] - 1788:14, 1790:12, 1791:8, 1792:10, 1792:15, 1902:7, 1902:8
ASSUMPTION[4] - 1789:7, 1904:11, 1904:12, 1904:14
ATTEND[1] - 1795:6
ATTENDING[2] - 1805:25, 1806:5
ATTORNEY[1] - 1828:24
ATTORNEY-CLIENT[1] - 1828:24
ATTRIBUTABLE[1] - 1881:20
AUDIENCE[1] - 1778:8
AUGMENTS[1] - 1903:21
AUTHOR[3] - 1830:19, 1864:17, 1865:3
AUTHORED[2] - 1830:11, 1865:1
AUTHORITY[2] - 1801:24, 1905:23
AUTHORIZATION[1] - 1779:22
AVAILABLE[5] - 1806:15, 1806:20, 1877:2, 1878:12, 1878:19
AVERAGE[5] - 1892:6, 1892:10, 1892:20, 1892:23, 1893:2
AVERAGES[1] - 1890:22
AWAITING[2] - 1765:14, 1774:1
AWARE[22] - 1772:23, 1774:24, 1776:24, 1778:12, 1794:3, 1795:18, 1795:20, 1797:10, 1797:17, 1799:24, 1800:10, 1801:5, 1801:13, 1807:9, 1812:16, 1812:19, 1812:25, 1813:3, 1813:5, 1816:10, 1816:25, 1831:8
AWARENESS[1] -

1797:18

# B

B.J[2] - 1826:2, 1826:17
BACHELOR'S[1] - 1869:22
BACK-AND-FORTH[2] - 1766:24, 1770:22
BACKGROUND[3] - 1869:19, 1869:21, 1889:6
BACKTRACKING[1] - 1772:4
BACKWASH[1] - 1787:6
BASE[1] - 1866:11
BASED[29] - 1765:4, 1772:17, 1772:19, 1774:12, 1786:11, 1796:14, 1800:1, 1811:24, 1812:1, 1815:22, 1818:5, 1819:11, 1844:15, 1844:21, 1849:21, 1854:21, 1868:5, 1879:12, 1879:24, 1884:15, 1884:16, 1884:18, 1887:6, 1888:15, 1894:6, 1894:11, 1895:21, 1898:25
BASELINE[1] - 1786:25
BASIC[1] - 1786:6
BASIN[1] - 1828:2
BASIS[3] - 1784:22, 1851:5, 1902:9
BATES[1] - 1839:17
BEGIN[2] - 1791:25, 1826:20
BEGINNING[1] - 1862:17
BEGINS[1] - 1814:23
BEHALF[5] - 1764:23, 1773:1, 1782:1, 1783:7, 1878:18
BEHIND[1] - 1818:23
BELIEF[1] - 1892:24
BELOW[6] - 1771:2, 1771:7, 1771:9, 1771:17, 1855:25, 1886:6
BENEATH[2] - 1866:25
BENEFIT[7] - 1760:9, 1760:22, 1765:20, 1804:11, 1804:13,

1805:3, 1825:12
BENJAMIN[3] - 1759:10, 1826:16, 1826:17
BENJAMIN[1] - 1827:5
BERMITE[8] - 1774:17, 1777:21, 1781:25, 1839:9, 1840:2, 1840:25, 1880:6, 1887:10
BEST[2] - 1804:19, 1822:4
BETTER[4] - 1838:2, 1865:22, 1872:13, 1899:11
BETWEEN[17] - 1767:2, 1769:13, 1772:9, 1784:13, 1785:25, 1790:22, 1795:1, 1795:7, 1800:23, 1801:7, 1822:11, 1865:16, 1870:11, 1870:17, 1871:15, 1874:22, 1879:15
BEYOND[8] - 1761:9, 1791:15, 1792:18, 1824:19, 1832:16, 1836:15, 1837:7, 1844:10
BIBLE[1] - 1820:23
BID[6] - 1819:6, 1822:18, 1822:24, 1823:5, 1825:4, 1825:6
BIG[3] - 1806:10, 1849:16, 1904:7
BILL[1] - 1773:21
BIND[2] - 1801:24, 1802:2
BINDER[8] - 1759:10, 1826:22, 1830:8, 1858:4, 1864:2, 1864:10, 1901:7, 1901:9
BINDERS[3] - 1762:5, 1842:2, 1858:2
BIT[7] - 1767:2, 1772:4, 1774:22, 1808:18, 1862:4, 1876:16, 1878:20
BLENDED[2] - 1780:2
BLENDING[1] - 1780:5
BLOB[1] - 1879:19
BLOW[5] - 1843:21, 1849:4, 1856:5, 1866:9, 1873:22
BLOWN[1] - 1885:1

**BLUE** [10] - 1879:9, 1879:17, 1880:8, 1880:14, 1882:5, 1882:6, 1883:17, 1884:14, 1899:12
**BLUER** [1] - 1882:16
**BLUM** [106] - 1758:13, 1759:15, 1759:18, 1760:3, 1760:6, 1762:9, 1762:11, 1762:21, 1762:23, 1763:1, 1763:8, 1826:1, 1826:24, 1827:2, 1827:4, 1827:8, 1829:1, 1829:5, 1830:5, 1832:24, 1833:3, 1833:6, 1833:9, 1833:14, 1834:2, 1834:7, 1834:15, 1834:19, 1834:22, 1835:13, 1835:16, 1836:21, 1839:19, 1839:21, 1841:2, 1841:25, 1842:1, 1842:23, 1843:3, 1843:19, 1843:21, 1843:22, 1844:5, 1844:9, 1845:19, 1846:6, 1846:10, 1847:18, 1847:21, 1847:25, 1848:3, 1848:15, 1849:4, 1849:6, 1851:14, 1851:19, 1852:20, 1853:12, 1853:19, 1853:21, 1853:22, 1855:19, 1855:22, 1856:4, 1856:7, 1857:24, 1858:5, 1858:22, 1859:4, 1859:15, 1859:17, 1860:6, 1860:10, 1860:18, 1860:24, 1861:4, 1864:11, 1864:13, 1864:16, 1864:23, 1864:25, 1865:1, 1866:9, 1866:10, 1869:14, 1873:5, 1890:5, 1890:7, 1898:12, 1898:19, 1898:23, 1899:3, 1899:6, 1900:4, 1900:23, 1901:2, 1901:5, 1901:7, 1901:12, 1902:3, 1905:3, 1905:10, 1905:13, 1905:19, 1905:24, 1906:3
**BLUM** [11] - 1758:13,

1762:8, 1827:3, 1833:5, 1833:8, 1847:24, 1858:21, 1859:16, 1890:4, 1898:18, 1901:21
**BOARD** [3] - 1893:18, 1893:23, 1894:4
**BOOKLET** [1] - 1820:21
**BORDER** [4] - 1899:9, 1899:12, 1899:18, 1899:23
**BOTTOM** [1] - 1843:21
**BREAK** [11] - 1762:7, 1776:12, 1789:17, 1826:25, 1833:10, 1841:3, 1841:6, 1841:7, 1841:19, 1900:9
**BREAK** [1] - 1841:16
**BREAKDOWN** [1] - 1886:18
**BREAKING** [1] - 1790:22
**BRIEF** [5] - 1904:23, 1905:3, 1905:19, 1905:23, 1905:25
**BRIEF** [1] - 1905:18
**BRIEFLY** [4] - 1820:19, 1869:18, 1869:20, 1879:2
**BROADLY** [1] - 1804:6
**BROUGHT** [2] - 1778:21, 1823:16
**BUDGET** [1] - 1891:20
**BUILD** [6] - 1784:16, 1810:2, 1811:2, 1813:23, 1822:1, 1825:9
**BUILDING** [1] - 1823:1
**BUILT** [7] - 1782:21, 1787:16, 1787:25, 1788:3, 1789:3, 1816:1, 1816:17
**BUNCH** [1] - 1761:21
**BUSIER** [3] - 1798:23, 1799:2
**BUSINESS** [4] - 1798:11, 1798:14, 1819:12, 1822:13
**BUSINESSMAN** [1] - 1796:16
**BUY** [5] - 1784:3, 1784:9, 1822:4, 1822:5, 1822:7
**BUYING** [2] - 1784:9, 1811:7
**BY** [88] - 1764:11, 1765:7, 1767:9,

1767:21, 1768:1, 1768:20, 1768:21, 1770:5, 1770:18, 1771:5, 1771:14, 1772:4, 1773:14, 1774:5, 1775:23, 1777:3, 1782:6, 1785:3, 1786:10, 1792:14, 1793:2, 1794:9, 1796:19, 1797:18, 1800:2, 1800:9, 1802:13, 1811:16, 1811:22, 1814:14, 1817:25, 1819:23, 1820:11, 1821:11, 1823:15, 1824:7, 1825:2, 1827:8, 1829:1, 1829:5, 1830:5, 1833:14, 1834:2, 1834:7, 1834:15, 1834:22, 1835:16, 1836:21, 1839:21, 1842:1, 1843:3, 1843:22, 1844:9, 1845:19, 1846:10, 1848:15, 1849:6, 1851:19, 1852:20, 1853:12, 1853:19, 1853:22, 1856:7, 1857:24, 1859:4, 1859:15, 1859:17, 1860:10, 1861:4, 1864:16, 1865:1, 1866:10, 1869:17, 1873:7, 1873:17, 1873:24, 1874:13, 1875:11, 1878:23, 1881:8, 1882:4, 1884:23, 1887:1, 1888:9, 1890:7, 1898:12, 1898:23, 1899:6
**BYPASS** [1] - 1874:14
**BYPRODUCT** [1] - 1886:18

## C

**C-H-U-A-N-G** [1] - 1842:20
**CALCULATION** [1] - 1771:2
**CALCULATIONS** [5] - 1770:17, 1770:21, 1770:24, 1871:13
**CALIFORNIA** [1] - 1870:1
**CALIFORNIA** [1] - 1758:2
**CAPITAL** [5] -

1789:10, 1790:20, 1790:24, 1791:2, 1791:8
**CAPPED** [1] - 1819:16
**CAPTURE** [9] - 1765:18, 1766:12, 1856:24, 1857:1, 1857:9, 1857:12, 1857:17, 1859:6, 1884:9
**CAR** [6] - 1822:5, 1822:7, 1822:8, 1822:10
**CARBON** [5] - 1785:9, 1785:18, 1790:14, 1793:4
**CAREER** [1] - 1870:18
**CARTOONISH** [1] - 1849:11
**CASE** [19] - 1761:14, 1761:25, 1763:18, 1785:9, 1792:9, 1809:8, 1810:15, 1811:5, 1813:15, 1814:15, 1815:8, 1819:5, 1825:24, 1829:2, 1841:9, 1848:19, 1900:11, 1902:13, 1905:11
**CASE** [1] - 1758:5
**CASES** [4] - 1852:7, 1893:22, 1893:23
**CASTAIC** [4] - 1765:15, 1765:16, 1797:25, 1843:17
**CATCH** [1] - 1833:8
**CATEGORIES** [1] - 1891:11
**CATEGORIZATION** [1] - 1872:19
**CATEGORIZE** [1] - 1877:4
**CATEGORIZED** [1] - 1880:18
**CATEGORY** [1] - 1903:15
**CAUSED** [1] - 1833:15
**CAUSING** [1] - 1897:7
**CENTER** [13] - 1832:19, 1839:12, 1839:12, 1840:2, 1840:14, 1852:3, 1878:15, 1885:15, 1888:24, 1888:25, 1889:1, 1889:10, 1889:16
**CENTRAL** [1] - 1782:19
**CERTAIN** [10] - 1786:11, 1799:17,

1799:18, 1799:25, 1850:18, 1861:6, 1861:12, 1878:10, 1879:25, 1893:21
**CERTAINLY** [4] - 1767:18, 1778:2, 1778:8, 1785:7
**CERTAINTY** [2] - 1810:24, 1849:23
**CERTIFIED** [1] - 1870:2
**CH2M** [3] - 1860:13, 1865:4, 1870:20
**CHAIN** [3] - 1812:19, 1816:15, 1868:12
**CHALLENGED** [4] - 1759:22, 1759:24, 1760:5, 1864:21
**CHALLENGES** [1] - 1812:19
**CHAMBERS** [1] - 1901:10
**CHANCE** [3] - 1761:23, 1855:6, 1901:17
**CHANGE** [3] - 1834:25, 1862:21, 1872:21
**CHANGED** [2] - 1845:1, 1871:11
**CHANGES** [1] - 1863:16
**CHARACTERIZATION** [4] - 1850:8, 1850:11, 1870:8, 1893:7
**CHARACTERIZE** [4] - 1832:20, 1838:2, 1852:8, 1872:12
**CHARACTERIZED** [2] - 1866:16, 1867:20
**CHARACTERIZING** [1] - 1902:9
**CHECK** [1] - 1817:15
**CHECKED** [3] - 1812:10, 1812:13, 1817:20
**CHECKMARK** [1] - 1887:9
**CHECKMARKS** [1] - 1888:13
**CHEMICAL** [4] - 1814:25, 1819:25, 1886:22, 1887:2
**CHEMICALS** [10] - 1818:19, 1824:17, 1880:24, 1885:20, 1888:15, 1888:16, 1889:1, 1889:6, 1889:8, 1889:21

5

CHLORIDE [3] - 1889:11, 1889:12, 1889:15
CHLORINE [1] - 1780:3
CHLOROFORM [11] - 1885:1, 1885:6, 1885:8, 1885:11, 1885:17, 1886:10, 1886:12, 1886:14, 1886:17
CHRISTMAS [1] - 1797:12
CHROM [3] - 1771:2, 1771:3, 1771:4
CHRONIC [1] - 1897:14
CHUANG [3] - 1842:11, 1842:18, 1842:19
CIRCLES [4] - 1855:14, 1879:15, 1882:8, 1884:17
CLARA [3] - 1779:20, 1827:15, 1828:2
CLARITA [3] - 1758:6, 1763:12, 1828:4
CLASSIFICATION [1] - 1820:20
CLEANERS [4] - 1895:3, 1895:6, 1895:11, 1895:24
CLEANERS [2] - 1895:25, 1896:3
CLEANING [1] - 1895:14
CLEAR [8] - 1764:18, 1771:11, 1773:13, 1801:23, 1882:3, 1883:13, 1902:19, 1902:22
CLEARLY [1] - 1764:3
CLIENT [4] - 1794:15, 1816:25, 1819:16, 1828:24
CLIENTS [2] - 1808:19, 1820:25
CLOSE [2] - 1863:6, 1896:18
CLOSED [1] - 1893:22
CLOSER [1] - 1904:24
CLOSING [5] - 1852:3, 1903:16, 1903:17, 1904:7, 1904:8
CLUMPED [1] - 1880:21
CO [2] - 1842:11, 1842:13
CO-WORKER [2] - 1842:11, 1842:13

COLLAR [1] - 1797:20
COLLEAGUE [1] - 1778:19
COLLEAGUES [1] - 1860:12
COLLECT [2] - 1838:1, 1895:16
COLLECTING [1] - 1890:14
COLOR [1] - 1882:10
COLORED [1] - 1884:17
COLUMN [2] - 1887:8, 1888:14
COLUMNS [1] - 1887:5
COMING [8] - 1762:25, 1809:22, 1813:5, 1863:15, 1872:4, 1878:8, 1881:22, 1886:19
COMMENT [4] - 1777:23, 1830:22, 1830:25, 1904:18
COMMENTED [2] - 1868:21, 1868:23
COMMENTS [8] - 1769:9, 1772:24, 1793:10, 1831:1, 1831:2, 1831:3, 1831:5, 1868:24
COMMODITY [3] - 1784:1, 1784:2, 1784:11
COMMONLY [1] - 1895:13
COMMUNICATING [1] - 1871:17
COMPANY [2] - 1865:4, 1865:7
COMPARABLE [1] - 1804:9
COMPARE [2] - 1862:6, 1896:12
COMPARED [2] - 1877:17, 1877:21
COMPARISON [6] - 1784:23, 1886:22, 1887:2, 1887:3, 1888:15, 1896:22
COMPILATION [1] - 1870:7
COMPLETE [4] - 1823:22, 1823:24, 1855:17, 1903:6
COMPLETED [12] - 1781:15, 1790:3, 1806:22, 1810:19, 1810:23, 1811:6, 1811:17, 1813:4,

1813:16, 1865:16, 1870:9, 1870:12
COMPLETENESS [2] - 1761:20, 1762:12
COMPLICATED [3] - 1782:18, 1847:8, 1891:21
COMPLICATIONS [1] - 1822:20
COMPONENT [2] - 1878:5, 1891:4
COMPONENTS [1] - 1891:6
COMPOSITE [1] - 1881:16
COMPOUND [1] - 1830:17
COMPOUNDS [2] - 1808:6, 1886:4
CONCENTRATION [4] - 1879:12, 1885:1, 1885:4, 1886:9
CONCENTRATIONS [13] - 1780:6, 1807:22, 1856:1, 1879:13, 1882:20, 1884:3, 1885:24, 1886:14, 1889:9, 1889:16, 1889:21, 1897:6, 1898:7
CONCEPT [2] - 1786:6, 1809:1
CONCEPTUAL [4] - 1847:2, 1847:10, 1847:15, 1868:9
CONCEPTUALIZATION [1] - 1847:16
CONCEPTUALLY [4] - 1847:6, 1848:21, 1849:16, 1859:19
CONCERN [10] - 1770:14, 1770:15, 1778:11, 1806:14, 1807:17, 1823:17, 1823:20, 1843:13, 1843:14, 1898:5
CONCERNED [2] - 1796:9, 1796:17
CONCERNING [3] - 1824:22, 1829:11, 1843:9
CONCERNS [7] - 1769:20, 1769:22, 1770:1, 1770:7, 1778:12, 1778:13, 1778:21
CONCLUDE [10] - 1833:15, 1834:3, 1834:8, 1839:3, 1844:15, 1853:2,

1861:4, 1863:17, 1863:19, 1900:20
CONCLUDED [2] - 1833:22, 1860:24
CONCLUSION [12] - 1832:3, 1832:14, 1832:17, 1834:2, 1837:11, 1839:7, 1839:22, 1840:19, 1849:25, 1861:23, 1862:1, 1882:23
CONCLUSIONS [8] - 1832:6, 1835:1, 1837:16, 1838:14, 1846:2, 1861:24, 1888:17, 1892:11
CONCURRED [1] - 1869:7
CONDITIONS [3] - 1816:15, 1817:4, 1819:17
CONDUCT [4] - 1832:22, 1843:10, 1878:3, 1878:13
CONDUCTED [4] - 1870:22, 1870:23, 1871:18, 1877:10
CONDUCTING [1] - 1865:13
CONDUCTIVITY [8] - 1890:21, 1891:24, 1891:25, 1892:3, 1892:5, 1892:6, 1893:1, 1893:8
CONFER [4] - 1761:23, 1800:3, 1901:18, 1904:15
CONFIGURATION [2] - 1813:2, 1825:8
CONFIRM [2] - 1850:17, 1850:20
CONFIRMED [2] - 1846:22, 1905:16
CONFUSED [1] - 1768:24
CONNECTED [4] - 1871:21, 1872:9, 1872:15, 1873:3
CONNECTION [7] - 1777:4, 1778:7, 1782:8, 1787:10, 1799:11, 1821:20, 1878:10
CONSIDER [1] - 1808:24
CONSIDERATION [1] - 1810:7
CONSIDERATIONS [1] - 1895:22
CONSIDERED [3] -

1839:4, 1840:3, 1888:20
CONSIDERING [1] - 1823:25
CONSISTENT [2] - 1759:13, 1803:15
CONSISTENTLY [3] - 1886:5, 1897:7, 1898:6
CONSTRUCTION [7] - 1787:23, 1790:8, 1790:15, 1806:22, 1816:5, 1816:16, 1822:19
CONSTRUED [1] - 1761:1
CONSULTANT [5] - 1765:15, 1765:17, 1817:15, 1818:1, 1818:4
CONSULTANTS [9] - 1766:6, 1766:24, 1769:5, 1769:13, 1769:19, 1772:14, 1878:16, 1878:17, 1880:10
CONSULTATION [1] - 1776:18
CONSULTED [1] - 1817:20
CONSULTING [2] - 1772:1, 1806:17
CONSULTING [1] - 1819:2
CONTACT [6] - 1773:2, 1785:14, 1786:2, 1786:3, 1794:17, 1818:5
CONTACTING [1] - 1797:11
CONTAIN [2] - 1765:21, 1876:5
CONTAINMENT [15] - 1765:14, 1765:22, 1765:25, 1766:7, 1766:11, 1767:22, 1768:2, 1768:4, 1768:8, 1775:15, 1804:2, 1804:11, 1804:13, 1805:3, 1805:9
CONTAINS [1] - 1780:3
CONTAMINANT [2] - 1776:24, 1875:25
CONTAMINANTS [8] - 1771:1, 1785:25, 1808:4, 1877:25, 1878:1, 1881:17, 1886:22

**CONTAMINATE**[1] - 1854:10

**CONTAMINATION** [41] - 1795:11, 1800:4, 1801:17, 1828:4, 1829:13, 1832:23, 1846:12, 1846:24, 1847:6, 1848:25, 1849:22, 1850:21, 1853:25, 1854:9, 1854:16, 1855:7, 1856:11, 1859:18, 1863:19, 1863:21, 1863:22, 1865:23, 1867:16, 1867:22, 1870:5, 1870:13, 1870:14, 1874:17, 1875:1, 1875:12, 1876:2, 1877:5, 1877:6, 1894:22, 1896:4, 1896:7, 1896:11, 1896:13, 1896:15, 1896:24

**CONTAMINATORS**[1] - 1895:4

**CONTEMPORANEO USLY** [1] - 1760:11

**CONTEXT** [3] - 1823:19, 1867:25, 1901:22

**CONTINGENCIES** [8] - 1809:24, 1815:25, 1816:5, 1816:14, 1816:17, 1816:23, 1817:1, 1818:24

**CONTINGENCY** [7] - 1783:17, 1783:21, 1783:24, 1786:16, 1788:1, 1789:3, 1816:24

**CONTINGENCY'S** [1] - 1816:1

**CONTINUE** [4] - 1763:24, 1841:9, 1841:23, 1900:12

**CONTOUR** [6] - 1856:7, 1856:14, 1872:10, 1875:17, 1875:21, 1881:14

**CONTOURING** [1] - 1856:10

**CONTOURS** [2] - 1855:14, 1879:17

**CONTRACTOR** [5] - 1784:19, 1822:12, 1825:10, 1825:12, 1828:5

**CONTRIBUTING** [1] - 1839:15

**CONTROL** [7] - 1775:13, 1776:19, 1778:24, 1831:9, 1853:9, 1893:18, 1894:4

**CONTROL** [3] - 1785:23, 1787:12, 1787:13

**CONTROLS** [1] - 1787:11

**CONVERSATION** [8] - 1764:16, 1771:24, 1774:6, 1797:22, 1829:11, 1829:14, 1842:5, 1843:4

**CONVERSATIONS** [8] - 1770:5, 1770:19, 1772:12, 1772:19, 1774:12, 1794:10, 1794:11, 1829:15

**CONVEY** [1] - 1782:18

**COOPERATE** [1] - 1803:7

**COORDINATES** [1] - 1777:11

**COPIED** [1] - 1767:1

**COPY** [2] - 1830:22, 1835:15

**CORPORATION** [3] - 1758:7, 1763:13, 1904:1

**CORPS** [9] - 1827:22, 1828:5, 1830:12, 1842:14, 1864:2, 1865:12, 1867:15, 1870:7, 1878:18

**CORRECT** [170] - 1761:24, 1764:20, 1765:16, 1765:24, 1772:8, 1772:11, 1772:16, 1778:25, 1779:3, 1779:4, 1781:1, 1781:2, 1782:9, 1787:2, 1791:1, 1791:4, 1791:9, 1791:10, 1792:3, 1792:4, 1793:6, 1794:19, 1794:23, 1795:2, 1795:3, 1795:4, 1795:8, 1795:9, 1795:12, 1795:13, 1796:21, 1796:22, 1796:24, 1799:3, 1799:8, 1799:10, 1799:14, 1801:12, 1801:13, 1801:25, 1802:1, 1802:3, 1802:24, 1803:4, 1803:17, 1803:19,

1803:23, 1804:25, 1806:2, 1806:8, 1806:11, 1806:12, 1806:21, 1806:24, 1807:4, 1808:11, 1808:12, 1810:17, 1811:19, 1811:21, 1811:23, 1811:24, 1812:9, 1815:7, 1815:16, 1815:25, 1816:7, 1816:18, 1816:23, 1817:3, 1818:2, 1818:3, 1818:7, 1818:9, 1818:14, 1818:16, 1818:20, 1818:25, 1819:1, 1820:2, 1820:8, 1821:4, 1821:18, 1821:19, 1821:21, 1823:6, 1823:10, 1823:18, 1823:22, 1823:25, 1824:1, 1824:3, 1825:6, 1828:6, 1828:7, 1830:1, 1831:16, 1831:19, 1831:20, 1835:20, 1835:23, 1836:7, 1837:4, 1837:14, 1837:15, 1840:3, 1840:19, 1842:6, 1843:4, 1843:6, 1843:7, 1844:3, 1844:4, 1845:4, 1845:5, 1846:18, 1847:11, 1848:13, 1849:20, 1850:4, 1850:19, 1852:22, 1852:25, 1854:1, 1854:11, 1854:15, 1855:4, 1856:8, 1856:12, 1856:13, 1856:24, 1859:15, 1859:18, 1859:23, 1859:25, 1860:11, 1860:12, 1860:15, 1861:16, 1861:18, 1861:19, 1862:23, 1864:3, 1865:2, 1865:5, 1865:9, 1865:25, 1867:5, 1867:9, 1867:12, 1867:13, 1867:23, 1869:4, 1870:23, 1875:23, 1891:3, 1891:17, 1891:18, 1891:24, 1892:3, 1892:7, 1892:9, 1892:24, 1893:15, 1896:1, 1896:9, 1899:15, 1899:18,

1899:23, 1900:3

**CORRECTLY** [2] - 1866:19, 1903:9

**CORRESPONDENC E** [1] - 1767:1

**CORRESPONDING** [1] - 1887:10

**COST** [60] - 1780:17, 1780:20, 1780:23, 1781:13, 1783:6, 1783:13, 1783:21, 1783:23, 1784:23, 1785:6, 1785:8, 1787:15, 1787:24, 1788:8, 1788:17, 1788:18, 1789:2, 1789:10, 1789:13, 1789:18, 1789:23, 1790:1, 1790:5, 1790:7, 1790:8, 1790:9, 1790:24, 1791:7, 1796:17, 1808:14, 1808:17, 1808:22, 1809:5, 1809:7, 1809:11, 1809:15, 1809:22, 1810:1, 1810:6, 1810:16, 1810:24, 1811:17, 1813:7, 1813:18, 1814:20, 1815:1, 1815:23, 1816:19, 1818:12, 1819:11, 1820:19, 1820:23, 1820:24, 1821:13, 1821:15, 1821:25, 1822:3, 1823:5, 1823:8

**COSTS** [18] - 1781:11, 1783:15, 1786:15, 1787:3, 1790:6, 1790:20, 1791:3, 1791:8, 1791:11, 1796:10, 1804:2, 1813:24, 1814:24, 1815:16, 1816:10, 1816:16, 1818:2, 1821:24

**COUNSEL** [17] - 1758:8, 1758:9, 1823:16, 1828:20, 1828:21, 1829:2, 1830:9, 1833:10, 1848:5, 1855:17, 1864:9, 1870:3, 1870:21, 1873:11, 1904:6, 1904:23, 1905:1

**COUNSEL** [3] - 1835:11, 1841:5, 1858:4

**COUNT** [1] - 1787:10

**COUNTER** [4] - 1761:18, 1901:19, 1901:22, 1901:23

**COUNTER-DESIGNATIONS** [1] - 1761:18

**COUPLE** [9] - 1758:19, 1797:12, 1868:11, 1877:15, 1882:17, 1885:13, 1887:15, 1896:17, 1904:3

**COURSE** [2] - 1761:9, 1805:22

**COURSES** [1] - 1809:11

**COURT** [1] - 1842:16

**COURT** [146] - 1758:16, 1759:17, 1759:20, 1760:4, 1760:8, 1760:21, 1761:7, 1762:2, 1762:8, 1762:19, 1762:22, 1762:24, 1763:3, 1763:6, 1763:10, 1763:12, 1763:17, 1764:1, 1765:1, 1767:4, 1767:20, 1767:25, 1768:18, 1770:4, 1770:10, 1771:3, 1771:10, 1771:21, 1772:2, 1773:12, 1774:2, 1774:4, 1775:22, 1776:4, 1776:8, 1776:12, 1782:2, 1786:9, 1791:17, 1791:19, 1791:23, 1791:25, 1792:6, 1792:11, 1792:19, 1793:1, 1794:8, 1796:13, 1797:16, 1799:21, 1800:6, 1802:10, 1811:20, 1814:13, 1819:21, 1820:10, 1821:10, 1823:14, 1824:6, 1824:21, 1824:25, 1825:21, 1825:24, 1826:3, 1826:18, 1826:23, 1827:1, 1827:3, 1828:25, 1829:3, 1829:23, 1829:25, 1830:3, 1833:2, 1833:5, 1833:12, 1833:25, 1834:5, 1834:14, 1834:17, 1836:17, 1841:5,

1841:15, 1841:18, 1841:23, 1842:25, 1843:2, 1843:20, 1844:7, 1845:12, 1846:8, 1847:23, 1848:1, 1851:17, 1852:18, 1853:11, 1853:16, 1855:20, 1857:22, 1858:4, 1858:6, 1858:10, 1858:14, 1858:17, 1858:20, 1858:23, 1859:2, 1859:16, 1860:21, 1861:1, 1864:12, 1864:15, 1864:20, 1864:24, 1869:15, 1873:6, 1873:12, 1873:16, 1888:4, 1888:7, 1890:1, 1890:4, 1898:10, 1898:17, 1898:21, 1900:5, 1900:8, 1900:17, 1901:1, 1901:4, 1901:6, 1901:8, 1901:13, 1902:1, 1902:8, 1902:17, 1902:22, 1903:7, 1903:16, 1904:9, 1905:5, 1905:11, 1905:18, 1905:22, 1906:1, 1906:4

**COURT** [12] - 1758:21, 1760:16, 1761:8, 1761:11, 1762:18, 1763:8, 1826:9, 1864:12, 1905:1, 1905:8, 1905:11, 1906:2

**COURT'S** [7] - 1758:22, 1758:24, 1759:13, 1760:9, 1760:22, 1761:5, 1904:22

**COURTROOM** [11] - 1758:5, 1826:4, 1826:13, 1829:24, 1830:1, 1841:12, 1858:8, 1858:12, 1858:15, 1858:18, 1900:14

**COVER** [1] - 1851:4

**COVERED** [2] - 1795:11, 1866:3

**COVID** [1] - 1778:2

**COWORKERS** [1] - 1864:18

**CREATE** [1] - 1867:21

**CREATED** [1] - 1892:6

**CREATING** [1] -

1798:11

**CROSS** [2] - 1792:13, 1869:16

**CROSS** [4] - 1762:3, 1762:5, 1857:7, 1904:3

**CROSS-DESIGNATIONS** [2] - 1762:3, 1762:5

**CROSS-EXAMINATION** [1] - 1904:3

**CROSS-EXAMINATION** [2] - 1792:13, 1869:16

**CRUZ** [1] - 1858:6

**CURRENT** [4] - 1775:20, 1812:10, 1845:16, 1845:17

**CUSTOMERS** [1] - 1867:4

**CUT** [1] - 1893:15

**CV** [1] - 1758:6

**CW** [1] - 1898:13

**CW-01** [1] - 1876:3

**CW-1** [10] - 1873:17, 1873:19, 1873:25, 1874:14, 1874:22, 1874:24, 1875:6, 1875:7, 1875:13, 1876:5

**CW-1C** [1] - 1873:21

# D

**DAILY** [1] - 1903:22

**DASH** [2] - 1882:5, 1882:6

**DASHED** [1] - 1880:18

**DATA** [2] - 1865:25, 1866:5

**DATA** [49] - 1777:14, 1837:10, 1837:14, 1837:16, 1837:18, 1837:20, 1837:23, 1837:24, 1838:2, 1838:14, 1838:17, 1845:17, 1866:8, 1866:10, 1867:20, 1867:21, 1872:10, 1878:13, 1878:14, 1878:16, 1878:18, 1880:12, 1882:10, 1882:19, 1882:21, 1882:22, 1883:3, 1883:4, 1883:5, 1884:15, 1884:16, 1884:19, 1887:6, 1890:14, 1890:15, 1893:1, 1894:18,

1894:20, 1895:2, 1895:16, 1895:17, 1895:20, 1895:21, 1899:22, 1900:1, 1904:5, 1904:6

**DATABASE** [1] - 1894:1

**DATABASES** [1] - 1877:2

**DATE** [6] - 1772:9, 1793:17, 1831:22, 1844:10, 1844:12, 1865:17

**DATED** [2] - 1851:19, 1860:8

**DAUS** [1] - 1761:15

**DAWSON** [5] - 1901:14, 1901:16, 1902:13, 1902:25, 1904:2

**DAYS** [3] - 1797:12, 1822:6, 1904:3

**DDW** [28] - 1764:13, 1766:17, 1766:21, 1766:23, 1767:2, 1767:10, 1769:1, 1769:9, 1769:10, 1769:14, 1769:18, 1769:20, 1772:24, 1773:2, 1773:16, 1773:20, 1773:21, 1774:7, 1774:8, 1774:9, 1806:17, 1807:2, 1808:8, 1808:10, 1823:15, 1823:20, 1824:16

**DEAL** [7] - 1769:24, 1784:17, 1807:18, 1808:3, 1808:4, 1808:9, 1836:14

**DEALERSHIP** [1] - 1822:5

**DEALING** [6] - 1770:20, 1774:18, 1785:19, 1793:11, 1873:8, 1890:20

**DECEMBER** [1] - 1758:1

**DECHLORINATE** [1] - 1780:4

**DECHLORINATED** [1] - 1780:1

**DECIDE** [5] - 1777:14, 1796:23, 1797:4, 1797:6, 1852:15

**DECIDED** [1] - 1797:8

**DECIDING** [2] - 1776:2, 1777:6

**DECLINED** [1] - 1861:12

**DECREASED** [1] - 1861:18

**DEDICATED** [1] - 1889:4

**DEEMED** [1] - 1807:8

**DEEP** [1] - 1874:25

**DEEPER** [4] - 1872:25, 1876:8, 1882:25, 1883:1

**DEEPEST** [1] - 1873:21

**DEFENDANT** [1] - 1758:14

**DEFENDANT'S** [2] - 1764:9, 1827:6

**DEFENDANTS** [1] - 1826:1

**DEFENSE** [3] - 1763:18, 1825:24, 1900:22

**DEFINE** [2] - 1782:3, 1818:17

**DEFINED** [1] - 1810:10

**DEGREE** [4] - 1783:19, 1848:19, 1869:22, 1869:23

**DELAY** [4] - 1772:18, 1773:23, 1774:7, 1797:20

**DELAYED** [2] - 1766:13, 1861:5

**DELAYING** [1] - 1806:17

**DELINEATED** [1] - 1880:9

**DELINEATING** [2] - 1849:22, 1865:22

**DELIVER** [1] - 1819:7

**DELIVERED** [3] - 1762:6, 1812:11, 1814:8

**DELIVERY** [1] - 1812:17

**DELVING** [1] - 1764:12

**DEMONSTRATE** [1] - 1892:1

**DEMONSTRATIVE** [3] - 1784:25, 1788:11, 1791:6

**DEPARTMENT** [8] - 1775:13, 1776:18, 1778:24, 1831:9, 1843:9, 1843:14, 1843:15, 1853:9

**DEPARTMENT** [1] - 1853:14

**DEPICTION** [1] - 1849:11

**DEPOSITION** [45] - 1758:23, 1761:22, 1798:15, 1798:25, 1803:9, 1808:20, 1808:23, 1814:7, 1814:15, 1817:19, 1818:11, 1829:5, 1831:17, 1831:21, 1832:25, 1833:19, 1833:21, 1834:6, 1834:7, 1834:10, 1834:12, 1834:17, 1834:20, 1844:11, 1844:19, 1844:20, 1844:24, 1845:6, 1845:15, 1845:23, 1845:25, 1846:5, 1847:19, 1848:18, 1849:10, 1857:16, 1857:25, 1858:11, 1858:14, 1858:16, 1859:5, 1859:8, 1859:13, 1868:16, 1869:9

**DEPOSITIONS** [4] - 1762:16, 1900:21, 1900:22, 1900:25

**DEPOT** [1] - 1784:9

**DEPTHS** [2] - 1872:4, 1873:20

**DEPUTY** [11] - 1758:5, 1826:4, 1826:13, 1829:24, 1830:1, 1841:12, 1858:8, 1858:12, 1858:15, 1858:18, 1900:14

**DESCRIBE** [10] - 1775:1, 1776:1, 1821:7, 1834:15, 1837:19, 1846:19, 1847:4, 1849:10, 1855:10, 1869:20

**DESCRIBED** [7] - 1802:5, 1811:6, 1847:9, 1848:6, 1857:12, 1882:4, 1882:5

**DESCRIBING** [3] - 1855:21, 1860:10, 1890:9

**DESCRIPTION** [1] - 1866:24

**DESIGN** [8] - 1784:16, 1808:25, 1810:2, 1811:2, 1813:23, 1822:1, 1822:7, 1825:9

**DESIGN-BUILD** [6] - 1784:16, 1810:2, 1811:2, 1813:23,

1822:1, 1825:9
**DESIGNATE** [2] - 1762:12, 1904:10
**DESIGNATED** [1] - 1761:17
**DESIGNATION** [2] - 1807:13, 1901:19
**DESIGNATIONS** [8] - 1761:18, 1761:19, 1762:3, 1762:5, 1864:10, 1901:22, 1901:23
**DESK** [1] - 1890:16
**DESKTOP** [2] - 1890:9, 1890:12
**DESTROYED** [1] - 1883:22
**DETAIL** [2] - 1812:21, 1896:21
**DETAILED** [1] - 1822:18
**DETECT** [1] - 1879:16
**DETECTED** [60] - 1794:22, 1796:20, 1803:5, 1807:21, 1836:4, 1839:5, 1855:7, 1874:18, 1875:13, 1876:9, 1877:16, 1877:18, 1877:20, 1877:22, 1877:24, 1877:25, 1878:1, 1879:5, 1879:16, 1879:21, 1880:1, 1883:19, 1885:4, 1885:17, 1885:21, 1885:22, 1885:24, 1886:4, 1887:4, 1887:7, 1887:9, 1887:18, 1887:19, 1887:20, 1887:22, 1887:24, 1888:3, 1888:22, 1888:23, 1889:1, 1889:2, 1889:9, 1889:13, 1889:21, 1894:25, 1895:1, 1896:19, 1897:1, 1897:3, 1897:7, 1897:12, 1897:13, 1897:15, 1897:17, 1898:3, 1898:6, 1899:22, 1899:25
**DETECTING** [1] - 1876:19
**DETECTION** [3] - 1803:8, 1807:22, 1897:5
**DETECTIONS** [15] - 1765:9, 1782:25, 1799:18, 1800:15,

1801:1, 1807:20, 1820:4, 1866:11, 1879:18, 1882:15, 1883:25, 1885:11, 1885:12, 1885:14, 1885:15
**DETENTION** [1] - 1818:8
**DETERMINATION** [2] - 1765:23, 1904:10
**DETERMINE** [13] - 1832:15, 1849:18, 1860:1, 1866:16, 1867:16, 1867:22, 1871:20, 1875:18, 1881:4, 1886:11, 1886:13, 1886:16, 1893:1
**DETERMINED** [2] - 1872:16, 1893:17
**DETERMINING** [1] - 1893:11
**DEVELOP** [2] - 1801:10, 1897:4
**DEVELOPED** [2] - 1803:16, 1821:12
**DIAGRAM** [2] - 1856:11, 1875:3
**DIAGRAMS** [1] - 1849:2
**DIAZ** [1] - 1853:9
**DIFFERENCE** [4] - 1784:12, 1785:16, 1785:25, 1822:11
**DIFFERENT** [25] - 1782:15, 1785:14, 1805:6, 1810:1, 1811:12, 1814:24, 1814:25, 1835:14, 1841:3, 1848:12, 1859:10, 1863:13, 1866:18, 1872:1, 1873:9, 1873:20, 1876:10, 1877:19, 1880:7, 1886:20, 1887:16, 1891:2, 1892:2, 1892:3
**DIFFICULT** [1] - 1886:16
**DIMENSIONAL** [1] - 1859:9
**DIMENSIONS** [1] - 1859:9
**DIRECT** [4] - 1763:18, 1826:20, 1841:23, 1861:14
**DIRECT** [2] - 1764:10, 1827:7
**DIRECTION** [4] - 1759:14, 1855:1,

1879:8, 1884:10
**DIRECTIONS** [2] - 1854:6, 1884:18
**DIRECTLY** [6] - 1784:17, 1795:19, 1827:20, 1875:18, 1875:23, 1902:20
**DISAGREE** [1] - 1783:15
**DISCHARGE** [1] - 1779:23
**DISCHARGE** [4] - 1779:24, 1779:25, 1780:4, 1780:6
**DISCHARGED** [3] - 1779:19, 1779:21, 1780:8
**DISCIPLINE** [1] - 1809:5
**DISCLOSED** [1] - 1849:7
**DISCOVERED** [1] - 1793:16
**DISCUSS** [6] - 1800:3, 1821:23, 1824:8, 1846:19, 1865:19, 1879:2
**DISCUSSED** [11] - 1775:17, 1794:21, 1800:15, 1801:21, 1821:24, 1824:17, 1838:15, 1846:25, 1849:2, 1866:23, 1893:10
**DISCUSSES** [1] - 1889:7
**DISCUSSION** [1] - 1838:21
**DISCUSSION** [8] - 1766:16, 1771:13, 1771:14, 1775:20, 1805:8, 1808:20, 1838:9, 1889:5
**DISCUSSIONS** [16] - 1767:1, 1769:1, 1769:5, 1769:13, 1770:11, 1778:15, 1796:14, 1805:7, 1808:8, 1808:10, 1823:16, 1824:7, 1824:13, 1824:16, 1824:22, 1902:15
**DISPLAY** [7] - 1873:7, 1874:11, 1874:12, 1880:2, 1881:6, 1884:21, 1888:8
**DISPLAYED** [1] - 1881:5
**DISPOSAL** [2] - 1844:14, 1844:21

**DISPOSED** [1] - 1903:25
**DISPUTE** [1] - 1803:11
**DISPUTED** [1] - 1759:9
**DISTANCE** [1] - 1895:22
**DISTRIBUTION** [5] - 1837:25, 1838:3, 1866:11, 1879:4, 1896:4
**DIVISION** [4] - 1891:2, 1891:7, 1891:19, 1891:21
**DOCUMENT** [4] - 1809:17, 1836:20, 1862:17, 1904:22
**DOCUMENTED** [1] - 1854:19
**DOCUMENTS** [8] - 1760:5, 1766:23, 1769:2, 1769:10, 1774:1, 1774:10, 1903:8, 1903:23
**DOLLARS** [2] - 1788:4, 1817:7
**DONE** [24] - 1769:6, 1777:21, 1790:2, 1811:1, 1819:8, 1819:9, 1822:9, 1826:24, 1827:15, 1828:8, 1829:12, 1849:20, 1850:15, 1850:25, 1852:25, 1858:25, 1860:9, 1860:11, 1862:2, 1862:18, 1864:2, 1865:19, 1880:10, 1883:10
**DOT** [1] - 1883:16
**DOTS** [2] - 1879:13, 1879:15
**DOTTED** [2] - 1883:15, 1883:17
**DOUBLE** [1] - 1787:10
**DOWN** [23] - 1776:12, 1778:3, 1779:10, 1793:15, 1794:25, 1796:21, 1797:5, 1797:14, 1807:2, 1825:22, 1854:8, 1854:15, 1854:16, 1859:20, 1861:7, 1863:1, 1863:3, 1867:8, 1877:7, 1884:1, 1893:12, 1898:4, 1900:18
**DOWNGRADIENT** [1] - 1768:16
**DOWNS** [1] - 1784:8

**DPH** [1] - 1843:13
**DR** [17] - 1778:19, 1780:17, 1781:7, 1783:16, 1784:23, 1786:13, 1788:2, 1789:7, 1791:11, 1809:20, 1810:5, 1812:6, 1813:6, 1814:4, 1825:15, 1869:2, 1869:7
**DRAFT** [1] - 1801:6
**DRAIN** [1] - 1779:20
**DRAW** [3] - 1856:19, 1867:4, 1881:18
**DRAWDOWN** [3] - 1862:6, 1863:8, 1863:9
**DRAWING** [4] - 1861:21, 1875:16, 1880:4, 1882:5
**DRAWN** [4] - 1777:1, 1861:25, 1884:14, 1884:16
**DRAWS** [1] - 1807:7
**DREW** [4] - 1861:6, 1863:1, 1899:15, 1900:2
**DRINKING** [3] - 1806:11, 1806:15, 1807:3
**DRIVING** [1] - 1807:13
**DROVE** [1] - 1783:24
**DRY** [6] - 1876:7, 1895:3, 1895:6, 1895:11, 1895:14, 1895:24
**DRY** [2] - 1895:25, 1896:3
**DRY-CLEANING** [1] - 1895:14
**DTSC** [19] - 1775:13, 1778:7, 1778:9, 1778:10, 1778:12, 1778:15, 1778:19, 1850:3, 1850:18, 1850:21, 1851:1, 1851:5, 1851:8, 1851:23, 1852:12, 1852:21, 1893:18, 1893:23, 1894:2
**DUE** [3] - 1848:24, 1862:4, 1871:11
**DURANT** [1] - 1901:7
**DURANTS** [1] - 1758:23
**DURING** [17] - 1763:9, 1772:13, 1794:18, 1817:4, 1833:18, 1837:5, 1837:8, 1861:17, 1863:2,

Case 2:18-cv-06825-SB-RAO   Document 515   Filed 05/17/22   Page 163 of 180   Page ID #:44489

9

1866:23, 1871:19, 1872:16, 1873:18, 1873:20, 1875:4, 1880:10

# E

**E-MAIL** [10] - 1842:5, 1842:7, 1842:8, 1842:10, 1843:3, 1843:9, 1843:12, 1843:25, 1868:12
**E-MAILS** [1] - 1868:17
**EARLY** [8] - 1776:22, 1810:7, 1810:9, 1827:21, 1869:24, 1870:10, 1889:4, 1889:5
**EASIER** [1] - 1862:15
**EAST** [1] - 1875:3
**EASTERN** [1] - 1828:2
**EDUCATION** [1] - 1869:20
**EFFECT** [2] - 1840:22, 1862:22
**EFFECTIVE** [2] - 1793:5, 1825:7
**EFFECTIVELY** [1] - 1822:14
**EFFORT** [4] - 1767:22, 1768:2, 1777:9, 1810:12
**EFFORTS** [3] - 1773:1, 1777:11, 1853:8
**EIGHT** [1] - 1759:23
**EITHER** [22] - 1769:8, 1796:4, 1816:14, 1832:4, 1832:21, 1833:16, 1845:1, 1847:1, 1851:4, 1852:2, 1854:1, 1864:12, 1877:18, 1887:5, 1887:18, 1893:17, 1893:18, 1896:12, 1896:13, 1896:23, 1897:1, 1897:13
**ELECTRICAL** [2] - 1785:21, 1787:11
**ELIMINATION** [1] - 1779:23
**EMANATING** [4] - 1853:4, 1856:11, 1856:14, 1859:19
**ENCIRCLES** [2] - 1882:14, 1883:18
**ENCLOSURE** [1] - 1782:21
**END** [9] - 1760:21,

1789:9, 1790:17, 1812:22, 1812:24, 1819:24, 1820:7, 1820:12, 1822:10
**ENDED** [1] - 1804:22
**ENGAGED** [1] - 1824:11
**ENGINEER** [3] - 1772:1, 1784:19, 1808:24
**ENGINEERING** [9] - 1783:19, 1784:5, 1784:20, 1790:15, 1822:15, 1825:5, 1825:11, 1825:14, 1827:12
**ENGINEERS** [3] - 1809:16, 1810:17, 1817:21
**ENGINEERS** [5] - 1827:23, 1830:13, 1842:14, 1865:12, 1867:15
**ENTIRE** [2] - 1855:1, 1870:18
**ENTITLED** [2] - 1842:5, 1905:18
**ENTITY** [1] - 1864:5
**ENVIRONMENTAL** [1] - 1819:3
**ENVIRONMENTAL** [1] - 1819:4
**ENVIROSTOR** [4] - 1893:19, 1893:25, 1894:13, 1895:21
**EQUIPMENT** [2] - 1785:23, 1809:7
**EQUIVALENCY** [3] - 1770:20, 1771:6, 1771:16
**EQUIVALENT** [2] - 1770:17, 1771:8
**ES9** [1] - 1865:25
**ESPECIALLY** [1] - 1810:7
**ESSENTIALLY** [9] - 1828:3, 1848:24, 1852:6, 1870:18, 1871:16, 1874:15, 1877:13, 1882:12, 1890:15
**ESTABLISH** [1] - 1767:6
**ESTIMATE** [25] - 1780:17, 1780:21, 1780:23, 1781:13, 1781:14, 1783:21, 1785:6, 1785:8, 1786:4, 1787:19, 1787:21, 1788:7,

1788:22, 1788:24, 1790:1, 1790:18, 1811:13, 1812:13, 1813:25, 1816:18, 1817:9, 1817:11, 1817:12, 1819:5, 1819:11
**ESTIMATED** [1] - 1886:8
**ESTIMATES** [14] - 1781:12, 1783:18, 1786:25, 1788:2, 1789:17, 1803:21, 1808:19, 1808:22, 1814:20, 1816:19, 1818:12, 1820:24, 1822:23, 1823:12
**ESTIMATING** [7] - 1783:18, 1809:16, 1809:18, 1810:16, 1820:20, 1820:23, 1822:3
**ESTIMATION** [6] - 1809:5, 1809:7, 1809:11, 1810:6, 1813:19, 1815:2
**ESTIMATIONS** [1] - 1808:17
**ESTIMATOR** [1] - 1808:14
**EVALUATE** [2] - 1766:11, 1837:10
**EVALUATED** [1] - 1873:18
**EVALUATION** [5] - 1861:13, 1868:24, 1877:8, 1878:4, 1878:13
**EVENTS** [1] - 1803:16
**EVENTUALLY** [5] - 1777:1, 1779:20, 1798:2, 1798:5, 1798:6
**EVIDENCE** [10] - 1759:1, 1839:8, 1839:21, 1840:18, 1844:6, 1844:8, 1851:18, 1852:18, 1873:13, 1888:21
**EXACT** [7] - 1793:17, 1825:17, 1831:22, 1848:23, 1849:15, 1863:4, 1871:24
**EXACTLY** [6] - 1806:13, 1832:10, 1840:9, 1846:15, 1850:5, 1871:3
**EXAMINATION** [3] - 1826:20, 1841:24, 1904:3

**EXAMINATION** [7] - 1764:10, 1792:13, 1819:22, 1825:1, 1827:7, 1869:16, 1890:6
**EXAMPLE** [5] - 1778:4, 1781:16, 1782:20, 1801:14, 1872:10
**EXCEPT** [2] - 1888:13, 1903:8
**EXCHANGE** [3] - 1782:13, 1785:17, 1789:24
**EXCISE** [1] - 1833:10
**EXCLUDE** [4] - 1894:8, 1894:9, 1897:25, 1898:8
**EXCLUDED** [7] - 1894:5, 1895:3, 1895:6, 1895:8, 1895:16, 1895:23, 1895:24
**EXCUSE** [11] - 1774:7, 1778:5, 1783:2, 1790:21, 1791:7, 1834:24, 1835:11, 1836:25, 1879:3, 1883:9, 1883:11
**EXCUSED** [2] - 1825:21, 1900:17
**EXECUTE** [1] - 1784:20
**EXECUTED** [1] - 1784:15
**EXECUTING** [2] - 1810:2, 1813:22
**EXECUTION** [2] - 1810:10, 1817:4
**EXECUTIVE** [2] - 1865:25, 1866:2
**EXERCISE** [1] - 1809:6
**EXHIBIT** [6] - 1788:10, 1830:2, 1860:19, 1901:2, 1901:4, 1901:6
**EXHIBIT** [10] - 1829:17, 1835:5, 1842:1, 1843:19, 1844:8, 1851:14, 1851:18, 1860:5, 1864:6, 1873:9
**EXHIBITS** [9] - 1759:9, 1759:11, 1759:12, 1759:15, 1759:18, 1760:15, 1760:17, 1829:21
**EXIST** [2] - 1855:3, 1903:13

**EXISTED** [2] - 1849:24, 1850:2
**EXISTING** [4] - 1810:11, 1866:8, 1866:10, 1890:15
**EXIT** [1] - 1856:2
**EXONERATE** [1] - 1869:8
**EXPECT** [1] - 1817:2
**EXPENSE** [1] - 1812:2
**EXPERIENCE** [5] - 1796:4, 1825:12, 1894:6, 1894:11, 1894:21
**EXPERT** [6] - 1780:11, 1785:4, 1792:24, 1793:8, 1808:15, 1903:11
**EXPERTS** [2] - 1810:17, 1904:5
**EXPLAIN** [11] - 1767:17, 1785:4, 1786:10, 1787:17, 1815:5, 1839:11, 1859:8, 1859:12, 1874:13, 1875:14, 1897:16
**EXPLAINED** [4] - 1896:15, 1896:17, 1896:23, 1897:10
**EXPLAINS** [1] - 1903:3
**EXPLANATION** [4] - 1862:5, 1863:15, 1897:4, 1897:18
**EXPLANATIONS** [1] - 1897:19
**EXPRESSED** [2] - 1843:13, 1843:14
**EXPRESSING** [1] - 1806:14
**EXTENDS** [1] - 1775:5
**EXTENSIVE** [1] - 1865:15
**EXTENT** [8] - 1759:25, 1775:5, 1776:8, 1832:22, 1849:22, 1852:9, 1856:11, 1879:24
**EXTRACTED** [1] - 1769:23
**EXTRAORDINARY** [1] - 1887:23
**EXTRAPOLATION** [1] - 1815:2
**EXTRAPOLATIONS** [3] - 1811:23, 1813:18, 1814:20
**EXTRAS** [6] - 1787:22, 1788:4, 1789:3,

1789:5, 1817:7
**EXTREMELY** [1] - 1807:8

# F

**FACILITIES** [8] - 1808:17, 1832:22, 1877:1, 1877:3, 1877:4, 1894:2, 1895:14, 1895:20
**FACILITY** [5] - 1825:4, 1839:9, 1840:2, 1850:21, 1889:22
**FACILITY** [1] - 1782:12
**FACT** [7] - 1783:3, 1793:5, 1801:11, 1802:4, 1815:11, 1825:13, 1904:25
**FACTOR** [2] - 1788:1, 1824:2
**FACTORED** [1] - 1809:7
**FACTORS** [1] - 1863:13
**FAIR** [16] - 1772:15, 1791:21, 1798:15, 1800:9, 1801:8, 1805:15, 1806:13, 1808:16, 1809:6, 1809:12, 1810:8, 1818:21, 1819:8, 1820:18, 1825:7, 1868:6
**FAIRLY** [6] - 1769:15, 1783:25, 1810:12, 1860:15, 1865:14, 1904:4
**FAITH** [1] - 1800:3
**FAMILIAR** [4] - 1795:5, 1809:10, 1809:17, 1820:20
**FAMILIARITY** [1] - 1810:25
**FAR** [4] - 1832:12, 1847:3, 1872:5, 1893:8
**FAST** [1] - 1905:14
**FASTER** [1] - 1892:21
**FASTEST** [1] - 1892:13
**FEE** [1] - 1819:12
**FEES** [2] - 1815:20, 1815:21
**FEET** [5] - 1861:18, 1863:1, 1863:3, 1863:9, 1872:3
**FEW** [4] - 1812:7, 1814:15, 1815:7,

1865:6
**FIELD** [2] - 1890:14, 1895:16
**FIGURE** [9] - 1848:6, 1849:3, 1855:10, 1855:11, 1856:5, 1881:6, 1898:12, 1899:3, 1899:5
**FIGURE** [22] - 1784:6, 1829:19, 1855:12, 1855:20, 1855:22, 1859:7, 1859:21, 1871:13, 1875:10, 1878:24, 1878:25, 1879:2, 1879:3, 1880:5, 1880:13, 1880:22, 1881:4, 1898:14, 1898:15, 1898:25, 1899:24, 1900:2
**FIGURED** [1] - 1829:9
**FILE** [1] - 1905:24
**FILED** [3] - 1766:2, 1766:14, 1905:17
**FILL** [2] - 1879:15, 1882:21
**FILLED** [3] - 1785:15, 1785:24
**FINAL** [5] - 1788:22, 1831:3, 1831:13, 1865:11, 1895:8
**FINALIZED** [1] - 1830:21
**FINALLY** [2] - 1766:1, 1788:6
**FINANCIAL** [2] - 1781:20, 1783:8
**FINDINGS** [5] - 1835:3, 1838:12, 1839:7, 1845:1, 1845:24
**FINE** [3] - 1759:20, 1762:22, 1793:1
**FINGER** [2] - 1856:19, 1873:25
**FINGERPRINTING** [2] - 1868:14, 1868:22
**FINISH** [1] - 1898:20
**FIRM** [15] - 1794:15, 1798:8, 1798:11, 1799:5, 1816:19, 1817:1, 1818:10, 1818:15, 1818:22, 1819:1, 1819:6, 1819:10, 1819:13, 1827:12, 1829:1
**FIRST** [22] - 1763:2, 1768:4, 1776:23, 1777:8, 1781:6, 1781:21, 1781:25,

1782:7, 1783:17, 1789:22, 1793:3, 1807:5, 1817:23, 1827:19, 1839:19, 1840:24, 1842:19, 1870:19, 1876:23, 1876:25, 1893:15, 1894:15
**FIVE** [2] - 1898:19, 1898:22
**FIXED** [1] - 1819:12
**FLAG** [1] - 1886:8
**FLAMINGO** [2] - 1895:25, 1896:3
**FLIP** [1] - 1877:24
**FLOW** [18] - 1789:7, 1789:8, 1849:17, 1854:25, 1872:10, 1872:14, 1875:12, 1875:18, 1875:23, 1879:7, 1879:8, 1884:3, 1884:4, 1884:5, 1884:7, 1884:11, 1884:18
**FLOWING** [2] - 1856:3, 1868:1
**FLOWS** [4] - 1857:3, 1857:14, 1871:13, 1885:12
**FLUCTUATE** [1] - 1862:4
**FLY** [1] - 1905:6
**FOCUS** [10] - 1789:16, 1862:13, 1878:20, 1887:17, 1887:25, 1898:4, 1899:7, 1899:12
**FOCUSED** [1] - 1838:14
**FOCUSING** [2] - 1790:23, 1809:5
**FOLKS** [5] - 1767:14, 1770:6, 1772:20, 1818:10, 1818:11
**FOLKS'** [1] - 1808:21
**FOLLOW** [3] - 1800:17, 1810:15, 1836:14
**FOLLOW-UP** [2] - 1800:17, 1836:14
**FOLLOWING** [3] - 1839:11, 1840:13, 1884:3
**FOLLOWS** [2] - 1764:9, 1827:6
**FORCE** [3] - 1778:1, 1778:9, 1778:19
**FORGET** [1] - 1806:13
**FORM** [3] - 1782:12, 1831:13, 1886:18

**FORMAL** [1] - 1800:11
**FORMATION** [1] - 1830:17
**FORMATION** [11] - 1836:4, 1866:24, 1867:2, 1874:6, 1879:4, 1879:5, 1879:8, 1883:1, 1891:3, 1891:8, 1892:15
**FORMED** [1] - 1784:22
**FORMER** [3] - 1839:8, 1840:2, 1850:17
**FORTH** [3] - 1766:24, 1770:22, 1810:16
**FORUM** [1] - 1778:10
**FORWARD** [6] - 1777:3, 1796:18, 1797:9, 1804:20, 1816:6, 1826:5
**FOUNDATION** [20] - 1760:12, 1760:14, 1767:5, 1767:6, 1770:2, 1785:5, 1785:21, 1787:5, 1790:7, 1792:18, 1792:24, 1794:5, 1794:7, 1796:12, 1799:19, 1824:5, 1836:16, 1853:10, 1864:14
**FOUNDATIONAL** [1] - 1861:3
**FOUNDATIONALLY** [1] - 1786:5
**FOUR** [22] - 1759:11, 1759:12, 1759:23, 1759:24, 1760:5, 1760:17, 1797:14, 1810:19, 1811:6, 1811:17, 1813:16, 1815:14, 1816:6, 1816:7, 1816:8, 1817:14, 1819:7, 1845:8, 1855:13, 1855:14, 1855:24, 1863:7
**FOUR-MONTH** [1] - 1863:7
**FRAME** [5] - 1827:21, 1865:13, 1879:23, 1879:25, 1882:11
**FRED** [1] - 1758:13
**FREQUENCY** [2] - 1896:20, 1898:3
**FREQUENTLY** [4] - 1887:6, 1887:7, 1889:9, 1898:6
**FRONT** [3] - 1829:17, 1842:2, 1857:25

**FRYER** [1] - 1758:15
**FRYER** [1] - 1762:16
**FULFILL** [1] - 1804:7
**FULL** [4] - 1784:4, 1832:22, 1852:8, 1866:23
**FULLY** [1] - 1857:9
**FUND** [3] - 1797:23, 1798:1, 1798:5
**FUNDAMENTALLY** [1] - 1785:22
**FUNDED** [1] - 1816:10
**FUNDING** [3] - 1800:3, 1828:8, 1828:11
**FUTURE** [5] - 1776:10, 1776:14, 1816:5, 1816:14, 1838:15

# G

**GAC** [7] - 1793:3, 1811:8, 1811:19, 1817:13, 1817:16, 1818:2, 1818:18
**GALLAGHER** [5] - 1758:14, 1764:4, 1793:13, 1807:15, 1819:21
**GALLAGHER** [43] - 1762:10, 1763:5, 1764:6, 1764:11, 1765:7, 1767:9, 1767:21, 1768:1, 1768:20, 1768:21, 1770:5, 1770:18, 1771:5, 1771:14, 1772:4, 1773:13, 1773:14, 1774:5, 1775:23, 1776:6, 1776:10, 1777:3, 1782:4, 1782:6, 1785:3, 1786:10, 1791:18, 1791:21, 1792:18, 1794:5, 1796:11, 1797:15, 1799:19, 1800:5, 1802:9, 1814:10, 1814:12, 1819:23, 1820:11, 1821:11, 1823:15, 1824:7, 1824:23
**GALLONS** [1] - 1789:8
**GAP** [5] - 1837:18, 1867:20, 1867:21, 1882:19, 1882:21
**GAPS** [2] - 1865:25, 1866:5
**GAPS** [7] - 1837:14, 1837:16, 1837:23, 1837:24, 1838:14,

1838:17, 1882:22
**GAS** [2] - 1894:23, 1894:24
**GATHER** [1] - 1832:15
**GATHERED** [1] - 1832:6
**GEARS** [1] - 1774:16
**GEE** [48] - 1760:20, 1761:6, 1826:21, 1828:24, 1833:11, 1833:24, 1835:11, 1836:16, 1842:22, 1842:24, 1843:1, 1845:10, 1851:16, 1853:10, 1853:15, 1855:17, 1857:21, 1859:14, 1860:20, 1864:9, 1864:22, 1869:17, 1873:7, 1873:8, 1873:14, 1873:17, 1873:22, 1873:24, 1874:11, 1874:13, 1875:9, 1875:11, 1878:22, 1878:23, 1881:6, 1881:8, 1882:3, 1882:4, 1884:21, 1884:23, 1886:24, 1887:1, 1888:6, 1888:8, 1888:9, 1889:24, 1890:3, 1900:7
**GEE** [7] - 1758:11, 1760:19, 1829:1, 1869:15, 1888:4, 1893:11, 1900:6
**GENERAL** [8] - 1768:19, 1771:25, 1797:10, 1806:1, 1832:10, 1871:4, 1872:17, 1879:8
**GENERALLY** [13] - 1760:18, 1775:1, 1780:14, 1785:19, 1785:20, 1802:5, 1803:15, 1803:17, 1804:24, 1807:21, 1809:21, 1884:8, 1884:10
**GENERATE** [2] - 1872:10, 1881:9
**GENTLEMEN** [1] - 1763:15
**GEOGRAPHIC** [1] - 1893:22
**GEOGRAPHY** [1] - 1868:5
**GEOLOGIST** [1] - 1870:2
**GEOLOGY** [1] -

1869:22
**GEOSTAR** [1] - 1894:14
**GEOTRACKER** [3] - 1893:19, 1894:2, 1895:21
**GIST** [2] - 1832:13, 1832:17
**GIVEN** [6] - 1759:23, 1792:23, 1817:17, 1830:9, 1834:1, 1846:22
**GOD** [1] - 1826:11
**GOODS** [1] - 1812:17
**GRANULAR** [3] - 1785:9, 1785:18, 1793:4
**GRAPHIC** [2] - 1873:23, 1874:12
**GRAPHICALLY** [1] - 1874:16
**GRAYISH** [1] - 1882:10
**GREAT** [1] - 1805:20
**GREATER** [2] - 1862:8, 1863:9
**GREEN** [1] - 1879:13
**GROUND** [2] - 1860:21, 1905:22
**GROUNDS** [2] - 1760:17, 1833:25
**GROUNDWATER** [1] - 1828:2
**GROUNDWATER** [27] - 1775:4, 1775:7, 1775:12, 1775:14, 1793:5, 1814:25, 1818:19, 1828:15, 1838:3, 1852:10, 1853:3, 1854:9, 1854:25, 1861:6, 1867:12, 1867:18, 1871:13, 1872:14, 1875:18, 1875:23, 1875:24, 1879:7, 1879:8, 1884:18, 1885:12, 1893:7
**GROUP** [3] - 1809:15, 1810:16
**GSI** [2] - 1819:1, 1819:3
**GUARANTEE** [3] - 1818:22, 1819:10, 1819:12
**GUARANTEEING** [1] - 1819:6
**GUESS** [21] - 1783:6, 1800:8, 1822:4, 1837:19, 1839:14, 1849:23, 1857:3,

1857:5, 1857:18, 1870:8, 1877:4, 1880:9, 1882:11, 1886:20, 1889:24, 1890:24, 1892:4, 1892:18, 1897:4, 1899:2, 1903:11
**GUIDANCE** [1] - 1809:14
**GUIDE** [2] - 1783:18, 1820:21
**GUYS** [1] - 1828:23

## H

**HALF** [5] - 1788:4, 1817:7, 1828:8, 1872:1, 1896:18
**HAND** [7] - 1769:17, 1826:7, 1873:22, 1874:11, 1874:12, 1875:9, 1884:22
**HARD** [2] - 1822:5, 1835:15
**HAZARDOUS** [1] - 1903:24
**HEAD** [2] - 1885:25, 1892:18
**HEADING** [1] - 1840:12
**HEALTH** [3] - 1843:10, 1843:14, 1843:15
**HEAR** [6] - 1764:3, 1805:3, 1858:13, 1860:22, 1904:17, 1905:1
**HEARD** [4] - 1786:23, 1793:20, 1808:1, 1809:6
**HEARING** [1] - 1765:5
**HEARSAY** [5] - 1761:21, 1764:25, 1774:3, 1842:22, 1860:20
**HELD** [2] - 1778:1, 1778:2
**HELP** [10] - 1765:22, 1801:6, 1805:9, 1826:10, 1838:21, 1861:9, 1881:4, 1881:8, 1887:16, 1888:17
**HELPED** [1] - 1887:25
**HELPS** [2] - 1798:20, 1836:23
**HEXAVALENT** [3] - 1771:2, 1771:3, 1771:4
**HIGH** [6] - 1783:19, 1803:22, 1810:1,

1889:9, 1889:15, 1898:3
**HIGHER** [2] - 1873:1, 1879:13
**HIGHEST** [3] - 1853:3, 1889:21, 1898:7
**HIGHLIGHT** [3] - 1839:19, 1886:24, 1888:8
**HILL** [3] - 1860:13, 1865:4, 1870:20
**HIRED** [1] - 1870:19
**HIRING** [1] - 1822:12
**HISTORICALLY** [2] - 1776:4, 1876:10
**HISTORY** [3] - 1774:17, 1793:10, 1903:1
**HOKKANEN** [3] - 1902:12, 1902:19, 1902:25
**HOLD** [6] - 1774:2, 1779:6, 1833:1, 1853:21, 1898:21, 1904:18
**HOLDUP** [1] - 1774:13
**HOLLISTER** [1] - 1799:7
**HOLLYWOOD** [1] - 1799:9
**HOME** [1] - 1784:9
**HONE** [2] - 1768:20, 1823:20
**HONESTLY** [1] - 1892:19
**HONOR** [78] - 1758:13, 1759:15, 1760:3, 1760:7, 1760:20, 1762:4, 1762:7, 1762:9, 1762:14, 1763:1, 1763:8, 1764:6, 1764:25, 1767:19, 1770:3, 1770:9, 1771:18, 1774:3, 1775:21, 1785:2, 1786:8, 1791:15, 1791:24, 1792:22, 1794:7, 1811:14, 1814:6, 1814:8, 1817:22, 1819:20, 1820:9, 1821:9, 1823:13, 1824:20, 1825:20, 1826:1, 1826:21, 1826:24, 1829:24, 1833:1, 1833:3, 1833:6, 1841:2, 1841:25, 1842:22, 1843:1, 1843:19, 1844:5,

1846:6, 1847:18, 1851:14, 1853:21, 1858:5, 1858:12, 1858:18, 1860:7, 1860:18, 1864:14, 1864:22, 1869:14, 1873:8, 1889:24, 1890:3, 1898:19, 1900:4, 1900:7, 1901:7, 1901:12, 1901:20, 1902:3, 1902:11, 1903:20, 1904:8, 1905:3, 1905:10, 1905:13, 1905:15, 1905:20
**HOOK** [1] - 1784:6
**HOPE** [1] - 1765:12
**HOPEFUL** [1] - 1901:24
**HORIZONTAL** [1] - 1863:20
**HORIZONTALLY** [2] - 1854:1, 1854:10
**HOT** [1] - 1797:20
**HOUR** [2] - 1807:25, 1901:20
**HOUSTON** [1] - 1818:12
**HSU** [3] - 1866:15, 1866:21, 1866:24
**HSU'S** [1] - 1872:25
**HSU-3** [1] - 1873:4
**HSUS** [6] - 1866:22, 1872:13, 1873:1, 1874:5, 1891:5, 1891:10
**HYDRAULIC** [5] - 1765:18, 1878:10, 1890:21, 1891:25, 1893:8
**HYDRAULICALLY** [2] - 1871:16, 1871:21
**HYDROGEOLOGICAL** [2] - 1878:3, 1878:13
**HYDROGEOLOGICALLY** [2] - 1872:9, 1878:6
**HYDROGEOLOGIST** [4] - 1827:14, 1846:11, 1863:8, 1870:2
**HYDROGEOLOGY** [1] - 1869:23
**HYDROLOGIC** [1] - 1861:14
**HYDROLOGY** [1] - 1890:21
**HYDROSTRATIGRAPHIC** [3] - 1872:13,

1891:2, 1891:7
**HYPOTHETICAL** [7] - 1847:15, 1848:7, 1849:2, 1849:7, 1849:19, 1892:11, 1898:25
**HYPOTHETICALLY** [2] - 1848:21, 1859:19
**HYPOTHETICALS** [3] - 1847:13, 1848:13, 1848:17

# I

**IDEA** [2] - 1777:1, 1783:12
**IDENTIFICATION** [1] - 1867:25
**IDENTIFIED** [9] - 1761:15, 1818:5, 1837:3, 1837:13, 1837:16, 1837:24, 1880:11, 1888:16, 1889:11
**IDENTIFY** [5] - 1817:16, 1835:22, 1836:3, 1836:6, 1837:6
**IDENTIFYING** [2] - 1837:23, 1876:25
**IGNORE** [1] - 1882:12
**ILLUSTRATE** [3] - 1847:7, 1848:23, 1849:16
**IMMEDIATE** [7] - 1872:23, 1872:24, 1874:4, 1891:13, 1891:14, 1891:16, 1891:17
**IMMEDIATELY** [1] - 1872:20
**IMPACT** [1] - 1824:9
**IMPACTED** [4] - 1852:9, 1880:8, 1880:16, 1881:13
**IMPACTING** [1] - 1881:2
**IMPACTS** [3] - 1796:6, 1866:17, 1880:15
**IMPAIRED** [2] - 1807:8, 1824:9
**IMPEACHMENT** [2] - 1833:11, 1857:21
**IMPLEMENT** [5] - 1768:13, 1781:14, 1781:18, 1787:21, 1790:8
**IMPLEMENTATION** [1] - 1768:11

**IMPLY** [1] - 1840:23
**IMPORT** [1] - 1884:6
**IMPORTANCE** [2] - 1884:8, 1887:14
**IMPORTANT** [3] - 1768:2, 1872:8, 1888:2
**IMPOSSIBLE** [1] - 1848:24
**IMPRESSION** [2] - 1797:24, 1798:4
**IMPROPER** [2] - 1833:11, 1857:21
**IN-KIND** [1] - 1828:10
**INABILITY** [1] - 1867:22
**INACCURATE** [1] - 1905:7
**INCLINATION** [1] - 1904:12
**INCLUDE** [8] - 1797:19, 1815:15, 1815:24, 1817:1, 1818:24, 1868:9, 1895:2
**INCLUDED** [4] - 1813:10, 1864:9, 1890:19, 1894:15
**INCLUDES** [3] - 1788:4, 1789:2, 1816:22
**INCLUDING** [3] - 1812:2, 1812:17, 1841:20
**INCOMPLETE** [1] - 1903:15
**INCONCLUSIVE** [2] - 1868:24, 1869:13
**INCORPORATED** [1] - 1831:3
**INCORRECT** [3] - 1813:8, 1831:14, 1831:19
**INCREASE** [1] - 1809:25
**INCREASED** [1] - 1816:15
**INCUR** [1] - 1823:8
**INCURRED** [6] - 1786:15, 1786:17, 1788:5, 1790:5, 1817:8
**INDEED** [2] - 1766:9, 1811:12
**INDICATE** [2] - 1759:2, 1875:7
**INDICATING** [6] - 1856:20, 1856:22, 1874:1, 1881:20, 1884:1, 1884:2

INDICATING) [2] - 1881:22, 1883:23
**INDICATIONS** [1] - 1861:13
**INDIRECTLY** [1] - 1861:20
**INDUSTRIAL** [13] - 1832:19, 1839:2, 1839:12, 1840:2, 1840:14, 1852:2, 1878:15, 1885:15, 1888:24, 1888:25, 1889:1, 1889:10, 1889:16
**INDUSTRY** [1] - 1809:21
**INFERENCE** [1] - 1903:11
**INFERENCES** [1] - 1871:12
**INFLUENCE** [2] - 1860:2, 1872:7
**INFLUENCES** [2] - 1857:14, 1872:5
**INFORMATION** [23] - 1769:18, 1801:10, 1801:16, 1812:1, 1813:8, 1832:5, 1832:16, 1834:25, 1837:21, 1838:2, 1840:6, 1844:13, 1844:15, 1844:21, 1867:16, 1871:10, 1875:17, 1875:22, 1875:25, 1881:8, 1887:12, 1905:6
**INITIAL** [3] - 1865:14, 1877:10, 1895:7
**INITIALS** [1] - 1826:17
**INSIDE** [1] - 1882:9
**INSPECTING** [1] - 1808:21
**INSTALL** [9] - 1781:9, 1796:3, 1804:19, 1817:13, 1822:14, 1822:21, 1822:25, 1823:8, 1890:17
**INSTALLED** [18] - 1768:14, 1772:6, 1776:2, 1776:9, 1776:13, 1776:18, 1781:17, 1782:1, 1782:3, 1782:9, 1783:1, 1790:4, 1793:25, 1797:7, 1802:20, 1820:1, 1820:3, 1883:7
**INSTALLING** [7] - 1770:15, 1786:19, 1787:3, 1788:15,

1803:7, 1810:11, 1821:21
**INSTANCE** [7] - 1762:19, 1854:7, 1865:19, 1887:19, 1887:21, 1891:1, 1894:10
**INSTEAD** [2] - 1786:15, 1890:22
**INSTRUCT** [1] - 1764:22
**INSTRUCTIONS** [1] - 1761:8
**INTEND** [2] - 1759:18, 1903:16
**INTENDED** [3] - 1759:21, 1776:21, 1801:9
**INTENT** [10] - 1768:3, 1847:4, 1848:20, 1851:3, 1855:12, 1862:11, 1862:12, 1862:14, 1880:22, 1897:5
**INTENTIONALLY** [1] - 1894:9
**INTERCHANGEABLE** [1] - 1786:7
**INTERCONNECTEDNESS** [1] - 1871:15
**INTEREST** [1] - 1804:19
**INTERPRETATION** [3] - 1759:10, 1881:10, 1899:21
**INTERPRETED** [4] - 1856:1, 1856:2, 1874:17, 1884:18
**INTERPRETS** [1] - 1881:11
**INTERRUPT** [1] - 1801:3
**INTERVAL** [3] - 1874:17, 1874:25, 1879:17
**INTERVALS** [1] - 1891:14
**INTRODUCE** [2] - 1760:15, 1902:5
**INTRODUCTION** [1] - 1835:17
**INVEST** [1] - 1887:23
**INVESTIGATE** [3] - 1843:18, 1860:16, 1876:22
**INVESTIGATED** [1] - 1851:24
**INVESTIGATION** [2] - 1828:2, 1830:18
**INVESTIGATION** [33] -

1829:12, 1830:6, 1836:2, 1836:3, 1838:13, 1838:22, 1839:14, 1843:11, 1843:16, 1849:20, 1850:4, 1850:12, 1851:21, 1852:3, 1852:13, 1852:25, 1853:8, 1853:14, 1853:19, 1855:25, 1865:20, 1868:8, 1876:17, 1876:18, 1876:24, 1879:17, 1880:5, 1883:9, 1890:8, 1890:10, 1890:12, 1892:25, 1893:3
**INVESTIGATIONS** [2] - 1851:6, 1880:10
**INVITED** [1] - 1904:25
**INVOICES** [4] - 1781:21, 1787:25, 1821:14, 1821:15
**INVOLVE** [8] - 1775:7, 1811:7, 1811:8, 1811:19, 1813:16, 1821:15, 1823:21, 1890:13
**INVOLVED** [20] - 1767:10, 1768:6, 1768:11, 1769:1, 1769:15, 1772:21, 1772:23, 1774:22, 1777:18, 1781:19, 1783:10, 1784:5, 1784:14, 1798:23, 1813:1, 1822:17, 1841:9, 1870:4, 1890:17, 1900:12
**INVOLVES** [2] - 1774:18, 1881:16
**INVOLVING** [4] - 1798:21, 1799:5, 1808:1, 1818:18
**ION** [3] - 1782:13, 1785:17, 1789:24
**ISH** [1] - 1879:6
**ISSUE** [19] - 1761:19, 1762:13, 1763:1, 1796:25, 1806:6, 1806:18, 1824:22, 1832:5, 1846:7, 1846:13, 1897:14, 1901:15, 1901:25, 1902:5, 1902:14, 1904:2, 1904:20, 1905:4, 1905:23
**ISSUED** [3] - 1771:19, 1774:14, 1852:2
**ISSUES** [6] - 1769:17,

1816:15, 1857:5, 1891:23, 1897:8, 1901:14
**ISSUING** [5] - 1772:19, 1772:23, 1773:23, 1774:7, 1774:8
**ITEM** [1] - 1758:5
**ITEM** [8] - 1767:13, 1786:14, 1801:20, 1815:16, 1815:20, 1815:24, 1816:22
**ITEMED** [1] - 1815:22
**ITEMS** [1] - 1766:25
**ITSELF** [2] - 1811:1, 1870:22

## J

**JACOBS** [4] - 1827:10, 1827:11, 1865:4, 1865:6
**JAMES** [3] - 1826:17, 1829:11, 1843:6
**JEON** [1] - 1817:21
**JIM** [3] - 1842:6, 1843:4, 1843:6
**JMOL** [4] - 1761:9, 1905:18, 1905:19, 1905:23
**JOINED** [1] - 1763:14
**JUDGMENT** [1] - 1877:7
**JUMPED** [1] - 1876:15
**JURISDICTIONAL** [3] - 1778:1, 1778:9, 1778:18
**JURORS** [1] - 1758:19
**JURY** [1] - 1763:16
**JURY** [17] - 1758:4, 1758:18, 1761:8, 1762:24, 1763:11, 1763:14, 1787:14, 1795:14, 1819:15, 1841:12, 1841:14, 1841:17, 1855:10, 1856:17, 1900:14, 1900:16, 1903:19

## K

**KEEP** [3] - 1805:19, 1841:10, 1900:12
**KEPT** [2] - 1766:12, 1766:13
**KIND** [22] - 1801:18, 1819:25, 1822:11, 1828:10, 1865:15, 1870:9, 1872:5, 1877:24, 1879:6,

1879:17, 1880:18, 1880:20, 1881:18, 1882:10, 1882:14, 1882:18, 1882:21, 1887:16, 1888:2, 1888:17, 1889:19
**KINDLY** [1] - 1763:19
**KNOWING** [1] - 1813:9
**KNOWLEDGE** [7] - 1767:11, 1771:12, 1771:25, 1845:17, 1850:16, 1883:8, 1883:11
**KNOWS** [1] - 1858:2

## L

**LABEL** [1] - 1814:8
**LABORATORY** [1] - 1886:6
**LACKING** [1] - 1884:19
**LACKS** [8] - 1770:2, 1792:18, 1794:5, 1796:11, 1799:19, 1824:4, 1836:16, 1853:10
**LADIES** [1] - 1763:15
**LAG** [1] - 1818:7
**LAID** [1] - 1760:12
**LAKE** [3] - 1765:16, 1797:25, 1843:17
**LAKE'S** [1] - 1765:15
**LANG** [2] - 1773:21, 1773:25
**LANGUAGE** [1] - 1845:20
**LARDIERE** [26] - 1758:15, 1764:20, 1764:22, 1765:8, 1794:3, 1794:11, 1794:12, 1794:18, 1794:21, 1795:15, 1795:20, 1796:4, 1797:11, 1797:19, 1800:11, 1800:12, 1800:17, 1800:25, 1801:6, 1801:14, 1801:19, 1802:2, 1802:6, 1804:18, 1805:7, 1902:20
**LARGE** [7] - 1812:17, 1849:16, 1857:12, 1857:13, 1857:14, 1867:21, 1870:8
**LARGER** [3] - 1866:3, 1872:14, 1882:16
**LARGEST** [1] - 1812:2
**LAST** [14] - 1766:16,

1773:25, 1779:10, 1805:15, 1826:15, 1828:12, 1828:14, 1830:1, 1835:25, 1837:17, 1840:1, 1842:19, 1868:11, 1888:13
**LATE** [4] - 1764:14, 1827:20, 1862:3, 1869:24
**LATERAL** [6] - 1863:20, 1866:18, 1867:11, 1868:3, 1868:7, 1868:10
**LATERALLY** [3] - 1852:9, 1867:18, 1868:2
**LAW** [1] - 1761:24
**LAWSUIT** [1] - 1766:2
**LAY** [3] - 1792:24, 1794:7, 1864:14
**LEAD** [1] - 1818:7
**LEAD-LAG** [1] - 1818:7
**LEADING** [3] - 1786:8, 1820:9, 1824:4
**LEARN** [1] - 1777:13
**LEARNED** [1] - 1767:12
**LEAST** [15] - 1760:13, 1760:22, 1798:14, 1799:4, 1808:7, 1812:7, 1836:22, 1855:3, 1859:19, 1861:20, 1866:25, 1876:5, 1885:22, 1897:12, 1904:16
**LEAVING** [1] - 1856:2
**LECHLER** [2] - 1826:16, 1827:5
**LECHLER** [21] - 1759:10, 1826:2, 1826:16, 1827:4, 1827:9, 1832:9, 1833:14, 1846:10, 1848:4, 1869:18, 1873:17, 1873:24, 1874:13, 1878:23, 1880:4, 1884:24, 1887:1, 1888:9, 1890:8, 1893:10, 1900:17
**LECHLER'S** [1] - 1832:25
**LEEWAY** [1] - 1792:23
**LEFT** [7] - 1766:16, 1849:5, 1856:6, 1873:22, 1875:9, 1884:22, 1887:4
**LEFT-HAND** [3] -

1873:22, 1875:9, 1884:22
**LEGAL** [3] - 1803:11, 1815:20
**LESERMAN** [4] - 1829:11, 1843:6, 1843:8, 1843:22
**LESS** [2] - 1807:25, 1839:12
**LESSER** [1] - 1862:8
**LETTER** [13] - 1800:11, 1800:12, 1800:13, 1800:14, 1800:17, 1851:4, 1851:10, 1851:14, 1851:19, 1852:4, 1852:14, 1853:7
**LEVEL** [9] - 1799:18, 1807:20, 1815:18, 1861:18, 1863:3, 1863:15, 1871:11, 1872:21, 1897:16
**LEVELS** [11] - 1820:4, 1853:3, 1861:11, 1862:4, 1862:19, 1862:20, 1863:11, 1871:8, 1871:25, 1872:6, 1876:20
**LICENSES** [1] - 1869:25
**LIFE** [1] - 1781:16
**LIGHT** [1] - 1771:19
**LIKELY** [13] - 1760:16, 1832:18, 1839:12, 1845:21, 1852:22, 1855:6, 1868:25, 1875:1, 1881:15, 1886:7, 1888:18, 1905:1
**LIMIT** [3] - 1760:14, 1765:2, 1807:22
**LIMITATIONS** [1] - 1904:20
**LIMITED** [3] - 1893:16, 1901:22, 1906:1
**LIMITS** [3] - 1779:25, 1886:5, 1886:7
**LINE** [27] - 1759:2, 1771:20, 1786:14, 1814:9, 1814:10, 1814:11, 1815:16, 1815:20, 1815:22, 1815:24, 1816:22, 1832:24, 1832:25, 1833:7, 1833:9, 1879:9, 1879:17, 1882:6, 1883:15, 1883:17, 1884:5, 1899:12
**LINE-ITEMED** [1] -

1815:22
**LINES** [13] - 1839:8, 1839:21, 1840:18, 1847:19, 1847:20, 1856:7, 1857:19, 1858:20, 1858:22, 1875:17, 1875:21, 1880:18, 1888:21
**LIST** [7] - 1877:7, 1877:19, 1877:21, 1888:2, 1894:16, 1895:8, 1897:1
**LISTEN** [1] - 1804:20
**LISTING** [3] - 1877:3, 1887:4, 1895:7
**LISTS** [2] - 1894:7, 1894:9
**LITERATURE** [2] - 1810:17, 1814:23
**LITIGATION** [5] - 1766:2, 1766:13, 1766:14, 1766:21, 1805:22
**LIVE** [2] - 1761:17, 1761:21
**LOAD** [2] - 1798:18, 1798:21
**LOCAL** [1] - 1779:19
**LOCATED** [1] - 1776:21
**LOCATING** [1] - 1901:10
**LOCATION** [6] - 1782:17, 1805:6, 1855:3, 1873:19, 1874:8, 1874:10
**LOCATIONS** [5] - 1861:12, 1874:18, 1876:11, 1880:25, 1881:1
**LOGISTICAL** [1] - 1762:14
**LOGS** [1] - 1903:22
**LOOK** [25] - 1786:17, 1790:12, 1791:11, 1829:18, 1830:10, 1835:4, 1838:19, 1842:4, 1849:1, 1851:22, 1860:5, 1861:8, 1861:9, 1864:7, 1871:8, 1877:25, 1878:19, 1879:22, 1882:25, 1884:22, 1894:12, 1894:19, 1896:11, 1898:23, 1904:24
**LOOKED** [16] - 1781:14, 1821:12, 1830:10, 1848:12, 1848:15, 1848:16,

1868:19, 1877:16, 1888:13, 1891:2, 1891:5, 1891:23, 1893:21, 1896:6, 1896:21, 1903:2

**LOOKING** [20] - 1783:23, 1790:19, 1790:20, 1791:3, 1813:15, 1842:7, 1844:12, 1845:24, 1851:23, 1875:16, 1876:21, 1878:6, 1879:22, 1881:13, 1884:24, 1887:24, 1891:6, 1897:6, 1899:21, 1904:10

**LOOKS** [8] - 1783:23, 1837:9, 1840:11, 1874:20, 1880:7, 1884:25, 1885:3, 1887:3

**LOOP** [2] - 1767:3, 1800:18

**LOS** [1] - 1758:2

**LOST** [4] - 1797:5, 1804:1, 1903:18, 1903:19

**LOUD** [1] - 1850:10

**LOW** [8] - 1807:20, 1807:22, 1820:4, 1876:20, 1886:3, 1886:14, 1896:20, 1897:16

**LOW-LEVEL** [1] - 1807:20

**LOWER** [1] - 1879:14

**LUNCH** [1] - 1901:20

**LYNN** [1] - 1869:5

---

**M**

**MAGNITUDE** [1] - 1886:1

**MAIL** [10] - 1842:5, 1842:7, 1842:8, 1842:10, 1843:3, 1843:9, 1843:12, 1843:25, 1868:12

**MAILS** [1] - 1868:17

**MAIN** [14] - 1784:12, 1785:16, 1787:11, 1822:13, 1838:11, 1854:5, 1867:19, 1869:12, 1870:6, 1872:11, 1877:25

**MAINTENANCE** [1] - 1779:11

**MAJOR** [1] - 1864:4

**MAN** [1] - 1808:5

**MAN-MADE** [1] -

1808:5

**MANAGED** [1] - 1783:7

**MANAGEMENT** [3] - 1777:13, 1815:16, 1815:18

**MANAGER** [4] - 1781:20, 1797:10, 1806:1, 1842:14

**MANAGES** [1] - 1818:15

**MANNER** [1] - 1847:10

**MANUFACTURED** [1] - 1812:18

**MAP** [8] - 1857:6, 1881:9, 1881:10, 1882:11, 1884:17, 1886:2, 1899:4, 1899:15

**MARCH** [5] - 1800:11, 1800:18, 1800:23, 1801:7, 1801:15

**MARKET** [2] - 1812:10, 1819:17

**MARKETS** [1] - 1812:17

**MARKS** [6] - 1882:17, 1883:6, 1883:12, 1883:16, 1884:13, 1884:20

**MASK** [1] - 1826:18

**MASNADA** [2] - 1797:11, 1797:19

**MASTER'S** [1] - 1869:23

**MATCHING** [1] - 1828:11

**MATT** [3] - 1800:10, 1806:1, 1806:6

**MATTER** [5] - 1765:3, 1780:11, 1841:9, 1841:19, 1900:12

**MAXIMIZE** [1] - 1892:21

**MAXIMUM** [3] - 1879:24, 1885:3

**MCGUANE** [1] - 1758:11

**MCL** [8] - 1770:16, 1770:20, 1770:23, 1771:2, 1771:6, 1771:8, 1771:16, 1807:23

**MEAN** [59] - 1759:23, 1760:25, 1768:22, 1783:8, 1783:15, 1784:2, 1784:4, 1785:21, 1790:14, 1795:14, 1799:2,

1801:3, 1805:5, 1810:22, 1811:11, 1824:11, 1825:15, 1845:21, 1846:16, 1848:18, 1857:13, 1857:14, 1861:20, 1867:19, 1867:24, 1868:3, 1868:4, 1868:5, 1868:6, 1871:22, 1871:24, 1872:17, 1874:3, 1874:16, 1875:11, 1875:21, 1875:24, 1876:2, 1876:4, 1876:13, 1878:5, 1881:10, 1882:8, 1884:8, 1885:8, 1885:9, 1886:7, 1886:13, 1886:17, 1888:20, 1890:17, 1890:20, 1891:17, 1895:1, 1896:25, 1897:9, 1898:8

**MEANING** [1] - 1853:24

**MEANS** [4] - 1760:25, 1771:8, 1771:9, 1886:8

**MEANT** [5] - 1770:20, 1773:15, 1847:7, 1848:23, 1849:15

**MEANTIME** [1] - 1758:21

**MEDIA** [5] - 1785:15, 1785:16, 1785:17, 1785:24, 1786:1

**MEET** [7] - 1761:23, 1779:25, 1800:3, 1818:8, 1828:17, 1901:17, 1904:15

**MEETING** [5] - 1766:10, 1767:13, 1806:9, 1806:15, 1807:25

**MEETINGS** [18] - 1766:3, 1766:5, 1767:12, 1769:4, 1772:14, 1772:18, 1778:1, 1778:9, 1778:19, 1778:20, 1795:6, 1801:20, 1801:24, 1805:15, 1805:16, 1805:25, 1806:5, 1806:6

**MEMO** [5] - 1860:8, 1860:10, 1862:12, 1862:14, 1872:18

**MEMORY** [3] - 1801:11, 1803:15, 1857:23

**MENTION** [1] - 1770:15

**MENTIONED** [7] - 1779:2, 1812:20, 1818:11, 1870:21, 1871:18, 1883:3, 1886:21

**METAL** [1] - 1812:17

**METHOD** [3] - 1809:3, 1809:22, 1815:5

**METHODOLOGY** [2] - 1809:20, 1810:5

**METRICS** [1] - 1815:5

**MIAE** [1] - 1817:21

**MICEVYCH** [1] - 1758:12

**MICROPHONE** [2] - 1764:3, 1826:19

**MID** [1] - 1800:23

**MID-MAY** [1] - 1800:23

**MIDDLE** [2] - 1840:17

**MIGHT** [3] - 1763:2, 1829:12, 1869:8

**MIGRATED** [2] - 1854:8, 1855:3

**MIGRATING** [3] - 1848:25, 1850:18, 1854:23

**MIGRATION** [10] - 1866:17, 1866:18, 1867:7, 1867:11, 1868:7, 1868:9, 1868:10, 1881:16

**MILE** [1] - 1872:1

**MILLION** [21] - 1787:4, 1787:22, 1788:1, 1788:4, 1788:8, 1788:9, 1788:15, 1789:10, 1789:22, 1790:10, 1790:16, 1790:18, 1813:7, 1813:12, 1815:14, 1817:7, 1818:23, 1819:7, 1819:11, 1819:16, 1819:17

**MIND** [5] - 1763:2, 1841:10, 1845:1, 1900:12, 1901:24

**MINE** [3] - 1842:13, 1864:18, 1873:15

**MINIMIZE** [1] - 1892:20

**MINUTE** [4] - 1779:1, 1789:8, 1818:8, 1853:21

**MINUTES** [10] - 1761:15, 1762:13, 1841:11, 1888:6, 1889:24, 1898:19,

1898:22, 1900:9, 1900:13, 1902:15

**MINUTES'** [1] - 1818:5

**MISLEAD** [1] - 1800:19

**MISLEADING** [2] - 1831:14, 1831:19

**MISSPOKE** [1] - 1789:20

**MISSTATED** [1] - 1759:21

**MISSTATES** [1] - 1770:8

**MISUNDERSTANDING** [1] - 1789:14

**MODELING** [1] - 1828:15

**MOMENT** [6] - 1762:25, 1764:5, 1833:2, 1833:12, 1844:13, 1901:8

**MONEY** [1] - 1810:3

**MONITOR** [4] - 1787:12, 1862:19, 1863:4, 1871:5

**MONITORED** [6] - 1861:11, 1862:24, 1863:2, 1871:25, 1873:21, 1875:4

**MONITORING** [35] - 1775:16, 1775:20, 1775:23, 1776:2, 1776:9, 1776:11, 1776:13, 1776:14, 1776:16, 1776:17, 1776:25, 1777:5, 1777:9, 1777:15, 1777:17, 1778:5, 1778:11, 1778:16, 1778:22, 1783:10, 1855:13, 1862:2, 1872:9, 1873:2, 1874:7, 1874:9, 1877:22, 1879:11, 1883:22, 1885:2, 1885:16, 1889:16

**MONTH** [6] - 1812:12, 1828:12, 1828:14, 1863:6, 1863:7

**MONTHLY** [5] - 1766:3, 1778:2, 1778:20, 1795:6, 1806:6

**MONTHS** [3] - 1779:10, 1812:7, 1863:9

**MORNING** [14] - 1758:10, 1758:13, 1758:15, 1758:17, 1762:1, 1763:15,

1763:16, 1763:21,
1807:14, 1826:4,
1876:15, 1901:18,
1905:17, 1906:6
**MOST** [5] - 1837:19,
1852:22, 1886:7,
1889:8, 1898:6
**MOTIVATED** [1] -
1768:15
**MOVE** [16] - 1788:10,
1788:12, 1791:5,
1795:15, 1797:8,
1804:20, 1830:3,
1841:2, 1844:6,
1844:9, 1844:10,
1852:19, 1854:9,
1854:15, 1854:16,
1859:20
**MOVED** [2] - 1803:2,
1867:18
**MOVES** [2] - 1867:8,
1867:11
**MOVING** [7] - 1759:9,
1777:3, 1796:17,
1854:1, 1863:21,
1863:22, 1905:14
**MR** [250] - 1758:10,
1758:13, 1759:15,
1759:18, 1760:3,
1760:6, 1760:20,
1761:6, 1761:14,
1762:4, 1762:9,
1762:10, 1762:11,
1762:21, 1762:23,
1763:1, 1763:5,
1763:8, 1764:6,
1764:11, 1764:25,
1765:7, 1767:9,
1767:19, 1767:21,
1767:23, 1768:1,
1768:20, 1768:21,
1770:2, 1770:5,
1770:8, 1770:18,
1771:5, 1771:14,
1771:18, 1772:4,
1773:9, 1773:13,
1773:14, 1774:3,
1774:5, 1775:21,
1775:23, 1776:6,
1776:10, 1777:3,
1782:4, 1782:6,
1785:2, 1785:3,
1786:8, 1786:10,
1791:15, 1791:18,
1791:21, 1791:24,
1792:14, 1792:18,
1792:22, 1793:2,
1794:5, 1794:7,
1794:9, 1796:11,
1796:19, 1797:15,

1797:18, 1799:19,
1800:2, 1800:5,
1800:9, 1802:9,
1802:13, 1811:14,
1811:16, 1811:22,
1814:6, 1814:10,
1814:11, 1814:12,
1814:14, 1817:22,
1817:25, 1819:20,
1819:23, 1820:9,
1820:11, 1821:9,
1821:11, 1823:13,
1823:15, 1824:4,
1824:7, 1824:19,
1824:23, 1825:2,
1825:20, 1826:1,
1826:21, 1826:24,
1827:2, 1827:4,
1827:8, 1828:24,
1829:1, 1829:5,
1830:5, 1832:24,
1833:1, 1833:3,
1833:4, 1833:6,
1833:7, 1833:9,
1833:11, 1833:14,
1833:24, 1834:2,
1834:7, 1834:15,
1834:19, 1834:22,
1835:11, 1835:13,
1835:16, 1836:16,
1836:21, 1839:19,
1839:21, 1841:2,
1841:25, 1842:1,
1842:22, 1842:23,
1842:24, 1843:1,
1843:3, 1843:19,
1843:21, 1843:22,
1844:5, 1844:9,
1845:10, 1845:19,
1846:6, 1846:10,
1847:18, 1847:20,
1847:21, 1847:22,
1847:25, 1848:3,
1848:15, 1849:4,
1849:6, 1851:14,
1851:16, 1851:19,
1852:20, 1853:10,
1853:12, 1853:15,
1853:19, 1853:21,
1853:22, 1855:17,
1855:19, 1855:22,
1856:4, 1856:7,
1857:21, 1857:24,
1858:5, 1858:22,
1859:4, 1859:14,
1859:15, 1859:17,
1860:6, 1860:10,
1860:18, 1860:20,
1860:24, 1861:4,
1864:9, 1864:11,
1864:13, 1864:16,

1864:22, 1864:23,
1864:25, 1865:1,
1866:9, 1866:10,
1869:14, 1869:17,
1873:5, 1873:7,
1873:8, 1873:14,
1873:17, 1873:22,
1873:24, 1874:11,
1874:13, 1875:9,
1875:11, 1878:22,
1878:23, 1881:6,
1881:8, 1882:3,
1882:4, 1884:21,
1884:23, 1886:24,
1887:1, 1888:6,
1888:8, 1888:9,
1889:24, 1890:3,
1890:5, 1890:7,
1898:12, 1898:19,
1898:23, 1899:3,
1899:6, 1900:4,
1900:7, 1900:23,
1901:2, 1901:5,
1901:7, 1901:12,
1901:17, 1902:3,
1902:11, 1902:18,
1902:25, 1903:10,
1903:20, 1905:3,
1905:10, 1905:13,
1905:19, 1905:24,
1906:3
**MULTI** [3] - 1778:1,
1778:9, 1778:18
**MULTI-JURISDICTIONAL**
[3] - 1778:1, 1778:9,
1778:18
**MULTIPLE** [4] -
1788:2, 1839:7,
1885:5, 1885:6
**MW-1** [1] - 1875:4
**MW-1A** [1] - 1874:19

---

# N

**NAJM** [16] - 1781:7,
1783:14, 1783:16,
1784:23, 1786:13,
1788:2, 1789:7,
1809:20, 1810:5,
1812:6, 1813:6,
1814:4, 1819:24,
1822:3, 1823:1,
1825:15
**NAJM'S** [5] - 1780:17,
1781:12, 1791:11,
1822:23, 1823:12
**NAME** [6] - 1826:15,
1828:1, 1842:19,
1858:11

**NAMED** [1] - 1905:21
**NARRATIVE** [1] -
1768:19
**NARROW** [2] -
1887:17, 1887:25
**NARROWLY** [1] -
1792:19
**NATIONAL** [1] -
1779:23
**NATIVE** [1] - 1886:17
**NATURAL** [1] - 1780:5
**NATURALLY** [2] -
1770:25, 1808:5
**NATURE** [2] -
1769:12, 1848:24
**NEAR** [1] - 1886:6
**NEARBY** [1] - 1866:17
**NEARING** [1] -
1760:21
**NECESSARILY** [11] -
1760:25, 1811:11,
1825:11, 1846:22,
1861:22, 1862:13,
1867:24, 1876:4,
1876:13, 1890:13,
1899:2
**NECESSARY** [1] -
1760:15
**NECESSITY** [1] -
1792:7
**NEED** [16] - 1760:10,
1766:11, 1768:15,
1777:5, 1778:15,
1784:7, 1787:6,
1792:2, 1817:18,
1818:7, 1829:19,
1846:16, 1852:14,
1863:4, 1904:19
**NEEDED** [23] - 1769:2,
1772:22, 1777:6,
1777:15, 1777:18,
1780:20, 1781:5,
1781:7, 1789:5,
1790:13, 1793:21,
1796:23, 1797:24,
1806:17, 1817:13,
1817:17, 1822:19,
1825:9, 1832:5,
1832:15, 1852:25,
1865:19, 1903:12
**NEEDS** [3] - 1761:8,
1761:11, 1762:15
**NETWORK** [2] -
1778:12, 1778:22
**NEVER** [5] - 1763:2,
1805:13, 1850:25,
1893:3, 1893:7
**NEW** [12] - 1786:20,
1790:3, 1798:11,
1803:7, 1811:7,

1811:18, 1812:1,
1813:17, 1816:14,
1883:5, 1890:14
**NEWHALL** [1] -
1894:10
**NEXT** [10] - 1776:14,
1788:10, 1791:5,
1812:12, 1825:25,
1883:17, 1887:5,
1892:25, 1893:3,
1893:5
**NIGHT** [1] - 1766:16
**NON** [1] - 1879:16
**NON-DETECT** [1] -
1879:16
**NONE** [3] - 1883:8,
1883:10, 1890:18
**NONSTANDARD** [2] -
1815:4, 1815:9
**NORMAL** [2] -
1826:25
**NORMALLY** [1] -
1902:4
**NORTH** [1] - 1799:9
**NORTH** [4] - 1875:12,
1875:18, 1875:23
**NORTHERN** [3] -
1880:19, 1885:10
**NOSSAMAN** [1] -
1828:21
**NOTEBOOKS** [1] -
1829:16
**NOTES** [3] - 1805:16,
1805:19, 1805:21
**NOTETAKER** [1] -
1805:20
**NOTHING** [11] -
1791:22, 1807:22,
1824:24, 1826:10,
1831:14, 1831:18,
1837:7, 1845:1,
1893:8, 1898:8,
1900:4
**NOTICE** [8] - 1764:15,
1764:18, 1765:9,
1766:8, 1799:25,
1800:1, 1800:11,
1800:17
**NOTICING** [1] -
1761:3
**NOTIFICATION** [1] -
1800:14
**NOTIFIED** [2] -
1799:17, 1801:16
**NOTION** [2] - 1903:5,
1904:5
**NOTORIOUS** [2] -
1895:4, 1895:11
**NPDES** [3] - 1779:22,
1780:7

NUMBER [31] - 1758:23, 1771:16, 1776:15, 1787:17, 1788:15, 1789:22, 1790:25, 1793:13, 1794:9, 1794:10, 1805:14, 1811:22, 1813:21, 1815:11, 1815:12, 1818:23, 1819:15, 1821:11, 1858:8, 1858:9, 1858:10, 1860:6, 1863:13, 1867:21, 1870:8, 1870:13, 1871:23, 1871:24, 1876:10, 1886:19, 1887:19
NUMBERED [3] - 1855:14, 1873:1, 1891:10
NUMBERING [1] - 1835:14
NUMBERS [5] - 1759:2, 1786:11, 1873:9, 1889:18, 1890:22
NUMEROUS [2] - 1784:11, 1881:25

O

O&M [2] - 1791:11, 1791:14
O'CLOCK [3] - 1807:15, 1900:10, 1901:19
OATH [3] - 1763:24, 1841:21, 1845:6
OBJECT [3] - 1824:19, 1836:10, 1902:4
OBJECTING [1] - 1760:23
OBJECTION [38] - 1759:4, 1759:5, 1764:25, 1765:1, 1767:19, 1767:24, 1770:2, 1770:9, 1771:19, 1775:21, 1785:2, 1786:8, 1791:15, 1791:19, 1792:21, 1814:12, 1820:9, 1821:9, 1823:13, 1824:4, 1828:24, 1833:11, 1833:13, 1833:24, 1836:16, 1842:22, 1842:25, 1845:10, 1851:16, 1853:10, 1853:15, 1857:21, 1859:14, 1860:20,

1860:23, 1901:3, 1902:6, 1902:7
OBJECTIONS [6] - 1758:24, 1759:11, 1760:11, 1760:16, 1833:10, 1901:23
OBJECTIVES [2] - 1835:10, 1835:13
OBJECTIVES [3] - 1836:10, 1871:23, 1872:11
OBLIGATION [2] - 1792:16, 1804:23
OBLIGATIONS [1] - 1804:7
OBSERVE [1] - 1874:4
OBTAIN [1] - 1769:2
OBVIOUSLY [1] - 1788:19
OCCASIONS [1] - 1795:4
OCCUR [3] - 1776:5, 1816:5, 1872:22
OCCURRED [5] - 1776:5, 1789:4, 1815:19, 1819:18, 1871:1
OCCURRING [3] - 1770:25, 1808:5, 1848:9
OCTOBER [1] - 1829:10
OFFERED [1] - 1761:1
OFFERING [1] - 1809:19
OFFICIALLY [2] - 1828:1, 1870:12
OFFSITE [9] - 1774:19, 1775:2, 1775:4, 1775:12, 1775:14, 1776:16, 1776:17, 1777:10, 1874:7
OFTEN [2] - 1816:24, 1890:1
ONCE [1] - 1887:24
ONE [104] - 1763:1, 1793:15, 1798:10, 1798:12, 1799:7, 1799:9, 1800:2, 1800:18, 1805:10, 1805:25, 1806:5, 1806:9, 1807:5, 1807:10, 1807:11, 1808:24, 1812:20, 1813:9, 1813:13, 1817:20, 1829:16, 1829:21, 1830:11, 1830:12, 1830:13,

1833:2, 1833:12, 1836:10, 1837:3, 1837:13, 1840:12, 1841:1, 1842:2, 1846:3, 1846:21, 1846:23, 1847:13, 1848:8, 1848:22, 1849:1, 1849:2, 1849:4, 1849:6, 1849:17, 1852:5, 1853:17, 1856:5, 1858:2, 1861:15, 1861:24, 1862:24, 1863:13, 1863:15, 1864:2, 1865:14, 1865:18, 1866:14, 1867:11, 1869:6, 1870:8, 1871:7, 1871:15, 1871:17, 1871:23, 1872:11, 1873:10, 1873:12, 1873:17, 1874:20, 1875:3, 1876:7, 1877:13, 1877:14, 1877:18, 1881:1, 1882:24, 1883:23, 1884:6, 1885:22, 1887:11, 1887:16, 1888:12, 1888:21, 1890:13, 1891:1, 1891:19, 1891:23, 1892:3, 1892:11, 1892:25, 1894:7, 1895:24, 1897:12, 1897:19, 1897:23, 1900:24, 1901:8, 1903:23, 1905:17, 1905:20
ONE-OFF [1] - 1846:3
ONES [6] - 1759:22, 1876:8, 1877:19, 1882:9, 1896:18
ONGOING [2] - 1769:11, 1772:10
ONLINE [6] - 1768:8, 1772:6, 1779:2, 1808:11, 1877:1, 1894:1
ONSITE [8] - 1774:18, 1775:2, 1775:3, 1775:4, 1775:6, 1776:17, 1777:9, 1899:17
OOO [1] - 1758:3
OPEN [3] - 1841:10, 1893:22, 1900:12
OPERATE [1] - 1769:3
OPERATED [1] - 1844:3
OPERATING [3] -

1768:15, 1779:10, 1856:23
OPERATION [1] - 1765:12
OPERATIONAL [1] - 1903:23
OPINION [11] - 1781:4, 1781:6, 1792:1, 1792:2, 1792:7, 1792:9, 1803:23, 1809:19, 1821:6, 1822:2, 1823:12
OPINIONS [6] - 1780:10, 1781:12, 1783:3, 1793:3, 1793:8, 1903:6
OPPORTUNITY [1] - 1760:2
OPPOSED [3] - 1771:12, 1782:20, 1890:16
OPTION [1] - 1904:14
OPTIONS [1] - 1854:3
ORANGE [3] - 1879:6, 1879:14, 1879:20
ORANGE-ISH [1] - 1879:6
ORANGE-YELLOW [1] - 1879:20
ORDER [16] - 1779:25, 1780:4, 1822:24, 1822:25, 1823:4, 1832:20, 1839:14, 1846:11, 1849:18, 1850:3, 1872:10, 1878:13, 1886:1, 1890:23, 1900:21, 1904:22
ORDERS [1] - 1852:2
ORGANIC [1] - 1830:17
ORIGINAL [7] - 1768:3, 1787:19, 1787:21, 1807:1, 1842:8, 1842:10, 1905:19
ORIGINALLY [4] - 1802:11, 1802:16, 1820:1, 1820:3
OTHERWISE [3] - 1759:12, 1848:2, 1901:13
OU-4 [4] - 1875:18, 1875:19, 1875:23, 1899:19
OU-7 [11] - 1775:3, 1775:4, 1775:9, 1775:16, 1775:24, 1776:3, 1776:9,

1777:4, 1777:22, 1778:7, 1778:17
OUS [5] - 1774:22, 1774:25, 1775:1, 1775:3, 1775:6
OUTLINE [2] - 1837:1, 1851:3
OUTLINED [5] - 1847:5, 1855:6, 1881:11, 1895:9, 1895:23
OUTSIDE [1] - 1758:18
OVER-ENGINEER [1] - 1784:19
OVERALL [4] - 1798:18, 1798:20, 1838:13, 1881:23
OVERESTIMATE [1] - 1889:25
OVERLAPPING [1] - 1881:24
OVERRULE [4] - 1760:16, 1765:1, 1860:21, 1902:7
OVERRULED [9] - 1759:4, 1770:10, 1771:21, 1796:13, 1797:16, 1799:21, 1800:6, 1802:10, 1845:12
OVERRUNS [1] - 1821:15
OVERSIGHT [1] - 1822:19
OWN [4] - 1771:12, 1773:1, 1806:16, 1858:11

P

P.M [1] - 1906:6
PAGE [40] - 1759:2, 1814:9, 1814:10, 1832:24, 1833:7, 1835:5, 1835:6, 1835:7, 1836:22, 1836:23, 1839:16, 1839:17, 1840:10, 1840:17, 1847:19, 1849:3, 1850:7, 1852:20, 1855:9, 1855:15, 1855:16, 1857:19, 1858:20, 1861:9, 1865:25, 1866:1, 1873:9, 1874:12, 1880:2, 1881:7, 1884:22, 1884:23, 1884:24, 1884:25, 1886:24,

1888:8, 1905:25
**PAGES**[3] - 1852:16, 1873:10, 1906:2
**PAID**[5] - 1787:25, 1802:11, 1804:1, 1815:23, 1821:14
**PARAGRAPH**[6] - 1839:11, 1839:20, 1840:11, 1840:12, 1840:13, 1840:24
**PARDON**[1] - 1798:3
**PART**[14] - 1769:6, 1775:16, 1775:24, 1776:3, 1776:9, 1781:11, 1785:4, 1818:23, 1824:17, 1843:21, 1893:4, 1903:6, 1904:7, 1904:8
**PARTICIPATE**[2] - 1778:18, 1778:20
**PARTICIPATED**[1] - 1778:14
**PARTICIPATES**[1] - 1778:10
**PARTICIPATION**[1] - 1777:25
**PARTICULAR**[6] - 1772:24, 1773:6, 1773:19, 1797:12, 1803:24, 1863:12
**PARTICULARLY**[1] - 1842:4
**PARTICULARS**[1] - 1769:17
**PARTIES**[8] - 1758:22, 1759:14, 1760:5, 1760:10, 1852:5, 1901:9, 1901:13, 1902:1
**PARTS**[2] - 1776:13, 1822:8
**PAST**[2] - 1828:16, 1900:10
**PATHS**[1] - 1872:14
**PATHWAY**[13] - 1846:13, 1846:22, 1846:23, 1846:25, 1847:2, 1847:8, 1848:23, 1849:14, 1849:15, 1850:2, 1854:23, 1868:9
**PATHWAYS**[14] - 1846:19, 1846:20, 1847:5, 1847:9, 1847:12, 1848:6, 1848:7, 1848:12, 1848:15, 1848:16, 1849:2, 1849:7, 1849:24, 1898:25

**PATRICK**[1] - 1758:10
**PAUSE**[1] - 1789:12
**PAY**[13] - 1792:17, 1795:16, 1795:24, 1797:13, 1797:21, 1802:5, 1802:6, 1803:10, 1803:12, 1803:13, 1803:14, 1822:6, 1822:8
**PAYING**[1] - 1804:22
**PAYMENT**[1] - 1781:23
**PAYMENTS**[1] - 1783:11
**PC-4A**[1] - 1874:19
**PCE**[11] - 1785:13, 1832:18, 1839:4, 1840:3, 1866:11, 1866:16, 1886:6, 1895:4, 1895:12, 1895:13, 1903:24
**PENCIL**[1] - 1808:24
**PENDING**[1] - 1761:9
**PEOPLE**[3] - 1821:2, 1841:9, 1900:11
**PER**[1] - 1789:8
**PERCENT**[3] - 1798:14, 1798:18, 1887:20
**PERCHLORATE**[1] - 1782:11
**PERCHLORATE**[56] - 1765:9, 1765:21, 1779:3, 1779:15, 1780:17, 1780:22, 1782:14, 1782:25, 1783:1, 1785:12, 1785:17, 1786:12, 1786:24, 1787:16, 1789:18, 1789:23, 1789:24, 1790:4, 1790:8, 1790:22, 1790:23, 1790:25, 1792:7, 1792:17, 1793:16, 1794:22, 1795:11, 1795:16, 1796:6, 1799:17, 1800:4, 1800:15, 1801:17, 1802:19, 1802:23, 1803:5, 1803:8, 1806:19, 1807:1, 1807:12, 1820:2, 1820:5, 1820:6, 1824:2, 1828:4, 1870:5, 1870:14, 1876:5, 1876:9, 1876:12, 1876:14, 1879:5, 1879:21, 1879:25,

1880:16, 1881:13
**PERCHLORATE'S**[1] - 1796:20
**PERCIPIENT**[1] - 1792:23
**PERFECTLY**[1] - 1759:20
**PERFORM**[1] - 1868:14
**PERFORMED**[1] - 1877:9
**PERHAPS**[2] - 1759:20, 1847:24
**PERIOD**[5] - 1815:5, 1861:13, 1862:2, 1863:2, 1863:7
**PERMIT**[20] - 1769:3, 1771:19, 1772:19, 1772:23, 1773:24, 1774:8, 1774:13, 1779:5, 1779:17, 1779:22, 1779:23, 1780:1, 1780:7, 1805:24, 1806:7, 1806:10, 1806:18, 1807:2, 1824:10
**PERMITS**[1] - 1772:21
**PERMITTED**[1] - 1906:2
**PERMITTING**[18] - 1764:13, 1766:17, 1766:21, 1767:10, 1767:14, 1768:1, 1768:7, 1768:23, 1768:25, 1769:6, 1769:20, 1772:10, 1772:13, 1773:3, 1773:6, 1773:17, 1773:20, 1824:12
**PERSONALLY**[2] - 1796:20, 1798:17
**PERSPECTIVE**[3] - 1796:3, 1804:18, 1805:6
**PERTAIN**[1] - 1775:2
**PFAS**[2] - 1820:1, 1820:3
**PH.D**[1] - 1869:3
**PHRASED**[2] - 1832:11, 1833:18
**PHRASING**[2] - 1832:12, 1832:13
**PHYSICAL**[1] - 1847:8
**PHYSICALLY**[1] - 1762:3
**PICTURE**[2] - 1849:16, 1881:24
**PIECES**[1] - 1810:14

**PIPELINES**[1] - 1822:21
**PIPES**[1] - 1787:3
**PIPING**[2] - 1785:23, 1808:25
**PLAINTIFF**[3] - 1758:11, 1761:12, 1904:19
**PLAINTIFF'S**[1] - 1758:9
**PLAN**[5] - 1775:11, 1776:10, 1825:8, 1850:22, 1856:16
**PLANNED**[2] - 1893:3, 1893:5
**PLANS**[2] - 1822:18, 1825:5
**PLANT**[8] - 1782:16, 1782:19, 1788:16, 1802:21, 1820:14, 1822:17, 1876:21, 1897:8
**PLATFORM**[1] - 1826:6
**PLAY**[2] - 1761:22, 1848:2
**PLOT**[1] - 1890:22
**PLUME**[14] - 1765:21, 1775:5, 1856:1, 1874:14, 1881:4, 1881:9, 1881:16, 1881:21, 1884:6, 1884:14, 1899:4, 1899:17
**PLUMES**[1] - 1881:24
**PLUS**[2] - 1790:25, 1791:3
**POINT**[25] - 1760:4, 1771:20, 1788:3, 1789:1, 1797:4, 1797:6, 1803:6, 1806:14, 1812:6, 1814:22, 1814:24, 1816:2, 1817:9, 1817:11, 1824:20, 1831:23, 1867:19, 1868:12, 1869:12, 1873:25, 1877:15, 1895:17, 1900:22, 1903:17, 1903:22
**POLLUTANT**[1] - 1779:23
**POLLUTER**[1] - 1852:8
**PORTION**[13] - 1761:17, 1866:24, 1874:9, 1875:8, 1875:25, 1878:10, 1881:20, 1883:1, 1884:25, 1885:9,

1885:10, 1887:2, 1904:9
**POSITION**[1] - 1761:23
**POSSIBILITIES**[1] - 1897:22
**POSSIBILITY**[8] - 1833:19, 1844:16, 1844:22, 1845:7, 1854:17, 1859:23, 1898:1, 1898:9
**POSSIBLE**[14] - 1768:14, 1768:16, 1789:18, 1793:22, 1794:1, 1811:15, 1832:4, 1832:15, 1832:16, 1833:15, 1833:23, 1845:20, 1846:2, 1897:19
**POTABLE**[2] - 1768:8, 1769:3
**POTENTIAL**[36] - 1783:22, 1810:24, 1832:20, 1834:16, 1834:23, 1836:4, 1836:7, 1836:15, 1837:2, 1837:4, 1837:6, 1837:10, 1837:11, 1838:1, 1838:18, 1838:23, 1839:1, 1839:4, 1839:13, 1839:24, 1840:3, 1840:21, 1846:19, 1847:2, 1849:24, 1851:6, 1862:1, 1877:8, 1877:13, 1885:6, 1886:20, 1893:12, 1894:13, 1895:9
**POTENTIALLY**[5] - 1843:18, 1874:6, 1881:12, 1881:15, 1881:19
**PRACTICE**[4] - 1809:9, 1809:18, 1821:3, 1821:6
**PREDECESSORS**[1] - 1827:16
**PREDISPOSITION**[1] - 1904:16
**PREFER**[1] - 1832:11
**PREFERENCE**[1] - 1762:16
**PREPARE**[11] - 1758:25, 1765:8, 1780:16, 1781:12, 1808:16, 1808:19, 1818:12, 1820:24, 1828:18, 1830:5, 1868:17

**UNITED STATES DISTRICT COURT**

PREPARED [18] - 1769:6, 1784:24, 1785:3, 1786:4, 1817:25, 1831:7, 1832:12, 1834:25, 1844:25, 1863:24, 1864:5, 1865:11, 1878:14, 1878:16, 1878:17, 1882:11, 1887:7, 1889:13
PREPARING [4] - 1769:2, 1783:2, 1783:3, 1822:18
PRESENCE [6] - 1758:4, 1758:18, 1763:11, 1841:14, 1841:17, 1900:16
PRESENT [3] - 1826:3, 1841:19
PRESENTATION [1] - 1758:25
PRESENTED [4] - 1848:20, 1859:24, 1878:15, 1884:17
PRESSURE [1] - 1812:5
PRESUME [1] - 1873:14
PRETTY [2] - 1797:19, 1810:10
PREVALENT [2] - 1889:6, 1889:8
PREVALENTLY [1] - 1885:21
PREVENTING [1] - 1796:17
PREVIOUS [1] - 1840:10
PREVIOUSLY [1] - 1764:9
PREVIOUSLY [3] - 1759:14, 1763:23, 1888:12
PRICE [3] - 1783:25, 1784:4, 1788:7
PRICES [1] - 1817:16
PRICING [1] - 1816:4
PRIMARY [1] - 1898:5
PRINCIPAL [2] - 1794:17, 1798:7
PRINCIPLE [3] - 1785:15, 1901:21, 1901:24
PRINCIPLES [2] - 1809:14, 1810:16
PRIORITY [1] - 1806:10
PRIVILEGE [1] - 1828:24
PROBABLE [3] -

1834:4, 1834:8, 1834:13
PROBATIVE [1] - 1834:1
PROBLEM [3] - 1763:8, 1783:16, 1852:6
PROCEED [8] - 1764:5, 1792:12, 1814:13, 1843:2, 1847:23, 1864:24, 1904:11, 1904:12
PROCEEDING [2] - 1803:22, 1904:14
PROCEEDINGS [1] - 1906:6
PROCESS [45] - 1760:23, 1761:5, 1766:21, 1767:7, 1767:10, 1768:1, 1768:6, 1768:7, 1768:23, 1769:7, 1769:9, 1769:11, 1769:21, 1772:10, 1772:13, 1773:3, 1773:7, 1773:17, 1773:20, 1776:1, 1776:11, 1777:4, 1777:6, 1777:18, 1777:19, 1777:20, 1777:22, 1777:24, 1778:6, 1781:22, 1807:16, 1823:21, 1824:8, 1824:9, 1824:10, 1824:12, 1824:18, 1837:1, 1837:5, 1837:8, 1839:1, 1839:25, 1840:5, 1877:3, 1877:12
PROCESSES [1] - 1886:20
PROCESSING [1] - 1783:11
PRODUCE [1] - 1856:24
PRODUCING [2] - 1878:11, 1883:2
PRODUCTION [17] - 1775:15, 1776:21, 1776:23, 1777:1, 1782:8, 1797:5, 1804:14, 1866:16, 1867:1, 1867:3, 1867:23, 1870:14, 1874:23, 1877:18, 1878:2, 1878:11, 1883:20
PROFESSION [2] - 1772:1, 1810:22

PROFESSIONAL [4] - 1869:25, 1870:2, 1870:18, 1877:7
PROGRESS [1] - 1783:11
PROJECT [58] - 1777:24, 1781:19, 1781:21, 1782:15, 1782:17, 1782:22, 1783:9, 1783:11, 1783:20, 1784:13, 1784:14, 1784:15, 1784:20, 1786:18, 1787:4, 1787:20, 1790:2, 1798:18, 1798:21, 1799:4, 1799:7, 1799:9, 1802:19, 1810:2, 1810:7, 1810:9, 1810:10, 1810:18, 1810:22, 1811:6, 1811:17, 1813:4, 1813:6, 1813:11, 1813:16, 1813:22, 1814:24, 1815:13, 1816:5, 1816:7, 1816:8, 1816:9, 1816:11, 1817:5, 1820:12, 1820:16, 1820:17, 1822:24, 1825:6, 1827:19, 1827:25, 1828:1, 1828:8, 1828:11, 1842:14, 1870:19
PROJECTS [17] - 1783:25, 1796:18, 1798:17, 1799:5, 1811:12, 1815:15, 1816:6, 1818:13, 1818:15, 1818:17, 1818:18, 1819:7, 1825:4, 1825:17, 1827:23, 1828:15, 1870:13
PROMISED [1] - 1766:12
PRONOUNCE [1] - 1866:13
PRONOUNCED [1] - 1866:14
PROPER [2] - 1792:24, 1902:6
PROPERLY [1] - 1758:25
PROPERTY [3] - 1846:17, 1887:10, 1905:4
PROPOSE [1] - 1814:6
PROTECT [2] -

1765:13, 1796:18
PROTECTION [1] - 1768:16
PROTECTS [1] - 1796:5
PROVIDE [8] - 1758:21, 1768:4, 1768:16, 1792:7, 1805:9, 1837:20, 1849:23, 1905:8
PROVIDED [6] - 1760:15, 1764:19, 1805:21, 1817:25, 1828:10, 1903:14
PROVIDES [2] - 1810:23, 1902:19
PROVIDING [3] - 1805:3, 1806:17, 1829:2
PUBLIC [6] - 1777:20, 1777:22, 1777:24, 1822:20
PUBLIC [3] - 1843:10, 1843:14, 1843:15
PUBLICLY [2] - 1877:2, 1878:19
PUBLISH [7] - 1784:25, 1843:19, 1851:15, 1860:18, 1864:13, 1878:22, 1886:24
PUBLISHED [4] - 1810:17, 1845:3, 1864:8, 1865:14
PUMP [8] - 1870:21, 1871:3, 1871:4, 1871:5, 1871:20, 1872:16, 1873:18
PUMPED [3] - 1817:17, 1861:5, 1862:25
PUMPING [28] - 1818:6, 1860:1, 1860:2, 1861:14, 1861:17, 1861:21, 1862:21, 1862:22, 1863:13, 1871:5, 1871:6, 1871:9, 1871:11, 1871:12, 1871:16, 1872:5, 1872:7, 1872:20, 1872:21, 1872:25, 1873:20, 1874:4, 1875:4, 1876:1, 1878:9, 1884:9, 1891:13, 1891:15
PUMPS [4] - 1784:7, 1785:23, 1787:3, 1808:25
PURCHASING [2] -

1811:18, 1813:17
PURELY [1] - 1848:17
PURPOSE [2] - 1835:9, 1835:13
PURPOSE [11] - 1835:22, 1836:1, 1836:3, 1836:24, 1836:25, 1837:22, 1838:9, 1860:22, 1865:10, 1876:18
PURPOSES [4] - 1761:10, 1769:3, 1784:25, 1865:18
PURSUANT [3] - 1776:14, 1795:6, 1797:24
PUSHING [1] - 1782:13
PUT [20] - 1765:18, 1776:25, 1782:21, 1786:13, 1793:21, 1811:13, 1822:18, 1822:24, 1823:5, 1823:19, 1825:4, 1825:6, 1850:7, 1855:20, 1855:22, 1856:4, 1863:24, 1864:25, 1880:12, 1891:11
PUTTING [1] - 1768:3

## Q

Q-2 [25] - 1782:10, 1782:23, 1782:24, 1782:25, 1783:4, 1786:24, 1790:2, 1790:4, 1802:7, 1802:12, 1802:15, 1802:20, 1802:23, 1803:1, 1803:6, 1803:8, 1803:18, 1804:9, 1804:10, 1804:11, 1804:23, 1805:1, 1805:13, 1816:9, 1821:12
QUALITY [2] - 1875:24, 1893:7
QUALITY [2] - 1893:17, 1894:4
QUATERNARY [1] - 1861:10
QUATERNARY [1] - 1866:12
QUESTION [4] - 1814:19, 1814:22, 1848:4, 1848:11
QUESTIONING [1] - 1792:1
QUESTIONS [7] -

19

1793:13, 1794:10, 1807:15, 1848:5, 1861:3, 1868:11, 1890:2
**QUICK** [1] - 1872:21
**QUICKLY** [12] - 1768:14, 1768:16, 1779:8, 1783:1, 1784:20, 1793:22, 1794:1, 1795:16, 1796:24, 1797:7, 1871:13, 1898:4
**QUITE** [4] - 1808:18, 1845:23, 1862:4, 1876:15

## R

**RAINFALL** [2] - 1862:5, 1863:14
**RAISE** [2] - 1771:18, 1826:7
**RAISED** [2] - 1770:7, 1901:15
**RAN** [1] - 1793:9
**RAP** [8] - 1775:12, 1775:16, 1775:24, 1776:3, 1776:9, 1776:14, 1777:4, 1850:22
**RATE** [3] - 1789:7, 1789:8, 1871:11
**RATES** [1] - 1818:6
**RATHER** [4] - 1758:22, 1810:24, 1893:1, 1903:3
**REACH** [2] - 1853:25, 1888:17
**REACHED** [5] - 1795:1, 1817:15, 1818:1, 1818:4, 1821:17
**READ** [15] - 1762:15, 1762:17, 1814:7, 1814:18, 1836:2, 1847:24, 1848:2, 1850:9, 1850:10, 1851:10, 1852:14, 1852:17, 1854:21, 1858:23, 1866:18
**READY** [4] - 1764:5, 1764:7, 1827:4, 1848:2
**REAL** [3] - 1781:16, 1783:15
**REAL-LIFE** [1] - 1781:16
**REALIZE** [2] - 1813:24, 1823:8
**REALIZED** [6] -

1786:15, 1787:3, 1789:2, 1815:12, 1815:23, 1817:10
**REALLY** [17] - 1760:24, 1761:1, 1766:11, 1783:24, 1784:13, 1805:2, 1805:8, 1805:9, 1810:25, 1866:23, 1874:7, 1874:8, 1874:24, 1882:14, 1886:13, 1887:22, 1905:14
**REASON** [12] - 1772:18, 1780:5, 1792:20, 1807:1, 1836:6, 1850:25, 1860:23, 1869:7, 1891:22, 1902:19, 1904:13, 1905:16
**REASONABLE** [1] - 1861:24
**REASONS** [5] - 1807:5, 1807:10, 1891:20, 1892:11, 1895:9
**REBUT** [2] - 1781:12, 1903:7
**REBUTS** [1] - 1904:4
**REBUTTAL** [7] - 1761:14, 1761:25, 1780:16, 1902:4, 1902:10, 1902:17, 1902:23
**REBUTTING** [2] - 1902:24, 1903:5
**RECEIVE** [3] - 1765:25, 1766:14, 1904:21
**RECEIVED** [10] - 1761:18, 1766:1, 1812:1, 1831:1, 1831:2, 1844:7, 1844:8, 1851:18, 1853:7, 1904:23
**RECENT** [6] - 1786:18, 1786:23, 1790:2, 1815:13, 1816:11, 1828:16
**RECENTLY** [6] - 1781:15, 1810:22, 1811:1, 1812:13, 1813:4, 1883:4
**RECESS** [2] - 1841:15, 1906:5
**RECHARGE** [1] - 1863:14
**RECOGNIZE** [1] - 1878:23
**RECOGNIZED** [4] -

1810:6, 1810:16, 1810:21, 1852:21
**RECOLLECTION** [8] - 1771:23, 1831:25, 1846:7, 1858:24, 1859:4, 1876:4, 1876:8, 1886:4
**RECOMMEND** [2] - 1851:24, 1852:4
**RECOMMENDATION** [2] - 1777:16, 1849:21
**RECOMMENDATIONS** [5] - 1838:13, 1865:21, 1882:24, 1883:8, 1893:6
**RECOMMENDATIONS** [1] - 1838:22
**RECOMMENDED** [9] - 1832:21, 1849:19, 1850:1, 1850:13, 1850:24, 1851:7, 1853:14, 1855:13, 1855:25
**RECORD** [6] - 1763:12, 1826:14, 1841:18, 1873:8, 1902:3, 1903:22
**RECORDS** [6] - 1902:12, 1903:2, 1903:3, 1903:12, 1903:15, 1903:23
**RECROSS** [1] - 1825:1
**RECROSS-EXAMINATION** [1] - 1825:1
**RED** [4] - 1874:16, 1879:12, 1879:13, 1880:16
**REDIRECT** [2] - 1819:22, 1890:6
**REDIRECT** [1] - 1890:4
**REDO** [1] - 1770:23
**REDUNDANT** [1] - 1787:8
**REFER** [10] - 1832:7, 1838:16, 1838:17, 1839:23, 1839:24, 1847:3, 1847:18, 1850:5, 1850:12, 1856:9
**REFERENCE** [3] - 1847:1, 1882:12, 1902:16
**REFERENCED** [4] - 1870:3, 1872:19, 1882:23, 1888:10
**REFERENCING** [1] -

1873:10
**REFERRED** [3] - 1826:17, 1838:20, 1870:24
**REFERRING** [9] - 1795:25, 1825:15, 1830:13, 1832:8, 1838:24, 1839:25, 1859:7, 1863:23, 1901:4
**REFINE** [1] - 1872:12
**REFINED** [1] - 1888:2
**REFLECT** [1] - 1904:12
**REFRESH** [4] - 1831:24, 1846:6, 1857:23, 1859:4
**REFRESHES** [1] - 1858:24
**REFUSING** [1] - 1797:23
**REGARD** [3] - 1783:10, 1785:22, 1813:8
**REGARDING** [12] - 1773:20, 1793:10, 1802:14, 1803:18, 1806:1, 1818:1, 1840:13, 1840:14, 1868:13, 1875:22, 1888:18, 1901:18
**REGARDLESS** [2] - 1819:17, 1832:13
**REGARDS** [1] - 1768:25
**REGIONAL** [2] - 1828:3, 1854:25
**REGIONAL** [1] - 1893:17, 1893:23, 1894:4
**REGIONALLY** [3] - 1862:20, 1870:15, 1880:1
**REGISTERED** [1] - 1870:1
**REGULATED** [2] - 1894:2, 1894:3
**REGULATORY** [1] - 1781:9
**RELATE** [1] - 1853:20
**RELATED** [11] - 1766:22, 1827:23, 1828:3, 1828:15, 1850:21, 1855:7, 1864:5, 1870:5, 1870:7, 1870:13, 1877:22
**RELATES** [3] - 1778:16, 1791:12, 1882:19

**RELATING** [4] - 1828:13, 1837:25, 1848:5, 1851:21
**RELATIVE** [2] - 1810:1, 1857:13
**RELATIVELY** [1] - 1886:3
**RELEASE** [3] - 1876:14, 1881:15, 1893:21
**RELEASED** [1] - 1880:24
**RELEASES** [3] - 1854:19, 1876:12, 1881:25
**RELEVANCE** [2] - 1765:2, 1771:19
**RELEVANT** [7] - 1767:16, 1767:21, 1783:3, 1783:4, 1813:10, 1829:9, 1877:5
**RELIABILITY** [1] - 1821:8
**RELIABLE** [3] - 1815:12, 1822:2, 1823:11
**RELIED** [2] - 1819:24, 1904:5
**RELY** [2] - 1813:21, 1821:13
**RELYING** [2] - 1786:5, 1786:6
**REMAIN** [3] - 1763:12, 1841:18, 1841:21
**REMAINING** [1] - 1900:22
**REMEDIAL** [2] - 1775:11, 1850:22
**REMEDY** [3] - 1774:19, 1775:7, 1775:10
**REMEMBER** [9] - 1774:22, 1774:24, 1800:20, 1800:22, 1803:24, 1831:22, 1841:8, 1898:14, 1900:11
**REMOVAL** [1] - 1818:18
**REMOVE** [3] - 1782:14, 1793:5, 1826:18
**REMOVED** [1] - 1793:18
**RENDER** [1] - 1792:6
**RENDERED** [1] - 1792:9
**REPEAT** [3] - 1795:21, 1806:3, 1875:20

UNITED STATES DISTRICT COURT

REPEATED[1] - 1846:1
REPEATEDLY[1] - 1767:7
REPHRASE[2] - 1782:4, 1817:23
REPLACEMENT[1] - 1804:2
REPORT[112] - 1766:14, 1767:15, 1780:16, 1785:4, 1791:16, 1791:20, 1813:25, 1818:1, 1830:6, 1830:16, 1830:19, 1830:21, 1831:7, 1831:12, 1831:14, 1831:18, 1832:3, 1832:7, 1832:8, 1832:11, 1832:12, 1833:18, 1833:20, 1834:5, 1834:11, 1834:25, 1835:1, 1835:3, 1835:4, 1835:23, 1836:6, 1836:9, 1836:11, 1836:13, 1836:14, 1836:22, 1837:17, 1837:22, 1838:5, 1838:19, 1839:17, 1840:8, 1844:10, 1844:13, 1844:25, 1845:3, 1845:8, 1845:16, 1845:18, 1845:24, 1846:18, 1847:3, 1847:5, 1848:12, 1848:16, 1848:20, 1849:7, 1849:9, 1850:1, 1850:5, 1851:2, 1851:3, 1851:4, 1851:5, 1851:8, 1851:11, 1851:23, 1855:5, 1855:9, 1859:22, 1860:14, 1860:25, 1861:4, 1863:17, 1863:23, 1863:24, 1864:8, 1864:16, 1864:17, 1865:1, 1865:10, 1865:11, 1865:14, 1865:16, 1865:18, 1865:21, 1866:4, 1867:15, 1868:8, 1876:17, 1879:1, 1879:23, 1880:3, 1880:6, 1880:22, 1881:11, 1883:9, 1884:23, 1887:2, 1887:7, 1889:3, 1889:13,

1889:19, 1890:9, 1890:19, 1891:9, 1892:1, 1895:10, 1895:23, 1898:4
REPORT[1] - 1830:18
REPORTED[2] - 1801:1, 1893:18
REPORTER'S[1] - 1842:16
REPORTING[3] - 1771:11, 1886:5, 1886:7
REPORTS[8] - 1769:16, 1772:22, 1777:23, 1830:11, 1854:21, 1864:1, 1864:4, 1878:16
REPRESENT[3] - 1874:16, 1880:4, 1882:17
REPRESENTATIVES[5] - 1770:12, 1770:23, 1771:15, 1793:24, 1794:2
REPRESENTED[3] - 1860:16, 1883:6, 1887:13
REPRESENTING[1] - 1880:7
REPRESENTS[4] - 1829:1, 1879:19, 1879:21, 1882:7
REPURPOSED[1] - 1802:18
REQUEST[8] - 1766:6, 1766:10, 1777:17, 1778:4, 1778:7, 1801:15, 1804:6, 1850:3
REQUESTING[3] - 1769:18, 1797:12, 1843:16
REQUIRE[5] - 1780:7, 1811:18, 1822:15, 1850:18, 1850:22
REQUIRED[11] - 1780:22, 1780:25, 1787:6, 1791:9, 1792:10, 1792:15, 1795:7, 1799:25, 1839:14, 1852:13
REQUIREMENT[1] - 1781:9
REQUIREMENTS[1] - 1800:8
REQUIRES[2] - 1788:20, 1823:22
REQUIRING[1] - 1792:5
RESOLVE[3] -

1762:13, 1763:2, 1901:24
RESOLVED[1] - 1901:14
RESPECT[6] - 1768:23, 1837:10, 1837:25, 1900:21, 1901:14, 1904:24
RESPOND[6] - 1764:22, 1766:7, 1801:15, 1833:5, 1851:8, 1871:9
RESPONDED[2] - 1772:24, 1829:3, 1872:20
RESPONDING[2] - 1770:1, 1878:9
RESPONDS[1] - 1902:18
RESPONSE[25] - 1765:9, 1766:4, 1799:17, 1800:22, 1801:1, 1801:5, 1801:7, 1801:10, 1801:11, 1801:18, 1806:17, 1842:8, 1861:5, 1861:14, 1862:21, 1871:5, 1872:23, 1872:25, 1875:5, 1875:6, 1891:16, 1891:17, 1904:18, 1904:19, 1905:9
RESPONSES[5] - 1801:19, 1874:4, 1891:13, 1891:14
RESPONSIBILITIES[4] - 1798:10, 1798:12, 1799:22, 1828:13
RESPONSIBILITY[1] - 1852:8
RESPONSIBLE[1] - 1798:11
RESTORE[2] - 1768:5, 1768:14
RESUBMIT[1] - 1769:10
RESULT[5] - 1863:18, 1863:20, 1866:17, 1881:12, 1881:25
RESULTANT[2] - 1881:13, 1881:14
RESULTED[1] - 1890:8
RESULTS[3] - 1765:14, 1770:24, 1809:25
RESUME[2] - 1763:6, 1763:19

RESUMED[1] - 1764:10
RETAINED[1] - 1780:11
RETENTION[1] - 1780:15
RETURNED[2] - 1862:19, 1870:25
REVIEW[10] - 1760:2, 1829:5, 1868:17, 1902:13, 1902:20, 1903:4, 1903:6, 1903:9, 1903:12, 1903:13
REVIEWED[5] - 1859:2, 1883:3, 1883:5, 1902:12, 1903:11
REVIEWING[2] - 1808:21, 1845:16
REVISED[1] - 1770:24
RICHARD[53] - 1758:10, 1761:14, 1762:4, 1764:25, 1767:19, 1767:23, 1770:2, 1770:8, 1771:18, 1773:9, 1774:3, 1775:21, 1785:2, 1786:8, 1791:15, 1791:24, 1792:14, 1792:22, 1793:2, 1794:7, 1794:9, 1796:19, 1797:18, 1800:2, 1800:9, 1802:13, 1811:14, 1811:16, 1811:22, 1814:6, 1814:11, 1814:14, 1817:22, 1817:25, 1819:20, 1820:9, 1821:9, 1823:13, 1824:4, 1824:19, 1825:2, 1825:20, 1833:1, 1833:4, 1833:7, 1847:20, 1847:22, 1901:17, 1902:11, 1902:18, 1902:25, 1903:10, 1903:20
RICHARD[5] - 1758:10, 1761:13, 1791:23, 1824:25, 1901:15
RICK[1] - 1839:20
RIGHT-HAND[1] - 1874:12
RIGHT-OF-WAY[1] - 1822:20
RISE[2] - 1841:12,

1900:14
RIVER[1] - 1779:20
RIVER[1] - 1780:8
RN[1] - 1874:19
RN-W4A[1] - 1874:19
ROLE[1] - 1808:14
ROUND[1] - 1788:8
ROUTE[1] - 1778:7
ROUTINELY[3] - 1808:16, 1809:14, 1818:12
RULE[1] - 1839:14
RULED[1] - 1901:3
RULING[5] - 1758:22, 1758:24, 1759:3, 1759:6, 1759:7
RUN[4] - 1786:25, 1796:6, 1796:9, 1796:18

## S

S-1[12] - 1854:10, 1857:12, 1857:17, 1860:2, 1861:17, 1866:15, 1866:21, 1866:24, 1867:17, 1871:19, 1874:5, 1892:16
S-2[3] - 1854:10, 1867:17, 1871:19
S-3[1] - 1892:19
S-3A[1] - 1874:6
S-3C[2] - 1872:25, 1873:1
SACRAMENTO[1] - 1818:11
SAKE[1] - 1842:16
SAMPLE[1] - 1897:13
SAMPLED[2] - 1897:3, 1897:15
SAMPLES[2] - 1887:21, 1887:22
SANCTION[1] - 1904:23
SANTA[6] - 1758:6, 1763:12, 1779:20, 1827:15, 1828:2, 1828:4
SAUGUS[119] - 1779:13, 1780:18, 1780:20, 1781:8, 1782:11, 1782:16, 1784:13, 1786:20, 1788:16, 1788:19, 1802:21, 1804:13, 1804:14, 1805:2, 1817:13, 1818:6, 1820:16, 1822:17, 1823:3, 1830:17,

1832:18, 1832:19, 1835:2, 1836:4, 1839:1, 1839:5, 1839:9, 1839:10, 1839:12, 1840:2, 1840:14, 1852:2, 1854:24, 1855:3, 1856:14, 1856:17, 1856:21, 1859:6, 1859:18, 1861:5, 1861:14, 1861:21, 1862:18, 1862:19, 1862:23, 1862:25, 1863:20, 1866:24, 1867:1, 1870:24, 1870:25, 1871:21, 1872:2, 1872:9, 1872:10, 1872:15, 1873:3, 1874:6, 1874:23, 1876:16, 1876:19, 1877:16, 1877:17, 1878:15, 1879:1, 1879:4, 1879:5, 1879:8, 1880:19, 1880:20, 1883:1, 1883:20, 1883:21, 1885:15, 1885:18, 1885:21, 1885:24, 1886:22, 1887:5, 1887:18, 1888:19, 1888:23, 1888:25, 1889:1, 1889:2, 1889:10, 1889:13, 1889:14, 1889:16, 1891:3, 1891:8, 1891:10, 1891:12, 1891:13, 1892:15, 1895:1, 1895:22, 1896:8, 1896:13, 1896:14, 1896:15, 1896:16, 1896:19

**SAVE** [1] - 1810:3
**SAW** [3] - 1768:15, 1800:19, 1872:21
**SCADA** [2] - 1787:11, 1787:12
**SCALE** [1] - 1849:16
**SCATTERED** [2] - 1872:1, 1885:8
**SCENARIO** [1] - 1820:7
**SCIENTIST** [1] - 1862:10
**SCOPE** [5] - 1780:15, 1791:16, 1792:18, 1792:20, 1824:20
**SCREEN** [2] - 1835:18, 1877:4
**SCREENED** [5] -

1872:3, 1885:2, 1894:18, 1894:20, 1894:24
**SCREENING** [7] - 1837:5, 1837:8, 1838:25, 1839:25, 1840:5, 1877:11, 1877:12
**SEASONALLY** [1] - 1862:3
**SEAT** [4] - 1766:25, 1767:8, 1768:22, 1783:9
**SEATED** [4] - 1758:17, 1763:21, 1826:13, 1900:19
**SECOND** [7] - 1768:4, 1835:25, 1840:11, 1840:24, 1852:20, 1864:2, 1866:8
**SECOND-TO-THE-LAST** [1] - 1835:25
**SECONDS** [1] - 1761:15
**SECTION** [14] - 1835:9, 1835:19, 1835:22, 1836:24, 1837:1, 1837:17, 1838:10, 1838:12, 1840:12, 1861:10, 1865:24, 1866:3, 1889:4, 1889:7
**SECTION** [6] - 1835:17, 1836:21, 1838:4, 1840:11
**SECTIONAL** [1] - 1857:7
**SEE** [40] - 1763:2, 1765:19, 1776:24, 1787:14, 1792:20, 1799:12, 1804:6, 1805:10, 1835:9, 1835:18, 1836:1, 1838:19, 1838:21, 1838:22, 1841:11, 1857:6, 1858:23, 1860:8, 1862:7, 1862:16, 1862:20, 1866:5, 1871:8, 1872:5, 1875:2, 1875:5, 1875:7, 1877:23, 1877:25, 1879:23, 1882:8, 1883:5, 1884:20, 1884:21, 1890:25, 1891:12, 1891:14, 1896:14, 1900:13, 1904:9
**SEEKING** [1] - 1860:16

**SEISMIC** [1] - 1784:8
**SELL** [2] - 1784:12, 1784:18
**SEMANTICS** [3] - 1845:15, 1845:19, 1848:19
**SEND** [2] - 1800:16, 1830:22
**SENDS** [1] - 1800:11
**SENT** [5] - 1801:7, 1801:12, 1831:9, 1831:12, 1851:11
**SENTENCE** [6] - 1836:1, 1836:2, 1840:1, 1840:24, 1866:8, 1876:17
**SENTRY** [2] - 1776:20
**SEPARATE** [3] - 1782:17, 1873:20, 1891:11
**SEPTEMBER** [3] - 1831:24, 1844:11, 1851:20
**SERVE** [1] - 1807:3
**SERVED** [1] - 1785:5
**SERVICE** [5] - 1765:19, 1793:18, 1862:19, 1870:25
**SET** [3] - 1810:16, 1877:8, 1877:23
**SETS** [1] - 1873:9
**SETTLEMENT** [5] - 1795:7, 1795:10, 1799:16, 1799:23, 1804:8
**SETUP** [1] - 1820:8
**SEVEN** [2] - 1774:25, 1902:15
**SEVERAL** [2] - 1846:1, 1896:23
**SEVERELY** [1] - 1824:9
**SHADED** [7] - 1879:6, 1879:11, 1879:20, 1880:7, 1880:8, 1880:14, 1882:10
**SHADING** [2] - 1880:16, 1882:9
**SHALL** [2] - 1826:9
**SHALLOW** [2] - 1866:17, 1867:1
**SHALLOWER** [3] - 1804:12, 1874:5, 1875:8
**SHALLOWEST** [1] - 1876:7
**SHARED** [1] - 1818:23
**SHARP** [1] - 1808:24
**SHORT** [2] - 1796:9, 1899:17

**SHORTLY** [1] - 1762:25
**SHOW** [10] - 1847:5, 1848:20, 1855:12, 1856:2, 1856:10, 1856:17, 1860:24, 1880:23, 1885:5, 1887:5
**SHOWED** [2] - 1802:19, 1872:24
**SHOWING** [3] - 1825:8, 1847:10, 1879:7
**SHOWN** [8] - 1787:14, 1820:5, 1855:13, 1859:21, 1874:15, 1879:18, 1881:14, 1886:2
**SHOWS** [16] - 1802:23, 1822:11, 1879:2, 1879:3, 1879:10, 1880:6, 1884:8, 1884:10, 1885:8, 1885:11, 1885:13, 1885:14, 1887:8, 1899:24, 1902:18
**SHUT** [4] - 1779:10, 1793:15, 1797:5, 1807:2
**SHUTS** [1] - 1796:21
**SIC** [30] - 1832:4, 1833:16, 1834:16, 1839:4, 1852:21, 1852:25, 1853:4, 1853:22, 1854:13, 1854:20, 1855:7, 1855:8, 1856:3, 1856:11, 1856:15, 1857:16, 1859:5, 1859:19, 1868:3, 1868:9, 1877:14, 1887:11, 1888:10, 1896:8, 1896:12, 1896:14, 1896:24, 1897:11, 1897:13, 1897:20
**SIC** [1] - 1894:14
**SIC'S** [1] - 1848:5
**SIDE** [4] - 1875:3, 1877:24, 1884:22, 1889:5
**SIGNIFICANCE** [3] - 1771:6, 1771:16, 1873:3
**SIGNIFICANT** [2] - 1777:9, 1874:2
**SIGNS** [1] - 1776:22
**SIMILAR** [17] - 1782:14, 1785:13,

1785:16, 1787:2, 1788:17, 1788:18, 1789:1, 1813:23, 1813:24, 1815:18, 1817:6, 1820:15, 1822:16, 1823:3, 1865:20, 1877:23, 1887:11
**SIMILARLY** [1] - 1883:18
**SIMPLE** [2] - 1783:25, 1863:14
**SIMPLER** [3] - 1782:22, 1890:23, 1891:7
**SIMPLIFIED** [1] - 1891:9
**SIMPLIFYING** [1] - 1881:23
**SIMPLY** [6] - 1758:24, 1783:6, 1837:19, 1847:10, 1894:6, 1905:9
**SIMPSON** [9] - 1763:4, 1763:18, 1763:19, 1764:4, 1764:12, 1785:11, 1793:3, 1796:20, 1814:5
**SIMPSON** [1] - 1764:8
**SIMPSON'S** [1] - 1763:9
**SINGLE** [5] - 1820:8, 1820:11, 1820:14, 1847:13, 1881:15
**SIT** [8] - 1773:22, 1774:6, 1774:11, 1774:18, 1778:14, 1781:3, 1800:7, 1814:22
**SITE** [39] - 1774:17, 1774:25, 1777:21, 1781:18, 1781:25, 1787:9, 1793:11, 1810:11, 1811:1, 1816:15, 1825:6, 1832:21, 1847:12, 1850:17, 1851:25, 1852:13, 1852:25, 1854:7, 1854:20, 1856:3, 1866:6, 1870:5, 1874:18, 1875:2, 1875:12, 1875:13, 1878:21, 1880:6, 1880:11, 1881:17, 1882:1, 1885:9, 1888:16, 1888:23, 1888:24, 1894:13, 1894:19, 1903:1

SITES [15] - 1877:22, 1878:1, 1878:7, 1880:23, 1886:23, 1888:3, 1889:4, 1889:8, 1893:21, 1894:3, 1894:5, 1894:10, 1895:7, 1895:9, 1897:2
SITTING [1] - 1890:15
SITUATION [2] - 1764:13, 1820:7
SIX [8] - 1813:1, 1813:7, 1817:18, 1818:7, 1863:6, 1863:7, 1863:9, 1898:20
SIX-MONTH [2] - 1863:6, 1863:7
SIX-VESSEL [1] - 1813:1
SIZE [2] - 1784:7, 1785:20
SKIP [1] - 1788:23
SLAB [1] - 1784:7
SLIDE [1] - 1791:5
SLOWER [1] - 1892:22
SMALL [1] - 1870:13
SMATTERING [1] - 1885:14
SOIL [2] - 1775:7, 1880:15
SOLEMNLY [1] - 1826:8
SOLVE [1] - 1852:6
SOMEONE [4] - 1807:16, 1822:7, 1822:8, 1876:21
SOMETIME [1] - 1806:23
SOMEWHERE [3] - 1812:18, 1852:4, 1879:14
SOON [2] - 1758:20, 1764:4
SORRY [31] - 1759:17, 1762:9, 1768:24, 1769:2, 1779:6, 1779:7, 1779:15, 1780:1, 1789:15, 1790:14, 1795:19, 1795:21, 1806:3, 1817:10, 1825:18, 1835:7, 1838:7, 1842:24, 1843:1, 1847:20, 1849:3, 1854:15, 1854:23, 1855:23, 1858:12, 1858:19, 1860:6, 1875:19, 1875:20,

1879:19, 1901:20
SORT [3] - 1762:7, 1777:24, 1781:20
SOUNDS [4] - 1760:4, 1832:1, 1844:18, 1903:7
SOURCE [49] - 1807:8, 1823:22, 1823:24, 1829:12, 1832:4, 1832:14, 1832:18, 1832:20, 1834:23, 1835:2, 1836:15, 1837:7, 1837:12, 1839:9, 1839:12, 1839:13, 1839:15, 1839:22, 1839:24, 1840:7, 1840:21, 1840:22, 1840:25, 1843:18, 1843:24, 1844:2, 1844:17, 1844:22, 1845:7, 1846:2, 1846:12, 1846:16, 1850:2, 1853:25, 1867:22, 1867:24, 1876:22, 1880:12, 1881:19, 1881:21, 1886:11, 1886:14, 1886:16, 1894:12, 1896:3, 1897:21, 1898:9, 1903:1
SOURCES [35] - 1832:15, 1834:16, 1836:4, 1836:7, 1837:2, 1837:4, 1837:10, 1837:11, 1838:1, 1838:16, 1838:17, 1838:18, 1838:23, 1838:24, 1839:1, 1839:4, 1840:3, 1843:11, 1847:7, 1851:6, 1852:22, 1877:8, 1877:13, 1885:6, 1885:7, 1888:18, 1893:12, 1893:16, 1893:17, 1893:20, 1894:6, 1894:22, 1895:12, 1897:7
SOUTHERN [2] - 1880:20
SPEAKING [3] - 1780:14, 1785:19, 1904:1
SPECIFIC [4] - 1771:23, 1829:14, 1890:25, 1897:17
SPECIFICALLY [5] - 1780:19, 1800:20, 1837:24, 1838:14,

1854:19
SPECIFICS [1] - 1774:5
SPECIFY [1] - 1808:25
SPECS [1] - 1822:18
SPECULATION [5] - 1794:6, 1796:11, 1797:15, 1799:20, 1853:15
SPELL [3] - 1826:15, 1842:16, 1842:17
SPEND [1] - 1798:17
SPILL [2] - 1854:8, 1854:13
SPINE [1] - 1814:8
SPRING [2] - 1862:3, 1871:1
STAFF [1] - 1798:20
STAGE [2] - 1810:7, 1810:9
STAMP [1] - 1839:17
STAND [9] - 1762:17, 1763:7, 1763:20, 1826:5, 1833:20, 1834:11, 1835:3, 1844:25, 1845:17
STANDALONE [1] - 1836:20
STANDARD [4] - 1813:19, 1813:20, 1814:3, 1818:8
STANDARDS [1] - 1780:6
STANDS [1] - 1906:4
START [8] - 1761:12, 1790:21, 1801:6, 1811:6, 1811:16, 1827:18, 1871:19
START-UP [1] - 1871:19
STARTED [8] - 1758:20, 1766:18, 1787:20, 1865:13, 1870:9, 1870:19, 1872:22, 1894:8
STARTING [7] - 1758:8, 1788:3, 1789:1, 1810:18, 1816:2, 1817:9, 1817:11
STATE [1] - 1877:2
STATE [9] - 1758:8, 1766:12, 1773:10, 1775:13, 1826:14, 1835:2, 1845:16, 1845:17, 1870:1
STATEMENT [3] - 1761:24, 1867:19, 1868:6
STATIONS [2] -

1894:24
STATUS [13] - 1766:17, 1766:21, 1767:11, 1767:14, 1767:15, 1772:13, 1773:3, 1773:6, 1773:17, 1773:20, 1773:23, 1775:9, 1775:20
STATUTE [1] - 1904:20
STAYING [1] - 1818:22
STEP [10] - 1785:11, 1801:4, 1810:4, 1821:12, 1825:22, 1876:23, 1876:25, 1900:18
STEPS [2] - 1892:25, 1893:5
STEROIDS [1] - 1777:25
STILL [18] - 1761:8, 1761:9, 1763:17, 1772:10, 1774:1, 1774:9, 1785:19, 1785:20, 1785:21, 1807:2, 1822:23, 1825:24, 1839:13, 1881:23, 1902:22, 1903:18
STIPULATED [4] - 1788:11, 1791:6, 1864:20, 1864:22
STONE [3] - 1800:10, 1806:1, 1806:6
STONE [6] - 1800:16, 1801:7, 1851:20, 1852:12, 1853:7, 1853:12
STOP [2] - 1767:4, 1768:18
STOPPED [1] - 1899:17
STOPPING [1] - 1789:21
STORE [2] - 1784:3, 1784:8
STORED [1] - 1903:25
STORM [1] - 1779:20
STORY [1] - 1859:10
STRAIGHTFORWAR D [1] - 1810:12
STRATA [5] - 1892:2, 1892:6, 1892:10, 1892:13, 1893:1
STRATAS [2] - 1892:21, 1892:22
STRATEGY [1] - 1775:14

STREET [1] - 1855:7
STRONG [1] - 1860:2
STUDIED [1] - 1868:20
STUDIES [2] - 1870:3, 1870:4
STUDY [19] - 1765:15, 1765:22, 1765:25, 1766:7, 1766:11, 1804:2, 1860:1, 1862:2, 1862:15, 1862:18, 1863:18, 1865:12, 1870:6, 1870:9, 1870:12, 1876:18, 1877:5, 1890:16, 1890:19
STUDYING [1] - 1870:16
STUFF [1] - 1817:2
SUB [1] - 1828:2
SUB-BASIN [1] - 1828:2
SUBDIVIDE [1] - 1880:17
SUBJECT [9] - 1771:13, 1829:15, 1830:3, 1836:18, 1841:3, 1841:9, 1842:5, 1858:11, 1900:12
SUBMITTED [2] - 1766:23, 1905:2
SUBMITTING [1] - 1819:6
SUBSECTIONS [1] - 1838:12
SUBSEQUENT [4] - 1820:4, 1837:9, 1850:12, 1863:17
SUBSET [1] - 1877:23
SUBSTANCE [1] - 1797:22
SUBSTANCES [5] - 1775:13, 1776:19, 1778:24, 1831:9, 1853:9
SUBSTANCES [1] - 1903:24
SUBSTANTIAL [2] - 1783:24, 1810:3
SUBTRACTED [1] - 1787:8
SUCCESSFUL [1] - 1786:19
SUED [1] - 1805:12
SUFFICIENCY [3] - 1765:18, 1778:11, 1778:21
SUFFICIENT [2] - 1765:13, 1765:20

**SUGGEST** [6] - 1759:23, 1795:14, 1813:8, 1825:15, 1839:8, 1852:12

**SUGGESTED** [2] - 1852:24, 1853:8

**SUGGESTING** [1] - 1854:2

**SUGGESTION** [3] - 1777:5, 1777:16, 1853:2

**SUGGESTS** [2] - 1866:10, 1874:5

**SULFATE** [1] - 1780:6

**SUMMARIZE** [1] - 1843:17

**SUMMARIZED** [4] - 1843:3, 1843:8, 1843:13, 1843:25

**SUMMARY** [9] - 1837:15, 1838:12, 1839:6, 1840:4, 1865:15, 1866:1, 1866:2, 1889:5, 1889:19

**SUMMER** [1] - 1862:3

**SUNDAY** [1] - 1761:16

**SUPPLEMENT** [2] - 1904:25, 1905:9

**SUPPLEMENT** [1] - 1905:21

**SUPPLEMENTAL** [2] - 1904:23, 1905:23

**SUPPLEMENTAL** [1] - 1905:18

**SUPPLEMENTED** [2] - 1905:6, 1905:19

**SUPPLEMENTING** [1] - 1905:20

**SUPPLY** [5] - 1768:5, 1768:14, 1812:19, 1816:4, 1816:15

**SUPPLYING** [1] - 1874:10

**SUPPORT** [5] - 1772:22, 1796:5, 1810:18, 1839:22, 1840:18

**SUPPORTING** [1] - 1801:9

**SUPPOSE** [1] - 1819:19

**SURFACE** [8] - 1779:21, 1779:24, 1780:3, 1854:8, 1863:22, 1867:8, 1867:17

**SURPRISING** [1] - 1852:7

**SURROUNDING** [4] -

1871:7, 1877:1, 1882:20, 1885:16

**SUSPECT** [1] - 1903:18

**SUSTAIN** [6] - 1792:21, 1824:21, 1833:13, 1833:25, 1860:23, 1861:1

**SUSTAINED** [21] - 1759:5, 1759:6, 1759:7, 1759:8, 1767:20, 1770:4, 1773:12, 1774:4, 1775:22, 1786:9, 1791:17, 1791:19, 1820:10, 1821:10, 1823:14, 1824:6, 1826:25, 1853:11, 1857:22, 1873:6

**SWEAR** [1] - 1826:8

**SWITCHING** [1] - 1774:16

**SWORN** [3] - 1763:22, 1763:23, 1826:7

**SWORN** [2] - 1764:9, 1827:6

**SYSTEM** [1] - 1779:23

**SYSTEM** [10] - 1784:3, 1784:10, 1787:7, 1787:12, 1787:16, 1793:4, 1820:20, 1896:4

**SYSTEMS** [4] - 1785:13, 1786:6, 1813:1, 1818:7

---

# T

**TABLE** [1] - 1896:7

**TABLE** [18] - 1766:25, 1767:8, 1768:22, 1783:9, 1785:3, 1787:14, 1788:6, 1788:22, 1789:14, 1790:19, 1886:25, 1887:11, 1887:13, 1887:14, 1887:15, 1888:9, 1888:12, 1888:14

**TABLES** [2] - 1784:24, 1896:6

**TABLETOP** [1] - 1890:10

**TAKAICHI** [5] - 1869:2, 1869:4, 1869:5, 1869:7

**TALKS** [2] - 1800:12, 1840:18

**TANK** [1] - 1790:6

**TANKS** [9] - 1768:13,

1784:12, 1784:18, 1785:23, 1787:3, 1788:16, 1809:1, 1812:3, 1825:9

**TAPERED** [2] - 1778:3

**TASK** [3] - 1778:1, 1778:9, 1778:19

**TASKED** [1] - 1800:25

**TCE** [30] - 1807:21, 1832:18, 1835:2, 1839:4, 1839:9, 1840:3, 1840:25, 1853:3, 1854:19, 1856:1, 1856:2, 1856:11, 1856:14, 1866:11, 1866:16, 1879:12, 1879:13, 1879:16, 1881:14, 1882:15, 1883:19, 1883:22, 1883:23, 1883:25, 1886:5, 1889:11, 1898:4, 1898:5, 1903:24

**TE** [1] - 1873:7

**TEACH** [1] - 1809:11

**TEAM** [1] - 1806:17

**TECHNICAL** [24] - 1766:5, 1766:25, 1767:12, 1767:14, 1769:4, 1770:6, 1772:14, 1772:18, 1772:20, 1772:22, 1778:20, 1783:8, 1793:24, 1794:2, 1795:6, 1796:24, 1801:1, 1801:20, 1801:24, 1804:18, 1805:5, 1805:15, 1806:6, 1844:5

**TECHNOLOGY** [1] - 1848:1

**TEN** [5] - 1762:13, 1778:5, 1818:5, 1818:8, 1871:1

**TEN-MINUTE** [1] - 1818:8

**TENS** [1] - 1872:2

**TENTATIVE** [2] - 1760:9, 1761:3

**TENTATIVELY** [1] - 1760:13

**TERM** [1] - 1857:13

**TERMS** [11] - 1765:4, 1768:7, 1768:21, 1769:17, 1783:14, 1808:9, 1810:5, 1821:7, 1824:7, 1835:23, 1872:17

**TEST** [9] - 1870:21, 1870:22, 1870:24,

1871:3, 1871:4, 1871:19, 1871:20, 1872:16, 1873:18

**TESTIFIED** [2] - 1764:9, 1827:6

**TESTIFIED** [23] - 1765:11, 1772:5, 1774:21, 1782:15, 1791:18, 1795:23, 1796:15, 1802:4, 1803:13, 1803:18, 1803:21, 1805:1, 1805:14, 1807:6, 1807:14, 1807:17, 1813:6, 1815:7, 1815:10, 1829:6, 1859:5, 1895:4

**TESTIFY** [2] - 1763:24, 1857:16

**TESTIFYING** [2] - 1761:10, 1763:18

**TESTIMONY** [12] - 1763:9, 1770:8, 1803:24, 1807:24, 1826:8, 1828:17, 1829:9, 1868:18, 1902:5, 1903:1, 1903:14, 1903:21

**THE** [186] - 1758:5, 1758:16, 1759:17, 1759:20, 1760:4, 1760:8, 1760:21, 1761:7, 1762:2, 1762:8, 1762:19, 1762:22, 1762:24, 1763:3, 1763:6, 1763:10, 1763:12, 1763:16, 1763:17, 1763:25, 1764:1, 1764:7, 1765:1, 1767:4, 1767:20, 1767:25, 1768:18, 1770:4, 1770:10, 1770:13, 1771:3, 1771:4, 1771:10, 1771:21, 1771:25, 1772:2, 1773:12, 1774:2, 1774:4, 1775:22, 1776:4, 1776:8, 1776:12, 1776:15, 1782:2, 1786:9, 1791:17, 1791:19, 1791:23, 1791:25, 1792:4, 1792:6, 1792:10, 1792:11, 1792:19, 1793:1, 1794:8, 1796:13, 1796:16, 1797:16, 1797:17, 1799:21, 1799:24,

1800:6, 1800:7, 1802:10, 1802:11, 1811:20, 1811:21, 1814:13, 1819:21, 1820:10, 1821:10, 1823:14, 1824:6, 1824:21, 1824:25, 1825:21, 1825:23, 1825:24, 1826:3, 1826:4, 1826:12, 1826:13, 1826:16, 1826:18, 1826:23, 1827:1, 1827:3, 1828:25, 1829:3, 1829:23, 1829:24, 1829:25, 1830:1, 1830:3, 1833:2, 1833:5, 1833:12, 1833:25, 1834:5, 1834:14, 1834:17, 1834:20, 1835:14, 1836:17, 1836:19, 1841:5, 1841:12, 1841:15, 1841:18, 1841:22, 1841:23, 1842:25, 1843:2, 1843:20, 1844:7, 1845:12, 1845:14, 1846:8, 1847:23, 1848:1, 1851:17, 1852:18, 1853:11, 1853:16, 1853:18, 1855:20, 1855:24, 1857:22, 1858:4, 1858:6, 1858:8, 1858:9, 1858:10, 1858:12, 1858:14, 1858:15, 1858:17, 1858:18, 1858:19, 1858:20, 1858:23, 1859:1, 1859:2, 1859:16, 1860:8, 1860:21, 1861:1, 1864:12, 1864:15, 1864:20, 1864:24, 1869:15, 1873:6, 1873:12, 1873:16, 1888:4, 1888:7, 1890:1, 1890:4, 1898:10, 1898:17, 1898:21, 1900:5, 1900:8, 1900:14, 1900:17, 1901:1, 1901:4, 1901:6, 1901:8, 1901:13, 1902:1, 1902:8, 1902:17, 1902:22, 1903:7, 1903:16, 1904:9, 1905:5, 1905:11, 1905:18, 1905:22, 1906:1,

1906:4
**THEMSELVES** [1] - 1852:6
**THEORETICAL** [1] - 1786:14
**THEORETICALLY** [2] - 1854:9, 1892:4
**THEREFORE** [2] - 1805:2, 1868:25
**THEY'VE** [1] - 1852:9
**THINKING** [1] - 1760:9
**THIRD** [3] - 1887:8, 1897:20, 1898:9
**THOROUGH** [1] - 1903:6
**THOUGHTS** [1] - 1761:4
**THREAD** [1] - 1868:13
**THREE** [17] - 1762:15, 1779:10, 1812:24, 1818:7, 1820:13, 1859:9, 1870:3, 1873:19, 1873:21, 1874:18, 1876:6, 1880:18, 1889:10, 1889:20, 1899:18, 1905:25, 1906:2
**THREE-PAGE** [1] - 1905:25
**THROUGHOUT** [5] - 1760:10, 1855:1, 1879:9, 1885:12, 1885:15
**TIE** [1] - 1784:8
**TIE-DOWNS** [1] - 1784:8
**TIED** [1] - 1820:13
**TIMING** [1] - 1796:25
**TIMOTHY** [1] - 1764:8
**TITLE** [1] - 1830:16
**TODAY** [16] - 1758:11, 1773:22, 1774:12, 1774:18, 1778:14, 1781:3, 1793:12, 1793:20, 1794:20, 1809:19, 1812:10, 1821:6, 1828:17, 1834:22, 1868:18, 1901:21
**TOGETHER** [5] - 1786:13, 1790:17, 1811:13, 1820:13, 1880:21
**TON** [1] - 1822:19
**TOOK** [6] - 1773:15, 1787:3, 1805:13, 1811:22, 1823:2, 1853:13
**TOOL** [2] - 1821:2, 1821:4

**TOP** [4] - 1790:9, 1867:17, 1885:25, 1892:18
**TOPIC** [4] - 1766:3, 1806:2, 1866:3, 1902:16
**TOTAL** [4] - 1789:13, 1791:7, 1821:13, 1887:20
**TOTALITY** [1] - 1844:12
**TOWARDS** [2] - 1854:23, 1857:3
**TOXIC** [5] - 1775:13, 1776:18, 1778:24, 1831:9, 1853:9
**TRADITIONALLY** [2] - 1894:12, 1894:21
**TRANSCRIPT** [1] - 1762:20
**TRAVEL** [5] - 1846:13, 1847:12, 1892:1, 1892:21
**TRAVELED** [1] - 1849:14
**TREAT** [11] - 1779:9, 1780:8, 1783:1, 1785:9, 1790:4, 1802:24, 1803:1, 1809:2, 1814:25, 1820:1, 1820:3
**TREATED** [3] - 1779:17, 1780:3, 1785:17
**TREATING** [7] - 1779:3, 1779:12, 1785:12, 1788:16, 1819:25, 1820:6
**TREATMENT** [124] - 1767:22, 1768:2, 1768:3, 1768:7, 1768:12, 1770:15, 1771:9, 1772:6, 1775:7, 1779:2, 1780:17, 1780:18, 1780:19, 1780:22, 1780:24, 1780:25, 1781:4, 1781:7, 1781:9, 1781:14, 1781:18, 1781:25, 1782:2, 1782:6, 1782:7, 1782:9, 1782:12, 1782:16, 1782:19, 1782:22, 1783:4, 1783:13, 1784:9, 1784:14, 1785:6, 1786:6, 1786:11, 1786:20, 1786:24, 1787:1, 1787:6, 1787:13,

1787:16, 1787:21, 1788:7, 1788:16, 1788:18, 1789:2, 1789:10, 1789:14, 1789:18, 1789:19, 1789:24, 1790:8, 1790:13, 1790:20, 1790:23, 1790:25, 1791:2, 1791:8, 1791:12, 1792:3, 1792:8, 1792:17, 1793:4, 1793:21, 1793:25, 1795:16, 1795:24, 1796:4, 1796:23, 1797:6, 1797:9, 1797:13, 1797:21, 1800:4, 1802:7, 1802:12, 1802:14, 1802:15, 1802:18, 1802:20, 1802:21, 1803:3, 1803:7, 1804:19, 1804:23, 1805:1, 1805:9, 1806:20, 1807:1, 1808:17, 1808:18, 1809:2, 1810:11, 1811:8, 1811:19, 1812:21, 1812:24, 1813:1, 1813:10, 1815:15, 1817:13, 1817:16, 1818:18, 1819:7, 1820:8, 1820:12, 1820:14, 1820:16, 1821:21, 1821:25, 1822:17, 1822:25, 1823:1, 1823:9, 1825:4, 1876:20, 1876:21, 1897:8
**TREATMENT** [1] - 1782:11
**TREMENDOUS** [2] - 1822:15, 1890:17
**TRIAL** [3] - 1760:10, 1760:16, 1841:18
**TRIALS** [1] - 1798:24
**TRIED** [3] - 1765:11, 1859:12, 1875:14
**TROWBRIDGE** [2] - 1758:14, 1762:17
**TRUE** [21] - 1760:10, 1782:23, 1802:7, 1823:9, 1836:12, 1839:23, 1844:14, 1845:25, 1846:25, 1848:10, 1848:11, 1848:14, 1849:8, 1854:13, 1860:15, 1891:6, 1894:5, 1895:5, 1895:18,

1896:22, 1900:1
**TRUTH** [7] - 1765:3, 1826:10, 1844:23, 1845:2, 1869:10
**TRY** [5] - 1852:5, 1868:14, 1886:13, 1890:21, 1897:4
**TRYING** [4] - 1770:14, 1783:20, 1808:10, 1890:22
**TURMOIL** [1] - 1812:16
**TURN** [2] - 1780:10, 1808:14
**TWO** [34] - 1771:1, 1776:12, 1785:25, 1799:5, 1828:12, 1828:14, 1830:11, 1835:2, 1838:11, 1852:16, 1854:2, 1854:5, 1857:5, 1859:9, 1861:12, 1864:1, 1864:4, 1873:9, 1873:10, 1876:8, 1876:17, 1877:13, 1878:7, 1886:5, 1887:5, 1889:20, 1891:11, 1893:12, 1894:7, 1895:6, 1895:20, 1896:6
**TYPE** [3] - 1786:1, 1825:17, 1877:5
**TYPES** [5] - 1818:13, 1818:15, 1818:17, 1880:24, 1903:23
**TYPICALLY** [5] - 1816:22, 1817:1, 1852:7, 1866:25, 1872:24

**U**

**ULTIMATE** [4] - 1788:7, 1791:7, 1791:8
**UNAWARE** [1] - 1803:10
**UNCERTAINTIES** [1] - 1819:18
**UNCERTAINTY** [4] - 1783:19, 1882:18, 1883:25, 1884:1
**UNCONTAMINATED** [1] - 1884:11
**UNDER** [17] - 1763:24, 1779:22, 1797:20, 1797:23, 1798:4, 1799:23, 1804:7, 1835:9, 1838:21,

1840:11, 1841:21, 1845:6, 1846:8, 1852:19, 1855:14, 1861:9, 1866:5
**UNDERGROUND** [3] - 1847:8, 1848:24, 1853:25
**UNDERSCORES** [1] - 1903:10
**UNDERSTOOD** [7] - 1761:16, 1795:10, 1807:18, 1808:2, 1810:13, 1822:22, 1847:10
**UNEXPECTED** [1] - 1817:4
**UNIQUE** [1] - 1825:5
**UNIT** [2] - 1863:12, 1891:12
**UNITS** [2] - 1863:12, 1872:13
**UNIVERSE** [1] - 1759:25
**UNKNOWN** [1] - 1783:20
**UNKNOWNS** [1] - 1783:22
**UNRELIABLE** [1] - 1815:11
**UP** [57] - 1761:16, 1773:13, 1778:21, 1780:20, 1780:23, 1781:13, 1783:24, 1784:6, 1785:8, 1788:8, 1789:9, 1790:6, 1790:17, 1790:19, 1790:22, 1790:24, 1800:17, 1800:25, 1802:19, 1802:23, 1804:22, 1805:19, 1806:7, 1809:22, 1814:20, 1817:19, 1819:5, 1820:5, 1821:13, 1823:16, 1826:6, 1829:22, 1833:4, 1835:15, 1836:14, 1843:21, 1845:2, 1849:4, 1850:7, 1855:20, 1856:4, 1856:5, 1858:2, 1858:16, 1863:15, 1864:25, 1866:9, 1868:16, 1871:19, 1872:2, 1873:22, 1879:10, 1884:1, 1885:1, 1885:11, 1885:14, 1898:20
**UPDATING** [1] - 1769:10

UPFRONT [1] - 1825:11
UPGRADIENT [3] - 1765:13, 1776:21, 1776:25
UPSET [1] - 1806:16
URANIUM [1] - 1771:2
USES [2] - 1810:5, 1867:4
UTILIZED [1] - 1782:8

## V

V-157 [1] - 1883:21
V-201 [37] - 1767:16, 1767:21, 1768:2, 1773:24, 1774:13, 1780:18, 1781:8, 1781:15, 1783:4, 1784:14, 1785:10, 1787:16, 1788:7, 1793:13, 1793:23, 1794:21, 1794:25, 1795:11, 1795:16, 1795:25, 1796:21, 1797:13, 1797:21, 1802:19, 1803:2, 1804:14, 1805:25, 1806:7, 1806:10, 1806:19, 1808:1, 1808:10, 1815:19, 1816:7, 1817:6, 1820:16, 1883:21
V-205 [13] - 1765:14, 1780:18, 1789:13, 1789:18, 1790:24, 1792:8, 1792:17, 1794:21, 1796:1, 1799:12, 1800:23, 1804:15, 1883:21
VAGUE [11] - 1767:19, 1767:24, 1767:25, 1773:9, 1775:21, 1797:18, 1800:5, 1821:9, 1823:13, 1873:5, 1903:3
VAGUELY [1] - 1797:17
VALENCIA [1] - 1797:10
VALLEY [4] - 1758:6, 1763:13, 1827:16, 1828:4
VALUE [1] - 1834:1
VALUES [2] - 1892:1, 1893:8
VARIATIONS [1] - 1854:4
VARIOUS [15] - 1766:25, 1777:23,

1809:24, 1822:7, 1847:7, 1847:16, 1862:20, 1872:4, 1881:17, 1886:15, 1888:3, 1891:5, 1891:10, 1894:1, 1895:9
VARY [1] - 1863:12
VENDOR [1] - 1812:14
VENDORS [6] - 1784:12, 1784:18, 1812:2, 1821:17, 1821:20, 1821:24
VERIFIED [1] - 1850:1
VERSION [1] - 1831:4
VERSUS [9] - 1758:6, 1763:13, 1775:2, 1789:18, 1822:15, 1885:21, 1886:22, 1888:16, 1903:12
VERTICAL [6] - 1863:21, 1866:17, 1867:7, 1868:3, 1868:6, 1868:10
VERTICALLY [7] - 1852:9, 1854:1, 1854:15, 1854:16, 1859:20, 1868:1, 1872:6
VESSEL [1] - 1813:1
VESSELS [36] - 1782:14, 1782:17, 1782:22, 1783:1, 1785:15, 1785:20, 1785:24, 1787:5, 1788:20, 1789:6, 1789:9, 1789:25, 1790:2, 1790:3, 1790:14, 1802:18, 1802:20, 1802:24, 1802:25, 1803:2, 1811:7, 1811:18, 1812:5, 1812:7, 1812:11, 1812:18, 1813:7, 1813:17, 1817:12, 1817:14, 1817:18, 1818:2, 1818:7, 1821:25, 1822:14
VICINITY [1] - 1867:1
VIEW [6] - 1786:18, 1816:4, 1856:16, 1857:6, 1857:7, 1859:9
VIEWED [1] - 1859:9
VINYL [3] - 1889:11, 1889:12, 1889:15
VIOLATION [1] - 1904:22
VOC [37] - 1780:17,

1780:19, 1781:7, 1786:25, 1787:6, 1788:7, 1789:18, 1790:12, 1790:20, 1790:23, 1791:2, 1792:3, 1829:12, 1832:23, 1843:18, 1865:20, 1868:7, 1874:14, 1874:17, 1875:11, 1876:17, 1876:18, 1877:18, 1879:1, 1880:5, 1880:8, 1880:15, 1883:9, 1887:9, 1893:17, 1893:20, 1894:6, 1894:22, 1897:17, 1898:5, 1899:17
VOCS [81] - 1769:22, 1770:13, 1770:16, 1774:12, 1780:8, 1780:22, 1781:1, 1781:5, 1781:9, 1785:10, 1785:13, 1785:18, 1788:16, 1793:5, 1807:10, 1807:13, 1807:17, 1808:1, 1808:2, 1808:8, 1820:2, 1823:16, 1823:19, 1823:25, 1832:5, 1832:20, 1833:15, 1834:23, 1836:4, 1837:2, 1837:25, 1838:3, 1838:23, 1843:11, 1843:14, 1844:2, 1846:13, 1846:16, 1847:12, 1849:13, 1850:18, 1850:23, 1854:19, 1867:17, 1868:15, 1874:20, 1874:21, 1876:13, 1876:20, 1876:22, 1877:6, 1877:16, 1877:17, 1877:21, 1877:23, 1886:19, 1887:4, 1887:17, 1887:25, 1888:3, 1888:18, 1888:22, 1894:12, 1894:23, 1894:25, 1896:18, 1896:23, 1897:1, 1897:2, 1897:7, 1897:9, 1897:12, 1897:17, 1897:20, 1898:2, 1899:19, 1899:22, 1899:24
VOLATILE [1] - 1830:17
VOLUME [1] - 1829:23

VOLUMES [1] - 1817:17

## W

W4A [1] - 1874:19
WAIT [3] - 1799:12, 1804:6, 1805:10
WAIT-AND-SEE [3] - 1799:12, 1804:6, 1805:10
WAITING [7] - 1758:19, 1765:19, 1766:7, 1769:8, 1774:9, 1801:15, 1833:3
WALK [2] - 1788:24, 1826:5
WARNING [2] - 1776:22, 1904:21
WAS [1] - 1827:6
WATCH [2] - 1825:22, 1900:18
WATER [7] - 1758:6, 1763:13, 1797:25, 1827:16, 1843:17, 1861:11, 1894:4
WATER [94] - 1765:17, 1766:24, 1767:2, 1767:15, 1768:5, 1768:9, 1768:14, 1769:23, 1773:10, 1774:10, 1777:11, 1779:9, 1779:12, 1779:16, 1779:17, 1779:19, 1779:21, 1779:24, 1780:1, 1780:3, 1780:5, 1780:8, 1781:17, 1781:22, 1782:13, 1782:18, 1782:25, 1785:17, 1787:20, 1793:11, 1795:1, 1795:8, 1800:10, 1803:1, 1804:2, 1806:1, 1806:11, 1806:15, 1807:3, 1807:7, 1807:8, 1807:19, 1808:9, 1808:17, 1808:18, 1809:2, 1819:16, 1823:22, 1823:24, 1824:13, 1825:17, 1827:23, 1828:9, 1828:10, 1828:13, 1828:18, 1828:19, 1830:9, 1830:22, 1843:10, 1844:3, 1849:17, 1851:11, 1853:8, 1853:13,

1854:14, 1857:3, 1857:14, 1861:18, 1861:21, 1862:4, 1862:19, 1862:20, 1863:2, 1863:11, 1863:15, 1867:4, 1868:14, 1871:8, 1871:11, 1871:24, 1872:4, 1872:5, 1872:21, 1878:7, 1883:2, 1884:9, 1896:2
WATER'S [1] - 1884:10
WATERLINE [1] - 1787:11
WAYS [1] - 1854:2
WEDNESDAY [1] - 1758:1
WEEK [1] - 1773:25
WEEKS [2] - 1814:15, 1815:8
WEIGHT [3] - 1760:24, 1761:2, 1903:14
WELCOME [1] - 1890:1
WELLHEAD [38] - 1767:22, 1768:2, 1768:3, 1768:7, 1768:12, 1772:5, 1779:2, 1781:18, 1781:25, 1782:2, 1782:6, 1782:7, 1782:9, 1782:12, 1783:4, 1783:12, 1784:14, 1785:6, 1786:11, 1786:24, 1793:25, 1795:24, 1796:3, 1796:23, 1797:6, 1797:9, 1802:6, 1802:12, 1802:15, 1810:11, 1813:10, 1820:8, 1820:12, 1820:16, 1821:21, 1822:25, 1823:1, 1823:8
WELLS [141] - 1768:17, 1769:24, 1775:15, 1775:16, 1775:20, 1775:23, 1776:2, 1776:9, 1776:11, 1776:13, 1776:14, 1776:16, 1776:17, 1776:20, 1776:21, 1776:25, 1777:6, 1777:9, 1777:10, 1777:15, 1777:17, 1778:6, 1778:16, 1780:18, 1781:10, 1781:14,

1782:8, 1782:18, 1785:6, 1790:13, 1794:22, 1796:7, 1797:2, 1804:14, 1812:20, 1812:24, 1819:24, 1820:4, 1820:5, 1820:13, 1832:5, 1832:18, 1832:19, 1835:3, 1836:5, 1844:2, 1846:12, 1846:14, 1846:24, 1847:6, 1847:13, 1854:24, 1855:3, 1855:13, 1856:23, 1859:18, 1860:2, 1861:6, 1861:15, 1862:7, 1862:20, 1862:23, 1862:24, 1863:20, 1865:22, 1866:16, 1867:1, 1867:3, 1867:23, 1868:2, 1870:14, 1871:7, 1871:8, 1871:16, 1871:20, 1871:25, 1872:1, 1872:2, 1872:3, 1872:15, 1872:18, 1872:20, 1872:24, 1873:2, 1873:18, 1873:20, 1873:21, 1874:10, 1874:21, 1874:23, 1874:24, 1875:3, 1876:1, 1876:6, 1876:22, 1877:1, 1877:19, 1877:22, 1878:2, 1878:7, 1878:8, 1878:11, 1879:3, 1879:11, 1880:1, 1882:25, 1883:1, 1883:5, 1883:6, 1883:11, 1883:20, 1883:22, 1884:2, 1885:2, 1885:4, 1885:16, 1885:20, 1885:24, 1886:5, 1886:10, 1886:15, 1888:16, 1888:22, 1889:17, 1890:18, 1895:1, 1895:22, 1897:10, 1898:7, 1899:9, 1899:13, 1899:18, 1899:23
**WEST** [6] - 1854:23, 1855:1, 1856:3, 1866:5, 1874:22, 1885:13
**WHEREAS** [1] - 1891:12
**WHITTAKER** [119] -

1758:7, 1763:13, 1764:19, 1773:2, 1774:17, 1777:10, 1781:24, 1783:7, 1787:25, 1792:16, 1793:11, 1793:21, 1793:25, 1794:3, 1794:14, 1794:17, 1795:1, 1795:7, 1795:15, 1797:11, 1797:20, 1797:23, 1797:25, 1798:4, 1798:13, 1798:17, 1798:21, 1799:2, 1799:5, 1799:12, 1799:16, 1799:23, 1799:25, 1800:23, 1801:25, 1802:2, 1802:11, 1803:7, 1803:10, 1803:12, 1803:13, 1804:1, 1804:5, 1804:7, 1804:17, 1804:22, 1805:3, 1808:15, 1815:23, 1816:9, 1821:14, 1824:12, 1832:4, 1832:17, 1833:16, 1834:4, 1834:9, 1834:15, 1834:23, 1835:2, 1837:3, 1839:1, 1839:3, 1839:8, 1839:9, 1839:22, 1839:23, 1840:2, 1840:13, 1840:25, 1843:23, 1844:1, 1844:16, 1844:17, 1844:22, 1845:7, 1846:2, 1846:12, 1846:14, 1846:16, 1847:12, 1850:2, 1850:17, 1851:25, 1852:2, 1852:13, 1852:21, 1853:4, 1854:7, 1854:8, 1863:21, 1868:4, 1869:8, 1870:5, 1873:11, 1874:18, 1875:2, 1875:12, 1877:14, 1878:16, 1878:21, 1880:6, 1880:9, 1885:9, 1887:10, 1888:23, 1896:9, 1896:12, 1896:14, 1896:24, 1897:10, 1897:14, 1897:20, 1902:14, 1904:1, 1904:21
**WHITTAKER'S** [2] - 1764:23, 1850:22
**WHITTAKER-**

**BERMITE** [6] - 1774:17, 1839:9, 1840:2, 1840:25, 1880:6, 1887:10
**WHITTLE** [1] - 1877:7
**WHOA** [1] - 1833:1
**WHOLE** [4] - 1771:20, 1826:10, 1839:19, 1903:15
**WILLING** [2] - 1802:6, 1818:22
**WITNESS** [30] - 1763:25, 1764:7, 1764:9, 1770:13, 1771:4, 1771:25, 1776:15, 1792:4, 1792:10, 1796:16, 1797:17, 1799:24, 1800:7, 1802:11, 1811:21, 1825:23, 1826:12, 1826:16, 1827:6, 1834:20, 1835:14, 1836:19, 1841:22, 1845:14, 1853:18, 1855:24, 1858:9, 1858:19, 1859:1, 1860:8
**WITNESS** [16] - 1761:16, 1761:20, 1762:16, 1763:6, 1763:20, 1792:23, 1814:7, 1825:25, 1826:6, 1826:22, 1841:20, 1888:5, 1900:5, 1902:14, 1902:21
**WITNESS'S** [1] - 1846:6
**WITNESSES** [1] - 1771:10
**WORD** [4] - 1845:20, 1846:1, 1848:21
**WORDS** [4] - 1823:1, 1834:3, 1840:22, 1857:4
**WORKER** [2] - 1842:11, 1842:13
**WORKS** [2] - 1777:10, 1817:21
**WORLD** [1] - 1897:22
**WORTHWHILE** [1] - 1868:25
**WRITE** [2] - 1801:14, 1835:25
**WRITTEN** [9] - 1765:8, 1800:22, 1801:5, 1801:6, 1830:5, 1835:23, 1836:6, 1836:13, 1851:20
**WROTE** [6] - 1831:12,

1835:19, 1836:9, 1845:8, 1860:14, 1864:16

## Y

**Y-U-E-H** [1] - 1842:19
**YEAR** [5] - 1790:3, 1802:14, 1803:15, 1803:19, 1812:14
**YEARS** [15] - 1794:15, 1794:18, 1797:14, 1805:16, 1810:19, 1811:6, 1811:17, 1813:16, 1816:7, 1816:9, 1845:8, 1863:10, 1865:6, 1870:17, 1871:1
**YELLOW** [5] - 1879:6, 1879:14, 1879:19, 1879:20, 1880:18
**YESTERDAY** [18] - 1764:2, 1764:12, 1764:15, 1765:11, 1774:22, 1782:15, 1793:10, 1793:12, 1793:19, 1794:9, 1794:20, 1795:6, 1795:23, 1799:11, 1804:16, 1807:7, 1902:12, 1905:24
**YOURSELF** [5] - 1773:2, 1773:15, 1773:16, 1850:9, 1858:23
**YUEH** [2] - 1842:11, 1842:19

## Z

**ZONE** [6] - 1856:24, 1857:1, 1857:9, 1857:12, 1857:17, 1859:6