1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3     HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

4

5  SANTA CLARITA VALLEY WATER AGENCY,      )
                                           )
6              PLAINTIFF,                   )CASE NO.
                                           )
7          vs.                             )CV 18-06825-SB
                                           )
8  WHITTAKER CORPORATION, et al.,          )VOLUME 19
                                           )PAGES 2019 TO 2125
9              DEFENDANTS.                  )
   _____)

10

11

12

13              REPORTER'S TRANSCRIPT OF
                    TRIAL DAY 10
14            THURSDAY, DECEMBER 2, 2021
                     8:02 A.M.
15            LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22

23  _____

24        MIRANDA ALGORRI, CSR 12743, RPR, CRR
            FEDERAL OFFICIAL COURT REPORTER
25          350 WEST 1ST STREET, SUITE 4455
            LOS ANGELES, CALIFORNIA 90012
               MIRANDAALGORRI@GMAIL.COM

1                        **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4          NOSSAMAN, LLP
           BY:  BYRON P. GEE
5          BY:  RAVEN MCGUANE
           BY:  PATRICK J. RICHARD
6          BY:  FRED FUDACZ
           777 South Figueroa Street
7          34th Floor
           Los Angeles, California 90017

8

9          NOSSAMAN, LLP
           BY:  ILSE CHANDALAR SCOTT
10         50 California Street
           34th Floor
11         San Francisco, California 94111

12

      **FOR THE DEFENDANTS:**
13
           EDLIN GALLAGHER HUIE & BLUM
14         BY:  MICHAEL E. GALLAGHER, JR.
           BY:  FRED M. BLUM
15         BY:  DANIEL ERIC TROWBRIDGE
           500 Washington Street
16         Suite 700
           San Francisco, California 94111
17

18    **ALSO PRESENT:**

19         Matt Stone
           Scott Fryer
20         Ron Beaton
           Eric Lardiere
21

22

23

24

25

**INDEX OF WITNESSES**

**WITNESSES**                                                                    **PAGE**

(None)

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| | | | |

(None)

1 **THURSDAY, DECEMBER 2, 2021; 8:02 A.M.**

2 **LOS ANGELES, CALIFORNIA**

3 -oOo-

4

08:02AM 5 THE CLERK:  This is case number CV 18-6825,

6 Santa Clarita Valley Water Agency versus Whittaker Corporation,

7 et al.

8 Counsel, please state your appearances.

9 MR. RICHARD:  Good morning.  Patrick Richard for

08:02AM 10 plaintiff.  With me is Ms. Scott, Mr. Gee, and Ms. Micevych

11 stepped out, and Mr. Fudacz stepped out but will be returning

12 shortly, Your Honor.

13 THE COURT:  Good morning.

14 MR. BLUM:  Good morning, Your Honor.  Fred Blum

08:02AM 15 for Defendant Whittaker.  With me this morning is

16 Mr. Trowbridge and Mr. Gallagher.  Mr. Lardiere will be here in

17 a moment, and Mr. Fryer is here.

18 Your Honor, I just sent your clerk a WeTransfer

19 file that contains the closing minus the special verdict form.

08:03AM 20 THE COURT:  Thank you.  And good morning,

21 everyone.  We are outside the presence of the jury.

22 First of all, I did receive a message this

23 morning that the plaintiff does not intend to introduce any

24 further evidence including the evidence from Gaynor,

08:03AM 25 G-a-y-n-o-r, Dawson.

1          Is that correct?

2          MR. RICHARD:  That's correct, Your Honor.  We

3   took another look and didn't seem like we needed it.

4          THE COURT:  So at this point all parties have

08:03AM  5   rested.  The Court did provide to counsel last night the latest

6   version of the instructions with some highlighted sections that

7   remain open questions.  And I'm going to start with the new

8   material that was provided by plaintiff last night.  And by

9   "new," I mean a request to add some language to the nuisance

08:04AM  10   elements.

11          So let me hear from you, Mr. Blum, whether

12   there's any objection.

13          MR. BLUM:  Your Honor, my understanding, they

14   only changed the definition of ownership on it, and if that's

08:04AM  15   the only change, then we have no problem with it.

16          THE COURT:  All right.  And so I'm going to --

17   it's going to say that SCV owned, leased, occupied, or

18   controlled the property, namely, the water wells.

19          MR. BLUM:  Yes, sir.  Your Honor, that's under

08:04AM  20   one of the factors that they have to prove; correct?

21          THE COURT:  It is.

22          MR. BLUM:  That's fine then, Your Honor.

23          THE COURT:  Then I'm going to include that both

24   in what is my Instruction 15, private nuisance essential

08:04AM  25   factual elements, and it appears in one other place.  Let me

1    just make sure I'm making the change.

2                Did this appear in two locations?  I thought it

3    did.

4                MS. SCOTT:  Yes, Your Honor.  The other location

08:05AM   5    would be your Instruction No. 19 for trespass.

6                THE COURT:  I see.  So I thought it was in two

7    nuisance locations, but it's in the trespass in 19.  I will

8    make the change as well there without objection.

9                Then let me turn to --

08:06AM  10                MR. BLUM:  Your Honor, as to trespass, does it

11   say, namely, the water wells?  Trespass has to be the land, not

12   the water wells.

13                THE COURT:  This just says the property.  It

14   doesn't -- the --

08:06AM  15                MR. BLUM:  That's fine.

16                THE COURT:  So you're okay with the change with

17   the reference to the property, not to the water wells?

18                MR. BLUM:  Correct, Your Honor.

19                THE COURT:  All right.  Then it will be that

08:06AM  20   "SCV Water owned, leased, occupied, or controlled the property

21   for trespass," and that's given without objection.

22                MR. BLUM:  Your Honor, to be clear, the change is

23   okay.  We still object for other reasons stated.

24                THE COURT:  Understood.  And the objection that

08:06AM  25   you're stating relates generally to the property interests that

1  we're going to talk about as well in what is my Instruction 26?

2        MR. BLUM:  Your Honor, I don't want to repeat

3  what I've said.  For the same basis we raised yesterday and in

4  the JMOLs which deals with the propriety of the instruction,

08:07AM  5  et al., and all of the issues of the factories' rights.  Again,

6  I don't want to repeat it.

7        THE COURT:  I do understand that.  I also do want

8  to address your instruction which I said remained to be

9  decided.  I hadn't decided that.

08:07AM  10        I recognize, Mr. Blum, that there is an issue

11  with respect to the JMOL which I haven't decided.  But I'm

12  proceeding with the jury instructions which, if I agree with

13  you on the JMOL, will turn out to be largely an academic

14  exercise.  But given that I am instructing the jury, you are

08:07AM  15  requesting Instruction 26, plaintiff's property interest, in

16  order to address the issue you have raised on the JMOL;

17  correct?

18        MR. BLUM:  Yes, Your Honor.

19        THE COURT:  All right.  So let us turn to that

08:08AM  20  because, as I said, I haven't decided that issue.  I did take a

21  look and, Mr. Blum, I don't know -- I'm sorry.  Mr. Richard, I

22  think you are addressing this.  You addressed it yesterday.  I

23  did take a further look at the case law now in light of the

24  evidence that has been elicited.  When I previously ruled on

08:08AM  25  this issue, it was my understanding that the plaintiff was

```
 1  going to introduce different evidence than it wound up
 2  introducing.  I thought it was going to introduce evidence of
 3  property ownership, and the evidence that was introduced is
 4  thin, in my view, questionable, in my view.  But I will have to
 5  further consider that in the context of the JMOL.
 6           All I mean to convey is that it is a question in
 7  my mind.  I took a look at the excerpts from Mr. Alvord's
 8  testimony, and his testimony was not crystal clear on the issue
 9  of ownership, it seemed to me.  I still have to look at it more
10  carefully.  I haven't had time.
11           The other item of evidence that I expected might
12  be elicited was that there was actual contamination of the
13  subsurface interests other than the water at the water agency
14  location.  And as I understand it, there really has -- there is
15  no evidence of that.  The only evidence is Mr. Richard's
16  correct observation that there is some hydrogeologic evidence
17  that, with the concept of absorption and other hydrogeological
18  concepts, there can be a certain amount of sticking of the --
19  of the chemical to the surrounding soil.
20           I don't know where that necessarily gets you in
21  terms of cases like Orange County Water District versus Sabic,
22  S-a-b-i-c.
23           So I am going to give you an opportunity to
24  address that again, Mr. Richard, but I am concerned about
25  whether there is evidence in this case that would require the
```

1    Court to give Instruction 26.  That is to say that a reasonable

2    jury arguably can conclude that the only contamination was of

3    the water here and not of the property.  And I know you

4    mentioned the wells.  I'm not sure how the wells were -- and

08:11AM    5    what the evidence is on how the wells were somehow harmed.

6              So I will let you address that, but I will tell

7    you that I'm seriously considering giving this instruction.

8              MR. RICHARD:  When Your Honor says this

9    instruction, which one?

08:11AM    10             THE COURT:  This is the plaintiff's property

11    interest which I indicated was to be decided.  It should be 26

12    of what I sent last night.  It's "For plaintiff to recover

13    restoration damages, it must first prove it has a possessory

14    interest," and then it goes into appropriative right and

08:12AM    15    interest in land.

16             MR. RICHARD:  Yes, Your Honor.  It's what we

17    previously had as No. 60.  I see.

18             This is the appropriative right, the interest in

19    land.  This is an incorrect statement of the law.  I believe we

08:12AM    20    briefed this that our negligence and nuisance and trespass

21    claims can squarely be based on our rights to groundwater.  And

22    the contamination of the groundwater I'm not -- we actually

23    cited the authority on that point.  The notion that we need to

24    have soil samples in addition to groundwater pollution I don't

08:12AM    25    think is supported by the case law.

08:13AM

1        THE COURT:  Why don't you address the *Sabic* case.

2   That might be useful to the Court since that case, which

3   Whittaker has relied heavily on, does in the context of

4   trespass and nuisance distinguish between use of usufructuary

5   rights or appropriative rights in groundwater and whether that

6   is sufficient to allow for trespass and nuisance claim.  And in

7   that case, the Court concluded that it was not sufficient.

8        MR. RICHARD:  Yes, Your Honor.  I don't have that

9   case with me.  I know we were relying on *City of Pomona*, a

08:13AM

10  9th Circuit decision.

11       THE COURT:  The *City of Pomona* case, as I recall,

12  wasn't dealing with trespass and nuisance, was it?

13       MR. RICHARD:  I thought it addressed common law

14  claims more broadly, Your Honor.

08:14AM

15       THE COURT:  All right.  So here's the state law

16  case dealing with state law claims.  And are you able to

17  address how you would distinguish that case?

18       MR. RICHARD:  Honestly, as I stand here,

19  Your Honor, I don't know what -- our briefing on that.  I know

08:14AM

20  we relied on *Starrh and Starrh* and the orange city -- or

21  *Orange County Water District* decision as well as other

22  authority.

23       THE COURT:  The 9th Circuit case that you're

24  referring to was a negligence case.  *Starrh and Starrh* and

08:14AM

25  these other cases that this Court also relied upon was

1    predicated on proof that your subsurface rights, which your

2    client had an ownership interest in, were invaded.

3                    *Starrh and Starrh*, as you may recall, involves a

4    case of oil contamination, I believe, where there was actual

08:14AM   5    offsite migration into the subsurface of the plaintiff.  And

6    that's why yesterday, when I was focused on the fact that the

7    evidence here really only shows groundwater contamination

8    onsite -- that is on your client's site --

9                    MR. RICHARD:  The issue, I believe, in *Starrh and*

08:15AM  10    *Starrh* was there was no allegation of use of water for any

11    purpose other than to benefit the land itself.  So we're

12    relying on the principle that, where the groundwater is

13    actually used and the groundwater has been contaminated, that

14    provides sufficient standing to allege trespass nuisance and

08:15AM  15    negligence in California.

16                    THE COURT:  I don't know, Mr. Richard, that the

17    issue is standing.  The issue has to do with the kind of claim

18    that you're presenting.  And so a trespass claim necessarily

19    presupposes a possessory interest that has been trespassed

08:15AM  20    upon.  And there's a similar theory with regard to nuisance,

21    and that's what the *Sabic*, S-a-b-i-c, case is discussing.  So

22    it discusses not a threshold standing question but the

23    fundamental nature of the claims that are being asserted.

24                    MR. RICHARD:  Well, in *Starrh and Starrh*, I mean,

08:16AM  25    it was the absence of an allegation regarding use of the water.

1    But as Your Honor just phrased it, an evidence of an interest

2    in the land beneath the wells and piping and pumping, that's

3    Mr. Alvord's testimony that for all these wells the water

4    agency after the merger either owns or has exclusive right to

08:16AM  5    control that land.

6                THE COURT:  Well, putting aside what he said --

7    and I'm not sure what he said is entirely clear -- that still

8    doesn't address the facts of this case.  The facts of this case

9    involve groundwater contamination on your client's property.

08:17AM  10               MR. RICHARD:  Right.

11               THE COURT:  And it's distinguishable from *Starrh*

12   in that case, in that situation.

13               MR. RICHARD:  Yes.  Because our client uses the

14   contaminated groundwater, and it needs to be remediated.

08:17AM  15               THE COURT:  All right.  Do you have anything

16   further that could explain to the Court why *Sabic* doesn't apply

17   here?

18               MR. RICHARD:  Your Honor, actually, I'd have to

19   grab my copy of the case.

08:17AM  20               THE COURT:  Let me hear from Mr. Blum because

21   there is an issue in *Sabic* that I find at least to be of

22   concern in terms of the instruction that you're suggesting, and

23   that is footnote 37 which says "We need not consider whether a

24   trespass claim would be viable if the district were extracting

08:17AM  25   or capturing water in the south basin that was contaminated."

1            As you know, *Sabic* focused quite heavily on

2     usufructuary rights and the nature of those particular rights

3     in the context of this case, and then it drops this disclaimer.

4     In this case we have extraction.  So what am I to do with that?

08:18AM   5            MR. BLUM:  Well, Your Honor, that's always

6     difficult when a court says we're not dealing with this, but in

7     essence they dealt with it.  They dealt with it.  They didn't

8     do it in the sense of a trespass claim.  I think it's a

9     nuisance claim they dealt with it.

08:18AM  10            But the nuisance and trespass rules are pretty

11     much the same with some minor differences in terms of the

12     causes of action.  And the rights don't change which is why

13     this case isn't *Starrh*.

14            *Starrh* was a possessory case.  They had a

08:18AM  15     possessory interest in the land.  That means you interpret the

16     trespass rules with water differently.  That's the base --

17     that's one of the basic holdings of the *Orange County* case.

18            When you deal with usufructuary rights like we

19     clearly have here, it's different.  And it doesn't matter

08:19AM  20     whether it's a nuisance claim, and it doesn't matter whether

21     it's a trespass claim.  It's dealt with the same.  And I don't

22     think the footnote says other than -- I want to say this

23     respectfully to the appellate court.  We don't have to deal

24     with what we don't have to deal with.  And since it's not a

08:19AM  25     trespass claim here, we're not going to make the decision

|     |                                                             |
|-----|-------------------------------------------------------------|
|  1  | because we don't have to.                                   |
|  2  | THE COURT:  If there was evidence in this case              |
|  3  | that the water agency owned the land, not just the well -- the |
|  4  | right to extract water and the wells but they actually owned |
|  5  | the surrounding land, would that be like the *Starrh and Starrh* |
|  6  | case?                                                        |
|  7  | MR. BLUM:  No.  Because what *Sabic* and *Starrh*           |
|  8  | combined say is the extraction of the water has to be used to |
|  9  | benefit the property.  The extraction here doesn't benefit the |
| 10  | property.  It benefits their parties.  They extract it to use |
| 11  | it somewhere else.  That's why it's a usufructuary right and |
| 12  | not a possessory right.                                      |
| 13  | THE COURT:  And the argument that you have raised           |
| 14  | extends to trespass and nuisance claims, not to negligence -- |
| 15  | the negligence claim.                                        |
| 16  | MR. BLUM:  No.  I think it does extend to the               |
| 17  | negligence claim.                                            |
| 18  | THE COURT:  And what authority are you relying              |
| 19  | upon that suggests it extends to the negligence claim?       |
| 20  | MR. BLUM:  Well, first, as Your Honor said, it              |
| 21  | goes to the basic restoration damages.  It extends -- it     |
| 22  | doesn't extend to the claim as much as it extends to the claim |
| 23  | for damages.  And when they're asking to restore, it really |
| 24  | doesn't matter in a real sense the name of the cause of action |
| 25  | because, if you look at the negligence cause of action, other |

08:19AM (line 5)
08:20AM (line 10)
08:20AM (line 15)
08:20AM (line 20)
08:20AM (line 25)

```
        1   than the -- other than some of the remedies and some of the

        2   nature that's unique to nuisance, they have to prove negligence

        3   in order to prevail on both of them -- I mean, all three

        4   claims.

08:21AM 5                 So there's not that much difference between them.

        6   There's no policy difference that would make --

        7                 THE COURT:  Well, the claims are different, are

        8   they not?  When you're talking about a trespass claim, for

        9   example, an element that's fairly critical is the superior

08:21AM 10  possessory interest whereas with the negligence claim that's

        11  not the case, is it?

        12                MR. BLUM:  True, Your Honor.  But if you look at

        13  the technical end, yes, they're different.  But in the reality

        14  here, they're all three identical.  They're asking for the same

08:21AM 15  damages.

        16                THE COURT:  But what you're doing essentially is

        17  asking the Court, are you not, to direct a verdict on the

        18  nuisance claim if the jury concludes that the only right that

        19  the water company has is to the extracting the groundwater.  So

08:22AM 20  if they reach that conclusion based upon that extraction, then

        21  you would say they necessarily have to find that the damage

        22  claim fails.

        23                MR. BLUM:  Right.  Which would eliminate

        24  nuisance, trespass, and negligence.

08:22AM 25                THE COURT:  Although you started, if I understood
```

1    you correctly, with this is essentially a limitation on damages

2    with respect to negligence.

3              MR. BLUM:  Your Honor, that's because it came up

4    in the context of the rest -- it wasn't that important,

08:22AM  5    Your Honor, until restoration damages became an issue.

6              THE COURT:  You're not able to cite the Court to

7    any authority where a Court has held that the same analysis

8    contained in *Sabic* and *Starrh and Starrh* would apply to a

9    negligence claim?

08:23AM  10             MR. BLUM:  May I talk to Mr. Trowbridge for a

11   moment, please?

12             THE COURT:  Yes.

13             (Counsel confer.)

14             MR. RICHARD:  Your Honor, can I just ask, just to

08:23AM  15   be on the same page, where defendant cited the *Sabic* case?  I'm

16   looking at their motion.  I'm looking at their briefing on this

17   instruction.  I want to make sure we're talking about the same

18   case.

19             THE COURT:  I thought they had cited it, but the

08:23AM  20   citation is 14 Cal App. 5th 343.  I'll repeat it.

21   14 Cal App. 5th 343.

22             MR. RICHARD:  Thank you.

23             THE COURT:  Mr. Blum.

24             MR. BLUM:  Just a second, please, Your Honor.

08:23AM  25   I'm just reading something.

1        Your Honor, it's not directly on point, but if
2   you take a look at the case notes under CACI No. 3903(f) under
3   sources and authority, the third one makes clear that the
4   instruction applies to injury to real property which is what
08:24AM  5   the negligence claim is.  I don't think -- I don't think the
6   instruction is any different for any cause of action as long as
7   they're claiming damage to real property.

8        THE COURT:  But that doesn't squarely address
9   this issue, does it?

08:24AM 10        MR. BLUM:  I agree.  I hope I made that clear.
11   It's not directly -- not directly answering your question.

12        THE COURT:  Right.  But it's not that it isn't
13   directly on point.  It's that it doesn't address the issue.
14   What about the *Pomona* case which you have cited to the Court, I
08:25AM 15   believe, numerous times.  Doesn't that case hold that a
16   usufructuary right can confer standing for a negligence claim?

17        MR. BLUM:  Your Honor, we're not claiming that,
18   if you have -- if you only have usufructuary rights you can
19   never have standing, but you have to prove it.  This is an
08:25AM 20   issue of proof.  This is not an issue of are they barred
21   because they have usufructuary rights.  We're not claiming
22   they're barred.  We're saying they still have to prove their
23   claim, and they haven't.  I think that's the point we're trying
24   to make, Your Honor.

08:25AM 25        THE COURT:  All right.  What I am inclined to do

on this, but I want to -- just to take a moment further to

think about it -- is I will give you the last word, if you'd

like to be heard further, Mr. Richard, but I'm inclined to give

the instruction but limit it to trespass -- the trespass and

08:26AM  nuisance claims.

Mr. Richard, do you wish to be heard further?

MR. RICHARD:  No.  I believe we have briefed it.

Just so the record is clear, we don't think it's an appropriate

instruction, but I understand Your Honor's inclination.

08:26AM  THE COURT:  All right.  And I do think the law is

not crystal clear on this issue, particularly with respect to

nuisance.  And then -- I'm sorry.  With regard to negligence.

And I think there is a question that the *Sabic* case has raised

with regard to that footnote.  And the Court doesn't have the

08:26AM  benefit of really any useful briefing in my view on this

particular issue.  But I have to make a call, and that's the

call I'm going to make.

With regard to negligence per se, Mr. Richard, if

you wish to be heard further on this -- I'm sorry -- Mr. Gee,

08:27AM  if you wish to be heard further on this, I will hear you.  I'm

inclined not to give this instruction at all and find

essentially that you have waived this issue or not properly

presented it.

I have looked at the third party -- the Third

08:27AM  Amended Complaint and the history surrounding how this has been

presented, and it really has been at best delayed

substantially.  It's been evolving.  You have initially in the

Third Amended Complaint cited just a laundry list of general

statutes where the law appears to support reasonably that you

08:27AM   have to provide specific statutory authority.  And then only

recently have you started to roll out some specific statutes

beginning with the Porter-Cologne Act statute where you do cite

a case that supports a presumption but it's relating to a

different statute within the -- within that act.  And you, as I

08:28AM   understand it, only presented that in October, very recently,

while this case was trailing for trial.  And then more

recently, still, you have presented these L.A. County

ordinances.

            These are difficult issues.  What I mean by that

08:28AM   is, in order to determine whether it is appropriate to present

a negligence per se instruction where you're essentially just

throwing into the jury box, in a manner of speaking, statutes

that you're asking them to figure out if it applies, it

requires, it seems to me, much earlier notice where the other

08:29AM   side can look at what you're claiming, if they wish, conduct

discovery to see if it is applicable.  Further, they can

potentially file briefing in the ordinary course so that the

Court can make a determination as to whether, in fact, it is

applicable and does raise the presumption.  And to present it

08:29AM   for the first time essentially during trial when we're

|   | |
|---|---|
| 1 | instructing really, in my view, imposes a real burden on the |
| 2 | system that threatens due process. |
| 3 | I don't believe that the defense has been given a |
| 4 | fair opportunity to explore this issue both factually and |
| 5 | legally, and I know the Court hasn't.  The Court is being |
| 6 | thrust upon last minute to make a determination as to whether |
| 7 | these statutes apply in the -- in the midst of trial without |
| 8 | having the benefit of time for deliberation and to hear whether |
| 9 | the evidence and the law has been properly developed and |
| 10 | presented in a proper way. |
| 11 | And so I just don't see how I can give this to |
| 12 | the jury in any fashion other than I'm throwing it out there |
| 13 | because I don't know whether it is appropriate to do so, and |
| 14 | you're thrusting a statute upon everybody. |
| 15 | MR. GEE:  Your Honor, we will submit it. |
| 16 | THE COURT:  All right.  So with regard then to |
| 17 | apportionment of responsibility, Mr. Blum, you were going to |
| 18 | tell the Court whether you even wanted that instruction. |
| 19 | MR. BLUM:  Your Honor, we withdraw it.  I'm |
| 20 | sorry, Your Honor.  I have a dissenting opinion here. |
| 21 | THE COURT:  All right. |
| 22 | MR. BLUM:  Your Honor, can I amend that?  We |
| 23 | withdraw a request for anything other than SIC. |
| 24 | THE COURT:  That's fine.  The Court will give it. |
| 25 | I don't know what its practical significance is, but I think it |

         1    is appropriate to give it as to SIC.

         2                   Anyone disagree on the plaintiff's side?

         3    Mr. Richard?

         4                   MR. RICHARD:  Well, as I said yesterday, we

08:31AM  5    disagree that the evidence supports this instruction at all.

         6    Nothing I've heard changes that.  Dr. Hokkanen said he did not

         7    have an opinion.  But I understand the Court's opinion.

         8                   THE COURT:  All right.  I am going to give the

         9    instruction as requested by Whittaker which will be limited to

08:31AM  10   SIC.

         11                  Let me see if there's anything else that the

         12   Court has overlooked.  If not, I will just have to conform

         13   these instructions, and we will bring in the jury as soon as I

         14   am able to do that.  We will need to break before then.

08:32AM  15                  MR. RICHARD:  There is one other issue,

         16   Your Honor.

         17                  THE COURT:  Yes.

         18                  MR. RICHARD:  Before we bring in the jury, we'd

         19   still like to know if we're cross-defendants.

08:32AM  20                  THE COURT:  Oh, yes.  But actually, before we

         21   touch upon that, are there any other issues with the

         22   instructions other than those that have been discussed?

         23   Otherwise, I will consider them to be settled.

         24                  MR. RICHARD:  No other issues on jury

08:32AM  25   instructions.  There's the outstanding verdict form, I believe.

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | THE COURT:  All right.  Let me hear what the                     |
|       | 2  | issue is with the -- actually, let me get closure on the         |
|       | 3  | settling of the instructions.                                    |
|       | 4  | Mr. Blum?                                                         |
| 08:32AM | 5 | MR. BLUM:  Your Honor, we proposed to the                       |
|       | 6  | plaintiffs we would dismiss it for a cost waiver, but we         |
|       | 7  | haven't heard from them.                                          |
|       | 8  | MR. RICHARD:  I didn't get a call.                               |
|       | 9  | THE COURT:  Hold on.  With regard to the jury                    |
| 08:33AM | 10 | instructions, are they now settled?                             |
|       | 11 | MR. BLUM:  For the jury instructions?                            |
|       | 12 | THE COURT:  They're settled?                                     |
|       | 13 | MR. BLUM:  Yes.                                                  |
|       | 14 | THE COURT:  All right.  And so now, what's the --               |
| 08:33AM | 15 | what's your response with regard to the -- your client's        |
|       | 16 | claims?                                                          |
|       | 17 | MR. BLUM:  We sent an e-mail last night to the                  |
|       | 18 | plaintiff that we would dismiss with a cost waiver and haven't  |
|       | 19 | heard if they would.                                            |
| 08:33AM | 20 | THE COURT:  Mr. Richard?                                         |
|       | 21 | MR. RICHARD:  Yes.  I haven't seen that e-mail,                 |
|       | 22 | but that makes good sense to me, Your Honor.                     |
|       | 23 | THE COURT:  All right.                                           |
|       | 24 | MR. BLUM:  Then we would agree to dismiss them,                 |
| 08:33AM | 25 | Your Honor.                                                      |

1          THE COURT:  All right.  Those claims will be

2     dismissed on the terms that were just now agreed-upon on the

3     record.

4          So with that, then, I'm going to need a moment to

08:33AM  5     conform the instructions.

6          What is the outstanding issue or issues

7     concerning the special verdict form?  It will have to be

8     conformed certainly, but what's the issue?  Ms. Scott?

9          MS. SCOTT:  Yes, Your Honor.  The main issue is

08:34AM 10     to have it conform to the jury instructions.  There are a

11     couple spots where I believe the special verdict form we

12     initially submitted said "own."  That would now be own, lease,

13     occupy, and control.

14          Also, in the trespass section -- and we did send

08:34AM 15     to your clerk Mr. Cruz yesterday a Word version of this just so

16     you would know where the changes are.  Under trespass

17     paragraph 4, it initially said just VOCs.  That's a little

18     imprecise, I think.  We believe the jury should be

19     instructed -- I'm sorry -- the jury should have a verdict form

08:34AM 20     that names the VOCs here -- the TCE, PCE, and perchlorate.

21          The only other issues, I believe there was just a

22     typographical error on paragraph 18 where it instructed the

23     jurors to move on if they answered "No."  It should have said

24     "Yes."

08:34AM 25          THE COURT:  All right.

2043

1       MS. SCOTT:  We made a slight change to the

2   damages at paragraph 24, just giving the jury a single line to

3   make it less complicated.  And then again a typographical error

4   after paragraph 27 which just was confusing to the jurors.  So

08:35AM   5   we corrected that.

6       THE COURT:  And you said you did submit those to

7   Mr. Cruz?

8       MS. SCOTT:  Yes.  We sent Mr. Cruz an e-mail with

9   a clean Word copy and also a track changes version so you could

08:35AM   10   see where the errors had been corrected.

11       THE COURT:  All right.  Is there any objection to

12   the corrections that were made?

13       MR. BLUM:  Your Honor, we had agreed as to the

14   substantive --

08:35AM   15       THE COURT:  Into the microphone, please.

16       MR. BLUM:  Your Honor, we had an agreement as to

17   how to describe the substantive issues for the verdict form,

18   but there was a disagreement how damages were laid out.  And I

19   don't think you resolved that disagreement.

08:35AM   20       As to those changes to the substantive parts,

21   subject to all the objections we made prior, the wording is

22   fine.

23       THE COURT:  All right.  The Court will provide

24   you with a clean version at some point today.  It may be just

08:36AM   25   as the jury is about to deliberate.  But you will get a clean

2044

 1   copy, and you will have an opportunity to make sure it

 2   conforms, and I will address the damages issue.

 3             MR. BLUM:  Your Honor, a procedural issue.  I

 4   know you're not allowed to use your phone to take pictures, but

08:36AM  5   my phone is also a scanner.  May I scan the verdict form with

 6   my phone?

 7             THE COURT:  Yes.

 8             MR. BLUM:  Thank you.

 9             THE COURT:  All right.  Ms. Scott, I do need to

08:36AM 10   leave the bench now.  Is there something that you wish to

11   address?

12             MS. SCOTT:  Just briefly, Your Honor.  I just

13   wanted to confirm that the parties are in agreement that

14   prejudgment interest will be addressed by the Court and the

08:36AM 15   jury does not need to do that.

16             THE COURT:  Mr. Blum?

17             MR. BLUM:  Assuming they have a right to it,

18   that's correct.

19             THE COURT:  All right.  We will be in recess just

08:36AM 20   so I can conform these changes.

21             Thank you.

22             (A recess was taken at 8:36 a.m.)

23             THE COURT:  We are back on the record in

24   Santa Clarita Valley Water Agency versus Whittaker.  We're

08:51AM 25   outside the presence of the jury.

1        And my understanding is that there is an issue

2   that the defense wishes to raise with the Court.

3        MR. BLUM:  Your Honor, one of the issues on the

4   JMOL was punitive damages.  I know you haven't ruled on it.

08:51AM   5   But we would ask a ruling just on the punitive damage aspect.

6   And the reason is that, more than anything else that we have

7   moved on, the ability of the plaintiff to argue that their

8   rights to punitive damages changes the whole context in which

9   they can argue.

08:51AM  10        Because punitive damages are on the table, they

11   can make arguments about public policy, the harm to the public

12   generally that they might never be allowed to make otherwise.

13        THE COURT:  All right.  I am going to be denying

14   the JMOL across the board.  So they can argue the punitive

08:52AM  15   damages issue.

16        Actually, let me restate that.  I'm going to

17   defer ruling on the JMOL until the close, but I am going to

18   permit argument on the issue of punitive damages.  But you have

19   at least the Court's inclination that I'm likely going to deny

08:52AM  20   it.  But I'm going to give myself at least an opportunity to

21   further reflect upon it.  But the request by the defense to

22   exclude the punitive damages at this point is denied.

23        Let's go ahead and bring in the jury, please.

24        And I do need to have the -- before you go, I

08:53AM  25   have a PowerPoint that's up here that should not be -- that

1    should not be up.  One moment, please.

2              All right.  We can bring them in.  Thank you.

3              (The following proceedings were held in

4              open court in the presence of the jury:)

08:56AM   5              THE COURT:  We remain on the record now in the

6    presence of the jury.

7              Good morning, ladies and gentlemen.

8              THE JURY:  Good morning.

9              THE COURT:  At this time, both sides have rested.

08:56AM   10   And so there is no further evidence that you will be hearing.

11             At this point, I am going to be providing you

12   with the final jury instructions.  You will receive a copy of

13   these instructions in Word form with you.  So I invite your

14   close attention to the instructions as I will be reading them.

08:57AM   15   But you will have the ability to look at these instructions in

16   the jury room to refer back to them, if you wish.

17             Also, the lawyers do have an opportunity in

18   closing arguments to argue these instructions and how these

19   instructions apply to the facts as they believe the facts have

08:57AM   20   been revealed.  To the extent that they misstate the law as I

21   have presented it or will present it to you, ignore their

22   arguments and go with these instructions.

23             But now that you have heard all of the evidence,

24   it is my duty to instruct you on the law that applies to this

08:57AM   25   case.  It is your duty to find the facts from all the evidence

1    in the case.  To those facts, you will apply the law as I give

2    it to you.  You must follow the law as I give it to you,

3    whether you agree with it or not.  And you must not be

4    influenced by any personal likes or dislikes, opinions,

08:58AM    5    prejudices, or sympathy.  That means that you must decide the

6    case solely on the evidence before you.  You will recall that

7    you took an oath to do so.

8            Please do not read anything into these

9    instructions or anything I may say or do or have said or done

08:58AM    10    throughout the course of this trial as indicating that I have

11    an opinion regarding the evidence or what your verdict should

12    be.

13            Now, I do want to provide you with some basic

14    evidentiary principles, beginning with one that you may

08:58AM    15    generally be familiar with, and that is ignorance of the law

16    does not excuse a person from -- for violating the law.

17            Also, you may consider the ability of each party

18    to provide evidence.  If a party provided weaker evidence when

19    it could have provided stronger evidence, you may distrust the

08:59AM    20    weaker evidence.

21            Now, you have heard testimony from experts, a

22    number of experts, who testified to opinions and the reasons

23    for their opinions.  This opinion testimony is allowed because

24    of the education or experience of these witnesses.

08:59AM    25            Such opinion testimony should be judged like any

other testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

When a corporation designates a Rule 30(b)(6) deponent, that witness is authorized to speak for the organization on the specified matters, unlike other employees deposed in the litigation.  The testimony of a Rule 30(b)(6) representative is an evidentiary admission.

When you evaluate the testimony of a Rule 30(b)(6) representative, you may have to decide which testimony to believe and which testimony not to believe.  You may consider the credibility of the witness in determining whether to believe the testimony of a Rule 30(b)(6) representative.

Now I'm going to explain some general liability principles.  And the first has to do with the liability of a corporation.  Whenever I refer, by the way, to "Whittaker," I think you know by now I'm referring to Whittaker Corporation. Whittaker Corporation is the defendant in this lawsuit.

Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers.

Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers

1    performed within the scope of authority.

2              Now I'm going to talk to you about an idea or

3    concept called "successor liability."

4              Now, Whittaker Corporation is the successor to

09:01AM   5    the Bermite Powder Company, and Bermite occupied the site from

6    1943 until Whittaker purchased it in 1967.  Whittaker is,

7    therefore, liable for any act or omission by Bermite that

8    resulted in negligence, nuisance, or trespass.

9              And one other liability concept is that of

09:01AM  10    vicarious responsibility.

11             One may authorize another to act on one's behalf

12    in transactions with third parties.  This relationship is

13    called "agency."  The person giving the authority is called

14    "the principal."  The person to whom authority is given is

09:01AM  15    called "the agent."

16             An employer is responsible for harm caused by the

17    wrongful conduct of its employees while acting within the scope

18    of their employment.

19             Now, with regard to the claims in this case, I'm

09:02AM  20    going to first just give you a bird's-eye view of the different

21    claims that are asserted, and then I'm going to drill down and

22    give you instructions that apply to the claims, starting with

23    negligence.  Negligence is the first claim that is asserted by

24    the Santa Clarita Valley Water Agency.  They also assert a

09:02AM  25    claim for private nuisance.  They assert a claim for public

```
 1    nuisance.  And they also assert a claim for trespass.

 2                    So with respect to all of these claims, when a

 3    party has the burden of proof on any claim -- or we will get to

 4    affirmative defenses asserted by Whittaker.  When a party has

 5    the burden of proof on any claim or affirmative defense by a

 6    preponderance of the evidence, it means you must be persuaded

 7    by the evidence that the claim is more probably true than not

 8    true.  You should base your decision on all the evidence,

 9    regardless of which party presented it.

10                    Now we start with Claim No. 1, Negligence.  And

11    this is regarding the basic standard of care.

12                    Negligence is the failure to use a reasonable --

13    strike that.

14                    Negligence is the failure to use reasonable care

15    to prevent harm to oneself or to others.  A person can be

16    negligent by acting or by failing to act.  A person is

17    negligent if that person does something that a reasonably

18    careful person would not do in the same situation or fails to

19    do something that a reasonably careful person would do in that

20    same situation.

21                    You must decide how a reasonably careful person

22    would have acted in Whittaker's situation.

23                    Now, here are the elements of a negligence claim.

24                    The Santa Clarita Valley Water Agency claims that

25    it was harmed by Whittaker's negligence.  To establish this
```

1      claim, SCV Water must prove all of the following:

2                    One, that Whittaker was negligent;

3                    Two, that SCV Water was harmed; and

4                    Three, that Whittaker's negligence was a

09:04AM   5      substantial factor in causing SCV Water's harm.

6                    What is a substantial factor?  A substantial

7      factor in causing harm is a factor that a reasonable person

8      would consider to have contributed to the harm.  It must be

9      more than a remote or trivial factor.  It does not, however,

09:04AM  10      have to be the only cause of the harm.

11                    A person who owns property is negligent if that

12      person fails to use reasonable care to keep the property in a

13      reasonably safe condition.  A person who owns property must use

14      reasonable care to discover any unsafe conditions and to

09:05AM  15      repair, replace, or give adequate warning of anything that

16      could be reasonably expected to harm others.

17                    In deciding whether Whittaker used reasonable

18      care, you may consider, among other factors, the following:

19                    The location of the property;

09:05AM  20                    The likelihood of harm;

21                    The probable seriousness of such harm;

22                    Whether Whittaker knew or should have known of

23      the condition that created the risk of harm;

24                    The difficulty of protecting against the risk of

09:05AM  25      such harm; and

1        The extent of Whittaker's control over the

2   condition that created the risk of harm.

3        Now let's turn to the next claim which is private

4   nuisance, and I will describe the essential factual elements

09:06AM   5   that the plaintiff must prove for this claim.

6        SCV Water claims that it suffered harm because

7   Whittaker created a nuisance.  To establish this claim,

8   SCV Water must prove all of the following:

9        One, that SCV Water owned, leased, occupied, or

09:06AM  10   controlled the property, namely, wells;

11        Two, that Whittaker, by acting or failing to act,

12   created a condition or permitted a condition to exist that:

13        A, was harmful to health; or

14        B, was indecent or offensive to the senses; or

09:06AM  15        C, was an obstruction to the free use of property

16   so as to interfere with the comfortable enjoyment of life or

17   property.

18        Three, that:

19        A, Whittaker's conduct in acting or failing to

09:07AM  20   act was intentional and unreasonable or unintentional but

21   negligent or reckless; or

22        B, the condition that Whittaker created or

23   permitted to exist was the result of an abnormally dangerous

24   activity;

09:07AM  25        Element four, that this condition substantially

1   interfered with SCV Water's use or enjoyment of its land;

2            Five, that an ordinary person would reasonably be

3   annoyed or disturbed by Whittaker's conduct;

4            Six, that SCV Water did not consent to

09:07AM  5   Whittaker's conduct;

6            Seven, that SCV Water was harmed;

7            Eight, that Whittaker's conduct was a substantial

8   factor in causing SCV Water's harm; and

9            Nine, that the seriousness of the harm outweighs

09:08AM  10   the public benefit of Whittaker's conduct.

11            Now, in determining whether the seriousness of

12   the harm to SCV Water outweighs the public benefit of

13   Whittaker's conduct, you should consider a number of factors.

14            To determine the seriousness of the harm that

09:08AM  15   SCV Water suffered, you should consider the following:

16            One, the extent of the harm, meaning how much the

17   condition Whittaker caused interfered with SCV Water's use or

18   enjoyment of its property and how long that interference

19   lasted;

09:08AM  20            Two, the character of the harm, that is, whether

21   the harm involved a loss from the destruction or impairment of

22   physical things that SCV Water was using or personal discomfort

23   or annoyance;

24            Three, the value that society places on the type

09:09AM  25   of use or enjoyment invaded.  The greater the social value of

1    the particular type of use or enjoyment of land that is

2    invaded, the greater is the seriousness of the harm from the

3    invasion;

4            Four, the suitability of the type of use or

5    enjoyment invaded to the nature of the locality.  The nature of

6    the locality is based on the primary kind of activity at that

7    location, such as residential, industrial, or other activity;

8            Five, the extent of the burden, such as expense

9    and inconvenience, placed on SCV Water to avoid the harm.

10           Now, to determine the public benefit of

11   Whittaker's conduct, you should consider:

12           One, the value that society places on the primary

13   purpose of the conduct that caused the interference.  The

14   primary purpose of the conduct means Whittaker's main objective

15   for engaging in the conduct.  How much social value a

16   particular purpose has depends on how much its achievement

17   generally advances or protects the public good;

18           Two, the suitability of the conduct that caused

19   the interference to the nature of the locality.  The

20   suitability of the conduct depends upon its compatibility to

21   the primary activities carried on in the locality;

22           Three, the practicability or impracticality of

23   preventing or avoiding the invasion.

24           Now, SCV Water claims that Whittaker unreasonably

25   failed to put an end to an artificial condition on Whittaker's

2055

1    land that was a private nuisance.

2              To establish this claim, in addition to proving

3    that the condition created a nuisance, SCV Water must also

4    prove all of the following:

09:10AM   5              One, that Whittaker was in possession of the land

6    where the artificial condition existed;

7              Two, that Whittaker knew or should have known of

8    the condition and that it created a nuisance or an unreasonable

9    risk of nuisance;

09:11AM   10             Three, that Whittaker knew or should have known

11   that SCV Water did not consent to the condition; and

12             Four, that after a reasonable opportunity,

13   Whittaker failed to take reasonable steps to put an end to the

14   condition or to protect SCV Water from the nuisance.

09:11AM   15             Now we go to the next claim, which is public

16   nuisance.

17             So we just went through private nuisance, which

18   is a claim, and public nuisance is a separate claim.  And now

19   we go to public nuisance.

09:11AM   20             SCV Water claims that it suffered harm because

21   Whittaker created a nuisance.  To establish this claim,

22   SCV Water must prove all of the following:

23             One, that Whittaker, by acting or failing to act,

24   created a condition or permitted a condition to exist that:

09:11AM   25             A, was harmful to health; or

1      B, was indecent or offensive to the senses; or

2      C, was an obstruction to the free use of property

3  so as to interfere with the comfortable enjoyment of life or

4  property.

5      Two, that the condition affected a substantial

6  number of people at the same time;

7      Three, that an ordinary person would be

8  reasonably annoyed or disturbed by the condition;

9      Four, that the seriousness of the harm outweighs

10  the social utility of Whittaker's conduct;

11      Five, that SCV Water did not consent to

12  Whittaker's conduct;

13      Six, that SCV Water suffered harm that was

14  different from the type of harm suffered by the general public;

15  and

16      Seven, that Whittaker's conduct was a substantial

17  factor in causing SCV Water's harm.

18      Now we get to the fourth claim, Trespass.

19      SCV Water claims that Whittaker trespassed on its

20  property.  To establish this claim, SCV Water must prove all of

21  the following:

22      One, that SCV Water owned, leased, occupied, or

23  controlled the property;

24      Two, that Whittaker either intentionally,

25  recklessly, or, although not intending to do so, negligently

2057

caused perchlorate, TCE, and/or PCE to enter SCV Water's property;

Three, that SCV Water did not give permission for the entry;

09:13AM Four, that SCV Water was harmed; and

Five, that Whittaker's conduct was a substantial factor in causing SCV Water harm.

Entry can be on, above, or below the surface of the land.

09:13AM Now, you may consider customs or practices in the community at the time in deciding whether SCV Water Agency and Whittaker acted reasonably.  Customs and practices do not necessarily determine what a reasonable person would have done in their situation.  They are only factors for you to consider.

09:14AM Following a custom or practice does not excuse conduct that is unreasonable.  You should consider whether the custom or practice itself is reasonable.

Now, with regard to these claims, the plaintiff, SCV Water, has the burden of proof by a preponderance of the evidence.  Now we're going to turn to some affirmative defenses.

And as to an affirmative defense, the burden of proof by a preponderance of the evidence belongs to Whittaker.

And the first is something called contributory or comparative fault.

1          Whittaker claims that SCV Water's own negligence

2    contributed to its harm.  To succeed on this claim, Whittaker

3    must prove both of the following:

4          That SCV Water was negligent and that SCV Water's

09:15AM  5    negligence was a substantial factor in causing its harm.

6          If Whittaker proves the above, SCV Water's

7    damages are reduced by your determination of the percentage of

8    SCV Water's responsibility.  I will calculate the actual

9    reduction.

09:15AM 10          And now something called "apportionment of

11    responsibility," which is also an affirmative defense.

12          Whittaker claims that the negligence and fault of

13    Saugus Industrial Center, abbreviated SIC, contributed to

14    SCV Water's harm.  To succeed on this claim, Whittaker must

09:15AM 15    prove both of the following:

16          One, that SIC was negligent or at fault; and,

17          Two, that the negligence or fault of SIC was a

18    substantial factor in causing SCV Water's harm.

19          If you find the negligence or fault of more than

09:16AM 20    one person was a substantial factor in causing SCV Water's

21    harm, you must then decide how much responsibility each has by

22    assigning percentages of responsibility to each person listed

23    on the verdict form.

24          So you're going to get a verdict form which will

09:16AM 25    ask you a number of questions, and it will give you direction.

|      |    |                                                                      |
|------|----|----------------------------------------------------------------------|
|      | 1  | So as to this claim, if the claim is negligence, you will            |
|      | 2  | answer the Question 1 and then it will tell you what to do           |
|      | 3  | depending upon how you answer.  And that's what the special          |
|      | 4  | verdict form is.  It asks you questions and it gives you             |
| 09:16AM | 5  | direction on how to fill out the form, and you provide what       |
|      | 6  | your responses are, which is ultimately your verdict in the          |
|      | 7  | case.                                                                |
|      | 8  |            And each of the lawyers will undoubtedly go               |
|      | 9  | through that in more detail.  But since I'm mentioning the           |
| 09:16AM | 10 | verdict form and you're wondering, that's what I'm referring      |
|      | 11 | to.                                                                  |
|      | 12 |            Now, back onto this instruction.  The percentages         |
|      | 13 | must total 100 percent.                                              |
|      | 14 |            So let me just read -- since I diverged, let me           |
| 09:17AM | 15 | read the prior paragraph, and then I will read this next          |
|      | 16 | paragraph that I was just starting.                                  |
|      | 17 |            If you find that the negligence of fault of more          |
|      | 18 | than one person was a substantial factor in causing SCV Water's     |
|      | 19 | harm, you must then decide how much responsibility each has by       |
| 09:17AM | 20 | assigning percentages of responsibility to each person listed    |
|      | 21 | on the verdict form.                                                 |
|      | 22 |            The percentages must total 100 percent.  You will         |
|      | 23 | make a separate finding of SCV Water's total damages, if any.        |
|      | 24 | In determining an amount of damages, you should not consider         |
| 09:17AM | 25 | any person's assigned percentage of responsibility.  A person    |

1    can mean an individual or a business entity.

2            Now I'm going to provide you with instructions

3    concerning damages, and we will begin with a general

4    introduction to tort damages.  And when I say "tort damages,"

09:17AM  5    these claims fall under the legal umbrella of what we refer to

6    as torts.

7            If you decide that SCV Water has proved its claim

8    against Whittaker, you also must decide how much money will

9    reasonably compensate SCV Water for the harm.

09:18AM  10           This compensation is called damages.  The amount

11   of damages must include an award for each item of harm that was

12   caused by Whittaker's wrongful conduct even if the particular

13   harm could not have been anticipated.

14           SCV Water does not have to prove the exact amount

09:18AM  15   of damages that will provide reasonable compensation for the

16   harm.  However, you must not speculate or guess in awarding

17   damages.

18           Now, to recover damages for harm to property,

19   SCV Water must prove the reasonable cost of repairing the harm.

09:18AM  20   To determine whether the cost of repairing the harm is

21   reasonable, you must decide if there is a reasonable

22   relationship between the cost of repair and the harm caused by

23   Whittaker's conduct.  You must consider the expense and time

24   involved to restore the property to its original condition

09:19AM  25   compared to the value of the property.

1        Once you determine how much it costs or how much

2   it might cost to restore the groundwater under SCV Water's

3   property to its original state, you must then determine whether

4   the cost to restore SCV Water's property to its original

09:19AM  5   condition are reasonable in light of all the competing

6   interests set forth in the evidence presented by the parties.

7        Now, to recover damages for loss of use,

8   SCV Water must prove the reasonable cost to purchase

9   replacement water for the time when it could not use its own

09:20AM  10  wells.

11       For plaintiff to recover restoration damages on

12  its trespass and/or nuisance claims, it must first prove that

13  it has a possessory interest in the property that is damaged.

14  Plaintiff contends it has two separate property interests, an

09:20AM  15  appropriative interest in groundwater, allowing it to extract

16  groundwater to sell for drinking water and, separately, that it

17  owns an interest in the land, including the surface water and

18  the subsurface on which its supply wells are located.

19       Now, appropriative right, I will provide you with

09:20AM  20  some additional information about that.

21       So plaintiff has no actual property interests in

22  the groundwater but only a right to use the water.  This is

23  called an appropriative right.

24       In California, the groundwater belongs to and is

09:21AM  25  owned by the state, not any person or entity.  Because

1    plaintiff's appropriative right is based only upon its right to

2    use the water, plaintiff does not obtain a possessory interest

3    in the groundwater until it is extracted from the ground for

4    use as drinking water.  For plaintiff to recover damages for an

09:21AM    5    injury to its interest in the use of the groundwater, plaintiff

6    must prove that the injury took place after the water was

7    extracted from its wells.

8            Interest in land.  Plaintiff also contends that

9    it owns an interest in land upon which its wells are located,

09:21AM   10    including the surface property and the subsurface.

11           Now, you must award damages in an amount that

12    fully compensates SCV Water for its damages in accordance with

13    the instructions that I'm giving you.  You may not speculate or

14    consider any other possible sources of benefit that SCV Water

09:22AM   15    may have received.  After you have returned your verdict, the

16    Court will make whatever adjustments are necessary in this

17    regard.

18           Now, you will hear closing arguments from both

19    counsel shortly.  And the arguments of the attorneys are not

09:22AM   20    evidence of damages.  Your award must be based on your reasoned

21    judgment applied to the testimony of the witnesses and the

22    other evidence that has been admitted during trial.

23           Now, you may recall that, during jury selection,

24    I made reference to the fact that the plaintiff, SCV Water, was

09:22AM   25    claiming not just compensatory damages but punitive damages.

And so, if you decide that Whittaker's conduct caused SCV Water harm, you must decide whether the conduct justifies an award of punitive damages.  The amount, if any, of punitive damages will be an issue decided later.

09:22AM  At this time, you must decide whether SCV Water has proved that Whittaker engaged in that conduct with malice, oppression, or fraud.  To do this, SCV Water must prove one of the following by clear and convincing evidence.

So you are now hearing a different burden of proof than you have previously heard.  With regard to the 09:23AM claims that the plaintiff has to prove and the affirmative defenses, that burden of proof is called preponderance of the evidence.

With regard to the issue of punitive damages, it 09:23AM has its own burden of proof, which is a higher burden of proof, which is called clear and convincing evidence.  And the plaintiff shoulders that burden.  And I will explain to you what clear and convincing evidence is or what the burden is after I give you this punitive damage instruction.

09:23AM  So this is what SCV must prove by clear and convincing evidence:

One, that the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of Whittaker who acted on behalf 09:24AM of Whittaker; or

1          Two, that the conduct constituting malice,

2     oppression, or fraud was authorized by one or more officers,

3     directors, or managers -- strike that -- or managing agents of

4     Whittaker; or

09:24AM     5          That one or more officers, directors, or managing

6     agents of Whittaker knew of the conduct constituting malice,

7     oppression, or fraud and adopted or approved that conduct after

8     it occurred.

9          Now, I'm going to give you definitions, if you

09:24AM    10     will, concerning some of these concepts, beginning with malice.

11          "Malice" means that Whittaker acted with intent

12     to cause injury or that Whittaker's conduct was despicable and

13     was done with a willful and knowing disregard of the rights or

14     safety of another.

09:24AM    15          A person acts with knowing disregard when the

16     person is aware of the probable dangerous consequences of the

17     person's conduct and deliberately fails to avoid those

18     consequences.

19          "Oppression" means that Whittaker's conduct was

09:25AM    20     despicable and subjected SCV Water to cruel and unjust hardship

21     in knowing disregard of its rights.

22          Despicable conduct is conduct that is so vile,

23     base, or contemptible that it would be looked down on and

24     despised by reasonable people.

09:25AM    25          "Fraud" means that Whittaker intentionally

1   misrepresented or concealed a material fact and did so

2   intending to harm SCV Water.

3           An employee is a managing agent if the person

4   exercises substantial independent authority and judgment in the

09:25AM   5   person's corporate decision-making such that the person's

6   decisions ultimately determine corporate policy.

7           And now the instruction on what clear and

8   convincing evidence means.

9           When a party has the burden of proving any claim

09:25AM   10  or defense by clear and convincing evidence, it means that the

11  party must present evidence that leaves you with a firm belief

12  or conviction that it is highly probable that the factual

13  contentions of the claim or defense are true.

14          This is a higher standard of proof than proof by

09:26AM   15  a preponderance of the evidence, but it does not require proof

16  beyond a reasonable doubt.

17          Now, I am going to provide you at this point with

18  some instructions concerning -- or that will guide your

19  deliberations.  And the first is that, once you have heard all

09:26AM   20  of the evidence and you assemble in the jury room, the first

21  thing that you should do before you even begin your

22  deliberations is elect one member of the jury as the presiding

23  juror.  The presiding juror will preside over the deliberations

24  and serve as the spokesperson for the jury in court.

09:26AM   25          That person, however, will not be asked, as you

see on TV or in movies, to actually read the verdict itself.
That will be done by my courtroom deputy.  And I tell you that
because sometimes someone -- some people might not want to
serve as a foreperson, not because they don't want to do it
inside the deliberation room, but they don't want to have to
announce the verdict in open court.  Don't let that dissuade
you.  You won't be asked to do that task.

You shall diligently strive to reach agreement
with all of the other jurors if you can do so.  Your verdict
must be unanimous.

Each of you must decide the case for yourself,
but you should do so only after you have considered all of the
evidence, discussed it fully with the other jurors, and
listened to their views.

It is important that you attempt to reach a
unanimous verdict, but, of course, only if each of you can do
so after having made your own conscientious decision.  Do not
be unwilling -- excuse me -- do not be unwilling to change your
opinion if the discussion persuades you that you should.  But
do not come to a decision simply because other jurors think it
is right or change an honest belief about the weight and effect
of the evidence simply to reach a verdict.

Because you must base your verdict only on the
evidence received in the case and on these instructions, I want
to remind you that you must not be exposed to any other

1    information about the case or to the issues it involves.

2              Except for discussing the case with your fellow

3    jurors during deliberations, I remind you do not communicate

4    with anyone in any way and do not let anyone else communicate

09:28AM    5    with you in any way about the merits of the case or anything to

6    do with it.

7              This includes discussing the case in person, in

8    writing, by phone, tablet, or computer or any other electronic

9    means via e-mail, text messaging, or any Internet chat room,

09:28AM   10    blog, website, or application, including, but not limited to,

11    Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat,

12    TikTok, or any other forms of social media.

13              This applies to communicating with your family

14    members, your employer, the media or press, and the people

09:29AM   15    involved in the trial.

16              If you are asked or approached in any way about

17    your jury service or anything about the case, you must respond

18    that you have been ordered not to discuss the matter and then

19    please report the contact to the Court.

09:29AM   20              Do not read, watch, or listen to any news or

21    media accounts or commentary about the case or anything to do

22    with it; although, I have no information that there will be

23    news reports about this case.

24              Also, please do not do any research, such as

09:29AM   25    consulting dictionaries, searching the Internet, or using other

reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

Also, do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place that was discussed during the trial.

Also, do not do any research about this case, the law, or the people involved, including, but not limited to, the parties, the witnesses, or the lawyers until you have been excused as jurors.  If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules, as I explained to you during the preliminary instructions, protect each party's right to have this case decided only on the evidence that has been presented here in court.

Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process that you witnessed.

If you do any research or investigation outside of the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial

by an impartial jury.  And if you decide the case based on information not presented in court, you will have denied the parties a fair trial.  Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

09:31AM

          A juror who violates these restrictions jeopardizes the fairness of these proceedings.  If any juror is exposed to any outside information, please notify the Court immediately.

09:31AM

          Now, if it does become necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more of your members.

          No member of the jury should ever attempt to communicate with me except by a signed writing.  I will communicate with any member of the jury on anything concerning the case only in writing or here in open court.

          If you send out a question, I will consult with the parties before answering it, which may take some time.  So please continue your deliberations while you await my answer to your question.

          Remember that you're not to tell anyone, including me, how the jury stands numerically or otherwise until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the

```
  1    Court.
  2              Now, a verdict form, which I have explained a
  3    little bit to you, has, in fact, been prepared for you in this
  4    case.  And after you have reached a unanimous verdict -- or
  5    agreement on a verdict, I should say, your presiding juror
  6    should complete the verdict form according to your
  7    deliberations, sign and date it, and advise the bailiff that
  8    you are ready to return to the courtroom.
  9              Now, that concludes the instructions that I am
 10    going to give you.  It is possible that I may give you some
 11    additional instructions following the closing arguments.
 12              But at this time, ladies and gentlemen, you're
 13    going to hear the closing arguments.  And we will begin with
 14    the plaintiff, SCV Water.  SCV Water is the plaintiff.  They
 15    bear the burden of proof on the claims.
 16              So you're going to hear from them twice.  They
 17    will have an opportunity to present you with what's called an
 18    opening closing argument.  Then you will hear from Whittaker,
 19    which will present the defense closing argument.  And then you
 20    will hear, once again and finally, from the plaintiff who will
 21    present what is called a rebuttal closing argument.
 22              A couple of things.  I remind you that argument
 23    is not evidence.  What the lawyers will now do is sum up the
 24    evidence.  What they're allowed to do is to accurately report
 25    to you on the evidence that you heard and argue the evidence
```

1    and reasonable inferences from the evidence that you heard.

2    They're not permitted to misstate the evidence.

3         If they do that and you -- your memory tells you

4    that the evidence was one thing and they're telling you

09:33AM  5    something else, disregard what they tell you.  Your memory

6    controls.

7         Second thing, as I mentioned, they can argue how

8    the law intersects with the facts as they believe the facts

9    have unfolded.  But again, if they tell you something about the

09:34AM  10   law that differs from the law that I have instructed you on,

11   disregard what they say that's inconsistent and follow the law

12   that I have given to you.

13        Now, with that, Mr. Richard, you may present your

14   opening closing argument.

09:34AM  15        MR. RICHARD:  Thank you, Your Honor.

16        I think I'm okay here.  Let's see.  Thank you,

17   Your Honor.

18        Good morning, ladies and gentlemen of the jury.

19        We have learned a bit about how groundwater flows

09:34AM  20   and contamination in this case.  And this is my opportunity to

21   talk to you about what some of the evidence shows.  And before

22   I do that, I want to thank you for your time and attention in

23   this matter.  At times, the evidence has been time-consuming,

24   perhaps, or repetitive, and that's the nature of trials.

09:35AM  25        In this case, it's -- while I thank you for your

```
 1   time, it's important -- isn't it? -- that we take the time

 2   because this issue matters.  Clean drinking water.  It's not

 3   just that we're in a drought, but we're here talking about

 4   groundwater and contamination.

 5              And so my client, which serves that groundwater,

 6   has brought claims against Whittaker for the contamination at

 7   its property.  And so while we have learned a bit or maybe a

 8   lot about the geology and that groundwater, in fact, does flow

 9   downhill, we have also learned about what corporations, in this

10   case Whittaker Corporation, does when it discovers

11   contamination.  We have learned how it gets there.  We have

12   learned about deceit, deception, delay, denial, haven't we?  We

13   have seen that evidence.  So I will talk about some of that

14   evidence now.

15              But the last thing I want is, when you retire to

16   answer the questions on the verdict form and think about what

17   happened in this case, just because I don't mention evidence,

18   please don't think, well, Mr. Richard didn't think it was

19   important.  All the evidence is important.  And I know you will

20   look at that when you make your decision.

21              But I want to start by every case -- every trial

22   has turning points, at least for me.  And for me, the first

23   turning point came -- and by the way, my closing will look a

24   lot like my opening.  When an attorney tells a jury this is

25   what they believe the evidence will show, that's a -- that's a
```

09:35AM (line 5)
09:35AM (line 10)
09:36AM (line 15)
09:36AM (line 20)
09:36AM (line 25)

1    serious bond.  That's a commitment.  This is what I believe the

2    evidence will show.

3                So you will see some of the same evidence, but

4    we've also seen additional evidence that wasn't in my opening.

09:37AM  5   So I will be talking a bit about Whittaker's opening statement.

6    What did they tell you?  Did they prove that?  Because that's

7    important.

8                But, for me, after I told you what I thought the

9    evidence would show and what I think we have proven in this

09:37AM  10  case, and more, frankly, I sat down and I was surprised.  There

11   was a turning point for me when Whittaker's attorney stood up

12   and told you that Whittaker takes responsibility.

13               So I'm going to start there because I think, for

14   me, this frames why we're here because I thought -- I thought

09:37AM  15  if only my clicker worked.  I can do it the old-fashioned way.

16               This case is about responsibility, and that's

17   something that Whittaker's attorney told us.  And I thought,

18   you know, we agreed on that.  Right?  We're here to hold

19   Whittaker responsible for the contamination over many decades

09:38AM  20  at its property.

21               Then he said we're responsible for the

22   perchlorate.  I will say it again.  Whittaker is responsible

23   for the perchlorate contamination.  I thought, well, that's

24   great.  Why don't you just take responsibility for the rest of

09:38AM  25  the contamination, then we can all go home.  But then I

1    realized -- and the evidence tells us -- this is not true.

2    Whittaker didn't take responsibility.  Whittaker hasn't taken

3    responsibility.

4              The evidence tells us that Whittaker only takes

09:38AM 5    responsibility when it's imposed, when they're sued, when

6    there's an arbitration, when there's a ruling against them.

7    They delay, they deny.  The evidence told us over and over.

8    They denied responsibility for perchlorate contamination for

9    years.  Then they were sued.  Then they denied it for years

09:39AM 10   more.

11             So that's the context of this case, I believe.

12   And I think the evidence tells us that sometimes the attorneys

13   tell you one thing and the evidence tells you something else.

14   And always follow the evidence.

09:39AM 15             So that was a few weeks ago in their opening

16   statement.

17             So did Whittaker take responsibility?  You heard

18   from Mr. Peloquin.  He was the fellow who was out there, head

19   of safety.  He's the fellow who led a tour in 1987 of the EPA

09:39AM 20   and the state EPA, the DTSC.  And then he prepared some notes

21   to the vice president and general counsel Gordon Louttit.

22             Whittaker didn't call Mr. Louttit.  They didn't

23   present him.  And we will talk about jury instructions when a

24   party has -- the judge just read it for you -- a party presents

09:39AM 25   weaker evidence rather than stronger evidence.  They didn't

 1    present Mr. Louttit.

 2            In his own words, he told Mr. Louttit, after this

 3    tour, "I note that we didn't get to East Fork."  That was one

 4    of the landfills, the one that had the most contamination.

 5    "Just can't imagine how that happened.  Landfills did not come

 6    up, slipped my mind."

 7            This is the evidence we have seen in this case.

 8    This is the candid kind of admission that tells us, when we

 9    hear words like "despicable" or "malice" or "oppression" or

10    "deceit," this is the kind of corporate conduct that comes to

11    mind, isn't it?

12            And Mr. Sorsher, our first witness, the older

13    gentleman, he was there in 1987.  He remembered Mr. Peloquin.

14    And he emphasized, hey, we got this memo in 1988.  And they

15    told us, no big deal.  We have three landfills.  No hazardous

16    substances.  No hazardous releases.

17            And I asked him, Did you rely on them, on

18    Whittaker, to tell the truth?  And he said, Yes, I did.  He

19    said, We thought it was innocuous based on their disclosures in

20    1988.

21            He went on to say he was shocked and surprised

22    because their 1988 submittal was saying how innocuous the site

23    was.  And now in 1991, I get this other memo -- and I will just

24    interrupt there -- the other memo is trial Exhibit 445.  It is

25    what is called the mystery memo.  Whittaker knew about it.  It

1    was prepared by their consultant Wenck.  Norman Wenck, another

2    witness that Whittaker didn't bring before you.

3                    I brought Mr. Sorsher into this courtroom.  He

4    described -- three years later, I get this memo delivered to

09:41AM  5    me.  Everybody called it the mystery memo because we weren't

6    sure who it came from.  It looked similar to other documents he

7    had gotten.  He had been dealing with Norm Wenck and Whittaker

8    for years, hadn't he?  That's what the evidence tells us.

9                    Then he gets a memo in 1991, dated June 1987

09:42AM  10   describing not three landfills, numerous landfills.  Not

11   innocuous trash, pallets, metal.  Hazardous waste all over the

12   site.

13                   Again, that's the kind of deception and

14   despicable corporate conduct that may matter to you when you

09:42AM  15   deliberate in this matter in a bit.

16                   He goes on to say, I get this other memo which is

17   saying they found all these things.  I didn't correct that.

18   Sorry.  They were digging this stuff up basically behind my

19   back.

09:42AM  20                   Did -- President Joe Alibrandi, he met with

21   Gordon Louttit, he met with John Peloquin.  He's the president.

22   Mr. Peloquin said he was the head guy.  I didn't tell Joe

23   anything.  Joe ran things.  Did he take responsibility?

24                   There was a meeting, June 17th, 1987, same date

09:43AM  25   as that mystery memo that showed up three years later.  In his

own words, "Joe feels it is not necessary to sift the landfills
to the degree that we have been presently."

So now, this is an example of, well, what is a
reasonable inference when you read this?  They met, they
09:43AM  talked, they were dealing with contamination.  They started
going through their landfills, sifting it, let's find out
what's out there.  And then the president of Whittaker says, I
don't think we need to do that.  That's how I read these words.
But again, you'll decide.  Does that mean something else?  I
09:43AM  don't think so.

Then we get to, well, why?  And that's something
in every case I ask myself.  Why are we here?  How did this
happen?  Who made the decision?

And there's an old saying in this type of work,
09:43AM  follow the money.  Right?  And so he tells us, oh, the costs
were pared down from 1.8 million, which was their estimate to
deal with these landfills at that time, to about a third of
that.  Oh, well, there's nothing wrong, their witnesses tell
us, with a corporation wanting to save some money.

09:44AM  Well, there is when it comes to cleaning up
hazardous waste sites, isn't there?  You want companies, you
want corporations to be responsible corporate citizens in this
country, not to pare down in the face of hazardous
contamination and hope to sell the property to someone else and
09:44AM  make it their problem.

1    It goes on to say, "Joe made a comment to the

2    effect, if he cannot sell the property because of a

3    contamination problem, he will write off the loss and will the

4    property to the EPA or maybe Tammy Bakker.  I was going to

09:44AM  5    include a picture of Tammy Faye Bakker for you, but -- and I'm

6    not sure who the modern counterpart might be.  I don't know.

7    Not Britney Spears.  But she was a public figure in the '80s

8    because of her husband that -- the minister.

9    And so this is, obviously -- she wasn't a serious

09:45AM  10    consideration for someone that he would will the property to

11    as a -- and neither was the EPA.

12    This gives us an insight into how Whittaker

13    viewed this at the time.  Pretty cavalier, isn't it?  Pretty

14    sarcastic.  Big joke.

09:45AM  15    We have contamination.  Let's not tell the EPA.

16    Let's not tell Alan Sorsher of the state EPA.  Did President

17    Eric Lardiere take responsibility?  He's here.  He's been with

18    Whittaker for over 20 years.  He heard his attorney say we take

19    responsibility.

09:45AM  20    So we went through dispute after dispute after

21    dispute involving perchlorate, involving an actual agreement

22    between Whittaker and my client, the water agency.  So I asked

23    him, fair to say that, even after the water agencies sued

24    Whittaker, Whittaker denied any liability for the perchlorate

09:46AM  25    contamination?

1          Well, we did eventually settle.  We went through

2     this.  We heard this.  Eventually taking responsibility after

3     you have been sued, after a federal judge has ruled against

4     you, doesn't quite mean what counsel suggested, I would submit,

09:46AM  5     we take responsibility.

6          We went through a number of the disputes that

7     arose even after that settlement agreement.  He talked about a

8     well at Magic Mountain.  He admitted they paid over $8 million

9     after the water agency filed an arbitration against him.  He

09:46AM  10    talked about another dispute to refurbish -- costs on some of

11    the vessels, those big treatment vessels.  They paid after a

12    cost consultant arbitration.

13         He talked about V-201.  We've had a lot of

14    testimony about that well.  Shut down in 2010.  It's subject to

09:46AM  15    the 2007 settlement agreement.

16         You heard testimony from Dan Masnada himself.

17    Yeah, I wrote him a couple days before Christmas 2014 and then

18    I called him.  And he described exactly where he was driving.

19    Gets ahold of Mr. Lardiere and he's pretty hot under the

09:47AM  20    collar.  He didn't want to share precisely the words he used.

21         But suffice it to say, years had gone by.  And

22    when asked about that phone call, Mr. Lardiere couldn't quite

23    remember the phone call, but, again, well, we did eventually

24    agree.

09:47AM  25         Well V-205, you heard this evidence.  Again,

1   Mr. Lardiere testified in this proceeding, he gets a letter, a

2   formal notice under the 2007 settlement agreement.  Hey, we've

3   had a detection.  It's over the limit set forth in our

4   agreement.  You're required to take these steps to meet and

09:47AM   5   agree to reimburse.

6           And he says -- this is Mr. Matt Stone writing a

7   formal request, asking Whittaker to accept responsibility under

8   the agreement to do what?  Quote, "Reimburse SCVWA for all past

9   and future costs to treat perchlorate contamination and other

09:48AM   10   contaminants released at the Whittaker site as necessary to

11   restore Well V-205 as a water production well."

12          Seems like a pretty clear request.  We have an

13   agreement, there's perchlorate contamination.  He received no

14   response to that notification sent seven weeks ago.  This is

09:48AM   15   from an e-mail he wrote in May, and there's still no agreement.

16          And then you heard testimony from their longtime

17   consultant just yesterday and the day before, well, we were

18   waiting for them to give us something.  You didn't cite to

19   anything.  There's no document he presented to you.  It's just

09:48AM   20   another excuse.

21          We got a formal notification, and I talked to

22   Mr. Lardiere.  And we were going to provide a response, but we

23   were waiting.  Well, where is the letter that says that?  Total

24   failure of proof on that.  Just another excuse.  They certainly

09:49AM   25   didn't take responsibility, and they still haven't.  There is

```
 1   still no agreement to provide perchlorate treatment at

 2   Well V-205.  That's one of the claims in this case.

 3            And then you heard about this other well,

 4   Well Q2.  There was just a dispute earlier this year where,

 5   again, as they are here -- you heard the judge.  One of the

 6   issues is, oh, there's been negligence by the water agency.  We

 7   shouldn't have to pay.  The water agency should have done

 8   something differently.  Very similar issue to this arbitration

 9   earlier this year, as you heard.

10            MR. BLUM:  Objection, Your Honor.  There is no

11   facts supporting that assertion.

12            MR. RICHARD:  Other than Mr. Lardiere's

13   testimony.

14            THE COURT:  All right.  Please, when there is an

15   objection, you need to wait until the Court rules.

16            The objection is overruled.

17            MR. RICHARD:  So we heard Mr. Lardiere describe

18   this proceeding.  You heard Mr. Simpson just a couple days ago.

19   Yeah, I testified in that proceeding.

20            And just so we're clear, Mr. Lardiere sat in that

21   chair and said that was the arbitration that I said we lost.

22   He said it more than once.

23            Whittaker was ordered to pay for a containment

24   study.  You heard testimony on that.  Replacement water and the

25   treatment facility.
```

09:49AM (line 5)
09:49AM (line 10)
09:49AM (line 15)
09:50AM (line 20)
09:50AM (line 25)

1          So that was a litany of disputes where every time

2     there was an issue for perchlorate contamination, there was

3     delay, denial, and excuses.  And yet this case is about taking

4     responsibility.

09:50AM   5          And so one of the claims we just heard about from

6     the Court's instruction -- and you will have a hard copy of

7     these instructions -- is negligence.  And this sets forth, you

8     know, what we expect of citizens, including corporate citizens.

9          Negligence is the failure to use reasonable care

09:51AM  10     to prevent harm to oneself or to others.  A person can be

11     negligent by acting or by failing to act.  And these principles

12     have special application to the evidence we've heard in this

13     case.

14          Not only was there widespread dumping -- and we

09:51AM  15     will go through some of that evidence, including of PCE and

16     solvents -- there was a failure to act -- wasn't there? -- in

17     the early '80s when they started looking into the extent of

18     their contamination.

19          So it goes on to say, "A person is negligent if

09:51AM  20     that person does something that a reasonably careful person

21     would not do in the same situation or fails to do something

22     that a reasonably careful person would do."

23          And then there's a number of factors that you

24     consider.  And again, I think these factors apply very clearly

09:51AM  25     to the evidence that you will be discussing when you retire to

1       the jury room.

2                Quote, "A person who owns property is negligent

3       if that person fails to use reasonable care to keep the

4       property in a reasonably safe condition." And we will go

5       through some of the evidence that tells us that they failed to

6       do that.

7                "A person who owns property must use reasonable

8       care to discover any unsafe conditions."  Well, here, not

9       only -- they learned of unsafe conditions, didn't they?  They

10      hired that geologist we'll talk about, Bob Bean, in 1982.

11               Oh, you have an impoundment with contamination

12      from chlorinated solvents and it's overflowing.  That

13      creates -- brings to mind a certain image.  I have this

14      overflowing impoundment, 32,000 gallons that is now being used

15      for well beyond its original purpose.  That's in writing.  We

16      saw that.  I think it's Exhibit 25.  We will get to that.  So

17      these factors will help guide you.

18               But we know.  We know.  The evidence tells us --

19      doesn't it? -- that Whittaker wasn't just negligent.  They were

20      reckless.  They were reckless with these dangerous chemicals at

21      their property, both before 1980 and after 1980.

22               And as the Court instructed you, this idea that

23      they have no liability of the chlorinated solvents that got

24      into the ground before 1967 is not true.  They're responsible

25      back to 1943.

1          So I'm not going to go through all these factors

2     at this time.  You will have those instructions.

3          But let's look at what they knew.  Right?  That's

4     what the negligence instruction says.  Were they reasonable?

09:53AM   5          Well, their own documents tell us -- this is that

6     memo, Exhibit 25, from Bob Bean.  This is back in 1982.  He

7     comes out, he does a -- walks around the property, talks to

8     Jim Jisa, who you heard the deposition read from yesterday.  He

9     tells him, there's almost certainly the potential for migration

09:54AM  10     of hazardous waste or hazardous waste constituents.

11          According to Jim Jisa, the Whittaker fellow that

12     you heard from yesterday in that deposition read, there had

13     been liner breaks.  Liner breaks in what?  In this

14     32,000-gallon impoundment that was being used for more

09:54AM  15     chemicals and more runoff than it should have been used for, as

16     set forth in this exhibit.

17          The hazardous wastewater would move essentially

18     straight down through those liner breaks.  The wastewater would

19     then move downgradient.  That's a term we have heard in this

09:54AM  20     case; right?  For groundwater, travels from higher elevations

21     to lower elevations -- in that aquifer.

22          In the case of both sumps, both of these

23     impoundments, they're referred to as Building 317 and

24     Building 342.  And they come up over and over again as the

09:54AM  25     regulators figure out what Whittaker knew back in 1982.

1          This would almost certainly be in a westerly

2     direction.  Again, didn't need a whole bunch of studies.  They

3     knew.  You've got a liner break or it's overflowing, it's going

4     to go straight down, get in the aquifer, and go west.

09:55AM  5          They knew of the risks of even mild chronic

6     exposure to these solvents because these solvents were used in

7     what?  Well, one of the big uses of them at this site was for

8     their degreasers; right?  You have ammunition that comes packed

9     in grease.  You have equipment that needs to have the grease

09:55AM 10     cleaned off it.  And you put it through these degreasers.  And

11     degreasers have a vapor that has some of this -- some of these

12     solvents.  They have sludge that's created.  We saw no evidence

13     as to where all that sludge went, did we?

14          So this is back in 1979.  The vapor degreaser

09:55AM 15     outside the machine shop -- and this is another -- this is from

16     Mr. Peloquin to Zoyd Luce, the two Whittaker folks that we

17     heard from in their deposition reads.  "The vapor degreaser

18     outside the machine shop needs fail-safe.  Acute exposure to

19     the solvent vapors can cause death.  Chronic mild exposure to

09:56AM 20     the vapors has been known to cause permanent liver damage."

21     And this was well-known before 1979, as Dr. Hughto went through

22     and explained the history of use of chlorinated solvents and

23     surface contamination in groundwater.

24          I'm just going to jump ahead.  There was a lot of

09:56AM 25     intervening evidence from the regulators before 2002.  But in

2002, we see the same reference to health effects.  TCE is classified as what?  A probable human carcinogen.  Can cause reproductive defects, tumorigenic effects, chloracne, and what?  And liver damage.  It's been known a long time.  Whittaker has had a safety -- knew it in 1979.  They were reminded of it in 2002.

And the evidence tells us that they knew or certainly should have known of the risks of dumping waste on the ground.  I say groundwater.  We will keep going.

And Dr. Hughto went through some of this history for us.  He talked about a study in 1899, that manufacturing processes can create pollution of nearby wells.  There were early laws in California he talked about.  There was a special concern going back to the '40s and '50s in Southern California about groundwater contamination.

And he talked about -- Dr. Hughto described that the USGS, the United States Geological Survey -- he's actually quite an authority on this, and there was quite a bit of publication in the 1960s.  He described and read for us a portion of this 1899 study.  Some of the nuances and potential liabilities that he identified -- they're talking about the author of this study -- was pollution of private wells adjacent to a property, pollution of state streams, pollution of rivers used for water supply in the cities, an emission of noxious fumes.

1          In the 1940s, the propensity of industrial

2    wastes, including chlorinated solvents, to contaminate

3    groundwater was understood in the 1940s in Southern California.

4    This understanding was not limited to a small group of

09:58AM  5    specialists but extended to regulators, industry, and the

6    interested public.

7          That testimony stands undisputed, doesn't it?

8    Mr. Blum for Whittaker talked about another expert that he said

9    you would hear from.  He mentioned him by name, Gaynor Dawson,

09:58AM 10   and we never heard from him.  So this evidence is true, and it

11   stands uncontested.

12          Dr. Hughto went through a well-known law in

13   California and the commission giving rise to that law back in

14   1949.  "Industrial wastes discharged onto land can reach

09:59AM 15   underground waters where dilution occurs so slowly that the

16   effects are always long-lasting and in some places practically

17   permanent pollution."  That was his testimony on November 18th.

18          1953, he talked about this and read this into the

19   record.  Pollution of underground water -- underground water is

09:59AM 20   more serious than that of surface water because subterranean

21   water movement is slow.  And he was citing to another journal.

22          So while we don't have evidence that Whittaker,

23   you know, read the Dickey law in 1949 or the other laws, you

24   just heard the judge instruct that ignorance of the law is no

09:59AM 25   excuse, something I think we all learned somewhere along the

2088

```
 1   way.
 2              But in addition to the history, especially in
 3   Southern California, of an awareness that contamination on the
 4   ground, especially massive contamination -- the tremendous
 5   amounts of TCE and PCE that were used here, we don't have the
 6   records of how much they purchased or when they purchased it or
 7   when they stored it or how they disposed of it.  But we do have
 8   the evidence of hundreds of thousands of pounds being
 9   identified, much of which has been removed, maybe
10   100,000 pounds, but much of which has not been removed.
11              So this wasn't, you know, someone taking a cup of
12   something and dumping it on the ground.  This was industrial
13   practices.  They should have been more careful.  That's what
14   the evidence tells us.
15              But we also have their own testimony, their own
16   documents.  How do we know that Whittaker knew it was not
17   supposed to dump waste on the ground?  Well, they told us,
18   didn't they?  We did not allow people.  It wasn't part of our
19   policy to just dump things.  It wouldn't have been safe.  That
20   was read, I believe, yesterday from Mr. Zoyd Luce.
21              Did Whittaker have a policy against dumping on
22   the ground?  Yes.  Did they violate their own policy against
23   dumping on the ground?  Yes.  And again, they tell us in their
24   own words -- they actually use the word "dumped."  Types of
25   materials being dumped on ground by building location.  This is
```

10:00AM  (line 5)
10:00AM  (line 10)
10:00AM  (line 15)
10:01AM  (line 20)
10:01AM  (line 25)

1    Exhibit 205.

2            It talks about 29 sites just in this one memo.

3    And he names them.  Building 317, reference to

4    perchloroethylene, PCE.  The auto shop with solvents, the burn

10:01AM  5    pits.  What ended up in the burn pit?  All chemicals.  So

6    that -- as Dr. Hughto explained, four specific references out

7    of the 29 sites to PCE being dumped on the ground.  And then

8    the catch-all burn pit areas where everything in the plant, all

9    the chemicals, ended up.

10:02AM  10            You know, there was some testimony that was read

11    yesterday and it brought to mind an image where you have this

12    big burn pit.  And then just to see what would happen, they put

13    a barrel next to it.  And you heard the testimony, we came back

14    and it was incinerated.  And it was almost this image of, you

10:02AM  15    know, big boys wanting to just throw things in the burn pit to

16    see what would happen or set something next to it to see what

17    would happen.

18            Well, burn pits have a way of becoming a

19    landfill, don't they?  And they found a massive amount of these

10:02AM  20    chemicals in the soil at the burn pit.  So if everything was

21    incinerated, you wouldn't expect to find tens of thousands of

22    pounds of these chemicals in the soil, would you?

23            And Dr. Hughto explained -- I asked him, well,

24    would dumping that sludge from the degreasing with the TCE in

10:03AM  25    it be consistent with the amount of TCE found in the burn pit?

       1    And he said, yes, it would.  So did the burn pit become a

       2    dumping ground?  This memo comes pretty close to telling us

       3    that that's exactly what it became; right?  He's saying we're

       4    dumping certain chemicals in certain areas.  Everything on the

10:03AM  5   plant ends up in the burn pit.

       6              Talked about the Hula Bowl and the solvents.

       7    That's one of the areas where, of course, they found these

       8    solvents later.

       9              Did they have reckless disposal practices?  Well,

10:03AM 10   another word for reckless might be indiscriminate.

      11    Indiscriminate dumping of waste to the environment was

      12    occurring.

      13              As I listened to Whittaker's counsel ask

      14    questions of their witnesses and argue or state in opening

10:03AM 15   statement, oh, they were just being good corporate citizens.

      16    Nobody knew anything until this new law, RCRA, came into effect

      17    in 1976.  And he said in his opening, the evidence would show

      18    everything changed in 1976.

      19              I think the evidence tells us that's not true.

10:04AM 20   In fact, I think the inference is, if they were dumping, even

      21    after RCRA was adopted, and they were trying to get their arms

      22    around it, the evidence tells us, especially given the amount

      23    of materials they found in the burn pit and these other

      24    landfills, they certainly didn't have better disposal

10:04AM 25   practices, better waste handling practices before this new law,

1    did they?  Again Whittaker submitted no evidence of that.

2              So 1979, we need to stop this indiscriminate

3    dumping of waste to the environment.  And yet the evidence

4    tells us they kept coming back to the same dumping, the same

10:04AM   5    areas, the same practices.

6              It came up with instructions for waste disposal,

7    yet those instructions have been ignored.  Why?  So this is a

8    good example.  What makes someone negligent?  Not following

9    instructions for how you should handle hazardous waste is

10:05AM   10    pretty good evidence of negligence.

11             The hog-out area, that was a mess.  Sounds like

12    negligence.

13             Can't control the problem.  Sounds like

14    negligence.

10:05AM   15             And then they tell us the problem is serious.

16    Again, we're not just -- this isn't a couple fellows who, you

17    know, made a mistake and, you know, dropped something and

18    didn't clean it up.  The problem is serious.

19             The safety department, again, of Whittaker cannot

10:05AM   20    continue to promulgate guidelines.  We draft them.  We tell you

21    about them, guidelines and rules, when their execution by

22    management does not occur.  Management.  Mr. Peloquin,

23    Joe Alibrandi, the same folks who sat in that room in June 1987

24    and joked about the contamination.  That was management at

10:06AM   25    Whittaker.

```
 1              They had another internal inspection by
 2     Mr. Peloquin.  You saw this evidence.  The Hula Bowl and other
 3     areas were still a problem.  So this is now three years after
 4     they came up with those new rules in 1979.
 5              So widespread dumping, reckless practices, not
 6     following our own policies.  But they knew in 1982 because they
 7     hired a geologist.  Hey, there are these new rules.  We're
 8     going to need some groundwater monitoring at this impoundment.
 9     And then they hire someone.  Can we get a waiver?  Can we get
10     out of this rule?  Can we avoid putting in groundwater
11     monitoring that would start to tell us how far this
12     contamination is spreading?
13              And the evidence tells us that for year after
14     year, for decades, they avoided this common sense and necessary
15     step to start putting in let's find out how far the
16     contamination has spread.
17              And I'm going to circle back to this point.  But
18     there's a great dividing line in this case.  And I'm sure it
19     will become more clear as Mr. Blum stands up and talks to you
20     about what he thinks the evidence shows.
21              And the dividing line is they want to say we had
22     these monitoring wells everywhere onsite and offsite and, oh,
23     the contamination disperses everywhere.  So if we have one
24     monitoring well, that tells us everything that's going on.  And
25     we know that's not true because the wells aren't deep enough.
```

1      The wells weren't put in soon enough.  And the wells,

2      especially the offsite wells, a handful of these monitoring

3      wells, the little 2-inch wells, there's a handful.  You see a

4      few dots.  Onsite, over 200 monitoring wells detecting.  So

10:07AM   5      there was a reason that Whittaker delayed groundwater

6      monitoring.

7                 So you can't come in after the fact and say, oh,

8      the water quality data tells us exactly what's happening.  That

9      would be true if you had 200 onsite wells and 200 offsite wells

10:08AM  10      in 1980 or 1985.  But we don't.  We don't.  Those three border

11      wells that, oh, that 1,200-foot area, we've got these clusters

12      of 2-inch wells.  Well, when were they put in, Dr. Hokkanen?  I

13      don't know.  Could it have been 2011?  Maybe.

14                 So on the one hand, you have data.  We follow the

10:08AM  15      data.  And it's almost this deception -- isn't it? -- that the

16      groundwater quality data tells us everything we need to know so

17      we don't have to look at -- what?  We don't have to look at

18      where the chemicals got dumped at the site.  We don't have to

19      look at groundwater direction.  We don't have to look at the

10:09AM  20      contour lines.

21                 So the evidence tells us and the witnesses have

22      explained this.  We just heard from B.J. Lechler yesterday.

23      When you don't have complete groundwater data, when you don't

24      have the monitoring wells going down to the right aquifer, then

10:09AM  25      you look at, well, where is the water flowing?  What's in the

1    water at the site and which way is it flowing?  And is it

2    contaminating this groundwater basin?  Yes.

3            Their expert didn't even want to calculate the

4    speed of groundwater, even though he knows how to do it and

10:09AM   5    he's done it many, many times.  So that's the great divide in

6    this case, and we will go through some of the evidence.

7            Can we look at groundwater direction and we have

8    contamination at Point A and contamination at Point B and we

9    know the aquifers are connected and we know the perchlorate got

10:09AM   10   there and we know that Whittaker denied it was their

11   perchlorate for years, just like they are denying it is their

12   VOC contamination.

13           So let's go back to groundwater monitoring.  And

14   again, this is not really in dispute.  They knew the condition,

10:10AM   15   if it was discovered, would trigger this groundwater monitoring

16   requirement.  They didn't want it.  Mr. Peloquin explained how

17   expensive it could be and that regulators could make you do

18   crazy things.

19           (The video commenced playing before the jury.)

10:11AM   20           MR. RICHARD:  That's Mr. Peloquin.  He's kind of

21   explaining his attitude, regulators, like the EPA, if they

22   discover your hazardous waste, your hazardous contamination,

23   your many, many landfills, they can make you do crazy things,

24   like, put in groundwater monitoring and clean it up before it

10:11AM   25   spreads.

```
 1              That's the same fellow who didn't show

 2   Mr. Sorsher those landfills.  That's the same fellow who wrote

 3   the memo to the vice president and general counsel,

 4   Gordon Louttit, who I believe Mr. Lardiere said he spoke to.

 5   Right?  That was his predecessor.  He's been there 20 years.

 6   He knows Gordon.

 7              But that's not the only evidence.  That kind of

 8   sets the stage.  Well, we don't want groundwater monitoring.

 9   So they hired this fellow, Bob Bean.  We talked about it.

10   There is no question that they were trying to get a waiver.  No

11   one from Whittaker came in to try to explain this memo ever.

12              He tells him there's almost certainly the

13   potential for migration of hazardous waste.  He tells them a

14   more complete hydrogeologic investigation could be undertaken.

15   "However, since the results of a complete investigation would

16   probably be negative as far as justifying a waiver on

17   monitoring wells is concerned, such an investigation is not

18   recommended," back in 1982.

19              And yet we will hear, we've heard, we will look

20   at the evidence again, Whittaker now comes into this court and

21   says, not us.  It was the water agency.  Let's blame the

22   victim.  They should have done more to investigate the scope of

23   our contamination.  They had the opportunity back in 1982,

24   except they knew that, if we investigate further, that will

25   almost be certainly negative for trying to get out of
```

1    groundwater monitoring.

2              That's an example of a reasonable interpretation

3    of this run-on sentence, I would submit.  You will look at this

4    evidence.  You will decide.

10:12AM    5              The estimated cost of a groundwater monitoring

6    system based on a proposal from International Engineering

7    Company they said was $120,000.  This is Whittaker, again, in

8    1982.  They don't send that 1982 Bob Bean memo to anyone.  They

9    certainly don't tell their neighbors, the water agencies.

10:13AM   10    There is no evidence that they ever gave that candid assessment

11   of you have leaks at 317, this is most certainly getting into

12   the aquifer.  They don't send that to Mr. Sorsher.  No evidence

13   of that.

14              Instead, they say we feel no benefit would be

10:13AM   15   derived by Bermite.  Right?  They're writing to the California

16   Department of Health by the installation of a groundwater

17   monitoring system at Bermite.  So there really is no question

18   that they avoided it.

19              Then in 1985 -- and this is Exhibit 437 -- the

10:13AM   20   DTSC came out, looked at the one well that they used onsite at

21   Whittaker, "show recent groundwater sampling results" -- this

22   is November 1985 -- "of your facility's water well have shown

23   levels of organic contamination above the State Department of

24   Health Services action levels."

10:14AM   25              So now, this is three years after the Bob Bean

1    memo; right?  I think the evidence tells us that, had they been

2    a good corporate citizen, had they taken responsibility in

3    1982, they could have really done something to stop this

4    contamination -- right? -- the flow, the plume.  They could

10:14AM    5    have really done something to identify the scope of the

6    contamination.  Years go by.

7               So now the Regional Water Quality Control Board

8    is coming out.  "Because of this" -- right?  So they find some

9    of these volatile organic compounds in their own well at

10:14AM    10    Whittaker.  "Because of this you are requested to supply the

11    following information."  They want to know the name and

12    quantity of all chemicals used or stored in the facility,

13    right?  How much of this stuff did you guys have out there?

14    Where are your records?

10:15AM    15               "Two, present and past waste disposal practices

16    for organic liquids."  Well, they certainly didn't send them

17    their memo saying we have been dumping these on the ground.  We

18    have indiscriminate dumping.  Management doesn't follow our

19    policies; right?  All the documents we just saw.  Those would

10:15AM    20    have actually been pretty good documents, wouldn't they?

21    Documents of past -- present and past waste disposal practices

22    for organic liquids.  They listed the organic liquids in

23    Exhibit 205, the PCE.  It's right in there.

24               "Three, the Regional Water Quality Control Board

10:15AM    25    wants a brief description of your manufacturing process and

1    byproducts or waste generated for information on all your

2    facility's active and inactive water wells."

3              So the evidence tells us we never saw this

4    information.  Dr. Hughto never saw this information.

10:16AM  5    Whittaker's experts never saw this information.  Where did it

6    go?

7              Well, 1986 -- this is also in evidence --

8    Whittaker was actually cited for violating these monitoring

9    wells.  This didn't all start in 2002.  They learned in 1982

10:16AM  10   they should be putting in groundwater monitoring.  They tried

11   to avoid it.  Now here we are in 1986, Exhibit 1381, USEPA

12   groundwater monitoring program.  They're being cited here.  The

13   code section requires the owner of a hazardous waste surface

14   impoundment, like that surface impoundment 317 that Bob Bean

10:16AM  15   looked at in 1982 that had the tear in it.

16             "The owner of a hazardous waste surface

17   impoundment to implement a groundwater monitoring program

18   capable of determining the facility's impact on the quality of

19   groundwater in the uppermost aquifer."  Almost the same words

10:17AM  20   in Bob Bean's memo.  It talked about the uppermost aquifer and

21   if you have a problem.  And they go on.  The EPA inspector came

22   out in June 1985, reviewed the files.  Refers to those two

23   impoundments, Building 317, 342.  "The respondent could not

24   produce any groundwater monitoring data for the facility."

10:17AM  25   Where is that?  Oops.  Goes on to say, "A review of the maps

contained in the respondent's revised part A application of August 1985 does not show any monitoring wells onsite.

No evidence that they should have been putting in monitoring wells back in the '80s?  Exhibit 1381 suggests otherwise.

The same notice from the EPA, all these counts of various violations, again, pointed out "There were no analysis records for wastes stored, treated, or disposed onsite."  So if, in fact, they were dumping sludge or other VOCs into the burn pit or those other areas set forth in Exhibit 205, they certainly didn't keep a record of it, did they?  No record of onsite disposal.

Whittaker also failed to, quote, "Provide sufficient information to adequately characterize the hazardous waste."  They also failed to produce records.  This is Count 5, operating records.  "They failed to produce records to the EPA showing specific dates of treatment, storage, or disposal of the hazardous waste or records describing the quantity of waste at each hazardous waste management unit."

Now, you heard, well, wait a minute.  We carefully disposed of all of our wastes, and we have manifests; right?  And these are documents that are -- show how much waste went from our facility to some offsite facility.  That was the promise.  That was the evidence you were going to be shown.  Those were the questions they asked Dr. Hughto.  Weren't these

1    manifests?  They're cited back in 1986.  Well, we came and

2    looked at your manifests.  And what was wrong with them?  Were

3    they simply missing a signature?  No.  The manifests -- and

4    they list, you know, five of them -- did not specify the name

10:19AM    5    of the facility to be permitted to handle the hazardous waste.

6             So this wasn't some, oh, we forgot to get

7    someone's signature.  We don't even have a record of where

8    these wastes were going.  That's the undisputed evidence in

9    this case.  Reasonable?

10:20AM    10            So this notion that these documents that were

11    supposed to exist in 1985 and 1986 showing where the waste

12    went, Mr. Blum tried to have Dr. Hughto -- it was late in the

13    day.  I remember this -- tried to change it from, oh, it's not

14    that the manifests didn't provide the name of the entity that

10:20AM    15    perhaps you were delivering or not delivering these hazardous

16    wastes to.

17            He asks, is it your understanding that the

18    signatures that were missing -- it wasn't about signatures.  It

19    was about the names of who has taken our hazardous wastes.

10:20AM    20    That's what the USEPA said.  Put it in a separate count in that

21    1986 document.  Yet he's asking Dr. Hughto, is it your

22    understanding the signatures that were missing were from the

23    party that received the waste rather than from the generator

24    which would have been Whittaker?

10:20AM    25            It's my understanding it is the missing

signatures that are cited in that document were of the
receiving facility.  So he's right that there was missing
information about the receiving facility.  But, again, it was
their name.  We don't even know who it was.

10:21AM            So then the follow-up question -- I don't know
why it says B, BQ.  "So Whittaker did what they needed to do.
It was somebody else who messed up."  Okay.  That's the
suggestion throughout this case.  It was somebody else.  It was
that Saugus Industrial Center.  It was somebody -- not us.  It
10:21AM  was the water agency who messed up.  It was someone else.  Yet
the evidence tells us, no, it was you, Whittaker.  You messed
up time and time again.

            In 1990 -- this is Exhibit 382 -- further
violations regarding Building 317 impoundment -- and, again, I
10:21AM  know I'm being a little repetitive, but that is the same
impoundment Whittaker knew was leaking.  Now, we don't know how
long it was leaking, but we know that Jim Jisa told Bob Bean we
got a leak in our 317 impoundment.

            And here we are now eight years later, report of
10:22AM  violation, schedule of compliance.  Talks about Building 317.
Talks about the Hula Bowl.  Refers to Alan Sorsher.  I don't
want to take you through this now, but it's just part of the
ongoing growing concern from the regulators that something is
terribly remiss at the Whittaker site.

10:22AM            Whittaker Corporation Bermite division failed to

install at least three monitoring wells hydraulically

downgradient.  That is exactly what Mr. Hughto said.  They

should have installed it at the time, 1982.  Now here they are

being cited for it.  "There is only one monitoring well in the

required area consequently not ensuring immediate detection."

Then the next paragraph refers to Building 317.  "They prepared

a groundwater quality assessment program for the 317

impoundment area but -- but it is inadequate since it is

incapable of determining the rate and extent of migration of

hazardous waste or hazardous waste constituents in the

groundwater."

            And yet miraculously with no groundwater -- with

no groundwater monitoring wells in the '80s -- this is 1990

now -- Whittaker can come in and tell you, none of this stuff

ever got offsite.  I think the evidence tells us otherwise.

They certainly don't have the water quality data from the

monitoring wells that they were cited for not having back in

1986 and again in 1990.

            The Hula Bowl area was apparently used as a

general dump.  We have seen that evidence.  That was to

Gordon Louttit.

            You have Exhibit 486.  That is the consent order

where Gordon Louttit signs on behalf of Whittaker agreeing to

take a number of steps.  You have the 2002 substantial

engagement order which goes into detail about the chemicals and

the steps.

Now it's 20 years after Bob Bean's memo.  What could have been done in those 20 years?  We sold the property in 1999.  Okay.  Well, doesn't the evidence tell us, if you had been the good corporate citizen in 1982 and started the investigation and the remediation, maybe you would have gotten it cleaned up.  Maybe you would have told your neighbors sooner.  20 years later.  Now we will put in the 200 monitoring wells.  Delay, denial, deception.  That's what the evidence tells us.

So we talked about the history here and how the chemicals got there and what they did when they found them.  The question of did the chemicals go from point A to point B and get to our wells, I think the evidence is very clear on that.

So how do -- one of the first questions you ask is, well, what contaminants are in our wells or near our wells and what contaminants are at the site?  And are the aquifers connected?  And again, there's no question.  The chemicals are the same.  The aquifers are connected.  The perchlorate has gotten there.

The experts all talked about these elevation contour lines.  They define groundwater flow direction because -- I thought about this this morning as I was coming into court.  There's those reflecting pools outside.  The water

goes over the edge.  It's always perpendicular.  Okay.  That's why these elevation contour lines are so important.  If they go like this, groundwater direction is perpendicular to those.

10:26AM

So this is one of the exhibits in this case.  It is interesting because you heard reference and you may hear reference again.  Well, this says Todd Groundwater on it, doesn't it?  Well, yes, it does.  Because Ms. Stanin attached it to her own report.  This was entirely prepared by Whittaker's consultant though -- right? -- in 2019 after

10:26AM

Whittaker had already been sued.  It's just an example though of the contour lines.  But just because Ms. Todd {sic} used it, she didn't draw that plume.  This was Whittaker's consultant.  And they added the groundwater flow.

So there's really no dispute about that that the groundwater flows from the site to our wells.  We know that

10:26AM

why?  The groundwater carrying the perchlorate got there which they now admitted.

So I thought it was interesting when we had this map up with Dr. Hokkanen and we had this high concentration

10:27AM

down on one edge of the Whittaker site.  And of course, the property boundary is just an artificial boundary; right?  There's no wall that goes down hundreds of feet at boundary.  And you see we have all these groundwater monitoring wells onsite.  They show huge detections of TCE, and then there's

10:27AM

nothing immediately offsite.  There's just a handful of these

1    wells offsite at various levels.

2            So we know that contaminated groundwater did not

3    stop at the edge of the Whittaker site.  Even Dr. Hokkanen

4    admitted that.  And that's what's represented here.  Thank you.

10:27AM  5            You have these materials in evidence in this

6    case.  This just shows the groundwater flowing from those

7    contaminated areas at the Whittaker site with high TCE and that

8    those generally flow in a westerly direction.  Again, as

9    Whittaker was told in 1982, there is really no dispute about

10:28AM  10   that.

11           You have seen this, that the groundwater travels

12   in these different aquifers.  Sandy areas it travels faster.

13   And again, the aquifer, there's no question it is connected

14   from the Whittaker site to these wells.

10:28AM  15           Here we have an exhibit.  This was, I think,

16   exhibit -- figure 42 to Dr. Hokkanen's report.  But we heard

17   from the author of this, BJ Lechler.  This was part of

18   Exhibit 34.  He did an investigation.  He's the fellow who

19   worked with the Army Corps of Engineers.  Was it just yesterday

10:28AM  20   he testified?  He's been working in this groundwater basin for

21   20 years.  Very credible.  Doesn't have a dog in this fight.

22   Whittaker called him.  He's their witness.

23           And he identified very candidly groundwater flow

24   in this direction.  He described exactly what he did.  And he

10:29AM  25   identified, well, there seem to be these areas of massive TCE

1    and PCE at the Whittaker site, and we know where the

2    groundwater is flowing.  We know the contamination left the

3    site and contaminated the aquifer and the wells drawing on that

4    aquifer.

10:29AM    5         And he pointed out in this area north of the

6    Whittaker site here no adequate offsite monitoring wells.  No

7    wells in that area.  And he was candid in his recommendation

8    that there ought to be.  And he was asked, well, did the

9    agency -- he said, well, in my experience, it is the polluter's

10:30AM    10   obligation to pay for and make sure that -- adequate

11   characterization is the technical term, right -- that we find

12   out.

13        But the evidence tells us Whittaker is never

14   going to put in groundwater monitoring wells.  Not on their own

10:30AM    15   site.  Certainly not offsite to confirm precise or more

16   precisely where those chemicals are traveling in the

17   groundwater.

18        So, you know, the experts went through.  Is there

19   TCE in the soil at Whittaker?  Is there TCE in the groundwater?

10:30AM    20   Is it in our wells?  Are the aquifers connected?  Yes.  Yes.

21   Yes.  Is there perchlorate in the soil?  Is there perchlorate

22   in the groundwater?  Is there perchlorate in our client's

23   groundwater wells?  Yes.  Yes.  Yes.  That tells us that the

24   TCE and PCE in my client's -- as they extract that water from

10:30AM    25   the groundwater, that it contains chemicals from Whittaker.

1          Now, one of the -- I will call it excuses -- that

2     we have heard about and may or may not hear more about -- but

3     it was a big deal in opening statement -- the water agency

4     failed to investigate other sources; right?  They would rather

10:31AM   5     litigate than investigate.  That was the claim.  That was the

6     promise that Whittaker was going to prove to you.  And if they

7     came up short, as the evidence tells us they did, then this

8     excuse should be rejected, shouldn't it?

9          So in opening, now, the evidence is going to show

10:31AM  10     that they have done no investigation.  This was the promise.

11     No investigation, even though employees, the head of their

12     laboratory has looked at results and said, wait a minute.  This

13     can't come from Whittaker.  The numbers are just too high.

14          He told you plaintiff has taken the position to

10:31AM  15     litigate this case rather than investigate.  No investigation

16     of VOC detections at the turnouts.  They went heavy on this,

17     the turnouts.  Never investigated.  High detections.  The only

18     reasonable assumption to draw is that there is a source of

19     VOCs, particularly TCE and PCE, that is entering their system

10:32AM  20     that they -- oops.  I didn't fix that one either -- just don't

21     want to find.

22          And they called the statistician, the fellow with

23     all the dots.  Didn't actually do any probability analysis;

24     right?  Didn't do what statisticians normally do.  Can't tell

10:32AM  25     you if it's more likely here, more likely there, didn't count

1    up the whole population.  But he was their guy who was going to

2    come in and show to fulfill that promise that counsel made to

3    you that there were these spikes and the water agency did not

4    investigate.

10:32AM    5    So they called the witness.  He sat in that

6    chair.  I think -- and he presented this set of data.  He

7    called it the most extreme example.  These extreme points in

8    2012.  And this is a theme for their witnesses.  Well, I didn't

9    see any evidence of this, therefore, I'm going to draw this

10:33AM    10    conclusion.

11    Dr. Steffey emphasized -- and counsel told you --

12    he looked at every piece of evidence and turnout detections.

13    He testified, in my review of the documents, I didn't see any

14    indication or any reports of an agency investigation of

10:33AM    15    anomalies.

16    And I was thinking, wow, you know, it's so

17    similar to their other experts.  And if we stopped there, you

18    have a fellow come in, he puts dots on a page, he's trying to

19    tell you, see, you can draw some conclusion from that, I didn't

10:33AM    20    see any investigation, therefore, none occurred.  And had it

21    stopped there, wow, there was no investigation.

22    So what does the evidence tell us?  Was that

23    true?  That was one of Mr. Blum's favorite questions.  Was that

24    true in your deposition?  Was that true?

10:34AM    25    I was actually a little surprised, to be honest,

1    Dr. Steffey sitting there.  So I asked him, so you don't --

2    even today -- what was this, Monday?  Even today you don't know

3    that the water agency investigated and found an abandoned pipe

4    and capped it off in 2012?  No, I don't believe I know that.

10:34AM    5    That surprised me.  That was another turning point for me

6    because there was a report prepared by Jim Leserman.  You

7    haven't seen this photo, I asked him, of some folks working on

8    looks like a big flange with a bunch of bolts?  You've never

9    seen this photo before today?  I have not seen this photo

10:34AM   10   before today.

11                So there was an investigation, those most extreme

12   detections, both Mr. Leserman testified, the head of operations

13   Mike Alvord -- he's the fellow who talked about the hydraulics

14   and there's not perfect mixing and you have to understand

10:34AM   15   what's going on in our distribution -- testified about this

16   investigation.  There was a report done.

17                Again, this is -- Dr. Steffey was asked, so you

18   don't know if, in fact, there was an investigation?  If they

19   did, there was no documentation of that.  In the materials I

10:35AM   20   reviewed, no one gave that to me.

21                And yet we know they prepared a detailed report.

22   We know there was testimony on it.  We have seen the photos.

23   They investigated.  They identified the issue.  And it wasn't

24   getting into their system.  There's a tap there.  You heard

10:35AM   25   Mr. Alvord talk about, well, there's a tap where we get our

water sample.  And it was so close to this contaminated soil

from this pipeline that wasn't closed off that, when we closed

it off -- first they changed the tap.

Remember that?  It was brass and they changed it

10:35AM   to steel or something.  So they thought maybe something was

collecting on the tap.  And when we turned off that turnout and

turned it back on, and we went through all that testimony.  So

they investigated.  They found it.  And the problem went away.

And yet Whittaker told you none of that happened.  They would

10:36AM   rather litigate than investigate except for the one most

extreme problem which they did investigate and fix.

There is Mr. Alvord.

So their first excuse, we failed to investigate,

I think the evidence tells us who failed to investigate in this

10:36AM   case time and time again.

Travel time.  Again, opening statement you were

told that their own expert -- water agency's own expert

Phyllis Stanin, water travels at .87 linear feet per year, and

I think that was a typo because I think she said per day.  And

10:36AM   then he draws off 10,000 feet across the site and says, oh, it

would take 80 years.  Again, he said this is what the evidence

would show.

Did Dr. Hokkanen or Mr. Daus or anyone else on

their side calculate groundwater velocity?  I've done that in

10:37AM   other cases, but I didn't do that here.  Well, would you agree

1    that it travels at different rates for different aquifers?  Oh,

2    yeah.  Everybody knows that.

3              So this is in evidence.  You have table 8 -- I'm

4    forgetting the trial exhibit number, but we can find it.  She

10:37AM   5    identified that for onsite -- right?  Because there's onsite

6    travel time and offsite.  So she went through this analysis --

7    this is right out of her expert report -- and presented in this

8    courtroom onsite average linear groundwater velocity.  It's not

9    .87 feet per year.  It's 6.6 feet per day.  Per day.  And she

10:37AM   10   said, this is not a precise number.  Could it be lower?  Could

11   it be higher?  Is it impacted when it rains and there's a

12   recharge event and the groundwater flows a little faster?

13             But to say -- to stand here and say it was .87

14   feet per year -- we will assume that was a mistake or a typo --

10:38AM   15   but it's not.  This is the average of all of those aquifers.

16             I think Mr. Lechler was just asked yesterday, you

17   wouldn't average those; right?  Because that would suggest that

18   the slower aquifers are moving faster and the faster ones are

19   moving slower.  We asked him that question, Mr. Lechler.  He

10:38AM   20   knew the answer when he talked to you in opening statement.

21   The .87 is what's called the bulk rate.  It's offsite and

22   onsite for all the aquifers.

23             She testified, Ms. Stanin, quote, "The movement

24   of groundwater would be consistent with about 3,000 feet per

10:38AM   25   year.  It's just simple math after that.  If you want to go

1    from the burn area and it's 10,000 feet, then three-and-a-half

2    years, something like that."  Is it three and a half?  Is it

3    five years?  Is it ten years?  It's not 80 years.

4              And, of course, there were a number of things

10:39AM  5    like groundwater velocity that Whittaker's witnesses,

6    well-polished I thought, experienced, testified a lot in court,

7    they knew to stay away from groundwater velocity, didn't they?

8              Their reliance on the monitoring wells, there are

9    too few.  They're in the wrong area.  They were installed late.

10:39AM 10   They don't tell us what was happening.  You need to look at the

11   groundwater flow direction and where the chemicals start and

12   where they end up.

13             And so this was -- we're looking now at a page

14   from Exhibit 34.  This is the CW-1 well.  Why are we talking

10:39AM 15   about the CW-1 well?  Because it's in that northern area where

16   Ms. Stanin and Mr. Lechler explained, no, that's an

17   undifferentiated, undelineated area.  There are not offsite

18   monitoring wells.  And yet their expert, oh, well, we have this

19   one here.  And if this plume was there, it would spread out

10:40AM 20   everywhere, and it would show up in this one monitoring well.

21   Well, here's that monitoring well, CW-1.  It's too shallow.

22   Doesn't get down into the contaminated aquifer.  That's from

23   the 2015 report by Mr. Lechler.

24             We heard over and over, and we saw just a flurry

10:40AM 25   of these maps, and you may see them again.  They were coming up

fast and furious with their witnesses earlier this week.  So we went back and looked at them.  Again, these are maps prepared every quarter, or they were, by AECOM.

They clearly show offsite migration.  Here you can see this is what -- they will draw a TCE plume just out to -- you know, if there's a hit in one monitoring well.  But you can see hundreds and hundreds of feet.  I mean, this area, just for perspective, is over a thousand feet.  And this won't show up in the record, but we can all see it.  AECOM drew these areas.  There's no monitoring wells there.

So their only excuse is you must assume complete dispersion of these chemicals.  Well, then why do you have 200 groundwater monitoring wells at your site?  Maybe you only need five since the groundwater with the contamination -- it's just not true.  It's not true.

So failed to investigate, travel time.  That's not true.  I won't talk too much about this, but we heard references in opening statement, the evidence will show Whittaker didn't even occupy this site until 1967 as though they had no responsibility for what went on before that.

And yet, as you were just instructed, Whittaker is the successor to Bermite Powder Company.  Bermite occupied the site from 1943 to 1967.  Whittaker is, therefore, liable for any act or omission by Bermite that resulted in negligence, nuisance, or trespass.

1          And why is this important?  Because Mr. Blum will

2     stand up and say, well, he may have those memos from 1979 and

3     1980 and 1982, but he doesn't have anything from Bermite saying

4     we are also dumping.  This is what we call a reasonable

10:42AM   5     inference.  First of all, it doesn't matter, does it, if the

6     TCE and PCE got into the ground through this dumping in 1980 or

7     1960.  It goes back to 1943.

8          You will also see the instruction that says where

9     the party has the ability to produce better evidence but

10:43AM  10     produced weaker evidence.  They produced zero evidence from

11     Bermite's operations.  How did they dispose of the sludge from

12     those degreasing operations?  The evidence is -- the proof is

13     in the pudding; right?  There is a massive amount in the ground

14     and not just one area; right?

10:43AM  15          This one I don't think we need to spend a lot of

16     time on.  Whittaker has now in 2017 and 2018 put in a handful

17     of these extraction wells that all together pump about

18     300 gallons per minute as though that's going to contain all

19     the contamination on the site.  Of course, if you start doing

10:43AM  20     that in 2017, what happened between 1982 and 2017?  So that

21     doesn't provide them a -- allow them to avoid their

22     responsibility in this case.

23          The pumping capacity of the Saugus 1 and 2 wells

24     dwarfs all of the wells in their extraction system.  All of

10:44AM  25     their wells are about 300 gallons per minute.  The Saugus wells

1    pump at 2,200 gallons per minute.  Of course the contamination

2    migrated offsite.

3                One of the other things that occurred to me --

4    and I'm winding up here, and I appreciate your patience.  We

10:44AM   5    heard a phrase yesterday from Mr. Lechler when he was asked,

6    didn't you say potential?  Didn't you say potential?  Where do

7    you say that it is Whittaker?  Throughout this case -- and this

8    is just something lawyers do, and you will have to sift through

9    it with the evidence.  You know, what do we know to be true in

10:44AM   10   this case?

11                Well, finally, I mean, Mr. Lechler explained, I

12   did a scoping part of my investigation.  That's when I said

13   there were potential sources.  Well, you didn't look at this

14   source.  Yes, I did.  It's in my report.  I ruled it out.  That

10:45AM   15   was the scoping phase.  That's when -- so lawyers sometimes

16   seize on a word in a document or a word that a witness said in

17   a deposition and becomes this game of semantics.

18                And that was the word that Mr. Lechler used

19   yesterday, and then he explained, I stand by what was in my

10:45AM   20   report.  There was a scoping phase.  I investigated.  Well,

21   where did you say that Whittaker is a source?  Well, it's right

22   here, page 34.  "Multiple lines of evidence --"  I'm reading

23   from Exhibit 34.  Mr. Lechler wrote this in 2015.  "Multiple

24   lines of evidence suggest that the former Whittaker-Bermite

10:45AM   25   facility is --" he was asked, where do you say that it is a

1   source?  Well, I used the word "is" "-- is a source of TCE."

2              And he goes on to explain in detail what those

3   numerous sources are.  This includes the similarities of the

4   distribution of TCE and perchlorate, et cetera.  It follows

10:46AM   5   that Whittaker-Bermite is a likely source of PCE.  So TCE,

6   Whittaker is a source.  PCE, they're a likely source.  But

7   didn't you say potential at page -- so this is what we know to

8   be true, I would submit.

9              And he prepared a number of charts; right?

10:46AM   10   Because we said, well, you look at where is the contamination

11   at your site?  What's in our wells?  And in the Saugus wells,

12   94 percent of the time they're detecting PCE at Saugus 1,

13   28 percent at Saugus 2.  100 percent of the time they're

14   detecting TCE.  99 percent of the time they're detecting TCE in

10:46AM   15   Saugus 2.  Obviously both of those chemicals are in huge

16   amounts at the Whittaker-Bermite site.  And it was on that

17   basis that he prepared these charts.

18              He also talked about -- and we looked at this.

19   Again, he went through a detailed investigation.  Did scoping,

10:47AM   20   did investigation, came to conclusions.  Yes, I thought there

21   should be more offsite monitoring wells to give us better

22   information.  But you can't rely on this one.  And he went

23   through this whole well.  It's too shallow.  Well, this was

24   just your -- no.  This is data.  We can measure.

10:47AM   25              So one of the instructions you will receive in

hard copy and that the judge read to you was about a
substantial factor.  And the evidence tells us there's no
question that the Whittaker site with the dumping, the bearing,
the delayed remediation for two decades, that they are a

10:47AM  substantial factor in causing harm.  That's a factor that a
reasonable person would consider to have contributed to the
harm.  It must be more than a remote or trivial factor.  It
does not have to be the only cause of harm.

So all this discussion about what about SIC?

10:48AM  Well, it's their burden to prove that SIC is a substantial
factor.  Their own expert said, I can't say that.  I can't say
that.  I see where they are.  They're close.  His own attorney
asked him, well, there's a couple chemicals that we find at
SIC -- right? -- that 1,2-DCA and vinyl chloride used PVC, used

10:48AM  in huge amounts, detected in large amounts, not found in the
Saugus wells.

And he was asked, well -- his own witness --
right? -- Dr. Hokkanen, doesn't that mean that the TCE is not
from SIC?  Dr. Hokkanen, not necessarily.  Okay.  Well, he's

10:48AM  the fellow, when I asked him, can you say more likely than not
that the TCE is from SIC?  No.  I'm not saying that.  I'm
saying it's possible.  Okay.  Well, then they haven't met their
burden.

SIC is not a substantial factor.  But the

10:49AM  evidence tells us certainly that Whittaker, a thousand-acre

1    site with decades and hundreds of thousands of pounds of this

2    contamination, is more than a trivial source here.

3              Last thing I want to talk about is that the

4    proper way for Whittaker to take responsibility is with proper

10:49AM  5    water treatment.  This is one of the instructions -- I won't

6    read the whole thing to you.  But the important thing is did we

7    present evidence of damages; right?  The water agency was

8    clearly impacted.  They shut down their wells.  They had to buy

9    replacement water, and now they want treatment.

10:49AM  10             Keith Abercrombie, one of the first witnesses in

11   the case, in operations testified repeatedly, we need the

12   treatment.  So that's what the evidence tells us.  And he went

13   through his calculations of replacement water which are really

14   undisputed.

10:50AM  15             And this instruction -- of course the SCV Water

16   does not have to prove the exact amount of damages that will

17   provide reasonable calculation for the harm.  You must not

18   speculate or guess.

19             So you have these exhibits.  This is 491.  There

10:50AM  20   were a series of calculations for -- well, we had to blend the

21   water at this well because of the contamination.  Then we had

22   to buy replacement water.  And he went through those, and he

23   explained his whole process.  And that was Keith Abercrombie.

24             And if you go through all those exhibits, 491-A,

10:50AM  25   492, that covers his blend water and replacement water.  He's

1    the operations guy.  He understood those sources of water.

2         And the only response to this was, well, couldn't

3    you use banked water instead of this water?  Then the next

4    witness came in -- I think it was Mr. Masnada -- and said,

10:51AM   5    well, that generally costs twice as much.  So that didn't go

6    anywhere.  This was a reasonable approach.  It's actual harm.

7    And he identified the cost to the agency.

8         And then we heard from Dr. Najm who works with

9    treatment systems for a living.  He teaches.  He's very

10:51AM   10   familiar with this.  He works with clients who need to know

11   what these treatment systems are going to cost.  And this is in

12   evidence.  This is Exhibit 523.

13        And he went through the standard cost estimate,

14   and he identified that for capital costs, for all of these

10:51AM   15   treatment systems at Saugus, V-201, V-205, the capital costs

16   would be $30 million, 30.4.  And when I asked him, do you still

17   think those are the costs?  He hesitated because he knows

18   what's going on right now.  He knows that -- and he said in his

19   report -- the costs could be as high as 45.6 million.  And he's

10:52AM   20   concerned with projects right now because they're more

21   expensive, and that's why you build in contingencies.  Yes,

22   vessels six months ago cost about $200,000 each.  I think he

23   said it would take many, many months to even get those now.  So

24   markets change.

10:52AM   25        This was a reasonable accurate estimate by an

expert in the field.  He does this for a living.  He relied on

the standard principles that bona fide cost estimators use.

And then he identified over the next 30 years we have O&M costs

$34 million, undisputed.  No one came in, even Mr. Simpson, the

10:52AM   longtime Whittaker consultant working with Mr. Lardiere the

last 16, 17 years, had no opinion on O&M costs to share.

So you take the cost of the treatment -- and you

have this exhibit.  It's part of 524.  He explained each of the

detailed areas.  You start with equipment -- and he's very

10:53AM   familiar with these equipment costs.  And you didn't hear

Mr. Simpson or anyone else from Whittaker say that cartridge

filters, vessels, the backwash tank, valves, and miscellaneous,

the slabs, these are all essential requirements.

What you did hear Mr. Simpson say is -- I think

10:53AM   you heard Mr. Blum in opening say, it's like a watch.  Just go

in and buy a ready-made watch.  And Mr. Simpson said, it's like

a car.  You can either go to the dealer and buy a car or you

can hire someone to design.  It's not like a car.  It's a

construction project.  It's a construction project.  Each site

10:53AM   is different.

So you will have to decide what makes the most

sense when you deliberate on this.  But Dr. Najm went through

exactly how he came up with these -- this estimate.

So the damages from Keith Abercrombie, he

10:54AM   identified 11-and-a-half-million dollars.  Dr. Najm identified

the $64.6 million to build all these treatment systems and to operate them for 30 years.  Yes, that's a lot of money, but that's the price for taking responsibility.

So when you deliberate, you will have that evidence.  And I think the evidence tells us that $76.1 million is the appropriate measure of damages in this case to deal with the contamination that Whittaker did not deal with.

And so the verdict form is pretty self-explanatory.  Negligence, fault of plaintiff, was Whittaker Corporation negligent?  I think the evidence tells us they were.  Was it a substantial factor?  I think the evidence tells us yes.  Did the water agency own, lease, occupy, or control the property?  Mike Alvord testified to this. Keith Abercrombie talked about all the equipment they used in these operations.  Yes, of course, they own it or control it.

This is under the trespass claim.  You won't be asked questions on that.  Public nuisance.

So in each of these, you know, you will weigh it. You will look at the evidence.  It's not up to the lawyers to tell you how to decide this.  As I said at the beginning and will say again, just follow the evidence, and I think the evidence tells us the just outcome here.

Punitive damages, this is a -- you have instructions on this, and I think, if ever there was a case where punitive damages are appropriate for the delay, denial,

and deception, this is that case.  And so the evidence tells us

that there was malice or oppression or fraud.  Was it committed

by one or more officers, directors, or managing agents?  Well,

you saw the evidence.  Joe Alibrandi, John Peloquin, and

10:56AM   Gordon Louttit sat in that meeting in June 1987 and, you know,

decided not to deal with it.  Don't deal with the

contamination.  We can always give the property to

Tammy Faye Bakker or the EPA.  You saw the evidence from -- you

know, that Alan Sorsher was shown around the property by

10:56AM   John Peloquin.

So this wasn't some, you know, salesman out in

Ohio.  This was the president of Whittaker.  There is no

question that this was the managing directors or agents of

Whittaker that were involved in this.  For what?  To save some

10:56AM   money.

Burden of proof, and I think we all understand

this.  The judge explained that in this case there's two levels

of burden of proof.  To prove liability, to prove the damages,

to prove the negligence, the standard is more likely than not

10:56AM   probably true.  More probably true.  For punitive damages it's

clear and convincing.  The evidence here is really undisputed.

So, of course, it's clear and convincing.

I won't go through all the directions on this on

punitive damages.

10:57AM   But to talk about the preponderance of the

evidence, what does that mean?  That means, if you thought that the evidence was equally balanced -- right? -- that Whittaker actually came in and explained these things and that Whittaker had delivered on the promises they made in opening statement, then we would lose.  You would say it's evenly balanced.  I don't think Mr. Richard proved his case.  But if we have just a feather more evidence than -- that tilts the scale in our favor.

But in this case the witnesses, the documents, the memos, we brought this evidence into court.  We showed you.  This gives us a glimpse into how these decisions were made at Whittaker.  The evidence is overwhelming, and it certainly meets more likely than not.

And there's at the bottom of the heap is BJ Lechler.  I should have put him at the top.

And so I come back to the point I made in opening statement which is that every citizen of California has the right to pure and safe drinking water.  And on behalf of my client, I would ask that you hold Whittaker responsible.  Sometimes responsibility has to be imposed.  Someone has to lose a case or be told you did the wrong thing here and now, as Joe Alibrandi said in 1987, we might have some liability for this at some point.  This is that point.

So we would ask on behalf of my client that, when you deliberate, look at the evidence.  Does it tell us that

1    Whittaker should now be held responsible?  And I think it does.

2              So thank you.

3              THE COURT:  Ladies and gentlemen, we will take

4    our morning break.  It is now just about 11:00 o'clock.  We

10:59AM    5    will take a 15-minute break.

6              Please remember, don't speak to anyone about the

7    case, the people, or the subject matter involved.  Continue to

8    keep an open mind until you have heard all of the closing

9    arguments and the views of your fellow jurors.  Thank you.

10:59AM   10              (The following proceedings were held in

11              open court outside the presence of the jury:)

12              THE COURT:  We are in recess until 11:15.

13              MR. BLUM:  Do you have a special verdict form

14    yet?

10:59AM   15              THE COURT:  Not yet.

16              (A recess was taken at 10:59 a.m.)

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15              DATED THIS  3RD  DAY OF DECEMBER, 2021.

16

17

18              /S/ MIRANDA ALGORRI

19              _____
                MIRANDA ALGORRI, CSR NO. 12743, CRR
20              FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```

**$**

**$120,000** [1] - 2096:7
**$200,000** [1] - 2119:22
**$30** [1] - 2119:16
**$34** [1] - 2120:4

**'**

**'40S** [1] - 2086:14
**'50S** [1] - 2086:14
**'80S** [4] - 2078:7, 2082:17, 2099:4, 2102:13

**/**

**/S** [1] - 2125:18

**1**

**1** [4] - 2050:10, 2059:2, 2114:23, 2116:12
**1,2-DCA** [1] - 2117:14
**1,200-FOOT** [1] - 2093:11
**1.8** [1] - 2077:16
**10** [1] - 2019:13
**10,000** [2] - 2110:20, 2112:1
**100** [3] - 2059:13, 2059:22, 2116:13
**100,000** [1] - 2088:10
**10:59** [1] - 2124:16
**11-AND-A-HALF-MILLION** [1] - 2120:25
**11:00** [1] - 2124:4
**11:15** [1] - 2124:12
**12743** [2] - 2019:23, 2125:19
**1381** [2] - 2098:11, 2099:4
**14** [2] - 2035:20, 2035:21
**15** [1] - 2024:24
**15-MINUTE** [1] - 2124:5
**16** [1] - 2120:6
**17** [1] - 2120:6
**17TH** [1] - 2076:24
**18** [1] - 2042:22
**18-06825-SB** [1] - 2019:7
**18-6825** [1] - 2023:5
**1899** [2] - 2086:11, 2086:20
**18TH** [1] - 2087:17
**19** [3] - 2019:8,

2025:5, 2025:7
**1940S** [2] - 2087:1, 2087:3
**1943** [4] - 2049:6, 2083:25, 2113:23, 2114:7
**1949** [2] - 2087:14, 2087:23
**1953** [1] - 2087:18
**1960** [1] - 2114:7
**1960S** [1] - 2086:19
**1967** [4] - 2049:6, 2083:24, 2113:19, 2113:23
**1976** [2] - 2090:17, 2090:18
**1979** [6] - 2085:14, 2085:21, 2086:5, 2091:2, 2092:4, 2114:2
**1980** [5] - 2083:21, 2093:10, 2114:3, 2114:6
**1982** [16] - 2083:10, 2084:6, 2084:25, 2092:6, 2095:18, 2095:23, 2096:8, 2097:3, 2098:9, 2098:15, 2102:3, 2103:5, 2105:9, 2114:3, 2114:20
**1985** [6] - 2093:10, 2096:19, 2096:22, 2098:22, 2099:2, 2100:11
**1986** [6] - 2098:7, 2098:11, 2100:1, 2100:11, 2100:21, 2102:18
**1987** [7] - 2074:19, 2075:13, 2076:9, 2076:24, 2091:23, 2122:5, 2123:22
**1988** [3] - 2075:14, 2075:20, 2075:22
**1990** [3] - 2101:13, 2102:13, 2102:18
**1991** [2] - 2075:23, 2076:9
**1999** [1] - 2103:4
**1ST** [1] - 2019:24

**2**

**2** [5] - 2019:14, 2023:1, 2114:23, 2116:13, 2116:15
**2,200** [1] - 2115:1
**2-INCH** [1] - 2093:3, 2093:12

**20** [6] - 2078:18, 2095:5, 2103:2, 2103:3, 2103:8, 2105:21
**200** [5] - 2093:4, 2093:9, 2103:8, 2113:13
**2002** [5] - 2085:25, 2086:1, 2086:6, 2098:9, 2102:24
**2007** [2] - 2079:15, 2080:2
**2010** [1] - 2079:14
**2011** [1] - 2093:13
**2012** [2] - 2108:8, 2109:4
**2014** [1] - 2079:17
**2015** [2] - 2112:23, 2115:23
**2017** [3] - 2114:16, 2114:20
**2018** [1] - 2114:16
**2019** [2] - 2019:8, 2104:9
**2021** [3] - 2019:14, 2023:1, 2125:15
**205** [3] - 2089:1, 2097:23, 2099:10
**24** [1] - 2043:2
**25** [2] - 2083:16, 2084:6
**26** [4] - 2026:1, 2026:15, 2028:1, 2028:11
**27** [1] - 2043:4
**28** [2] - 2116:13, 2125:8
**29** [2] - 2089:2, 2089:7

**3**

**3,000** [1] - 2111:24
**30** [2] - 2120:3, 2121:2
**30(B)(6** [4] - 2048:5, 2048:8, 2048:11, 2048:14
**30.4** [1] - 2119:16
**300** [2] - 2114:18, 2114:25
**317** [10] - 2084:23, 2089:3, 2096:11, 2098:14, 2098:23, 2101:14, 2101:18, 2101:20, 2102:6, 2102:7
**32,000** [1] - 2083:14
**32,000-GALLON** [1] - 2084:14
**34** [4] - 2105:18, 2112:14, 2115:22,

2115:23
**342** [2] - 2084:24, 2098:23
**343** [2] - 2035:20, 2035:21
**34TH** [2] - 2020:7, 2020:10
**350** [1] - 2019:24
**37** [1] - 2031:23
**382** [1] - 2101:13
**3903(F** [1] - 2036:2
**3RD** [1] - 2125:15

**4**

**4** [1] - 2042:17
**42** [1] - 2105:16
**437** [1] - 2096:19
**445** [1] - 2075:24
**4455** [1] - 2019:24
**45.6** [1] - 2119:19
**486** [1] - 2102:22
**491** [1] - 2118:19
**491-A** [1] - 2118:24
**492** [1] - 2118:25

**5**

**5** [1] - 2099:15
**50** [1] - 2020:10
**500** [1] - 2020:15
**523** [1] - 2119:12
**524** [1] - 2120:8
**5TH** [2] - 2035:20, 2035:21

**6**

**6.6** [1] - 2111:9
**60** [1] - 2028:17
**64.6** [1] - 2121:1

**7**

**700** [1] - 2020:16
**753** [1] - 2125:8
**76.1** [1] - 2121:5
**777** [1] - 2020:6

**8**

**8** [2] - 2079:8, 2111:3
**80** [2] - 2110:21, 2112:3
**87** [4] - 2110:18, 2111:9, 2111:13, 2111:21
**8:02** [2] - 2019:14, 2023:1
**8:36** [1] - 2044:22

**9**

**90012** [1] - 2019:25
**90017** [1] - 2020:7
**94** [1] - 2116:12
**94111** [2] - 2020:11, 2020:16
**99** [1] - 2116:14
**9TH** [2] - 2029:10, 2029:23

**A**

**A.M** [2] - 2044:22, 2124:16
**A.M** [2] - 2019:14, 2023:1
**ABANDONED** [1] - 2109:3
**ABBREVIATED** [1] - 2058:13
**ABERCROMBIE** [4] - 2118:10, 2118:23, 2120:24, 2121:14
**ABILITY** [4] - 2045:7, 2046:15, 2047:17, 2114:9
**ABLE** [3] - 2029:16, 2035:6, 2040:14
**ABNORMALLY** [1] - 2052:23
**ABOVE** [1] - 2125:11
**ABOVE-ENTITLED** [1] - 2125:11
**ABSENCE** [1] - 2030:25
**ABSORPTION** [1] - 2027:17
**ACADEMIC** [1] - 2026:13
**ACCEPT** [2] - 2048:1, 2080:7
**ACCORDANCE** [1] - 2062:12
**ACCORDING** [2] - 2070:6, 2084:11
**ACCOUNTS** [1] - 2067:21
**ACCURACY** [1] - 2068:18
**ACCURATE** [1] - 2119:25
**ACCURATELY** [1] - 2070:24
**ACHIEVEMENT** [1] - 2054:16
**ACRE** [1] - 2117:25
**ACT** [1] - 2038:7
**ACT** [11] - 2038:3, 2048:22, 2049:7,

2049:11, 2050:16, 2052:11, 2052:20, 2055:23, 2082:11, 2082:16, 2113:24
**ACTED** [4] - 2050:22, 2057:12, 2063:24, 2064:11
**ACTING** [6] - 2049:17, 2050:16, 2052:11, 2052:19, 2055:23, 2082:11
**ACTION** [5] - 2032:12, 2033:24, 2033:25, 2036:6, 2096:24
**ACTIVE** [1] - 2098:2
**ACTIVITIES** [1] - 2054:21
**ACTIVITY** [3] - 2052:24, 2054:6, 2054:7
**ACTS** [2] - 2048:25, 2064:15
**ACTUAL** [6] - 2027:12, 2030:4, 2058:8, 2061:21, 2078:21, 2119:6
**ACUTE** [1] - 2085:18
**ADD** [1] - 2024:9
**ADDED** [1] - 2104:13
**ADDITION** [3] - 2028:24, 2055:2, 2088:2
**ADDITIONAL** [3] - 2061:20, 2070:11, 2073:4
**ADDRESS** [11] - 2026:8, 2026:16, 2027:24, 2028:6, 2029:1, 2029:17, 2031:8, 2036:8, 2036:13, 2044:2, 2044:11
**ADDRESSED** [3] - 2026:22, 2029:13, 2044:14
**ADDRESSING** [1] - 2026:22
**ADEQUATE** [3] - 2051:15, 2106:6, 2106:10
**ADEQUATELY** [1] - 2099:14
**ADJACENT** [1] - 2086:22
**ADJUSTMENTS** [1] - 2062:16
**ADMISSION** [2] - 2048:9, 2075:8
**ADMITTED** [4] - 2062:22, 2079:8,

2104:17, 2105:4
**ADOPTED** [2] - 2064:7, 2090:21
**ADVANCES** [1] - 2054:17
**ADVISE** [1] - 2070:7
**AECOM** [2] - 2113:3, 2113:9
**AFFECTED** [1] - 2056:5
**AGENCIES** [2] - 2078:23, 2096:9
**AGENCY** [5] - 2023:6, 2044:24, 2049:24, 2050:24, 2057:11
**AGENCY** [1] - 2019:5
**AGENCY** [18] - 2027:13, 2031:4, 2033:3, 2049:13, 2078:22, 2079:9, 2081:6, 2081:7, 2095:21, 2101:10, 2106:9, 2107:3, 2108:3, 2108:14, 2109:3, 2118:7, 2119:7, 2121:12
**AGENCY'S** [1] - 2110:17
**AGENT** [2] - 2049:15, 2065:3
**AGENTS** [7] - 2048:22, 2048:25, 2063:24, 2064:3, 2064:6, 2122:3, 2122:13
**AGO** [4] - 2074:15, 2080:14, 2081:18, 2119:22
**AGREE** [7] - 2026:12, 2036:10, 2041:24, 2047:3, 2079:24, 2080:5, 2110:25
**AGREED** [3] - 2042:2, 2043:13, 2073:18
**AGREED-UPON** [1] - 2042:2
**AGREEING** [1] - 2102:23
**AGREEMENT** [13] - 2043:16, 2044:13, 2066:8, 2070:5, 2078:21, 2079:7, 2079:15, 2080:2, 2080:4, 2080:8, 2080:13, 2080:15, 2081:1
**AHEAD** [2] - 2045:23, 2085:24
**AHOLD** [1] - 2079:19
**AL** [3] - 2019:8,

2023:7, 2026:5
**ALAN** [3] - 2078:16, 2101:21, 2122:9
**ALGORRI** [4] - 2019:23, 2125:5, 2125:18, 2125:19
**ALIBRANDI** [4] - 2076:20, 2091:23, 2122:4, 2123:22
**ALLEGATION** [2] - 2030:10, 2030:25
**ALLEGE** [1] - 2030:14
**ALLOW** [3] - 2029:6, 2088:18, 2114:21
**ALLOWED** [4] - 2044:4, 2045:12, 2047:23, 2070:24
**ALLOWING** [1] - 2061:15
**ALMOST** [7] - 2084:9, 2085:1, 2089:14, 2093:15, 2095:12, 2095:25, 2098:19
**ALSO** [1] - 2020:18
**ALVORD** [4] - 2109:13, 2109:25, 2110:12, 2121:13
**ALVORD'S** [2] - 2027:7, 2031:3
**AMEND** [1] - 2039:22
**AMENDED** [2] - 2037:25, 2038:3
**AMMUNITION** [1] - 2085:8
**AMOUNT** [11] - 2027:18, 2059:24, 2060:10, 2060:14, 2062:11, 2063:3, 2089:19, 2089:25, 2090:22, 2114:13, 2118:16
**AMOUNTS** [4] - 2088:5, 2116:16, 2117:15
**ANALYSIS** [4] - 2035:7, 2099:7, 2107:23, 2111:6
**AND** [3] - 2125:6, 2125:9, 2125:11
**ANGELES** [1] - 2020:7
**ANGELES** [3] - 2019:15, 2019:25, 2023:2
**ANNOUNCE** [1] - 2066:6
**ANNOYANCE** [1] - 2053:23
**ANNOYED** [2] - 2053:3, 2056:8
**ANOMALIES** [1] -

2108:15
**ANSWER** [5] - 2059:2, 2059:3, 2069:20, 2072:16, 2111:20
**ANSWERED** [1] - 2042:23
**ANSWERING** [2] - 2036:11, 2069:19
**ANTICIPATED** [1] - 2060:13
**APP** [2] - 2035:20, 2035:21
**APPEAR** [1] - 2025:2
**APPEARANCES** [1] - 2020:1
**APPEARANCES** [1] - 2023:8
**APPELLATE** [1] - 2032:23
**APPLICABLE** [2] - 2038:21, 2038:24
**APPLICATION** [3] - 2067:10, 2082:12, 2099:1
**APPLIED** [1] - 2062:21
**APPLIES** [4] - 2036:4, 2038:18, 2046:24, 2067:13
**APPLY** [7] - 2031:16, 2035:8, 2039:7, 2046:19, 2047:1, 2049:22, 2082:24
**APPORTIONMENT** [2] - 2039:17, 2058:10
**APPRECIATE** [1] - 2115:4
**APPROACH** [1] - 2119:6
**APPROACHED** [1] - 2067:16
**APPROPRIATE** [6] - 2037:8, 2038:15, 2039:13, 2040:1, 2121:6, 2121:25
**APPROPRIATIVE** [7] - 2028:14, 2028:18, 2029:5, 2061:15, 2061:19, 2061:23, 2062:1
**APPROVED** [1] - 2064:7
**AQUIFER** [10] - 2084:21, 2085:4, 2093:24, 2096:12, 2098:19, 2098:20, 2105:13, 2106:3, 2106:4, 2112:22
**AQUIFERS** [9] - 2094:9, 2103:18, 2103:20, 2105:12,

2106:20, 2111:1, 2111:15, 2111:18, 2111:22
**ARBITRATION** [5] - 2074:6, 2079:9, 2079:12, 2081:8, 2081:21
**AREA** [13] - 2091:11, 2093:11, 2102:5, 2102:8, 2102:19, 2106:5, 2106:7, 2112:1, 2112:9, 2112:15, 2112:17, 2113:7, 2114:14
**AREAS** [11] - 2089:8, 2090:4, 2090:7, 2091:5, 2092:3, 2099:10, 2105:7, 2105:12, 2105:25, 2113:10, 2120:9
**ARGUABLY** [1] - 2028:2
**ARGUE** [7] - 2045:7, 2045:9, 2045:14, 2046:18, 2070:25, 2071:7, 2090:14
**ARGUMENT** [7] - 2033:13, 2045:18, 2070:18, 2070:19, 2070:21, 2070:22, 2071:14
**ARGUMENTS** [8] - 2045:11, 2046:18, 2046:22, 2062:18, 2062:19, 2070:11, 2070:13, 2124:9
**ARMS** [1] - 2090:21
**ARMY** [1] - 2105:19
**AROSE** [1] - 2079:7
**ARTIFICIAL** [3] - 2054:25, 2055:6, 2104:21
**ASIDE** [1] - 2031:6
**ASPECT** [1] - 2045:5
**ASSEMBLE** [1] - 2065:20
**ASSERT** [3] - 2049:24, 2049:25, 2050:1
**ASSERTED** [4] - 2030:23, 2049:21, 2049:23, 2050:4
**ASSERTION** [1] - 2081:11
**ASSESSMENT** [2] - 2096:10, 2102:7
**ASSIGNED** [1] - 2059:25
**ASSIGNING** [2] - 2058:22, 2059:20
**ASSUME** [2] -

2111:14, 2113:11
**ASSUMING** [1] - 2044:17
**ASSUMPTION** [1] - 2107:18
**ATTACHED** [1] - 2104:7
**ATTEMPT** [2] - 2066:15, 2069:14
**ATTENTION** [2] - 2046:14, 2071:22
**ATTITUDE** [1] - 2094:21
**ATTORNEY** [5] - 2072:24, 2073:11, 2073:17, 2078:18, 2117:12
**ATTORNEYS** [2] - 2062:19, 2074:12
**AUGUST** [1] - 2099:2
**AUTHOR** [2] - 2086:22, 2105:17
**AUTHORITY** [11] - 2028:23, 2029:22, 2033:18, 2035:7, 2036:3, 2038:5, 2049:1, 2049:13, 2049:14, 2065:4, 2086:18
**AUTHORIZE** [1] - 2049:11
**AUTHORIZED** [2] - 2048:6, 2064:2
**AUTO** [1] - 2089:4
**AVERAGE** [3] - 2111:8, 2111:15, 2111:17
**AVOID** [5] - 2054:9, 2064:17, 2092:10, 2098:11, 2114:21
**AVOIDED** [2] - 2092:14, 2096:18
**AVOIDING** [1] - 2054:23
**AWAIT** [1] - 2069:20
**AWARD** [4] - 2060:11, 2062:11, 2062:20, 2063:2
**AWARDING** [1] - 2060:16
**AWARE** [1] - 2064:16
**AWARENESS** [1] - 2088:3

**B**

**B.J** [1] - 2093:22
**BACKWASH** [1] - 2120:12
**BAILIFF** [2] - 2069:12,

2070:7
**BAKKER** [3] - 2078:4, 2078:5, 2122:8
**BALANCED** [2] - 2123:2, 2123:5
**BANKED** [1] - 2119:3
**BARRED** [2] - 2036:20, 2036:22
**BARREL** [1] - 2089:13
**BASE** [4] - 2032:16, 2050:8, 2064:23, 2066:23
**BASED** [8] - 2028:21, 2034:20, 2054:6, 2062:1, 2062:20, 2069:1, 2075:19, 2096:6
**BASIC** [4] - 2032:17, 2033:21, 2047:13, 2050:11
**BASIN** [3] - 2031:25, 2094:2, 2105:20
**BASIS** [2] - 2026:3, 2116:17
**BEAN** [7] - 2083:10, 2084:6, 2095:9, 2096:8, 2096:25, 2098:14, 2101:17
**BEAN'S** [2] - 2098:20, 2103:2
**BEAR** [1] - 2070:15
**BEARING** [1] - 2117:3
**BEATON** [1] - 2020:20
**BECAME** [2] - 2035:5, 2090:3
**BECOME** [3] - 2069:10, 2090:1, 2092:19
**BECOMES** [1] - 2115:17
**BECOMING** [1] - 2089:18
**BEGIN** [3] - 2060:3, 2065:21, 2070:13
**BEGINNING** [4] - 2038:7, 2047:14, 2064:10, 2121:20
**BEHALF** [5] - 2049:11, 2063:24, 2102:23, 2123:18, 2123:24
**BEHIND** [1] - 2076:18
**BELIEF** [2] - 2065:11, 2066:21
**BELONGS** [2] - 2057:23, 2061:24
**BELOW** [1] - 2057:8
**BENCH** [1] - 2044:10
**BENEATH** [1] - 2031:2
**BENEFIT** [10] - 2030:11, 2033:9,

2037:15, 2039:8, 2053:10, 2053:12, 2054:10, 2062:14, 2096:14
**BENEFITS** [1] - 2033:10
**BERMITE** [13] - 2049:5, 2049:7, 2096:15, 2096:17, 2101:25, 2113:22, 2113:24, 2114:3, 2115:24, 2116:5, 2116:16
**BERMITE'S** [1] - 2114:11
**BEST** [1] - 2038:1
**BETTER** [4] - 2090:24, 2090:25, 2114:9, 2116:21
**BETWEEN** [5] - 2029:4, 2034:5, 2060:22, 2078:22, 2114:20
**BEYOND** [2] - 2065:16, 2083:15
**BIG** [8] - 2075:15, 2078:14, 2079:11, 2085:7, 2089:12, 2089:15, 2107:3, 2109:8
**BIRD'S** [1] - 2049:20
**BIRD'S-EYE** [1] - 2049:20
**BIT** [6] - 2070:3, 2071:19, 2072:7, 2073:5, 2076:15, 2086:18
**BJ** [2] - 2105:17, 2123:15
**BLAME** [1] - 2095:21
**BLEND** [2] - 2118:20, 2118:25
**BLOG** [1] - 2067:10
**BLUM** [14] - 2023:14, 2024:11, 2026:10, 2026:21, 2031:20, 2035:23, 2039:17, 2041:4, 2044:16, 2087:8, 2092:19, 2100:12, 2114:1, 2120:15
**BLUM** [38] - 2020:13, 2020:14, 2023:14, 2024:13, 2024:19, 2024:22, 2025:10, 2025:15, 2025:18, 2025:22, 2026:2, 2026:18, 2032:5, 2033:7, 2033:16, 2033:20, 2034:12,

2034:23, 2035:3, 2035:10, 2035:24, 2036:10, 2036:17, 2039:19, 2039:22, 2041:5, 2041:11, 2041:13, 2041:17, 2041:24, 2043:13, 2043:16, 2044:3, 2044:8, 2044:17, 2045:3, 2081:10, 2124:13
**BLUM'S** [1] - 2108:23
**BLUMENFELD** [1] - 2019:3
**BOARD** [2] - 2097:7, 2097:24
**BOARD** [1] - 2045:14
**BOB** [9] - 2083:10, 2084:6, 2095:9, 2096:8, 2096:25, 2098:14, 2098:20, 2101:17, 2103:2
**BOLTS** [1] - 2109:8
**BONA** [1] - 2120:2
**BOND** [1] - 2073:1
**BORDER** [1] - 2093:10
**BOTTOM** [2] - 2123:14
**BOUNDARY** [3] - 2104:21, 2104:22
**BOWL** [4] - 2090:6, 2092:2, 2101:21, 2102:19
**BOX** [1] - 2038:17
**BOYS** [1] - 2089:15
**BQ** [1] - 2101:6
**BRASS** [1] - 2110:4
**BREAK** [4] - 2040:14, 2085:3, 2124:4, 2124:5
**BREAKS** [3] - 2084:13, 2084:18
**BRIEF** [1] - 2097:25
**BRIEFED** [2] - 2028:20, 2037:7
**BRIEFING** [4] - 2029:19, 2035:16, 2037:15, 2038:22
**BRIEFLY** [1] - 2044:12
**BRING** [5] - 2040:13, 2040:18, 2045:23, 2046:2, 2076:2
**BRINGS** [1] - 2083:13
**BRITNEY** [1] - 2078:7
**BROADLY** [1] - 2029:14
**BROUGHT** [4] - 2072:6, 2076:3, 2089:11, 2123:10
**BUILD** [2] - 2119:21,

2121:1
**BUILDING** [7] - 2084:23, 2084:24, 2089:3, 2098:23, 2101:14, 2101:20, 2102:6
**BUILDING** [1] - 2088:25
**BULK** [1] - 2111:21
**BUNCH** [2] - 2085:2, 2109:8
**BURDEN** [18] - 2039:1, 2050:3, 2050:5, 2054:8, 2057:19, 2057:22, 2063:9, 2063:12, 2063:15, 2063:17, 2063:18, 2065:9, 2070:15, 2117:10, 2117:23, 2122:16, 2122:18
**BURN** [13] - 2089:4, 2089:5, 2089:8, 2089:12, 2089:15, 2089:18, 2089:20, 2089:25, 2090:1, 2090:5, 2090:23, 2099:10, 2112:1
**BUSINESS** [1] - 2060:1
**BUY** [4] - 2118:8, 2118:22, 2120:16, 2120:18
**BY** [8] - 2020:4, 2020:5, 2020:5, 2020:6, 2020:9, 2020:14, 2020:14, 2020:15
**BYPRODUCTS** [1] - 2098:1
**BYRON** [1] - 2020:4

**C**

**CACI** [1] - 2036:2
**CAL** [2] - 2035:20, 2035:21
**CALCULATE** [3] - 2058:8, 2094:3, 2110:24
**CALCULATION** [1] - 2118:17
**CALCULATIONS** [2] - 2118:13, 2118:20
**CALIFORNIA** [13] - 2020:7, 2020:10, 2020:11, 2020:16, 2030:15, 2061:24, 2086:13, 2086:14, 2087:3, 2087:13,

2088:3, 2096:15, 2123:17
**CALIFORNIA** [5] - 2019:2, 2019:15, 2019:25, 2023:2, 2125:7
**CANDID** [3] - 2075:8, 2096:10, 2106:7
**CANDIDLY** [1] - 2105:23
**CANNOT** [2] - 2078:2, 2091:19
**CAPABLE** [1] - 2098:18
**CAPACITY** [1] - 2114:23
**CAPITAL** [2] - 2119:14, 2119:15
**CAPPED** [1] - 2109:4
**CAPTURING** [1] - 2031:25
**CAR** [3] - 2120:17, 2120:18
**CARCINOGEN** [1] - 2086:2
**CARE** [8] - 2050:11, 2050:14, 2051:12, 2051:14, 2051:18, 2082:9, 2083:3, 2083:8
**CAREFUL** [6] - 2050:18, 2050:19, 2050:21, 2082:20, 2082:22, 2088:13
**CAREFULLY** [2] - 2027:10, 2099:21
**CARRIED** [1] - 2054:21
**CARRYING** [1] - 2104:16
**CARTRIDGE** [1] - 2120:11
**CASE** [93] - 2023:5, 2026:23, 2027:25, 2028:25, 2029:1, 2029:2, 2029:7, 2029:9, 2029:11, 2029:16, 2029:17, 2029:23, 2029:24, 2030:4, 2030:21, 2031:8, 2031:12, 2031:19, 2032:3, 2032:4, 2032:13, 2032:14, 2032:17, 2033:2, 2033:6, 2034:11, 2035:15, 2035:18, 2036:2, 2036:14, 2036:15, 2037:13, 2038:8, 2038:11, 2046:25,

2047:1, 2047:6, 2048:4, 2049:19, 2059:7, 2066:11, 2066:24, 2067:1, 2067:2, 2067:5, 2067:7, 2067:17, 2067:21, 2067:23, 2068:2, 2068:4, 2068:7, 2068:11, 2068:15, 2069:1, 2069:17, 2070:4, 2071:20, 2071:25, 2072:10, 2072:17, 2072:21, 2073:10, 2073:16, 2074:11, 2075:7, 2077:12, 2081:2, 2082:3, 2082:13, 2084:20, 2084:22, 2092:18, 2094:6, 2100:9, 2101:8, 2104:4, 2105:6, 2107:15, 2110:15, 2114:22, 2115:7, 2115:10, 2118:11, 2121:6, 2121:24, 2122:1, 2122:17, 2123:6, 2123:9, 2123:21, 2124:7
**CASE** [1] - 2019:6
**CASES** [3] - 2027:21, 2029:25, 2110:25
**CATCH** [1] - 2089:8
**CATCH-ALL** [1] - 2089:8
**CAUSED** [8] - 2049:16, 2053:17, 2054:13, 2054:18, 2057:1, 2060:12, 2060:22, 2063:1
**CAUSES** [1] - 2032:12
**CAUSING** [10] - 2051:5, 2051:7, 2053:8, 2056:17, 2057:7, 2058:5, 2058:18, 2058:20, 2059:18, 2117:5
**CAVALIER** [1] - 2078:13
**CENTER** [2] - 2058:13, 2101:9
**CENTRAL** [2] - 2019:2, 2125:7
**CERTAIN** [4] - 2027:18, 2083:13, 2090:4
**CERTAINLY** [16] - 2042:8, 2080:24, 2084:9, 2085:1, 2086:8, 2090:24,

2095:12, 2095:25, 2096:9, 2096:11, 2097:16, 2099:11, 2102:16, 2106:15, 2117:25, 2123:12
**CERTIFICATE** [1] - 2125:1
**CERTIFY** [1] - 2125:7
**CETERA** [1] - 2116:4
**CHAIR** [2] - 2081:21, 2108:6
**CHANDALAR** [1] - 2020:9
**CHANGE** [11] - 2024:15, 2025:1, 2025:8, 2025:16, 2025:22, 2032:12, 2043:1, 2066:18, 2066:21, 2100:13, 2119:24
**CHANGED** [4] - 2024:14, 2090:18, 2110:3, 2110:4
**CHANGES** [6] - 2040:6, 2042:16, 2043:9, 2043:20, 2044:20, 2045:8
**CHARACTER** [1] - 2053:20
**CHARACTERIZATIO N** [1] - 2106:11
**CHARACTERIZE** [1] - 2099:14
**CHARTS** [2] - 2116:9, 2116:17
**CHAT** [1] - 2067:9
**CHEMICAL** [1] - 2027:19
**CHEMICALS** [19] - 2083:20, 2084:15, 2089:5, 2089:9, 2089:20, 2089:22, 2090:4, 2093:18, 2097:12, 2102:25, 2103:12, 2103:13, 2103:19, 2106:16, 2106:25, 2112:11, 2113:12, 2116:15, 2117:13
**CHLORACNE** [1] - 2086:3
**CHLORIDE** [1] - 2117:14
**CHLORINATED** [4] - 2083:12, 2083:23, 2085:22, 2087:2
**CHRISTMAS** [1] - 2079:17
**CHRONIC** [2] - 2085:5, 2085:19

**CIRCLE** [1] - 2092:17
**CIRCUIT** [2] - 2029:10, 2029:23
**CITATION** [1] - 2035:20
**CITE** [3] - 2035:6, 2038:7, 2080:18
**CITED** [11] - 2028:23, 2035:15, 2035:19, 2036:14, 2038:3, 2098:8, 2098:12, 2100:1, 2101:1, 2102:4, 2102:17
**CITIES** [1] - 2086:24
**CITING** [1] - 2087:21
**CITIZEN** [3] - 2097:2, 2103:5, 2123:17
**CITIZENS** [4] - 2077:22, 2082:8, 2090:15
**CITY** [2] - 2029:9, 2029:11
**CITY** [1] - 2029:20
**CLAIM** [1] - 2050:10
**CLAIM** [50] - 2029:6, 2030:17, 2030:18, 2031:24, 2032:8, 2032:9, 2032:20, 2032:21, 2032:25, 2033:15, 2033:17, 2033:19, 2033:22, 2034:8, 2034:10, 2034:18, 2034:22, 2035:9, 2036:5, 2036:16, 2036:23, 2049:23, 2049:25, 2050:1, 2050:3, 2050:5, 2050:7, 2050:23, 2051:1, 2052:3, 2052:5, 2052:7, 2055:2, 2055:15, 2055:18, 2055:21, 2056:18, 2056:20, 2058:2, 2058:14, 2059:1, 2060:7, 2065:9, 2065:13, 2107:5, 2121:16
**CLAIMING** [5] - 2036:7, 2036:17, 2036:21, 2038:20, 2062:25
**CLAIMS** [29] - 2028:21, 2029:14, 2029:16, 2030:23, 2033:14, 2034:4, 2034:7, 2037:5, 2041:16, 2042:1, 2049:19, 2049:21, 2049:22, 2050:2,

2050:24, 2052:6, 2054:24, 2055:20, 2056:19, 2057:18, 2058:1, 2058:12, 2060:5, 2061:12, 2063:11, 2070:15, 2072:6, 2081:2, 2082:5
**CLARITA** [4] - 2023:6, 2044:24, 2049:24, 2050:24
**CLARITA** [1] - 2019:5
**CLASSIFIED** [1] - 2086:2
**CLEAN** [6] - 2043:9, 2043:24, 2043:25, 2072:2, 2091:18, 2094:24
**CLEANED** [2] - 2085:10, 2103:7
**CLEANING** [1] - 2077:20
**CLEAR** [19] - 2025:22, 2027:8, 2031:7, 2036:3, 2036:10, 2037:8, 2037:11, 2063:8, 2063:16, 2063:18, 2063:20, 2065:7, 2065:10, 2080:12, 2081:20, 2092:19, 2103:14, 2122:21, 2122:22
**CLEARLY** [4] - 2032:19, 2082:24, 2113:4, 2118:8
**CLERK** [1] - 2023:5
**CLERK** [2] - 2023:18, 2042:15
**CLICKER** [1] - 2073:15
**CLIENT** [6] - 2030:2, 2031:13, 2072:5, 2078:22, 2123:19, 2123:24
**CLIENT'S** [5] - 2030:8, 2031:9, 2041:15, 2106:22, 2106:24
**CLIENTS** [1] - 2119:10
**CLOSE** [5] - 2045:17, 2046:14, 2090:2, 2110:1, 2117:12
**CLOSED** [2] - 2110:2
**CLOSING** [11] - 2023:19, 2046:18, 2062:18, 2070:11, 2070:13, 2070:18, 2070:19, 2070:21, 2071:14, 2072:23, 2124:8
**CLOSURE** [1] -

2041:2
**CLUSTERS** [1] - 2093:11
**CODE** [1] - 2098:13
**CODE** [1] - 2125:8
**COLLAR** [1] - 2079:20
**COLLECTING** [1] - 2110:6
**COLOGNE** [1] - 2038:7
**COMBINED** [1] - 2033:8
**COMFORTABLE** [2] - 2052:16, 2056:3
**COMING** [4] - 2091:4, 2097:8, 2103:24, 2112:25
**COMMENCED** [1] - 2094:19
**COMMENT** [1] - 2078:1
**COMMENTARY** [1] - 2067:21
**COMMISSION** [1] - 2087:13
**COMMITMENT** [1] - 2073:1
**COMMITTED** [2] - 2063:23, 2122:2
**COMMON** [2] - 2029:13, 2092:14
**COMMUNICATE** [5] - 2067:3, 2067:4, 2069:11, 2069:15, 2069:16
**COMMUNICATING** [1] - 2067:13
**COMMUNICATIONS** [1] - 2068:22
**COMMUNITY** [1] - 2057:11
**COMPANIES** [1] - 2077:21
**COMPANY** [1] - 2034:19
**COMPANY** [3] - 2049:5, 2096:7, 2113:22
**COMPARATIVE** [1] - 2057:25
**COMPARED** [1] - 2060:25
**COMPATIBILITY** [1] - 2054:20
**COMPENSATE** [1] - 2060:9
**COMPENSATES** [1] - 2062:12
**COMPENSATION** [2] - 2060:10, 2060:15

**COMPENSATORY** [1] - 2062:25
**COMPETING** [1] - 2061:5
**COMPLAINT** [2] - 2037:25, 2038:3
**COMPLETE** [5] - 2070:6, 2093:23, 2095:14, 2095:15, 2113:11
**COMPLIANCE** [1] - 2101:20
**COMPLICATED** [1] - 2043:3
**COMPOUNDS** [1] - 2097:9
**COMPUTER** [1] - 2067:8
**CONCEALED** [1] - 2065:1
**CONCENTRATION** [1] - 2104:19
**CONCEPT** [3] - 2027:17, 2049:3, 2049:9
**CONCEPTS** [2] - 2027:18, 2064:10
**CONCERN** [3] - 2031:22, 2086:14, 2101:23
**CONCERNED** [3] - 2027:24, 2095:17, 2119:20
**CONCERNING** [5] - 2042:7, 2060:3, 2064:10, 2065:18, 2069:16
**CONCLUDE** [1] - 2028:2
**CONCLUDED** [1] - 2029:7
**CONCLUDES** [2] - 2034:18, 2070:9
**CONCLUSION** [3] - 2034:20, 2108:10, 2108:19
**CONCLUSIONS** [1] - 2116:20
**CONDITION** [22] - 2051:13, 2051:23, 2052:2, 2052:12, 2052:22, 2052:25, 2053:17, 2054:25, 2055:3, 2055:6, 2055:8, 2055:11, 2055:14, 2055:24, 2056:5, 2056:8, 2060:24, 2061:5, 2083:4, 2094:14
**CONDITIONS** [3] -

2051:14, 2083:8, 2083:9
**CONDUCT** [35] - 2038:20, 2049:17, 2052:19, 2053:3, 2053:5, 2053:7, 2053:10, 2053:13, 2054:11, 2054:13, 2054:14, 2054:15, 2054:18, 2054:20, 2056:10, 2056:12, 2056:16, 2057:6, 2057:16, 2060:12, 2060:23, 2063:1, 2063:2, 2063:6, 2063:22, 2064:1, 2064:6, 2064:7, 2064:12, 2064:17, 2064:19, 2064:22, 2075:10, 2076:14
**CONFER** [2] - 2035:13, 2036:16
**CONFERENCE** [1] - 2125:12
**CONFIRM** [2] - 2044:13, 2106:15
**CONFORM** [4] - 2040:12, 2042:5, 2042:10, 2044:20
**CONFORMANCE** [1] - 2125:12
**CONFORMED** [1] - 2042:8
**CONFORMS** [1] - 2044:2
**CONFUSING** [1] - 2043:4
**CONNECTED** [5] - 2094:9, 2103:19, 2103:20, 2105:13, 2106:20
**CONSCIENTIOUS** [1] - 2066:17
**CONSENT** [4] - 2053:4, 2055:11, 2056:11, 2102:22
**CONSEQUENCES** [2] - 2064:16, 2064:18
**CONSEQUENTLY** [1] - 2102:5
**CONSIDER** [18] - 2027:5, 2031:23, 2040:23, 2047:17, 2048:13, 2051:8, 2051:18, 2053:13, 2053:15, 2054:11, 2057:10, 2057:14, 2057:16, 2059:24, 2060:23, 2062:14, 2082:24, 2117:6

**CONSIDERATION** [1] - 2078:10
**CONSIDERED** [2] - 2048:21, 2066:12
**CONSIDERING** [2] - 2028:7, 2048:2
**CONSISTENT** [2] - 2089:25, 2111:24
**CONSTITUENTS** [2] - 2084:10, 2102:10
**CONSTITUTING** [3] - 2063:22, 2064:1, 2064:6
**CONSTRUCTION** [2] - 2120:19
**CONSULT** [1] - 2069:18
**CONSULTANT** [6] - 2076:1, 2079:12, 2080:17, 2104:9, 2104:12, 2120:5
**CONSULTING** [1] - 2067:25
**CONSUMING** [1] - 2071:23
**CONTACT** [1] - 2067:19
**CONTAIN** [1] - 2114:18
**CONTAINED** [2] - 2035:8, 2099:1
**CONTAINMENT** [1] - 2081:23
**CONTAINS** [2] - 2023:19, 2106:25
**CONTAMINANTS** [3] - 2080:10, 2103:17, 2103:18
**CONTAMINATE** [1] - 2087:2
**CONTAMINATED** [8] - 2030:13, 2031:14, 2031:25, 2105:2, 2105:7, 2106:3, 2110:1, 2112:22
**CONTAMINATING** [1] - 2094:2
**CONTAMINATION** [50] - 2027:12, 2028:2, 2028:22, 2030:4, 2030:7, 2031:9, 2071:20, 2072:4, 2072:6, 2072:11, 2073:19, 2073:23, 2073:25, 2074:8, 2075:4, 2077:5, 2077:24, 2078:3, 2078:15, 2078:25, 2080:9, 2080:13, 2082:2,

2082:18, 2083:11, 2085:23, 2086:15, 2088:3, 2088:4, 2091:24, 2092:12, 2092:16, 2092:23, 2094:8, 2094:12, 2094:22, 2095:23, 2096:23, 2097:4, 2097:6, 2106:2, 2113:14, 2114:19, 2115:1, 2116:10, 2118:2, 2118:21, 2121:7, 2122:7
**CONTEMPTIBLE** [1] - 2064:23
**CONTENDS** [2] - 2061:14, 2062:8
**CONTENTIONS** [1] - 2065:13
**CONTEXT** [6] - 2027:5, 2029:3, 2032:3, 2035:4, 2045:8, 2074:11
**CONTINGENCIES** [1] - 2119:21
**CONTINUE** [3] - 2069:20, 2091:20, 2124:7
**CONTOUR** [4] - 2093:20, 2103:23, 2104:2, 2104:11
**CONTRIBUTED** [4] - 2051:8, 2058:2, 2058:13, 2117:6
**CONTRIBUTORY** [1] - 2057:24
**CONTROL** [6] - 2031:5, 2042:13, 2052:1, 2091:13, 2121:13, 2121:15
**CONTROL** [2] - 2097:7, 2097:24
**CONTROLLED** [4] - 2024:18, 2025:20, 2052:10, 2056:23
**CONTROLS** [1] - 2071:6
**CONVEY** [1] - 2027:6
**CONVICTION** [1] - 2065:12
**CONVINCING** [8] - 2063:8, 2063:16, 2063:18, 2063:21, 2065:8, 2065:10, 2122:21, 2122:22
**COPY** [6] - 2031:19, 2043:9, 2044:1, 2046:12, 2082:6, 2117:1
**CORPORATE** [9] -

2065:5, 2065:6, 2075:10, 2076:14, 2077:22, 2082:8, 2090:15, 2097:2, 2103:5
**CORPORATION** [1] - 2019:8
**CORPORATION** [5] - 2048:5, 2048:18, 2048:21, 2048:24, 2077:19
**CORPORATION** [7] - 2023:6, 2048:19, 2048:20, 2049:4, 2072:10, 2101:25, 2121:10
**CORPORATIONS** [2] - 2072:9, 2077:22
**CORPS** [1] - 2105:19
**CORRECT** [1] - 2125:9
**CORRECT** [8] - 2024:1, 2024:2, 2024:4, 2024:20, 2025:18, 2026:17, 2027:16, 2044:18, 2076:17
**CORRECTED** [2] - 2043:5, 2043:10
**CORRECTIONS** [1] - 2043:12
**CORRECTLY** [1] - 2035:1
**COST** [16] - 2041:6, 2041:18, 2060:19, 2060:20, 2060:22, 2061:2, 2061:4, 2061:8, 2079:12, 2096:5, 2119:7, 2119:11, 2119:13, 2119:22, 2120:2, 2120:7
**COSTS** [12] - 2061:1, 2077:15, 2079:10, 2080:9, 2119:5, 2119:14, 2119:15, 2119:17, 2119:19, 2120:3, 2120:6, 2120:10
**COUNSEL** [10] - 2023:8, 2024:5, 2035:13, 2062:19, 2074:21, 2079:4, 2090:13, 2095:3, 2108:2, 2108:11
**COUNSEL** [1] - 2020:1
**COUNT** [1] - 2099:15
**COUNT** [1] - 2069:25, 2100:20, 2107:25
**COUNTERPART** [1] -

2078:6
**COUNTRY** [1] - 2077:23
**COUNTS** [1] - 2099:6
**COUNTY** [4] - 2027:21, 2029:21, 2032:17, 2038:12
**COUPLE** [6] - 2042:11, 2070:22, 2079:17, 2081:18, 2091:16, 2117:13
**COURSE** [11] - 2038:22, 2047:10, 2066:16, 2090:7, 2104:20, 2112:4, 2114:19, 2115:1, 2118:15, 2121:15, 2122:22
**COURT** [72] - 2019:1, 2019:24, 2023:13, 2023:20, 2024:4, 2024:16, 2024:21, 2024:23, 2025:6, 2025:13, 2025:16, 2025:19, 2025:24, 2026:7, 2026:19, 2028:10, 2029:1, 2029:11, 2029:15, 2029:23, 2030:16, 2031:6, 2031:11, 2031:15, 2031:20, 2033:2, 2033:13, 2033:18, 2034:7, 2034:16, 2034:25, 2035:6, 2035:12, 2035:19, 2035:23, 2036:8, 2036:12, 2036:25, 2037:10, 2039:16, 2039:21, 2039:24, 2040:8, 2040:17, 2040:20, 2041:1, 2041:9, 2041:12, 2041:14, 2041:20, 2041:23, 2042:1, 2042:25, 2043:6, 2043:11, 2043:15, 2043:23, 2044:7, 2044:9, 2044:16, 2044:19, 2044:23, 2045:13, 2046:5, 2046:9, 2081:14, 2124:3, 2124:12, 2124:15, 2125:6, 2125:19
**COURT** [14] - 2032:6, 2032:23, 2046:4, 2065:24, 2066:6, 2068:16, 2068:17, 2069:2, 2069:17, 2095:20, 2103:25,

2112:6, 2123:10, 2124:11
**COURT** [26] - 2024:5, 2028:1, 2029:2, 2029:7, 2029:25, 2031:16, 2034:17, 2035:6, 2035:7, 2036:14, 2037:14, 2038:23, 2039:5, 2039:18, 2039:24, 2040:12, 2043:23, 2044:14, 2045:2, 2062:16, 2067:19, 2069:8, 2070:1, 2081:15, 2083:22
**COURT'S** [3] - 2040:7, 2045:19, 2082:6
**COURTROOM** [5] - 2066:2, 2068:21, 2070:8, 2076:3, 2111:8
**COVERS** [1] - 2118:25
**CRAZY** [2] - 2094:18, 2094:23
**CREATE** [1] - 2086:12
**CREATED** [10] - 2051:23, 2052:2, 2052:7, 2052:12, 2052:22, 2055:3, 2055:8, 2055:21, 2055:24, 2085:12
**CREATES** [1] - 2083:13
**CREDIBILITY** [1] - 2048:13
**CREDIBLE** [1] - 2105:21
**CRITICAL** [1] - 2034:9
**CROSS** [1] - 2040:19
**CROSS-DEFENDANTS** [1] - 2040:19
**CRR** [2] - 2019:23, 2125:19
**CRUEL** [1] - 2064:20
**CRUZ** [3] - 2042:15, 2043:7, 2043:8
**CRYSTAL** [2] - 2027:8, 2037:11
**CSR** [2] - 2019:23, 2125:19
**CUP** [1] - 2088:11
**CUSTOM** [2] - 2057:15, 2057:17
**CUSTOMS** [2] - 2057:10, 2057:12
**CV** [2] - 2019:7, 2023:5
**CW-1** [3] - 2112:14, 2112:15, 2112:21

**D**

**DAMAGE** [6] - 2034:21, 2036:7, 2045:5, 2063:19, 2085:20, 2086:4
**DAMAGED** [1] - 2061:13
**DAMAGES** [46] - 2028:13, 2033:21, 2033:23, 2034:15, 2035:1, 2035:5, 2043:2, 2043:18, 2044:2, 2045:4, 2045:8, 2045:10, 2045:15, 2045:18, 2045:22, 2058:7, 2059:23, 2059:24, 2060:3, 2060:4, 2060:10, 2060:11, 2060:15, 2060:17, 2060:18, 2061:7, 2061:11, 2062:4, 2062:11, 2062:12, 2062:20, 2062:25, 2063:3, 2063:14, 2118:7, 2118:16, 2120:24, 2121:6, 2121:23, 2121:25, 2122:18, 2122:20, 2122:24
**DAN** [1] - 2079:16
**DANGEROUS** [3] - 2052:23, 2064:16, 2083:20
**DANIEL** [1] - 2020:15
**DATA** [9] - 2093:8, 2093:14, 2093:15, 2093:16, 2093:23, 2098:24, 2102:16, 2108:6, 2116:24
**DATE** [2] - 2070:7, 2076:24
**DATED** [1] - 2125:15
**DATED** [1] - 2076:9
**DATES** [1] - 2099:17
**DAUS** [1] - 2110:23
**DAWSON** [2] - 2023:25, 2087:9
**DAY** [2] - 2019:13, 2125:15
**DAYS** [2] - 2079:17, 2081:18
**DEAL** [10] - 2032:18, 2032:23, 2032:24, 2075:15, 2077:17, 2107:3, 2121:6, 2121:7, 2122:6
**DEALER** [1] - 2120:17
**DEALING** [5] -

2029:12, 2029:16, 2032:6, 2076:7, 2077:5
**DEALS** [1] - 2026:4
**DEALT** [4] - 2032:7, 2032:9, 2032:21
**DEATH** [1] - 2085:19
**DECADES** [4] - 2073:19, 2092:14, 2117:4, 2118:1
**DECEIT** [2] - 2072:12, 2075:10
**DECEMBER** [3] - 2019:14, 2023:1, 2125:15
**DECEPTION** [5] - 2072:12, 2076:13, 2093:15, 2103:9, 2122:1
**DECIDE** [17] - 2047:5, 2048:11, 2050:21, 2058:21, 2059:19, 2060:7, 2060:8, 2060:21, 2063:1, 2063:2, 2063:5, 2066:11, 2069:1, 2077:9, 2096:4, 2120:21, 2121:20
**DECIDED** [8] - 2026:9, 2026:11, 2026:20, 2028:11, 2063:4, 2068:15, 2122:6
**DECIDING** [2] - 2051:17, 2057:11
**DECISION** [9] - 2029:10, 2029:21, 2032:25, 2050:8, 2065:5, 2066:17, 2066:20, 2072:20, 2077:13
**DECISION-MAKING** [1] - 2065:5
**DECISIONS** [2] - 2065:6, 2123:11
**DEEP** [1] - 2092:25
**DEFECTS** [1] - 2086:3
**DEFENDANT** [1] - 2023:15
**DEFENDANT** [2] - 2035:15, 2048:20
**DEFENDANTS** [1] - 2040:19
**DEFENDANTS** [2] - 2019:9, 2020:12
**DEFENSE** [9] - 2039:3, 2045:2, 2045:21, 2050:5, 2057:22, 2058:11, 2065:10, 2065:13, 2070:19

**DEFENSES** [3] - 2050:4, 2057:21, 2063:12
**DEFER** [1] - 2045:17
**DEFINE** [1] - 2103:23
**DEFINITION** [1] - 2024:14
**DEFINITIONS** [1] - 2064:9
**DEGREASER** [2] - 2085:14, 2085:17
**DEGREASERS** [3] - 2085:8, 2085:10, 2085:11
**DEGREASING** [2] - 2089:24, 2114:12
**DEGREE** [1] - 2077:2
**DELAY** [5] - 2072:12, 2074:7, 2082:3, 2103:9, 2121:25
**DELAYED** [3] - 2038:1, 2093:5, 2117:4
**DELIBERATE** [5] - 2043:25, 2076:15, 2120:22, 2121:4, 2123:25
**DELIBERATELY** [1] - 2064:17
**DELIBERATION** [2] - 2039:8, 2066:5
**DELIBERATIONS** [7] - 2065:19, 2065:22, 2065:23, 2067:3, 2069:11, 2069:20, 2070:7
**DELIVERED** [2] - 2076:4, 2123:4
**DELIVERING** [2] - 2100:15
**DENIAL** [4] - 2072:12, 2082:3, 2103:9, 2121:25
**DENIED** [6] - 2045:22, 2069:2, 2074:8, 2074:9, 2078:24, 2094:10
**DENY** [2] - 2045:19, 2074:7
**DENYING** [2] - 2045:13, 2094:11
**DEPARTMENT** [1] - 2091:19
**DEPARTMENT** [2] - 2096:16, 2096:23
**DEPONENT** [1] - 2048:6
**DEPOSED** [1] - 2048:8
**DEPOSITION** [5] -

2084:8, 2084:12, 2085:17, 2108:24, 2115:17
**DEPUTY** [1] - 2066:2
**DERIVED** [1] - 2096:15
**DESCRIBE** [3] - 2043:17, 2052:4, 2081:17
**DESCRIBED** [5] - 2076:4, 2079:18, 2086:16, 2086:19, 2105:24
**DESCRIBING** [2] - 2076:10, 2099:18
**DESCRIPTION** [1] - 2097:25
**DESCRIPTION** [1] - 2022:3
**DESERVES** [1] - 2048:2
**DESIGN** [1] - 2120:18
**DESIGNATES** [1] - 2048:5
**DESPICABLE** [5] - 2064:12, 2064:20, 2064:22, 2075:9, 2076:14
**DESPISED** [1] - 2064:24
**DESTRUCTION** [1] - 2053:21
**DETAIL** [3] - 2059:9, 2102:25, 2116:2
**DETAILED** [3] - 2109:21, 2116:19, 2120:9
**DETECTED** [1] - 2117:15
**DETECTING** [4] - 2093:4, 2116:12, 2116:14
**DETECTION** [2] - 2080:3, 2102:5
**DETECTIONS** [5] - 2104:24, 2107:16, 2107:17, 2108:12, 2109:12
**DETERMINATION** [3] - 2038:23, 2039:6, 2058:7
**DETERMINE** [8] - 2038:15, 2053:14, 2054:10, 2057:13, 2060:20, 2061:1, 2061:3, 2065:6
**DETERMINING** [5] - 2048:13, 2053:11, 2059:24, 2098:18, 2102:9

**DEVELOPED** [1] - 2039:9
**DEVICES** [1] - 2068:4
**DICKEY** [1] - 2087:23
**DICTIONARIES** [1] - 2067:25
**DIFFERENCE** [2] - 2034:5, 2034:6
**DIFFERENCES** [1] - 2032:11
**DIFFERENT** [13] - 2027:1, 2032:19, 2034:7, 2034:13, 2036:6, 2038:9, 2049:20, 2056:14, 2063:9, 2105:12, 2111:1, 2120:20
**DIFFERENTLY** [2] - 2032:16, 2081:8
**DIFFERS** [1] - 2071:10
**DIFFICULT** [2] - 2032:6, 2038:14
**DIFFICULTY** [1] - 2051:24
**DIGGING** [1] - 2076:18
**DILIGENTLY** [1] - 2066:8
**DILUTION** [1] - 2087:15
**DIRECT** [1] - 2034:17
**DIRECTION** [10] - 2058:25, 2059:5, 2085:2, 2093:19, 2094:7, 2103:23, 2104:3, 2105:8, 2105:24, 2112:11
**DIRECTIONS** [1] - 2122:23
**DIRECTLY** [4] - 2036:1, 2036:11, 2036:13
**DIRECTORS** [7] - 2048:23, 2048:25, 2063:24, 2064:3, 2064:5, 2122:3, 2122:13
**DISAGREE** [2] - 2040:2, 2040:5
**DISAGREEMENT** [2] - 2043:18, 2043:19
**DISCHARGED** [2] - 2069:25, 2087:14
**DISCLAIMER** [1] - 2032:3
**DISCLOSE** [1] - 2069:25
**DISCLOSURES** [1] - 2075:19
**DISCOMFORT** [1] -

2053:22
**DISCOVER** [3] - 2051:14, 2083:8, 2094:22
**DISCOVERED** [1] - 2094:15
**DISCOVERS** [1] - 2072:10
**DISCOVERY** [1] - 2038:21
**DISCUSS** [1] - 2067:18
**DISCUSSED** [4] - 2040:22, 2066:13, 2068:3, 2068:5
**DISCUSSES** [1] - 2030:22
**DISCUSSING** [4] - 2030:21, 2067:2, 2067:7, 2082:25
**DISCUSSION** [2] - 2066:19, 2117:9
**DISLIKES** [1] - 2047:4
**DISMISS** [3] - 2041:6, 2041:18, 2041:24
**DISMISSED** [1] - 2042:2
**DISPERSES** [1] - 2092:23
**DISPERSION** [1] - 2113:12
**DISPOSAL** [7] - 2090:9, 2090:24, 2091:6, 2097:15, 2097:21, 2099:12, 2099:17
**DISPOSE** [1] - 2114:11
**DISPOSED** [3] - 2088:7, 2099:8, 2099:21
**DISPUTE** [8] - 2078:20, 2078:21, 2079:10, 2081:4, 2094:14, 2104:14, 2105:9
**DISPUTES** [2] - 2079:6, 2082:1
**DISREGARD** [5] - 2064:13, 2064:15, 2064:21, 2071:5, 2071:11
**DISSENTING** [1] - 2039:20
**DISSUADE** [1] - 2066:6
**DISTINGUISH** [2] - 2029:4, 2029:17
**DISTINGUISHABLE** [1] - 2031:11

**DISTRIBUTION** [2] - 2109:15, 2116:4
**DISTRICT** [2] - 2027:21, 2029:21
**DISTRICT** [1] - 2031:24
**DISTRICT** [5] - 2019:1, 2019:2, 2019:3, 2125:6, 2125:7
**DISTRUST** [1] - 2047:19
**DISTURBED** [2] - 2053:3, 2056:8
**DIVERGED** [1] - 2059:14
**DIVIDE** [1] - 2094:5
**DIVIDING** [2] - 2092:18, 2092:21
**DIVISION** [2] - 2101:25
**DIVISION** [1] - 2019:2
**DO** [1] - 2125:7
**DOCUMENT** [4] - 2080:19, 2100:21, 2101:1, 2115:16
**DOCUMENTATION** [1] - 2109:19
**DOCUMENTS** [10] - 2076:6, 2084:5, 2088:16, 2097:19, 2097:20, 2097:21, 2099:22, 2100:10, 2108:13, 2123:9
**DOG** [1] - 2105:21
**DOLLARS** [1] - 2120:25
**DONE** [13] - 2047:9, 2057:13, 2064:13, 2066:2, 2081:7, 2094:5, 2095:22, 2097:3, 2097:5, 2103:3, 2107:10, 2109:16, 2110:24
**DOTS** [3] - 2093:4, 2107:23, 2108:18
**DOUBT** [1] - 2065:16
**DOWN** [13] - 2049:21, 2064:23, 2073:10, 2077:16, 2077:23, 2079:14, 2084:18, 2085:4, 2093:24, 2104:20, 2104:22, 2112:22, 2118:8
**DOWNGRADIENT** [2] - 2084:19, 2102:2
**DOWNHILL** [1] - 2072:9
**DR** [24] - 2040:6, 2085:21, 2086:10, 2086:16, 2087:12,

8

2089:6, 2089:23, 2093:12, 2098:4, 2099:25, 2100:12, 2100:21, 2104:19, 2105:3, 2105:16, 2108:11, 2109:1, 2109:17, 2110:23, 2117:18, 2117:19, 2119:8, 2120:22, 2120:25
**DRAFT** [1] - 2091:20
**DRAW** [5] - 2104:12, 2107:18, 2108:9, 2108:19, 2113:5
**DRAWING** [1] - 2106:3
**DRAWS** [1] - 2110:20
**DREW** [1] - 2113:9
**DRILL** [1] - 2049:21
**DRINKING** [4] - 2061:16, 2062:4, 2072:2, 2123:18
**DRIVING** [1] - 2079:14
**DROPPED** [1] - 2091:17
**DROPS** [1] - 2032:3
**DROUGHT** [1] - 2072:3
**DTSC** [2] - 2074:20, 2096:20
**DUE** [1] - 2039:2
**DUMP** [3] - 2088:17, 2088:19, 2102:20
**DUMPED** [4] - 2088:24, 2088:25, 2089:7, 2093:18
**DUMPING** [19] - 2082:14, 2086:8, 2088:12, 2088:21, 2088:23, 2089:24, 2090:2, 2090:4, 2090:11, 2090:20, 2091:3, 2091:4, 2092:5, 2097:17, 2097:18, 2099:9, 2114:4, 2114:6, 2117:3
**DURING** [7] - 2038:25, 2062:22, 2062:23, 2067:3, 2068:5, 2068:13, 2069:10
**DUTY** [2] - 2046:24, 2046:25
**DWARFS** [1] - 2114:24

# E

**E-MAIL** [5] - 2041:17, 2041:21, 2043:8, 2067:9, 2080:15

**EARLY** [2] - 2082:17, 2086:13
**EAST** [1] - 2075:3
**EDGE** [3] - 2104:1, 2104:20, 2105:3
**EDLIN** [1] - 2020:13
**EDUCATION** [2] - 2047:24, 2048:3
**EFFECT** [3] - 2066:21, 2078:2, 2090:16
**EFFECTS** [3] - 2086:1, 2086:3, 2087:16
**EIGHT** [2] - 2053:7, 2101:19
**EITHER** [4] - 2031:4, 2056:24, 2107:20, 2120:17
**ELECT** [1] - 2065:22
**ELECTRONIC** [1] - 2067:8
**ELEMENT** [2] - 2034:9, 2052:25
**ELEMENTS** [4] - 2024:10, 2024:25, 2050:23, 2052:4
**ELEVATION** [2] - 2103:22, 2104:2
**ELEVATIONS** [2] - 2084:20, 2084:21
**ELICITED** [2] - 2026:24, 2027:12
**ELIMINATE** [1] - 2034:23
**EMISSION** [1] - 2086:24
**EMPHASIZED** [2] - 2075:14, 2108:11
**EMPLOYEE** [1] - 2065:3
**EMPLOYEES** [5] - 2048:7, 2048:22, 2048:25, 2049:17, 2107:11
**EMPLOYER** [2] - 2049:16, 2067:14
**EMPLOYMENT** [1] - 2049:18
**END** [4] - 2034:13, 2054:25, 2055:13, 2112:12
**ENDED** [2] - 2089:5, 2089:9
**ENDS** [1] - 2090:5
**ENGAGED** [1] - 2063:6
**ENGAGEMENT** [1] - 2102:25
**ENGAGING** [1] - 2054:15
**ENGINEERING** [1] -

2096:6
**ENGINEERS** [1] - 2105:19
**ENJOYMENT** [7] - 2052:16, 2053:1, 2053:18, 2053:25, 2054:1, 2054:5, 2056:3
**ENSURING** [1] - 2102:5
**ENTER** [1] - 2057:1
**ENTERING** [1] - 2107:19
**ENTIRELY** [2] - 2031:7, 2104:8
**ENTITLED** [1] - 2068:25
**ENTITLED** [1] - 2125:11
**ENTITY** [3] - 2060:1, 2061:25, 2100:14
**ENTRY** [2] - 2057:4, 2057:8
**ENVIRONMENT** [2] - 2090:11, 2091:3
**EPA** [11] - 2074:19, 2074:20, 2078:4, 2078:11, 2078:15, 2078:16, 2094:21, 2098:21, 2099:6, 2099:16, 2122:8
**EQUALLY** [1] - 2123:2
**EQUIPMENT** [4] - 2085:9, 2120:9, 2120:10, 2121:14
**ERIC** [1] - 2020:15
**ERIC** [2] - 2020:20, 2078:17
**ERROR** [2] - 2042:22, 2043:3
**ERRORS** [1] - 2043:10
**ESPECIALLY** [4] - 2088:2, 2088:4, 2090:22, 2093:2
**ESSENCE** [1] - 2032:7
**ESSENTIAL** [3] - 2024:24, 2052:4, 2120:13
**ESSENTIALLY** [6] - 2034:16, 2035:1, 2037:22, 2038:16, 2038:25, 2084:17
**ESTABLISH** [5] - 2050:25, 2052:7, 2055:2, 2055:21, 2056:20
**ESTIMATE** [4] - 2077:16, 2119:13, 2119:25, 2120:23
**ESTIMATED** [1] -

2096:5
**ESTIMATORS** [1] - 2120:2
**ET** [4] - 2019:8, 2023:7, 2026:5, 2116:4
**EVALUATE** [1] - 2048:10
**EVENLY** [1] - 2123:5
**EVENT** [1] - 2111:12
**EVENTUALLY** [3] - 2079:1, 2079:2, 2079:23
**EVERYWHERE** [3] - 2092:22, 2092:23, 2112:20
**EVIDENCE** [1] - 2022:2
**EVIDENCE** [158] - 2023:24, 2026:24, 2027:1, 2027:2, 2027:3, 2027:11, 2027:15, 2027:16, 2027:25, 2028:5, 2030:7, 2031:1, 2033:2, 2039:9, 2040:5, 2046:10, 2046:23, 2046:25, 2047:6, 2047:11, 2047:18, 2047:19, 2047:20, 2048:4, 2050:6, 2050:7, 2050:8, 2057:20, 2057:23, 2061:6, 2062:20, 2062:22, 2063:8, 2063:13, 2063:16, 2063:18, 2063:21, 2065:8, 2065:10, 2065:11, 2065:15, 2065:20, 2066:13, 2066:22, 2066:24, 2068:15, 2070:23, 2070:24, 2070:25, 2071:1, 2071:2, 2071:4, 2071:21, 2071:23, 2072:13, 2072:14, 2072:17, 2072:19, 2072:25, 2073:2, 2073:3, 2073:4, 2073:9, 2074:1, 2074:4, 2074:7, 2074:12, 2074:13, 2074:14, 2074:25, 2075:7, 2076:8, 2079:25, 2082:12, 2082:15, 2082:25, 2083:5, 2083:18, 2085:12, 2085:25, 2086:7, 2087:10,

2087:22, 2088:8, 2088:14, 2090:17, 2090:19, 2090:22, 2091:1, 2091:3, 2091:10, 2092:2, 2092:13, 2092:20, 2093:21, 2094:6, 2095:7, 2095:20, 2096:4, 2096:10, 2096:12, 2097:1, 2098:3, 2098:7, 2099:3, 2099:24, 2100:8, 2101:11, 2102:15, 2102:20, 2103:4, 2103:9, 2103:14, 2105:5, 2106:13, 2107:7, 2107:9, 2108:9, 2108:12, 2108:22, 2110:14, 2110:21, 2111:3, 2113:18, 2114:9, 2114:10, 2114:12, 2115:9, 2115:22, 2115:24, 2117:2, 2117:25, 2118:7, 2118:12, 2119:12, 2121:5, 2121:10, 2121:11, 2121:19, 2121:21, 2121:22, 2122:1, 2122:4, 2122:8, 2122:21, 2123:1, 2123:2, 2123:7, 2123:10, 2123:12, 2123:25
**EVIDENTIARY** [2] - 2047:14, 2048:9
**EVOLVING** [1] - 2038:2
**EXACT** [2] - 2060:14, 2118:16
**EXACTLY** [6] - 2079:18, 2090:3, 2093:8, 2102:2, 2105:24, 2120:23
**EXAMPLE** [6] - 2034:9, 2077:3, 2091:8, 2096:2, 2104:10, 2108:7
**EXCEPT** [4] - 2067:2, 2069:15, 2095:24, 2110:10
**EXCERPTS** [1] - 2027:7
**EXCLUDE** [1] - 2045:22
**EXCLUSIVE** [1] - 2031:4
**EXCUSE** [9] - 2047:16, 2057:15,

2066:18, 2080:20, 2080:24, 2087:25, 2107:8, 2110:13, 2113:11

**EXCUSED** [1] - 2068:10

**EXCUSES** [2] - 2082:3, 2107:1

**EXECUTION** [1] - 2091:21

**EXERCISE** [1] - 2026:14

**EXERCISES** [1] - 2065:4

**EXHIBIT** [15] - 2075:24, 2083:16, 2084:6, 2089:1, 2096:19, 2097:23, 2098:11, 2099:4, 2099:10, 2101:13, 2102:22, 2105:18, 2112:14, 2115:23, 2119:12

**EXHIBIT** [5] - 2084:16, 2105:15, 2105:16, 2111:4, 2120:8

**EXHIBITS** [3] - 2104:4, 2118:19, 2118:24

**EXHIBITS** [1] - 2022:1

**EXIST** [4] - 2052:12, 2052:23, 2055:24, 2100:11

**EXISTED** [1] - 2055:6

**EXPECT** [2] - 2082:8, 2089:21

**EXPECTED** [2] - 2027:11, 2051:16

**EXPENSE** [2] - 2054:8, 2060:23

**EXPENSIVE** [2] - 2094:17, 2119:21

**EXPERIENCE** [3] - 2047:24, 2048:3, 2106:9

**EXPERIENCED** [1] - 2112:6

**EXPERT** [8] - 2087:8, 2094:3, 2110:17, 2111:7, 2112:18, 2117:11, 2120:1

**EXPERTS** [6] - 2047:21, 2047:22, 2098:5, 2103:22, 2106:18, 2108:17

**EXPLAIN** [5] - 2031:16, 2048:16, 2063:17, 2095:11, 2116:2

**EXPLAINED** [14] - 2068:13, 2070:2,

2085:22, 2089:6, 2089:23, 2093:22, 2094:16, 2112:16, 2115:11, 2115:19, 2118:23, 2120:8, 2122:17, 2123:3

**EXPLAINING** [1] - 2094:21

**EXPLANATORY** [1] - 2121:9

**EXPLORE** [1] - 2039:4

**EXPOSED** [2] - 2066:25, 2069:8

**EXPOSURE** [2] - 2085:6, 2085:18, 2085:19

**EXTEND** [2] - 2033:16, 2033:22

**EXTENDED** [1] - 2087:5

**EXTENDS** [4] - 2033:14, 2033:19, 2033:21, 2033:22

**EXTENT** [6] - 2046:20, 2052:1, 2053:16, 2054:8, 2082:17, 2102:9

**EXTRACT** [4] - 2033:4, 2033:10, 2061:15, 2106:24

**EXTRACTED** [2] - 2062:3, 2062:7

**EXTRACTING** [2] - 2031:24, 2034:19

**EXTRACTION** [6] - 2032:4, 2033:8, 2033:9, 2034:20, 2114:17, 2114:24

**EXTREME** [4] - 2108:7, 2109:11, 2110:11

**EYE** [1] - 2049:20

---

## F

**FACE** [1] - 2077:23

**FACEBOOK** [1] - 2067:11

**FACILITY** [9] - 2081:25, 2097:12, 2098:24, 2099:23, 2100:5, 2101:2, 2101:3, 2115:25

**FACILITY'S** [3] - 2096:22, 2098:2, 2098:18

**FACT** [10] - 2030:6, 2038:23, 2062:24, 2065:1, 2070:3, 2072:8, 2090:20,

2093:7, 2099:9, 2109:18

**FACTOR** [19] - 2051:5, 2051:6, 2051:7, 2051:9, 2053:8, 2056:17, 2057:7, 2058:5, 2058:18, 2058:20, 2059:18, 2117:2, 2117:5, 2117:7, 2117:11, 2117:24, 2121:11

**FACTORIES'** [1] - 2026:5

**FACTORS** [8] - 2024:20, 2051:18, 2053:13, 2057:14, 2082:23, 2082:24, 2083:17, 2084:1

**FACTS** [9] - 2031:8, 2046:19, 2046:25, 2047:1, 2071:8, 2081:11

**FACTUAL** [3] - 2024:25, 2052:4, 2065:12

**FACTUALLY** [1] - 2039:4

**FAIL** [1] - 2085:18

**FAIL-SAFE** [1] - 2085:18

**FAILED** [11] - 2054:25, 2055:13, 2083:5, 2099:13, 2099:15, 2099:16, 2101:25, 2107:4, 2110:13, 2110:14, 2113:16

**FAILING** [5] - 2050:16, 2052:11, 2052:19, 2055:23, 2082:11

**FAILS** [6] - 2034:22, 2050:18, 2051:12, 2064:17, 2082:21, 2083:3

**FAILURE** [5] - 2050:12, 2050:14, 2080:24, 2082:9, 2082:16

**FAIR** [4] - 2039:4, 2068:25, 2069:3, 2078:23

**FAIRLY** [1] - 2034:9

**FAIRNESS** [1] - 2069:7

**FALL** [1] - 2060:5

**FAMILIAR** [3] - 2047:15, 2119:10, 2120:10

**FAMILY** [1] - 2067:13

**FAR** [3] - 2092:11, 2092:15, 2095:16

**FASHION** [1] - 2039:12

**FASHIONED** [1] - 2073:15

**FAST** [1] - 2113:1

**FASTER** [4] - 2105:12, 2111:12, 2111:18

**FAULT** [7] - 2057:25, 2058:12, 2058:16, 2058:17, 2058:19, 2059:17, 2121:9

**FAVOR** [1] - 2123:8

**FAVORITE** [1] - 2108:23

**FAYE** [2] - 2078:5, 2122:8

**FEATHER** [1] - 2123:7

**FEDERAL** [3] - 2019:24, 2125:5, 2125:19

**FEDERAL** [1] - 2079:3

**FEET** [10] - 2104:22, 2110:18, 2110:20, 2111:9, 2111:14, 2111:24, 2112:1, 2113:7, 2113:8

**FELLOW** [13] - 2067:2, 2074:18, 2074:19, 2084:11, 2095:1, 2095:2, 2095:9, 2105:18, 2107:22, 2108:18, 2109:13, 2117:20, 2124:9

**FELLOWS** [1] - 2091:16

**FEW** [3] - 2074:15, 2093:4, 2112:9

**FIDE** [1] - 2120:2

**FIELD** [1] - 2120:1

**FIGHT** [1] - 2105:21

**FIGUEROA** [1] - 2020:6

**FIGURE** [4] - 2038:18, 2078:7, 2084:25, 2105:16

**FILE** [2] - 2023:19, 2038:22

**FILED** [1] - 2079:9

**FILES** [1] - 2098:22

**FILL** [1] - 2059:5

**FILTERS** [1] - 2120:12

**FINAL** [1] - 2046:12

**FINALLY** [2] - 2070:20, 2115:11

**FINE** [4] - 2024:22, 2025:15, 2039:24, 2043:22

**FIRM** [1] - 2065:11

**FIRST** [18] - 2023:22,

2028:13, 2033:20, 2038:25, 2048:17, 2049:20, 2049:23, 2057:24, 2061:12, 2065:19, 2065:20, 2072:22, 2075:12, 2103:16, 2110:3, 2110:13, 2114:5, 2118:10

**FIVE** [7] - 2053:2, 2054:8, 2056:11, 2057:6, 2100:4, 2112:3, 2113:14

**FIX** [2] - 2107:20, 2110:11

**FLANGE** [1] - 2109:8

**FLOOR** [2] - 2020:7, 2020:10

**FLOW** [7] - 2072:8, 2097:4, 2103:23, 2104:13, 2105:8, 2105:23, 2112:11

**FLOWING** [4] - 2093:25, 2094:1, 2105:6, 2106:2

**FLOWS** [3] - 2071:19, 2104:15, 2111:12

**FLURRY** [1] - 2112:24

**FOCUSED** [2] - 2030:6, 2032:1

**FOLKS** [3] - 2085:16, 2091:23, 2109:7

**FOLLOW** [10] - 2047:2, 2069:4, 2071:11, 2074:14, 2077:15, 2093:14, 2097:18, 2101:5, 2121:21

**FOLLOW-UP** [1] - 2101:5

**FOLLOWING** [17] - 2046:3, 2051:1, 2051:18, 2052:8, 2053:15, 2055:4, 2055:22, 2056:21, 2057:15, 2058:3, 2058:15, 2063:8, 2070:11, 2091:8, 2092:6, 2097:11, 2124:10

**FOLLOWS** [1] - 2116:4

**FOOTNOTE** [3] - 2031:23, 2032:22, 2037:14

**FOR** [6] - 2020:3, 2020:12, 2022:2, 2125:6

**FOREGOING** [1] - 2125:9

**FOREPERSON** [1] - 2066:4

**FORGETTING** [1] - 2111:4

**FORGOT** [1] - 2100:6

**FORK** [1] - 2075:3

**FORM** [19] - 2023:19, 2040:25, 2042:7, 2042:11, 2042:19, 2043:17, 2044:5, 2046:13, 2058:23, 2058:24, 2059:4, 2059:5, 2059:10, 2059:21, 2070:2, 2070:6, 2072:16, 2121:8, 2124:13

**FORMAL** [3] - 2080:2, 2080:7, 2080:21

**FORMAT** [1] - 2125:11

**FORMER** [1] - 2115:24

**FORMS** [1] - 2067:12

**FORTH** [5] - 2061:6, 2080:3, 2082:7, 2084:16, 2099:10

**FOUR** [6] - 2052:25, 2054:4, 2055:12, 2056:9, 2057:5, 2089:6

**FOURTH** [1] - 2056:18

**FRAMES** [1] - 2073:14

**FRANCISCO** [2] - 2020:11, 2020:16

**FRANKLY** [1] - 2073:10

**FRAUD** [6] - 2063:7, 2063:23, 2064:2, 2064:7, 2064:25, 2122:2

**FRED** [2] - 2020:6, 2020:14

**FRED** [1] - 2023:14

**FREE** [2] - 2052:15, 2056:2

**FRYER** [1] - 2020:19

**FRYER** [1] - 2023:17

**FUDACZ** [1] - 2020:6

**FUDACZ** [1] - 2023:11

**FULFILL** [1] - 2108:2

**FULLY** [2] - 2062:12, 2066:13

**FUMES** [1] - 2086:25

**FUNDAMENTAL** [1] - 2030:23

**FURIOUS** [1] - 2113:1

**FUTURE** [1] - 2080:9

### G

**GAIN** [1] - 2068:21

**GALLAGHER** [1] -
2023:16

**GALLAGHER** [2] - 2020:13, 2020:14

**GALLONS** [4] - 2083:14, 2114:18, 2114:25, 2115:1

**GAME** [1] - 2115:17

**GAYNOR** [2] - 2023:24, 2087:9

**GAYNOR** [1] - 2023:25

**GEE** [2] - 2020:4, 2039:15

**GEE** [2] - 2023:10, 2037:19

**GENERAL** [7] - 2038:3, 2048:16, 2056:14, 2060:3, 2074:21, 2095:3, 2102:20

**GENERALLY** [6] - 2025:25, 2045:12, 2047:15, 2054:17, 2105:8, 2119:5

**GENERATED** [1] - 2098:1

**GENERATOR** [1] - 2100:23

**GENTLEMAN** [1] - 2075:13

**GENTLEMEN** [4] - 2046:7, 2070:12, 2071:18, 2124:3

**GEOLOGICAL** [1] - 2086:17

**GEOLOGIST** [2] - 2083:10, 2092:7

**GEOLOGY** [1] - 2072:8

**GIVEN** [7] - 2025:21, 2026:14, 2039:3, 2048:3, 2049:14, 2071:12, 2090:22

**GLIMPSE** [1] - 2123:11

**GORDON** [7] - 2074:21, 2076:21, 2095:4, 2095:6, 2102:21, 2102:23, 2122:5

**GRAB** [1] - 2031:19

**GREASE** [2] - 2085:9

**GREAT** [3] - 2073:24, 2092:18, 2094:5

**GREATER** [2] - 2053:25, 2054:2

**GROUND** [14] - 2062:3, 2083:24, 2086:9, 2088:4, 2088:12, 2088:17,

2088:22, 2088:23, 2088:25, 2089:7, 2090:2, 2097:17, 2114:6, 2114:13

**GROUNDWATER** [79] - 2028:21, 2028:22, 2028:24, 2029:5, 2030:7, 2030:12, 2030:13, 2031:9, 2031:14, 2034:19, 2061:2, 2061:15, 2061:16, 2061:22, 2061:24, 2062:3, 2062:5, 2071:19, 2072:4, 2072:5, 2072:8, 2084:20, 2085:23, 2086:9, 2086:15, 2087:3, 2092:8, 2092:10, 2093:5, 2093:16, 2093:19, 2093:23, 2094:2, 2094:4, 2094:7, 2094:13, 2094:15, 2094:24, 2095:8, 2096:1, 2096:5, 2096:16, 2096:21, 2098:10, 2098:12, 2098:17, 2098:19, 2098:24, 2102:7, 2102:11, 2102:12, 2102:13, 2103:23, 2104:3, 2104:13, 2104:15, 2104:16, 2104:23, 2105:2, 2105:6, 2105:11, 2105:20, 2105:23, 2106:2, 2106:14, 2106:17, 2106:19, 2106:22, 2106:23, 2106:25, 2110:24, 2111:8, 2111:12, 2111:24, 2112:5, 2112:7, 2112:11, 2113:13, 2113:14

**GROUNDWATER** [1] - 2104:6

**GROUP** [1] - 2087:4

**GROWING** [1] - 2101:23

**GUESS** [2] - 2060:16, 2118:18

**GUIDE** [2] - 2065:18, 2083:17

**GUIDELINES** [2] - 2091:20, 2091:21

**GUY** [3] - 2076:22, 2108:1, 2119:1

**GUYS** [1] - 2097:13

### H

**HALF** [2] - 2112:1, 2112:2

**HAND** [1] - 2093:14

**HANDFUL** [4] - 2093:2, 2093:3, 2104:25, 2114:16

**HANDLE** [2] - 2091:9, 2100:5

**HANDLING** [1] - 2090:25

**HARD** [2] - 2082:6, 2117:1

**HARDSHIP** [1] - 2064:20

**HARM** [51] - 2045:11, 2049:16, 2050:15, 2051:5, 2051:7, 2051:8, 2051:10, 2051:16, 2051:20, 2051:21, 2051:23, 2051:25, 2052:2, 2052:6, 2053:8, 2053:9, 2053:12, 2053:14, 2053:16, 2053:20, 2053:21, 2054:2, 2054:9, 2055:20, 2056:9, 2056:13, 2056:14, 2056:17, 2057:7, 2058:2, 2058:5, 2058:14, 2058:18, 2058:21, 2059:19, 2060:9, 2060:11, 2060:13, 2060:16, 2060:18, 2060:19, 2060:20, 2060:22, 2063:2, 2065:2, 2082:10, 2117:5, 2117:7, 2117:8, 2118:17, 2119:6

**HARMED** [5] - 2028:5, 2050:25, 2051:3, 2053:6, 2057:5

**HARMFUL** [2] - 2052:13, 2055:25

**HAZARDOUS** [22] - 2075:15, 2075:16, 2076:11, 2077:21, 2077:23, 2084:10, 2084:17, 2091:9, 2094:22, 2095:13, 2098:13, 2098:16, 2099:14, 2099:18, 2099:19, 2100:5, 2100:15, 2100:19, 2102:10

**HEAD** [4] - 2074:18, 2076:22, 2107:11,

2109:12

**HEALTH** [2] - 2096:16, 2096:24

**HEALTH** [3] - 2052:13, 2055:25, 2086:1

**HEAP** [1] - 2123:14

**HEAR** [18] - 2024:11, 2031:20, 2037:20, 2039:8, 2041:1, 2062:18, 2068:10, 2070:13, 2070:16, 2070:18, 2070:20, 2075:9, 2087:9, 2095:19, 2104:5, 2107:2, 2120:10, 2120:14

**HEARD** [47] - 2037:3, 2037:6, 2037:19, 2037:20, 2040:6, 2041:7, 2041:19, 2046:23, 2047:21, 2063:10, 2065:19, 2070:25, 2071:1, 2074:17, 2078:18, 2079:2, 2079:16, 2079:25, 2080:16, 2081:3, 2081:5, 2081:9, 2081:17, 2081:18, 2081:24, 2082:5, 2082:12, 2084:8, 2084:12, 2084:19, 2085:17, 2087:10, 2087:24, 2089:13, 2093:22, 2095:19, 2099:20, 2104:5, 2105:16, 2107:2, 2109:24, 2112:24, 2113:17, 2115:5, 2119:8, 2120:15, 2124:8

**HEARING** [2] - 2046:10, 2063:9

**HEAVILY** [2] - 2029:3, 2032:1

**HEAVY** [1] - 2107:16

**HELD** [1] - 2125:10

**HELD** [4] - 2035:7, 2046:3, 2124:1, 2124:10

**HELP** [1] - 2083:17

**HEREBY** [1] - 2125:7

**HESITATED** [1] - 2119:17

**HIGH** [5] - 2104:19, 2105:7, 2107:13, 2107:17, 2119:19

**HIGHER** [4] - 2063:15, 2065:14, 2084:20, 2111:11

**HIGHLIGHTED** [1] -

2024:6
**HIGHLY** [1] - 2065:12
**HIMSELF** [1] - 2079:16
**HIRE** [2] - 2092:9, 2120:18
**HIRED** [3] - 2083:10, 2092:7, 2095:9
**HISTORY** [5] - 2037:25, 2085:22, 2086:10, 2088:2, 2103:11
**HIT** [1] - 2113:6
**HOG** [1] - 2091:11
**HOG-OUT** [1] - 2091:11
**HOKKANEN** [7] - 2040:6, 2093:12, 2104:19, 2105:3, 2110:23, 2117:18, 2117:19
**HOKKANEN'S** [1] - 2105:16
**HOLD** [4] - 2036:15, 2041:9, 2073:18, 2123:19
**HOLDINGS** [1] - 2032:17
**HOME** [1] - 2073:25
**HONEST** [2] - 2066:21, 2108:25
**HONESTLY** [1] - 2029:18
**HONOR** [47] - 2023:12, 2023:14, 2023:18, 2024:2, 2024:13, 2024:19, 2024:22, 2025:4, 2025:10, 2025:18, 2025:22, 2026:2, 2026:18, 2028:8, 2028:16, 2029:8, 2029:14, 2029:19, 2031:1, 2031:18, 2032:5, 2033:20, 2034:12, 2035:3, 2035:5, 2035:14, 2035:24, 2036:1, 2036:17, 2036:24, 2039:15, 2039:19, 2039:20, 2039:22, 2040:16, 2041:5, 2041:22, 2041:25, 2042:9, 2043:13, 2043:16, 2044:3, 2044:12, 2045:3, 2071:15, 2071:17, 2081:10
**HONOR'S** [1] - 2037:9
**HONORABLE** [1] -

2019:3
**HOPE** [2] - 2036:10, 2077:24
**HOT** [1] - 2079:19
**HUGE** [3] - 2104:24, 2116:15, 2117:15
**HUGHTO** [1] - 2085:21, 2086:10, 2086:16, 2087:12, 2089:6, 2089:23, 2098:4, 2099:25, 2100:12, 2100:21, 2102:2
**HUIE** [1] - 2020:13
**HULA** [4] - 2090:6, 2092:2, 2101:21, 2102:19
**HUMAN** [1] - 2086:2
**HUNDREDS** [5] - 2088:8, 2104:22, 2113:7, 2118:1
**HUSBAND** [1] - 2078:8
**HYDRAULICALLY** [1] - 2102:1
**HYDRAULICS** [1] - 2109:13
**HYDROGEOLOGIC** [2] - 2027:16, 2095:14
**HYDROGEOLOGICAL** [1] - 2027:17

# I

**IDEA** [2] - 2049:2, 2083:22
**IDENTICAL** [1] - 2034:14
**IDENTIFICATION** [1] - 2022:2
**IDENTIFIED** [11] - 2086:21, 2088:9, 2105:23, 2105:25, 2109:23, 2111:5, 2119:7, 2119:14, 2120:3, 2120:25
**IDENTIFY** [1] - 2097:5
**IGNORANCE** [2] - 2047:15, 2087:24
**IGNORE** [1] - 2046:21
**IGNORED** [1] - 2091:7
**ILSE** [1] - 2020:9
**IMAGE** [3] - 2083:13, 2089:11, 2089:14
**IMAGINE** [1] - 2075:5
**IMMEDIATE** [1] - 2102:5
**IMMEDIATELY** [2] - 2069:9, 2104:25

**IMPACT** [1] - 2098:18
**IMPACTED** [2] - 2111:11, 2118:8
**IMPAIRMENT** [1] - 2053:21
**IMPARTIAL** [1] - 2069:1
**IMPLEMENT** [1] - 2098:17
**IMPORTANT** [10] - 2035:4, 2066:15, 2069:4, 2072:1, 2072:19, 2073:7, 2104:2, 2114:1, 2118:6
**IMPOSED** [2] - 2074:5, 2123:20
**IMPOSES** [1] - 2039:1
**IMPOUNDMENT** [11] - 2083:11, 2083:14, 2084:14, 2092:8, 2098:14, 2098:17, 2101:14, 2101:16, 2101:18, 2102:8
**IMPOUNDMENTS** [2] - 2084:23, 2098:23
**IMPRACTICALITY** [1] - 2054:22
**IMPRECISE** [1] - 2042:18
**IMPROPER** [1] - 2068:21
**IN** [3] - 2125:6, 2125:10, 2125:11
**INACCURATE** [1] - 2068:23
**INACTIVE** [1] - 2098:2
**INADEQUATE** [1] - 2102:8
**INCAPABLE** [1] - 2102:9
**INCINERATED** [2] - 2089:14, 2089:21
**INCLINATION** [1] - 2037:9, 2045:19
**INCLINED** [3] - 2036:25, 2037:3, 2037:21
**INCLUDE** [3] - 2024:23, 2060:11, 2078:5
**INCLUDES** [2] - 2067:7, 2116:3
**INCLUDING** [9] - 2023:24, 2061:17, 2062:10, 2067:10, 2068:8, 2069:23, 2082:8, 2082:15, 2087:2
**INCOMPLETE** [1] -

2068:23
**INCONSISTENT** [1] - 2071:11
**INCONVENIENCE** [1] - 2054:9
**INCORRECT** [1] - 2028:19
**INDECENT** [2] - 2052:14, 2056:1
**INDEPENDENT** [1] - 2065:4
**INDEX** [1] - 2021:1, 2022:1
**INDICATED** [1] - 2028:11
**INDICATING** [1] - 2047:10
**INDICATION** [1] - 2108:14
**INDISCRIMINATE** [4] - 2090:10, 2090:11, 2091:2, 2097:18
**INDIVIDUAL** [1] - 2060:1
**INDUSTRIAL** [4] - 2054:7, 2087:1, 2087:14, 2088:12
**INDUSTRIAL** [2] - 2058:13, 2101:9
**INDUSTRY** [1] - 2087:5
**INFERENCE** [3] - 2077:4, 2090:20, 2114:5
**INFERENCES** [1] - 2071:1
**INFLUENCED** [2] - 2047:4, 2068:22
**INFORMATION** [15] - 2061:20, 2067:1, 2067:22, 2068:21, 2068:23, 2069:2, 2069:8, 2097:11, 2098:1, 2098:4, 2098:5, 2099:14, 2101:3, 2116:22
**INJURY** [4] - 2036:4, 2062:5, 2062:6, 2064:12
**INNOCUOUS** [3] - 2075:19, 2075:22, 2076:11
**INSIDE** [1] - 2066:5
**INSIGHT** [1] - 2078:12
**INSPECTION** [1] - 2092:1
**INSPECTOR** [1] - 2098:21
**INSTAGRAM** [1] - 2067:11

**INSTALL** [1] - 2102:1
**INSTALLATION** [1] - 2096:16
**INSTALLED** [2] - 2102:3, 2112:9
**INSTEAD** [2] - 2096:14, 2119:3
**INSTRUCT** [2] - 2046:24, 2087:24
**INSTRUCTED** [5] - 2042:19, 2042:22, 2071:10, 2083:22, 2113:21
**INSTRUCTING** [2] - 2026:14, 2039:1
**INSTRUCTION** [5] - 2024:24, 2025:2, 2026:1, 2026:15, 2028:1
**INSTRUCTION** [22] - 2026:4, 2026:8, 2028:7, 2028:9, 2031:22, 2035:17, 2036:4, 2036:6, 2037:4, 2037:9, 2037:21, 2038:16, 2039:18, 2040:5, 2040:9, 2059:12, 2063:19, 2065:7, 2082:6, 2084:4, 2114:8, 2118:15
**INSTRUCTIONS** [35] - 2024:6, 2026:12, 2040:13, 2040:22, 2040:25, 2041:3, 2041:10, 2041:11, 2042:5, 2042:10, 2046:12, 2046:13, 2046:14, 2046:15, 2046:18, 2046:19, 2046:22, 2047:9, 2049:22, 2060:2, 2062:13, 2065:18, 2066:24, 2068:14, 2070:9, 2070:11, 2074:23, 2082:7, 2084:2, 2091:6, 2091:7, 2091:9, 2116:25, 2118:5, 2121:24
**INTEND** [1] - 2023:23
**INTENDING** [2] - 2056:25, 2065:2
**INTENT** [1] - 2064:11
**INTENTIONAL** [1] - 2052:20
**INTENTIONALLY** [2] - 2056:24, 2064:25
**INTEREST** [18] - 2026:15, 2028:11,

2028:14, 2028:15, 2028:18, 2030:2, 2030:19, 2031:1, 2032:15, 2034:10, 2044:14, 2061:13, 2061:15, 2061:17, 2062:2, 2062:5, 2062:8, 2062:9

**INTERESTED** [1] - 2087:6

**INTERESTING** [2] - 2104:5, 2104:18

**INTERESTS** [5] - 2025:25, 2027:13, 2061:6, 2061:14, 2061:21

**INTERFERE** [2] - 2052:16, 2056:3

**INTERFERED** [2] - 2053:1, 2053:17

**INTERFERENCE** [3] - 2053:18, 2054:13, 2054:19

**INTERNAL** [1] - 2092:1

**INTERNATIONAL** [1] - 2096:6

**INTERNET** [3] - 2067:9, 2067:25, 2068:4

**INTERPRET** [1] - 2032:15

**INTERPRETATION** [1] - 2096:2

**INTERRUPT** [1] - 2075:24

**INTERSECTS** [1] - 2071:8

**INTERVENING** [1] - 2085:25

**INTRODUCE** [3] - 2023:23, 2027:1, 2027:2

**INTRODUCED** [1] - 2027:3

**INTRODUCING** [1] - 2027:2

**INTRODUCTION** [1] - 2060:4

**INVADED** [4] - 2030:2, 2053:25, 2054:2, 2054:5

**INVASION** [2] - 2054:3, 2054:23

**INVESTIGATE** [11] - 2095:22, 2095:24, 2107:4, 2107:5, 2107:15, 2108:4, 2110:10, 2110:11, 2110:13, 2110:14,

2113:16

**INVESTIGATED** [5] - 2107:17, 2109:3, 2109:23, 2110:8, 2115:20

**INVESTIGATION** [19] - 2068:1, 2068:20, 2095:14, 2095:15, 2095:17, 2103:6, 2105:18, 2107:10, 2107:11, 2107:15, 2108:14, 2108:20, 2108:21, 2109:11, 2109:16, 2109:18, 2115:12, 2116:19, 2116:20

**INVITE** [1] - 2046:13

**INVOLVE** [1] - 2031:9

**INVOLVED** [6] - 2053:21, 2060:24, 2067:15, 2068:8, 2122:14, 2124:7

**INVOLVES** [2] - 2030:3, 2067:1

**INVOLVING** [2] - 2078:21

**IS** [2] - 2125:9, 2125:11

**ISSUE** [34] - 2026:10, 2026:16, 2026:20, 2026:25, 2027:8, 2030:9, 2030:17, 2031:21, 2035:5, 2036:9, 2036:13, 2036:20, 2037:11, 2037:16, 2037:22, 2039:4, 2040:15, 2041:2, 2042:6, 2042:8, 2042:9, 2044:2, 2044:3, 2045:1, 2045:15, 2045:18, 2063:4, 2063:14, 2072:2, 2081:8, 2082:2, 2109:23

**ISSUES** [10] - 2026:5, 2038:14, 2040:21, 2040:24, 2042:6, 2042:21, 2043:17, 2045:3, 2067:1, 2081:6

**ITEM** [2] - 2027:11, 2060:11

**ITSELF** [3] - 2030:11, 2057:17, 2066:1

---

**J**

**JEOPARDIZES** [1] - 2069:7

---

**JIM** [4] - 2084:8, 2084:11, 2101:17, 2109:6

**JISA** [3] - 2084:8, 2084:11, 2101:17

**JMOL** [7] - 2026:11, 2026:13, 2026:16, 2027:5, 2045:4, 2045:14, 2045:17

**JMOLS** [1] - 2026:4

**JOE** [8] - 2076:20, 2076:22, 2076:23, 2077:1, 2078:1, 2091:23, 2122:4, 2123:22

**JOHN** [3] - 2076:21, 2122:4, 2122:10

**JOKE** [1] - 2078:14

**JOKED** [1] - 2091:24

**JOURNAL** [1] - 2087:21

**JR** [2] - 2019:3, 2020:14

**JUDGE** [6] - 2074:24, 2079:3, 2081:5, 2087:24, 2117:1, 2122:17

**JUDGE** [1] - 2019:3

**JUDGED** [1] - 2047:25

**JUDGMENT** [2] - 2062:21, 2065:4

**JUDICIAL** [1] - 2125:12

**JUMP** [1] - 2085:24

**JUNE** [5] - 2076:9, 2076:24, 2091:23, 2098:22, 2122:5

**JUROR** [6] - 2065:23, 2069:6, 2069:7, 2069:12, 2070:5

**JURORS** [8] - 2042:23, 2043:4, 2066:9, 2066:13, 2066:20, 2067:3, 2068:10, 2124:9

**JURY** [1] - 2046:8

**JURY** [39] - 2023:21, 2026:12, 2026:14, 2028:2, 2034:18, 2038:17, 2039:12, 2040:13, 2040:18, 2040:24, 2041:9, 2041:11, 2042:10, 2042:18, 2042:19, 2043:2, 2043:25, 2044:15, 2044:25, 2045:23, 2046:4, 2046:6, 2046:16, 2062:23, 2065:20, 2065:22,

---

2065:24, 2067:17, 2069:1, 2069:14, 2069:16, 2069:23, 2071:18, 2072:24, 2074:23, 2083:1, 2094:19, 2124:11

**JUSTIFIES** [1] - 2063:2

**JUSTIFYING** [1] - 2095:16

---

**K**

**KEEP** [5] - 2051:12, 2083:3, 2086:9, 2099:11, 2124:8

**KEITH** [4] - 2118:10, 2118:23, 2120:24, 2121:14

**KEPT** [1] - 2091:4

**KIND** [7] - 2030:17, 2054:6, 2075:8, 2075:10, 2076:13, 2094:20, 2095:7

**KNOWING** [3] - 2064:13, 2064:15, 2064:21

**KNOWN** [8] - 2051:22, 2055:7, 2055:10, 2085:20, 2085:21, 2086:4, 2086:8, 2087:12

**KNOWS** [5] - 2094:4, 2095:6, 2111:2, 2119:17, 2119:18

---

**L**

**L.A** [1] - 2038:12

**LABORATORY** [1] - 2107:12

**LADIES** [4] - 2046:7, 2070:12, 2071:18, 2124:3

**LAID** [1] - 2043:18

**LAND** [18] - 2025:11, 2028:15, 2028:19, 2030:11, 2031:2, 2031:5, 2032:15, 2033:3, 2033:5, 2053:1, 2054:1, 2055:1, 2055:5, 2057:9, 2061:17, 2062:8, 2062:9, 2087:14

**LANDFILL** [1] - 2089:19

**LANDFILLS** [11] - 2075:4, 2075:5, 2075:15, 2076:10,

---

2077:1, 2077:6, 2077:17, 2090:24, 2094:23, 2095:2

**LANGUAGE** [1] - 2024:9

**LARDIERE** [11] - 2020:20, 2023:16, 2078:17, 2079:19, 2079:22, 2080:1, 2080:22, 2081:17, 2081:20, 2095:4, 2120:5

**LARDIERE'S** [1] - 2081:12

**LARGE** [1] - 2117:15

**LARGELY** [1] - 2026:13

**LAST** [9] - 2024:5, 2024:8, 2028:12, 2037:2, 2039:6, 2041:17, 2072:15, 2118:3, 2120:6

**LASTED** [1] - 2053:19

**LASTING** [1] - 2087:16

**LATE** [2] - 2100:12, 2112:9

**LATEST** [1] - 2024:5

**LAUNDRY** [1] - 2038:3

**LAW** [27] - 2026:23, 2028:19, 2028:25, 2029:13, 2029:15, 2029:16, 2037:10, 2038:4, 2039:9, 2046:20, 2046:24, 2047:1, 2047:2, 2047:15, 2047:16, 2048:21, 2068:8, 2071:8, 2071:10, 2071:11, 2087:12, 2087:13, 2087:23, 2087:24, 2090:16, 2090:25

**LAWS** [2] - 2086:13, 2087:23

**LAWSUIT** [1] - 2048:20

**LAWYERS** [7] - 2046:17, 2059:8, 2068:9, 2070:23, 2115:8, 2115:15, 2121:19

**LEAK** [1] - 2101:18

**LEAKING** [2] - 2101:16, 2101:17

**LEAKS** [1] - 2096:11

**LEARN** [1] - 2068:2

**LEARNED** [8] - 2071:19, 2072:7, 2072:9, 2072:11,

2072:12, 2083:9, 2087:25, 2098:9
**LEASE** [2] - 2042:12, 2121:12
**LEASED** [4] - 2024:17, 2025:20, 2052:9, 2056:22
**LEAST** [5] - 2031:21, 2045:19, 2045:20, 2072:22, 2102:1
**LEAVE** [1] - 2044:10
**LEAVES** [1] - 2065:11
**LECHLER** [11] - 2093:22, 2105:17, 2111:16, 2111:19, 2112:16, 2112:23, 2115:5, 2115:11, 2115:18, 2115:23, 2123:15
**LED** [1] - 2074:19
**LEFT** [1] - 2106:2
**LEGAL** [1] - 2060:5
**LEGALLY** [1] - 2039:5
**LESERMAN** [2] - 2109:6, 2109:12
**LESS** [1] - 2043:3
**LETTER** [2] - 2080:1, 2080:23
**LEVELS** [4] - 2096:23, 2096:24, 2105:1, 2122:17
**LIABILITIES** [1] - 2086:21
**LIABILITY** [8] - 2048:16, 2048:17, 2049:3, 2049:9, 2078:24, 2083:23, 2122:18, 2123:22
**LIABLE** [2] - 2049:7, 2113:23
**LIFE** [2] - 2052:16, 2056:3
**LIGHT** [2] - 2026:23, 2061:5
**LIKELIHOOD** [1] - 2051:20
**LIKELY** [8] - 2045:19, 2107:25, 2116:5, 2116:6, 2117:20, 2122:19, 2123:13
**LIMIT** [2] - 2037:4, 2080:3
**LIMITATION** [1] - 2035:1
**LIMITED** [4] - 2040:9, 2067:10, 2068:8, 2087:4
**LINE** [3] - 2043:2, 2092:18, 2092:21
**LINEAR** [2] - 2110:18,

2111:8
**LINER** [4] - 2084:13, 2084:18, 2085:3
**LINES** [6] - 2093:20, 2103:23, 2104:2, 2104:11, 2115:22, 2115:24
**LINKEDIN** [1] - 2067:11
**LIQUIDS** [3] - 2097:16, 2097:22
**LIST** [2] - 2038:3, 2100:4
**LISTED** [3] - 2058:22, 2059:20, 2097:22
**LISTEN** [1] - 2067:20
**LISTENED** [2] - 2066:14, 2090:13
**LITANY** [1] - 2082:1
**LITIGATE** [3] - 2107:5, 2107:15, 2110:10
**LITIGATION** [1] - 2048:8
**LIVER** [2] - 2085:20, 2086:4
**LIVING** [2] - 2119:9, 2120:1
**LLP** [2] - 2020:4, 2020:9
**LOCALITY** [4] - 2054:5, 2054:6, 2054:19, 2054:21
**LOCATED** [2] - 2061:18, 2062:9
**LOCATION** [5] - 2025:4, 2027:14, 2051:19, 2054:7, 2088:25
**LOCATIONS** [2] - 2025:2, 2025:7
**LONG-LASTING** [1] - 2087:16
**LONGTIME** [2] - 2080:16, 2120:5
**LOOK** [26] - 2024:3, 2026:21, 2026:23, 2027:7, 2027:9, 2033:25, 2034:12, 2036:2, 2038:20, 2046:15, 2072:20, 2072:23, 2084:3, 2093:17, 2093:19, 2093:25, 2094:7, 2095:19, 2096:3, 2112:10, 2115:13, 2116:10, 2121:19, 2123:25
**LOOKED** [10] - 2037:24, 2064:23, 2076:6, 2096:20,

2098:15, 2100:2, 2107:12, 2108:12, 2113:2, 2116:18
**LOOKING** [4] - 2035:16, 2082:17, 2112:13
**LOOKS** [1] - 2109:8
**LOS** [1] - 2019:15, 2019:25, 2023:2
**LOS** [1] - 2020:7
**LOSE** [2] - 2123:5, 2123:21
**LOSS** [3] - 2053:21, 2061:7, 2078:3
**LOST** [1] - 2081:21
**LOUTTIT** [9] - 2074:21, 2074:22, 2075:1, 2075:2, 2076:21, 2095:4, 2102:21, 2102:23, 2122:5
**LOWER** [2] - 2084:21, 2111:10
**LUCE** [2] - 2085:16, 2088:20

## M

**MACHINE** [2] - 2085:15, 2085:18
**MAGIC** [1] - 2079:8
**MAIL** [5] - 2041:17, 2041:21, 2043:8, 2067:9, 2080:15
**MAIN** [2] - 2042:9, 2054:14
**MALICE** [8] - 2063:6, 2063:22, 2064:1, 2064:6, 2064:10, 2064:11, 2075:9, 2122:2
**MANAGEMENT** [5] - 2091:22, 2091:24, 2097:18, 2099:19
**MANAGERS** [1] - 2064:3
**MANAGING** [6] - 2063:24, 2064:3, 2064:5, 2065:3, 2122:3, 2122:13
**MANIFESTS** [5] - 2099:21, 2100:1, 2100:2, 2100:3, 2100:14
**MANNER** [1] - 2038:17
**MANUFACTURING** [2] - 2086:11, 2097:25
**MAP** [1] - 2104:19
**MAPS** [3] - 2098:25,

2112:25, 2113:2
**MARKETS** [1] - 2119:24
**MASNADA** [2] - 2079:16, 2119:4
**MASSIVE** [4] - 2088:4, 2089:19, 2105:25, 2114:13
**MATERIAL** [2] - 2024:8, 2065:1
**MATERIALS** [5] - 2068:1, 2088:25, 2090:23, 2105:5, 2109:19
**MATH** [1] - 2111:25
**MATT** [2] - 2020:19, 2080:6
**MATTER** [9] - 2032:19, 2032:20, 2033:24, 2067:18, 2071:23, 2076:14, 2076:15, 2114:5, 2124:7
**MATTER** [1] - 2125:11
**MATTERS** [2] - 2048:7, 2072:2
**MCGUANE** [1] - 2020:5
**MEAN** [12] - 2024:9, 2027:6, 2030:24, 2034:3, 2038:14, 2060:1, 2077:9, 2079:4, 2113:7, 2115:11, 2117:18, 2123:1
**MEANING** [1] - 2053:16
**MEANS** [11] - 2032:15, 2047:5, 2050:6, 2054:14, 2064:11, 2064:19, 2064:25, 2065:8, 2065:10, 2067:9, 2123:1
**MEASURE** [2] - 2116:24, 2121:6
**MEDIA** [4] - 2067:12, 2067:14, 2067:21, 2068:11
**MEET** [1] - 2080:4
**MEETING** [2] - 2076:24, 2122:5
**MEETS** [1] - 2123:13
**MEMBER** [3] - 2065:22, 2069:14, 2069:16
**MEMBERS** [2] - 2067:14, 2069:13
**MEMO** [19] - 2075:14, 2075:23, 2075:24, 2075:25, 2076:4,

2076:5, 2076:9, 2076:16, 2076:25, 2084:6, 2089:2, 2090:2, 2095:3, 2095:11, 2096:8, 2097:1, 2097:17, 2098:20, 2103:2
**MEMORY** [2] - 2071:3, 2071:5
**MEMOS** [2] - 2114:2, 2123:10
**MENTION** [1] - 2072:17
**MENTIONED** [3] - 2028:4, 2071:7, 2087:9
**MENTIONING** [1] - 2059:9
**MERGER** [1] - 2031:4
**MERITS** [1] - 2067:5
**MESS** [1] - 2091:11
**MESSAGE** [1] - 2023:22
**MESSAGING** [1] - 2067:9
**MESSED** [3] - 2101:7, 2101:10, 2101:11
**MET** [4] - 2076:20, 2076:21, 2077:4, 2117:22
**METAL** [1] - 2076:11
**MICEVYCH** [1] - 2023:10
**MICHAEL** [1] - 2020:14
**MICROPHONE** [1] - 2043:15
**MIDST** [1] - 2039:7
**MIGHT** [8] - 2027:11, 2029:2, 2045:12, 2061:2, 2066:3, 2078:6, 2090:10, 2123:22
**MIGRATED** [1] - 2115:2
**MIGRATION** [5] - 2030:5, 2084:9, 2095:13, 2102:9, 2113:4
**MIKE** [2] - 2109:13, 2121:13
**MILD** [2] - 2085:5, 2085:19
**MILLION** [7] - 2077:16, 2079:8, 2119:16, 2119:19, 2120:4, 2121:1, 2121:5
**MIND** [6] - 2027:7, 2075:6, 2075:11,

2083:13, 2089:11, 2124:8

**MINISTER** [1] - 2078:8
**MINOR** [1] - 2032:11
**MINUS** [1] - 2023:19
**MINUTE** [6] - 2039:6, 2099:20, 2107:12, 2114:18, 2114:25, 2115:1
**MIRACULOUSLY** [1] - 2102:12
**MIRANDA** [4] - 2019:23, 2125:5, 2125:18, 2125:19
**MIRANDAALGORRI @GMAIL.COM** [1] - 2019:25
**MISCELLANEOUS** [1] - 2120:12
**MISLEADING** [1] - 2068:23
**MISREPRESENTED** [1] - 2065:1
**MISSING** [5] - 2100:3, 2100:18, 2100:22, 2100:25, 2101:2
**MISSTATE** [2] - 2046:20, 2071:2
**MISTAKE** [2] - 2091:17, 2111:14
**MIXING** [1] - 2109:14
**MODERN** [1] - 2078:6
**MOMENT** [5] - 2023:17, 2035:11, 2037:1, 2042:4, 2046:1
**MONDAY** [1] - 2109:2
**MONEY** [5] - 2060:8, 2077:15, 2077:19, 2121:2, 2122:15
**MONITORING** [39] - 2092:8, 2092:11, 2092:22, 2092:24, 2093:2, 2093:4, 2093:6, 2093:24, 2094:13, 2094:15, 2094:24, 2095:8, 2095:17, 2096:1, 2096:5, 2096:17, 2098:8, 2098:10, 2098:12, 2098:17, 2098:24, 2099:2, 2099:4, 2102:1, 2102:4, 2102:13, 2102:17, 2103:8, 2104:23, 2106:6, 2106:14, 2112:8, 2112:18, 2112:20, 2112:21, 2113:6, 2113:10, 2113:13,

2116:21
**MONTHS** [2] - 2119:22, 2119:23
**MORNING** [11] - 2023:9, 2023:13, 2023:14, 2023:15, 2023:20, 2023:23, 2046:7, 2046:8, 2071:18, 2103:24, 2124:4
**MOST** [6] - 2075:4, 2096:11, 2108:7, 2109:11, 2110:10, 2120:21
**MOTION** [1] - 2035:16
**MOUNTAIN** [1] - 2079:8
**MOVE** [3] - 2042:23, 2084:17, 2084:19
**MOVED** [1] - 2045:7
**MOVEMENT** [2] - 2087:21, 2111:23
**MOVIES** [1] - 2066:1
**MOVING** [2] - 2111:18, 2111:19
**MR** [62] - 2023:9, 2023:14, 2024:2, 2024:13, 2024:19, 2024:22, 2025:10, 2025:15, 2025:18, 2025:22, 2026:2, 2026:18, 2028:8, 2028:16, 2029:8, 2029:13, 2029:18, 2030:9, 2030:24, 2031:10, 2031:13, 2031:18, 2032:5, 2033:7, 2033:16, 2033:20, 2034:12, 2034:23, 2035:3, 2035:10, 2035:14, 2035:22, 2035:24, 2036:10, 2036:17, 2037:7, 2039:15, 2039:19, 2039:22, 2040:4, 2040:15, 2040:18, 2040:24, 2041:5, 2041:8, 2041:11, 2041:13, 2041:17, 2041:21, 2041:24, 2043:13, 2043:16, 2044:3, 2044:8, 2044:17, 2045:3, 2071:15, 2081:10, 2081:12, 2081:17, 2094:20, 2124:13
**MS** [5] - 2025:4, 2042:9, 2043:1, 2043:8, 2044:12

**MULTIPLE** [2] - 2115:22, 2115:23
**MUST** [46] - 2028:13, 2047:2, 2047:3, 2047:5, 2050:6, 2050:21, 2051:1, 2051:8, 2051:13, 2052:5, 2052:8, 2055:3, 2055:22, 2056:20, 2058:3, 2058:14, 2058:21, 2059:13, 2059:19, 2059:22, 2060:8, 2060:11, 2060:16, 2060:19, 2060:21, 2060:23, 2061:3, 2061:8, 2061:12, 2062:6, 2062:11, 2062:20, 2063:2, 2063:5, 2063:7, 2063:20, 2065:11, 2066:10, 2066:11, 2066:23, 2066:25, 2067:17, 2083:7, 2113:11, 2117:7, 2118:17
**MYSTERY** [3] - 2075:25, 2076:5, 2076:25

## N

**NAJM** [3] - 2119:8, 2120:22, 2120:25
**NAME** [6] - 2033:24, 2087:9, 2097:11, 2100:4, 2100:14, 2101:4
**NAMELY** [3] - 2024:18, 2025:11, 2052:10
**NAMES** [3] - 2042:20, 2089:3, 2100:19
**NATURE** [7] - 2030:23, 2032:2, 2034:2, 2054:5, 2054:19, 2071:24
**NEAR** [1] - 2103:17
**NEARBY** [1] - 2086:12
**NECESSARILY** [5] - 2027:20, 2030:18, 2034:21, 2057:13, 2117:19
**NECESSARY** [5] - 2062:16, 2069:10, 2077:1, 2080:10, 2092:14
**NEED** [18] - 2028:23, 2031:23, 2040:14, 2042:4, 2044:9,

2044:15, 2045:24, 2077:8, 2081:15, 2085:2, 2091:2, 2092:8, 2093:16, 2112:10, 2113:14, 2114:15, 2118:11, 2119:10
**NEEDED** [2] - 2024:3, 2101:6
**NEEDS** [3] - 2031:14, 2085:9, 2085:18
**NEGATIVE** [2] - 2095:16, 2095:25
**NEGLIGENCE** [1] - 2050:10
**NEGLIGENCE** [43] - 2028:20, 2029:24, 2030:15, 2033:14, 2033:15, 2033:17, 2033:19, 2033:25, 2034:2, 2034:10, 2034:24, 2035:2, 2035:9, 2036:5, 2036:16, 2037:12, 2037:18, 2038:16, 2049:8, 2049:23, 2050:12, 2050:14, 2050:23, 2050:25, 2051:4, 2058:1, 2058:5, 2058:12, 2058:17, 2058:19, 2059:1, 2059:17, 2081:6, 2082:7, 2082:9, 2084:4, 2091:10, 2091:12, 2091:14, 2113:24, 2121:9, 2122:19
**NEGLIGENT** [13] - 2050:16, 2050:17, 2051:2, 2051:11, 2052:21, 2058:4, 2058:16, 2082:11, 2082:19, 2083:2, 2083:19, 2091:8, 2121:10
**NEGLIGENTLY** [1] - 2056:25
**NEIGHBORS** [2] - 2096:9, 2103:7
**NEVER** [9] - 2036:19, 2045:12, 2087:10, 2098:3, 2098:4, 2098:5, 2106:13, 2107:17, 2109:8
**NEW** [6] - 2024:7, 2024:9, 2090:16, 2090:25, 2092:4, 2092:7
**NEWS** [2] - 2067:20, 2067:23

**NEXT** [8] - 2052:3, 2055:15, 2059:15, 2089:13, 2089:16, 2102:6, 2119:3, 2120:3
**NIGHT** [4] - 2024:5, 2024:8, 2028:12, 2041:17
**NINE** [1] - 2053:9
**NO** [2] - 2019:6, 2125:19
**NOBODY** [1] - 2090:16
**NONE** [3] - 2102:14, 2108:20, 2110:9
**NONE** [2] - 2021:5, 2022:5
**NORM** [1] - 2076:7
**NORMALLY** [1] - 2107:24
**NORMAN** [1] - 2076:1
**NORTH** [1] - 2106:5
**NORTHERN** [1] - 2112:15
**NOSSAMAN** [2] - 2020:4, 2020:9
**NOTE** [3] - 2069:11, 2069:25, 2075:3
**NOTES** [2] - 2036:2, 2074:20
**NOTHING** [3] - 2040:6, 2077:18, 2104:25
**NOTICE** [3] - 2038:19, 2080:2, 2099:6
**NOTIFICATION** [2] - 2080:14, 2080:21
**NOTIFY** [1] - 2069:8
**NOTION** [2] - 2028:23, 2100:10
**NOVEMBER** [2] - 2087:17, 2096:22
**NOXIOUS** [1] - 2086:24
**NUANCES** [1] - 2086:20
**NUISANCE** [36] - 2024:9, 2024:24, 2025:7, 2028:20, 2029:4, 2029:6, 2029:12, 2030:14, 2030:20, 2032:9, 2032:10, 2032:20, 2033:14, 2034:2, 2034:18, 2034:24, 2037:5, 2037:12, 2049:8, 2049:25, 2050:1, 2052:4, 2052:7, 2055:1, 2055:3, 2055:8,

2055:9, 2055:14, 2055:16, 2055:17, 2055:18, 2055:19, 2055:21, 2061:12, 2113:25, 2121:17

**NUMBER** [1] - 2022:3

**NUMBER** [12] - 2023:5, 2047:22, 2053:13, 2056:6, 2058:25, 2079:6, 2082:23, 2102:24, 2111:4, 2111:10, 2112:4, 2116:9

**NUMBERS** [1] - 2107:13

**NUMERICALLY** [1] - 2069:23

**NUMEROUS** [3] - 2036:15, 2076:10, 2116:3

## O

**O&M** [2] - 2120:3, 2120:6

**O'CLOCK** [1] - 2124:4

**OATH** [3] - 2047:7, 2068:17, 2069:3

**OBJECT** [1] - 2025:23

**OBJECTION** [8] - 2024:12, 2025:8, 2025:21, 2025:24, 2043:11, 2081:10, 2081:15, 2081:16

**OBJECTIONS** [1] - 2043:21

**OBJECTIVE** [1] - 2054:14

**OBLIGATION** [1] - 2106:10

**OBSERVATION** [1] - 2027:16

**OBSTRUCTION** [2] - 2052:15, 2056:2

**OBTAIN** [1] - 2062:2

**OBVIOUSLY** [2] - 2078:9, 2116:15

**OCCUPIED** [6] - 2024:17, 2025:20, 2049:5, 2052:9, 2056:22, 2113:22

**OCCUPY** [3] - 2042:13, 2113:19, 2121:12

**OCCUR** [1] - 2091:22

**OCCURRED** [3] - 2064:8, 2108:20, 2115:3

**OCCURRING** [1] - 2090:12

**OCCURS** [1] - 2087:15

**OCTOBER** [1] - 2038:10

**OF** [11] - 2019:2, 2019:13, 2020:1, 2021:1, 2022:1, 2125:1, 2125:7, 2125:9, 2125:12, 2125:15

**OFFENSIVE** [2] - 2052:14, 2056:1

**OFFICERS** [6] - 2048:23, 2048:25, 2063:23, 2064:2, 2064:5, 2122:3

**OFFICIAL** [4] - 2019:24, 2125:1, 2125:5, 2125:19

**OFFSITE** [16] - 2030:5, 2092:22, 2093:2, 2093:9, 2099:23, 2102:15, 2104:25, 2105:1, 2106:6, 2106:15, 2111:6, 2111:21, 2112:17, 2113:4, 2115:2, 2116:21

**OHIO** [1] - 2122:12

**OIL** [1] - 2030:4

**OLD** [2] - 2073:15, 2077:14

**OLD-FASHIONED** [1] - 2073:15

**OLDER** [1] - 2075:12

**OMISSION** [2] - 2049:7, 2113:24

**ONCE** [4] - 2061:1, 2065:19, 2070:20, 2081:22

**ONE** [63] - 2024:20, 2024:25, 2028:9, 2032:17, 2036:3, 2040:15, 2045:3, 2046:1, 2047:14, 2049:9, 2049:11, 2051:2, 2052:9, 2053:16, 2054:12, 2055:5, 2055:23, 2056:22, 2058:16, 2058:20, 2059:18, 2063:7, 2063:22, 2063:23, 2064:2, 2064:5, 2065:22, 2069:12, 2071:4, 2074:13, 2075:3, 2075:4, 2081:2, 2081:5, 2082:5, 2085:7, 2089:2, 2090:7, 2092:23,

2093:14, 2095:11, 2096:20, 2102:4, 2103:16, 2104:4, 2104:20, 2107:1, 2107:20, 2108:23, 2109:20, 2110:10, 2112:19, 2112:20, 2113:6, 2114:14, 2114:15, 2115:3, 2116:22, 2116:25, 2118:5, 2118:10, 2120:4, 2122:3

**ONE'S** [1] - 2049:11

**ONES** [1] - 2111:18

**ONESELF** [2] - 2050:15, 2082:10

**ONGOING** [1] - 2101:23

**ONSITE** [13] - 2030:8, 2092:22, 2093:4, 2093:9, 2096:20, 2099:2, 2099:8, 2099:12, 2104:24, 2111:5, 2111:8, 2111:22

**OOO** [1] - 2023:3

**OOPS** [2] - 2098:25, 2107:20

**OPEN** [6] - 2024:7, 2046:4, 2066:6, 2069:17, 2124:8, 2124:11

**OPENING** [16] - 2070:18, 2071:14, 2072:24, 2073:4, 2073:5, 2074:15, 2090:14, 2090:17, 2107:3, 2107:9, 2110:16, 2111:20, 2113:18, 2120:15, 2123:4, 2123:16

**OPERATE** [1] - 2121:2

**OPERATING** [1] - 2099:16

**OPERATIONS** [6] - 2109:12, 2114:11, 2114:12, 2118:11, 2119:1, 2121:15

**OPINION** [9] - 2039:20, 2040:7, 2047:11, 2047:23, 2047:25, 2048:3, 2066:19, 2120:6

**OPINIONS** [3] - 2047:4, 2047:22, 2047:23

**OPPORTUNITY** [9] - 2027:23, 2039:4, 2044:1, 2045:20, 2046:17, 2055:12,

2070:17, 2071:20, 2095:23

**OPPRESSION** [7] - 2063:7, 2063:23, 2064:2, 2064:7, 2064:19, 2075:9, 2122:2

**ORANGE** [3] - 2027:21, 2029:21, 2032:17

**ORANGE** [1] - 2029:20

**ORDER** [5] - 2026:16, 2034:3, 2038:15, 2102:22, 2102:25

**ORDERED** [2] - 2067:18, 2081:23

**ORDINANCES** [1] - 2038:13

**ORDINARY** [3] - 2038:22, 2053:2, 2056:7

**ORGANIC** [5] - 2096:23, 2097:9, 2097:16, 2097:22

**ORGANIZATION** [1] - 2048:7

**ORIGINAL** [4] - 2060:24, 2061:3, 2061:4, 2083:15

**OTHERWISE** [5] - 2040:23, 2045:12, 2069:23, 2099:5, 2102:15

**OUGHT** [1] - 2106:8

**OUTCOME** [1] - 2121:22

**OUTSIDE** [8] - 2023:21, 2044:25, 2068:20, 2069:8, 2085:15, 2085:18, 2103:25, 2124:11

**OUTSTANDING** [2] - 2040:25, 2042:6

**OUTWEIGHS** [3] - 2053:9, 2053:12, 2056:9

**OVERFLOWING** [3] - 2083:12, 2083:14, 2085:3

**OVERLOOKED** [1] - 2040:12

**OVERRULED** [1] - 2081:16

**OVERWHELMING** [1] - 2123:12

**OWN** [25] - 2042:12, 2058:1, 2061:9, 2063:15, 2066:17, 2068:2, 2075:2,

2077:1, 2084:5, 2088:15, 2088:22, 2088:24, 2092:6, 2097:9, 2104:8, 2106:14, 2110:17, 2117:11, 2117:12, 2117:17, 2121:12, 2121:15

**OWNED** [7] - 2024:17, 2025:20, 2033:3, 2033:4, 2052:9, 2056:22, 2061:25

**OWNER** [2] - 2098:13, 2098:16

**OWNERSHIP** [4] - 2024:14, 2027:3, 2027:9, 2030:2

**OWNS** [7] - 2031:4, 2051:11, 2051:13, 2061:17, 2062:9, 2083:2, 2083:7

## P

**PACKED** [1] - 2085:8

**PAGE** [5] - 2035:15, 2108:18, 2112:13, 2115:22, 2116:7

**PAGE** [2] - 2021:3, 2125:11

**PAGES** [1] - 2019:8

**PAID** [2] - 2079:8, 2079:11

**PALLETS** [1] - 2076:11

**PARAGRAPH** [7] - 2042:17, 2042:22, 2043:2, 2043:4, 2059:15, 2059:16, 2102:6

**PARE** [1] - 2077:23

**PARED** [1] - 2077:16

**PART** [6] - 2088:18, 2099:1, 2101:22, 2105:17, 2115:12, 2120:8

**PARTICULAR** [5] - 2032:2, 2037:16, 2054:1, 2054:16, 2060:12

**PARTICULARLY** [2] - 2037:11, 2107:19

**PARTIES** [9] - 2024:4, 2033:10, 2044:13, 2049:12, 2061:6, 2068:9, 2068:25, 2069:3, 2069:19

**PARTS** [1] - 2043:20

**PARTY** [12] - 2037:24, 2047:17, 2047:18,

2050:3, 2050:4, 2050:9, 2065:9, 2065:11, 2074:24, 2100:23, 2114:9
**PARTY'S** [1] - 2068:14
**PAST** [4] - 2080:8, 2097:15, 2097:21
**PATIENCE** [1] - 2115:4
**PATRICK** [1] - 2023:9
**PATRICK** [1] - 2020:5
**PAY** [3] - 2081:7, 2081:23, 2106:10
**PCE** [14] - 2042:20, 2057:1, 2082:15, 2088:5, 2089:4, 2089:7, 2097:23, 2106:1, 2106:24, 2107:19, 2114:6, 2116:5, 2116:6, 2116:12
**PELOQUIN** [11] - 2074:18, 2075:13, 2076:21, 2076:22, 2085:16, 2091:22, 2092:2, 2094:16, 2094:20, 2122:4, 2122:10
**PEOPLE** [7] - 2056:6, 2064:24, 2066:3, 2067:14, 2068:8, 2088:18, 2124:7
**PER** [12] - 2037:18, 2038:16, 2110:18, 2110:19, 2111:9, 2111:14, 2111:24, 2114:18, 2114:25, 2115:1
**PERCENT** [6] - 2059:13, 2059:22, 2116:12, 2116:13, 2116:14
**PERCENTAGE** [2] - 2058:7, 2059:25
**PERCENTAGES** [4] - 2058:22, 2059:12, 2059:20, 2059:22
**PERCHLORATE** [19] - 2042:20, 2057:1, 2073:22, 2073:23, 2074:8, 2078:21, 2078:24, 2080:9, 2080:13, 2081:1, 2082:2, 2094:9, 2094:11, 2103:20, 2104:16, 2106:21, 2106:22, 2116:4
**PERCHLOROETHYL ENE** [1] - 2089:4
**PERFECT** [1] -

2109:14
**PERFORMED** [1] - 2049:1
**PERHAPS** [2] - 2071:24, 2100:15
**PERMANENT** [2] - 2085:20, 2087:17
**PERMISSION** [1] - 2057:3
**PERMIT** [1] - 2045:18
**PERMITTED** [5] - 2052:12, 2052:23, 2055:24, 2071:2, 2100:5
**PERPENDICULAR** [2] - 2104:1, 2104:3
**PERSON** [37] - 2047:16, 2048:22, 2049:13, 2049:14, 2050:15, 2050:16, 2050:17, 2050:18, 2050:19, 2050:21, 2051:7, 2051:11, 2051:12, 2051:13, 2053:2, 2056:7, 2057:13, 2058:20, 2058:22, 2059:18, 2059:20, 2059:25, 2061:25, 2064:15, 2064:16, 2065:3, 2065:25, 2067:7, 2082:10, 2082:19, 2082:20, 2082:22, 2083:2, 2083:3, 2083:7, 2117:6
**PERSON'S** [4] - 2059:25, 2064:17, 2065:5
**PERSONAL** [2] - 2047:4, 2053:22
**PERSPECTIVE** [1] - 2113:9
**PERSUADED** [1] - 2050:6
**PERSUADES** [1] - 2066:19
**PG** [2] - 2022:3
**PHASE** [2] - 2115:15, 2115:20
**PHONE** [6] - 2044:4, 2044:5, 2044:6, 2067:8, 2079:22, 2079:23
**PHOTO** [3] - 2109:7, 2109:9
**PHOTOS** [1] - 2109:22
**PHRASE** [1] - 2115:5
**PHRASED** [1] - 2031:1
**PHYLLIS** [1] - 2110:18
**PHYSICAL** [1] -

2053:22
**PICTURE** [1] - 2078:5
**PICTURES** [1] - 2044:4
**PIECE** [1] - 2108:12
**PIPE** [1] - 2109:3
**PIPELINE** [1] - 2110:2
**PIPING** [1] - 2031:2
**PIT** [10] - 2089:5, 2089:8, 2089:12, 2089:15, 2089:20, 2089:25, 2090:1, 2090:5, 2090:23, 2099:10
**PITS** [2] - 2089:5, 2089:18
**PLACE** [4] - 2024:25, 2062:6, 2068:3, 2068:5
**PLACED** [1] - 2054:9
**PLACES** [3] - 2053:24, 2054:12, 2087:16
**PLAINTIFF** [25] - 2023:10, 2023:23, 2024:8, 2026:25, 2028:12, 2030:5, 2041:18, 2045:7, 2052:5, 2057:18, 2061:11, 2061:14, 2061:21, 2062:2, 2062:4, 2062:5, 2062:8, 2062:24, 2063:11, 2063:17, 2070:14, 2070:20, 2107:14, 2121:9
**PLAINTIFF** [2] - 2019:6, 2020:3
**PLAINTIFF'S** [4] - 2026:15, 2028:10, 2040:2, 2062:1
**PLAINTIFFS** [1] - 2041:6
**PLANT** [2] - 2089:8, 2090:5
**PLAYING** [1] - 2094:19
**PLUME** [4] - 2097:4, 2104:12, 2112:19, 2113:5
**POINT** [18] - 2024:4, 2028:23, 2036:1, 2036:13, 2036:23, 2043:24, 2045:22, 2046:11, 2065:17, 2072:23, 2073:11, 2092:17, 2103:13, 2109:5, 2123:16, 2123:23
**POINT** [2] - 2094:8
**POINTED** [2] - 2099:7,

2106:5
**POINTS** [2] - 2072:22, 2108:7
**POLICIES** [2] - 2092:6, 2097:19
**POLICY** [6] - 2034:6, 2045:11, 2065:6, 2088:19, 2088:21, 2088:22
**POLISHED** [1] - 2112:6
**POLLUTER'S** [1] - 2106:9
**POLLUTION** [7] - 2028:24, 2086:12, 2086:22, 2086:23, 2087:17, 2087:19
**POMONA** [3] - 2029:9, 2029:11, 2036:14
**POOLS** [1] - 2103:25
**POPULATION** [1] - 2108:1
**PORTER** [1] - 2038:7
**PORTER-COLOGNE** [1] - 2038:7
**PORTION** [1] - 2086:20
**POSITION** [1] - 2107:14
**POSSESSION** [1] - 2055:5
**POSSESSORY** [8] - 2028:13, 2030:19, 2032:14, 2032:15, 2033:12, 2034:10, 2061:13, 2062:2
**POSSIBLE** [4] - 2062:14, 2068:12, 2070:10, 2117:22
**POTENTIAL** [7] - 2084:9, 2086:20, 2095:13, 2115:6, 2115:13, 2116:7
**POTENTIALLY** [1] - 2038:22
**POUNDS** [4] - 2088:8, 2088:10, 2089:22, 2118:1
**POWDER** [2] - 2049:5, 2113:22
**POWERPOINT** [1] - 2045:25
**PRACTICABILITY** [1] - 2054:22
**PRACTICAL** [1] - 2039:25
**PRACTICALLY** [1] - 2087:16
**PRACTICE** [2] - 2057:15, 2057:17

**PRACTICES** [10] - 2057:10, 2057:12, 2088:13, 2090:9, 2090:25, 2091:5, 2092:5, 2097:15, 2097:21
**PRECISE** [2] - 2106:15, 2111:10
**PRECISELY** [2] - 2079:20, 2106:16
**PREDECESSOR** [1] - 2095:5
**PREDICATED** [1] - 2030:1
**PREJUDGMENT** [1] - 2044:14
**PREJUDICES** [1] - 2047:5
**PRELIMINARY** [1] - 2068:14
**PREPARED** [10] - 2070:3, 2074:20, 2076:1, 2102:6, 2104:8, 2109:6, 2109:21, 2113:2, 2116:9, 2116:17
**PREPONDERANCE** [6] - 2050:6, 2057:19, 2057:23, 2063:12, 2065:15, 2122:25
**PRESENCE** [5] - 2023:21, 2044:25, 2046:4, 2046:6, 2124:11
**PRESENT** [13] - 2038:15, 2038:24, 2046:21, 2065:11, 2070:17, 2070:19, 2070:21, 2071:13, 2074:23, 2075:1, 2097:15, 2097:21, 2118:7
**PRESENT** [1] - 2020:18
**PRESENTED** [13] - 2037:23, 2038:1, 2038:10, 2038:12, 2039:10, 2046:21, 2050:9, 2061:6, 2068:15, 2069:2, 2080:19, 2108:6, 2111:7
**PRESENTING** [1] - 2030:18
**PRESENTLY** [1] - 2077:2
**PRESENTS** [1] - 2074:24
**PRESIDE** [1] - 2065:23

**PRESIDENT** [2] - 2076:20, 2078:16

**PRESIDENT** [5] - 2074:21, 2076:21, 2077:7, 2095:3, 2122:12

**PRESIDING** [4] - 2065:22, 2065:23, 2069:12, 2070:5

**PRESS** [1] - 2067:14

**PRESUMPTION** [2] - 2038:8, 2038:24

**PRESUPPOSES** [1] - 2030:19

**PRETTY** [9] - 2032:10, 2078:13, 2079:19, 2080:12, 2090:2, 2091:10, 2097:20, 2121:8

**PREVAIL** [1] - 2034:3

**PREVENT** [2] - 2050:15, 2082:10

**PREVENTING** [1] - 2054:23

**PREVIOUSLY** [3] - 2026:24, 2028:17, 2063:10

**PRICE** [1] - 2121:3

**PRIMARY** [4] - 2054:6, 2054:12, 2054:14, 2054:21

**PRINCIPAL** [1] - 2049:14

**PRINCIPLE** [1] - 2030:12

**PRINCIPLES** [4] - 2047:14, 2048:17, 2082:11, 2120:2

**PRIVATE** [6] - 2024:24, 2049:25, 2052:3, 2055:1, 2055:17, 2086:22

**PROBABILITY** [1] - 2107:23

**PROBABLE** [4] - 2051:21, 2064:16, 2065:12, 2086:2

**PROBLEM** [10] - 2024:15, 2077:25, 2078:3, 2091:13, 2091:15, 2091:18, 2092:3, 2098:21, 2110:8, 2110:11

**PROCEDURAL** [1] - 2044:3

**PROCEEDING** [4] - 2026:12, 2080:1, 2081:18, 2081:19

**PROCEEDINGS** [1] - 2125:10

**PROCEEDINGS** [3] - 2046:3, 2069:7, 2124:10

**PROCESS** [5] - 2039:2, 2068:19, 2068:24, 2097:25, 2118:23

**PROCESSES** [1] - 2086:12

**PRODUCE** [4] - 2098:24, 2099:15, 2099:16, 2114:9

**PRODUCED** [2] - 2114:10

**PRODUCTION** [1] - 2080:11

**PROGRAM** [3] - 2098:12, 2098:17, 2102:7

**PROGRAMS** [1] - 2068:4

**PROJECT** [2] - 2120:19

**PROJECTS** [1] - 2119:20

**PROMISE** [4] - 2099:24, 2107:6, 2107:10, 2108:2

**PROMISES** [1] - 2123:4

**PROMULGATE** [1] - 2091:20

**PROOF** [18] - 2030:1, 2036:20, 2050:3, 2050:5, 2057:19, 2057:23, 2063:10, 2063:12, 2063:15, 2065:14, 2065:15, 2070:15, 2080:24, 2114:12, 2122:16, 2122:18

**PROPENSITY** [1] - 2087:1

**PROPER** [3] - 2039:10, 2118:4

**PROPERLY** [1] - 2037:22, 2039:9

**PROPERTY** [53] - 2024:18, 2025:13, 2025:17, 2025:20, 2025:25, 2026:15, 2027:3, 2028:3, 2028:10, 2031:9, 2033:9, 2033:10, 2036:4, 2036:7, 2051:11, 2051:12, 2051:13, 2051:19, 2052:10, 2052:15, 2052:17, 2053:18, 2056:2, 2056:4,

2056:20, 2056:23, 2057:2, 2060:18, 2060:24, 2060:25, 2061:3, 2061:4, 2061:13, 2061:14, 2061:21, 2062:10, 2072:7, 2073:20, 2077:24, 2078:2, 2078:4, 2078:10, 2083:2, 2083:4, 2083:7, 2083:21, 2084:7, 2086:23, 2103:3, 2104:21, 2121:13, 2122:7, 2122:9

**PROPOSAL** [1] - 2096:6

**PROPOSED** [1] - 2041:5

**PROPRIETY** [1] - 2026:4

**PROTECT** [2] - 2055:14, 2068:14

**PROTECTING** [1] - 2051:24

**PROTECTS** [1] - 2054:17

**PROVE** [28] - 2024:20, 2028:13, 2034:2, 2036:19, 2036:22, 2051:1, 2052:5, 2052:8, 2055:4, 2055:22, 2056:20, 2058:3, 2058:15, 2060:14, 2060:19, 2061:8, 2061:12, 2062:6, 2063:7, 2063:11, 2063:20, 2073:6, 2107:6, 2117:10, 2118:16, 2122:18, 2122:19

**PROVED** [3] - 2060:7, 2063:6, 2123:6

**PROVEN** [1] - 2073:9

**PROVES** [1] - 2058:6

**PROVIDE** [1] - 2099:13

**PROVIDE** [15] - 2024:5, 2038:5, 2043:23, 2047:13, 2047:18, 2059:5, 2060:2, 2060:15, 2061:19, 2065:17, 2080:22, 2081:1, 2100:14, 2114:21, 2118:17

**PROVIDED** [3] - 2024:8, 2047:18, 2047:19

**PROVIDES** [1] -

2030:14

**PROVIDING** [1] - 2046:11

**PROVING** [2] - 2055:2, 2065:9

**PUBLIC** [14] - 2045:11, 2049:25, 2053:10, 2053:12, 2054:10, 2054:17, 2055:15, 2055:18, 2055:19, 2056:14, 2078:7, 2087:6, 2121:17

**PUBLICATION** [1] - 2086:19

**PUDDING** [1] - 2114:13

**PUMP** [2] - 2114:17, 2115:1

**PUMPING** [2] - 2031:2, 2114:23

**PUNITIVE** [16] - 2045:4, 2045:5, 2045:8, 2045:10, 2045:14, 2045:18, 2045:22, 2062:25, 2063:3, 2063:14, 2063:19, 2121:23, 2121:25, 2122:20, 2122:24

**PURCHASE** [1] - 2061:8

**PURCHASED** [3] - 2049:6, 2088:6

**PURE** [1] - 2123:18

**PURPOSE** [5] - 2030:11, 2054:13, 2054:14, 2054:16, 2083:15

**PURSUANT** [1] - 2125:8

**PUT** [12] - 2054:25, 2055:13, 2085:10, 2089:12, 2093:1, 2093:12, 2094:24, 2100:20, 2103:8, 2106:14, 2114:16, 2123:15

**PUTS** [1] - 2108:18

**PUTTING** [5] - 2031:6, 2092:10, 2092:15, 2098:10, 2099:3

**PVC** [1] - 2117:14

**Q**

**Q2** [1] - 2081:4

**QUALITY** [5] - 2093:8, 2093:16, 2098:18, 2102:7, 2102:16

**QUALITY** [2] - 2097:7, 2097:24

**QUANTITY** [2] - 2097:12, 2099:18

**QUARTER** [1] - 2113:3

**QUESTIONABLE** [1] - 2027:4

**QUESTIONS** [9] - 2024:7, 2058:25, 2059:4, 2072:16, 2090:14, 2099:25, 2103:16, 2108:23, 2121:17

**QUITE** [5] - 2032:1, 2079:4, 2079:22, 2086:18

**QUOTE** [4] - 2080:8, 2083:2, 2099:13, 2111:23

**R**

**RAINS** [1] - 2111:11

**RAISE** [2] - 2038:24, 2045:2

**RAISED** [4] - 2026:3, 2026:16, 2033:13, 2037:13

**RAN** [1] - 2076:23

**RATE** [2] - 2102:9, 2111:21

**RATES** [1] - 2111:1

**RATHER** [5] - 2074:25, 2100:23, 2107:4, 2107:15, 2110:10

**RAVEN** [1] - 2020:5

**RCRA** [2] - 2090:16, 2090:21

**REACH** [5] - 2034:20, 2066:8, 2066:15, 2066:22, 2087:14

**REACHED** [2] - 2069:24, 2070:4

**READ** [19] - 2047:8, 2059:14, 2059:15, 2066:1, 2067:20, 2068:10, 2074:24, 2077:4, 2077:8, 2084:8, 2084:12, 2086:19, 2087:18, 2087:23, 2088:20, 2089:10, 2117:1, 2118:6

**READING** [3] - 2035:25, 2046:14, 2115:22

**READS** [1] - 2085:17

**READY** [2] - 2070:8,

2120:16
**READY-MADE** [1] - 2120:16
**REAL** [4] - 2033:24, 2036:4, 2036:7, 2039:1
**REALITY** [1] - 2034:13
**REALIZED** [1] - 2074:1
**REALLY** [14] - 2027:14, 2030:7, 2033:23, 2037:15, 2038:1, 2039:1, 2094:14, 2096:17, 2097:3, 2097:5, 2104:14, 2105:9, 2118:13, 2122:21
**REALTIME** [1] - 2125:5
**REASON** [2] - 2045:6, 2093:5
**REASONABLE** [33] - 2028:1, 2050:12, 2050:14, 2051:7, 2051:12, 2051:14, 2051:17, 2055:12, 2055:13, 2057:13, 2057:17, 2060:15, 2060:19, 2060:21, 2061:5, 2061:8, 2064:24, 2065:16, 2071:1, 2077:4, 2082:9, 2083:3, 2083:7, 2084:4, 2096:2, 2100:9, 2107:18, 2114:4, 2117:6, 2118:17, 2119:6, 2119:25
**REASONABLY** [13] - 2038:4, 2050:17, 2050:19, 2050:21, 2051:13, 2051:16, 2053:2, 2056:8, 2057:12, 2060:9, 2082:20, 2082:22, 2083:4
**REASONED** [1] - 2062:20
**REASONS** [3] - 2025:23, 2047:22, 2048:3
**REBUTTAL** [1] - 2070:21
**RECEIVE** [3] - 2023:22, 2046:12, 2116:25
**RECEIVED** [4] - 2062:15, 2066:24, 2080:13, 2100:23
**RECEIVING** [2] -

2101:2, 2101:3
**RECENT** [1] - 2096:21
**RECENTLY** [3] - 2038:6, 2038:10, 2038:12
**RECESS** [4] - 2044:19, 2044:22, 2124:12, 2124:16
**RECHARGE** [1] - 2111:12
**RECKLESS** [6] - 2052:21, 2083:20, 2090:9, 2090:10, 2092:5
**RECKLESSLY** [1] - 2056:25
**RECOGNIZE** [1] - 2026:10
**RECOMMENDATION** [1] - 2106:7
**RECOMMENDED** [1] - 2095:18
**RECORD** [9] - 2037:8, 2042:3, 2044:23, 2046:5, 2087:19, 2099:11, 2100:7, 2113:9
**RECORDS** [7] - 2088:6, 2097:14, 2099:8, 2099:15, 2099:16, 2099:18
**RECOVER** [5] - 2028:12, 2060:18, 2061:7, 2061:11, 2062:4
**REDUCED** [1] - 2058:7
**REDUCTION** [1] - 2058:9
**REFER** [3] - 2046:16, 2048:18, 2060:5
**REFERENCE** [7] - 2025:17, 2062:24, 2068:1, 2086:1, 2089:3, 2104:5, 2104:6
**REFERENCES** [2] - 2089:6, 2113:18
**REFERRED** [1] - 2084:23
**REFERRING** [3] - 2029:24, 2048:19, 2059:10
**REFERS** [3] - 2098:22, 2101:21, 2102:6
**REFLECT** [1] - 2045:21
**REFLECTING** [1] - 2103:25

**REFURBISH** [1] - 2079:10
**REGARD** [12] - 2030:20, 2037:12, 2037:14, 2037:18, 2039:16, 2041:9, 2041:15, 2049:19, 2057:18, 2062:17, 2063:10, 2063:14
**REGARDING** [4] - 2030:25, 2047:11, 2050:11, 2101:14
**REGARDLESS** [1] - 2050:9
**REGIONAL** [2] - 2097:7, 2097:24
**REGULATIONS** [1] - 2125:12
**REGULATORS** [6] - 2084:25, 2085:25, 2087:5, 2094:17, 2094:21, 2101:23
**REIMBURSE** [1] - 2080:5
**REIMBURSE** [1] - 2080:8
**REJECT** [1] - 2048:1
**REJECTED** [1] - 2107:8
**RELATES** [1] - 2025:25
**RELATING** [1] - 2038:8
**RELATIONSHIP** [2] - 2049:12, 2060:22
**RELEASED** [1] - 2080:10
**RELEASES** [1] - 2075:16
**RELIANCE** [1] - 2112:8
**RELIED** [4] - 2029:3, 2029:20, 2029:25, 2120:1
**RELY** [2] - 2075:17, 2116:22
**RELYING** [3] - 2029:9, 2030:12, 2033:18
**REMAIN** [2] - 2024:7, 2046:5
**REMAINED** [1] - 2026:8
**REMEDIATED** [1] - 2031:14
**REMEDIATION** [2] - 2103:6, 2117:4
**REMEDIES** [1] - 2034:1
**REMEMBER** [6] - 2069:3, 2069:22,

2079:23, 2100:13, 2110:4, 2124:6
**REMEMBERED** [1] - 2075:13
**REMIND** [3] - 2066:25, 2067:3, 2070:22
**REMINDED** [1] - 2086:5
**REMISS** [1] - 2101:24
**REMOTE** [2] - 2051:9, 2117:7
**REMOVED** [2] - 2088:9, 2088:10
**REPAIR** [2] - 2051:15, 2060:22
**REPAIRING** [2] - 2060:19, 2060:20
**REPEAT** [3] - 2026:2, 2026:6, 2035:20
**REPEATEDLY** [1] - 2118:11
**REPETITIVE** [2] - 2071:24, 2101:15
**REPLACE** [1] - 2051:15
**REPLACEMENT** [6] - 2061:9, 2081:24, 2118:9, 2118:13, 2118:22, 2118:25
**REPORT** [14] - 2067:19, 2068:11, 2070:24, 2101:19, 2104:8, 2105:16, 2109:6, 2109:16, 2109:21, 2111:7, 2112:23, 2115:14, 2115:20, 2119:19
**REPORTED** [1] - 2125:10
**REPORTER** [4] - 2019:24, 2125:1, 2125:6, 2125:19
**REPORTER'S** [1] - 2019:13
**REPORTS** [2] - 2067:23, 2108:14
**REPRESENTATIVE** [3] - 2048:9, 2048:11, 2048:15
**REPRESENTED** [1] - 2105:4
**REPRODUCTIVE** [1] - 2086:3
**REQUEST** [5] - 2024:9, 2039:23, 2045:21, 2080:7, 2080:12
**REQUESTED** [2] - 2040:9, 2097:10
**REQUESTING** [1] -

2026:15
**REQUIRE** [2] - 2027:25, 2065:15
**REQUIRED** [2] - 2080:4, 2102:5
**REQUIREMENT** [1] - 2094:16
**REQUIREMENTS** [1] - 2120:13
**REQUIRES** [2] - 2038:19, 2098:13
**RESEARCH** [3] - 2067:24, 2068:7, 2068:20
**RESIDENTIAL** [1] - 2054:7
**RESOLVED** [1] - 2043:19
**RESPECT** [4] - 2026:11, 2035:2, 2037:11, 2050:2
**RESPECTFULLY** [1] - 2032:23
**RESPOND** [1] - 2067:17
**RESPONDENT** [1] - 2098:23
**RESPONDENT'S** [1] - 2099:1
**RESPONSE** [4] - 2041:15, 2080:14, 2080:22, 2119:2
**RESPONSES** [1] - 2059:6
**RESPONSIBILITY** [31] - 2039:17, 2049:10, 2058:8, 2058:11, 2058:21, 2058:22, 2059:19, 2059:20, 2059:25, 2073:12, 2073:16, 2073:24, 2074:2, 2074:3, 2074:5, 2074:8, 2074:17, 2076:23, 2078:17, 2078:19, 2079:2, 2079:5, 2080:7, 2080:25, 2082:4, 2097:2, 2113:20, 2114:22, 2118:4, 2121:3, 2123:20
**RESPONSIBLE** [9] - 2048:24, 2049:16, 2073:19, 2073:21, 2073:22, 2077:22, 2083:24, 2123:19, 2124:1
**REST** [2] - 2035:4, 2073:24
**RESTATE** [1] -

2045:16
**RESTED** [2] - 2024:5, 2046:9
**RESTORATION** [4] - 2028:13, 2033:21, 2035:5, 2061:11
**RESTORE** [5] - 2033:23, 2060:24, 2061:2, 2061:4, 2080:11
**RESTRICTIONS** [1] - 2069:6
**RESULT** [1] - 2052:23
**RESULTED** [2] - 2049:8, 2113:24
**RESULTS** [3] - 2095:15, 2096:21, 2107:12
**RETIRE** [2] - 2072:15, 2082:25
**RETURN** [1] - 2070:8
**RETURNED** [1] - 2062:15
**RETURNING** [1] - 2023:11
**REVEALED** [1] - 2046:20
**REVIEW** [2] - 2098:25, 2108:13
**REVIEWED** [2] - 2098:22, 2109:20
**REVISED** [1] - 2099:1
**RICHARD** [12] - 2023:9, 2026:21, 2027:24, 2030:16, 2037:3, 2037:6, 2037:18, 2040:3, 2041:20, 2071:13, 2072:18, 2123:6
**RICHARD** [26] - 2020:5, 2023:9, 2024:2, 2028:8, 2028:16, 2029:8, 2029:13, 2029:18, 2030:9, 2030:24, 2031:10, 2031:13, 2031:18, 2035:14, 2035:22, 2037:7, 2040:4, 2040:15, 2040:18, 2040:24, 2041:8, 2041:21, 2071:15, 2081:12, 2081:17, 2094:20
**RICHARD'S** [1] - 2027:15
**RIGHTS** [14] - 2026:5, 2028:21, 2029:5, 2030:1, 2032:2, 2032:12, 2032:18, 2036:18, 2036:21,

2045:8, 2064:13, 2064:21
**RISE** [1] - 2087:13
**RISK** [4] - 2051:23, 2051:24, 2052:2, 2055:9
**RISKS** [2] - 2085:5, 2086:8
**RIVERS** [1] - 2086:23
**ROLL** [1] - 2038:6
**RON** [1] - 2020:20
**ROOM** [6] - 2046:16, 2065:20, 2066:5, 2067:9, 2083:1, 2091:23
**RPR** [1] - 2019:23
**RULE** [4] - 2048:5, 2048:8, 2048:11, 2048:14
**RULE** [1] - 2092:10
**RULED** [4] - 2026:24, 2045:4, 2079:3, 2115:14
**RULES** [9] - 2032:10, 2032:16, 2068:13, 2069:4, 2069:5, 2081:15, 2091:21, 2092:4, 2092:7
**RULING** [3] - 2045:5, 2045:17, 2074:6
**RUN** [1] - 2096:3
**RUN-ON** [1] - 2096:3
**RUNOFF** [1] - 2084:15

---

**S**

**S-A-B-I-C** [1] - 2027:22
**SABIC** [1] - 2030:21
**SABIC** [10] - 2027:21, 2029:1, 2030:21, 2031:16, 2031:21, 2032:1, 2033:7, 2035:8, 2035:15, 2037:13
**SAFE** [5] - 2051:13, 2083:4, 2085:18, 2088:19, 2123:18
**SAFETY** [4] - 2064:14, 2074:19, 2086:5, 2091:19
**SALESMAN** [1] - 2122:11
**SAMPLE** [1] - 2110:1
**SAMPLES** [1] - 2028:24
**SAMPLING** [1] - 2096:21
**SAN** [2] - 2020:11, 2020:16

**SANDY** [1] - 2105:12
**SANTA** [1] - 2019:5
**SANTA** [4] - 2023:6, 2044:24, 2049:24, 2050:24
**SARCASTIC** [1] - 2078:14
**SAT** [5] - 2073:10, 2081:20, 2091:23, 2108:5, 2122:5
**SAUGUS** [10] - 2058:13, 2101:9, 2114:23, 2114:25, 2116:11, 2116:12, 2116:13, 2116:15, 2117:16, 2119:15
**SAVE** [2] - 2077:19, 2122:14
**SAW** [10] - 2083:16, 2085:12, 2092:2, 2097:19, 2098:3, 2098:4, 2098:5, 2112:24, 2122:4, 2122:8
**SCALE** [1] - 2123:7
**SCAN** [1] - 2044:5
**SCANNER** [1] - 2044:5
**SCHEDULE** [1] - 2101:20
**SCOPE** [4] - 2049:1, 2049:17, 2095:22, 2097:5
**SCOPING** [4] - 2115:12, 2115:15, 2115:20, 2116:19
**SCOTT** [6] - 2020:9, 2025:4, 2042:9, 2043:1, 2043:8, 2044:12
**SCOTT** [4] - 2020:19, 2023:10, 2042:8, 2044:9
**SCV** [64] - 2024:17, 2025:20, 2051:1, 2051:3, 2051:5, 2052:6, 2052:8, 2052:9, 2053:1, 2053:4, 2053:6, 2053:8, 2053:12, 2053:15, 2053:17, 2053:22, 2054:9, 2054:24, 2055:3, 2055:11, 2055:14, 2055:20, 2055:22, 2056:11, 2056:13, 2056:17, 2056:19, 2056:20, 2056:22, 2057:1, 2057:3, 2057:5, 2057:7,

2057:11, 2057:19, 2058:1, 2058:4, 2058:6, 2058:8, 2058:14, 2058:18, 2058:20, 2059:18, 2059:23, 2060:7, 2060:9, 2060:14, 2060:19, 2061:2, 2061:4, 2061:8, 2062:12, 2062:14, 2062:24, 2063:1, 2063:5, 2063:7, 2063:20, 2064:20, 2065:2, 2070:14, 2118:15
**SCVWA** [1] - 2080:8
**SE** [2] - 2037:18, 2038:16
**SEARCH** [1] - 2068:5
**SEARCHING** [1] - 2067:25
**SECOND** [2] - 2035:24, 2071:7
**SECTION** [2] - 2042:14, 2098:13
**SECTION** [1] - 2125:8
**SECTIONS** [1] - 2024:6
**SEE** [25] - 2025:6, 2028:17, 2038:21, 2039:11, 2040:11, 2043:10, 2066:1, 2071:16, 2073:3, 2086:1, 2089:12, 2089:16, 2093:3, 2104:23, 2108:9, 2108:13, 2108:19, 2108:20, 2112:25, 2113:5, 2113:7, 2113:9, 2114:8, 2117:12
**SEEM** [2] - 2024:3, 2105:25
**SEIZE** [1] - 2115:16
**SELECTION** [1] - 2062:23
**SELF** [1] - 2121:9
**SELF-EXPLANATORY** [1] - 2121:9
**SELL** [3] - 2061:16, 2077:24, 2078:2
**SEMANTICS** [1] - 2115:17
**SEND** [6] - 2042:14, 2069:11, 2069:18, 2096:8, 2096:12, 2097:16
**SENSE** [5] - 2032:8, 2033:24, 2041:22,

2092:14, 2120:22
**SENSES** [2] - 2052:14, 2056:1
**SENT** [5] - 2023:18, 2028:12, 2041:17, 2043:8, 2080:14
**SENTENCE** [1] - 2096:3
**SEPARATE** [4] - 2055:18, 2059:23, 2061:14, 2100:20
**SEPARATELY** [1] - 2061:16
**SERIES** [1] - 2118:20
**SERIOUS** [5] - 2073:1, 2078:9, 2087:20, 2091:15, 2091:18
**SERIOUSLY** [1] - 2028:7
**SERIOUSNESS** [6] - 2051:21, 2053:9, 2053:11, 2053:14, 2054:2, 2056:9
**SERVE** [2] - 2065:24, 2066:4
**SERVES** [1] - 2072:5
**SERVICE** [1] - 2067:17
**SERVICES** [1] - 2096:24
**SET** [6] - 2061:6, 2080:3, 2084:16, 2089:16, 2099:10, 2108:6
**SETS** [2] - 2082:7, 2095:8
**SETTLE** [1] - 2079:1
**SETTLED** [3] - 2040:23, 2041:10, 2041:12
**SETTLEMENT** [3] - 2079:7, 2079:15, 2080:2
**SETTLING** [1] - 2041:3
**SEVEN** [3] - 2053:6, 2056:16, 2080:14
**SHALL** [1] - 2066:8
**SHALLOW** [2] - 2112:21, 2116:23
**SHARE** [2] - 2079:20, 2120:6
**SHOCKED** [1] - 2075:21
**SHOP** [3] - 2085:15, 2085:18, 2089:4
**SHORT** [1] - 2107:7
**SHORTLY** [2] - 2023:12, 2062:19
**SHOULDERS** [1] -

2063:17
**SHOW** [16] - 2072:25, 2073:2, 2073:9, 2090:17, 2095:1, 2096:21, 2099:2, 2099:22, 2104:24, 2107:9, 2108:2, 2110:22, 2112:20, 2113:4, 2113:9, 2113:18
**SHOWED** [2] - 2076:25, 2123:10
**SHOWING** [1] - 2099:17, 2100:11
**SHOWN** [3] - 2096:22, 2099:24, 2122:9
**SHOWS** [4] - 2030:7, 2071:21, 2092:20, 2105:6
**SHUT** [2] - 2079:14, 2118:8
**SIC** [12] - 2039:23, 2040:1, 2040:10, 2058:13, 2058:16, 2058:17, 2117:9, 2117:10, 2117:14, 2117:19, 2117:21, 2117:24
**SIC** [1] - 2104:11
**SIDE** [3] - 2038:20, 2040:2, 2110:24
**SIDES** [1] - 2046:9
**SIFT** [2] - 2077:1, 2115:8
**SIFTING** [1] - 2077:6
**SIGN** [1] - 2070:7
**SIGNATURE** [2] - 2100:3, 2100:7
**SIGNATURES** [4] - 2100:18, 2100:22, 2101:1
**SIGNED** [2] - 2069:12, 2069:15
**SIGNIFICANCE** [1] - 2039:25
**SIGNS** [1] - 2102:23
**SIMILAR** [4] - 2030:20, 2076:6, 2081:8, 2108:17
**SIMILARITIES** [1] - 2116:3
**SIMPLE** [1] - 2111:25
**SIMPLY** [3] - 2066:20, 2066:22, 2100:3
**SIMPSON** [5] - 2081:18, 2120:4, 2120:11, 2120:14, 2120:16
**SINGLE** [1] - 2043:2
**SITE** [29] - 2030:8,

2049:5, 2075:22, 2076:12, 2080:10, 2085:7, 2093:18, 2094:1, 2101:24, 2103:18, 2104:15, 2104:20, 2105:3, 2105:7, 2105:14, 2106:1, 2106:3, 2106:6, 2106:15, 2110:20, 2113:13, 2113:19, 2113:23, 2114:19, 2116:11, 2116:16, 2117:3, 2118:1, 2120:19
**SITES** [3] - 2077:21, 2089:2, 2089:7
**SITTING** [1] - 2109:1
**SITUATION** [6] - 2031:12, 2050:18, 2050:20, 2050:22, 2057:14, 2082:21
**SIX** [3] - 2053:4, 2056:13, 2119:22
**SLABS** [1] - 2120:13
**SLIGHT** [1] - 2043:1
**SLIPPED** [1] - 2075:6
**SLOW** [1] - 2087:21
**SLOWER** [2] - 2111:18, 2111:19
**SLOWLY** [1] - 2087:15
**SLUDGE** [5] - 2085:12, 2085:13, 2089:24, 2099:9, 2114:11
**SMALL** [1] - 2087:4
**SNAPCHAT** [1] - 2067:11
**SOCIAL** [4] - 2053:25, 2054:15, 2056:10, 2067:12
**SOCIETY** [2] - 2053:24, 2054:12
**SOIL** [7] - 2027:19, 2028:24, 2089:20, 2089:22, 2106:19, 2106:21, 2110:1
**SOLD** [1] - 2103:3
**SOLELY** [1] - 2047:6
**SOLVENT** [1] - 2085:19
**SOLVENTS** [11] - 2082:16, 2083:12, 2083:23, 2085:6, 2085:12, 2085:22, 2087:2, 2089:4, 2090:6, 2090:8
**SOMEONE** [9] - 2066:3, 2077:24, 2078:10, 2088:11, 2091:8, 2092:9,

2101:10, 2120:18, 2123:20
**SOMETIMES** [4] - 2066:3, 2074:12, 2115:15, 2123:20
**SOMEWHERE** [2] - 2033:11, 2087:25
**SOON** [3] - 2040:13, 2068:12, 2093:1
**SOONER** [1] - 2103:8
**SORRY** [6] - 2026:21, 2037:12, 2037:19, 2039:20, 2042:19, 2076:18
**SORSHER** [7] - 2075:12, 2076:3, 2078:16, 2095:2, 2096:12, 2101:21, 2122:9
**SOUNDS** [2] - 2091:11, 2091:13
**SOURCE** [9] - 2107:18, 2115:14, 2115:21, 2116:1, 2116:5, 2116:6, 2118:2
**SOURCES** [6] - 2036:3, 2062:14, 2107:4, 2115:13, 2116:3, 2119:1
**SOUTH** [1] - 2031:25
**SOUTH** [1] - 2020:6
**SOUTHERN** [3] - 2086:14, 2087:3, 2088:3
**SPEAKING** [1] - 2038:17
**SPEARS** [1] - 2078:7
**SPECIAL** [7] - 2023:19, 2042:7, 2042:11, 2059:3, 2082:12, 2086:13, 2124:13
**SPECIALISTS** [1] - 2087:5
**SPECIFIC** [4] - 2038:5, 2038:6, 2089:6, 2099:17
**SPECIFIED** [1] - 2048:7
**SPECIFY** [1] - 2100:4
**SPECULATE** [3] - 2060:16, 2062:13, 2118:18
**SPEED** [1] - 2094:4
**SPEND** [1] - 2114:15
**SPIKES** [1] - 2108:3
**SPOKESPERSON** [1] - 2065:24
**SPOTS** [1] - 2042:11

**SPREAD** [2] - 2092:16, 2112:19
**SPREADING** [1] - 2092:12
**SPREADS** [1] - 2094:25
**SQUARELY** [2] - 2028:21, 2036:8
**STAGE** [1] - 2095:8
**STAND** [4] - 2029:18, 2111:13, 2114:2, 2115:19
**STANDARD** [5] - 2050:11, 2065:14, 2119:13, 2120:2, 2122:19
**STANDING** [5] - 2030:14, 2030:17, 2030:22, 2036:16, 2036:19
**STANDS** [4] - 2069:23, 2087:7, 2087:11, 2092:19
**STANIN** [4] - 2104:7, 2110:18, 2111:23, 2112:16
**STANLEY** [1] - 2019:3
**STARRH** [18] - 2029:20, 2029:24, 2030:3, 2030:9, 2030:10, 2030:24, 2031:11, 2032:13, 2032:14, 2033:5, 2033:7, 2035:8
**START** [10] - 2024:7, 2050:10, 2072:21, 2073:13, 2092:11, 2092:15, 2098:9, 2112:11, 2114:19, 2120:9
**STARTED** [5] - 2034:25, 2038:6, 2077:5, 2082:17, 2103:5
**STARTING** [2] - 2049:22, 2059:16
**STATE** [1] - 2096:23
**STATE** [9] - 2023:8, 2029:15, 2029:16, 2061:3, 2061:25, 2074:20, 2078:16, 2086:23, 2090:14
**STATEMENT** [10] - 2028:19, 2073:5, 2074:16, 2090:15, 2107:3, 2110:16, 2111:20, 2113:18, 2123:4, 2123:17
**STATES** [1] - 2086:17
**STATES** [4] - 2019:1,

2125:6, 2125:8, 2125:13
**STATING** [1] - 2025:25
**STATISTICIAN** [1] - 2107:22
**STATISTICIANS** [1] - 2107:24
**STATUTE** [3] - 2038:7, 2038:9, 2039:14
**STATUTES** [4] - 2038:4, 2038:6, 2038:17, 2039:7
**STATUTORY** [1] - 2038:5
**STAY** [1] - 2112:7
**STEEL** [1] - 2110:5
**STEFFEY** [3] - 2108:11, 2109:1, 2109:17
**STENOGRAPHICALLY** [1] - 2125:10
**STEP** [1] - 2092:15
**STEPPED** [2] - 2023:11
**STEPS** [4] - 2055:13, 2080:4, 2102:24, 2103:1
**STICKING** [1] - 2027:18
**STILL** [11] - 2025:23, 2027:9, 2031:7, 2036:22, 2038:12, 2040:19, 2080:15, 2080:25, 2081:1, 2092:3, 2119:16
**STONE** [2] - 2020:19, 2080:6
**STOOD** [1] - 2073:11
**STOP** [3] - 2091:2, 2097:3, 2105:3
**STOPPED** [2] - 2108:17, 2108:21
**STORAGE** [1] - 2099:17
**STORED** [3] - 2088:7, 2097:12, 2099:8
**STRAIGHT** [2] - 2084:18, 2085:4
**STREAMS** [1] - 2086:23
**STREET** [3] - 2020:6, 2020:10, 2020:15
**STREET** [1] - 2019:24
**STRIKE** [2] - 2050:13, 2064:3
**STRIVE** [1] - 2066:8
**STRONGER** [2] - 2047:19, 2074:25
**STUDIES** [1] - 2085:2

**STUDY** [4] - 2081:24, 2086:11, 2086:20, 2086:22
**STUFF** [3] - 2076:18, 2097:13, 2102:14
**SUBJECT** [3] - 2043:21, 2079:14, 2124:7
**SUBJECTED** [1] - 2064:20
**SUBMIT** [5] - 2039:15, 2043:6, 2079:4, 2096:3, 2116:8
**SUBMITTAL** [1] - 2075:22
**SUBMITTED** [2] - 2042:12, 2091:1
**SUBSTANCES** [1] - 2075:16
**SUBSTANTIAL** [18] - 2051:5, 2051:6, 2053:7, 2056:5, 2056:16, 2057:6, 2058:5, 2058:18, 2058:20, 2059:18, 2065:4, 2102:24, 2117:2, 2117:5, 2117:10, 2117:24, 2121:11
**SUBSTANTIALLY** [2] - 2038:2, 2052:25
**SUBSTANTIVE** [3] - 2043:14, 2043:17, 2043:20
**SUBSURFACE** [5] - 2027:13, 2030:1, 2030:5, 2061:18, 2062:10
**SUBTERRANEAN** [1] - 2087:20
**SUCCEED** [2] - 2058:2, 2058:14
**SUCCESSOR** [3] - 2049:3, 2049:4, 2113:22
**SUED** [5] - 2074:5, 2074:9, 2078:23, 2079:3, 2104:10
**SUFFERED** [5] - 2052:6, 2053:15, 2055:20, 2056:13, 2056:14
**SUFFICE** [1] - 2079:21
**SUFFICIENT** [4] - 2029:6, 2029:7, 2030:14, 2099:14
**SUGGEST** [2] - 2111:17, 2115:24
**SUGGESTED** [1] - 2079:4

**SUGGESTING** [1] - 2031:22
**SUGGESTION** [1] - 2101:8
**SUGGESTS** [2] - 2033:19, 2099:4
**SUITABILITY** [3] - 2054:4, 2054:18, 2054:20
**SUITE** [1] - 2019:24
**SUITE** [1] - 2020:16
**SUM** [1] - 2070:23
**SUMPS** [1] - 2084:22
**SUPERIOR** [1] - 2034:9
**SUPPLY** [3] - 2061:18, 2086:24, 2097:10
**SUPPORT** [1] - 2038:4
**SUPPORTED** [1] - 2028:25
**SUPPORTING** [1] - 2081:11
**SUPPORTS** [2] - 2038:8, 2040:5
**SUPPOSED** [2] - 2088:17, 2100:11
**SURFACE** [8] - 2057:8, 2061:17, 2062:10, 2085:23, 2087:20, 2098:13, 2098:14, 2098:16
**SURPRISED** [4] - 2073:10, 2075:21, 2108:25, 2109:5
**SURROUNDING** [3] - 2027:19, 2033:5, 2037:25
**SURVEY** [1] - 2086:17
**SYMPATHY** [1] - 2047:5
**SYSTEM** [6] - 2039:2, 2096:6, 2096:17, 2107:19, 2109:24, 2114:24
**SYSTEMS** [4] - 2119:9, 2119:11, 2119:15, 2121:1

---

**T**

**TABLE** [2] - 2045:10, 2111:3
**TABLET** [1] - 2067:8
**TALKS** [5] - 2084:7, 2089:2, 2092:19, 2101:20, 2101:21
**TAMMY** [3] - 2078:4, 2078:5, 2122:8
**TANK** [1] - 2120:12
**TAP** [4] - 2109:24,

2109:25, 2110:3, 2110:6
**TASK** [1] - 2066:7
**TCE** [22] - 2042:20, 2057:1, 2086:1, 2088:5, 2089:24, 2089:25, 2104:24, 2105:7, 2105:25, 2106:19, 2106:24, 2107:19, 2113:5, 2114:6, 2116:1, 2116:4, 2116:5, 2116:14, 2117:18, 2117:21
**TEACHES** [1] - 2119:9
**TEAR** [1] - 2098:15
**TECHNICAL** [2] - 2034:13, 2106:11
**TEN** [1] - 2112:3
**TENS** [1] - 2089:21
**TERM** [2] - 2084:19, 2106:11
**TERMS** [4] - 2027:21, 2031:22, 2032:11, 2042:2
**TERRIBLY** [1] - 2101:24
**TESTED** [2] - 2068:18, 2068:24
**TESTIFIED** [11] - 2047:22, 2080:1, 2081:19, 2105:20, 2108:13, 2109:12, 2109:15, 2111:23, 2112:6, 2118:11, 2121:13
**TESTIMONY** [26] - 2027:8, 2031:3, 2047:21, 2047:23, 2047:25, 2048:1, 2048:8, 2048:10, 2048:12, 2048:14, 2062:21, 2068:18, 2079:14, 2079:16, 2080:16, 2081:13, 2081:24, 2087:7, 2087:17, 2088:15, 2089:10, 2089:13, 2109:22, 2110:7
**TEXT** [1] - 2067:9
**THAT** [3] - 2125:7, 2125:8, 2125:11
**THE** [80] - 2020:3, 2020:12, 2023:5, 2023:13, 2023:20, 2024:4, 2024:16, 2024:21, 2024:23, 2025:6, 2025:13, 2025:16, 2025:19, 2025:24, 2026:7,

2026:19, 2028:10, 2029:1, 2029:11, 2029:15, 2029:23, 2030:16, 2031:6, 2031:11, 2031:15, 2031:20, 2033:2, 2033:13, 2033:18, 2034:7, 2034:16, 2034:25, 2035:6, 2035:12, 2035:19, 2035:23, 2036:8, 2036:12, 2036:25, 2037:10, 2039:16, 2039:21, 2039:24, 2040:8, 2040:17, 2040:20, 2041:1, 2041:9, 2041:12, 2041:14, 2041:20, 2041:23, 2042:1, 2042:25, 2043:6, 2043:11, 2043:15, 2043:23, 2044:7, 2044:9, 2044:16, 2044:19, 2044:23, 2045:13, 2046:5, 2046:8, 2046:9, 2081:14, 2124:3, 2124:12, 2124:15, 2125:6, 2125:7, 2125:8, 2125:9, 2125:10, 2125:11, 2125:12, 2125:13
**THEME** [1] - 2108:8
**THEORY** [1] - 2030:20
**THEREFORE** [5] - 2048:24, 2049:7, 2108:9, 2108:20, 2113:23
**THIN** [1] - 2027:4
**THINKING** [1] - 2108:16
**THINKS** [1] - 2092:20
**THIRD** [4] - 2036:3, 2037:24, 2049:12, 2077:17
**THIRD** [2] - 2037:24, 2038:3
**THIS** [1] - 2125:15
**THOUSAND** [2] - 2113:8, 2117:25
**THOUSAND-ACRE** [1] - 2117:25
**THOUSANDS** [3] - 2088:8, 2089:21, 2118:1
**THREATENS** [1] - 2039:2
**THREE** [20] - 2034:3, 2034:14, 2051:4, 2052:18, 2053:24,

2054:22, 2055:10, 2056:7, 2057:3, 2075:15, 2076:4, 2076:10, 2076:25, 2092:3, 2093:10, 2096:25, 2097:24, 2102:1, 2112:1, 2112:2
**THREE-AND-A-HALF** [1] - 2112:1
**THRESHOLD** [1] - 2030:22
**THROUGHOUT** [3] - 2047:10, 2101:8, 2115:7
**THROW** [1] - 2089:15
**THROWING** [2] - 2038:17, 2039:12
**THRUST** [1] - 2039:6
**THRUSTING** [1] - 2039:14
**THURSDAY** [2] - 2019:14, 2023:1
**TIKTOK** [1] - 2067:12
**TILTS** [1] - 2123:7
**TIME-CONSUMING** [1] - 2071:23
**TITLE** [1] - 2125:8
**TO** [2] - 2019:8, 2125:8
**TODAY** [5] - 2043:24, 2109:2, 2109:9, 2109:10
**TODD** [2] - 2104:6, 2104:11
**TOGETHER** [1] - 2114:17
**TOOK** [4] - 2024:3, 2027:7, 2047:7, 2062:6
**TOP** [1] - 2123:15
**TORT** [2] - 2060:4
**TORTS** [1] - 2060:6
**TOTAL** [4] - 2059:13, 2059:22, 2059:23, 2080:23
**TOUCH** [1] - 2040:21
**TOUCHING** [1] - 2068:11
**TOUR** [2] - 2074:19, 2075:3
**TRACK** [1] - 2043:9
**TRAILING** [1] - 2038:11
**TRANSACTIONS** [1] - 2049:12
**TRANSCRIPT** [3] - 2019:13, 2125:9, 2125:11
**TRASH** [1] - 2076:11

TRAVEL [3] - 2110:16, 2111:6, 2113:16
TRAVELING [1] - 2106:16
TRAVELS [5] - 2084:20, 2105:11, 2105:12, 2110:18, 2111:1
TREAT [1] - 2080:9
TREATED [1] - 2099:8
TREATMENT [12] - 2079:11, 2081:1, 2081:25, 2099:17, 2118:5, 2118:9, 2118:12, 2119:9, 2119:11, 2119:15, 2120:7, 2121:1
TREMENDOUS [1] - 2088:4
TRESPASS [29] - 2025:5, 2025:7, 2025:10, 2025:11, 2025:21, 2028:20, 2029:4, 2029:6, 2029:12, 2030:14, 2030:18, 2031:24, 2032:8, 2032:10, 2032:16, 2032:21, 2032:25, 2033:14, 2034:8, 2034:24, 2037:4, 2042:14, 2042:16, 2049:8, 2050:1, 2061:12, 2113:25, 2121:16
TRESPASS [1] - 2056:18
TRESPASSED [2] - 2030:19, 2056:19
TRIAL [1] - 2019:13
TRIAL [14] - 2038:11, 2038:25, 2039:7, 2047:10, 2062:22, 2067:15, 2068:6, 2068:19, 2068:24, 2068:25, 2069:3, 2072:21, 2075:24, 2111:4
TRIALS [1] - 2071:24
TRIED [3] - 2098:10, 2100:12, 2100:13
TRIGGER [1] - 2094:15
TRIVIAL [3] - 2051:9, 2117:7, 2118:2
TROWBRIDGE [2] - 2023:16, 2035:10
TROWBRIDGE [1] - 2020:15
TRUE [20] - 2034:12, 2050:7, 2050:8,

2065:13, 2074:1, 2083:24, 2087:10, 2090:19, 2092:25, 2093:9, 2108:23, 2108:24, 2113:15, 2113:17, 2115:9, 2116:8, 2122:20
TRUE [1] - 2125:9
TRUTH [2] - 2068:18, 2075:18
TRY [2] - 2068:2, 2095:11
TRYING [5] - 2036:23, 2090:21, 2095:10, 2095:25, 2108:18
TUMORIGENIC [1] - 2086:3
TURN [6] - 2025:9, 2026:13, 2026:19, 2052:3, 2057:20, 2068:11
TURNED [2] - 2110:6, 2110:7
TURNING [4] - 2072:22, 2072:23, 2073:11, 2109:5
TURNOUT [2] - 2108:12, 2110:6
TURNOUTS [2] - 2107:16, 2107:17
TV [1] - 2066:1
TWICE [2] - 2070:16, 2119:5
TWITTER [1] - 2067:11
TWO [17] - 2025:2, 2025:6, 2051:3, 2052:11, 2053:20, 2054:18, 2055:7, 2056:5, 2056:24, 2058:17, 2061:14, 2064:1, 2085:16, 2097:15, 2098:22, 2117:4, 2122:17
TYPE [5] - 2053:24, 2054:1, 2054:4, 2056:14, 2077:14
TYPES [1] - 2088:24
TYPO [2] - 2110:19, 2111:14
TYPOGRAPHICAL [2] - 2042:22, 2043:3

U

U.S [1] - 2019:3
ULTIMATELY [2] - 2059:6, 2065:6
UMBRELLA [1] - 2060:5

UNANIMOUS [4] - 2066:10, 2066:16, 2069:24, 2070:4
UNCONTESTED [1] - 2087:11
UNDELINEATED [1] - 2112:17
TRUE [11] - 2024:19, 2036:2, 2042:16, 2048:21, 2060:5, 2061:2, 2079:19, 2080:2, 2080:7, 2121:16
UNDERGROUND [3] - 2087:15, 2087:19
UNDERSTOOD [4] - 2025:24, 2034:25, 2087:3, 2119:1
UNDERTAKEN [1] - 2095:14
UNDIFFERENTIATED [1] - 2112:17
UNDISPUTED [5] - 2087:7, 2100:8, 2118:14, 2120:4, 2122:21
UNDOUBTEDLY [1] - 2059:8
UNFOLDED [1] - 2071:9
UNINTENTIONAL [1] - 2052:20
UNIQUE [1] - 2034:2
UNIT [1] - 2099:19
UNITED [1] - 2086:17
UNITED [4] - 2019:1, 2125:6, 2125:8, 2125:13
UNJUST [1] - 2064:20
UNLIKE [1] - 2048:7
UNREASONABLE [3] - 2052:20, 2055:8, 2057:16
UNREASONABLY [1] - 2054:24
UNSAFE [3] - 2051:14, 2083:8, 2083:9
UNWILLING [2] - 2066:18
UP [35] - 2027:1, 2035:3, 2045:25, 2046:1, 2070:23, 2073:11, 2075:6, 2076:18, 2076:25, 2077:20, 2084:24, 2089:5, 2089:9, 2090:5, 2091:6, 2091:18, 2092:4, 2092:19, 2094:24,

2101:5, 2101:7, 2101:10, 2101:12, 2103:7, 2104:19, 2107:7, 2108:1, 2112:12, 2112:20, 2112:25, 2113:9, 2114:2, 2115:4, 2120:23, 2121:19
UPPERMOST [2] - 2098:19, 2098:20
USEFUL [2] - 2029:2, 2037:15
USEPA [2] - 2098:11, 2100:20
USES [2] - 2031:13, 2085:7
USGS [1] - 2086:17
USUFRUCTUARY [7] - 2029:4, 2032:2, 2032:18, 2033:11, 2036:16, 2036:18, 2036:21
UTILITY [1] - 2056:10

V

V-201 [2] - 2079:13, 2119:15
V-205 [4] - 2079:25, 2080:11, 2081:2, 2119:15
VALLEY [4] - 2023:6, 2044:24, 2049:24, 2050:24
VALLEY [1] - 2019:5
VALUE [5] - 2053:24, 2053:25, 2054:12, 2054:15, 2060:25
VALVES [2] - 2120:12
VAPOR [3] - 2085:11, 2085:14, 2085:17
VAPORS [2] - 2085:19, 2085:20
VARIOUS [2] - 2099:7, 2105:1
VELOCITY [4] - 2110:24, 2111:8, 2112:5, 2112:7
VERDICT [31] - 2023:19, 2034:17, 2040:25, 2042:7, 2042:11, 2042:19, 2043:17, 2044:5, 2047:11, 2058:23, 2058:24, 2059:4, 2059:6, 2059:10, 2059:21, 2062:15, 2066:1, 2066:6, 2066:9, 2066:16, 2066:22, 2066:23,

2068:22, 2069:24, 2070:2, 2070:4, 2070:5, 2070:6, 2072:16, 2121:8, 2124:13
VERSION [4] - 2024:6, 2042:15, 2043:9, 2043:24
VERSUS [3] - 2023:6, 2027:21, 2044:24
VESSELS [4] - 2079:11, 2119:22, 2120:12
VIA [1] - 2067:9
VIABLE [1] - 2031:24
VICARIOUS [1] - 2049:10
VICE [2] - 2074:21, 2095:3
VICTIM [1] - 2095:22
VIDEO [1] - 2094:19
VIEW [7] - 2027:4, 2037:15, 2039:1, 2049:20, 2068:3, 2068:5
VIEWED [1] - 2078:13
VIEWS [2] - 2066:14, 2124:9
VILE [1] - 2064:22
VINYL [1] - 2117:14
VIOLATE [1] - 2088:22
VIOLATES [1] - 2069:6
VIOLATING [2] - 2047:16, 2098:8
VIOLATION [1] - 2101:20
VIOLATIONS [2] - 2099:7, 2101:14
VISIT [1] - 2068:3
VOC [2] - 2094:12, 2107:16
VOCS [4] - 2042:17, 2042:20, 2099:9, 2107:19
VOLATILE [1] - 2097:9
VOLUME [1] - 2019:8
VOTE [1] - 2069:25
VS [1] - 2019:7

W

WAIT [3] - 2081:15, 2099:20, 2107:12
WAITING [2] - 2080:18, 2080:23
WAIVED [1] - 2037:22
WAIVER [5] - 2041:6, 2041:18, 2092:9,

2095:10, 2095:16
**WALKS** [1] - 2084:7
**WALL** [1] - 2104:22
**WANTS** [1] - 2097:25
**WARNING** [1] - 2051:15
**WASHINGTON** [1] - 2020:15
**WASTE** [28] - 2076:11, 2077:21, 2084:10, 2086:8, 2088:17, 2090:11, 2090:25, 2091:3, 2091:6, 2091:9, 2094:22, 2095:13, 2097:15, 2097:21, 2098:1, 2098:13, 2098:16, 2099:15, 2099:18, 2099:19, 2099:22, 2100:5, 2100:11, 2100:23, 2102:10
**WASTES** [7] - 2087:2, 2087:14, 2099:8, 2099:21, 2100:8, 2100:16, 2100:19
**WASTEWATER** [2] - 2084:17, 2084:18
**WATCH** [3] - 2067:20, 2120:15, 2120:16
**WATER** [1] - 2019:5
**WATER** [66] - 2024:18, 2025:11, 2025:12, 2025:17, 2027:13, 2028:3, 2030:10, 2030:25, 2031:3, 2031:25, 2032:16, 2033:3, 2033:4, 2033:8, 2034:19, 2061:9, 2061:16, 2061:17, 2061:22, 2062:2, 2062:4, 2062:6, 2072:2, 2078:22, 2078:23, 2079:9, 2080:11, 2081:6, 2081:7, 2081:24, 2086:24, 2087:19, 2087:20, 2087:21, 2093:8, 2093:25, 2094:1, 2095:21, 2096:9, 2096:22, 2098:2, 2101:10, 2102:16, 2103:25, 2106:24, 2107:3, 2108:3, 2109:3, 2110:1, 2110:17, 2110:18, 2118:5, 2118:7, 2118:9, 2118:13, 2118:21, 2118:22, 2118:25, 2119:1,

2119:3, 2121:12, 2123:18
**WATER** [53] - 2023:6, 2025:20, 2027:21, 2029:21, 2044:24, 2049:24, 2050:24, 2051:1, 2051:3, 2052:6, 2052:8, 2052:9, 2053:4, 2053:6, 2053:12, 2053:15, 2053:22, 2054:9, 2054:24, 2055:3, 2055:11, 2055:14, 2055:20, 2055:22, 2056:11, 2056:13, 2056:19, 2056:20, 2056:22, 2057:3, 2057:5, 2057:7, 2057:11, 2057:19, 2058:4, 2060:7, 2060:9, 2060:14, 2060:19, 2061:8, 2062:12, 2062:14, 2062:24, 2063:1, 2063:5, 2063:7, 2064:20, 2065:2, 2070:14, 2097:7, 2097:24, 2118:15
**WATER'S** [17] - 2051:5, 2053:1, 2053:8, 2053:17, 2056:17, 2057:1, 2058:1, 2058:4, 2058:6, 2058:8, 2058:14, 2058:18, 2058:20, 2059:18, 2059:23, 2061:2, 2061:4
**WATERS** [1] - 2087:15
**WEAKER** [4] - 2047:18, 2047:20, 2074:25, 2114:10
**WEBSITE** [1] - 2067:10
**WEEK** [1] - 2113:1
**WEEKS** [2] - 2074:15, 2080:14
**WEIGH** [1] - 2121:18
**WEIGHT** [2] - 2048:2, 2066:21
**WELL-KNOWN** [2] - 2085:21, 2087:12
**WELL-POLISHED** [1] - 2112:6
**WELLS** [66] - 2024:18, 2025:11, 2025:12, 2025:17, 2028:4, 2028:5, 2031:2, 2031:3, 2033:4,

2052:10, 2061:10, 2061:18, 2062:7, 2062:9, 2086:12, 2086:22, 2092:22, 2092:25, 2093:1, 2093:2, 2093:3, 2093:4, 2093:9, 2093:11, 2093:12, 2093:24, 2095:17, 2098:2, 2098:9, 2099:2, 2099:4, 2102:1, 2102:13, 2102:17, 2103:9, 2103:14, 2103:17, 2104:15, 2104:23, 2105:1, 2105:14, 2106:3, 2106:6, 2106:7, 2106:14, 2106:20, 2106:23, 2112:8, 2112:18, 2113:10, 2113:13, 2114:17, 2114:23, 2114:24, 2114:25, 2116:11, 2116:21, 2117:16, 2118:8
**WENCK** [3] - 2076:1, 2076:7
**WEST** [1] - 2085:4
**WEST** [1] - 2019:24
**WESTERLY** [2] - 2085:1, 2105:8
**WESTERN** [1] - 2019:2
**WETRANSFER** [1] - 2023:18
**WHEREAS** [1] - 2034:10
**WHITTAKER** [135] - 2023:6, 2023:15, 2029:3, 2040:9, 2044:24, 2048:18, 2048:19, 2048:20, 2049:4, 2049:6, 2050:4, 2051:2, 2051:17, 2051:22, 2052:7, 2052:11, 2052:22, 2053:17, 2054:24, 2055:5, 2055:7, 2055:10, 2055:13, 2055:21, 2055:23, 2056:19, 2056:24, 2057:12, 2057:23, 2058:1, 2058:2, 2058:6, 2058:12, 2058:14, 2060:8, 2063:6, 2063:24, 2063:25, 2064:4, 2064:6, 2064:11, 2064:25, 2070:18, 2072:6,

2072:10, 2073:12, 2073:19, 2073:22, 2074:2, 2074:4, 2074:17, 2074:22, 2075:18, 2075:25, 2076:2, 2076:7, 2077:7, 2078:12, 2078:18, 2078:22, 2078:24, 2080:7, 2080:10, 2081:23, 2083:19, 2084:11, 2084:25, 2085:16, 2086:4, 2087:8, 2087:22, 2088:16, 2088:21, 2091:1, 2091:19, 2091:25, 2093:5, 2094:10, 2095:11, 2095:20, 2096:7, 2096:21, 2097:10, 2098:8, 2099:13, 2100:24, 2101:6, 2101:11, 2101:16, 2101:24, 2101:25, 2102:14, 2102:23, 2104:10, 2104:20, 2105:3, 2105:7, 2105:9, 2105:14, 2105:22, 2106:1, 2106:6, 2106:13, 2106:19, 2106:25, 2107:6, 2107:13, 2110:9, 2113:19, 2113:21, 2113:23, 2114:16, 2115:7, 2115:21, 2115:24, 2116:5, 2116:6, 2116:16, 2117:3, 2117:25, 2118:4, 2120:5, 2120:11, 2121:7, 2121:10, 2122:12, 2122:14, 2123:2, 2123:3, 2123:12, 2123:19, 2124:1
**WHITTAKER** [1] - 2019:8
**WHITTAKER'S** [30] - 2050:22, 2050:25, 2051:4, 2052:1, 2052:19, 2053:3, 2053:5, 2053:7, 2053:10, 2053:13, 2054:11, 2054:14, 2054:25, 2056:10, 2056:12, 2056:16, 2057:6, 2060:12, 2060:23, 2063:1, 2064:12, 2064:19, 2073:5, 2073:11, 2073:17, 2090:13, 2098:5, 2104:9,

2104:12, 2112:5
**WHITTAKER-BERMITE** [3] - 2115:24, 2116:5, 2116:16
**WHOLE** [6] - 2045:8, 2085:2, 2108:1, 2116:23, 2118:6, 2118:23
**WIDESPREAD** [2] - 2082:14, 2092:5
**WILLFUL** [1] - 2064:13
**WINDING** [1] - 2115:4
**WISH** [6] - 2037:6, 2037:19, 2037:20, 2038:20, 2044:10, 2046:16
**WISHES** [1] - 2045:2
**WITH** [1] - 2125:12
**WITHDRAW** [2] - 2039:19, 2039:23
**WITNESS** [9] - 2048:6, 2048:13, 2075:12, 2076:2, 2105:22, 2108:5, 2115:16, 2117:17, 2119:4
**WITNESS'S** [1] - 2048:2
**WITNESSED** [1] - 2068:19
**WITNESSES** [12] - 2047:24, 2062:21, 2068:9, 2068:17, 2077:18, 2090:14, 2093:21, 2108:8, 2112:5, 2113:1, 2118:10, 2123:9
**WITNESSES** [2] - 2021:1, 2021:3
**WONDERING** [1] - 2059:10
**WORD** [7] - 2037:2, 2088:24, 2090:10, 2115:16, 2115:18, 2116:1
**WORD** [3] - 2042:15, 2043:9, 2046:13
**WORDING** [1] - 2043:21
**WORDS** [7] - 2075:2, 2075:9, 2077:1, 2077:8, 2079:20, 2088:24, 2098:19
**WORKS** [2] - 2119:8, 2119:10
**WOUND** [1] - 2027:1
**WOW** [2] - 2108:16, 2108:21
**WRITE** [1] - 2078:3

**WRITING** [6] - 2067:8,
2069:15, 2069:17,
2080:6, 2083:15,
2096:15
**WRONGFUL** [2] -
2049:17, 2060:12
**WROTE** [4] - 2079:17,
2080:15, 2095:2,
2115:23

## Y

**YEAR** [8] - 2081:4,
2081:9, 2092:13,
2092:14, 2110:18,
2111:9, 2111:14,
2111:25
**YEARS** [25] - 2074:9,
2076:4, 2076:8,
2076:25, 2078:18,
2079:21, 2092:3,
2094:11, 2095:5,
2096:25, 2097:6,
2101:19, 2103:2,
2103:3, 2103:8,
2105:21, 2110:21,
2112:2, 2112:3,
2120:3, 2120:6,
2121:2
**YESTERDAY** [15] -
2026:3, 2026:22,
2030:6, 2040:4,
2042:15, 2080:17,
2084:8, 2084:12,
2088:20, 2089:11,
2093:22, 2105:19,
2111:16, 2115:5,
2115:19
**YOURSELF** [1] -
2066:11
**YOUTUBE** [1] -
2067:11

## Z

**ZERO** [1] - 2114:10
**ZOYD** [2] - 2085:16,
2088:20