1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTA CLARITA VALLEY WATER AGENCY, | Case No. 2:18-cv-06825-SB-RAO |
| | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Plaintiffs, | |
| v. | |
| WHITTAKER CORPORATION, | |
| Defendants. | |

Plaintiff Santa Clarita Valley Water Agency (Plaintiff) is a regional water agency that supplies water throughout the Santa Clarita Valley in California.  Plaintiff operates a number of supply wells that draw water from a source that has been contaminated by hazardous chemicals.   Plaintiff maintains that Defendant Whittaker Corporation (Defendant or Whittaker), which owned and operated a nearby manufacturing site, is responsible for that contamination.  Plaintiff filed this lawsuit, bringing state and federal claims and seeking recovery for past and future damages, and Defendant filed counterclaims.  Most of the state claims were tried to a jury,

which found in favor of Plaintiff, leaving the federal claims (and certain related state claims) for this Court to decide.  The parties filed bench trial briefs.  *See* Dkt. Nos. 485 (Pltf. Br.), 489 (Def. Br.), 493 (Pltf. Resp. Br.), and 495 (Def. Resp. Br.).  The Court's findings of fact and conclusions of law are set forth below.[1]

## FINDINGS OF FACT

1.     From 1967 to 1987, Defendant manufactured munitions, missiles, and related products at a 996-acre site located at 22116 West Soledad Canyon Road in Santa Clarita, California (Site).  Defendant acquired the Site from the Bermite Powder Company (Bermite) in 1967 and is concededly the successor to Bermite.  Bermite produced munitions and explosives at the Site between 1943 and 1967.  Defendant ceased manufacturing operations at the Site in approximately 1987.

### Groundwater Contamination

2.     In the regular course of its business, Defendant used a variety of chemicals and solvents, including perchlorate, perchloroethylene (PCE), and trichloroethylene (TCE).  PCE and TCE are volatile organic compounds (VOCs).  Perchlorate, TCE, and PCE are hazardous substances.

3.     Defendant deposited a large volume of perchlorate, TCE, and PCE into the ground by its waste disposal practices, which included dumping these chemicals onto the ground and burying these chemicals in the ground.  These practices violated Defendant's own policy prohibiting such disposal and resulted in contamination of the soil and groundwater beneath the Site.

---

[1] The characterization of a finding as one of "fact" or "law" shall not be controlling. That is, to the extent that a finding is characterized as one of "fact" but substantively is more properly characterized as one of "law" (or vice versa), substance shall prevail over form.  Moreover, where the evidence was conflicting, the findings reflect the Court's resolution of the conflicts.

4.     The groundwater in the Santa Clarita Valley generally exists in two aquifers—the Alluvium and the Saugus Formation.  The Alluvium is a shallower aquifer that lies above the larger and deeper Saugus Formation.  Perchlorate, PCE, and TCE were released from the Site into the soil, reached the Saugus Formation, and migrated offsite through groundwater pathways.

5.     Investigations at the Site determined that perchlorate and VOCs were generally released from the same source areas on the Site and generally followed the same migration pathway in groundwater.  Perchlorate moves at approximately the same rate as groundwater.  Releases of perchlorate from the source areas have migrated faster and further than TCE, as TCE moves at a rate up to 2.5 times slower than perchlorate.

**Supply Wells**

6.     Plaintiff is a regional water agency in the Santa Clarita Valley that provides water to individuals and businesses throughout that valley.  To support its operations, Plaintiff has a number of supply wells, including Saugus 1 (S-1), Saugus 2 (S-2), V-201, and V-205 (collectively, Wells).  S-1 and S-2 were installed in approximately 1988; V-201 was installed in approximately 1989; and V-205 was installed in approximately 2004.

7.     S-1 and S-2 supplied water to Plaintiff's customers from 1988 through 1997.  In 1997, perchlorate from the Site was detected in S-1 and S-2.  Plaintiff notified the State Water Resources Control Board, Division of Drinking Water (DDW) of the contamination and shut down S-1 and S-2.

8.     There are a number of recognized techniques for reducing or eliminating contaminants of concern, including blending and treatment.  Blending is the process of mixing contaminated water with water free of the relevant contaminant to reduce the contaminant level.  Treatment is the process of using a filtration-type system to remove the contaminant from the water.

3

9.      Plaintiff subsequently installed, at Defendant's expense, a perchlorate treatment system for S-1 and S-2, known as the Saugus Perchlorate Treatment Facility (SPTF).[2]   The water from S-1 and S-2 is passed through the SPTF, which acts as a filtration system to remove the perchlorate.  The treated water is then mixed with VOC-free water from the State Water Project within the distribution system.  The blended water is ultimately distributed throughout the system for delivery through the turnouts.

10.     Plaintiff resumed use of S-1 and S-2 after receiving a permit from DDW in 2010.  DDW determined that the water supplied by S-1 and S-2 derived from an "extremely impaired" groundwater source and thus imposed more stringent operational conditions pursuant to a process established by the state agency in 1997 (in Process Memorandum 97-005).  The permit sets forth an operational goal for VOCs at the non-detect level (NDL).  The NDL is one-tenth of the maximum contaminant level (MCL) established for the VOCs.  An MCL is the highest level of a contaminant that is allowed in drinking water.

11.     In 2010, the same year that Plaintiff obtained a permit to resume the use of S-1 and S-2, perchlorate was detected in V-201 at levels exceeding the MCL.  As a result, V-201 was taken out of service.  The parties then entered into a settlement agreement requiring Defendant to pay for a perchlorate treatment system for V-201.

12.     The treatment system for V-201 was installed and became operational in 2017.  Plaintiff operates V-201 as a containment well.  A containment well is used to capture a contaminant to prevent its spread to another location.  Plaintiff has not used V-201 as a drinking water source because it has not yet received a permit from DDW.

---

[2] Defendant paid for the SPTF pursuant to a 2007 agreement between the parties that settled a prior lawsuit filed in 2000.  The settlement agreement also required payment for the purchase of replacement water to compensate Plaintiff for the lost well capacity.

13.     Plaintiff pumps the water from V-201, runs it through the treatment system, and discharges the treated water to the Santa Clara River.  The discharge into the river is authorized by a permit obtained from the California State Water Resources Control Board through its National Pollutant Discharge Elimination System (NPDES) program.  The NPDES permit contains limits on the levels of certain constituents that could be discharged, including limits for total dissolved solids and sulfates.  On March 16, 2018, Plaintiff was cited for violating its NPDES permit by disposing water from V-201 containing detectable concentrations of VOCs into a storm drain leading to the Santa Clara River.

14.     In 2012, perchlorate was detected in V-205 below the MCL.  V-205 is located near, slightly downgradient of V-201.  Plaintiff's predecessor, the Valencia Water Company, decided to take the well out of service to contain the perchlorate plume.  V-205 does not have any treatment system.

15.     Federal and state regulations require water utilities, including Plaintiff, to constantly monitor, sample, and test water supply wells.  Plaintiff's chief operating officer, Keith Abercrombie, described the sampling and testing protocol as "an ongoing, every day, all-the-time thing that's done throughout the year," resulting in thousands of water quality samples tested by a certified laboratory.  Plaintiff monitors and tests the water quality along various points throughout its distribution system.  Final testing occurs at the turnouts, before the water is delivered to the public.  This regular and rigorous testing regime allows Plaintiff to monitor and maintain the water quality delivered from its wells.

16.     The testing of water sources is necessary to ensure that drinking water satisfies safety standards.  The U.S. Environmental Protection Agency (EPA) has enacted drinking water regulations for numerous contaminants that may cause adverse health effects, which includes the establishment of MCLs. The MCL for perchlorate is 6 parts per billion.  The MCL for PCE and TCE is 5 parts per billion.

17.     There are other measurements used to evaluate the safety of drinking water that contains contaminants.  The maximum contaminant level equivalent (MCLE) is a mathematical calculation that considers a group of chemicals in water and determines whether in the aggregate they present significant adverse health risks. If the MCLE is below 1, the water satisfies the safety limit contemplated by this measurement.  When submitting applications to DDW for a permit, Plaintiff has generally calculated that the MCLE was below 1.

18.     Another measure is the public health goal (PHG) established by a department of the California EPA.  The PHG is not a regulatory standard but rather reflects an assessment of the level of a chemical contaminant in drinking water that does not pose a significant health risk.  The PHG for TCE is 1.7 parts per billion. Plaintiff's chief operating officer testified that he is not aware that the VOCs at V-201 or V-205 ever exceeded the public health goal.

19.     Plaintiff has repeatedly represented that it delivers water that meets or exceeds all applicable safety standards, including water that contains detectable VOCs below the MCL.  Five to ten percent of the water produced from S-1 and S-2 contains VOCs that are not completely blended out before delivery to the public.  The VOCs in the delivered water are below the MCLs.  Plaintiff has represented to the public for years that this water is safe to drink because it meets health department standards.

20.     In 2016, Plaintiff's senior engineer, James Leserman, wrote a letter informing DDW that the water from S-1 and S-2 was safe despite the presence of contaminants, stating:  "Although some of these wells have detectible concentrations of constituents of concern, no discernible trends can be observed at this time that would suggest a water quality change or any new imminent threat to Saugus 1 and 2 wells."  At trial, Leserman confirmed that the level of VOCs at S-1 and S-2 has not increased since his 2016 letter.  Leserman testified that "there is no imminent threat to the wells, Saugus 1 and Saugus 2, from VOCs."

21.     Plaintiff has issued annual water quality reports stating that it monitors, samples, tests, and maintains the water that it serves in order to consistently deliver safe water.  In these reports, Plaintiff asserted that the water it served to the public "met or surpassed all U.S. Environmental Protection Agency and California state drinking water health standards."  The reports also state that TCE and PCE were found "in trace amounts (below the MCL) at a few locations." Abercrombie testified that "trace" levels would be used to describe levels that fall below the relevant regulatory limits.

22.     The state regulators charged with protecting the public have not taken issue with Plaintiff's representations about the safety of the water being delivered. The California Department of Toxic Substances Control (DTSC), whose stated mission is to "protect[] California's people and environment from the harmful effects of toxic substances,"[3] has had extensive involvement with the Site (as discussed below).  DTSC has not disagreed with Plaintiff's assessment of the water quality. And despite receiving regular reports about water quality, DDW has never claimed that Plaintiff violated its permit because the VOCs exceeded the level of detection (though not the MCL).

23.     DDW also has not stated that Plaintiff must install a VOC treatment system to obtain a permit to use V-201 and V-205 as a source of drinking water.  Nor did the Court find reliable the evidence presented by Plaintiff about its communications with DDW about what DDW might require.  In dealing with DDW on this subject, Plaintiff acted in a manner that was at least partially motivated by enhancing its litigation position.  This was evident, for example, from an email from

---

[3] *See* https://dtsc.ca.gov/about-dtsc/our-history/.  DTSC was a division of the California Department of Health Services (DHS) until 1991, when it became its own department under the California Environmental Protection Agency as part of a reorganization plan. *Id*.

1  Plaintiff's counsel advising Plaintiff that it needed the state agency to order water
2  treatment to assist in this lawsuit.

3      24.    The Court also found unreliable the evidence about whether Plaintiff has
4  violated its permit when delivering water with VOCs below the MCL but above the
5  operational goal (i.e., the NDL).  At his deposition, Plaintiff's director of operations,
6  Michael Alvord, admitted that it was permissible to send water containing VOCs into
7  the distribution system for delivery of water so long as the VOC concentration did not
8  exceed the applicable MCL.  Yet Alvord changed that testimony at trial and provided
9  an unconvincing explanation for doing so (i.e., he had not been deposed before and he
10  subsequently learned more information).  Alvord admitted that he knew at his
11  deposition that the Saugus Formation was an extremely impaired source, and he
12  reasonably could be expected to have known the significance of that designation from
13  an operational standpoint given his role as director of operations.  Leserman followed
14  the same inconsistent course—testifying at his deposition that Plaintiff's policy was
15  that it could deliver water to customers with VOC concentrations below the MCL and
16  then retracting that testimony at trial (explaining that it was his first deposition).

17      **Plaintiff's Alleged Negligence**

18      25.    At trial, Defendant attempted to assign to Plaintiff substantial blame for
19  negligently responding to the contamination affecting its wells.  This attempt was
20  largely scattered, exaggerated, and unpersuasive.  The Court finds that Plaintiff
21  generally acted responsibly in trying to address the groundwater contamination and its
22  impact on the water supply—but not always.

23      26.    On several occasions between 2012 and 2015, Plaintiff detected
24  concentrations of VOCs at the turnouts that exceeded the levels of VOCs found at the
25  SPTF.  These detections were anomalous because the VOC level should be lower at
26  the turnout after being blended with VOC-free water, and these anomalies warranted a
27  reasonable investigation.

28

27.     Plaintiff did investigate a report in 2012 of high PCE levels and discovered that it was caused by an improperly abandoned pipe next to the sample location that allowed contamination to enter the main distribution system through an open valve.  Plaintiff concluded that the likely source of the contamination was a dry cleaners store called Flamingo Dry Cleaners.

28.     But Plaintiff's response to other anomalies is more questionable.  At times, Plaintiff was not fully forthright when confronted with information of higher chemical concentrations than would be expected.  A senior official suggested in an e-mail that he would "blame" the anomalous readings on "laboratory error" or "sampling artifacts" and "hope that it is lowered by the next reading."  This appears to have reflected a cavalier response rather than a genuine belief.  While the Court does not condone this conduct, it views it (and all other allegations of negligence made by Defendant) as being minor in affixing relative fault in the overall context of this case.[4]

**Regulatory Oversight**

29.     For decades, the Site has been the subject of environmental concern and investigation by numerous consultants and has attracted the attention of both federal and state regulators, including the EPA, the California Regional Water Quality Control Board (RWQCB), DHS, and DTSC.

---

[4] At trial, Defendant argued that the anomalous readings at the turnouts proved that the contamination was caused by another source (or other sources).  Plaintiff disputed this argument, suggesting that other factors would explain the anomalies, including Plaintiff's use of indirect rather than direct blending.  Direct blending is the process of mixing two water sources in one container (which is practically impossible in this case given the container size that would be required to achieve such mixing).  Indirect blending is the process of mixing two water sources through separate pipes that feed into one distribution system (which does not always result in consistent blending throughout the system).  The Court was not persuaded by either party's explanation, as the causation evidence for the anomalous readings was ambiguous.  The most the Court can say is that the readings warranted a more serious inquiry than it was given.

30.     DTSC is the lead agency overseeing the soil and groundwater remediation program at the Site.  Other state agencies providing oversight within their respective regulatory purview include the South Coast Air Quality Management District and the California Department of Fish and Wildlife.  The regulatory history is too extensive to relate in detail.  The Court describes below some of the salient facts in order to provide a contextual overview relevant to the legal conclusions in this case.

31.     In 1987, the EPA advised Defendant that it would be required to install a groundwater monitoring program and conduct additional soil sampling to determine the extent of contamination at the Site.  This requirement occurred after discussions among the EPA, RWQCB, DHS, and Defendant.

32.     In 1994, DTSC and Defendant entered into a Consent Order requiring further investigation and possible remedial action to address the contamination at the Site.  DTSC subsequently approved a plan to divide the areas affected by the contamination into seven operable units (OUs):  six soil cleanup areas (OUs 1-6); and one groundwater cleanup area (OU7).

33.     In 1999, Defendant sold the property to Santa Clarita LLC (SCLLC), a "Brownfields" developer, for a planned mixed-use development.  SCLLC, owned by Remediation Financial, Inc., agreed to assume remediation responsibilities for the Site.  SCLLC defaulted on its obligations, however, and ceased cleanup activities in 2002.

34.     In 2002, DTSC issued an Imminent and Substantial Endangerment Determination and Remedial Action Order (ISE Order).  The ISE Order describes the extensive regulatory process, replete with specific tasks, required to investigate and remediate the environmental contamination.  DTSC also describes the review and approval process, noting that "[a]ll response actions taken pursuant to this Order shall be subject to the approval of DTSC," that Defendant "shall submit all deliverables required by this Order to DTSC," and that "[o]nce the deliverables are approved by DTSC, they shall be deemed incorporated into . . . and enforceable under this Order."

In addition, DTSC reserved substantial authority to modify documents as necessary if "DTSC determines that any report, plan, schedule, or other document submitted for approval pursuant to this Order fails to comply with this Order or fails to protect public health or safety or the environment."

35.    In 2003, Plaintiff entered into an Environmental Oversight Agreement (EOA) with DTSC.  In 2005, in accordance with the EOA, Plaintiff submitted an Interim Remedial Action Plan (IRAP) to DTSC.  One of Plaintiff's consultants participated in the preparation of the IRAP.  Plaintiff asked DTSC to require Defendant to add monitoring wells to supplement Plaintiff's investigation into VOC contamination of its wells.  DTSC declined the request and instead required Defendant to treat VOCs to the MCL (rather than to the NDL required for S-1 and S-2).

36.    The remediation work for the OUs has been undertaken under the supervision of DTSC.  Defendant has removed significant quantities of contaminated soil (by excavation) and soil gas (by vapor extraction) to such an extent that onsite remediation no longer appears to be needed.  Based on that determination, DTSC approved the completion of OU1 to OU6.

37.    The remaining work has focused on OU7—which is focused on cleaning the groundwater onsite and protecting the water supplies offsite.  For OU7, Defendant is operating under a Remedial Action Plan (RAP) approved by DTSC in 2014 after substantial investigation and feasibility studies dating back to 2003.  The remedial objectives for OU7 include "[p]rotect[ing] off-site water supply wells from impact of the site-related [chemicals of concern]," "[r]educ[ing] the potential for further off-site transport of impacted groundwater," and engaging in "[b]oundary containment" strategies "to protect downgradient receptors" from contamination.

38.    Pursuant to the approved plans, Defendant has installed an onsite remediation system to reduce the mass of VOCs in the groundwater and soil beneath the Site.  Defendant also has installed more than 200 monitoring wells at and around

the Site.  Remediation, containment, and monitoring for OU7 continue to this day under the regulatory oversight of DTSC.

**Requested Recovery Costs**

39.     Abercrombie testified about the past and future costs associated with replacing and blending the water for V-201 and V-205.  He identified the following past costs associated with V-201:  $2,920,726.57 in blend water costs; $466,469.09 in replacement water costs; and $83,729 in unpaid dichlorination costs.  He also projected that Plaintiff will incur an additional $2,300,475.60 in blend water costs and $238,045.04 in replacement water costs for V-201 through October 2023.

40.     Abercrombie identified the following past costs associated with V-205: $4,126,541.34 in replacement water costs.  He also projected that Plaintiff will incur an additional $1,434,944.40 in replacement water costs for V-205 through March 1, 2025.

41.     Another witness for Plaintiff, Dr. Jeffrey Zelikson, identified the following costs incurred for investigation, permitting, and design:  $176,625 for perchlorate/VOC investigation; $233,359 for conducting an engineering evaluation and cost analysis (EECA); $59,747 in permit compliance for S-1 and S-2; $68,497 in permitting for V-201; and $137,196 in V-205 treatment system design.

42.     Plaintiff did not seek or obtain the public's involvement in deciding to purchase replacement water from the State Water Project.  Plaintiff presented the EECA, including a suggested remedy and alternatives, to the public in July 2021.

43.     Since 2007, Plaintiff has regularly attended meetings with Defendant, as well as representatives from DTSC and DDW, to discuss issues related to the implementation of treatment and containment projects.  There is no reliable evidence that any state agency considered and approved Plaintiff's purchase of replacement water.

**Procedural History**

44.     On August 8, 2018, Plaintiff sued Defendant.  Dkt. No. 1.  On March 18, 2019, Plaintiff filed the operative pleading in this case, the Third Amended Complaint (TAC), which asserts claims for (1) recovery under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607(a); (2) declaratory relief under CERCLA, 42 U.S.C. § 9613(g); (3) negligence; (4) negligence per se; (5) nuisance; (6) public nuisance; (7) trespass; (8) recovery under the California Hazardous Substance Account Act (HSAA), California Health & Safety Code § 25300 et seq.; (9) declaratory relief under 28 U.S.C. §§ 2201-2202; and (10) injunctive relief under the Resource, Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq.  Dkt. No. 42.

45.     On April 4, 2019, Defendant filed a third-party complaint against several parties, including Saugus Industrial Center, LLC (SIC), the owner of the property located at 26000 Springbrook Avenue, Santa Clarita, California.  Dkt. No. 44.  Defendant alleged that SIC was obligated to reimburse it for the costs of VOC remediation of Plaintiff's wells.

46.     On January 13, 2020, Defendant filed an amended answer and various counterclaims against Plaintiff for:  contribution under CERCLA, 42 U.S.C. § 9613(f)(1), HSAA, Cal. Health and Safety Code § 25363, and the common law; declaratory relief under federal law, CERCLA, 42 U.S.C. § 9613(g) and 28 U.S.C. §§ 2201-2202, and state law; equitable indemnification; and negligence.  Dkt. No. 116.

47.     Plaintiff and SIC subsequently settled and filed a joint motion for settlement approval, a claim bar, and a good faith determination.  Dkt. No. 189.  Under the settlement agreement, SIC agreed to pay Plaintiff $2.9 million to settle all VOC-related issues between Plaintiff and SIC, including a bar of Defendant's third-party claims against SIC.  The Court approved the settlement agreement on November 16, 2020, finding that it was in good faith and a fair, adequate, and reasonable settlement.  Dkt. No. 248 at 9.  The Court further ordered that:  (1) no contribution or

indemnity claims arising out of the TAC or Defendant's third-party complaint would be allowed; (2) SIC was dismissed from the action with prejudice; and (3) the proceeds of the settlement agreement would be allocated as an offset against any judgment on a pro tanto basis (thereby reducing the judgment by the settlement amount).  The Court rejected the pro rata approach advocated by Defendant (which, if adopted, would serve to reduce the judgment by SIC's proportionate share of the damages as determined at trial).  *Id.* at 9-10.

48.     Plaintiff and Defendant filed cross-motions for partial summary judgment.  Dkt. Nos. 250, 253.  The Court denied both motions, with the following relevant exceptions:  (1) finding that a plausible pathway undisputedly exits for the migration of TCE and PCE from the Site to Plaintiff's wells;  and (2) granting Defendant's request for summary adjudication on the issue of whether Plaintiff is a potentially responsible party (PRP) for purposes of CERCLA (and finding that Plaintiff is undisputedly a PRP).  Dkt. No. 272 at 29-30.

49.     The CERCLA, HSAA, and RCRA claims brought by Plaintiff, as well as Defendant's remaining counterclaims, were tried to the bench rather than the jury.  The parties had an opportunity to present additional evidence for this part of the case but elected not to do so, except for one witness—Dr. Zelikson.  For its CERCLA and HSAA claims, Plaintiff seeks cost recovery for past and future response costs and declaratory relief.  For its RCRA claim, Plaintiff seeks injunctive relief and litigation costs.  Defendant seeks contribution, equitable indemnification, and declaratory relief for any response costs it incurs arising out of this litigation.

50.     The jury found in favor of Plaintiff on all claims and awarded $7 million in past damages and $68.3 million in restoration or repair costs.  On the negligence claims, the jury found fault as follows:  Plaintiff—10%; Defendant—60%; and SIC—30%.  Consistent with its fault allocation, the jury also found that 10% of Plaintiff's damages was caused by its failure to mitigate damages.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSIONS OF LAW**

51.    Plaintiff has asserted claims under CERCLA, HSAA, and RCRA.  The requirements to prove cost recovery under CERCLA and HSAA are essentially identical.  *United Alloys, Inc. v. Baker*, 797 F. Supp. 2d 974, 1004 (C.D. Cal. 2011) ("The HSAA expressly incorporates the liability standards and defenses set forth in CERCLA").  The Court, therefore, does not treat the HSAA claim separately below.  After analyzing the CERCLA claim, the Court will then consider whether Plaintiff has proven a violation under RCRA.

**CERCLA**

52.    The elements of a CERCLA response cost claim are:  "(1) the property at issue is a 'facility' . . . ; (2) a 'release' or 'threatened release' of a 'hazardous substance' has occurred; (3) the 'release' or 'threatened release' has caused the plaintiff to incur response costs that were 'necessary' and 'consistent with the national contingency plan'; and (4) the defendants are in one of four classes of persons subject to liability . . . ."  *Carson Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006).  As both parties acknowledge, the requirements for declaratory relief under CERCLA or cost recovery under HSAA are essentially identical.  *See United Alloys* 797 F. Supp. 2d at1004.

53.    Most of these elements are not at issue.  The Site is a "facility" as defined by CERCLA; the chemicals at issue, TCE, PCE, and perchlorate, are "hazardous substances" that were released at the Site; and Defendant is within the class of persons liable under CERCLA because it "owned or operated" the facility at the time of disposal of these chemicals.  42 U.S.C. § 9607(a)(2).  The principal dispute between the parties focuses on the third element—i.e., whether the release of contaminants at the Site caused Plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan."  Defendant acknowledges that it is a responsible

1   party, but contends that Plaintiff has not proven that it is entitled to the claimed

2   response costs.[5]

3        54.    Plaintiff seeks three categories of response costs under CERCLA:

4   replacement water costs; blend water costs; and costs related to investigation,

5   permitting, and design (IPD).  Plaintiff asserts that it has incurred approximately $11.5

6   million in replacement and blend water costs (the first two categories) and $675,000 in

7   IPD costs (the third category).  Plaintiff is entitled to recover its IPD costs; but it is not

8   entitled to recover replacement and blend water costs for a number of independent

9   reasons.

10        55.    Defendant challenges the recovery of the IPD costs on the grounds that

11   Plaintiff failed to provide adequate documentation establishing that it incurred those

12   costs.  The NCP requires documentation of costs incurred in response actions by the

13   government or private parties.  40 C.F.R. § 300.160(a)(1); *see Roosevelt Irrigation*

14   *Dist. v. Salt River Project Agric. Improvement & Power Dist*., No. 2:10-CV-00290

15   DAE-BGM, 2017 WL 2721439, at *11 (D. Ariz. Mar. 14, 2017).  There are no

16   "prescriptive standards for the content of cost documents," however.  *United States v.*

17   *W.R. Grace & Co.-Conn.*, 280 F. Supp. 2d 1149, 1179-80 (D. Mont. 2003).  Instead,

18   "courts have applied civil evidentiary standards to assess the adequacy of cost

19   documentation supporting a CERCLA recovery claim" and inquire whether "the costs

20   have been proven by a preponderance of the evidence." *Id*. at 1180.  This Court

21   previously concluded on the summary judgment record that Plaintiff had proven

22   "NCP compliance as to cost documentation" and adopts that ruling here.   Dkt. No.

23   272 at 11-12.[6]  Thus, the Court finds that Plaintiff is entitled to recover the IPD costs.

24

25   [5] To the extent that Defendant has not conceded that it is a responsible party, the Court

26   finds that Defendant caused perchlorate, TCE, and PCE to migrate offsite and
     contaminate Plaintiff's wells.

27

28   [6] In its summary judgment motion, Plaintiff argued that its IPD (and other) response
     costs complied with NCP requirements.  Dkt. No. 250 at 34.  Although Defendant

56.     As for the replacement and blend water costs, the Court finds that they are not recoverable under CERCLA because Plaintiff is not entitled to a double recovery.  42 U.S.C. § 9614(b) (prohibiting double recovery in CERCLA cases); *see Teutscher v. Woodson*, 835 F.3d 936, 954 (9th Cir. 2016) (discussing the basic remedial principle requiring courts to "avoid awarding a litigant double recovery for the same harm").

57.     As stated, the jury awarded Plaintiff $7 million for past damages and $68.3 million for restoration or repair costs.  To understand the elements of this award, it is necessary to consider the specific damages requested by Plaintiff at trial and divide them into past and future damages.

58.     For past damages, Plaintiff claimed that it was entitled to recover its costs to replace and blend water to address the contamination affecting V-201 and V-205. Plaintiff presented a precise calculation in an exhibit and an approximate calculation when reviewed at trial with Abercrombie.

59.     For V-201, Plaintiff identified the following past damages:  blend water costs of $2,920,726.57 (through November 1, 2021); replacement water costs of $466,469.09 (through April 26, 2021); and unpaid dichlorination cost of $83,729.  For V-205, Plaintiff identified the following past damages:  $4,126,541.36 in replacement water costs (through November 1, 2021).  The total past damages, as set forth in an exhibit, is $7,597,466.02.

60.     At trial, however, Abercrombie presented the jury with an approximation of $7 million, testifying that Plaintiff incurred "just over $2.9 million" in blend water

_____

argued that Plaintiff failed to properly document the expenses incurred for replacement and blend water costs, Defendant did not even challenge the adequacy of the documentation for the IPD costs.  Dkt. No. 255 at 27.

costs for V-201 and "just over $4.1 million" in replacement water costs for V-205.  The jury awarded $7 million.

61.    For future damages, Plaintiff sought "reasonable restoration or repair costs."  This was comprised of projected costs for replacement and/or blend water for V-201 and V-205 and for installation of three treatment systems for all four wells.  The proposed systems would remove VOCs by utilizing a filter with granular activated carbon (GAC).

62.    For V-201, Plaintiff projected replacement and blend water costs to be $2,488,446.63 (through October 2023).  For V-205, Plaintiff projected replacement water costs to be $1,406,639.21 (through February 2025).  These projected costs total $3,895,085.84.

63.    For the three GAC treatment systems, Plaintiff projected that the "likely cost range" would be $45.2 million to $96.9 million" with the "probable cost" being $64.6 million.

64.    The jury appears to have awarded $64.6 million for the three treatment systems and $3.7 million for the projected costs for water replacement and blending.

65.    Plaintiff therefore seeks a duplicative award of $11.5 million for costs associated with water replacement and blending.  The jury already awarded these damages, although in an amount slightly less than requested (i.e., $10.7 million).  This is the most reasonable interpretation of the jury verdict.  The jury was asked to render a verdict for "past damages" and "reasonable restoration and repair costs."  The jury awarded the amount suggested by Abercrombie for past damages ($7 million), and it is logical that the jury would not have included projected costs in the portion of the verdict form entitled "past damages."  It is also logical that the $68.3 million award for "restoration and repair costs" included projected costs associated with water replacement and blending—because that award is $3.7 million more than requested for the three treatment systems.  Indeed, Plaintiff specifically told the jury in closing argument that "$76.1 million is the appropriate measure of damages in this case,"

1    noting that Abercrombie identified $11.5 million in damages and that Plaintiff's

2    expert identified $64.6 million to build and operate the treatment systems. The jury

3    awarded a total of $75.3 million, almost the entire amount requested.

4         66.    Aside from the double-recovery bar, the Court finds that Plaintiff has not

5    established that it is entitled to recover its water replacement costs under CERCLA

6    because it failed to comply with the requirements of the national contingency plan

7    (NCP). The NCP was promulgated by the EPA and "specifies procedures for

8    preparing and responding to contaminations . . . ." *City of Colton v. Am. Promotional*

9    *Events, Inc.-W.*, 614 F.3d 998, 1003 (9th Cir. 2010). According to the NCP, a private

10   cleanup is consistent with the NCP "when evaluated as a whole, [it] is in substantial

11   compliance with the applicable requirements [of the NCP] and results in a CERCLA-

12   quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). The substantial compliance analysis

13   focuses "on the entirety of the cleanup, rather than on a checklist of required actions."

14   *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1160 (C.D. Cal.

15   2003) (*Unocal*), *aff'd* 433 F.3d 1260 (9th Cir. 2006). This flexible case-by-case

16   standard was adopted out of a concern that "a list of rigid requirements [might] serve

17   to defeat cost recovery for meritorious cleanup actions based on a mere technical

18   failure by the private party." *Id.* (quoting 55 FR 8793).

19        67.    The NCP requires public participation in developing the remedial plan.

20   *Waste Mgmt. of Alameda Cnty., Inc. v. E. Bay Reg'l Park Dist.*, 135 F. Supp. 2d 1071,

21   1103 n.32 (N.D. Cal. 2001) ("[A]n opportunity for public participation is required

22   regardless of whether an action is characterized as a removal or remedial action.").

23   The Ninth Circuit has described the steps necessary to satisfy this regulatory

24   requirement:

25        The public participation requirement has two main components. First, in
26        developing a remedial action plan, prior to actual field work beginning,
          the party conducting the cleanup "shall ... to the extent practicable"
27        interview local officials, community residents, or other interested or
28        affected parties to learn their concerns. 40 C.F.R. § 300.430(c)(2)(i).

> Additionally, a formal community relations plan must be prepared to ensure an opportunity for public involvement, and at least one local "information repository" must be established to make information available to the public about the site remediation. 40 C.F.R. § 300.430(c)(2)(ii).  Second, after a remediation plan has been chosen, the party conducting the cleanup shall publish notice of the plan in a local newspaper, provide an opportunity for submission of comments on the proposed plan, provide an opportunity for a public meeting, make a transcript of the meeting available to the public, and prepare a written summary of significant comments and responses to those comments.  40 C.F.R. § 300.430(f)(3).

*Carson Harbor*, 433 F.3d at 1266.

68.     There are two categories of removal actions:  time-critical removal actions (TCRA) and those that are not time critical.  See *Raytheon Constructors, Inc. v. ASARCO Inc.*, No. Civ. A. 96 N 2072, 2000 WL 1635482, at *21 (D. Col. Mar. 31, 2000).  A non-TCRA "occurs when there is a planning period of at least six months before on-site activities must be initiated at a site." *Id.* (citing 40 C.F.R. § 300.415(b)(4)).  Conversely, a TCRA is a removal action that does not allow for a six-month planning period.  *Id.*  Even when a removal action is considered time critical, however, the NCP still requires various forms of public participation "where on-site action is expected to extend beyond 120 days from the initiation of on-site removal activities." 40 C.F.R. § 300.415(n)(3).

69.     In purchasing replacement water, Plaintiff did not follow these procedures.  Instead, Plaintiff offered the testimony of Dr. Zelikson in support of an argument whose logical thrust is that Plaintiff was not required to do so because this was a TCRA and there was no alternative to using replacement water.  Dr. Zelikson testified that Plaintiff did not have time to comply with the public participation requirement as described in the NCP because it had to take immediate action, and that he did not believe that there was any benefit in doing so because Plaintiff had no choice other than to act as it did.  When pressed on the issue of the public's right to

comment if the removal action is expected to last for more than 120 days, Dr.

Zelikson stood firm, arguing that the 120-day rule applies only to "very visible,

potentially disruptive onsite activities."

70.    Plaintiff's view of the public participation requirement, as articulated by

Dr. Zelikson, is without legal support.  At trial, Dr. Zelikson drew heavily on the

preamble to the NCP, which states that consistency with the NCP is to be judged on

whether the private party has achieved "substantial compliance with potentially

applicable requirements" rather than "strict compliance with that list of NCP

provisions." 55 FR 8666-01, 8793 (Mar. 8, 1990).  But the EPA did not suggest that a

private party may dispense with public participation altogether.  On the contrary, the

EPA rejected this suggestion in responding to regulatory comments:

> One commenter asserted that EPA is misapplying statutory requirements
> by stating that private parties must engage in the full panoply of public
> participation procedures under CERCLA, even though the statute
> imposes these requirements only on EPA.  Because no governmental
> actions are involved, no public process should be required as a
> precondition of cost recovery.

> EPA disagrees.  Public participation is an important component of a
> CERCLA-quality cleanup, and of consistency with the NCP.  The
> public—both PRPs and concerned citizens—have a strong interest in
> participating in cleanup decisions that may affect them, and their
> involvement helps to ensure that these cleanups—which are performed
> without governmental supervision—are carried out in an environmentally
> sound manner.  Thus, EPA has decided that providing public
> participation opportunities should be a condition for cost recovery under
> CERCLA.  The rule does not, however, require rigid adherence to a set of
> procedural requirements.

*Id.* at 8795.

71.    In other words, the "substantial compliance" requirement does not

establish a "no compliance" standard.  *Id.*; *see also Carson Harbor*, 433 F.3d at 1266-

67 (referring to public participation as a "requirement").  Rather, the relaxed standard

adopted by the EPA recognizes that an action "will not be considered 'inconsistent with the NCP' . . . based on immaterial or insubstantial deviations from the provisions of 40 CFR part 300.  40 C.F.R. § 300.700.  Courts have adopted this reading of the applicable regulations.  *See, e.g., Waste Mgmt.*, 135 F. Supp. 2d at 1103 (holding that the plaintiff's "failure to provide any meaningful opportunity for public participation was more than a technical or de minimis deviation from the NCP"); *Unocal*, 287 F. Supp. 2d at 1171-72 (holding that the "failure to solicit input from the public before approving . . . [the] plan, to offer the public an opportunity to review and critique the plan, and to afford a mechanism for the public to suggest alternatives is inconsistent with the NCP").

72.     Plaintiff has not satisfied the public participation requirement under the relaxed standard.  Plaintiff has cited no evidence that the public was involved in selecting the water replacement remedy.  Instead, Plaintiff argues that it "conducted an Engineering Evaluation and Cost Analysis (EECA) to evaluate and select a remedy and presented the EECA, the suggested remedy, and alternatives to the public for public comment."  Pltf. Br. at 8-9.  The EECA, however, was not admitted into evidence—and, in any event, Plaintiff has not shown that it is appropriate to rely on the EECA to recover response costs that predate the completion of the EECA (which, according to Defendant, occurred in July 2021).  Def. Resp. Br. at 7; *see Waste Mgmt.*, 135 F. Supp. 2d at 1102 ("The lack of opportunity for meaningful public participation is further evidenced by the timing of the notice, which ran . . . three years after RUST had recommended the proposed remedy . . . .").

73.     Plaintiff further argues that it "provide[d] numerous public documents related to water quality, water management and water resource planning."  Pltf. Br. at 9.  But Plaintiff appears to be relying on its routine communications with the public rather than to any specific outreach to address the proposed action.  *See id.* (citing materials for the proposition that "[Plaintiff] regularly conducts community relations as a part of normal operations").  Thus, "[n]o evidence has been submitted to show

1    that the public was able to comment upon the options that were available and/or

2    considered after the time that the . . . contamination was discovered." *City of Oakland*

3    *v. Nestle USA, Inc*., No. C-98-3963 SC, 2000 WL 1130066, at *5 (N.D. Cal. Aug. 8,

4    2000) (concluding that the public participation requirement was not satisfied).

5         74.    Perhaps recognizing the factual weakness of its position, Plaintiff argues

6    that it has met the public participation requirement "through its cooperation with

7    public agencies, like DDW and DTSC." Pltf. Br. at 9. The Ninth Circuit "has not

8    decided if significant agency involvement can satisfy the National Contingency Plan's

9    public participation requirement." *Carson Harbor*, 433 F.3d at 1266. Like the Ninth

10   Circuit in *Carson Harbor*, this Court "need not decide that issue of first impression to

11   resolve this case." *Id*. Plaintiff asserts that it "participated in a CERCLA-quality

12   cleanup" with DTSC. Pltf. Br. at 9. In support, Plaintiff cites to the fact that one of

13   its consultants participated in the preparation of an IRAP that was issued in 2005.

14   Plaintiff also relies on the fact that it entered into an EOA with DTSC in 2003 and

15   submitted the IRAP in accordance with the EOA two years later. Plaintiff further

16   notes that it has "attended monthly meetings with Whittaker, as well as representatives

17   from DTSC and DDW to consider issues related to the implementation of  . . . various

18   treatment and containment projects." Pltf. Br. at 9.

19        75.    Plaintiff has not shown that this activity constitutes the type and level of

20   significant agency involvement that would satisfy the public participation

21   requirement. In *Carson Harbor*, the Ninth Circuit discussed and distinguished a

22   Second Circuit decision finding significant agency involvement, *Bedford Affiliates v.*

23   *Sills*, 156 F.3d 416 (2d Cir. 1998). The facts in *Bedford* demonstrated "extensive

24   involvement of a government agency," including active supervision for several years

25   in the cleanup of the site, leading the Second Circuit to conclude:  "Where a state

26   agency responsible for overseeing remediation of hazardous wastes gives

27   comprehensive input, and the private parties involved act pursuant to those

28   instructions, the state participation may fulfill the public participation requirement."

*Carson Harbor*, 433 F.3d at 1266-67 (quoting *Bedford*, 156 F.3d at 428).  In contrast, the Ninth Circuit found the facts before it to be an insufficient substitute for public participation (assuming the propriety of such substitution).  While the agency in *Carson Harbor* visited the property and participated in meetings, it "did not take a lead role" or "oversee the cleanup" but rather approved a "proposed remedial action plan" and "inspected the [p]roperty after cleanup was complete to verify" compliance "with the remedial action plan."  *Id.*  The Ninth Circuit concluded that "[e]ven if we adopted the rule . . . that significant government agency involvement fulfills the public participation requirement . . . , the minor and ministerial involvement by the [agency] in this case would not suffice to be an effective substitute for public participation."  *Id.*

76.     On the record in this case, Plaintiff has not persuaded the Court that, even if significant governmental involvement in the remediation of a contaminated site could satisfy the NCP's public participation requirement, DTSC's and DDW's involvement has satisfied that substitute standard.  Though Plaintiff claims to have had regular meetings with those agencies to discuss the contamination, permit status, and remediation efforts, it did not adequately show at trial the extent of involvement by those agencies in providing input into the decision to incur replacement water costs after being presented with and considering the alternatives.  While there can be no doubt that DTSC worked closely with Defendant on remediation activities, Plaintiff has not produced evidence that DTSC and DDW actively considered and approved Plaintiff's decision to purchase water from the State Water Project.

77.     Moreover, Plaintiff cannot seek to recover future costs for water replacement and blending under CERCLA.  See *In re Dant & Russell, Inc*, 951 F.2d 246, 250 (9th Cir. 1991) (holding that a party may not seek recovery of response costs not yet incurred); *see also Stanton Rd. Assocs. v. Lohrey Ents.*, 984 F.2d 1015, 1021 (9th Cir. 1993) (same).  In *Stanton Road*, the Ninth Circuit explained:

Section 107(a)(4)(B) permits a private party to recover costs incurred in responding to the contamination.  42 U.S.C. § 9607(a)(4)(B).  CERCLA

24

> further provides for a declaratory judgment action to establish liability for future response costs.  42 U.S.C. § 9613(g)(2).  Section 9607(a)(4)(B) limits damages in private response actions to expenses that were "necessary" and "consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B).  We held in *Dant & Russell v. Burlington N. R.R. Co.* that CERCLA requires plaintiffs "to actually incur response costs before they can recover them . . . ."

984 F.3d at 1021.  Plaintiff, therefore, cannot recover costs it has not yet incurred.

78.     Nor can Plaintiff obtain declaratory relief for future costs.  It is true that CERCLA allows a party to "go to court and obtain reimbursement for their initial outlays, as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job." *In re Dant & Russell*, 951 F.2d at 249-50; *see also ASARCO LLC v. Atl. Richfield Co., LLC*, 975 F.3d 859, 866 (9th Cir. 2020) (noting that "our circuit historically has refused to award future response costs" and that "a declaratory judgment, whereby liability for future response costs would be allocated at a set percentage across responsible parties, is the proper mechanism for recouping future response costs in the CERCLA regime").  To obtain a declaration of "continuing liability," however, the requesting party must first prove liability for the "initial outlays." *Id*.; *see also City of Colton*, 614 F.3d at  1007.  This threshold requirement includes a showing that the costs already incurred "comply with the NCP," which is necessary to demonstrate the plaintiff's "commitment to comply with the NCP" in the future when finishing the job. *Id.* at 1008.  As discussed, Plaintiff has not made that showing here.

79.     While Plaintiff has not shown that it is entitled to costs not yet incurred or declaratory relief, the Court must determine the proper allocation for the recoverable costs (i.e., IPD costs).  Before doing so, the Court first considers the dispute over the "innocent landowner" defense and orphan shares.

80.     CERCLA provides a limited number of defenses to its imposition of strict liability, including defenses for "an act of God," "an act of war," and "an act or omission of a third party" who proves certain facts by a preponderance of the

evidence.  42 U.S.C. § 9607(b).  Plaintiff claims that it is an innocent landowner who should not be allocated any responsibility for the cleanup of the Site.  As a technical matter, Plaintiff appears to be relying on the "third party" rather than the "innocent landowner" defense.  The latter defense is an offshoot of the former.  *N. Cnty. Transit Dist. v. Atl. Richfield Co.*, No. 06CV0213 DMS (BLM), 2006 WL 8455571, at *3 (S.D. Cal. Sept. 27, 2006).  As one court explained:

> Because land deeds and other instruments transferring possession are normally a sufficient 'contractual relationship' to preclude assertion of the third party defense, *see* 42 U.S.C. § 9601(35), Congress created an exception to the 'no contractual relationship' requirement of the third party defense, thereby making it available to some owners who acquired the relevant property after the disposal or placement of hazardous substances occurred.

*Foster v. United States*, 922 F. Supp. 642, 654 (D.D.C. 1996).

81.    To prove the third-party defense, Plaintiff must show:

1)  that a third party was the sole cause of the release of hazardous substance;

2)  that the third party was not [Plaintiff's] employee or agent;

3)  that the act or omission of the third party causing the release did not occur in connection with a contractual relationship, existing either directly or indirectly, with [Plaintiff];

4)  that [Plaintiff] exercised due care with respect to the hazardous substance concerned; and

5)  that [Plaintiff] took precautions against foreseeable acts or omissions of the third party.

*Lincoln Props., Ltd. v. Higgins*, 823 F. Supp. 1528, 1539–40 (E.D. Cal. 1992); *see also PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 179 (4th Cir. 2013).

82.    The parties mainly dispute the first ("sole cause") and fourth ("due care") elements of the defense.  On the "sole cause" element, Defendant argues that Plaintiff failed to prove that a third party is solely responsible for the release of VOCs because

Plaintiff dumped water with detectable concentrations of VOCs into a storm drain

flowing to the Santa Clara River in violation of its NPDES permit.  Def. Br. at 4-5.

Plaintiff's chief operating officer acknowledged that Plaintiff was cited for improper

disposal from Well V-201.  CERCLA's definition of "release" includes "pouring,"

"emptying," and "dumping" hazardous substances into the environment.  42 U.S.C. §

9601(22).  Plaintiff does not address or respond to this argument.  *See* Pltf. Resp. Br.

at 4-6.[7]  Defendant also cursorily argues that Plaintiff's "operations contributed to

further disposal and releases by drawing VOC-contaminated water to its wells and

distributing it to customers," and that these releases defeat the third-party defense

"[e]ven if this pumping had been done for the purpose of containing contamination."

Def. Br. at 5; Def. Resp. Br. at 8.  Defendant has failed to cite any authority, or

provide any explanation, to support its argument that this activity forecloses the third-

party defense on the element of "sole cause."  This argument, moreover, seems more

suited to other elements of the defense—i.e., the failure to exercise due care or take

appropriate precautions when addressing known releases of hazardous substances

caused by a third party.

83.     On the "due care" element, Defendant raises a number of claims of

negligent conduct on the part of Plaintiff.  This element considers "whether a party

'took all precautions with respect to the particular waste that a similarly situated

reasonable and prudent person would have taken in light of all relevant facts and

circumstances.'"  *PCS Nitrogen*, 714 F.3d at 181(quoting *New York v. Lashins Arcade*

*Co.,* 91 F.3d 353, 361 (2d Cir. 1996)).  At trial, Defendant offered evidence that

---

[7] It is not clear that this release was significant enough to defeat the third-party
defense.  *See Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053,
1082 (C.D. Cal. 2003) (discussing this evidence from the perspective of the summary
judgment standard).  Abercrombie explained that the VOC levels were "below the
regulatory limits for those constituents," i.e., they "f[e]ll within the drinking water
standards" established by the permits.  However, Plaintiff bears the burden and the
consequences of record uncertainty at trial.

Plaintiff failed to properly investigate, and take appropriate steps to address, anomalous test results of high concentrations of VOCs in its distribution system. Defendant also presented evidence that when confronted with such an anomaly, Plaintiff was prepared, when meeting with DDW, to "blame it on 'laboratory or sampling artifacts' and hope that it is lowered by the next reading." Ex. 1383.  At trial, Plaintiff unconvincingly tried to dismiss this statement as nothing more than a poor choice of words.

84.    After considering the evidence, the jury assigned 10% fault to Plaintiff on its negligence claim.  This meant that the jury found that Plaintiff was negligent and that Plaintiff's negligence was a substantial factor in causing its harm.  Dkt. No. 468 at 9.  Plaintiff fails to address this finding and its implication on the third-party defense. The Court, for its part, finds that the jury's assignment of partial fault (a total of 10%) was a reasonable interpretation of the evidence and apportionment of responsibility. Accordingly, Plaintiff is not entitled to rely on the third-party defense and escape all liability.

85.    The parties also dispute the propriety of allocating liability to "orphan" PRPs.[8]  Defendant raises this issue in support of its contribution claim in its cross-complaint.  Def. Br. at 4 ("If the Court proceeds to allocate future response costs under Section 113 of CERCLA, it should [Plaintiff's] affirmative defenses to [Defendant's] counterclaims, and fashion an equitable allocation that takes into account the significant role of [Plaintiff], SIC, and orphan shares in the VOC releases.").  As the party seeking contribution, Defendant bears the burden of proving the existence and appropriate allocation of orphan shares.  *See Boeing Co. v. N. W.*

---

[8] The parties previously raised the issue of orphan shares, and the Court declined to address it because of their cursory treatment of it.  Dkt. No. 353 at 5 n.3 (requiring further briefing during the bench trial).  To the extent that Plaintiff suggests that the Court ruled on this issue, it is mistaken.  Pltf. Br. at 12.

*Steel Rolling Mills, Inc.*, No. 97-35973, 2004 WL 540706, at *3 (9th Cir. Mar. 17, 2004) (noting that "[t]he burden of proof regarding exclusion of the alleged orphan shares . . . rested on . . . the plaintiff in this contribution suit"); *see also Trinity Indus., Inc. v. Greenlease Holding Co.*, 173 F. Supp. 3d 108, 217 (W.D. Pa. 2016)  (same).

86.    An "orphan share" is an assignment of responsibility to a party who "cannot be located or cannot be identified," *Seattle Times Co. v. LeatherCare, Inc.*, 337 F. Supp. 3d 999, 1025 (W.D. Wash. 2018), *aff'd*, 829 F. App'x 176 (9th Cir. 2020), is "unknown," *United States v. Kramer,* 953 F. Supp. 592, 595 (D.N.J. 1997), "cannot be found," *Miami-Dade Cnty., Fla. v. United States*, 345 F. Supp. 2d 1319, 1336 (S.D. Fla. 2004), or is "unidentifiable," *Action Mfg. Co. v. Simon Wrecking Co.*, 428 F. Supp. 2d 288, 328–29 (E.D. Pa. 2006) (allocating liability to unidentifiable companies), *aff'd*, 287 F. App'x 171 (3d Cir. 2008).  On the other hand, an orphan share will not be assigned in the case of a known PRP that is solvent.  *See Trinity*, 173 F. Supp. 3d at 217 (declining to recognize "orphan shares because the evidence is insufficient to show by a preponderance of the evidence that any of those parties are unknown, insolvent, or otherwise immune from suit"); *United States v. Davis*, 31 F. Supp. 2d 45, 68 (D.R.I. 1998), *aff'd,* 261 F.3d 1 (1st Cir. 2001) (same).

87.    The Court finds that Defendant failed to prove its claim of orphan PRPs. Defendant raised suspicion of unidentified sources of contamination, particularly at the Mall/DW wells.  Defendant also raised suspicion about the potential for unidentified sources at the turnouts for S-1 and S-2.  However, the evidence does not rise to the requisite level of proof.  Moreover, even if the evidence crossed that evidentiary threshold, Defendant has not shown that these unidentified sources materially contributed to the groundwater contamination—or at least not to an extent that would allow for a non-speculative quantification.  Defendant's suggestion that it should allocate a 35% orphan share to address the contamination at S-1 and S-2 and a

40% orphan share to address the contamination at V-201 is rooted in advocacy, not

persuasive evidence.[9]   Def. Resp. Br. at 9-11.

88.     Moreover, even if Defendant had satisfied its burden of proof, it does not

follow that the appropriate remedy is to relieve Defendant of all responsibility for the

orphan share and to impose the obligation entirely on Plaintiff.  This is an equitable

determination, *Seattle Times Co.*, 337 F. Supp. 3d at 1025 (noting that the orphan

share "doctrine is equitable in nature"); and there is nothing fair about Defendant's

proposal.  Equity would demand that any orphan share in this case be divided among

the identified PRPs according to their allocated shares.  *See Miami-Dade Cnty.,* 345 F.

Supp. 2d at1336  ("[T]o the extent the Court determines there are orphan shares, or

those shares attributable to defunct, bankrupt or unidentified persons, or persons

otherwise unable to pay, the Court may apportion such orphan shares among the

solvent parties according to the solvent parties' relative equitable shares . . . ."); *see*

*also Action Mfg. Co.*, 428 F. Supp. 2d at 328.

89.     Having addressed the preliminary questions of the third-party defense

and orphan shares, the Court now considers the issue of an equitable allocation of IPD

costs.  Under CERCLA, a responsible party who has incurred liability under § 9607(a)

may bring an action for contribution under § 9613(f)(1) against any other potentially

responsible party.  *AmeriPride Servs. Inc. v. Texas E. Overseas Inc*., 782 F.3d 474,

480 (9th Cir. 2015).  "Contribution" is not defined in CERCLA, but is interpreted to

mean "the tortfeasor's right to collect from others responsible for the same tort after

the tortfeasor has paid more than his or her proportionate share, the shares being

---

[9] Defendant did provide evidence that the likely source of high concentrations of PCE
at the S-1 and S-2 turnouts in 2012 was the Flamingo Dry Cleaners.  But this source is
not "unidentified," and Defendant did not prove that the Flamingo Dry Cleaners was
insolvent.  Nor did Defendant prove the extent to which this release contributed to the
overall contamination.

determined as a percentage of fault." *United States v. Atl. Research Corp.*, 551 U.S. 128, 138 (2007) (internal quotation marks omitted). "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). The Ninth Circuit has stated that district courts have "broad discretion in allocating costs among PRPs." *TDY Holdings, LLC v. United States*, 885 F.3d 1142, 1149 (9th Cir. 2018).

90.   CERCLA does not limit the equitable factors a court may consider. The most commonly applied factors are the so-called "Gore factors" (proposed by then-Congressman Al Gore in an unsuccessful legislative amendment to the 1980 House Superfund Bill), which include:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished; (ii) the amount of the hazardous waste involved; (iii) the degree of toxicity of the hazardous waste involved; (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (vi) the degree of cooperation by the parties with federal, state, or local officials to prevent any harm to public health or the environment.

*ASARCO*, 975 F.3d at 869 n.7.

91.   This multi-factor inquiry is not designed to produce an exact measurement of a proper allocation among PRPs. *Id*. at 869. But then again, courts are not expected to "allocate response costs to a mathematical certainty." *Id*. The objective is more modest—to "apply general principles of fairness and equity in deciding whether to err on the side of over- or under-compensation." *Id*. And its application is necessarily discretionary, so much so that it does not limit a court to consideration of the six equitable factors listed above. *See id*. at 871 (noting that the district court considered general equitable principles as well).

92.     Both parties list the Gore factors and make minimal and select application of them.  Defendant focuses on the sixth factor and takes credit for its "significant cooperation with DTSC and the near completion of the on-site soil and soil gas remediation." Def. Br. at 7.   Defendant further argues that "[u]nder DTSC supervision, [it] has removed significant quantities of contaminated soil and soil gas to such an extent that on-site remediation is no longer needed.  Groundwater remediation to the extent of all off-site plumes continues under a DTSC approved and supervised Remedial Action Plan for OU-7.  [Its] work under the OU-7 RAP, including work to address off-site groundwater, remains ongoing." *Id.*  While there is some truth to Defendant's claim, it is not the whole truth.  The evidence at trial demonstrated that Defendant was not fully forthright with the regulators and attempted to conceal its improper waste-disposal practices.  The evidence also demonstrated that Defendant sought to avoid having to install monitoring wells that could have resulted in earlier detection and cleanup of contaminants.

93.     The other Gore factors also do not favor Defendant.  The first three factors relate to the amount and type of contamination caused by each responsible party.  These factors disfavor Defendant, which disposed of massive quantities of VOCs (and perchlorate) in the soil, and the VOCs are carcinogenic and potentially harmful.  As to the fourth factor—the degree of involvement in generating, transporting, treating, storing, or disposing of the waste—the evidence shows (and the jury concluded) that Defendant was largely responsible for the contamination (twice more responsible than SIC).  Plaintiff's principal involvement was being forced to contend with an environmental problem that it did not create, and it generally acted responsibly in doing so.  The fifth factor "assesses the degree of care exercised by the parties with respect to the hazardous waste concerned."  This factor cuts heavily against Defendant in light of the evidence of indiscriminate dumping and knowing violations of its own waste-disposal practices.  While the jury found that Plaintiff bore some responsibility, the relative amount of fault was minimal.  And the nature of its

culpability differed:  Plaintiff did not generate the waste; instead, it neglected to respond properly at all times to the contamination produced by others.

94.    Defendant also argues as "an equitable factor in its favor" that its "conduct was in furtherance of the nation's security goals."  Def Br. at 7-8 (citing *TDY*, 885 F.3d at 1148, *Cadillac Fairview v. Dow Chem.,* 299 F.3d 1019, 1022 (9th Cir. 2002), and *United States v. Shell*, 294 F.3d 1045, 1049 (9th Cir. 2002)).  The cited cases involved a question not presented in this case—namely, "how CERCLA cleanup costs should be allocated between military contractors and the U.S. government."  *TDY,* 885 F.3d at 1148.  "[I]n all three cases the government either required the use of the hazardous substances to ensure the final product met quality standards, or mandated that production proceed in a certain manner to increase output, resulting in the generation of hazardous waste."  *Id*.  The question raised in those cases was whether, and the extent to which, the government bore clean-up cost responsibility.  The equities in such cases are not implicated here.  *See Cadillac Fairview*, 299 F.3d at 1029 ("This is a shocking case.  The government is trying to take money from firms it conscripted for a critical part of a great war effort. The government's arguments are strikingly weak.").

95.    Defendant next contends that any allocation should include orphan shares and SIC.  The Court already addressed the fact that Defendant has failed to prove its orphan-share claim; and in seeking to allocate a proportionate share to SIC, Defendant neglects to address this Court's prior order precluding any contribution claim against SIC based on its good-faith settlement with Plaintiff.  Dkt. No. 248 at 9-10.  In that order, the Court concluded that the pro tanto approach would apply to the proceeds of the SIC settlement.  *Id*.  SIC paid $2.9 million to settle the claims against it.  In finding that the settlement was made in good faith, the Court noted that SIC agreed to pay approximately 33% of its total exposure because its "liability exposure is concededly limited to damage to the first two of the four wells [i.e., S-1 and S-2]

(which amounts to $8.89 million)." Dkt. No. 248 at 6.[10]  Defendant will therefore receive a reduction in the total judgment, including the awards from the jury and bench trials, by the settlement amount.  *See AmeriPride*, 782 F.3d at 488 (noting that a court applying the pro tanto approach does not determine the proportionate share of the settling party but instead provides to the non-settling defendant(s) a dollar-for-dollar credit for the settlement).

96.     In its proposed allocation, Defendant seeks to apportion responsibility on a well-by-well basis without explaining its reason for doing so.  The Court declines to adopt this approach and instead considers the apportionment of liability on a site-wide basis.  The jury affixed fault attributable to Plaintiff in the total amount of 10%, and Defendant has argued that this Court is bound to accept that determination.  Def. Resp. Br. at 8 (quoting *Teutscher*, 835 F.3d at 954, and arguing that this Court "'must follow the jury's implicit and explicit factual determinations in deciding the equitable claims'").  Based on its evaluation of the evidence and the Gore factors, the Court finds that an allocation of no more than a minor share to Plaintiff is warranted.

97.     Accordingly, the Court allocates 90% of the IPD costs to Defendant and 10% of those costs to Plaintiff.

**RCRA**

98.     Plaintiff also seeks liability under RCRA.  To obtain injunctive relief under RCRA's citizen suit provision, 42 U.S.C. § 6972(a)(1)(B), a plaintiff must show that (1) the defendant is "any person, . . . including any past or present generator . . . transporter, or . . . owner or operator of the treatment, storage, or disposal facility, (2) who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste, (3) which may present an imminent and substantial endangerment to health or the environment."

---

[10] In its proposed allocation, Defendant seeks to allocate a 30% share to SIC for response costs associated with S-1 and S-2 only.  Def. Br. at 9-12.

*Center for Cmty. Action & Envtl. Justice v. BNSF Ry. Co.*, 764 F.3d 1019, 1023 (9th Cir. 2014). Defendant contends that Plaintiff has failed to establish the third element of its RCRA claim.

99.   The Ninth Circuit has explained the meaning of "imminent and substantial endangerment," construing it liberally.  *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994).  Endangerment means "threatened or potential harm and does not require proof of actual harm." *Id*.  Imminence "does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present"; indeed, "[a]n 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public." *Id*. (citation omitted).  Substantial endangerment occurs when the threatened harm is "serious" and there is need for remedial action to avoid the risk of harm. *Id*.

100.   Plaintiff claims that it has satisfied the standard for showing imminent and substantial endangerment because it has "presented evidence that dangerous levels of VOCs are migrating toward drinking wells that will pose a risk to Plaintiff's customers if left unabated, and that none of Defendant's current offsite remediation efforts (which are limited to perchlorate) address the threat." Pltf. Br. at 3.  The Court is not persuaded that the risk of harm is imminent and substantial.

101.   While there is a large volume of VOCs and perchlorate near and beneath the Site, there have been substantial remediation and containment efforts for years— including strategies for monitoring (e.g., the installation of monitoring wells), removal (e.g., the use of soil vapor extraction and excavation) and containment (e.g., the use of extraction wells). *See, e.g.*, Ex. 1.  These efforts have been subject to close and extensive governmental oversight pursuant to a carefully crafted regulatory process. *See, e.g.,* Ex. 1.39 (describing DTSC's review and approval requirements) & 1.44 – 1.53 (describing the detailed tasks and schedule for each operable unit).  While DTSC has been monitoring the environmental cleanup, the DDW has been overseeing the quality of the water delivered from the supply wells.

102.   Both agencies are well aware of the presence of perchlorate, TCE, and PCE in the groundwater and have been actively involved in monitoring these chemicals to ensure public health and safety.  According to DTSC, low levels of TCE and PCE were detected in S-1 and S-2 since 2010.  In February 2016, DTSC reviewed a report prepared by CH2M Hill that identified potential sources of VOCs that had been detected in the Saugus Formation wells over the past few years.  Ex. 12.  DTSC "recognize[d] that SIC and the Whittaker Site are the most likely sources of VOC releases" and explained that it would address this issue through the ongoing regulatory process, stating:

> Any further characterization of the Whittaker VOC plume in the Saugus Formation should be conducted in conjunction with implementation of the Operable Unit 7 Remedial Action Plan (OU7 RAP).  Groundwater removal and associated groundwater monitoring done as part of the OU7 RAP will provide data to evaluate how the different hydrologic units within the Saugus Formation are hydraulically connected.  This will help refine the site conceptual model.  If additional characterization is required, these refinements can help guide investigation planning.

Ex. 12.2.

103.   Of course, Plaintiff knows about the quality of the water it delivers.  For years, Plaintiff has informed the public that it has been testing for perchlorate, VOCs, and other chemicals and that it consistently delivers safe and high quality water.  Ex. 89 (2011 – 2019 Water Quality Reports).  In 2019, Plaintiff told the public that it "take[s] great pride in reporting that, in 2018, your tap water again met or surpassed all U.S. Environmental Protection Agency and California State drinking water health standards," and that its "[s]tate-certified operators . . . make certain that your tap water is . . . safe to drink through constant monitoring, sampling, testing and maintenance." Ex. 89.3.  In this (and other similar) reports, Plaintiff explains that TCE and PCE were found "in trace amounts (below the MCL) at a few locations," and that consuming

water containing those chemicals "in excess of the MCL over many years may lead to . . . an increased risk of cancer."  Ex. 89.10.

104.   Plaintiff's report to the public was consistent with its disclosures to the regulators.  In 2016, Leserman wrote a letter to the DDW, stating:  "Although some of these wells have detectible concentrations of constituents of concern, no discernible trends can be observed at this time that would suggest a water quality change or any new imminent threat to Saugus 1 and 2 wells."  At trial, Leserman acknowledged that the level of VOCs in S-1 and S-2 have not increased since the time he wrote the memorandum, and that "there is no imminent threat to the wells, Saugus 1 and Saugus 2, from VOCs."

105.   This Court concludes that Plaintiff has not presented evidence that establishes "anything more than a speculative prospect of harm."  *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 214 (2d Cir. 2009).  The mere fact that contamination levels exceed state regulatory limits does not necessarily equate to "imminent and substantial endangerment."  *City of W. Sacramento, Cal. v. R & L Bus. Mgmt.*, No. 2:18-cv-00900 WBS EFB, 2019 WL 6528957, at *5 (E.D. Cal. Dec. 4, 2019); *see also City of Fresno v. United States*, 709 F. Supp. 2d 888, 930 (E.D. Cal. 2010) (same).  Here, DTSC is monitoring and directing the remediation efforts to protect the environment and public health, and those efforts have resulted in the removal of substantial contamination through a variety of actions.  The ongoing work to address groundwater contamination includes containment and treatment activities as well, which have resulted—by all accounts—in the delivery of safe water to the community for years.  Plaintiff has not shown that the situation has taken a turn for the worse, or that anything has happened that would warrant injunctive relief.

106.   While the involvement of regulators is surely not dispositive of a RCRA claim, this does not mean that their participation is necessarily irrelevant.  A claim of imminent and substantial endangerment requires an evaluation of specific facts, and a regulator's involvement in addressing a release of hazardous substances may bear on

that evaluation.  In this case, DTSC has been directing, approving, and monitoring the investigation, remediation, and containment of the Site for decades. That fact, coupled with the other previously discussed evidence, supports the conclusion that Plaintiff has failed to prove the existence of a substantial threat of harm requiring an injunction to avoid the risk that the threat will materialize.[11]

107.   Accordingly, the Court finds that Plaintiff has not proven its RCRA claim, and thus it is not entitled to the requested relief, including an injunction and attorneys' fees.

**Prejudgment Interest**

108.   Although the jury tried the state-law claims for negligence, nuisance, and trespass, the parties stipulated that the Court would decide the issue of prejudgment interest on any award rendered by the jury.

109.   Plaintiff seeks $1,735,035.25 in prejudgment interest on the past damages awarded by the jury.  The jury awarded $7 million in past damages for replacement and blend water costs for V-201 and V-205.

110.   As relevant here, California law authorizes prejudgment interest "[i]n an action for the breach of an obligation not arising from contract."  Cal. Civ. Code § 3288.  Under section 3288, prejudgment interest is an element of damages to be considered in compensating an injured party for the loss suffered.  *Nordahl v. Dep't of Real Est.*, 48 Cal. App. 3d 657, 664 (1975).  Like all other elements of

---

[11] In requesting injunctive relief, Plaintiff seeks to obtain an order that it was denied by DTSC.  Plaintiff notes that it "asked [DTSC] to require [Defendant] to add monitoring wells to supplement [Plaintiff's] investigation into VOC contamination of its wells, but DTSC did not order [Defendant] to conduct further characterization of the VOC plume."  Pltf. Br. at 4-5.  Plaintiff then states that Defendant should be ordered to do so "as recommended [seven years ago] by CH2MHill in the 2015 VOC investigation report."  *Id*.  The Court is not persuaded that such an order is necessary or appropriate.

compensatory damages, prejudgment interest is part of a "make-whole" remedy when necessary to return the plaintiff to its pre-harm position—i.e., the position the plaintiff would have occupied had the harm not occurred.  *Id.*  As the *Nordahl* court explained:

> [When] a plaintiff has been deprived of the use of his money or property and is obliged to resort to litigation to recover it, the inclusion of interest in the award is necessary in order to make the plaintiff whole.  It is for this reason that it is proper to have such interest run from the time the plaintiff parted with the money or property on the basis of the defendant's [wrongdoing].

*Id.* at 665.

111.   In other words, "[t]he award of such interest represents the accretion of wealth which money or particular property could have produced during a period of loss."  *Greater Westchester Homeowners Assn. v. City of Los Angeles*, 26 Cal. 3d 86, 102–03 (1979).  For instance, the California Supreme Court affirmed the award of prejudgment interest when the injured party "was deprived of the use of a quarter of a million dollars for several years due to [the wrongdoer's] negligence."  *Bullis v. Sec. Pac. Nat. Bank*, 21 Cal. 3d 801, 815 (1978).

112.   To prove that it is entitled to prejudgment interest, a plaintiff must (a) demonstrate that such an award is necessary to compensate the plaintiff for the loss of use of money or other property and (b) establish the date of loss to allow for an accurate calculation of interest.  *See id.* (noting that prejudgment interest is available when necessary "to compensate a party for the loss of the use of his or her property"); *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231, 1249 (9th Cir. 2021) (noting that a trial court must determine whether there is a legally compensable loss warranting prejudgment interest and, if so, when the loss occurred).

113.   Plaintiff's factual analysis in support of its request for prejudgment interest is limited to a single sentence:

> Here, the testimony of Keith Abercrombie and Trial Exhibits 492 and 494 establish that replacement and blend water costs accrued on a monthly basis; prejudgment interest is readily determined based on simple arithmetic, and totals $1,735,035.25 through November 30, 2021.

39

(Declaration of Patrick J. Richard in Support of Plaintiff's Post-Verdict Briefing on Non-Jury Claims, ¶¶ 3-5, and exhibits thereto.)

Pltf. Br. at 15.

114.    The cited record consists of a declaration of Plaintiff's counsel and two trial exhibits.  One exhibit calculates past replacement and blend water costs for V-201 (Exhibit 492), while the other calculates past replacement water costs for V-205 (Exhibit 494).  The exhibits show the total number of acre-feet of water purchased each year, the months when the water was purchased, and the cost of purchasing the water.  The supporting declaration relies on the information in the two exhibits to calculate costs for each well.  The calculation is broken down into several columns that show:  the monthly expenditure for the purchase of water; the number of months between the month of purchase and the trial; and the simple interest calculation for each monthly expenditure.  The simple interest calculation for each monthly expenditure is then added to obtain a total amount of prejudgment interest for the well.

115.    Defendant contends that Plaintiff has failed to show that "it has been harmed by deprivation of money" and thus has not established that the award of damages for replacement and blend water costs is "insufficient to make it whole." Def. Resp. Br. at 12 (emphasis in original).  The Court agrees with this contention as it applies to the replacement water costs for V-201 and V-205.

116.    Plaintiff has not cited any evidence to explain whether, and the extent to which, the loss of use of the money necessary to pay for replacement water costs resulted in harm.  Plaintiff purchased water to replace the water it otherwise would have obtained from a supply well that had to be taken out of service because of contamination.  Absent contamination, the supply well produced potable water for customer delivery, and Plaintiff presumably made similar economic use of the replacement water by delivering it to its customers.  This case therefore differs from those in which the deprivation of money or other property results in a total loss of use. *See, e.g., Bullis*, 21 Cal. 3d at 815.  Here, Plaintiff failed to provide evidence of the

specific economic consequences of the resale of the purchased water and thus has not shown that prejudgment interest is needed to make it whole.

117.   The purchase of blend water for V-201, however, did result in a total loss.  That water was purchased to reduce, by blending, the contaminant level in the V-201 water so that it could be lawfully discharged into the river.  The purchase of water for purposes of blending and discharge therefore results in a total economic loss of use for each expenditure.

118.   Plaintiff has calculated the prejudgment interest for blend water costs for V-201 through the time of trial in the total amount of $363,318.09.  This calculation is based on the summary of costs in Exhibit 492 and the supporting declaration of Plaintiff's counsel (as described above).  Defendant does not object to the declaration or any of its calculations, which otherwise appear reasonably well supported.  Any objection is therefore waived.

119.   Thus, the Court finds that Plaintiff has failed to show that it should be awarded prejudgment interest for the purchase of replacement water.  The Court does find it reasonable and appropriate, however, to award prejudgment interest in the amount of $363,318.09 for the costs of purchasing blend water to properly compensate Plaintiff for the loss of use of those funds.

**Summary**

120.   The Court **grants in part** Plaintiff's CERCLA cost recovery claim under 42 U.S.C. § 9607(a) and its HSAA claim under Cal. Health & Safety Code § 25300 et seq.  Plaintiff is entitled to recover as response costs its IPD costs (totaling $675,000).  But Plaintiff is not entitled to recover its replacement and blend water costs because the jury already awarded these costs as past damages, and double recovery is not permitted.  Plaintiff also failed to establish that its water replacement costs complied with the NCP's public participation requirement.  Moreover, Plaintiff cannot recover future water replacement and blend costs because they have not yet been incurred.

121.   The Court **denies** Plaintiff's claim for declaratory relief under CERCLA, 42 U.S.C. § 9613(g), because Plaintiff has not demonstrated that the costs for which it seeks a declaration of future liability were incurred in a manner compliant with the NCP.  The Court **denies** Plaintiff's claim for declaratory relief under 28 U.S.C. §§ 2201-2202 for the same reason.

122.   The Court **grants in part** Defendant's counterclaims for contribution under CERCLA, 42 U.S.C. § 9613(f)(1), HSAA, Cal. Health & Safety Code § 25363, and the common law.  The Court finds that Plaintiff is not entitled to the third-party defense, 42 U.S.C. § 9607(b), and that Defendant failed to establish the existence of an orphan share.  The Court equitably allocates liability for the IPD costs as follows: 90% to Defendant ($607,500) and 10% to Plaintiff ($67,500).

123.   The Court **denies** Plaintiff's claim for injunctive relief under RCRA, 42 U.S.C. § 6901 et seq., because Plaintiff failed to prove that the risk of harm posed by VOC and perchlorate contamination constitutes an imminent and substantial endangerment.

124.   The Court **denies** Defendant's claim for equitable indemnification and for a declaratory judgment under federal law (42 U.S.C. § 9613(g)(2) and 28 U.S.C. §§ 2201-2202) and state law.

125.   Finally, the Court finds that Plaintiff has failed to show that it should be awarded prejudgment interest for the purchase of replacement water.  The Court does find it reasonable and appropriate, however, to award prejudgment interest in the amount of $363,318.09 for the costs of purchasing blend water to properly compensate Plaintiff for the loss of use of those funds.

Dated:  June 6, 2022



_____
    Stanley Blumenfeld, Jr.
    United States District Judge